FILED

2008 Jul-24  AM 10:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| INDIA LYNCH, by her parent, SHAWN KING LYNCH, *et al.*, individually and on behalf of others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>THE STATE OF ALABAMA; BOB RILEY, in his official capacity as Governor of the State of Alabama; and TIM RUSSELL, in his official capacity as Commissioner of Revenue for the State of Alabama;<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 08-S-450-NE |

## MEMORANDUM OPINION AND ORDER

This case is a sequel to the long-running, higher-education desegregation action filed in this District in 1981.[1] *See Knight v. Alabama*, 628 F. Supp. 1137 (N.D. Ala. 1985) ("*Knight I* "), *rev'd*, 828 F.2d 1532 (11th Cir. 1987) ("*Knight II* "), *cert. denied*, 487 U.S. 1210 (1988), *on remand*, 787 F. Supp. 1030 (N.D. Ala. 1991) ("*Knight III* "), *aff'd in part*, *rev'd in part*, *vacated in part*, 14 F.3d 1534 (11th Cir. 1994) ("*Knight IV* "), *on remand*, *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala.

---

[1] For convenience, the citations following this marginal note are recited in chronological, not Bluebook, order.

1995) ("*Knight V* ").  *See also Knight v. Alabama*, 458 F. Supp. 2d 1273, 1277 (N.D. Ala. 2004) ("*Knight VI* "), *aff'd*, 476 F.3d 1219 (11th Cir.) ("*Knight VII* "), *cert. denied* 127 S. Ct. 3014 (2007).

The plaintiffs in the original action claimed that the State of Alabama had failed to complete the desegregation of its colleges and universities, and that "many of the State's policies governing higher education tended to perpetuate its formerly *de jure* segregated university system."  *Knight VII*, 476 F.3d at 1220.  After ten years of litigation, including two bench trials, the district court issued a lengthy and complex opinion finding liability.  *See Knight III*, 787 F. Supp. at 1030.  In 1995, following the Eleventh Circuit's review of that opinion, the district court entered a remedial decree ordering numerous changes in Alabama's higher education policies, and retained jurisdiction to monitor the State's progress.  *See Knight V*, 900 F. Supp. at 272.  The parties were informed that the district court expected to return control of the college and university systems to the State in 2005.  *See id*. at 374.

Before that date was reached, however, the plaintiffs filed a motion requesting additional relief in the form of "an injunction ordering Alabama to adequately fund its system of *lower* [*i.e.*, K-12] education."  *Knight VI*, 476 F.3d at 1223 (emphasis in original).  The following six provisions embedded in Alabama's 1901 Constitution

were the focus of those plaintiffs' claims for additional relief:[2]

    (1)    Article XI, section 214, as amended, which limits the rate of ad valorem taxation[3] the Alabama legislature may place on taxable property;[4]

    (2)    Article XI, section 215, as amended, which limits the rate of ad valorem taxation counties may place on taxable property;[5]

    (3)    Article XI, section 216, as amended, which limits the rate of ad valorem taxation municipalities may place on taxable property;[6]

---

[2] The following descriptive summaries of the challenged state constitutional provisions are based upon those found in Judge Harold Murphy's decision in *Knight VI*, 458 F. Supp. 2d at 1278-79, and reiterated in the plaintiffs' complaint. *See* doc. no. 1, ¶ 1, at 2.

[3] "Ad valorem" is a Latin phrase that is translated as meaning "according to the value." When the phrase is used as an adjective modifying the nouns "tax" or "taxation," it generally means "proportional to the value of the thing [or property] taxed." *Black's Law Dictionary* 57 (8th ed. 2004). *See also id.* at 1496 (defining the term "ad valorem tax" as meaning "[a] tax imposed proportionally on the value of something (esp. real property), rather than on its quantity or some other measure") (citing 71 Am. Jur. 2d *State and Local Taxation* § 20, at 355 (1973) (stating that "an ad valorem tax is a tax of a fixed proportion of the value of the property with respect to which the tax is assessed, and requires the intervention of assessors or appraisers to estimate the value of such property before the amount due from each taxpayer can be determined")).

[4] Section 214 states that "[t]he legislature shall not have the power to levy in any one year a greater rate of taxation than sixty-five one-hundredths of one per centum on the value of the taxable property within this state." Ala. Const. of 1901 art. XI, § 214.

[5] Section 215 states, in pertinent part, that "[n]o county in this state shall be authorized to levy a greater rate of taxation in any one year on the value of the taxable property therein than one-half of one per centum." Ala. Const. of 1901 art. XI, § 215. The full text of § 215, which contains certain exceptions that are not relevant here, is set out in Appendix I to this opinion.

[6] Section 216 states, in pertinent part, that "[n]o city, town, village, or other municipal corporation, other than as provided in this article, shall levy or collect a higher rate of taxation in any one year on the property situated therein than one-half of one per centum of the value of such property as assessed for state taxation during the preceding year. . . ." Ala. Const. of 1901 art. XI, § 216. The full text of § 216, which contains certain exceptions that are not relevant here, is set out in Appendix II to this opinion.

(4)     Article XIV, section 269, as amended, which limits the rate of ad

valorem taxation counties may place on taxable property for the benefit

of public education, and which further requires approval of those

property taxes by the voters in a referendum election;[7]

(5)     Amendment 325, which changed the language of Article XI, § 217 of

Alabama's 1901 Constitution in order to establish *three* classes of

property for purposes of ad valorem taxation, lower assessment ratios,

require voter approval of all property tax increases, and establish a cap

(or "lid") on total ad valorem taxes;[8] and

---

[7] The full text of this provision reads as follows:

The several counties in this state shall have the power to levy and collect a special tax not exceeding ten cents on each one hundred dollars of taxable property in such counties, for the support and furtherance of education in such manner as may be authorized by the legislature; provided, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, state and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads, bridges, and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.

Ala. Const. of 1901 art. XIV, § 269.

[8] Amendment 325 established the following three classes of property:

Class I.        All property of utilities used in the business of such utilities,
Class II.       All property not otherwise classified,
Class III       All agricultural, forest and residential property.

Ala. Const. § 217(a), as amended by Amend. 325 (ratified 1972) (*reproduced at* Ala. Code Vol. 1

(6)     Amendment 373, which further changed the language of Article XI, §
217, as previously revised by Amendment 325, in order to establish *four*
classifications of property subject to taxation, further lower assessment
ratios, establish the so-called "current use" method of property
assessment, and establish lower caps (or "lids") on total ad valorem
taxes.[9]

After a thorough review of the factual and legal history of the foregoing
provisions, the district court held that "the current ad valorem tax structure is a

_____

(Recomp. 1958) (Cum. Supp. 1974), at 292.  The assessment ratios for each of those categories were
as follows:

Class I.        30 per centum
Class II.       25 per centum
Class III.      15 per centum.

*Id.* at (b).  Each of these assessment ratios was to be applied to the "fair and reasonable market
value" of the property.  *Id.*  With regard to voter approval, the amendment stated:

        Any county, municipality, or other taxing authority may increase the rate at
    which ad valorem taxes are levied above the limit now provided in the Constitution
    provided that the proposed increase shall have been (1) proposed by the authority
    having power to levy the tax after a public hearing on such proposal, (2) thereafter
    approved by an act of the legislature, and (3) subsequently approved by a majority
    vote of the qualified electors of the area in which the tax is to be levied or increased
    who vote on the proposal.

*Id.* at (e).  The cap (or "lid") imposed by Amendment 325 was 1.5 percent of fair market value.  *See
id.* at (h) ("Any provision of the Constitution of Alabama to the contrary notwithstanding, ad
valorem taxes shall never exceed 1 ½ % of the fair and reasonable market value of the property in
any one taxable year.").

[9] The present language of Article XI, § 217 of Alabama's 1901 Constitution, as revised by
Amendments 325 and 373, is set out in Appendix III to this opinion.

vestige of discrimination inasmuch as the constitutional provisions governing the taxation of property are traceable to, rooted in, and have their antecedents in an original segregative, discriminatory policy." *Knight VI*, 458 F. Supp. 2d at 1311. Even so — and despite finding that "the current tax structure in Alabama cripples the effectiveness of state and local governments in Alabama to raise funds adequate to support *higher education*," *id*. (emphasis supplied) — the district court concluded that

> the relationship between the funding of *higher education* and f[u]nding of *K-12* is marginal insofar as ad valorem property tax is concerned.  Put differently, the effect of the state's inability to raise revenue due to the challenged constitutional provisions is simply too attenuated to form a causal connection between the tax policy and any segregative effect on school [*i.e.*, college] choice.

*Id*. at 1312 (emphasis supplied).[10]

---

[10] This conclusion needs to be read in the context of the district court's factual findings on the issue of causation, which are set out below:

> 10.  Plaintiffs having satisfied their burden to show that the current tax structure is "traceable to" de jure segregation, the burden shifts to Defendants to show that the challenged provisions of the Alabama constitution do not have a continuing segregative effect.

> 11.  Defendants contend that the property tax is not related to Alabama's system of higher education — *i.e.*, that no nexus exists between the lack of funds derived from state and local property taxation and the effect on student enrollment decisions.  Consequently, Defendants submit, the challenged provisions of the Alabama Constitution do not and cannot have a continuing segregative effect.

> 12.  Plaintiffs contend that a causal nexus does indeed exist, arguing that the lack of property tax revenue has financially strained K-12 schools in Alabama, thereby requiring that the State allocate an increased proportion of the ETF [*i.e.*,

The plaintiffs appealed that decision, but were rebuffed by the Eleventh

Circuit, which "agree[d] with the district court that plaintiffs' *present claim* is

---

Educational Trust Fund] to K-12.  As a result of this inequitable distribution, Plaintiffs claim that tuition at Alabama's institutions of higher education has skyrocketed and that funds available for need-based financial assistance have plummeted.  Consequently, the ability of poorer students, who are disproportionately black, to attend college is adversely affected.

13.  The Court appreciates Plaintiffs' argument, and agrees that the current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K-12 schools.  Nevertheless, the Court cannot agree that the property tax structure stymies school choice in such a way that results in an unconstitutional denial of a student's right to make a decision unfettered by vestiges of discrimination.

14.  The Court finds that the relationship between the funding of higher education and finding [*sic*] of K-12 is marginal insofar as ad valorem property tax is concerned.  Put differently, the effect of the state's inability to raise revenue due to the challenged constitutional provisions is simply too attenuated to form a causal connection between the tax policy and any segregative effect on school choice.

15.  Additionally, although the proportion of the ETF allocated to higher education has fallen since 1990, the actual amount of money paid to higher education has increased from $820,063,882 to $1,160,033,885 over that same period.

16.  Moreover, insofar as Plaintiffs contend that the lack of funding for property taxes somehow works to frustrate the Court's prior remedial decrees, the Court finds that argument unavailing.  Rather, the State has unbegrudgingly complied with the Court's remedial decrees, meeting all its obligations as ordered by the Court.  Along those same lines, between the 1991-92 and 2002-03 academic years, black student enrollment and graduation rates at HWIs [*i.e.*, Historically White Institutions of higher education] have increased considerably.

17.  The Court concludes, therefore, that although the ad valorem taxation system in Alabama may be traceable to past discriminatory decisions, Defendants have satisfied their burden to demonstrate that the challenged provisions of the Alabama constitution do not continue to have a segregative effect on student choice.

*Knight VI*, 458 F. Supp. 2d at 1312-13 (citations and footnote omitted).

fundamentally about reforming Alabama's K-12 school funding system, and not about [the focus of the case during the preceding fifteen years of litigation: *i.e.*,] desegregating its *colleges and universities*." *Knight VII*, 476 F.3d at 1223 (emphasis supplied).  Nevertheless, and importantly, the Eleventh Circuit's opinion did not foreclose the possibility of a separate action, specifically aimed at those constitutional provisions constraining the extent to which the State of Alabama, its counties, municipalities, and school districts fund public education from pre-school and kindergarten programs through high school.  Thus came the present suit, which now is before this court on defendants' multifaceted motions to dismiss for lack of subject matter jurisdiction.[11]  Before reaching the issues raised in those motions, the court pauses to set the scene.

The plaintiffs in the present action are a group of African American ("black") and Caucasian ("white") public school students who bring this putative, state-wide class action by and through their parents, all of whom reside in either Lawrence County or Sumter County, Alabama.[12]  Plaintiffs allege that they "are injured by the racially discriminatory property tax restrictions in the Alabama Constitution, which impede their ability and the ability of their elected representatives to raise state and

---

[11] *See* doc. no. 22 (Governor Bob Riley's Motion to Dismiss); doc. no. 24 (Motion to Dismiss filed jointly by the State of Alabama and Commissioner of Revenue Tim Russell).

[12] *See* doc. no. 1 (Complaint), ¶¶ 7-9.  None of the plaintiffs in this action were parties to the prior *Knight* case.

local revenues adequately to fund the public services they need, including public education."[13]  As redress for those grievances, plaintiffs ask this court to enter a judgment declaring that the property tax restrictions embedded in Alabama's 1901 Constitution violate Title VI of the Civil Rights Act, 42 U.S.C. § 2000d *et seq*., and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, "and to [fashion] a prohibitory injunction against their future enforcement."[14]

Plaintiffs fully recognize that, if such an injunction should be entered, the immediate effect would be a tremendous increase in property taxes in the State of Alabama.[15]  Plaintiffs are not deterred by that possibility.  Indeed, they make quite plain that they seek the invalidation of the state constitutional provisions described above, no matter the cost, but suggest that the court could stay enforcement of the prohibitory injunction for a period of one year, to permit state lawmakers "an

---

[13] *Id.*

[14] *Id.* at ¶ 6.

[15] *See* doc. no. 31 (Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss), at 9-11. According to defendants, residential property taxes alone could increase as much as 1,000%.  *See* doc. no. 33 (Defendants' Reply to Plaintiffs' Brief Opposing Dismissal), at 13 (discussing "the incalculable damage to . . . citizens that would result from 1,000% property tax increases") (footnote omitted).  As defendants explain, this increase would be attributable to the fact that the current restrictions embedded in Article XI, § 217 of the Alabama Constitution of 1901 (as revised by Amendments 325 and 373) cap property tax assessment ratios at just a small fraction of actual market value.  Prohibiting further enforcement of these restrictions would likely require assessment to be based on the full value of the subject property, less any offsets for exemptions.  *See* doc. no. 27 (Defendants' Brief in Support of Dismissal), at 2 & n.2.

opportunity" to adopt an appropriate, and constitutionally sound, alternative property tax scheme.[16]   Defendants construe this invitation for legislative involvement as a concession that full relief cannot be obtained from this court; and — citing other factors that allegedly diminish plaintiffs' interest in having the subject state constitutional provisions stricken — argue that plaintiffs lack standing to bring this suit.   Defendants also argue that the remedies plaintiffs request are prohibited by the Tax Injunction Act.   *See* 28 U.S.C. § 1341.   Finally, defendants suggest that the judicial principle of "comity" divests this court of subject matter jurisdiction.   Each of these arguments will be addressed in the following sections.

## I.  STANDING

"Standing frequently has been identified by both justices and commentators as

---

[16] Doc. no. 1, at 26 (Prayer for Relief).  Earlier in their complaint, plaintiffs state that:

The sole purposes of the instant action are to obtain a declaratory judgment that the property tax restrictions in the Alabama Constitution this Court has already found to be purposefully discriminatory violate Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq., and the Constitution of the United States and to seek a prohibitory injunction against their future enforcement.  *Plaintiffs do not ask this Court to oversee reform of Alabama's property tax system, its system for raising revenue for public education, or the adequacy of its funding of the system of public education.* As stated by the Alabama Supreme Court and the U.S. Court of Appeals, *tax reform and the provision of adequate education are the responsibility of the legislative branch of government.*  If this Court grants the relief requested herein, the Governor and Legislature of Alabama will be able to carry out these vital legislative functions free of the purposefully racially discriminatory barriers placed in the state constitution.

*Id.* at 4-5 (emphasis supplied).

one of the most confused areas of the law." Erwin Chemerinsky, *Federal Jurisdiction*

§ 2:3, at 57 (5th ed. 2007).  "Many exasperated courts and commentators have . . .

[complained] that [the] standing doctrine is no more than a convenient tool to avoid

uncomfortable issues or to disguise a surreptitious ruling on the merits."  Charles

Allen Wright, Arthur R. Miller & Edward H. Cooper, 13 *Federal Practice &*

*Procedure:  Jurisdiction* § 3531 (2d ed. 2006) (footnote omitted).

In light of this persistent confusion and consternation, it is helpful to "begin

with the most basic doctrinal principles:  Article III, § 2, of the Constitution restricts

the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'"  *Sprint*

*Communications Co.*, *L.P. v. APCC Services*, *Inc.*, ___ U.S. ___, 125 S. Ct. 2531,

2535 (2008) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)).[17]  "One

element of that 'bedrock' case-or-controversy requirement is that plaintiffs must

establish that they have standing to sue."   *McConnell  v.  Federal  Election*

---

[17] Article III, § 2 reads, in pertinent part, as follows:

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;— to all Cases affecting Ambassadors, other public Ministers and Consuls;— to all Cases of admiralty and maritime Jurisdiction;— to Controversies to which the United States shall be a Party;— to Controversies between two or more States;— between a State and Citizens of another State;— between Citizens of different States;— between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. Const. art. III, § 2.

*Commission*, 540 U.S. 93, 225 (2003) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

Standing is essential because "[t]he constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity 'to adjudge the legal rights of litigants in actual controversies.'" *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1982) (quoting *Liverpool S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 (1885)). In other words, federal courts are not, and were never intended to be, national forums for airing "generalized grievances." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Our business is to decide concrete disputes brought to our attention by parties possessing more than a mere metaphysical or theoretical interest in the outcome. *See id*. ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, . . . though the court's judgment may benefit others collaterally.").

Hence, the presence of a plaintiff with standing to sue is a necessary pre-condition to a federal court's exercise of Article III judicial power, and a challenge to a plaintiff's standing is an attack on the court's subject matter jurisdiction. *See*, *e.g.*, *Stalley v. Orlando Regional Healthcare System*, *Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) ("Because standing is jurisdictional, a dismissal for lack of standing has

the same effect as a dismissal for lack of subject matter jurisdiction[.]") (internal

quotations omitted); *London v. Wal-Mart Stores*, *Inc.*, 340 F.3d 1246, 1251 (11th Cir.

2003) ("The issue of whether plaintiff lacks standing is jurisdictional[.]").

Although the standing doctrine is animated in part by prudential considerations,

*see Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 11-12 (2004), the

Supreme Court has identified three requirements that collectively constitute an

"'irreducible constitutional minimum.'"  *Vermont Agency of Natural Resources v.*

*Stevens*, 529 U.S. 765, 771 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560 (1992)).

> First, a plaintiff must demonstrate an injury in fact, which is concrete,
> distinct and palpable, and actual or imminent.  Second, a plaintiff must
> establish a causal connection between the injury and the conduct
> complained of — the injury has to be fairly traceable to the challenged
> action of the defendant, and not the result of some third party not before
> the court.  Third, a plaintiff must show the substantial likelihood that the
> requested relief will remedy the alleged injury in fact.

*McConnell*, 540 U.S. at 225-26 (internal quotations, citations, and alterations omitted)

(citing, *e.g.*, *Stevens*, 529 U.S. at 771; *Lujan*, 504 U.S. at 560-61; *Whitmore v.*

*Arkansas*, 495 U.S. 149, 155 (1990)).  Reduced to jurisprudential buzzwords, this

constitutional formula requires:  (1) "an injury in fact"; (2) "causation"; and (3)

"redressability." *Sprint Communications*, 125 S. Ct. at 2535.[18]  "This triad of injury

---

[18] The Court in *Sprint Communications* outlined these elements with helpful parenthetical
references:

in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *U.S. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04 (1998) (footnote omitted).  Defendants contest plaintiffs' ability to establish each of these elements.

In response, plaintiffs call attention to the fact that at least one of these three requirements (causation) is also a *prima facie* element of just about any cause of action — including the one underlying this case, which is fundamentally based upon alleged violations of the Equal Protection Clause of the Fourteenth Amendment.[19] *See*, *e.g.*, *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272

---

And in order to have Article III standing, a plaintiff must adequately establish (1) an injury in fact (*i.e.*, a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (*i.e.*, a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, is it 'likely' and not 'merely speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Sprint Communications*, 125 S. Ct. at 2535 (quoting *Lujan*, 504 U.S. at 560-61) (bracketed alteration in *Sprint Communications*).

[19] The Equal Protection Clause is situated within the final clause of § 1 of the Fourteenth Amendment.  In full, § 1 reads as follows:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend XIV, § 1.

(1979) (holding that, "even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose"); *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000) (holding that "the government's discriminatory intent alone, without a causal connection between the intent and some cognizable injury to Plaintiffs, cannot entitle Plaintiffs to relief").

As this court sees it, however, not just the element of causation, but *each element* of the standing analysis merges into the ultimate merits inquiry in this case. For one thing, plaintiffs have neither standing nor a viable cause of action under the Constitution unless they can show "an invasion of a *legally protected interest*." *Lujan*, 504 U.S. at 560 (emphasis supplied). *See also McConnell*, 540 U.S. at 227 (noting that standing "'often turns on the *nature* and *source* of the claim asserted'") (emphasis supplied) (quoting *Warth*, 422 U.S. at 500). Moreover, causation is not altogether distinct from redressability. Indeed, the Supreme Court has indicated that in cases where, as here, "[t]he relief requested . . . [is] simply the cessation of the allegedly illegal conduct . . . . the 'redressability' analysis is identical to the 'fairly traceable' analysis." *Allen v. Wright*, 468 U.S. 737, 759 n.24 (1984). Overlaps of this sort in cases where standing is an issue raise concerns of "drive-by jurisdictional rulings," *U.S. Steel Co.*, 523 U.S. at 91; that is, situations in which opinions actually

-15-

addressing substantive defects with a cause of action might later be read as jurisdictional precedents.  *See id.* (rejecting any reliance on such cases).  The converse also is possible:  courts have dismissed lawsuits on explicitly *jurisdictional* grounds based on the conclusion that the complaint fails to state a viable *cause of action*.  *See, e.g.*, *Bell v. Hood*, 327 U.S. 678, 680 (1946) (reversing such a decision).

Truth be told, "[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which [plaintiffs] could actually recover," *Bell*, 327 U.S. at 682, "unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'" *U.S. Steel Co.*, 523 U.S. at 89 (quoting *Bell*, 327 U.S. at 682-83).  *See also id.* (holding that it is "firmly established . . . that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case") (emphasis in original); *Baker v. Carr*, 369 U.S. 186, 199 (1962) ("Since the District Court obviously and correctly did not deem the asserted federal constitutional claim unsubstantial and frivolous, it should not have dismissed the complaint for want of jurisdiction of the subject matter.").

Likewise, "'standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.'" *McConnell*, 540 U.S. at 227 (quoting

*Warth v. Seldin*, 422 U.S. 490, 500 (1975)).  *See also* Wright, Miller & Cooper, 13 *Federal Practice & Procedure: Jurisdiction* § 3531 (2d ed. 2006) ("The focus on the party also means that standing is not defeated by failure to prevail on the merits."). Nevertheless, standing "'often turns on the *nature* and *source* of the claim asserted.'" *McConnell*, 540 U.S. at 227 (emphasis supplied) (quoting *Warth*, 422 U.S. at 500). "Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  *Warth*, 422 U.S. at 500.

In other words, the standing question in cases such as the present action essentially conflates with the substantive question of whether the cause of action itself is cognizable at law or in equity.  If the court addressed standing in this context, its opinion could just as easily be read as a commentary on the merits or demerits of plaintiffs' underlying Equal Protection claim.  This might amount to nothing more than a mere tip of the hat if it were based exclusively on a generous reading of the allegations present in plaintiffs' complaint, accepted as true for purposes of ruling upon defendants' motions.  That would be the situation had defendants mounted a traditional "facial" challenge to plaintiffs' standing pursuant to Federal Rule of Civil Procedure 12(b)(1), because the question would simply be whether plaintiffs had *alleged* sufficient facts to support a presumably valid cause of action.  *See*, *e.g.*,

*Warth*, 422 U.S. at 502 (assuming for purposes of the standing discussion that the practices complained of, "if proved in a proper case, would be adjudged violative of the constitutional and statutory rights of the persons [aggrieved]").  *See also generally McElmurray v. Consolidated Government*, *Augusta-Richmond*, 501 F.3d 1244, 1251 (11th Cir. 2007) (discussing facial challenges); *S.E.C. v. Mutual Benefits Corp.*, 408 F.3d 737, 742 (11th Cir. 2005) (same); *Goodman v. Sipos*, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001) (same); *McMaster v. United States*, 177 F.3d 936, 940 (11th Cir. 1999) (same); *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-30 (11th Cir. 1990) (same); *Williamson v. Tucker*, 645 F.2d 404, 415-16 (5th Cir. 1981) (same); *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (same).[20]

Here, however, defendants repeatedly stress that they intend a "*factual* attack," or one that "challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony."  *Stalley*, 524 F.3d at 1233 (emphasis supplied).  When fielding such attacks, courts "do not accord any presumption of truthfulness to the allegations in the complaint." *McMaster*, 177 F.3d at 940 (citing *Lawrence*, 919 F.2d at 1529).  Thus, a plaintiff is "required to submit facts through some evidentiary method and has the burden of proving by a

---

[20] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

preponderance of the evidence that the trial court does have subject matter jurisdiction." *Patterson*, 644 F.2d at 523.  Because the evidence that plaintiffs need to submit to establish standing is identical to the evidence needed to substantiate their claim of a cognizable Fourteenth Amendment violation, this paradigm would require them to *prove their case* at the beginning of the lawsuit, without the benefit of any discovery, and without the usual presumption, applicable on Federal Rule of Civil Procedure 12(b)(6) motions and at summary judgment, that all well-pleaded allegations and/or disputed facts are construed in the light most favorable to the nonmovant.  This is obviously not a workable formulation.  *See Bell*, 327 U.S. at 682 ("Whether the complaint states a cause of action on which relief could be granted is a question of law and just as questions of fact it must be decided *after and not before the court has assumed jurisdiction over the controversy*.") (emphasis supplied).

Recognizing this reality, the former Fifth Circuit held, in a decision that continues to be binding precedent in this Circuit, that:

> Where the defendant's [factual] challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court (assuming that the plaintiff's federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) *is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.*

*Williamson v. Tucker*, 645 F.2d at 416 (emphasis supplied).  *See also McGinnis v.*

-19-

*Ingram Equipment Co.*, 918 F.2d 1491, 1494 (11th Cir. 1990) (*en banc*) (following *Williamson*).  *See generally Lawrence v. Dunbar*, 919 F.2d 1525, 1531 (11th Cir. 1990) (holding that "federal claims should not be dismissed on motion for lack of subject matter jurisdiction when that determination is intermeshed with the merits of the claim and when there is a dispute as to a material fact."); *Eaton v. Dorchester Development*, *Inc.*, 692 F.2d 727, 733 (11th Cir. 1982) ("The argument against premature dismissal on [Federal Rule of Civil Procedure] 12(b)(1) grounds is particularly strong when the basis of jurisdiction is also an element of plaintiffs' cause of action on the merits.").

Defendants seek to circumvent the principles set forth in these cases by urging the court that their factual attack does not seek an adjudication on the merits.  This contention simply cannot be credited because, regardless of what defendants purport to *seek*, "the jurisdictional basis of [the] claim [*i.e.*, plaintiffs' assertion of standing] is intertwined with the merits." *Lawrence*, 919 F.2d at 1530.  *See also*, *e.g.*, *American Civil Liberties Union v. Mote*, 423 F.3d 438, 441 n.1 (4th Cir. 2005) (recognizing that, "when the contested basis for jurisdiction is also an element of a plaintiff's federal claim, . . . the claim should not be dismissed for lack of jurisdiction").

Accordingly, "the district court should apply a Rule 56 summary judgment standard." *Lawrence*, 919 F.2d at 1530.  *See also Mote*, 423 F.3d at 441 n.1 (holding

that "the proper course of action is for the district court to accept jurisdiction and address the objection as an attack on the merits").

However, now is not the time to apply that standard. *See Wooden v. Board of Regents of University System of Georgia*, 247 F.3d 1262, 1280 n.16 (11th Cir. 2001) ("Although some overlap may be inevitable, [the] standing doctrine was not intended to provide a vehicle for resolution at the threshold of fundamentally merits issues."). This case has just begun, and neither party has submitted evidence that is highly probative on the issues pertaining to causation.  Plaintiffs have filed a motion for partial summary judgment, which is not yet fully briefed; if that motion is granted, many necessary facts may be established.  Whether causation would be one of them remains to be seen; but, in any event, defendants will also have ample opportunity to file and brief a summary judgment motion of their own.  In that context, the court will be able to rule upon the merits of plaintiffs' case without the willing suspension of disbelief that would be required to separate out the issue of standing.  Moreover, the filing of any additional dispositive motions will be preceded by a period of discovery that should allow all parties an opportunity to buttress their respective positions with facts. *See McElmurray*, 501 F.3d at 1251 (noting that "in a *factual challenge* the district court *must* give the plaintiff an opportunity for discovery") (emphasis in original).

-21-

All that remains at this juncture is to determine whether plaintiffs' "alleged claim under the Constitution . . . clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or [whether the] claim is wholly insubstantial and frivolous." *Bell*, 327 U.S. at 682-83.  The sheer number of pages devoted to plaintiffs' theory of discrimination by both Judge Harold Murphy, who authored the opinion in *Knight VI*, and the Eleventh Circuit panel that affirmed his decision, *see Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004), *aff'd*, 476 F.3d 1219 (11th Cir.), *cert. denied* 127 S. Ct. 3014 (2007), suggests that plaintiffs' present claim is both material and substantial, and a quick review of the allegations of the complaint confirms this assessment.  The black plaintiffs in this action allege that they were singled out for unequal treatment because of their race:  in other words, they allege that the drafters of the subject constitutional provisions made a series of conscious decisions to limit their ability to compete for government dollars on an equal footing with their white counterparts (and, thereby, hampered the black plaintiffs' attempts to dismantle structural barriers to change) based on animosity toward their race.  The complaint alleges that the inclusion of certain racially discriminatory provisions in the Alabama Constitution has, perhaps unexpectedly, also resulted in the denial of equal access to educational benefits and other public services to whites, especially those who reside in poor, majority-black school districts.  These are troubling

allegations of deep-rooted, invidious discrimination, not entirely unlike those that gave rise to the Supreme Court's watershed decision in the case of *Brown v. Board of Education*, 347 U.S. 483 (1954).

In short, there is nothing before the court to "show that [plaintiffs'] cause is insubstantial or frivolous, and the complaint does in fact raise serious questions, both of law and fact, which the district court can decide only after it has assumed jurisdiction over the controversy." *Bell*, 327 U.S. at 683-84. "And of course no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter." *Baker*, 369 U.S. at 199. Therefore, plaintiffs' claims will not be dismissed for lack of standing.

## II.  TAX INJUNCTION ACT

Defendants also argue that the remedies plaintiffs request are prohibited by the Tax Injunction Act of 1937 ("the Act" or "the TIA"), which provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Defendants' argument is thwarted by the latest decision of the Supreme Court interpreting that Act.

In *Hibbs v. Winn*, 542 U.S. 88 (2004), the Supreme Court considered a challenge to a provision of Arizona state law that allowed income-tax credits for

individuals who make payments to organizations that award educational scholarships and tuition grants to children attending private schools. *Id.* at 92. The plaintiffs, all of whom were Arizona taxpayers, alleged that the law violated the Establishment Clause of the First Amendment because the scholarship and grant funds could be directed to "schools that provide religious instruction or that give admissions preference on the basis of religion or religious affiliation." *Id.* at 95. The plaintiffs did not contest their own personal tax liability, or "seek to impede Arizona's receipt of tax revenues." *Id.* at 93. Instead, they sought the following relief: (1) an injunction prohibiting the Director of the Arizona Department of Revenue from allowing the tax credit for payments directed to religious schools; (2) a declaration that the state law violated the Establishment Clause, both on its face and as applied; and (3) an order mandating that all organizations which had received funds in violation of the Establishment Clause repay the money into the state's general fund. *Id.* at 99.

The defendant in *Hibbs* — the Director of the Arizona Department of Revenue ("the Director") — argued that the plaintiffs' claims were precluded by the Act. More specifically, the Director argued that the Act "bars *all* lower federal-court interference with state tax systems, even when the challengers are not endeavoring to avoid a tax imposed on them, and no matter whether the State's revenues would be raised or

lowered should the plaintiffs prevail." *Id.* at 94 (emphasis supplied).  The Supreme

Court unequivocally rejected that argument, and held that the Act did not preclude the

plaintiffs' claims.  *Id.*

In determining the proper reach of the Act, the Supreme Court examined its

legislative history, which revealed

> two closely related, state-revenue-protective objectives: (1) to eliminate
> disparities between taxpayers who could seek injunctive relief in federal
> court — usually out-of-state corporations asserting diversity jurisdiction
> — and taxpayers with recourse only to state courts, which generally
> required taxpayers to pay first and litigate later; and (2) to stop
> taxpayers, with the aid of a federal injunction, from withholding large
> sums, thereby disrupting state government finances. . . .  In short, in
> enacting the TIA, Congress trained its attention on taxpayers who
> sought to avoid paying their tax bill by pursuing a challenge route other
> than the one specified by the taxing authority.   Nowhere does the
> legislative history announce a sweeping congressional direction to
> prevent "federal-court interference with all aspects of state tax
> administration."

*Hibbs*, 542 U.S. at 104-05 (citations omitted).  The Court characterized its prior Tax

Injunction Act decisions as being in harmony with the Act's legislative purpose, and

distinguished past decisions barring claims under the Act because they "involved

plaintiffs who mounted federal litigation to *avoid* paying state taxes (or to gain a

refund of such taxes)."  *Id.* at 106 (emphasis supplied).  In all of those cases, the

granting of federal court relief "would have operated to *reduce* the flow of state tax

revenue."  *Id.* (citing *California v. Grace Brethren Church*, 457 U.S. 393, 408-10

(1982); *Arkansas v. Farm Credit Services of Central Arkansas*, 520 U.S. 821, 824 (1997); *National Private Truck Council, Inc. v. Oklahoma Tax Commission*, 515 U.S. 582, 584 (1995); *Fair Assessment in Real Estate Association, Inc. v. McNary,* 454 U.S. 100, 105-06 (1981); *Rosewell v. LaSalle National Bank,* 450 U.S. 503, 510 (1981)) (emphasis supplied).

The Court also found it important that other federal courts had construed the Act "to restrain state taxpayers from instituting federal actions to contest their liability for state taxes, but not to stop third parties from pursuing constitutional challenges to tax benefits in a federal forum." *Hibbs*, 542 U.S. at 108-09 (citing *In re Jackson County*, 834 F.2d 150, 151-52 (8th Cir. 1987); *Dunn v. Carey*, 808 F.2d 555, 558 (7th Cir. 1986); *Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir. 1975)). Finally the Court noted that it and other federal courts had issued "numerous" decisions reaching "the merits of third-party constitutional challenges to tax benefits without mentioning the TIA." *Hibbs*, 542 U.S. at 110-12 (citations omitted).

In the present case, the only items of relief sought by plaintiffs are a declaratory judgment that the challenged provisions of the Alabama Constitution violate their rights under Title VI and the Equal Protection Clause, and, an injunction prohibiting defendants or any others associated with them from enforcing the challenged provisions and any statutes and regulations implementing those provisions. Plaintiffs

do not challenge their respective personal liabilities to pay property taxes under the allegedly unconstitutional provisions.  Furthermore, if plaintiffs are successful, their challenge will not *reduce* the flow of state revenue; to the contrary, the effect of a successful challenge will be to raise *additional* revenue to fund public services, particularly education.

Defendants' arguments in favor of applying the Tax Injunction Act are unavailing.  Defendants first argue that the holding in *Hibbs* should be limited to cases involving state tax credits or benefits.  As support for that argument, they rely primarily on the decision of the Tenth Circuit in *Hill v. Kemp*, 478 F.3d 1236, 1249 (10th Cir. 2007) — a case in which a group of motorists in the State of Oklahoma sought injunctive relief and a declaratory judgment that the State's scheme for granting specialty motor vehicle license plates violated the First and Fourteenth Amendments "by permitting drivers to obtain license plates bearing the messages 'Adoption Creates Families' and 'Choose Life' under terms and conditions more favorable than those available to those who wish to have license plates bearing messages of support for abortion rights." *Id.* at 1239.  The defendants argued that the suit was barred by the Tax Injunction Act, and the Tenth Circuit agreed.  The court refused to interpret *Hibbs* as allowing *any* lawsuit by taxpayers who are "not seeking to challenge an assessment imposed on them, but rather assessments imposed on and

paid by other persons or entities." *Id.* at 1249.  The Tenth Circuit panel reasoned that

> [n]othing in the language of the TIA indicates that our jurisdiction to hear challenges to state taxes can be turned like a spigot, off when brought by taxpayers challenging their own liabilities and on when brought by third parties challenging the liabilities of others.  Rather, Congress plainly directed us that we "shall not enjoin . . . any tax under State law," without qualification — and nothing in *Hibbs* commands a result contrary to the Congress's express direction.

*Id.*  The Tenth Circuit acknowledged that *Hibbs* did involve a third-party challenge to the Arizona law at issue, but dismissed *Hibbs*' entire discussion of the plaintiffs' third-party status as nothing more than a long side-note, included to "simply . . . underscore how unusual the case before it was compared with most [Tax Injunction Act] suits." *Hill*, 478 F.3d at 1249.  According to the Tenth Circuit, *Hibbs* held that the Act did not apply *only because* "the plaintiff there simply did not seek to enjoin the *levy or collection* of any *tax* under State law, as is typically the case, but instead sought to challenge the *provision* of a *tax credit* aimed at limiting or constraining State tax revenues." *Hill*, 478 F.3d at 1249 (citing *Hibbs*, 542 U.S. at 95) (emphasis in original).  In other words, *Hibbs* "held that giving away a tax credit is a very different thing than assessing, levying or collecting a tax." *Hill*, 478 F.3d at 1249.

This court disagrees with the Tenth Circuit's interpretation of *Hibbs*.  The Supreme Court would not have paused so long to underscore how the plaintiffs' third-party status distinguished the case from other Tax Injunction Act cases if the

difference was not significant to the Court's decision.  Furthermore, the holding in *Hibbs* should not be limited solely to the context of tax credits or benefits.  Rather, the Court's intent appears to have been to use the unique circumstances of the case — a third-party challenge to a state tax credit — as a vehicle for limiting the application of the Act itself, as opposed to limiting the application of *exceptions* to the Act.  Indeed, the Court repeatedly emphasized that the primary purpose of the Act was to protect the flow of state tax revenue by preventing challenges in federal court by taxpayers seeking to *avoid* their own tax liability.  *See Hibbs*, 542 U.S. at 106 ("Our prior decisions are not fairly portrayed cut loose from their secure, state-revenue-protective moorings."); *id.* at 107 ("In sum, this Court has interpreted and applied the [Act] only in cases Congress wrote the Act to address, *i.e.,* cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes."), *id.* at 108 ("In other federal courts as well, [the Act] has been read to restrain state taxpayers from instituting federal actions to contest their liability for state taxes, but not to stop third parties from pursuing constitutional challenges to tax benefits in a federal forum."); *id.* at 108 ("The text of [the Act] does not suggest that federal courts should tread lightly in issuing orders that might allow local governments to raise additional taxes.") (citing *Dunn v. Carey*, 808 F.2d 555, 558 (7th Cir. 1986)).  Moreover, the Court firmly rejected the notion that the Act was intended as a

-29-

"sweeping congressional direction to prevent 'federal-court interference with *all* aspects of state tax administration.'" *Hibbs*, 542 U.S. at 105 (citation omitted) (emphasis supplied).[21]

Defendants also argue that the possibility that plaintiffs' requested relief actually will increase state revenue is too speculative to defeat application of the Tax Injunction Act.[22] In that regard, the Tenth Circuit stated in *Hill* that

> there is simply nothing in the [Act] or *Hibbs* suggesting that federal courts can entertain challenges to state taxes on the basis of predictive judgments that doing so will not harm state coffers; rather our jurisdiction is precluded by the plain language of the [Act] in *all* cases

---

[21] Defendants argue that it is improper for this court to consider the legislative history of the Act, because the language of the statute is clear. *See Harry v. Marchant*, 291 F.3d 767, 772 (11th Cir. 2002) ("Where the language of a statute is unambiguous, . . . we need not, and ought not, consider legislative history.") (citations omitted). Defendants are correct in principle, and their argument would carry more weight if this court actually were being called upon to conduct an independent analysis of the legislative history supporting the Act. It is not. Instead, the Supreme Court conducted that examination, and this court is bound to follow the Supreme Court's decision. Further, it is worth noting that, in the very decision defendants cite to dissuade this court from considering the legislative history findings of the *Hibbs* Court, the Eleventh Circuit went on to examine a statute's legislative history despite the lack of ambiguity in any of its terms. *See Harry*, 291 F.3d at 772 ("Despite this elementary principle of statutory construction, 'sometimes judges . . . cannot resist the temptation to set out [legislative] history.' . . . We likewise succumb and examine the legislative history of EMTALA.") (citations omitted, first ellipsis in original, bracketed alteration in original).

[22] *See* doc. no. 27 (Defendants' Memorandum in Support of Motions to Dismiss), at 26 ("While it is certainly plausible that tax revenue would increase, *it is by no means guaranteed*, and as we have stated previously, the Legislature may in fact lower tax revenues.") (emphasis supplied); doc. no. 33 (Defendants' Reply to Plaintiffs' Brief Opposing Dismissal), at 13 ("[R]egardless of whether the Legislature takes any action in response to a Court order, *the results remain highly speculative*.") (emphasis supplied). The bald inconsistency between these assertions and defendants' argument that the immediate effect of granting the relief sought by plaintiffs would be a tremendous increase in property taxes passes strange. *See supra* note 15. *See also infra* note 23 and accompanying text.

seeking to enjoin the levy or collection of taxes under State law.  Were the case otherwise, judges might be free to become second rate, supply-side economists, hazarding guesses that enjoining this or that revenue raising measure would help rather than hurt overall tax collections.  But we are not authorized by Congress to be in the business of forecasting the likely fiscal effects of variations on state tax policy; nor do we think ourselves well equipped to do so.

*Hill*, 478 F.3d at 1250 (emphasis in original).  As discussed above, however, the Supreme Court in *Hibbs* expressly rejected the idea that the Act precludes *all* cases involving the assessment, collection, or levy of state taxes.  Furthermore, there is no need in this case for "hazarding guesses" as to the fiscal effect of granting plaintiffs' requested relief.  *Id*.  Indeed, it is undisputed that the immediate effect of granting the declaratory judgment and injunction plaintiffs seek will be to increase property taxes in the State of Alabama.[23]   The amount of the increase will vary from

---

[23] Defendants acknowledge in their brief that "[p]laintiffs' requested relief would decimate the entire Alabama property tax structure and could increase residential property taxes by 1,000%, commercial property taxes by 500% and utility property taxes by more than 300%."  Doc. no. 27 (Defendants' Memorandum in Support of Motions to Dismiss), at 2.  Even more to the point, defendants state the following in a footnote:

> If Plaintiffs are successful in challenging the restrictions on assessment ratios in Amendment 373 to the Alabama Constitution, and an injunction is issued, property in every classification would automatically be assessed at 100%, as opposed to the 10%, 20%, and 30% current ratios for residential, commercial, and utility property, respectively.  Millage rates, which Plaintiffs do not attack, would remain constant.  By way of example, Alabama taxpayers with a $100,000 home in  a county with a property tax rate of 50 mills would see their annual property tax bill increase from $300 to $3,000, after taking into account the homestead exemption and the change in assessment ratio.

*Id.* at 2 n.1.

jurisdiction to jurisdiction, but the total increase for each jurisdiction can be pre-determined with certainty, according to the assessment ratio currently in place in each jurisdiction.

It is true, of course, but nevertheless irrelevant that, if this court invalidates the provisions challenged by plaintiffs, the Alabama legislature could later vote to impose even lower property taxes than those required by the current structure. If that should occur, it will be not be as a result of this court's injunction. The undisputed, direct effect of the requested injunction would be to *increase* state property tax revenue.

In light of all of these observations, this court rejects defendants' argument that the Tenth Circuit's non-binding and unpersuasive opinion in the *Hill* case precludes plaintiffs' claims. The other cases cited by defendants either pre-date *Hibbs*, or they are distinguishable. *See South Carolina v. Regan*, 465 U.S. 367, 399 (1984) (O'Connor, J., concurring) (majority and concurring opinions discussed the Anti-Injunction Act, 26 U.S.C. § 7421(a), not the Tax Injunction Act); *California v. Grace Brethren Church*, 457 U.S. 393 (1982) (distinguished by *Hibbs*); *Tully v. Griffin*, Inc., 429 U.S. 68 (1976) (taxpayer sought to avoid payment of New York state sales tax); *Levy v. Pappas*, 510 F.3d 755 (7th Cir. 2007) (challenge to county's administration of its tax refund system, if successful, would "operate[] to reduce the flow of state tax revenue") (bracketed alteration in original).

Accordingly, plaintiff's claims are not precluded by the Tax Injunction Act.

## III. COMITY

Defendants' final argument is that the broader principle of "comity" operates as a jurisdictional bar to plaintiffs' claims.[24]  This argument is fundamentally flawed because defendants misconstrue the principle of comity as constituting a bar to this court's subject matter jurisdiction over the instant action.[25]  Defendants do not cite any authority in support of the premise that the principle of comity creates a mechanism to strip a federal court of jurisdiction, and this court does not understand

---

[24] "Comity," in the sense that word is used here, is a term that refers to

> the deference federal courts owe to state courts as those of another sovereign.  For example, some contend that comity requires that federal courts minimize friction with state courts and avoid any doctrines or practices that will implicitly insult the competence of state courts.  Many decisions of the Burger Court expressly invoked comity as a justification for restricting federal court jurisdiction.  Yet, others argue that federal courts should safeguard constitutional rights, irrespective of what friction or insult might be created.  They maintain that arguments about friction and insults are based on unsubstantiated theories about the reaction of state court judges and that, in any event, the protection of constitutional rights is more important than institutional harmony or judicial sensibilities.

Erwin Chemerinsky, *Federal Jurisdiction* § 1.5, at 39-40 (5th ed. 2007) (footnotes omitted).  *See also*, *e.g.*, *Black's Law Dictionary* 1134 (8th ed. 2004) (defining *comity* as "The doctrine holding that a federal court must refrain from hearing a constitutional challenge to state action if federal adjudication would be considered an improper intrusion into the state's right to enforce its own laws in its own courts.").

[25] *See* doc. no. 33 (Defendants' Reply to Plaintiffs' Brief Opposing Dismissal), at 20.  *See also* doc. no. 27 (Defendants' Memorandum in Support of Motions to Dismiss), at 3 ("[F]ederal jurisdiction to hear this action is barred by the principle of comity.").

the principle to be either as expansive or absolute as defendants contend.[26]

The doctrine of comity "teaches that one court should defer action on causes *properly within its jurisdiction* until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)) (emphasis supplied). In *Fair Assessment in Real Estate Association*, *Inc. v. McNary*, 454 U.S. 100 (1981), the Supreme Court stated that the "notion of 'comity'" is founded on

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways . . . . [T]he concept [represents] a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*McNary*, 454 U.S. at 111 (quoting *Younger v. Harris*, 401 U.S. 37, 44-45 (1971)) (brackets in original). Stated differently,

the "principle of comity" refers to the "proper respect for state

---

[26] In this instance, defendants assumed too much in stating, without citing legal authority, that the principle of comity thwarts this court's very jurisdiction over this dispute. This court is not obligated to give consideration to arguments that are not fully developed or bolstered with legal authority. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument").

> functions" that organs of the National Government, most particularly the federal courts, are expected to demonstrate in the exercise of their own legitimate powers. *See Younger v. Harris*, 401 U.S. 37, 44-45, 91 S.Ct. 746, 750-751, 27 L.Ed.2d 669 (1971). So employed, the "principle of comity" *is nothing more than an encapsulation of policy*, albeit policy with roots in the Constitution and our federal system of government.

*McNary*, 454 U.S. at 119 (Brennan, J., concurring) (emphasis supplied). Furthermore, as the former Fifth Circuit noted when answering the question of whether a federal court should exercise jurisdiction over an action involving assets in a state court receivership, "comity . . . is not a rule of law fixing the rights of litigants." *Lydick v. Fischer*, 135 F.2d 983, 985 (5th Cir. 1943).

Contrary to defendants' argument that comity operates as a bar to this court's jurisdiction over the present action, "the 'principle of comity' may be a source of judicial policy, [but] it is emphatically no source of judicial *power* to renounce jurisdiction." *McNary*, 454 U.S. at 119 (Brennan, J., concurring) (emphasis in original). *See also*, *e.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 851-52 (1999) (implying that a court's refusal to hear a case on comity grounds is premised on an "abstention principle" that is separate from the question of subject matter jurisdiction); *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 297 (1943) (applying the principle of comity and noting that the "withholding of extraordinary [injunctive] relief by courts having the authority to give it is not a denial of the

jurisdiction which Congress has conferred on the federal courts . . . . On the contrary, it is but a recognition that the jurisdiction conferred on the federal courts embraces suits in equity. . . .").

The gaping leap defendants make from comity operating as a judicial principle (or, stated differently, as a prudential guidepost for courts to consider) to comity functioning as an absolute jurisdictional bar cuts against the Supreme Court's prior rulings in which the principle plays a role.  Accordingly, this court rejects defendants' argument that comity is a doctrine that can operate to preclude this court's *jurisdiction* over this controversy.

## IV.  CONCLUSION AND ORDER

For the foregoing reasons, it is ORDERED that defendants' motions to dismiss for lack of subject matter jurisdiction be, and they hereby are, DENIED.

Defendants are ORDERED to respond to plaintiffs' pending motion for partial summary judgment[27] on or before **August 14**, **2008**.  Plaintiffs shall file a reply brief in support of partial summary judgment on or before **August 25**, **2008**.

DONE and ORDERED this 24th day of July, 2008.

_____
United States District Judge

---

[27] Doc. no. 10 (Plaintiffs' Motion for Partial Summary Judgment).

# APPENDIX I

## ALABAMA CONSTITUTION OF 1901, art. XI, § 215, as amended

No county in this state shall be authorized to levy a greater rate of taxation in any one year on the value of the taxable property therein than one-half of one per centum; provided, that to pay debts existing on the sixth day of December, eighteen hundred and seventy-five, an additional rate of one-fourth of one per centum may be levied and collected which shall be appropriated exclusively to the payment of such debts and the interest thereon; provided, further, that to pay any debt or liability now existing against any county, incurred for the erection, construction, or maintenance of the necessary public buildings or bridges, or that may hereafter be created for the erection of necessary public buildings, bridges, or roads (a) any county may levy and collect such special taxes, not to exceed one-fourth of one per centum, as may have been or may hereafter be authorized by law. The proceeds of taxes levied under said proviso (a) for public building, road, or bridge purposes in excess of amounts payable on bonds, warrants, or other securities issued by the county may be spent for general county purposes, in such manner as the court of county commissioners, board of revenue, or other like county governing body may determine.

# APPENDIX II

## ALABAMA CONSTITUTION OF 1901, art. XI, § 216, as amended

No city, town, village, or other municipal corporation, other than as provided in this article, shall levy or collect a higher rate of taxation in any one year on the property situated therein than one-half of one per centum of the value of such property as assessed for state taxation during the preceding year; provided, that for the purpose of paying debts existing on the sixth day of December, eighteen hundred and seventy-five, and the interest thereon, a tax of one per centum may be levied and collected, to be appropriated exclusively to the payment of such indebtedness; and provided further, that this section shall not apply to the city of Mobile, which city may from and after the ratification of this Constitution, levy a tax not to exceed the rate of three-fourths of one per centum to pay the expenses of the city government, and may also levy a tax not to exceed three-fourths of one per centum to pay the debt existing on the sixth day of December, eighteen hundred and seventy-five, with interest thereon, or any renewal of such debt; and, provided further, that this section shall not apply to the cities of Birmingham, Huntsville, and Bessemer, and the town of Andalusia, which cities and town may levy and collect a tax not to exceed one-half of one per centum in addition to the tax of one-half of one per centum as hereinbefore allowed to be levied and collected, such special tax to be applied exclusively to the payment of interest on bonds of said cities of Birmingham, Huntsville, and Bessemer, and town of Andalusia, respectively, heretofore issued in pursuance of law, or now authorized by law to be issued and for a sinking fund to pay off said bonds at the maturity thereof; and, provided further, that this section shall not apply to the city of Montgomery, which city shall have the right to levy and collect a tax of not exceeding one-half of one per centum per annum upon the value of the taxable property therein, as fixed for state taxation, for general purposes, and an additional tax of not exceeding three-fourths of one per centum per annum upon the value of the property therein, as fixed for state taxation, to be devoted exclusively to the payment of its public debt, interest thereon, and renewals thereof, and to the maintenance of its public schools, and public conveniences; and, provided further, that this section shall not apply to Troy, Attalla, Gadsden, Woodlawn, Brewton, Pratt City, Ensley, Wylam, and Avondale, which cities and towns may from and after the ratification of this Constitution, levy and collect an additional tax of not exceeding one-half of one per centum; and, provided further, that this section shall not apply to the cities of Decatur, New Decatur, and Cullman, which cities may from and after the ratification of this Constitution, levy and collect an additional tax of not exceeding three-tenths of one per centum per annum; such special tax of said city of Decatur to be applied exclusively for the public schools, public school buildings, and public improvements; and such special tax of New Decatur and Cullman to be applied exclusively for educational purposes, and to be expended under their respective boards of public school trustees; but this additional tax shall not be levied by Troy, Attalla, Gadsden,

Woodlawn, Brewton, Pratt City, Ensley, Wylam, Avondale, Decatur, New Decatur, or Cullman unless authorized by a majority vote of the qualified electors voting at a special election held for the purpose of ascertaining whether or not said tax shall be levied; and, provided further, that the purposes for which such special tax is sought to be levied shall be stated in such election call, and, if authorized, the revenue derived from such special tax shall be used for no other purpose than that stated; and, provided further, that the additional tax authorized to be levied by the city of Troy, when so levied and collected, shall be used exclusively in the payment of the bonds and interest coupons thereon, hereafter issued in the adjustment of the present bonded indebtedness of said city; and, provided further, that the additional tax authorized to be levied and collected by the city of Attalla shall, when so levied and collected, be used exclusively in the payment of bonds to the amount of not exceeding twenty-five thousand dollars and the interest coupons thereon, hereafter to be issued in the adjustment of the present indebtedness of said city; provided further that the governing boards of said cities, which are authorized to levy an additional tax after the holding of an election as aforesaid, are hereby authorized to provide by ordinance the necessary machinery for the holding of said election and declaring the result thereof.

# APPENDIX III

**ALABAMA CONSTITUTION OF 1901, art. XI, § 217, as amended**

(a) On and after October 1, 1978, all taxable property within this state, not exempt by law, shall be divided into the following classes for the purposes of ad valorem taxation:

| | |
|---|---|
| Class I. | All property of utilities used in the business of such utilities. |
| Class II. | All property not otherwise classified. |
| Class III. | All agricultural, forest and single-family owner-occupied residential property, and historic buildings and sites. |
| Class IV. | All private passenger automobiles and motor trucks of the type commonly known as "pickups" or "pickup trucks" owned and operated by an individual for personal or private use and not for hire, rent or compensation. |

(b) With respect to ad valorem taxes levied by the state, all taxable property shall be forever taxed at the same rate. On and after October 1, 1978, such property shall be assessed for ad valorem tax purposes according to the classes thereof as herein defined at the following ratios of assessed value to the fair and reasonable market value (except as otherwise provided in subsection (j) hereof) of such property:

| | |
|---|---|
| Class I. | 30 per centum. |
| Class II. | 20 per centum. |
| Class III. | 10 per centum. |
| Class IV. | 15 per centum. |

(c) With respect to ad valorem taxes levied by counties, municipalities or other taxing authorities, all taxable property shall be forever taxed at the same rate. On and after October 1, 1978, such property shall be assessed for ad valorem tax purposes according to the classes of property defined in subsection (a) hereof and at the same ratios of assessed value to the fair and reasonable market value thereof as fixed in subsection (b) hereof, except as otherwise provided in subsection (j) hereof and this subsection (such ratios being herein called "assessment ratios"). In connection with the ad valorem taxes that a county, municipality or other taxing authority is authorized or required to levy and collect pursuant to any provision of this Constitution, for the ad valorem tax year beginning October 1, 1978, any such taxing authority may, subject to criteria established by act of the legislature, by resolution of the governing body of that taxing authority, at any time not later than September 30, 1979, increase or decrease the assessment ratio applicable to any class of taxable property, such increase or decrease to be effective for ad valorem tax years beginning on and

-40-

after October 1, 1978.  If (1) a county, municipality or other taxing authority adjusts an assessment ratio pursuant to the preceding sentence and (2) the receipts from all ad valorem taxes levied by or with respect to such taxing authority during the ad valorem tax year beginning October 1, 1978, exceed by more than five percent, or are less than 95 percent of, the receipts from such ad valorem taxes for the ad valorem tax year beginning October 1, 1977, then at any time not later than September 30, 1980, for ad valorem tax years beginning on and after October 1, 1979, the taxing authority may, subject to criteria established by act of the legislature, by resolution of the governing body of that taxing authority, adjust any assessment ratio applicable to any class of taxable property.  On and after October 1, 1979, the governing body of any county, municipality or other taxing authority may, subject to criteria established by act of the legislature, at any time increase or decrease the assessment ratio applicable to any class of taxable property; provided, that any proposed adjustment to an assessment ratio to be made pursuant to this sentence, whether an increase or a decrease, shall have been (1) proposed by the governing body of the taxing authority after a public hearing on such proposal, (2) thereafter approved by an act of the legislature, and (3) subsequently approved by a majority vote of the qualified electors residing in the taxing authority who vote on the proposal at a special election called and held in accordance with the law governing special elections.  No decrease in an assessment ratio pursuant to this subsection (c) shall be permitted with respect to either of the ad valorem tax years beginning October 1, 1978, and October 1, 1979, if such county, municipality or other taxing authority has increased any millage rate under subsection (e) of this section with respect to such ad valorem tax year.  The legislature shall enact general laws applicable to all counties, municipalities and other taxing authorities regulating and establishing criteria for the exercise of the powers granted such taxing authorities to adjust assessment ratios as hereinabove provided.  Such assessment ratios as herein authorized may vary among taxing authorities so long as each such assessment ratio is uniform within a taxing authority.  Any decrease in any assessment ratio pursuant to this subsection shall not jeopardize the payment of any bonded indebtedness secured by any tax levied by the taxing authority decreasing the assessment ratio.  Any action authorized by this subsection to be taken by a taxing authority, or the governing body thereof, shall, other than in the case of a municipality, be taken by resolution of the governing body of the county in which such taxing authority is located acting on behalf of such taxing authority.

(d) With respect to ad valorem taxes levied by the state or by any county, municipality or other taxing authority, no class of taxable property shall have an assessment ratio of less than five per centum nor more than 35 per centum.

(e) A county, municipality or other taxing authority may decrease any ad valorem tax rate at any time, provided such decrease shall not jeopardize the payment of any bonded indebtedness secured by such tax.  For the ad valorem tax year beginning October 1, 1978,

when the tax assessor of each county shall complete the assembly of the assessment book for his county for that ad valorem tax year and the computation of ad valorem taxes that will be paid upon such assessment, he shall certify to each authority within his county that levies an ad valorem tax the amount of ad valorem tax that will be produced by every levy in that ad valorem tax year but excluding for this purpose any assessment of new taxable property not previously subject to taxation (except "escaped" property as defined by law) added to the tax rolls of such county for the ad valorem tax year in which such certification is made that was not included on the tax rolls for the next preceding ad valorem tax year.  Any county, municipality or other taxing authority, at any time not later than September 30, 1979, may increase the rate at which any ad valorem tax is levied by or with respect to that taxing authority above the limit otherwise provided in this Constitution, provided that the amount of the above-described certification of the anticipated tax receipts with respect to such tax is less than 120 percent of the actual receipts from such tax for the ad valorem tax year beginning October 1, 1977, such increase to be effective for ad valorem tax years beginning on and after October 1, 1978; provided, that any such millage increase shall not exceed in mills the total of (I) the number of additional mills that is necessary, when added to the millage rate imposed with respect to such tax on each dollar of taxable property situated in the taxing authority for the ad valorem tax year beginning October 1, 1977, to produce revenue that is not less than and that is substantially equal to that received by the taxing authority with respect to such tax during such immediately preceding ad valorem tax year, plus (ii) a number of additional mills equal to 20 percent of the total mills imposed by that taxing authority with respect to such tax on each dollar of taxable property situated in the taxing authority for the ad valorem tax year beginning October 1, 1977.  If, for the ad valorem tax year beginning October 1, 1978, the receipts from any ad valorem tax with respect to which any millage rate has been increased pursuant to the immediately preceding sentence are less than 95 percent of the receipts from such ad valorem tax for the ad valorem tax year beginning October 1, 1977, then at any time not later than September 30, 1980, the taxing authority may increase any millage rate with respect to such ad valorem tax in the manner provided in the immediately preceding sentence, such increase to be effective for ad valorem tax years beginning on and after October 1, 1979.  It is further provided that all millage adjustments shall be made in increments of not less than one tenth (1/10) mill.

(f) On and after October 1, 1979, any county, municipality or other taxing authority may at any time increase the rate at which any ad valorem tax is levied above the limit otherwise provided in this Constitution; provided, that the proposed increase to be made pursuant to this subsection shall have been (1) proposed by the governing body of the taxing authority after a public hearing on such proposal, (2) thereafter approved by an act of the legislature, and (3) subsequently approved by a majority vote of the qualified electors residing in the taxing authority who vote on the proposal at a special election called and held in accordance with the law governing special elections.  Any adjustments or other actions

authorized to be made or taken pursuant to this subsection and subsection (e) hereof shall be made or taken by resolution of the governing body of such taxing authority, or if there is no such governing body and in the case of a taxing authority other than a municipality, by resolution of the governing body of the county in which such taxing authority is located acting on behalf of such taxing authority.  The provisions of subsections (c), (e) and (f) of this section shall not apply to ad valorem taxes levied by the state.

(g) The legislature is authorized to enact legislation to implement the provisions of this section and may provide for exemptions from taxation; provided, that unless otherwise expressly provided, no amendment to this section shall be construed to repeal any statutory exemption existing on the effective date of any such amendment hereto.

(h) Wherever any constitutional provision or statute provides for, limits or measures the power or authority of any county, municipality or other taxing authority to levy taxes, borrow money or incur indebtedness in relation to the assessment of property therein for state taxes or for state and county taxes, such provision shall mean as assessed for county or municipal taxes, as the case may be.

(i) Except as otherwise provided in this Constitution, including any amendment thereto whenever adopted with respect to taxable property located in the city of Mountain Brook, the city of Vestavia Hills, or the city of Huntsville, the amount of ad valorem taxes payable to the state and to all counties, municipalities and other taxing authorities with respect to any item of taxable property described as Class I property shall never exceed 2 percent of the fair and reasonable market value of such taxable property in any one ad valorem tax year, such amount with respect to any item of Class II property shall never exceed 1 ½ percent of the fair and reasonable market value of such taxable property in any one ad valorem tax year, such amount with respect to any item of Class IV property shall never exceed 1 1/4 percent of the fair and reasonable market value fo such taxable property in any one ad valorem tax year, and such amount with respect to any item of Class III property shall never exceed 1 percent of the fair and reasonable market value of such taxable property in any one ad valorem tax year.  Whenever the total amount of ad valorem property taxes otherwise payable by any taxpayer with respect to any item of taxable property shall exceed in any one ad valorem tax year the maximum amount of such taxes permitted by this section, such amount of taxes shall be reduced by subtracting that amount of tax due that is in excess of the amount of tax otherwise permissible under the constitution.  In connection with the taxation of any item of taxable property, the amount of tax to be subtracted with respected to each authority levying and collecting any ad valorem property tax shall be in the same proportion to the total amount of tax to be subtracted that the total number of mills on each dollar of taxable property situated in the taxing authority levied by such taxing authority bears to the total number of mills on each dollar of taxable property situated in the taxing

-43-

authority levied by all taxing authorities with respect to such item of taxable property. Before sending to any taxpayer any notice relating to the collection of ad valorem taxes, the tax collector in each county shall determine whether any portion of the amount of ad valorem property tax otherwise due with respect to any item of taxable property shall be subtracted pursuant to the provisions of this subsection and shall apportion the amount to be subtracted in accordance with the provisions of this subsection.

(j) Notwithstanding any other provision of this section, on and after October 1, 1978, taxable property defined in subsection (a) hereof as Class III property shall, upon application by the owner of such property, be assessed at the ratio of assessed value to the current use value of such taxable property and not the fair and reasonable market value of such property. The legislature may enact laws uniformly applicable to the state and all counties, municipalities and other taxing authorities establishing criteria and procedures for the determination fo the current use value of any eligible taxable property and procedures for qualifying such property for assessment at its current use value.  The legislature may also enact laws uniformly applicable to the state and all counties, municipalities and other taxing authorities providing for the ad valorem taxation of any taxable property ceasing to qualify for current use valuation; provided, however, that any additional tax on taxable property ceasing to qualify for current use valuation shall not apply to more than the three ad valorem tax years immediately preceding such cessation of qualification (including as one such year the year in which cessation of qualification occurs).

(k) The following property shall be exempt from all ad valorem taxation: the real and personal property fo the state, counties and municipalities and property devoted exclusively to religious, educational or charitable purposes, household and kitchen furniture, all farm tractors, all farming implements when used exclusively in connection with agricultural property and all stocks of goods, wares and merchandise.

(*l*) Not withstanding the other provisions of this section, with respect to the costs of reappraisal incident to the state-wide reappraisal of property heretofore authorized by the legislature, each county, municipality or other taxing authority for ad valorem tax years beginning on and after October 1, 1978, may impose and levy an additional ad valorem tax of not more than two mills on all taxable property located in the taxing authority in order to reimburse itself for its payment of such costs of reappraisal or to pay any unpaid costs or its pro rata share of such unpaid costs of reappraisal.  The taxes provided for in this subsection, or any pro rata part thereof, shall terminate at the end of the ad valorem tax year in which sufficient funds are received from the taxes to pay in full the said reappraisal costs and any receipts from such taxes that are received during the ad valorem tax year of their termination that are not needed for the purposes specified herein may be used by the taxing authority levying the tax for general purposes of the taxing authority.  The taxes authorized in this

subsection shall not exceed in the aggregate, with respect to any item of taxable property located in the taxing authority, a total of two mills for all such taxes levied by all taxing authorities in a county and not tow mills for each taxing authority in a county.  If more than one such taxing authority in a county has paid or owes all or a portion of its reappraisal costs, such two mills shall be prorated among such taxing authorities in the county as they may agree, or if they cannot agree, in the percentage which each such taxing authority's costs of reappraisal bear to the total costs of reappraisal of all taxing authorities in the county.  The provisions of this subsection shall apply only to the costs incurred by a taxing authority incident to the state-wide reappraisal of property heretofore authorized by the legislature, the amount of which costs shall be certified by the department of revenue, and shall not be applicable to any future reappraisals that may be required by law.

(m) If any portion of this section should be declared invalid by any court of competent jurisdiction, such invalidity shall not affect the validity of any of the remaining portions of this section, which shall continue effective.