FILED
2011 Mar-10  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| INDIA LYNCH, by her parent, | ) | |
| SHAWN KING LYNCH, *et al.*, | ) | |
| individually and on behalf of | ) | |
| others similarly situated, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. 08-S-450-NE |
| | ) | |
| THE STATE OF ALABAMA; | ) | |
| ROBERT BENTLEY, in his official | ) | |
| capacity as Governor of the State | ) | |
| of Alabama; and JULIE MAGEE, | ) | |
| in her official capacity as | ) | |
| Commissioner of Revenue for the | ) | |
| State of Alabama, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION & ORDERS ON PRETRIAL MOTIONS

### I. Plaintiffs' Motion *in Limine*

Plaintiffs' motion *in limine* addresses six issues that counsel suggest will assist the parties to "expedite their preparation for trial and facilitate the scheduling of witnesses and the conduct of trial."[1]  Defendants agree with five of the proposals, and consent to the entry of the orders listed in the concluding part of this opinion.[2]

---

[1] Doc. no. 231, at 1.

[2] *See* doc. no. 232 (Defendants' Response to Plaintiffs' Motion *in Limine*), at 2 ("Defendants agree with Plaintiffs' position regarding the trial conduct issues outlined in individually numbered paragraphs 2 through 6 and hereby consent to the same.").

The sole accommodation requested in the present motion that is opposed by defendants reads as follows:

> 1.  Plaintiffs request the Court to schedule one or more days for hearing in Birmingham.  The scheduled days need not be consecutive days or days proximate to the currently scheduled trial.  In particular, plaintiffs seek to take the testimony of the Honorable J. Richmond Pearson, who, for health reasons, is not able to travel to Huntsville.  There are additionally a number of fact witnesses whose testimony is expected to be relatively brief, and their residences are much more convenient to Birmingham than to Huntsville.  Plaintiffs believe it would be a particularly efficient use of the Court's time.[3]

Another, unarticulated reason for plaintiffs' request is intertwined with their opposition to defendants' stated intent to present by means of deposition the testimony of fourteen former state officials who were influential during the decade of the 1970s, when critical Amendments to the 1901 state constitution were debated in and proposed by the Alabama Legislature.[4]  Many of those witnesses reside more than 100 miles from the United States Courthouse in Huntsville and, therefore,

---

[3] Doc. no. 231 (Plaintiffs' Motion *in Limine*) ¶ 1, at 1-2.

[4] *See* doc. no. 230 (Plaintiffs' Opposition to Defendants' Use of Depositions) ¶¶ 1-4.  *See also* doc. no. 226 (Defendants' Fact Witness List), at 2-10 (identifying the following persons, among others, as witnesses whose testimony defendants intend to present by means of a deposition:  (1) former Lt. Governor and Governor Albert Brewer, but "only if not available"; (2) Sumter County Commissioner Aubrey Ellis; (3) former State Representative and U.S. Congressman Ben Erdreich, but "only if not available"; (4) former State Senator Joseph Fine; (5) pioneering civil rights attorney Fred Gray; (6) former Alabama Democratic Conference Field Director Jerome Gray; (7) Executive Director of the Alabama Education Association Paul Hubbert; (8) former Associate Justice of the Alabama Supreme Court and state legislator Douglas Johnstone; (9) former Lawrence County Superintendent of Education Dewayne Key; (10) former State Representative John Knight; (11) State Senator Ted Little; (12) former State Representative Richard Manley; (13) state Senator James "Jabbo" Waggoner; and (14) former State Representative Dewey White).

Federal Rule of Civil Procedure 32(a)(4), addressing the topic of "unavailable witnesses," comes into play: *i.e.*, "A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition." Fed. R. Civ. P. 32(a)(4)(B).

In their response to plaintiffs' request "to schedule one or more days for hearing in Birmingham," defendants cite not only Rule 32(a)(4)(B), but also 28 U.S.C. § 81(a)(2), listing the counties included within the Northeastern division of the Northern District of Alabama, and stating that "Court for the Northeastern Division shall be held at Huntsville and Decatur."[5]  Despite that statute's use of the word "shall" — a term that, in law, normally means that an action is mandatory, and not subject to discretion[6] — this provision is not iron-clad.  For decades, judges of the Northern District of Alabama have conducted hearings and trials in Birmingham,

---

[5] The full text of 28 U.S.C. § 81(a)(2) reads as follows:  "The Northeastern Division comprises the counties of Cullman, Jackson, Lawrence, Limestone, Madison, and Morgan.  Court for the Northeastern Division shall be held at Huntsville and Decatur."

[6] *See*, *e.g.*, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."). Judge Edward Carnes of the Eleventh Circuit drew the distinction more colorfully in *United States v. Quirante*, 486 F.3d 1273 (11th Cir. 2007), where he observed that "[t]he word 'shall' does not convey discretion.  It is not a leeway word."  *Id*. at 1275 (holding that the "safety valve" provisions of 18 U.S.C. § 3553(f) and U.S. Sentencing Guidelines § 5C1.2, when applicable, are mandatory).

3

without regard to the divisional courthouses specified in § 81(a), for the convenience of parties, counsel, witnesses, or, indeed, the individual judge.  (It also should be noted that the subsection listing the counties included within the Jasper division, 28 U.S.C. § 81(a)(7), states that "Court for the Jasper Division shall be held at Jasper,"[7] but that is an impossibility, because the judges of this court closed the Jasper courthouse in 2000.)

In any event, by standing upon the language of Section 81(a)(2) and Rule 32(a)(4)(B), defendants overlook a salient fact:  trial will be conducted without a jury, and this judicial officer will be the finder of contested facts and opinions.  *See, e.g.*, *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) ("[I]t is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony.").

Counsel apparently dismiss the possibility that this judge may conceive of questions that he desires to address to particular witnesses:  questions that may not have been asked during deposition or, in the opinion of this court, were not answered adequately.   Counsel also neglect the most important tool for determining the credibility of conflicting witnesses, and for assessing the weight of their testimony:

---

[7] The full text of this statutory sub-section provides:  "The Jasper Division comprises the counties of Fayette, Lamar, Marion, Walker, and Winston.  Court for the Jasper Division shall be held at Jasper."  28 U.S.C. § 81(a)(7).

*that is*, how each witness stands up to cross-examination, "the 'greatest legal engine ever invented for the discovery of truth.'"  *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 John Henry Wigmore, *Evidence* § 1367 (3d ed. 1940)).  The classic treatise on this subject observed that cross-examination is an "indispensable" implement "in all trials of questions of fact" for discerning "which side is honestly mistaken," or whose "opinions . . . are warped by prejudice or blinded by ignorance"; indeed, "no substitute has ever been found for cross-examination as a means of separating truth from falsehood, and of reducing exaggerated statements to their true dimensions." Francis L. Wellman, *The Art of Cross-Examination* 7 (New York:  The Macmillan Co., 1927).

As Judge Posner of the Seventh Circuit Court of Appeals observed, there is a "strong preference of Anglo-American courts for live testimony, especially in a case that turns on the credibility of testimony contradicted by other witnesses . . . ." *Griman v. Makousky*, 76 F.3d 151, 153 (7th Cir. 1996).  That is because the fact-finder's opportunity to observe the *demeanor* of any witness when under cross-examination is a critically-important instrument for assessing the credibility of the witness and the weight of testimony.

> *Some people call it the language of the eye, or the tone of the voice, or the countenance of the witness, or his "manner of testifying", or all combined*, that betrays the wilful perjurer.  It is difficult to say exactly

> what it is, excepting that constant practice seems to enable a trial lawyer to form a fairly accurate judgment on this point.  A skillful cross-examiner seldom takes his eye from an important witness while he is being examined by his adversary.  *Every expression of his face, especially his mouth, even every movement of his hands, his manner of expressing himself, his whole bearing — all help the examiner to arrive at an accurate estimate of his integrity.*

Wellman, *supra* at 9 (emphasis supplied).  In short, as between competing witnesses, the one who shows up in person has an inherent advantage.[8]

Nevertheless, and assuming that, despite such considerations, defendants persist in their opposition to this court conducting some portion of the trial in Birmingham for the convenience of some witnesses (not to mention that of counsel, virtually all of whom reside in or near that city), and insist upon presenting the testimony of former state officials who were influential during the decade of the 1970s by means of deposition, *and*, defendants establish that the witnesses are "unavailable" (*see*, *e.g.*, *Jauch v. Corley*, 830 F.2d 47, 50 (5th Cir. 1987) (holding that the "burden of showing the witness's unavailability . . . rests with the party seeking to introduce the deposition")), then this aspect of plaintiffs' motion *in limine*

---

[8] *See*, *e.g.*, *Maggio v. Fulford*, 462 U.S. 111, 118 (1983) (stating that, "[i]n doubtful cases the exercise of [the factfinder's] power of observation often proves the most accurate method of ascertaining the truth") (quoting *United States v. Oregon Medical Society*, 343 U.S. 326, 339 (1952)).  *Cf. Lansford-Coaldale Joint Water Authority v. Tonolli Corp.*, 4 F.3d 1209, 1218 n.7 (3d Cir. 1993) (holding that the appellate court would "not disturb the district court's decision to credit the reasonable testimony of one of two competing experts," particularly where their differences rest on different interpretations of the same data).

will be denied.[9]

## II.  Defendants' Motion *in Limine*

Defendants move *in limine* for the exclusion of four categories of evidence.[10]

Each is addressed below.

### A.  Preclusion of Opinion Evidence of Purpose, Intent, or Motive

Defendants first request that this court rule, prior to trial, that

> no expert witness may testify by way of opinion that any individual or group of individuals was possessed of discriminatory purpose or intent, racial animus, or racial motive, regardless of the exact phrase used (and including statements that individuals or groups "feared" or "desired" various outcomes), in proposing, supporting, or voting for or against any legislation or constitutional provision.[11]

Principally, defendants contend that they "are aware of no authority for the proposition that any witness . . . may state to a court that it is his or her 'opinion' that a person or group of persons possessed a specific intent, purpose or other state of

---

[9] It must be noted in passing that defendants misunderstood the standard that applies under Rule 32(a)(4)(B) when listing in their Amended Preliminary Pretrial Disclosures the names of those witnesses whose testimony they then intended to present by a deposition, because such witnesses "reside[d] more than 100 miles *driving distance* from the place of trial." Doc. no. 184, at 7 n.1 (bracketed alteration and emphasis supplied).  The 100-mile distance calculation is made, as in other Federal Rules where identical language is used, "as the crow flies."  *United States v. International Business Machines Corp.*, 90 F.R.D. 377, 383 n.9, 385 (S.D. N.Y. 1981) (Edelstein, J.) (holding that distance should be measured "as the crow flies") (citing *SCM Corp. v. Xerox Corp.*, 76 F.R.D. 214, 214-16 (D. Conn. 1977) (Newman, J.)).

[10] *See* doc. no. 233.

[11] *Id*. at 2.  In a footnote, defendants also move to strike "any such opinions or conclusions" in testimony that has been previously preserved.  *Id.* at 3 n.2.  For the same reasons discussed below, this aspect of the subject motion also is denied.

mind."[12]   They contend, therefore, that plaintiffs' historians should not be able to

express an opinion regarding the subjective motivation behind any constitutional

provisions, amendments, or statutes that may be at issue.   Defendants further argue

that, once an academician has testified to the historical facts, he or she possesses no

further "specialized knowledge" with respect to inferences to be drawn from those

facts and, thus, any opinion expressed about which inference is more likely would not

"assist the trier of fact" as required by Federal Rule of Evidence 702.[13]

This is, as plaintiffs state in response, "a novel request — and one completely

at odds with Evidence Rule 704(a),"[14] addressing the expression of opinions on the

---

[12] *Id*. at 4.  This broad assertion is, of course, plainly untrue.  *Cf. United States v. Alexander*, 805 F.2d 1458, 1463 (11th Cir. 1986) ("[A]s the legislative history of Rule 704(b) shows, '[p]sychiatrists, of course, must be permitted to testify fully about the defendant's diagnosis, mental state and motivation (in clinical and commonsense terms) at the time of the alleged act so as to permit the jury or judge to reach the ultimate conclusion about which they and they only are expert.'") (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 231, reprinted in 1984 U.S. Code Cong. & Admin. News 3413).  *See also*, *e.g.*, *United States v. Puerto*, 392 Fed. Appx. 692, 712 (11th Cir. 2010) ("In short, appropriate testimony includes *testimony about mental state and motivation*.") (citations and quotation marks omitted, emphasis supplied).

[13] Doc. no. 233 (Defendants' Motion *in Limine*), at 4.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

[14] Doc. no. 236 (Plaintiffs' Response to Defendants' Motion *in Limine*), at 2.

ultimate issues of a case, and reading as follows:

> (a)  Except as provided in subdivision (b) [*relating to an expert witness testifying with respect to the mental state or condition of a defendant in a criminal case*], testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Fed. R. Evid. 704(a) (bracketed alteration supplied).

Furthermore, and contrary to defendants' contention that they are aware of "no authority" for the proposition that academicians and the authors of respected treatises may state opinions about the motivations of historical actors, the Supreme Court itself *expressly* relied upon the opinions of expert historians regarding the motives of delegates to the 1901 Alabama Constitutional Convention on the precise element of "intent" at issue here in the Court's opinion in *Hunter v. Underwood*, 471 U.S. 222, 228-30 (1985) — a point that defendants surreptitiously concede in a footnote.[15] Indeed, the Supreme Court quoted in uncommonly extensive fashion from a portion of the trial transcript for one such expert's opinion testimony regarding the motivation behind the provision of the 1901 Alabama Constitution challenged in that case. *See*

---

[15] *See* doc. no. 233 (Defendants' Motion *in Limine*), at 4 n.5, where defendants state that they "are aware that opinion evidence was relied on to sustain the findings underlying the decision in *Hunter v. Underwood*, 471 U.S. 222 (1985), but the Court there strongly cautioned against the 'guesswork' involved in attempting to determine 'what motivates' a legislator to enact a statute, and relied on opinion testimony only because 'opinions of historians were offered and received without objection.' *Hunter*, 471 U.S. at 228-29 (emphasis added)."  The qualifying phrase emphasized by defendants, "without objection," is completely understandable in light of Federal Rule of Evidence 704(a), quoted in text.

*id.* at 230-31.

Although understandably no "eyewitnesses" to the 1901 [Alabama Constitutional Convention] proceedings testified, testimony and opinions of historians were offered and received without objection. These showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks. *See* S. Hackney, *Populism to Progressivism in Alabama* 147 (1969); C. Vann Woodward, *Origins of the New South*, *1877-1913*, pp. 321-322 (1971). The delegates to the all-white convention were not secretive about their purpose. John B. Knox, president of the convention, stated in his opening address:

> "And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State." 1 Official Proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901 to September 3rd, 1901, p. 8 (1940).

Indeed, neither the District Court nor appellants seriously dispute the claim that this zeal for white supremacy ran rampant at the convention.

As already noted, the District Court nonetheless found that the crimes provision in § 182 [of the 1901 state constitution] was not enacted out of racial animus, only to have the Court of Appeals set aside this finding. In doing so, the Court of Appeals applied the clearly-erroneous standard of review required by Federal Rule of Civil Procedure 52(a), *see Pullman-Standard v. Swint*, 456 U.S. 273, 287, 102 S. Ct. 1781, 1789, 72 L. Ed. 2d 66 (1982), but was "left with a firm and definite impression of error . . . with respect to the issue of intent." 730 F.2d, at 620. *The evidence of legislative intent available to the courts below consisted of the proceedings of the convention*, *several historical studies*, and *the testimony of two expert historians*. *Having reviewed this evidence*, *we are persuaded that the Court of Appeals was correct in its assessment*. That court's opinion presents a thorough analysis of the evidence and demonstrates conclusively that § 182 was enacted with the intent of disenfranchising blacks. We see little purpose in repeating

that factual analysis here.  At oral argument in this Court appellants' [the state defendants'] counsel essentially conceded this point, stating:  "*I would be very blind and naive* [to] *try to come up and stand before this Court and say* that race was not a factor in the enactment of Section 182; *that race did not play a part in the decisions of those people who were at the constitutional convention of 1901* and I won't do that."  Tr. of Oral Arg. 6.

In their brief to this Court, appellants [the state defendants below] maintain on the basis of their expert's testimony that the real purpose behind § 182 was to disenfranchise poor whites as well as blacks.  The Southern Democrats, in their view, sought in this way to stem the resurgence of Populism which threatened their power:

> "Q. The aim of the 1901 Constitution Convention was to prevent the resurgence of Populism by disenfranchising practically all of the blacks and a large number of whites; is that not correct?
>
> "A. [Dr. J. Mills Thorton:  the state defendants' expert witness] Yes, sir.
>
> "Q. The idea was to prevent blacks from becoming a swing vote and thereby powerful and useful to some group of whites such as Republicans?
>
> "A. Yes, sir, that's correct.
>
> "Q. The phrase that is quite often used in the Convention is to, on the one hand limit the franchise to [the] intelligent and virtuous, and on the other hand to disenfranchise those [referred] to as 'corrupt and ignorant,' or sometimes referred to as the ignorant and vicious?
>
> "A. That's right.
>
> "Q. Was that not interpreted by the people at that

Constitutional Convention to mean that they wanted to disenfranchise practically all of the blacks and disenfranchise those people who were lower class whites?

"A. That's correct."

"Q. Near the end of the Convention, John Knox did make a speech to the Convention in which he summarized the work of the Convention, and in that speech is it not correct that he said that the provisions of the Suffrage Article would have a disproportionate impact on blacks, but he disputed that that would be [a] violation of the Fifteenth Amendment?

"A. Yes, sir, that is true.  Repeatedly through the debates, the delegates *say* that they are interested in disfranchising blacks and not interested in disfranchising whites.  And in fact, *they go out of their way to make that point*. . . .  But the point that I am trying to make is that *this is really speaking to the galleries*, *that it is attempting to say to the white electorate that must ratify this constitution what it is necessary for that white electorate to be convinced of in order to get them to vote for it*, and not merely echoing what a great many delegates say. . . .  [I]n general, the delegates aggressively *say* that they are not interested in disfranchising any whites.  I think falsely*, but that's what they *say*.

"Q. So they were simply trying to overplay the extent to which they wanted to disenfranchise blacks, but that they did desire to disenfranchise practically all of the blacks?

"A. Oh, absolutely, certainly." Cross-examination of Dr. J. Mills Thornton, 4 Record 73-74, 80-81.

Even were we to accept this explanation as correct, it hardly saves § 182

from invalidity.  *The explanation concedes both that discrimination against blacks, as well as against poor whites, was a motivating factor for the provision and that § 182 certainly would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation.*

Citing *Palmer v. Thompson*, 403 U.S., at 224, 91 S. Ct., at 1944, and *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 472, n.7, 101 S. Ct. 1200, 1205, n.7, 67 L. Ed. 2d 437 (1981) (plurality opinion), appellants make the further argument that the existence of a permissible motive for § 182, namely, the disenfranchisement of poor whites, trumps any proof of a parallel impermissible motive.  Whether or not intentional disenfranchisement of poor whites would qualify as a "permissible motive" within the meaning of *Palmer* and *Michael M.*, it is clear that where both impermissible racial motivation and racially discriminatory impact are demonstrated, *Arlington Heights*[ 16 ] and *Mt. Healthy*[ 17 ] supply the proper analysis.  *Under the view that the Court of Appeals could properly take of the evidence*, an additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against all blacks, *and it is beyond peradventure that the latter was a "but-for" motivation for the enactment of § 182.*

*Hunter*, 471 U.S. at 228-32 (bracketed alterations and emphasis added) (Rehnquist, J., unanimous opinion).

While defendants are correct when observing that the *Hunter* Court advised caution when attempting to discern the motives of legislative assemblies[18] — *i.e.*, "[p]roving the motivation behind official action is often a problematic undertaking,"

---

[16] *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

[17] *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977).

[18] See the statements from defendants' motion *in limine* (doc. no. 233, at 4 n.5) quoted in note 15, *supra*.

*Hunter*, 471 U.S. at 228 — it was *precisely because the district court had* the

opinions of historians regarding such motivation, as demonstrated by the testimony

quoted above, that "the[se] sort of difficulties . . . [*did*] *not obtain* in th[at] case." *Id.*

(bracketed alterations and emphasis supplied).

The Supreme Court's unanimous opinion in *Hunter* affirmed a decision of the

Eleventh Circuit which "conclude[d] that the district court's finding of lack of

discriminatory intent in the adoption of section 182 [was] clearly erroneous," largely

because the district judge had ignored extensive expert testimony about the racial

animus that motivated that provision's adoption. *Underwood v. Hunter*, 730 F.2d

614, 617, 620 (11th Cir. 1984) (Vance, J.) (alteration added), *aff'd* 471 U.S. 222

(1985). Indeed, the Eleventh Circuit *relied upon* the expert historical testimony heard

by the district judge when holding that "race was a substantial or motivating factor":

> Applying the *Arlington Heights* test to the case at hand, the first
> step is to inquire whether *intent* to deny the franchise *on the basis of*
> *race was a substantial or motivating factor* in the enactment of section
> 182. In conducting this inquiry *we are mindful of the testimony by*
> *expert witnesses* for both sides that the *purpose* of section 182 must be
> considered in light of the overall purpose of the 1901 constitutional
> convention and the suffrage article, taken as a whole.

*Id.* at 618 (emphasis added). Later in the same opinion, the Eleventh Circuit observed

that:

> In reviewing this record we are left with a firm and definite

impression of error by the court below with respect to the issue of intent. Plaintiffs have more than shouldered their burden of showing that discriminatory intent was a motivating factor in the adoption of section 182; *they have presented evidence from which the district court was required to find as a matter of law that discriminatory intent motivated section 182.*

*Id*. at 620 (emphasis supplied).[19]

Defendants are correct when observing that the state defendants in the *Hunter* case failed to lodge contemporaneous objections to the admissibility of such opinion testimony in the district court.[20]   Even so, *both* the Eleventh Circuit *and*, subsequently, a unanimous Supreme Court relied heavily upon the opinions of those historical experts when determining that the district judge's factual findings following *a bench trial* were "clearly erroneous."   The expert historians who testified in *Hunter* stated opinions regarding the same propositions to which defendants here preliminarily object:   *i.e.*, that the official bodies debating and proposing provisions of (and, subsequently, amendments to) the 1901 Alabama Constitution possessed an

---

[19] Two other passages from the Eleventh Circuit's opinion in *Underwood*, in addition to those quoted in text, are of particular note as diametrically contrary to defendants' contention.  First, the court noted that:  "In the judgment of modern *scholars*, the organizers of the 1901 Alabama Constitution *sought to disenfranchise* poor dissident whites as well as blacks." *Id.* at 618 (emphasis supplied).  Second, the court noted that, "[a]ccording to *experts for both sides*, the evident *racial animus* of section 182 was used to *induce delegates* representing poor whites *to vote* for other provisions in the suffrage article . . . ."  *Id.* at 620 (emphasis supplied).  In these passages, the Eleventh Circuit relies expressly (and castigates the court below for failing to rely) upon experts in support of its holding that the "district court was required to find as a matter of law that discriminatory intent motivated section 182."  *Id.*; *see also id.* at 617 ("Our review of the record reveals that the district court erred both in its factual findings and in its legal analysis.").

[20] *See* doc. no. 233 (Defendants' Motion *in Limine*), at 4 n.5.

intent to discriminate on the basis of race.  It would be totally inexplicable for both of the higher courts to have overturned a district court's factual findings on those issues under an extremely deferential standard *for failing to rely upon* (according to defendants) *inadmissible* expert opinion testimony *without once making any reference to* (as defendants here argue) *the allegedly* "inadmissible" *testimony simply because a contemporaneous objection to that evidence was not lodged by the state defendants*.

To put a finer point on it, the notion that a trial judge — who, by long-standing rule, is "presumed to *ignore* [inadmissible evidence] when making decisions" in a bench trial[21] — would be *reversed* because he *failed to rely upon* (as the present defense counsel would have it) *inadmissible evidence* merely upon the basis that no

---

[21] *Harris v. Rivera*, 454 U.S. 339, 346 (1981) (*per curiam*) (emphasis and bracketed alteration supplied).  *See also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1077 (1991) ("[T]rial judges often have access to inadmissible and highly prejudicial information and are presumed to be able to discount or disregard it."); *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1216 (11th Cir. 2003) (same); *Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc.*, 104 F.3d 1050, 1057 (8th Cir. 1997) ("[I]n bench trials, the admission of incompetent or irrelevant evidence is not a ground for reversal 'when there is sufficient competent evidence to support the judgment and it does not appear that the court was induced by . . . [that] evidence to make essential findings that it otherwise would not have made.'") (quoting *O'Connor v. Peru State College*, 781 F.2d 632, 639 (8th Cir. 1986)) (alteration in original); *United States v. Joseph*, 781 F.2d 549, 552-53 (6th Cir. 1986) (stating that "[i]t is well settled that in a non-jury trial the introduction of incompetent evidence does not require a reversal in the absence of an affirmative showing of prejudice"); *Fishing Fleet Inc. v. Trident Insurance Co.*, 598 F.2d 925 (5th Cir. 1979) ("In a bench trial it is presumed that a district judge's findings are based on admissible evidence."); *Havelock v. United States*, 427 F.2d 987, 991 (10th Cir. 1970) ("[W]hen a case is tried by a court without a jury, it is presumed, absent an affirmative showing to the contrary, that only material and competent evidence is considered.").

contemporaneous objection was lodged, is flatly preposterous.

The opinions of the Eleventh Circuit and Supreme Court in *Hunter extensively utilized* the expert historical evidence as to motivation *in their respective analyses* of the intent element of an equal protection claim.  *See*, *e.g.*, *Hunter*, 471 U.S. at 228-33 (citing extensively from expert historian testimony, and concluding that the enactment of the challenged provision to the Alabama Constitution "was motivated by a desire to discriminate against blacks on account of race").

Both of the *Hunter* opinions are binding precedent upon this court, and both militate inexorably in favor of rejecting this aspect of defendants' motion *in limine*. This court is unwilling to assume that the opinion of an Eleventh Circuit panel of three, greatly-respected judges,[22] and, a Supreme Court opinion authored for a unanimous Court by then Justice (later Chief Justice) Rehnquist, both consciously relied upon (as defense counsel argue) "inadmissible evidence" when overturning the district court's decision, and that all of those jurists did so without making *even the barest reference* to the purported inadmissibility of such evidence, simply because the state defendants had failed to timely lodge the objection and marshal the argument defendants now make.

---

[22] The *Hunter* opinion was authored for the Eleventh Circuit by Judge Robert S. Vance and a panel that included Gerald Bard Tjoflat and Thomas A. Clark.  *See Hunter v. Underwood*, 730 F.2d 614, 615 (11th Cir. 1984), *aff'd* 471 U.S. 222 (1985).

This conclusion is further confirmed by several other cases in which the Eleventh Circuit has either expressly approved of, or itself relied upon, the opinion testimony of expert historians about the racial animus motivating certain legislative or constitutional enactments. *See*, *e.g.*, *Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1219-20 & n.10, 1223, 1225 (2005) (*en banc*) (accepting, without qualification as to admissibility, plaintiffs' expert testimony that a contested provision of the Florida constitution was motivated by racial animus, and referring several times, with apparent approval, to expert opinion of racial animus, or the lack thereof, as probative evidence on the issue of the existence or non-existence of discriminatory intent); *id.* at 1245 n.1 (Barkett, J., dissenting) (noting with approval the district court's reliance upon expert testimony regarding racially discriminatory intent); *United States v. Dallas County Commission*, 739 F.2d 1529, 1541 (11th Cir. 1984) ("To aid the district court in its consideration on remand, we note that, in analyzing the intent issue, it stated: '[T]he plaintiff's witness *testified to the opinion that race was the sole or predominant motivation*.'") (quoting the opinion below) (emphasis supplied).[23]

_____

[23] Other Circuits agree. *See*, *e.g.*, *Vander Linden v. Hodges*, 193 F.3d 268, 270 (4th Cir. 1999) (relying, in part, upon expert historian's testimony regarding the existence of a discriminatory intent behind the enactment of a South Carolina statutory scheme); *Price v. Austin Independent School District*, 945 F.2d 1307, 1317-18 (5th Cir. 1991) (rejecting contention that admission of opinion regarding the existence of discriminatory intent was error where district court had not "shirked the burden of determining, based on the evidence presented, whether the plan had been

Further, the very decision defendants cite for the purpose of defining "the permissible . . . use of testimony from an expert historian in this context"[24] itself expressly stated that the expert historian "testified in this case . . . that the change *had been made to dilute the growing strength of the black vote*."  *N.A.A.C.P. ex rel. Campbell v. Gadsden County School Board*, 691 F.2d 978, 982 (11th Cir. 1982) (emphasis supplied).  This court sees no daylight between the testimony that a legislative enactment was "made to" achieve an impermissible result relied upon there, and testimony that a constitutional provision, amendment, or legislative enactment was motivated by an intent or purpose to achieve a constitutionally-impermissible result, the kind of expert testimony to which defendants preemptively object here.  At the very least, defendants have made no convincing argument at all regarding such a subtle distinction.

Finally, defendants are simply wrong when asserting that academic historians and the authors of respected historical treatises may testify only to "facts," and that

---

adopted with discriminatory intent").

[24] Doc. no. 233 (Defendants' Motion *in Limine*), at 4 n.4 ("For an example of the permissible, albeit insufficient, use of testimony from an expert historian in this context, *see N.A.A.C.P. ex rel. Campbell v. Gadsden County Sch. Bd.*, 691 F.2d 978, 981-982 (11th Cir. 1982) ('A review of the record discloses that the plaintiffs in this action did not rely solely on the Zimmer factors to establish by circumstantial evidence the presence of discriminatory motivation in the enactment or operation of the voting system.  *Direct* evidence of discriminatory intent in the enactment of the election scheme was presented by plaintiff's expert witness, Dr. Shofner.  The district court, however, found that his testimony was '"simply not sufficient" to carry plaintiff's burden on the intent issue') (emphasis added).").

such witnesses neither possess a helpful expertise, nor may they state opinions, regarding the historical conclusions that might be derived from those facts.  The principal entry in the *Oxford English Dictionary* for the word "historian" defines the term as meaning:  "A writer or author of a history; esp. one who produces a work of history in the higher sense, *as distinguished from the simple annalist or chronicler of events*, *or from the mere compiler of a historical narrative*."  5 *Oxford English Dictionary* 303 (1961) (emphasis supplied).  In this respect, historians are not unlike the statistical experts who will testify in this case.  Just as those experts examine scatterplots of data to determine a curve-of-best-fit that implies some fact that is difficult to directly observe, so too historians examine disparate, isolated, and often conflicting historical incidents in an attempt to develop a narrative-of-best-fit.  Doing so necessarily entails drawing conclusions, based upon the methodology of the historian's craft, about the motivations behind historical changes.

Certainly, this court will not uncritically rely upon opinion testimony regarding the existence or non-existence of impermissible motivations without any examination whatsoever into the historical, factual support the witnesses assert for their opinions.[25]

---

[25] Defendants' citation to Judge Thompson's uncommonly well-written opinion, adopted and incorporated as an appendix to *Hall v. Alabama Association of School Boards*, 326 F.3d 1157 (11th Cir. 2003) (*per curiam*), has no effect whatsoever upon the court's determination.  Though Judge Thompson's language lucidly explains why drawing lines between overbroad generalizations from bird's-eye-view synopses of history to specific, local, present-day contexts may involve dangerous leaps of faith, it says *nothing whatsoever* about the *admissibility* of *expert historian* opinions.  *See*

Nor, however, need the court police the phrasing of expert historians' opinions to ensure that it only hears the historical "facts" relied upon by the witnesses, but not the historical conclusions those experts have drawn from the facts they present. It is worth noting again, and especially in this context, that this is a bench trial; and, accordingly, the court *should* admit a broader range of expert testimony than would necessarily be the case in a *jury* trial. *See*, *e.g.*, *United States v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005) (stating that the rules regarding the admissibility of expert testimony "are even more relaxed in a bench trial situation, where the judge is serving as factfinder"); *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999) (reiterating that the law governing the admissibility of expert opinions is based upon concern with "dumping a barrage of questionable scientific evidence *on a jury*, who would likely be even *less equipped than the judge* to make reliability and relevance determinations and *more likely than the judge* to be awestruck by the expert's mystique") (emphasis supplied); *Goodman v. Highlands Insurance Co.*, 607 F.2d 665, 668 (5th Cir. 1979)[26] (restating the longstanding principle that, especially in the context of expert testimony, "a trial judge sitting without a jury is entitled to even greater latitude concerning the admission or

---

*id.* at 1170-71.

[26] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

exclusion of evidence").[27]

Excluding all opinions regarding the existence or non-existence of a discriminatory intent motivating the actions of historical actors would be not only an utterly useless exercise in meaningless technical parsing, but would also hamstring the court's ability to hear (and comprehend) in their entirety the historical narratives propounded by the historian-expert witnesses called by *both* parties.

Accordingly, defendants' motion to preclude experts from offering their opinions regarding the purpose, intent, or motives of historical actors or groups of actors when proposing, supporting, or voting for or against any legislation or constitutional provision is due to be denied.

**B**.    **"The Case That Must Not Be Named"**

Defendants next request the court to prevent plaintiffs from offering any factual findings made by Judge Harold Murphy in *Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004), *aff'd* 476 F.3d 1219 (11th Cir.), *cert. denied* 511 U.S. 1146 (2007),

---

[27] *See also*, *e.g.*, *Whitehouse Hotel Ltd. Partnership v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010) ("[O]ur court [has] noted that the importance of the trial court's gatekeeper role is significantly diminished in bench trials . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence."); *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("Thus, where the factfinder and the gatekeeper are the same, the court *does not err in admitting the evidence* subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.") (emphasis supplied); *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.").

as "evidence" in the present controversy.  The court agrees with defendants that those

findings are not admissible as "evidence."  *See United States v. Jones,* 29 F.3d 1549,

1554 (11th Cir. 1994) ("The district court erred in granting the Government's motion

for summary judgment because the findings of fact and references to testimony within

Judge Alaimo's order upon which it relied were inadmissible evidence and therefore,

should not have been considered.").  Accordingly, this aspect of defendants' motion

*in limine* is due to be granted.

## C.   Preclusion of Opinion Testimony Not Contained in an Expert Witness's Original Report or Filed Out of Time

Defendants next request the court to rule that none of plaintiffs' expert

witnesses may testify to any matter not contained in a timely submitted expert report.

Defendants previously asserted this same argument in a motion to strike certain

exhibits submitted by plaintiffs in support of their response to defendants' motion for

summary judgment.[28]   That motion was denied.[29]   The court is not inclined to

reconsider its prior ruling on the matter.  Therefore, this aspect of defendants' motion

*in limine* is due to be denied.  Defendants' alternative motion to strike portions of Dr.

Norrell's testimony also is due to be denied.[30]

---

[28] *See* doc. no. 170.

[29] *See* doc. no. 193.

[30] These subjects are addressed again in Part IV(A)(3) of this opinion, *infra*, discussing defendants' "renewed objections."

23

**D**.     **Exclusion of Plaintiffs' Proposed Experts Under *Daubert***

Finally, defendants "renew and reassert the objections to admission of Plaintiffs' proposed testimony from their expert witnesses contained in Defendants' *Daubert* Motion to Exclude The Testimony Of Drs. Robert J. Norrell, Wayne Flynt, Jeff Frederick and Henry M. McKiven, Jr., filed on March 16, 2010 (Doc. 163)."[31] Defendants' *Daubert* motion was denied in an order entered on July 29, 2010.[32] Defendants have offered no new argument in support of their motion, and the court sees no reason to reconsider its earlier decision.   Accordingly, this aspect of defendants' motion *in limine* is due to be denied.  Defendants' alternative motion to strike portions of Dr. Norrell's testimony also is due to be denied.

Before leaving the topic of opinion testimony offered by academic historians and other expert witnesses, however, this court believes that it may be helpful to elaborate a bit upon some of the rationale underlying the present and prior rulings upon defendants' objections and motions to strike such testimony.

**1**.     **"Hearsay" in the mouths of expert witnesses**

To begin, experts may rely upon hearsay in forming their conclusions.  For historians, that means that they may rely upon primary source materials, the works of

---

[31] Doc. no. 233 (Defendants' Motion *in Limine*), at 9.

[32] *See* doc. no. 193.

other historians, articles in scholarly publications, newspapers, interviews, and many

other sources when drawing their conclusions, even if those materials would be

substantively inadmissible if offered independently, because such things are

customarily and reasonably relied upon by academicians in the field of history when

forming opinions or drawing inferences.  Further, in the context of a bench trial,

experts may testify to the facts and data upon which they rely, even if those facts or

data would be otherwise admissible.  Accordingly, this court will not endorse

"hearsay" objections to expert testimony about such facts or data because, as more

fully explained below, such testimony is permissible evidence by which to evaluate

the soundness, reliability, and credibility of opinions drawn from such facts or data

by the witness.

Interpretation of a Rule of Evidence, as with any other governing text, must

begin with the plain text of the Rule itself.[33]  Federal Rule of Evidence 703 states:

> The facts or data in the particular case upon which an expert bases
> an opinion or inference may be those perceived by or made known to the
> expert at or before the hearing.  If of a type reasonably relied upon by
> experts in the particular field in forming opinions or inferences upon the
> subject, *the facts or data need not be admissible in evidence* in order for
> the opinion or inference to be admitted.  Facts or data that are *otherwise*

---

[33] *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 178 (1987); *see also id.* at 194-96
(Blackmun, J., dissenting) (contesting the majority's "plain meaning" approach); *Williamson v.
United States*, 512 U.S. 594, 614-615 (1994) (Kennedy J., concurring);  *Daubert v. Merrell Dow
Pharmaceuticals, Inc.*, 509 U.S. 579, 587 (1993) ("We interpret the legislatively enacted Federal
Rules of Evidence as we would any statute.").

> *inadmissible* shall not be disclosed *to the jury* by the proponent of the
> opinion or inference unless the court determines that their probative
> value in *assisting the jury to evaluate* the expert's opinion substantially
> outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis supplied).   Two important points regarding expert

testimony flow from this language.

### a.    An expert witness may rely upon hearsay

Long before the enactment of Rule 703, the former Fifth Circuit held that an

expert can rely upon hearsay in forming his or her opinion.  *See United States v.*

*Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971).  The Eleventh Circuit reiterated that

binding precedent in *United States v. Brown*, 299 F.3d 1252 (11th Cir. 2002), saying

that,

> even before the enactment of Federal Rule of Evidence 703, "[e]xpert
> witness testimony [was] a widely-recognized exception to the rule
> against hearsay testimony. It has long been the rule of evidence in the
> federal courts that an expert witness can express an opinion . . . even
> though his opinion is based in part *or solely* upon hearsay sources."

*Id*. at 1258 (emphasis supplied) (quoting *Williams*, *supra*).  "[H]earsay testimony by

experts is permitted if it is based upon the type of evidence reasonably relied upon by

experts in the particular field."  *United States v. Floyd*, 281 F.3d 1346, 1349 (11th

Cir. 2002) (citing Fed. R. Evid. 703; *United States v. Cox*, 696 F.2d 1294, 1297 (11th

Cir. 1983)).

The only limiting principle is that the hearsay must be of a type "reasonably relied upon" by experts in the field. *See* Fed. R. Evid. 703. The determination of what is "reasonably relied upon" is reviewed only for abuse of discretion. *United States v. Garcia*, 447 F.3d 1327, 1336-37 (11th Cir. 2006). The burden to prove that such evidence underlying an expert opinion is of a type "reasonably relied upon" by the relevant class of experts lies with the party offering the expert. *See United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987) (suggesting that an expert could "refer to hearsay evidence," provided he demonstrated that experts in the relevant field "customarily rely upon such statements"). With respect to historians, it cannot be rationally contended that they do not rely upon primary sources, the works of their historian predecessors, scholarly journals, newspapers, interviews, and and a wide variety of other sources when forming opinions or inferences upon the subjects about which they are called to testify.

### b. Experts may disclose any hearsay facts or data relied upon

Hearsay facts and data reasonably relied upon by an expert in forming an opinion *need not* be excluded in a bench trial. Therefore, objections to their presentation when the judge is sitting as factfinder should not be countenanced.

The third sentence of Rule 703 states that: "Facts or data that are otherwise inadmissible *shall not be disclosed to the jury* by the proponent of the opinion or

inference unless the court determines that their probative value in *assisting the jury to evaluate* the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703 (3d sent.) (emphasis supplied).  This language was added to the rule in 2000, and there are few reported cases even vaguely addressing its meaning in the context of a bench trial.[34]  Significantly, however, the sentence uses the word "jury" in a way not employed anywhere else within the Federal Rules of Evidence.[35]

---

[34] Indeed, the only example found is *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 331 F. Supp. 2d 134 (E.D. N.Y. 2004):

> While the probative effect of the Jacoby report and data is almost nil, its potentially prejudicial effect has even less weight.  *Cf.* Fed. R. Evid. 703 ("Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.").  It will *have no prejudicial effect in this bench trial*.  *Cf.* Fed. R. Evid. 703 advisory committee's note to 2000 amendments (stressing that guarding against the prejudicial effect of otherwise inadmissible data introduced to assist the trier of fact in evaluating an expert's opinion presents a danger of prejudicing the jury).

*Id.* at 236 (emphasis supplied).

[35] The only arguable exception is in Rule 403, which discusses exclusion of evidence that would be "misleading to a jury."  The existence of this arguable exception, however, only bolsters the court's conclusion that the exclusionary principle in the final sentence of 703 is inapplicable in a bench trial.  As will be discussed more fully below, the Eleventh Circuit has held the "unfair prejudice" prong of 403 inapplicable in bench trials because "Rule 403 assumes a trial judge is able to discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity.  Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision." *Woods v. United States*, 200 Fed. Appx. 848, 853 (11th Cir. 2006) (citing *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.3d 517, 519 (5th Cir. Unit A Jan. 1981)).  Rule 703 is significantly *more explicit* in limiting the "probative value" *versus* "prejudice" balancing test it prescribes to jury trials than Rule 403.  Thus, reading Rule 703 in context with Rule 403 and the caselaw interpreting it strongly suggests that the balancing test in the final sentence of Rule 703, just like the balancing test in Rule 403, has no application in a bench trial.

The commentary to the amendment adding this sentence uniformly uses the word "jury."[36]  The rule itself was enacted to clarify the application of the pre-existing rule, and for the purpose of abrogating decisions indicating that otherwise inadmissible evidence was always admissible in all circumstances when offered by an expert as a basis for her opinion.[37]  The necessary negative implication, then, is that those facts and data *are always admissible* for the purposes of evaluating the expert's opinions and conclusions *in a bench trial*.

Furthermore, both the preceding Rule, number 702, and succeeding Rule, number 704, discuss other limitations on expert testimony using the words "*trier of fact*," as opposed to the word "*jury*" employed in the text of Rule 703.[38]

_____

[36] *See* Adv. Comm. Notes to Fed. R. Evid. 703 (2000 amends.) ("When information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, a trial court applying this Rule must consider the information's probative value in assisting *the jury* to weigh the expert's opinion on the one hand, and the risk of prejudice resulting from the *jury's potential misuse* of the information for substantive purposes on the other.") (emphasis supplied).

[37] *See id.* ("Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible *simply because the opinion or inference is* admissible.") (emphasis supplied); *see also generally* Paul Rice, *Inadmissible Evidence as a Basis for Expert Testimony:  A Response to Professor Carlson*, 40 Vand. L. Rev. 583 (1987) (arguing the previous version of the Rule made all otherwise inadmissible evidence admissible, provided it was reasonably relied upon by an expert).

[38] Rule 702 provides that:

If scientific, technical, or other specialized knowledge will assist *the trier of fact* to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the

Significantly, Rule 702 was amended contemporaneously with Rule 703.  It also is notable that, in other provisions of the Federal Rules of Evidence using the same or similar "probative value" *versus* "prejudice" language, no reference is made to a "jury."[39]  Given the extraordinarily painstaking process of rulemaking, subsequent notice and comment, Committee Approval, Judicial Conference Approval, Supreme

_____

case.

Fed. R. Evid. 702 (emphasis supplied).  Rule 704 reads as follows:

> (a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by *the trier of fact*.

> (b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.  Such ultimate issues are matters for *the trier of fact* alone.

Fed. R. Evid. 704 (emphasis supplied).

[39] *Compare* Fed. R. Evid. 703 ("Facts or data that are otherwise inadmissible shall not be *disclosed to the jury* by the proponent of the opinion or inference unless the court determines that their *probative value in assisting the jury* to evaluate the expert's opinion substantially *outweighs their prejudicial effect*.") (emphasis supplied), *with* Fed. R. Evid. 412(b)(2) ("In a civil case, evidence offered to prove the sexual behavior or sexual predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party."), *and* Fed. R. Evid. 609(b) ("Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.").  Despite using the same or substantially similar language, none of these Rules contain any textual reference to a "jury."  The obvious contextual inference to be drawn is that the drafters of the Rules (as well as the judicial and legislative bodies that approved their text) intended to strongly emphasize that the exclusionary balancing test in Rule 703's final sentence was limited to jury trials.

Court Approval, and Congressional Review, this emphasis on the limitation to jury trials of the exclusionary balancing test prescribed in the final sentence of Rule 703 can hardly have been a mere oversight.  *See* 28 U.S.C. §§ 2072-2075.

The Advisory Committee Notes from the 2000 Amendments even more forcefully imply that otherwise inadmissible facts or data underpinning expert opinions are admissible in a bench trial, even if they are not in a jury trial:  "The amendment governs *only the disclosure to a jury* of information that is reasonably relied on by an expert, when that information is not admissible for substantive purposes."  *Id.*  Those notes use the word "jury" a dozen times, reaffirming the limitation to jury trials implied in the final sentence added in the 2000 Amendment. Thus, read both by its plain meaning, and together with the other Rules and the Advisory Committee notes, it is clear to this court that *the third sentence of Rule 703 has no application in a bench trial*.

This conclusion is further bolstered by decisions holding that the "probative value" *versus* "unfair prejudice" balancing test in Rule 403 has no application in a bench trial.  Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403. The Eleventh Circuit, however, has held that "'[t]he exclusion of . . . evidence [where the judge sits without a jury] under Rule 403's weighing of probative value against

prejudice [is] improper. *This portion of Rule 403 has no logical application to bench trials.*'" *Woods v. United States*, 200 Fed. Appx. 848, 853 (11th Cir. 2006) (quoting *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981)) (bracketed alteration and emphasis supplied).[40]

> Rule 403 assumes [that] a trial judge is able to discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision.

*Gulf States Utilities Co.*, 635 F.2d at 519.

If a judge in a bench trial is, as this binding precedent states, *presumed* to be able to exclude improper inferences flowing from prejudicial evidence under Rule 403 and take probative evidence for whatever value it might have, and exclusion of such evidence would be *error*, *see Woods*, 200 Fed. Appx. at 853, then certainly the same concept would obtain under Rule 703.  Hence, text, context, *and* binding precedent strongly indicate that hearsay facts reasonably relied upon by experts in forming their conclusions and opinions *should not* be excluded, and that to do so, at least by implication, would be error.

---

[40] *See Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir.1994) ("[I]n the context of a bench trial, evidence should not be excluded under 403 on the ground that it is unfairly prejudicial."); *United States v. Hall*, 202 F.3d 270 (6th Cir. 2000) (*per curiam*) ("In bench trials, the application of the unfair prejudice portion of Rule 403 has been seen as an unnecessary and 'useless procedure.'") (citation omitted).

Finally, and also corroborating the obvious implication of the plain language of Rule 703, it is clear that a judge in a bench trial may admit, and as factfinder hear, significantly more expert testimony than would be proper in a jury trial.

> Th[e] barriers are . . . more relaxed in a bench trial situation, where the judge is serving as factfinder and we are not concerned about "dumping a barrage of questionable scientific evidence on a jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999); *see also id.* (recognizing that the jury "would likely be even less equipped than the judge to make reliability and relevance determinations and more likely than the judge to be awestruck by the expert's mystique"). *There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.*

*United States v. Brown*, 415 F.3d 1257, 1268-1269 (11th Cir. 2005) (emphasis supplied).  As Judge Posner of the Seventh Circuit Court of Appeals has observed: "*Daubert* requires a binary choice — admit or exclude — and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003) (sitting by designation), *aff'd on other grounds*, 403 F.3d 1331 (Fed. Cir. 2005).[41]  Again, the obvious implication is

---

[41] *E.g.*, *Whitehouse Hotel Ltd. Partnership v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010) ("[O]ur court [has] noted that the importance of the trial court's gatekeeper role is significantly diminished in bench trials . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence."); *Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) ("[W]hile *Daubert's* standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial."); *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability

that, because *more* expert testimony should be admitted in a bench trial, there will be *more* need to hear the underlying facts and data the experts have relied upon — even though they might be inadmissible if offered independently — in order to evaluate the weight to be given to the witnesses' opinions and conclusions.

Hence, every indication is that a witness who testifies as an expert in a bench trial should be allowed to state the facts or data underlying her opinions and conclusions, even if those facts or data are rank hearsay. These underlying facts or data, if otherwise inadmissible, may only be used to evaluate the soundness of the expert's conclusion.

The court hopes this discussion makes clear to counsel that facts and data that otherwise might be objectionable on the basis of the rule against hearsay evidence will be admitted, but only for the purpose of enabling this court to evaluate the conclusions and opinions of the experts who rely upon those facts and data.

### III. Plaintiffs' Objections to Defendants' Exhibit List

Plaintiffs have lodged upon multiple grounds objections to several of the trial exhibits identified by defendants.[42]  However, plaintiffs have only identified the

---

established by Rule 702."); *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.").

[42] *See* doc. no. 235, at 1-2.

exhibits by their numbers, and even cross-referencing them with defendants' voluminous spreadsheet[43] fails to provide sufficient information upon which this court could preliminarily determine whether plaintiffs' objections have merit. Accordingly, the court will defer ruling upon plaintiffs' objections until such time as it has adequate information upon which to do so.

## IV.  Defendants' Objections to Plaintiffs' Exhibit List

Defendants lodged objections to approximately 226 of the documents and things identified by plaintiffs in their list of trial exhibits.[44]   Their objections are lodged to exhibits with numbers ranging from 4 through 698.  On August 3, 2010, however, this court ruled from the bench, during the course of a hearing to preserve the trial testimony of Dr. Robert J. Norrell, that defendants had waived all objections to the admissibility of the 695 exhibits then identified by plaintiffs in the list of trial exhibits filed on May 3, 2010.[45]   That oral ruling was restated in a written order entered on August 16, 2010,[46] in response to defendants' motion for reconsideration.[47]

---

[43] *See* doc. no. 222, Ex. A, at 1-19.

[44] *See* doc. no. 238 (Defendants' Objections to Plaintiffs' Exhibit List filed on Feb. 18, 2011 as doc. no. 221), Exhibit "A" (listing exhibits objected to and the bases therefor).

[45] *See* doc. no. 172 (Plaintiffs' Exhibit List filed May 3, 2010); Transcript of August 3, 2010 hearing, at 11-16 (noting that defendants waived objections to the admissibility of materials identified in plaintiffs' list of pre-trial exhibits).

[46] *See* doc. no. 198.

[47] *See* doc. no. 195.

35

The rationale for the court's ruling was explicated fully in that order, and will not be reiterated here.

Defendants concede in their present objections that the first 695 exhibits identified by plaintiffs in the list filed on February 18, 2011[48] are, with the exception of minor, inconsequential changes, "the same exhibits that were included on Plaintiffs' preliminary exhibit list" filed on May 3, 2011,[49] and addressed in the rulings discussed in the preceding paragraph.[50]   The only challenges lodged to exhibits outside that range are those numerically identified as 697 and 698, which are simply described by plaintiffs as "What-if analysis of 2008 Abstract" and "What-ifs 2008 Abstract," respectively.   Defendants contend those exhibits are objectionable on the basis of a lack of authenticity and because they are hearsay.[51]   The contents of

---

[48] *See* doc. no. 221.

[49] *See* doc. no. 172.

[50] Doc. no. 238 (Defendants' Objections to Plaintiffs' Exhibit Lists, filed Mar. 4, 2011) ¶ 2, at 2.  The entirety of that paragraph states:

> Plaintiffs' current exhibit list contains exhibits 1-813.  *Exhibits 1-695 are the same exhibits that were included on Plaintiffs' preliminary exhibit list*; however, Plaintiffs deleted several exhibits within that same range.  Plaintiffs have also added new Exhibits 696-698 and have broken down Exhibits 100 and 101 into subparts listed separately as Exhibits 699-813.

*Id.* (emphasis supplied).  Defendants state that the only reason for including in "Exhibit A" to their objections to plaintiffs' exhibit list "all applicable objections (other than Rule 402 and 403 objections) they may have to" the 695 exhibits identified in plaintiffs' May 3, 2010 list (doc. no. 172) is "to preserve those objections for appeal."  *Id.* ¶ 5, at 4.

[51] *See* doc. no. 238, Exhibit "A," at 30.

36

those two exhibits are not sufficiently defined for this court to presently determine their admissibility and, consequently, rulings on defendants' objections will have to be deferred until such time as the documents are offered.

## A.   Defendants' Non-Waived Objections

Defendants correctly observe that, in any event, they cannot be deemed to have waived any objections that might be asserted pursuant to Federal Rules of Evidence 402 and 403.[52]  *See* Fed. R. Civ. P. 26(a)(3)(B) ("An objection not so made — *except for one under Federal Rule of Evidence 402 or 403* — is waived unless excused by the court for good cause.") (emphasis supplied).

Further, defendants tuck into a footnote their

> renewed objections to Plaintiffs' Exhibits 4, 7, 8, 10, 11, 13, 14, 16, 17, 18, 20, and 21.  These exhibits are declarations, affidavits, and expert reports to which State Defendants objected via their Motion to Strike [Materials From Plaintiffs' Response Brief to Defendants' Summary Judgment Motion] (Doc. 170) filed on April 19, 2010 before the First Amended Scheduling Order's deadline for objections to exhibit lists. Thus, State Defendants assert that their objections to these specific exhibits were properly asserted prior to any due date for objections to Plaintiffs' exhibit list.

Doc. no. 238 (Defendants' Objections to Plaintiffs' Exhibit List), at 3 n.1.

Each of these grounds will be addressed in turn.

## 1.   Objections based upon Rule 402

---

[52] *See id.* ¶ 4, at 3 (stating that "State Defendants expressly reserve their right to object to any of Plaintiffs' exhibits on the basis of Fed. R. Evid. 402 and 403") (footnote omitted).

Rule 402 provides that: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 402 (1st sent.). In contrast, "[e]vidence which is not relevant is not admissible." *Id*. (2d sent.). The term "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

In the context of a bench trial, all of the trial court's evidentiary rulings are granted great deference, because "it is presumed that the district judge will rely only upon properly admitted and relevant evidence." *Tampa Bay Shipbuilding and Repair Co. v. Cedar Shipping Co*., 320 F.3d 1213, 1216 (11th Cir. 2003) (citing *Community Action Group v. City of Columbus*, 473 F.2d 966, 973 (5th Cir.1973)). That presumption applies "even when the judge allows the presentation of evidence that had no permissible relevance." *United States v. Parcels of Property Located at 14 Leon Drive, Houston County, Alabama*, 225 Fed. Appx. 825, 827 (11th Cir. 2007) (citing *Community Action Group*, 473 F.2d at 973). Thus, "*in a bench trial*, it has been an acceptable method 'to admit evidence of borderline admissibility and give it the (slight) weight to which it is entitled.'" *United States v. Brown*, 279 F. Supp.

2d 1238, 1243-44 (S.D. Ala. 2003) (emphasis supplied) (quoting *SmithKline Beecham*

*Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003)).

### 2.    Objections based upon Rule 403

Rule 403 provides that:

> Although relevant, evidence may be excluded if its probative
> value is substantially outweighed by the danger of unfair prejudice,
> confusion of the issues, or misleading the jury, or by considerations of
> undue delay, waste of time, or needless presentation of cumulative
> evidence.

Fed. R. Civ. P. 403.  As discussed more fully in Part II(D)(1)(b) of this opinion, on

pages 31-32, *supra*, the "unfair prejudice" prong of Rule 403 does not apply in a

bench trial and, therefore, a court should not exclude evidence upon the basis that its

probative value allegedly is outweighed by unfair prejudice.  *See Gulf States Utilities*

*Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981).  Accordingly, even though

such objections have not been waived by defendants, this court will not consider any

objections by either party that the probative value of otherwise admissible evidence

is outweighed by some allegedly unfairly prejudicial effect it may have.

Similarly, exclusion of evidence under any of the other bases for objection

enumerated in Rule 403, to the extent that such bases are applicable at all in a non-

jury trial, is expressly within the court's discretion.  The former Fifth Circuit, in the

opinion cited above, made plain that "[e]xcluding relevant evidence in a bench trial

because it is cumulative or a waste of time is clearly a proper exercise of the judge's power," but that is not the same thing as saying that the exclusion of such evidence is mandated by the language of the Rule. *Gulf States*, 635 F.2d at 519. To the contrary, Rule 403 itself is couched in precatory language, stating that evidence "*may be* excluded" under the conditions set forth therein. Fed. R. Evid. 403 (emphasis supplied). Further, this court sees no reason why a judge who, according to *Gulf States*, is prohibited in a bench trial from excluding probative evidence based upon an argument that its probative value is substantially outweighed by "unfair" prejudice[53] would, nevertheless, be free to exclude relevant and probative evidence because of its tendency to confuse the issues. The remainder of the bases for objection addressed in Rule 403 — "undue delay, waste of time, or needless presentation of cumulative evidence" — appear to this court wholly discretionary, especially in the context of a bench trial. It is well-established that judges in bench trials are necessarily afforded "great latitude" to admit  more evidence than would be the case where the judge was sitting with a jury. *See Goodman v. Highlands Ins. Co.*, 607 F.2d 665, 668 (5th Cir. 1979); 11 Wright, Miller, & Kane, *Federal Practice & Procedure* § 2885 (1995 & Supp. 2010) ("In nonjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do

---

[53] It is axiomatic that *all evidence* is prejudicial to the parties against whom it is offered, and that is why Rule 403 speaks only to the concept of "*unfair* prejudice."

so by admitting evidence.").

### 3.     Defendants' "renewed objections"

As noted in the preface to this Part IV(A) of the opinion, defendants tuck into

a footnote their

> renewed objections to Plaintiffs' Exhibits 4, 7, 8, 10, 11, 13, 14, 16, 17,
> 18, 20, and 21.  These exhibits are declarations, affidavits, and expert
> reports to which State Defendants objected via their Motion to Strike
> [Materials From Plaintiffs' Response Brief to Defendants' Summary
> Judgment Motion] (Doc. 170) filed on April 19, 2010 before the First
> Amended Scheduling Order's deadline for objects to exhibit lists.  Thus,
> State Defendants assert that their objections to these specific exhibits
> were properly asserted prior to any due date for objections to Plaintiffs'
> exhibit list.[54]

Preliminarily, the court is unable to comprehend how a motion to strike filed

on April 19, 2010 can properly be construed as asserting objections to an exhibit list

filed *fifteen days later*, since the exhibit list was not yet in existence.[55]

More importantly, the exhibits to which defendants object are as follows:[56] a

report and declaration of Dr. Robert J. Norrell;[57] a report and declaration of Dr. J.

---

[54] Doc. no. 238 (Defendants' Objections to Plaintiffs' Exhibit List), at 3 n.1.

[55] *See* doc. no. 170 (Defendants' Motion to Strike Materials From Plaintiffs' Response Brief to Defendants' Summary Judgment Motion, filed Apr. 19, 2010); doc. no. 172 (Plaintiffs' Exhibit List, filed May 3, 2010).

[56] *Compare* doc. no. 238, at 3 n.1 (stating objections to Plaintiffs' Exhibits 4, 7, 8, 10, 11, 13, 14, 16, 17, 18, 20, and 21) *with* doc. no. 221 (Plaintiffs' Exhibit List), at 4 (describing each of these documentary exhibits and the place in the docket where copies may be found).

[57] Plaintiffs' Exhibits 4 and 7, originally filed with the court as doc. no. 166, Exs. 4 and 7.

Wayne Flynt;[58] a report and declaration of Dr. Jeffrey J. Frederick;[59] a report and declaration of Dr. Henry M. McKiven;[60] the declaration of J. Richmond Pearson;[61] the affidavit of Robert S. Edington;[62] the declaration of Dr. Ira Harvey;[63] and the declaration of Dr. Daniel Sullivan.[10]  Each of these persons is identified in plaintiffs' list of expert or fact witnesses they anticipate calling at trial, or (in the case of Dr. Norrell) whose testimony has been preserved.[11]  There could be no conceivable value to excluding the written version of the opinions of a witness who will provide (or, in the case of Dr. Norrell, already has provided) those same opinions to the court in person.

Thus, defendants' "renewed objections" appear to be, at best, simply a backdoor restatement of that aspect of their motion *in limine* seeking to prevent plaintiff's witnesses from testifying to any material not expressly contained in a timely-filed expert report.  That argument has already been ruled upon in Part II(C)

---

[58] Plaintiffs' Exhibits 8 and 10, originally filed with the court as doc. no. 166, Exs. 8 and 10.

[59] Plaintiffs' Exhibits 11 and 13, originally filed with the court as doc. no. 166, Exs. 11 and 13.

[60] Plaintiffs' Exhibits 14 and 16, originally filed with the court as doc. no. 166, Exs. 14 and 16.

[61] Plaintiffs' Exhibit 17, originally filed with the court as doc. no. 166, Ex. 17.

[62] Plaintiffs' Exhibit 18, originally filed with the court as doc. no. 166, Ex. 18.

[63] Plaintiffs' Exhibit 20, originally filed with the court as doc. no. 166, Ex. 20.

[10] Plaintiffs' Exhibit 21, originally filed with the court as doc. no. 166, Ex. 21.

[11] *See* doc. no. 224, at 2-4.

of this opinion, and will not be revisited here.  Accordingly, defendants' "renewed

objections" are overruled.

### V.  Concluding Observations About Objections in a Bench Trial

Federal Rule of Evidence 611 addresses the mode and order of interrogating

witnesses and presenting evidence in a trial.  The first subsection states:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Fed. R. Evid. 611(a).  More to the point, the last subsection of the same rule provides

that:

> Leading questions *should* not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony.   Ordinarily leading questions should be permitted on cross-examination.  When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

Fed. R. Evid. 611(c) (emphasis supplied).  A plain reading of these two subsections

of Rule 611 in combination with one another — and especially the use of the word

"should" in subsection (c), as opposed to "must" — suggests that a trial judge has

discretion regarding the use of leading questions during the course of a trial.  This

sensible conclusion is confirmed by the Advisory Committee Notes to Rule 611(c),

which state:

> **Note to Subdivision (c)**.  The rule continues the traditional view that the suggestive powers of the leading question are as a general proposition undesirable.  Within this tradition, however, numerous exceptions have achieved recognition:  The witness who is hostile, unwilling, or biased; the child witness or the adult with communication problems; the witness whose recollection is exhausted; and undisputed preliminary matters. 3 Wigmore §§ 774-778.  An almost total unwillingness to reverse for infractions has been manifested by appellate courts.  *See* cases cited in 3 Wigmore § 770.  *The matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command.*

Adv. Comm. Notes to Fed. R. Evid. 611(c) (emphasis supplied); *see also*, *e.g.*, *Scenic Holding, L.L.C. v. New Board of Trustees of Tabernacle Missionary Baptist Church*, 506 F.3d 656, 664 (8th Cir. 2007) ("Rule 611(c) is permissive and must be read in context with the trial court's general authority and discretion to control the conduct of the trial.").  Indeed, as numerous courts have held,[12] "the extent to which the use

---

[12] *See*, *e.g.*, *United States v. Bowie*, 618 F.3d 802, 815-16 (8th Cir. 2010) ("[T]he trial judge has wide latitude in permitting leading questions because he or she is in the best position to determine the need for them.") (citation omitted) (bracketed alteration in original); *United States v. Fenner*, 600 F.3d 1014, 1022 (8th Cir. 2010) ("We observe that although Federal Rule of Evidence 611(c) generally discourages the use of leading questions on direct, it is not automatically improper . . . to ask such questions or for the district court to permit their use.  The plain language of the rule allows leading questions, for example, as necessary as to develop a witness's testimony.  Simply put, the trial judge has wide latitude in permitting leading questions because he or she is in the best position to determine the need for them.") (citations omitted); *United States v. Hansen*, 434 F.3d 92, 104-05 (1st Cir. 2006) ("The evil of leading a friendly witness is that the information conveyed in the questions may supply a false memory.  There is, of course, a degree of tolerance for leading questions under certain circumstances.  Because it is so case-specific, the trial judge is best situated to strike a practical and fair balance and is afforded extensive discretion over the phrasing of questions.") (citations and internal quotation marks omitted); *United States v. Grassrope*, 342 F.3d

of leading questions may be indulged or limited is a matter primarily for the discretion of the trial judge and an appellate court will intervene only if there is a clear abuse of discretion." *United States v. Durham*, 319 F.2d 590, 592 (4th Cir. 1963) (collecting cases). "Simply put, the trial judge has wide latitude in permitting leading questions because he or she is in the best position to determine the need for them." *United States v. Fenner*, 600 F.3d 1014, 1022 (8th Cir. 2010); *see also*, *e.g.*, *United States v. Birdsong*, 330 Fed. Appx. 573, 582 (6th Cir. 2009) ("We have stated that '[i]t is well recognized that the use of leading questions *during the direct examination of a witness* falls within the sound discretion of the trial court.'") (quoting *United States v. Shoupe*, 548 F.2d 636, 641 (6th Cir. 1977) (citing in turn 3 Wigmore, *Evidence* § 770 at 157 (1970))) (emphasis supplied).

     Moreover, for those of us who cut our teeth as trial lawyers in federal court in

---

866, 869 (8th Cir. 2003) (deferring to the trial court's judgment regarding the use of leading questions and noting that "[t]he Advisory Committee Notes to Rule 611(c) state that with respect to leading questions, '[t]he matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command'"); *Gell v. Town of Aulander*, 252 F.R.D. 297, 307 (E.D.N.C. 2008) (noting that "whether or not to allow [leading questions] is within the discretion of the trial court") (bracketed alteration supplied); *see also Jaffee v. Bank of America, N.A.,* 395 Fed. Appx. 583, 588 (11th Cir. 2010) (noting that the district court has the "discretion to allow or disallow leading questions"); *Saurini v. Adams County School District No. 12*, 191 Fed. Appx. 628, 639 (10th Cir. 2006) ("Fed. R. Evid. 611 discourages the use of leading questions on direct examination, but it does not forbid them. Permitting them is within the trial court's discretion. *See United States v. Olivo,* 69 F.3d 1057, 1065 (10th Cir. 1995) ('Rule 611(c) governs leading questions; it vests broad discretion in the trial judge.'); *see also* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 611.06[2][b] (2d ed. 2006) ('Leading questions on direct examination will more quickly get the witness over preliminary matters. Often, leading questions are asked on preliminary and collateral matters to expedite the trial.')").

cases presided over by Judge Seybourn Harris Lynne, we learned very early on that Judge Lynne not only permitted, but would routinely overrule objections to leading questions on direct examination of witnesses *in non-jury trials*, saying that he was fully capable of separating "wheat from chaff," and that leading questions assisted in moving the trial to a conclusion.

As is already clear from the parties' submissions, this court will hear a tremendous amount of testimony over the course of trial.  In the interest of expediency and preserving scarce judicial resources, therefore, this court will permit the parties to ask leading questions during direct examination of witnesses.  The parties are directed to refrain from making, or at least to minimize, objections to questions on the grounds that counsel is "leading the witness."

For all of the reasons addressed above, the parties also are requested to limit their objections on the basis of "lack of relevance" to a bare minimum, if any such objections are made at all.  The better course of action in a bench trial is for the court to allow all even-remotely-relevant evidence to be admitted during the trial, and to determine the relevance of the evidence (and the weight to be given to it, if any) on the basis of the parties' post-trial briefs and arguments.

Furthermore, for the reasons discussed in Part II(D)(1)(b) on pages 31-32, and, Part IV(A)(2) on pages 39-41, *supra*, the court will not endorse objections to the

presentation of evidence under any of the bases enumerated in Rule 403.  Exclusion of evidence on those bases may be error, but overruling *in toto* objections on those bases will not be, and will only ensure that all issues are fully aired.

As one of the most utilized treatises on the law of evidence observes, the Advisory Committee on the Federal Rules of Evidence recognized the "received orthodoxy that the common law courts developed exclusionary rules in large part due to their doubts about the capacity of *lay jurors*.  For their part, judges possess professional experience in valuing evidence, greatly lessening the need for exclusionary rules."  1 Kenneth S. Brown *et al.*, *McCormick on Evidence* § 60, at 298 (6th ed. 2006).  Accordingly, many judges have developed a practice in non-jury cases of "provisionally admit[ting] all arguably admissible evidence, even if objected to, *with the announcement that all admissibility questions are reserved until all the evidence is in*."  *Id*. at 299-300 (alteration and emphasis added).  The parties may consider this court as having here so "announced."

Further, the Fourth Circuit has observed that "the broader admissibility of evidence in bench trials is premised on the helpfulness of the practice in appellate review."  *National Railroad Passenger Corp. v. Catalina Enterprises, Inc. Pension Trust*, 147 Fed. Appx. 378, 384 (4th Cir. 2005).

Finally, in view of the fact that most of the testimony to be heard at trial will

be elicited from historians, it will be useful for the parties' counsel to remember that "[e]vidence is relevant if its exclusion would leave a chronological and conceptual void in the story." *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir. 1986) (citing *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir. 1984)).

## **VI**. **Conclusion and Orders**

**A**. In accordance with the foregoing, it is **ORDERED** that plaintiffs' motion *in limine* be, and the same hereby is, denied with respect to plaintiffs' request to schedule one or more days for hearing in Birmingham, but granted in the following respects:

1. Counsel may satisfy Federal Rule of Evidence 803(18), governing the admission of statements contained in "Learned Treatises,"[13] by pointing to the pages in an exhibit, publication, or other document containing the statement to be received in evidence, rather than by actually reading the statement out loud for purposes of transcription.[14]

2. Testifying expert witnesses will not be excluded from the courtroom pursuant

---

[13] This rule provides that:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:  . . .  To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.  If admitted, the statements may be read into evidence but may not be received as exhibits.

Fed. R. Evid. 803(18).

[14] *See* doc. no. 231 (Plaintiffs' Motion *in Limine*) ¶ 2, at 2.

to Federal Rule of Evidence 615.[15]

3.    An opportunity for counsel to meet with the court's technology staff in the main courtroom of the United States Courthouse at 101 Holmes Avenue in Huntsville, Alabama, for the purpose of testing the compatibility of the parties' computers, software, and other devices with the electronic equipment located in that courtroom and, thereby, to expedite the conduct of trial, has been arranged for Monday, March 14, 2011, beginning at 11:00 o'clock a.m.[16]

4.    This court will be available to confer with counsel regarding the adoption of procedures that will assist the parties in having witnesses available to testify when needed at the conclusion of the meeting referenced in the preceding paragraph.[17]

5.    Counsel may begin the examination of each witness by giving a brief biographical introduction of the witness, and then asking the witness whether the information stated is correct.

    **B**.  It is further **ORDERED** that defendants' motion *in limine* be, and the same hereby is, granted in one respect:  the factual findings made by Judge Harold Murphy in *Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004), *aff'd*, 476 F.3d 1219 (11th Cir.), *cert. denied*, 511 U.S. 1146 (2007), may not be offered by plaintiffs as

---

[15] *Id*. ¶ 3, at 2-3.  Rule 615 provides that:

        At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.  This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

Fed. R. Evid. 615.

[16] *See* doc. no. 231 (Plaintiffs' Motion *in Limine*) ¶ 5, at 3.

[17] *Id*. ¶ 4, at 3.

"evidence" during the trial of this case; in all other respects, however, defendants'

motion is overruled and denied.

      **DONE** and **ORDERED** this 10th day of March, 2011.

                           _____

                           United States District Judge