FILED
2011 Oct-21  PM 04:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| INDIA LYNCH, a minor who sues by her parent, SHAWN KING LYNCH, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 08-S-450-NE |
| THE STATE OF ALABAMA, *et al.*, | ) ) | |
| Defendants. | ) | |

# MEMORANDUM OF OPINION

## SUMMARY OF CONTENTS

**Topic**

**Page**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  THE CENTRALITY OF RACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.  STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.  THE "BLACK BELT," "BIG MULES," AND OTHER TERMS . . . . . . . . . . . . . . . . . . . . . 45

II. PRELIMINARY CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

    A.  STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

    B.  TAX INJUNCTION ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    C.  COMITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

    D.  ELEVENTH AMENDMENT IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

    E.  GENERAL OVERVIEW OF K-12 FUNDING IN ALABAMA . . . . . . . . . . . . . . . . . . . 133

    F.  THE COMPUTATION OF PROPERTY TAXES IN ALABAMA . . . . . . . . . . . . . . . . . . . 171

    G.  SUMMARY OF PREDECESSOR LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . 197

H.   CONTROLLING PRINCIPLES OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   391

III.  FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   445

A.   FINDINGS HISTORICAL FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   445

B.   FINDINGS OF FACT RELEVANT TO AN ASSESSMENT OF DISPARATE IMPACT
ON THE BASIS OF RACE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   683

IV.  CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   749

A.   DISCRIMINATORY INTENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   749

B.   DISPARATE IMPACT ON THE BASIS OF RACE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   769

C.   RATIONAL BASIS REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   779

D.   TITLE VI OF THE CIVIL RIGHTS ACT OF 1964. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   785

V.  CONCLUSIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   789

VI.  APPENDICES

## EXPANDED TABLE OF CONTENTS

### I. INTRODUCTION

A.  The Centrality of Race. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

1.   The Slave Experience. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

2.   The Post-Emancipation Experience. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

B.  Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

1.   The Plaintiffs and Their Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

a.   The state constitutional provisions challenged by plaintiffs. . . . . . . . . . . . . . . .   18

i.   Article XI, Section 214 — limiting the State tax rate. . . . . . . . . . . . . . . . . . . .   19

ii.   Article XI, Section 215 — limiting county tax rates. . . . . . . . . . . . . . . . . . . .   20

iii.   Article XI, Section 216 — limiting municipal tax rates. . . . . . . . . . . . . . . . . .   21

iv.   Article XI, Section 217, as twice amended. . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

(A) **Amendment 325**, *ratified in 1972.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

(B) **Amendment 373**, *ratified in 1978.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*v.* **Article XIV, Section 269**, *as amended.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

b. **The injuries alleged by plaintiffs.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

c. **The relief sought by plaintiffs.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

2. **The Defendants and Their Contentions.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

C. The "Black Belt," "Big Mules," and Other Terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1. **The Defining Characteristics of the "Black Belt".** . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

a. **The geology of the Black Belt.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

b. **The social history of the Black Belt.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*i.* **The origins of those persons who settled the region,**
**and their society, education, and wealth.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*ii.* **From the Virginia Piedmont to the Broad River**
**Valley of Georgia.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

(A) **The Virginians of the Broad River Valley.** . . . . . . . . . . . . . . . . . . . . . . . 57

*iii.* **From the Broad River Valley to the "Great Bend of the**
**Tennessee River" in the Alabama Territory.** . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*iv.* **The War of 1812, the Battle of Horseshoe Bend, the Federal**
**Road, and the Opening of East-Central Alabama.** . . . . . . . . . . . . . . . . . . . . . 62

*v.* **From the Broad River Valley of Georgia to the Alabama**
**Black Belt.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*vi.* **"The Georgia Machine".** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

c. **The demographic make-up of the Black Belt.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

d. **The enduring political influence of the Black Belt.** . . . . . . . . . . . . . . . . . . . . . . . . . 74

2. **"Big Mules".** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

3. **"Carpetbaggers".** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

**4.**   **"Scalawags"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

**5.**   **"Radical Republicans"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

**6.**   **"Conservative Democrats" and "Bourbons"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

**7.**   **"Black Codes"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

**8.**   **"Redeemers"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

**9.**   **"Jim Crow laws"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

## II.  PRELIMINARY CONSIDERATIONS

A.   Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

B.   Tax Injunction Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

C.   Comity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

D.   Eleventh Amendment Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

E.   General Overview of K-12 Funding in Alabama. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

   **1.**   **Federal Funding Sources**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

      **a.**   **Elementary and Secondary Education Act of 1965**. . . . . . . . . . . . . . . . . . . . . 134

      **b.**   **Individuals with Disabilities Education Act of 1975**. . . . . . . . . . . . . . . . . . . . 136

   **2.**   **State Funding Sources**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

      **a.**   **The Education Trust Fund**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

         **i.**   **Current sources of revenue.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

      **b.**   **The Public School Fund**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

      **c.**   **Special trust funds**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

      **d.**   **The Foundation Program**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

   **3.**   **Local Funding Sources**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

      **a.**   **1.0 mill county tax** — *Section 269*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

      **b.**   **3.0 mill county tax** — *Section 269.01*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

       **c.**    **3.0 mill school district tax** — *Section 269.02*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

       **d.**    **5.0 mill special county tax** — *Section 269.04*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

       **e.**    **3.0 mill school district tax** — *Section 269.05*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

       **f.**    **Municipal levies**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

    **4.**    **Exceeding Generally Authorized Millage Rates**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

       **a.**    **General constitutional amendment with statewide application**. . . . . . . . . . . . . . . 162

       **b.**    **So-called "general constitutional amendments *with local application*"**. . . . . . . . . 163

       **c.**    **Local constitutional amendment** — *Amendments 425 & 555*. . . . . . . . . . . . . . . . . 164

       **d.**    **Increasing the millage rate of an existing tax**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

**F.**    The Computation of Property Taxes in Alabama. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

    **1.**    **First Step** — *Identifying the property subject to taxation*. . . . . . . . . . . . . . . . . . . . . . . . 173

    **2.**    **Second Step** — *Appraisal*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

       **a.**    **The usual methods of determining fair market value**. . . . . . . . . . . . . . . . . . . . . . . 176

       **b.**    **The "current use" method of valuation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

            **i.**    **Residential property and historic buildings and sites**. . . . . . . . . . . . . . . . . 179

            **ii.**    **Agricultural and timber properties**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

                **(A)**  **Agricultural land**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

                **(B)**  **Timber property**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

                **(C)**  **2008 current use standard values for agricultural
                     and timber properties**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

    **3.**    **Third Step** — *Determining the assessed value*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

    **4.**    **Fourth Step** — *Deduction of exemptions*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

    **5.**    **Fifth Step** — *Applying the tax millage rate*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

       **a.**    **Computation of the State *ad valorem* tax on Class III agricultural
           and timber properties**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

6.    The "Lid Bill's" Impact Upon the Aggregate Amount of *Ad Valorem* Property Taxes Owed the State, Counties, Municipalities, and School Districts. . . . . . . . . .   192

G.  Summary of Predecessor Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   197

    1.    *Brown v. Board of Education* **and its Progeny**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   198

        a.    *Plessy v. Ferguson*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   198

        b.    *Brown v. Board of Education*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   205

        c.    Overcoming the South's campaign of "massive resistance". . . . . . . . . . . . . .   211

        d.    *Milliken v. Bradley* **and the issue of interdistrict desegregation remedies**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   219

    2.    **School Finance Litigation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   225

        a.    *Serrano v. Priest*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   227

        b.    *San Antonio Independent School District v. Rodriguez*. . . . . . . . . . . . . . .   229

            i.    **The underlying facts**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   229

            ii.    **Socioeconomic status as a "suspect classification"**. . . . . . . . . . . . . . . .   236

            iii.    **Public education as a "fundamental right"**. . . . . . . . . . . . . . . . . . . . .   238

            iv.    **"Rational basis review" of the Texas system**. . . . . . . . . . . . . . . . . . . .   241

        c.    **The Alabama Equity Funding litigation**. . . . . . . . . . . . . . . . . . . . . . . . . . .   244

    3.    **The** *Weissinger* **Line of Cases**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   253

        a.    **The requirement of uniformity and equality**. . . . . . . . . . . . . . . . . . . . . . .   254

        b.    **The requirement of uniform assessment ratios**. . . . . . . . . . . . . . . . . . . . .   256

        c.    *State v. Alabama Power Co*. — Ala. Sup. Ct. (Oct. 19, 1950). . . . . . . . . . . . . .   260

        d.    **The interregnum —** *1950-1959*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   264

        e.    **The Haden Regulation —** *1959*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   265

        f.    *Louisville and Nashville Railroad Co. v. State* — Montgomery County, Ala. Circuit Court (Apr. 5, 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   275

**g.**   *Hornbeak v. Hamm* — M.D. Ala. Civil Action No. 2608-N. . . . . . . . . . . . . . . . . . . . .   276

**h.**   *Hornbeak v. Rabren* — M.D. Ala. Civil Action No. 2877-N. . . . . . . . . . . . . . . . . . .   285

**i.**   M.D. Ala. Civil Action No. 2877-N *redux* — the evolution of
*Hornbeak v. Rabren* into *Weissinger v. Boswell* (June 29, 1971). . . . . . . . . . . . . . .   290

**j.**   **Amendment 325**:  *the initial Legislative response
to the* Weissinger *mandate.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   294

**k.**   *McCarthy v. Jones* — S.D. Ala. Civil Action No. 77-242-H and
the second invalidation of variable assessment ratios. . . . . . . . . . . . . . . . . . . . . . . . .   296

**l.**   *Thorn v. Jefferson County* — Ala. Sup. Ct.
(Sept. 28, 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   301

**m.**   **Amendment 373** — *the second Legislative attempt to deflect the
substantial increases in* ad valorem *taxes portended by the*
Weissinger *mandate.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   302

**n.**   *Weissinger v. Eagerton* — M.D. Ala. Civil Action No.
2877-N *continued.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   304

**o.**   *Weissinger v. White* — M.D. Ala. Civil Action No.
2877-N *continued* (October 5, 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   309

**p.**   *Weissinger v. White* — Eleventh Circuit appeal (June 1, 1984). . . . . . . . . . . . . . . .   316

**q.**   **Summary of the *Weissinger* line of cases and plaintiffs' claims.** . . . . . . . . . . . . . .   318

**4.**   **The *Knight* Line of Cases.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   325

**a.**   **The original, Middle District action.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   325

**b.**   **The Northern District action.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   327

**c.**   **Merger of the Middle and Northern District actions.** . . . . . . . . . . . . . . . . . . . . . . . .   329

**d.**   **Motions to disqualify Judge U.W. Clemon.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   330

**e.**   **The first trial** — *conducted by Judge Clemon.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   331

**f.**   **Eleventh Circuit reversal and disqualification of
Judge Clemon.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   332

**g.**   **Reassignment of Northern District action to Judge
Murphy.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   332

*vii*

**h.**   **Designation of the Knight Class as lead plaintiffs.** . . . . . . . . . . . . . . . . . . . . . . . . .   333

**i.**   **The second trial** — *but the first conducted by Judge Murphy.* . . . . . . . . . . . . . . . . . .   334

**j.**   **Judge Murphy's first opinion** — "*Knight I*". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   334

    **i.**   **Relevant findings of fact**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   335

**k.**   **The Supreme Court's intervening opinion in** *Fordice*. . . . . . . . . . . . . . . . . . . . . .   358

**l.**   **Eleventh Circuit reversal and remand of Judge Murphy's first opinion** — "*Knight I-A*". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   365

**m.**   **Proceedings on remand and Judge Murphy's second opinion** — "*Knight II*". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   366

**n.**   **Third and final opinion by Judge Murphy, addressing plaintiffs' "motion for additional relief"** — "*Knight III*". . . . . . . . . . . . . . . . . . . . . . . . . . . . .   368

**o.**   **Eleventh Circuit affirmance** — "*Knight III-A*". . . . . . . . . . . . . . . . . . . . . . . . . . . .   373

**H.**   Controlling Principles of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   391

  **1.**   **Express Racial Classifications**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   393

  **2.**   **Facially Neutral Racial Classifications**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   395

    **a.**   **"Ordinary equal protection standards"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   400

      **i.**   **Disproportionate effects along racial lines**. . . . . . . . . . . . . . . . . . . . . . . . . .   406

      **ii.**   **Racially-discriminatory purpose**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   411

      **iii.**   **Causation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   419

      **iv.**   **The defendant's burden under** *Mt. Healthy*. . . . . . . . . . . . . . . . . . . . . . . . . .   422

  **3.**   **The alleged impact of** *San Antonio Indep. Sch. Dist. v. Rodriguez* **upon the analysis**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   426

  **4.**   **The alleged impact of** *Personnel Admin. of Mass. v. Feeney* **upon the analysis**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   427

  **5.**   **The alleged impact of** *United States v. Fordice* **upon the analysis**. . . . . . . . . . . . . . . .   439

## III.  FINDINGS OF FACT

A.  Findings of Historical Fact.................................................. 447

    1.   **Antebellum Alabama**........................................ 452

        a.   **The Alabama Constitution of 1819**................... 452

        b.   **The rapid accumulation of wealth in the "Black Belt"**........ 455

        c.   **Taxation in Antebellum Alabama**................... 460

        d.   **Education Funding**............................. 464

            i.   **"Sixteenth Section Lands"**.................. 464

            ii.   **Public Schools Act of 1854**................... 469

    2.   **Secession and the 1861 Constitution**................... 472

        a.   **The politics of secession**......................... 472

        b.   **Secession and Alabama's 1861 Constitution**.......... 475

    3.   **The End of the Civil War and "Presidential" Reconstruction**.... 476

    4.   **Congressional, or "Radical," Reconstruction**............ 482

        a.   **The movement toward the 1868 Constitution.**........ 486

        b.   **The 1868 "Radical Reconstruction" Constitution**..... 490

            i.   **The State Board of Education**................ 494

            ii.   **Increased taxation for public schools**.......... 495

        c.   **The ratification campaign**....................... 498

        d.   **Alabama under the 1868 "Radical Reconstruction" Constitution**.......... 502

            i.   **Public schools and taxation**................. 503

            ii.   **White hostility to education of the former slaves and the taxation that supported it**.......... 506

    5.   **"Redemption"**...................................... 509

6.   The 1875 "Redeemer" Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 513

7.   Democratic Rule Under the 1875 Constitution — *1875-1901* . . . . . . . . . . . . . . . . . . . . . 529

   a.   Extra-legal means of subverting black rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 529

   b.   The "convict leasing system" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 534

   c.   Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 537

      i.   White motives to subvert black education . . . . . . . . . . . . . . . . . . . . . . . . . 537

      ii.   Diversion of funding for black schools to white schools . . . . . . . . . . . . . . 539

      iii.   Failed attempts to improve public education . . . . . . . . . . . . . . . . . . . . . . . 544

   d.   Division within the Democratic Party and the movement for
        a new constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 549

      i.   Class differences resurface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556

      ii.   Disfranchisement of black voters viewed as possible in the
           absence of federal intervention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 559

      iii.   Black Belt support for a constitutional convention . . . . . . . . . . . . . . . . . . 563

      iv.   A constitutional convention, but with preconditions . . . . . . . . . . . . . . . . . 568

8.   Alabama's Present Constitution — *Disfranchisement and
     White Supremacy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 572

   a.   Raw, racist rhetoric in the convention debates . . . . . . . . . . . . . . . . . . . . . . . . . 574

   b.   Taxes and education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 585

   c.   Tax provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 589

   d.   Embedding the 1891 Apportionment Act in the constitution . . . . . . . . . . . . . . 595

   e.   Suffrage provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 599

   f.   The Black Belt's continued domination of state politics . . . . . . . . . . . . . . . . . . 604

   g.   The fraudulent ratification of  the 1901 Constitution . . . . . . . . . . . . . . . . . . . . 609

9.   Alabama from 1901 to 1954 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 614

*x*

**10. Public school funding after *Brown v. Board of Education*** . . . . . . . . . . . . . . . . . . . . . . . . 618

**11. Amendments 325 and 373** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 623

    **a.   Historical context** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 623

        *i.*   **The "fightin' little judge" who vowed to "never be out-niggered again"** — *George C. Wallace* . . . . . . . . . . . . . . . . . . . . . . . . . 625

            **(A) Early campaigning and election in his second, 1962 race for Governor** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 626

            **(B) Wallace's rhetoric** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 631

            **(D) George Wallace and linkages to the Alabama Farm Bureau Federation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 635

        *ii.*  **History repeating itself** — *Black Belt rule again threatened by the "Second Reconstruction"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 637

        *iii.* **The racial context of events leading up to the enactment of Amendment 325** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 640

    **b.   Amendment 325** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 651

        *i.*   **Failed equalization attempts and *Weissinger v. Boswell*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 651

        *ii.*  **The Farm Bureau and Amendment 325** . . . . . . . . . . . . . . . . . . . . . . . . . . 655

            **(A) The immediate impact of *Weissinger*** . . . . . . . . . . . . . . . . . . . . . . . . 655

            **(B) The legislative process of Amendment 325** . . . . . . . . . . . . . . . . . . . . 656

            **(C) Ratification and the Farm Bureau advertising blitz** . . . . . . . . . . . . . . 667

            **(D) Race in the legislative debate on Amendment 325** . . . . . . . . . . . . . . . 670

    **C.  Amendment 373 (the "Lid Bill") and "current use"** . . . . . . . . . . . . . . . . . . . . . 672

        *i.*   **The passage of Amendment 373** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 672

        *ii.*  **The passage of the 1982 statutes implementing "current use"** . . . . . . . . . . . 679

B. Findings of Facts Relevant to an Assessment of Disparate Impact on the Basis of Race. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 683

   1. **Background Information**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 683

      a. **The concept of "adequate" education funding**. . . . . . . . . . . . . . . . . . . . . . 683

      b. **Racial demographics**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685

      c. **Poverty**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 689

      d. **The distribution of Class III and "current use" properties**. . . . . . . . . . . 691

         *i.* **"Current use" property distribution by county classification**. . . . . . . . . . 692

         *ii.* **"Current use" property distribution by race**. . . . . . . . . . . . . . . . . . . . . . 694

   2. **Statistical Measures**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 697

   3. **Measures of Impact**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 703

      a. **Property tax capacity**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 704

         *i.* **County per-capita property tax base.**. . . . . . . . . . . . . . . . . . . . . . . . . . 706

         *ii.* **Per-capita school property tax base.** . . . . . . . . . . . . . . . . . . . . . . . . . 709

         *iii.* **Per-student school property tax base.** . . . . . . . . . . . . . . . . . . . . . . . 712

         *iv.* **Yield per-mill per-student by school system.**. . . . . . . . . . . . . . . . . . . 714

      b. **Tax Revenue**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 722

         *i.* **Per-capita school tax revenue measures**. . . . . . . . . . . . . . . . . . . . . . . 723

         *ii.* **Per-student school tax revenue measures**. . . . . . . . . . . . . . . . . . . . . . 725

      c. **Per-student expenditures**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 726

      d. **The hypothetical Alabama in which the challenged provisions do not apply: *i.e.*, "what-if" measurements**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 730

         *i.* **Uniform assessment ratio for all properties**. . . . . . . . . . . . . . . . . . . . . 734

         *ii.* **"Current use" appraisal methodologies abolished**. . . . . . . . . . . . . . . . 738

         *iii.* **Uniform assessment ratio for all properties *and***

**"current use" methodologies abolished**............................... 743

## IV. CONCLUSIONS OF LAW

A. Discriminatory Intent............................................ 749

    1. **Analysis of Section 217, as modified by Amendment 325**........................ 753

    2. **Analysis of Section 217, as modified by Amendment 373**........................ 761

    3. **Analysis of Sections 214, 215, and 216**......................................... 764

    4. **Analysis of Section 269, as modified by Amendment 111**........................ 765

    5. **Conclusion**.................................................................. 767

B. Disparate Impact on the Basis of Race.................................... 770

C. Rational Basis Review.................................................. 780

D. Title VI of the Civil Rights Act of 1964................................... 786

## V. CONCLUSIONS

## VI. APPENDICES

### CITATION ABBREVIATIONS & BIBLIOGRAPHY
#### TRIAL EXHIBITS

| | |
|---|---|
| **PX** | Plaintiffs' Exhibit [Number (and Parenthetical Description)] |
| **DX** | Defendants' Exhibit [Number (and Parenthetical Description)] |

#### TRIAL TESTIMONY

| | |
|---|---|
| **Anderson 10 Tr.** | Testimony of Stella Anderson, Transcript Vol. 10 (doc. no. 266) |
| **Ball 7 Tr.** | Testimony of Miranda Ball, Transcript Vol. 7 (doc. no. 263) |
| **Bell 15 Tr.** | Testimony of Michael Bell, Transcript Vol. 15 (doc. no. 271) |
| **Berryman 7 Tr.** | Testimony of Tyler Berryman, Transcript Vol. 7 (doc. no. 263) |
| **Brewer 10 Tr.** | Testimony of Albert Brewer, Transcript Vol. 10 (doc. no. 266) |
| **Brooks 10 Tr.** | Testimony of Michael Brooks, Transcript Vol. 10 (doc. no. 266) |
| **Brunori 3 Tr.** | Testimony of David Brunori, Transcript Vol. 3 (doc. no. 259) |

**Edington 5 Tr.**    Testimony of Robert Edington, Transcript Vol. 5 (doc. no. 261)

**Erdreich 10 Tr.**    Testimony of Ben Erdreich, Transcript Vol. 10 (doc. no. 266)

**Flynt 1 Tr.**    Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257)

**Flynt 2 Tr.**    Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258)

**Flynt 3 Tr.**    Testimony of Dr. Wayne Flynt, Transcript Vol. 3 (doc. no. 259)

**Frederick 9 Tr.**    Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265)

**Frederick 10 Tr.**    Testimony of Dr. Jeff Frederick, Transcript Vol. 10 (doc. no. 266)

**Gray 6 Tr.**    Testimony of Jerome Gray, Transcript Vol. 6 (doc. no. 262)

**Gregory 14 Tr.**    Testimony of Stan Gregory, Transcript Vol. 14 (doc. no. 270)

**Harris 14 Tr.**    Testimony of Robert Harris, Transcript Vol. 14 (doc. no. 270)

**Harvey 3 Tr.**    Testimony of Dr. Ira Harvey, Transcript Vol. 3 (doc. no. 259)

**Harvey 4 Tr.**    Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260)

**Harvey 6 Tr.**    Testimony of Dr. Ira Harvey, Transcript Vol. 6 (doc. no. 262)

**Hubbard 13 Tr.**    Testimony of Mike Hubbard, Transcript Vol. 13 (doc. no. 269)

**Kelly 12 Tr.**    Testimony of Boyd Kelly, Transcript Vol. 12 (doc. no. 268)

**Knight 6 Tr.**    Testimony of John Knight, Transcript Vol. 6 (doc. no. 262)

**Lynch 6 Tr.**    Testimony of Shawn King Lynch, Transcript Vol. 6 (doc. no. 262)

**McKenzie 7 Tr.**    Testimony of Fannie McKenzie, Transcript Vol. 7 (doc. no. 263)

**McKiven 5 Tr.**    Testimony of Dr. Henry McKiven, Transcript Vol. 5 (doc. no. 261)

**McMillan 11 Tr.**    Testimony of George McMillan, Transcript Vol. 11 (doc. no. 267)

**Manley 10 Tr.**    Testimony of Richard Manley, Transcript Vol. 10 (doc. no. 266)

**Marsh 13 Tr.**    Testimony of Delbert Marsh, Transcript Vol. 13 (doc. no. 269)

**Norrell Tr.**    Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253)

**Ormand 10 Tr.**    Testimony of Barbara Ormand, Transcript Vol. 10 (doc. no. 266)

**Pearson 11 Tr.**    Testimony of J. Richmond Pearson, Transcript Vol. 11 (doc. no. 267)

**Perry 14 Tr.**    Testimony of David Perry, Transcript Vol. 14 (doc. no. 270)

**Pride 7 Tr.**    Testimony of Wendell Pride, Transcript Vol. 7 (doc. no. 263)

*xiv*

**Primm 7 Tr.**          Testimony of Fred Primm, Transcript Vol. 7 (doc. no. 263)

**Quick 7 Tr.**          Testimony of Gary Quick, Transcript Vol. 7 (doc. no. 263)

**Rigney 12 Tr.**        Testimony of Douglas Rigney, Transcript Vol. 12 (doc. no. 268)

**Stewart 7 Tr.**        Testimony of Keith Stewart, Transcript Vol. 7 (doc. no. 263)

**Sullivan 7 Tr.**       Testimony of Dr. Daniel Sullivan, Transcript Vol. 7 (doc. no. 263)

**Sullivan 8 Tr.**       Testimony of Dr. Daniel Sullivan, Transcript Vol. 8 (doc. no. 264)

## DEPOSITION TESTIMONY

**Anderson Depo**       Deposition of Stella Anderson (Court's Exhibit 8)

**Ball Depo**           Deposition of Miranda Ball (Court's Exhibit 4)

**Berryman Depo**       Deposition of Tyler Berryman (Court's Exhibit 5)

**Brewer Depo**         Deposition of Albert Brewer (Plaintiffs' Exhibit 533)

**Brooks Depo**         Deposition of Michael Brooks (Court's Exhibit 10)

**Ellis Depo**          Deposition of Aubrey Ellis (Court's Exhibit 18)

**F. Gray Depo**        Deposition of Fred Gray (Court's Exhibit 16)

**J. Gray Depo**        Deposition of Jerome Gray (Plaintiffs' Exhibit 19)

**Hubbert Depo**        Deposition of Dr. Paul Hubbert (Court's Exhibit 14)

**Johnstone Depo**      Deposition of Hon. Douglas Johnstone (Court's Exhibit 13)

**Key Depo**            Deposition of DeWayne Key (Court's Exhibit 15)

**Little Depo**         Deposition of Sen. Ted Little (Court's Exhibit 17)

**Lynch Depo**          Deposition of Shawn King Lynch (Court's Exhibit 2)

**Ormand Depo**         Deposition of Barbara Ormand (Court's Exhibit 9)

**Pride Depo**          Deposition of Wendell Pride (Court's Exhibit 6)

**Thornton Depo**       Deposition of J. Mills Thornton III from *Knight v. Alabama* (Plaintiffs' Exhibit 682)

**Waggoner Depo**       Deposition of Sen. James Thomas Waggoner, Jr. (Court's Exhibit 12)

**White Depo**          Deposition of Dr. Dewey White, Jr. (Court's Exhibit 11)

## EXPERT WITNESS REPORTS

**Bell 1st Report**     First Report of Dr. Michael Bell (doc. no. 90)

*xv*

| | |
|---|---|
| **Bell 2d Report** | Amended Report of Dr. Michael Bell (Defendants' Exhibit 881) |
| **Brunori Report** | Report of David Brunori (Defendants' Exhibit 479) |
| **Flynt Report** | Report of Dr. Wayne Flynt (Plaintiffs' Exhibit 8) |
| **Frederick Report** | Report of Dr. Jeff Frederick (Plaintiffs' Exhibit 11) |
| **McKiven Report** | Report of Dr. Henry McKiven (Plaintiffs' Exhibit 14) |
| **Norrell Report** | Report of Dr. Robert Norrell (Plaintiffs' Exhibit 4) |
| **Stewart Report** | Report of Dr. William Stewart (Defendants' Exhibit 498) |
| **Sullivan Report** | Amended Report of Dr. Daniel J. Sullivan (Plaintiffs' Exhibit 117) |

### AFFIDAVITS AND DECLARATIONS

| | |
|---|---|
| **Eddington Aff.** | Affidavit of Robert S. Eddington (Plaintiffs' Exhibit 18) |
| **Flynt Dec.** | Declaration of Dr. Wayne Flynt (Plaintiffs' Exhibit 10) |
| **Frederick Dec.** | Declaration of Dr. Jeff Frederick (Plaintiffs' Exhibit 13) |
| **Harvey Dec. I** | Declaration of Dr. Ira Harvey (Plaintiffs' Exhibit 20) |
| **Harvey Dec. II** | Corrected Declaration of Dr. Ira Harvey (Plaintiffs' Exhibit 824) |
| **McKiven Dec.** | Declaration of Dr. Henry McKiven (Plaintiffs' Exhibit 16) |
| **Norrell Dec.** | Declaration of Dr. Robert Norrell (Plaintiffs' Exhibit 7 ) |
| **Pearson Dec.** | Declaration of J. Richmond Pearson (Plaintiffs' Exhibit 17) |
| **Sullivan Dec.** | Declaration of Dr. Daniel Sullivan (Plaintiffs' Exhibit 21) |

### DOCUMENTS IN CASE FILE

| | |
|---|---|
| **Doc. no. 44** | Doc. no. 44 (Plaintiffs' Reply Brief in Support of Motion for Summary Judgment) |

### PRIMARY SOURCES

| | |
|---|---|
| **1865 Journal** | http://www.archives.alabama.gov/senateproject/convjour/search_vsearchform.cfm |
| **1875 Journal** | Journals of the 1875 Constitutional Convention: http://www.legislature.state.al.us/misc/history/constitutions/1875/1875-constitution-journals/nav.html |
| **1901 Proceedings** | Official Proceedings of the 1901 Constitutional Convention (1901), http://www.legislature.state.al.us/misc/history/constitutions/1901/proceedings/1901_proceedings_vol1/1901.html. |

**SECONDARY WORKS**

| | |
|---|---|
| **Appraisal of Real Estate** | The Appraisal Institute, *The Appraisal of Real Estate* (Chicago: The Appraisal Institute 11th ed. 1996). |
| **Atkins** | Leah Rawls Atkins, "Part One: From Early Times to the End of the Civil War," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama: The History of a Deep South State* (Tuscaloosa: The University of Alabama Press 1994). |
| **Bailey** | Richard Bailey, *Neither Carpetbaggers Nor Scalawags: Black Officeholders During the Reconstruction of Alabama 1867–1878* (Montgomery, Ala.: New South Books 5th ed. 2010). |
| **Baldwin** | Joseph G. Baldwin, *The Flush Times of Alabama and Mississippi: A Series of Sketches* (New York: D. Appleton & Co. 1854). |
| **Bass & DeVries** | Jack Bass & Walter DeVries, *The Transformation of Southern Politics: Social Change and Political Consequences Since 1945* (Athens: The University of Georgia Press 1995) (1976). |
| **Bell** | Michael E. Bell, "Property Tax Assessment," in *The Encyclopedia of Taxation & Tax Policy* (Washington, D.C.: The Urban Institute 2d ed. 2005) (Joseph J. Cordes, Robert D. Ebel & Jane G. Gravelle eds.). |
| **Blair** | Lewis H. Blair, *A Southern Prophecy: The Prosperity of the South Dependent upon the Elevation of the Negro* (Boston: Little, Brown and Company 1964) (C. Vann Woodward ed.) (1889). |
| **Blight** | David W. Blight, *Passages to Freedom: The Underground Railroad in History and Memory* (Washington, D.C.: Smithsonian Books 2001). |
| **Bond** | Horace Mann Bond, *Negro Education in Alabama: A Study in Cotton and Steel* (Tuscaloosa: The University of Alabama Press 1994) (1939). |
| **Branch** | Taylor Branch, *Parting the Waters: America in the King Years 1954-63* (New York: Simon & Schuster 1989). |
| **Brantley** | William H. Brantley, *Banking in Alabama 1816-1860* (privately printed) (Volume I printed in 1961 by Birmingham Printing Co., Volume II printed in 1967 by the Oxmoor Press of Birmingham, Ala.). |
| **Brewer** | Willis Brewer, *Alabama: Her History, Resources, War Record, and Public Men – From 1540 to 1872* (Montgomery, Ala.: Barrett & Brown, Steam Printers and Book Binders 1872). |
| **Bridges** | Edwin C. Bridges, "Historical Alabama," in *The Alabama Guide: Our People, Resources, and Government* (Montgomery, Ala.: Alabama Department of Archives and History 2009). |

| | |
|---|---|
| **Brookings Institution** | Vol 4 (Part 3) of the 1932 *Report on a Survey of the Organization and Administration of the State and County Governments of Alabama Submitted to Governor B.M. Miller by the Institute for Government Research of the Brookings Institution* (Washington, D.C. 1932). |
| **Brunori** | David Brunori, *State Tax Policy:  A Political Perspective* (Washington, D.C.:  The Urban Institute Press 2001). |
| **Cardozo** | Benjamin N. Cardozo, *The Nature of the Judicial Process* (New Haven, Conn.:  Yale University Press 1921). |
| **CCH Tax Guide** | 1 *CCH Alabama State Tax Reporter* (2006). |
| **Chemerinsky I** | Erwin Chemerinsky, *Constitutional Law:  Principles and Policies* (New York:  Aspen Publishers 3rd ed. 2006). |
| **Chemerinsky II** | Erwin Chemerinsky, *Federal Jurisdiction* (New York:  Aspen Publishers 5th ed. 2007). |
| **Coulter** | Ellis Merton Coulter, *Old Petersburg and the Broad River Valley of Georgia: Their Rise and Decline* (Athens:  The University of Georgia Press 1965). |
| **Curtin** | Mary Ellen Curtain, *Black Prisoners and Their World, Alabama 1865 – 1900* (Charlottesville:  The University Press of Virginia 2000). |
| **Crawford** | Samuel W. Crawford, *The History of the Fall of Fort Sumpter* (Whitefish, Mont.:  Kessinger Publishing LLC 2006) (1887). |
| **W.E.B. Du Bois** | W.E.B. Du Bois, *A Soliloquy on Viewing My Life from the Last Decade of Its First Century:  The Autobiography of W.E.B. Du Bois* (New York:  International Publishers Co. 1968) (Herbert Aptheker ed.). |
| **J. W. DuBose** | John Witherspoon DuBose, *Alabama's Tragic Decade:  Ten Years of Alabama 1865-1874* (Birmingham, Ala.:  Webb Book Company 1940) (James K. Greer ed.). |
| **Dunning** | William Archibald Dunning, *Reconstruction:  Political and Economic, 1865–1877* (New York: Harper & Brothers Publishers 1907). |
| **Dupre I** | Daniel S. Dupre, *Transforming the Cotton Frontier:  Madison County, Alabama 1800–1840* (Baton Rouge:  Louisiana State University Press 1997). |
| **Dupre II** | Daniel S. Dupre, "William Wyatt Bibb, 1919 – 1820, and Thomas Bibb, 1820 – 1821," in *Alabama Governors:  A Political History of the State* (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Armbrester eds.). |
| **Ely, Compton, & Compton** | Bruce P. Ely, J. Whiteney Compton, & Chris W. Compton, *The Property Tax Deskbook — Alabama* (St. Paul, Minn.:  American Bar Association Section of Taxation, 14th ed. 2009) (Stewart M. Weintraub *et al*. eds.). |

**Eskew I**        Glenn T. Eskew, "George C. Wallace, 1963–1967, 1971–1979, 1983–1987," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.).

**Eskew II**      Glenn T. Eskew, "Lurleen B. Wallace, 1967–May 1968," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.).

**Feldman I**     Glenn Feldman, *The Disenfranchisement Myth: Poor Whites and Suffrage Restriction in Alabama* (Athens: The University of Georgia Press 2004).

**Feldman II**    Glenn Feldman, *Politics, Society and the Klan in Alabama, 1915-1949* (Tuscaloosa: The University of Alabama Press 1999).

**Feldman III**   Glenn Feldman, *From Demagogue to Dixiecrat: Horace Wilkinson and the Politics of Race* (Privately Printed 1995).

**Fink & Tushnet**  Howard P. Fink & Mark V. Tushnet, *Federal Jurisdiction*: *Policy and Practice – Cases and Materials* (Charlottesville, Va.: The Michie Co. 1984).

**Fischer**       David Hackett Fischer, *Albion's Seed: Four British Folkways in America* (New York: Oxford University Press 1989).

**Fleming**       Walter Lynwood Fleming, *Civil War and Reconstruction in Alabama* (New York: The Columbia University Press 1905).

**Fleming Docs**  Walter Lynwood Fleming (ed.), *Documentary History of Reconstruction, 2 Volumes* (Cleveland: Arthur H. Clark Co. 1907).

**Flynt I**         Wayne Flynt, "Part Three: From the 1920s to the 1990s," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama: The History of a Deep South State* (Tuscaloosa: The University of Alabama Press 1994).

**Flynt II**       Wayne Flynt, *Alabama in the Twentieth Century* (Tuscaloosa: The University of Alabama Press 2004).

**Flynt III**     Wayne Flynt, *Poor but Proud: Alabama's Poor Whites* (Tuscaloosa: The University of Alabama Press 1989).

**Flynt IV**     Wayne Flynt, "Bibb Graves, 1927–1931, 1935–1939," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.).

**Foner I**        Eric Foner, *Reconstruction — America's Unfinished Revolution: 1863–1877* (New York: History Book Club Francis Parkman Prize Edition 2005) (Harper & Row 1988).

**Foner II**       Eric Foner, *Forever Free: The Story of Emancipation and Reconstruction* (New York: Knopf 2005).

**Frady**            Marshall Frady, *Wallace: The Classic Portrait of Alabama Governor George Wallace* (New York: Random House 1996) (1968).

**Franklin**         John Hope Franklin, *Reconstruction After the Civil War* (Chicago: University of Chicago Press 1994).

**Franklin & Moss**  John Hope Franklin & Alfred A. Moss, Jr., *From Slavery to Freedom: A History of African Americans* (New York: McGraw-Hill Companies 7th ed. 1994).

**Frederick**        Jeffrey J. Frederick, *Stand Up For Alabama: Governor George C. Wallace* (Tuscaloosa: The University of Alabama Press 2007).

**Frederick II**     Jeffrey J. Frederick, *Command and Control: George Wallace, Governor of Alabama, 1963-1972* (May 10, 2003) (unpublished Ph.D. dissertation, Auburn University) (available through ProQuest Information and Learning Co., Ann Arbor Michigan).

**Friedman**         Lawrence M. Friedman, *A History of American Law* (New York: Simon & Schuster 2d ed. 1985).

**Gates**            Grace Hooten Gates, *The Model City of the New South: Anniston, Alabama 1872-1900* (Tuscaloosa: The University of Alabama Press 1978).

**Going**            Allen Johnston Going, *Bourbon Democracy in Alabama 1874-1890* (Tuscaloosa: The University of Alabama Press 1992) (1951).

**Goldstone**        Lawrence Goldstone, *Inherently Unequal: The Betrayal of Equal Rights by the Supreme Court, 1865–1903* (New York: Walker & Company 2011).

**Hackney**          Sheldon Hackney, *Populism to Progressivism in Alabama* (Princeton, N.J.: Princeton University Press 1969).

**Hamill I**         Susan Pace Hamill, *As Certain as Death: A Fifty-State Survey of State and Local Tax Laws* (Durham, N.C.: Carolina Academic Press 2007).

**Hamilton**         Virginia Van der Veer Hamilton, *Lister Hill – Statesman From the South* (Tuscaloosa: University of Alabama Press 1987).

**Hanson**           Harry Hanson, *The Civil War: A History* (New York: Signet Classics 2010) (1961).

**Harvey I**         Ira W. Harvey, *A History of Educational Finance in Alabama* (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989).

**Harvey II**        Ira W. Harvey, *Financing Alabama's Schools: The Pursuit of Accountability, Adequacy and Equity* (Montgomery, Ala.: Auburn University Montgomery Center for Government and Public Affairs 2000).

**Harvey III**       Ira W. Harvey, *School Finance Training Program Manual* (Tuscaloosa: University of Alabama Superintendents' Academy, Jan. 2005 Rev.), found at http://uasa.ua.edu/academy%20programs%20html/school_finance_Training_Manual.html

**Holmes**  Oliver Wendell Holmes, Jr., *The Common Law* (Boston, Mass.:  Little, Brown, and Company 1881).

**Irons**  Peter Irons, *Jim Crow's Children:  The Broken Promise of the* Brown *Decision* (London:  Penguin Books 2004).

**Jackson**  Harvey H. Jackson III, *Inside Alabama: A Personal History of My State* (Tuscaloosa:  The University of Alabama Press 2004).

**Jacobs**  Grover Tolbert Jacobs, *Constitutional, Statutory and Judicial History of Property Tax as a Source of Support for Public Education in Alabama, 1819-1976* (June 8, 1976) (unpublished Ph.D. dissertation, Auburn University) (on file with University of Georgia Libraries).

**Jaisingh**  Lloyd Jaisingh, *Statistics for the Utterly Confused* (New York: McGraw-Hill 2000).

**James**  Lawrence James, *Aristocrats — Power, Grace, and Decadence:  Britain's Great Ruling Classes from 1066 to the Present* (New York:  St. Martin's Press 2009).

**Johns & Morphet**  Roe L. Johns & Edgar L. Morphet, *The Economics and Financing of Education* (Englewood Cliffs, N.J.:  Prentice Hall 2d ed. 1969).

**V.O. Key**  V.O. Key, Jr., *Southern Politics in State and Nation* (New York:  Alfred A. Knopf 1949).

**Legislator's Guide**  The Legislative Fiscal Office, *A Legislator's Guide to Alabama's Taxes:  A Summary of the Major Revenue Sources of the State of Alabama* (2007).

**Lester**  Julius Lester, *To Be A Slave* (New York:  Scholastic Press 1968).

**Martin**  Thomas W. Martin, *The Story of Horseshoe Bend National Military Park* (Birmingham, Ala.:  The Southern University Press 1959).

**Mayfield**  James J. Mayfield, *Constitutions of 1875 and 1901:  Paralleled, Annotated and Indexed* (Nashville, Tenn:  Marshall & Bruce Co. 1904).

**McCurley & Norman**  Robert L. McCurley & Keith B. Norman, *Alabama Legislation* (Tuscaloosa: Alabama Law Institute 4th ed. 1997).

**Martineau**  Harriet Martineau, *Society in America* (London: Saunders & Otley 1837).

**McKelvey**  John Jay McKelvey, *Principles of Common-Law Pleading* (New York:  Baker, Voorhis & Company 2d ed. 1917)

**McMillan**  Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901: A Study in Politics, the Negro, and Sectionalism* (Chapel Hill:  University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Company 1978).

**McPherson**  James M. McPherson, *Ordeal by Fire:  The Civil War & Reconstruction* (New York:  McGraw-Hill 2d ed. 1992).

**Miller I**  Perry Miller, *Errand into Wilderness* (Boston:  Harvard University Press 1956)

**Miller II**          Perry Miller, *The New England Mind, From Colony to Province* (Boston:  Harvard University Press 1953)

**Mitchell**           Margaret Mitchell, *Gone With The Wind* (New York:  Macmillan Publishing Co. 1936).

**Morgan**             Edmund S. Morgan, *American Slavery, American Freedom — The Ordeal of Colonial Virginia* (New York:  History Book Club Francis Parkman Prize Edition 2005) (1975).

**Newman**             Roger K. Newman, *Hugo Black:  A Biography* (New York:  Fordham University Press 1997).

**Norrell I**          Robert J. Norrell, *Reaping the Whirlwind:  The Civil Rights Movement in Tuskegee* (Chapel Hill:  The University of North Carolina Press 1998) (1985).

**Norrell II**         Robert J. Norrell, *Up From History:  The Life of Booker T. Washington* (Cambridge, Mass.:  The Belknap Press 2009).

**Oxford Sup. Ct. I**  *The Oxford Companion to the Supreme Court of the United States* (New York:  Oxford University Press 1992) (Kermit L. Hall, James W. Ely, Jr., Joel B. Grossman & William M. Wiecek eds.).

**Oxford Sup. Ct. II** *The Oxford Companion to the Supreme Court of the United States* (New York:  Oxford University Press 2d ed. 2005) (Kermit L. Hall, James W. Ely, Jr. & Joel B. Grossman eds.).

**Patrick**            Rembert W. Patrick, *Jefferson Davis and His Cabinet* (Baton Rouge: Louisiana State University Press 1944).

**Patterson**          James T. Patterson, Brown v. Board of Education: *A Civil Rights Milestone and Its Troubled Legacy* (New York:  Oxford University Press 2001).

**Permaloff & Grafton I**    Anne Permaloff & Carl Grafton, *Political Power in Alabama: The More Things Change* . . . (Athens:  The University of Georgia Press 1996).

**Permaloff & Grafton II**   Carl Grafton & Anne Permaloff, "James E. Folsom, 1947-1951, 1955-1959," in *Alabama Governors:  A Political History of the State* (Tuscaloosa:  The University of Alabama Press 2001, Samuel L. Webb & Margaret E. Arbrester eds.).

**Permaloff & Grafton III**  Anne Permaloff & Carl Grafton, "John Patterson*, 1959-1963*," in *Alabama Governors:  A Political History of the State* (Tuscaloosa:  The University of Alabama Press 2001) (Samuel E. Webb & Margaret E. Arbrester eds.).

**Pickett**            Albert James Pickett, *Pickett's History of Alabama:  And Incidentally of Georgia and Mississippi from the Earliest Period* (Montgomery, Ala.: River City Publishing 2003) (1851).

**Remini**             1 Robert V. Remini, *Andrew Jackson: The Course of American Empire, 1767–1821* (Baltimore:  The Johns Hopkins University Press 1998) (1977).

| | |
|---|---|
| **Roberts** | Frances Cabaniss Roberts, *Background and Formative Period in the Great Bend and Madison County* (May 10, 1956) (unpublished Ph.D. dissertation, University of Alabama) (on file with Gorgas Library, The University of Alabama, Tuscaloosa). |
| **Rogers I** | William Warren Rogers, *The One-Gallused Rebellion:  Agrarianism in Alabama, 1865–1896* (Baton Rouge:  Louisiana State University Press 1970). |
| **Rogers & Ward I** | William Warren Rogers & Robert David Ward, *August Reckoning: Jack Turner and Racism in Post-Civil War Alabama* (Baton Rouge:  Louisiana State University Press 1973). |
| **Rogers & Ward II** | William Warren Rogers & Robert David Ward, "Part Two: From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* (Tuscaloosa:  The University of Alabama Press 1994). |
| **Sellers** | James Benson Sellers, *Slavery in Alabama* (Tuscaloosa: The University of Alabama Press 1994) (1950). |
| **Sracic** | Paul A. Sracic, San Antonio v. Rodriguez *and the Pursuit of Equal Education:  The Debate over Discrimination and School Funding* (Lawrence:  The University Press of Kansas 2006) |
| **Smith** | Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* (New York:  P.F. Collier & Son ed. 1902) (1776). |
| **Stewart I** | William H. Stewart, "Forrest ('Fob') James, Jr., 1979–1983, 1995–1999," in *Alabama Governors:  A Political History of the State* (Tuscaloosa:  The University of Alabama Press 2001, Samuel L. Webb & Margaret E. Armbrester eds.). |
| **Stewart II** | William H. Stewart, *The Alabama State Constitution* (New York:   Oxford University Press 2011). |
| **Thornton I** | J. Mills Thornton III, *Politics and Power in a Slave Society: Alabama, 1800-1869* (Baton Rouge:  Louisiana State University Press 1978). |
| **Thornton II** | J. Mills Thornton III, "Fiscal Policy and the Failure of Radical Reconstruction in the Lower South," in J. Morgan Kousser & James M. McPherson, *Region, Race, and Reconstruction: Essays in Honor of C. Vann Woodward* (New York:  Oxford University Press 1982). |
| **Trest** | Warren Trest, *Nobody But The People:  The Life and Times of Alabama's Youngest Governor* (Montgomery, Ala.:  New South Books 2008). |
| **Triola** | Mario F. Triola, *Elementary Statistics* (Boston:  Addison Wesley Longman 8th ed. 2001). |
| **Vitaliano** | Donald F. Vitaliano, in "Property tax, farm," *The Encyclopedia of Taxation and Tax Policy* (Washington, D.C.:  The Urban Institute Press 1999) (Joseph J. Cordes, Robert D. Ebel, and Jane G. Gravelle eds.). |

| | |
|---|---|
| **Vogt** | W. Paul Vogt, *Dictionary of Statistics and Methodology* (Thousand Oaks, Cal.: Sage Publications 2d ed. 1999). |
| **Walker** | Williston Walker, *The Creeds and Platforms of Congregationalism* (New York: Charles Scribner's Sons 1893). |
| **Ward & Sparkman** | Keith J. Ward & Betty D. Sparkman, *Property Tax Administration:  Reappraisal in Alabama* (Auburn, Ala.:  Office of Public Service & Research, School of Arts & Sciences 1980). |
| **Washington** | Booker T. Washington, *Up From Slavery:   An Autobiography* (New York: Doubleday, Page & Co. 1907). |
| **Webb** | Samuel L. Webb, "The Populist Revolt in Alabama:  Prelude to Disfranchisement," in *A Century of Controversy:  Constitutional Reform in Alabama* (Tuscaloosa: The University of Alabama Press 2002, Bailey Thomson ed.). |
| **Webb & Armbrester** | *Alabama Governors: A Political History of the State* (Tuscaloosa:  The University of Alabama Press 2001, Samuel L. Webb & Margaret E. Armbrester eds.). |
| **White** | Marjorie Longenecker White, *The Birmingham District:  An Industrial History and Guide* (Birmingham:  Birmingham Publishing Co., for the Birmingham Historical Society 1981). |
| **Wiggins** | Sarah Woolfolk Wiggins, *The Scalawag in Alabama Politics, 1865–1881* (Tuscaloosa:  The University of Alabama Press 1977). |
| **Wood** | Gordon S. Wood, *The Purpose of the Past:  Reflections on the Use of History* (New York:  The Penguin Press 2008). |
| **Woodward** | C. Vann Woodward, *The Strange Career of Jim Crow* (New York:   Oxford University Press 2002) (1955). |
| **Ziegler** | Edith Ziegler, *Schools in the Landscape: Localism, Cultural Tradition, and the Development of Alabama's Public Education System, 1865-1915* (Tuscaloosa: The University of Alabama Press 2010). |

## PERIODICALS, SCHOLARLY JOURNALS, AND PUBLISHED REPORTS

| | |
|---|---|
| **Bagwell** | David Ashley Bagwell, *The "Magical Process": The Sayre Election Law of 1893*, 25 Alabama Review 83 (April 1972). |
| **Bailey** | Hugh C. Bailey, *John W. Walker and the "Georgia Machine" in Early Alabama Politics,* 8 Ala. Rev. 179 (1955). |
| **Barnes & Chemerinsky** | Mario L. Barnes & Erwin Chemerinsky, *The Once and Future Equal Protection Doctrine*, 43 Connecticut Law Review 1059 (2011). |
| **Bickel** | Alexander M. Bickel*, The Original Understanding and the Segregation Decision*, 69 Harvard Law Review 1 (1955). |

**Brest**  Paul Brest, Palmer v. Thompson: *An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Supreme Court Review 95 (Chicago:  The University of Chicago Press 1972).

**Bryant**  Douglas H. Bryant, *Unorthodox and Paradox: Revisiting the Ratification of the Fourteenth Amendment*, 53 Alabama Law Review 555 (2002)

**Bryce**  James D. Bryce, *Tax Reform Issues in Alabama,* 43 Alabama Law Review 541 (1992)

**Chafetz**  Josh Chafetz, *Multiplicity in Federalism and the Separation of Powers*, 120 Yale Law Journal 1084 (2011).

**Chemerinsky III**  Erwin Chemerinsky, *Lost Opportunity:  The Burger Court and the Failure to Achieve Equal Educational Opportunity*, 45 Mercer Law Review 999 (1994).

**Currie**  David P. Currie, *The Reconstruction Congress*, 75 University of Chicago Law Review 383 (2008).

**Dayton & Dupre**  John Dayton & Anne Dupre, *School Funding Litigation: Who's Winning the War?*, 57 Vanderbilt Law Review 2351 (2004).

**Eisenberg & Johnson**  Theodore Eisenberg & Sherri Lynn Johnson, *The Effects of Intent:  Do We Know How Legal Standards Work?*, 76 Cornell Law Review 1151 (1991).

**Ely**  John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale Law Journal 1205 (1970).

**Ely & Walthall**  Bruce P. Ely & Howard P. Walthall, Sr., *State Constitutional Limitations on Taxing and Spending: A Comparison of the Alabama Constitution of 1901 to its Counterparts*, 33 Cumberland Law Review 463 (2003).

**Fair**  Bryan K. Fair, *Equality for All: The Case For a New Declaration of Rights Article of the Alabama Constitution*, 33 Cumberland Law Review 339 (2003).

**Farber & Frickey**  Daniel A. Farber & Philip P. Frickey, *Is* Carolene Products *Dead?  Reflections on Affirmative Action and the Dynamics of Civil Rights Legislation*, 79 California Law Review 685 (1991).

**Fellner**  Jamie Fellner, Race, Drugs, and Law Enforcement in the United States, 20 Stanford Law & Policy Review 257 (2009).

**Gibson**  J. Sullivan Gibson, *The Alabama Black Belt:  Its Economic Status*, 17 Economic Geography 1 (1941).

**Haden**  Harry H. Haden, *Equality — The Cornerstone of Democracy*, 21 Alabama Lawyer 269 (1960).

**Hamill II**  Susan Pace Hamill, *An Argument for Tax Reform Based on Judeo-Christian Ethics*, 54 Alabama Law Review 1 (2002).

**Hamill III**    Susan Pace Hamill, *Constitutional Reform in Alabama:  A Necessary Step Towards Achieving a Fair and Efficient Tax Structure*, 33 Cumberland Law Review 437 (2003).

**Howe**    Scott W. Howe, *Human Dignity as the Polestar for Rights Decision Making*, 73 Boston University Law Review 695 (1993).

**Hutchinson**    D.J. Hutchinson, *Unanimity and Desegregation*, 68 Georgetown Law Journal 1 (1979).

**Kaczorowski**    Robert J. Kaczorowski, *The Enforcement Provisions of the Civil Rights Act of 1866:  A Legislative History in Light of* Runyon v. McCrary, 98 Yale Law Journal 565 (1989).

**Karlan**    Pamela S. Karlan, *John Hart Ely and the Problem of Gerrymandering:  The Lion in Winter*, 114 Yale Law Journal 1329 (2005).

**Klarman**    Michael Klarman, Brown*, Racial Change, and the Civil Rights Movement*, 80 Virginia Law Review 7 (1994).

**Kobick**    Julia Kobick, *Discriminatory Intent Reconsidered:  Folk Concepts of Intentionality and Equal Protection Jurisprudence*, 45 Harvard Civil Rights – Civil Liberties Law Review 517 (2010).

**Landsberg**    Brian K. Landsberg, *Sumter County, Alabama and the Origins of the Voting Rights Act*, 54 Alabama Law Review 877 (2003).

**Linzer**    Peter Linzer, *The* Carolene Products *Footnote and the Preferred Position of Individual Rights*, 12 Constitutional Commentary 277 (1995) (Minneapolis, Minn.: Minnesota Center for Legal Studies 1995).

**Longmore**    Paul K. Longmore, *Good English Without Idiom or Tone:  The Colonial Origins of American Speech*, 37 Journal of Interdisciplinary History 513 (2007).

**McLaughlin**    Glory McLaughlin, *A Mixture of Race and Reform: The Memory of the Civil War in the Alabama Legal Mind*, 56 Alabama Law Review 285 (2004).

**Mills & Fisher**    Michael R. Mills & Deborah Perry Fisher, Comment, *Alabama's Property Tax: Ineffective, Inefficient, and Inequitable*, 36 Alabama Law Review 147 (1984).

**Nourse & Maguire**    V.F. Nourse & Sarah A. Maguire, *The Lost History of Governance and Equal Protection*, 58 Duke Law Journal 955 (2009).

**Ortiz**    Daniel R. Ortiz, *Got Theory?*, 153 University of Pennsylvania Law Review 459 (2004).

**Peters**    Christopher J. Peters, *Outcomes, Reasons, and Equality*, 80 Boston University Law Review 1095 (2000).

**Riley**    Kathleen Riley, *The Long Shadow of the Confederacy in America's Schools: State-Sponsored Use of Confederate Symbols in the Wake of* Brown v. Board, 10 William & Mary Bill of Rights Journal 525 (2002).

| | |
|---|---|
| **Rubin** | Peter J. Rubin, *Reconnecting Doctrine and Purpose:  A Comprehensive Approach to Strict Scrutiny after* Adarand *and* Shaw, 49 University of Pennsylvania Law Review 1 (2000). |
| **Shavers** | Anna Williams Shavers, *Rethinking the Equity vs. Adequacy Debate: Implications for Rural School Finance Reform Litigation*, 82 Nebraska Law Review 133 (2003). |
| **Sherry** | Suzanna Sherry, *All the Supreme Court Really Needs to Know it Learned from the Warren Court*, 50 Vanderbilt Law Review 459 (1997). |
| **Smedley** | Theodore Smedley, *Developments in the Law of School Desegregation*, 26 Vanderbilt Law Review 405 (1973). |
| **Starkey** | Brando Simeo Starkey, *Criminal Procedure, Jury Discrimination & the Pre-Davis Intent Doctrine:  The Seeds of a Weak Equal Protection Clause*, 38 American Journal of Criminal Law 1 (2010). |
| **Stumpf** | Juliet P. Stumpf, *States of Confusion:  The Rise of State and Local Power Over Immigration*, 86 North Carolina Law Review 1557 (2008). |
| **Sutton** | Jeffrey S. Sutton, San Antonio Independent School District v. Rodriguez *and its Aftermath*, 94 Virginia Law Review 1963 (2008). |
| **Ward & Sauser** | Keith J. Ward & Lane D. Sauser, *Equity Funding for Education:  A Report to the Alabama Legislature* (Auburn, Ala.:  Auburn University Center for Governmental Services 1997). |
| **Ward & Sparkman** | Keith J. Ward & Betty D. Sparkman, *Property Tax Administration:  Reappraisal in Alabama* (Auburn, Ala.:  Auburn University School of Arts & Sciences, Office of Public Service & Research 1980). |
| **Yoshino** | Kenji Yoshino, *The New Equal Protection*, 124 Harvard Law Review 747 (2011). |

### MISCELLANEOUS SOURCES

| | |
|---|---|
| **Agreed Facts** | Doc. no. 242-1 (Parties' Statement of Agreed Facts). |
| **1st Reconst. Act** | First Reconstruction Act of 1867, ch. 153, 14 Stat. 428 (1867). |
| **2d Reconst. Act** | Second Reconstruction Act of 1867, ch. 6, 15 Stat. 2 (1867). |
| **2007 National Resources Inventory** | 2007 National Resources Inventory Summary Report (compiled and published jointly by the United States Department of Agriculture Natural Resources Conservation Service and the Iowa State University Center for Survey Statistics and Methodology). |
| **Kendrick** | Benjamin Burks Kendrick, *The Journal of the Joint Committee of Fifteen on Reconstruction* (1914). |

| | |
|---|---|
| **Winemiller** | Terrance L. Winemiller, "Black Belt Region in Alabama," in online version of The Encyclopedia of Alabama, found at http://www. encyclopediaofalabama.org/face/Article.jsp?id=h-2458 (last visited Oct. 5, 2011). |
| **Wright, Miller, & Cooper** | Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure:  Jurisdiction* (2d ed. 2006). |

**ALABAMA COUNTIES**
(Showing Dates of Creation)

ALABAMA
DATES OF CREATION OF COUNTIES

*xxix*

# I.  INTRODUCTION

*We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. . . .*

> The unanimous Declaration of the thirteen united States of America, adopted in Congress, July 4, 1776.

This case is a sequel to the action litigated in this District from 1981 through 2004 under the style of "*John F. Knight, Jr., et al. vs. State of Alabama, et al.*," Civil Action No. CV 83-M-1676-S (N.D. Ala. July 11, 1983) (Murphy, J., sitting by designation).[1]  The plaintiffs in the *Knight* line of cases, discussed in detail later in this opinion, originally claimed that Alabama had failed to complete the desegregation of its public colleges and universities, and that "many of the State's policies governing higher education tended to perpetuate its formerly *de jure* segregated university system."  *Knight v. Alabama*, 476 F.3d 1219, 1220 (11th Cir. 2004) ("*Knight III-A* ").  As such, both *Knight* and the present case implicate the Nation's original sin, slavery, and its post-emancipation manifestations:  segregation and oppression of African-Americans in virtually all aspects of their lives, but

---

[1] *See, e.g.*, *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), *aff'd in part*, *rev'd in part*, *vacated in part*, 14 F.3d 1534 (11th Cir. 1994), *on remand*, *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995); *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1277 (N.D. Ala.), *aff'd*, 476 F.3d 1219 (11th Cir. 2004), *cert. denied* 127 S. Ct. 3014 (2007).  For convenience, the foregoing citations were listed in chronological, as opposed to *Bluebook*, order.

especially in educational opportunities.  Judge Harold Murphy addressed the same

points in his first *Knight* opinion, saying:

> More than three hundred and fifty years ago, Africans were first brought to this country to be sold into slavery.  Forbidden formal education, slaves served at the pleasure of their white masters and learned only the anguish of unrewarded toil.  The "self-evident" truth contained within the Declaration of Independence that all persons are created equal had no application to the slave.  The slave was neither free nor equal.  Commenting on whether the Framers of the Constitution considered slaves to be included within the phrase "We the People," Chief Justice Taney penned the following remarks in the *Dred Scott* case:

>> We think they are not, . . . [and] were not intended to be included. . . .
>>> . . . .

>> They had for more than a century before been regarded as beings of an inferior order; and altogether unfit to associate with the white race . . .; and so far inferior, that the negro might justly and lawfully be reduced to slavery for his benefit.

>>> . . . .

>> [A]ccordingly, a negro of the African race was regarded . . . as an article of property, and held, and bought and sold as such. . . .

> *Scott v. Sandford*, 60 U.S. (19 How.) 393, 405, 407-08, 15 L. Ed. 691 (1857) quoted by, Marshall, *The Constitution's Bicentennial: Commemorating the Wrong Document?,* 40 Vand. L. Rev. 1337, 1340 (1987).

> The emancipation of the African American as property was

2

accomplished at the conclusion of the Civil War with the ratification of the Thirteenth Amendment to the United States Constitution.  The prize of freedom was effectively denied[,] however, by the enactment of the Black Codes whose intent was the continued subordination of the newly freed slave.  *One of the forms of subordination was the rigid control by whites of black education.  Most whites wanted blacks educated, if at all, only to the minimum level necessary to provide semi-skilled labor.  Black educational institutions were under the complete control of white officials who, for the most part, shared the paternalistic view that black subordination was a natural condition that worked for the betterment of both races.*

The history of black higher education in Alabama following the Civil War is not atypical.  *Strict white control was the hallmark of black higher education in the state until the 1970's.*  For many years blacks were effectively denied the benefits of a collegiate education by the operation of two interrelated practices: the uncompromising segregation of the state's white institutions and the limited educational mission assigned to the state's black colleges.  *Concomitant to these two practices, there arose a host of policies and laws designed to institutionalize segregation while assuring the inferior status of black education.*  The case at bar is[,] in large measure, about identifying and eliminating those segregative policies and practices which survived federally mandated integration.

These surviving policies and practices, referred to as vestiges of the *de jure* period of segregation, must be abolished root and branch if the mandate of the Constitution is to be satisfied.  . . .

*Knight v. Alabama*, 787 F. Supp. 1030, 1045-46 (N.D. Ala. 1991) ("*Knight I* ")

(emphasis and bracketed alterations supplied).  The following two subsections

elaborate Judge Murphy's observations.

[This page intentionally left blank.]

## A.   The Centrality of Race

The history, politics, and policies of all Southern states, but those of Alabama in particular, must take into account the centrality of race, and the destructive influence of the evil institution of human slavery on the human mind and spirit.  For just one example, when Thomas Jefferson penned the immortal testament from our Nation's secular scripture that is quoted at the beginning of this opinion, "he was personally depriving nearly two hundred men, women, and children of their liberty. When he died, on the fiftieth anniversary of his great Declaration, he still owned slaves, probably more than two hundred."[2]  The fact that two such, inherently-contradictory notions — *i.e.*, the toleration of slavery in the Southern colonies, concurrently with the evolution of concepts of self-governance and the "unalienable Rights" of all men to "Life, Liberty and the pursuit of Happiness" — could coexist side-by-side is far more than just a perplexing conundrum.  It is, as Professor Edmund S. Morgan observed, "the central paradox of American history":

> For the historian it poses a challenge to probe the connection:  to explain how a people could have developed the dedication to human liberty and dignity exhibited by the leaders of the American Revolution and at the same time have developed and maintained a system of labor that denied human liberty and dignity every hour of the day.

---

[2] Edmund S. Morgan, *American Slavery, American Freedom — The Ordeal of Colonial Virginia* 4 (New York:  History Book Club Francis Parkman Prize Edition 2005) (1975) (footnote omitted) ("**Morgan**").

5

. . . .

The paradox is American, and it behooves Americans to understand it if they would understand themselves. . . .[3]

Harvard Professor V.O. Key made a similar observation in his monumental

study of Southern politics:

> In its grand outlines the politics of the South revolves around the position of the Negro.  It is at times interpreted as a politics of cotton, as a politics of free trade, as a politics of agrarian poverty, or as a politics of planter and plutocrat.  Although such interpretations have a superficial validity, in the last analysis the major peculiarities of southern politics go back to the Negro.  Whatever phase of the southern political process one seeks to understand, sooner or later the trail of inquiry leads to the Negro.[4]

1.    **The Slave Experience**

For at least eighty-eight years, from the "Corrupt Bargain" of 1877,[5] ending

---

[3] *Id*. at 4-5.

[4] V.O. Key, Jr., *Southern Politics in State and Nation* 5 (New York:  Alfred A. Knopf 1949) ("**V.O. Key**").

[5] The Compromise of 1877, or "Corrupt Bargain" as it also was known, refers to the reliably authenticated, but unwritten deal that resolved the disputed 1876 Presidential election, ended Congressional ("Radical") Reconstruction, and led to withdrawal of federal troops from those southern states still under military occupation, and the end of martial law and "provisional governments."  As a result of this politically-brokered bargain, the Republican candidate for President, Rutherford B. Hayes, who had not attained the largest share of the popular votes, was awarded the White House over the Democratic candidate, Samuel J. Tilden, on the understanding that Hayes would remove the federal troops that were propping up Republican state governments in Florida, Louisiana, and South Carolina.  However, as will be seen in Part III(A) of this opinion, *infra*, discussing this court's findings of historical facts, conservative Alabama Democrats previously had "redeemed" control of State government from Republican carpetbaggers, scalawags, and former slaves in the 1874 general election.

federal attempts to "Reconstruct" the rebellious, former-slaveholding states, until the enactment of the Civil Rights Act of 1964 and the Voting Rights Act of 1965, historians,[6] movie makers,[7] and authors[8] crafted romanticized versions of the Antebellum South and its "peculiar institution."

"The typical slave experience, however, was very different and characterized by a vicious cruelty."[9]  "Regarding the African slaves as little more than animals, the slave-holders bought them at market, branded them, sometimes gave them names ordinarily reserved for dogs and horses, and bridled, haltered, and punished them as if they were domesticated livestock."[10] With the sole exception of those blessed few who found their way to freedom on the "Underground Railroad,"[11] death was the only

[6] *E.g.*, Walter Lynwood Fleming, *Civil War and Reconstruction in Alabama* (New York:  The Columbia University Press 1905); John Witherspoon DuBose, *Alabama's Tragic Decade:  Ten Years of Alabama 1865-1874* (Birmingham, Ala.:  Webb Book Company 1940) (James K. Greer ed.).

[7] *E.g.*, D.W. Griffith's 1915 silent film classic, "The Birth of a Nation" (originally released as "The Clansman," after the title of the 1905 novel by Thomas Dixon, Jr., upon which the movie script was based).

[8] *E.g.*, Margaret Mitchell, *Gone With The Wind* (New York:  Macmillan Publishing Co. 1936).

[9] Julius Lester, *To Be A Slave* 32 (New York:  Scholastic Press 1968).  *See generally* James Benson Sellers, *Slavery in Alabama* (Tuscaloosa:  The University of Alabama Press 1994) (1950).

[10] Gordon S. Wood, *The Purpose of the Past:  Reflections on the Uses of History* 295 (New York:  The Penguin Press 2008).

[11] The Underground Railroad was an informal network of secret routes and safe houses used by Nineteenth Century black slaves in the Southern states to escape to free states and Canada with the aid of abolitionists and other allies who were sympathetic to their plight.  *See generally*, *e.g.*, David W. Blight, *Passages to Freedom:  The Underground Railroad in History and Memory* (Washington, D.C.:  Smithsonian Books 2001).  Unreliable accounts indicate that as many as 30,000 slaves escaped by means of this network at its pre-Civil War peak, but respected chroniclers of the

7

escape from "the anguish of their unrewarded toil."[12]

More accurate portrayals of a slave's daily existence were provided by contemporary witnesses who traveled through Alabama during its "flush times," prior to the Civil War.[13]  The following account, for example, was penned by an English noblewoman and diarist in 1837, and describes her impressions of African slaves observed during a transit through the Black Belt counties of East-Central Alabama.

> We saw to-day, the common sight of companies of slaves traveling westwards; and the very uncommon one of a party returning into South Carolina.  When we overtook such a company proceeding westwards, and asked where they were going, the answer commonly given by the slaves was, "Into Yellibama."[14] — Sometimes these poor creatures were encamped, under the care of the slave-trader, on the banks of a clear stream, to spend a day in washing their clothes. Sometimes they were loitering along the road; the old folks and infants mounted on the top of a wagon-load of luggage; the able-bodied, on foot, perhaps silent, perhaps laughing; the prettier of the girls, perhaps with a flower in the hair, and a lover's arm around her shoulder.  *There were wide differences in the air and gait of these people.  It is usual to*

---

African experience in America put the number at closer to 6,000 precious few.  John Hope Franklin & Alfred A. Moss, Jr., *From Slavery to Freedom:  A History of African Americans* 204-209 (New York:  McGraw-Hill Companies 7th ed. 1994).

   [12] *Knight I*, 787 F. Supp. at 1045.

   [13] *Cf.* Joseph G. Baldwin, *The Flush Times of Alabama and Mississippi:  A Series of Sketches* (New York: D. Appleton & Co. 1854).

   [14] This court speculates that the description probably was based upon either the Yellow-bellied Woodpecker (*Picus varius*), a beautiful species that migrates to Southern states about the beginning of October, and departs before the beginning of April, returning to the middle and northern parts of the United States (*see*, *e.g.*, www.audabon.org), or the "Yellowhammer" (the Northern Flicker, *Colaptes auratus*), which has been Alabama's official State Bird since 1927 (*see*, *e.g.*, www.statesymbolsusa.org/Alabama/bird/_yellowhammer).  Both should be distinguished from the Yellow-bellied Sapsucker (*Sphyrapicus varius*).

*call the most depressed of them brutish in appearance.  In some sense they are so*; *but I never saw in any brute an expression of countenance so low*, *so lost*, *as the most degraded class of negroes*.  There is some life and intelligence in the countenance of every animal; even in that of "the silly sheep," [but] *nothing so dead as the vacant, unheeding look of the depressed slave is to be seen*.  To-day there was a spectacle by the roadside which showed that *this has nothing to do with negro nature. . . .  To-day, we passed, in the Creek Territory, *an establishment of Indians who held slaves.  Negroes are anxious to be sold to Indians*, who give them moderate work, and accommodations as good as their own.  *Those seen today among the Indians were sleek, intelligent, and cheerful-looking*, *like the most favored house-slaves*, *or free servants of colour, where the prejudice is least strong.*[15]

An even more poignant, first-hand description of what it was like to be born into the slave system was provided by one of the extraordinary historical figures of the nineteenth century, and a great leader of his race, Dr. Booker T. Washington, President of Tuskegee Institute:

> I was born a slave on a plantation in Franklin County, Virginia. I am not quite sure of the exact place or exact date of my birth, but at any rate I suspect I must have been born somewhere and at some time. As nearly as I have been able to learn, I was born near a cross-roads post-office called Hale's Ford, and the year was 1858 or 1859.  I do not know the month or the day.  The earliest impressions I can now recall are of the plantation and the slave quarters — the latter being that part of the plantation where the slaves had their cabins.
>
> My life had its beginning in the midst of the most miserable, desolate, and discouraging surroundings.  This was so, however, not

---

[15] Harriet Martineau, *Society in America* (London:  Saunders & Otley 1837) (emphasis and bracketed alteration supplied), quoted in Walter Bertram Hitchcock, Jr., "Telling Observations: Early Travelers in East-Central Alabama," in *Clearings in the Thicket:  An Alabama Humanities Reader* 39, 51-52 (Macon, Ga.:  Mercer University Press 1985) (Jerry Elijah Brown, ed.).

because my owners were especially cruel, for they were not, as compared with many others.  I was born in a typical log cabin, about fourteen by sixteen feet square.  In this cabin I lived with my mother and a brother and sister till after the Civil War, when we were all declared free.

Of my ancestry I know almost nothing.  In the slave quarters, and even later, I heard whispered conversations among the coloured people of the tortures which the slaves, including, no doubt, my ancestors on my mother's side, suffered in the middle passage of the slave ship while being conveyed from Africa to America.  I have been unsuccessful in securing any information that would throw any accurate light upon the history of my family beyond my mother.  She, I remember, had a half-brother and a half-sister.  In the days of slavery not very much attention was given to family history and family records — that is, black family records.  My mother, I suppose, attracted the attention of a purchaser who was afterward my owner and hers.  Her addition to the slave family attracted about as much attention as the purchase of a new horse or cow. Of my father I know even less than of my mother.  I do not even know his name.  I have heard reports to the effect that he was a white man who lived on one of the near-by plantations.  Whoever he was, I never heard of his taking the least interest in me or providing in any way for my rearing.  But I do not find especial fault with him.  He was simply another unfortunate victim of the institution which the Nation unhappily had engrafted upon it at that time.[16]

## 2.    The Post-Emancipation Experience

*In the beauty of the lilies Christ was born across the sea,*
*With a glory in His bosom that transfigures you and me:*
*As He died to make men holy, let us die to make men free,*
*While God is marching on.*

> Julia Ward Howe, "Battle Hymn of the Republic," 5th verse (1861).

---

[16] Booker T. Washington, *Up From Slavery:  An Autobiography* 1-3 (New York: Doubleday, Page & Co. 1907) ("**Washington**").

The Civil War was the deadliest conflict in American history. More than 620,000 persons died in the struggle to restore the Union and eradicate the evil institution of slavery — more Americans than have died in all other wars and conflicts in which this Nation has been involved, before or since.[17]  Sadly, that sacrifice of blood by the hallowed dead produced few beneficial effects in the lives of the emancipated slaves. As Judge Murphy observed, the "prize of freedom was effectively denied . . . by the enactment of the Black Codes whose intent was the continued subordination of the newly freed slave."[18]  Indeed, the lives of an overwhelming number of black men, women, and children for most of the century following the end of the Civil War continued to be one of drudgery, illiteracy, few (or no) educational opportunities, poor nutrition, bad health, high infant mortality rates, short life expectancies for those who survived infancy, oppressive discrimination, brutal violence, and lynchings (mob murder unsanctioned by state law).

As Professors Rogers and Ward observed, during the nine decades between the 1874 election cycle (when "Conservative Democrats" "redeemed" control of State government from the "Radical Republican" cabal of carpetbaggers, scalawags, and

---

[17] Confederate deaths were about 260,000, of whom 93,000 were killed in combat, and 137,000 were wounded. Union deaths numbered at least 360,000, and 275,200 were wounded in combat. Disease was the major cause of death in the Civil War. Of the 620,000 who died on both sides, more than 400,000 succumbed to disease.

[18] *Knight I*, 787 F. Supp. at 1045.

11

former slaves) and the Civil Rights Act of 1964,

Alabama became a state whose institutions were frankly, admittedly, unashamedly, and triumphantly dominated by whites. The theory of white supremacy and black inferiority found daily expression and constant application. If Caucasian dominance became legally fixed and formalized (as it did), Anglo-Saxon superiority was no less manifest in unstated ways. If a white man and a black man met face to face on a narrow walk, it was the black who stepped aside to let the other pass; a white man's surname was always prefaced with "Mister," or some sort of title, a Negro's never; purchases paid for in cash primarily involved the color green[,] until a merchant was confronted simultaneously with two customers whom he must accommodate according to black or white.

White superiority was no less evident in a verbal folklore spawned by, repeated by, and believed by whites: Negro men were naturally lazy and without ambition, desirous of having sexual relations with white women, incapable of higher reasoning, uncontrollable when under the influence of liquor, and cursed forever with an offensive body smell. And yet with all his negative qualities, the black, according to the Southern mystique, given proper guidance by his white mentors[,] was carefree, musical, naive, gentle, mercurial, anatomically limber, religious (in an outlandish way), and humorous. Still, the black race, as everyone knew, *was* inferior, and all things proceeded from this basic premise.

Schools at all levels were separate and unequal. With a few exceptions white people worshiped in white churches and heard sermons by white preachers, while black congregations gathered in black churches and listened to the discourses of black ministers. Presumably both races prayed to the same God and were somehow hopeful of the same hereafter — but in the here and now religious life was firmly segregated. The Negro did not achieve economic independence. In the debased, sub-marginal world of tenant farmers and sharecroppers, the unenvied place on the bottom rail was occupied by the black man. In a society where the accumulation of money bore integral relation to the possession of power, the Negro was tragically unarmed.

As for politics, the Negro was frequently discouraged from voting, but not until the Populists courted Negro votes in the 1890s and threatened Bourbon supremacy . . . was there a movement for mass disfranchisement.  Before that, what was important to the Bourbons was how the Negroes voted, and their votes were, as a matter of course, manipulated and controlled.   After the Bourbons came to power, government and politics and all their trappings — the rewards of office, fame, the awarding of contracts, the right to draft, pass and enforce legislation — were the domain of the white race and Negro participation was by sufferance.[19]

---

[19] William Warren Rogers & Robert David Ward, *August Reckoning:  Jack Turner and Racism in Post-Civil War Alabama*, at *ix-xi* (Baton Rouge:  Louisiana State University Press 1973) (bracketed alteration supplied) ("**Rogers & Ward**").

[This page intentionally left blank.]

## B.   Statement of the Case

*No governmental power is more easily abused, or more often perverted, than the taxing power.*

> *Mayor of Mobile v. Stonewall Insurance Co.*, 53 Ala. 570, 576 (1875) (Brickell, C.J., unanimous opinion).

The proximate thrust of the claims asserted in this case against the State of Alabama, its Governor, and the Commissioner of the State's Department of Revenue concern the State's *ad valorem* property tax system.  Such forms of taxation are

the oldest type tax that we know anything about.  As far as history shows, there was no tax used earlier than the ad valorem property tax. I suppose that when the very first group organized into a unit of society and decided to have one police force to protect the property of all rather than to operate as they had in the past with each man protecting by force his own property, that the first question to arise was how the cost of this one police force would be met.  I suppose that the obvious answer to this question was that the man with the most property would bear the greater portion of the cost, and the man with least property would bear the least portion of the cost.  *This seems to be such an obvious and fair answer to this problem that it is amazing that today we have large groups of individuals denying openly that this would be a fair manner in which to divide the cost of government.  This is the basic premise upon which the* ad valorem *property tax is built.*  The words "ad valorem" mean in Latin "by value."  Ad valorem "by value" property tax is the only kind of property tax we can have under the Alabama Constitution.  In some states you can have a per specie property tax, but not in Alabama.[20]

### 1.    The Plaintiffs and Their Contentions

*Verily the work does not end with the abolition of slavery, but only*

---

[20] Harry H. Haden, *Equality — The Cornerstone of Democracy*, 21 Ala. Law. 269, 270-71 (1960) (emphasis supplied) ("**Haden**").

15

*begins.*

Frederick Douglass (1818–1895).[21]

*Education makes a people easy to lead, but difficult to drive; easy to govern, but impossible to enslave.*

> Henry Peter Brougham, First Baron of Broughham and Vaux, Lord Chancellor of Great Britain (1778–1868).

Fifth.  *We want our children educated.  The school system in the country districts of the South is a disgrace and in few towns and cities are the Negro schools what they ought to be.  We want the national government to step in and wipe out illiteracy in the South. Either the United States will destroy ignorance or ignorance will destroy the United States.*

*And when we call for education we mean real education.  We believe in work.  We ourselves are workers, but work is not necessarily education.  Education is the development of power and ideal.  We want our children trained as intelligent human beings should be, and we will fight for all time against any proposal to educate black boys and girls simply as servants and underlings, or simply for the use of other people.  They have a right to know, to think, to aspire.*

> The Niagra Address to the Country, issued at the second Niagra Conference held at Harper's Ferry, West Virginia in 1906.[22]

*Upon the education of the people of this country, the fate of this country depends.*

> Benjamin Disraeli, Lord Beaconsfield, Prime Minister of Great Britain (1804-1881).

---

[21] Quoted in Eric Foner, *Forever Free:  The Story of Emancipation and Reconstruction* 67 (New York:  Knopf 2005) ("**Foner II**").

[22] Quoted in W.E.B. Du Bois, *A Soliloquy on Viewing My Life from the Last Decade of Its First Century:  The Autobiography of W.E.B. Du Bois* 251 (New York:  International Publishers Co. 1968) (Herbert Aptheker ed.).

16

This action was commenced by the parents of two African-American ("black")

and three Caucasian ("white") public school students residing in Lawrence County,

Alabama,[23] and five black public school students residing in Sumter County,

Alabama.[24] Those persons assert that the current *ad valorem* tax structure of the State

_____

[23] *See* doc. no. 1 (Complaint) ¶ 7 ("Plaintiffs India Lynch and Wendell Pride, Jr., are minor African-American citizens of Alabama and students in the Lawrence County, Alabama, public schools. They appear through their parents and next friends, Shawn King Lynch and Wendell Pride, who are residents and taxpayers of Lawrence County over the age of eighteen years.") and ¶ 8 ("Plaintiffs Ivy Rose Ball, Slade Berryman, and Cannon Berryman, are minor white citizens of Alabama and students in the Lawrence County, Alabama, public schools. They appear through their parents and next friends, Miranda Ball and Tyler Berryman, who are residents and taxpayers of Lawrence County over the age of eighteen years.").

[24] *Id*. ¶ 9 ("Plaintiffs Rochester Anderson, Cezanne Anderson, Sharnay Brooks, Zekeiah Ormond, and Adrian Widemon are minor African-American citizens of Alabama and students in the Sumter County, Alabama, public schools. They appear through their parents and next friends, Stella Anderson, Michael Brooks, Barbara L. Ormond, and Ada Widemon Jones, who are residents and taxpayers of Sumter County over the age of eighteen years.").

All plaintiffs allege that they satisfy the requirements of Federal Rules of Civil Procedure 23(a) and (b)(2), and asked the court to certify them as representatives of a class consisting of

> all public school students and citizens of Alabama who are injured by the racially discriminatory property tax provisions in the Alabama Constitution complained of herein.
>
> 14. Plaintiffs India Lynch, Wendell Pride, Jr., Rochester Anderson, Cezanne Anderson, Zekeiah Ormond, Adrian Widemon and their parents further request that they be certified to represent a subclass of all African-American public school students and citizens of Alabama who are injured by the racially discriminatory property tax provisions in the Alabama Constitution complained of herein.
>
> 15. Plaintiffs Ivy Rose Ball, Slade Berryman, Cannon Berryman and their parents further request that they be certified to represent a subclass of all white public school students and citizens of Alabama who are injured by the racially discriminatory property tax provisions in the Alabama Constitution complained of herein.

*Id*. ¶¶ 13-15. Plaintiffs never filed a motion seeking class certification, however, and for that reason no plaintiff classes have been certified. For purposes of this opinion, the court will *assume* that the

17

of Alabama "is a vestige of discrimination inasmuch as the [State] constitutional provisions governing the taxation of property are traceable to, rooted in, and have their antecedents in an original segregative, discriminatory policy."[25] Further, in their response to defendants' motion to dismiss, plaintiffs stated that they are "members of a racially defined group who have been purposefully targeted by state legislative action, and who continue to be disadvantaged in exactly the way the laws' drafters intended."[26] They also allege that they are affected by "a set of Alabama constitutional provisions rooted in historic racially discriminatory policies and practices that directly create multiple barriers to the ability of black citizens to obtain school revenues through ad valorem taxes."[27]

### a. The state constitutional provisions challenged by plaintiffs

The five provisions of the State's Constitution that plaintiffs contend "are traceable to Alabama's prior *de jure"* segregated system of K-12 public education facilities are outlined in the following subsections.[28]

---

purported plaintiff classes could satisfy all the certification requirements set forth in Federal Rules of Civil Procedure 23(a) and (b)(2), and that it is, therefore, appropriate to construe and consider their claims as having been brought by the sub-classes of individuals discussed in the complaint.

[25] *Id.* ¶ 1 (quoting *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1311 (N.D. Ala. 2004) ("*Knight III* ")).

[26] Doc. no. 31 (Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss), at 11-12.

[27] *Id.* at 16.

[28] The words between quotation marks in the sentence preceding this footnote are copied from that portion of Judge Murphy's third, 2004 opinion in the *Knight* line of cases ("*Knight III* "), discussed later in this opinion, in which Judge Murphy set out his conclusions of law. In part, he

*i*.        **Article XI, Section 214** — *limiting the State tax rate*

Section 214 of Alabama's 1901 Constitution limits the rate of *ad valorem*

taxation *the State* may levy upon real and personal property to 6.5 mills:  *i.e.*, "The

legislature shall not have the power to levy in any one year a greater rate of taxation

than sixty-five one-hundredths of one per centum on the value of the taxable property

within this State."  Ala. Const. art. XI, § 214 (1901).  A "mill" is equivalent to one-

thousandth of a dollar, or one-tenth of a penny ($0.001).  Thus, the state tax of 6.5

mills is equivalent to slightly more than one-half of one cent ($0.0065);[29] *or*, as stated

---

said the following:

> 7.  The Court first considers whether Plaintiffs have demonstrated that the constitutional restrictions placed on the property tax authority of both state and local governments are traceable to Alabama's prior *de jure* dual system [of public colleges and universities].

> 8.  Based on the extensive record before the Court, the Court finds that Plaintiffs have met their burden to demonstrate that the current ad valorem tax structure is a vestige of discrimination inasmuch as the constitutional provisions governing the taxation of property are traceable to, rooted in, and have their antecedents in an original segregative, discriminatory policy.

> 9.  It is clear that the current tax structure in Alabama cripples the effectiveness of state and local governments in Alabama to raise funds adequate to support higher education.  The Lid Bill and the low assessment ratios impede and restrict the ability of the State and local governments from raising revenue from taxation of property.

*Knight III*, 458 F. Supp. 2d at 1311-12 (addressing the first element of the analytical framework sketched by the Supreme Court in *United States v. Fordice*, 505 U.S. 717 (1992), the Mississippi college desegregation case that also is discussed *infra*).

[29] *See* The Legislative Fiscal Office, *A Legislator's Guide to Alabama's Taxes:  A Summary of the Major Revenue Sources of the State of Alabama* 3 (2007) ("**Legislator's Guide**") ("6.5 mills

in Section 214, "sixty-five one-hundredths of one per centum." *See also* Ala. Const. art. XIV, § 260, *amended by* amend. 111 (*ratified* Sept. 7, 1956) (containing an alternative manner of stating the maximum State millage rate: *i.e*., "nothing herein contained shall be so construed as to authorize the legislature to levy in any one year a greater rate of state taxation for all purposes, including schools, than *sixty-five cents on each one hundred dollars' worth of taxable property*") (emphasis supplied).[30]

Even though the language of Sections 214 and 260 does not explicitly say so, the millage rate is applied to the *assessed value* of the property subject to taxation, as distinguished from its *appraised* (estimated fair market) *value*.[31]   The distinction between the "appraised" and "assessed" values of property is discussed in detail in Part II(F) of this opinion, *infra*, addressing the subject of the manner of computing property taxes in Alabama.

### *ii*.   **Article XI, Section 215** — *limiting county tax rates*

The pertinent portion of Section 215 limits the rate of *ad valorem* taxation that *county governments* may levy upon taxable property to 5 mills:  *i.e*., "No county in this state shall be authorized to levy a greater rate of taxation in any one year on the

---

equal $.0065").

[30] The full text of § 260 is set out in "**Appendix I-5**."

[31] Legislator's Guide, at 3 (observing that millage rates are applied to the "*assessed* value of property") (emphasis in original).

value of the taxable property therein than one-half of one per centum [0.005]."  Ala. Const. art. XI, § 215 (1901), *amended by* amend. 208 (*ratified* Nov. 11, 1962) (bracketed alteration added).[32]

### *iii*.    **Article XI, Section 216** — *limiting municipal tax rates*

The pertinent portion of Section 216 limits the rate of *ad valorem* taxation *municipalities* may levy upon taxable property to 5 mills:  *i.e.*, "No city, town, village, or other municipal corporation, other than as provided in this article, shall levy or collect a higher rate of taxation in any one year on the property situated therein than one-half of one per centum [0.005] of the value of such property as assessed for state taxation during the preceding year. . . ."  Ala. Const. of 1901 art. XI, § 216.[33]

### *iv*.    **Article XI, Section 217**, *as twice amended*

As originally adopted, Section 217 of the Alabama Constitution simply provided that:  "The property of private corporations, associations and individuals of this State shall forever be taxed at the same rate; provided, this section shall not apply to institutions devoted exclusively to religious, education or charitable purposes."  Ala. Const. art. XI, § 217 (1901).[34]  This language was extensively modified in 1972

---

[32] The full text of § 215, which contains certain exceptions that are not relevant here, is set out in "**Appendix I-1**."

[33] The full text of § 216, which contains certain exceptions that are not relevant here, is set out in "**Appendix I-2**."

[34] *See* James J. Mayfield, *Constitutions of 1875 and 1901:  Paralleled, Annotated and*

by Amendment 325, and a second time in 1978 by Amendment 373.  Both are discussed below.

### (A)    **Amendment 325**, *ratified in 1972*

Amendment 325 revised the language of Section 217 in order to establish three classes of property for purposes of *ad valorem* taxation:  *i.e.*, Class I (all property of public utilities used in the business of such utilities); Class II (all property not otherwise classified); and Class III (agricultural, forest, and residential property).  The Amendment also set the assessment ratio corresponding to each class at 30% of the "fair and reasonable market value" for Class I properties, 25% for Class II properties, and 15% for Class III properties.  *See* Ala. Const. art. XI, §§ 217(a), (b) (1901), *amended by* amend. 325 (*ratified* Jun. 8, 1972), *reproduced at* 1940 Ala. Code, vol. 1 (Recomp. 1958) (Supp. 1973), at 292.[35]  The amendment also required voter approval of all property tax increases:

> (e)  Any county, municipality, or other taxing authority may increase the rate at which ad valorem taxes are levied above the limit now provided in the Constitution provided that the proposed increase shall have been (1) proposed by the authority having power to levy the tax after a public hearing on such proposal, (2) thereafter approved by an act of the legislature, and (3) subsequently approved by a majority vote of the qualified electors of the area in which the tax is to be levied

---

*Indexed* 120 (Nashville, Tenn:  Marshall & Bruce Co. 1904) ("**Mayfield**").

[35] See "**Appendix I-3**" for the full text of Ala. Const. art. XI, § 217 (1901), *amended by* amend. 325 (*ratified* June 8, 1972).

or increased who vote on the proposal.

*Id*. § 217(e).  Finally, Amendment 325 imposed a cap (or "lid") of 1.5% of the

appraised fair market value on the *aggregate* amount of *ad valorem* taxes that could

be levied by *all* taxing authorities in each tax year:  *i.e*., the State, a county, any

municipalities within the county, and all school districts within the county, *combined*.

*Id*. § 217(h) ("Any provision of the Constitution of Alabama to the contrary

notwithstanding, ad valorem taxes shall never exceed 1½% of the fair and reasonable

market value of the property in any one taxable year.").

(B)   **Amendment 373**, *ratified in 1978*

Amendment 373, ratified on November 20, 1978, further altered the language

of Section 217, as previously revised by Amendment 325.   It established *four*

property classifications, and lowered the assessment ratios for all classifications

(except that of utilities) below those established by the previous amendment.   The

four classifications and their respective assessment ratios are as follows:

Class I   all real and personal property owned by public utility companies used
          in the business of such utilities[36] — assessed at 30% of fair market
          value;

Class II  all property not otherwise classified (a catch-all category, capturing all
          real and personal property that does not fit within the definitions of the
          other three classifications, and including most business, commercial, and

---

[36] *See* Ala. Code §§ 40-8-1(a), (b)(5) (1975) (2003 Replacement Vol.).

23

industrial properties, as well as residential rental properties and "second homes" not occupied as the owner's primary residence)[37] — assessed at 20% of fair market value;

Class III    all agricultural, forest, and single-family owner-occupied residential property, and historic buildings and sites — assessed at 10% of fair market value; and,

Class IV    all private passenger automobiles and motor trucks of the type commonly known as "pickups" or "pickup trucks" owned and operated by an individual for personal or private use, and not for hire, rent, or compensation — assessed at 15% of fair market value.

*See* Ala. Const. art. XI, §§ 217(a), (b) (1901), *amended by* amend. 373 (*ratified* Nov. 20, 1978).[38]

Amendment 373 also imposed variable caps (or "lids") on the *total* amount of *ad valorem* taxes that can be levied on a particular parcel of taxable property within one year by *all* taxing authorities:  state, county, municipalities, *and* school districts *combined*.   These absolute dollar limits are based upon the *appraised value* (estimated fair and reasonable market value) of the property — *not* its *assessed value* — and the sum of *all* property taxes levied by *all* taxing authorities may not exceed in any one year:  2% (0.02) of the fair market value of Class I property; 1.5% (0.015) of the fair market value of Class II property; 1% (0.01) of the fair market value of

---

[37] *Id*. §§ 40-8-1(a), (b)(4).

[38] See "**Appendix I-4**" for the full text of Ala. Const. art. XI, § 217 (1901), *amended by* amend. 373 (*ratified* Nov. 20, 1978).

24

Class III property; and 1.25% (0.0125) of the fair market value of Class IV property.[39]

*Id*. § 217(i).  Thus, the computation of the absolute dollar limits on the aggregate

amount of all *ad valorem* property taxes is made *before* applying the *assessment* ratio

applicable to the class in which the property is grouped.[40]

This means, for example, that a Class III residence with an appraised fair

market value of $100,000 can only be assessed by all taxing authorities at a total tax

that does not exceed the aggregate amount of $1,000 (*i.e.*, 100,000 x 0.01 "lid").[41]

Practically speaking,

> [t]he local tax assessor applies any "Lid Bill" dollar limitations before
> sending the property tax notice to the property owner.  If the "Lid Bill"
> disallows the collection of a portion of the property tax, the actual
> property tax collection enjoyed by the state, county, municipalities and
> school districts is reduced proportionally according to each of their
> relative millage rates as compared to the total, which is obtained by
> adding up all four levels of millage rates.[42]

The most fundamental change in preexisting law wrought by Amendment 373,

however, was the provision that allows the owners of Class III properties — *i.e.*, land

---

[39] The absolute dollar limits on the aggregate amount of taxes that may be imposed within any one year by all taxing authorities are specified in § 217(i), which is commonly referred to as "the Lid Bill."  *Nota bene*:  The cities of Mountain Brook, Vestavia Hills, and Huntsville were specifically exempted from the limitations imposed by the Lid Bill amendment because the total taxes levied within those municipalities exceeded the lids when Amendment No. 373 was proposed.

[40] *See*, *e.g.*, Susan Pace Hamill, *Constitutional Reform in Alabama*:  *A Necessary Step Towards Achieving a Fair and Efficient Tax Structure*, 33 Cumb. L. Rev. 437, 445 (2003) ("**Hamill III**").

[41] *Id*. at 446.

[42] *Id*. at 446 n.25.

25

devoted to agricultural pursuits or timber and forest-product production, historical buildings and sites, and single-family, owner-occupied, residential dwellings — the option of electing to have the value of such property appraised on the basis of *either* its "fair and reasonable market value" (as in the case of the other three classes of property created by Amendment 373), *or* on the basis of the property's "current use value"[43] — a method of appraisal that ignores the property's fair market value, and limits the valuation process to the use being made of the property on the date of appraisal.[44]  It is specifically provided that "*no consideration* shall be taken of the *prospective value* such property *might* have *if it were put to some other possible use*."[45]  As one academician has noted:  "Virtually every state in the Union has some sort of program designed to confer special property tax treatment upon farms. . . ."[46]

> Farm property is accorded special treatment in several different ways:  preferential assessment at current use value instead of market value; deferred taxation of land kept in farming; credits against state income taxes; purchase of development rights; and land-use zoning. ...[47]

---

[43] *See* Ala. Const. art. XI, § 217, ¶ (j) (1901), *amended by* amend. 373 (*ratified* Nov. 20, 1978) (providing, in part, that "Class III property shall, *upon application by the owner of such property*, be assessed at the ratio of assessed value to the *current use value* of such taxable property *and not the fair and reasonable market value* of such property") (emphasis supplied).

[44] *See* Ala. Code § 40-7-25.1(a) (defining "current use" as "the value of eligible taxable property based on the use being made of that property on October 1 of any taxable year").

[45] *Id*. (emphasis supplied).

[46] Donald F. Vitaliano, "Property tax, farm," in *The Encyclopedia of Taxation and Tax Policy* 287 (Washington, D.C.:  The Urban Institute Press 1999) (Joseph J. Cordes, Robert D. Ebel, and Jane G. Gravelle eds.) ("**Vitaliano**").

[47] *Id*.  Professor Vitaliano goes on to observe that such plans originally were thought of as

26

As of 1997, forty-four states "relied primarily upon some variant of use-value assessment."[48]

The policy rationale undergirding most of the programs adopted by other states to confer special property tax treatment upon farms is that they allow the owners of agricultural lands located on the fringe of an urban area, or next to a commercial development or industrial site, to avoid the higher property taxes that would result if the property were to be appraised on the basis of a speculative value that might be attributed to the property "because of market forces on adjoining property,"[49] and, based upon an assumption that the parcel would be devoted (or converted) to the same use as the adjoining and higher-valued property if sold.[50] Dr. Harvey observed,

a way to preserve family farming.  "However, *the weight of professional judgment and empirical evidence appears not to support such programs*, whether judged on their own terms or by the conventional public finance criteria of equity, economic efficiency, and ease of administration."  *Id*. (emphasis supplied).

[48] *Id*.

[49] Ira W. Harvey, *A History of Educational Finance in Alabama* 471 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**").

[50] *See*, *e.g.*, Ira W. Harvey, *School Finance Training Program Manual*, at 7-12 to 7-13 (Tuscaloosa:  University of Alabama Superintendents' Academy, Jan. 2005 Rev.) ("**Harvey III**") ("In other states, current use is a greenbelt assessment method created to protect agricultural land on the urban fringe from a rate of taxation similar to that on developed land similarly situated.  Normal use of current use provisions values land on a greenbelt perimeter as that outside the urban perimeter."), found at http://uasa.ua.edu/academy (School Finance Training Manual Module 7); Susan Pace Hamill, *An Argument for Tax Reform Based on Judeo-Christian Ethics*, 54 Ala. L. Rev. 1, 24-25 (2002) ("**Hamill II**") ("The current use election of valuation protects owners of Class III property from unreasonably high property taxes that would result if property values were *artificially inflated by prospective developers*.  For example, if a homeowner elects current use status, the value of the house and lot must reflect only what a willing buyer will pay for the house to be used as a house *and cannot reflect a higher price a willing developer would offer to convert the house to*

however, that Alabama's approach is materially different from other states in important respects.

> "Rather than protecting suburban area farm land from tax values that might apply to developing land, current use in Alabama is applied statewide and becomes a special tax exemption benefitting the special interest groups which wrote and sought passage of the legislation [that implemented the provisions of Amendment 373] in 1982." Current use valuation can be obtained by all Class III landowners who file for the exemption by claiming that their land is used for agricultural purposes. The loss in revenue, a large portion [of] which would be for rural public schools, has been estimated to be as high as $40 million.[51]

The "current use" method of appraisal is a focal point of plaintiffs' claim that Alabama Constitution Section 217 as amended by Amendments 325 and 373, is unconstitutional because, omitting the 997,900 acres of Federal land,[52] and 1,290,100

---

*commercial use*.") (emphasis supplied, footnotes omitted).

[51] Harvey III, at 7-13 (quoting Keith J. Ward & Lane D. Sauser, *Equity Funding for Education: A Report to the Alabama Legislature* 5.4 (Auburn: Auburn University Center for Governmental Services 1997) ("**Ward & Sauser**")).

[52] "Federal land" is a term defined by the 2007 National Resources Inventory Summary Report (compiled and published jointly by the United States Department of Agriculture Natural Resources Conservation Service and the Iowa State University Center for Survey Statistics and Methodology) ("**2007 National Resources Inventory**") as: "A land ownership category designating land that is owned by the Federal Government. It does not include, for example, trust lands administered by the Bureau of Indian Affairs or Tennessee Valley Authority (TVA) land. No data are collected for any year that land is in this ownership." *Id*. at 13. A copy is available at www.nrcs.usda.gov/wps/portal/nrcs/main (click on the bold blue words in the first sentence of the second paragraph appearing on the "Land Use" page (*i.e.*, "Per the 2007 National Resources Inventory there are . . ."), and a PDF copy of the Summary Report can be viewed with Adobe Acrobat®) (last viewed Aug. 31, 2011).

acres of water areas,[53] and 2,942,900 acres of developed land[54] from the total surface

area encompassed within the boundaries of the State of Alabama (33,423,800 acres)

leaves a remainder of 28,192,900 acres of rural land subject to being devoted to

agricultural pursuits or timber production.[55]  Of that acreage, the following land areas

were devoted to the uses listed during 2007, the most recent year for which reliable,

objective, and unimpeachable governmental information is available:[56]  2,221,900

---

[53] "Water areas" is defined as:  "A *Land cover/use* category comprising water bodies and streams that are permanent open water."  *Id*. at 16 (emphasis in original).

[54] "Developed land" is defined as:  "A combination of land cover/use categories.  *Large urban and built-up areas, Small built-up areas, and Rural transportation land*."  *Id*. at 10 (emphasis in original).  The term "urban and built-up areas" is, in turn, defined as:  "A *Land cover/use* category consisting of residential, industrial, commercial, and institutional land; construction sites; public administrative sites; railroad yards; cemeteries; airports; golf courses; sanitary landfills; sewage treatment plants; water control structures and spillways; other land used for such purposes; small parks (less than 10 acres) within urban and built-up areas; and highways, *railroads*, and other transportation facilities if they are surrounded by urban areas. . . ."  *Id*. at 16 (emphasis in original).  The term "small built-up areas" is defined as:  "A *Land cover/use* category consisting of developed land units of 0.25 to 10 acres, which meet the definition of *Urban and built-up areas*."  *Id*. at 15 (emphasis in original).  "Rural transportation land" is defined as:  "A *Land cover/use* category which consists of all highways, roads, railroads and associated rights-of-way outside *urban and built-up areas*; also includes private roads to *farmsteads or ranch headquarters*, logging roads, and other private roads (field lines are not included)."  *Id*. at 14 (emphasis in original).

[55] All of the figures quoted in text are taken from the 2007 National Resources Inventory, at 19 ("Table 1 – Surface area of non-Federal land and water areas, by State and year").

[56] *I.e.*, the 2007 National Resources Inventory cited in the preceding footnote.  *See also* Federal Rule of Evidence 803, providing, in the part here relevant, that public records, reports, statements, or data compilations, in any form, of public offices or agencies, that set forth "**(B)** matters observed pursuant to [a] duty imposed by law as to which matters there was a duty to report, . . . or **(C)** in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness," are not excluded by the hearsay rule, even though the author(s) of the governmental report ("declarant") may be available as a witness. Fed. R. Evid. 803(8)(B), (C).

acres (7.88%) to Cropland;[57] 456,600 acres (1.62%) to Conservation Reserve Program (CRP) land;[58] 3,464,200 acres (12.29%) to Pastureland;[59] 73,300 acres (0.26%) to Rangeland;[60] and 21,529,400 acres (76.36%) to Forest land.[61]

In other words, a total of 27,745,400 acres of rural land[62] — 98.4% of the total rural acreage in Alabama, and 83.0% of the total surface area encompassed within the State's boundaries — was subject to being appraised under the "current use" methodologies discussed in more detail in Part II(F)(2)(b)(*ii*) of this opinion, *infra*. In addition, 1,499,200 of the 2,221,900 acres of Alabama cropland in 2007 (67.47%) was defined as "Prime farmland."[63]

---

[57] "Cropland" is defined, in part, as:  "A *Land cover/use* category that includes areas used for the production of adapted crops for harvest. . . ." 2007 National Resources Inventory, at 10 (emphasis in original).

[58] "Conservation Reserve Program (CRP) land" is defined as:  "A *Land cover/use* category that includes land under a CRP contract." *Id*. at 9 (emphasis in original).

[59] "Pastureland" is defined, in part, as:  "A *Land cover/use* category of land managed primarily for the production of introduced forage plants for livestock grazing. . . ." *Id*. at 13 (emphasis in original).

[60] "Rangeland" is defined, in part, as:  "A *Land cover/use* category on which the climax or potential cover is composed principally of native grasses, grasslike plants, forbs or shrubs suitable for grazing and browsing, and introduced forage species that are managed like rangeland. . . ." *Id*. at 14 (emphasis in original).

[61] "Forest land" is defined, in part, as:  "A *Land cover/use* category that is at least 10 percent stocked by single-stemmed woody species of any size that will be at least 4 meters (13 feet) tall at maturity.  Also included is land bearing evidence of natural regeneration of tree cover (cut over forest or abandoned farmland) and not currently developed for nonforest use. . . ." *Id*. at 14 (emphasis in original).

[62] 2007 National Resources Inventory, at 32 ("Table 2 – Land Cover/Use of non-Federal rural land by State and year").

[63] *Id*. at 72 (Table 11 – Prime farmland, by land cover/use, by State and year").  The generic term "Prime farmland," which apparently encompasses crop, pasture, and range land, is defined as

For such reasons, plaintiffs have made this approach to appraising the value of Class III agricultural and timber properties a primary target of this action.

### *v*.    **Article XIV, Section 269**, *as amended*

As originally adopted, Section 269 of the 1901 Constitution limited the rate of *ad valorem* taxation that counties could levy "for the support of public schools" to one mill (*i.e*., "ten cents on each one hundred dollars of taxable property in such counties"). The language of that provision was revised in 1956 by Amendment 111, in order to remove the reference to "public schools"[64] and replace that term with a generic reference to "*education*" — a pattern of language that was, as will be seen

---

"Land that has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops and is also available for these uses."  *Id*. at 13.

[64] The original language of Section 269 read as follows:

> Sec. 269.  The several counties in this state shall have power to levy and collect a special tax (a) not exceeding ten cents on each one hundred dollars of taxable property in such counties, *for the support of public schools*; provided, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, state and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads, bridges, and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.  The funds arising from such special school tax shall be so apportioned and paid through the proper school officials to the several schools in the townships and districts in the county that the school terms of the respective schools shall be extended by such supplement as nearly the same length of time as practicable; provided, that this section shall not apply to the cities of Decatur, New Decatur and Cullman.

Ala. Const. art. XIV, § 269 (1901) (emphasis supplied).  *See also* Mayfield, at 139-40.

31

later in this opinion, designed to include *private* as well as public educational

facilities.  The present provision reads as follows:

> The several counties in this state shall have the power to levy and collect a special tax not exceeding ten cents on each one hundred dollars of taxable property in such counties, for the support and furtherance of *education in such manner as may be authorized by the legislature*; provided, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, state and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads, bridges, and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.

Ala. Const. art. XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956)

(emphasis supplied).

### b.    The injuries alleged by plaintiffs

Plaintiffs contend that they "are injured by the racially discriminatory property

tax restrictions . . . which impede their ability and the ability of their elected

representatives to raise state and local revenues adequately to fund the public services

they need, including public education."[65]  The essence of plaintiffs' contentions is

captured in the following allegations:

> 33.  Alabama's constitutional development since Reconstruction

---

[65] Doc. no. 1 (Complaint) ¶¶ 7-9.

has been driven by its policy of shielding property from taxation that whites in the Black Belt feared could be imposed for the benefit of black public school students by democratically elected state and local governments potentially influenced by a re-enfranchised black electorate. The two main mechanisms of this policy were constitutionally entrenched millage caps and artificially low property assessments. This century-old scheme came under attack on several fronts after *Brown v. Board of Education*, 347 U.S. 483 (1954).

. . . .

43.   The racially motivated property tax restrictions in the Alabama Constitution continue to have their intended discriminatory effects, namely, inadequate revenues currently collected from local property taxes, the resulting underfunding of the state's K-12 public school system, particularly rural and majority-black schools, the over-dependence of K-12 on the Education Trust Fund and the consequent underfunding of Alabama's entire system of public education, including higher education.

> [O]ne of the most important changes needed in Alabama is a substantial increase in property taxes because in Alabama, the property tax revenue is so low the state has to pick up the bulk of the cost of the public schools from regressive sales and income taxes; moreover, inasmuch as higher education is funded from the same source as K-12, the monies available to higher education are substantially reduced.

[*Knight v. Alabama*,] 458 F. Supp. 2d [1273,] 1304 [(N.D. Ala. 2004)] (citations omitted).

. . . .

46.  This tax system disadvantages low-income citizens and poor, rural counties. It is neither just nor practical to seek more education revenues through sales and income taxes; "a greater reliance on sales

taxes cannot compensate for disproportionately low property taxes." 458 F. Supp. 2d at 1298.

. . . .

49. "The effect of low property tax revenues has had a crippling effect on poor, majority black school districts." 458 F. Supp. 2d at 1299 (citation omitted). These majority-black school districts are primarily in the rural Black Belt.

> In rural areas of the state, most local school districts simply do not have a critical mass of valuable commercial property and residential homes — the two types of property shouldering eighty-five percent of the property taxes — to raise adequate funds for public education. Moreover, in areas where the significant source of wealth is timber, the property tax structure bars taxation above ten percent of the current use value of such areas; consequently, that property does not provide much property tax revenue. *Id*. (Citations omitted).[66]

The primary variable affecting the amount of *ad valorem* tax owed to any taxing authority is the "tax base": that is, the value of the real and personal property subject to taxation that is located within the relevant jurisdiction. As a result, unintended (and, plaintiffs say, intended) consequences may flow from such a system. For example, property-poor tax districts are unlikely to generate as much revenue to fund public services, such as the local public school systems, as can those districts with a more valuable property base.[67] For such reasons, plaintiffs concentrated their

---

[66] *Id*. ¶¶ 33, 43, 46, and 49.

[67] *See*, *e.g*., Ward & Sauser, at 1.1 (observing that, "when a child lives in a district with less

attention upon Alabama's system of levying *ad valorem* property taxes at the *local*

level.[68]

All of the paragraphs of plaintiffs' complaint falling under the subsection

heading "Continuing racially discriminatory impact" discuss underfunding of

education in the State and, particularly, the disproportionate impact that taxation

---

wealth, that district will have less money to spend for each student than will districts with greater amounts of wealth").

[68] Without question, plaintiffs challenge the constitutionality of the 6.5 mill limitation on the State's *ad valorem* tax levy. Even so, plaintiffs' counsel made clear on the last day of trial that the focus of their challenge is on the various provisions that limit the levy of property taxes at the *local* level. Counsel stated:

> Your Honor, if you would look at Page 2 of the complaint, it lists the six constitutional provisions that the plaintiffs are challenging. And they include as you say, Section 214 of the original 1901 constitution, which limits the 6.5 mills the state legislature may levy. But it also challenges Section 215, which is the limit on what a county may levy; Section 216, which is a limit on what a municipality may levy; Section 269, which is a limit on what may be levied by a county for school purposes; and then Amendments 325 and 373, which amend the original 269 —
>
> . . . .
>
> *So — and actually, the main focus is on local revenues, not state revenues.*
>
> In fact, we have not challenged the way the Minimum Foundation Program redistributes the Education Trust Fund, which is mainly, as you know, sales and income taxes; nor are we challenging the way the 3 mills that are levied by the state and go to education are being restricted.
>
> . . . .
>
> But *the case is mainly about the ability of each local school system to raise local revenues so that they can fund things that state funds don't provide.* . . .

Transcript Vol. 15 (doc. no. 271) (arguments of counsel), at 40-42 (emphasis supplied).

revenue shortages have on the least-well-funded, and often majority-black, school systems.[69]   In their reply brief in support of their motion for summary judgment, plaintiffs emphasized that "[t]he harm intended by — and all too well accomplished by — the challenged property tax provisions is to restrict the ability of local school systems to raise revenue for their students."[70]  In plaintiffs' responses to defendants' First Interrogatories, which were filed with this court on April 9, 2009, plaintiffs answered "yes" to both of the following questions:  "Is it your contention that the alleged underfunding of K-12 public education in Alabama denies Plaintiffs an adequate education?"; and "Is it your contention that the quality of Plaintiffs' public education is diminished by the alleged racially discriminatory property tax restrictions in the Alabama Constitution?"[71]   In response to defendants' motion for summary judgment, plaintiffs argued that

> the six racially motivated property tax restrictions in the Alabama
> Constitution **targeted** students in Black Belt counties like Sumter, that
> those provisions are the proximate **cause** of why their school systems
> are under-resourced, and that students in rural Lawrence County are
> among the drive-by victims of the Black Belt scheme to shield white
> landowners.[72]

---

[69] Doc. no. 1 (Complaint) ¶¶ 43-57.

[70] Doc. no. 44 (Plaintiffs' Brief in Response to Defendants' Brief Opposing Summary Judgment), at 38.

[71] Doc. no. 68 (Plaintiffs' Responses to Defendants' First Series of Interrogatories) ¶¶ 42-43.

[72] Doc. no. 166 (Plaintiffs' Brief Opposing Defendants' Motion for Summary Judgment), at 44 (boldface emphasis in original).

In the same brief, plaintiffs state that the relevant question is not the **distribution** of school revenues among school systems in Alabama, but "whether the six challenged constitutional provisions cause a substantial diminution of the **amount** of local school revenues available to residents and students in Sumter, Lawrence, and other similarly impacted counties and school systems."[73]  They also state that the "millage caps and cumbersome override process" in the Alabama Constitution cause "**local** school revenues to be regressive and inadequate" to fund schools in the Black Belt and other rural areas, thereby causing an over-reliance on state school funding and a consequent reduction in the overall amount of revenues for all public schools in the state.[74]  Later in the brief, plaintiffs state:

> African-Americans in the Black Belt counties that were targeted by the drafters of these constitutional provisions continue to suffer from inadequate local revenues to fund their (almost all-black) public schools. In addition, black and white students of public schools in other rural counties suffer a similar lack of local revenues, because the facially neutral devices written into the state constitution to accomplish the purposeful discrimination necessarily removed the same kinds of property from all rural tax bases and revenues.[75]

Finally, plaintiffs sum up their theory as follows: "the six[76] racially motivated

---

[73] *Id.* at 45 (boldface emphasis in original).

[74] *Id.* at 6, ¶¶ 4(b), 5, & 6 (boldface emphasis in original).

[75] *Id.* at 38.

[76] Plaintiffs' Complaint lists the challenged provisions as:  (1) § 214, (2) § 215, (3) § 216, (4) § 269, (5) Amendment 325, and (6) Amendment 373, as opposed to the manner in which this court organized them in Part I(A)(1)(a)(*i*)–(*v*) above.

property tax provisions have accomplished their two-pronged racially discriminatory purpose:  whites are favored with lower taxes, and blacks are burdened with less funding for schools."[77]

During the trial, in response to defendants' oral motion for judgment as a matter of law at the close of plaintiffs' case-in-chief, plaintiffs' counsel stated:

> counsel for the state continues to insist on an argument that was rejected by earlier motions that they filed[;] that in order for the plaintiffs to establish the continuing discriminatory effects we have to prove that the money that is raised by the state is being distributed unfairly.  That is not our case.  *This is not an equity case.  This is an adequacy case.*
>
> There is no question but that Amendment 373, by its lids, by its procedures, by its — certainly by the classification assessment ratios, and, most importantly, by the current use provisions, restrict the amount of property tax than can be raised, particularly at the local level where property tax is needed the most.
>
> *This is a case about adequacy.*  And we have produced evidence through Dr. Sullivan and others, Dr. Harvey, I believe also testified about this, how because the local revenues are restricted in the amount that they can raise, there's a disproportionate reliance in our public schools or [sic: "on"] state school revenues, and that reduces the amount of money that's available for schools everywhere in the state.  And the reduction of that amount falls most heavily on schools that need more money the most, which are poor schools and which are predominantly black schools.[78]

At the conclusion of trial, plaintiffs' counsel again emphasized that this case

---

[77] Doc. no. 166 (Plaintiffs' Brief Opposing Defendants' Motion for Summary Judgment), at 56.

[78] Transcript Vol. 11 (doc. no. 267) (arguments of counsel), at 91-92 (emphasis supplied).

was about the "size of the pie," not the "distribution of the pie."[79]  And, in plaintiffs'

post-trial brief, counsel argued that:

> The racially motivated property tax restrictions in the Alabama Constitution continue to have their intended discriminatory effects, namely, inadequate revenues currently collected from local property taxes, the resulting underfunding of the state's K-12 public school system, particularly rural and majority-black schools, the over-dependence of K-12 on the Education Trust Fund and the consequent underfunding of Alabama's entire system of public education, including higher education.[80]

They also state:

> 11.  Today these constitutional restrictions on millage and on the tax base to which the millage is applied still operate as their drafters intended to reduce the amount of **local** school revenues in the Black Belt counties more than elsewhere in Alabama, because these counties are most dependent on farm and timber land for their tax base.  But the millage caps, complicated override procedures, low assessment ratios, and current use provisions embedded in the Alabama constitution necessarily restrict the amount of local property taxes that can be raised by all school systems, especially those in other rural counties.  White public school children necessarily are denied adequate local revenues just as are black children.

> 12.  Moreover, the absence of adequate local revenues to meet even the state's own education requirements causes an over-reliance on the regressive sales and income taxes that contribute most of the funds in the state's education trust fund.  That means less overall funding for all public K-12 students in Alabama and less state funding for public higher education.  Underfunding public education hurts low- and middle- income students most, because they need more K-12 resources

---

[79] Transcript Vol. 15 (doc. no. 271) (arguments of counsel), at 186.

[80] Doc. no. 274 (Plaintiffs' Post-Trial Brief) ¶ 3.

and more financial aid to meet the rising costs of college.[81]

Immediately below the subheading "*This Litigation is About Inadequate Local Funding of Education*" in their post-trial brief, plaintiffs state, "The gravamen of plaintiffs' Complaint is the inability of local school systems to raise sufficient ad valorem tax revenues to provide for an adequate education."[82]

Finally, in their response to defendants' post-trial brief, plaintiffs describe the injury allegedly caused by the challenged constitutional provisions as follows: "[The complaint] alleges causes of action based on racial discrimination. *Lack of adequate school revenues, especially at the local level, is the injury caused by the racial discrimination.*"[83] Later in that same brief, however, plaintiffs appear to contradict that assertion when saying that their "injury in this action is caused by racial discrimination, not by 'underfunding that deprives' them an 'adequate education,' as defendants argue."[84] On the following page, plaintiffs' counsel attempts to clarify the apparent inconsistency between the foregoing statements by linking them:

> So the first injury suffered by plaintiffs is being subject to state constitutional provisions that were designed to discriminate against African Americans. But, in addition to this continuing official insult,

---

[81] *Id.* ¶¶ 11-12 (boldface emphasis in original).

[82] *Id.* ¶ 427.

[83] Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 5-6 (emphasis supplied).

[84] *Id.* at 76-77.

40

these six provisions continue, as they were intended, to benefit white landowners and to make it more difficult to raise local school revenues for black students, particularly for those black students in the targeted Black Belt school systems.[85]

### c.   The relief sought by plaintiffs

Plaintiffs ask this court to enter a judgment declaring that the property tax restrictions embedded in Alabama's Constitution violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, "and to [fashion] a prohibitory injunction against their future enforcement."[86]

> Plaintiffs do not ask this Court to oversee reform of Alabama's property tax system, its system for raising revenue for public education, or the adequacy of its funding of the system of public education. As stated by the Alabama Supreme Court and the U.S. Court of Appeals, tax reform and the provision of adequate education funding are the responsibility of the legislative branch of government. If this Court grants the relief requested herein, the Governor and Legislature of Alabama will be able to carry out these vital legislative functions free of the purposefully racially discriminatory barriers placed in the state constitution.[87]

### 2.   The Defendants and Their Contentions

Plaintiffs asserted their claims against three defendants:   the State of Alabama;[88] the Governor of the State of Alabama;[89] and the Revenue Commissioner

---

[85] *Id.* at 78.

[86] Doc. no. 1 (Complaint) ¶ 6.

[87] *Id.*

[88] *Id.* ¶ 10 ("Defendant State of Alabama has departments, agencies and political subdivisions

41

for the State of Alabama.[90]   According to plaintiffs, the State of Alabama receives

federal funding within the meaning of Title VI, and has waived its sovereign

immunity from suit in this case.  The Governor holds the "supreme executive power"

in the State, including the responsibility for appointing the Revenue Commissioner

and approving legislation governing the State's revenue policies.  The Revenue

Commissioner is responsible for enforcing all of the constitutional provisions

challenged in this case and their enabling statutes, as well as for promulgating rules

and regulations governing the valuation of property subject to *ad valorem* taxes.

The interests and positions of all defendants were aligned throughout this

litigation, despite the fact that the Governor is represented by separate counsel from

the State and Revenue Commissioner.  All defendants have generally denied the

---

which are programs or activities receiving federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d and 2000d-4a. Congress has abrogated the Eleventh Amendment immunity of the State of Alabama with respect to plaintiffs' claims in this action. 42 U.S.C. § 2000d-7.").

[89] *Id.* ¶ 11 ("Defendant Bob Riley [now Dr. Robert J. Bentley, pursuant to Fed. R. Civ. P. 25(d)], in his official capacity as Governor of Alabama, exercises the supreme executive power of the State of Alabama.  Ala. Const., Art. V, § 13.  Among his executive duties, Governor [Bentley] must appoint the Alabama Commissioner of Revenue, who holds office at the pleasure of the Governor.  Ala. Code § 40-2-41.  As Governor, defendant  [Bentley] must also approve legislation governing the revenue policies of state and local governments in Alabama.").

[90] *Id.* ¶ 12 ("Defendant Tim Russell [now Julie P. Magree], in his [now her] official capacity as Commissioner of Revenue, is the chief executive officer of the Alabama Department of Revenue and exercises all the powers, authority, and duties vested in the Department of Revenue.  Ala. Code § 42-2-40.  The Department of Revenue enforces the provisions of the Alabama Constitution complained of herein and their enabling statutes and promulgates rules and regulations governing the valuation of property subject to ad valorem taxes pursuant to its enforcement authority.").

material allegations of plaintiffs' complaint.[91]  This court has concluded that the best

manner in which to state defendants' specific arguments in opposition to plaintiffs'

claims is to address them in the contexts in which they arise, rather than attempting

to summarize them here.  For the sake of introduction, however, and in only the most

general of terms, the primary arguments defendants advance are that this court does

not have jurisdiction, that plaintiffs have failed to prove that the challenged

provisions were enacted with a discriminatory intent, that plaintiffs have failed to

prove any discriminatory effect of the challenged provisions, and that plaintiffs have

failed to prove a violation of Title VI.[92]

---

[91] See doc. no. 37 (Answer of the State of Alabama and Revenue Commissioner), at 10; doc. no. 38 (Answer of the Governor), at 9.

[92] *See generally* doc. no. 275 (Defendants' Post-Trial Brief); doc. no. 279 (Defendants' Response to Plaintiffs' Post-Trial Brief).

# BLACK BELT AS IDENTIFIED BY PLAINTIFFS



44

## C.    The "Black Belt," "Big Mules," and Other Terms

Plaintiffs identified a group of twelve Alabama counties that, they contend, constitute the present-day "Black Belt" for the purpose of illustrating the allegedly racially-discriminatory effects of the challenged constitutional provisions.[93]  Those counties are Barbour, Bullock, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Perry, Pickens, Sumter, and Wilcox;[94] and their respective locations within the State are depicted in the map on the facing page.  During the course of trial, however, the attorneys for the State and its Commissioner of Revenue repeatedly objected to any questions by plaintiffs' attorneys that referred to, or incorporated that definition.[95] That debate may be excused somewhat, because at least eight different iterations of what constitutes the "Black Belt" emerged during the course of trial, ranging from

---

[93] *See, e.g.*, doc. no. 274 (Plaintiffs' Post-Trial Brief), at 165; Declaration of Dr. Ira Harvey (Plaintiffs' Exhibit 20), at 1 n.1 (using the same twelve counties for purposes of analysis); PX 387 (DOR Current Use Data Set 4-14-09 Enhanced), *passim* (same); PX. 415 (Assessed Valuation per Square Mill per County), *passim* (same); Transcript Vol. 3 (doc. no. 259) (arguments of counsel), at 253-55 (describing plaintiffs' use of these twelve counties and the school systems contained within or coterminous with them throughout their statistical evidentiary presentation).

[94] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief); *see also* PX 135 (Black Belt Alternative Lists), at 2.

[95] *See, e.g.*, Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258) ("**Flynt 2 Tr.**"), at 200-09; Testimony of Dr. Ira Harvey, Transcript Vol. 6 (doc. no. 262) ("**Harvey 6 Tr.**"), at 36-38; Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265) ("**Frederick 9 Tr.**"), at 132-34. More substantively, defense counsel challenged whether any such category of counties, however described, is relevant to determining whether the property tax provisions at issue have a disproportionate effect along racial lines. *See, e.g.*, doc. no. 279 (Defendants' Response to Plaintiffs' Post-Trial Brief), at 142, 144-46, 149-51.

eleven to twenty-two counties.[96]   Fundamentally, however, attempts to target the specific Alabama counties that should or should not be included in a contemporary (as opposed to an historical or "traditional") definition of that section of Alabama known as the "Black Belt" totally miss the mark.   Indeed, such an exercise overlooks the fact that the disputed section may be — and, at various times since the land that became "Alabama" was opened to settlement by English-speaking peoples, *has been* — more accurately defined in terms of a number of characteristics:  features such as the region's physical geography; its societal history (*i.e.*, the origins of those persons who settled the region, and their society, education, and wealth); its demographic make-up; and, possibly of greatest importance, the section's enduring influence over the State's political history.   Some of those inextricably-intertwined characteristics are explored below.

---

[96] *See* doc. no. 279 (Defendants' Response to Plaintiffs' Post-Trial Brief), Appendix B, at 1 (collecting different definitions of "Black Belt" offered at trial); PX 135 (Black Belt Alternative Lists), at 2; *see also* Flynt 2 Tr., at 202 ("When I used the term Black Belt, I referred to three different phenomena that lead to one culture.  But depending upon which of these three you use, you get three different answers to the question of what is the Black Belt."); *id.* at 203 ("So the answer to your question is some maps say 12, some maps say 14, some maps say 20, some say 22.").   *See generally id.* at 200-207 (describing in detail multiple different definitions of the Black Belt).  The "Black Belt Action Commission," formed during the Administration of Governor Robert R. "Bob" Riley for the purpose of improving the lives of persons residing in that section of the State (*see* Executive Order # 22 issued on Aug. 11, 2004, and, Executive Order # 50 issued on June 4, 2010), defined the Black Belt as consisting of the following twelve counties:  Bullock, *Choctaw*, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Perry, Pickens, Sumter, and Wilcox.  Notice that the Black Belt Action Commission's definition does not include Barbour County (on plaintiffs' list), but does include Choctaw County (not on plaintiffs' list).

### 1.    The Defining Characteristics of the "Black Belt"

### a.    The geology of the Black Belt

The label "Black Belt" originated with descriptions provided by the earliest settlers of the dark, rich topsoil found in a narrow (25–30 mile wide), crescent-shaped, fertile plain stretching like a belt nearly 310 miles across central Alabama. That defining soil-belt runs out of Georgia, through parts of Russell and Barbour Counties in eastern Alabama, and then arcs in a northwesterly direction to (and through) Sumter County in western Alabama, and from there proceeds into the northeastern portions of Mississippi.[97] "At the heart of Alabama's Black Belt is the Ripley *cuesta*, a ridge with a steep north face and a gentle, sloping southern face."[98] A geological formation known as "the Selma Chalk" underlies the so-called "Blackland Prairie," a major physiographic component of the region. This sedimentary limestone bed was formed over millions of years in the warm and shallow gulf waters that once covered much of present-day Alabama. That prehistoric sea abounded with marine creatures and algae that produced tiny platelets of calcium carbonate. When the marine organisms died, their remains settled to the

---

[97] *See, e.g.*, www.ag.auburn.edu/hort/landscape/blackbelt.html for a map and description of the geological features and soils of the Alabama Black Belt. Similar soil runs through parts of northeastern Georgia, eastern Tennessee, and southern South Carolina.

[98] Terrance L. Winemiller, "Black Belt Region in Alabama," in online version of The Encyclopedia of Alabama, found at http://www.encyclopediaofalabama.org/face/Article.jsp?id=h-2458 (last visited Sept. 7, 2011).

47

bottom and, over eons of time, accumulated to form a thick layer of white, chalk-like material.  When the ocean waters receded, those landmasses began to weather and plants colonized them.  The impermeable nature of the underlying chalk, together with the alkalinity of the soils originating from the chalk, promoted the growth of prairie grasses and cane.[99]  The organic material left behind by countless generations of decayed grasses and cane produced a fertile black clay soil that gave the region its distinctive color and original name.[100]

Moreover, unlike other portions of the State, the land of the Black Belt "was easily cleared because it had no large forests on it."[101]  Navigable rivers also were interwoven throughout the region, thereby making the transportation of cotton from plantations to markets in Mobile, New Orleans, and (eventually) Pensacola easy and efficient.[102]

### b.    The social history of the Black Belt

Even though the term "Black Belt" originated as a description of the prairies and dark soil of central Alabama and northeastern Mississippi, it also long has been

---

[99] In fact, during the earliest period of exploration, the central Alabama Black Belt Prairie region was "once known as the 'Canebrake' . . . ."  *See  Agriculture in Alabama*, www.encyclopediaofalabama.org (last visited Aug. 10, 2011).

[100] *See, e.g.*, David K. Nelson, *The Origins of Alabama's Black Belt Prairies*, www.outdooralabama.com; *Black Belt Region in Alabama*, www.encyclopediaofalabama.org (last visited Aug. 10, 2011).

[101] Flynt 2 Tr., at 200-03.

[102] *Id.*

used to describe a broad agricultural region in the American South characterized by a history of plantation agriculture in the nineteenth century, and, a very high percentage of African-Americans in the population. As many as one million persons were taken there before the Civil War, in a forced migration of enslaved laborers for the region's cotton plantations. After several generations in the area, many remained in the region following the Civil War and emancipation as rural workers, tenant farmers, and sharecroppers.

Because of the decline of family farms, the rural communities in the Black Belt commonly face acute poverty, exodus to cities, inadequate education programs, low educational attainments, poor health care, high infant mortality rates, short life expectancies, substandard housing, and high levels of crime and unemployment. Those socioeconomic problems led the *Birmingham News* to publish in 2002 a series of twenty-nine "special reports" over the course of seven months, all under the series title of "The Black Belt: *Alabama's Third World.*"[103]  The emphasized portion of that title speaks volumes. Even though the authors of that series did an admirable job of describing may of the difficulties faced by persons residing in that section of the State, they failed to address fundamental questions, such as: Who settled the Black Belt?; How did they create its society?; and, Given the abundance and richness of the

---

[103] *See* www.al.com/specialreport/birminghamnews/?blackbelt.html (last visited October 10, 2011) (emphasis added).  The series ran from May 12, 2002, to December 15, 2002.

region's natural resources, why did it become "Alabama's Third World"?[104]   The

following subsections attempt to address some of those questions.

### i.   The origins of those persons who settled the region, and their society, education, and wealth

David Hackett Fischer observed in his provocative study of the settlement of

the Atlantic seaboard, *Albion's Seed*,[105] that the British colonies were settled by at

least four great waves of English-speaking immigrants during the period between the

early seventeenth century and the American Revolution.   The first was an exodus

during the period of 1629 to 1640 of about twenty thousand "Puritans," originally

from the eastern region of England, by way of a sojourn in the Netherlands, and then

to Massachusetts.[106]   The second was composed of a small group of royalist

---

[104] During undergraduate school, the author of this opinion took a series of courses on Latin- and South-American politics.  Initially, I did so because that was my Departmental Advisor's area of specialization, and it seemed only proper that I should exhibit some academic interest in subjects about which he possessed a passionate interest.  Over time, however, I perceived similarities between the politics of that region of the world and those of Alabama.  I was particularly struck by the metaphorical similarity between this State and a phrase that one author penned to describe the economic condition of twentieth-century Peruvians:  they were "a nation of beggars sitting on benches of gold."  So also have been Alabamians.  We reside in a state that was blessed with an abundance of natural resources.  Yet we are impoverished spiritually, economically, and politically by the original sin of slavery, and its modern manifestations:  segregation and racism.

[105] *I.e.*, David Hackett Fischer, *Albion's Seed: Four British Folkways in America* (New York: Oxford University Press 1989) ("**Fischer**").

[106] These immigrants were a deeply-religious people with a Calvinist bent who "protested" the creeds and rituals of the Church of England, and who are more accurately described as either *Separatists* or *Congregationalists*.  *See, e.g.*, Williston Walker, *The Creeds and Platforms of Congregationalism* (New York:  Charles Scribner's Sons 1893);  Perry Miller, *Errand into the Wilderness* (Boston:  Harvard University Press 1956) ("**Miller I**"); Perry Miller, *The New England Mind, From Colony to Province* (Boston:  Harvard University Press 1953) ("**Miller II**").

aristocrats that Fischer calls "Cavaliers," and large numbers of servants indentured to those aristocrats,[107] who migrated from the south and west of England to Virginia between the early 1640s and the 1670s.  The third wave was the movement of twenty-three thousand Quakers and Quaker sympathizers from the North Midlands of England during the half-century after 1675 to the Delaware Valley region, encompassing parts of New Jersey, Delaware, and Maryland, but principally the Colony of Pennsylvania.  The final wave of immigration was a massive flow of English-speaking peoples from the borders of north Britain and northern Ireland to the Appalachian backcountry during the second and third quarters of the eighteenth century.

---

[107] As Lawrence James observed, the word "aristocracy"

appeared late in our language, arriving via France in the mid-sixteenth century.  It was a compound of the Greek 'aristo' (the best) and 'kratos' (government) and defined an Aristotelian notion of the distribution of political power in an ideal state. Aristotle's aristocrats were men of learning and wisdom whose wealth gave them the leisure to devote their lives to government and the general welfare of the rest of society.  *This concept of aristocracy was highly flattering to an already dominant elite*, which, since the eleventh century, had been called the 'baronage,' 'nobility and latterly 'the peerage.'  *The Aristotelian notion of aristocracy reinforced an already deeply rooted sense of superiority and public responsibility which justified power and privilege.*

This new word assisted the long process of collective self hypnosis by which aristocrats convinced themselves that their distinctive qualities made them indispensable to the nation.  . . .

Lawrence James, *Aristocrats — Power, Grace, and Decadence:  Britain's Great Ruling Classes for 1066 to the Present* 1-2 (New York:  St. Martin's Press 2009) (single 'quotation marks' in original, emphasis supplied).

Although all of these groups of migrants were alike in speaking English, in being Protestants, and in being jealous of their British liberties, they differed from one another in many other, and significant, ways: *e.g.*, in their particular brands of Protestantism; in their social ranks; in their education and commitment to the education of younger generations; in their historical customs; and, of course, in the British regions from whence they came and, therefore, the peculiar dialects spoken by each.[108]  Significantly, writes Fischer, each group "carried across the Atlantic four different sets of British folkways which became the basis of regional cultures in the New World."[109]  By the eve of the Revolution, these four cultures were firmly established in America.  The people of each group built their houses in different ways, ate different foods, cooked differently, treated the opposite sex differently, used time differently, and ordered their society and government differently.

The earliest settlers who had the greatest, and most enduring, influence upon the land that became "Alabama," and particularly that section of the State known as the "Black Belt," were those aristocratic elitists who moved from the south and west of England to (initially) Virginia and (later) Georgia.  Virginia's culture was

---

[108] George Bernard Shaw famously said:  "England and America are two countries separated by a common language."  The same can be said of the dialects spoken in different parts of the small island-home of English-speaking peoples, *especially* during the periods discussed above.  *See* Paul K. Longmore, *Good English Without Idiom or Tone:  The Colonial Origins of American Speech*, 37 J. of Interdisc. Hist. 513, 517 (2007).

[109] Fischer, at 6.

decisively shaped by the long-existing customs of its English immigrants.  As Fischer notes, most of the forty to fifty thousand people who migrated to Virginia between 1645 and 1670 came from sixteen counties in the south and west of England,[110] a triangular territory between Bristol, Warwick, and Kent that was roughly coterminous with the medieval kingdom of Wessex:  a region with its own distinctive culture dating back a millennium or more, and one that was well-established and deeply-ingrained in the psyche and mores of the peoples of that region long before King Harold II lost the Battle of Hastings to William of Normandy on October 14, 1066, during the Norman Conquest of England.[111]

"The countryside of [the Wessex] region was divided into comparatively large manors — larger than in the east of England — and dominated by a small landholding class":[112]  a socioeconomic group of lords, ladies, and other aristocratic elitists who were related to one another by blood and marriage, who had a highly developed sense of "honor," and who held a hierarchical conception of the "liberties" accorded to the multiple strata of their society.[113]

In the seventeenth century, a very much "smaller part of the population were

---

[110] *Id.* at 236.

[111] *Id.* at 241.

[112] *Id.* (bracketed alteration supplied).

[113] *Id.*

53

freeholders in the south and west of England than in East Anglia."[114]  People from the former region were royalist in their politics, Anglican in their faith,[115] and accustomed to extreme inequalities in their society, scattered rural living, and the production of agricultural staples.[116]  Of even greater significance for purposes of the present discussion is this fact:  slavery had existed on a huge scale throughout that area of England during the early Middle Ages,[117] and in the eighth and ninth centuries the size of major slaveholdings had been as large as some plantations in the American South a thousand years later.[118]  Indeed, Wessex slavery lasted far longer than in any other part of England.  Although slavery on the soil of England's home island had disappeared by the seventeenth century, the region that is the subject of this discussion was generally slow to change:  "The long continuity from the twelfth to the eighteenth century was very striking."[119]

Seventeenth century migrants to Virginia from the Wessex region of England brought their culture with them; and, argues Fischer, it was the inherited and deeply-ingrained culture of those aristocrats — *not* the physical environment of the

---

[114] Fischer, at 243.

[115] *Id.* at 243.

[116] *Id*. at 245.

[117] *Id.* at 241.

[118] *Id.* at 243.

[119] Fischer, at 245.

Chesapeake, *not* the plantation economies of the James and Potomac River regions, *not* the character of tobacco production, and *not* the demand for labor to cultivate the tobacco — that determined most of the patterns and social habits of living in Virginia. Thus, writes Fischer, in one of the most provocative of his theses, American slavery "did not create the culture of the tidewater Virginia; [instead,] *that culture created slavery*."[120]   If Fischer's thesis is correct, and the author of this opinion tends to believe that it is, then the following discussion should serve to demonstrate that the same culture created the slavery that first took root in the "Great Bend of the Tennessee River Valley" and, later, spread like Kudzu the Black Belt of Alabama.

### *ii*.   From the Virginia Piedmont to the Broad River Valley of Georgia

Many of the descendants of those English-speaking peoples who originally migrated to Virginia — Fischer's royalist "Cavaliers" — eventually moved from the Old Dominion to an area of Georgia known as the Broad River Valley, located in the northeastern portion of the state.  That Valley was bordered on the west by the river for which the region is named, and on the east by the Savannah River, which forms the boundary between Georgia and South Carolina.[121]   The confluence of the two

---

[120] *Id.* at 256 (emphasis and bracketed alteration supplied).

[121] The North Fork of the Broad River begins in the foothills of the Appalachian Mountains, in Stephens County, then joins the Middle Fork west of Royston in Franklin County to form the main stem.  The river flows in a generally southeasterly course, being joined along its sixty-mile length by the Hudson Fork, flowing from the west out of Franklin County, and the South Fork, which joins

rivers was the most strategic location in upper Georgia; and, for that reason, the third (and last) of Georgia's Colonial Governors, Sir James Wright, ordered "Fort James" to be constructed at the juncture of the rivers in 1773.  South Carolina's Colonial Governor also recognized the strategic importance of the location — and not just for defense of settlers from Indian assaults,[122] but also to assist in putting-down rebellion if the traitorous rumblings emanating from Massachusetts should reverberate into his Colony.  Consequently, he ordered "Fort Charlotte" to be built nearby, on the South Carolina side of the Savannah River.[123]  Those fortifications, plus the natural advantages of the Valley, attracted settlers like iron filings pulled to a magnet.

> The Broad River, itself, was kind to its settlers.  Its waters provided fish for their tables and sport in catching them.  Since much of its watershed was never denuded of its timber and vegetation, the rains seldom ran off in such quantities as to produce devastating floods . . . . Broad River's bottom lands were as fertile as any to be found anywhere, and much of its uplands were almost as good for tobacco and cotton as the bottoms were for corn.  In fact, the Broad River Valley was a good place for those who chose to come and to stay.[124]

---

from the west at the junction of Oglethorpe, Madison, and Elbert counties.  From there the Broad River continues its course uninterrupted toward the Savannah River.

[122] Prior to the nineteenth century, the Broad River was the mutual border between the Cherokee people to the north, and the Creek people to the south.

[123] *See* Ellis Merton Coulter, *Old Petersburg and the Broad River Valley of Georgia: Their Rise and Decline* 12-13, 31 (Athens, Ga.:  The University of Georgia Press 1965) ("**Coulter**").

[124] *Id.* at 30.

### (A)   The Virginians of the Broad River Valley

Many of the Virginians who migrated to the Broad River Valley came from Albemarle County — the home of, among other notable families, the Jeffersons, Randolphs, and Monroes — but the Potomac River, James River, and Tidewater regions of the Old Dominion also contributed settlers.[125]   Dionysius Oliver was among the earliest persons to move from Virginia to Georgia.  He settled in the Broad River Valley  "about the time of the outbreak of the Revolution.  He is reputed to have been captain of a privateer . . . to have been with General Benjamin Lincoln's army at the siege of Savannah in 1778, and subsequently to have fought at Kettle Creek and Kings Mountain.  . . ."[126]

Oliver capitalized on his war services by obtaining from the State of Georgia in July of 1784 lands grants in the Broad River Valley amounting to 5,250 acres.[127]  Oliver then laid-out in the fork of the junction of the Broad and Savannah Rivers, on the site of the former "Fort James," the plat of a town that he named "Petersburg," "in honor of Petersburgh, Virginia, in or near which he was born in 1735."[128]

The promotion of Petersburg became the marvel of the times.  Its location between its two rivers made it appear to all who had its location

---

[125] *Id.* at 16.

[126] *Id.* at 31.

[127] *Id*. at 31-32.

[128] Coulter, at 32.

57

described to them or its location viewed on a map, as the commercial center of all the upper Savannah river country.  Here was a bonanza for investors that should not be ignored.  All those Virginians who had settled up the Broad River Valley would be tributary to Petersburg as would the people living up the Savannah, on both sides of the river.  The down river towns of Augusta and Savannah would court the trade of this upcountry metropolis.  Its fame would not stop short of Philadelphia, New York, and Boston.  This was the era of the Yazoo Speculation, when Georgia lands and lots were being hawked and bought as far away as even Europe.[129]

The greatest speculator in Petersburg lots was a man who later became even more prominent in Alabama:  LeRoy Pope, who had been born in Northumberland County, Virginia on January 30, 1765, but moved with his parents to (and was reared in) Amherst County, Virginia.  In 1790, Pope and a host of friends and relations removed to the town of Petersburg, where Pope became a tobacco planter, an important merchant, and served as postmaster for a half dozen years.[130]

> [Pope] was allied through marriage relations with the Watkinses and the Walkers, other prominent residents of Petersburg.  He was already buying and selling lots when in 1797 he bought all fifteen lots which [another speculator] owned.  With this supply, he carried on an active real estate business for some years thereafter. . . .[131]

Dr. Ellis Merton Coulter, the former dean of the University of Georgia Department of History,[132] described the Watkins family from Prince Edward County,

---

[129] *Id.* at 34.

[130] *Id.* at 35.

[131] *Id.*

[132] Dr. Coulter taught at the University of Georgia for more than fifty years, and served at

Virginia, as "one of the most prominent families to settle in Petersburg," adding that they were "notable in their many marriage connections and in their migrations westward, principally to Alabama."[133]   Most of the Watkins children moved to Alabama.  The only daughter born into the family, Sarah Herndon Watkins, married Captain Robert Thompson, and the couple followed LeRoy Pope to Huntsville, Alabama.  "One of their daughters, Pamelia [Thompson], married Thomas Bibb, the second governor of the State of Alabama, his brother William Wyatt Bibb having been the first."[134]   The Bibb family bears special attention because, as Dr. Coulter observed:

> No family which came out of Virginia to Georgia was more famous, prolific, and widely connected than the Bibbs.  The original ancestor of the Bibbs in America came to Virginia from Wales, but by tradition the Bibbs were Huguenots.[135]  Of the fourth generation of Bibbs in Virginia two brothers became of special note — Richard and William.  Richard moved to Kentucky; his son George M. Bibb had a distinguished career in that state as judge, United States Senator, and Secretary of the Treasury under President John Tyler.  William moved to Georgia in 1789 and settled up Broad River and died seven years later.  His first wife having died, he married Sally Wyatt, described at the time as "an amiable young lady, with a handsome fortune."  By his first wife there were four children, and by his second wife, eight. . . .

---

various times as Dean of the Department of History and Regents' Professor Emeritus of History. He authored or edited more than 25 books, and his contributions to periodicals were extensive.

[133] Coulter, at 38.

[134] *Id.*

[135] A French Protestant of the Sixteenth and Seventeenth Centuries.

All of Sally Wyatt Bibb's children married and did well.  As previously noted, Thomas married Pamelia Thompson, a daughter of Robert Thompson and his wife Sarah . . . .  They later moved to Alabama where Thomas became the second governor of that state. . . .

The oldest of Sally Wyatt Bibb's children was William Wyatt Bibb, her most famous one.  Born in 1780 in Prince Edward County, Virginia, he came to the Broad River Valley with his parents when he was nine years old.  He attended the College of William and Mary [in Williamsburg, Virginia] . . . .  He then studied medicine in the Medical College of the University of Pennsylvania, and after completing his course began his practice in Petersburg in 1801.  He was soon attending patients far up the Broad River, even in Lexington . . . .[136]

The practice of medicine was not sufficient to satisfy William Wyatt Bibb's worldly ambitions, however, "nor to fill his pockets with needed money — especially so the latter."[137]  Consequently, in 1803, he ran for and was elected to the Georgia House of Representatives, where he served until 1806, when he was elected to the United States House of Representatives.  Bibb resigned his House seat in 1813, to accept his selection by the Georgia Legislature as United States Senator

to fill the vacancy made by the resignation of his friend William H. Crawford. [Bibb] served in this position until 1816, when he resigned to accept the appointment of governor of the Territory of Alabama.  He now moved to Alabama, and when the territory was admitted as a state in 1819 he was elected its first governor.[138]

---

[136] Coulter, at 41-42 (bracketed alteration and ellipses supplied).

[137] *Id.* at 43.

[138] Coulter, at 44 (bracketed alteration supplied).  *See also* U.S. Const. art. I, § 3, cl. 1 ("The Senate of the United States shall be composed of two Senators from each State, *chosen by the Legislature thereof* for six Years; and each Senator shall have one Vote.") (1797) (emphasis supplied).  The emphasized portion of the foregoing clause was affected by the Seventeenth

As Mills Thornton observed, "[s]ince the homes of many of the Broad River people had been in the same area of Virginia, some intermarriage had already taken place, but in Georgia the intermarriage reached such heights that every member of the group was closely related to every other."[139]  The most significant of those marriages was the union of John Williams Walker and Matilda Pope, the daughter of LeRoy Pope.   Among the couple's children were two sons who achieved political prominence.  Percy Walker followed in the footsteps of his father and became a United States Senator, while LeRoy Pope Walker served, among other prominent positions in Alabama history, as the first Secretary of War for the Confederacy,[140]

Amendment, providing in pertinent part that:  "The Senate of the United States shall be composed of two Senators from each State, *elected by the people thereof*, for six years; and each Senator shall have one vote."  U.S. Const. amend. XVII, cl. 1 (*ratified* May 31, 1913) (emphasis supplied).

[139] J. Mills Thornton III, *Politics and Power in a Slave Society:  Alabama, 1800-1869* 8 (Baton Rouge:  Louisiana State University Press 1978) ("**Thornton I**").

[140] Coulter, at 170.  It was LeRoy Pope Walker who, from his Montgomery, Alabama office (the first and temporary capitol of the Confederate States of America), drafted and transmitted on April 10, 1861 the telegram to Pierre Gustave Toutant Beauregard, the General commanding Confederate forces in Charleston, South Carolina, giving him permission to fire upon Fort Sumpter, if Union forces failed to comply with the demand to evacuate the citadel:

> If you have no doubt of the authorized character of the agent [of the United States government] who communicated to you the intention of the Washington Government to supply Fort Sumter by force [*in fact, the message from President Lincoln stated his intention to provide provisions to the troops stationed in Fort Sumter* "*peaceably if they can, forcibly if they must* "], you will at once demand its evacuation and, if this is refused, proceed in such manner as you may determine to reduce it.  Answer.
>
> L.P. Walker, Secretary of War

Samuel W. Crawford, *The History of the Fall of Fort Sumter* 421 (Whitefish, Mont.:  Kessinger Publishing LLC 2006) (1887) (bracketed alterations and emphasis supplied).  *See generally* Rembert

and, as Chairman of the 1875 "Redeemer Constitutional Convention."[141]

### iii.   From the Broad River Valley to the "Great Bend of the Tennessee River" in the Alabama Territory

The first public sales of lands in the Tennessee Valley region of Alabama were held in Nashville, Tennessee in 1809, and "much of the best land was purchased by wealthy Georgians":[142]   a group that Mills Thornton characterized as "a most interesting congregation."[143]   "Interesting" is an understated adjective:  the Broad River aristocracy dominated the social, political, and economic life of Alabama in its early years.[144]

### iv.   The War of 1812, the Battle of Horseshoe Bend, the Federal Road, and the Opening of East-Central Alabama

Following the 1803 Louisiana Purchase, the federal government began planning a new road to connect the Eastern cities with New Orleans.  Construction began on a post road through Indian territory in 1806, to connect Washington to the

W. Patrick, *Jefferson Davis and His Cabinet* 104–120 (Baton Rouge:  Louisiana State University Press 1944).  Pursuant to those instructoins, the first mortar shell arched over Charleston Harbor in the pre-dawn hours of Friday, April 12, 1861, and exploded above Fort Sumter at 4:30 a.m.  Thus was ignited the fuse that exploded into Civil War.

[141] *See generally* www.georgiaencyclopedia.org/nge/Article.

[142] Thornton I, at 7; *see also* Edwin C. Bridges, "Historical Alabama," in *The Alabama Guide:  Our People, Resources, and Government* 62 (Montgomery:  Alabama Department of Archives and History 2009) ("**Bridges**") ("For many yeoman farmers, even the base price of $1.25 an acre ($200 for a 160-acre parcel) was an impossibly large amount.").

[143] Thornton I, at 7.

[144] *Id.* at 8.

Crescent City by a more direct route than the existing Natchez Trace.  As traffic on

the new Federal Road increased, tensions with the Creek Indian Nation, through

whose territory the road passed, grew as well.  Those tensions eventually resulted in

"the Creek War of 1813-14," a subchapter of the War of 1812 between the United

States and Great Britain.[145]

General Andrew Jackson, commanding an army of some 3,300 men,[146]

decisively defeated "Red Stick" warriors from the "Upper Creek" faction of the Creek

Indian Nation at the Battle of Horseshoe Bend on the Tallapoosa River in east-central

Alabama on March 27, 1814.[147]  Jackson forced the defeated Creeks to sign the Treaty

---

[145] For more information on the Federal Road, see *Federal Road in Alabama*, www.encyclopediaofalabama.org (last visited October 10, 2011).

[146] Jackson's army was composed of West Tennessee militia units, the 39th United States Infantry Regiment, 500 Cherokee and Choctaw warriors, and about 100 warriors from the "Lower Creek" faction of the Creek Indian Nation.

[147] The Creek Indian Nation of Georgia and Alabama had become divided into two factions: the "Lower Creeks," who had assimilated many aspects of the culture of the white Americans and maintained a generally good relationship with United States Indian Agent Benjamin Hawkins; and, the "Upper Creeks," a majority of whom opposed American expansion and joined with the British and Spanish during the War of 1812.  The Shawnee Indian leader Tecumseh went to Creek and other Southeastern Indian settlements in 1811-12, to recruit warriors to join his war against American encroachment into frontier territories.  The British attempted to aid Tecumseh in his recruitment efforts by proposing a large "neutral" Indian state west of the Appalachian Mountains that would serve as a buffer to westward expansion by the Americans.  *See* 1 Robert V. Remini, *Andrew Jackson: The Course of American Empire, 1767–1821*, Chap. 13 (Baltimore:  The Johns Hopkins University Press 1998) (1977).

The "Red Sticks" were impetuous young warriors of the Upper Creek faction of the Creek Indian Nation who resisted white assimilation, and who desired to revive traditional religious and cultural values.  They began to raid American frontier settlements and homesteads.  After the July 27, 1813 "Battle of Burnt Corn" in Monroe County, Alabama, and the Aug. 30, 1813 "Fort Mims Massacre" in Baldwin County, Alabama (in which 250 American men, women and children were slaughtered), frontier settlers appealed to the government for assistance.  Tennessee, Georgia, and

of Fort Jackson on August 9, 1814, thereby ceding twenty-three million acres (half of central Alabama and part of southern Georgia) to the United States government.[148] The defeat of the Creeks allowed white settlers migrating westward, into the newly opened lands, to travel the Federal Road unmolested.

### *v.* From the Broad River Valley of Georgia to the Alabama Black Belt

*Land is the only thing in the world that amounts to anything, . . . the only thing in this world that lasts, . . . the only thing worth working for, worth fighting for — worth dying for.*

Gerald O'Hara, in Margaret Mitchell, *Gone With The Wind* 55 (New York: Macmillan Publishing Co. 1936).

---

Alabama organized militias, placed under the overall command of General Jackson, to march against the Red Sticks.

Jackson's army attacked about 1,000 Red Stick warriors, of whom more than 800 died. According to the National Park Service:  "Never before or since in the history of our country have so many American Indians lost their lives in a single battle."  *See* www.nps.gov/hobe/index (last visited Oct. 8, 2011).  *See generally* Thomas W. Martin, *The Story of Horseshoe Bend National Military Park* (Birmingham, Ala.:  The Southern University Press 1959); *see also*, *e.g.*, Albert James Pickett, *Pickett's History of Alabama:  And Incidentally of Georgia and Mississippi from the Earliest Period* 510–43, 588–611 (Montgomery, Ala.:  River City Publishing 2003) (1851).

Among the Americans who attacked the Creek barricade that day was a young officer named Sam Houston, who fought on in spite of being hit in the thigh by an arrow, and shot twice by musket balls.  Houston subsequently was elected governor of two states, Tennessee and Texas.  He served as president of the latter when it was an independent republic.

[148] As evidence of the treacherous nature of America's first "Caesar," 1.9 million of the 23 million acres that Jackson forced the Creeks to cede in the Treaty of Fort Jackson *actually was land claimed by the Cherokee Nation* — warriors from which had allied with the United States during the War of 1812.  During Jackson's Presidency and the "Indian Removal" of the 1830s, many Cherokees bitterly recalled how their warriors fought with Jackson at the Battle of Horseshoe Bend, and how (according to oral tribal tradition) Cherokee warrior Chief Junaluska saved Jackson's life during that battle.  Even though there is no written evidence to prove that Chief Junaluska did save Jackson's life, there is no question about the fact that Cherokee warriors played a pivotally important part in the battle.  Such was the nature of General (and later President) Jackson's "gratitude."

When the federal government held the first auctions for land in North Alabama, Broad River residents were eager to buy up the fertile lands in the "Great Bend of the Tennessee River" of north Alabama.[149]  LeRoy Pope became, as he had been in the purchase of Petersburg lots from Dionysius Oliver some years before, the largest speculator in north Alabama land.  He purchased large tracts of land around the "Big Spring," now the heart of downtown Huntsville, and laid out a new town that he proudly named "Twickenham" after a fashionable suburb of London.[150]

Quickly, however, Pope and his fellow Broad River Band — both those who moved with him to Huntsville, and those who came later — realized that Alabama's Black Belt had more to offer in terms of the malleability of the region and the fertility of the soil for cotton production.  Further, the defeat of the Creek Indians at Horseshoe Bend in 1814 brought peace to what then was called "the Southwest

---

[149] Thornton I, at 7.

[150] Bridges, at 65.  *See generally* Daniel S. Dupre, *Transforming the Cotton Frontier: Madison County, Alabama 1800–1840* (Baton Rouge:  Louisiana State University Press 1997) ("**Dupre I**"); Frances Cabaniss Roberts, *Background and Formative Period in the Great Bend and Madison County* (May 10, 1956) (unpublished Ph.D. dissertation, University of Alabama) (on file with Gorgas Library, The University of Alabama, Tuscaloosa).  John Hunt, one of the earliest pioneers to move into the Territory, had erected a log cabin at the site of Huntsville's "Big Spring." Hunt either could not, or failed to, purchase the land, however.  Consequently, when LeRoy Pope bought all of what now is downtown Huntsville at the federal auction in Nashville, Hunt was forced to move on.  As Dr. Edwin Bridges observed in his brilliant and all too brief history of the State, what next occurred exhibited the class tensions that existed between yeoman farmers and the aristocratic Planters from Georgia's Broad River Valley:  "Madison County delegates to the territorial assembly appealed to yeoman farmers back home by voting to rename the town Huntsville in honor of the unfortunate squatter Pope had supplanted."  Bridges, at 65.

frontier," and caused "Alabama fever" to sweep the Nation.  Consequently, when in 1817, the federal government held a land auction in Milledgeville, Georgia for the huge tracts of land ceded in the Treaty of Fort Jackson, many more persons from the Broad River Valley migrated to Alabama.

> Thousands of settlers began to migrate into the rich river valleys and carve farms from lands ceded by the Creeks.  James Graham, writing from Lincoln County, North Carolina, observed that "The *Alabama Feaver* [*sic*] rages here with great violence and has carried off vast numbers of our Citizens. . . .  There is no question that this *feaver* [*sic*] is contagious . . . for as soon as one neighbor visits another who has just returned from Alabama he immediately discovers the same symptoms which are exhibited by the one who has seen alluring Alabama."  Graham complained that "anxiety and confusion" reigned in his county as people were selling their farms to seek a "new home in the wide wild wilderness" of Alabama.

> In the decade before 1820 the population of Alabama increased more than 1,000 percent to 127,901, most of that growth coming after 1815.  In 1830 the United States census counted a population of 309,527, a 142 percent increase, far greater than that for any other southwestern state.  Riding in wagons or on mules or horses, pushing or pulling a hogshead with all their worldly possessions, and even walking with gear upon their backs, settlers came from the piedmont regions of Georgia, South Carolina, North Carolina, and Virginia.[151]

"During that boom, the bulk of the Broad River community decided to follow its pioneer relatives from Georgia to the new territory."[152]  They settled in a "choice"

---

[151] Leah Rawls Atkins, "Part One:  From Early Times to the End of the Civil War," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* 54 (Tuscaloosa:  The University of Alabama Press 1994) (emphasis in original, footnotes omitted).

[152] Thornton I, at 10.

section of land around what later became Montgomery.[153]  As Dr. Edwin Bridges, the

Director of the Alabama Department of Archives and History perceptively observed:

> In an interesting way, federal land policy shaped future Alabama
> politics.  Wealthy planters purchased prime tracts in river valleys and
> across the fertile Black Belt.  These areas would remain under planter
> domination for generations.  *So many prominent Georgia planters
> bought land in Alabama that they immediately formed a political
> network, transposed from Georgia to the new territory*.  Yeoman
> farmers were left with more remote and less productive tracts.  They
> settled the hill country and the Wiregrass, where society and culture
> today still bear their imprint.[154]

As discussed in the beginning of this part of the opinion, the soil of the Black

Belt was extraordinarily fertile at the time the region was opened for settlement.  The

nutrient-laden soil, along with the extensive network of navigable rivers in the area,

made the Black Belt ideal for the cultivation of cotton.  Perhaps equally important

was the natural state of vegetation in the region before the Planters arrived.  Unlike

much of Alabama and the rest of the Southeastern United States, the Black Belt was

---

[153] *Id*.

[154] Bridges, at 63 (emphasis supplied).  Dr. Bridges also noted that, for many of the yeoman farmers who bid on central Alabama land at the 1817 federal land auction in Milledgeville, Georgia,

> even the base price of $1.25 an acre ($200 for a 160-acre parcel) was an impossibly
> large amount.  some tried borrowing the money.  Others squatted on unclaimed land,
> hoping they might eventually raise the money to buy it[,] but knowing they might
> have to move if someone bought the land from underneath them.  *Many squatters
> expected to keeping moving*.

*Id*. at 62 (emphasis supplied).

not covered by pine forests.  Instead, low brush and natural grasses abounded.[155]  The scions of Virginia and Georgia Planters looking to establish their own cotton society had fertile, easily cleared soil, in an ideal climate.  They only needed one other ingredient to establish a booming cotton industry — labor.  The soil characteristics that proved such a blessing to the Broad River transplants were a curse upon the hundreds of thousands of African slaves they purchased and put to work.

### *vi*.   **"The Georgia Machine"**

The close-knit community of tobacco planters in Petersburg, Georgia enjoyed spectacular political success in that state.  The small Broad River town sent a succession of representatives to the federal congress, its candidates repeatedly winning statewide elections.[156]  One of those early members of the House of Representatives was William Wyatt Bibb.[157]  Bibb then became a United States Senator, joining Charles Tait in the upper chamber, and for three years in the second decade of the nineteenth century "there was the unheard of situation when both [United States] Senators came from the same neighborhood — Petersburg."[158]  "The combination of [William] Crawford, [William Wyatt] Bibb, and [Charles] Tait [went

---

[155] J. Sullivan Gibson, *The Alabama Black Belt:  Its Economic Status*, 17 Econ. Geog. 1, 10 (1941) ("**Gibson**").

[156] Coulter, at 87.

[157] *Id.*

[158] *Id.* at 88 (bracketed alteration supplied).

68

on to] make itself felt as a dominant force in the rise of the State of Alabama."[159]

In the early days of Alabama, the political leaders came from Huntsville and Madison County.  And in the early days, the Alabama leaders came from the Broad River Valley of Georgia.  The result was "two Petersburgers as governors in succession [the Bibb brothers], another as a Federal judge [Charles Tait], and others from Petersburg and the Broad River Valley in responsible positions," including William Crawford as United States Attorney[160] and John Williams Walker as United States Senator,[161] creating "a matter of Petersburgers running the State of Alabama during its infant years . . . ."[162]  This "Georgia Machine" in Alabama politics was transplanted from the Broad River Valley, and was made up of the same Virginians who had dominated Georgia politics while living in that state.[163]

The goal of the Georgia Machine was "to have Alabama admitted to the Union as a Broad River fief."[164]  The Machine's connections with Georgia politicians in Washington allowed it to quickly move the Alabama territory toward statehood, a

---

[159] *Id.* (bracketed alteration supplied).

[160] Hugh C. Bailey, *John W. Walker and the "Georgia Machine" in Early Alabama Politics*, 8 Ala. Rev. 179, 191 (1955) ("**Bailey**").

[161] *Id.* at 190.

[162] Coulter, at 170.

[163] Bailey, at 180 ("It was popularly referred to as the party of the 'Virginians and their allies' since it commanded the allegiance of the majority of Virginians in the state and was ably led by the sons of the 'Old Dominion.'").

[164] Thornton I, at 11.

69

goal that also was shared by many of the poorer residents of the territory.[165]   Once

Alabama was admitted to the Union, however, the Georgia Machine's success was

short-lived.   Governor William Wyatt Bibb died after being thrown from a horse in

1820.[166]   His brother and successor, Thomas Bibb, was not nearly as popular a

Governor, and the Machine's leader in the southern part of the state, Israel Pickens,

broke ranks with the party to form his own faction.[167]   Then, as has often occurred in

the course of historical events, the economy collapsed during the "Panic of 1819,"

completing the damage to the Machine's political fortunes.   Once again, Dr. Edwin

Bridges provides a succinct account:

> Most of Alabama's first state officials were, like Governor Bibb,
> members of the Georgia planter network.   They had connections in
> Washington and were leaders by habit and tradition.   But just as
> Alabama became a state, the economy collapsed under the weight of a
> worldwide depression.   Cotton prices fell and banks retrenched.   The
> Planters and Merchants Bank of Huntsville [founded by LeRoy Sims],
> the first and largest bank in the state, squeezed its debtors to repay their
> loans.   Then, the bank refused to pay off its own paper notes in gold or
> silver of equal value.
>
> The bank's policies infuriated Alabama voters.   It had been
> chartered by the state, and its owners included leading members of the
> "Georgia aristocracy."   Political opponents of the Georgians denounced

---

[165] *Id.* at 10-12 (noting that the Broad River group, while not generally popular in the territorial elections, was able to use its influence in Washington to defeat more popular local leaders who did not support statehood).

[166] Bailey, at 192.

[167] *Id.* at 192-94.

the bank, the state officials who had chartered it, and the planters who owned it.  They urged Alabama voters to reject "royal party" leaders, whom they accused of misusing their offices for personal enrichment.  Voters responded, and the Georgia aristocracy was soundly defeated in the 1821 elections.

The 1821 elections reflected a deep cultural division between planters and yeoman farmers.  Planters tended to view government as an instrument for promoting the economic development of the state.  They favored banks, improved transportation, and education.  Yeoman farmers, by contrast, were descendants of people who had lived under some type of aristocracy for as far back in time as their collective memory could recall.  Having just thrown off the yoke of British monarchy in their fathers' time, they feared anything that might lead to a new aristocracy in America.  They were intensely suspicious of governments, banks, great wealth, or anything new that smacked of "special privilege."[168]

### c.   The demographic make-up of the Black Belt

*The hard core of the political South — and the backbone of southern political unity — is made up of those counties and sections of the southern states in which Negroes constitute a substantial proportion of the population.  In these areas a real problem of politics, broadly considered, is the maintenance of control by a white minority.  The situation resembles fundamentally that of the Dutch in the East Indies or the former position of the British in India.*  Here, in the southern black belts, the problem of governance is similarly one of the control by a small, white minority of a huge, retarded, colored population.  *And, as in the case of the colonials, that white minority can maintain its position only with the support, and by the tolerance, of those outside — in the home country or in the rest of the United States.*

*It is the whites of the black belts who have the deepest and most immediate concern about the maintenance of white supremacy.  Those whites who live in counties with populations 40, 50, 60, and even 80 percent Negro share a common attitude toward the Negro.  Moreover, it is generally in these counties that large-scale plantation*

---

[168] Bridges, at 64.

> *or multiple-unit agriculture prevails.  Here are located most of the large agricultural operators who supervise the work of many tenants, sharecroppers, and laborers, most of whom are colored.  As large operators they lean generally in a conservative direction in their political views.*

V. O. Key, at 5.

That part of Alabama possessing the thick, dark, and naturally rich soil was the section of Alabama best suited for the cultivation of upland cotton.  Prior to the invention of the gasoline engine and mechanization of farm operations, however, cotton cultivation was an extraordinarily, and incredibly, labor-intensive form of agriculture.  Accordingly, the Black Belt was the section in which the possession of slaves was most profitable and, consequently, they were taken there in the largest numbers.  In antebellum America, that meant that large slave populations and cotton production went hand-in-hand.  For that reason, the Planters in the Black Belt were *far outnumbered* by the people they enslaved, and the Black Belt historically had a demographic makeup distinct from the rest of the state.  While the rest of Alabama was predominantly white, the total population of the Black Belt was overwhelmingly black.  At the time of the Civil War, roughly half of all Alabamians were Africans or descendants of Africans,[169] but they were largely concentrated in a relatively small

---

[169] *See, e.g.*, "Preface" in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* xxi (Tuscaloosa:  The University of Alabama Press 1994) (stating that, by 1860, there were 526,271 whites and 435,080 blacks); Horace Mann Bond, *Negro Education in Alabama:  A Study in Cotton and Steel* 4 (Tuscaloosa:  University of Alabama Press 1994) (1939) ("**Bond**") (calculating the number at 526,271 whites, and 437,770

area:  *i.e.*, the Black Belt counties.[170]

From the end of the Civil War to the present day, the population of the Black

Belt as a percentage of the total Alabama population has steadily declined.  *Within*

the Black Belt, however, the percentage of the population that is black has remained

very high.  Nearly eighty years after the Civil War, distribution of black Alabamians

had changed very little:  *i.e.*, in 1940, all of the counties in which at least 45% of the

population was black were located in the Black Belt.[171]  In the "heart" of the region,

blacks outnumbered whites four to one.[172]  In 2009, of Alabama's eleven majority-

black counties, ten were in the Black Belt as defined by plaintiffs, and the eleventh,

Montgomery County, is included in many alternate definitions of the section.[173]  Some

---

blacks).

[170] *See* Booker T. Washington, *Up From Slavery:  An Autobiography* 108 (New York: Doubleday, Page & Co. 1907) ("I have often been asked to define the term 'Black Belt.'  So far as I can learn, the term was first used to designate a part of the country which was distinguished by the colour of the soil.  The part of the country possessing this thick, dark, and naturally rich soil was, of course, the part of the South where the slaves were most profitable, and consequently they were taken there in the largest numbers.  Later, and especially since the war, the term seems to be used wholly in a political sense — that is, to designate the counties where the black people outnumber the white.").

[171] V.O. Key, Jr., *Southern Politics in State and Nation*, 43 (New York:  Alfred A. Knopf 1949) ("**V.O. Key**").  Key includes a map showing these counties, which form a contiguous belt across the state.  Although they include counties outside plaintiffs' definition of the Black Belt, almost all of them are included in at least one of the alternate definitions.

[172] Gibson, at 15.

[173] *See*, PX 353 (2009 Estimated County Population by Race); PX 135 (Black Belt Alternative Lists), at 2.

of those counties have black concentrations as high as 82%.[174]  This population

distribution is distinct from the rest of the State's rural areas, which are

predominantly white, and its urban areas, which are more racially balanced.[175]

### d.    The enduring political influence of the Black Belt

> *The black belts make up only a small part of the area of the
> South and — depending on how one defines black belt — account for
> an even small part of the white population of the South.  Yet if the
> politics of the South revolves around any single theme, it is that of the
> role of the black belts.*  Although the whites of the black belts are few
> in number, their unity and their political skill have enabled them to
> run a shoestring into decisive power at critical junctures in southern
> political history.

V.O. Key, at 5-6.

The Black Belt's demographic makeup — many black slaves and few white

Planters — limited its political power during the antebellum period.  Alabama's first,

1819 Constitution apportioned representation in the State Legislature on the basis of

each county's *white* population, not total population (*i.e.*, slaves were not counted in

any respect, even as a percentage of the county population).[176]  Coupled with

extremely liberal suffrage provisions, that apportionment rule kept political power in

the hands of the smaller, yeoman farmers who populated the "white" counties.[177]  As

Dr. Mills Thornton extensively documents, "aristocratic" politicians had little

---

[174] *See* PX 353; part III(B)(1)(b), *infra*.

[175] For an in depth discussion about Alabama's demographics, see Part III(B)(1)(b), *infra*.

[176] Thornton I, at 12.

[177] *See id.* at 14.

74

electoral success following the demise of the Georgia Machine.[178]   Following the Civil War and during Congressional ("Radical") Reconstruction, however, black Alabamians were awarded the franchise and the Legislature was apportioned accordingly.   Thus, the Black Belt counties suddenly became very powerful politically, because they had a very large *total* population relative to the white counties of the hill country and Wiregrass.  Following the end of Reconstruction, this newfound political power fell into the hands of the region's old Planter class:  those descendants of the Broad River Georgia aristocracy who were accustomed to domination, and able to manipulate black votes to ensure that the counties' smaller white population held all the elective offices.[179]   Because these white leaders "represented" vast numbers of recently-freed slaves, the Black Belt had the largest and strongest caucus in the State Capitol.

As will be discussed more fully in Part III(A)(7)(d), *infra*, Alabama's white politicians eventually decided it was better to strip blacks of the franchise than to manipulate their "exercise" of it.  Even so, the crafty and extremely-intelligent elite class of men who shaped and guarded the interests most critical to the Black Belt's economy ensured that the loss of their black "votes" would not dilute their influence

---

[178] *See generally id.*

[179] For a discussion of election fraud in this period, see Part III(A)(5), *infra*.

in the Legislature.  They brokered a deal with the leaders of the faction representing the white, agrarian counties of the hill country and Wiregrass that bordered upon the coin-toss game of "heads, I win; tails, you lose."  Under the terms of Alabama's 1901 Constitution, even though blacks would be almost completely disfranchised, legislative apportionment would continue to be based upon total population. Ostensibly, the Black Belt was conceding electoral control of the Governor's mansion to maintain its control of the State Legislature until the next decennial census.  The cleverness of their ruse, however, lay in the fact that the Black Belt leaders had no intention of allowing reapportionment, either in 1910, or following any other decennial census.  Thus, as urbanization and migration reduced the proportionate total population of the Black Belt, its Planter elite continued to be able to elect far more than their fair share of state senators and house representatives.  The region was allotted seats not only on the basis of its nonvoting black population, but also on the basis of nonvoting blacks who had long since died or moved out of the Black Belt. Alabama's Legislature remained apportioned according to the 1901 total population until federal courts ordered reapportionment in the late 1960s.  *See Reynolds v. Sims*, 377 U.S. 533 (1964).  By such means, the Black Belt leadership was able to retain its disproportionate political influence far into the twentieth century.[180]

---

[180] For an in-depth discussion of the Black Belt hold on power, see Part III(A)(8)(f), *infra*.

The power of the Black Belt Planter class was not merely a function of malapportionment, or even of its wealth. The earliest aristocrats of Alabama kept close ties not only among themselves, but also with their cousins in Georgia and Virginia. Even after the downfall of the Georgia Machine, reducing the "aristocratic" influence in the State Legislature, the Planters remained a tightknit network of like-minded men who shared not only the same politics, background, education, and training, but also common ancestors and a deeply-seated sense of self-identity. Such a blood bond goes far deeper, and is far stronger, than the shifting alliances of partisan politics and "democratic government" (to the extent that the elite class understood "democracy"), and ensured that the Black Belt power structure would be perpetuated for decades. When apportionment by total population increased their representation in the Legislature, the Black Belt leadership took a firm grip on state politics that it would not relinquish for decades.

The unity of political goals among the Black Belt electorate resulted in stability and continuity in the region's representation in the State Legislature. The power brokers in the region would identify politically talented men and ensure their election to key state offices, and especially the Legislature. The Black Belt network ensured that those legislators had a reliable source of steady income at home, allowing them to focus on their roles in the State's capitol. Thus, the Black Belt legislators were

77

able to take up what amounted to full time residence in Montgomery during their terms of office.  Moreover, while legislators from other parts of the State would come and go — having to return home to resume working full time after a term or two of public service — the secure income received by Black Belt legislators (and lack of competitive elections in the region) allowed them to stay in the Legislature for decades, developing institutional experience and expertise to pair with their political instincts.  Among those long-tenured and politically powerful Black Belt legislators were:  Walter Givhan, who spent 38 years in the Legislature (16 years in the house, and another 22 in the senate); Rick Manley, who served 21 years (17 in the house, and one term in the senate); "Jimmie" Clark, who spent 32 years in Montgomery (16 in the house and another 16 in the senate);[181] and Roland "the Wily Fox from Wilcox" Cooper, who spent 26 years in the Legislature.

### 2.    "Big Mules"

The pejorative term "Big Mules" refers to Alabama's monied interests:  *i.e.*, the coal mining, iron, steel, railroad, power, telephone, insurance, banking, and other industrial and financial institutions that clustered in and around Birmingham,

---

[181] James S. ("Jimmie") Clark of Barbour County was a very powerful figure in Alabama politics for nearly forty years.  He served four consecutive terms in the Alabama Senate (1959 to 1975), then as Mayor of Eufaula from 1976 to 1978, followed by four consecutive terms in the Alabama House of Representatives (1983 to 1999), during the last three of which he was Speaker of the House of Representatives.

beginning in 1871, with the founding of the City and the construction of the first blast furnaces.[182]  The label was hung around the necks of those wealthy interests by David Bibb Graves during his 1926 campaign for Governor of Alabama.  Graves was a Democratic politician who served as the State's thirty-eighth and fortieth Governor during the period when the Alabama Constitution did not permit Governors to serve consecutive terms.  He was the first person in State history to be elected to serve two, four-year, non-consecutive terms (*i.e.*, 1927 to 1931, and, 1935 to 1939),[183] and he undoubtedly "would have been elected again in 1942 had death not overtaken him during the campaign."[184]

Graves was an extraordinarily able, if incongruous political figure in Alabama history.[185]  He was a descendent of Alabama's first Governor, William Wyatt Bibb,

[182] *See generally* Marjorie Longenecker White, *The Birmingham District:  An Industrial History and Guide* (Birmingham:  Birmingham Publishing Co. for the Birmingham Historical Society 1981); Grace Hooton Gates, *The Model City of the New South:  Anniston, Alabama 1872-1900* (Tuscaloosa:  The University of Alabama Press 1978).

[183] *See* Wayne Flynt, "Bibb Graves, 1927–1931, 1935–1939," in *Alabama Governors:  A Political History of the State* 173 et seq. (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) ("**Flynt IV**").

[184] V.O. Key, at 50.  Graves died at age 68 on March 14, 1942, in Sarasota, Florida, while preparing for another gubernatorial campaign.  *Id.*

[185] Graves served as Adjutant-General of the Alabama National Guard from 1907 to 1911, and as Colonel of an Alabama regiment in World War I.  "He endeared himself to his men.  Campaigners in later years were amazed by the number of his erstwhile comrades in arms who idolized the colonel and talked him up in their communities."  V.O. Key, at 51-52.

Graves first ran for Governor in 1922 and made a poor showing, but four years later, with the secret endorsement of the Ku Klux Klan, he was elected.  He almost certainly was the Exalted Cyclops (chapter president) of the Montgomery Klavern.  *See generally* Glenn Feldman, *Politics, Society and the Klan in Alabama, 1915-1949* (Tuscaloosa: The University of Alabama Press 1999)

("**Feldman II**").  Thereafter, Graves constructed the most powerful political machine in State history, and that assertion does not exclude the political organization of George C. Wallace who — although elected governor more times than any other person in Alabama history (not even counting the partial-term of his wife, Lurleen Burns Wallace (Jan. 17, 1967–May 7, 1968), for whom George served as her "number one advisor") — built his political fortunes on an unparalleled ability to engage in racist demagogy and oratory, and not upon the basis of organizational politics.

Unlike Wallace, Graves succeeded by utilizing the tools that had been employed so successfully in New York City by William March "Boss" Tweed during the hegemony of "Tammany Hall politics," and the same "Ward-healing" techniques that later would be used to equal effect in Kansas City, Missouri by Thomas J. Pendergast, in Memphis by Edward "Boss" Crump, and in Chicago by the first Mayor Richard J. Daley:  *i.e.*, Graves "impressed local politicians over the state as *a practical man who could and would do business with them* to meet the immediate practical problems of governing *with mutually beneficial results*.  With the *friends produced by favors and the expectation of favors*, he bound to himself an essentially personal following."  V.O. Key, at 51 (emphasis supplied).  For example, during a 1934 campaign speech in Selma, Graves proclaimed: "Those who help me bake the pie will help me eat it."

One of the most important "friends" bound to Governor Graves "by favors and the expectation of favors" was Horace C. Wilkinson, the "Boss" of Birmingham's "Wilkinson Machine."  *See* Glenn Feldman, *From Demagogue to Dixiecrat:  Horace Wilkinson and the Politics of Race* 99-120 (Privately Printed 1995) ("**Feldman III**"); *see also* the memorandum opinion filed as document number 934 in the case of *United States v. Jefferson County*, Civil Action No. 75-666 (N.D. Ala. July 8, 2002) (Smith, J.), at 92 *et seq*.

As Governor, Graves earned a reputation as a reformer by abolishing the convict leasing system and raising taxes on public utilities, railroads, and coal and iron companies.  The new revenue was used to expand educational and public health facilities, increase teachers' salaries and veterans' pensions, fund an ambitious road-building program, and improve the port facilities in Mobile.  Even though both Governor Graves and his close political associate, United States Senator (and, later, Supreme Court Justice) Hugo L. Black, were both identified as staunch "New Deal Democrats" during Franklin D. Roosevelt's first two terms, V.O. Key described Graves as

> an able man but not notable as the exponent of any particular philosophy or point of view in politics . . . .  In his long political career he gathered about himself a popular following that coincided with no apparent natural grouping of voters.  The area of his highest popular strength wove in and out of the black belt — with its center of gravity there — and in and out of northern Alabama *in a manner completely at variance with the way Alabama voters divide when the chips are down in a battle over issues comprehensible to them* [*e.g.*, race].
>
> "A natural-born dealer" — thus he is described by his friends and associates. "He would deal with anybody on anything," one of them reports but with no suggestion of personal dishonesty.  . . .

and he attended the University of Alabama, where he was a member of the school's first football team and a Phi Beta Kappa graduate with a degree in Civil Engineering (1893). He subsequently earned a degree from Yale Law School (1896). The "little brown hickory nut of a man" softened the shock of his Yale law degree and intellectual prowess on dirt-poor agrarian voters with a chew of tobacco, an energetic, captivating personality, and folksy metaphors that captured his position on complex social and economic issues. For example, when speaking to groups of small farmers in the north Alabama hill counties or the Wiregrass, Graves would say that the State's industrial and monied interests "reminded him of a farmer who had harnessed a small mule to a wagon heavily loaded with corn. Behind the wagon, he had hitched a big mule who munched contentedly while the smaller animal strained every muscle to pull the load."[186] If elected Governor, Graves vowed, he would "hitch the big mules to the wagon" and make them shoulder a heavier portion of the State's and counties' tax burdens.[187] "The imagery was memorable, and many ordinary Alabamians became convinced that the wealthiest and most powerful citizens were not pulling

---

V.O. Key, at 50-51 (emphasis and bracketed alteration supplied).

[186] Flynt IV, at 177.

[187] *See*, *e.g.*, Roger K. Newman, *Hugo Black:  A Biography* 102 (New York: Fordham University Press 1997); Virginia Van der Veer Hamilton, *Lister Hill — Statesman From the South* 83 (Tuscaloosa:  University of Alabama Press 1987).

their fair share of the load."[188]

### 3.    "Carpetbaggers"

"Carpetbaggers" was a derogatory term used to describe Republicans who came south during Reconstruction, and who often arrived toting "carpet bags," a common form of luggage at the time made from carpet material.  As Eric Foner recorded in his definitive analysis of Reconstruction,[189] white Southerners viewed such persons as unscrupulous, dishonest profit-seekers who came south to loot and plunder the defeated region:

> Political, regional, and class prejudices combined to produce the image of the carpetbagger as a member of "the lowest class" of the Northern population.  Able to pack "all of his earthly belongins" in his carpetbag, he supposedly journeyed south after the passage of the Reconstruction Act "to fatten on our misfortunes," in the process poisoning the allegedly harmonious race relations of 1865–67.  In fact, far from the dregs of Northern society, carpetbaggers tended to be well educated and middle class in origin.  Not a few had been lawyers, businessmen, newspaper editors, and other pillars of Northern communities.  The majority (including fifty-two of the sixty who served in Congress during Reconstruction) were veterans of the Union Army, and their ranks included teachers, Freedmen's Bureau agents, and men who had invested tens of thousands of dollars in cotton plantations.[190]

---

[188] Flynt IV, at 177.

[189] Eric Foner, *Reconstruction — America's Unfinished Revolution: 1863–1877* (New York: History Book Club Francis Parkman Prize Edition 2005) (Harper & Row 1988) ("**Foner I**").

[190] *Id.* at 294-95 (footnotes omitted, emphasis supplied); *see also id.* at 137 (where Foner observes that those "northerners who purchased land, leased plantations, or formed partnerships with Southern planters" were "a varied, ambitious group, mostly former soldiers eager to invest their savings in this promising new frontier, and civilians lured south by press reports of 'the fabulous sums of money to be made in the South in raising cotton.' . . . Joined with the quest for profit,

### 4.   "Scalawags"

"Scalawags" were native Southerners who cast their lot with the Republicans and Freedmen.  To Democrats, the scalawag was even more detestable than the hated carpetbaggers.  "We can appreciate a man who lived north, and . . . even fought against us," declared one Southern politician, "but a traitor to his own home cannot be trusted or respected."[191]  Evidence of the odium heaped upon Alabama's scalawags appeared in the August 7, 1868 edition of the Montgomery *Daily Advertiser*, which printed the following, scornful description:

> Our scalawag is the local leper of the community.  Unlike the carpetbagger, he is native, which is so much the worse.  Once he was respected in his circle; his head was level, and he could look his neighbor in the face.  Now, possessed of the itch of office and the salt rheum of Radicalism, he is a mangy dog, slinking through the alleys, haunting the Governor's office, defiling with tobacco juice the steps of the Capitol, stretching his lazy carcass in the sun on the Square, or the benches of the Mayor's Court.[192]

### 5.   "Radical Republicans"

"Radicals" was a term that described those Republicans who had most strongly opposed slavery prior to and during the Civil War, who distrusted former

---

however, was a reforming spirit, a vision of themselves as agents of sectional reconciliation and the South's 'economic regeneration.'").

[191] *Id.* at 297.

[192] Sarah Woolfolk Wiggins, *The Scalawag in Alabama Politics, 1865–1881*, at 1-2 (Tuscaloosa:  The University of Alabama Press 1977) (bracketed alterations supplied).

Confederates (particularly Army officers and those who held political offices in the former Confederate States), who believed that harsh and punitive policies were required (both to punish those who had led the Nation into Civil War and thereby caused the loss of so much blood and treasure, and to "Reconstruct" the South), who demanded civil and political rights for the recently-freed slaves, and who understood that the moral redemption and future prosperity of the South were dependent upon the education and elevation of the Freedmen.[193]

### 6.    "Conservative Democrats" and "Bourbons"

Professor William Archibald Dunning, the progenitor of the "Dunning School of Reconstruction historiography" at Columbia University, observed that the Southern opponents to the Radical Republicans, carpetbaggers, scalawags, and Freedmen were

> generally designated as the conservatives, though the name Democrats became also a common and sufficiently accurate title.  In it were included the great mass of the white political population, with a sprinkling of negroes too scanty in number to serve any purpose save that of illustrating from time to time the claim of the more optimistic whites that some headway was being made against the radical control of the freedmen.  . . .[194]

The term "Bourbon" — regardless of whether it is used as a noun or an

---

[193] *See*, *e.g.*, Lewis H. Blair, *A Southern Prophecy:  The Prosperity of the South Dependent upon the Elevation of the Negro* (Boston:  Little, Brown and Company 1964, C. Vann Woodward ed.) (1889).

[194] William Archibald Dunning, *Reconstruction:  Political and Economic, 1865–1877,* at 116-17 (New York:  Harper & Brothers Publishers 1907).

adjective ("Bourbon Democrats") — "originated during the Reconstruction period and was used by the Radicals to label their Democratic opponents as anti-progressive and ultra-conservative."[195]   The term was derogatory, and used to disparage those members of the "Conservative and Democratic Party" who were attempting to reclaim control of State government from the "Radical Republicans."   It referenced the Bourbon Dynasty that had been overthrown in the French Revolution (1788–94), but returned to power in 1815, and thereafter ruled in a harsh, reactionary fashion until its final overthrow during the July Revolution of 1830.

In Alabama, the term "Bourbon Democrats" more specifically referenced those persons who represented the interests of Black Belt plantation owners who farmed huge tracts of cotton-producing land, and who had owned most of the State's slave population prior to the Civil War.   As the coal, iron, steel, and other industrial enterprises located in Anniston and the "Birmingham district" began to grow in wealth and political influence during the last two decades of the nineteenth century, the Bourbons allied themselves with the so-called "Big Mules" of Birmingham, which quickly had become the State's largest and wealthiest city.[196]

---

[195] Allen Johnston Going, *Bourbon Democracy in Alabama 1874-1890* xvii (Tuscaloosa: The University of Alabama Press 1992) (1951).

[196] *See supra* Part I(D)(2).  *See also*, *e.g.*, Samuel L. Webb, "The Populist Revolt in Alabama: Prelude to Disfranchisement," in *A Century of Controversy:  Constitutional Reform in Alabama* 5 (Tuscaloosa:  The University of Alabama Press 2002, Bailey Thomson ed.) ("Since the end of Reconstruction the Democrats' statewide leaders had been a group of wealthy, elite men known

7.    **"Black Codes"**

The phrase "Black Codes" generically refers to laws enacted immediately after the end of the Civil War and during the period of "Presidential Reconstruction"[197] by Southern states to "replace slavery with some kind of caste system and to preserve as much as possible of the prewar way of life."[198]   As Eric Foner observed, the "centerpiece" of the Black Codes

> was the attempt to stabilize the black work force and limit its economic options apart from plantation labor.  Henceforth, the state would enforce labor agreements and plantation discipline, punish those [Freedmen] who refused to contract [with plantation owners], and prevent whites from competing among themselves for black workers [by, *e.g.*, offering higher wages and better working conditions].[199]

8.    **"Redeemers"**

Reconstruction came to an end in all states of the former Confederacy as a result of "the Corrupt Bargain" of 1877:  the politically-brokered deal that resolved

---

popularly as the 'Bourbons.'  Whether they were large Black Belt planters, directors of railroads, corporation lawyers, or leaders of Alabama's growing iron and steel industry, Bourbons had one common interest:  they wanted to control the tenant farmers, sharecroppers, farm laborers, textile workers, lumber millhands, coal and iron ore miners, and workers in iron and steel mills who produced the wealth for the state's upper classes.").

[197] As Eric Foner observed, the Black Codes enacted before the smoke of war had fully dissipated played "a crucial role in the undoing of Presidential Reconstruction," and strengthened the hand of those Congressional leaders who lobbied successfuly for the imposition of a harsh, punitive period of "Radical Reconstruction."  Foner I, at 199.

[198] Lawrence M. Friedman, *A History of American Law* 504 (New York:  Simon & Schuster 2d ed. 1985).

[199] Foner I, at 199 (bracketed alterations supplied, footnote omitted).

the disputed 1876 Presidential election, ended Congressional ("Radical") Reconstruction, and led to withdrawal of all federal troops from those southern states still under military occupation, martial law, and "provisional governments." Reconstruction in Alabama had effectively ended in November of 1874, however, when candidates representing the "Conservative Democratic Party" swept all state offices, elected safe majorities in both chambers of the State Legislature, and reclaimed most of county government offices across the State. The leaders of that political *coup d'état* were called "Redeemers" because, by way of analogy to the legal term defining the *equity of redemption*, they had reclaimed control of State government. Eric Foner described them as follows:

> No single generalization can fully describe the social origins or political purposes of the South's Redeemers, whose ranks included secessionist Democrats and Union Whigs, veterans of the Confederacy and rising younger leaders, traditional planters and advocates of a modernized New South. They shared, however, a commitment to dismantling the Reconstruction state, reducing the political power of blacks, and reshaping the South's legal system in the interests of labor control and racial subordination. In a majority of Southern States, they moved, upon assuming office, to replace Reconstruction constitutions with new documents severely restricting the scope and expense of government. "Instruments of prohibition," as one newspaper described them, Redeemer constitutions reduced the salaries of state officials, limited the length of legislative sessions, slashed state and local property taxes, curtailed the government's authority to incur financial obligations (in Georgia and Louisiana, it could borrow money only to repel an invasion or suppress an insurrection), and repudiated, wholly or in part, Reconstruction state debts. Public aid to railroads and other

87

corporations was prohibited, and several states abolished their central boards of education.[200]

A North Carolina Democrat had presciently predicted at the beginning "Radical" Reconstruction: "When the bayonets shall depart . . . then look out for the reaction. Then the bottom rail will descend from the top of the fence."[201] And, indeed, the "bottom rail" — the hated cabal of "Radical Republicans," carpetbaggers, scalawags, and Freedmen — descended "from the top of the [Reconstruction] fence," and was replaced by members of the "Conservative and Democratic Party" who immediately set about the business of enacting "Jim Crow laws" for the purpose of forcing the former slaves to stay in their allotted "places," and out of white "spaces."[202]

**9**.    **"Jim Crow laws"**

"Jim Crow laws" were state laws and local ordinances enacted from the end of Reconstruction through the first six decades of the twentieth century for the purpose of mandating *de jure* racial segregation of all public transportation conveyances, restaurants, restrooms, water fountains, schools, hotels, libraries, and virtually every other form of public accommodations and facilities. C. Vann Woodward, the

---

[200] Foner I, at 588 (footnote omitted).

[201] *Id.* at 588 (footnoted citation omitted).

[202] *See* Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265), at 118 ("**Frederick 9 Tr.**") (describing white attitudes about "spaces and places").

preeminent historian of the South during and following Reconstruction, said that the origin of the term "Jim Crow," as it was applied to such laws and African-Americans, was "lost in obscurity."[203]   Nevertheless, he *believed* the source to be "Thomas D. Rice, who wrote a song and dance called 'Jim Crow' in 1832, and the term had become an adjective by 1838.  The first example of 'Jim Crow law' listed by the *Dictionary of American English* is dated 1904.  But the expression was used by writers in the 1890's . . . ."[204]  Woodward's supposition was endorsed and expanded by the subsequent work of another historian, Peter Irons, who wrote:

> During the last two decades of the nineteenth century, the white lawmakers who controlled the South began the process of replacing slavery with segregation, installing the Jim Crow system that separated the races in every aspect of life.  The term itself had its origins in the 1830s, beginning with the minstrel show of Thomas "Daddy" Rice, a white man who blackened his face with burnt cork, dressed in rags, and danced and sang in a caricature of blacks.  He called this part of his show "Jump Jim Crow," after a crippled black slave who belonged to a white man named Crow.  White audiences loved the demeaning portrayal of a grinning, shuffling black man, and the term quickly entered the language.  During the 1840s, abolitionist newspapers adopted the term to describe the segregated railroad cars in northern states.
>
> The Jim Crow laws passed by southern legislatures in the 1880s and '90s mandated racial segregation in restaurants, hotels, parks, libraries, theaters, railroads, beauty parlors, and barbershops.  With its

---

[203] C. Vann Woodward, *The Strange Career of Jim Crow* 7 n.1 (New York:  Oxford University Press 2002) (1955) ("**Woodward**").

[204] *Id.*

"WHITES ONLY" and "COLORED ONLY" signs posted above the railroad waiting rooms, bathrooms, and drinking fountains, the Jim Crow system inflicted daily humiliations on blacks of both sexes and all ages. Jim Crow laws were accompanied by a system of southern "customs" that allowed whites to address black men as "boy" and black women as "girl." Blacks who refused to conform to white expectations of deference and grinning servility were considered "uppity" and could lose their jobs or credit if they failed to mend their ways.[205]

---

[205] Peter Irons, *Jim Crow's Children:   The Broken Promise of the* Brown *Decision* 12 (London:  Penguin Books 2004) ("**Irons**").

# II.  PRELIMINARY CONSIDERATIONS

## A.   Standing

"Standing frequently has been identified by both justices and commentators as one of the most confused areas of the law."[206]  "Many exasperated courts and commentators have . . . [complained] that [the] standing doctrine is no more than a convenient tool to avoid uncomfortable issues or to disguise a surreptitious ruling on the merits."[207]

In light of this persistent confusion and consternation, it is helpful to "begin with the most basic doctrinal principles:  Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'"  *Sprint Communications Co.*, *L.P. v. APCC Services*, *Inc.*, 554 U.S. 269, 273 (2008) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)).[208]  "One element of that

---

[206] Erwin Chemerinsky, *Federal Jurisdiction* § 2:3, at 57 (5th ed. 2007) ("**Chemerinsky II**").

[207] Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, 13 *Federal Practice & Procedure:  Jurisdiction* § 3531 (2d ed. 2006) ("**Wright, Miller & Cooper**")  (footnote omitted).

[208] Article III, § 2 reads, in pertinent part, as follows:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;— to all Cases affecting Ambassadors, other public Ministers and Consuls;— to all Cases of admiralty and maritime Jurisdiction;— to Controversies to which the United States shall be a Party;— to Controversies between two or more States;— between a State and Citizens of another State;— between Citizens of different States;— between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof,

'bedrock' case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *McConnell v. Federal Election Commission*, 540 U.S. 93, 225 (2003) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

Standing is essential because "[t]he constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity 'to adjudge the legal rights of litigants in actual controversies.'" *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1982) (quoting *Liverpool S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 (1885)).   In other words, federal courts are not, and were never intended to be, national forums for airing "generalized grievances." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).   Our business is to decide concrete disputes brought to our attention by parties possessing more than a mere metaphysical or theoretical interest in the outcome.[209]

Hence, the presence of a plaintiff with standing to sue is a necessary pre-condition to a federal court's exercise of Article III judicial power, and a challenge to a plaintiff's standing is an attack on the court's subject matter jurisdiction.   *See*,

---

and foreign States, Citizens or Subjects.

U.S. Const. art. III, § 2.

[209] *See Warth*, 422 U.S. at 499 ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, . . . though the court's judgment may benefit others collaterally.").

*e.g.*, *Stalley v. Orlando Regional Healthcare System, Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) ("Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction[.]") (internal quotations omitted); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1251 (11th Cir. 2003) ("The issue of whether plaintiff lacks standing is jurisdictional[.]").

Although the standing doctrine is animated in part by prudential considerations, *see Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 11-12 (2004), the Supreme Court has identified three requirements that collectively constitute an "'irreducible constitutional minimum.'" *Vermont Agency of Natural Resources v. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

> First, a plaintiff must demonstrate an injury in fact, which is concrete, distinct and palpable, and actual or imminent.  Second, a plaintiff must establish a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of some third party not before the court.  Third, a plaintiff must show the substantial likelihood that the requested relief will remedy the alleged injury in fact.[210]

Reduced to jurisprudential buzzwords, this constitutional formula requires:  (1) "an injury in fact"; (2) "causation"; and (3) "redressability."[211]  "This triad of injury in

---

[210] *McConnell*, 540 U.S. at 225-26 (internal quotations, citations, and alterations omitted) (citing, *e.g.*, *Stevens*, 529 U.S. at 771; *Lujan*, 504 U.S. at 560-61; *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

[211] *Sprint Communications*, 554 U.S. at 273.  The Court in *Sprint Communications* outlined

fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *U.S. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04 (1998) (footnote omitted).  Defendants contest plaintiffs' ability to establish each of these elements.

Plaintiffs call attention to the fact that at least one of these three requirements (causation) is also a *prima facie* element of just about any cause of action — including the one underlying this case, which is fundamentally based upon alleged violations of the Equal Protection Clause of the Fourteenth Amendment.[212]  *See*, *e.g.*,

---

these elements with helpful parenthetical references:

> And in order to have Article III standing, a plaintiff must adequately establish (1) an injury in fact (*i.e.*, a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (*i.e.*, a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, is it 'likely' and not 'merely speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Id.* at 273 (quoting *Lujan*, 504 U.S. at 560-61) (bracketed alteration in *Sprint Communications*).

[212] The Equal Protection Clause is situated within the final clause of § 1 of the Fourteenth Amendment.  In full, § 1 reads as follows:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend XIV, § 1.

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) (holding that, "even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose"); *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000) (holding that "the government's discriminatory intent alone, without a causal connection between the intent and some cognizable injury to Plaintiffs, cannot entitle Plaintiffs to relief").

However, as this court explained previously, in connection with its ruling on defendants' motion to dismiss for lack of subject matter jurisdiction, not just the element of causation, but *each element* of the standing analysis merges into the ultimate merits inquiry in this case.[213]  For one thing, plaintiffs have neither standing nor a viable cause of action under the Constitution unless they can show "an invasion of a *legally protected interest*."[214]  Moreover, causation is not altogether distinct from redressability.  Indeed, the Supreme Court has indicated that in cases where, as here, "[t]he relief requested . . . [is] simply the cessation of the allegedly illegal conduct . . . . the 'redressability' analysis is identical to the 'fairly traceable' analysis."  *Allen v. Wright*, 468 U.S. 737, 759 n.24 (1984).  Overlaps of this sort in cases where

---

[213] *See* doc. no. 35 (Memorandum Opinion and Order on Motion to Dismiss), at 15.

[214] *Lujan*, 504 U.S. at 560 (emphasis supplied).  *See also McConnell*, 540 U.S. at 227 (noting that standing "'often turns on the *nature* and *source* of the claim asserted'") (emphasis supplied) (quoting *Warth*, 422 U.S. at 500).

standing is an issue raise concerns of "drive-by jurisdictional rulings,"[215] that is, situations in which opinions actually addressing substantive defects with a cause of action might later be read as jurisdictional precedents.[216]   The converse also is possible:  courts have dismissed lawsuits on explicitly *jurisdictional* grounds based on the conclusion that the complaint fails to state a viable *cause of action*.  *See*, *e.g.*, *Bell v. Hood*, 327 U.S. 678, 680 (1946) (reversing such a decision).

It is true that "'standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.'"[217]  Nevertheless, standing, as previously noted, "'often turns on the *nature* and *source* of the claim asserted.'"[218]  "Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."[219]

In other words, the standing question in cases such as the present action essentially conflates with the substantive question of whether plaintiffs can prevail on the claims asserted in this action.  This is especially true considering that, at the

---

[215] *U.S. Steel Co.*, 523 U.S. at 91.

[216] *See id.* (rejecting any reliance on such cases).

[217] *McConnell*, 540 U.S. at 227 (quoting *Warth*, 422 U.S. at 500); s*ee also* Wright, Miller & Cooper § 3531 (2d ed. 2006) ("The focus on the party also means that standing is not defeated by failure to prevail on the merits.").

[218] *McConnell*, 540 U.S. at 227 (emphasis supplied) (quoting *Warth*, 422 U.S. at 500).

[219] *Warth*, 422 U.S. at 500.

post-trial stage, it is not sufficient for the plaintiffs merely to *allege* a specific harm; instead, they must *prove* harm, by a preponderance of the evidence in the record.[220] In the present case, that analysis will require the court to consider many of the same facts, and ponder many of the same legal conclusions, that will be relevant to the substantive analysis of plaintiffs' claims on the merits.   There is no point in conducting separate, repetitive analyses of the these facts and legal principles.  As the former Fifth Circuit has pointed out in a case that remains binding on this court:

> Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court (assuming that the plaintiff's federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.   The Supreme Court has made it clear that in that situation no purpose is served by indirectly arguing the merits in the context of federal jurisdiction.  Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits.

*Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. May 20, 1981) (footnote omitted).[221]

---

[220] *See, e.g., Lujan,* 504 U.S. at 561 ("Since [the three elements of the standing inquiry] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.") (citations omitted).

[221] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

This court sees no reason why the same principles should not apply when considering the standing issue in conjunction with the merits of a plaintiff's claim based upon the evidence presented at trial.  Furthermore, this court already has found that plaintiffs' claim is not "immaterial," "insubstantial," or "frivolous."[222]   If anything, the court is even more emphatic about that finding after hearing all of the evidence at trial.  Consequently, the court concludes that the standing analysis is inextricably intertwined with the analysis of plaintiffs' claims on the merits, and all

---

[222] This court found in its Memorandum Opinion and Order on Motion to Dismiss:

All that remains at this juncture is to determine whether plaintiffs' 'alleged claim under the Constitution . . . clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or [whether the] claim is wholly insubstantial and frivolous.'  *Bell*, 327 U.S. at 682-83.  The sheer number of pages devoted to plaintiffs' theory of discrimination by both Judge Harold Murphy, who authored the opinion in *Knight VI* [now *Knight III*], and the Eleventh Circuit panel that affirmed his decision, *see Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004), *aff'd*, 476 F.3d 1219 (11th Cir.), *cert. denied* 127 S. Ct. 3014 (2007), suggests that plaintiffs' present claim is both material and substantial, and a quick review of the allegations of the complaint confirms this assessment.  The black plaintiffs in this action allege that they were singled out for unequal treatment because of their race: in other words, they allege that the drafters of the subject constitutional provisions made a series of conscious decisions to limit their ability to compete for government dollars on an equal footing with their white counterparts (and, thereby, hampered the black plaintiffs' attempts to dismantle structural barriers to change) based on animosity toward their race.  The complaint alleges that the inclusion of certain racially discriminatory provisions in the Alabama Constitution has, perhaps unexpectedly, also resulted in the denial of equal access to educational benefits and other public services to whites, especially those who reside in poor, majority-black school districts.   These are troubling allegations of deep-rooted, invidious discrimination, not entirely unlike those that gave rise to the Supreme Court's watershed decision in the case of *Brown v. Board of Education*, 347 U.S. 483 (1954).").

Doc. no. 35, at 22.

issues relevant to the standing analysis will be addressed in the discussion of the merits of plaintiffs' claims.[223]

---

[223] The court acknowledges that the issue of whether plaintiffs have standing in this case is a very close question, particularly with regard to the elements of causation and redressability.  The court need not engage in that close and complex analysis, however, because defendants are entitled to a judgment on the merits.

[This page intentionally left blank.]

## B.   Tax Injunction Act

Defendants assert, once again, that plaintiffs' claims are barred by the Tax Injunction Act of 1937 ("the Act" or "the TIA"), which provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  This court first addressed that argument in the memorandum opinion and order denying defendants' motion to dismiss for lack of subject matter jurisdiction, and concluded that the Act did not preclude plaintiffs' claims.[224]   In their post-trial brief, defendants contend that a Supreme Court case decided after that opinion should cause this court to reach a different conclusion.[225]

This court's prior decision was based primarily upon *Hibbs v. Winn,* 542 U.S. 88 (2004), in which the Supreme Court considered a challenge to a provision of Arizona state law that allowed income-tax credits for individuals who make payments to organizations that award educational scholarships and tuition grants to children

---

[224] *See* doc. no. 35, at 23-33.

[225] The case relied upon by defendants as the basis for their renewed argument, *Levin v. Commerce Energy, Inc.*, — U.S.—, 130 S. Ct. 2323 (2010), was decided on June 1, 2010, almost two years after this court's memorandum opinion and order on defendant's motion to dismiss. Consequently, the case was not discussed in that opinion, nor was it briefed by the parties before trial.  In any event, for the sake of convenience and clarity, the court will reiterate much of its prior discussion of the Tax Injunction Act here.

attending private schools.[226]  The plaintiffs were Arizona taxpayers who alleged that

the state statute violated the Establishment Clause of the First Amendment, because

the scholarship and grant funds could be directed to "schools that provide religious

instruction or that give admissions preference on the basis of religion or religious

affiliation."[227]  The plaintiffs did not contest their personal tax liability or "seek to

impede Arizona's receipt of tax revenues."[228]  Instead, they sought:  a judgment

declaring that the state law violated the Establishment Clause, both on its face and as

applied; an injunction prohibiting the Director of the Arizona Department of Revenue

from allowing the tax credit for payments directed to religious schools; and an order

mandating that all organizations that had received funds in violation of the

Establishment Clause repay the money into the state's general fund.[229]

The Director of the Arizona Department of Revenue argued that the plaintiffs'

claims were barred by the Tax Injunction Act.  Specifically, he contended that the Act

"bars *all* lower federal-court interference with state tax systems, even when the

challengers are not endeavoring to avoid a tax imposed on them, and no matter

whether the State's revenues would be raised or lowered should the plaintiffs

---

[226] *See Hibbs*, 542 U.S. at 92.

[227] *Id.* at 95.

[228] *Id.* at 93.

[229] *Id.* at 99.

prevail."[230]   The Supreme Court unequivocally rejected that argument, and held that the Act did not preclude the plaintiffs' claims.

In determining the proper reach of the Act, the Supreme Court examined its legislative history, which revealed

> two closely related, state-revenue-protective objectives: (1) to eliminate disparities between taxpayers who could seek injunctive relief in federal court — usually out-of-state corporations asserting diversity jurisdiction — and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later; and (2) to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances. . . .  In short, in enacting the TIA, Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority.  Nowhere does the legislative history announce a sweeping congressional direction to prevent "federal-court interference with all aspects of state tax administration."[231]

The *Hibbs* Court characterized its prior decisions under the Tax Injunction Act as being in harmony with the Act's legislative purpose, and distinguished past decisions barring claims under the Act because they "involved plaintiffs who mounted federal litigation to *avoid* paying state taxes (or to gain a refund of such taxes)."[232]  In all of those prior cases, the granting of federal court relief "would have

---

[230] *Id.* at 94 (emphasis supplied).

[231] *Hibbs*, 542 U.S. at 104-05 (citations omitted).

[232] *Id.* at 106 (emphasis supplied).

operated to *reduce* the flow of state tax revenue."[233]

The *Hibbs* Court also found it important that other federal courts had construed the Tax Injunction Act "to restrain state taxpayers from instituting federal actions to contest their liability for state taxes, but not to stop third parties from pursuing constitutional challenges to tax benefits in a federal forum."[234]  Finally, the Court noted that it and other federal courts had issued "numerous" decisions reaching "the merits of third-party constitutional challenges to tax benefits without mentioning the TIA."[235]

When applying *Hibbs* to defendants' motion to dismiss based on the Tax Injunction Act, this court concluded the motion should be denied, and wrote:

> In the present case, the only items of relief sought by plaintiffs are a declaratory judgment that the challenged provisions of the Alabama Constitution violate their rights under Title VI and the Equal Protection Clause, and, an injunction prohibiting defendants or any others associated with them from enforcing the challenged provisions and any statutes and regulations implementing those provisions.  Plaintiffs do not challenge their respective personal liabilities to pay property taxes under the allegedly unconstitutional provisions.  Furthermore, if

---

[233] *Id.* (emphasis supplied) (citing *Arkansas v. Farm Credit Services of Central Arkansas*, 520 U.S. 821, 824 (1997); *National Private Truck Council, Inc. v. Oklahoma Tax Commission*, 515 U.S. 582, 584 (1995); *California v. Grace Brethren Church*, 457 U.S. 393, 408-10 (1982); *Fair Assessment in Real Estate Association, Inc. v. McNary,* 454 U.S. 100, 105-06 (1981); *Rosewell v. LaSalle National Bank,* 450 U.S. 503, 510 (1981)).

[234] *Hibbs*, 542 U.S. at 108-09 (citing *In re Jackson County*, 834 F.2d 150, 151-52 (8th Cir. 1987); *Dunn v. Carey*, 808 F.2d 555, 558 (7th Cir. 1986); *Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir. 1975)).

[235] *Hibbs*, 542 U.S. at 110-12 (citations omitted).

104

plaintiffs are successful, their challenge will not *reduce* the flow of state revenue; to the contrary, the effect of a successful challenge will be to raise *additional* revenue to fund public services, particularly education.[236]

This court also rejected defendants' argument that the *Hibbs* holding should be limited to cases involving state tax credits or benefits. In so doing, this court discredited the Tenth Circuit's decision in *Hill v. Kemp,* 478 F.3d 1236, 1249 (10th Cir. 2007), which held that the *Hibbs* exception to the TIA's prohibition only applied to cases involving tax *credits*.[237]

---

[236] Doc. no. 35, at 26-27 (emphasis in original). *See also Weissinger v. Boswell,* 330 F. Supp. 615, 618 n.4 (M.D. Ala. 1971) (three-judge court) (*per curiam*) ("It should also be noted that defendant's contention, as a ground for dismissal, to the effect that plaintiffs' action is barred by the Tax Injunction Act of 1937, 28 U.S.C.A. § 1341, was considered and disposed of by this Court in the October 29, 1969, order. This portion of our order was to the effect that the Alabama courts do not afford plaintiffs a plain, speedy and efficient remedy. In this connection *see State ex rel. Foshee v. Butler*, 225 Ala. 194, 142 So. 533; *State ex rel. Chilton County v. Butler*, 225 Ala. 191, 142 So. 531; *Morrison v. Morris*, 273 Ala. 390, 141 So. 2d 169.").

[237] The underlying facts of the Tenth Circuit's decision in *Hill v. Kemp* were as follows:

a group of motorists in the State of Oklahoma sought injunctive relief and a declaratory judgment that the State's scheme for granting specialty motor vehicle license plates violated the First and Fourteenth Amendments "by permitting drivers to obtain license plates bearing the messages 'Adoption Creates Families' and 'Choose Life' under terms and conditions more favorable than those available to those who wish to have license plates bearing messages of support for abortion rights." *Id.* at 1239. The defendants argued that the suit was barred by the Tax Injunction Act, and the Tenth Circuit agreed. The court refused to interpret Hibbs as allowing any lawsuit by taxpayers who are "not seeking to challenge an assessment imposed on them, but rather assessments imposed on and paid by other persons or entities." *Id.* at 1249. The Tenth Circuit panel reasoned that

[n]othing in the language of the TIA indicates that our jurisdiction to hear challenges to state taxes can be turned like a spigot, off when brought by taxpayers challenging their own liabilities and on when brought by third parties challenging the liabilities of

105

This court also rejected defendants' argument that the possibility of the relief requested by the plaintiffs in this case would actually increase state revenue was too speculative to defeat application of the Tax Injunction Act, because the undisputed "immediate effect of granting the declaratory judgment and injunction plaintiffs seek will be to increase property taxes in the State of Alabama."[238]  As noted in this court's

---

> others.  Rather, Congress plainly directed us that we "shall not enjoin . . . any tax under State law," without qualification — and nothing in *Hibbs* commands a result contrary to the Congress's express direction.

> *Id.*  The Tenth Circuit acknowledged that *Hibbs* did involve a third-party challenge to the Arizona law at issue, but dismissed *Hibbs*' entire discussion of the plaintiffs' third-party status as nothing more than a long side-note, included to "simply . . . underscore how unusual the case before it was compared with most [Tax Injunction Act] suits."  *Hill*, 478 F.3d at 1249.  According to the Tenth Circuit, *Hibbs* held that the Act did not apply only because "the plaintiff there simply did not seek to enjoin the levy or collection of any tax under State law, as is typically the case, but instead sought to challenge the provision of a tax credit aimed at limiting or constraining State tax revenues."  *Hill*, 478 F.3d at 1249 (citing *Hibbs*, 542 U.S. at 95) (emphasis in original).  In other words, *Hibbs* "held that giving away a tax credit is a very different thing than assessing, levying or collecting a tax."  *Hill*, 478 F.3d at 1249.

Doc. no. 35, at 27-28.  This court disagreed with *Hill* because the Supreme Court in *Hibbs* "would not have paused so long to underscore how the plaintiffs' third-party status distinguished the case from other Tax Injunction Act cases if the difference was not significant to the Court's decision," and because the Supreme Court's intent was to *limit,* not enlarge, the application of the TIA.  *Id.* at 28-29.  Indeed, the Court in *Hibbs* firmly rejected the notion that the TIA was intended as a "sweeping congressional direction to prevent 'federal-court interference with *all* aspects of state tax administration."  *Hibbs,* 542 U.S. at 105 (citation omitted) (emphasis supplied).

[238] Doc. no. 35, at 31.  In support of this statement, the court noted that defendants had stated the following in the brief they filed in support of their motion to dismiss:

> If Plaintiffs are successful in challenging the restrictions on assessment ratios in Amendment 373 to the Alabama Constitution, and an injunction is issued, property in every classification would automatically be assessed at 100%, as opposed to the 10%, 20%, and 30% current ratios for residential, commercial, and utility property,

106

previous opinion, that effect would be true even though the Alabama legislature could later vote to impose even lower tax rates than those required by the current structure. "If that should occur, it will not be as a result of this court's injunction. The undisputed, direct effect of the requested injunction would be to *increase* property tax revenue."[239]

Defendants now argue that this court should reconsider its prior decision in light of the Supreme Court's intervening decision in *Levin v. Commerce Energy, Inc.,* — U.S.—, 130 S. Ct. 2323 (2010). This court is not persuaded by defendants' argument. The *Levin* case will be discussed in more detail in the following section, but it is important to note for purposes of the Tax Injunction Act analysis that the *Levin* case did not reach any decision based upon that Act. *Levin* did spend significant time discussing the Act and the *Hibbs* case, but its ultimate decision was based upon principles of comity, *not* upon the TIA.[240] Therefore, any discussion of

---

respectively. Millage rates, which Plaintiffs do not attack, would remain constant. By way of example, Alabama taxpayers with a $100,000 home in a county with a property tax rate of 50 mills would see their annual property tax bill increase from $300 to $3,000, after taking into account the homestead exemption and the change in assessment ratio.

*Id.* at 31 n.23 (citing doc. no. 27 (Defendants' Memorandum in Support of Motions to Dismiss), at 2 n.1).

[239] Doc. no. 35, at 32 (emphasis in original).

[240]*Levin,* 130 S. Ct. at 2336-37 ("Because we conclude that the comity doctrine justifies dismissal of respondents' federal-court action, we need not decide whether the TIA itself would block the suit.") (citations omitted).

107

the TIA in *Levin* was *dicta*, and is helpful only insofar as it informs the comity analysis.  *Levin* is not precedent for a TIA challenge, and, contrary to defendants' assertion, it did not constitute "a dramatic about-face" from the Supreme Court's decision in *Hibbs*.[241]

In summary, this court is not persuaded, even after considering the *Levin* case, that it should reconsider its prior decision that plaintiffs' claims are not barred by the Tax Injunction Act.

---

[241] *See* doc. no. 275 (Defendants' Post-Trial Brief), at 180.

## C.   Comity

This court also addressed the effect of the "comity" doctrine on the viability of plaintiffs' claims in the memorandum opinion and order denying defendants' motion to dismiss for lack of subject matter jurisdiction, but that was not a substantive discussion.  Rather, this court found that considerations of comity within our federal system of government were never intended to operate as a jurisdictional bar, so comity could not serve as the basis for dismissing a case for lack of subject matter jurisdiction.[242]  The court now will substantively address the subject for the first time, giving consideration to both the arguments raised in the parties' post-trial briefs, and the arguments raised in the parties' earlier briefings filed in connection with defendant's motion to dismiss for lack of subject matter jurisdiction.

The most relevant Supreme Court decision on comity is also the most recent, and the one relied upon most heavily by the parties in their post-trial briefs: *Levin v.*

---

[242] *See* doc. no. 35 (Memorandum Opinion and Order on Motion to Dismiss), at 33-36.  *See also, e.g., Rhines v. Weber,* 544 U.S. 269, 274 (2005) (stating that the doctrine of comity "teaches that one court should defer action on causes *properly within its jurisdiction* until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.") (emphasis supplied) (citing *Rose v. Lundy,* 455 U.S. 509, 518 (1982)); *O'Sullivan v. Boerckel,* 526 U.S. 838, 851-52 (1999) (implying that a court's refusal to hear a case on comity grounds is premised on an "abstention principle" that is separate from the question of subject matter jurisdiciton); *Fair Assessment in Real Estate Association, Inc. v. McNary,* 454 U.S. 100, 119 (1981) (Brennan, J., concurring) ("[T]he 'principle of comity' may be a source of judicial policy, [but] it is emphatically no source of judicial *power* to renounce jurisdiction.") (emphasis in original).

*Commerce Energy, Inc.,* — U.S. —, 130 S. Ct. 2323 (2010).  In that case, two corporations that marketed and sold natural gas to Ohio consumers, together with one of the customers of those corporations, sued the Ohio Tax Commissioner in federal district court, alleging that state tax exemptions provided to competitors of the plaintiff-corporations, but not to the plaintiffs themselves, were discriminatory in violation of the Commerce Clause and Equal Protection Clause.[243]  The plaintiffs sought "declaratory and injunctive relief invalidating the three tax exemptions [the competitors] enjoy and ordering the Commissioner to stop 'recognizing and/or enforcing' the exemptions."[244]  The question before the court was whether the plaintiffs' suit should be barred by considerations of comity.[245]

The Supreme Court provided the following summary of the policy undergirding the comity doctrine, and its application to the case:

> The comity doctrine counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction. The doctrine reflects
>
>> "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States

---

[243] *See Levin*, 130 S. Ct. at 2328-29.

[244] *Id.* at 2329.

[245] *Id.* at 2328.  The Court acknowledged that the Tax Injunction Act also was relevant to its decision, but that Act nonetheless did not serve as the grounds for the Court's decision.

and their institutions are left free to perform their separate functions in separate ways." *Fair Assessment*[ *in Real Estate Ass'n v. McNary*, 454 U.S. 100, 112 (1981)] (quoting *Younger v. Harris*, 401 U.S. 37, 44, 91 S. Ct. 746, 27 L. Ed.2d 669 (1971)).

Comity's constraint has particular force when lower federal courts are asked to pass on the constitutionality of state taxation of commercial activity.  For "[i]t is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible." *Dows v. Chicago*, 11 Wall. 108, 110, 20 L. Ed. 65 (1871).

"An examination of [our] decisions," this Court wrote more than a century ago, "shows that a proper reluctance to interfere by prevention with the fiscal operations of the state governments has caused [us] to refrain from so doing in all cases where the Federal rights of the persons could otherwise be preserved unimpaired." *Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276, 282, 29 S. Ct. 426, 53 L. Ed. 796 (1909).  *Accord Matthews v. Rodgers*, 284 U.S. 521, 525-526, 52 S. Ct. 217, 76 L. Ed. 447 (1932) (So long as the state remedy was "plain, adequate, and complete," the "scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it.").[246]

---

[246] *Levin,* 130 S. Ct. at 2330 (footnoted omitted) (first bracketed alteration supplied, other bracketed alterations in original).  In the omitted footnote, the Court related Justice Brennan's prior explanation of "the special reasons justifying the policy of federal noninterference with state tax collection":

> The procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules.  State tax agencies are organized to discharge their responsibilities in accordance with the state procedures.  If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape

The Court emphasized that "the comity doctrine is more embracive than" the Tax Injunction Act, and criticized Courts of Appeals that "have comprehended *Hibbs* to restrict comity's compass."[247]   Even though, as discussed in the previous Part of this opinion, *Hibbs* was decided under the Tax Injunction Act, the defendants in that case also raised the doctrine of comity as a bar to the plaintiffs' claims.  The *Hibbs* Court paused only briefly to consider the comity argument, stating the following in a footnote:  "We note, furthermore, that this Court has relied upon 'principles of comity' . . . to preclude original federal-court jurisdiction only when plaintiffs have sought district-court aid in order to arrest or countermand state tax collection."[248] Other courts, including the Sixth Circuit Court of Appeals, which decided the *Levin* case before *certiorari* was granted by the Supreme Court, had interpreted the *Hibbs* footnote narrowly to restrict the application of the comity doctrine.  The *Levin* Court rejected that approach, however, by stating that

----

the ordinary procedural requirements imposed by state law.  During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency.  Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts.

*Levin,* 130 S. Ct. at 2330 n.2 (quoting *Perez v. Ledema,* 401 U.S. 82, 128 n.2 (1971)) (Brennan, J., concurring in part and dissenting in part).

[247] *Id*. at 2332.  *Hibbs v. Winn*, 542 U.S. 88 (2004), was discussed in the preceding Part of this opinion.

[248] *Hibbs,* 542 U.S. at 107 n.9 (citing *McNary,* 454 U.S. at 107-08; *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 296-99 (1943)) (citation to the record in *Hibbs* omitted).

the *Hibbs* footnote comment on comity is most sensibly read to affirm that, just as the case was a poor fit under the TIA, so it was a poor fit for comity. The Court, in other words, did not deploy the footnote to recast the comity doctrine; it intended the note to convey only that the Establishment Clause-grounded case cleared both the TIA and comity hurdles.[249]

The *Levin* Court also explained why that case was distinguishable from *Hibbs*,

saying:

> A confluence of factors in this case, absent in *Hibbs,* leads us to conclude that the comity doctrine controls here. First, respondents seek federal-court review of commercial matters over which Ohio enjoys wide regulatory latitude; their suit does not involve any fundamental right or classification that attracts heightened judicial scrutiny.[250] Second, while respondents portray themselves as third-party challengers to an allegedly unconstitutional tax scheme, they are in fact seeking federal-court aid in an endeavor to improve their competitive position.[251] Third, the Ohio courts are better positioned than their

---

[249] *Levin,* 130 S. Ct. at 2335-36.

[250] *See also id.* at 2333 ("When economic legislation does not employ classifications subject to heightened scrutiny or impinge on fundamental rights, courts generally view constitutional challenges with the skepticism due respect for legislative choices demands. *See, e.g., Hodel v. Indiana*, 452 U.S. 314, 331–332, 101 S. Ct. 2376, 69 L. Ed. 2d 40 (1981); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488–489, 75 S. Ct. 461, 99 L. Ed. 563 (1955). And 'in taxation, even more than in other fields, legislatures possess the greatest freedom in classification.' *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590 (1940)."); *id.* at 2334 ("A 'State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination.'") (quoting *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation,* 496 U.S. 18, 39-40 (1990)).

[251] The Court's conclusion in this regard would have been different if the plaintiffs had in fact been third parties whose tax liabilities would remain unaffected by their requested relief. As the Court explained,

> The plaintiffs in *Hibbs* were outsiders to the tax expenditure, "third parties" whose own tax liability was not a relevant factor. In this case, by contrast, the very premise of respondents' suit is that they are taxed differently from [their competitors]. Unlike

113

federal counterparts to correct any violation because they are more familiar with state legislative preferences and because the TIA does not constrain their remedial options.[252]  Individually, these considerations may not compel forbearance on the part of federal district courts; in combination, however, they demand deference to the state adjudicative process.[253]

The *Levin* Court's ultimate conclusion was that "comity precludes the exercise of original federal-court jurisdiction" in a case involving "a taxpayer's complaint about allegedly discriminatory state taxation framed as a request to increase a competitor's tax burden."[254]

Defendants assert that, under *Levin,* the principle of comity should also bar plaintiffs' claims in this action, because those claims could have a disruptive effect on the state's system of tax administration, and because the Alabama state courts would be better suited than this court to remedy any constitutional violations.  Those

---

the *Hibbs* plaintiffs, respondents *do* object to their own tax situation, measured by the allegedly more favorable treatment accorded [their competitors].

*Levin,* 130 S. Ct. at 2335 (emphasis supplied).

[252] The Court pointed out that there would be no appropriate way to remedy the plaintiffs' grievances, even if the plaintiffs were able to succeed on the merits of their claims.  The Court could not help the plaintiffs achieve parity with their competitors by reducing their tax liability, because such an action would be prohibited by the Tax Injunction Act.  The Court also could not "reshape the relevant provisions of Ohio's tax code," because by doing so, it "would engage in the very interference in state taxation the comity doctrine aims to avoid."  *Id.* at 2334-35.  Instead, if the Ohio tax scheme was deemed unconstitutional, the plaintiffs' requested remedy, "an order invalidating the exemptions enjoyed by [their competitors], may be far from what the Ohio Legislature would have willed."  The Ohio courts would be "better positioned to determine — unless and until the Ohio Legislature weighs in — how to comply with the mandate of equal treatment."  *Id.* at 2335.

[253] *Id.* at 2336.

[254] *Id.* at 2332-33.

concerns are alleviated, however, by the precise nature of the relief sought by plaintiffs. Plaintiffs ask this court to invalidate the challenged state constitutional provisions, but they do not ask this court to reshape the property tax system. The Alabama courts may indeed be better suited than this court for the task of fashioning a new property tax system, if one is constitutionally required, but this court is better suited than the state courts for determining whether the United States Constitution has been violated, and that is the only relief plaintiffs have requested here. Furthermore, plaintiffs asked the court to stay any injunction that might issue for at least a one-year period, in order to allow the State Legislature an opportunity to consider what measures might bring the *ad valorem* property tax system into compliance with the United States Constitution. Consequently, in that event, there would be no disruptive effect on the State's tax system. To the contrary, the system would continue to operate as it currently does, until the Alabama legislature convenes to take any necessary remedial action.[255]

Plaintiffs assert two additional arguments to distinguish *Levin*, and this court

---

[255] It also should be remembered that the court in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971) (three-judge court) (*per curiam*) — a case that will be discussed in great detail in Part II(G)(3)(i) of this opinion, *infra* — also originally allowed the State of Alabama one year to comply with the court's mandate, but that one-year hiatus stretched into ten. Thus, there should be little concern that, in the event this court rules in plaintiffs' favor on the issue of liability, the Alabama Legislature might not "be convened on the spot, and the blunt interim relief respondents ask the District Court to decree 'may [immediately] derange the operations of government, and thereby cause serious detriment to the public.'" *Levin*, 130 S. Ct. at 2335 n.11 (quoting *Dows v. Chicago*, 11 Wall. (78 U.S.) 108, 110 (1871)) (bracketed alteration in original).

finds both to be persuasive.  First, plaintiffs assert that they are like third-party challengers to an allegedly unconstitutional tax scheme, because they are not seeking the aid of the federal courts to ease their tax burden.  Indeed, quite to the contrary, if plaintiffs are granted all of their requested relief, their individual property tax burdens almost certainly will be *increased*.  Second, "and even more importantly,"[256] plaintiffs have asserted claims for discrimination based on race, a suspect class that triggers heightened constitutional review, whereas *Levin* involved alleged discrimination in the taxation of commercial activity, which enjoys no such scrutiny and involves no suspect class.  The importance of the federal issues involved in this case is the primary factor distinguishing it from *Levin*.  Weighing the vital constitutional issues at stake here, especially in light of the long and detailed history of federal equal protection jurisprudence and race relations in this State, is a task the federal courts are uniquely qualified to perform.

In summary, this court finds that the federal issues at stake in this litigation outweigh any concerns over the preservation of state sovereignty.  Consequently, the principle of comity should not be applied as a bar to plaintiffs' claims.

---

[256] Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 95.

## D.   Eleventh Amendment Immunity

The issue of the Eleventh Amendment as a defense to plaintiffs' claims was first raised in defendants' motion for judgment on the pleadings.[257]   Defendants argued that the Eleventh Amendment barred plaintiffs' Fourteenth Amendment claims against all defendants:   the State of Alabama, its Governor, and the Revenue Commissioner.[258]   In response, plaintiffs conceded that "the Eleventh Amendment bars claims against the State of Alabama based solely on the Fourteenth Amendment," but opposed defendants' motion in all other respects.[259]   Following consideration of the parties' briefs and oral arguments, this court dismissed all claims against the State of Alabama based upon the Fourteenth Amendment, but denied the motion in all other respects.[260]

---

[257] *See* doc. no. 79 (Defendants' Motion for Judgment on the Pleadings).

[258] *See* doc. no. 79-2 (Brief in Support of Defendants' Motion for Judgment on the Pleadings), at 4-5, 22-31.

[259] *See* doc. no. 93 (Plaintiffs' Response to Defendants' Motion for Judgment on the Pleadings), at 5-6; doc. no. 99 (Defendants' Reply Brief in Support of Motion for Judgment on the Pleadings).

[260] *See* doc. no. 126 (Order Addressing Defendants' Motion for Judgment on the Pleadings), stating in part:

> This case is before the court on defendants' motion for judgment on the pleadings.  Upon consideration of the motion, pleadings, briefs, and oral arguments of counsel, the motion is GRANTED in part and DENIED in part.  Plaintiffs' claims against the State of Alabama based solely upon the Fourteenth Amendment to the United States Constitution are DISMISSED.  All other claims asserted by plaintiffs – including their Fourteenth Amendment claim against the Governor and Revenue Commissioner for the State of Alabama, and their Title VI claim against all

117

Defendants renewed this issue in their post-trial brief, arguing that the Eleventh Amendment also prohibits plaintiffs' claims against the Governor and Revenue Commissioner.[261]  Because this court's prior order denying defendants' motion for judgment on the pleadings did not discuss that contention in a substantive manner, the court will address it now, for the sake of completeness.

The Eleventh Amendment limits the power of federal courts to hear suits instituted by private litigants against a state.  The Amendment itself is quite brief, containing only forty-three words.  Its full text provides that:  "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI (1795).  Despite the Amendment's brevity and (to this court) extraordinary clarity of expression — explicitly denying to federal courts the power to decide suits against states brought by only two classes of plaintiffs, "Citizens of another State" and "Citizens or Subjects of any Foreign State" — the Supreme Court has layered a case-law gloss on the Amendment's language that "is replete with historical anomalies,

---

defendants – remain.

*Id*. at 1-2 (capitalization in original) (footnotes omitted).

[261] *See* doc. no. 275 (Defendants' Post-Trial Brief), at 172-77.

internal inconsistencies, and senseless distinctions."[262]

For example, the Supreme Court long ago interpreted the Amendment as barring federal court suits against a state by *one of its own citizens*, and not just "Citizens of another State."  *See Hans v. Louisiana*, 134 U.S. 1, 13-15 (1890) (holding that the ancient doctrine of sovereign immunity barred a person from suing his own state in federal court, even when the basis of the claim was a federal question arising under the laws or Constitution of the United States).[263]

The Court also has held that a plaintiff's claim based upon a federal statute is barred when it is filed in the defendant state's own court system, rather than a federal forum.  *See Alden v. Maine*, 527 U.S. 706 (1999) (holding that state employees could not subject their state to suit in the state's own court system to recover damages for violation of the overtime provisions of the Fair Labor Standards Act of 1938, because

---

[262] Howard P. Fink and Mark V. Tushnet, *Federal Jurisdiction*:  *Policy and Practice – Cases and Materials* 137 (Charlottesville, Va.:  The Michie Co. 1984).

[263] *See also*, *e.g.*, *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001) (holding that Congress did not validly abrogate the states' sovereign immunity to suits by private individuals when enacting the Americans with Disabilities Act of 1990 (ADA) and, accordingly, such suits are barred by the Eleventh Amendment); *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) (holding that Congress did not validly abrogate the states' sovereign immunity to suits by private individuals when enacting the Age Discrimination in Employment Act of 1967 and, accordingly, such suits also are barred by the Eleventh Amendment); *Edelman v. Jordan*, 415 U.S. 651, 662-663 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."), *overruled on other grounds by Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *In re Employment Discrimination Litigation Against State of Alabama*, 198 F.3d 1305, 1317 (11th Cir. 1999) ("The Amendment has been interpreted as a jurisdictional bar on the federal courts from hearing suits brought against states by their own citizens, or by citizens of other states.")

Congress lacked the power under Article I of the Constitution to abrogate the states' sovereign immunity to suit in their own courts upon claims based on federal statutes).

The bases for such conclusions are obscure at best, especially when they are read beside the scant, forty-three words of the Amendment itself.  The murkiness of the rationale results from the confluence of powerful historical streams:  "the non-constitutional but ancient doctrine of sovereign immunity,"[264] *and*

> the Constitution's structure, . . . its history, and the authoritative interpretations by the [Supreme] Court [which] make clear [that] the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.[265]

For such reasons, as well as others that it is not necessary to discuss here, the Eleventh Amendment has been construed in a manner that bars federal courts from hearing suits commenced by private litigants against non-consenting states for the retrospective recovery of money damages.[266]  In other words, the amendment is a

---

[264] *Fitzpatrick v. Bitzer*, 427 U.S. 445, 457 (1975) (Brennan, J., concurring).

[265] *Alden*, 527 U.S. at 713 (bracketed alterations supplied).

[266] *See, e.g., Garrett*, 531 U.S. at 363 ("Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States.  The ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court.") (citations omitted); *Kimel*, 528 U.S. at 73 ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States."); *Edelman*, 415 U.S. at 663 (observing that the Eleventh Amendment insulates states from "private parties seeking to impose a liability [in federal

limitation on the judicial power of United States courts under Article III of the Constitution, and federal courts accordingly "lack jurisdiction to entertain claims that are barred by the Eleventh Amendment." *McClendon v. Georgia Department of Community Health*, 261 F.3d 1252, 1256 (11th Cir. 2001) (citations omitted).

The Eleventh Amendment also shields state officials who are sued under 42 U.S.C. § 1983 in their "official capacity" from federal court actions seeking money damages for past actions allegedly committed in violation of the Constitution or federal statutes, because such claims are tantamount to a suit against the state itself; and, absent waiver or consent, the Eleventh Amendment bar remains intact.[267]  As the Court explained in *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), it is obvious that "state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  . . .  As such, it is no different from a suit against the State itself."[268]

_____

court] which must be paid from public funds in the state treasury").

[267] *See*, *e.g.*, *McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Lassiter v. Alabma A & M University*, 3 F.3d 1482, 1485 (11th Cir. 1993) ("Official capacity actions seeking damages are deemed to be against the entity of which the officer is the agent."); *Carr v. City of Florence*, 916 F.2d 1521, 1524 (11th Cir. 1990) (observing that, in such cases, "the state is considered the real party in interest because an award of damages would be paid by the state").

[268] *Will*, 491 U.S. at 71; *see also*, *e.g.*, *Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) ("[T]he Eleventh Amendment prohibits suits against state officials where the state is, in fact, the real party in interest."); *Lassiter*, 3 F.3d at 1485 ("Where the defendant

It is undisputed that the Governor and Revenue Commissioner are each sued only in their respective official capacities.[269]  Thus, the Eleventh Amendment would bar plaintiffs' claims against those defendants, *but only if* those claims were for money damages as payment for past unlawful acts.  Indeed, a well-recognized exception applies in suits by private individuals against state officials seeking *declaratory relief* or *prospective injunctive relief* for *continuing violations* of federal law.  *See Ex Parte Young,* 209 U.S. 123, 1599-60 (1908) (holding that a state official who has acted unconstitutionally may be sued in his official capacity for prospective injunctive relief because such a suit "does not affect the State in its sovereign or governmental capacity," and, an official who commits an unconstitutional act is deemed to have been "stripped of his official or representative character").[270]

_____

is an entity other than the state, the suit may nonetheless be barred where the state is the real party in interest.") (quotation marks and citation omitted).

[269] When determining the capacity in which a governmental employee is sued, the court looks "at the complaint and the course of proceedings."  *Colvin v. McDougall*, 62 F.3d 1316, 1317 (11th Cir. 1995).  Plaintiffs clearly state in their complaint that the Governor and the Revenue Commissioner both are sued in their respective official capacities.  *See* doc. no. 1 (Complaint), at ¶ 11 ("Defendant Bob Riley [now Dr. Robert J. Bentley pursuant to Fed. R. Civ. P. 25(d)], *in his official capacity as Governor of Alabama . . . .*") (emphasis supplied); ¶ 12 ("Defendant Tim Russell [now Julie Magee pursuant to the same Rule], in his [now her] *official capacity as Commissioner of Revenue . . . .*") (emphasis and bracketed alterations supplied).

[270] *See also*, *e.g.*, *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102 (1984) (discussing *Young*, and holding that prospective injunctive relief may be sought in "a suit challenging the constitutionality of a state official's action"); *Miller v. King*, 384 F.3d 1248, 1264 (11th Cir. 2004) ("While the Eleventh Amendment generally bars suits against non-consenting states, '[u]nder the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), there is a long and well-recognized exception to this rule for suits against state *officers* seeking prospective equitable relief to end continuing violations of federal law."); *McClendon*, 261 F.3d at 1256 ("The *Young* doctrine permits

The Eleventh Circuit has observed that the exception to Eleventh Amendment immunity established in *Young* "turns on three considerations: *first*, does the Plaintiff seek prospective or retrospective relief; *second*, is the violation ongoing and continuous; and *finally*, would equitable relief 'implicate special sovereignty interests.'" *Sandoval v. Hagan*, 197 F.3d 484, 500 (11th Cir. 1999) (quoting *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261 (1997)) (emphasis supplied, and some internal quotation marks omitted), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001).   As Judge Harold Murphy astutely observed in his first opinion in the *Knight* line of cases discussed in detail in Part II(G)(4)(j) of this opinion, *infra* (*i.e.*, *Knight v. State of Alabama,* 787 F. Supp. 1030 (N.D. Ala. 1991) ("*Knight I* ")),

> *Ex parte Young* focuses on ongoing violations of federal law "as opposed to cases in which federal law has been violated at one time or over a period of time in the past. . . ." *Papasan v. Allain*, 478 U.S. 265, 277–78, 106 S. Ct. 2932, 2939–40, 92 L. Ed. 2d 209 (1986).   Relief that

---

federal courts to entertain suits against state officers seeking *prospective* equitable relief to end continuing violations of federal law.") (citations omitted) (emphasis in original); *Summit Medical Associates*, 180 F.3d at 1336 ("The Eleventh Amendment generally does not bar the exercise of the judicial power of the United States where a plaintiff seeks to compel a state officer to comply with federal law."); *Cross v. State of Alabama*, 49 F.3d 1490, 1502-03 (11th Cir. 1995) (holding that plaintiffs' § 1983 official capacity claims against the Commissioner and Associate Commissioner of the state Department of Mental Health and Mental Retardation, and the Director of that department's Taylor Hardin Secure Medical Facility, for prospective injunctive relief [*i.e.*, *reinstatement*] "is not treated as an action against the state, and the 'Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief'") (quoting *Lassiter*, 3 F.3d at 1485).   *See generally* Erwin Chemerinsky, *Federal Jurisdiction* § 7.5 (New York: Aspen Publishers 5th ed. 2007) ("**Chemerinsky II**").

in essence serves to compensate a party injured by past illegal state conduct is barred by the Eleventh Amendment. Only that relief which is designed to bring an end to a present violation of federal law is not barred by the Eleventh Amendment "even though accompanied by a substantial ancillary effect on the state treasury." *Id.* at 278, 106 S. Ct. at 2940.[271]

All of the requirements for application of the *Young* doctrine are satisfied in the present action. Plaintiffs seek *prospective* relief to end ongoing and continuous violations of federal law. They do not seek any compensation for past injuries. Instead, they seek only a declaration that the challenged provisions are unconstitutional, and an injunction to prevent *future* injuries. Furthermore, "special sovereignty interests" do not weigh in favor of exercising the Eleventh Amendment bar in this case. While the federal courts are obligated to give special weight to state sovereignty interests when considering issues of "state taxation *of commercial activity*,"[272] the federal interests at stake here are sufficient to outweigh any concerns over unduly interfering with the fiscal operations of state government.

Defendants' arguments to the contrary are not persuasive. They argue that the *Young* doctrine does not apply in this case because "[t]he claims for injunctive relief against the Governor and Revenue Commissioner simply are not the type of claims

---

[271] *Knight I,* 787 F. Supp. at 1370.

[272] *Levin v. Commerce Energy, Inc.,* – U.S. – , 130 S. Ct. 2323, 2330 (2010) (emphasis supplied), quoted in Part II(C) of this opinion, *supra,* discussing the subject of "Comity."

permitted in *Ex parte Young.*"[273]  Defendants base that argument upon the following

passage from the *Young* decision:

> The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and *who threaten and are about to commence proceedings*, either of a civil or criminal nature, *to enforce against parties affected* an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.[274]

According to defendants, this passage demonstrates that there are "two required

elements of a *Young* injunction":  *i.e.,* imminent threat of civil or criminal

enforcement action; and, plaintiffs who would be "parties affected" by the threatened

enforcement action.[275]

Defendants first rely upon the undisputed fact that none of the minor student-

plaintiffs own property or pay property taxes in this State.[276]  Thus, according to

defendants, none of those plaintiffs would be "parties affected" by any action taken

to enforce property tax laws.  However, that argument ignores the fact that the minor

plaintiffs are suing by and through their parental representatives, most of whom *do*

---

[273] Doc. no. 275 (Defendants' Post-Trial Brief), at 173.

[274] *Young,* 209 U.S. at 155-56 (emphasis supplied).

[275] *See* doc. no. 275, at 174.

[276] *See* doc. no. 242-1 (Parties' Statement of Agreed Facts) ("**Agreed Facts**") ¶ 357 ("The minor student Plaintiffs do not own property or pay property taxes in the State of Alabama.").

own property and pay taxes in this State.[277]    Furthermore, defendants' argument

implicitly assumes that the only way for a plaintiff to be "affected" by an injunction

in a case about the constitutionality under the United States Constitution of the

Alabama Constitutional provisions restricting the *ad valorem* millage rates that may

be levied for the support of public schools is through an increase or decrease in tax

burden.    That, of course, is not the case.    Plaintiffs would be affected by any

injunction that might be entered in this case, because any such injunction would alter

the amount of tax revenue available to fund the K-12 school systems in the counties

in which they reside, regardless of whether plaintiffs' personal tax burdens are

increased or decreased, and regardless of whether plaintiffs even pay *ad valorem*

property taxes in the first place.

Defendants also argue that the first purported "element" of the *Young* analysis

has not been satisfied, because it is undisputed that, "[a]t no time has any official of

the State of Alabama ever initiated or threatened to initiate any civil or criminal

action against any plaintiff in this action threatening the liberty or property of that

---

[277] The deposition testimony demonstrates that five of those parental representatives pay property taxes. Deposition of Stella Anderson (Court's Exhibit 8), at 8-9; Deposition of Miranda Ball (Court's Exhibit 4), at 11; Deposition of Tyler Berryman (Court's Exhibit 5), at 9; Deposition of Michael Brooks (Court's Exhibit 10), at 11; Deposition of Shawn King Lynch (Court's Exhibit 2), at 10. One of the parental representatives paid property taxes until he was exempted due to disability. Deposition of Wendell Pride (Court's Exhibit 6), at 16-17. Property taxes were not addressed in the testimony of the other parental representative. *See generally* Deposition of Barbara Ormand (Court's Exhibit 9).

plaintiff in any way regarding the challenged Property Tax Provisions."[278]  Because

the injunction sought in this case "does not target any threatened or even reasonably

anticipated act of the Revenue Commissioner or Governor for prohibition, but rather

seeks only to have a State's constitutional provision declared unconstitutional under

the Fourteenth Amendment,"[279] defendants assert that the case actually amounts to

nothing more than a disguised request for an advisory opinion.  That is impermissible,

according to defendants, under the Supreme Court's decision in *Fitts v. McGhee,* 172

U.S. 516 (1899), which was cited by the Court in *Young.*  Defendants focus their

argument on the following passage from *Fitts*:

> There is a wide difference between a suit against individuals, holding
> official positions under a state, to prevent them, under the sanction of an
> unconstitutional statute, from committing by some positive act a wrong
> or trespass, and a suit against officers of a state merely to test the
> constitutionality of a state statute, in the enforcement of which those
> officers will act only by formal judicial proceedings in the courts of the
> state.[280]

Although the Court's directive to avoid suits "merely to test the constitutionality of

a state statute" does appear, on initial reading, to caution against asserting jurisdiction

over this case, seeking an injunction prohibiting the Governor and the Revenue

Commissioner from enforcing the allegedly unlawful state constitutional provisions,

---

[278] Agreed Facts ¶ 356.

[279] Doc. no. 275, at 175.

[280] *Fitts*, 172 U.S. at 529-30.

a closer examination of the quoted passage from the *Fitts* opinion, and construed *in its proper context*, actually suggests otherwise. In the portion of the *Fitts* opinion relied upon by defendants, the Court was concerned with the question of whether the claims asserted against the State officials were, in reality, claims against the State as a sovereign governmental entity entitled to claim Eleventh Amendment immunity. The *Fitts* Court addressed that question as follows:

> [T]here is no escape from the conclusion that, although the state of Alabama was dismissed as a party defendant, this suit against its officers is really one against the state. As a state can act only by its officers, an order restraining those officers from taking any steps, by means of judicial proceedings, in execution of the statute of February 9, 1895, is one which restrains the state itself, and the suit is consequently as much against the state as if the state were named as a party defendant on the record.[281]

Thus, the language relied upon by defendants is part of a long passage discussing whether the State Attorney General and a local prosecutor, both of whom were defendants in the case, had a sufficient connection to the enforcement of the challenged law to be parties to any injunction that might be entered.

> It is to be observed that neither the attorney general of Alabama nor the solicitor of the Eleventh judicial circuit of the state appear to have been charged by law with any special duty in connection with the act of February 9, 1895. In support of the contention that the present suit is not one against the state, reference was made by counsel to several cases, among which were *Poindexter v. Greenhow*, 114 U. S.

---

[281] *Id.* at 528-29.

270, 5 Sup. Ct. 903, 962; *Allen v. Railroad*, 114 U. S. 311, 5 Sup. Ct. 925, 962; *Pennoyer v. McConnaughy*, 140 U. S. 1, 11 Sup. Ct. 699; *In re Tyler*, 149 U. S. 164, 13 Sup. Ct. 785; *Reagan v. Trust Co.*, 154 U. S. 362, 388, 14 Sup. Ct. 1047; *Scott v. Donald*, 165 U. S. 58, 17 Sup. Ct. 265; and *Smyth v. Ames*, 169 U. S. 466, 18 Sup. Ct. 418.  Upon examination, it will be found that the defendants in each of those cases were officers of the state, specially charged with the execution of a state enactment alleged to be unconstitutional, but under the authority of which, it was averred, they were committing, or were about to commit, some specific wrong or trespass to the injury of the plaintiffs' rights. *There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state.  In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional.   They were not expressly directed to see to its enforcement.*  If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes.  That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.  If their officers commit acts of trespass or wrong to the citizen, they may be individually proceeded against for such trespasses or wrongs.  Under the view we take of the question, the citizen is not without effective remedy, when proceeded against under a legislative enactment void for repugnancy to the supreme law of the land; for,

129

whatever the form of proceeding against him, he can make his defense upon the ground that the statute is unconstitutional and void. And that question can be ultimately brought to this court for final determination.[282]

It seems clear, to this court at least, that the Supreme Court in *Fitts* was more concerned over the question of whether the named defendants had proper enforcement authority over the challenged law — not whether those defendants, as State officials, had actually initiated or threatened to initiate any enforcement action against the plaintiffs in the case. *Fitts*, therefore, cannot properly be construed as limiting *Young* to only that class of cases in which actual enforcement proceedings have been commenced against a plaintiff; and that seems especially to be the proper rule, in light of all the subsequent authority interpreting *Young* as allowing challenges to the constitutionality of a state law.

Furthermore, even if this court did construe the *Fitts* passage quoted by defendants in isolation and apart from all other considerations, that passage, in the opinion of this court, still would not bar plaintiffs' claims. Plaintiffs are not simply asking this court to render an "advisory opinion" on the constitutionality of the challenged State constitutional provisions and implementing statutes and related Department of Revenue regulations. Unquestionably, they *do* request a judgment

---

[282] *Id*. at 529-30 (emphasis supplied).

declaring the challenged provisions, statutes, and regulations to be unconstitutional under the Fourteenth Amendment's Equal Protection Clause; but, importantly, they also request an injunction prohibiting the future enforcement of those provisions. That relief is precisely the kind of remedy that the *Young* doctrine was designed to permit.

In conclusion, the Eleventh Amendment does not prohibit plaintiffs' Fourteenth Amendment claims against the Governor of Alabama and his Revenue Commissioner.

[This page intentionally left blank.]

# E.    General Overview of K-12 Funding in Alabama

Alabama had 131 public school systems during the period relevant to this action.[283]   Each received revenue from federal, State, county, municipal, and other local sources.[284]   For the 2006-2007 school year, federal programs provided only 8.3% of the total revenue for all Alabama public school systems.[285]   Nearly half of the total revenue (48%) came from the State,[286] leaving approximately 37.5% to be paid from local sources, and 6.2% from other, unspecified sources.   Some of those revenue streams are summarized in the following sections.

## 1.    Federal Funding Sources

The State receives federal revenues to support a variety of academic programs in the K-12 public school system.[287]   Local jurisdictions also receive federal funding

---

[283] Agreed Facts ¶ 340.  After this litigation began, one additional public school system was created in Alabama, bringing the current total to 132 systems.  *See* Testimony of Dr. Ira Harvey, Transcript Vol. 6 (doc. no. 262), at 180 ("**Harvey 6 Tr.**").  That new school system is Saraland, created in Mobile County, which was previously a unified county school system.  *Id.*; *see also* Testimony of Dr. Ira Harvey, Transcript Vol. 3 (doc. no. 259), at 252 ("**Harvey 3 Tr.**").  Because it is so new, the statistics presented to this court do not include data about Saraland, nor do they remove from the Mobile County school system that portion of students or revenues that previously would have been attributed to the Mobile County school system.  *See* Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 66 ("**Harvey 4 Tr.**"); Harvey 6 Tr., at 180.  This court also has seen newspaper accounts reporting that the citizens of Pike Road, Alabama recently voted in favor of establishing their own public school system.  If that is true, the number soon will be 133 systems.

[284] Agreed Facts ¶ 20.

[285] PX 403 (Annual Report, 2006-2007), at 25.

[286] Harvey 4 Tr., at 15-16; PX 403, at 25

[287] *See* Testimony of David Perry, Transcript Vol. 14 (doc. no. 270), at 7 ("**Perry 14 Tr.**").

133

for specific programs on an as-needed basis.  An exhaustive analysis of every source of federal funding received by local jurisdictions within the State is not necessary to this opinion, and it would not be supported by the evidence gathered at trial.  By way of example only, local school boards may receive money from:  the U.S. Department of Agriculture for school breakfast, lunch, and snack programs; the U.S. Department of Health and Human Services for Head Start and rural health programs; and the U.S. Department of Defense for Junior ROTC programs.[288]

### a.    Elementary and Secondary Education Act of 1965

Alabama schools also receive several categories of funds from the United States Department of Education pursuant to the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701 *et seq*.[289]  First, Title I of the Act encompasses a group of programs established by the U.S. Department of Education to distribute funds to schools and school districts with a high percentage of students from low-income families.  Part A of the Title authorizes the grant of federal funds to support academic

---

[288] *See, e.g.,* Ira W. Harvey, *School Finance Training Program Manual* 11-1, and 11-45 to 11-46 (Tuscaloosa:  University of Alabama Superintendents' Academy, Jan. 2005 Rev.), found at http://uasa.ua.edu/academy%20programs%20html/school_finance_Training_Manual.html ("**Harvey III**").

[289] The Elementary and Secondary Education Act was enacted on April 11, 1965, as a part of President Lyndon B. Johnson's "War on Poverty."  The Act is an extensive statute that funds primary and secondary education, while explicitly forbidding the establishment of a "national curriculum."  The Act was originally authorized only through 1970, but Congress has reauthorized it every five years since its enactment.  One reauthorized version of the Act was the so-called "No Child Left Behind Act of 2001," named and proposed by President George W. Bush.

programs designed to increase student achievement among student populations with the highest risks of academic failure.  A state's entitlement to these funds is based upon a formula that considers the number of students in poverty, as measured by the number of students receiving free and reduced-price lunches.[290]

The U.S. Department of Education also disburses Title I, Part A "School Improvement" funds to individual schools that are considered to be "failing" under certain performance metrics set forth in the No Child Left Behind Act of 2001, 20 U.S.C. § 6301 *et seq*.  Schools must apply to receive these "School Improvement" funds.[291]

Additionally, each school system receives federal funds pursuant to Title II, Part A, for teacher and principal training designed to improve academic performance in at-risk student populations.  Title II, Part A funds are disbursed according to a formula that considers levels of poverty, as measured by the number of students receiving free and reduced-price lunches.[292]

Alabama schools also receive funds under Title III of the Act to support "English Language Acquisition" programs.  Those funds are disbursed according to

---

[290] Perry 14 Tr., at 8-9; *see also* DX 889 (Alabama Department of Education Analysis of School Districts and Federal Allocations FY 2011).

[291] Perry 14 Tr., at 9-10; *see also* DX 889.

[292] Perry 14 Tr., at 10-11; *see also* DX 889.

the number of students in each school system for whom English is a second language.[293]

Alabama schools receive funds under Title IV, Part B, for the "21st Century Community Learning Program."  Those funds are used to support after-school programs, such as tutoring, technical instruction, and drug prevention, for at-risk students, and they are disbursed upon application to qualifying school systems.[294]

Finally, Title VI, Part B funds are available to support the "Rural Education Initiative," which offers supplemental assistance to students in school systems that are defined as "rural" by the United States Census Bureau.[295]

### b.    Individuals with Disabilities Education Act of 1975

Alabama schools receive two types of federal funds under the Individuals with Disabilities Education Act of 1975, as amended, 20 U.S.C. § 1400 *et seq.* ("IDEA").[296]    First, the schools receive general IDEA Part B funds to pay for

---

[293] Perry 14 Tr., at 11; *see also* DX 889.

[294] Perry 14 Tr., at 11-12; *see also* DX 889.

[295] Perry 14 Tr., at 12; *see also* DX 889.

[296] The IDEA was originally enacted by Congress in 1975 to ensure that children with disabilities have the opportunity to receive a free appropriate public education like other children without disabilities.  The law has been revised many times over the years.  The most recent amendments were passed by Congress in December of 2004, with final regulations published in August 2006.  So, in one sense, the law is very new, even as it has a long, detailed, and powerful history.  IDEA 2004 is divided into the following four parts:  Part A – *General Provisions*, which includes findings of Congress, the purposes of IDEA, and key definitions; Part B – *Assistance for Education of All Children with Disabilities*, which describes the processes that school systems and States must use to identify children with disabilities and educate them, including preschoolers, as

instructional staff and support for the education of individuals with disabilities. Schools also receive funds under the IDEA Part B preschool program to provide additional services, such as speech and physical therapy, for children less than five years of age who have been identified as being learning disabled or developmentally handicapped.[297]

### 2.    State Funding Sources

As noted at the beginning of this discussion, nearly half of the total revenue for the operation of Alabama's public school systems during the 2006-2007 school year (48%) came from State sources.  State funds are generally prorated among the school systems on the basis of each system's "Average Daily Membership" ("ADM"), a measurement of the number of students "enrolled or anticipated to be enrolled in [a] school system for [any given academic] year."[298]  The parties provided the following summary of State funding for K-12 education in their pre-trial statement of agreed

---

[297] well as such other critical areas as parent and student rights; Part C– *Infants and Toddlers with Disabilities*, which describes the responsibilities that States have for providing early intervention services to babies and toddlers with disabilities or developmental delays; and Part D – *National Activities to Improve Education of Children with Disabilities*, which authorizes programs meant to improve outcomes for children with disabilities, including teacher training programs, parent training and information centers ("PTIs") in every state, and the Technical Assistance and Dissemination ("TA&D") network of projects that assist states, locales, and families to implement the IDEA.

[297] Perry 14 Tr., at 12-13; *see also* DX 889.

[298] Harvey 4 Tr., at 23 (describing the calculation of ADM under the current regulations); *see also* doc. no. 274 (Plaintiffs' Post-Trial Brief), at 152-53 ("State funds for schools are generally distributed on the basis of the average daily membership ('ADM')."); Harvey 4 Tr., at 40-42 (stating that distribution of state funds is principally based upon the count of ADM).

facts:

> 21.  State-provided funds for the benefit of local public schools in Alabama are primarily derived from statewide income and sales taxes, utilities gross receipts and use taxes, and excise taxes on mobile telecommunications, the payment of certain insurance premiums and on the sale of beer.  In addition, approximately one-half of the State-level ad valorem tax (3.0 of 6.5 mills) is dedicated to public school education.

> 22.  Almost all state income taxes are earmarked for payment of teacher salaries.  State sales taxes are first used to pay debt service on bond issues for capital outlay for public schools and colleges and universities; however, the bulk of state sales tax proceeds are appropriated for general education purposes through the state Education Trust Fund.[299]

This summary is succinct and accurate, but a more detailed discussion of the intricacies of the State system for funding public education is necessary to place the present controversy in its proper, relative perspective.

### a.    The Education Trust Fund

State government and public school systems depended heavily on *ad valorem* property tax revenues to finance their operations during the first quarter of the Twentieth Century.[300]  When that funding began to prove inadequate, Governor Bibb Graves pushed for legislative approval to establish a new fund to improve public

---

[299] Agreed Facts ¶¶ 21-22.

[300] Harvey III, at 3-2; Ira W. Harvey, *Financing Alabama's Schools: The Pursuit of Accountability, Adequacy and Equity* 204 (Montgomery, Ala.:  Auburn University Montgomery Center for Government and Public Affairs 2000) ("**Harvey II**"); Ira W. Harvey, *A History of Educational Finance in Alabama* 402 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**"); Harvey 4 Tr., at 3-2.

education in the State.  The difficulty of that endeavor lay in the fact that Governor Graves had campaigned on a promise not to raise property taxes and, as a consequence, he was forced to arrange for other funding sources, which included luxury and excise taxes.  The Alabama Legislature established the "Special Education Trust Fund" (as it originally was known) in 1927, and specified that revenues deposited into that fund were to be spent "for educational purposes only."[301]  Just two years later, however, on "Black Tuesday," October 29, 1929, the Stock Market crashed and ushered in the Great Depression.  The economic deprivations of that period hit hardest in the South, a region that had not recovered fully from the ravages of the Civil War and Reconstruction, and public school funding suffered most grievously of all.  To remedy the desperate funding situation, Governor Graves pushed for and received legislative approval to levy sales taxes in 1936 and 1937. Sales tax revenues were earmarked for the Special Education Trust Fund.

The state legislature also adopted a personal and corporate income tax in 1933, for the purpose of paying off the State's mounting debt and creating a homestead exemption to ease the property tax burden on homeowners.  In 1947, the income tax was largely repurposed to the Special Education Trust Fund, for the specific purpose

---

[301] Harvey II, at 204.

of funding public school teachers' salaries.[302]

### *i*.    Current sources of revenue

The legislature changed the name of the Special Education Trust Fund to, simply, the "Education Trust Fund" ("ETF") in 1996.  *See* Ala. Code § 16-13-16 (1975) (2001 Replacement Vol.).  The ETF receives the lion's share of its funding from State income tax and sales tax revenues.  Most of the income tax remains earmarked for the payment of teachers' salaries.  The State sales tax (currently at a rate of 4.0%) is used first to pay debt service on bond issues for capital outlays for public schools, colleges, and universities in the State, but the bulk of the proceeds are used to fund the ETF.  Other, less significant sources of revenue deposited to the ETF include the following taxes:

> 1. *Utility Tax*— a privilege tax on every utility:  electricity, domestic water, natural gas, telegraph, and telephone service;

> 2. *Use Tax*— an excise tax applied as a companion to the sales tax on storage, use, or other consumption in Alabama on items purchased outside the State, due on or before the 20th of each month;

> 3. *Insurance Premium Tax*— a premium tax imposed on the amount of insurance coverages written by an insurer within Alabama

---

[302] Under Amendment 61, after annually deducting allocations of income tax revenues to cover the amount of State *ad valorem* tax revenue lost due to homestead exemptions, the residue is deposited in "the state treasury to the credit of the Alabama special education trust fund to be used for the payment of public school teachers salaries only."  Ala. Const. art XI, § 211.02 (1901), *added by* amend. 61, § B (last sentence) (*ratified* Sept. 11, 1947); *see also* Ala. Code § 40-9-24; Harvey I, at 402-03; Harvey II, at 204-05; Harvey III, at 3-2 to 3-3; Harvey 4 Tr., at 11-13.

(the proceeds of this tax that are deposited into the ETF are capped at $30,993,296);

4. *Beer Tax*— an excise tax on the sale, storage, or receipt of malt or brewed beverages for the purpose of distribution;

5. *Hydroelectric Tax*— a privilege tax levied on each person, firm, or corporation engaged in the production or sale of hydroelectric power, computed as a percentage of the number of kilowatt hours of electricity so produced or sold within the State;

6. *Store Licenses Tax*— an annual license fee for the purpose of opening, establishing, operating, or maintaining stores; and

7. *Mobile Telecommunications Services Tax*— a gross receipts tax levied on the monthly, recurring, access charges on all air-time charges with a primary use in Alabama.[303]

### b.    The Public School Fund

The Public School Fund was created by Section 260 of the 1901 Constitution.[304] The name of the fund was officially changed to the "Education Fund"

---

[303] *See* Harvey III, at 3-3 to 3-4; *see also* Harvey I, at 403; Harvey II, at 204-07; Harvey 4 Tr., at 13-16.

[304] As originally adopted in 1901, Section 260 read as follows:

The income arising from the sixteenth section trust fund, the surplus revenue fund, until it is called for by the United States Government, and the funds enumerated in Sections 257 and 258 of this Constitution, together with a special annual tax of thirty cents on each one hundred dollars of taxable property in this state, which the legislature shall levy, shall be applied to the support and maintenance of *the public schools*, and it shall be the duty of the legislature to increase *the public school fund* from time to time as the necessity therefor and the condition of the treasury and the resources of the State may justify; provided, that nothing herein contained shall be so construed as to authorize the legislature to levy in any one year a greater rate of state taxation for all purposes, including schools, than sixty-five cents on each one hundred dollars' worth of property; and provided further, that nothing herein

141

by Amendment 111, ratified on September 7, 1956.  Nevertheless, the fund continues

to be commonly referred to by its original name, "the Public School Fund."[305]  As will

be discussed in succeeding Parts of this opinion, Amendment 111 was a part of the

State's "massive resistance" to integration of the public schools mandated by the

Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), and

the purpose of changing the name of this fund, as well as other amendments to

Section 260,[306] was that of allowing tax revenues deposited into the Public School

---

contained shall prevent the legislature from first providing for the payment of the
bonded indebtedness of the state and interest thereon out of all the revenue of the
state.

Ala. Const. art. XIV, § 260 (1901) (emphasis supplied).  *See also* James J. Mayfield, *Constitutions
of 1875 and 1901:  Paralleled, Annotated and Indexed* (Nashville, Tenn.:  Marshall & Bruce Co.
1904) ("**Mayfield**").

[305] *See* Harvey II, at 127, 221; Harvey III, at 6-1 to 6-2.

[306] Amendment 111, ratified on Sept. 7, 1956, deleted the terms "public schools" and "public
school fund" from the preexisting language of Section 260, and replaced them with the terms
"education" and "educational fund," respectively.  The amendment also added an entirely new
second paragraph, emphasizing that all *ad valorem* property taxes levied by any taxing authority for
"for *public school purposes*, shall be applied to the support and furtherance of *education* pursuant
to section 256 of the Constitution, as amended" (emphasis supplied).  As thus amended, Section 260
now reads as follows:

The income arising from the sixteenth section trust fund, the surplus revenue
fund, until it is called for by the United States government, and the funds enumerated
in sections 257 and 258 of this Constitution, together with a special annual tax of
thirty cents on each one hundred dollars of taxable property in this state, which the
legislature shall levy, shall be applied to the support and furtherance of *education*,
and it shall be the duty of the legislature to increase *the educational fund* from time
to time as the necessity therefor and the condition of the treasury and the resources
of the state may justify; provided, that nothing herein contained shall be so construed
as to authorize the legislature to levy in any one year a greater rate of state taxation
for all purposes, including schools, than sixty-five cents on each one hundred dollars'

142

Fund to be used to fund K-12 educational programs in *private*, white-only, segregation academies, as well as the integrated public school systems.

The Public School Fund receives an overwhelming portion of its revenue from the State's *ad valorem* property tax revenues. Three of the 6.5 mills of property tax levied statewide are earmarked for the Public School Fund.[307] Other, less significant revenue sources for the Public School Fund include income arising from the "Sixteenth Section Trust Fund"[308] and the "Surplus Revenue Fund,"[309] principal from

worth of taxable property; and provided further, that nothing herein contained shall prevent the legislature from first providing for the payment of the bonded indebtedness of the state and interest thereon out of all the revenue of the state.

Except as they may be specifically set aside in trust funds or otherwise applied to the payment of indebtedness, all proceeds of income or other taxes levied by the state, and of all special ad valorem or other taxes levied by counties and other municipalities, or school districts, pursuant to the Constitution as heretofore amended, for *public school purposes*, shall be applied to the support and furtherance of *education* pursuant to section 256 of the Constitution, as amended.

Ala. Const. art. XIV, § 260 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956) (emphasis supplied).

[307] *Id*. (calling for "a special annual tax of thirty cents on each one hundred dollars of taxable property in this state" to be payable to the Public School Fund).

[308] The Sixteenth Section Trust Fund is a "permanent trust[] established to account for the funds accumulated from the sale or use of properties set aside for educational purposes." Harvey III, at 6-6.

[309] Dr. Harvey explained the origins of the Surplus Revenue Fund as follows:

By 1833, surplus had accumulated in the United States Bank, and President Andrew Jackson authorized the withdrawal of $10 million of this surplus to be deposited in the various state banks. . . .

On June 23, 1836, Congress approved "An Act to Regulate the deposits of public money," which provided that any surplus money in excess of $5 million

the sale or other disposition of lands or other property granted to the State, property

donated by individuals, and all estates of deceased intestates.[310]

The Public School Fund is used for two primary purposes.[311]  The first is to

fund the "Endowment Interest Program" for interest due on Sixteenth Section land

funds held by the State.[312]  *See* Ala. Code § 16-13-234(a) (1975 & 2011 Amends.).

---

remaining in the U.S. Treasury on January 1, 1837, would be deposited with the states of the union in direct proportion to their number of representatives in Congress. Under the terms of this act, the deposits were a loan and not a permanent grant. An official receipt was required from the state and the state was obligated to pay any partial or full amount upon demand by the Secretary of the United States Treasury. An estimated $37 million was set aside to be lent to the states, but only $28 million was actually transferred to the states . . . .

Alabama, Delaware, Louisiana, Missouri, and New York all set aside their respective shares as a separate fund or deposited them with some permanent school fund already established. From this United States Surplus Revenue Loan Alabama received its share of $669,086.78 in 1837. This amount was deposited in the state bank of Alabama and used as capital for the operation of the bank . . . .

The surplus revenue was made part of the public school fund in 1840, when the legislature on February 3, 1840, passed "An Act to raise a School Fund to aid the valueless Sixteenth Sections in this State." . . . The interest of six percent per annum was set aside as part of the Public School Fund and paid to schools until the bank failed in 1843, and the principal was lost forever. Accordingly, the interest on this amount was also lost to the schools until 1854.

Harvey I, at 35-36.

[310] *See* Ala. Const. art. XIV, § 260 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956). *See also* Harvey II, at 127-28, 221-22; Harvey III, at 6-1 to 6-2, 6-17; Harvey 4 Tr., at 16.

[311] A third fund — the Hold Harmless Fund — originally was included in the statute. The purpose of the Hold Harmless Fund was "to insure that no local board of education receive less state funds per pupil than it received in fiscal year 1994-95." Ala. Code § 16-13-234(b) & (c) (1975 & 2011 Amends.). However, the Hold Harmless Fund was phased out, by statute, in 2002. Ala. Code § 16-13-234(c) (1975 & 2011 Amends.)

[312] Harvey II, at 131-32; Harvey III, at 6-5 to 6-7.

144

After the Endowment Interest Program requirement has been satisfied, the remainder of the Public School Fund is used for

> capital outlay, including the planning, construction, reconstruction, enlargement, improvement, repair or renovation of public school facilities, for the purchase of land for public school facilities, for debt payments related to public school facilities, for insuring public school facilities, and for the acquisition and/or purchase of education technology and equipment.

Ala. Code § 16-13-234(d) (1975) (Supp. 2011).  Capital improvement funds are distributed on a matching basis according to a formula that takes into account the wealth of each local board of education, which is determined by evaluating the yield of 1.0 mill of school district tax per pupil.[313]

### c.    Special trust funds

The Alabama Legislature also has established a number of special funds in the state treasury that have more minor roles in the funding of K-12 education.  These include the "State Drivers' Fund," the "Catastrophic Trust Fund for Special Education," and the "Children First Trust Fund."

The State Drivers' Fund was created in 1975 to collect a portion of the costs and charges for violation of municipal traffic ordinances and a portion of docket fees for traffic offenses.  The statute creating the State Drivers' Fund was amended in

---

[313] Harvey II, at 134-35; Harvey III, at 6-9.

145

1991 to allocate part of the proceeds to the Catastrophic Trust Fund for Special Education.[314]  The purpose of this fund is to provide funding for school systems that have students whose exceptional needs cause their education to be "unduly expensive, extraordinary and/or beyond the routine and reasonable education and services provided."[315]

The Children First Trust Fund was established in 1998 to receive moneys from tobacco revenues and private donations.[316]  The proceeds of the fund are allocated as follows:  10% to programs sponsored by the Alabama Department of Public Health, including the Children's Health Insurance Program, tobacco control programs, and the Alabama Qualified Health Center Grant Program; 22% to the State Board of Education for the operation of alternative schools, the School Safety Enhancement Program ("designed to prevent or reduce violence in the schools and communities and reduce school disciplinary or safety problems"), and other programs; 20% to the Alabama Department of Human Resources to fund foster care programs, child care programs, child care shelters, special needs adoptions, and child advocacy centers; 5% to the Children's Trust Fund for various community programs to benefit children;

---

[314] *See* Ala. Code §§ 12-14-14, 16-39-30 to 16-39-34, and 32-5-313 (1975) (2005 and 2010 Replacement Vols.).  *See also* Harvey III, at 5A-1.

[315] Harvey III, at 5A-2.

[316] *See* Ala. Code § 41-15B-2 (1975) (2000 Replacement Vol.).

5% to the State Multiple Needs Children's Fund to fund various programs for the benefit of children with multiple needs; 5% to the Department of Mental Health to fund services for children and families in crisis, intensive long-term rehabilitation programs, and other programs; 10% to the Juvenile Probation Services Fund to "unify and upgrade the juvenile justice system and improve the delivery of services to children who have been referred to the juvenile court"; 17% to the Department of Youth Services to fund group homes, graduated release facilities, regional detention facilities, "boot camp" programs, and other alternatives to detention; 3.5% percent to the Alabama Medicaid Agency to fund services benefitting children; 1.0% to the Alcoholic Beverage Control Board for education and enforcement of laws that prohibit access to tobacco products by minors; 1.0% to the Department of Forensic Sciences to fund child abuse education, investigation of child deaths, and other child-related forensic services; and, one-half of one percent to the Department of Rehabilitation Services to fund child death review teams and early intervention services for children with traumatic brain injuries.[317]

### d.   The Foundation Program

The Alabama Foundation Program is a State "equalization aid program" that guarantees a foundational level of funding for each student or group of students,

---

[317] Ala. Code § 41-15B-2.2 (1975) (Supp. 2009).

together with a minimum tax effort that each local school system must provide for the

educational purposes of the program.[318]  The program attempts to equalize variations

in the respective abilities of various cities and counties to fund public schools by

distributing State funds on the basis of the number of students enrolled in a school

system, while also requiring a minimum rate of local *ad valorem* tax contributions as

the prerequisite for participation in and receipt of Foundation funds.[319]  The program

has three basic components which combine to determine the amount of funds paid by

the State to local school systems.  First, the average number of students actually

enrolled in a school system on a daily basis (the so-called "Average Daily

Membership" or ADM)[320] is counted.

---

[318] Harvey III, at 12-4.

[319] Harvey 6 Tr., 114-16; *see also* Testimony of David Brunori, Transcript Vol. 3 (doc. no. 259), at 168-69 ("**Brunori 3 Tr**.") (stating some of the factors that have driven states to centralized funding programs like Alabama's Foundation Program over the course of the past few decades); Harvey 3 Tr., at 11, 40-41; Harvey 4 Tr., at 62-63 (discussing the funding impacts of "state equalization"); Harvey III, at Chs. 12 & 13.  *Cf.* John Dayton & Anne Dupre, *School Funding Litigation:  Who's Winning the War?*, 57 Vand. L. Rev. 2351 (2004) (discussing state equal protection challenges, both successful and unsuccessful, that have been based upon gross disparities in revenue raising ability between districts and the "major education funding changes" some of these suits have occasioned, including state programs directed at funding equalization); Anna Williams Shavers, *Rethinking the Equity vs. Adequacy Debate:  Implications for Rural School Finance Reform Litigation*, 82 Neb. L. Rev. 133, 135-36 (2003) (discussing various state foundation programs "under which the state will provide funds up to a minimum guaranteed level for any district that is unable to raise that level of money through local property taxes assessed at levels specified by the state" as well as "equalization plan[s] whereby the state guarantees the same amount of money per-pupil to all districts that tax themselves at the same rate").

[320] Harvey III, at 13-7 ("The method for counting students [under the 1995 and present Foundation Program] is Average Daily Membership (ADM), or the average number of students actually enrolled on a daily basis.").

Second, the costs necessary to provide a minimum educational program during a school year are estimated by the State Superintendent of Education.[321]  Four basic categories of cost factors are taken into account:  salaries; fringe benefits; other current expenses; and classroom instructional support (*e.g.*, textbooks, library enhancement, classroom materials and supplies, professional development programs, and technology).[322]  The sum of those cost factors for

> each school site represents the foundation program cost for that school. The sum of the amounts of the school sites constituting a local school system is the foundation program cost for that local school system.  This cost is designed to be shared among two revenue sources:  the first is local revenues, and the second is a state appropriation from the Education Trust Fund [through the Foundation Program.][323]

To participate in the Foundation Program and, thereby, receive State funding, a local school district *must* contribute an amount of local revenue which is calculated as being available for specified state educational purposes.  This required level of local revenue — which, for some reason that was not made clear to this court is called the "chargeback" — was defined during fiscal year ("FY") 1995-96 as being the tax-based equivalent of the yield of 5.0 mills of school district tax.  The chargeback for

---

[321] *See id.* at 12-5; Harvey 4 Tr., at 21 (stating that the Foundation Program is "a statement by the legislature of the anticipated cost of operating statewide a minimum school term").

[322] *See* Harvey III, at 13-21 to 13-35.

[323] *Id*. at 13-35 (alteration added).  The Foundation Program "is the largest consumer of ETF revenues through the annual appropriations process."  *Id*. at 3-5.

149

FY 1996-97 increased to 7.5 equivalent mills, and for FY 1997-98 to an amount of

local receipts equivalent to 10.0 mills of school tax, where it remains today.[324]

It should be noted, however, that Amendment 778, adopted in 2006, amended

Section 269 of the Constitution in order to *require* that every "school tax district"[325]

---

[324] *See* Ala. Code § 16-13-231 (1975) (Supp. 2009).  The text of the relevant portions of this statute read as follows:

> REQUIREMENTS FOR PARTICIPATING IN FUND.  In order for a local board of education to share in the apportionment of the Foundation Program Fund and to receive the maximum benefits therefrom, the board shall meet the following conditions:
>
> a. The appropriate local governing body must insure that the local board of education within its jurisdiction is receiving an amount of local tax receipts equivalent to ten mills of school tax as computed from the most current assessed valuation of property which comprises the school tax district or districts of the local board of education.  The State Superintendent of Education shall determine compliance with this provision of the law in accordance with rules or procedures adopted by the State Board of Education.  In determining compliance for a county board of education, tax revenues provided to the county board of education from the county, from whatever tax source derived, shall be considered.  In determining compliance for a city board of education, tax revenues provided to the city board of education by the county and the city, from whatever tax source derived, shall be considered.

*Id.*, at § 16-13-231(b)(1)(a); *see also* Harvey 4 Tr., at 21.

[325] Due to the peculiar requirements of Amendment 3 to the Alabama Constitution, counties have subdivided themselves into school districts, a geographical division that is unique to property taxation for education purposes.  *See* Harvey 3 Tr., at 246-47.  As noted below, each school tax district may have different rates of taxation from other school districts that are nominally within the same school system under the direction of the same local school board.  *See* doc. no. 242-1 (Parties' Statement of Agreed Facts) ("**Agreed Facts**") ¶ 38.  Counties or, in some cases, school *systems*, however, actually levy the taxes collected in these school tax districts.  *Id.*  Moreover, "[i]n Alabama, what we commonly refer to nationwide as a school district is a school system.  A system is that educational activity which is under the control of a local board of education.  Counties are subdivided for educational taxation purposes into tax districts.  This is peculiar to education." Harvey 3 Tr., at 246.  Throughout this opinion, however, "school district" may sometimes be used interchangeably with "school system," for ease of reference, unless the phrase "school tax district"

150

*actually* levy and collect *at least* 10 mills in *ad valorem* property taxes for general public school purposes.[326] Thus, the statutory requirement that the "chargeback" be "equivalent to" 10 mills of school tax was rendered redundant, as Amendment 778 now requires each school district to levy and collect *10 actual mills of property tax for general public school purposes.*[327] In other words, prior to the enactment of

---

is used.

[326] Agreed Facts ¶ 43.

[327] The Alabama Administrative Code sets forth regulations intended to "establish guidelines and procedures for the minimum levy of 10 mills of property tax in each school district pursuant to Act 2005-215, passed in the 2005 Regular Session of the State Legislature and approved as a Constitutional Amendment by a majority vote of the electorate in the General Election held November 7, 2006." Ala. Admin. Code § 810-4-1-.08(a) (2007). That regulation states that "each school district of the state, in addition to all other taxes, shall levy a minimum of 10 mills property tax . . . for general public school purposes." *Id.* at (b). Statutory requirements for participation in the Foundation Program Fund state that the "local governing body [of each school system] must insure that the local board of education within its jurisdiction is receiving an amount of local tax revenue equivalent to ten mills of school tax as computed from the most current assessed valuation of property which comprises the school tax district or districts of the local board of education." Ala. Code § 16-13-231(b)(1)a. (1975). The same provision states that the "required local effort charged against each local board of education for its share of the cost of the Foundation Program shall be . . . the equivalent of ten mills of local school tax district *ad valorem* tax" for each fiscal year after 1997-98. That provision appears never to have been amended to take account of the change wrought by Amendment 778, but it is plain that the requirement of ensuring each board of education receives "revenue equivalent to ten mills" is factually made redundant by those portions of Amendment 778 and its implementing regulations that require the levy of 10 mills of property tax. *See also* Harvey 4 Tr., at 31 ("Amendment 778, as applied to both the recordkeeping and activities of the revenue department and the Department of Education, says that you've got to have every taxpayer in each school tax district of the state paying 10 mills of ad valorem tax."); Corrected Declaration of Dr. Ira Harvey (PX 824), at 4 ("Funding of the 1995 Foundation Program requires local boards of education to contribute the equivalent amount of local tax-based revenues to 10.0 mills of school tax district ad valorem tax. . . . This is known as the chargeback."). *Cf. id.* at 77 (stating that an "equivalent mill" can come from a mix of city and/or county *ad valorem* property taxes; city and/or county sales taxes; business franchise license fees (taxes); and parimutuel betting taxes, and that "the entire range of tax-based revenue is considered"). *See* "Appendix IV-1" for the text of Ala. Const. art. XIV, § 269.08(a) (1901), *amended by* amend. 778 (*ratified* Dec. 4, 2006).

151

Amendment 778, the "chargeback" could consist of revenue from any source, including sales or income tax receipts, so long as the total amount of the "chargeback" was "equivalent to" the amount that would be collected from the levy of 10 mills of property tax.  Now, after Amendment 778, the "chargeback" must actually come from the levy of property tax.  Even so, Amendment 778 did not otherwise substantively affect the Foundation Program.

Once the minimum educational program cost for a local school system is determined by summing the four cost factors discussed above, the amount of local revenue generated for public school purposes is subtracted.  The difference is due to be paid to local boards of education.[328]

The amount of revenue thus distributed by the State to local school systems on a *per capita* (per student) basis, as determined by the ADM, is *inversely proportional* to the amount of revenue the school system is able to raise in local sources for each pupil.[329]  *For example*, the Homewood school system, which raised $8,407.08 in local tax revenue for each student in 2009, received State Foundation funds in the amount of $3,833.16 per pupil, while the Linden school system, which raised only $2,291.98 per pupil in local tax revenues during the same year, received $8,263.34 per student

---

[328] *See* Harvey III, at 3-5; Harvey II, at 205-06.
[329] Harvey 6 Tr., at 114-16.

from the State.[330]  Even though the total amount of local and State revenue received by Homewood ($12,240.24 per student) still exceeded the aggregate funding of the Linden school system ($10,555.32 per pupil) by $1,684.92, the disparity between the amount of revenue available for the education of public school students in the wealthy Birmingham suburb of Homewood *vis-a-vis* the less wealthy town of Linden was ameliorated by the Foundation Program.[331]

### 3.    Local Funding Sources

Local support for public education may include such funding sources as sales and use taxes; franchise fees; privilege license fees; occupational taxes; auto registration fees; lodging taxes; "sin taxes" on cigarettes, alcoholic beverages and liquors; gasoline taxes; and mineral lease taxes.[332]  As the parties have stipulated, however, "[l]ocal funds provided for public schools in Alabama are primarily derived from *ad valorem* taxes and local sales and use taxes."[333]  Of those two revenue

---

[330] PX 403A (Alabama Education Report Card 2008-09), at 22-23.  Plaintiffs' expert Dr. Daniel J. Sullivan stated that the state's contribution to public schooling could be stated as $6,500 per pupil per district per year, plus or minus $1,100.  *See* Amended Expert Report of Dr. Daniel J. Sullivan (PX 117), at 11.  However, that formula is contradicted by the figures in PX 403A, which shows a much broader range of state contributions per ADM, though the figures for county systems only are closer to the range suggested by Dr. Sullivan.  *Id.* at 22-23.

[331] These figures indicate that state equalization eliminated approximately 72.447% of the disparity between per pupil funding between these two districts.

[332] Harvey II, at 239-43; *See* Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 17 ("**Harvey 4 Tr.**").

[333] *See* Agreed Facts ¶ 26.

streams, *ad valorem* property taxes have traditionally been the major source of funds for the operation of the public school systems, not only in Alabama, but elsewhere.[334]

> In Alabama, property taxes are levied by the state, counties, municipalities, and in certain cases school boards (these various school boards are hereinafter collectively referred to as "School Systems"), for the benefit of local public schools located within the School Systems or within School Tax Districts within School Systems.  Counties and municipalities are also School Tax Districts.  The millage rate does not have to be the same for each School Tax District in a School System, because School Tax Districts are not necessarily coterminous with School Systems.[335]

Through various amendments to Section 269 of the 1901 Constitution that apply to the State as a whole (as opposed to constitutional amendments that apply only to a specific county, municipality, or school tax district), Alabama has authorized all local school systems to levy up to an aggregate of 15.0 mills in *ad valorem* property taxes for educational purposes, in a combination of county and school tax district taxes.

> Any School Tax District can benefit from all or a portion of this authority through a local referendum for additional financial support for its schools, and there is no requirement to seek prior approval from the state legislature.  Their levy and collection, upon a referendum, cannot

---

[334] *See* Keith J. Ward & Lane D. Sauser, *Equity Funding for Education:  A Report to the Alabama Legislature* 5.1 (Auburn, Ala.: Auburn University Center for Governmental Services 1997) ("All states use the property tax as a fundamental provider in the revenue stream for public education.  At one time property taxes constituted 80 percent of public school support.  The percentage has declined over the decades, but the property tax still provides over two-thirds of the educational support in our nation.").

[335] Agreed Facts ¶ 28.

154

be for more than thirty years.[336]

The 15.0 mills are the sum of the taxes permitted by the five constitutional provisions described below.

### a.    1.0 mill county tax — *Section 269*

Section 269, as amended by Amendment 111, allows counties to call for an election authorizing the levy of a special *ad valorem* tax of not more than 1.0 mill for the support of public education.[337]   The proposal to impose this tax may be initiated

---

[336] *Id*. ¶ 36 (citing Ala. Code § 16-13-108 (1975)).  Section 16-13-108 provides, in pertinent part, that "[n]o election for the voting of the tax shall be held which would authorize the tax for a period or aggregate periods which would cause the tax to become due and payable later than 30 years from the October 1 next after such election."  Ala. Code § 16-13-108(b) (1975).

[337] Section 269 provides that:

> The several counties in this state shall have power to levy and collect *a special tax not exceeding ten cents on each one hundred dollars of taxable property in such counties*, for the support and furtherance of education in such manner as may be authorized by the legislature; *provided*, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, state and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads, bridges, and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.

Ala. Const. art XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956) (emphasis supplied).  As two attorneys familiar with Alabama's tax structure have observed, the italicized language of Section 269 "sound generous but, since it is only ten cents measured against 'each one hundred dollars' rather than against each dollar of taxable or assessed value, [the formulation] translates into a one mill ceiling on each dollar of assessed value."  Bruce P. Ely & Howard P. Walthall, Sr., *State Constitutional Limitations on Taxing and Spending: A Comparison of the Alabama Constitution of 1901 to its Counterparts*, 33 Cumb. L. Rev. 463, 481 (2003).

either by the county commission itself, or by presentation of a petition to the commission signed by at least 200 qualified voters.[338]  The rate, duration, and purpose of the tax must be approved by *an extraordinary majority of "three-fifths of those voting at such election.*"[339]  If there is more than one school system in the county, the tax is divided among the systems based upon each system's proportionate share of the total Foundation Program allocation to the school systems within the county.[340]

       **b**.    **3.0 mill county tax** — *Section 269.01*

Amendment 3, Section 1 added a new provision to the State Constitution, identified as Section 269.01, that authorizes a special 3.0 mill county tax for school purposes.[341]  The proposal to impose a tax under this provision may be initiated either

---

[338] *See* Ala. Code § 16-13-160 (1975) ("Upon a petition signed by 200 or more qualified electors of the county, who are also freeholders, to the county commission in any county within the State of Alabama, the said commission shall order an election to determine whether or not a special tax of one mill shall be levied for the support of the public schools within said county as hereinafter provided.").

[339] *See* Ala. Const. art XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956) (emphasis supplied).

[340] *See* Ala. Code § 16-13-166 (1975) ("The tax collector shall collect such special tax in the same manner and under the same requirements and laws as taxes of the state are collected, shall keep said amount separate and apart from all other funds, shall keep a clear and distinct account thereof and shall turn the same over to the custodian of county school funds whose duty it shall be to receipt therefor.  The county board of education shall apportion the same to the various schools throughout the county in the same manner as the public school funds from the state are apportioned in said county.").

[341] Section 269.01 provides that:

        The several counties in the state shall have power to levy and collect a special county tax not exceeding thirty cents on each one hundred dollars worth of taxable property in such counties in addition to that now authorized or that may hereafter be

by the county commission, or by presentation of a petition to the commission signed by at least 200 registered voters.[342]  Again, the tax proposal must specify the rate, duration, and purpose of the levy, and must be approved by a simple "majority of those voting at such election."[343]  If there is more than one school system in the county, the tax is divided among the systems based upon each system's proportionate share of the total Foundation Program allocation to the school systems within the county.[344]

c.     **3.0 mill school district tax** — *Section 269.02*

Amendment 3, Section 2 added another provision to the 1901 Constitution,

---

authorized for public school purposes, and in addition to that now authorized under section 260 of article XIV of the Constitution; provided, that the rate of such tax, the time it is to continue and the purpose thereof shall have been first submitted to the vote of the qualified electors of the county, and voted for by a majority of those voting at such election.

Ala. Const. art. XIV, § 269.01, *added by* amend. 3, § 1 (*ratified* Nov. 22, 1916).

[342] *See* Ala. Code § 16-13-160 (1975).

[343] *See* Ala. Const. art. XIV, § 269.01, *added by* amend. 3, § 1 (*ratified* Nov. 22, 1916); s*ee also* Ala. Code § 16-13-180 (1975).

[344] *See* Ala. Const. art. XIV, § 269.03, *added by* amend. 3, § 3 (*ratified* Nov. 22, 1916) ("The funds arising from the special county school tax levied and collected by any county shall be apportioned and expended as the law may direct, and the funds arising from the special school tax levied in any district which votes the same independently of the county shall be expended for the exclusive benefit of the district, as the law may direct."); s*ee also* Ala. Code § 16-13-166; Ala. Code § 16-13-197 ("Whenever such a levy as is provided for in this article is made, it shall be the duty of the tax collector within and for that county to collect such tax in the same manner and under the same requirements and laws as the taxes of the state are collected, and he shall keep said amount separate and apart from all other funds and keep a clear and distinct account thereof, showing what amount is paid, and turn the same over to the county custodian of school funds whose duty it shall be to receipt therefor, and pay the same on monthly payrolls and other prescribed forms, with the authority and approval of the county board of education.").

157

identified as Section 269.02, that authorizes "school districts of any county in the state . . . to levy and collect a special district tax not exceeding thirty cents on each one hundred dollars worth of taxable property in such district [*i.e.*, 3.0 mills] for public school purposes."[345]   The proposal to impose a tax under this provision is initiated by a resolution by the school board of the concerned district presented to the county commission.[346]   If the resolution specifies the rate, duration, and purpose of the proposed levy, and the date when a referendum should be called, the county commission is required to call the election.[347]   The levy must be approved by a simple

_____

[345] Ala. Const. art. XIV, § 269.02 (first clause) (1901), *added by* amend. 3, § 2 (*ratified* Nov. 22, 1916).  From 1916, when Amendment 3 was ratified, through the end of 2000, this tax could not be levied *unless* the 3.0 mill county tax authorized by Section 269.01 (Amendment 3, § 1) had been levied.  However, Amendment 669 removed that condition precedent.  *See* Ala. Const. art. XIV, § 269.07 (1901), *added by* amend. 669 (*ratified* Dec. 13, 2000) ("The provision contained in Section 2 of Amendment No. 3 to this constitution [§ 269.02] relating to district school taxes and providing that no district school tax shall be voted upon or collected except in those counties that are levying and collecting not less than a three-mill special county school tax *is hereby repealed*. Notwithstanding any other provision of this constitution or any law to the contrary, *the levy of a countywide tax shall not be required as a condition precedent for the levy and collection of any district school tax in any school district in the state*.") (alteration and emphasis supplied).

[346] The Constitutional provision defines "a school district" as including "incorporated cities or towns, or any school district of which an incorporated city or town is a part, or such other school districts now existing or hereafter formed as may be approved by the county board of education. . . ." Ala. Const. art. XIV, § 269.02 (second clause) (1901), *added by* amend. 3, § 2 (*ratified* Nov. 22, 1916).  Dr. Harvey's Training Manual for newly appointed or elected Superintendents of Education of the State's various school systems states that, "[i]n the event there is a separate municipal school system, this school system constitutes a separate school tax district, and the balance of the county, excluding the municipal system(s), comprises one or more school tax districts."  Ira W. Harvey, *School Finance Training Program Manual* 8-2 (Tuscaloosa:   University of Alabama Superintendents' Academy, Jan. 2005 Rev.), found at http://uasa.ua.edu/academy%20programs%20html/school_finance_Training_Manual.html ("**Harvey III**").

[347] Harvey III at 8-3.

majority of those district residents voting at an election called for that purpose.  The funds arising from the special school tax levied and collected "in any district which votes the same independently of the county shall be expended for the exclusive benefit of the district, as the law may direct."[348]

### d.    5.0 mill special county tax — *Section 269.04*

Amendment 202 added another provision to the State Constitution, identified as Section 269.04, that authorizes county governments to levy a special county tax that does not exceed 5.0 mills for educational purposes.[349]  As before, the rate, duration, and purpose of the levy must be approved by a simple majority of those voting in an election.  If there is more than one school system in the county, the tax

---

[348] Ala. Const. art. XIV, § 269.03, *added by* amend. 3, § 3 (*ratified* Nov. 22, 1916).

[349] Section 269.04 provides:

> The court of county commissioners, board of revenue, or other like governing body of each of the several counties in the state shall have the power to levy and collect a special county tax of not to exceed fifty cents on each one hundred dollars of taxable property, in addition to all other taxes now or hereafter authorized by the Constitution and laws of Alabama, for educational purposes, on the value of the taxable property in the county as assessed for state taxation, provided the purpose thereof, and the time such tax is proposed to be continued shall have been first submitted to a vote of the qualified electors of the county and voted for by a majority of those voting at such election. If any proposal to levy the tax is defeated in any election, subsequent elections thereon may be held at any time. The election provided for herein shall be called, held, conducted, paid for, and governed otherwise in the manner provided for an election on the school district tax authorized in constitutional amendment III [§§ 269.01-269.03].

Ala. Const. art. XIV, § 269.04 (1901), *added by* amend. 202 (*ratified* May 10, 1962) (bracketed alteration supplied).

is divided among the systems based upon each system's proportionate share of the total Foundation Program allocation to the school systems within the county.[350]

### e.    3.0 mill school district tax — *Section 269.05*

Finally, Amendment 382 added Section 269.05 to the Constitution, which authorizes school districts to levy a special school tax that does not exceed 3.0 mills, provided the rate, duration, and purpose of the tax are approved by a majority of those voting in an election.[351]

### f.    Municipal levies

Municipalities have no set limits on the millage rates each may impose upon taxable property, except in the manner in which the taxes are levied.

The first five mills may be levied by the city simply through an

---

[350] *See* Ala. Code § 16-13-166 (1975).

[351] Section 269.05 provides:

> In addition to any and all taxes now authorized, or that may be hereafter authorized by the Constitution and laws of Alabama, the several school districts of any in the state shall have power to levy and collect an additional special district school tax not exceeding thirty cents on each one hundred dollars worth of taxable property in such district for public school purposes in addition to that now authorized or that may hereafter be authorized for public school purposes; provided, that a school district under this section shall include incorporated cities or towns, or any school district of which an incorporated city or town is a part, or such other school districts now existing or hereafter formed as may be approved by the county board of education; provided, further, that the rate of such tax, the time it is to continue and the purpose thereof shall have been first submitted to the vote of the qualified electors of the district, and voted for a majority of those voting at such election.

Ala. Const. art. XIV, § 269.05, *added by* amend. 382 (*ratified* Mar. 26, 1980).

ordinance passed by the governing body.  To levy more than five but less than twelve and one-half mills, an ordinance must be passed and then a referendum held.  For millage rates more than twelve and one-half, legislative approval and a successful referendum must accompany the city ordinance.[352]

## 4.    Exceeding Generally Authorized Millage Rates

As of 2010, no more than 68 of Alabama's 131 public school systems had levied all of the 15.0 mills authorized by the constitutional provisions with statewide application discussed in sub-sections 3(a) through (e) above.[353]  Neither of the counties in which the plaintiffs reside was levying all of the generally-authorized mills:  Sumter County levies 13.8 mills, and Lawrence County levies 10 mills, for the support of public education.[354]

Of those sixty-odd school systems that *have* levied the full 15.0 mills, and which desire to further increase property tax revenues for the support of public education, there are basically two methods for doing so: one, a new *ad valorem* tax may be authorized by constitutional amendment; or two, the millage rate of an existing tax may be increased.  There are three processes for amending the Constitution to levy new millages, and a single process for increasing the rate of an

---

[352] Keith J. Ward & Betty D. Sparkman, *Property Tax Administration:  Reappraisal in Alabama* 82-83 (Auburn, Ala.:  Auburn University School of Arts & Sciences, Office of Public Service & Research 1980) ("**Ward & Sparkman**").

[353] Agreed Facts ¶ 36(A).

[354] *See id.* ¶ 36(B).

existing millage.  Each is discussed below.

### a.    General constitutional amendment with statewide application

Amendments that apply to the State as a whole may be proposed by the introduction in the Legislature of a bill or resolution setting forth the proposed amendment.  For example, the Legislature might propose a general constitutional amendment that, if approved by a majority of the qualified electors participating in a statewide election, would allow every school system in the state to conduct a separate election on the question of whether the additional millage specified in the general amendment should be levied in the geographic area encompassed by that system.[355]  The bill or resolution must be read in the house in which it originates on three separate days, and three-fifths of the members elected to that house must vote affirmatively to pass the proposal.  The measure then goes forward to the second house, where it also must be read on three separate days and receive a three-fifths affirmative vote of the members elected to that house.  If the proposal passes both houses, it will be submitted to the electorate in a statewide election.  The Legislature has the responsibility for fixing the date of the election on proposed amendments.

---

[355] The parties stipulated that the Alabama Constitution has been amended "at least" four times since 1980 "to provide for additional property taxes for schools in all counties," Agreed Facts ¶ 37(B); but, only one of the amendments cited in the footnote to that statement, *id*. at 11 n.5 ("The amendments affecting all counties are Amendments 395, 525, 669, and 778."), appears to support the assertion:  *i.e.*, Amendment 778, ratified on Dec. 4, 2006, and adding Section 269.08 to Article XIV of the 1901 Constitution.

Such a referendum may be held either at the next general election, or at a special election conducted not less that three months after the final adjournment of the session at which the amendment was proposed.[356]   A constitutional amendment submitted at a general election along with another amendment will become a part of the Constitution if a majority of the votes cast on the amendment are in favor of its adoption, even if that majority did not constitute a majority of the votes cast in the general election on other amendments, candidates for public office, or other issues.[357]

> **b**.   **So-called "general constitutional amendment *with local application*"**

The same process described in the preceding subsection is followed to propose an amendment affecting only one county, municipality, or school tax district. Significantly, however, the proposed amendment must win approval by a majority of all persons voting in a statewide election, even though only one local taxing authority is affected:  hence, the adjective "general."[358]   Despite that requirement, numerous constitutional amendments having a local application, and referring to only one

---

[356] *See* Ala. Const. art. XVIII, § 284 (1901), *amended by* amend. 24 (*ratified* Aug. 2, 1933); *id*., art. XVIII, § 285 (1901); *see also* Harvey III, at 8-14; Robert L. McCurley & Keith B. Norman, *Alabama Legislation* 219-20 (Tuscaloosa:  Alabama Law Institute 4th ed. 1997) ("**McCurley & Norman**").

[357] *See*, *e.g.*, *Harris v. Walker*, 199 Ala. 51, 74 So. 40, 41 (1917).

[358] Harvey III, at 8-15.

163

county or local school system, have been ratified.[359]

  c.  **Local constitutional amendment** — *Amendments 425 & 555*

  Amendment 425, ratified in 1982, added Section 284.01 to the 1901 Constitution, and provided a method to propose a constitutional amendment affecting only one county, or a political subdivision within a county (or counties).[360]  Section 284.01 was itself amended in 1995 by Amendment 555.  As the law now stands, the required steps are as follows.  *First*, the proposed amendment must be approved by the affirmative vote of at least three-fifths of the elected members of each house of the Legislature, *with no dissenting vote cast*.[361]

  *Second*, the legislation proposing the constitutional amendment also must be approved by a majority of the Local Constitutional Amendment Commission, which is composed of the Governor, Presiding Officer of the Senate, Attorney General, Secretary of State, and Speaker of the House of Representatives.[362]

  *Finally*, approval of the proposed amendment rests with the voters in the affected local area.  If it is a county amendment, it must receive "a favorable vote of

---

[359] Dr. Harvey wrote that there were "approximately 83 such amendments at this time" (Winter of 2004).  *Id*.

[360] For example, the incorporated area of the City of Huntsville extends into Limestone County, to the west of Madison County.

[361] Ala. Const. art. XVIII, § 284.01(b), *added by* amend. 425 (*ratified* Nov. 17, 1982), and *amended by* amend. 555 (*ratified* Jan. 6, 1995).

[362] Ala. Const. art. XVIII, § 284.01(b).

a majority of the qualified electors of the affected county who vote on the amendment," but if the amendment "affects or applies to only one political subdivision within a county or counties," it must receive "a favorable vote of a majority of the qualified electors of *both* the county *and* the political subdivision affected by the amendment who vote on the amendment."[363]

Two scenarios potentially affecting this amendatory process must be considered: *on the one hand*, if legislation proposing a local amendment under these procedures is approved by at least a three-fifths vote of the elected members of each house of the Legislature, *but* with one or more dissenting votes cast, *or*, *on the other hand*, if after having been approved by at least a three-fifths vote of the elected members of each house of the Legislature without a dissenting vote cast, the proposed amendment is not approved by a majority of the Local Constitutional Amendment Commission, *then*, *in either of those events*, the following special procedures apply: (*i*) the amendment must be voted upon in a statewide election, in the same manner as general constitutional amendments with statewide application;[364] and (*ii*) in addition to receiving a majority of the votes cast in the affected local area, the proposed amendment must receive a majority of the votes cast across the state, in counties and

---

[363] *Id*. § 284.01(a) (emphasis added).

[364] *See*, *e.g*., McCurley & Norman, at 234 ("Amendment No. 555 provides that proposed local constitutional amendments that are not certified become general constitutional amendments.").

areas that will not be affected by the local amendment.[365]

The parties stipulated that, "[s]ince 1980, the Alabama Constitution has been amended at least 17 times to provide for the levy of additional ad valorem taxes for school purposes in specific counties, cities or school system[s] . . . ."[366]

### d.   Increasing the millage rate of an existing tax

Amendment 373 was proposed and ratified in 1978, ostensibly for the purpose of complying with the federal court orders in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971) (three-judge court) (*per curiam*):  a case that will be discussed in more detail in Part II(G)(3)(i) of this opinion, *infra*.   Essentially, however, the *Weissinger* decision put an end to the seven-decade-long corrupt practices of State and county tax authorities of intentionally applying arbitrary assessment ratios to similar properties in abject defiance of State constitutional and statutory law.

This amendment, often referred to as the "Lid Bill," spawned six complex

---

[365] *See* Ala. Const. art. XVIII, §§ 284.01(d), (e).  The specific language is:

If the proposed amendment is submitted in a statewide referendum, it shall not become effective unless approved at a referendum by a majority of the qualified voters of the affected county voting on the proposition and the affected political subdivision voting on the proposition, if it affects less than the whole county.  The referendum in a political subdivision may be held at the same time as the election for the ratification of the proposed amendment, or at another time if provided by the proposed amendment.

*Id.* at § 284.01(e); s*ee also* Ala. Const. art. XVIII, §§ 284, 285.

[366] Agreed Facts ¶ 37(B).

statutes, enacted for the purpose of implementing the amendment.  The amendment and its enforcement statutes do not allow for a referendum on the levy of *a new ad valorem* property tax, but instead only provide a means for *increasing* the millage rate of *an existing tax* that previously had been levied under one of the constitutional provisions discussed above.  The process entails the following steps.

First, if the board of education was not the governmental taxing authority that initiated the proposal for the existing school district tax, the millage rate of which is proposed to be increased, then the school board must identify the taxing authority that levied the existing tax:  *i.e.*, the county commission in a county tax levy, or the municipal government body in the case of a city tax levy.  The school board then must adopt a resolution requesting the applicable taxing authority (county commission or city council) to conduct a public hearing on the board's proposed millage rate increase, and thereby initiate Amendment 373's increase procedures by giving public notice of the hearing, proposed millage rate increase, duration of the tax, and purpose for which the additional revenue is sought.  However, it is not sufficient for the taxing authority to simply hold a public hearing on the school board's proposal; instead, following the hearing, the taxing authority must formally propose and vote to approve the millage rate increase.

If the relevant taxing authority gives its approval, the proposed increase also

167

must be approved by local act of the State Legislature.[367]  According to the Alabama Constitution, local acts must be advertised for four weeks before being introduced to the Legislature.[368]

Finally, if the local act is approved by the legislature, the proposed rate increase must be approved by a majority of the voters residing within the governmental taxing authority that levied the existing tax.  Amendment 373 and its implementing statutes require that the election be held under laws governing "special elections."[369]

> Election requirements for municipal taxes (a "municipal tax" is a tax levied by a municipality; school district taxes, even in a municipal school district, are county-levied taxes and are not "municipal taxes") differ from those for county and district taxes.  State law (Code of Alabama 1975, § 11-46-22 and § 11-46-93) requires an eight-week notice of the election.  The election has to be held on [a] Tuesday or Thursday and notice of the election first must be published on or before the corresponding Tuesday or Thursday of the second month prior to the election.

> Election procedures for county and district taxes require a 30-day

---

[367] The parties have stipulated that "[w]ith respect to local amendments[,] the Alabama Legislature has long observed an informal local courtesy rule, pursuant to which local constitutional amendments that enjoy the unanimous support of a local legislative delegation are not opposed." Agreed Facts ¶ 37(A).

[368] Harvey III, at 8-17.

[369] "Neither statutory nor judicial guidance has specified the type of special election; [but] a sound recommendation is to follow the pertinent election procedure relating to the tax under consideration.  State law governs elections for school district and county 3-mill taxes (*Code of Alabama 1975*, §§ 16-13-180 through 199), and there are specific laws relating to special elections conducted by municipalities."  Harvey III, at 8-17.

notice published in a newspaper in the county.  If there is no newspaper published in the county, the notice must be posted at the courthouse door and at three other public places in the county.  In addition to the newspaper notice, notice of *district tax elections* must be posted in three public places within the district.  The notice should include the election date and the rate, duration and purpose of the tax . . .[370]

The parties have stipulated that, since 1978, "counties and other local taxing authorities have been successful in obtaining Legislative approval in substantially all the instances where a county local legislative delegation has sought such approval to hold a referendum on local property tax increases."[371]  More specifically, as of 2007 (which apparently is the latest set of statistics available), "the rates of property taxes for schools in School Tax Districts in 36 of 67 Alabama counties have been increased through the procedures set forth in Amendment 373."[372]

      c.  In the 2007 Regular Session of the Alabama Legislature, the Legislature approved 13 new or increased property taxes in various local taxing jurisdictions (including the counties of Barbour, Bullock, Wilcox, and Tallapoosa, and the cities of Auburn and Phenix City), subject to a favorable vote of the qualified voters of the affected jurisdictions. *See e.g.*, 2007 Ala. Acts 295.

      d.  Lawrence County has received legislative approval for at least two local ad valorem tax increases under Amendment 373 of the Alabama Constitution:  one for 3 mills in 1989 and one for 11 mills in 1992.  *See* 1989-90 Ala. Acts 30; 1992 Ala. Acts 842.  Both proposals were thereafter submitted to the voters of Lawrence County for

---

[370] *Id*. at 8-18.

[371] Agreed Facts ¶ 38(a) (citations omitted).

[372] *Id.* ¶ 38(b).

approval.  The proposed increases were rejected by Lawrence County voters.  However, 5 of the 6 majority-black precincts voted in favor of the 1992 increase.  *See* Key Aff. (Doc. 31-7) at 3.

     e.  Sumter County has successfully obtained legislative approval for at least three local ad valorem tax increases since 1978 (11 mills in 1987, 3 mills in 1997, and 15 mills in 2006).  *See* 1987 Ala. Acts 829; 1997 Ala. Acts 262; 2006 Ala. Acts 513.  Sumter County has approximately 5,870 black registered voters and 2,200 white registered voters.  *See* Singleton Aff. (Doc. 31-6) at p. 3.

     f.  In Sumter County, with an African-American voting majority of roughly 2.7 to 1, the electorate in 2006 defeated, by a 60-40 margin, a proposal under the Amendment 373 procedure to increase local property taxes by 15 mills.  The majority-black Sumter County Commission also opposed the tax increase.  *Id*.[373]

Unfortunately, "[t]here is no evidence showing on how many occasions a school system's request for a millage increase has been turned down either by the county or municipal governing body or by the local legislative delegation."[374]

---

[373] *Id*. ¶¶ 38(c) – (f).

[374] *Id*. ¶ 39.

170

## F.    The Computation of Property Taxes in Alabama

All real and personal property in Alabama is subject to *ad valorem* taxation,

unless specifically exempted by law.[375]   The taxes imposed are based upon the

property's fair market value as determined by an appraisal,[376] as opposed to the

property's quantity, weight, or measurement.[377]   The Alabama Constitution limits the

rate of taxation that may be levied by the State to 6.5 mills of the *assessed* value of

property subject to taxation,[378] as distinguished from its *appraised* value.   As

explained in Part II(F)(3), *infra*, the "assessed" and "appraised" values of property are

not identical.

A "mill" is a notational unit of currency that is used in figuring rates of

___

[375] *See*, *e.g.*, Ala. Code § 40-11-1(b) (1975) (2003 Replacement Vol.) (listing the property that is subject to ad valorem taxation, "except as exempted by law"). Intangible personal property (*e.g.*, stocks, bonds, equities, copyrights, patent rights, franchises, money on deposit, futures contracts, insurance policies, and other financial assets) is not taxed in Alabama.

[376] "The essential characteristic of an *ad valorem* tax is that the tax is levied according to the value of property, as determined by an assessment or appraisal." 71 Am. Jur. 2d *State and Local Taxation* § 18 (2010); *see also id*. § 20 (1973) (stating that "an *ad valorem* tax . . . requires the intervention of assessors or appraisers to estimate the value of such property before the amount due from each taxpayer can be determined").

[377] "Taxes may be specific or *ad valorem*.  Specific taxes are of a fixed amount by the head or number, or by some standard of weight or measurement, and require no assessment other than a listing or classification of the subjects to be taxed. " *Id.* at § 18.

[378] *See* Ala. Const. art. XI, § 214 (1901) ("The legislature shall not have the power to levy in any one year a greater rate of taxation than sixty-five one-hundredths of one per centum on the value of the taxable property within this state."); *id*. art. XIV, § 260 (1901), *amended by* Amend. 111 (*ratified* Sept. 7, 1956) (providing that "nothing herein contained shall be so construed as to authorize the legislature to levy in any one year a greater rate of state taxation for all purposes, including schools, than sixty-five cents on each one hundred dollars' worth of taxable property; . . .").

taxation.  The term generally is defined as one-thousandth of a dollar, or one-tenth of

a penny,[379] but both fractions can be expressed decimally as 0.001.  In other words,

10 mills is one cent (0.01), 100 mills is ten cents (0.10), and 1,000 mills is one dollar

(1.00).  The maximum State tax rate of 6.5 mills, therefore, is equivalent to slightly

more than one-half of one cent ($0.0065) of each dollar of a property's *assessed*

value.[380]

The process of calculating the amount of tax due under Alabama's *ad valorem*

tax structure can entail as many as six steps.[381]  *First*, the property subject to taxation

must be identified.  *Second*, the fair and reasonable market value of the property must

be estimated by means of an "appraisal."  *Third*, the "assessed value" of the property

---

[379] The term was first used in the United States in the Aug. 8, 1786 *Journal of the Continental Congress*, where it was described as the "lowest money of account, of which 1,000 shall be equal to the federal dollar."  See the online edition of the *Oxford English Dictionary*, found at www.oed.com (last viewed Aug. 12, 2011).

[380] *See*, *e.g.*, The Legislative Fiscal Office, *A Legislator's Guide to Alabama's Taxes:  A Summary of the Major Revenue Sources of the State of Alabama* 2-3 (2007) ("**Legislator's Guide**") ("A mill is 1/1000 of a dollar or 1/10 of a cent, so that 6.5 mills equal $.0065 or .65% of $1.  One mill equals $1 of taxes per $1,000 of *assessed* value of property.") (emphasis in original).

[381] The process was described in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1970), as

"a three-step procedure.  For purposes of assessment, property must be estimated at its fair and reasonable market value.  Then it must be assessed for the purpose of taxation at a fixed percentage . . . of that fair and reasonable market value, and, finally, the tax rate is applied to the assessed value."

*Id*. at 620 n.11 (three-judge court) (*per curiam*).  In point of fact, however, as discussed in text, the process can entail as many as six steps.

172

is calculated.  *Fourth*, if any exemptions from taxation are allowed by law, they are subtracted from the assessed value.  *Fifth*, the *net* assessed value is multiplied by the applicable millage rate.  *Finally*, if a taxpayer disagrees with the county tax assessor's appraised or assessed values, he or she may take the issue before the county's board of equalization, an entity that is charged with the duty of equalizing the assessment of all property within the county.[382]  The first five steps of this computational process are discussed in more detail below.

### 1.  **First Step** — *Identifying the property subject to taxation*

The first step in the calculation of State, county, municipal, or school district *ad valorem* tax levies requires the county tax assessor to identify each parcel of real

---

[382] *See*, *e.g.*, Ala. Code § 40-3-16 (1975) (2009 Supp.) ("It shall be the duty of the boards of equalization to inspect, review, revise, and fix the value of all the property returned to or listed with the assessing official for taxation each year. . . .").  In addition:

> The State Department of Revenue is charged with the responsibility of equalizing the various county equalization board assessments and its own assessments on railroad and utility property, so that all taxable property in the state will be assessed in accordance with Sections 211 and 217.  Sections 131 and 133 of Title 51 of the Code of Alabama [*now codified at* Ala. Code § 40-2-11 (1975)] authorize the Department of Revenue to exercise general and complete supervision over and control of valuation, equalization, and assessment of property "to the end that all taxable property in the state shall be assessed and taxes shall be imposed and collected thereon in compliance with the law, and that all assessments on property . . . shall be made in exact proportion to the fair and reasonable market value thereof."

*Weissinger v. Boswell*, 330 F. Supp. 615, 620-21 (M.D. Ala. 1971) (three-judge court) (*per curiam*) (footnotes omitted, alteration added).

property and each taxable unit of personal property within his or her jurisdiction.[383]

The identification of real property — land and the improvements that have been made thereon — typically involves the preparation of a tax map that depicts each parcel of real estate within the county, "showing for each the boundaries, size, location, parcel identification number, ownership, value, and other spatially oriented details such as easements, rights-of-way, soil types, and flood plains."[384]

### 2.   **Second Step** — *Appraisal*

The second step requires an "appraisal" — a term that describes the process of

_____

[383] *See, e.g., State v. Alabama Power Co.*, 254 Ala. 327, 48 So. 2d 445 (1950), observing that, when beginning the process for computing the property taxes due,

> the taxpayer or tax assessor [is required to] list all the different kinds and types of property owned by the taxpayer.  On one sheet the taxpayer lists his real estate and improvements thereon and on another sheet he lists his personal property.  The personal property is then broken down into a considerable number of different types, classes or species of property set out in the printed form.  . . .  The reason for enumerating the various species or classes of property is to make sure that the taxpayer is listing for assessment and taxation all his property and not omitting or overlooking any.

*Id*. at 339, 48 So. 2d at 455 (alteration added).

[384] Michael E. Bell, "Property Tax Assessment," in *The Encyclopedia of Taxation & Tax Policy* 307-308 (Washington, D.C.:  The Urban Institute 2d ed. 2005) (Joseph J. Cordes, Robert D. Ebel & Jane G. Gravelle eds.) ("**Bell**"); *see also* Ira W. Harvey, *A History of Educational Finance in Alabama* 223 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**") ("The basis for identification is the tax map found in the tax assessor's office in the county courthouse.  This tax map is a map which is drawn to scale and delineated by lot lines, property lines, or both with sufficient identification for all parcels of land.  From these maps, all real property is identified based upon ownership, property size, and location.  Tax maps are to be properly maintained and kept current to reflect changes in ownership or changes in the size of the lot.  Currently, the use of computerized mapping and geographic information systems has greatly improved the process.") (citation omitted); Harvey III, at 7-7.

developing a well-supported opinion about the property's "fair and reasonable market value": that is, the highest price at which the property would sell on the open market in a voluntary, arm's-length transaction between a willing seller and a willing purchaser, with neither party under compulsion to sell or to buy, and allowing a reasonable time to find a buyer who purchases with full knowledge of all uses to which the property can be put, and for which it is capable of being used, in the light of applicable zoning, building set-back lines, access, and other limiting laws, restrictions, or ordinances.[385]   The valuation process "is inherently subjective and

---

[385] *See* Ala. Const. art. XI, § 217(c) (1901); Ala. Code § 40-1-1(16) (1975) (defining the "value" of property subject to *ad valorem* taxation as "[t]he fair and reasonable market value of property, estimated at the price which the property would bring at a fair voluntary sale"); *id*. § 40-7-15 (stating that "for the purpose of assessment, real and personal property shall be appraised at its fair and reasonable market value, according to the best judgment the assessor, the board of equalization, and agents of the Department of Revenue can form upon information, inspection, or otherwise, taking into consideration all elements or factors bearing on such value").  The following definition of market value is used by federal agencies charged with the regulation of financial institutions:

> Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) Buyer and seller are typically motivated; (2) Both parties are well informed or well advised, and acting in what they consider their own best interests; (3) A reasonable time is allowed for exposure in the open market; (4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

55 Fed. Reg. § 1608.2(f), at 34228-29; s*ee also*, *e.g.*, 1 *CCH Alabama State Tax Reporter* ¶ 20-610 (2006) ("**CCH Tax Guide**") (citing Ala. Dept. of Revenue, *Alabama Appraisal Manual* (1995)); The

requires the talents of highly trained and experienced personnel, generally referred to as assessors, valuers, property appraisers, or property valuation administrators."[386]

### a.    The usual methods of determining fair market value

The fair and reasonable market value of real property usually is determined by application of one or more standard appraisal methods.   The most commonly employed techniques are the "market," "cost," and "income capitalization" approaches.[387]   Those methodologies are not mutually exclusive, but interrelated, in the sense that "each requires the gathering and analysis of sales, cost, and the income data that pertain to the property being appraised."[388]

The *market approach* to valuation is commonly used to estimate the worth of residential property, based upon a comparison of the sale prices and relevant amenities of comparable properties within the general vicinity of the subject property.[389]   It is the least complex appraisal method.[390]

The *cost approach* derives the value of a subject property by adding the estimated value of land to the current cost of constructing a reproduction or

---

Appraisal Institute, *The Appraisal of Real Estate* 23-24 (Chicago: The Appraisal Institute 11th ed. 1996) ("**Appraisal of Real Estate**").

[386] Bell, at 307.

[387] *See* 1 CCH Tax Guide ¶ 20-615 (2008).

[388] Appraisal of Real Estate, at 81.

[389] *See*, *e.g.*, 1 CCH Tax Guide ¶ 20-625, at 2222.

[390] Harvey III, at 7-7.

replacement for the structures and other improvements located on that land, and then subtracting an amount for the depreciation of the structures from all causes (*e.g.*, deterioration, functional or economic obsolescence, etc.).[391]

The *income capitalization approach* is most often used in connection with the evaluation of rental and commercial properties, and takes into account the property's ability to produce revenue or income.[392]   The present value of a subject property's projected income stream and resale value are capitalized into a current, lump-sum value.[393]   This is, by far, the most complicated of the standard appraisal methodologies.   Even so, a *significantly* more complex method of appraising the value of some Alabama properties was added to the State Constitution by Amendment 373, ratified in 1978.

### b.   The "current use" method of valuation

Amendment 373 significantly altered Article XI, Section 217 of the Alabama

---

[391] "This approach is particularly useful in valuing new or nearly new improvements and properties that are not frequently exchanged in the market.   Cost approach techniques can also be employed to derive information needed in the sales comparison and income capitalization approaches to value, such as the costs to cure items of deferred maintenance."   Appraisal of Real Estate, at 90.

[392] *See* Harvey III, at 7-7.

[393] There are two methods of income capitalization — direct capitalization and yield capitalization — but a description of the complex algebraic formulas used to produce estimated property values by use of those methods is unnecessary to discussion of the issues addressed in this opinion.   *See*, *e.g.*, Appraisal of Real Estate at 91-92, 184-85; 1 CCH Tax Guide ¶ 20-620, at 2221-22 (citing Alabama Department of Revenue, *Alabama Appraisal Manual*, Chapter 4 ("The Appraisal Process") (1995)).

Constitution, as previously amended by Amendment 325. Alabama property now is appraised on two bases. The value of all real and personal property that is *not included* within "Class III" is appraised at its fair and reasonable market value as determined (normally) by one of the standard methods summarized in the preceding section. On the other hand, the owners of Class III properties — *i.e.*, land devoted to agricultural pursuits or timber and forest-product production, historical buildings and sites, and single-family, owner-occupied, residential dwellings — are given the option of electing to have the value of such property appraised on the basis of *either* its "fair and reasonable market value" (as in the case of the other three classes of property created by Amendment 373), *or* on the basis of the property's "current use value"[394] — a method of valuation that ignores the property's fair market value, and limits the estimation process to the use being made of the property on the date of appraisal.[395] It is specifically provided that "*no consideration* shall be taken of the *prospective value* such property *might* have *if it were put to some other possible use.*"[396]

---

[394] *See* Ala. Const. art. XI, § 217, ¶ (j) (1901), *as amended by* Amend. 373 (ratified Nov. 20, 1978) (providing, in part, that "Class III property shall, *upon application by the owner of such property*, be assessed at the ratio of assessed value to the *current use value* of such taxable property *and not the fair and reasonable market value* of such property") (emphasis supplied).

[395] *See* Ala. Code § 40-7-25.1(a) (1975) (2003 Replacement Vol.) (defining "current use" as "the value of eligible taxable property based on the use being made of that property on October 1 of any taxable year").

[396] *Id*. (emphasis supplied).

178

There are some significant nuances in the methods of estimating the current use values of, on the one hand, historic buildings and sites and single-family, owner-occupied residential dwellings and, on the other hand, properties devoted to agricultural pursuits and timber production.  Those differences are discussed below.

### *i*.    Residential property and historic buildings and sites

An Alabama statute dictates that the value of a historic building or site,[397] or a single-family, owner-occupied, residential dwelling,[398] is to be determined by comparing the subject property to the "fair and reasonable market values of comparable residential or historic building and site property located in the county," but tax assessors also are specifically directed "to presume that there is no possibility of the property being used for any other purpose than as residential property or an historic building and site, as if there were a legal prohibition against its use for any other purpose."[399]  As a result of those legislative directives, a county tax assessor is prohibited from taking into account the value of property that adjoins the residential

---

[397] Ala. Code § 40-8-1(b)(2) (1975) (defining the term *historic buildings and sites* as including, "[r]egardless of the use to which such property is put, all buildings or structures (*i*) determined eligible by the state historic preservation officer for listing on the National Register of Historic Places; or (*ii*) located in a registered historic district and certified by the United States Secretary of the Interior as being of historic significance to the district").

[398] *See* Ala. Code § 40-8-1(b)(6) (defining the term *residential property* as meaning "[o]nly real property, used by the owner thereof exclusively as the owner's single-family dwelling.  This includes an owner who resides on the property and remains in possession of the property after it is sold at a tax sale.").

[399] Ala. Code § 40-7-25.1(d)(3).

179

property or historic building or site, regardless of whether the adjoining property is devoted to "higher and better uses,"[400] such as a shopping center, apartment units, other residential rental properties, a condominium complex, or an industrial site.

## ii. Agricultural and timber properties

The statutory methodology for determining the "current use" values of land devoted to agricultural pursuits or timber and forest-product production is "unusually long and complex."[401] It is based upon the productivity of the soil. State law divides Alabama land into ten "soil groups," determined by the U.S. Soil Conservation Service,[402] and then rates the productivity of each soil group for agricultural and forest purposes as "good," "average," "poor," or "nonproductive."[403] The basic assumption is that each soil group will produce a stream of income that can be capitalized to estimate property value on a per-acre basis.

---

[400] The phrase "highest and best use," as used in conjunction with the term "fair market value," refers to the estimated amount that a willing buyer might pay, if the property were put to some other, possible, more lucrative function than the use being made of the property at the moment of valuation. *See* 1 CCH Tax Guide ¶ 20-620 ("The 'highest and best use' of property means the use most likely to produce the highest yield or maximum benefit over a reasonably foreseeable period of time for a prudent or typical owner.").

[401] *Weissinger v. White*, 733 F.2d 802, 805 n.11 (11th Cir. 1984).

[402] *See* Ala. Code §§ 40-7-25.1(c)(1) – (c)(10).

[403] The productivity ratings for seven of the ten soil groups are the same, regardless of whether the land is devoted to agricultural purposes or timber production: that is, the ratings are different only for soil groups 6 ("poor" for agriculture, "average" for timber), 7 ("nonproductive" for agriculture, "poor" for timber), and 9 ("poor" for agriculture, "average" for timber). *See* Ala. Code § 40-7-25.1(c).

The Alabama Department of Revenue is charged with the responsibility of determining the stream of income presumptively produced by each of the various agricultural and forest soil groups — a computational process that yields estimated productivity figures which are described in the Alabama Code as "current use standard values per acre of property."[404]

### (A)   Agricultural land

In order to determine "the current use standard values per acre" for land devoted to agricultural uses,[405] the Department of Revenue, "utilizing statistics from the Alabama Crop and Livestock Reporting Service, the Alabama Cooperative Extension Service and the Alabama Agricultural Experiment Station,"[406] annually identifies the "state's top three crops," meaning those that produced the greatest harvest on a per acre basis.[407]  The Department then determines the "seasonal average price received" for those crops during each of the preceding ten years.[408]  The Department next multiplies the total production in the State for each of the top three crops during the

---

[404] *See*, *e.g.*, Ala. Code §§ 40-7-25.1(d)(1) (final para.) (1975).

[405] Agricultural property is defined as "real property used for raising, harvesting, and selling crops or for the feeding, breeding, management, raising, sale of, or the production of livestock, including beef cattle, sheep, swine, horses, ponies, mules, poultry, fur-bearing animals, honeybees, and fish, or for dairying and the sale of dairy products, or for . . . any other agricultural or horticultural use or animal husbandry and any combination thereof."  *Id.* at § 40-8-1(b)(1) (1975).

[406] *Id*. §§ 40-7-25.1(d)(1) (final para.).

[407] *Id*. § 40-7-25.1(d)(1)(a).

[408] Ala. Code § 40-7-25.1(d)(1)(b).

current year by the "seasonal average price."

  **c**. From the gross return figures thus obtained, costs of production for each crop (determined for each crop using U.S. Department of Agriculture cost of production data [excluding land costs and general farm overhead costs] or such similar data as may be available to the department) shall be subtracted, giving the net return to land per year per crop;

  **d**. The net return per year to land per crop shall be totaled, the total being weighted to give effect to the average number of acres of each crop being harvested in the state in the 10 most recent calendar years since 1973 for which statistics are available, such total yielding income flow per acre; and

  **e**. Income flow per acre shall be capitalized by dividing it by the average of the annual effective interest rates on new federal land bank loans . . . charged by the New Orleans District Federal Land Bank for the 10 most recent calendar years since 1973 for which figures are available as of October 1 of each tax year, such rate to be reduced by four and one-half percent for determinations made for the first tax year to which the provisions of this chapter shall apply; with respect to tax years thereafter, the income flow per acre shall be divided by the average of said annual effective interest rates determined for the 10 most recent calendar years since 1973 for which figures are available, such rate to be reduced by the lesser of four and one-half percent or the difference between such rate and two percent.[409]

The "current use standard values per acre of property in agricultural use in the state" then is calculated by adjusting the figure produced by the foregoing formula as follows: *increasing* the final figure by 20% for land having a productivity rating of "good"; *decreasing* the final figure by 30% for land having a productivity rating of

---

[409] *Id*. §§ 40-7-25.1(d)(1)(c) – (e).

"poor"; *decreasing* the final figure by 75% for "nonproductive" soil; and leaving the final figure "unchanged with respect to property having a productivity rating of average. . . ."[410]

## (B)    Timber property

A different, and somewhat simpler, process is followed to determine the "current use standard values for forest property in the state."[411]   As stated in the Alabama Code, the Forestry Commission is charged with the responsibility of annually determining

the average pulpwood price per cord received by timber growers in the

---

[410] *Id*. §§ 40-7-25.1(d)(1) (final para.).  The Eleventh Circuit summarized this "unusually long and complex" computational process in the following manner:

1.  Determine the state's top three crops for the current year.

2.  Determine the average net income (gross income less production costs) of each crop per acre.

3.  Compute a weighted average net income per acre figure based on the respective proportions of land that were planted in each of the three crops over the last 10 years.

4.  Take this final net income per acre figure and capitalize it using a specified interest rate.

5.  Finally, take the capitalized figure and increase or decrease it by a specified percentage depending on soil productivity.

Timberland valuation is based on a similar, low-variable formula.

*Weissinger v. White*, 733 F.2d at 805 n.11.

[411] Ala. Code § 40-7-25.1(d)(2) (1975).  Forest property is defined as land used for "the growing and sale of timber and forest products. . . ."  *Id*. § 40-8-1(b)(1).

state by estimating the average pine pulpwood price per cord and the average hardwood pulpwood price per cord received in the state during such year and determining the weighted average of those two average prices, weighting those prices on the basis of the ratio that the approximate number of cords of each of those two types of pulpwood harvested in Alabama bears to the total cords of both of such types of pulpwood harvested in Alabama, and provide that information to the Department of Revenue. The Department of Revenue shall utilize timber yields of 1.38 cords per acre per year, 1.05 cords per acre per year, .75 cords per acre per year and .6 cords per acre per year for land having good, average, poor, and nonproductive productivity ratings respectively to establish annual yields per acre in cords and multiply the yield per acre of timber property of each rating by the average pulpwood price per cord as provided by the Alabama Forestry Commission.  From the products thus obtained, 15 percent thereof shall be subtracted therefrom for expenses of ownership and management, and the result of that subtraction shall equal imputed timberland net income per acre for property of each productivity rating.  The imputed net income per acre figures for property of each productivity rating shall then be divided by the average of the annual effective interest rates charged on new federal land bank loans . . . by the New Orleans District Federal Land Bank for the 10 most recent calendar years since 1973 for which figures are available as of October 1 of each tax year, such rate to be reduced by four and one-half percent for determinations made for the first tax year to which the provisions of this act shall apply; with respect to tax years thereafter, the imputed net income per acre figures shall be divided by the average of said annual effective interest rates for the 10 most recent calendar years since 1973 for which figures are available, such rate to be reduced by the lesser of four and one-half percent or the difference between such rate and two percent. *The results thus obtained shall be the current use standard values per acre for property of each of the timber productivity ratings* with respect to which current use valuation is elected by the owner thereof; . . . .[412]

---

[412] *Id*. (emphasis supplied).

**(C)   2008 current use standard values for agricultural and timber properties**

By following the procedures outlined in sections 40-7-25.1 through 40-7-25.3 of the Alabama Code, the Department of Revenue annually computes and publishes current use values according to the productivity ratings of agricultural and forest properties.  As seen in Table II-1 and Table II-2 below, the values for the 2008 tax year, introduced as Plaintiffs' Exhibit 25, were:

**TABLE II-1:  2008 CURRENT USE VALUES FOR AGRICULTURAL LAND**

| SOIL GROUP | PRODUCTIVITY RATING | CURRENT USE VALUE |
|:---:|:---:|:---:|
| 1 | Good | $532 |
| 2 | Good | $532 |
| 3 | Average | $443 |
| 4 | Average | $443 |
| 5 | Average | $443 |
| 6 | Poor | $310 |
| 7 | Non-productive | $110 |
| 8 | Good | $532 |
| 9 | Poor | $310 |
| 10 | Non-productive | $110 |

**TABLE II-2:  2008 CURRENT USE VALUES FOR TIMBERLANDS**

| SOIL GROUP | PRODUCTIVITY RATING | CURRENT USE VALUE |
|:---:|:---:|:---:|
| 1 | Good | $653 |
| 2 | Good | $653 |
| 3 | Average | $498 |

185

| SOIL GROUP | PRODUCTIVITY RATING | CURRENT USE VALUE |
|---|---|---|
| 4 | Average | $498 |
| 5 | Average | $498 |
| 6 | Average | $498 |
| 7 | Poor | $355 |
| 8 | Good | $653 |
| 9 | Average | $498 |
| 10 | Non-productive | $284 |

### 3.  **Third Step** — *Determining the assessed value*

The third step in the calculation of *ad valorem* taxes is determination of the subject property's "assessed value."  It must be emphasized that, in Alabama, the appraised and assessed values of property are not synonymous.  Rather, the appraised value *always* is greater than the assessed value — a term referring to that portion of the appraised value against which State, county, municipal, or school district millage rates will be applied.[413]

The assessed value subject to taxation is determined by multiplying the

---

[413] As one treatise observed:

> Generally, "assessed value" is synonymous for property tax purposes with "taxable value," in that it is the amount to which tax applies.  Some states apply a single statutorily mandated percentage regardless of how property is classified.  Others eliminate this step altogether by assessing all property at its appraised value, so that "appraised value" is synonymous with "assessed value."  Others, such as Alabama, apply different assessment percentages (sometimes called assessment ratios) to different classes of property to arrive at assessed value.

1 CCH Tax Guide ¶ 20-700 (2006).

appraised value by the *assessment ratio* specified for each of the four property classifications defined by Article XI, Section 217 of the Alabama Constitution, as modified by Amendment 373 (the so-called "Lid Bill").  Those four classes and their respective assessment ratios are listed in the following Table:[414]

TABLE II-3: ASSESSMENT RATIOS BY CLASS OF PROPERTY

| CLASS | DESCRIPTION OF PROPERTY | ASSESSMENT RATIO |
|-------|------------------------|------------------|
| I | All real and personal property owned by utility companies that is used in the business of such utilities.[415] | 30% |
| II | A catch-all category, capturing all real and personal property that does not fit within the definitions of the other three classifications, and including most business, commercial, and industrial property, as well as residential rental properties and "second homes" not occupied as the owner's primary residence.[416] | 20% |
| III | All agricultural and timber property, single-family owner-occupied residential property, and historic buildings and sites. | 10% |
| IV | All private passenger automobiles and motor trucks of the type commonly known as "pickups" or "pickup trucks" owned and operated by the taxpayer for personal or private use, and not for hire, rent, or other compensation. | 15% |

### 4.    **Fourth Step** — *Deduction of exemptions*

The fourth step in calculating property taxes requires that any exemptions allowed by law be taken into account by deduction from the *assessed value*.  There are

---

[414] *See* Harvey I, at 469 (Table 7-4); s*ee also* Ira W. Harvey, *Financing Alabama's Schools*: *The Pursuit of Accountability, Adequacy and Equity* 224 (Table 10-5) (Montgomery, Ala.:  Auburn University Montgomery Center for Government and Public Affairs 2000) ("**Harvey II**").

[415] *See* Ala. Code §§ 40-8-1(a), (b)(5) (1975).

[416] *Id*. §§ 40-8-1(a), (b)(4).

187

more than 150 exemptions to *ad valorem* taxation in Alabama.[417]  Foremost among

those, as far as the average taxpayer is concerned, is the "homestead exemption" that

may be claimed by the owner of a single-family dwelling occupied as the taxpayer's

primary residence, together with the land upon which it is situated (not to exceed 160

acres), in order to reduce the property's "assessed value" for purposes of computing

the *State tax levy* by $4,000.[418]  State statutory law also exempts all homeowners from

county property taxes (except for school taxes) up to $2,000 of assessed value.[419]

> This means that an owner of a homestead valued at $40,000 (and,
> therefore, assessed at $4,000) would not pay any state property taxes on

---

[417] *See id.* §§ 11-20-47, 11-54-96, 31-2-80 to -81, 40-9-1 to -49, 40-11-1(1), 41-9-329, -358. For a comprehensive listing of exemptions to *ad valorem* taxation in Alabama, see Bruce P. Ely, J. Whiteney Compton, & Chris W. Compton, *The Property Tax Deskbook — Alabama* §§ 1-610 to -640, at pages 1-8 to 1-12 (St. Paul, Minn.:  American Bar Association Section of Taxation, 14th ed. 2009) (Stewart M. Weintraub *et al*. eds.).

[418] No State *ad valorem* tax is due on the first $4,000 of assessed value from a homeowner aged 65 or less, but the "homesteads of residents . . . over 65 years of age, or who are retired due to permanent and total disability, regardless of age, or who are blind . . . , regardless of age or whether such person is retired, shall be exempt from all *state* ad valorem taxes."  Ala. Code §§ 40-9-19(a) (1975) (emphasis supplied).  Further, any residents who are over 65 years of age and have an annual adjusted gross income of less than $12,000, or any residents who are blind or who are retired because of a disability, also qualify for an exemption from all county property taxes, including school district taxes.  *Id.* § 40-9-19(d).  This exemption may not exceed $5,000 in assessed value or 160 acres in area.  *Id.*  Those residents who are over 65 years of age with a net taxable income of less than $7,500, and those residents who are totally disabled, also receive a complete exemption for *all* property taxes on their "principal residence and 160 acres adjacent thereto."  *Id.* § 40-9-21.  The revenue lost to the State by virtue of the homestead exemption is replaced by a transfer from the first proceeds of the State income tax, before it is deposited to the credit of the Educational Trust Fund in accordance with the provisions of Amendment No. 61.  *See* Ala. Const. art XI, § 211.02 (1901), *added by* amend. 61, § B (last sentence) (*ratified* Sept. 11, 1947); s*ee also* Ala. Code § 40-9-24; Harvey I, at 402-03; Harvey II, at 204-05; Harvey III, at 3-2 to 3-3; Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 11-13 ("**Harvey 4 Tr**.").

[419] Ala. Code § 40-9-19(b).

his homestead, would pay county taxes based on only $2,000 of the $4,000 assessed value, and would pay school district and city property taxes based on the full $4,000 assessed value of the homestead.  . . .[420]

**5**.   **Fifth Step** — *Applying the tax millage rate*

Once all applicable exemptions are subtracted, the resulting *net* assessed value is multiplied by the millage rate levied by each taxing authority.  The total millage rate will include the 6.5 mills levied statewide, as well as any additional mills levied at the local level by counties, municipalities, and school districts.  The following table depicts the manner of calculating the State's 6.5 mill *ad valorem* tax, based upon hypothetical values for all classes of properties *except* Class III agricultural and timber tracts.[421]

TABLE II-4:  CALCULATING THE 6.5 MILL STATE AD VALOREM TAX

| DESCRIPTION | CLASS I UTILITIES | CLASS II COMMERCIAL | CLASS III HOMES | CLASS IV AUTOS |
|---|---|---|---|---|
| Appraised Value of Property | $1,000,000 | $400,000 | $100,000 | $20,000 |
| Assessment Ratio by Class | 30% | 20% | 10% | 15% |
| Assessed Value | $300,000 | $80,000 | $10,000 | $3,000 |
| Deduct Any Exemption | 0.00 | 0.00 | -$4,000 | 0.00 |
| Net Assessed Value | $300,000 | $80,000 | $6,000 | $3,000 |
| Multiply by Millage Rate | x 0.0065 | x 0.0065 | x 0.0065 | x 0.0065 |

[420] Michael R. Mills & Deborah Perry Fisher, Comment, *Alabama's Property Tax: Ineffective, Inefficient, and Inequitable*, 36 Ala. L. Rev. 147, 185 (1984).

[421] *See* Harvey II, at 226 (Table 10-7).

189

| DESCRIPTION | CLASS I UTILITIES | CLASS II COMMERCIAL | CLASS III HOMES | CLASS IV AUTOS |
|---|---|---|---|---|
| Tax Due State | $1,950 | $520 | $39 | $19.50 |

The State's 6.5 mills is allocated as follows:  3 mills for "the maintenance of the public schools of this state,"[422] 1 mill for "the relief of needy Confederate soldiers and sailors, resident citizens of Alabama and their widows;"[423] and, 2.5 mills to the State's General Fund.[424]

> a.    **Computation of the State *ad valorem* tax on Class III agricultural and timber properties**

As discussed in sub-section F(2)(b) of this Part of the opinion, *supra*, the Alabama Constitution allows the owners of Class III properties devoted to agricultural pursuits or timber and forest-products production to elect an alternative method of determining the market value of such properties — a method that limits the appraisal process to the "current use standard values per acre" established annually by the Department of Revenue.  As an example of how those values might have been applied by a county tax assessor in 2008, assume the case of a hypothetical farmer who owned

---

[422] Ala. Code § 40-8-3(1) (1975).

[423] *Id*. § 40-8-3(2) ("For the relief of needy Confederate soldiers and sailors, resident citizens of Alabama and their widows, $.10 on each $100 of the assessed value of taxable property of which one percent of the gross amount collected will be expended by the Alabama Historical Commission to provide for capital improvements and maintenance at the Confederate Memorial Park at Mountain Creek, Chilton County, Alabama."); *cf*. Jay Reeves, *Obscure Property Tax Pays for Confederate Memorial*, The Huntsville *Times*, July 21, 2011, at A6, col. 4.

[424] Ala. Code § 40-8-3(3) ("For the use of the state and to raise revenue therefor, $.25 on each $100 of the assessed value of taxable property.").

1,410 acres of "good" land in Soil Group 1, with a current use standard value of $532 an acre. The "appraised" value of that land, based upon the owner's then current agricultural use of it for row-crops and pasture, would have been $750,120 (1,410 acres x $532 an acre). Assume further that this same farmer owned an additional 501 acres of timberland in Soil Group 3, having an "average" productivity rating, and a current use value of $498 an acre. A county tax assessor accordingly would appraise that land as worth $249,498 (501 acres x $498 an acre). Thus, the aggregate "appraised value" of those 1,911 acres based upon their "current use standard values" would have been $999,618 — an amount that, for ease of computation, will be rounded-up to $1,000,000. The *ad valorem* property tax owed to the State of Alabama by this hypothetical farmer would have been as follows:

| | |
|---|---|
| $1,000,000 | aggregate "appraised" (current use) value |
| x   0.10 | ten percent assessment ratio for Class III properties |
| $100,000 | assessed value |
| – 0 – | (No amount is deducted for a homestead exemption because, for purposes of this hypothetical, it is assumed that the farmer either lived in town and not upon his farm property, or that his home and the acreage surrounding it was subject to an assessment separate from the "current use standard values per acre" used as a basis for determining the "appraised value" of the land devoted to income production.) |
| $100,000 | *Net* assessed value |
| x  0.0065 | 6.5 State millage rate |
| $650 | *ad valorem* property tax owed to the State |

The $650 tax bill represents only 0.00065% of the "appraised"/current use value of 1,410 acres of "good" agricultural and 501 acres of "average" timber lands (650 ÷ 1,000,000).

### 6. The "Lid Bill's" Impact Upon the Aggregate Amount of *Ad Valorem* Property Taxes Owed the State, Counties, Municipalities, and School Districts

As discussed in Part II(E)(3) of this opinion, *supra*, addressing the topic of local funding sources for K-12 education, Alabama has authorized all local school systems, through various amendments to the 1901 Constitution, to levy up to an aggregate of 15.0 mills in *ad valorem* property taxes for educational purposes in a combination of countywide and school tax district levies. In addition to those authorizations with statewide application, counties, municipalities, or school tax districts may increase school property taxes above the generally authorized 15.0 mills by following one or more of the procedures outlined in Part II(E)(4), *supra*.

The same steps previously outlined are followed when calculating the amount of taxes due to those local taxing authorities, but with one very important caveat. Each of the four classes of property also has a maximum dollar limit, or "lid," on the *aggregate amount of taxes* that may be levied in any one year by *all taxing authorities*: *i.e.*, the State, a county, municipalities within that county, *and* school districts within that county and its municipalities, *combined*. The dollar limits are based upon the

192

*appraised* (estimated fair and reasonable market) *value* of the property, *not* its *assessed value*.  The sum of *all* property taxes levied by *all* taxing authorities must not exceed in any one year:  2% of the appraised value of Class I property; 1.5% of the appraised value of Class II property; 1% of the appraised value of Class III property; and 1.25% of the appraised value of Class IV property.[425]

This means, for example, that a Class III single-family, owner-occupied residence with an appraised (fair market) value of $100,000 can only be assessed by all taxing authorities a total amount of tax levies that does not exceed the aggregate amount of $1,000 ($100,000 x 0.01).  These limits on taxation are summarized in the following Table.[426]

**TABLE II-5**:  **LIDS ON TOTAL PROPERTY TAXES BY CLASS AND PERCENTAGE OF APPRAISED, FAIR MARKET VALUE**

| CLASS | DESCRIPTION | ASSESSMENT RATIO | "LID" OR "CEILING TAX" |
|---|---|---|---|
| I | Utility Property | 30% (0.30) of Appraised Value | 2.0% (0.02) of Appraised Value |
| II | Commercial Property (all property not otherwise classified) | 20% (0.20) of Appraised Value | 1.5% (0.015) of Appraised Value |

[425] The text of Ala. Const. art. XI, § 217(i) (1901), *amended by* Amend. 373 (*ratified* Nov. 20, 1978) is set out in "Appendix I-4."  The cities of Mountain Brook, Vestavia Hills, and Huntsville were specifically exempted from the limitations imposed by that constitutional provision, because the total taxes levied by those municipalities exceeded the "lids" when Amendment No. 373 was proposed.

[426] The following Table II-5 is a combination of information depicted in Harvey I, at 469-70 (Tables 7-4 and 7-5) and Harvey II, at 24-25 (Tables 10-5 and 10-6).

| CLASS | DESCRIPTION | ASSESSMENT RATIO | "LID" OR "CEILING TAX" |
|---|---|---|---|
| III | Owner-Occupied Residential Dwellings, Historic Buildings or Sites, Agricultural and Timber Properties | 10% (0.10) of Appraised Value | 1.0% (0.01) of Appraised Value |
| IV | All private passenger autos and motor trucks devoted to personal uses | 15% (0.15) of Appraised Value | 1.25% (0.0125) of Appraised Value |

Thus, assuming a Class II parcel of commercial property with an appraised value of $400,000 and, therefore, an assessed value of $80,000 ($400,000 x 0.20 assessment ratio); excluding any applicable exemptions allowed by law; and, considering that millage rates vary from one taxing authority to another (with the exception of the State rate, which always is 6.5 mills), the following is an example of a basic computation of tax levies based on the millage rates shown:

| Taxing Authority | Mills x Assessed Value | | = Tax Levy |
|---|---|---|---|
| State (6.5 mills) | 0.0065 x $80,000 | = | $   520 |
| County (14.5 mills) | 0.0145 x $80,000 | = | $ 1,160 |
| Municipality (5 mills) | 0.0050 x $80,000 | = | $   400 |
| School District (2 mills) | 0.0020 x $80,000 | = | $   160 |
| Total Tax Bill | | | $ 2,240 |

Given that the "Lid" (or maximum aggregate tax levy) on Class II commercial property is 1.5% (0.015) of appraised (fair and reasonable market) value, the total amount of taxes that may be levied in any one year by all taxing authorities on such property is $6,000 ($400,000 x 0.015).  Therefore, the "lid" does not affect the total

194

levy in the hypothetical depicted above.

In the unlikely event those lids should be exceeded, the amount of taxes must be reduced by subtracting the amount that is in excess, and prorating the decrease among all applicable taxing authorities.[427]

---

[427] *See* Ala. Const. art. XI, § 217(i) (1901), *added by* amend. 325 (*ratified* June 8, 1972), *amended by* amend. 373 (*ratified* Nov. 20, 1978), providing in pertinent part:

> Whenever the total amount of ad valorem property taxes otherwise payable by any taxpayer with respect to any item of taxable property shall exceed in any one ad valorem tax year the maximum amount of such taxes permitted by this section, such amount of taxes shall be reduced by subtracting that amount of tax due that is in excess of the amount of tax otherwise permissible under the Constitution.   In connection with the taxation of any item of taxable property, the amount of tax to be subtracted with respect to each authority levying and collecting any ad valorem property tax shall be in the same proportion to the total amount of tax to be subtracted that the total number of mills on each dollar of taxable property situated in the taxing authority levied by such taxing authority bears to the total number of mills on each dollar of taxable property situated in the taxing authority levied by all taxing authorities with respect to such item of taxable property.  . . .

*Id*.; s*ee also* Ira W. Harvey, *A History of Educational Finance in Alabama* 470-71 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**") ("If the sum of all state and local ad valorem taxes exceeds the ceiling allowable, then those taxes must be reduced.  For example, a piece of Class I property valued at $1,000 and assessed at 30% or $300 still cannot be taxed in excess of 2% or $20.  If however, a total state and local ad valorem millage of 100 mills is levied, the tax bill is $30 ($300 x .10).  This excess tax of $10 must be reduced by that amount.  Reductions in taxes due are prorated back to each taxing authority in proportion to its millage as compared to the total millage levied, whether state or local.").

[This page intentionally left blank.]

# G.    Summary of Predecessor Litigation

> *The life of the law has not been logic.  It has been experience.
> . . . The law embodies the story of a nation's development through
> many centuries, and it cannot be dealt with as if it contained only the
> axioms and corollaries of a book of mathematics.  In order to know
> what it is, we must know what it has been, and what it tends to
> become.  We must alternately consult history and existing theories of
> legislation.  But the most difficult labor will be to understand the
> combination of the two into new products at every stage.*
>
> Oliver Wendell Holmes, Jr., *The Common Law* 1-2 (Boston,
> Mass.: Little, Brown, and Company 1881).[428]

The issues of this action are influenced by several lines of cases.  The oldest, but still influential line is identified by the name of the Supreme Court's most significant decision of the past century:  *Brown v. Board of Education*, 347 U.S. 483 (1954), *overruling in part Plessy v. Ferguson*, 163 U.S. 537 (1896).  The second progression addresses the school financing cases leading up to, and including, Alabama's so-called "Equity Funding litigation."  The third line includes the judgment of the three-judge district court in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971), which precipitated Amendments 325 and 373 to the 1901 Alabama Constitution.  The final line, and the one most proximate to the present action, both temporally and in terms of a common nucleus of operative facts, is the litigation commenced in this District during 1983, and ending with the Eleventh Circuit's decision in *Knight v. Alabama*,

---

[428] S*ee also*, *e.g.*, William Shakespeare, *The Tempest* act 2, sc. 2, line 254 ("What's past is prologue.") (This quotation is engraved on the National Archives Building in Washington, D.C.).

476 F.3d 1219 (11th Cir. 2007).  Even though hindsight does not ensure an unerring

perception of contemporary issues, it is helpful to trace from whence the present action

has come in order to better assess the merits of the parties' claims and defenses.

### 1.    *Brown v. Board of Education* **and its Progeny**

The Supreme Court's decision in *Brown v. Board of Education* cannot be

appreciated except by contrasting it to the judgment it partially overruled, *Plessy v.

Ferguson*, 163 U.S. 537 (1896).  Consequently, discussion of this line of cases actually

begins fifty-eight years before the first *Brown* opinion.

### a.    *Plessy v. Ferguson*

The *Plessy* case addressed the constitutionality of a Louisiana statute that

mandated separate railway carriages for members of the "white and colored races."[429]

The law required all railway companies operating within that state to provide "equal

but separate accommodations" for each race, and to prohibit members of one race from

riding in seats set apart for members of the other.[430]  Passengers who insisted upon

occupying seats other than those assigned to persons of their own race were subject

to fines and imprisonment, as were any railroad employees who assigned a passenger

to a seat other than one set aside for that person's race.[431]  Homer Plessy was arrested

---

[429] *Plessy v. Ferguson*, 163 U.S. 537, 540 (1896).

[430] *Id*.

[431] *Id*. at 541.

pursuant to that law for refusing to ride in the "colored only" section of an *intrastate* train.[432]

A New Orleans group of Creoles and blacks, who had organized themselves as the "Citizens' Committee to Test the Constitutionality of the Separate Car Law," orchestrated the incident in order to produce a "test case" to challenge the statute, which was but one example of the "Jim Crow laws" then being passed in Louisiana and other parts of the South as white supremacists sought to embellish their subjugation of persons with African ancestors.[433]  Their challenge enjoyed some support from the railroads, which objected to the additional costs of providing separate cars.  Homer Plessy agreed to initiate the challenge on behalf of the committee. Although he appeared to be white, Plessy was classified as "colored" under Louisiana law because one-eighth of his biological heritage was African.[434]

A Louisiana Supreme Court decision handed down prior to Plessy's arrest had held that the state statute could not apply to railway carriages moving in *interstate* commerce.[435]  Plessy therefore was careful to purchase a ticket for an *intrastate*

---

[432] *Id.*

[433] *See*, *e.g.*, Walter F. Pratt, Jr., "Plessy v. Ferguson," in *The Oxford Companion to the Supreme Court of the United States* 637 (New York:  Oxford University Press 1992) (Kermit L. Hall, James W. Ely, Jr., Joel B. Grossman & William M. Wiecek eds.) ("**Oxford Sup. Ct. I**").

[434] In the racist parlance common at that time, Plessy was called an "Octoroon," a person who was by descent seven-eighths Caucasian and one-eighth African.  *Plessy*, 163 U.S. at 541.

[435] *Id.* at 546.

199

journey, entirely within the State of Louisiana, and he also ensured in advance that both the railroad company and the conductor on his train knew of his mixed-race heritage.  He was arrested when he refused to move to the "colored only" section of the coach.  Plessy attempted to halt the subsequent criminal prosecution by arguing that the state statute was unconstitutional under both the Thirteenth and Fourteenth Amendments to the United States Constitution.  After the Louisiana courts rejected his arguments, he sought review by the United States Supreme Court.

Justice Henry Billings Brown, who authored the majority opinion for seven members of the Court,[436] passed quickly over Plessy's argument that the Louisiana statute violated the Thirteenth Amendment by construing it as prohibiting only "slavery," as that institution was known prior to the Civil War, and other forms of involuntary servitude, "of whatever class or name," except as punishment for crime.[437]

---

[436] The *Plessy* appeal was decided by a vote of 7 to 1:  Brown for the Court; Justice John Marshall Harlan in dissent; and Justice David Josiah Brewer not participating.

[437] *Id.* at 542.  The Thirteenth Amendment provides:  "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII, § 1 (1865).  Justice Brown's majority opinion construed that language as follows:

> This amendment was said in the *Slaughter-House Cases*, [83 U.S. (16 Wall.) 36 (1872)], to have been intended primarily to abolish slavery, as it had been previously known in this country, and that it equally forbade Mexican peonage or the Chinese coolie trade, when they amounted to slavery or involuntary servitude, and that the use of the word "servitude" was intended to prohibit the use of all forms of involuntary slavery, of whatever class or name.  It was intimated, however, in that case, that this amendment was regarded by the statesmen of that day as insufficient to protect the colored race from certain laws which had been enacted in the Southern states,

200

When addressing Plessy's argument that the Louisiana statute violated the Fourteenth Amendment, Brown's majority opinion conceded that the amendment was designed to "enforce the absolute equality of the two races *before the law*," but immediately distinguished that objective from "distinctions based upon color," and denied that the amendment had been intended to eradicate *social* prejudices, or to compel "commingling of the two races upon terms unsatisfactory to either."[438]   The

_____

imposing upon the colored race onerous disabilities and burdens, and curtailing their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value; and that the fourteenth amendment was devised to meet this exigency.

So, too, in the *Civil Rights Cases*, 109 U. S. 3, 3 Sup. Ct. 18 [(1883)], it was said that *the act of a mere individual*, *the owner of an inn*, a public conveyance *or place of amusement*, refusing accommodations to colored people, cannot be justly regarded as imposing any badge of slavery or servitude upon the applicant, but only as involving an ordinary civil injury, properly cognizable by the laws of the state, and presumably subject to redress by those laws until the contrary appears. "It would be running the slavery question into the ground," said Mr. Justice Bradley, "to make it apply to every act of discrimination which a person may see fit to make *as to the guests he will entertain*, *or as to the people he will* take into his coach or cab or car, or *admit to his concert or theater*, *or deal with in other matters of intercourse or business*."

A statute which implies merely a legal distinction between the white and colored races — a distinction which is founded in the color of the two races, and which must always exist so long as white men are distinguished from the other race by color — has no tendency to destroy the legal equality of the two races, or re-establish a state of involuntary servitude. . . .

*Plessy*, 163 U.S. at 542-43 (majority opinion) (emphasis supplied).

[438] *Id*. at 544 ("The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either.").

majority opinion also rejected the claim that the Louisiana statute stamped blacks with "a badge of inferiority," saying that: "If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it."[439]

The lone dissenter in *Plessy*, Justice John Marshall Harlan, chastised the majority for their dismissal of the Fourteenth Amendment as a barrier to racial segregation imposed by state law.  Justice Harlan believed that the Thirteenth, Fourteenth, and Fifteenth Amendments had, together, "removed the race line from our governmental systems," and no longer allowed "any public authority to know the race of those entitled to be protected in the enjoyment" of constitutional rights.[440]  Justice Harlan emphasized those points in some of the most eloquent statements in the history of American Constitutional law:  *i.e.*,

> [I]n view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens.  There is no caste here.  Our constitution is color-blind, and neither knows nor tolerates classes among citizens.  In respect of civil rights, all citizens are equal before the law.  The humblest is the peer of the most powerful.  The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved.  It is therefore to be regretted that this high tribunal, the final expositor of the fundamental law of the land, has reached the conclusion that it is competent for a state to regulate the enjoyment by citizens of

---

[439] *Id*. at 551.

[440] *Id*. at 555, 554 (Harlan, J., dissenting).

their civil rights solely upon the basis of race.

>    In my opinion, the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the Dred Scott Case.[441]

Harlan's prediction was correct.  The majority opinion sanctioning the doctrine of "separate but equal" did become a pernicious jurisprudential pestilence:  one that spread like a cancer to all facets of society — schools, hotels, restaurants, public restrooms and water fountains, recreational facilities, businesses, housing — and into all aspects of the lives of Americans of African descent, especially those residing within the eleven states of the former Confederacy.  Perhaps the most iniquitous effect of the *Plessy* doctrine over the course of the succeeding fifty-eight years, however, lay in that part of the majority opinion linking segregation on trains with that in public schools:

>    Laws permitting, and even requiring, [the] separation [of blacks from whites], in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power.  *The most common instance of this is connected with the establishment of separate schools for white and colored children, which have been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced.*[442]

---

[441] *Id.* at 559 (Harlan, J., dissenting).

[442] *Plessy*, 163 U.S. at 544 (Brown, J., majority opinion) (bracketed alterations and emphasis

203

Fifty-eight long, hard, and often violent years passed before Justice Harlan's statements in dissent began to have a substantive effect upon the Supreme Court's interpretation of the Reconstruction Amendments. During the interim, the heart of the "Jim Crow" system endorsed by the majority opinion in *Plessy*, and the institution most central to its functioning, was the segregated public school system. Peter Irons described its corrosive effects as follows:

> The consignment of black children to separate schools kept them "in their place" and safely away from white children, especially girls, who might not realize that black males — even at the grade-school level — might threaten the "purity" of the young "flowers of southern womanhood." The combined power of racial prejudice and sexual phobia should not be underestimated as a motivating factor in the southern insistence on school segregation. But an equally important reason for maintaining separate schools was to make it simpler to provide a separate curriculum for black children, one that would provide the rudiments of literacy and training for manual labor and domestic service. There was no need to educate blacks in literature, foreign languages, or advanced mathematics, or to encourage them to aspire to higher education. White southerners did recognize the need for "normal schools" to train black teachers, but

supplied). As one student of the opinion observed:

> By linking racial separation on trains with that in education, [Justice Brown's opinion for the majority] touched one of the most sensitive parts of the efforts to maintain separation of the races. Education was a bugbear for anyone who suggested legislation mandating racial equality. Brown therefore sought to support his conclusion by implying that transportation was like education. The enduring effect of Brown's analogy was to place the Court's imprimatur on a considerably expanded field in which segregation was justified.

Charles A. Lofgren, "Plessy v. Ferguson," in *The Oxford Companion to the Supreme Court of the United States* 739-40 (New York: Oxford University Press 2d ed. 2005) (Kermit L. Hall, James W. Ely, Jr. & Joel B. Grossman eds.) ("**Oxford Sup. Ct. II**") (bracketed alterations supplied).

these postsecondary schools were hardly "colleges" with a full curriculum in the liberal arts and sciences.  The governor of Georgia expressed a common attitude toward the efforts of northen philanthropists to establish black colleges:  "We can attend to the education of the darkey in the South and give them the education they most need.  I do not believe in the higher education of the darkey.  He must be taught the trades.  When he is taught the fine arts, he is educated above his caste, and it makes him unhappy."

Many blacks, even those with little or no education, were unhappy that their children were forced to attend segregated schools, many of them housed in churches or private homes, and most lacking desks and books for each student.  The children sat on benches, crowded together, and shared tattered, hand-me-down books that had been discarded by white schools.  The Jim Crow schools were "public" in name only, and often received so little funding from county school boards that hard-strapped parents had to "board" the teachers to supplement their meager salaries. . . .[443]

### b.    *Brown v. Board of Education*

The Supreme Court's 1954 decision under the style of *Brown v. Board of Education of Topeka, Shawnee County, Kansas,* 347 U.S. 483 (1954) ("*Brown I* "), *overruling in part Plessy v. Ferguson*, 163 U.S. 537 (1896), actually involved consolidated consideration of constitutional challenges to the segregated public school systems in four states,[444] as well as the District of Columbia.[445]

---

[443] Peter Irons, *Jim Crow's Children:  The Broken Promise of the* Brown *Decision* 12 (London:  Penguin Books 2004) ("**Irons**").

[444] The cases that were consolidated for decision by the opinion in *Brown* arose from the states of Kansas, South Carolina, Virginia, and Delaware.  *See Brown I*, at 486 & n.1 (1954).

[445] The companion case decided the same day as *Brown* — *Bolling v. Sharpe*, 347 U.S. 497 (1954) — addressed the segregated public school system in the District of Columbia.

205

In each of the cases, minors of the Negro race, through their legal representatives, [sought] the aid of the courts in obtaining admission to the public schools of their community on a nonsegregated basis.  In each instance, they [had] been denied admission to schools attended by white children under laws requiring or permitting segregation according to race.  This segregation was alleged to deprive the plaintiffs of the equal protection of the laws under the Fourteenth Amendment.  In each of the cases other than the Delaware case, a three-judge federal district court denied relief to the plaintiffs on the so-called "separate but equal" doctrine announced by this Court in *Plessy v. Ferguson*, 163 U.S. 537. *Under that doctrine, equality of treatment is accorded when the races are provided substantially equal facilities, even though these facilities be separate.*  In the Delaware case, the Supreme Court of Delaware adhered to that doctrine, but ordered that the plaintiffs be admitted to the white schools because of their superiority to the Negro schools.[446]

The plaintiffs in the four state cases consolidated under the style of *Brown v. Board of Education* did not focus their claims on the fact that, in most of the segregated school systems of Southern states, there was no pretense of compliance with *Plessy's* requirement that "substantially equal facilities" be provided to black children, even though they easily could have established such a claim, because black schools were uniformly under-financed, poorly staffed, and woefully maintained, compared to the white schools.[447]

---

[446] *Brown I*, 347 U.S. at 487-88 (alterations and emphasis supplied).

[447] *See, e.g.*, Irons at 33 ("In the Jim Crow states that stretched from Delaware to Texas, local school boards spent almost three times as much on each white student as they did on blacks.  The funding disparities in the Deep South states, where blacks outnumbered whites in hundreds of rural counties, were far greater.  Alabama spent $37 on each white child in 1930 and just $7 on those who were black; in Georgia the figures were $32 and $7, in Mississippi they were $31 and $6, and those in South Carolina were $53 and $5, a disparity of more than ten to one.").

Instead, the plaintiffs in the consolidated state cases founded their challenges on the Fourteenth Amendment, and argued that "segregated public schools are not 'equal' and cannot be made 'equal,' and . . . hence [black children were] deprived of the equal protection of the laws."[448]   The question thus presented was framed by the Supreme Court as follows:  "Does segregation of children in public schools solely on the basis of race, *even though the physical facilities and other 'tangible' factors may be equal*, deprive the children of the minority group of equal educational opportunities?"[449]

Because of the obvious importance of the question presented, the Court took jurisdiction.  The cases were argued together before the Supreme Court in December 1952, and then reargued by order of the Court a year later, in December of 1953, on specific questions propounded by the Court — particularly the historical circumstances surrounding the adoption and ratification of the Fourteenth

---

[448] *Id*. at 488 (alteration supplied).  Of course, the Fourteenth Amendment applies only to the states and, thus, was not available as a basis for the challenge to the segregated public schools in the District of Columbia.  Even so, Chief Justice Warren, again writing for a unanimous court, held that the Due Process Clause of the Fifth Amendment contained an equal protection "component" that *implicitly* forbid most racial discrimination by the federal government, just as the Equal Protection Clause of the Fourteenth Amendment restricted the states.  Such an embellishment of the Fifth Amendment's content was necessitated by the Court's decision in *Brown I*, holding that states could not segregate public schools on the basis of race.  As Chief Justice Warren said, the imposition of "a lesser duty" in the District of Columbia, where the Fifth Amendment covered Congressional action, would be "unthinkable."  *Bolling*, 347 U.S. at 500.

[449] Irons, at 493 (emphasis supplied).

207

Amendment.[450]

When Chief Justice Earl Warren announced the brief, nontechnical opinion he had authored for a unanimous Court on May 17, 1954, he began by observing that the historical evidence relating to the intent of Congress and the state ratification debates, as that evidence might shed light upon the meaning of the Equal Protection Clause of the Fourteenth Amendment as it related to segregated schools, was at best "inconclusive."[451]    Accordingly, said the Chief Justice:

> In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy v. Ferguson* was written. *We must consider public education in the light of its full development and its present place in American life throughout the Nation*. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws.
>
> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces.[452] It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the

---

[450] *See Brown I*, 347 U.S. at 488-89.

[451] *See id.*

[452] *See*, *e.g.*, Wayne Flynt, *Alabama in the Twentieth Century* 377 (Tuscaloosa:  The University of Alabama Press 2004) ("**Flynt II**") (observing that, even though nearly 80,000 Alabama men served in the military during the First World War, many more than that number were rejected for service because of "failure to pass a simple intelligence test").

208

opportunity of an education.  *Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.*[453]

Viewed in that light, the Court concluded that, "in the field of public education the doctrine of 'separate but equal' has no place.  Separate educational facilities are inherently unequal."[454]

---

[453] *Brown I*, at 493-93 (emphasis supplied).

[454] *Id*. at 495.  In reaching the conclusion that "[s]eparate educational facilities are inherently unequal,"  the Court held that "intangible considerations," similar to those that had supported its decisions in the cases raising Fourteenth Amendment challenges to segregated facilities in graduate and professional schools — *e.g.*, *McLaurin v. Oklahoma State Regents for Higher Education*, 339 U.S. 637 (1950) (holding that a black admitted to a white graduate school must not be segregated from all other students, because to do so would deprive him of the "ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession"), and *Sweatt v. Painter*, 339 U.S. 629 (1950) (holding that a segregated law school for blacks could not provide equal educational opportunities, because it deprived them of "those qualities which are incapable of objective measurement but which make for greatness in a law school") — applied with equal, *or*

> *added force* to children in grade and high schools.  To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.  The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:
>
> > "Segregation of white and colored children in public schools has a detrimental effect upon the colored children.  The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group.  A sense of inferiority affects the motivation of a child to learn.  Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system."

*Brown I*, 347 U.S. at 494 (emphasis supplied, footnote omitted).

209

Having thus established that segregated public education facilities were unconstitutional, the Court was then faced with the difficult questions of how, and at what pace, relief should be provided to the prevailing parties.  If the Court had ordered all public schools to be integrated the following Fall, there was the risk that its decree would be ignored in many areas, or that violence might erupt.  Furthermore, the Court explicitly observed that, "because of the wide applicability of [its] decision, and because of the great variety of local conditions, the formulation of [remedial] decrees [presented] problems of considerable complexity."[455]  Accordingly, the cases were restored to the Court's docket, and counsel were directed to brief and present further argument on specific questions propounded by the Court bearing on the formulation of remedial decrees.[456]

---

[455] *Id.* at 495.

[456] *Id*. at 495 n.13.  Another reason for not directly confronting the scope of the relief to be ordered in the first *Brown* opinion has been suggested by Dennis J. Hutchinson:

> When *Brown* was first argued in 1952, the Court internally was divided not so much on the merits but on how, and at what pace, to order relief.  The Court remained at loggerheads over the issue during the summer of 1953 when fate intervened.  Chief Justice Fred Vinson, who wrote *Sweatt* [*v. Painter*, 339 U.S. 629 (1950),] and *McLaurin* [*v. Oklahoma State Regents for Higher Education*, 339 U.S. 637 (1950),] but hesitated to require massive desegregation, died suddenly.  His replacement, Earl Warren, responded to the situation by convincing his colleagues to decide the merits in one opinion and to defer the question of relief to a second opinion following reargument.

Dennis J. Hutchinson, "Brown v. Board of Education," in Oxford Sup. Ct. II, at 111 (bracketed alterations supplied); s*ee also* D.J. Hutchinson, *Unanimity and Desegregation*, 68 Geo. L.J. 1, 36-44 (1979).

During reargument the following Term, Thurgood Marshall, then counsel for the Legal Defense and Education Fund, Inc., of the National Association for the Advancement of Colored People, and later Associate Justice of the Supreme Court, urged the Court to order that desegregation of all public school systems should proceed immediately, or at least within firm deadlines.  The Court did neither, however.  Apparently fearing hostility and even violence if the NAACP's proposals were adopted, the Court remanded the hard questions to lower courts.  Those courts were instructed to require that the defendants in each case "make a prompt and reasonable start toward full compliance with" the Court's ruling in the first *Brown* opinion, but once initial steps were taken, the Court provided little guidance to the lower courts in its second *Brown* opinion, other than admonishing those courts to apply "equitable principles," and, "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis *with all deliberate speed* the parties to these cases."  *Brown v. Board of Education*, 349 U.S. 294, 299-301 (1955) ("*Brown II*") (emphasis supplied).

### c.    Overcoming the South's campaign of "massive resistance"

The directive for lower courts to dismantle segregated public school systems "with all deliberate speed" surely is among the least-happy utterances in American

211

constitutional law.   The phrase provided an interstitial space into which racist

demagogues throughout the Nation, but especially those hate-mongers residing within

the eleven states comprising the former Confederacy, drove obstructive wedges.

Southern states used every imaginable technique to resist desegregation.

> Violence. Intimidation. Anguished alarms about social and sexual
> mingling.  Emotional appeals to the Cause of the Confederacy.  Raising
> the specter of communism.  These were among the many southern white
> reactions to *Brown* and *Brown II*.  But opponents of change in the South
> believed after *Brown II* that they had to do four things:  litigate, organize
> at the local level, agree on a sectionwide statement of resistance, and —
> most important — devise strategies for assignment of students that would
> satisfy the federal courts without giving away anything of substance.[457]

Governor Orville Faubus and the Arkansas state legislature sanctioned mob

opposition to the integration of Central High School in Little Rock at the beginning

of the 1957 school year by asserting that the state was not bound by the Supreme

Court's rulings in the *Brown* cases. The state's officials had to be re-educated that,

under the Supremacy Clause (U.S. Const. art. VI, cl. 2), "the federal judiciary is

supreme in the exposition of the law of the Constitution," *Cooper v. Aaron,* 358 U.S.

1, 18 (1958) (quoting *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 177 (1803)), a legal

point that was forcefully driven home by President Eisenhower's executive orders

federalizing the Arkansas National Guard and dispatching units of the 101st Airborne

---

[457] James T. Patterson, Brown v. Board of Education:  *A Civil Rights Milestone and Its
Troubled Legacy* 94 (New York:  Oxford University Press 2001).

Division to Little Rock.

Some Southern school systems simply closed their doors.  That occurred in Prince Edward County, Virginia, in 1959, when all public schools were closed, but a "private school foundation" was established for white students.  While initially maintained by state funds, the foundation was eventually financed by private contributions.  Most of the black school-age children, who constituted 52 percent of the students in Prince Edward County, received no formal education between 1959 and 1964, when the Supreme Court finally held in *Griffin v. County School Board of Prince Edward County*, 377 U.S. 218 (1964), that it was unconstitutional for one county to close its schools under state law while other schools in the state remained open.

As a result of such resistance, very little desegregation actually occurred during the first decade after *Brown*.  In Alabama, not one black child attended a public school with a white child during the 1962-63 school year.[458]  In the South, just 1.2% of black school-age students were attending schools with whites.[459]  During that period, some Southern school boards adopted so-called "freedom of choice" plans that allowed students to choose the school where they would enroll, with the result of continued

---

[458] Michael Klarman, Brown, *Racial Change, and the Civil Rights Movement*, 80 Va. L. Rev. 7, 9 (1994) ("**Klarman**").

[459] *Id.*

213

segregation. In 1968, however, the Court held that the adoption of such plans did not satisfy the obligations of a school systems that had been segregated as a matter of law (*de jure* systems) if the plan failed to decrease, if not eliminate, the racial imbalance within that system. *See Green v. County School Board of New Kent County*, 391 U.S. 430, 441 (1968). Instead, the Court required education officials to take affirmative steps to transform their "dual" K-12 educational systems into "unitary" ones in which "racial discrimination would be eliminated root and branch."[460] The Court noted that the racial identification of public schools as either historically (or predominantly) white or black facilities extended to every facet of the system, including not only the racial composition of each school's student body, but also the faculty, staff, transportation facilities, extracurricular activities, and physical facilities.[461] The Court charged the school board with the duty to produce an affirmative desegregation plan "that promises realistically to work, and promises realistically to work *now*."[462]

Persistent efforts at desegregation ultimately had an impact. The *Green* decision was followed by a nationwide wave of litigation and extensive, court-ordered desegregation plans addressing the racial identifiability of individual schools, as well as the other factors identified by the Court. *See*, *e.g.*, *Swann v. Charlotte-Mecklenburg*

---

[460] *Green,* 391 U.S. at 437-38.

[461] *Id.* at 435.

[462] *Id.* at 439 (emphasis in original).

*Board of Education*, 402 U.S. 1 (1971) (Mecklenburg County, North Carolina);[463]

*Keyes v. Denver School District No. 1*, 413 U.S. 189 (1973) (Denver, Colorado).[464]

By 1972-73, 91.3% of Southern schools were desegregated.[465]

Erwin Chemerinsky, the Dean of the University of California, Irvine School of Law, explained the nature of the issues subsequently faced by the Court in a perceptive article.

> But much more difficult issues faced the Supreme Court in the early 1970s [than continued resistance by elected officials in Southern states]. White flight to suburban areas — in part, to avoid school desegregation and, in part, as a result of a larger demographic

---

[463] The school district implicated in the *Swann* case was a sprawling, part-urban, part-rural, district that covered 550 square miles and served 84,000 pupils in 101 schools. The student population was 29% black, but those students were concentrated in one quadrant of the district. In the wake of the Supreme Court's *Green* decision, the federal district court — in an effort to attain a 71-to-29 white-to-black ratio in the various schools of the district — adopted a plan to disperse the highly-concentrated black-student population under a program that transported 13,000 children in more than 100 new buses at an annual operating cost of more than $500,000, and a startup cost of more than $1 million. The Supreme Court unanimously approved the busing remedy. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 30 (1971) ("Desegregation plans cannot be limited to the walk-in school."). Even so, the Court also observed that the "constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole," but, nevertheless, affirmed that "the very limited use of mathematical ratios was within the equitable remedial discretion of the District Court." *Id*. at 24-25.

[464] *Keyes* was the first non-Southern desegregation case to be reviewed by the Supreme Court. The court's opinion held that a school district that "racially or ethnically" segregated one part of a large urban district created a rebuttable presumption that similar segregation throughout the district was not "adventitious," and implied that wholesale, districtwide relief under *Swann* was appropriate. The opinion was generally "viewed as a greenlight for districtwide (if not necessarily interdistrict) desegregation of northern school districts," and "ambiguously signaled Green's application to de facto segregation in the North, but also indicated growing fissures within the Court over the issue." Dennis J. Hutchinson, "Keyes v. Denver School District No. 1," in Oxford Sup. Ct. II at 558-559.

[465] Klarman, at 10.

phenomenon — endangered successful desegregation.  In virtually every urban area, the inner city is predominately and increasingly, comprised of racial minorities.  By contrast, the surrounding suburbs are almost exclusively white and what little minority population does reside in the suburbs is concentrated in towns that are almost exclusively black. School district lines parallel town borders, meaning that the racial separation of cities and suburbs results in segregated school systems.  For example, by 1980, whites constituted less than one-third of the students enrolled in public schools in [the inner-city systems of] Baltimore, Dallas, Detroit, Houston, Los Angeles, Miami, Memphis, New York, and Philadelphia.

*Thus, by the 1970s it was clear that effective school desegregation required interdistrict remedies*.  There were simply not enough white students in most major cities to achieve desegregation.  Likewise, suburban school districts could not be desegregated via intradistrict remedies because of the scarcity of minority students in the suburbs.  As Professor Smedley explains:

> Regardless of the cause, the result of this movement [of whites to suburban areas] is that the remaining city public school population becomes predominately black.  When this process has occurred, no amount of attendance zone revision, pairing and clustering of schools, and busing of students within the city school district could achieve substantially integrated student bodies in the school, because there are simply not enough white students left in the city system.[466]

Moreover, efforts to desegregate inner cities, through intradistrict remedies, are often counter-productive because they encourage white-flight.  Desegregation of central city schools frequently encourages whites to flee to suburban areas, making desegregation even more difficult.

---

[466] Theodore Smedley, *Developments in the Law of School Desegregation*, 26 Vand. L. Rev. 405, 412 (1973).

By the 1970s, *the crucial issue — perhaps the single most important issue since* Brown *in achieving desegregation — was whether courts could fashion interdistrict remedies*.  By then it was clear that desegregating urban schools by relying solely on intradistrict solutions is simply impossible.

*Also, by the 1970s, it was clear that to make equal educational opportunity a reality, the Court had to address inequities in school funding*.  A series of reports and books in the early 1970s documented the enormous inequalities in educational expenditures.  In 1971, the National Educational Financing Project issued its report.  The report revealed that local property taxes are the primary source of funds for schools in the United States.  *The result is that wealthy suburban areas have far more to spend on education*, *with lower property tax rates*, *than poorer inner-city areas can spend*, *even with higher tax rates*. . . .

. . . .

By 1971, it was recognized that the *inequities in school funding correlated strongly to race*.  *As a result, achieving racial equality in education necessitated equalizing expenditures*.  Inadequate resources means that poorer, predominately black, inner city districts hire less qualified teachers and have significantly higher teacher-pupil ratios.  The separation of school districts along political boundary lines has created wealthy schools for whites and comparatively inadequate schools for African-Americans and Hispanics.  Hence, again, the 1970s were sure to be a critical juncture in the judicial effort to create equal educational opportunity as the Supreme Court was virtually certain to decide a case on the issue.

Also, it was clear that in the 1970s the Court would need to address the issue of segregation in northern city school systems.  Until then, cases involved school systems where segregation had been mandated by law.  Northern city school systems often were just as segregated, but not as a result of laws mandating separation of the races.  Racially separate residential housing patterns, which themselves frequently reflected discriminatory government policies, caused racial

separation in schooling.   Likewise, attendance zones within school districts often caused segregation.  A critical question was how the Court was going to deal with such *de facto* segregation.

All of these issues — the permissibility of interdistrict remedies; the constitutionality of inequities in school funding; the standard for evaluating *de facto* segregation — realistically could not have come before the Court much before the 1970s.  Thus, this was certain to be a crucial time in the battle for equalizing education.

As the Supreme Court entered the 1970s, two things were certainly clear.  First, effective equalization of educational opportunity would come only through the judiciary.  No legislature in the country adopted laws to desegregate schools.  The political realities were such that all of the legislative action was in the opposite direction.  Racial minorities lacked political clout to secure legislation for desegregation and there was insufficient political support among whites for such legislation.  *Nor was there any likelihood the school expenditures would be equalized via legislative action.  Equalizing schooling necessitated court action and if the judiciary failed, no other institution was likely to do much.*

Second, by the 1970s it was apparent that eliminating the vestiges of segregation and equalizing schooling would require a long-term effort. Jim Crow laws existed for almost a century; their effects could not be erased in a few years or even a decade.[467]

The first issue identified by Dean Chemerinsky in the article quoted above — the question of whether courts could fashion interdistrict remedies — was addressed by the Supreme Court in the case of *Milliken v. Bradley*, 418 U.S. 717 (1974), discussed in the following subsection.  The second issue — the need for a more

---

[467] Erwin Chemerinsky, *Lost Opportunity:  The Burger Court and the Failure to Achieve Equal Educational Opportunity*, 45 Mercer L. Rev. 999, 1005-08 (1994) (emphasis supplied, most footnotes omitted) ("**Chemerinsky III**").

equitable allocation of school funds — was the focus of *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1972), discussed in the next Part of this opinion, Part II(G)(2), addressing the subject of "School Finance Litigation."

### d. *Milliken v. Bradley* and the issue of interdistrict desegregation remedies

> [W]e *deal here with the right of all of our children, whatever their race, to an equal start in life and an equal opportunity to reach their full potential as citizens. Those children who have been denied that right in the past deserve better than to see fences thrown up to deny them that right in the future. Our nation, I fear, will be ill served by the Court's refusal to remedy separate and unequal education, for unless our children begin to learn together, there is little hope that our people will ever learn to live together.*
>
> *Milliken v. Bradley*, 418 U.S. 717, 783 (1974) (Marshall, J. dissenting).

In *School Board of Richmond v. State Board of Education*, 412 U.S. 92 (1973), an equally divided Court was unable to decide whether a district court could require the merger of three school districts in order to eliminate racial segregation in one.[468]

---

[468] Justice Lewis Powell did not participate in the *Richmond* case, because he had chaired the Richmond School Board from 1952 to 1961: a position that required him to assist in the desegregation of the school district in the aftermath of the *Brown* decisions. *See* Jeffrey S. Sutton, San Antonio Independent School District v. Rodriguez *and its Aftermath*, 94 Va. L. Rev. 1963, 1969 (2008) (citing John C. Jeffries Jr., *Justice Lewis F. Powell, Jr*. 139-60 (Bronx, N.Y.: Fordham University Press 2001) (1994)).

The result of the Court's inability to decide the appeal was to affirm the judgment of the Fourth Circuit in *Bradley v. School Board of Richmond*, 462 F.2d 1058 (4th Cir. 1972) (*en banc*), *rev'g*, 338 F. Supp. 67 (E.D. Va.), and holding that when it became clear that state-imposed, *de jure* segregation had been removed, further intervention by the district court was neither necessary nor justifiable; and, in the absence of any constitutional violation in the establishment and maintenance of three school districts in Richmond, or any unconstitutional consequences of such maintenance, it was not within the district judge's authority to order consolidation of separate political subdivisions of the Commonwealth of Virginia.

One year later, however, in the case of *Milliken v. Bradley*, 418 U.S. 717 (1974), the Court confronted a district court opinion finding that the Detroit Public School System, in which blacks constituted a majority of the students enrolled in the various school facilities,[469] had engaged in segregative practices, and concluding that the only way to achieve a "unitary" (racially integrated) school system was to order 53 surrounding, suburban school districts to participate in the busing of students.[470]  On appeal, the Sixth Circuit affirmed, saying that "any less comprehensive a solution than a metropolitan plan would result in an all-black system immediately surrounded by practically all-white suburban school systems."[471]  The court of appeals held that, since "school district lines are simply matters of political convenience . . . they may not be used to deny constitutional rights."[472]

---

[469] *See* Dennis J. Hutchinson, "Milliken v. Bradley," in Oxford Sup. Ct. II at 638 ("The Detroit school district, then fifth largest in the nation, covered 140 square miles; at the time of the suit in 1970, its school population of almost 290,000 was 65 percent black and 35 percent white — a substantial recent growth in black population owing to white flight to nearby suburbs; for the metropolitan area, the proportion of black to white student population was 19 to 81 percent."); *Milliken*, 418 U.S. at 799-800 (Marshall, J., dissenting).

[470] *See Bradley v. Milliken*, 338 F. Supp. 582 (E.D. Mich. 1971), *aff'd*, 484 F.2d 215 (6th Cir. 1973), *rev'd*, 418 U.S. 717 (1974).

[471] *Milliken v. Bradley*, 484 F.2d 215, 245 (6th Cir. 1973), *rev'd*, 418 U.S. 717 (1974).

[472] *Id.* at 244.  The Supreme Court's majority opinion began by acknowledging this principle, but quickly drew a distinction between that general proposition and the Detroit metropolitan-area-wide desegregation remedy, saying:

> Of course, no state law is above the Constitution.  School district lines and the present laws with respect to local control, are not sacrosanct and if they conflict with the Fourteenth Amendment federal courts have a duty to prescribe appropriate remedies.  . . .  But our prior holdings have been confined to violations and remedies

On further appeal, "a bitterly divided" Supreme Court ruled 5 to 4 that "segregative practices in one district did not warrant relief that included another nonsegregating district."[473]  In an opinion by Chief Justice Burger, the Court reasoned that suburban school districts could not be included in the desegregation plan in the absence of proof that the suburban districts had committed independent constitutional violations, and held that the metropolitan-wide desegregation remedy violated the equitable principle that "the scope of the remedy is determined by the nature and extent of the constitutional violation."[474]  The Court declared that, if it were to approve the remedy ordered by the district court, that would "impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy."[475]  In other words, the Court determined that the remedy for *de jure* segregation must be limited to districts responsible for the constitutional wrong.[476] Thus, the suburban districts that had not maintained segregation policies could not be forced to merge with the urban Detroit public schools to attain a greater racial balance.

---

within a single school district.  We therefore turn to address, for the first time, the validity of a remedy mandating cross-district or interdistrict consolidation to remedy a condition of segregation found to exist in only one district.

*Milliken v. Bradley*, 418 U.S. 717, 744 (1974) (Burger, C.J., majority opinion) (citations omitted).

[473] Oxford Sup. Ct., II at 638.

[474] *Milliken*, 418 U.S. at 744 (majority opinion).

[475] *Id*. at 745.

[476] *Id*. at 729

Although the Court did not completely rule out the possibility of judicially created metropolitan relief in all cases, the Court made it clear that such relief was to be viewed as an extraordinary remedy,[477] and emphasized the importance of local control over schools:  a concept that the majority believed to have been sacrificed unjustifiably by the district court's order.[478]

The practical result of *Milliken* was the preclusion of inter-district mergers as a remedy in desegregation lawsuits.

> The dissent by Justice Thurgood Marshall, who had argued *Brown I* and *II* for the NAACP, bitterly complained that the Court was now turning back the clock in response "to a perceived public mood that we have gone far enough in enforcing the Constitutions's guarantee of equal justice."

> The gradual ratcheting out of remedies to implement *Brown I* ended as abruptly and as conclusorily as it began twenty years and two months earlier.  Subsequent cases fine-tuned the grounds for identifying constitutional violations and added minor remedial weapons, but *Milliken*

---

[477] *See*, *e.g.*, Chemerinsky III, at 1010-11 ("*Milliken* only permits interdistrict remedies if there is proof that the suburban districts committed a constitutional violation.  Occasionally, this can be demonstrated. . . . Nonetheless, these instances in which metropolitan remedies were permitted are clearly the exception.  In case after case, the federal courts, following the dictates of *Milliken*, have refused to order metropolitan-wide remedies.  It is usually impossible to prove that the suburbs or state governments are directly responsible for the existence of segregated schools in the cities. As a result, after *Milliken* it is usually futile to hope for judicial action creating metropolitan school districts to eliminate the dual system of urban public education.") (footnote omitted); Dennis Hutchinson, "Pasadena Board of Education v. Spangler," Oxford Sup. Ct. II at 721 ("Whatever doubts remained after *Milliken v. Bradley* (1974) that the Supreme Court would exercise a more lenient overview of school desegregation remedies were put to rest two years later in *Pasadena Board of Education v. Spangler* [427 U.S. 424 (1976)].").

[478] *See*, *e.g.*, *Milliken*, 418 U.S. at 741 (observing that "[n]o single tradition in public education is more deeply rooted" than local control).

*v. Bradley*, by rejecting so-called interdistrict remedies, established the new outer limit of constitutional remedies.[479]

Unable to involve suburban districts as a means of achieving "unitary status," urban school systems in which blacks constituted a majority of the students enrolled were often left without a meaningful way to integrate.  As a result, urban plaintiffs soon shifted their attention to the manner in which states funded public education:  a topic that is addressed in the next Part of this opinion.

---

[479] Dennis J. Hutchinson, "Milliken v. Bradley," in Oxford Sup. Ct. II, at 639.

[This page intentionally left blank.]

### 2.    School Finance Litigation

*The poor you always have with you . . . .*

*John* 12:8 (Revised Standard Version)

As discussed in Part II(G)(1)(b), *supra*, the Supreme Court stated in the first *Brown* opinion that "education is perhaps the most important function of state and local governments," and proceeded to hold that, "in the field of public education the doctrine of 'separate but equal' has no place.   Separate educational facilities are inherently unequal."[480]   The first *Brown* opinion thus removed the most obvious barrier to equal educational opportunities, schools segregated as a matter of law, but left in place another:  the obstacle faced by poor public school systems that desire to provide an education to their students "on equal terms" relative to the educational facilities, curriculum, quality of teachers and staff, and other amenities offered by wealthier school systems.  The decision to not seek relief on the basis of the failure of Southern states to provide substantially equal facilities and funding for black schools was a conscious choice.[481]   Thurgood Marshall, lead counsel for plaintiffs in *Brown*,

---

[480] *Brown v. Board of Education of Topeka, Shawnee County, Kansas,* 347 U.S. 483, 493, 495 (1954 ("*Brown I*").

[481] See the discussion in Part II(G)(1)(b), *supra,* observing that plaintiffs in the four state cases consolidated under the style of *Brown v. Board of Education* did not focus their claims on the fact that, in most of the segregated school systems of Southern states, there was no pretense of compliance with *Plessy*'s requirement that "substantially equal facilities" be provided to black children, even though they easily could have established such a claim, because black schools were uniformly under-financed, poorly staffed, and woefully maintained, compared to the white schools.

225

believed the overriding condition that

> made the enforced separation of black children from whites most damaging . . . was not tattered books or untrained teachers, but the stigma of inferiority that segregation inflicted on black children. School officials could buy newer books and hire better teachers for black children, but they could not erase feelings of inferiority from their minds. . . .[482]

As a result, Marshall argued that "segregated public schools are not 'equal' and cannot be made 'equal' . . . ."[483]  To the extent that the first *Brown* opinion may be read as having addressed, *at all*, the huge disparities then existing between the funding provided to black and white schools, that argument can only be gleaned by implication from the following statements in Chief Justice Warren's brief opinion:

> In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.  Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all *on equal terms*."[484]

Thus, this part of the opinion in the present case confronts a subject that was neither addressed explicitly, nor clearly decided, by either *Brown* decision:  the disparity between the educational opportunities offered by wealthy (taxable-property-value rich) school systems *vis-a-vis* less wealthy ones.

---

[482] Peter Irons, *Jim Crow's Children:  The Broken Promise of the* Brown *Decision* 63 (London:  Penguin Books 2004) ("**Irons**").

[483] *Brown I,* 347 U.S. at 488.

[484] *Id.* at 492-93 (emphasis supplied).

### a.    *Serrano v. Priest*

[T]he *public schools of this state are the bright hope for entry of the poor and oppressed into the mainstream of American society.*

*Serrano v. Priest*, 487 P.2d 1241, 1259 (Cal. 1971).

California was among the first states to address the financial inequities in the funding of its public school systems. A group of elementary and high school students in Los Angeles County commenced an action "to secure equality of educational opportunity" on behalf of a class consisting of "all children attending public schools in California[,] except children in that unnamed, unknown school district which 'affords the greatest educational opportunity.'" *Serrano v. Priest*, 89 Cal. Rptr. 345 (Ct. App. 1970) ("*Serrano I* "), *rev'd*, 487 P.2d 1241 (Cal. 1971) ("*Serrano II* "). Plaintiffs alleged that the state's system of funding public education was substantially dependent upon local *ad valorem* property tax revenues and, as a consequence, the money spent per pupil varied from one school district to another in direct proportion to the wealth of the pupils' parents and the value of taxable property located in the school district, and not according to the pupils' educational needs. They claimed that such disparities violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar provisions of the California Constitution.[485] The California officials most responsible for collecting and disbursing

---

[485] *See, e.g.*, Cal. Const. art. I, §§ 11, 21.

state funds and county property tax revenues were named as defendants.[486]   The

Superior Court of Los Angeles County sustained defendants' "general demurrer" to

the complaint;[487] and, after the plaintiffs failed to amend within the time allowed,

granted defendants' motion to dismiss.

    The plaintiffs appealed to the California Supreme Court, which determined that

wealth was "a suspect classification," and, that education was a "fundamental right."

*Serrano v. Priest*, 487 P.2d 1241, 1250, 1259 (Cal. 1971).  That Court accordingly

applied a "strict scrutiny" standard of judicial review, and

> determined that this funding scheme invidiously discriminates against the
> poor because it makes the quality of a child's education a function of the
> wealth of his parents and neighbors.  Recognizing as we must that the
> right to an education in our public schools is a fundamental interest
> which cannot be conditioned on wealth, we can discern no compelling
> state purpose necessitating the present method of financing.  We have
> concluded, therefore, that such a system cannot withstand constitutional
> challenge and must fall before the equal protection clause.[488]

---

[486] The defendants were the State Treasurer, the State Superintendent of Public Instruction, the State Controller, the tax collector and treasurer of Los Angeles County, the superintendent of Los Angeles County schools, and fictional defendants.

[487] For those attorneys unfamiliar with the arcane system of pleading historically used in the three common-law courts of England (the King's Bench, the Court of Common Pleas, and the Court of the Exchequer) until 1873, and in the state courts of Alabama until 1973, you have this judge's warmest congratulations on being able to obtain a legal education without having your brain contorted by the necessity to master "pleadings subsequent to the declaration": *e.g.*,  "dilatory pleas," "general demurrers," "special demurrers," "speaking demurrers," "pleas by way of confession and avoidance," "pleas by way of traverse," "replications," etc.  *See generally*, *e.g.*, John Jay McKelvey, *Principles of Common-Law Pleading* (New York:  Baker, Voorhis & Company 2d ed. 1917).

[488] *Serrano*, 487 P.2d at 1244.  *Accord Van Dusartz v. Hatfield*, 334 F. Supp. 870 (D. Minn. 1971) (holding that the Minnesota system of financing public schools, which made spending per

### b.   *San Antonio Independent School District v. Rodriguez*

The year after the California Supreme Court's decision in *Serrano v. Priest*, however, the United States Supreme Court reached contrary conclusions on the same issues.  The Court held, in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1972) ("*Rodriguez II* "), that wealth was *not* a "suspect classification," *and*, that public education was *not* a "fundamental right."  As a consequence, the Court applied a "rational basis" standard of judicial review and concluded that the Texas system of financing public education was rationally related to a legitimate governmental purpose — *i.e.*, the state goal of allowing a measure of local control over school funding decisions — and, therefore, that the system did not violate the Fourteenth Amendment's Equal Protection Clause.[489]

### i.    The underlying facts

The case leading to the Supreme Court's decision began four years earlier, when a group of Mexican-American parents of children attending elementary and secondary schools in the Edgewood Independent School District — one of seven school districts lying wholly or partly within the City of San Antonio, Texas — filed a complaint in

---

pupil a function of each school district's wealth, *i.e.*, the value of taxable property located within the district, violated the Fourteenth Amendment's Equal Protection Clause).

[489] *Rodriguez II*, 411 U.S. at 44-55; *see also*, *e.g.*, *Papasan v. Allain*, 478 U.S. 265, 287 (1986) (describing *Rodriguez II* as holding "that funding disparities resulting from differences in local taxes were acceptable because related to the state goal of allowing a measure of effective local control over school funding levels").

the U.S. District Court for the Western District of Texas challenging the constitutionality of that state's system for funding public education. *See Rodriguez v. San Antonio Independent School District*, 337 F. Supp. 280, 281 (W.D. Tex. 1972) (three-judge court) (*per curiam*) ("*Rodriguez I* "). The plaintiffs sued on behalf of a class of "all other children throughout Texas who live in school districts with low property valuations."[490]   All public schools in Texas were

> dependent upon federal, state, and local sources of financing. Since the federal government contribute[d] only about ten percent of the overall public school expenditures, most revenue [was] derived from local sources and from two state programs — the Available School Fund and the Minimum Foundation Program. In accordance with the Texas Constitution, the $296 million in the Available School Fund for the 1970-1971 school year was allocated on a per capita basis determined by the average daily attendance within a district for the prior school year.

> Costing in excess of one billion dollars for the 1970-1971 school year, the Minimum Foundation Program provide[d] grants for the costs of salaries, school maintenance[,] and transportation. Eighty percent of the cost of this program is financed from general State revenue with the remainder apportioned to the school districts in "the Local Fund Assignment." Tex. Educ. Code Ann. arts. 16.71-16.73 (1969) . . . .

> To provide their share of the Minimum Foundation Program, to satisfy bonded indebtedness for capital expenditures, and to finance all expenditures above the state minimum, local school districts are empowered within statutory or constitutional limits to levy and collect ad valorem property taxes. Tex. Const. art. 7, §§ 3, 3a, Vernon's Ann. St.; Tex. Educ. Code Ann. art. 20.01 et seq. Since additional tax levies must

---

[490] *Rodriguez I*, 337 F. Supp. at 281. *Compare Rodriguez II*, 411 U.S. at 4 (where the majority characterizes the plaintiff class as "members of minority groups or who are poor and reside in school districts having a low property tax base").

be approved by a majority of the property-taxpaying voters within the individual district, these statutory and constitutional provisions require as a practical matter that all tax revenues be expended solely within the district in which they are collected.

Within this ad valorem taxation system lies the defect which plaintiffs challenge. *This system assumes that the value of property within the various* [school] *districts will be sufficiently equal to sustain comparable expenditures from one district to another. It makes education a function of the local property tax base.* The adverse effects of this erroneous assumption have been vividly demonstrated at trial through the testimony and exhibits adduced by plaintiffs. In this connection, a survey of 110 school districts throughout Texas demonstrated that[,] while the ten districts with a market value of taxable property per pupil above $100,000 enjoyed an equalized tax rate per $100 of only thirty-one cents, the poorest four districts, with less than $10,000 in property per pupil, were burdened with a rate of seventy cents. Nevertheless, the low rate of the rich districts yielded $585 per pupil, while the high rate of the poor districts yielded only $60 per pupil. As might be expected, those districts most rich in property also have the highest median family income and the lowest percentage of minority pupils, while the poor property districts are poor in income and predominately minority in composition.

*Rodriguez I,* 337 F. Supp. at 218-82 (bracketed alterations and emphasis supplied), footnotes omitted).

The central contention of the plaintiffs' complaint was that the school funding system that had existed in Texas since the late 1880s — one that consisted primarily of a State "Minimum Foundation Program," which contributed funds to local school districts on a *per capita* (per student) basis, as well as local *ad valorem* property taxes levied upon referendum by the residents of the various school districts — resulted in

231

gross disparities in the amount of revenue available for funding public schools in districts in which poor Hispanic (and/or other minority) children constituted a majority of the student bodies.

The *Rodriguez* plaintiffs based their claims upon the Fourteenth Amendment's Equal Protection Clause, and their complaint featured two theories of unconstitutionality:  one premised upon the contention that education is a "fundamental right," and the other upon the argument that wealth is "a suspect classification."  Both theories led to the same end:  *that is*, if either theory was accepted, the federal courts would be required to gauge the constitutionality of Texas's system under the "strict scrutiny" framework of judicial review, thereby forcing the state to provide a compelling justification for the marked disparities between the quality of public education offered to children living in property-rich *versus* property-poor school districts.

The *Rodriguez* plaintiffs illustrated those disparities by comparing the tax revenues generated in two San Antonio public school systems:  the Edgewood District in which the plaintiffs' children resided, and the neighboring Alamo Heights Independent School District.  Edgewood was located in the inner city, educated 22,000 students (96% of whom were members of a minority group, primarily Mexican-Americans) in 25 elementary and secondary schools, and had the lowest median family

232

income ($4,686 annually) and real-property values in the metropolitan area.  Further, *despite the fact that Edgewood's millage rate was the highest property tax rate in the San Antonio metropolitan area during the 1967-68 year* (*i.e.*, $1.05 per $100 of assessed valuation[491] = 10.5 mills, or 0.0105% of assessed value), *it generated the lowest amount of revenue*: *i.e.*, approximately $26 per student, per school year,  an amount that, when added to the $222 per student amount guaranteed by the State, and, an additional $108 in federal funds, yielded a total of $356 per pupil per school year.[492]

In contrast, the Alamo Heights Independent School District, in which white (non-minority) students constituted 80% of school enrollment, had an annual median family income of $8,001, and the district's local property tax rate of 85 cents per $100 of assessed valuation (8.5 mills, or 0.0085% of assessed value) supplied its students with $333 per student, per school year:[493]  *i.e., nearly thirteen times as much in local property tax revenue as Edgewood could generate with a tax rate that was 2.0 mills higher.*[494]  That amount, when added to the $225 per student amount guaranteed by the State, and, an additional $36 per student in federal funds, yielded a grand total of $594 per pupil per school year.  To equal the revenues of Alamo Heights, Edgewood would

---

[491] *Rodriguez II,* 411 U.S. at 11-12 (majority opinion).

[492] *See id.* at 11-12.

[493] *See id.* at 12-13.

[494] *Id.* at 13-14.

have had to increase its *ad valorem* property tax millage rate more than five times, to 52.5 mills — *something that was legally impossible*, because the aggregate millage rate for local *ad valorem* property taxes in Texas was capped by the state constitution at an amount that was just above the rate at which Edgewood residents were already taxing themselves.[495]  As Justice Byron White lamented in his dissenting opinion, the foregoing figures plainly demonstrated that "revenues d[id] not correlate with effort, in terms of tax rate."[496]

The Edgewood School District plaintiffs claimed that these "substantial interdistrict disparities" existed throughout Texas,[497] and the three-judge district court that tried the case found that similar disparities demonstrated a "statewide pattern."[498] Indeed, tables that summarized a 110-district survey relied upon by the district court[499] showed a strong correlation, at least at the top and bottom of the range of local property tax revenues, among those school districts with higher percentages of minority pupils, poverty, and lower assessed value of taxable property per pupil.[500] Those districts with more than $100,000 in assessed property value per pupil had an

---

[495] *Rodriguez II*, 411 U.S. at 13.

[496] *Id.* at 65 (White, J., dissenting) (alteration supplied).

[497] *Id.* at 15 (majority opinion).

[498] *Rodriguez I*, 337 F. Supp. at 282.

[499] The tables were appended to the dissenting opinion of Justice Thurgood Marshall.  *See Rodriguez II*, 411 U.S. at 134-37 (Marshall, J., dissenting).

[500] *Id.* at 15 n.38 (majority opinion).

234

annual median family income base of $5,900, and only 8% minority pupils, whereas

those school districts in which the assessed value of taxable property per student was

less than $10,000 had an annual median family income base of $3,325, and 79% of the

students enrolled in the public schools were minorities.[501]   Those disparities were

attributed by the Supreme Court majority "to differences in the rates of taxation or in

the degree to which the market value for any category of property varie[d] from its

assessed value,"[502] and the "differences in the amount of assessable property available

within any district."[503]

The three-judge district court that tried the *Rodriguez* claims held that such

funding "disparities, largely attributable to differences in the amounts of money

collected through local property taxation, . . . violated the Equal Protection Clause."[504]

The district court's holding was based upon its conclusion that "[m]ore than mere

rationality is required . . . to maintain a state classification which affects [*i*] a

'fundamental interest,' or which [*ii*] is based upon wealth," and that [*iii*] "both factors

---

[501] *Id.*; *see also Rodriguez I*, 337 F. Supp. at 282 (finding that, on average, "the low rate of the rich districts yielded $585 per pupil, while the high rate of the poor districts yielded only $60 per pupil," because of differences in assessed property value).

[502] *See Rodriguez II*, 411 U.S. at 46 n.100 (majority opinion) (alteration supplied) ("There is no uniform statewide assessment practice in Texas.  Commercial property, for example, might be assessed at 30% of market value in one county and at 50% in another.").

[503] *Id*. at 46.

[504] *Id*. at 16.

235

were involved" in the *Rodriguez* case.[505]  The district court further held that Texas had offered no evidence of a compelling governmental or educational interest that the funding system was "narrowly tailored" to promote and, accordingly, enjoined the enforcement of the challenged state constitutional provisions, together with the statutory provisions implementing those provisions.[506]

The Supreme Court split five to four when reviewing the three-judge district court's judgment.  The majority opinion castigated the lower court for failing to comprehend "the novelty and complexity of the constitutional questions posed."[507]

### ii.   Socioeconomic status as a "suspect classification"

The majority opinion first addressed the question of whether socioeconomic status — *i.e.*, relative wealth *versus* poverty — was a "suspect classification" requiring the application of a "strict scrutiny" standard of judicial review, and said that the three-judge district court — like other courts that had struck-down school financing systems in other states — had "virtually assumed" that such a classification applied "through a simplistic process of analysis . . . ."[508]  The majority said that the plaintiff-

---

[505] *Rodriguez I*, 337 F. Supp. at 282 (alterations supplied).

[506] *Id*. at 285-86; *see also Rodriguez II*, 411 U.S. at 16 (majority opinion) (observing that Texas had virtually conceded that "its historically rooted dual system of financing education could not withstand the strict judicial scrutiny") (footnotes omitted).

[507] *Rodriguez II*, 411 U.S. at 17 (majority opinion).

[508] *Id*. at 19 (alterations supplied).

class was not a group that had suffered an "absolute deprivation of education," but only a "relative" deprivation — *that is*, residence within school districts that generated *less* revenue for the support of public schools than other districts.[509] The majority held that, by accepting a class defined only in relative terms, the district court had "largely ignored the hard threshold questions."[510] The majority opinion further observed that, even though the expert statistical evidence presented to the district court judges showed a correlation between the wealth of residents and the assessed value of taxable property within the 110 school districts surveyed, especially when comparing the highest and lowest categories,[511] the asserted correlation evaporated when data for the remainder of Texas was taken into account.[512]  In other words, the evidence only showed a relationship between personal wealth and the assessed value of local taxable property when isolated sub-groups were compared, but not when looking at the state as a whole.   Thus, the majority concluded that, even if "comparative wealth discrimination" could be a constitutionally significant classification imposed by the financing system,[513] the "proof fail[ed] to support . . . the District Court's

---

[509] *Id*.

[510] *Id*.

[511] *See id*. at 134-37 (Marshall, J., dissenting) (copies of tabular results of 110 school districts surveyed).

[512] *Rodriguez II*, 411 U.S. at 26-27.

[513] *Id*. at 25-26 & n.61.

conclusions."[514]

Ultimately, the majority concluded that the plaintiffs were asking the Court "to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts."[515] The majority declined to do so, saying that the "system of alleged discrimination" and the class defined by the district court had "none of the traditional indicia of suspectness" that would warrant "extraordinary protection from the majoritarian political process."[516]   Accordingly, the opinion concluded that the Texas system of financing public education did "not operate to the peculiar disadvantage of any suspect class," even though it may have operated to the *relative* disadvantage of the poor; accordingly, it did not merit strict scrutiny upon that basis.[517]

### *iii*.    **Public education as a "fundamental right"**

The majority opinion then turned to a discussion of the alternative basis for evaluating the Texas system of financing public education under a strict scrutiny standard of judicial review that had been endorsed by the three-judge district court:

---

[514] *Id.* at 27 (alteration supplied).

[515] *Id*. at 28.

[516] *Id*.

[517] *Rodriguez II*, 411 U.S. at 28-29.

*i.e.,* that the system impermissibly interfered with the exercise of a "fundamental right."[518]   The majority recognized that the "question [of] whether education is a fundamental right, in the sense that it is among the rights and liberties protected by the Constitution . . . [had] consumed the attention of courts and commentators" for a number of years.[519]   The opinion also acknowledged that much of that academic and judicial discussion had its genesis in language from the first *Brown* opinion:  *i.e.*,

> "Today, education is *perhaps* the most important function of state and local governments.  Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society.  It is required in the performance of our most basic public responsibilities, even service in the armed forces.  It is the very foundation of good citizenship.  Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.  In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.  Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

*Rodriguez II,* 411 U.S. at 30-31 (quoting *Brown I*, 387 U.S. at 493) (emphasis supplied).   Even though the foregoing passage from the first *Brown* opinion constitutes a powerful affirmation of the civic and political importance of public education in a democratic republic, it did not explicitly acknowledge a fundamental

---

[518] *Id.* at 29 (alterations supplied) (citing *Graham v. Richardson*, 403 U.S. 265, 275-76 (1971); *Kramer v. Union Free School District*, 395 U.S. 621 (1969); *Shapiro v. Thompson*, 394 U.S. 618 (1969)).

[519] *Id.* (alterations supplied).

239

constitutional right to education. Instead, the Court said that education was "perhaps" the most important function of state and local governments. Moreover, when explaining that the history of the Fourteenth Amendment relating to its intended effect on public education was "inconclusive," the Court cited as one reason "the status of public education at that time," and its early stage of development. Thus, the argument was made by Charles Alan Wright on behalf of the State of Texas that "[t]he strict scrutiny test was applied in *Brown* not because education is a fundamental interest but because classification by race is clearly suspect."[520]

The majority opinion in *Rodriguez* acknowledged that the "grave significance of education[,] both to the individual and our society[,] cannot be doubted," but immediately denigrated that characterization by equating education with any other public service, and holding that "the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause."[521]

According to the *Rodriguez* majority, an individual does not have a fundamental right to a governmental benefit simply because that benefit is important, or even indispensable. If it were otherwise, opined the majority, access to health care, food,

---

[520] Brief for Appellants at 30, *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973) (No. 71-1332), 1972 WL 137565 at *29.

[521] *Rodriguez II*, 411 U.S. at 30-31 (bracketed alterations supplied).

shelter, and other needs of subsistence could be characterized as "fundamental rights," and all governmental decisions affecting such areas would be subject to rigorous review.[522]  Further, said the majority, if the Court were to base the constitutionality of legislative action upon shifting conceptions of what a majority of citizens considered the "relative social significance" of various public services, it would "be assuming a legislative role and one for which the Court lacks both authority and competence."[523] "Rather," said the majority, the determination of the position of public education in the Pantheon of rights, privileges, and immunities protected by the Constitution lay in "assessing whether there is a right to education explicitly or implicitly guaranteed in the Constitution."[524]  The Northwest Ordinance, written in the same year as the Constitution, explicitly stated that "schools and the means of education shall be forever encouraged," and tangibly affirmed that statment by dedicating the Sixteenth Section of each Township to education.  The Constitution, on the other hand, was silent on the subject of education.

### iv.    "Rational basis review" of the Texas system

As a result of the *Rodriguez* majority's conclusion that the case was not one "in which the challenged state action must be subjected to the searching judicial scrutiny

---

[522] *Id*. at 37.

[523] *Id.* at 31-33.

[524] *Id.* at 33-34.

reserved for laws that create suspect classifications or impinge upon constitutionally protected rights," the constitutional provisions and implementation statutes that defined the Texas system only had to "be shown to bear some rational relationship to legitimate state purposes."[525]

Ultimately, the Court found the Texas system to be "comparable to the systems employed in virtually every other state," in that it included a component designed to assure "a basic education for every child in the State," while permitting local governments to exceed the minimum amount of funding supplied by the state "foundation" program by imposing, or increasing — with the approval of a majority of persons voting in a local referendum — additional mills upon the assessed value of taxable property.[526]  The system served the governmental interest by permitting and encouraging "a large measure of participation in and control of each district's schools at the local level," including "the freedom to devote more money to the education of one's children" and the "opportunity for participation in the decisionmaking process that determines how those local tax dollars [would] be spent."[527]  The Court held that

---

[525] *Id.* at 40; *see also* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 9.7, at 786-87 (describing the Court's rejection of wealth ("poverty") as a suspect classification in *Rodriguez II*) (New York: Aspen Publishers 3rd ed. 2006) ("**Chemerinsky I**"); *id.* § 10.10, at 917-18 (describing the Court's refusal "to recognize a fundamental right to education" in the same opinion).

[526] *Rodriguez II*, 411 U.S. at 46-49; *see also id.* at 54 ("[T]he system here challenged is not peculiar to Texas or any other State.").

[527] *Id.* at 49-50 (alteration supplied).

local control, through local participation, satisfied the requirement of a legitimate governmental interest.[528]  Further, "[w]hile it [was] no doubt true that reliance on local property taxation for school revenues [had] provide[d] less freedom of choice with respect to expenditures for some districts than for others, the existence of 'some inequality' in the manner in which the State's rationale is achieved is not alone a sufficient basis for striking down the entire system."[529]

Thus, having determined that the Texas system of financing public education was rationally related to a legitimate governmental purpose, the majority found the system did not violate the Equal Protection Clause.[530]

The primary effect of the *Rodriguez* decision was to constrict, if not totally foreclose, challenges to school funding systems under the Equal Protection Clause of the United States Constitution.  As a consequence, plaintiffs seeking additional revenue for the support of public education began to turn their attention to state Constitutional provisions as the basis for challenges based upon a tax system's lack of "equity" or "adequacy."  The most relevant example of that tactic is the line of

---

[528] *Id.* at 50-51, 55.  *But see id.* at 63-70 (White, J., dissenting) (conceding that the law was not subject to strict scrutiny, but contending, nevertheless, that it bore no rational relationship to the goal of local control of school finance).

[529] *Rodriguez II*, 411 U.S. at 51 (alterations supplied).

[530] *See Papasan v. Allain*, 478 U.S. 265, 287 (1986) (describing *Rodriguez II* as holding "that funding disparities resulting from differences in local taxes were acceptable because related to the state goal of allowing a measure of effective local control over school funding levels").

Alabama cases commonly referred to as the "Equity Funding Litigation," discussed in the following section.

### c.    The Alabama Equity Funding Litigation

In 1990, the Alabama Coalition for Equity, Inc., a non-profit education advocacy organization acting on behalf of public school students, the parents of such children, and school systems from various parts of Alabama filed an action in the Circuit Court of Montgomery County, Alabama, seeking a judgment declaring that Amendment 111 to the Alabama Constitution was unconstitutional because its avowed purpose was racial discrimination.[531]    The suit was against the Governor and other

---

[531] Amendment 111 modified a number of provisions of the Alabama Constitution:  *e.g.*, art. V, § 137; art. XIV, § 256; art. XIV, § 258; art. XIV, § 259; art. XIV, § 260; art. XIV, § 269; and art. XIV, § 270.  Of those, the one most pertinent to the present discussion is Ala. Const. art. XIV, § 256 (1901), amended by amend. 111 (ratified Sept. 7, 1956), and reading as follows:

> It is the policy of the state of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources, and the willingness and ability of the individual student, but nothing in this Constitution shall be construed as creating or recognizing any right to education or training at public expense, nor as limiting the authority and duty of the legislature, in furthering or providing for education, to require or impose conditions or procedures deemed necessary to the preservation of peace and order.

> The legislature may by law provide for or authorize the establishment and operation of schools by such persons, agencies or municipalities, at such places, and upon such conditions as it may prescribe, and for the grant or loan of public funds and the lease, sale or donation of real or personal property to or for the benefit of citizens of the state for educational purposes under such circumstances and upon such conditions as it shall prescribe.  Real property owned by the state or any municipality shall not be donated for educational purposes except to nonprofit charitable or eleemosynary corporations or associations organized under the laws of the state.

244

State officials, and claimed that the "educational opportunities" available to public school students in Alabama were neither equitable nor adequate, and violated the education, equal protection, and due process clauses of the Alabama Constitution.[532] *Alabama Coalition for Equity, Inc. v. Hunt,* No CV-90-883-R (Ala. Cir. Ct. Apr. 1, 1993). That action subsequently was consolidated with a similar case filed in the same court the following year, *Harper v. Hunt,* No CV-91-0117-R (Ala. Cir. Ct. Jan.19, 1991), and together the consolidated actions became known as "*the Equity Funding Cases.*" *See Opinion of the Justices No. 338*, 624 So. 2d 107, 110-67 (Ala. 1993).[533]

Montgomery County Circuit Judge Eugene Reese, to whom the consolidated cases were assigned, found that widespread disparities existed in the revenues available for public school systems within the state, and that those disparities resulted in dramatic differences between school districts in which property values were quite high ("wealthy districts") and less-wealthy school districts in terms of: the age and

---

To avoid confusion and disorder and to promote effective and economical planning for education, the legislature may authorize the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end, such election to be effective for such period and to such extent as the legislature may provide.

[532] *Alabama Coalition for Equity*, 1993 WL 204083, at *1-2. The plaintiffs also launched a challenge to the education system under the Equal Protection Clause of the United States Constitution, but they did not substantively pursue that contention in the state Circuit Court, and Judge Reese did not address the issue in his opinion.

[533] The statements in the preceding paragraph are based upon doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 366, at 97 ("**Agreed Facts**").

quality of school facilities; the education levels of administrators, teachers, and other staff; books and supplies; and equipment.[534]  The court also found that the educational facilities, programs, and services provided by Alabama's public schools were, by any measure, inadequate under the Alabama Constitution, and that those inadequacies were very costly to the State in terms of social and economic progress.[535]  Based upon those factual findings, Judge Reese concluded that Alabama's system of public education violated the education clause of the State Constitution, which requires the State to "establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years."[536]  Judge Reese also determined that the system violated the equal protection and due process clauses of the State Constitution, because public education was a "fundamental right" deserving of the strictest constitutional scrutiny, and the State had not provided a compelling (or even rational) justification for the inequities and inadequacies found by the trial court.[537]  Judge Reese entered a judgment declaring that Alabama schoolchildren have a right under the State Constitution to an equitable and adequate education, and outlined the "essential

---

[534] *Alabama Coalition for Equity,* 1993 WL 204083 at *5-17.

[535] *Id.* at *19-34.

[536] *Id.* at *43 (quoting the text of Ala Const. art. XIV, § 256 that was in effect at the time); *see also id.* at *44-53.

[537] *Id*. at *53-59.

principles and features" of an equitable and adequate education system.  He ordered State officials to "establish, organize and maintain a system of public schools that provides equitable and adequate educational opportunities to all school-age children . . . ."[538]  Finally, Judge Reese retained jurisdiction to fashion an appropriate remedy.[539]

Less than a month after the entry of that judgment, however, members of the Alabama Senate requested the Justices of the Alabama Supreme Court to render an opinion advising the Legislature whether it was required to comply with Judge Reese's orders.[540]  In *Opinion of the Justices, No. 388,* 624 So. 2d 107 (Ala. 1993), the State Supreme Court concluded, in accordance with traditional separation of powers principles, that a state Circuit Court had "the power, and indeed the duty, when requested to do so in cases involving justiciable controversies, to interpret the constitution, and its interpretation, unless changed by a competent court having the power to overturn it, must be accepted and followed."[541]  Therefore, the Legislature was required to follow Judge Reese's orders, unless and until they were either modified by him, or modified or reversed by a higher court on appeal.[542]

---

[538] *Id.* at *62-63.

[539] *Alabama Coalition for Equity*, 1993 WL 204083, at *63.

[540] *See* Ala. Code § 12-2-10 (1975) (authorizing the Justices of the Supreme Court to issue advisory opinions in cases that involve "important constitutional questions").

[541] *Opinion of the Justices No. 338*, 624 So. 2d at 110.

[542] *Id.* at 109-10.

Two years later, however, the Alabama Supreme Court held in *Pinto v. Alabama Coalition for Equity,* 662 So. 2d 894 (Ala. 1995), that Judge Reese had erred when denying the applications of a class of State taxpayers and citizens, and a class of students in gifted programs and adequately funded schools and their parents, to intervene in the *remedy* phase of the trial of the Alabama Coalition for Equity litigation.[543]

Judge Reese then withdrew from any further proceedings in the consolidated cases, and they were reassigned to Montgomery County Circuit Judge Sarah M. Greenhaw.  *See Ex parte James,* 713 So. 2d 869, 871-72 (Ala. 1997) ("*James I* "). Following reassignment, the defendants moved to vacate the declaratory judgment and remedial orders entered by Judge Reese following the liability and remedy phases of trial, and to dismiss all of plaintiffs' claims for lack of subject matter jurisdiction. Both motions were denied,[544] and the Alabama Supreme Court upheld the trial court's denial of defendants' motions on appeal, saying that Judge Reese's prior judgment and orders were not automatically rendered ineffective by his withdrawal,[545] and the case still presented a justiciable controversy.[546]  The State Supreme Court also held that,

---

[543] *Pinto*, 662 So. 2d at 898-900.

[544] *James I*, 713 So. 2d at 872.

[545] *Id.* at 874-75.

[546] *Id.* at 876-78.

even though Judge Reese's liability and remedial orders did not *necessarily* violate the separation of powers doctrine, he should have allowed the State Legislature an opportunity to remedy the deficiencies in the education system before fashioning detailed remedial orders.[547]   Thus, the case was remanded with instructions for the Circuit Court to stay its judgment for a one-year period, to allow the Alabama Legislature an opportunity to consider remedial measures.[548]   On application for rehearing, the Alabama Supreme Court rephrased its remand directions to allow the Legislature "a reasonable time," as opposed to one year, to fashion remedial measures.[549]   Later that same year, the Alabama Supreme Court entered an opinion affirming the trial court's award of attorney's fees to the plaintiffs attorneys.  *See James v. Coalition for Equity, Inc.*, 713 So. 2d 937 (1997) ("*James II* ").

In an extraordinary turn of events, however, five years after the entry of its opinion in *James I*, the Alabama Supreme Court *sua sponte* reconsidered its jurisdiction over the Equity Funding Cases.  *See Ex parte James,* 836 So. 2d 813 (Ala. 2002) ("*James III* ").  As a result of the fact that Judge Reese's declaratory judgment following the *liability* phase of trial had never been appealed, the Supreme Court

---

[547] *Id.* at 878-82.

[548] *Id.* at 882.

[549] *James I*, 713 So. 2d at 935.

declined to consider the merits.[550]  Even so, and based upon the separation of powers doctrine and principles of judicial restraint, the Alabama Supreme Court declared that the trial judge's *remedial* orders could not stand.   Section 43 of the Alabama Constitution states that "the judicial [branch] shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."  Ala. Const. art. III, § 43 (1901).  The Court recognized that "any specific remedy that the judiciary could impose would, in order to be effective, necessarily involve a usurpation of that power entrusted exclusively to the Legislature."[551]   Thus, the court completed its "judicially prudent retreat from this province of the legislative branch in order that we may remain obedient to the command of the people of the State of Alabama" set forth in Section 43 of the State Constitution.[552]   The court dismissed all of the Equity Funding Cases and left resolution of the remaining issues to the state legislature.[553]

Within a year of the Alabama Supreme Court's dismissal of the *Equity Funding*

---

[550] *James III*, 836 So. 2d at 816.

[551] *Id.* at 819; *see also* Agreed Facts ¶ 367, at 97 ("The Alabama Supreme Court dismissed the Equity Funding Cases, holding that the circuit court's order requiring additional funding for Alabama's public schools did, after all, violate the Alabama Constitution's principle of separation of powers.  *Ex Parte James*, 836 So. 2d at 816.  The court held that "because the duty to fund Alabama's public schools is a duty that — for over 125 years — the people of this State have rested squarely upon the shoulders of the Legislature, it is the Legislature, not the courts, from which any further redress should be sought.").

[552] *James III*, 836 So. 2d at 819.

[553] *Id.* at 815.

250

*Cases*, the plaintiffs in the "*Knight* line of cases" discussed in Part II(G)(4), *infra*, filed a "Motion for Additional Relief with Respect to State Funding of Public *Higher Education*." *See Knight v. Alabama*, 458 F. Supp. 2d 1273, 1277 (N.D. Ala. 2004) (emphasis supplied) ("*Knight III* "). Although that motion was styled as a motion for "additional relief," the *Knight* plaintiffs actually sought an adjudication of a new claim: *i.e.*, "For the first time in the *Knight* line of cases, the plaintiffs claimed that segregation in Alabama's system of higher education was caused by Alabama's constitutional limitations on its ability to raise property taxes for K-12 education."[554]

---

[554] Agreed Facts ¶ 368, at 98.

[This page intentionally left blank.]

### 3.    The *Weissinger* Line of Cases

> *A state constitution is always interpreted in the light of the common law, and if it be not the first constitution, in the light of its predecessors.*
>
> *Mayor of Mobile v. Stonewall Insurance Co.*, 53 Ala. 570, 577 (1875) (Brickell, C.J., unanimous opinion).

Section 211 of the Alabama Constitution provides that "[a]ll taxes levied on property in this state shall be assessed in exact proportion to the value of such property . . . ."[555]  It prohibits "the Legislature from prescribing or declaring an arbitrary or artificial value of the property of individuals or corporations, and assessing taxes on such valuation." *Pullman Car & Mfg. Corp. v. Hamilton*, 229 Ala. 184, 187, 155 So. 616, 618 (1934) (citation omitted).[556]

For seventy-one years, Section 211 was invariably construed by state courts in conjunction with Section 217,[557] a provision that — until 1972, when it was substantially revised by Amendment 325 (and, in 1978, revised yet again by

---

[555] The full text of this provision reads as follows:  "All taxes levied on property in this State shall be assessed in exact proportion to the value of such property, but no tax shall be assessed upon any debt for rent or hire of real or personal property, while owned by the landlord or hirer during the current year of such rental or hire, if such real or personal property be assessed at its full value."  Ala. Const. art. XI, § 211 (1901).  Section 211 has never been amended.

[556] *See also Pullman Car*, 229 Ala. at 187, 155 So. at 618 (observing that this "constitutional limitation upon the taxing power . . . was designed to secure uniformity and equality by the enforcement of an ad valorem system of taxation and to prohibit arbitrary or capricious modes of taxation without regard to value") (citations omitted).

[557] *See*, *e.g.*, *State v. Murphy*, 45 Ala. App. 637, 645, 235 So. 2d 888, 895 (Ala. Civ. App. 1970) ("Section 211 of the Constitution of Alabama of 1901 must be considered in connection with Section 217.").

Amendment 373) — stated simply that "[t]he property of private corporations, associations and individuals of this State shall forever be taxed at the same rate. . . ."[558]

### a.  The requirement of uniformity and equality

Indeed, until the revision of Section 217 by Amendments 325 and 373, the Alabama Supreme Court consistently construed Sections 211 and 217 of the 1901 Constitution, as well as their predecessor provisions in the Constitutions of 1868 and 1875,[559] as requiring uniformity and equality in the methods employed to estimate the fair market value of comparable parcels and items of real and personal property,

---

[558] The full text of Section 217, prior to its amendment in 1972, provided that:  "The property of private corporations, associations and individuals of this State shall forever be taxed at the same rate; provided, this section shall not apply to institutions devoted exclusively to religious, education or charitable purposes."  Ala. Const. art XI, § 217 (1901); *see, e.g.*, James J. Mayfield, *Constitutions of 1875 and 1901:  Paralleled, Annotated and Indexed* 120 (Nashville, Tenn.:  Marshall & Bruce Co. 1904) ("**Mayfield**").

[559] For the forerunners to § 211, see Ala. Const. art. XI, § 1 (1875) ("All taxes levied on *property* in this State shall be assessed in exact proportion to the value of such property; *Provided, however*, the General Assembly may levy a poll-tax, not to exceed one dollar and fifty cents on each poll, which shall be applied exclusively in aid of the public school fund in the county so paying the same.") (emphasis supplied), and Ala. Const. art. IX, § 1 (1868) (same); Ala. Const. art. III, § 39 (1865) ("All *lands* subject to taxation in this State, shall be taxed in proportion to their value.") (emphasis supplied); Ala. Const. art. VI, § 8 (same).

Note that the 1819 and 1865 Constitutions restricted *ad valorem* taxation to real property ("lands").  "On personal property[,] taxes could be imposed as the legislature might consider most expedient."  *Western Union Tele. Co. v. State Bd. of Assessment*, 80 Ala. 273, 279 (1885); *see also Mayor of Mobile v. Stonewall Ins. Co.*, 53 Ala. 570, 576 (1875) (same) (unanimous opinion).

For the constitutional forerunners to § 217, see Ala. Const. art. XI, § 6 (1875) ("The property of private corporations, associations and individuals of this State shall forever be taxed at the same rate; *Provided*, this section shall not apply to institutions or enterprises devoted exclusively to religious, educational, or charitable purposes.") (emphasis in original), and Ala. Const. art. XIII, § 4 (1868) ("The property of corporations now existing, or hereafter created, shall forever be subject to taxation the same as property of individuals, except corporations for educational and charitable purposes.").

assessment ratios, and millage rates on all forms of taxable property. For example, the

Alabama Supreme Court held, in *State v. Alabama Power Co*., 254 Ala. 327, 336, 48

So. 2d 445, 452 (1950), that Sections 211 and 217 required "uniformity and equality

among all taxpayers, 'private corporations, associations and individuals alike,' both

as to ratio and percentage of taxation and also as to rate of taxation."[560]

---

[560] *See also*, *e.g.*, *State v. Alabama Power Co*., 254 Ala. at 339, 48 So. 2d at 454 ("[U]nder §§ 211 and 217 there can be no distinction between taxpayers with different powers or who own different kinds of real or personal property, because all property must be taxed at the same rate by whomsoever owned."); *Hamilton v. Adkins*, 250 Ala. 557, 35 So. 2d 183 (1948) (holding that "Sections 211 and 217 [of the 1901 State Constitution] are aimed at securing a practical and common sense equality in taxation"); *Pullman Car*, 229 Ala. at 187, 155 So. at 618 (holding that § 211 "was designed to secure uniformity and equality by the enforcement of an ad valorem system of taxation and to prohibit arbitrary or capricious modes of taxation without regard to value"); *Proctor v. State*, 215 Ala. 6, 109 So. 105, 106 (1926) (holding that § 217 of the 1901 Constitution was "a guaranty of uniformity and equality in the rate of taxation, and this requirement is fully met when a like tax is levied upon the same class of property by whomsoever owned"); *State Bank v. Board of Revenue of Montgomery County*, 91 Ala. 217, 223, 8 So. 852, 855 (1891) ("What we . . . decide is that, whenever the legislature levies a tax on property, the rate must be in exact proportion to the value of such property; and that, if a tax is imposed on any species of property, all property belonging to that species must be taxed at the same rate, whether it belongs to an individual, an association of persons, or to a private corporation."); *Moog v. Randolph*, 77 Ala. 597, 692 (1884) (holding "that the general purpose of these clauses [art. XI, §§ 1 and 6 of the 1875 Constitution] is to establish an *ad valorem* system of taxation, thus exacting a certain kind of uniformity in the rules of taxation, as applied to property of all persons, whether private or artificial. . . . Their object has been construed to be, to secure, as far as practicable, that equality in bearing the just burdens of government, which has become a distinguishing characteristic of the American States. . . ."); *Clark & Murrell v. The Port of Mobile*, 67 Ala. 217, 219 (1880) (observing that "the purpose of the [1875] Constitution was to prevent invidious exemptions or discriminations by which the property of an individual, or of a corporation, is relieved from bearing a just proportion of the common burden of taxation") (citing *Mayor of Mobile v. Stonewall Ins. Co*., 53 Ala. at 580-81 (Brickell, C.J., unanimous opinion) (construing the provision from Alabama's 1868 Constitution that paralleled Section 217 in the 1901 Constitution, and holding that: "If property of a particular kind is subject to taxation, and owned by a corporation, it must bear the rate of taxation imposed on individuals. . . . Equality in bearing a common burden . . . is secured alike to the corporation and to the citizen.")).

### b.   The requirement of uniform assessment ratios

Section 211's directive that "[a]ll taxes levied on property in this state shall be assessed in exact proportion to the value of such property" *suggested* — but, did not explicitly state — that taxable property was to be assessed at 100% of its appraised, fair market value.[561]   Moreover, the constitution did not define the term "assessed value" — *i.e.*, that portion of the fair market value of a particular parcel or item of real or personal property to which millage rates are applied.   For those reasons, a statute was enacted during the 1911 Regular Session of the Alabama Legislature stating that "taxable property within this State shall be assessed, for the purpose of taxation, at sixty per cent of its fair and reasonable *cash value*."   Act of March 31, 1911, No. 216, § 36 A, 1911 Ala. Acts 159, 185 (emphasis supplied).   That statute was amended in 1935, and the term "market value" was substituted for "cash value," but the sixty percent assessment ratio was retained.   *See* Act of July 10, 1935, No. 194, § 6, 1935 Ala. Acts 256, 263 ("All taxable property within this State shall be assessed for the purpose of taxation at 60% of its fair and reasonable *market value*.") (emphasis supplied), subsequently codified at Ala. Code Title 51, § 17 (1940) (Recomp. 1958).

---

[561] *See*, *e.g.*, Ira W. Harvey, *A History of Educational Finance in Alabama* 464 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**"); Keith J. Ward & Betty D. Sparkman, *Property Tax Administration:   Reappraisal in Alabama* 100-01 (Auburn, Ala.:  Office of Public Service & Research, School of Arts & Sciences 1980) ("**Ward & Sparkman**").  As discussed elsewhere in this opinion, the "assessed value" of taxable property in Alabama now is different from, and less than, its "appraised, fair market value."

The statutory requirement for a uniform assessment ratio of sixty percent of the fair and reasonable market value of all taxable property was briefly extinguished by a 1967 Act that repealed Alabama Code Title 51, § 17 (1940) (Recomp. 1958), and replaced it with statutory language allowing taxable property to be assessed at *any ratio* of fair market value *up to*, *but not more than*, thirty percent of the appraised value. *See* Act of September 8, 1967, No. 502, § 1, II 1967 Ala. Acts 1215 ("All taxable property within this state shall be assessed for the purpose of taxation *not to exceed* thirty percent of its fair and reasonable market value.") (emphasis supplied), subsequently codified at Ala. Code Title 51, § 17(1) (1940) (Recomp. 1958) (Supp. 1969).[562] That statutory provision was effective for less than four years, however. It

_____

[562] This Act was sponsored by Senator James S. Clark of Barbour County, one of the Black Belt counties, and introduced as Senate Bill 56, the stated purpose of which was: "To regulate the rate of assessing property for taxation and repeal conflicting laws." "Jimmie" Clark, as the Senator from Barbour generally was known, was a very powerful figure in Alabama politics for nearly forty years. He served four consecutive terms in the Alabama Senate (1959 to 1975), then as Mayor of Eufaula from 1976 to 1978, followed by four consecutive terms in the Alabama House of Representatives (1983 to 1999), during the last three of which he was Speaker of the House of Representatives. The Act referenced in the text accompanying this marginal note read as follows:

SECTION 1. All taxable property within this State shall be assessed for the purpose of taxation not to exceed thirty per cent of its fair and reasonable market value.

SECTION 2. Code of Alabama Title 51, Section 17, which conflicts with this Act, and all other laws or parts of law in conflict herewith[,] are hereby repealed.

SECTION 3. This Act shall take effect October 1, 1967.

Act of September 8, 1967, No. 502, § 1, II 1967 Ala. Acts 1215 (subsequently codified at Ala. Code Title 51, § 17(1) (Recomp. 1958) (Supp. 1969)).

was declared unconstitutional on June 29, 1971, in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971) (three-judge court) (*per curiam*) ("*Weissinger I*"), a case that will be discussed in more detail in Parts II(G)(3)(h) & (i), *infra*.

There were two rationales for the *Weissinger* Court's determination that Act No. 502 was unconstitutional: one state, and the other federal. The state law rationale was the Alabama constitutional provision requiring that "[a]ll *bills for raising revenue* shall originate in the house of representatives." Ala. Const. art. IV, § 70 (1901) (emphasis supplied). The Alabama Supreme Court had often construed the term "bills for raising revenue" as meaning "[a]ny bill . . .whose chief purpose is to create revenue, *or to* increase or *decrease revenue as created in another act. . . .*" *In re Opinion of the Justices*, 238 Ala. 289, 290, 190 So. 824, 825 (1939) (emphasis supplied).[563] Act No. 502 "decrease[d] revenue as created in" Alabama Code Title 51, § 17, the statute it repealed. The Act also originated in the Alabama Senate. Therefore, it was unconstitutional under state law.

> There can be no question that a bill which attempts to lower the ad valorem assessment rate from a fixed rate of 60 percent to a maximum rate of 30 percent is one "whose chief purpose is to . . . decrease

---

[563] *Accord Glasgow v. Aetna Ins. Co*., 284 Ala. 177, 180, 223 So. 2d 581, 583 (1969) (same); *In re Opinion of the Justices*, 260 Ala. 81, 82, 68 So. 2d 840, 841 (1953) (same); *In re Opinion of the Justices*, 259 Ala. 514, 516, 66 So. 2d 921, 923 (1953) (same); *see also*, *e.g*., *In re Opinion of the Justices*, 249 Ala. 389, 390, 31 So. 2d 558, 559 (1947) ("If the proposed act affects the amount of revenue which flows into the State treasury, either as an original measure, or as an amendment to one already in existence, it is one to raise revenue as provided in the first part of section 70.").

revenue."  Section 17(1), being a revenue bill, should, therefore, have originated in the House of Representatives.[564]

*Weissinger I*, 330 F. Supp. at 624 (footnote omitted).

The federal rationale for invalidating Act No. 502 was based upon the *Weissinger* Court's determination that the assessment scheme created by the statute was arbitrary and irrational and, therefore, could not survive scrutiny under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[565]

[A] statute which fails to provide clearly ascertainable and well-defined standards to guide the ministerial officers charged by law with its implementation and administration creates an unwarranted and void delegation of legislative power.

Section 17(1), literally interpreted, encourages, if not authorizes, the very situation we have previously condemned — unequal taxation among members of the same class — by permitting state and local tax officers to use assessment rates ranging from 0 to 30 percent of fair market value.  Vesting such wide discretion in the hands of tax officers, no matter how good their motives, necessarily will result in an arbitrary and discriminatory system of taxation.

---

[564] *See also Hornbeak v. Hamm*, 268 F. Supp. 549, 556 n.1 (M.D. Ala. 1968) (three-judge court) (Johnson, J., dissenting) (stating that Senate Bill 56, which became the Act subsequently codified as Ala. Code Tit. 51, § 17(1), "is clearly unconstitutional by reason of § 70, Article 4, Constitution of Alabama, which requires that all bills for the raising of revenue originate in the House of Representatives").

[565] The Supreme Court has held that a statute violates due process if the terms of the enactment are so vague that they "authorize and even encourage arbitrary and discriminatory enforcement," *City of Chicago v. Morales,* 527 U.S. 41, 56 (1999), or if the statute "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (decided in the context of the Fifth Amendment Due Process Clause) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

The power of taxation is a peculiarly legislative function. Delegating to an administrative agency the power to fix the ratio of assessment, without formulating a definite and intelligible standard to guide the agency in making its determination, constitutes an unconstitutional delegation of legislative power. [566]

As a result of the invalidation of Act No. 502, the assessment rate reverted to the uniform, sixty percent of appraised, fair-market-value ratio established during the 1935 Legislative Session.[567]  It remained at that ratio until Amendment 325 was declared to have been ratified on June 8, 1972, and thereby created a system of tax classifications with varying assessment ratios that was slated to become effective "[o]n or after October 1, 1978."[568]

    c.    ***State v. Alabama Power Co***. — Ala. Sup. Ct. (Oct. 19, 1950)

*Invidious exemptions or discriminations, by which the property of an individual, or of a corporation, is relieved from bearing a just proportion of the common burden* [that] *taxation is intended to discharge, are violative of the equality of right of the citizen, which is a fundamental principle of our institutions.*

    *Mayor of Mobile v. Stonewall Insurance Co.*, 53 Ala. 570, 579

---

[566] *Weissinger I,* 330 F. Supp. at 625.

[567] *See id.* at 625 ("Since Section 17(1) [Act No. 502] is unconstitutional in violation of Section 70 of the Alabama Constitution, Title 51, Section 17, which purported to have been repealed by Section 17(1), remains in full force.") (footnote and citations omitted; *see also* Act of July 10, 1935, No. 194, § 6, 1935 Ala. Acts 256, 263 (subsequently codified at Ala. Code Title 51, § 17 (1940) (Recomp. 1958)); Act of March 31, 1911, No. 216, § 36 A, 1911 Ala. Acts 159, 185 (providing that "taxable property within this State shall be assessed, for the purpose of taxation, at sixty per cent of its fair and reasonable cash value").

[568] Ala. Const. amend. 325, § (a) (amending Ala. Const. art. XI, § 217 (1901, amended 1972, 1978)) ("On and after October 1, 1978, all taxable property within this state, not exempt by law, shall be divided into the following classes for the purposes of ad valorem taxation: . . . .").

(1875) (Brickell, C.J., unanimous opinion).[569]

The statutory requirement for property to be assessed at sixty percent of its fair market value was systematically and intentionally ignored by Alabama taxing authorities for most of the twentieth century.  County tax assessors and boards of equalization commonly assessed taxable property at no more than forty percent of fair market value,[570] and usually a great deal less than that.[571]  Such willful refusals to acknowledge and follow state law were first brought to a head in 1949, when the Alabama Power Company complained of the fact that the State Department of Revenue (which is charged by statute with the sole responsibility of assessing for taxation all property of railroads and public utilities operating within the State[572]) had

---

[569] *See also*, *e.g.*, III Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* 225 (New York:  P.F. Collier & Son ed. 1902) (1776) ("The subjects of every state ought to contribute towards the support of the government, as nearly as possible, in proportion to their respective abilities; that is, in proportion to the revenue which they respectively enjoy under the protection of the state.").

[570] *See*, *e.g.*, *State v. Alabama Power Co.*, 254 Ala. 327, 337, 48 So. 2d 445, 453 (1950) ("In the case at bar there is . . . an allegation of an intentional and systematic undervaluation of the property of other taxpayers generally at less than forty percent and the valuation of appellee's property at sixty percent.").

[571] *See*, *e.g.*, *Weissinger I*, 330 F. Supp. at 621 (noting that a 1969 assessment-sales ratio study conducted by the Department of Revenue revealed that the median assessment ratios for Alabama counties ranged "from lows of 6.7 and 7 percent of fair market value in rural Hale and Washington Counties to highs of 23.1 and 26.8 percent of fair market value in urban Madison and Jefferson Counties," and that the median assessment ratio for the State as a whole "was approximately 16.9 percent of fair market value"); *Louisville and Nashville Railroad Co. v. State*, Nos. 36367, 36642, and 36936, slip op. at 8 (Circuit Court of Montgomery County, Ala., in Equity Apr. 5, 1967) (finding that, in 1967, the "general level of assessment in Alabama" was "approximately 15.4%" of fair market value and "the average with any reasonable degree of probability does not exceed 16.1% and could not exceed 16.7%").

[572] *See*, *e.g.*, Ala. Code Tit. 51, § 142 (1940) (Recomp. 1958), now codified at Ala. Code §

261

assessed the company's properties located in 58 of Alabama's 67 counties at the statutorily-required rate of sixty percent of fair market value, while county tax authorities had assessed comparable properties of other taxpayers in the same jurisdictions at ratios that did not exceed forty percent of market value.[573]

The power company asked the Court to "vacate and set aside the final assessment made by the Department against its properties and fix the assessment of its properties for the tax year 1949 . . . at a figure not in excess of the percentage at which other property is generally and systematically assessed in Alabama."[574]

The Alabama Supreme Court agreed that such disparate assessment ratios violated the uniformity and equality policies undergirding Sections 211 and 217, and held that "all taxable property in the state, by whomever owned, must for ad valorem tax purposes be taxed uniformly and equally at the same rate and the same ratio of assessment." *State v. Alabama Power Co.*, 254 Ala. 327, 340, 48 So. 2d 445, 456 (1950).

> What we want to make clear is that railroads and public utilities cannot be put in a class to themselves and their property taxed on a basis different from other taxpayers in the light of §§ 211 and 217 of the

---

40-21-1 (1975) (2008 Replacement Vol.).  The Department apportions the assessed values of such properties and the taxes received among the counties, municipalities, school districts, and other tax districts within the State.  *See*, *e.g.*, Ala. Code §§ 40-21-17, 40-21-27.

[573] *See Alabama Power Co.*, 254 Ala. at 331-32, 48 So. 2d at 447.

[574] *Id.* at 332, 48 So. 2d at 447-48.

> Alabama Constitution.  If this were not true not only would §§ 211 and
> 217 of the Alabama Constitution be emasculated but the confusion which
> would result is apparent.  It would mean that if a piece of real estate is
> owned by an individual, the county tax assessor could assess the same at
> less than 40% of its value, while on the contrary if an adjacent piece of
> real estate is owned and occupied by a company which is a public utility
> as an office or store, it could be assessed at 60% of its value.  No such
> power can be said to exist under the Alabama Constitution.

*Id.* at 338-39, 48 So. 2d at 454.

The Supreme Court held that the Alabama Department of Revenue could not

assess the property of public utilities and railroads at the statutory ratio of sixty

percent of fair market value, as long as county tax authorities were systematically

employing lower assessment ratios on all other property.[575]  Accordingly, the Court

ordered the Department to re-assess the power company's property at a ratio not

greater than forty percent of its fair market value, reasoning that, "where it is

impossible to secure both the standard of the true value [*i.e.*, the statutory requirement

for *all* assessments to be at sixty percent of fair market value], and the uniformity and

equality required by law, the latter requirement is to be preferred as the just and

---

[575] *See* Harry H. Haden, *Equality — The Cornerstone of Democracy*, 21 Ala. Law. 269, 271 (1960) ("**Haden**") (construing the *Alabama Power Co.* opinion as holding "that the sixty per cent assessment could not be used unless the State could show that enough property was assessed at sixty per cent [by county tax authorities] to dispel the lack of uniformity, and denial of due process, which would result from the use of the statutory ratio on certain property [railroads and public utilities] and at the same time a lessor [sic] ratio on other property") (alterations added); *see also* Anne Permaloff & Carl Grafton, *Political Power in Alabama: The More Things Change . . .* 107 (Athens, Ga.: The University of Georgia Press 1996) ("**Permaloff & Grafton I**") ("In 1950 the Supreme Court of Alabama held that assessment at 60 percent could not be enforced because virtually no property was in fact assessed at that amount.").

263

ultimate purpose of the law."[576]

### d.    The interregnum — *1950 - 1959*

The Alabama Supreme Court's holding in the *Alabama Power Co.* case inevitably resulted in substantial losses of revenue to all taxing authorities.  Even so, nothing was done to compel county tax assessors and boards of equalization to alter their systematic under-assessment of property.  The Alabama Legislature's "Interim Committee on the Revision of State Taxes" reported in June of 1957 that, despite the pervasive failure of taxing authorities to comply with state laws regulating the appraisal and assessment of property, no remedy had been provided by either the Commissioner of the Alabama Department of Revenue, or the office of Governor James E. Folsom.[577]  The Committee's report stated, in part, that:

> For tax purposes property in Alabama is valued whimsically and erratically under 67 county assessment units.  The statutory requirement is that property shall be assessed at 60 per cent of actual market (cash) value.  Actual assessments are at levels far below the statutory ratio.  Not a few counties are assessing at less than 20 percent; no county exceeds a 35 per cent level of assessments.

> For locally-assessed property the average assessment level in the state is estimated at 25 per cent of actual value.  This ratio of assessed to

---

[576] *Alabama Power Co.*, 254 Ala. at 341, 48 So. 2d at 457 (citation and quotation marks omitted, bracketed alteration supplied).

[577] James E. "Big Jim" Folsom — "the little man's big friend" — served two, non-consecutive terms as Governor of Alabama. *See* Carl Grafton & Anne Permaloff, "James E. Folsom, 1947-1951, 1955-1959," *Alabama Governors* 197-210 (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) ("**Permaloff & Grafton II**").

true value fixes *the effective maximum state tax rate at a very low* 1.6 *mills.*

Public utility property is assessed centrally by the State Department of Revenue.  Uniform assessment of this type of property has been achieved.  Although well below the legal 60 per cent ratio, utility assessments are considerably above the levels of locally-assessed property.[578]

e.    **The Haden Regulation** — *1959*

Following Attorney General John Patterson's 1958 election to the office of

Governor, he envisioned two primary objectives for his administration:  funding public

education at an adequate level;[579] and, reforming the state's property tax system.[580] Of

---

[578] Alabama Department of Archives & History, Accession No. SG 1964 Sec. of State, Bills & Resolutions (Report of Interim Legislative Committee on the Revision of State Tax Laws, *Current Tax Problems in Alabama* 16 (Montgomery, Ala.:  June 1957) (emphasis in original)); *see* Fed. R. Evid. 201 (Judicial Notice), 803(8) (Public Records and Reports), 803(16) (Ancient Documents), and 807 (Residual Exceptions); *see also* Harvey I, at 465 (quoting first paragraph of textual material).

[579] *See*, *e.g.*, Anne Permaloff & Carl Grafton, "John Patterson*, 1959-1963*," in *Alabama Governors* 210 *et seq.* (Tuscaloosa:  The Univ. of Ala. Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) ("**Permaloff & Grafton III**").

> Patterson's upbringing as the son of two schoolteachers predisposed him to support public education, and his campaign travels exposed him firsthand to the deplorable condition of the public education system of Alabama.  Urban schools were overcrowded due to the migration of population from Black Belt counties.  The physical plants of hundreds of schools were in appalling condition, with an estimated $340 million needed to repair rotting floors and leaking roofs and to replace inadequate plumbing and heating systems.  More than one hundred schools had failed to attain accreditation standards and were on probation.  Serious underfunding led to actual and threatened loss of accreditation for several programs on the college and university levels.  Property taxes, the major source of local support, were so low that public school funding was inadequate.  Reports from a blue-ribbon Commission on Alabama Education created by a legislative act in 1957, a legislative interim committee, and group meetings of educational leaders outlined actions to be taken.

course, both objectives were inextricably intertwined.

In connection with his ambition to reform the property tax system, Patterson asked Harry H. Haden, a Professor on the faculty of the University of Alabama School of Law, to become Commissioner of the Alabama Department of Revenue.  Patterson had been a student of taxation under Professor Haden,[581] and he told his former

_____

From these recommendations, Patterson forged a "rescue" reform package, which he presented to a special session of the legislature in June.

> Patterson's plan contained a tax package designed to raise $42 million per year in additional revenues beyond current educational funding levels.  Increased revenue was to come from higher taxes on the sale of automobiles, reductions in exemptions for personal income tax, and increases in corporate income tax rates.  In addition, he proposed a $75 million bond issue for school construction with two-thirds of the funds to be allocated to public schools and one-third to higher education.  In order to build legislative support, Patterson identified specific allocations in the plan for each school district and for each university and college and advertised them before the special session met.  . . .

*Id.* at 213.

[580] *See*, *e.g.*, *id.* at 214:

> Related to the education battle was Patterson's campaign for property tax equalization.  Each county had a board of equalization whose job was to hear appeals from property owners who believed their property had been assessed unfairly.  The state revenue commissioner appointed members to a four-year term but had to select them from a list submitted by the county commission, county board of education, and a county commissioner of revenue.  County boards of equalization rarely raised an assessment and frequently lowered them.  Furthermore, although Alabama's 1901 constitution called for property taxed to be assessed at 60 percent of its fair market value, this was never done in any county.  In 1950 the Alabama Supreme Court overturned the 60 percent rate, noting that actual assessments tended to run at 5 to 15 percent of fair market value with high population counties such as Jefferson and Mobile having their property assessed at higher rates.

[581] Haden, at 269 ("Soon after I joined the law faculty at the University of Alabama I became acquainted with a very excellent student by the name of John Patterson.  I recognized in this student sincerity, scholastic ability, honesty, and determination.  My judgment made at that time has proven

professor that he wanted the Commissioner of Revenue "to be a man who knows taxation and who is free of political obligations."[582]  Professor Haden agreed to leave his academic post and accept the appointment, but only upon the basis of an understanding with the Governor-elect that he would be allowed to run the Alabama Department of Revenue "according to law and free of politics."[583]

The year after assuming his duties, Haden wrote an article for *The Alabama Lawyer*, the official journal of the Alabama State Bar Association, in which he said that, after reviewing the forty-five taxes administered by the Department of Revenue,

> I found that the tax being administered further from the law than any other was, and is, the Ad Valorem Property Tax.  I say that I found this.  That is not a true statement.  I knew that this was the situation before becoming Commissioner, and every citizen of the State who has ever given this any thought knows that this is the situation.[584]  In the past a defeatist attitude has been taken in this matter.  I simply could not accept the position of Commissioner of Revenue with the avowed intent of running the Department according to the law and free of politics and not face the ad valorem tax situation *head-on*.[585]

Haden's "head-on" approach began with a recognition of two facts.  *First*, the

---

[582] *Id.*

[583] *Id.* at 269-70.

[584] *Id.* at 273 (observing that:  "A 'Sales-Assessment Ratio Study,' made in 1955, indicates that of the 22,229 taxpayers who purchased property during the study, 11% were assessed at over 35% of what they paid for the property, while 4% were assessed at less than 5% of what they paid for the property.  This study shows that 26% were assessed at between 5% and 15% of what they paid for the property, and that 56% fall between 15% and 35%.  Continued study of this subject indicates that the situation shown by this 1955 study is still basically true today.").

[585] Haden, at 270 (emphasis supplied).

267

various county tax assessors, the county boards of equalization, and the State Department of Revenue were, jointly and severally, "under a statutory duty to equalize assessments at that percentage of true value nearest sixty per cent of the 'fair and reasonable market value' which [would] protect the taxpayer's right to uniformity and due process."[586] *Second*, "[i]f any one of these three [taxing authorities] had performed their statutory duty, the State would not be in the unconscionable position it is now in with regard to ad valorem assessments."[587]

Haden's initial step in the effort to correct the systemic problems that existed was to launch a study aimed at determining the highest percentage at which an "appreciable" amount of taxable property then was being assessed in the State.[588] After several false starts, he settled on a thirty percent assessment ratio,[589] and issued a Regulation directing county taxing authorities to assess all property subject to taxation at thirty percent of its fair and reasonable market value. The regulation also defined the term "fair and reasonable market value and suggested some of the types

---

[586] *Id.* at 274 (bracketed alterations supplied).

[587] *Id.* (bracketed alterations supplied).

[588] *See id.* at 272 ("I felt that one of my first duties upon taking office should be to decide what per cent of the fair and reasonable market value should be used by the persons having the duty to assess. For this reason I assigned to several competent men the task of deciding the highest per cent at which an 'appreciable' amount of property was being assessed.").

[589] *Id.* at 272.

of evidence which should be used in arriving at the figure."[590]  Haden's authority for the directive was a statutory provision empowering the Revenue Commissioner to step in, and to appraise, assess, levy, and collect taxes whenever a county tax assessor or board of equalization failed to do so.[591]

Haden later stated his opinion that an across-the-board, "true equalization of assessments" at thirty percent of the appraised, fair market value of all taxable property — only half of what statutory law then required, but more than double the assessment ratios then being arbitrarily and unlawfully applied by most county tax

---

[590] *Id.*

[591] For contemporary authority to this effect, see Ala. Code §§ 40-2-11(1), (2) (1975).  The three-judge court's decision in the *Weissinger* case, *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971) (three-judge court) (*per curiam*) (footnotes omitted, bracketed alteration supplied) ("*Weissinger I* "), summarized preexisting Alabama law as follows:

> The State Department of Revenue is charged with the responsibility of equalizing the various county equalization board assessments and its own assessments on railroad and utility property, so that all taxable property in the state will be assessed in accordance with Sections 211 and 217.  Sections 131 and 133 of Title 51 of the Code of Alabama authorize the Department of Revenue to exercise general and complete supervision over and control of valuation, equalization, and assessment of property "to the end that all taxable property in the state shall be assessed and taxes shall be imposed and collected thereon in compliance with the law, and that all assessments on property . . . shall be made in exact proportion to the fair and reasonable market value thereof."

> The defendant [Commissioner of Revenue], as the chief executive officer of the Department of Revenue, thus has the responsibility for seeing that all taxable property in the state is assessed at uniform assessment ratios for ad valorem tax purposes. . . .

*Weissinger I*, 330 F. Supp. at 620-21 (footnotes omitted, bracketed alteration supplied).

assessors — would have increased annual tax receipts by at least $43.6 million,[592] more than enough to fund Governor Patterson's education initiatives.  Even so, after Haden issued his Regulation, "the lid blew off" in the State Legislature.[593]  Professors Permaloff and Grafton wrote that legislative opposition to Haden's regulation was "immediate and ferocious,"[594] and reprinted Bob Ingram's account of Haden's testimony to the Senate Finance and Taxation Committee that appeared in the March 8, 1959 edition of the *Montgomery Advertiser*:

> Haden went into painful detail citing the inequities which exist in assessments.  Especially was this the case, the non-political Haden observed, in the assessing of timber land, industrial property and farms.

> Sen. E. O. Eddins of Marengo, like Haden a Patterson man, nearly had apoplexy.  Rep. Ira Pruitt of Sumter, also a Patterson man, appeared on the verge of a stroke. . . [Pruitt] picked up a pencil and began to do a little figuring, obviously calculating what it would cost him (and his clients) if Haden's program was carried out.  When he completed his multiplying a look of sheer terror flashed across his flushed fact.

> Haden, nobody's fool, wasn't long in sensing the effect his words were having on some of the Patterson people.  But this only seemed to encourage him to new heights.

---

[592] The actual amount of Haden's estimated increase was $43,609,134.  *See* Haden, at 276.

[593] *Louisville and Nashville Railroad Co. v. State*, Nos. 36367, 36642, and 36936, slip op. at 3-4 (Circuit Court of Montgomery County, Ala., in Equity Apr. 5, 1967) ("Commissioner Haden, in the exercise of his statutory powers, issued an order in 1959 directing that ad valorem assessments be equalized throughout the State at 30%.  Such equalization at 30% would have produced additional revenues of over $43,600,000.  *One of the witnesses testified that when this order was issued 'the lid blew off' in the Legislature*.") (emphasis supplied).

[594] Permaloff & Grafton III, at 214.

Sen. Eddins finally broke in to voice a complaint.  After all, he reasoned, assessments in Marengo County had been increased 106 percent in the past 10 years.

"You ought to give some credit to counties who have done a good job like that," Eddins complained.

Had he been very politic Haden could have agreed to this thinking and in doing so reduce Eddins' rocketing blood pressure.  But he didn't.

"The assessments are still too low," Haden retorted.  "I can show you instances right now in your county where some property is assessed at 3 percent of its value while other property is assessed at 30 per cent."[595]

A classic Black Belt–Big Mule coalition formed in opposition to Haden's attempt to reform the property tax system's irrational, "crazy quilt" pattern of disparate assessment ratios across the State.[596]  Newspapers reported that Haden also had "antagonized the powerful farm bloc in the legislature along with large timberland owners and big industry."[597]  Those interest groups coalesced in support of a package of "Anti-Haden Bills" that were designed to strip the office of Revenue Commissioner of its statutory authority to seize control of the tax computation and collection process from county authorities, even though most local officials then were conducting

---

[595] Permaloff & Grafton I, at 108-09.

[596] *See* Parts I(D)(1) and (2), *supra*, defining "Black Belt" and "Big Mules."

[597] Warren Trest, *Nobody But The People: The Life and Times of Alabama's Youngest Governor* 282 (Montgomery, Ala.:  New South Books 2008) ("**Trest**") (quoting Hugh W. Sparrow, "Patterson, Legislature may fight on assessments," *Birmingham News*, Apr. 12, 1959; "Solons Open Fight to Kill 30 Pct. Tax," *Dothan Eagle*, June 5, 1959).

appraisal, assessment, and collection functions in blatant derogation of state law.[598]

Professors Permaloff and Grafton provided the following account of the legislative

shenanigans that ensued.

> During one committee hearing, Albert Davis (a former senator from Pickens County) and other Farm Bureau speakers drew applause as they tried to characterize equalization as a power grab by the revenue commissioner. The *Montgomery Advertiser* described the scene: "Davis, his white hair cut in a senatorial sweep, pumped out his indictment in orotund language. At one point, he got carried away and addressed the committee as 'gentlemen of the jury.'" His arguments had a well-used ring about them: "The power to tax is the power to destroy." "That's too much power for one man. The only man I would trust with that much power is the man who walked up Golgotha's hill." "My God, the sins that have been committed in the name of education."

> Anti-property tax legislators launched a filibuster that stopped the general appropriation bill. Filibuster participants included the Black Belt leader J. Roland Cooper; Walter Givhan, a veteran Farm Bureau, Citizens Council, and Black Belt power-wielder; and Bob Kendall, a frequent Black Belt supporter. While the hard core of filibusterers came from the Black Belt, the extended debate enjoyed support far beyond their ranks and included Senator Larry Dumas of Jefferson County.

> The major foes of property tax equalization were rural, but Larry

---

[598] Warren Trest, Governor Patterson's authorized biographer, recounted that:

> When the [Anti-Haden] bill's sponsors got enough signatures in both houses to pass it, they went to the governor with an ultimatum that if the commissioner didn't back off the plan to equalize property taxes, they were going to take the authority away from him. They threatened dire consequences for the state, perhaps resulting in losses of millions of dollars in revenue annually, and have even bankrupted some counties suffering losses from taxes on public utilities. Patterson "decided that the better part of valor would be [a] strategic retreat."

Trest, at 283 (footnotes omitted).

Dumas's active opposition, plus that of Associated Industries, individual mining companies and the Alabama Mining Institute, the Committee of 100, U.S. Steel, and Alabama Power, indicate that the ["Big Mule"] alliance was still functioning. John Patterson regards this explanation as valid, saying that opposition to equalization came from a "classic Black Belt-industrial coalition (with some exceptions) with a lot of other help and little enthusiasm on our side."

The Alabama League of Municipalities favored equalization, but Patterson believes that Ed Reid, the organization's politically astute head, regarded equalization as a lost cause even before the fight began and expended little effort on its behalf. "Even school people didn't support us much," Patterson says today, shaking his head in disbelief.

Patterson and the anti-property tax reform group finally agreed to end the filibuster. Under the truce, as reported in newspapers, Patterson would allow the bills that would strip Haden of his equalization powers out of the Senate Finance and Taxation Committee once the regular session resumed. The actual terms of the truce were different from those made public. Patterson promised to end widespread equalization in return for the legislature's abandoning the anti-equalization bills that would have stripped the revenue commissioner (Haden) of his authority.

According to Patterson, the leader who most effectively represented anti-equalization interests was Dallas County's Walter Givhan. J. Bruce Henderson, a former senator from Wilcox County, also played an important role behind the scenes. Both men had supported Patterson's gubernatorial candidacy because of his civil rights position, and both enjoyed support in Jefferson County. Givhan was always associated publicly with Black Belt agricultural interests, but he received campaign money from Jefferson County contributors even when he had no opponents.

Patterson finally gave up the fight in order to avoid damaging the revenue commissioner's authority and, less important, because he did not want to further antagonize the many legislators who opposed equalization but favored increased spending for education. "It became

obvious that they would win.  We felt that it was better to have the power and not exercise it than not have the power.  If we hadn't done this, the power would have been stripped."

In describing his defeat on equalization and his partial victory on school taxation, Patterson sketched out the basic technique by which Big Mules developed long-term legislative support.  A young man fresh out of law school would put up his shingle in a rural county as one of perhaps fifteen or twenty attorneys in the county.  He had no business.  Then a representative of Alabama Power Company would offer him a five-hundred-dollar-a-month retainer.  A railroad company would offer another five hundred, an insurance company another five hundred, and so forth.  Soon the young lawyer would have a steady two-thousand-dollar monthly income and have done little or nothing to earn it.  Then he might get into the legislature, perhaps with additional support from his benefactors.  "Do you think he will be reminded of those retainers?" Patterson asked rhetorically.[599]

Following the withdrawal of Commissioner Haden's Regulation, Alabama's *ad valorem* property tax system continued to be administered in an arbitrary and systemically dysfunctional manner.[600]  That began to change in 1967, however, with

---

[599] Permaloff & Grafton I; *see also*, *e.g.*, Permaloff & Grafton III, at 214.

[600] The Montgomery County, Alabama Circuit Court Judge who rendered the decision in the *Louisville & Nashville Railroad* case described in the sub-section immediately following this one stated in 1967 that he had been unable to find that the Department of Revenue had

taken any effective steps to equalize ad valorem taxation in Alabama at 40%, 30%, or even 20% [in the years following the withdrawal of Commissioner Haden's 1959 Regulation].  In fact, one witness for the State who has been head of the Ad Valorem Tax Division for 12 years admitted that during such period of time neither he nor the Department had set aside all assessments of real property in Alabama, nor had he done it in any one county in the state.  In fact, he admitted that during that 12-year period he had not set aside a single assessment involving one piece of real property in the State of Alabama.  Despite these undisputed facts and history, this same Department continued to assess L&N at 40%.  The head of the Department which assesses L&N and others similarly situated testified that as such he had no

274

the court cases discussed in the following sub-sections.

    **f.**    ***Louisville and Nashville Railroad Co. v. State*** — Montgomery County, Ala. Circuit Court (Apr. 5, 1967)

Even though the Louisville and Nashville Railroad Company ("L & N") had not been a party to the *Alabama Power Co.* case discussed in Part II(G)(3)(c), *supra*, that company, along with all other railroads and public utilities owning property in Alabama, had been a beneficiary of the Alabama Supreme Court's decision. Eventually, however, the railroad tired of paying *ad valorem* taxes calculated at a ratio of forty percent of the fair market value of its taxable property, while comparable properties in the same localities were assessed by county tax authorities at far lower ratios to value. Consequently, during three successive tax years (1964, 1965, and 1966), L & N appealed the assessments levied against it by the Alabama Department of Revenue to the Circuit Court of Montgomery County, Alabama. Following a trial of the consolidated cases,[601] the circuit judge found, among other things, that:

    1. The general level of assessment in Alabama (exclusive of centrally-assessed property) is approximately 15.4% of fair and

---

    jurisdiction or authority over the assessment of other taxpayers generally. However, the Department itself under our laws had the power and the duty to equalize [all assessments in the State].

*Louisville and Nashville Railroad Co. v. State*, Nos 36367, 36642, and 36936, slip op. at 4 (Circuit Court of Montgomery County, Ala., in Equity, Apr. 5, 1967) ("*L & N R.R.* ").

    [601] The three appeals were assigned Montgomery, Ala. Circuit Court Case Nos. 36367, 36642, and 36936, respectively, but eventually all were consolidated for a single trial and decision.

reasonable market value and the average with any reasonable degree of probability does not exceed 16.1% and could not exceed 16.7%.

2.   L & N's properties were systematically and intentionally assessed at 40% of fair and reasonable market value.

3.   Such disparity in assessment ratio is systematic and intentional and is illegal and discriminatory.

4.   L & N is entitled to have its assessments reduced.

5.   In the exercise of the Court's equitable powers . . . the Court finds that L & N's assessments should be reduced to 36⅔% for 1964, 33⅓% for 1965, and 30% for 1966, of fair and reasonable market value.[602]

The state circuit court retained jurisdiction of the case "for the purpose of receiving periodic reports at least annually from [the State Department of Revenue] of what steps it has taken to achieve uniformity among all taxpayers in Alabama, whether centrally or locally assessed, as required by the Constitution and laws of this State. . . ."[603]

> g.   *Hornbeak v. Hamm* — M.D. Ala. Civil Action No. 2608-N

As discussed above, in Part II(G)(3)(b), the 1935 statute requiring that all

---

[602] *L & N R.R.,* at 8. A copy of the state circuit court's slip opinion in the *L & N R.R.* case was attached as Exhibit "G" to the Aug. 28, 1969 answers of defendant Harvey L. Rabren, Commissioner of the Alabama Department of Revenue (*i.e.,* the predecessor to defendant Julie P. Magee in the present action) to interrogatories propounded by plaintiffs in the case of *Hornbeak v. Rabren*, No. 2877-N, M.D. Ala., discussed in Part II(G)(3)(h), *infra*.   As such, it is a matter of which this court may take judicial notice under Fed. R. Evid. 201.

[603] *L & N R.R.*, at 10.

taxable property be assessed at sixty percent of its "fair and reasonable market value"[604] was repealed in 1967 by Act No. 502, which briefly authorized state and county taxing authorities to assess taxable property at any ratio of market value up to, but not more than, thirty percent of the property's fair market value.  *See* Act of September 8, 1967, No. 502, § 1, II 1967 Ala. Acts 1215, subsequently codified at Ala. Code Title 51, § 17(1) (1940) (Recomp. 1958) (Supp. 1969).  That Act had an effective date of October 1, 1967.  Five days later, Martha A. Hornbeak, the owner of real estate located in Jefferson County that had been assessed at thirty percent of its fair market value, filed a suit challenging the constitutionality of Act No. 502 in the U.S. District Court for the Middle District of Alabama.  Her case was assigned Civil Action No. 2608-N.

Hornbeak cited the inequity of allowing tax assessors to arbitrarily assess taxable property at ratios between one and thirty percent of fair market value, and sought to require uniform assessments of all taxable property in the State at the thirty percent ratio applied to her property.  She alleged that the "lack of uniformity of valuation and assessment of property" permitted by Act No. 502 deprived her, and

---

[604] *See* Act of July 10, 1935, No. 194, § 6, 1935 Ala. Acts 256, 263 ("All taxable property within this State shall be assessed for the purpose of taxation at 60% of its fair and reasonable *market value*.") (emphasis supplied) (subsequently codified at Ala. Code Title 51, § 17 (1940) (Recomp. 1958)); *see also* Act of March 31, 1911, No. 216, § 36 A, 1911 Ala. Acts 159, 185 ("All taxable property within this State shall be assessed, for the purpose of taxation, at sixty per cent of its fair and reasonable *cash value*.") (emphasis supplied).

other, similarly situated taxpayers, "of property without due process of law and [was] a denial of equal protection of the laws, in violation of the 14th [sic] Amendment to the Constitution of the United States." *Hornbeak v. Hamm*, 283 F. Supp. 549, 550-51 (M.D. Ala. 1968) ("*Hornbeak I*") (three-judge court) (Godbold, J., majority opinion) (alterations supplied).   She sought an injunction against the Alabama Revenue Commissioner, who then was Phillip Hamm,[605] to prevent him from continuing, under color of state law, to deprive plaintiffs "of property without due process of law."[606] Two of the members of the three-judge district-court panel assembled to hear Hornbeak's claims dismissed her complaint on April 10, 1968,[607] because, in their view of the jurisdictional statute invoked by Hornbeak, the complaint only raised non-cognizable questions of "property rights."[608]

Hornbeak's constitutional claims were asserted under 42 U.S.C. §§ 1983 and 1988.[609]  However, neither of those statutes provides a jurisdictional basis for claims

---

[605] On Oct. 6, 1967, the date Hornbeak filed this action, Lurleen Burns Wallace, the wife of George C. Wallace, was Governor of Alabama. *See, e.g.*, Glenn T. Eskew, "Lurleen B. Wallace, 1967–May 1968," in *Alabama Governors* 230 *et seq.* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.).

[606] *Hornbeak I*, 283 F. Supp. at 551.

[607] Such a court was assembled because, in 1967, 28 U.S.C. § 2281 provided that an "injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute . . . shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application thereof is heard and determined by a district court of three judges."

[608] *Hornbeak I*, 283 F. Supp. at 554.

[609] For the benefit of readers not familiar with federal jurisprudence, 42 U.S.C. § 1983

asserted under their rubric.  Instead, both are "remedial vehicles": *that is*, they are

means of asserting claims that a person has been deprived of rights, privileges, or

immunities secured by the Constitution and laws of the United States.  For example,

as the Supreme Court once observed when addressing claims asserted under 42 U.S.C.

§ 1983, that statute is "not jurisdictional," and it is not "itself a source of substantive

rights, but merely provides a method for vindicating federal rights elsewhere

conferred."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citations and internal

quotation marks omitted).  Section 1988 is expressly non-jurisdictional.[610]

_____

provides a means of seeking redress against governmental entities and officials whose conduct, "*under color of state law*," deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes.  Section 1983 was originally § 1 of the Civil Rights Act of 1871, and it was "modeled" on § 2 of the Civil Rights Act of 1866; it also "was enacted for the express purpose of enforcing the provisions of the Fourteenth Amendment."  *Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972) (citations, internal quotation marks, footnotes, and bracketed alterations omitted).  In pertinent part, the statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  Section 1988 is discussed in the text preceding the following footnote.

[610] On the date Hornbeak filed this action, the portion of 42 U.S.C. § 1988 quoted by the majority opinion read as follows:

> Section 1988.  Proceedings in vindication of civil rights.  The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this

Consequently, the "jurisdiction" of federal courts — *i.e.*, their power to entertain claims asserted under either § 1983 or § 1988 — must be based upon other statutes.

Hornbeak had a choice of two jurisdictional statutes upon which to base her claims: 28 U.S.C. § 1343, the jurisdictional counterpart of 42 U.S.C. § 1983; and 28 U.S.C. § 1331, the general "federal question" statute.  Of the two statutes, Section 1331 provided for more expansive jurisdiction, because it afforded jurisdiction in all cases raising a "federal question":  that is, any action in which the plaintiff asserts that a defendant violated the United States Constitution or statute.  In 1967, however, Section 1331 required a plaintiff to allege and prove that more than $10,000 was "in controversy."[611]   In contrast, Section 1343 limited federal jurisdiction to suits involving "civil rights," but no minimum amount in controversy was required.[612] Hornbeak invoked Section 1343(3) as the basis for her claims:  a jurisdictional choice that proved fatal, because a majority of the three-judge panel concluded that it did not

---

chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced (etc).

*Hornbeak I,* 283 F. Supp. at 550-51 n. 3.

[611] On the date Hornbeak commenced this action, Section 1331 provided that:  "The district court shall have original jurisdiction of all civil actions *wherein the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs*, and arises under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331 (1967) (emphasis supplied).  The amount in controversy requirement was not removed until Dec. 1, 1980, with the passage of Public Law 96-486 (S. 2357), which amended § 1331 to state simply that:  "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."

[612] *See Hornbeak I*, 283 F. Supp. at 551 (majority opinion).

encompass her claims.[613]  Circuit Judge John C. Godbold, who wrote for himself and

Southern District of Alabama District Judge Virgil Pittman, adopted a restrictive

interpretation of the statute.  According to his majority opinion, the complaint alleged

"only a 'property right' and not a 'civil right'" cognizable under § 1343.[614]  That

conclusion was based upon a single Fifth Circuit opinion, *Bussie v. Long*, 383 F.2d

766 (5th Cir. 1967), *affirming* 254 F. Supp. 797 (E.D. La. 1966).

> *Bussie* was a similar attack on non-uniform assessments in Louisiana, in
> which it was alleged that plaintiff was assessed at a higher percentage of
> value than owners of similar property, and plaintiff asked that the State
> Tax Commission be ordered to determine actual cost value of all
> property, to fix a uniform percentage of cash value for purposes of ad
> valorem taxation and to carry out its statutory duty of equalizing
> assessments.  Basically these are the same allegations and the same type
> of relief involved in the case before us.  *Bussie* held such a suit involved
> only a "property or monetary right" and not a "civil right" within the
> purview of § 1343.
>
> The *Bussie* ruling was based upon *Hague v. Committee for
> Industrial Organization*, 307 U.S. 496, 59 S. Ct. 954, 83 L. Ed. 1423
> (1939).  There was no opinion of the court as such in *Hague*.  But the

---

[613] On Oct. 6, 1967, the date Hornbeak filed her complaint, the relevant portion of this statute provided that:

> The district courts shall have original jurisdiction of any civil action
> authorized by law to be commenced by any person:  . . .  (3) To redress the
> deprivation, under color of any State law, statute, ordinance, regulation, custom or
> usage, of any right, privilege or immunity secured by the Constitution of the United
> States or by any Act of Congress providing for equal rights of citizens or of all
> persons within the jurisdiction of the United States.

28 U.S.C. § 1343(3) (1967).

[614] *Hornbeak I*, 283 F. Supp. at 554.

concurring opinion of Mr. Justice Stone considered the two jurisdictional statutes, §§ 1331 and 1343, and distinguished between them, saying: "By treating [§ 1343] as conferring federal jurisdiction of suits brought under the Act of 1871 in which the right asserted is inherently incapable of pecuniary valuation, we harmonize the two parallel provisions of the Judicial Code, construe neither as superfluous, and give to each a scope in conformity with its history and manifest purpose." *Id*. at 530, 59 S. Ct. at 971, 83 L. Ed. at 1444-1445. Mr. Justice Stone distinguished between *Holt v. Indiana Mfg. Co*., 176 U.S. 68, 20 S. Ct. 272, 44 L. Ed. 374 (1900), a suit to restrain alleged unconstitutional taxation of patent rights, held not to involve a "civil right" under the predecessor to § 1343, and other cases in which "the gist of the cause of action was not damage or injury to property, but unconstitutional infringement of a right of personal liberty not susceptible of valuation in money."

> . . . .

> The plaintiff does not seek refund of ad valorem taxes or relief from the valuation of her property or the assessment based thereon. She asks that the assessments of all others be brought up to the same level as that against her, 30% of fair and reasonable market value. Such action, done statewide and involving millions of dollars in taxes, is said to make her claim one inherently incapable of pecuniary valuation. But this does not convert the essential nature of the claim from property tax and fiscal to a right of personal liberty.

*Hornbeak I*, 283 F. Supp. at 551-52 (Godbold, J., majority opinion) (bracketed alteration in original, footnote omitted).

Frank M. Johnson Jr., Chief Judge of the Middle District of Alabama and the third member of the *Hornbeak* panel, filed a vigorous dissent that accused the majority of ignoring the fact that Act No. 502, allowing assessment of property at "anything up to 30 percent," was inequitable, illegal, and failed to meet the minimal demands of the

282

Fourteenth Amendment.

The substance of plaintiff's constitutional claim is that the defendant Commissioner of Revenue for the State of Alabama and his predecessors in office have abridged, and the defendant and his successors in office will continue, unless prevented by this Court, to abridge, the privileges and immunities of the plaintiff and all other citizens of the State of Alabama similarly situated by continuing to refuse to perform, or neglecting to perform, the duties of the office of the Commissioner of Revenue for the State of Alabama.   In testing a complaint against a motion to dismiss, the allegations of the complaint and the reasonable inferences to be drawn therefrom must be assumed to be true.  *Cooper v. Pate*, 378 U.S. 546, 84 S. Ct. 1733, 12 L. Ed. 2d 1030. Thus we find here that Martha Hornbeak, the plaintiff and the owner of real estate located in Jefferson County, Alabama, has her real estate assessed for purposes of ad valorem taxation at 30 percent of its fair and reasonable market value; that the defendant Commissioner of Revenue has the power and duty to maintain equalization of the valuation of real property throughout the State of Alabama for the purposes of assessment for ad valorem taxation; that the defendant Commissioner of Revenue and his predecessors in office have for many years failed, refused or neglected to perform the statutory duties provided by §§ 131 and 133, Title 51, Code of Alabama, pertaining to the supervision and control of the valuation, equalization and assessment of property taxes; [and] that the average assessment of real estate for ad valorem taxation within the State of Alabama is approximately 15.4 percent of the fair and reasonable market value.  The plaintiff says that, by reason of the lack of uniformity in the valuation and assessment of real property by the defendant, she and others similarly situated are deprived of property without due process of law and are also denied the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States. Plaintiff further alleges, and again we must at this point accept as true, that she has no adequate state remedy.  To me, such allegations constitute a cause of action under 42 U.S.C. §§ 1983 and 1988 and are, therefore, cognizable under the federal jurisdictional statute, 28 U.S.C. § 1343(3).

. . . .

In dismissing this case, the majority of this Court is judicially determining that Alabama's statutory procedure for taxation, regardless of how inequitable or illegal, is not subject to the minimal demands of the Fourteenth Amendment to the Constitution of the United States. I simply do not believe this to be the law of this country. It is my firm conviction that such arbitrariness on the part of the State authorities (and upon the present submission it is conceded that the plaintiff has no State remedy) in the assessment of real estate for purposes of taxation by the State of Alabama is, if the appropriate complaint and allegations are made under 42 U.S.C.A. § 1983, cognizable in a federal district court as a "civil action for deprivation of rights" and jurisdiction exists under 28 U.S.C.A. § 1343(3) "to redress the deprivation."

*Id.* at 554-56 (Johnson, J., dissenting) (footnote omitted).[615]  In a footnote, Judge Johnson presciently predicted the ultimate ruling on the constitutionality of Act No. 502 under state law:

Act No. 502, which is under consideration here, legalizes the assessment of property for ad valorem taxation at "anything up to 30 percent." This means anything from one percent (1%) to thirty percent (30%) without any rational basis is authorized by this Act of the Alabama Legislature as a basis for taxing property. While it is not before us at this time, Senate Bill No. 56, which became Act No. 502 — the Act plaintiff is attacking in this case — originated in the Alabama Senate. The Act is clearly unconstitutional by reason of § 70, Article 4, Constitution of Alabama, which requires that all bills for the raising of revenue originate in the House of Representatives.

*Hornbeak I,* 283 F. Supp. at 556 n.1 (Johnson, J., dissenting).

---

[615] Judge Johnson also observed in dissent that *Bussie v. Long,* the basis for the majority opinion, was contrary to "at least four Fifth Circuit cases, . . . the preponderance of authority." *Hornbeak I,* 283 F. Supp. at 555-56 (discussing *Atlanta Bowling Center, Inc. v. Allen,* 389 F.2d 713 (5th Cir. 1968); *Mansell v. Saunders,* 372 F.2d 573 (5th Cir. 1967); *McGuire v. Sadler,* 337 F.2d 902 (5th Cir. 1964); *Hornsby v. Allen,* 326 F.2d 605 (5th Cir. 1964)).

The majority opinion in the *Hornbeak* case was affirmed by the Supreme Court on October 14, 1968, by means of a *per curiam* memorandum.[616]

**h**.   ***Hornbeak v. Rabren*** — M.D. Ala. Civil Action No. 2877-N

Undaunted, Hornbeak commenced a second suit on May 22, 1969, and once again filed it in the U.S. District Court for the Middle District of Alabama, where it was assigned Civil Action No. 2877-N.  She was joined in this action by about one hundred other individuals and several corporations.  All plaintiffs sued on their own behalf, as well as on behalf of all others similarly situated.  The sole defendant was Harvey L. Rabren who, during the interim between Hornbeak's suits, had succeeded Phillip Hamm as Commissioner of the Alabama Department of Revenue.[617]  The various plaintiffs were divided into three groups.  The first subclass was composed of corporate taxpayers owning real property in Jefferson County assessed at thirty percent of fair market value.[618]  The second subclass consisted of minors who attended public

---

[616] *Hornbeak I*, *aff'd*, 393 U.S. 9 (1968) (*per curiam*).  The Supreme Court's *per curiam* memorandum order of affirmance stated simply:  "The motion to affirm is granted and the judgment is affirmed.  Mr. Justice BLACK, Mr. Justice HARLAN, and Mr. Justice STEWART are of the opinion that probable jurisdiction should be noted and the case set for argument."  393 U.S. 9.  There is an indication in a subsequent decision that the Court apparently then believed that there was an adequate remedy available to Hornbeak in state court.  *See Lynch v. Household Finance Corp.*, 405 U.S. 538, 542 n.6 (1971).

[617] In his answers to plaintiffs' interrogatories in *Hornbeak v. Rabren*, No. 2877-N (M.D. Ala. Aug. 28, 1969), Rabren stated that he assumed the duties of Revenue Commissioner on Nov. 1, 1967.  *See* Fed. R. Evid. 201.

[618] The corporate plaintiffs included Booker T. Washington Insurance Company, Inc. ($360,655 assessed value); Ken Realty Company ($237,000 assessed value); and Vulcan Realty and Investment Corporation, Inc. ($416,170 assessed value).  *See Hornbeak v. Rabren*, No. 2877-N, slip

schools in the State of Alabama, and who sued by and through their parents or next friends.[619]  The final subclass consisted of adult taxpayers (of whom Hornbeak was one) who owned taxable property in various counties throughout the State, and who claimed that *ad valorem* assessments by the tax assessors of the counties in which their respective properties were located irrationally and illegally ranged from fifteen to thirty percent of the property's appraised, fair market value.[620]

All plaintiffs alleged that the determination of the appraised, fair market values of comparable properties, as well as the assessment ratios applied by county tax assessors to such fair market values, varied significantly from county to county in violation of Sections 211 and 217 of the Alabama Constitution.[621]  Plaintiffs contended that this lack of uniformity in the appraisal and assessment of taxable property resulted from the failure of the defendant and his predecessors in office to comply with and

---

op. at 1-2 and 3 (M.D. Ala. Oct. 29, 1969) (three-judge court) ("*Hornbeak II* ").  A copy of the slip opinion is attached as **Appendix II-1**.

[619] *Id*. at 2.

[620] *Id*. at 1.

[621] As discussed previously, Section 211 requires that all taxes levied on property in Alabama must be "assessed in exact proportion to the value of such property."  Further, when Section 211 is considered together with Section 217, the two provisions require "uniformity and equality among all taxpayers, 'private corporations, associations and individuals alike,' both as to ratio and percentage of taxation and also as to rate of taxation."  *See, e.g.*, *Alabama Power Co*., 254 Ala. at 336, 48 So. 2d at 452.  "In other words[,] under Sections 211 and 217, all taxable property, by whomsoever owned, in the State of Alabama must be assessed and taxed at uniform ratios for ad valorem purposes."  *Weissinger I*, 230 F. Supp. at 620.

discharge their statutory duties.[622]

Revenue Commissioner Rabren filed a motion to dismiss all claims, "the main thrust of which was to challenge the court's jurisdiction over the subject matter."[623] In an order entered on October 29, 1969, the three-judge district court ruled that the

---

[622] The plaintiffs relied upon two provisions of the Alabama Code:  Title 51, Sections 131 and 133, the pertinent portions of which then read as follows:

> *Powers and duties of department*.  It shall be the duty of the department of revenue . . . (a) To have and exercise general and complete supervision and control of the valuation, equalization and assessment of property . . . and of the enforcement of the tax laws of the state, and of the several county tax assessors, . . . and each and every state and county official, board or commission charged with any duty in the enforcement of tax laws, to the end that all taxable property in the state shall be assessed and taxes shall be imposed and collected thereon in compliance with the law, and that all assessments on property . . . in the state shall be made in exact proportion to the fair and reasonable market value thereof in substantial compliance with the law. (b) To equalize, value and assess . . . any property subject to taxation. . . .

Ala. Code, Title 51, § 131 (1940) (Recomp. 1958).  This statute is currently codified at Ala. Code § 40-2-11 (1975) (2003 Replacement Vol.).  Section 133 of the same Title provided that:

> *Equalization of valuation*. — It shall be the duty of the department of revenue to examine such of the tax records of the several counties as will enable it to ascertain whether the tax valuation of the various classes of property as made in the respective counties of the state, is reasonably uniform as between the respective counties, and is in proportion to the fair and reasonable market value of the property assessed.  . . .  If it shall appear to the said department of revenue that in any one or more counties of this state, . . . the taxable values upon any one or more classes of property are not reasonably uniform with the values fixed upon the same classes of property in other counties, . . . the department of revenue . . . shall have authority to order and direct the board of equalization to readjust and reequalize the same for the current or succeeding tax year, so that each item of property will bear its just proportion of the taxes as provided for herein.  . . .

*Id*. § 133.  The current provision is codified at Ala. Code § 40-2-16 (1975).

[623] *Weissinger I*, 330 F. Supp. at 617.

287

due process claims asserted by the subclass of adult plaintiffs who owned real property in various counties throughout the State (of which Hornbeak was the lead plaintiff), and, the subclass of corporate plaintiffs could not be asserted under 42 U.S.C. § 1983, because their claims involved only "property" rights that were capable of pecuniary valuation,[624] and federal district courts did not have jurisdiction of such claims under 28 U.S.C. § 1343(3).[625]   The court also granted defendant-Commissioner Rabren's motion to dismiss all claims asserted by the subclass of adult plaintiffs under 42 U.S.C. § 1331, saying that the court did not have jurisdiction because the individual claims of each plaintiff did not exceed the required, statutory-threshold amount in controversy ($10,000), and their individual claims could not be aggregated to confer jurisdiction.[626]

On the other hand, the court denied defendant Rabren's motion as to two of the three corporate plaintiffs owning real property in Jefferson County,[627] ruling that the court had jurisdiction over the claims of those defendants asserted under 42 U.S.C. §

---

[624] Those plaintiffs contended that the non-uniform appraisal of the fair market values of comparable properties, and the non-uniform assessment ratios applied to those values by the various county tax assessors, deprived them of the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.

[625] *Hornbeak II*, at 3 (citing *Hornbeak I* ); *see also Weissinger I*, 330 F. Supp.at 617-18.

[626] *Hornbeak II*, at 3 (citing *Snyder v. Harris*, 394 U.S. 332 (1969); *Brown v. Trousdale*, 138 U.S. 389 (1891)); *see also Weissinger I*, 330 F. Supp. at 618.

[627] Those entities were Vulcan Realty & Investment Corp. and Booker T. Washington Insurance Co., Inc.

1331 because "the difference between what each of these plaintiffs presently pays in taxes and what each of them would pay if its real property were assessed at the rate used in Madison County, Alabama . . . exceeds $10,000."[628]

Finally, the court denied defendant's motion to dismiss the Fourteenth Amendment due process and equal protection claims asserted by the subclass of public-school students under 42 U.S.C. § 1983 and its jurisdictional counterpart, saying that those plaintiffs had stated

> an equal protection claim within the meaning of 28 U.S.C. § 1343(3), in alleging that the refusal of the defendant equally to assess real property deprives them of monies to which they and their school districts are entitled.  Where the state undertakes to operate a public school system, it violates the Equal Protection Clause of the Fourteenth Amendment if it differentiates among those meeting the required qualifications for use of the system on grounds not based on rational classifications.  Furthermore, since the right to a non-discriminatory enjoyment of the public school system is incapable of pecuniary valuation, federal district courts have jurisdiction to hear such claims without regard to the amount in controversy.  *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *McGowan v. Maryland*, 366 U.S. 420 (1961); *Baker v. Carr*, 369 U.S. 186 (1962); *Lee v. Macon County Board of Education*, 221 F. Supp. 297, 298 (M.D. Ala. 1963); *Griffin v. County School Board of Prince Edward County*, 377 U.S. 218 (1964); *McInnis v. Shapiro*, 293 F. Supp. 327, 329 (N.D. Ill. 1968), *aff'd sub nom McInnis v. Ogilvie*, 394 U.S. 322 (1969).

---

[628] *Hornbeak v. Rabren*, No. 2877-N, slip op. at 3-4 (M.D. Ala. Oct. 29, 1969) (three-judge court) ("*Hornbeak II*"); *see also Weissinger I*, 330 F. Supp. at 618 ("Defendant's motion was denied . . . as to the two corporate defendants, each alleging an amount in controversy in excess of $10,000.").

*Hornbeak II,* at 1-2.[629]

    **i.**    M.D. Ala. Civil Action No. 2877-N *redux*[630]— the evolution of *Hornbeak v. Rabren* into ***Weissinger v. Boswell*** (June 29, 1971)

As a result of the rulings of the three-judge court on the motions to dismiss filed by Revenue Commissioner Harvey L. Rabren in the *Hornbeak* case discussed in the preceding section, the claims of those corporate plaintiffs that met the required jurisdictional amount and the claims of the subclass of minor schoolchildren evolved into a new action, styled "*Susan Lee Weissinger, et al. vs. Charles A. Boswell.*" Susan Lee Weissinger, a public school student, was the first plaintiff appearing on the court docket after the subclass of adult taxpayers had been dismissed as parties, and Charles A. Boswell had succeeded Harvey L. Rabren as the Commissioner of the Alabama Department of Revenue in 1971, at the beginning of George C. Wallace's second term as Governor.[631] The three-judge panel identified the subclass of corporate plaintiffs

---

[629] A copy of this slip opinion is attached as **Appendix II-1**; *see also Weissinger I*, 330 F. Supp. at 618 ("This Court further ruled in its order of October 29, 1969, that the plaintiff-schoolchildren's due process and equal protection claim stated a cause of action under 42 U.S.C.A. § 1983 and its jurisdictional counterpart, 28 U.S.C.A. § 1343, for the reason that plaintiffs' right to use and enjoy the public schools, free from arbitrary and unreasonable conduct (or lack of conduct) on the part of the Government, is clearly a "civil" right within the meaning of Section 1343. Defendant's motion to dismiss was therefore denied as to the Group II plaintiffs.") (footnotes omitted).

[630] *Redux*: from the Latin, an adjective defined by the *Oxford English Dictionary* as meaning: "Brought back, restored; experienced or considered for a second time; revisited."

[631] *See Charles A. Boswell*, http://www.encyclopediaofalabama.org. Boswell served as Commissioner of Revenue from 1971 to 1979, during George C. Wallace's second and third terms as Governor. *Cf.* Eskew I, at 216-230.

290

as "Group I," and the subclass of public-school students as "Group II." As thus

distinguished, the court described their respective claims in the following manner:

> The corporate (Group I) taxpayers contend that defendant's failure to perform his duties in accordance with state law, and the resultant disparity and inequality in the assessment and taxation of real property in the state, has deprived and continues to deprive them of property, in the form of ad valorem taxes, without due process of law, in violation of the Fourteenth Amendment to the United States Constitution. *The plaintiff-schoolchildren (Group II) contend that since a fixed percentage of the state's ad valorem tax revenue is distributed each year to the various public school districts in the state, defendant's systematic refusal to equalize assessments has deprived these school districts of monies to which they would otherwise be entitled for the education of plaintiffs and all others similarly situated, thus denying plaintiffs due process and equal protection of the law under the Fourteenth Amendment.*

*Weissinger v. Boswell*, 330 F. Supp. 615, 619 (M.D. Ala. 1971) (three-judge court)

(*per curiam*) (emphasis supplied, footnotes omitted) ("*Weissinger I* ").

The district court panel presiding over the *Weissinger* claims[632] acknowledged

that the United States Constitution did not prohibit a state from establishing

"reasonable" classes of property, or from subjecting "one class of property to one rate

of assessment and another class of property to a different rate."[633] Even so, the court

---

[632] The composition of the three-judge district court that entered the *Weissinger v. Boswell* opinion addressed in this section changed slightly from the panel that ruled upon the Revenue Commissioner Harvey L. Raben's motions to dismiss when the action was styled *Hornbeak v. Rabren*: *i.e.*, Senior U.S. District Judge for the Northern District of Alabama Hobart Grooms replaced James Hughes Hancock as the second District Judge sitting with Circuit Judge Godbold and Middle District Judge Frank M. Johnson, to whom the action originally had been assigned.

[633] *Weissinger I*, 330 F. Supp. at 619-20 ("Preliminarily, it should be noted that this case does not question the right of a state to establish different classes of property. Nor does it question the

291

held that,

> when a state, such as Alabama, has decided, through its duly elected officials, that all property in the state shall be assessed and taxed at a uniform ratio, and has enacted laws and formulated procedures to ensure this end, any substantial disparity or differences in taxation resulting from the failure of state officers to properly administer the state's tax laws will offend the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

> . . . .

> Even if the State of Alabama were permitted by its own Constitution and laws to classify property for tax purposes, it is clear that its present ad valorem tax program still would not comport with the stringent requirements of the Federal Constitution.  While distinctions based on geographical areas are not, in and of themselves, violative of the Fourteenth Amendment, *Salsburg v. Maryland*, 346 U.S. 545, 74 S. Ct. 280, 98 L. Ed. 281 (1954), a state must demonstrate, if it wishes to establish different classes of property based upon different geographical localities — *e.g.*, rural areas as opposed to urban areas — that the classification is neither capricious nor arbitrary but rests upon some reasonable consideration of difference or policy.  *State Board of Tax Comm'rs of Indiana v. Jackson*, 283 U.S. 527, 537, 51 S. Ct. 540, 75 L. Ed. 1248 (1931).  Such a showing has not been made in this case.

> Defendant has, for example, offered no explanation in an attempt to justify or explain why an urban area like Jefferson County assesses property at a higher percentage (26.8%) of actual cash value than does a rural area like Elmore County (9.7%), while at the same time an area like Dallas County with one municipality of substantial size —Selma— assesses property at a higher percentage (23.1%) of fair market value than does a similar area like Montgomery County (15.5%), which also

---

right of a state to subject one class of property to one rate of assessment and another class of property to a different rate.") (footnote omitted); *see also id*. at 622 ("It is true that the Federal Constitution does not prohibit a state from establishing reasonable classes of property and taxing these classes at different rates.") (footnote omitted).

has only one municipality of a substantial size.  Nor has any evidence been submitted to explain why property in Dale County is assessed at 19.1 percent of fair market value, while property in neighboring Coffee and Geneva Counties is assessed at 13.5 and 9.2 percent of actual cash value.

Being unable to find any legitimate state objective to be served by the vast disparity which presently exists in Alabama's ad valorem tax program, this Court is forced to conclude that the variation in percentages, as between geographical areas of the state, results in the arbitrary classification of taxable property and therefore violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

*Weissinger I,* 330 F. Supp. at 622-24.[634]

After ordering that "like property must be treated in a like manner,"[635] the three-judge panel in *Weissinger I* retained jurisdiction of the case, and allowed the Revenue Commissioner one year to bring the State's *ad valorem* tax system into compliance with the court's mandate.[636]

---

[634] *See also*, *e.g.*, *Louisville & Nashville Railroad Co. v. Public Service Comm'n of Tenn.*, 249 F. Supp. 894, 902 (M.D. Tenn. 1966), *aff'd*, 389 F.2d 247 (6th Cir. 1968) ("[T]he Fourteenth Amendment clearly prohibits unequal treatment within a class. . . .").

[635] *Weissinger v. White*, No. 2877-N, slip op. at 2 (M.D. Ala. Oct. 5, 1983) (Thompson, J.) ("The mandate of this court in 1971 was simple:  like property must be treated in a like manner.").

[636] *See Weissinger I*, 330 F. Supp. at 625 ("The Court is aware of the impact of the present decision upon the tax structure of the state and its subdivisions, since the type of discriminatory treatment here involved is deep-seated and of long standing.  For these reasons, the Court will give defendant [Commissioner of Revenue Charles A. Boswell] a reasonable period of time, up to one year from the date of this opinion and order, to bring assessments throughout the state into conformity with the mandate of this opinion.  It is so ordered.").

j.   **Amendment 325**:   *the initial Legislative response to the* Weissinger *mandate*

The Alabama Legislature responded to the *Weissinger I* decision with legislation directing statewide reappraisal on a uniform basis of all property subject to *ad valorem* taxation.  *See* Act of January 19, 1972, No. 160, 1971 Ala. Acts 4404-4409, subsequently codified at Ala. Code §§ 40-7-60 *et seq*. (1975).  The legislature also proposed a constitutional amendment that was designed to slip a revised Section 217 through the loophole identified in the *Weissinger* opinion — *i.e.*, that portion of the opinion acknowledging that "the Federal Constitution does not prohibit a state from establishing *reasonable classes of property* and *taxing these classes at different rates*"[637] — and thereby legitimize the illicit, *de facto* classification scheme that had been declared unconstitutional by the three-judge district court panel.[638]  *See* Ala. Const. amend. 325, proposed by Act of January 9, 1972, No. 116, 1971 Ala. Acts 4339

---

[637] *Id.* at 622; *see also id.* at 619-20 ("Preliminarily, it should be noted that this case does not question the right of a state to establish different classes of property.  Nor does it question the right of a state to subject one class of property to one rate of assessment and another class of property to a different rate.  The sole question presented in this case, as will be seen, is whether a state has the right to assess property in the same class at different ratios.") (footnotes omitted).

[638] *See* PX 841 (copy of *Stanley v. Eagerton*, No. 79-3448, slip op. (5th Cir., Unit B, July 16, 1981) (*per curiam*)), at slip op. page 2 ("The Alabama Legislature responded [to the decision in *Weissinger I*] by enacting Act No. 160 at the Third Extraordinary Session of 1971, Ala. Code § 40-7-60 *et seq*., directing a statewide reappraisal on a uniform basis of property subject to ad valorem taxation.  Also in 1971 the State Legislature proposed a constitutional amendment to Section 217 of the Constitution of Alabama of 1901."); *McCarthy v. Jones*, 449 F. Supp. 480, 484 (S.D. Ala. 1978) (Hand, J.) (observing that Amendment 325 "was passed in response to the *Weissinger* decision").

*et seq.*, amending Ala. Const. art. XI, § 217 (1901).[639]

As previously discussed in Part I(C)(1)(a)(*iv*)(A), *supra*, Amendment 325 created three classes of taxable property,[640] each assessed at a different ratio of appraised (fair market) value,[641] and imposed a cap (or "lid") of 1.5% of fair market value on the *aggregate* amount of *ad valorem* taxes that could be levied by *all* taxing authorities in a single tax year on property grouped within any of the three classes.[642]

The most telling indication that Amendment 325 was designed to evade the fiscal impact upon Alabama taxpayers portended by the decision in *Weissinger I*, however, was found in subsection (c) of the amendment, which authorized the legislature to vary the assessment ratios specified in the amendment among the State's 67 counties, so long as each ratio was uniform within a county.

> (c) With respect to ad valorem taxes levied by counties, municipalities or other taxing authority [sic], all taxable property shall be forever taxed at the same rate, and such property shall be assessed for ad valorem tax purposes according to the classes of property defined in paragraph (a) herein and at the same ratios of assessed value to the fair and reasonable market value thereof as fixed in paragraph (b) herein, provided, however, that the legislature may vary the ratio of assessed

---

[639] See "**Appendix I-3**" for the full text of Ala. Const. art. XI, § 217 (1901), as modified by amend. 325, ratified on June 8, 1972.

[640] Class I, all property of utilities used in the business of such utilities; Class II, all property not otherwise classified; and Class III, all agricultural, forest, and residential property.

[641] The ratios were 30% of the "fair and reasonable market value" for Class I properties; 25% for Class II properties; and 15% for Class III properties.

[642] *See* Ala. Const. art. XI, § 217(h), as modified by Amend. 325, ratified on June 8, 1972 (*reproduced at* Ala. Code Vol. 1 (Recomp. 1958) (1973 Cum. Supp.), at 292).

value to the fair and reasonable market value as to any class of property as defined in paragraph (b) herein, and provided, further, that the legislature may fix a uniform ratio of assessment of all property within a county defined in paragraph (a) herein as Class II and III and may fix a different ratio of assessment for property defined in paragraph (a) as Class I. *Such ratios as herein authorized may vary among counties so long as each such ratio is uniform within a county.*

No class of property shall have a ratio of assessed value to fair and reasonable market value of less than 15 per centum nor more than 35 per centum.

Ala. Const. art. XI, § 217(c), *added by* amend. 325(c) (*ratified* June 8, 1972) (emphasis supplied).  In effect, subsection (c) allowed the Alabama Legislature to assign different assessment ratios to comparable properties situated in different counties, thereby creating distinctions based on geographical location — the same arbitrary and irrational basis for distinction condemned in *Weissinger I.*  Not surprisingly, therefore, both subsection (c) and its implementing statute, Ala. Code § 40-8-1(e) (1975), eventually came under constitutional attack.

> **k**.   ***McCarthy v. Jones*** — S.D. Ala. Civil Action No. 77-242-H and the second invalidation of variable assessment ratios

The suit challenging Amendment 325 and its implementing statute was filed in the U.S. District Court for the Southern District of Alabama by a class composed of 77,000 public school students residing in seventeen Alabama counties: *i.e.*, Barbour, Bibb, Bullock, Clay, Cleburne, Coffee, Dale, Etowah, Hale, Henry, Houston,

Limestone, Monroe, Morgan, Perry, Randolph, and Wilcox.  *See McCarthy v. Jones*, 449 F. Supp. 480, 481-82 (S.D. Ala. 1978).  Defendants were the tax assessors and collectors in the same counties.[643]

Subsection (a) of the statute implementing Amendment 325 conflated the first two subsections of the amendment,[644] and read as follows:

> With respect to ad valorem taxes levied by the state, and, unless otherwise provided with respect to ad valorem taxes levied by a county, municipality or other taxing authority other than the State all taxable property shall be divided into the following classes and no other and shall be assessed for ad valorem tax purposes at the following ratios of assessed value to the fair and reasonable market value of such property:
>
> CLASS I.    All property of utilities used in the business of such utilities, 30%.
>
> CLASS II.   All property not otherwise identified, 25%.
>
> CLASS III.  All agricultural, forest and residential property, 15%.

Act of September 20, 1973, No. 1216, § 1(a), 1973 Ala. Acts 2062, originally codified at Ala. Code Title 51, § 17(1) (1940) (Recomp. 1958) (Supp. 1973), but subsequently recodified as Ala. Code § 40-8-1(a) (1975).

The district court found that Amendment 325(c) allowed "the state legislature to create distinctions in the rate of assessment of similar property in different counties,

---

[643] *McCarthy*, 449 F. Supp. at 482; *see also id.* at 485 ("Appendix A").

[644] See "**Appendix I-3**" for the full text of Ala. Const. art. XI, §§ 217, as modified by Amend. 325, ratified on June 8, 1972.

and that, in the instant case, such authorization has been employed to create such

distinctions based on nothing other than geographical location."[645]   Specifically,

Alabama Code § 40-8-1(e) provided:

> (e) In the following designated counties taxable property shall be assessed at the ratio of assessed value to fair and reasonable market value for each class of property at the rate indicated:

| County | Class I | Class II | Class III |
|--------|---------|----------|-----------|
| Morgan | 30% | 20% | 20% |
| Limestone | 30% | 20% | 15% |
| Etowah | 30% | 20% | 15% |
| Clay | 30% | 20% | 15% |
| Cleburne | 30% | 20% | 15% |
| Barbour | 30% | 15% | 15% |
| Coffee | 30% | 15% | 15% |
| Bullock | 30% | 15% | 15% |
| Hale | 30% | 15% | 15% |
| Wilcox | 30% | 15% | 15% |
| Monroe | 30% | 15% | 15% |
| Randolph | 30% | 15% | 15% |
| Perry | 30% | 15% | 15% |
| Bibb | 30% | 15% | 15% |
| Houston | 30% | 15% | 15% |
| Dale | 30% | 15% | 15% |
| Henry | 30% | 15% | 15% |

---

[645] *McCarthy*, 449 F. Supp. at 483.

298

| Jefferson | 30% | 25% | 20% |
| Calhoun | 30% | 25% | 15% |

Ala. Code § 40-8-1(e) (1975).[646]  In other words, this statutory scheme *mandated* that comparable Class II and Class III taxable properties located in nineteen of the State's 67 counties "shall be assessed" at different ratios of fair market value.  As a result, the seventeen counties implicated by the *McCarthy* suit had "a lower [assessed] property value upon which tax rates may be applied than would be available if the counties employed the state wide assessment rates set out in section 40-8-1(a)."[647]

There was no logical, geographic basis tying the counties together, and there was no reasonable justification for the distinctions in assessment ratios among them. The counties identified in the statute were scattered from the Wiregrass, in the southeastern corner of the State; to Limestone and Morgan counties, bracketing the

---

[646] Following the enactment of the Act of Sept. 20, 1973, No. 1216, 1973 Ala. Acts 2062, this language was originally codified at Ala. Code Title 51, § 17(5) (1940) (Recomp. 1958) (Supp. 1973), but subsequently recodified as cited in text:  Ala. Code § 40-8-1(e) (1975).

[647] *McCarthy,* 449 F. Supp. at 482 (alteration added, footnote omitted). *Nota bene* that none of the public school students on whose behalf *McCarthy* was filed resided within Jefferson or Calhoun counties and, therefore, the assessment ratios for those two counties were not at issue in *McCarthy.*

Also, note that the *McCarthy* plaintiffs' complaint focused upon the variable assessment ratios for Class II taxable properties ("all property not otherwise identified"), which Amendment 325 specified should be assessed at 25% of fair market value, because:  (a) Class I property of public utilities under the contested statute was assessed at the ratio specified in the Amendment (30%); and (b) Class III property in all of the counties identified in Ala. Code § 40-8-1(e), except for that located in Morgan and Jefferson Counties, was to be assessed under the statute at the ratio specified in Amendment 325 (15%).

Tennessee River in north-central Alabama; three were in east-central Alabama, along the Georgia line; and three were in the Black Belt.  *See* "**Map II-1**" on the following page.  Accordingly, the district court held that Alabama Code § 40-8-1(e) violated the Fourteenth Amendment's Equal Protection Clause.

> There is no rational pattern tying together the seventeen counties with decreased assessment ratios.  The Court takes judicial notice that many sparsely populated, rural counties are on the list, such as Bullock, Hale, Wilcox, Perry, and Bibb counties.  But there are other counties on the list that contain some of the larger municipalities within the state, such as Morgan (Decatur), Etowah (Gadsden), Barbour (Eufala) and Houston (Dothan).  Certainly there is no urban/rural dichotomy objective.  Nor is there a geographical objective, since the list includes counties in every area of the state; some are contiguous, some are not.  Facially, there is clearly no geographical justification for the statutory scheme.  The Court is of the opinion that the statutory scheme at issue is totally without a rational basis in making distinctions between the ratios of assessment of ad valorem taxes in various counties, and that, on this basis, the statute is repugnant to the Fourteenth Amendment to the United States Constitution.  . . .[648]

Nevertheless, the district court refused to strike down Amendment 325(c) as *facially* unconstitutional, saying that it might be possible for a future state legislature to ground variations in assessment ratios in different counties on some reasonable consideration of difference or policy.

> This Court does not subscribe to the theory that the fact that a statutory scheme is unconstitutional serves to invalidate the enabling legislation under which it was adopted.  The Court is convinced that a statutory

---

[648] *McCarthy*, 449 F. Supp. at 484 (footnote omitted).

scheme allowing variations in the assessment ratios in different counties grounded upon a legitimate and rational state interest would not be violative of the Fourteenth Amendment.  Since the Court is convinced that the Amendment itself permits the adoption of valid legislation, the Court is of the opinion that the relief requested as to the Amendment is due to be DENIED.[649]

### *l.      Thorn v. Jefferson County* — Ala. Sup. Ct. (Sept. 28, 1979)

Amendment 325 and the implementing statute addressed in *McCarthy* also came under attack in a class action filed in the Circuit Court of Jefferson County.  The plaintiffs claimed that the levy of taxes based upon Alabama Code § 40-8-1(e) (1975) violated the Fourteenth Amendment's Equal Protection Clause because

> they were required to pay ad valorem taxes to the Jefferson County Tax Collector on Class III [agricultural, forest, and residential properties] based upon an assessment rate of 20% of the market value of the property while taxpayers in other counties were required to pay only at the rate of 15% of the market value of the property.  . . .

*Thorn v. Jefferson County*, 375 So. 2d 780, 781 (Ala. 1979).  The circuit court granted defendants' motion to dismiss, and plaintiffs appealed to the Alabama Supreme Court, which reversed.  The Court found no rational basis for the variation in assessment ratios specified in the statute for Class III property.[650]  The Court remanded the case, with a direction for the circuit court to determine whether defendants could

---

[649]*Id.* at 484-85.

[650] *See Thorn*, 375 So. 2d at 785 (quoting *Weissinger I*, 330 F. Supp. at 623-24). "As to Class II property, § 40-8-1(e) has already been declared unconstitutional by a Federal District Court in *McCarthy v. Jones*, 449 F. Supp. 480 (S.D. Ala. 1978)."  *Id.*

demonstrate a rational basis for the variations.

> There may be a rational reason why the Legislature selected Jefferson and Morgan Counties for special classification. We do not now hold that there was no rational basis for the legislation, but we would point out that it is difficult for this Court to understand why citizens of Jefferson County should be taxed at a higher rate than citizens of Mobile County and Montgomery County. Why should citizens of Morgan County be taxed at a higher rate than citizens of Madison County? . . .[651]

> > m.   **Amendment 373** — *the second Legislative attempt to deflect the substantial increases in* ad valorem *taxes portended by the* Weissinger *mandate*

As the Supreme Court of Alabama observed in its 1983 decision in *Eagerton*

*v. Williams*, 433 So. 2d 436 (Ala. 1983), the state-wide reappraisals conducted in

response to the *Weissinger* mandate

> took considerably longer to complete than the one year contemplated by the federal court. *It* [also] *became clear that many Alabama landowners' property taxes would increase significantly.* In 1978, the Governor called the legislature into special session *to avert the substantial increases in ad valorem taxes imminent under the new appraisals.*

> Included in the governor's tax relief package was a proposed amendment to Section 217 of the Constitution of Alabama of 1901. It passed the legislature, was ratified by the people, and is now Amendment No. 373 to the Constitution of 1901. . . .[652]

During the same special session in which the Act proposing Amendment 373

---

[651] *Id.* at 787.

[652] *Eagerton,* 433 So. 2d at 238-39 (emphasis supplied, footnotes omitted).

(*i.e.*, the Act of August 4, 1978, No. 6, 1978 Ala. Acts 1602-09)[653] was passed, the Alabama Legislature also passed a series of acts designed to implement the provisions of the proposed amendment, in the event it was ratified by a majority of voters.

Two of those acts — *i.e.*, the Act of August 7, 1978, No. 46, 1978 Ala. Acts 1724-29, and, the Act of August 8, 1978, No. 135 (House Joint Resolution 172), 1978 Ala. Acts 1868-74 — together with the enabling provisions of Amendment 373, became the subjects of the issues presented in an amended complaint filed by the subclass of public school student plaintiffs who had initiated *Hornbeak v. Rabren*, subsequently restyled *Weissinger v. Boswell*, Civil Action No. 2877-N in the U.S. District Court for the Middle District of Alabama.

By the time those plaintiffs filed a motion to amend their complaint on December 6, 1978, however, the style of the action had evolved yet again, to "*Susan Lee Weissinger, et al. vs. Ralph P. Eagerton Jr., et al.*," as a result of the fact that Forrest Hood ("Fob") James, Jr., had been elected Governor in 1978, and, in January of 1979, had appointed Ralph P. Eagerton to be the Commissioner of Revenue.[654] That

---

[653] Act No. 6, which proposed Amendment No. 373 to the Constitution of Alabama for the purpose of further amending Section 217, as previously modified by Amendment No. 325, was proposed and enacted during the Second Special Session of the Alabama Legislature that convened on July 31, 1978.

[654] *See* PX 841 (copy of *Stanley v. Eagerton*, No. 79-3448, slip op. (5th Cir., Unit B, July 16, 1981) (*per curiam*)) at 2 ("This action was originally filed as a class action in 1969 [*i.e., Hornbeak v. Rabren*, No. 2877-N, slip op. (M.D. Ala. Oct. 29, 1969) (three-judge court)] challenging the federal constitutional validity of Alabama's ad valorem tax structure.  On June 29, 1971, a three-

chapter in the ongoing litigation is addressed in the following section.

  **n.**   ***Weissinger v. Eagerton*** — M.D. Ala. Civil Action No. 2877-N *continued*

As discussed in Parts I(C)(1)(a)(*iv*)(B) and II(F)(2)(b), *supra*, Amendment 373 altered Section 217 of the Constitution, as previously amended by Amendment 325, by creating a fourth class of taxable property, and, by changing some of the assessment ratios prescribed by Amendment 325.  The most important purposes of Amendment 373, however, were to place a cap (or "lid") on the *aggregate* amount of *ad valorem* taxes that could be levied by *all* taxing authorities in any one year on taxable property within *each* of the four classes (*i.e.*, 2.0%, 1.5%, 1.0%, and 1.25% of the fair market value of taxable properties grouped in Class I, II, III, and IV, respectively), *and*, the creation of a "current use" option, available to taxpayers owning Class III properties, and which allowed the owners of agricultural, forest, residential, and historic properties to elect to have their property appraised at its "current use value," as opposed to the property's fair and reasonable market value.  It was those provisions of the Amendment and their implementing statutes that the *Weissinger* subclass of public school students (the "Group II plaintiffs") challenged as violating the Fourteenth Amendment's Equal Protection Clause in this installment of the ongoing

judge district court panel entered an order [in *Weissinger I* that] found that the vast disparities that existed in the Alabama ad valorem tax system violated the fourteenth amendment's equal protection clause.") (alterations added).

304

Middle District litigation identified by Civil Action No. 2877-N.

After striking down only a small and, in the broad scheme of things, unimportant section of one of the statutes,[655] the three-judge district court dismissed the plaintiffs' facial challenge to the current use provisions of Amendment 373 and Act No. 135 under the Equal Protection Clause. The court applied the test set forth in its *Weissinger I* opinion,[656] and concluded that the plaintiffs had failed to carry their burden of proof.

> In considering plaintiffs' Fourteenth Amendment challenge to the current use valuation provisions, the following from this court's June 29, 1971 order is quite pertinent:
>
> > "It is well established that the states have wide discretion in the laying and collection of their taxes. The law is equally clear, however, that such discretion cannot be exercised so as to arbitrarily deprive persons of their constitutional rights. So, while the Fourteenth Amendment does not require precise equality or uniformity in taxation, or prohibit inequality in taxation which results from mere mistake or error in judgment of tax officials, it does 'secure every person within the state's jurisdiction against

---

[655] The court found that § 4 of Act No. 46 (which authorized a tax credit to taxpayers in counties that had collected higher taxes as a result of early completion of the property reappraisals ordered by *Weissinger I*) violated § 45 of the Alabama Constitution (which requires each Bill introduced in the state legislature to contain only one subject that must be clearly expressed in its title) because, before enactment, Act No. 46 (originally House Bill 171) was amended on the floor of the state House of Representatives to add § 4 to the text of the bill, but without amending the title of the bill. Defendant Eagerton conceded, and the court agreed, "that the presence of Section 4 in Act 46 causes Act 46 to be materially broader than its title and therefore its presence offends Section 45 of the Alabama Constitution of 1901." PX 840 (*Weissinger v. Eagerton*, No.2877-N, slip op. at 5 (M.D. Ala. Mar. 26, 1979) (three-judge court) (*per curiam*)) ("*Eagerton*").

[656] *See Weissinger I*, 330 F. Supp. at 621-22.

intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' Stated differently, the Fourteenth Amendment protects only against taxation which is palpably arbitrary or grossly unequal in its application to the persons concerned." [footnotes omitted] 330 F. Supp. at page 621.

Thus, to mount a successful challenge based upon a denial of equal protection, plaintiffs must show either (a) that there is no legitimate objective which the current use value classification is designed to achieve, or (b) that the current use value classification arbitrarily accomplishes or seeks to accomplish what otherwise would be a legitimate objective. Plaintiffs have shown neither. Indeed they virtually admit the objective sought to be achieved by the current use value classification is legitimate. And while plaintiffs do point out discriminatory effects of that classification, they have clearly failed in their effort to show that such discrimination is arbitrary. In *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, at 528 (1959), the court stated:

> " . . . [I]t has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it."

Defendant's brief and argument present a variety of reasonable bases for current use value classification, including the preservation of owner-occupied homes in or near developing urban areas, the preservation of land for farming or forestry purposes, the continued maintenance of historic properties, and the equalization of the tax burden on similar properties used for the same purpose. In short, plaintiffs have failed to carry the burden which rests on them in their effort to have Section 217(j) of the Alabama Constitution of 1901 and Act 135 declared facially unconstitutional and the order and decree at the end of this opinion will so hold.

*Weissinger v. Eagerton*, No. 2877-N, slip op. at 6-8 (M.D. Ala. Mar. 26, 1979)

306

(three-judge court) (*per curiam*) (PX 840) ("*Eagerton*").[657]

It is important to note that the *Eagerton* three-judge court determined only that the "current use" provisions of Amendment 373 were *facially* constitutional: the door was left open for "any person with proper standing . . . to pursue in an appropriate forum a claim of unconstitutional *application* of the 'current use value' provisions."[658]

In addition, the plaintiffs challenged Amendment 373(i), which places different ceilings (or "lids") on the aggregate tax levy for each of the four classes of property. Again, the court held that plaintiffs had failed to show that the classification was unreasonable or arbitrary.

> Plaintiffs also seek a declaration that Section 1(i) of Act 6 [which is now Section 217(i) of the Constitution of Alabama of 1901 by virtue of the approval of the votes on November 7, 1978, of Constitutional Amendment Number 373 proposed by Act 6] violates the Equal Protection Clause of the Fourteenth Amendment. Section 1(i) of Act 6 substitutes a different ceiling on the tax burden for each class of property rather than the single 1½% of value ceiling applicable to all classes of property under Amendment No. 325 to the Constitution of Alabama of 1901. Under the challenged provision the total ad valorem taxes payable

---

[657] This decision was affirmed *sub nom*. *Stanley v. Eagerton*, No. 79-3448, slip op. (5th Cir., Unit B, July 16, 1981) (*per curiam*). A copy of the Fifth Circuit opinion is identified in this record as PX 841.

[658] *Eagerton,* slip op. at 5. In that portion of the brief submitted by the schoolchildren subclass in support of (and also during their attorney's oral argument on) Count IV of plaintiffs' amended complaint — which alleged that the "current use" provisions of the amendment and implementing statute were unconstitutional on their face — plaintiffs attempted "to broaden their challenge to include a claim of unconstitutionality *as applied*." *Id.* at 6 (emphasis added). The three-judge district court panel did not permit the challenge to be expanded, and determined only plaintiffs' claim of facial unconstitutionality.

to all taxing authorities in any one year cannot exceed 2%, 1½%, 1% or 1¼% of fair and reasonable market value with regard to Classes I, II, III and IV, respectively. While three cities are expressly exempted from this ceiling, any other city and any county may obtain a similar exemption through a future constitutional amendment, and it is admitted that the enumerated three cities were the only cities in the state exceeding the proposed ceiling at the time of its adoption.

Plaintiffs concede that the objective sought by Section 1(i) of Act 6 is a proper objective, but once again they have not shown the approach the legislature selected to accomplish that objective to be unreasonable or arbitrary. While it is theoretically possible to have a variation in the rate of property tax owing the state in two different counties, no such variation exists at the present time. And in view of the valid objective sought by the challenged law, the *possibility* of a slight variation is not sufficient to justify a holding that Section 217(i) of the Constitution of Alabama of 1901 is unconstitutional on its face. The order and decree at the end of this opinion denying plaintiffs relief on their challenge of the validity of such Section 217(i) will of course not prevent any person with proper standing challenging hereinafter in an appropriate forum the constitutionality of an application of such Section 217(i) which produces an unacceptable variation.

*Id.* at 8-9.[659]

_____

[659] The subclass of schoolchildren plaintiffs also contended in Count VII of their amended complaint that the summary of Amendment 373 printed on the ratification election ballot omitted several important provisions that served to deceive the voters and, thereby, violated Section 285 of the 1901 Alabama Constitution. The three-judge district court noted in its order, however, that:

When confronted with *Jones v. McDade*, 200 Ala. 230 (1917), plaintiffs conceded during oral argument that the ballot did satisfy Section 285 and they abandoned that argument. They then, for the first time, orally pursued a due process claim under the Fourteenth Amendment. That claim is totally outside the scope of the issues framed by the pleadings before the court and will not be allowed as a basis for relief under Count VII. Plaintiffs having conceded that their original basis for relief under Count VII is not valid, defendant's motions for summary judgment on that claim will be granted.

      **o.**   ***Weissinger v. White*** — M.D. Ala. Civil Action No. 2877-N
*continued* (Oct. 5, 1983)

Amendment 373 was again challenged in Middle District Case No. 2877-N by the subclass of minor public schoolchildren (Group II) plaintiffs who initiated *Hornbeak v. Rabren*, subsequently restyled "*Weissinger v. Boswell*," and then "*Weissinger v. Eagerton*." In this chapter of the fourteen-year-old lawsuit, the style changed yet again, to "*Susan Lee Weissinger et al. vs. James C. White, et al.*," to reflect the re-election of George C. Wallace to his fourth (and final) term as Governor, and his appointment of James C. White as his Revenue Commissioner. Moreover, the three-judge district court panel had dissolved itself on August 26, 1980, and reassigned the case to a single judge, Myron Thompson,[660] for the purpose of supervising the implementation of the three-judge court's prior orders.[661]

This installment of the ongoing litigation focused upon that aspect of

*Id.* at 10. On April 4, 1979, the plaintiff schoolchildren subclass filed a motion requesting that the district court either reconsider its decision as to Count VII, or allow plaintiffs to amend their complaint to add a new Count VIII, essentially restating Count VII in the framework of a Fourteenth Amendment Due Process claim. Both aspects of that motion were denied by the district court, and those decisions — and only those decisions of the district court panel — were appealed to and affirmed by the former Fifth Circuit in an unpublished opinion entered on July 16, 1981. *See* PX 841 (copy of *Stanley v. Eagerton*, No. 79-3448, slip op. (5th Cir., Unit B, July 16, 1981) (*per curiam*)).

[660] Myron Thompson was nominated by President Carter to fill the Middle District seat vacated when Judge Frank M. Johnson Jr. was elevated to the former Fifth Circuit Court of Appeals. He was confirmed by the Senate on Sept. 26, 1980, becoming only the second person of African heritage to serve on a United States District Court in Alabama.

[661] *See Weissinger v. White*, No.2877-N, slip op. at 6 n.7 (M.D. Ala. Oct. 5, 1983) (citing *Costello v. Wainwright*, 430 U.S. 325 (1977) (*per curiam*); *Wyatt v. Ireland*, 515 F. Supp. 888 (M.D. Ala. 1981)).

Amendment 373 which allowed the owners of Class III properties (agricultural, forest, historical, and single-family, owner-occupied residential dwellings) the option of affirmatively electing to have their property assessed at its "current use value," as opposed to its fair and reasonable market value.  The amendment did not define the term "current use value," however, but instead authorized the legislature to determine and enact criteria and procedures for determining the current use value of eligible property.  In relevant part, Amendment 373(j) provided that:  "The legislature may enact laws uniformly applicable to the state and all counties, municipalities and other taxing authorities establishing criteria and procedures for the determination of the current use value of any eligible taxable property and procedures for qualifying such property for assessment at its current use value."

The Alabama Legislature initially responded to that enabling language with the Act of Aug. 8, 1978, No. 135 (also sometimes identified as "House Joint Resolution No. 172"), 1978 Ala. Acts 1868-74, which directed the Department of Revenue to "prescribe all needful rules and regulations for the enforcement and implementation" of the current use provisions of Amendment 373 by May 1, 1979.  *Id*. § 4, at 1870-71.  When the Department failed to issue any guidelines or regulations by that deadline, however, "the legislature responded with guidelines of its own, in the form of House Joint Resolution No. 153, 1979 Ala. Acts 269 . . . ."  *Eagerton v. Williams*, 433 So. 2d

310

436, 440 (Ala. 1983) (bracketed alteration added, footnote omitted).  House Joint

Resolution 153, also referred to as Act of May 31, 1979, No. 79-163, was the first

legislation to suggest "current use" valuation of farm and timber lands under a

complex "net income" formula based on ten soil groups — each having a suggested

net income flow per acre, with the net income being capitalized on the most recent

five-year average of the interest rates on certain long-term, United States Government

bonds.[662]

Act No. 135 and the Legislative Guidelines specified in Act No. 79-163

("House Joint Resolution 153") were repealed by the Act of Apr. 20, 1982, No. 82-

302, 1982 Ala. Acts 383, which replaced both with the current law now codified at

Alabama Code § 40-7-25.1 (1975) (2003 Replacement Vol.).  Act 82-302 directed that

current use valuation be made by employing a "standard value" method.

> Standard value can be calculated in one of two ways, depending on
> whether the property is agricultural or forest as opposed to residential or
> historic.  Residential and historic land is to be valued in much the same
> way as set forth in Act 135.  Conversely, Act 82-302 directs that the
> standard value of agricultural and forest land be computed applying a
> capitalized net income approach.

---

[662] *See* Act of May 31, 1979, No. 163 ("House Joint Resolution 153"), 1979 Ala. Acts 269; *see also Weissinger v. White*, 733 F.2d 802, 805 n.9 (11th Cir. 1984); *Weissinger v. White*, No. 2877-N, slip op. at 5; *Eagerton v. Williams*, 433 So. 2d at 441.  The current use valuation of historical and single-family, owner-occupied residential properties was based upon the fair market value of comparable properties, and on the assumption that the subject property being valued could never be put to a use different from the existing one.

311

*Weissinger v. White*, 733 F.2d 802, 805 (11th Cir. 1984) ("*Weissinger II*") (footnotes

omitted).  The district court opinion described those different methodologies more

specifically:

> *Current use value for residential and historical property* was based on
> the fair and reasonable market value of comparable property, with the
> assumption that the property being valued could never be put to a use
> different from the existing one.  *In contrast, current use value for
> agricultural and forest property* was unhinged from the concept of fair
> and reasonable market value; instead, current use value was based on a
> legislatively created complex formula, characterized and summarized by
> the Alabama Supreme Court as follows:  "[T]he current use value of
> agricultural and forest property [is] determined from a 'net income'
> formula.  This formula established ten soil groups along with a suggested
> net income per acre, the net income being capitalized at a percentage
> based on the most recent five-year average of the interest rates on
> long-term United States Government bonds."  *Eagerton v. Williams*, 433
> So. 2d at 441 (footnote omitted).  The intended effect of the formula was
> that agricultural and forest property located both in rural areas and in and
> near urban areas should be assessed at less than its fair and reasonable
> market value.  *Id.*, 433 So. 2d 443-46.

*Weissinger v. White*, No. 2877-N, slip op. at 5-6 (M.D. Ala. Oct. 5, 1983).[663]

Act No. 82-302 was the focus of the amended complaint filed by the subclass

of minor schoolchildren in the case discussed in the present section:  *i.e.*, "*Susan Lee

Weissinger et al. vs. James C. White, et al.*"  They argued that the current use option

authorized by Acts 135 and 82-302 created property classifications or distinctions

---

[663] The "current use standard value per acre" computations for the valuation of agricultural
and timber properties mandated by Act 82-302 were discussed previously, in Part II(F)(2)(b)(ii) of
this opinion, *supra*.

312

between (*a*) Class III property and all other classes of property, and (*b*) within Class III, a distinction between residential and historical properties *and* agricultural and forest properties. The plaintiffs claimed that such distinctions violated the Fourteenth Amendment's Equal Protection Clause, the 1971 order of the *Weissinger* court, and Amendment 373 to the Alabama Constitution. District Judge Myron Thompson rejected the contentions of the schoolchildren subclass, however, saying:

> Since this court in 1971 did nothing more than order state officials to adhere to the dictates of the fourteenth amendment, resolution of the plaintiffs['] fourteenth amendment claim also resolves the claim of non-compliance with prior orders of this court.
>
> It is beyond cavil that the United States Constitution does not prohibit states from classifying property and taxing different classes of property differently. Forty-three years ago the Supreme Court declared "[t]hat the states may classify property for taxation; may set up different modes of assessment, valuation and collection; [and] may tax some kinds of property at higher rates than others . . . — these are among the commonplaces of taxation and constitutional law." *Nashville, Chattanooga & St. Louis Railway Co. v. Browning*, 310 U.S. 362, 368, 60 S. Ct. 968, 972 (1940). This principle remains vital today. *Western & Southern Life Insurance Co. v. State Board of Equalization of California*, 451 U.S. 648, 656-57, 101 S. Ct. 2070, 2077 (1981); *Kahn v. Shevin*, 416 U.S. 351, 355, 94 S. Ct. 1734, 1737 (1974); *Lenhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 359, 92 S. Ct. 1001, 1003 (1973). The authority of the states is not unbridled, however. The equal protection clause provides that a "State must proceed upon a rational basis and may not resort to a classification that is palpably arbitrary." *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 527, 79 S. Ct. 437, 441 (1958). A classification is not palpably arbitrary if "any state of facts reasonably can be conceived that would sustain it." *Id*., 358 U.S. at 52, 79 S. Ct. at 441.

313

This court must determine whether there is any state of facts that could conceivably support the following classifications: the distinction between Class III property and all other property; and the distinction between residential and historical property and agricultural and forest property.

In an earlier opinion, this court pointed to a state of facts to support the first distinction:

> Defendant's brief and argument present a variety of reasonable bases for current use value classification, including the preservation of owner-occupied homes in or near developing urban areas, the preservation of land for farming or forestry purposes, [and] the continued maintenance of historic properties.

*Weissinger v. Eagerton*, No. 2877-N, mem. op., p. 7 (M.D. Ala. March 26, 1979). This observation is based on the fact that all of the land uses enumerated in Class III produce no or relatively low income as compared to more intensive uses. Fair market value ordinarily considers not only the value of the land in its present use but also the value of the land were it available on the open market for development. Class III property located in or near high or moderate income-producing property often has increased market value and, accordingly, increased tax liability. This process has often had the effect of making relatively low income uses uneconomical, with the consequence that the land was sold for more intensive use. *See* Nelson, *Differential Assessment of Agricultural Land in Kansas: A Discussion and Proposal*, 25 Kan. L. Rev. 215, 216-18 (1977).

Similar concerns justify the distinction between residential and historical property and agricultural and forest property. The plaintiffs appear to argue that by including four property types within Class III, Alabama is without constitutional power to draw further distinctions among them. The equal protection clause does not exalt form at the expense of substance to this extent. A state may constitutionally create subclasses within broader classifications and treat the subclasses

314

differently if such treatment is rational. *See Charleston Federal Savings & Loan Ass'n v. Alderson*, 324 U.S. 182, 65 S. Ct. 624 (1945). Alabama has essentially done this. Its property tax scheme, as interpreted by the Alabama Supreme Court in *Eagerton v. Williams*, *supra*, creates two subclasses within Class III property. And the rationale behind this subclass distinction is apparent: Alabama is particularly concerned about the preservation of its agricultural and forest property and seeks through its property tax structure to preserve such property by providing additional preferential tax treatment for such property.

The plaintiffs also broadly argue that the formula for current use valuation of agricultural and forest property fails to provide a "true measure" of the valuation, that it is not an "accepted method" among property experts. Whether the formula provides a true or accepted measure depends upon what is sought to be valued or measured. It is apparent that the intent behind Acts 135 and 82-302 was to value agricultural and forest property *at some point below* its fair and reasonable market value; and the current use formula created by the acts does just this. The plaintiffs note, however, that there are a few instances in which the current use valuation of agricultural and forest property has resulted in a valuation higher than its market value. These few instances do not necessarily condemn the entire valuation procedure. The United States Constitution does not require that a state select the best tax program conceivable, only that it select a rational one. In *Great Atlantic & Pacific Tea Co. v. Grosjean*, 301 U.S. 412, 57 S. Ct. 772 (1937), the Supreme Court was presented with fourteenth amendment challenges to a Louisiana license tax for retailers that was graduated according to the number of retail outlets the taxpayers controlled nationwide. The taxpayer argued that the tax was invalid because it did not accurately measure the earnings of the Louisiana stores that were actually being taxed. The Court rejected this argument holding that the legislature could rationally conclude that the existence of a nationwide distribution system enhanced the value of the Louisiana outlets and thus constituted a valid measure of their value. The Court stated:

> We cannot say that classification of chains according to the
> number of units must be condemned because another

> method more nicely adjusted to represent the differences in
> earning power of the individual stores might have been
> chosen, for the legislature is not required to make
> meticulous adjustments in an effort to avoid incidental
> hardships.

301 U.S. at 424, 57 S. Ct. at 776.

*Weissinger v. White*, No.2877-N, slip op. at 6 (M.D. Ala. Oct. 5, 1983) (Thompson,

J.).

### p.    *Weissinger v. White* — Eleventh Circuit appeal (June 1, 1984)

The *Weissinger* subclass of minor schoolchildren appealed the district court's

denial of their claims to the Eleventh Circuit, where they argued that

> the net income method is arbitrary in that it fails to take into account any
> variable except the soil group of farmland or the productivity rating of
> timber property.  It ignores such value-affecting factors as proximity to
> transportation facilities and the product actually grown.  Hence, the
> appellants argue that the use of two different methods for computation of
> the four types of Class III property violates the equal protection clause
> of the fourteenth amendment.

*Weissinger II,* 733 F.2d at 805 (footnote omitted).[664]  The Court of Appeals rejected

plaintiffs' contentions, saying:

> The law is well-settled that "[t]he States have a very wide
> discretion in the laying of their taxes."  *Allied Stores v. Bowers*, 358 U.S.

---

[664] In the omitted footnote, the Eleventh Circuit observed that:  "The net income
capitalization method does make an adjustment, however, for soil productivity in the farmland
computation.  The net figure is increased by 20%, or decreased by 30% or 75%, depending on
whether the soil is Good, Poor or Non-Productive, respectively. . . .  The appellants claim that this
adjustment is arbitrary as well."  *Id.* at 805 n.12.

316

522, 526, 79 S. Ct. 437, 440, 3 L. Ed. 2d 480, 484 (1959). They may "classify property for taxation; may set up different modes of assessment, valuation and collection; [and] may tax some lands or property at higher rates than others," all without offense to the Constitution. *Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362, 368, 60 S. Ct. 968, 972, 84 L. Ed. 1254, 1257 (1940). *See also Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359, 93 S. Ct. 1001, 1003, 35 L. Ed. 2d 351, 354-55 (1973) ("[w]here taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation."). To protect the states' fundamental taxing authority, federal equal protection challenges to state tax laws are reviewed with a minimal level of scrutiny. A statutory classification will withstand an equal protection challenge as long as it "rest[s] upon some ground of difference having a fair and substantial relation to the object of the legislation." *Allied Stores v. Bowers*, 358 U.S. 522, 527, 79 S. Ct. 437, 441, 3 L. Ed. 2d 480, 485 (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S. Ct. 560, 561, 64 L. Ed. 989, 990 (1920)).

The "fair and substantial relation" standard generally has been applied liberally to invalidate state taxing classifications only when they are "palpably arbitrary." *Randolph v. Simpson*, 410 F.2d 1067, 1069 (5th Cir. 1969). Even an intentionally discriminatory classification will pass muster if it "is founded upon a reasonable distinction, or difference in state policy," *Allied Stores v. Bowers*, 358 U.S. at 528, 79 S. Ct. at 441, 3 L. Ed. 2d at 485, or "any state of facts reasonably can be conceived that would sustain it." *Id.*, 79 S. Ct. at 441, 3 L. Ed. 2d at 486. *See also State Board of Tax Commissioners v. Jackson*, 283 U.S. 527, 51 S. Ct. 540, 75 L. Ed. 1248 (1931).

The foregoing authority clearly expresses the historical policy of federal deference to state taxing power. In view of the wide latitude accorded the states in matters of taxation, classification schemes creating disparate tax treatment which are justified by a legitimate state purpose and are rationally related to effectuating that valid purpose will withstand federal constitutional attack.

317

Alabama justifies its disparate tax treatment of half of the four types of Class III property in two ways. First, it claims that individualized assessment of income-producing property is not administratively feasible because compilation of the necessarily detailed evaluations required would be an unduly tedious and time-consuming burden. Second, it asserts a special interest in preserving farm and timberland. Because the state's desire to maintain property for these two pursuits warrants a different approach to taxation, we need not reach the question of whether administrative convenience alone would constitute a sufficient excuse. *See*, *e.g.*, *Frontiero v. Richardson*, 411 U.S. 677, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973) (administrative convenience alone will not justify disparate treatment based on sex).

The district court recognized that "Alabama is particularly concerned about the preservation of its agricultural and forest property and seeks through its property tax structure to preserve such property by providing additional preferential tax treatment for such property." *Weissinger v. White*, No. 2877-N, mem. op. at 10 (M.D. Ala. Oct. 5, 1983). Record at 52. The state is free to enact measures that attempt to perpetuate certain desirable uses of its land in the face of economic pressures to convert the property to other more lucrative pursuits. Institution of a favorable tax system is one rationally related means by which to effect that end. A formula for the evaluation of farm and timber property that routinely holds assessment values below the normal selling price will certainly encourage the continued use of land for its present purpose. Therefore, in view of Alabama's legitimate goal to preserve land for agriculture and forestry, we conclude that any disparity in the valuation of two of the types of Class III property is rationally related to the achievement of a permissible state purpose.

*Id.* at 805-07 (alteration in original, footnote omitted).

### q.   Summary of the *Weissinger* line of cases and plaintiffs' claims

In *Weissinger I*, the three-judge district court panel concluded that Alabama's *ad valorem* tax laws were being administered in violation of the Fourteenth

318

Amendment's Equal Protection Clause and the Alabama Constitution.  In particular, the court concluded that, while the Alabama Constitution required all property to be assessed at an equal ratio of its fair market value, the actual assessment rates within the State varied from approximately nine to thirty percent.  Consequently, the court declared a portion of the state's *ad valorem* tax structure to be unconstitutional and ordered all taxable property to be re-assessed at a fixed ratio of sixty percent of fair market value.[665]  The State was given a year to bring property assessments into conformity with *Weissinger I*'s mandate.

In compliance with that mandate, the state legislature twice passed, and the voters twice approved, amendments to the Alabama Constitution.  The amendment most at issue in the present action is No. 373, which created four classes of taxable property, each with a different assessment ratio ranging from a high of 30% for utility property to a low of 10% for "Class III" agricultural, forest, historical, and single-family, owner-occupied residential properties.  Moreover, the owners of Class III properties were given the option of affirmatively electing to have their properties assessed on a "current use" basis, as opposed to the property's fair and reasonable market value.

Relying on the considerable deference to which the states are entitled when

---

[665] *Weissinger I*, 330 F. Supp. at 625.

319

federal courts review state tax laws, the Eleventh Circuit in 1984 concluded that the *ad valorem* tax system established by Alabama after *Weissinger I* did not violate the United States Constitution.  In reaching that conclusion, the Court noted that "[e]ven an intentionally discriminatory [property] classification will pass muster if it is founded upon a reasonable distinction, or difference in state policy, or any state of facts reasonably can be conceived that would sustain it."[666]

As a general matter, the Eleventh Circuit's decision in *Weissinger II* would seem to preclude a broad-based attack on the constitutionality of Alabama's present *ad valorem* tax system, provided the State had a rational basis for structuring the system in the manner it did.  *Weissinger II* affirmed the constitutionality of the differing assessment ratios of Alabama's current system.  The Court concluded that such differentials were rationally related to the achievement of permissible state purposes — *e.g.*, "preservation of its agricultural and forest property," and the perpetuation of "certain desirable uses of its land in the face of economic pressures to convert the property to other more lucrative pursuits" — and that they therefore were proper under the Fourteenth Amendment's Equal Protection Clause.[667]

Even so, plaintiffs' challenge in the present case is *not* that the State's *ad*

---

[666] *Weissinger II*, 733 F.2d at 806 (alteration added, citations and quotation marks omitted).
[667] *Id.*

*valorem* tax system is unconstitutional because of differing assessment ratios for the four Classes of property created by Amendment 373, but that the system created in response to the mandate in *Weissinger I* is unconstitutional because it was devised as a means of perpetuating, as much as possible, the same anemic *ad valorem* tax revenues generated by a system that had been devised with the racially discriminatory intent of minimizing the monies available for the education of black children, *and*, that continues to adversely impact the educational opportunities of the State's black and poor-white children by unreasonable restrictions on the mechanism for increasing the millage rates of local *ad valorem* property taxes devoted to education. Indeed, plaintiffs hope to avoid the application of *Weissinger II* by asserting that the tax system is itself racially discriminatory, not that it generates revenue through the dissimilar treatment of similarly situated properties.

What is interesting about the theory of the case advanced by the *Lynch* plaintiffs and its relationship to the *Weissinger* line of cases is that the subclass of plaintiffs who were the driving force behind the *Weissinger* cases throughout the history of that litigation following the dismissal of Mrs. Hornbeak's claims consisted of minor children who attended Alabama's public schools.[668] The three-judge district court panel identified that subclass as the "Group II" plaintiffs, and described their claims

---

[668] *See Weissinger I*, 330 F. Supp. at 617.

as follows:

> The plaintiff-schoolchildren (Group II) contend that since a fixed percentage of the state's ad valorem tax revenue is distributed each year to the various public school districts in the state, defendant's systematic refusal to equalize assessments has deprived these school districts of monies to which they would otherwise be entitled for the education of plaintiffs and all others similarly situated, thus denying plaintiffs due process and equal protection of the law under the Fourteenth Amendment.

*Weissinger I,* 330 F. Supp. at 619 (footnote omitted).

Regrettably, in view of this court's duty to rule upon the issues raised by the *Lynch* plaintiffs, the three-judge panel in *Weissinger I* did not separately analyze the claims of the "Group II" plaintiff-schoolchildren.  Perhaps that is understandable, given the manner in which the three-judge district court framed the issue before it: *i.e.*, "The sole question presented in this case . . . is whether a state has the right to assess property *in the same class* at different ratios."[669]  In answer to that question, the court concluded that a state had no such right.[670]  By the time the litigation reached the

---

[669] *Id.* at 620 (emphasis in original, footnote omitted); *see also id.* at 617 ("This is a class action challenging the federal constitutional validity of Alabama's present ad valorem tax program. The crucial question presented in the case is whether the Due Process and Equal Protection Clauses of the Fourteenth Amendment require the State of Alabama to assess all property within the state at a uniform ratio for ad valorem tax purposes.").

[670] The panel's rationale for that conclusion was premised upon Sections 211 and 217 of the Alabama Constitution which, as observed previously, required

> "uniformity and equality among all taxpayers, 'private corporations, associations and individuals alike,' both as to ratio and percentage of taxation and also as to rate of taxation."  In other words under Sections 211 and 217, all taxable property, by whomsoever owned, in the State of Alabama must be assessed and taxed at uniform

Eleventh Circuit nearly fourteen years later, in *Weissinger II*, there was, again, no discussion of the claims asserted by the minor schoolchildren in *Weissinger I*.

In summary, plaintiffs' litigation strategy in the present action is focused on attempting to develop a tie between the alleged racial motivation of the legislature in creating the post-*Weissinger I ad valorem* tax system, and the limited funds available for K-12 education statewide. Metaphorically speaking, their legal task is somewhat akin to threading a very small needle, and the holdings of *Weissinger I* and *II* appear to be of little help in that endeavor.

---

ratios for ad valorem purposes. *Thus, rather than establishing various classes of taxable property, the State of Alabama has chosen to place all taxable property within the state in a single class for ad valorem tax purposes.*

*Id.* at 620 (quoting *Alabama Power Co.*, 254 Ala. at 336, 48 So. 2d at 453) (other footnoted citations omitted) (emphasis supplied); *see also id.* at 622 ("The Constitution and laws of the State of Alabama provide, for tax purposes, for but one class of property. This means that all property within the state must be assessed and taxed at uniform ratios.").

[This page intentionally left blank.]

### 4.    The *Knight* Line of Cases

The fourth line of cases, and the one most proximate to the present action in terms of time and a common nucleus of operative facts, began with a suit to desegregate Alabama's public colleges and universities that was commenced more than thirty years ago.  It is something of an understatement to say, as did the Eleventh Circuit in *Knight v. Alabama*, 14 F.3d 1534, 1539 (11th Cir. 1994), that the *Knight* litigation had "a complicated procedural history." That history is explored in the following sections.

### a.    The original, Middle District action

The original action was filed on January 15, 1981, in the United States District Court for the Middle District of Alabama, by John F. Knight, Jr., and other alumni, students, and faculty members of Alabama State University.  The defendants to that suit included Governor Forrest Hood ("Fob") James, Jr. (then serving the first of two, non-consecutive, terms as chief executive officer of the State of Alabama),[671] the Alabama Public School and College Authority, the Alabama Commission on Higher Education, Auburn University, and Troy State University.  The plaintiffs alleged that the State had perpetuated a *de jure* system of segregated public institutions of higher

---

[671] *See* William H. Stewart, "Forrest ('Fob') James, Jr., 1979–1983, 1995–1999," in *Alabama Governors:  A Political History of the State* 243-48 (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Armbrester eds.).

education by establishing and operating the predominantly white Auburn University at Montgomery ("AUM") and Troy State University at Montgomery ("TSUM") in the same metropolitan area served by the historically black institution of Alabama State University ("ASU").  The plaintiffs asserted that the "dual system" of public higher education in the Montgomery area violated their rights to equal protection under the Fourteenth Amendment, and they sought injunctive and declaratory relief under 42 U.S.C. § 1983.  The plaintiffs also argued that, as a result of the fact that AUM, TSUM, and ASU all received federal funding, the actions of defendants violated plaintiffs' rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.  The plaintiffs asked the court to order the merger of AUM and TSUM with ASU under the name of "Alabama State University," and under the control of ASU's Board of Trustees.[672]  That action was assigned to U.S. District Judge Truman M. Hobbs.

Governor James and the Alabama Commission on Higher Education responded to the complaint with motions to stay the case, pending exhaustion of Title VI administrative proceedings then ongoing between the State of Alabama and the U.S. Department of Education aimed at desegregating all public institutions of higher education throughout the State.  Judge Hobbs granted the motion on May 20, 1981,[673]

---

[672] *See Knight v. James*, 514 F. Supp. 567, 568 (M.D. Ala. 1981).

[673] *Id.*

but dissolved the stay nearly a year later, on April 6, 1982, when he was informed that the Department of Education had referred the Title VI enforcement proceedings to the United States Department of Justice.[674]  Thereafter, on October 24, 1982, Judge Hobbs certified a plaintiff class consisting of graduates of ASU and African American citizens of Alabama who were eligible for employment by, or who attended, or who might attend, public institutions of higher education in the Montgomery, Alabama area.

### b.   The Northern District action

On July 11th of the following year, notwithstanding the fact that the original *Knight* case was still pending in the Middle District, the Department of Justice filed an action in this District against the State of Alabama, George C. Wallace (who, by then, had begun his fourth, and final, term as Governor),[675] the State Board of Education, the State Superintendent of Education, the Alabama Commission on Higher Education, the Alabama Public School and College Authority, and most of the

---

[674] *See Knight v. Alabama*, 476 F.3d 1219, 1220 n.1 (11th Cir. 2007) ("***Knight III-A***") ("The United States Department of Education informed Governor Fob James and the various university presidents that there were vestiges of a prior de jure segregated system of higher education in Alabama.  After several months of unsuccessful negotiations, the Justice Department filed [suit in the Northern District of Alabama].  . . .").

[675] *See, e.g.*, Glenn T. Eskew, "George C. Wallace, 1963–1967, 1971–1979, 1983–1987," in *Alabama Governors:  A Political History of the State* 216-30 (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) ("**Eskew I**").

publicly-supported colleges and universities in the state.[676]   *See United States v. Alabama*, No. CV 83-C-1676-S (N.D. Ala. July 11, 1983).  The government exercised its statutory authority to bring suit to enforce Title VI of the Civil Rights Act of 1964, and alleged that the State had failed to complete the desegregation of its colleges and universities.  Specifically, the government claimed that

> many of Alabama's polices governing higher education tended to perpetuate its formerly *de jure* segregated university system.  The challenged education policies included:  admissions standards at historically white institutions, claimed to disqualify disproportionate numbers of black applicants; selection procedures for the governing boards, administrations and faculty of historically white institutions, claimed to result in the under representation of blacks; curriculum policies at historically white institutions, claimed to include little representation of black history, thought, or culture; campus environments at historically white institutions, claimed to be hostile to blacks; funding and facility policies governing historically black institutions, claimed to result in their inadequacy; duplication of programs at both historically white and historically black institutions, claimed to result in racial

---

[676] The institutions named as defendants in the government's complaint included Alabama Agricultural & Mechanical University, Alabama State University, Auburn University, Jacksonville State University, Livingston University, Troy State University, the University of Montevallo, the University of Alabama, the University of North Alabama, the University of South Alabama, Athens State College, and Calhoun State Community College.  Immediately after the government commenced the action, however, the two historically black institutions of higher education named as defendants, Alabama State University (ASU) and Alabama A & M University (AAMU), separately moved for realignment as plaintiffs, or in the alternative, for permission to file cross claims.  Judge U.W. Clemon, the judge to whom the United States' complaint was originally assigned, granted both motions.  ASU and AAMU thereafter sought leave to file amended complaints.  Judge Clemon granted the request, and AAMU subsequently asserted Title VI and Fourteenth Amendment claims against the University of Alabama System, Auburn University, and the State.  ASU asserted similar claims against Auburn University, Auburn University at Montgomery, Troy State University, Troy State University at Montgomery, and the State of Alabama.

separation; and restrictive institutional missions at historically black institutions, claimed to result in the absence of graduate and other desirable programs at those institutions. Plaintiffs sought change in these policies that would tend to decrease the *de facto* segregation, or racial identifiability, of Alabama's colleges and universities.

*Knight v. Alabama*, 476 F.3d 1219, 1220-21 (11th Cir. 2007) ("*Knight III-A*") (footnote omitted).[677]  That case was assigned to U.S. District Judge U.W. Clemon, now retired.

### c.  Merger of the Middle and Northern District actions

On April 18, 1984, Judge Clemon granted the motion of the class of private plaintiffs represented by John F. Knight and others (the plaintiffs in the parallel proceedings filed in the Middle District and described in Part II(G)(4)(a) above) to intervene in *United States v. Alabama*, on the ground that the outcome of the Northern District action would be determinative of the issues raised in the predecessor case of *Knight v. James*.  Further, on January 3, 1985, Judge Clemon certified the *Knight* intervenors to represent essentially the same Montgomery-related class that had been certified by Judge Hobbs.[678]  As a consequence of those actions, Judge Hobbs stayed

---

[677] The omitted footnote stated: "For a detailed summary of plaintiffs' contentions and those of the other parties, see *Knight v. Alabama*, 787 F. Supp. 1030, 1051-61 (N.D. Ala. 1991) ('*Knight I*')."  *Knight III-A*, 476 F.3d at 1221 n.2.

[678] *See Knight v. Alabama*, 14 F.3d 1534, 1539 (11th Cir. 1994) ("Knight and the other named plaintiffs were certified as representing in this suit a class composed of both the black citizens of Alabama generally, and the students, faculty, staff, and administrators of Alabama State University ('ASU') and Alabama A & M University ('A & M'), the two HBIs in the Alabama system.") ("*Knight I-A* ").

all further proceedings in his Middle District action, "until a final judgment or order is reached in *United States v. Alabama*. . . ."  *Knight v. Wallace*, CA No. 81-52-N (M.D. Ala., June 12, 1984).[679]

### d.    Motions to disqualify Judge U.W. Clemon

During September of 1983, Auburn University and the State Superintendent of Education moved Judge Clemon to disqualify himself.  He denied the motion.  *See United States v. Alabama*, 574 F. Supp. 762 (N.D. Ala. 1983), and *United States v. Alabama*, 571 F. Supp. 958 (N.D. Ala. 1983).[680]  Auburn then petitioned the Eleventh Circuit for a writ of mandamus, and a panel of that Court granted the writ in part and remanded the case with directions for another judge to be assigned to hear the recusal motion.  *See In re Auburn University*, No. 83-7557 (11th Cir. Nov. 10, 1983).

Senior District Judge Hobart Grooms was assigned to determine whether Judge Clemon should be disqualified.  After taking evidence, he entered an order on December 19, 1983, granting the motions to disqualify.  One month later, however,

---

[679] The change in the style of the Middle District case reflects the fact that George Wallace had been reelected Governor following Judge Hobbs' imposition of a stay.  No trial was ever conducted in *Knight v. Wallace*, however; and, on December 12, 1990, in light of the proceedings still pending in the Northern District, Judge Hobbs dismissed the Middle District case (which, by then, had been restyled yet again, as "*Knight v. Hunt*," to reflect the succession of Guy Hunt to the office of Governor from 1987-1993) without prejudice.

[680] Two grounds for recusal were argued by Auburn and the State Superintendent.  The first alleged that Judge Clemon was allegedly biased or prejudiced concerning one of the parties; and the second contended that the Judge's impartiality might reasonably be questioned.  Each of these issues was addressed separately by Judge Clemon, thus accounting for the two reported opinions.

Judge Grooms granted a motion for reconsideration, vacated his prior order, and recused *himself* from any further involvement in the disqualification controversy. Senior Circuit Judge David Dyer then heard the defendants' disqualification motion and denied it.  *See United States v. Alabama*, 582 F. Supp. 1197 (N.D. Ala. 1984). The defendants' subsequent request to certify the issue for interlocutory appeal was denied.  The case then proceeded to trial before Judge Clemon.

e.    **The first trial** — *conducted by Judge Clemon*

The trial began on July 1, 1985, and concluded on August 2.  Before the start of trial, Judge Clemon bifurcated the proceedings, so that the only issue heard concerned the liability of the defendants.  On December 9, 1985, Judge Clemon entered an order and memorandum of opinion finding that a racially "dual system" of public higher educational institutions had been operated by the State of Alabama until at least 1967, and that the State had failed to dismantle the vestiges of the prior *de jure* system.  *See United States v. Alabama*, 628 F. Supp. 1137 (N.D. Ala. 1985).  Judge Clemon ordered the State, the Governor, the Alabama Commission on Higher Education, and the Alabama Public School and College Authority to submit a plan to eliminate all vestiges of the dual system of higher education.[681]

---

[681] *United States v. Alabama,* 628 F. Supp. 1137, 1173 (N.D. Ala. 1985).

### f.    Eleventh Circuit reversal and disqualification of Judge Clemon

Before the directives of that order could be accomplished, however, the Eleventh Circuit reversed and remanded the case in an opinion holding that: the complaint of the United States should be dismissed without prejudice; the Knight plaintiffs' Title VI claim should also be dismissed without prejudice; Judge Clemon should be removed from presiding over any further proceedings in the consolidated cases; and a new trial should be conducted if the United States and the Knight class of plaintiffs refiled their claims.[682]   The Court of Appeals affirmed the Knight plaintiffs' right to challenge vestiges of segregation under the Fourteenth Amendment.[683]

### g.    Reassignment of Northern District action to Judge Murphy

Eventually, Harold L. Murphy, a United States District Judge for the Northern District of Georgia, was designated by the Chief Judge of the Eleventh Circuit to perform all judicial duties relating to the Northern District action on remand.  *See In re John F. Knight, Jr.*, No. 88-7764 (11th Cir. Apr. 12, 1989).[684]

---

[682] *See United States v. Alabama*, 828 F.2d 1532 (11th Cir. 1987) (*per curiam*), *cert. denied*, 487 U.S. 1210 (1988).

[683] *Id.* at 1551.

[684] This action occurred only after six other district judges on this court were recused on their own motion or by order of the Eleventh Circuit, and Sam C. Pointer Jr., the Chief Judge for the Northern District of Alabama, certified that a need existed for a judge from another district to preside over this case.

### h.    Designation of Knight Class as lead plaintiffs

On remand, John F. Knight and the other members of his class were designated

lead plaintiffs, and both they and the United States filed amended complaints.  On

March 12, 1990, Judge Murphy entered a lengthy order disposing of all pending

motions to dismiss.[685]

On June 15, 1990, following a hearing at which most of the named plaintiffs and

plaintiff-intervenors testified, the Court conditionally certified John F. Knight Jr.,

---

[685] Among other things, Judge Murphy denied all motions to dismiss the statewide Title VI claims of the United States and Knight plaintiffs, in reliance upon the Civil Rights Restoration Act of 1987, which legislatively overturned the Supreme Court's ruling in *Grove City College v. Bell*, 465 U.S. 555 (1984).  Motions to dismiss the Knight plaintiffs' Fourteenth Amendment claims and the intervention of the United States to assert its own Fourteenth Amendment claims were also denied.  Judge Murphy did grant, however, motions to dismiss the Knight plaintiffs' Section 2 Voting Rights Act claim, and, their vote dilution allegations, premised on the First, Thirteenth, Fourteenth, and Fifteenth Amendments.  Those counts were dismissed on the grounds that the factual predicate pled in the complaint did not constitute a cognizable claim concerning voting or voting strength as a matter of law.  *See Knight v. Alabama*, No. CV-83-M-1676-S, slip. op. at 52-63 (N.D. Ala. Mar. 12, 1990).  Finally, Judge Murphy dismissed the cross claims of Alabama State University and its Board of Trustees on the ground that they lacked standing to pursue the interest of third parties who were already adequately represented by the Knight plaintiffs.  *Id*. at 38-51.

Further, before the beginning of the second trial, and over the objection of the Knight plaintiffs, Judge Murphy reaffirmed several consent decrees that previously had been approved by Judge Clemon.  The reaffirmed decrees were between the United States and the University of South Alabama, the University of Montevallo, Jacksonville State University, and Livingston University.  Judge Murphy also approved, over the objections of the Knight plaintiffs, consent decrees entered into for the first time between the United States and the following defendants:  Troy State University; the State Board of Education; Athens State College; and Calhoun State Community College.  When approving these consent decrees, however, Judge Murphy took care to inform the parties that, in the event there was a finding of liability and a judicial remedy required, those colleges and universities that had entered into consent decrees with the Government might well have to participate in the remedy stage of litigation, regardless of their independent agreements with the United States.  In other words, Judge Murphy made clear that he retained jurisdiction over all settling parties for the purposes of shaping appropriate remedies following a trial on the merits.  *See Knight v. Alabama*, No. 83-M-1676-S, slip op. at 2-3 (N.D. Ala. June 28, 1990).

Alease S. Sims, and others, to represent a class of "all black citizens of Alabama and all past, present and future students, faculty, staff and administrators of Alabama State University and Alabama A & M University." *Knight v. Alabama*, No. CV-83-M-1676-S, slip op. at 9 (N.D. Ala. June 15, 1990). That class was thereafter referred to as the "Knight plaintiffs."

i.     **The second trial** — *but the first conducted by Judge Murphy*

The second trial began October 29, 1990, and, except for holiday recesses, it continued uninterrupted for six months, ending on April 16, 1991. The court heard from approximately 200 witnesses, received hundreds of thousands of pages of exhibits and produced a transcript well in excess of 22,000 pages.[686]

j.     **Judge Murphy's first opinion** — "*Knight I* "

Seven and a half months after the conclusion of that trial, Judge Murphy entered a 360-page opinion finding liability. Among other things, he concluded that vestiges of segregation remained in Alabama's system of public higher education, particularly in the areas of faculty and administrative employment, allocation of state funding and

---

[686] Judge Murphy ordered that the record and transcript from the 1985 trial before Judge Clemon be incorporated into the proceedings conducted by him. Even so, the parties were given an opportunity to object to any portion of the 1985 trial record which was, in their opinion, improperly introduced into evidence. The parties also were allowed to object to the introduction of testimony from the 1985 trial, if it was felt that the cross examination had been unduly restricted.

Finally, Judge Murphy chose not to bifurcate the issues of liability from those of remedy, saying that he believed the best use of judicial and financial resources would be to hear both issues during a single trial.

facilities at historically black institutions of higher education, admissions policies at historically white institutions, and program duplication.  *See Knight v. Alabama*, 787 F. Supp. 1030, 1368 (N.D. Ala. 1991) (Murphy, J., sitting by designation) ("*Knight I* ").  All of these vestiges of the former, *de jure* system of segregation combined to result in the racial identifiability of Alabama's colleges and universities, and the perpetuation of a dual system of public higher education within the State.  Judge Murphy's remedial decree ordered defendants to develop and the State to implement specific modifications to policies and practices in those areas, in order to remove barriers to black access to historically white institutions of higher education, and, to encourage whites to attend historically black colleges and universities.[687]  The court declined to hold that either the State's allocation of funding for land grant programs, the institutional missions assigned to the historically black institutions, the campus environments at the historically white institutions, or the curricula at the historically white institutions were vestiges of segregation.  He therefore ordered no relief in those areas.  *See Knight v. Alabama*, 14 F.3d 1534, 1539-40 (11th Cir. 1994) ("*Knight I-A* ").

### *i*.    Relevant findings of fact

En route to the foregoing conclusions, Judge Murphy made 1,859 findings of

---

[687] *See Knight I*, 787 F. Supp. at 1377-82.

fact.  Some of his factual determinations bear upon issues that have been raised in the present action.  Those findings are set out below.  The topical headings and paragraph numbers were assigned by Judge Murphy.

### A.   The Nineteenth Century

### 1.  The Antebellum Period

44.    Except at Mobile, which was founded by the French in the early eighteenth century, there were no whites in what is now Alabama until the Tombigbee settlement was founded in 1800 in southwest Alabama and the Big Bend settlements in modern Madison County in 1810.   After Andrew Jackson's Tennessee militia defeated the Creek Indians in 1814 [at the Battle of Horseshoe Bend], the United States began selling land in what was then the western territories of Georgia. Settlers poured into Alabama by the thousands during the period between 1816 and 1819.  In fact the growth was so rapid that by 1819 Alabama had enough settlers in its territory to petition the Congress for statehood which was granted that same year.  The settlers brought slaves with them to the newly open territory in contravention of the Northwest Ordinance. Upon the admission of Alabama into the Union, the provision of the Northwest Ordinance prohibiting the importation of slaves was removed. Thornton (11/5/90) 24-33.[688]

---

[688] Judge Murphy is here referencing the testimony of Dr. J. Mills Thornton, a native of Montgomery, Alabama, whom Judge Murphy described as

> probably the preeminent living authority on the social and political history of Alabama.  His doctoral dissertation at Yale (concerning antebellum Alabama) was supervised by C. Vann Woodward, the most respected Southern historian living. Thornton (11/5/90) 4-5.  Dr. Thornton presently is full professor of history at the University of Michigan, one of the five leading history departments in the United States.  *Id.* at 6-7.  He has published extensively over the whole scope of Alabama history up to and including the Civil Rights Movement.  KX 3116.

*Knight I*, 787 F. Supp. at 1065 & ¶ 39.

\* \* \* \*

47.    Alabama adopted a slave code similar to Georgia's immediately upon its admission to the Union in 1819.  In 1832, the year following Nat Turner's bloody insurrection in Virginia, *the Legislature of Alabama*, like those in most other Southern states, *enacted a statute making it a crime to instruct any black person*, *free or slave*, *in the arts of reading and writing*.  KX 653, 1832 Ala. Acts, sec. 10, p. 16.  In addition, among other things, the act provided criminal penalties, in the form of "lashes on the bare back" and being sold into slavery, for free blacks who wrote passes or free paper for slaves, sec. 11, who sold to or bought from a slave "any article or commodity whatsoever, without a written permission from the master," sec. 13, or who was found in the company of a slave without written permission of the master, sec. 14. Any person distributing "any seditious papers, pamphlets or writing, tending to produce conspiracy or insurrection or rebellion among the slaves or colored population" could be put to death.  Sec. 13.  Thornton (11/5/90) 37-39.

48.    Dramatically evincing the resolve of whites during this period to totally control the thoughts and attitudes of all blacks, slave or free, the 1832 act even made it a crime for any slave or free person of color to "preach to, exhort, or harangue any slave or slaves, or free persons of color, unless in the presence of five respectable slave holders." KX 653, sec. 24, p. 18.  On the other hand, the law was not to "be so construed . . . as to prevent free persons of color and slaves from attending places of public worship held by white persons."  *Id*., sec. 22, p. 18. Thornton (11/5/90) 38-39.

49.    *With the possible exception of a creole school in Mobile*, *there is no record of a school for black children in the State of Alabama prior to 1860.*

50.    At the outbreak of the Civil War, there were about 1,900 public schools and 200 private schools serving Alabama's white school-age children.  Thornton (11/5/90) 42.  There were seventeen private colleges, and only one public college — UA [*i.e.*, the University

of Alabama in Tuscaloosa].[689]  *Id*. at 44.

## 2. The Reconstruction Period

51.    The blood letting of the Civil War ended in April 1865, but the pain of Reconstruction was just beginning.  *During Reconstruction, the issue of access of newly freed black people to all levels of education was central to the political debate that characterized this historical period in Alabama.*  Blacks were able to vote for the first time, and the Black Belt[690] counties in particular elected black men and their white Republican allies to the Legislature.  Thornton (11/5/90) 125.

52.    During Reconstruction it is not possible to separate issues of partisan politics from the over-arching issues of race.

> [T]he Democratic Party was a white supremacist party, and the Republican — and all blacks were Republicans, or essentially all blacks were Republicans.  Now, there were elements within the Republican Party who were hostile to their black fellow Republicans, but all blacks were Republicans and all Democrats were white supremacists, so in that sense . . . what you have is the overlay of ordinary American political forms of election and passage of legislation over what is, in effect, a revolutionary situation over a deep seated division within the electorate over the nature of the polity and so there is not that consensus about aims or common set of presumptions about the goals of democracy and the welfare of the republic that ordinarily informs and surrounds the competition between the parties.

---

[689] This footnote bore the number "12" in Judge Murphy's opinion, and it read as follows: "Approximately 200 students were enrolled at UA at the outbreak of the Civil War."  *Knight I*, 787 F. Supp. at 1067 n.12.

[690] This footnote was numbered "13" in Judge Murphy's opinion, and read as follows:  "The 'Black Belt' counties are located in south Alabama and are so named because the soil in that region of the state is dark in color.  Additionally, during the period immediately following the Civil War, the majority population in that area of the state was black."  *Id*. at 1067 n.13.

338

> In fact, *the parties are deeply divided* over the most fundamental philosophical issues and those issues, *the issues that chiefly divide them are racial, that is to say the structure of the society, what the society is going to look like now that the blacks have been freed*.

Thornton (11/5/90) 124-25.

> 53.   The white supremacist attitude of this period is one which desire[s] to preserve blacks in a subordinate position within the society.  And as those whites, who held this idea would have understood it, to preserve civilization in the republic, . . ., they understand themselves to be fighting to preserve the essence of the republic.

Thornton (11/5/90) 128.[691]

> 54.   The dilemma for the Republican Party was always gaining and holding the support of enough white voters to parlay solid black support into electoral victory.  The Democrats used the Ku Klux Klan and other means of violence, intimidation and social ostracism against those white persons who aligned with the Republican Party.  Even white Republicans openly hostile to blacks' interests were ostracized merely for

---

[691] This footnote was numbered "14" in Judge Murphy's opinion, and read as follows:

> Dr. Adon Morris, an expert witness for the Knight Plaintiffs, and sociologist on the faculty at Northwestern University defined the current parameters of 'white supremacy' in a sociological sense in the following manner:

> > [White supremacy] . . . is a belief and practice which suggests that white people are superior to black people, number one.  Two, that the experiences and viewpoints of whites are superior to the experiences and viewpoints of black people,  That Europeans in general are superior to nonwhites, [noneuropeans], that western civilization is superior to nonwestern civilizations, and that black people are to serve white people.

*Id*. at 1068 n. 14 (quoting Morris Testimony) (bracketed alterations in original).

339

appearing on the same ticket with black candidates or for sitting in the Legislature with black Republicans.

> And of course, in the case of some scalawags, that has the effect of driving them to ostentatious desire to demonstrate that they . . . do not accept black goals and eventually it has the effect in some cases of simply driving them out of the Republican party and they join the Democratic party.  By 1874 that had happened on quite a broad front *and that's what we mean by drawing the color line, forcing all whites on one side and leaving the other side essentially black.*

Thornton (11/5/90) 126-27.

> 55.    As described by historian William Warren Rogers, any white politician who consents to appear before black politicians was looked upon

> > as a time-serving, degraded carpet-bagger, willing to accept office from a negro constituency. . . .   The white man who would submit to be summoned by a few negro politicians and made to render an account of his stewardship, and eat his own words, is a stigma on his color, and is beneath the respect of the blackest and most ignorant negro in the United States.

Thornton (11/5/90) 127-28, *quoting* The Butler *Courier*, October 14, 1882, from W. Rogers, *August Reckoning*: *Jack Turner and Racism in Post-Civil War Alabama* 153 (1973).[692]

> 56.    On September 12, 1865, a state constitutional convention opened in Montgomery with 99 elected delegates, all of them whites. The

---

[692] This note, numbered "15" in the opinion, read as follows:  "On numerous occasions, the Court allowed the parties to introduce excerpts from authoritative sources relied upon by the expert witnesses into the record.  This procedure was applied throughout the trial without objection and with the consent of the parties.  *See*, Thornton (11/7/90) 317-19 (discussing the admission of such exhibits)."  *Knight I*, 787 F. Supp. at 1068 n.15.

1865 Convention consisted mostly of unionists; they differed with other native whites about secession, but they shared the deep-seated social and racial attitudes of other native whites. "All of [them] believed that even though freed, the blacks had to be carefully regulated and controlled by the state government in order to preserve social order and the safety of the white population."  Thornton (11/5/90) 46-49.

57.    The 1865 Alabama Constitution drafted by this convention denied blacks the right to vote, as had the Constitutions of 1819 and 1860, *and it took no steps to provide them with educational opportunities*.  It apportioned representation in the General Assembly on the basis of white population.  The all-white legislature elected under the 1865 Constitution enacted the so-called "Black Codes" for the regulation and control of black labor, refused to ratify the Fourteenth Amendment,[693] and rejected proposals to give blacks the right to vote. Governor Patton said:

> We shall not only extend to the freedmen all their legitimate rights, but shall throw around them such effectual safeguards as will secure them in their full and complete enjoyment.  At the same time it must be understood that politically and socially ours is a white man's government.

Thornton (11/5/90) 49-56 quoting, Bond, *Negro Education in Alabama*: *A Study in Cotton and Steel* 23, (1969).

58.    On March 2, 1867, the First Reconstruction Act was passed by Congress over the veto of President Johnson.  It abolished the provisional governments of the Southern states and established districts under the control of the Union Army.  The Second Reconstruction Act, adopted March 23, 1867, provided for the registration of prospective voters "without distinction as to race, creed, or color," and for the holding of a Constitutional Convention to establish a new state government.  A prerequisite to registration was subscription to the "Test

---

[693] This footnote, numbered "16" in the opinion, read as follows:  "The Thirteenth Amendment was ratified by the Alabama Legislature during the Constitutional Convention of 1865. Thornton (11/5/90) 50."  *Id*. at 1069 n.16.

341

Oath," a proviso that effectively disfranchised all persons who had held office before the Civil War and then had supported the Confederacy. Thornton (11/5/90) 56-57.

59.    Of the 100 delegates to the 1867 Constitutional Convention, 19 were black, at least 26 were "carpetbaggers" (white Republicans who came to Alabama after 1865), and at least 48 were "scalawags" (white Republicans who were in Alabama before the Civil War), and three were Democrats.  Four Republicans cannot be further identified.  Thornton (11/5/90) 58-60.

60.    The 1867 Constitution enfranchised blacks and apportioned representation in the General Assembly on the basis of total population, including blacks.  After the re-registration, there were about 90,000 black and 75,000 white registered voters in the state.  Thornton (11/5/90) 57-58.  The previous three Alabama constitutions (1819, 1861 and 1865) had simply been declared in effect by their respective conventions.  But the Military Reconstruction Acts required the new constitution to be ratified by the voters.

61.    The election to ratify the 1867 Alabama Constitution was held in February 1868, along with elections to state offices.  White conservatives adopted a strategy of defeating the 1867 Constitution by refraining from voting, since the Reconstruction Act of March 2, 1867, provided that the Constitution should not be declared in force until ratified by a majority of voters.  The vote was 70,812 for and 1,005 against the Constitution, which was less than half the approximately 170,000 registered voters.  But the conservative strategy failed when Congress admitted Alabama as a reconstructed state in spite of the fact that the original proviso had not been met.  Thornton (11/5/90) 61-68.

62.    All the conservative boycott accomplished was a Republican sweep of nearly all state offices.  The Senate was composed of 32 Republicans, only one of whom was black, 10 were carpetbaggers, 21 were scalawags, and one was a democratic conservative.  The House of Representatives had 97 Republicans, at least 26 of whom were black, and 3 Democrats.  Thornton (11/5/90) 68-69.

63.    *Reflecting the importance blacks and Republicans placed on education*, *the 1867 Constitution completely centralized the entire state school system by delegating full legislative power over all education matters to the State Board of Education*, ("SBE") including governance of the University of Alabama.    Following the model of the Iowa constitution, the 1867 Alabama Constitution set up a procedure whereby the SBE would pass education laws, which then had to be signed or vetoed by the governor, with the SBE retaining the authority to override the governor's veto.    In addition, the Legislature retained the authority to declare any act of the SBE void.    Thornton (11/5/90) 80-82.

64.    In the 1870 elections, the Democrats won the governorship, a majority of the House of Representatives, and elected the State Superintendent of Education.    The Republicans retained control of the Senate (whose members served for four years) and the elected State Board of Education.    Thornton (11/5/90) 69-70.    By then, Congress had removed the civil disabilities of most former Confederates, allowing them to register and vote.    *Id*. at 58-59.    So many Democrats participated in the 1870 election, amid considerable Ku Klux Klan activity, particularly in the western Black Belt.    Most of the white counties in the northern hill counties and the southeastern wiregrass counties voted democratic.    *Id*. at 69.

65.    One reason the incumbent Republican Governor, William H. Smith, was defeated by Democrat Robert B. Lindsey in 1870, was the presence of a black candidate for Secretary of State on the Republican ticket, James Rapier.    Most whites, including Republicans, were infuriated over the prospect of a black state officer sitting in authority over white people.    If Rapier had been elected, he would have been the first black person ever to hold statewide office.    Even though Smith ran a close race with Lindsey, Rapier finished dead last among all Republican candidates.    Thornton (11/5/90) 70-71.

66.    One black man, Peyton Finley of Montgomery, was elected from his congressional district to the State Board of Education.    After the election, lots were drawn to divide up the seats into two-year and four-year terms, and Finley drew a two-year term. He therefore served

343

from 1870 to 1872.  Thornton (11/5/90) 72-73.

67.     The Republicans regained the offices of Governor and State Superintendent of Education and a majority of the House of Representatives in the 1872 elections.  The Democrats, however[,] controlled the Senate by one vote.  Thornton (11/5/90) 74-75. Republican rule would be short-lived.

68.     In 1874 the Democrats drew the color line in order to eliminate the Republican threat to white supremacy once and for all. There was considerable intimidation and violence directed at both black and white Republicans, and outright fraud was used to stuff ballot boxes in the Black Belt.  The Democrats circulated "massive fright propaganda" claiming that Republicans might seek racially mixed schools to win over whites in North Alabama, many of whom previously had voted with the Republicans.  The Democrats won all the statewide offices and both houses of the legislature in 1874.  Thornton (11/5/90) 75-76.

69.     This Democratic victory led to adoption of the 1875 "Redeemer" Constitution, which

> redeemed . . . white rule.  *Redemption in all of the southern states is a term which essentially means the tossing out of Republicans and particularly blacks from public life*, and *the conversion of all offices to white Democratic incumbency.*

Thornton (11/5/90) 79.

70.     The Democratic white conservatives who took control of the Alabama State House in 1874 spun a web of subordination around black schools sufficient to ensure adequate white control of black educational aspirations.  Thornton (11/5/90) 139-40.  While *de facto* segregation existed from the beginning of Alabama's public school system, *the Constitution of 1875 made segregated schools part of Alabama's basic law*.  The members of the constitutional convention understood that this *constitutional segregation applied to all levels of public education.*

344

Thornton (11/5/90) 140-146.

71.     The full scope and depth of the forms of racism created by post-Redemption white supremacy in Alabama is vividly described by Dr. Rogers in the preface to his book, *August Reckoning*: *Jack Turner and Racism in Post-Civil War Alabama* (1973):

> The decades of [powerful Democratic] ascendancy came after 1874, as Alabama became a state whose institutions were frankly, admittedly, unashamedly, and triumphantly dominated by whites. The theory of white supremacy and black inferiority found daily expression and constant application. If Caucasian dominance became legally fixed and formalized (as it did), Anglo-Saxon superiority was no less manifest in unstated ways. If a white man and a black man met face to face on a narrow walk, it was the black who stepped aside to let the other pass; a white man's surname was always prefaced with "Mister," or some sort of title, a Negro's never; purchases paid for in cash primarily involved the color green until a merchant was confronted simultaneously with two customers whom he must accommodate according to black or white.

> White superiority was no less evident in a verbal folklore spawned by, repeated by, and believed by whites: Negro men were naturally lazy and without ambition, desirous of having sexual relations with white women, incapable of higher reasoning, uncontrollable when under the influence of liquor, and cursed forever with an offensive body smell. And yet with all his negative qualities, the black, according to the Southern mystique, given proper guidance by his white mentors was carefree, musical, naive, gentle, mercurial, anatomically limber, religious (in an outlandish way), and humorous. Still, the black race, as everyone knew, was inferior, and all things proceeded from this basic premise.

345

KX 3129 (emphasis in original).[694]

72.    Emmet O'Neal, who attended the 1875 and 1901 Constitutional Conventions and who was elected Governor of Alabama in 1910, said in a 1917 address to the Alabama State Bar Association:

> The constitution of 1875 placed no restriction on negro suffrage.  The Federal government was under the complete control of the Republican Party, which was bitterly hostile to the South.   The fear of Federal interference, therefore, prevented any effort on the part of the framers of the constitution of 1875 from undertaking to restrict negro suffrage or lessen its admitted evils.

> The negro vote constituted an overwhelming majority in that portion of the state known as the black belt, and it was sufficiently large in many other portions of the state, in combination with the white republicans, to constantly threaten white supremacy, which was the chief tenet of the Democratic Party.   The fear of negro rule, with the misgovernment which would follow, and the race conflicts which it would create, constantly threatened the state and checked its progress.  White supremacy was maintained by methods which could only find their justification in the imperious necessity of self-defense and self-protection. Negro rule meant that the white man must surrender his home and lands or remain under conditions which were intolerable. *The white race had settled Alabama and owned its lands and hence was determined not to surrender to an alien and inferior race, which had been brought to Alabama as slaves and which had acquired the right of suffrage only by grant from the victorious North, and as one of the results of the war.*

KX 3240, pp. 9-10.

---

[694] The published opinion contains no emphasis in this quotation.  *See id.* at 1071.

73.    The SBE was very unpopular with white Democrats and scalawag Republicans "*because it aggressively sought educational opportunities for blacks* and it cooperated with the schools that had been established in Alabama by white northern missionaries during the years after 1865."  Thornton (11/5/90) 83.

74.    During the period of Redemption the SBE faced the wrath of the Democrats.  *The 1875 Constitution abolished the SBE* both as the governing body of the University of Alabama and *as the governing body of the public schools, in large part because it had sought to further equal educational opportunities for blacks*.  There would be no State Board of Education in Alabama from 1875 until 1919.  Thornton (11/6/90) 130.

* * * *

4. Blacks' Early Efforts For Equality Through Education

88.    After the Civil War, *during Congressional Reconstruction, a great struggle ensued over how much and what type education blacks in Alabama would have access to.  The freedmen, who made up nearly half the state's population, laid all their hopes for social equality on education, and they flocked in great numbers to every school available to them*.  Blacks' aspirations were supported by Northern white missionaries, who opened schools that taught blacks liberal curricula and equal rights.  *They were opposed by most native whites, who used violence to discourage any kind of education for blacks*.

89.    The hostile attitude of white Alabamians toward the northern missionary schools for blacks during Reconstruction was succinctly stated by one of the Knight Plaintiff's expert historians, Dr. J. Mills Thornton.

[The northern missionary schools] were highly unpopular with considerable number of whites who regarded the education of blacks as a threat and particularly were unpopular because it was thought that these missionaries were teaching blacks false notions.  They were teaching

347

them equality of the races, they were teaching them to be assertive. They were encouraging them not to continue a subservient role in the economy as part of the labor force. And white Democrats were also, particularly those allied with the Ku Klux Klan, were very hostile also to the history books that were used in these schools, because they thought that they presented a northern view of American history.

Thornton (11/5/90) 83-84.

90.    Access to higher education was particularly important to the freedmen's program of achieving full citizenship socially and economically. Higher education was the doorway to the many middle class social roles from which blacks had been excluded. "[T]he establishment of a black college therefore seemed to be essential to the general liberation of the freedmen." Thornton (11/5/90) 108.

91.    The main pressure on Alabama's whites to establish black schools came from Northern missionaries, who taught the newly freed blacks such "alien" values as equality, brotherhood, and citizenship for all, along with the traditional three R's. Thornton (11/5/90) 83-84.

92.    Whether the newly freed blacks were to be taught in integrated schools was an issue that consumed considerable debate but whose outcome was never seriously in question.

93.    *Among white Republicans, only some carpetbaggers favored school integration*; very few of the native white scalawags did. In fact, 23 of the scalawag delegates to the 1867 constitutional convention had repudiated the constitution adopted by the convention because it failed explicitly to require segregated schools and prohibit miscegenation. Thornton (11/5/90) 63-64.

94.    The Democratic charges in the 1874 elections that Republicans would promote school integration were outright lies. "[T]he scalawag element in the Republican party was strongly opposed to integration of the public schools. Very few scalawags would have

348

accepted integration of schools or for that matter any other facilities."
Thornton (11/5/90) 76.

95.    *In order to gain access to the education they so desperately desired*, Alabama's black citizens compromised with conservative whites on two major issues:  segregation and white control.

96.    *Black political leaders sought to require racially integrated schools*.    Black members of the 1867 Constitutional Convention promoted a requirement of integration, but white scalawags tried to write segregation into the constitution.    *As a compromise*, *the 1868 Constitution ended up requiring the SBE to establish* "one or more" *public schools in each township or school district*.  KX 655, 1868 Ala. Const., Art. XI, sec. 6.  Then at its first session the SBE passed a law requiring each township to have a school for whites and a school for blacks, unless every white parent in the township was willing to have one racially integrated school.  This provision had the necessary result of requiring segregated schools.  Thornton (11/5/90) 85-86.

\* \* \* \*

6.  Educational Access and Black Political Power:
the End of the Nineteenth Century

168.    Educational opportunity for blacks in the nineteenth century is directly tied to their political empowerment.  Both Alabama State and Alabama A & M were founded during Reconstruction, when, for the first time, blacks were allowed to vote and to serve in the State Legislature. *From 1868 to 1874, blacks and their white Republican allies actually exercised majority control of state government. Nevertheless, native white Alabamians considered racial integration of the schools unthinkable and thought sharing political power with blacks was dangerous and demeaning*.  The University of Alabama remained all white and almost closed its doors in 1872 rather than submit to governance by a State Board of Education that had a Republican majority, including one black member, Peyton Finley.  Funding for Alabama State and Alabama A & M had to come out of the blacks' share

349

of the state's public school fund used to finance elementary and secondary education. Even this modest progress toward education of the black population was reversed in 1874-75, when the Democrats "redeemed" the state from "black rule" and constitutionally installed the structures of official white supremacy. *The "Redeemer" Constitution of 1875 was the first Alabama constitution explicitly to forbid attendance of black and white children in the same schools.*

169. *Black educational opportunities declined directly in proportion to the decline of black political power after 1875.*

> [T]he absence of black participation and particularly the absence of black office holders really meant that the black community was at the mercy of Democratic politicians whose commitment was first and foremost to white supremacy.

Thornton (11/5/90) 190-91.

170. Black political influence did not disappear immediately, however, since not until the 1901 Constitution were most blacks disfranchised. Thornton (11/5/90) 193.

171. Along with the loss of political power came ever tighter, more oppressive white control of black educational institutions.

> *The white control, white Democratic and white supremacist control of black education in Alabama shaped the content of the curriculum because the schools were always to teach within the limits imposed by the knowledge that the kind of education which they imparted could never be permitted to challenge the supremacy of whites within the state, the existing social order and the subordinate position of the black race in the state.*

Thornton (11/5/90) 191.

350

172.    In Dr. Thornton's opinion, the limitation of ASU's mission to that of a normal school by the Alabama Supreme Court in *Elsberry v. Seay* was racially motivated:

> I think that there were racially discriminatory motives in the minds of justices of the Supreme Court who rendered the decision, and I think that the elimination of the university function of Alabama State which had been permitted all of those years was a reflection of the growing maturity of white supremacy within the state.  And certainly, the idea of not permitting blacks collegiate education was something that was congenial to white supremacists.

Thornton (11/5/90) 192.

173.    Black Alabamians fully understood the direct relation between their political powerlessness, white control of their schools, and the inferiority of public education made available to them.  They constantly made known their desire for autonomy with respect to black institutions — but the first half of the twentieth century would bring black education no repose.

*B. The Twentieth Century*

1.    Disenfranchisement's Impact on Black Education

174.    *The systematic disenfranchisement of blacks, accomplished by the 1901 Alabama Constitution*[,] *was a main plank in the platform of Southern Progressivism culminating* [*in the*] *defeat of efforts in the 1890's to form political coalitions between Hill Country white Populists and black voters*.    According to Dr. Thornton, *such a coalition threatened to undermine the color line of wite [sic] supremacy that had been drawn in 1874 with the ascendancy of the Democrats*.  Thornton (11/5/90) 200-04.

175.   The 1901 Constitution[695] embodied a major compromise between white political forces in various parts of the state.  Hill Country whites, Black Belt land owners, Bourbon whites and their "Big Mule" industrial allies, agreed that the Hill Country whites would control election of the governor through direct primary elections, *while the Bourbons and Big Mules would preserve their interests by creating and maintaining a malapportioned state legislature that overrepresented Black Belt counties*.  Rogers (3/13/91) 48-58.

> Ever pragmatic in their approach to politics, the majority of the Bourbon elite took the lesson of the populist period to heart.  Without the Negro vote, they could not maintain themselves in power.  *But as long as Negroes remained legal voters, there was always the danger that a dissident white group might capture the Negroes' confidence, and with these allies go on to effect a complete revolution in state government.  Clearly, the way to prevent such an eventuality was to admit to some degree of power the excluded white groups from whose ranks dissident movements had time and again arisen, while concurrently eliminating the Negro from politics*.  Of course, such a program meant a considerable diminution of power for the

---

[695] This footnote was numbered "22" in Judge Murphy's opinion, and read as follows:

The 1901 Alabama Constitution institutionalized and legitimized white supremacy. The delegates to the all-white convention fully support[ed] the doctrine of white supremacy.  John B. Knox, president of the constitutional convention, stated in his inaugural address to the convention:

> And what is it that we want to do?  Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State.

*Hunter v. Underwood*, 471 U.S. 222, 229, 105 S. Ct. 1916, 1921, 85 L. Ed. 2d 222 (1985), *quoting*, 1 Official proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901 to September 3rd, 1901, p. 8 (1940).

*Knight I*, 787 F. Supp. at 1090 n.22 (bracketed alteration supplied).

352

Bourbons, but, "half a loaf was better than none."  The result was the Constitution of 1901.  *The Bourbons contented themselves with disproportionate power in the malapportioned legislature*, while largely — through the institution of the direct primary — abandoning executive offices to the formerly excluded white groups.  *The Negro was removed as a possible bone of contention between the two segments of the white electorate by his disfranchisement.*

176.  *Ironically, ratification of the 1901 Constitution would have failed if the Black Belt whites had not fraudulently stuffed the ballot boxes with captive black votes.  Incredulously, the returns show that blacks voted for their own disenfranchisement.*  Thornton (11/5/90) 203-04.

177.  *As a practical matter, blacks had been denied a fair vote and a fair count even before the 1901 Constitution, because the Black Belt Bourbon white politicians used fraud and intimidation to manipulate the black vote to support conservative Democratic candidates.*  The threat of black political influence gave blacks the potential of determining election outcomes and thus some leverage — albeit minimal — to demand fair treatment.  For example, the U.S. House of Representatives threw out the declared Democratic winners for congressional seats after the 1892, 1894 and 1896 elections and seated their Populist opponents *based on the evidence of fraud with respect to the black vote.*

> So that kind of intervention from outside could give blacks some sense that there was something to be gained by holding on to this legal right to vote, even though it only in certain occasions never [sic] (ever) became a practical . . . thing.  After 1901 that hope is gone.

Thornton (11/5/90) 202-03.

178.  *The 1901 Alabama Constitution not only disenfranchised*

353

*the black population but entrenched a system of educational funding that was designed to improve white schools by raiding black students' portion of the public school fund.* This constitutional policy of racial discrimination in education was a hallmark of the so-called "Progressive" period in Alabama, as it was throughout the South.

> Vann Woodward in his *Origins of the New South* calls the chapter on progressivism For Whites Only. And that really is accurate, *indeed one of the ways in which increased funding for white schools is achieved by the progressives is transferring of financial resources out of the black schools and towards the white schools*. . . . [B]etween 1891 and 1908, the percentage that the black children are getting from the common school funds falls from 38 percent to 12 percent.

Thornton (11/5/90) 196-97. *The gap between state funds received by white and black students grew at all school levels*, including higher education. Thornton (11/5/90) 197.

> * * * *

### 5. Massive Resistance to Integration

i.    *The Legislature*

253.   Following World War II, Alabama's policy of segregation began to be attacked through the federal courts. Thornton (11/7/90) 247-49. A growing number of black war veterans were applying for admission to the University of Alabama, whose officials rejected the applications on the ground that the same programs were available to blacks at Alabama State or Alabama A & M. Thornton (11/7/90) 260.

254.   In 1952 a special committee of the all-white Alabama Bar Association was appointed by the Legislature to help design the state's master plan for massive resistance to anticipated federally mandated desegregation. *It was chaired by Birmingham lawyer, Joseph F.*

354

*Johnston, the grandson and namesake of Governor Johnston, who defeated the Populist candidate in 1896.*   The bar committee's membership included Gessner T. McCorvey, leader of Alabama's Dixiecrat revolt of 1948, and others, all of whom were characterized by Johnston as "lifetime staunch segregation advocates."   KX 3672.

255.   The four desegregation cases from South Carolina, Kansas, Virginia and Delaware were argued before the U.S. Supreme Court in December 1952 and reargued in December 1953.   On September 21, 1953, the Alabama Senate, anticipating rulings in the pending Supreme Court desegregation cases, appointed an Interim Joint Legislative Committee to work with the state bar on a massive resistance plan.   The committee resolution was sponsored by J.M. Bonner of Wilcox County, and the chair of the committee was State Senator Albert B. Boutwell. Boutwell "was genuinely convinced that segregated schools were the proper arrangement for Alabama and that the system had to be maintained."   KX 3672, p. 7.   The same resolution directed the Alabama Attorney General to file a brief in the Supreme Court defending segregation.   KX 3672, pp. 4-5.

256.   *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 was handed down May 17, 1954.   The Alabama Interim Legislative Committee responded to the *Brown* decision in its report issued October 18, 1954.   KX 600.   *The committee's report contained the main outlines of Amendment 111 to the Alabama Constitution, which would be adopted in 1956.*   KX 3672, p. 6.

257.   The Interim Legislative Committee recommended abandonment of legally explicit racial segregation of the schools in light of the Supreme Court's new ruling, but it proposed a new strategy for maintaining as much segregation as possible by means of seemingly neutral educational policies.   A centerpiece of this massive resistance strategy was the adoption of scholastic achievement standards that would exclude blacks.   The Committee expressed confidence in an academic standards-based strategy, because it shared the conviction of most white Southerners, instilled by a century of legal discrimination, that blacks are intellectually inferior to whites. According to the Interim Committee's

355

report:

> There are profound psychological and cultural differences,
> including differences in aptitudes, between the white and
> negro races in Alabama which should not be ignored in
> dealing realistically with as sensitive a problem as that of
> education.  Those differences will not be ignored except by
> those determined on mechanical social integration as a
> dominant end however punitive or disastrous its
> consequences.

KX 600, p. 65.

258.   But this new, "qualifications"-based strategy did not seem necessary to white university officials until the NAACP targeted the University of Alabama for litigation.

259.   Amendment 111 to the Alabama Constitution, adopted by the Legislature and ratified by the voters in 1956, adopted most of the recommendations of the 1954 Interim Legislative Committee report for the racially discriminatory purpose of preserving segregation in the public elementary and secondary schools of the state.[696]  KX 3672.

260.   When it became clear that its separate-but-equal defense of segregation would fail, the state government withdrew the financial support that had allowed Alabama State and Alabama A & M to gain accreditation briefly.  Both black colleges lost their accreditation in the early 1960's, despite pleas by their presidents for the additional funding needed to prevent it.  Thornton (11/7/90) 192-93; (11/26/90) 13-14.  It was not until several years later that ASU and Alabama A & M regained full collegiate accreditation.

---

[696] Judge Murphy's opinion contained the following note at this point:  "The Circuit Court for Montgomery County, Alabama recently found Amendment 111 to the Alabama Constitution void in its entirety since it violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  *See*, *Alabama Coalition for Equity Inc. v. Guy Hunt, Governor*, No. CV-91-117-R (August 13, 1991)."  *Knight I*, 787 F. Supp. at 1104 n.24.

261.   The March 22, 1967, order in *Lee v. Macon County Board of Education*, 267 F. Supp. 458 (1967), reinitiated the campaign of massive resistance orchestrated by the Governor and Legislature.  The *Lee v. Macon* order required the desegregation of all elementary and secondary schools and a start towards the desegregation of the junior colleges and state colleges administered by the SBE, including ASU, AAMU, TSU, JSU and UNA.  Following the court's order, the SBE immediately went into executive session with George and Lurleen Wallace.[697]  SOF ¶ 55.

262.   A week later, Governor Lurleen Wallace announced to the Legislature in a televised speech a five-point plan of open resistance to the federal court.  The Legislature was to resolve itself into a committee of the whole, receive testimony about the damage compliance with the court order would do, issue a "cease and desist" resolution, and if a stay was denied turn the whole education system over to the Governor, who would interpose the state's sovereignty.  On the same day as Governor

---

[697] Judge Murphy included the following footnote, numbered "25," to the textual statement:

The March 22, 1967, injunction issued by the three judge court in *Lee v. Macon* directed:

> No person shall be denied admission to any trade school, junior college, or state college administered by the Alabama State Board of Education upon the ground of race, nor shall he be subjected to racial discrimination in connection with his application for enrollment in or his attendance at any such trade school, junior college or state college. Dual attendance zones based on race for such trade schools, junior colleges, and state colleges shall be abolished. The State Department of Education shall direct such trade schools, junior colleges, and state colleges to recruit, hire, and assign teachers so as to desegregate faculty and to accomplish some faculty desegregation in each trade school, junior college and state college by September 1967.

*Lee v. Macon*, 267 F. Supp. 458, 484 (M.D. Ala. 1967), *aff'd sub nom.Wallace v. United States*, 389 U.S. 215, 88 S. Ct. 415, 19 L. Ed. 2d 422 (1967).

*Knight I*, 787 F. Supp. at 1105 n.25.

Wallace's speech, five state university presidents signed a resolution urging appeal of the March 22nd decree and the seeking of a stay of the decree's effects pending the appeal.  SOF ¶ 56.

263.   President Philpott of AU and President Rose of UA urged appeal of the *Lee v. Macon* order, even though it was addressed to neither of their institutions.  SOF ¶ 57.

264.   When the March 1967 *Lee v. Macon* order was appealed, one of the Governor's chief legal arguments against the statewide disestablishment of the dual system of elementary and secondary education was that the state government lacked authority to control local school boards to the extent needed to comply with federal court orders. This was a tactic advocated by the experts who were counselling Southern states involved in school desegregation cases.  John Satterfield of Yazoo City, Ms., the Governor's lawyer, explained it to members of the Alabama Legislature.[698]

### k.   The Supreme Court's intervening opinion in *Fordice*

In June of 1992, just six months after Judge Murphy entered his first judgment in the *Knight* case, the Supreme Court announced its decision in the case of *United States v. Fordice*, 505 U.S. 717 (1992), involving Mississippi's public system of colleges and universities.  Even though the end of segregation as a matter of state law (*i.e.*, *de jure* segregation) in the Mississippi system pursuant to a federal court order in 1962 had been hailed as a significant milestone in the burgeoning civil rights movement,[699] the Mississippi system of public institutions of higher education

---

[698] *Knight I*, 787 F. Supp. at 1066-74 (emphasis and some bracketed alterations added).

[699] *See Meredith v. Fair*, 306 F.2d 374 (5th Cir.), *cert. denied*, 371 U.S. 828, *enforced*, 313 F.2d 532 (5th Cir. 1962) (*en banc*) (*per curiam*).  That litigation forced the University of Mississippi to enroll James Meredith, the first person of African heritage to be admitted to that previously all-

remained segregated as a matter of fact (*i.e.*, *de facto* segregation) well into the

1980s.[700]   Consequently, the United States intervened in a lawsuit that had been

instituted by a group of private plaintiffs in 1975, claiming that Mississippi officials

had not met their obligations under the Equal Protection Clause and Title VI to

dismantle the state's "dual system" of public higher education.  "After the lawsuit was

filed, the parties attempted for twelve years to achieve a consensual resolution of their

difference through a voluntary dismantlement by the State of its prior segregated

system."[701]   When that effort ultimately proved unsuccessful, the case proceeded to

trial in 1987.  The district court and Fifth Circuit ruled in favor of the state.[702]  "The

---

white university.  *See*, *e.g.*, Taylor Branch, *Parting the Waters:  America in the King Years 1954-63*, 647-70 (New York:  Simon & Schuster 1988) ("**Branch**").

[700] *See*, *e.g.*, *Fordice*, 505 U.S. at 724-25 ("By the mid-1980's, 30 years after *Brown*, more than 99 percent of Mississippi's white students were enrolled at University of Mississippi, Mississippi State, Southern Mississippi, Delta State, and Mississippi University for Women.  The student bodies at these universities remained predominantly white, averaging between 80 and 91 percent white students.  Seventy-one percent of the State's black students attended Jackson State, Alcorn State, and Mississippi Valley State, where the racial composition ranged from 92 to 99 percent black.") (citing *Ayers v. Allain*, 893 F.2d 732, 734-735 (5th Cir. 1990) (panel decision)).

[701] *Fordice*, 505 U.S. at 724.

[702] The district court concluded that the defendants had demonstrated that they were "'fulfilling their affirmative duty to disestablish the former *de jure* segregated system of higher education.'"  *Id.* at 727 (quoting *Ayers*, 674 F. Supp. at 1564).  That conclusion was based upon the district court's understanding that,

> in the higher education context, "the affirmative duty to desegregate does not contemplate either restricting choice or the achievement of any degree of racial balance."  Thus, the court stated: "While student enrollment and faculty and staff hiring patterns are to be examined, greater emphasis should instead be placed on current state higher education policies and practices in order to insure that such policies and practices are racially neutral, developed and implemented in good faith, and do not substantially contribute to the continued racial identifiability of individual

Court of Appeals concluded that the State had fulfilled its affirmative obligation to disestablish its prior *de jure* segregated system by adopting and implementing race-neutral policies governing its college and university system."[703]  The Supreme Court reversed, holding that it was not sufficient to avoid liability for a state to show merely that it had abrogated the laws that previously enforced segregation in its public system of higher education.

> We do not agree with the Court of Appeals or the District Court . . . that the adoption and implementation of race-neutral policies alone suffice to demonstrate that the State has completely abandoned its prior dual system.  [The mere fact that] college attendance is by choice and not by assignment does not mean that a race-neutral admissions policy cures the constitutional violation of a dual system.  In a system based on choice, student attendance is determined not simply by admissions policies, but also by many other factors.  Although some of these factors clearly cannot be attributed to state policies, many can be.  Thus, even after a State dismantles its segregative admissions policy, there may still be state action that is traceable to the State's prior *de jure* segregation and that continues to foster segregation.  The Equal Protection Clause is offended by "sophisticated as well as simple-minded modes of discrimination."  If policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices.  . . .[704]

The Court held that a state was required to demonstrate that it had not left in

---

institutions."

*Id.* at 726-27 (quoting *Ayers,* 674 F. Supp. at 1553).

[703] *Fordice*, 505 U.S. at 728.

[704] *Id*. at 729 (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)) (other citations omitted).

360

place policies or practices "traceable to" its prior *de jure* system that continue to foster

segregation in fact.

> If the State [*i*] perpetuates policies and practices traceable to its prior
> system that [*ii*] continue to have segregative effects — whether by [*ii.a*]
> influencing student enrollment decisions [*e.g.*, student "choice" of which
> institution to attend] or by [*ii.b*] fostering segregation in other facets of
> the university system — and [*iii*] such policies are without sound
> educational justification and [*iv*] can be practicably eliminated, the State
> has not satisfied its burden of proving that it has dismantled its prior
> system.  Such policies run afoul of the Equal Protection Clause, even
> though the State has abolished the legal requirement that whites and
> blacks be educated separately and has established racially neutral policies
> not animated by a discriminatory purpose. . . .[705]

The Supreme Court's opinion in the *Fordice* case sketched an analytical

framework that could entail as many as four steps.  First, plaintiffs are required to

demonstrate that a challenged policy or practice is "traceable to" decisions that were

made, or practices that were instituted, in the past for the purpose of segregating the

---

[705] *Fordice*, 505 U.S. at 731-32 (footnote omitted, bracketed alterations added). In the omitted
footnote, the Court observed:

> Of course, if challenged policies are not *rooted in the prior dual system*, the
> question becomes whether the fact of racial separation establishes a new violation of
> the Fourteenth Amendment under traditional principles.  *Board of Ed. of Oklahoma
> City Public Schools v. Dowell*, 498 U.S. 237, 250-251, 111 S. Ct. 630, 638, 112 L.
> Ed. 2d 715 (1991); *Arlington Heights v. Metropolitan Housing Development Corp.*,
> 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).

*Fordice*, 505 U.S. at 732 n.6 (emphasis added).  *See also id.* at 728 ("Our decisions establish that
a State does not discharge its constitutional obligations until it eradicates policies and practices
traceable to its prior *de jure* dual system that continue to foster segregation. ").

361

races in the state's colleges and universities.[706]

If plaintiffs make such a showing, then the policy or practice is deemed to be a "vestige of segregation,"[707] and the analysis proceeds to a second step:   a determination of whether the challenged policy or practice *continues to have segregative effects*.   At this stage of the inquiry, the burden shifts to *the state* to show that the policy or practice no longer has continuing segregative effects.[708]   As the Eleventh Circuit later noted, a state may carry that burden in either of two ways.   On one hand, the state "may show that the challenged contemporary policy, though traceable to segregation, is not constitutionally objectionable because it does not today have segregative effects."   *Knight v. Alabama*, 14 F.3d 1534, 1541 (11th Cir. 1994) ("*Knight I-A* ").   If the state demonstrates that the challenged policy or practice no longer has segregative effects, the inquiry ends at that point.[709]

---

[706] *See*, *e.g.*, *Knight v. Alabama*, 14 F.3d 1534, 1540-41 (11th Cir. 1994) ("*Knight I-A*") ("Where plaintiffs in a lawsuit contend that a state or other public actor has not discharged its duty to dismantle its former system of *de jure* segregated higher education, the burden of proof lies with the charging party to show that a challenged contemporary policy is traceable to past segregation.").

[707] A "vestige of segregation" is a policy or practice that is traceable to a prior *de jure* system of school segregation, and which continues to have discriminatory effects.   *See*, *e.g.*, *United States v. Yonkers Bd. of Educ.*, 123 F. Supp. 2d 694 (S.D.N.Y. 2000) (citing *Fordice*, 505 U.S. at 727–28; *Freeman v. Pitts*, 503 U.S. 467, 495–96 (1992); *United States v. City of Yonkers*, 833 F. Supp. 214, 218–19 (S.D.N.Y. 1993)).

[708] *See Fordice,* 505 U.S. at 739 ("*Brown* and its progeny . . . established that the burden of proof falls on the *State*, and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system.") (citing *Brown II*, 349 U.S. at 300).

[709] *Knight I-A*, 14 F.3d at 1541 ("Where the state proves that a challenged policy, shown by plaintiffs to be traceable to segregation, has no segregative effects, it is relieved of its duty to eliminate or modify the policy.   This inquiry constitutes the second step in the *Fordice* analysis."

On the other hand, another circumstance identified by the Eleventh Circuit in which a state *may be* relieved of its obligation to abolish or modify higher education policies traceable to the former de jure system of segregation

> obtains where, in effect, it simply is not possible to do so.  Where "policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies . . . must be reformed to the extent practicable and consistent with sound educational practices." [*Fordice*, 505 U.S. at 729].  Thus, where the state can show that there are no less segregative alternatives which are practicable and educationally sound, then it may permissibly maintain the vestigial practice or policy in place.  *Id*. at [732-43], 112 S. Ct. at 2738-43; *id*. at [744], 112 S. Ct. at 2744 (O'Connor, J., concurring).  However, the state's burden of proving that such alternatives are impracticable or educationally unsound is a heavy one and "the circumstances in which a State may maintain a policy or practice traceable to *de jure* segregation that has segregative effects are narrow."  *Id*. at [744], 112 S. Ct. at 2743 (O'Connor, J., concurring).[710]

If the state cannot, or does not, make either of the foregoing showings, then the inquiry proceeds to a third step:  a determination of whether the policy or practice is supported by sound educational purposes.  "If policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies . . . must be reformed *to the extent practicable* and *consistent with sound educational practice*."[711]  "This

---

(citing *Fordice*, 505 U.S. at 738-39)).  This is the element of "causation" — the continuing adverse, "segregative effects" prong of proof — that ultimately proved to be determinative in the last two opinions in the *Knight* line of cases.

[710] *Knight I-A*, 14 F.3d at 1541.

[711] *Fordice*, 505 U.S. at 729 (emphasis supplied); *see also id.* at 746 ("A challenged policy does not survive under the standard we announce today if it began during the prior *de jure* era, produces adverse impacts, and persists without sound educational justification.") (Thomas, J., concurring).

examination of the . . . educational soundness of possible alternatives or modifications to a challenged policy constitutes the third step in the *Fordice* analysis."[712]

Even when the challenged policy or practice is supported by sound educational purposes, the inquiry still must proceed to a fourth step:  a determination of whether the educational purposes can be feasibly accomplished by alternative means that have less segregative effects.[713]

> The state is obligated to adopt, from among the full range of practicable and educationally sound alternatives to the challenged policy, the one that would achieve the greatest possible reduction in the identified segregative effects. [*Fordice*, 505 U.S.] at 743-44, 112 S. Ct. at 2744 (O'Connor, J., concurring).  Moreover, because the obligation to remedy the segregative effects of vestiges of segregation is an affirmative duty borne by the state, the onus is not on the plaintiffs to propose the remedy options to be considered.  Rather, a court should consider the full range of all possible alternative remedies, including closure, when determining which would achieve the greatest possible reduction in the identified segregative effects.  *Id.* at 742, 112 S. Ct. at 2743.  This examination of the practicability and educational soundness of possible alternatives or modifications to a challenged policy constitutes the third step in the *Fordice* analysis.

> Where plaintiffs show that a current policy is traceable to past segregation, and defendants fail to demonstrate either (1) that the policy, in combination with other policies, has no current segregative effects, or (2) that none of the full range of less segregative alternative remedies are

---

[712]*Knight I-A*, 14 F.3d at 1541-42.

[713] *See Fordice*, 505 U.S. at 743 ("[T]he State may not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound educational policies."); *see also Knight I-A*, 14 F.3d at 1541 (observing that a state may escape liability if it shows that "there are no less segregative alternatives which are practicable and educationally sound").

practicable and educationally sound, defendants must adopt the practicable and educationally sound alternatives that will bring about the greatest possible reduction in the segregative effects.  "If the State has not discharged [this remedial] duty, it remains in violation of the Fourteenth Amendment." *Id*. at 717, 112 S. Ct. at 2735.[714]

### *l.*   Eleventh Circuit reversal and remand of Judge Murphy's first opinion — "*Knight I-A* "

Thus, Judge Murphy's opinion in *Knight I* reached the Eleventh Circuit after the intervening *Fordice* decision, and his judgment was reviewed under the recently-minted standards.  As demonstrated by the following quotation, however, the appellate court was obviously impressed with the degree to which Judge Murphy had anticipated the *Fordice* standards, affirmed most of his judgment, and remanded only for a limited review of a few discrete elements of the prior decision.

> Although, as explained below, we find it necessary to reverse or vacate, and remand for reconsideration, a few isolated portions of the district court's judgment, in so doing we express nothing but the deepest respect for the manner in which the court below has handled this case. Judge Murphy's management of this complex piece of institutional reform litigation has been extraordinary.  His meticulous and scholarly opinion is a model of judicial thoroughness.  Writing without the benefit of Supreme Court guidance on the applicable legal standard, Judge Murphy anticipated in considerable measure the standards later set out by the Court in *Fordice*.  Our ruling today reversing or vacating, and remanding for reconsideration, a few discrete elements of the court's opinion is based primarily on the legal standards announced by the Supreme Court months after the district court opinion was issued.  This disposition therefore in no way reflects negatively on the district court's

---

[714] *Knight I-A*, 14 F.3d at 1541-42.

handling of the case.  The fact that defendants do not challenge the district court's judgment at all, and that plaintiffs at this time take issue with only a few isolated rulings, bears witness to the wisdom and fairness manifested in the court's decision.[715]

>    **m**.    **Proceedings on remand and Judge Murphy's second opinion**
>       — *"Knight II "*

Following remand, Judge Murphy "took the extraordinary step of appointing five neutral expert witnesses . . . in a effort to assist the Court and the parties in analyzing the issues remanded from the Circuit."  *Knight v. Alabama*, 900 F. Supp. 272, 285 (N.D. Ala. 1995) ("*Knight II* ").[716]  Those experts reviewed the policies previously found to perpetuate segregation in Alabama's colleges and universities and recommended changes to reduce racial separation in the system.  Judge Murphy then conducted an additional six-week trial.[717]

---

[715] *Id.* at 1540.

[716] Judge Murphy "felt it important to secure the assistance of educational experts not associated with any of the parties to this case."  *Knight II*, 900 F. Supp. at 285.  The five members of the committee were:  Dr. Robert M. Anderson, Jr., Vice Provost for Extension and Director of Cooperative Extension at Iowa State University; Lt. Gen. Julius W. Becton, Jr., former President of Prairie View A & M University and board member for various organizations committed to equal access to higher education and former member of various presidential administrations; Dr. Harold L. Enarson, President Emeritus of The Ohio State University, Executive Director of the Western Interstate Commission for Higher Education and member of President Truman's White House Staff; Dr. Robben Fleming, President Emeritus of the University of Michigan at Ann Arbor, former President of the Corporation for Public Broadcasting, Chairman of the American Association of Universities, and a Fellow of the American Academy of Arts and Sciences; and Dr. Bryce Jordan, President Emeritus of the Pennsylvania State University and founding president of the University of Texas at Dallas.  *Id*. at 286.  *See also Knight v. Alabama*, 476 F.3d 1219, 1222 n.4 (11th Cir. 2007) ("***Knight III-A***") (same).

[717] *See Knight II*, 900 F. Supp. at 280.

366

Judge Murphy entered another lengthy opinion on August 1, 1995, covering 113 pages in volume 900 of West's *Federal Supplement* reporter, and outlining remedial orders for each of the affected institutions.  The specific remedies were too numerous to recount here, but it can be said in summary that the decree was calculated to eliminate the vestiges of historical racial discrimination within the Alabama system of public higher education, and included orders to:  lessen duplication of programs at institutions that were geographically close to one another; strengthen curricula at historically black institutions; increase integration of administration and faculty at all institutions; fashion more flexible admissions policies; increase recruitment of black students; and, increase the amount of funds allocated to historically black institutions.[718]  Judge Murphy also appointed a Monitor[719] and committee of four neutral experts[720] to oversee the administration of the remedial decree, and retained jurisdiction to monitor the State's progress in implementing his orders.

Finally, and significantly, it was expressly provided that the remedial decree would terminate ten years after entry:  "On July 31, 2005, this Decree shall terminate

---

[718] *See id.* at 349 *et seq.*

[719] *See Knight v. Alabama*, 829 F. Supp. 1286, 1288 (N.D. Ala. 1993) (finding the existence of sufficient exceptional circumstances to authorize a Monitor to oversee compliance with remedial orders, and appointing Atlanta attorney Carlos A. González to serve in that capacity).

[720] *See Knight III-A*, 476 F.3d at 1222 n.5 (noting that the Oversight Committee was composed of four of the five previously appointed neutral expert witnesses).

automatically and without further formality unless a party to this litigation, by motion filed not less than sixty (60) days preceding the expiration date of this Decree, requests the Court to extend the term of the Decree."[721]

> **n**.  **Third and final opinion by Judge Murphy, addressing plaintiffs' "motion for additional relief" — "*Knight III*"**

Before the July 31, 2005 termination date was reached, however, plaintiffs filed a "Motion for Additional Relief with Respect to State Funding of Public *Higher Education*."  *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1277 (N.D. Ala. 2004) (emphasis supplied) ("*Knight III*").  Judge Murphy summarized the contentions of that motion in the following manner:

> 3.    Plaintiffs contend that serious underfunding of the Educational Trust Fund ("ETF"), from which appropriations are made for both K-12 and higher education, has jeopardized the success of the remedies crafted by the Court to eliminate the vestiges of historical discrimination in the State of Alabama's system of public higher education.

> 4.    Plaintiffs claim that adequate state funding is necessary for fashioning an effective, educationally sound, and practicable remedy for the State of Alabama's history of *de jure* racial discrimination. Specifically, Plaintiffs claim that adequate funding is necessary for: (1) recruiting and retaining of black faculty members and high-ranking administrators at historically white institutions ("HWI"); (2) providing ASU and Alabama A & M University ("AAMU") with the necessary resources to overcome a century of underfunding by the State; (3) providing ASU and AAMU the ability to fund adequately scholarships

---

[721] *Knight II*, 900 F. Supp. at 374.

to attract other-race students after the Court-ordered scholarships expire; and (4) developing new, high-quality programs at ASU and AAMU, including the capital facilities and faculty necessary to operate them.

5.     According to Plaintiffs, severe cuts in state funding have severely impeded the ability of ASU and AAMU to implement successfully remedial programs calculated to spur growth in academic, research, and public service functions.  *Plaintiffs specifically point to Alabama's property tax system*, *which Plaintiffs claim is unfair*, *inadequate*, *and unconstitutional*.  Plaintiffs argue that because of low and inadequate property taxes, which are intended to be the primary source of K-12 funding, the State of Alabama has been forced to allocate an increasingly greater percentage of funds from the ETF to K-12 appropriations.  As a result, over the past several years, all of the public state universities have been forced to increase tuition dramatically. Plaintiffs submit that the State's tax burden disproportionately falls on the low-income portion of the population, which remains predominately black, and consequently acts as a barrier against blacks obtaining public higher education.

6.     Plaintiffs claim[ed] that the State's tax system is traceable to a prior *de jure* segregation regime.  *Specifically, Plaintiffs contend that the restrictions on the amount of taxes that can be levied on real property are directly traceable to a policy of shielding the real property of white landowners from taxes that would benefit the education of blacks* — a policy that Plaintiffs claim persists to this day.  Plaintiffs identify six provisions of the Alabama Constitution that they claim are traceable to a legislative intent to preserve racial segregation throughout the State's system of public education and thwart and deny blacks an equal opportunity to obtain the benefits of public higher education in Alabama.

7.     Those provisions are:  [*the same provisions that plaintiffs have challenged in the present action*; see the discussion in Part I(D)(1)(a) of this opinion, *supra*].

8.     Plaintiffs contend that those six constitutional provisions, as

369

well as laws enacted pursuant to those provisions, effectively segregate the races and deny equal opportunity to African-Americans.[722]

Judge Murphy conducted an evidentiary hearing on the plaintiffs' motion for additional relief on May 4 and 5, 2004, and entered a memorandum opinion resolving the motion five months later.[723]  He concluded that plaintiffs had met their burden of demonstrating that Alabama's "current ad valorem tax structure is a vestige of discrimination inasmuch as the constitutional provisions governing the taxation of property are traceable to, rooted in, and have their antecedents in an original segregative, discriminatory policy."[724]  He also concluded that

> the current tax structure in Alabama cripples the effectiveness of state and local governments in Alabama to raise funds adequate to support *higher education*.  The Lid Bill and the low assessment ratios impede and restrict the ability of the State and local governments from raising revenue from taxation of property.[725]

Moreover, Judge Murphy "agree[d] that the current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K-12 schools."[726]  Nevertheless, Judge Murphy ultimately

---

[722] *Knight III*, 458 F. Supp. 2d at 1277-79 (emphasis supplied).

[723] *Id.* at 1279.

[724] *Id*. at 1311, ¶ 8.

[725] *Id*. at 1311-12, ¶ 9 (emphasis supplied). Those conclusions were not based solely upon the evidence adduced in a mere two-day hearing conducted from May 4 to 5, 2004, but upon the record from the 1991 trial, which lasted six months, and the second trial in 1995, which lasted six weeks. *See id.* at 1311, ¶ 8 ("*Based on the extensive record before the Court*, the Court finds . . . .") (emphasis supplied).

[726] *Id*. at 1312, ¶ 13.

concluded that defendants had carried their burden under *Fordice* of showing that the

challenged Alabama constitutional provisions did not have a "continuing segregative

effect," in the sense of resulting in "an unconstitutional denial of a student's right to

make a decision [about which college or university to attend,] unfettered by vestiges

of discrimination."[727]

That conclusion should be read in the context of Judge Murphy's statements on

the issue of causation — the so-called "continuing effects" step of the *Fordice*

analytical framework — which are set out below:

> 10.   Plaintiffs having satisfied their burden to show that the
> current tax structure is "traceable to" *de jure* segregation, the burden
> shifts to Defendants to show that the challenged provisions of the
> Alabama constitution do not have a continuing segregative effect.
> *Knight v. Alabama*, 14 F.3d at 1541.

> 11.   *Defendants contend that the property tax is not related to
> Alabama's system of higher education — i.e., that no nexus exists
> between the lack of funds derived from state and local property taxation
> and the effect on student enrollment decisions.*   Consequently,
> Defendants submit, the challenged provisions of the Alabama
> Constitution do not and cannot have a continuing segregative effect.

> 12.   Plaintiffs contend that a causal nexus does indeed exist,
> arguing that the lack of property tax revenue has financially strained
> K-12 schools in Alabama, thereby requiring that the State allocate an
> increased proportion of the ETF to K-12.  As a result of this inequitable
> distribution, Plaintiffs claim that tuition at Alabama's institutions of
> higher education has skyrocketed and that funds available for need-based

---

[727] *Id.* (bracketed alteration supplied).

financial assistance have plummeted.  Consequently, the ability of poorer students, who are disproportionately black, to attend college is adversely affected.

13.    *The Court appreciates Plaintiffs' argument, and agrees that the current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K-12 schools*.  Nevertheless, the Court cannot agree that the property tax structure stymies school choice in such a way that results in an unconstitutional denial of a student's right to make a decision unfettered by vestiges of discrimination.

14.    The Court finds that the relationship between the funding of higher education and finding [sic: "funding"] of K-12 is marginal insofar as ad valorem property tax is concerned.  *Put differently, the effect of the state's inability to raise revenue due to the challenged constitutional provisions is simply too attenuated to form a causal connection between the tax policy and any segregative effect on school choice*.

15.    Additionally, although the proportion of the ETF allocated to higher education has fallen since 1990, the actual amount of money paid to higher education has increased from $820,063,882 to $1,160,033,885 over that same period. (Defs.' Ex. 04-004.)

16.    Moreover, insofar as Plaintiffs contend that the lack of funding for property taxes somehow works to frustrate the Court's prior remedial decrees, the Court finds that argument unavailing.  Rather, the State has unbegrudgingly complied with the Court's remedial decrees, meeting all its obligations as ordered by the Court.  Along those same lines, between the 1991-92 and 2002-03 academic years, black student enrollment and graduation rates at HWIs [historically white institutions of higher education] have increased considerably. (Defs.' Exs. 04-001 to 003.)

17.    The Court concludes, therefore, that although the ad valorem taxation system in Alabama may be traceable to past discriminatory decisions, Defendants have satisfied their burden to demonstrate that the

challenged provisions of the Alabama constitution *do not continue to have a segregative effect on student choice.*[728]

o.     **Eleventh Circuit affirmance** — "*Knight III-A* "

The Knight plaintiffs appealed Judge Murphy's decision in *Knight III*, but were rebuffed by the Eleventh Circuit, which "agree[d] with the district court that plaintiffs' *present claim* is fundamentally about reforming *Alabama's K-12 school funding system*, *and not about* [the focus of the case during the preceding fifteen years of litigation,] *desegregating its colleges and universities*." *Knight v. Alabama*, 476 F.3d 1219, 1223 (11th Cir. 2007) (emphasis supplied) ("*Knight III-A* ").

In order to better understand the plaintiffs' claims in the present action, it may be helpful to quote at length from the opinion authored by Judge Thomas A. Clark for the Eleventh Circuit panel composed of himself, Chief Judge J. L. Edmondson, and Judge Phyllis A. Kravitch.

> Plaintiffs claim that certain tax provisions of the Alabama Constitution violate the United States Constitution. They assert that these tax provisions so seriously underfund public education in Alabama that they have a segregative effect on Alabama's colleges and universities. The district court denied the claim, and this appeal followed.

> **I.**

> This case was filed in 1981, claiming that the State of Alabama

---

[728] *Knight III*, 458 F. Supp. 2d at 1312-13 (emphasis supplied, footnote omitted).

had failed to complete the desegregation of its colleges and universities. Plaintiffs alleged that many of Alabama's polices governing higher education tended to perpetuate its formerly de jure segregated university system. The challenged education policies included: admissions standards at historically white institutions, claimed to disqualify disproportionate numbers of black applicants; selection procedures for the governing boards, administrations and faculty of historically white institutions, claimed to result in the under representation of blacks; curriculum policies at historically white institutions, claimed to include little representation of black history, thought, or culture; campus environments at historically white institutions, claimed to be hostile to blacks; funding and facility policies governing historically black institutions, claimed to result in their inadequacy; duplication of programs at both historically white and historically black institutions, claimed to result in racial separation; and restrictive institutional missions at historically black institutions, claimed to result in the absence of graduate and other desirable programs at those institutions. Plaintiffs sought change in these policies that would tend to decrease the de facto segregation, or racial identifiability, of Alabama's colleges and universities.

In 1991, following two bench trials that lasted over seven months, during which the court heard approximately 200 witnesses and received hundreds of thousands of pages of exhibits, the district court issued a 360-page opinion in which it found liability. *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991) ("Knight I"). The court found that several of Alabama's higher education policies, including those governing faculty and administrative employment, allocation of funds and facilities at historically black institutions, admissions at historically white institutions, and program duplication did tend to result in the racial identifiability of its colleges and universities. *Id*. at 1368. The court ordered the parties to develop and the State to implement specific modifications to these policies in order to increase black access to historically white institutions and encourage white attendance at historically black institutions. *Id*. at 1377-82.

Just six months after the district court entered its judgment in

*Knight I*, the Supreme Court decided *United States v. Fordice*, 505 U.S. 717, 112 S. Ct. 2727, 120 L. Ed. 2d 575 (1992), the first case in which the Court enunciated the constitutional standards governing claims of persistent segregation in higher education.  In *Fordice*, the court made clear that even race-neutral "policies now governing the State's university system" may violate the Fourteenth Amendment.  505 U.S. at 733, 112 S. Ct. 2727.  In order to successfully challenge such policies, the Court said, plaintiffs must demonstrate that they are traceable to the State's prior de jure system of segregation in higher education.  *Id*. Having done so, the burden shifts to the State to prove that these policies do not have a continuing segregative effect.  *Id*. at 738-39, 112 S. Ct. 2727.  Failure of the State to do so authorizes the court to find liability and issue remedial orders.  *Id*.

A few months later, *Knight I* reached us on appeal, and we reviewed the district court's judgment under the newly-established *Fordice* standards.  We were impressed with the extent to which the district court had anticipated those standards, and we acknowledged this prescience, affirming most of the judgment and remanding only for a limited review of a few discrete elements of it.  *Knight v. Alabama*, 14 F.3d 1534, 1540 (11th Cir. 1994).

On remand, and prior to any proceedings, the district court took the extraordinary step of appointing five neutral expert witnesses to assist it in fashioning a constructive remedial decree.  These experts reviewed the policies found to perpetuate segregation in Alabama's colleges and universities and recommended changes to reduce racial separation in the system.

Then, in 1995, the court entered its remedial decree.  The court ordered numerous changes in Alabama's higher education policies, including less duplication of programs at geographically close institutions; strengthened curricula at historically black institutions; increased integration of administration and faculty at all institutions; more flexible admissions policies; increased black student recruitment; and increased funding of historically black institutions.  *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995) ("Knight II").

Additionally, the court appointed a Monitor and an Oversight Committee, charged with the administration of its remedial decree. The court also conducted periodic reviews of the State's compliance with its orders. Finally, the district court retained jurisdiction to monitor the State's progress in implementing these changes.

Over the succeeding decade, under the supervision of the court, the parties worked tirelessly to develop and implement new programs, change old ones, and in many other ways to effectuate the changes called for in the court's remedial decree. The district court has noted on numerous occasions, as it did in ruling on the instant motion, that "the State has unbegrudgingly complied with the Court's remedial decrees, meeting all its obligations as ordered by the Court." *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1312 (N.D. Ala. 2004) ( "*Knight III* "). The court and the parties anticipated that, after ten years of constructive remediation of Alabama's system of higher education, the court would return control of that system to Alabama in the summer of 2005. *Knight I*, 900 F. Supp. at 374.

This lawsuit, then, for over fifteen years, has been about remedying segregation in Alabama's system of higher education by making changes in the education policies that tended to keep Alabama's historically black colleges black, and its historically white colleges white. While the court has ordered many changes that required the State to dramatically increase its funding of higher education — especially at its historically black institutions — the State has always "unbegrudgingly" raised and spent this money. *This lawsuit*, however, *has never been about how Alabama raised the money to meet its court-ordered obligations to higher education*, much less about how Alabama funds its system of lower ("K-12") education.

Nonetheless, in July of 2003, plaintiffs filed the pleading we now review. Although styled "Motion for Additional Relief," nowhere in the motion is there any request for additional relief regarding Alabama's higher education system. There is no request whatsoever for additional funding or any other changes in the education policies governing higher education in Alabama.

Instead, plaintiffs request an injunction ordering Alabama to fund adequately its system of lower education, and to do so by developing an entirely new method of public school finance in the state.  Plaintiffs contend that only the complete reformation of Alabama's school finance system for lower education — including the invalidation of certain provisions of the Alabama Constitution that limit both the rates and actual revenues from property taxation — will allow the State to raise the revenue necessary to adequately fund its K-12 schools.  And, only when Alabama's public schools are adequately funded, according to plaintiffs, will there be sufficient other funds to achieve the remedial goals of this lawsuit.  Therefore, plaintiffs asked the district court to invalidate the property tax limitations of the Alabama Constitution and to enjoin the State to reform its method of public school finance within one year to provide adequate and equitable funding for its K-12 schools.

Although moved by defendants not to allow a new theory of liability ten years after the entry of the court's remedial decree, the district court held a two-day evidentiary hearing on the claim in May of 2004.  The court heard from many experts on both the historical context and the school funding implications of Alabama's methods of public school finance.

The following October, the district court entered a ninety-page opinion and order denying the "Motion for Additional Relief."  *Knight III*, 458 F. Supp. 2d at 1314.  The district court held that, as a claim for liability, plaintiffs had failed to establish that the alleged funding crisis in Alabama's K-12 education system had a segregative effect on its system of higher education.  *Id*. at 1312-13.  Furthermore, the court held plaintiffs had failed to establish a need for any additional relief, as the State had already complied, or was complying, with all the court's previously-entered remedial orders, as agreed upon by all the parties.  *Id*.  The district court concluded that, while it "appreciate[d] Plaintiffs' argument" that "the current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K-12 schools," it disagreed with plaintiffs' assertion that this lower school funding problem was sufficiently related to the desegregation of the State's higher education system to permit a

remedy in this lawsuit.  458 F. Supp. 2d at 1312.

We agree with the district court that plaintiffs' present claim is fundamentally about reforming Alabama's K-12 school funding system, and not about desegregating its colleges and universities.  Plaintiffs themselves made this clear when they filed the claim.  On the first page of their supporting memorandum, plaintiffs called the district court's attention to Alabama Supreme Court's dismissal of the public school funding litigation in the Montgomery County Circuit Court, known as the *Equity Funding Cases*.  *See Ex Parte James*, 836 So. 2d 813, 816 (Ala. 2002).  Plaintiffs asserted that the dismissal of these state cases entitled them to "raise claims regarding Alabama's school funding system in this [federal] action."  Plaintiffs' requested relief was that the district court enter an injunction requiring the State to revise its tax policies and tax rates to *adequately fund K-12 education*.

Plaintiffs['] present claim, then, is not a claim for desegregation in Alabama's system of higher education.  It is a school finance claim.  Because we find this distinction fatal to plaintiffs' claim, we pause to explain the difference.

## II.

Section 256 of the 1901 Alabama Constitution requires "a liberal system of public schools throughout the state for the benefit of the children."  In 1956, as the State's direct, indeed avowed, response to *Brown v. Board of Education*, Section 256 was amended to provide that "nothing in this Constitution shall be construed as creating or recognizing any right to education or training at public expense."  Ala. Const., art. XIV, § 256, Amend. 111 (1901).  Thereby, Alabama served notice that its support for integrated public education was conditional.  Subsequently, other amendments were added to the state constitution that imposed strict limits on the ability of state and local governments to raise revenue from property taxes — the traditional method of funding K-12 education in Alabama.

In 1990, the Alabama Coalition for Equity, Inc. (the "Coalition"),

378

acting on behalf of schoolchildren, parents and school systems throughout the State of Alabama, brought a lawsuit in circuit court in Montgomery County, Alabama, seeking a declaration that Amendment 111 was unconstitutional because its avowed purpose was racial discrimination. The Coalition also sought a declaration that state funding of K-12 education did not provide an adequate or equal education for all of Alabama's school children. *Alabama Coalition for Equity, Inc. v. Hunt*, No. CV-90-883 (Ala. Cir. Ct. Apr. 1, 1993). This case was consolidated with a similar lawsuit filed in the same court in 1991, *Harper v. Hunt*, No. CV-91-0117 (Ala. Cir. Ct. Jan. 19, 1991) and together they became known as the *Equity Funding Cases*, reprinted in *Opinion of the Justices No. 338*, 624 So. 2d 107, 110-67 (Ala. 1993).

In April of 1993, the *Equity Funding Cases* state court held that Amendment 111's racially discriminatory purpose violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Id.* at 111-12. The court declared that Amendment 111 of Section 256 was void in its entirety. *Id.* The court also declared that the original language of Section 256, guaranteeing Alabama's school children an "adequate education," remained Alabama law. *Id.* The court further held that, although Alabama's schoolchildren were guaranteed an adequate education, Alabama's funding of its public school system did not provide it. *Id.* The court enjoined state officers to "establish, organize and maintain a system of public schools, that provides equitable and adequate educational opportunities to all school-age children." *Id.* at 166.

This judgment was not appealed, in part because the circuit court retained jurisdiction over the case to address other matters, but the legislature immediately passed a resolution requesting the Alabama Supreme Court to render an advisory opinion on whether the circuit court's judgment was binding in view of the separation of powers principle of the Alabama Constitution. On April 27, 1993, barely four weeks after the circuit court's judgment, the Supreme Court advised the legislature that the state court's order must be enforced. *Id.* at 110.

Over the course of the next decade, remedial plans were proposed

379

but none was implemented.  Although there was much ado, it turned out to be about nothing much.  Consequently, in 2001, the *Equity Funding Cases* plaintiffs moved the Montgomery County circuit court to take some action to enforce its injunction.  Shortly thereafter, the State proposed a new remedial plan containing an estimated annual increase in expenditures for K-12 education of $1.7 billion.

One year later, in 2002, the Alabama Supreme Court dismissed the *Equity Funding Cases*, holding that the circuit court's order did, after all, violate the Alabama Constitution's principle of separation of powers.  *Ex Parte James*, 836 So. 2d at 816.  The court held that "because the duty to fund Alabama's public schools is a duty that — for over 125 years — the people of this State have rested squarely upon the shoulders of the Legislature, it is the Legislature, not the courts, from which any further redress should be sought."

Within a year of the Alabama Supreme Court's dismissal of the *Equity Funding Cases*, plaintiffs in this case filed their "Motion for Additional Relief."[729]  Although styled as a motion for additional relief, plaintiffs really sought an adjudication of a new claim. For the first time in this lawsuit, plaintiffs claimed that segregation in Alabama's system of higher education is caused by Alabama's constitutional limitations on its ability to raise property taxes for K-12 education.

Although the connection between underfunding of Alabama's public *schools* and segregation in its *universities* is far from intuitive, plaintiffs constructed an elaborate "chain of causation" said to link the two.  According to plaintiffs, Alabama's property tax limitations result in underfunded public schools.  This, in turn, results in the diversion of state funds intended for higher education to lower education.  This diversion of state funds to K-12 education, results in Alabama's inability to adequately fund its system of higher education.  This, in turn, results in higher tuition at Alabama's colleges and universities.  At the same

---

[729] A footnote at this juncture in the Eleventh Circuit's opinion, which was numbered "13," read as follows:  "Plaintiffs seek an injunction requiring the legislature adequately to fund its K-12 schools.  This was the exact relief sought, ordered, but never obtained in the Equity Funding Cases." *Knight III-A*, 476 F.3d at 1225 n.13.

380

time, plaintiffs contend, there is less state money for college scholarships. All of this impacts negatively and disproportionately on Alabama's black students, plaintiffs assert, because most cannot attend college without financial assistance.

Plaintiffs argue, therefore, that their new claim against Alabama's property tax policies is properly brought in this lawsuit because those policies produce a "continuing segregative effect" on its colleges and universities, as proscribed by *Fordice*.  We disagree.

### III.

1.   *Alabama's Tax Policies Are Not Policies "Governing Higher Education"*

Plaintiffs allege that Alabama's tax policies seriously limit the ability of both the State and its counties to raise revenue from property taxes and, therefore, fund its K-12 schools.  *No one disputes that this is so*.  Plaintiffs also allege that these constitutionally enshrined tax policies were adopted for segregative purposes and with discriminatory intent. *The district court has so held*.   The trouble is that neither of these contentions advance the plaintiffs' claim — asserted in its motion for additional relief — that these tax policies may be challenged under *Fordice* as policies that perpetuate segregation in Alabama's system of higher education.  They may not.

Under *Fordice*, "policies now *governing the State's university system*" may violate the Fourteenth Amendment if they are "traceable to its prior *de jure* dual system" and "continue to have segregative effects." 505 U.S. at 733, 112 S. Ct. 2727 (emphasis added).  The segregative policies proscribed by *Fordice* govern *higher education*, not *revenue raising*.  The property tax policies plaintiffs now challenge, however, are revenue policies; they are not policies that "govern higher education" as contemplated by *Fordice*.  **The challenged tax policies have nothing to do with admissions, faculty and administration, availability of degree programs, student recruitment, education facilities or any other aspects of higher education that *Fordice* recognized may discourage**

381

**black students from attending historically white institutions and white students from attending historically black institutions**.  They are not, therefore, the sort of education policies that *Fordice* recognized could perpetuate racial identifiability in higher education.  We conclude, therefore, that plaintiffs' present claim is not properly brought under *Fordice*.  The district court knew that there was something wrong with this approach, but employed it anyway.  *See* 458 F. Supp. 2d at 1313 n.9 ("The Court expresses doubt that the matter before the Court even triggers *Fordice*").  We decline to do so.

Furthermore, even if Alabama's property tax policies were properly attacked under *Fordice*, we would agree with the district court that any segregative effect they may have on its system of higher education is far too attenuated to entitle plaintiffs to the relief they request.  Plaintiffs' chain of causation contains the following links: constitutional limits on property taxation result in underfunded K-12 schools, which causes the State to divert state funds intended for higher education to lower education, which results in higher tuition at Alabama's colleges and universities as well as fewer funds for student aid and, therefore, lower black attendance.  The district court concluded that there are simply far too many links in this chain to permit us to infer that Alabama's method of funding its K-12 education causes, in any meaningful way, the continuing segregation of its colleges and universities.  We agree.

Additionally, we note that plaintiffs' chain of causation silently incorporates too many unsupported assumptions.  First, plaintiffs assume that the abolition of Alabama's constitutional limitations on property taxation will result in increased tax revenues.  Second, plaintiffs assume that legislative decisions regarding the allocation of these putative increased revenues will result in increased funding of higher education.  Even a cursory examination reveals that neither of these assumptions is unproblematic.

It is not at all clear that the removal of Alabama's constitutional restrictions on property tax rates will necessarily result in either increased tax rates or increased tax revenues.  In 2003, for example, proposed

changes in Alabama's tax structure, including state and local property taxes, were overwhelmingly rejected by Alabama voters. Even in the absence of constitutional limitations, there is nothing in plaintiffs' request for relief that would inhibit the ability of the people of Alabama to refuse to raise property tax rates.

Similarly, there is no way to know how the elimination of constitutional limitations on property taxes will affect the willingness of industrial or other commercial activity to locate or remain in the state. The possibility of business flight, thereby decreasing tax revenues of all kinds, is not addressed by plaintiffs' chain of causation.

Furthermore, plaintiffs' demand for the removal of the constitutional property tax restrictions assumes not only that tax revenues will necessarily increase, but that these revenues would automatically go to Alabama's underfunded K-12 schools. But such revenue allocation decisions are the province of the Alabama state and local governments. Even if Alabama's property tax revenues were to increase, thereby potentially increasing funds for both K-12 and higher education, there is no way to know what the Alabama legislative response would be. Although Alabama presently spends a higher percentage of its total budget on public education than any other state in the union, and ranks higher in per capita spending for education than for overall government spending, there is no way to predict whether these levels of appropriations would continue if Alabama's property tax revenues were to increase.

Many other public programs compete with education for the Alabama tax dollar. Highway construction and maintenance, public safety programs, public health undertakings, and a host of other programs compete for Alabama's tax dollar. Presently, virtually 100% of the state income tax is appropriated to K-12 education (teacher salaries). Most of the state's sales tax revenues also go to general education purposes. If property tax revenues were to rise, it is impossible to say whether the State would continue to allocate the sales and income taxes to education or transfer these revenues to other programs.

Neither is there any way to know whether tuition would decline or student financial assistance would increase.  These appropriation decisions would remain totally unaffected by any order of this court affecting Alabama's property tax limitations, assuming, of course, that we do not also assume the "fundamental and delicate power of taxation" in the State of Alabama.  *Missouri v. Jenkins*, 495 U.S. 33, 51, 110 S. Ct. 1651, 109 L. Ed. 2d 31 (1990).

**We conclude that even if underfunding of Alabama's K-12 schools were related to segregation in its colleges and universities, this relationship is too attenuated and rests on too many unpredictable premises to entitle plaintiffs to relief under *Fordice*.**

At root, the problem with plaintiffs' new claim is that it is not a claim for desegregation, but is rather an attack on Alabama's method of public school funding.  Plaintiffs' claim is typical of those made in a proliferation of school finance litigation over the last thirty years.  Such litigation often attacks the county-based property tax method of funding K-12 education, seeking to increase the amount raised, and to equalize the amount available to each county in order to improve the academic opportunities and performance of students disadvantaged by existing finance schemes.  Aimed as it is at increased and equalized funding, it targets not only minority students, but all "poor" students.  **Thus, school finance litigation is not aimed at desegregation under the United States Constitution, but rather at equalization of resources in order to provide an adequate education required not by the federal, but by state constitutions**.[730]

---

[730] In a footnote to this sentence, numbered "18," the Eleventh Circuit panel observed that:

The Supreme Court rebuffed such efforts in the federal courts, holding that there is no federal constitutional right to education and upholding an unequal school finance scheme under rational review.  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 58-59, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973).  After *Rodriguez*, it has been noted that "[w]hether intentionally or not, at least some federal courts have used school desegregation decrees to circumvent the limitations imposed by Rodriguez or similar state-court decisions rejecting school finance challenges."  [James E. Ryan, *School, Race, and Money*, 109 Yale L.J. 249, 264 (1999).]  Others have noted that school districts that once intentionally segregated students "have become plaintiffs

The problem for plaintiffs is that this lawsuit *is* about desegregation.  Plaintiffs, themselves, filed a claim alleging continued segregation in Alabama's colleges and universities.  By asserting this claim, they set the agenda of the lawsuit, challenging Alabama's policies that govern higher education.  *Fordice*, 505 U.S. at 733, 112 S. Ct. 2727.  Alabama's property taxes are not such policies.

Plaintiffs' new claim, if successful, might obtain a remedy for the underfunding of Alabama's public schools already established in the *Equity Funding Cases*.  While we, like the district court, are not entirely unsympathetic to plaintiffs' attempt to bring Alabama's K-12 funding problems, identified but never remedied in the *Equity Funding Cases*, within the reach of the mandatory injunction already in place in this case, we agree with the district court that such a remedy is not available in this lawsuit.  After fifteen years of litigation aimed at changing Alabama's education policies that perpetuate segregation in its colleges and universities, plaintiffs are attempting to transform their *Fordice* attack on Alabama's segregative education policies into an attack on the adequacy and fairness of Alabama's entire public school finance system.  This claim is not properly before us.[731]

---

in school desegregation cases, seeking *Milliken II* relief against the state in an attempt to circumvent the limitations imposed by *Rodriguez*."  Theodore M. Shaw, *Missouri v. Jenkins:  Are We Really a Desegregated Society?*, 61 Fordham L. Rev. 57, 60 (1992).  Similarly, plaintiffs in this desegregation lawsuit are seeking school *finance* reform.

*Knight III-A*, 476 F.3d at 1228 n.18.

[731] In a footnote to this sentence, which was numbered "19," The Eleventh Circuit observed that:

Plaintiffs appear to argue in their brief that the legal basis for their present claim (including, apparently, any requirement for causation) is irrelevant.  They assert that it is Alabama's duty to eradicate "all the continuing barriers to black students' equal access to higher education, *regardless of how attenuated may be their causal connections to the property tax system* in the court's view." (emphasis added).  In plaintiffs' view, it is enough that "[h]igher education is where all the underfunded chickens in Alabama's K-Ph.D. system of public education come home to roost."  Plaintiffs urge this court to provide them the remedy denied in the state courts because "[t]here is no statewide K-12 school desegregation case; only in the instant

action can the full ramifications of the historical discrimination . . . be confronted and remedied."

This request for a remedy untethered to a constitutional violation, though sincere, misunderstands the nature of the judicial power. The courts are not empowered generally to "make things right." The district court's jurisdiction was invoked by plaintiffs to recognize and remedy the constitutional wrongs alleged to exist in Alabama's system of higher education.

Plaintiffs' property tax claim is aimed at Alabama's school finance policies. Although brought under *Fordice*, this claim has almost nothing to do with higher education policies. Furthermore, plaintiffs' belated attempt to add an argument against the tax policies under *Hunter v. Underwood*, 471 U.S. 222, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985) (raised for the first time on motion for reconsideration of the denial of their present claim) and *Hunter v. Erickson*, 393 U.S. 385, 89 S. Ct. 557, 21 L. Ed. 2d 616 (1969) [—] cases having absolutely nothing whatsoever to do with higher education — reinforce our conclusion that the present claim does not arise under *Fordice*.

To the extent that plaintiffs' attack on Alabama's tax policies is predicated upon allegations of underfunding that denies Alabama's schoolchildren an adequate education, it does not state a federal constitutional claim. *Rodriguez*, 411 U.S. at 58-59, 93 S. Ct. 1278. To the extent that plaintiffs' claim is that Alabama's tax policies evidence a discriminatory intent to deprive Alabama's K-12 children of equal protection of the law, under *Underwood* and *Erickson*, it does not state a claim for desegregation of higher education under *Fordice*.

Such distinctions are not mere legal technicalities. Simply put, it is plaintiffs' position that the district court in this case had not only the authority but the obligation to remedy any and all constitutional violations brought to its attention in this lawsuit (plaintiffs assert that "a federal court does not have the discretion to ignore patent constitutional violations solely because they expand the subject matter of the original complaint"). Plaintiffs believe that the district court should have enjoined enforcement of the offending tax provisions whether or not they affect higher education "in light of the findings of continuing adverse racial impact in other areas of public education and civil society." We are asked to correct the "clear equal protection violations" alleged in Alabama's tax policies notwithstanding the fact that, as plaintiffs concede, they have "limited their demands for relief to desegregation of higher education." We are empowered, plaintiffs assert, by Rule 54(c) of the Federal Rules of Civil Procedure to "grant the relief to which the party . . . is entitled, even if the party has not demanded such relief in his pleadings."

2.     *Even Under Fordice, the Constitutional Property Tax Provisions Do Not Have a Continuing Segregative Effect on Higher Education in Alabama.*

Even if we were to overlook the inapplicability of *Fordice*, and examine plaintiff's claim under that standard, we would agree with the district court that Alabama has met its burden to demonstrate that its property tax policies do not have a continuing segregative effect on its system of higher education.  Plaintiffs assert that higher education in Alabama is so underfunded that black students are denied an equal opportunity to attend college.  The record evidence is to the contrary.

Under *Knight I*, the State has demonstrated its willingness and ability to raise funds for higher education irrespective of its K-12 funding policies.  From 1990 to 2004, Alabama's appropriations for higher education increased from $820,063,882 to $1,160,033,885 annually.  Over $179 million in new funds had been appropriated to Alabama's historically black universities as of 2003.   Alabama has clearly demonstrated an ability to raise funds for its colleges and universities despite its K-12 funding limitations.

Furthermore, as a result of changes in the policies that govern higher education in Alabama — agreed to by the parties and implemented by the State — there has been enormous improvement in black students' access to higher education in Alabama.   During this period, total undergraduate or graduate degrees awarded to black students increased

---

We must decline such a request to expand our authority beyond this "case or controversy" to the general "doing of justice" that plaintiffs appear to believe to be our statutory mandate.  Despite what plaintiffs think, Rule 54(c) does not empower us generally to provide a remedy for all wrongs. Plaintiffs' challenge of Alabama's tax policies at this late date in this higher education litigation raises issues involving the Eleventh Amendment, the Tax Injunction Act, the availability of a state remedy and a host of other issues — none briefed, argued, or considered by the district court. We must resist this attempt and the invitation to abandon long-standing principles of judicial restraint.

*Knight III-A*, 476 F.3d at 1229 n.19.

96.43%, while white students' graduation rates actually dropped 13.36%.

Part of the credit for such improvement in black completion rates must be given to the many new financial aid programs benefitting black students that the State has instituted. Numerous minority and diversity scholarships have been added at both of Alabama's historically black universities. The State also created the Alabama State University Trust for Educational Excellence and the Alabama A & M University Trust for Educational Excellence — both of which have, as their first dedicated use, the funding of diversity scholarships. *See Knight II*, 900 F. Supp. at 349-56.

The district court has unflaggingly monitored Alabama's progress in completing the desegregation of its system of higher education over the last ten years, and it has pronounced itself satisfied that the State has met its *Fordice* burden (if any) to demonstrate that the challenged tax policies do not produce a segregative effect on Alabama's system of higher education. To be sure, Alabama's colleges and universities remain a work in desegregative process. But, over the last ten years, the State has worked diligently with the plaintiffs to develop and implement modifications in the policies that govern Alabama's system of higher education. These changes have ameliorated the segregative effects of underfunding — from *whatever* source — and underuse — for *whatever* reason — of Alabama's black colleges and universities, and brought meaningful desegregation to the State's system of higher education, as the district court envisioned and ordered. We agree with that court that the challenged tax policies have not undermined that desegregative process to a level that even remotely triggers the United States Constitution.

## IV.

We cannot permit federal lawsuits to be transformed into amorphous vehicles for the rectification of all alleged wrongs, no matter how belatedly asserted, nor how unrelated to the underlying action.[732]

---

[732] A footnote at this point in the Eleventh Circuit's opinion, numbered "22," observed that:

As the district court said in its 1995 remedial decree:

> This Court does not intend this Remedial Decree to solve all of Alabama's education woes or racial tensions.  Alabama has much of both that are beyond the scope of the court's remedial authority.  The court does intend the Decree to eliminate segregative effects remaining within Alabama's system of higher education, as far as practicable and educationally sound.

Because the district court correctly rejected plaintiffs' newly raised claim that Alabama's tax policies have a continuing segregative effect on its system of higher education, we hold that the judgment of the district court is

AFFIRMED.[733]

Nevertheless, and importantly, the Eleventh Circuit's opinion did not foreclose the possibility of a separate action, specifically aimed at those constitutional provisions constraining the extent to which the State of Alabama, its counties,

---

Although our decision today may be seen to leave plaintiffs without a remedy for the wrong identified in the Equity Funding Cases, the Supreme Court suggested in *Rodriguez* that:

> The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States . . . . [T]he need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax . . . but the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

*Knight III-A*, 476 F.3d at 1231 n.22 (quoting *Rodriguez*, 411 U.S. at 58-59) (bracketed alteration added).

[733] *Knight III-A*, 474 F.3d at 1220-31 (italicized emphasis in original, boldface emphasis added, most footnotes omitted).

389

municipalities, and school districts fund public education from pre-school and kindergarten programs through high school.  Thus came the present suit, which now is before this court following a lengthy bench trial.

# H.   Controlling Principles of Law

The Fourteenth Amendment provides, in the part pertinent to this case, that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1 (1868).  Only five years after the amendment was ratified, the Supreme Court pronounced the central principle of that clause, as well as the policy animating its addition to the Constitution:

> [I]t is not difficult to give a meaning to this clause.  The existence of laws in the States where the newly emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied by this clause, and by it such laws are forbidden.

*Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36, 81 (1872).  Eight years later, the Court elaborated its prior decision, saying in *Strauder v. West Virginia*, 100 U.S. 303 (1880), that the Fourteenth Amendment was "designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States."  *Id*. at 307.  Specifically, the Court said that the Fourteenth Amendment was

> one of a series of constitutional provisions having a common purpose; namely, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy.  The true spirit and meaning of the amendments, as we said in the *Slaughter-House Cases* (16 Wall. 36), cannot be

391

understood without keeping in view the history of the times when they were adopted, and the general objects they plainly sought to accomplish. At the time when they were incorporated into the Constitution, it required little knowledge of human nature to anticipate that those who had long been regarded as an inferior and subject race would, when suddenly raised to the rank of citizenship, be looked upon with jealousy and positive dislike, and that State laws might be enacted or enforced to perpetuate the distinctions that had before existed.  Discriminations against them had been habitual.  It was well known that in some States laws making such discriminations then existed, and others might well be expected.  The colored race, as a race, was abject and ignorant, and in that condition was unfitted to command the respect of those who had superior intelligence.  Their training had left them mere children, and as such they needed the protection which a wise government extends to those who are unable to protect themselves.  They especially needed protection against unfriendly action in the States where they were resident.   It was in view of these considerations the Fourteenth Amendment was framed and adopted.  It was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. It not only gave citizenship and the privileges of citizenship to persons of color, but it denied to any State the power to withhold from them the equal protection of the laws, and authorized Congress to enforce its provisions by appropriate legislation.  To quote the language used by us in the *Slaughter-House Cases*, 'No one can fail to be impressed with the one pervading purpose found in all the amendments, lying at the foundation of each, and without which none of them would have been suggested, — we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over them.'  So again: 'The existence of laws in the States where the newly emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied, and by it [the Fourteenth Amendment] such laws were forbidden.  If, however, the States did not conform their laws to its requirements, then, by the fifth section of the article of amendment,

392

> Congress was authorized to enforce it by suitable legislation.' And it was
> added, 'We doubt very much whether any action of a State, not directed
> by way of discrimination against the negroes, as a class, will ever be held
> to come within the purview of this provision.'

*Id.* at 306-07 (quoting *Slaughterhouse Cases*, 83 U.S. at 71, 81).  Since that time, the Supreme Court has consistently reaffirmed that "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States."  *Loving v. Virginia,* 388 U.S. 1, 10 (1967) (citations omitted).

## 1.    Express Racial Classifications

The *Strauder* case addressed a challenge to a West Virginia statute that limited service on a jury to white males.[734]  The court held that the statute, "discriminating in the selection of jurors . . . against negroes because of their color, amounts to a denial of the equal protection of the laws to a colored man . . . ."[735]  Laws of that sort, which *expressly* draw distinctions based upon a person's race or color — so-called "facial racial classifications" — are almost invariably deemed unconstitutional under the Equal Protection Clause, *unless* the state can carry the heavy burden of demonstrating that such distinctions are necessary to the accomplishment of a compelling governmental interest, *and*, that the distinctions are narrowly tailored to the

---

[734] *Strauder*, 100 U.S. at 305.

[735] *Id.* at 310.

accomplishment of that purpose.  That standard of constitutional review is called "strict scrutiny."  *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 326-27 (2003) ("[A]ll racial classifications imposed by government must be analyzed by a reviewing court under strict scrutiny.  This means that such classifications are constitutional only if they are narrowly tailored to further compelling governmental interests.") (citations and quotation marks omitted).[736]

During the more than one-hundred-forty years that have passed since the Fourteenth Amendment was ratified, "[t]here is only one situation in which the [Supreme] Court expressly upheld [express, or facial] racial classifications burdening minorities . . . ."[737]  That situation involved laws placing special restrictions upon Japanese Americans during World War II:  a shameful episode in American history that virtually all educated persons now view with justifiable embarrassment.[738]

Even laws intended to provide special *benefits* to historically disadvantaged

---

[736] *See also*, *e.g.*, Erwin Chemerinsky, *Constitutional Law:  Principles and Policies* § 9.3.2, at 695 (New York:  Aspen Publishers 3rd ed. 2006) ("**Chemerinsky I**").

[737] *Id*. § 9.3.3.1, at 697 (bracketed alterations supplied).  "Ironically, the Supreme Court first articulated the requirement for strict scrutiny for discrimination based upon race . . . in *Korematsu v. United States* [323 U.S. 214 (1944)] during World War II."  *Id*. § 9.3.2, at 695.  *Korematsu* is the only case in which the Supreme Court has found that an explicit racial classification disadvantaging a minority *survived* strict scrutiny analysis.

[738] In *Hirabayashi v. United States*, 320 U.S. 81, 94-95 (1943), the Court upheld a curfew applicable only to persons of Japanese ancestry.  In *Korematsu, supra* at 218-19, the Court upheld the federal government's decision to evacuate and forcibly intern Americans of Japanese descent.  On the same day that it decided *Korematsu*, however, the Court also held that the detention of "loyal" Japanese was no longer authorized under the executive orders that had provided authority for the internment.  *Ex parte Endo*, 323 U.S. 283, 302 (1944).

minorities rarely survive strict scrutiny review if they do so based upon explicit racial

classifications.  *See*, *e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493

(1989).[739]

## 2.    **Facially Neutral Racial Classifications**

From the beginning of equal protection jurisprudence, courts have recognized

that laws which are (or which *appear* to be) neutral on their face may, nevertheless,

camouflage an insidious, clandestine, discriminatory purpose.  The Equal Protection

Clause was intended to excise from our society not only the cancer of *overt* official

prejudice (*de jure* racial discrimination), but also the more subtle, more devious forms

of discrimination.  *See*, *e.g.*, *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 467

(1988) (Marshall, J., dissenting) ("[T]he Constitution is concerned with 'sophisticated

as well as simple-minded modes of discrimination.'") (quoting *Lane v. Wilson*, 307

U.S. 268, 275 (1939)).  Indeed, it is a disappointing fact that, 146 years after the close

of the Civil War, 121 years after *Strauder*, and 57 years after *Brown v. Board of

Education*, "racial and other forms of discrimination still remain a fact of life, in the

administration of justice as [well as] in our society as a whole.  Perhaps today that

discrimination takes a form more subtle than before.  But it is not less real or

---

[739] *See also Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 742, 748 (2007) (Roberts, C.J.) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.")  *See generally* Chemerinsky I § 9.3.5.1, at 732 ("It is now clearly established that strict scrutiny is used to evaluate all government affirmative action plans.").

pernicious." *Rose v. Mitchell*, 443 U.S. 545, 558-59 (1979) (alteration added).[740]

Within eighteen years after ratification of the Fourteenth Amendment, the Supreme Court had occasion to address just such an ostensibly-neutral, but, nevertheless, invidiously-discriminatory law in the case of *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).[741] That case addressed the constitutionality of a pair of ordinances adopted by the City of San Francisco in 1880 which made it a misdemeanor to provide laundry services in a wooden building without first obtaining permission from the city's board of supervisors.[742] At the time, all but ten of San Francisco's 320 laundries were housed in wooden structures, and about 240 of those (three-quarters of the total) were owned and operated by persons of Chinese descent.[743] Each petition for permission to continue business by a Chinese-owned laundry was denied by the board

---

[740] *See also*, *e.g.*, *Freeman v. Pitts*, 503 U.S. 467, 490 (1992) ("[T]he potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms after the effects of *de jure* segregation have been eliminated.").

[741] Both *Washington v. Davis*, 426 U.S. 229 (1976), and *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), indicate that *Yick Wo* is the generative case for the proposition that a neutral law with a disproportionate effect may violate the Equal Protection Clause. *Feeney*, 442 U.S. at 272 (citing *Yick Wo* for the proposition that, absent "extraordinary justification," a court should invalidate a "classification that is ostensibly neutral but is an obvious pretext for racial discrimination"); *Washington*, 426 U.S. at 241 (citing only *Yick Wo* as supporting the notion that "[a] statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race"); *see also* Juliet P. Stumpf, *States of Confusion: The Rise of State and Local Power Over Immigration*, 86 N.C. L. Rev. 1557, 1575 (2008) ("*Yick Wo* is usually cited for the proposition . . . that laws that are neutral on their face may violate the Equal Protection Clause if motivated by discriminatory intent.").

[742] *Yick Wo,* 118 U.S. at 357-58.

[743] *Id.* at 358-59.

of supervisors, while all but one of the petitions by non-Chinese-owned laundries were granted.[744]  Moreover, the Sheriff admitted that 150 persons of Chinese descent had been arrested for violation of the ordinance, but no non-Chinese laundry operators had been subjected to the same treatment.[745]  Appalled by this egregious pattern of discrimination, the Supreme Court reasoned that, even though the law did not contain an express racial classification, it contained no principle to limit its extraordinarily discriminatory enforcement, and it was, for that reason, in violation of the Fourteenth Amendment's Equal Protection Clause.  *Id*. at 373-74.

Some commentators have noted that the *Yick Wo* opinion did not clarify whether it was the discriminatory *impact* of the San Francisco ordinance, or its discriminatory *intent*, that was the crucial consideration in the Court's decision.[746]  Further,

---

[744] *Id.*

[745] *Id.*

[746] *See*, *e.g.*, Theodore Eisenberg & Sherri Lynn Johnson, *The Effects of Intent:  Do We Know How Legal Standards Work?*, 76 Cornell L. Rev. 1151, 1154 (1991).  There is, nonetheless, language in the *Yick Wo* opinion suggesting that the intent of the enacting body was *not* important to the Court's decision:  "[T]he facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, *whatever may have been the intent of the ordinances as adopted*, they are *applied* . . . with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured . . . by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States."  *Yick Wo*, 118 U.S. at 373.  However, the Court quoted, approvingly and extensively, language from the Circuit Judge's decision in one of the two cases consolidated under the style of *Yick Wo v. Hopkins*, and finding that *both* the starkness of the discriminatory enforcement, *and* the extreme disjunction between the proffered rationale for the law and the discretion granted those who enforced it, gave rise to *a presumption* that the ordinance *was* enacted for a discriminatory purpose:

397

subsequent decisions — such as the Court's opinion in *Palmer v. Thompson*, 403 U.S. 217 (1971) — have warned against the "hazards of declaring a law unconstitutional because of the motivations [intent] of its sponsors," and suggested that "the focus . . . [of equal protection jurisprudence is] on the actual *effect* of the enactments, not upon the motivations which led the States to behave as they did."  *Id.* at 224-25 (bracketed alteration and emphasis supplied).  *Palmer* involved a decision of the City of Jackson, Mississippi to close public swimming facilities because, according to the City, they could not be safely and economically operated on an integrated basis.[747]  Without

---

[I]n a territory some ten miles wide by fifteen or more miles long, much of it still occupied as mere farming and pasturage lands, and much of it unoccupied sand banks, in many places without a building within a quarter or half a mile of each other, including the isolated and almost wholly unoccupied Goat island, the right to carry on this, when properly guarded, harmless and necessary occupation, in a wooden building, is not made to depend upon any prescribed conditions giving a right to anybody complying with them, but upon the consent or arbitrary will of the board of supervisors.  In three-fourths of the territory covered by the ordinance there is no more need of prohibiting or regulating laundries than if they were located in any portion of the farming regions of the state.  Hitherto the regulation of laundries has been limited to the thickly-settled portions of the city.  Why this unnecessary extension of the limits affected, if not designed to prevent the establishment of laundries, after a compulsory removal from their present locations, within practicable reach of the customers or their proprietors?  And the uncontradicted petition shows that all Chinese applications are, in fact, denied, and those of Caucasians granted; thus, in fact, making the discriminations in the administration of the ordinance which its terms permit.

*Id.* at 361 (quoting *The Case of Wo Lee*, 26 F. 471, 473-74 (C.C. Cal. 1886)).  *Cf.*  Brando Simeo Starkey, *Criminal Procedure, Jury Discrimination & the Pre-Davis Intent Doctrine:  The Seeds of a Weak Equal Protection Clause*, 38 Am. J. Crim. L. 1, 17 (2010) ("One interesting facet of *Yick Wo* was that the Court found an equal protection violation in the absence of proof establishing discriminatory purpose.").

[747] *Palmer*, 403 U.S. at 224-26.

expressing doubt that racial considerations had played a part in the decision, the Court stated that it had never "held that a legislative act may violate equal protection *solely because* of the motivations of the men who voted for it." *Id.* at 224 (emphasis supplied). Thus, the City's decision to close the pools did not violate rights secured to its black citizens because it involved "no state action *affecting blacks differently from whites.*" *Id.* at 225 (emphasis supplied).

However, just five years after *Palmer*, the Court reiterated that "[t]he central purpose of the Equal Protection clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Providing an interesting echo of the previous quotation from *Palmer*, the Court declared that it had never held that "a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." *Id.* (emphasis in original). "Disproportionate impact is not irrelevant," said the Court, but "[s]tanding alone, it does not trigger the rule . . . that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations." *Id.* at 242. "[T]he invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Id.* at 240.

In the years since the decision in *Washington v. Davis*, the Court has repeatedly reaffirmed the centrality of proof of a discriminatory *purpose* to equal protection analysis.  *See*, *e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 333 (2004) ("In evaluating a claim that a governmental decision violates the Equal Protection Clause, we have long required a showing of discriminatory purpose."); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").[748]

### a.    "Ordinary equal protection standards"

The evolution of doctrinal principles sketched above has resulted in what the Supreme Court has sometimes referred to as "ordinary equal protection standards": that is, proof that a contested governmental policy has both a discriminatory effect *and* that it was motivated by a discriminatory purpose.  *See*, *e.g.*, *United States v. Armstrong*, 517 U.S. 456, 465 (1996); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 9.3.3.2, at 713-14 (stating that "ordinary equal protection standards" means that "a facially neutral law will be regarded as creating [an unconstitutional] race . . . classification only if there is proof of *both* a discriminatory

---

[748] *See also* Chemerinsky I § 9.3.3.2, at 710 ("Many times the Court has reaffirmed this principle that discriminatory impact is not [alone] sufficient to prove a racial classification.").

impact to the law and a discriminatory purpose behind it") (emphasis in original, alteration supplied) (New York:  Aspen Publishers 3rd ed. 2006).[749]

Additionally, to demonstrate that a facially neutral law is a subterfuge for racial discrimination, a plaintiff must prove the existence of a causal connection between the discriminatory intent of the governmental decisionmakers and the disproportionate, adverse impact that the plaintiff identifies.  *See e.g.*, *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000) (stating as established law that a plaintiff must show "a causal connection between the intent and some

---

[749] *See also United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), *Arlington Heights*, and *Washington v. Davis* as cases that established "ordinary equal protection standards"); *Brooks v. Miller*, 158 F.3d 1230, 1236-37, 1241 (11th Cir. 1998), *cert. denied sub nom. Brooks v. Barnes*, 526 U.S. 1131 (1999) (addressing, as the relevant issues in an equal protection challenge, "Discriminatory Purpose" *and* "Discriminatory Impact"); *Rozar v. Mullis*, 85 F.3d 556, 565 (11th Cir. 1996) (citing *Arlington Heights* for the proposition that "evidence of *both* discriminatory intent *and* discriminatory impact are required to show an equal protection violation") (emphasis supplied); Jamie Fellner, *Race, Drugs, and Law Enforcement in the United States*, 20 Stan. L. & Pol'y Rev. 257, 279 (2009) ("**Fellner**") ("Under longstanding constitutional jurisprudence in the United States, facially race-neutral governmental policies do not violate the guarantee of equal protection unless there is both discriminatory impact and discriminatory purpose."); Kathleen Riley, *The Long Shadow of the Confederacy in America's Schools:  State-Sponsored Use of Confederate Symbols in the Wake of Brown v. Board*, 10 Wm. & Mary Bill Rts. J. 525, 538-39 (2002) ("[T]he Court's interpretation of the Equal Protection Clause is well defined.  The United States Supreme Court has firmly established that a state's violation of equal protection requires a showing of both disparate impact and discriminatory intent.") (footnotes omitted); Christopher J. Peters, *Outcomes, Reasons, and Equality*, 80 B.U. L. Rev. 1095, 1108 (2000) ("[E]vidence of both discriminatory intent and discriminatory effect is required in litigation under the Equal Protection Clause."); Scott W. Howe, *Human Dignity as the Polestar for Rights Decision Making*, 73 B.U. L. Rev. 695, 713 (1993) ("[B]y the mid-1970s several U.S. Supreme Court decisions indicated that intent to discriminate in addition to racially disproportionate impact had to be shown under . . . the equal protection clause . . . ."); Daniel R. Ortiz, *Got Theory?*, 153 U. Pa. L. Rev. 459, 491 (2004) ("Ordinary equal protection doctrine requires a showing of both discriminatory intent and discriminatory effects.").

cognizable injury to Plaintiffs").[750]

Once the foregoing requirements are met, the burden shifts to the law's defenders to establish that "the same decision would have resulted even had the impermissible purpose not been considered.  If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose."[751]

In short, under the principles of "ordinary equal protection," *if* proof of (*i*) a racially-discriminatory intent, or (*ii*) adverse impact, or (*iii*) a causal linkage between the invidious intent and the disparate impact is lacking, *or if* (*iv*) the defendant demonstrates that racial animus was not the "but-for" cause of the enactment, then the kind of "purposeful discrimination" that triggers analysis under strict scrutiny standards is not present and, accordingly, the law need only be subjected to so-called "rational basis" scrutiny:  that is, it need only be rationally related to some conceivable, legitimate governmental purpose.[752]

---

[750] *See also Feeney*, 442 U.S. at 279 (holding that plaintiffs in an equal protection action must demonstrate that the defendant "selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group").

[751] *Arlington Heights*, 429 U.S. at 270 n.21 (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)).

[752] *See, e.g.*, *Washington*, 426 U.S. at 242 (holding that proof of discriminatory impact, absent proof of discriminatory purpose, "does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny") (citations omitted); Chemerinsky I § 9.3.3.2, at 710, 718 ("[L]aws that are facially neutral as to race . . . will receive more than rational basis review only if there is proof of a discriminatory purpose."); *cf. Heller v. Doe*, 509 U.S. 312, 320 (1993) (restating the

Conversely, if the plaintiff does establish that a facially neutral law was enacted with a racially-discriminatory purpose and causes a disproportionate impact upon the intended targets, and the defendant cannot show that the law would have been enacted absent the discriminatory purpose, then the law must be subjected to "the most exacting scrutiny"; that is, "to pass constitutional muster, [it] must be justified by a compelling governmental interest and must be 'necessary . . . to the accomplishment' of [that] purpose." *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984) (alterations supplied) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 196 (1964)).[753]

_____

standard for rational basis review under which "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification") (citation and internal quotation marks omitted); *Estate of McCall ex rel. McCall v. United States*, 642 F.3d 944, 950 (11th Cir. 2011) (reciting the rational basis test as requiring only that the challenged enactment be "rationally related to a legitimate governmental purpose," and observing that, under such a standard of review, a court "must uphold the statute against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification") (citations and internal quotation marks omitted); *Georgia Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1321 (11th Cir. 2003) (stating that, in an equal protection challenge where neither a suspect classification nor infringement of a fundamental right is established, "[a]ll there need be is a conceivable rational basis for the legislation"); *Tefel v. Reno*, 180 F.3d 1286, 1299 (11th Cir. 1999) ("Under rational-basis scrutiny, a statute is accorded a strong presumption of validity and will be upheld if any reasonably conceivable state of facts could demonstrate that the statute is rationally related to a legitimate government purpose.").

[753] *See also, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("A facially neutral law . . . warrants strict scrutiny . . . if it can be proved that the law was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race.") (citations and internal quotation marks omitted); *Washington*, 426 U.S. at 242; Chemerinsky I § 9.3.2, at 694-95 ("It now is clearly established that racial classifications will be allowed only if the government can meet the heavy burden of demonstrating that the discrimination is necessary to achieve a compelling government purpose. In other words, the government must show an extremely important reason for its action *and* it must demonstrate that the goal cannot be achieved through any less discriminatory alternative.") (emphasis in original); Julia Kobick, *Discriminatory Intent Reconsidered: Folk Concepts of Intentionality and Equal Protection Jurisprudence*, 45 Harv. C.R.-C.L. Rev. 517, 522 (2010) ("If

All parties to this action agree that the "ordinary equal protection" standards enunciated and clarified in, among other cases, *Arlington Heights* and *Hunter v. Underwood*, 471 U.S. 222 (1985), are the principal lens through which this court should examine plaintiffs' claims.[754]  This framework was perhaps most succinctly articulated in *Hunter*:

> Presented with a neutral state law that produces disproportionate effects along racial lines, [a court is] correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment:
>
> > "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . .  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." [*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*,] 429 U.S., at 264-265.
>
> *See Washington v. Davis*, 426 U.S. 229, 239 (1976).  Once racial discrimination is shown to have been a "substantial" or "motivating" factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.  *See Mt. Healthy*, 429 U.S., at 287.

a plaintiff can prove that the government intended to discriminate on the basis of race despite the facially neutral action, the Court will apply a strict scrutiny analysis, upholding the government action only if it is necessary to achieve a compelling government objective and is narrowly tailored to achieve that objective.").

[754] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief), at 183-84 (stating that "[t]he legal standards for assessing plaintiffs' claims that facially neutral state constitutional provisions have been adopted for racially discriminatory purposes and thus violate . . . the Equal Protection Clause of the Fourteenth Amendment are set out in *Hunter v. Underwood*, 471 U.S. 222 (1985), and *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)."); doc. no. 275 (Defendants' Post-Trial Brief), at 13, 186-87 (citing these two cases extensively for the basic principles).

*Hunter*, 471 U.S. at 227-28 (first and third alterations supplied) (parallel citations omitted).

Further, said the Court, "it is clear that where both impermissible racial motivation and racially discriminatory impact are demonstrated, *Arlington Heights* and *Mt. Healthy* supply the proper analysis." *Id.* at 232.

It also should be noted that neither plaintiffs nor defendants dispute that the standards applicable to plaintiffs' claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, are identical to those the court must apply to their claims under the Equal Protection Clause. *See, e.g.*, *United States v. Fordice*, 505 U.S. 717, 732 n.7 (1992) ("Our cases make clear . . . that the reach of Title VI's protection extends no further than the Fourteenth Amendment.").[755]

Even so, there *is* a significant dispute between the parties regarding the *meaning* of the standards that must be applied — both as to the kinds of legal theories they support, and, the kinds of evidence required to prove them. Accordingly, a more detailed exposition of each of the four elements of "ordinary equal protection" analysis sketched above — *i.e.*, proof of a racially-discriminatory purpose, disproportionate effects along racial lines, a causal linkage between the first two elements, and the

---

[755] *See also* Chemerinsky I § 9.3.5.1, at 733 (noting that, in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), "five Justices . . . . concluded that the analysis under Title VI and the Constitution is identical").

defendants' burden to negate but-for causation if all of the preceding elements are established — will be beneficial.

### i. Disproportionate effects along racial lines

"[T]he Fourteenth Amendment guarantees equal laws, not equal results." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 273 (1979). Even so, results are not irrelevant. A facially neutral law may still be determined to violate the Equal Protection Clause if it is proven to have had "disproportionate effects along racial lines . . . ." *Hunter*, 471 U.S. at 227; *Cook v. Randolph County, Georgia*, 573 F.3d 1143, 1152 (11th Cir. 2009) (same).[756]  "Only when it is shown that the legislation has a substantial disparate impact on classes defined in a different fashion may analysis continue on the basis of the impact on those classes." *Califano v. Boles*, 443 U.S. 282, 294 (1979).[757]

In the course of this action, there has been some disagreement and confusion regarding the meaning of what the Supreme Court has variously termed "racially disproportionate impact,"[758]  "disproportionate effects along racial lines,"[759] racially

---

[756] *See also East-Bibb Twiggs Neighborhood Association v. Macon Bibb Planning & Zoning Commission*, 896 F.2d 1264, 1266 (11th Cir. 1989) (holding proof of "racially disproportionate impact" necessary to finding an equal protection violation).

[757] *See also Reno v. Bossier Parish School Board*, 528 U.S. 320, 337 (2000) (noting that it is "established that [proof of both a] discriminatory purpose as well as discriminatory effect [is] necessary [to establish] a constitutional violation") (alterations supplied).

[758] *Arlington Heights*, 429 U.S. at 265.

[759] *Hunter*, 471 U.S. at 227.

"disparate impact,"[760] or racially "discriminatory effect."[761] As plaintiffs correctly point out, this element of an equal protection claim does not entail proof that *more blacks* than whites were adversely affected by the contested law, because such a requirement of proof would undermine the central minority-protective rationale for the Equal Protection Clause by setting an often-insurmountable evidentiary hurdle. Rather than requiring proof that *more blacks* than whites are adversely affected, the discriminatory effects requirement in a race-classification case under the Equal Protection Clause contemplates proof that *blacks are more affected* than are whites. In other words, racially-motivated legislation violates the Constitution only when it "affect[s] blacks differently than whites";[762] or better stated, when the law disadvantages "*a greater proportion* of one race than of another."[763]

The Supreme Court's decision in *Hunter v. Underwood* provides an archetypal example of "disproportionate effects along racial lines" that satisfies the discriminatory impact element.[764] That case, like this one, involved a challenge to certain provisions of the 1901 Alabama Constitution. The provisions at issue disfranchised "persons convicted of, among other offenses, 'any crime . . . involving

---

[760] *Feeney*, 442 U.S. at 273.

[761] *McClesky v. Kemp*, 481 U.S. 279, 292 (1987).

[762] *Palmer*, 403 U.S. at 224.

[763] *Washington*, 426 U.S. at 242 (emphasis supplied).

[764] *See Hunter*, 421 U.S. at 227.

moral turpitude.'"[765]  The Eleventh Circuit stated that the "disparate effect of the law persist[ed]" into the present, finding that "[i]n Jefferson and Montgomery Counties blacks are by even the most modest estimates at least *1.7 times as likely* as whites to suffer disenfranchisement" under the challenged provisions.  *Underwood v. Hunter*, 730 F.2d 614, 620 (11th Cir. 1984), *quoted in Hunter*, 471 U.S. at 227 (emphasis supplied).[766]  Early in the case, the *Hunter* district court held those figures "to be

---

[765] *Id*. at 223 (quoting Ala. Const. art. XI, § 218 (1901)).

[766] Plaintiffs "argu[e] that the reference to 1.7 times black/white disqualification was made in the context of proving original intent, not current effect."  Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 101-02 (citing doc. no. 166 (Plaintiffs' Brief Opposing Defendants' Motion for Summary Judgment), at 40-42).  That is contradicted by the sentence preceding and the sentences following the Supreme Court's only reference to the "1.7 times" figure:

> "'This *disparate effect persists today*.  In Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under section 182 for the commission of nonprison offenses.' [*Underwood v. Hunter*,] 730 F.2d [614,] 620 [11th Cir. 1984].
>
> So far as we can tell *the impact of the provision has not been contested*, and we can find no evidence in the record below or in the briefs and oral argument in this Court that would *undermine this finding* by the Court of Appeals.
>
> Presented with a neutral state law *that produces disproportionate effects along racial lines*, the Court of Appeals was correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment:
>
> > "[O]fficial action will not be held unconstitutional *solely because it results in a racially disproportionate impact*. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S., at 264-265.

*Hunter*, 471 U.S. at 227-28 (emphasis supplied) (parallel citations omitted).  This court need not, as plaintiffs argue, "resolve this ambiguity in the *Hunter* opinion," doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 102, because there is no ambiguity.  The 1.7 multiple of blacks

typical of the other counties when it certified [the defendants'] registrars as class representatives . . . ." Brief of the Appellees, *Hunter v. Underwood*, 471 U.S. 222 (No. 84-76), 1985 WL 669182, at *17.  By the time the case reached the Supreme Court, the present-day impact of the disfranchisement provision was uncontested, and the Supreme Court saw nothing that "would undermine this finding":  *i.e.*, the conclusion of the Eleventh Circuit Court of Appeals that the disfranchisement of 1.7 times as many blacks as whites satisfied the requirement of disproportionate effect.[767]  Even though, in absolute terms, there very well may have been more whites disfranchised by the challenged provision, blacks were nearly *twice as likely* to be disfranchised, satisfying the Court that the provision had a present disproportionate effect that justified an inquiry into the motivation or intent behind its enactment.[768]

Ten years later, in the case of *United States v. Armstrong*, 517 U.S. 456 (1996), the Court confirmed that its holding in *Hunter* was entirely

---

disenfranchised *versus* whites was indisputably the evidence from which the Court found that the challenged provision "continues to this day to have th[e] effect" of "discriminat[ing] against blacks on account of race . . . ."  *Hunter*, 471 U.S. at 231.  The absence of *any other* evidence that would satisfy the racially disproportionate effects prong, as well as the affirmed Eleventh Circuit's sole reliance upon the 1.7 figure in its finding on that element, also refutes plaintiffs' argument.  *See Underwood*, 730 F.3d at 617.

Even if there were some "ambiguity," the Supreme Court's subsequent discussion of *Hunter* in the case of *United States v. Armstrong*, 517 U.S. 456 (1996), which is addressed below, eliminated it.

[767] *Hunter*, 471 U.S. at 228 ("So far as we can tell the impact of the provision has not been contested, and we can find no evidence . . . that would undermine this finding by the Court of Appeals.").

[768] *See id.* at 227, 233.

> consistent with ordinary equal protection principles, including the similarly situated requirement.  There was convincing direct evidence that the State had enacted the provision *for the purpose of disfranchising blacks . . .* and *indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites*: Blacks were "by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under" the law in question.

*Armstrong,* 517 U.S. at 467 (quoting *Hunter*, 471 U.S. at 227) (emphasis supplied, internal citations omitted).  "*Hunter* thus affords no support for [plaintiffs'] position" that proof of disproportionate effect along racial lines is not always required.  *Id.* (alteration supplied).  Rather, as noted above, it was not necessary for the Court in *Hunter* to discuss the requirement of "disproportionate effects along racial lines" in any detail, because evidence satisfying that element was neither disputed nor disputable.[769]

Under these precedents, therefore, plaintiffs must prove that the Alabama constitutional provisions they challenge cause  racially disproportionate effects in the present day.  Failure of proof on that element will render the provisions subject only to scrutiny for a conceivable rational relationship to a legitimate governmental purpose.

Defendants argue that this court *must* determine whether plaintiffs have satisfied the disproportionate effects element of proof *before* proceeding to determine whether

---

[769] *See id.* at 227.

410

the enactments were motivated by racial animus.[770]  This court disagrees.  Such an order of progression is precatory, not mandatory, much like the order of analysis advocated in *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."), but later restated as simply a *suggested* order of progression.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

### *ii*.  Racially-discriminatory purpose

On the other hand, proof that a challenged provision produces "disproportionate effects along racial lines" is not, alone, sufficient to establish an equal protection claim.[771]  The Supreme Court has never "embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." *Washington*,

---

[770] *See* doc. no. 275 (Defendants' Post-Trial Brief), at 13 ("Yet, the Supreme Court and the Eleventh Circuit have both made it indisputably clear that the analysis of whether a law violates the Equal Protection Clause **begins** with whether the law has a discriminatory effect.") (boldface emphasis in original).

[771] *Hunter*, 471 U.S. at 227.

426 U.S. at 239 (emphasis in original).  "[H]aving a disproportionate effect on the group will be deemed to violate the Equal Protection Clause only if a discriminatory purpose can be proven."  *Joel v. City of Orlando*, 232 F.3d 1353, 1359 (11th Cir. 2000) (alteration supplied) (citing *Washington*, 426 U.S. at 239-40; *Feeney*, 442 U.S. at 272-81).  *See also Crawford v. Board of Education of Los Angeles*, 458 U.S. 527, 537-38 (1982) ("[E]ven when a neutral law has a disproportionately adverse effect on a racial minority, the Fourteenth Amendment is violated only if a discriminatory purpose can be shown.").

As the Supreme Court observed in *Feeney*, the concepts of "discriminatory intent" or "[d]iscriminatory purpose" imply

> more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Feeney,* 442 U.S. at 279 (footnotes and internal citation omitted).  Nonetheless, the standard

> does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes.  Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one.

*Arlington Heights*, 429 U.S. at 265.  Rather, "racial discrimination [must be] shown

412

to have been a 'substantial' or 'motivating' factor behind the enactment of the law .

. . ." *Hunter*, 471 U.S. at 228 (alteration supplied).

"Proving the motivation behind official action is often a problematic undertaking." *Id.* This is especially true of "a body of the size of the Alabama Constitutional Convention of 1901," for example, or the Alabama Legislatures that enacted the bills leading to Amendments 325 and 373, because of the added "difficulties in determining the actual motivations of various legislators that produced a given decision . . . ." *Id.* As the Court warned more than forty years ago in *United States v. O'Brien*, 391 U.S. 367 (1968):

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. *What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.*

*Id*. at 383-84 (emphasis supplied); *see also Hunter*, 471 U.S. at 228 (quoting this passage in its entirety). Thus, the Court has repeatedly cautioned that "the search for the 'actual' or 'primary' purpose of a statute is likely to be elusive." *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 469-70 (1981) (citing *Arlington*

413

*Heights*, 429 U.S. at 265; *McGinnis v.Royster*, 410 U.S. 263, 276-77 (1973)).

Furthermore, the level of precision in reconstructing legislative purpose that may suffice in the more familiar task of *statutory interpretation* will not suffice where the gravamen of the determination is the *constitutional validity* of a state law. Professor John Hart Ely made that observation in a 1970 law review article, saying that "there is a distinction between statutory construction and constitutional adjudication in terms of ascertainability.  For the inquiry into motivation as it typically is framed . . . in a constitutional context is of a sort which is different from the questions of motivation involved in statutory construction." John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205, 1213 (1970). Thus, "[a]ny judicial use of legislators' remarks for imputing an unconstitutional motive to the legislative majority (as opposed to merely inferring the intended *meaning* of ambiguous legislation) raises troubling questions."  *News America Publishing, Inc. v. FCC*, 844 F.2d 800, 810 n.12 (D.C. Cir. 1988) (emphasis in original).

The inquiry must be both sensitive and exacting.[772]  It is not enough for a court to find that a decisionmaker generally had disgraceful racial motivations.[773]  Rather,

---

[772] *E.g.*, *Arlington Heights*, 429 U.S. at 266.

[773] *E.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) (superseded by statute in non-relevant part) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."); *see also McClesky*, 481 U.S. at 298 n.20 ("[W]e

the plaintiff "must prove that the decisionmakers in *his* case acted with a discriminatory purpose," *and*, "prove that [they] . . . enacted or maintained the . . . [policy he challenges] *because of* an anticipated racially discriminatory effect" about which he complains.  *McClesky,* 481 U.S. at 292, 298 (emphasis in original) (alterations supplied).[774]

In *Arlington Heights*, the Court "identifie[d], without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed."  *Arlington Heights,* 429 U.S. at 268.

> The impact of the official action — whether it "bears more heavily on one race than another," *Washington v. Davis, supra*, 426 U.S., at 242 — may provide an important starting point.  Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.

*Id.* at 266 (parallel citation omitted).  The Court in *Arlington Heights* cited *Yick Wo*, 118 U.S. at 356 and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) as examples of such clear patterns of disparate impact that, standing alone, demonstrated a discriminatory purpose.  In *Gomillion*, the Court confronted "an uncouth twenty-eight-sided" urban voting district in Alabama, "the inescapable human effect of [which was] . . . to

---

cannot accept official actions taken long ago as evidence of current intent").

[774] *See also Johnson v. Governor of Florida*, 405 F.3d 1214, 1219 (11th Cir.) (*en banc*), *cert. denied sub nom. Johnson v. Bush*, 546 U.S. 1015 (2005) (stating that, even though "racial discrimination may have motivated certain . . . provisions in Florida's 1868 Constitution," that "does not . . . establish that racial animus motivated the [challenged] provision").

415

despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights." *Id.* at 340; *see also Arlington Heights*, 429 at 266.

"But such cases," in which "impact alone" is determinative, "are rare," and "[i]n many instances," a showing of "disproportionate impact" has only "limited probative value" on the issue of discriminatory purpose. *Id.* at 266 & n.15. "In the absence of a pattern as stark as those in *Yick Wo* or *Gomillion*, 'impact alone is not determinative, and the Court must look to other evidence' of race-based decisionmaking." *Miller v. Johnson*, 515 U.S. 900, 914 (1995) (quoting *Arlington Heights*, 429 U.S. at 266).

"The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. When examining the historical context in which a decision arose, the Court suggested that analyzing "[t]he specific sequence of events leading up to the challenged decision . . . may shed some light on the decisionmaker's purposes." *Id.* That chain of events may be particularly indicative of improper motives where a court uncovers "[d]epartures from the normal procedural sequence" or "[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.*

Additionally, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the

416

decisionmaking body, minutes of its meetings, or reports." *Id.* at 268. "In some

extraordinary instances the members [of the decisionmaking body] might be called to

the stand at trial to testify concerning the purpose of the official action . . . ." *Id.* The

*Arlington Heights* Court expressed concern that such testimony by legislators

"frequently will be barred by privilege," *id.*, and the Eleventh Circuit has suggested

that "after-the-fact reconstructions of legislative purpose can be self-serving and

unreliable"; and, accordingly, noted that the Supreme Court, in other contexts, has

"caution[ed] that such recollections should be viewed critically." *Brooks v. Miller*,

158 F.3d 1230, 1242 (11th Cir. 1998), *cert. denied sub nom. Brooks v. Barnes*, 526

U.S. 1131 (1999) (summarizing a passage from *Citizens to Preserve Overton Park,*

*Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on unrelated grounds by Califano*

*v. Sanders*, 430 U.S. 99, 105 (1977)).   Even so, in *Brooks*, the Eleventh Circuit

rejected the contention that the contemporaneous record is, inevitably, more reliable

than the first-hand testimony of legislators:

> To the extent the Plaintiffs contend that *newspaper evidence* is part of the
> contemporaneous record and should, therefore, be the primary source for
> ascertaining legislative intent, *we reject this theory*.  News articles often
> contain multiple layers of hearsay and do not trump the sworn testimony
> of eyewitnesses.

*Brooks*, 158 F.3d at 1242 (emphasis supplied).  The Eleventh Circuit in *Brooks* also

made clear that the dog that did not bark may be just as probative as the one that did.

"[T]he clear historical trail of racial purpose on other issues [may] stand[] in stark contrast with the *absence* of evidence on racial purpose in connection with" the challenged provision. *Id.* at 1243 (emphasis in original) (alterations supplied).

To this list, *Hunter v. Underwood* added the often critical evidentiary factor of expert historical testimony and opinions, which may shed considerable light upon what the contemporaneous record divulges about the motivations behind challenged enactments. *Hunter,* 471 U.S. at 228-29. Such testimony can drastically reduce the evidentiary difficulties associated with divining "motivating" intent from the ephemera of a multifarious decisionmaking body. *Id.* The Supreme Court in *Hunter* quoted extensively from the testimony of Dr. J. Mills Thornton, III, whose deposition is also in evidence in this case,[775] and the written work of Dr. Malcolm Cook McMillan, upon which both parties in this action extensively rely.[776] Such evidence, examined with the careful precision that an inquiry into the constitutionality of a legislature's motivations requires, proved critically important to the Court in that case. *Hunter*, 471 U.S. at 230-32.

---

[775] *See generally* Deposition of J. Mills Thornton III from *Knight v. Alabama* (Plaintiffs' Exhibit 682) ("**Thornton Depo**").

[776] *Hunter,* 471 U.S. at 230-32; *see also* doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 78 ("**Agreed Facts**") ("McMillan's CONSTITUTIONAL DEVELOPMENT is the most definitive work on the 1875 and 1901 Alabama Constitutions.") (citing Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901:  A Study in Politics, the Negro, and Sectionalism* (Chapel Hill:  University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Company 1978) ("**McMillan**")).

### *iii.* **Causation**

The Supreme Court has also clarified that there must exist a strong, direct, causal relationship between the racially-discriminatory intent motivating a facially-neutral statute, *and*, its disproportionate effects upon the targeted population. *Freeman v. Pitts*, 503 U.S. 467, 506 (1992) ("[P]laintiffs alleging equal protection violations must prove intent and causation and not merely the existence of racial disparity . . . ."). "[A]s was made clear in *Washington . . .* and *Arlington Heights . . .*, even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause *only if that impact can be traced to a discriminatory purpose*." *Feeney*, 442 U.S. at 272 (emphasis supplied) (parallel citations omitted).[777]

"Causality plays a central role . . . in all equal protection analysis." *Columbus Board of Education v. Penick*, 443 U.S. 449, 501 (1979) (Rehnquist, J., dissenting).[778]

---

[777] *See also United States v. Byse*, 28 F.3d 1165, 1169 (11th Cir. 1994) ("Disparate impact of a facially neutral law on racial minorities, however, is insufficient to establish an equal protection violation unless the disparity 'can be traced to a discriminatory purpose.'") (quoting *Feeney*, 442 U.S. at 272. A plaintiff's "essential burden" in demonstrating an equal protection violation is to "prov[e] discriminatory purpose with a *consequent* discriminatory effect." *Jones v. White*, 992 F.2d 1548, 1573 (11th Cir.), *cert denied*, 510 U.S. 967 (1993) (alteration and emphasis supplied); *Fairfield Prop. Mgmt. v. Hous. Auth. of Shreveport*, 16 F.3d 1214, 1214 n.6 (5th Cir. 1994) (holding that, in *Mt. Healthy* and *Arlington Heights*, "the Supreme Court made clear that liability cannot be imposed absent adequate causation — *i.e.*, the defendant's consideration of the illegitimate factor must be a 'but for' cause of the complained of result").

[778] *See also* doc. no. 31 (Plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction), at 14 ("[C]ausation also is an element of the plaintiffs' equal protection cause of action . . ."). Though seldom at issue, and therefore seldom discussed at any

419

Proof of "discriminatory intent alone, without a causal connection between the intent and some cognizable injury to Plaintiffs, cannot entitle Plaintiffs to relief . . . ." *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000). "Causation is . . . implicit in the term 'discriminatory effects.'" *Id.* at 1345 n.20.

Further, as suggested above, this causation requirement is a two-way street: *that is*, the racially disparate impact must result from the enactment challenged as purposefully discriminatory, *and*, a desire to produce the challenged racially-discriminatory effect must have motivated the deicisionmaker to enact the allegedly discriminatory law. In other words, a successful equal protection claim requires the challenger to prove that the Legislature "enacted or maintained the . . . statute *because of* an anticipated racially discriminatory effect." *McCleskey*, 481 U.S. at 298

---

length, there is a consensus that an equal protection claim under the *Arlington Heights* framework necessarily involves an inquiry into causation. *Sullivan v. City of Springfield*, 561 F.3d 7, 15 (1st Cir. 2009) ("[On an alleged Equal Protection Clause violation], the plaintiff must show more than invidious intent. She must also 'demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct.'") (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125 (2d Cir. 2004) (quoting, in turn, *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998))) (alteration in original); *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1345 (11th Cir. 2000) ("That a plaintiff, claiming a violation of his . . . rights under the Fourteenth . . . Amendment[], must show that an injury is caused by the government conduct he seeks to challenge is hardly a novel proposition."); *Sylvia Development Corp. v. Calvert County*, 48 F.3d 810, 819 (4th Cir. 1995) ("[W]e recognize that there is an element of causation that is a necessary part of plaintiff's showing, especially when plaintiff is trying to uncover the motivation of a multi-member decisionmaking body . . . .").

(emphasis original).[779]  That is, the challenged provisions must have been "originally devised or subsequently re-enacted *because* [they] would accomplish" the identified "adverse effect[] upon an identifiable group."  *Feeney*, 442 U.S. at 279 (alteration and emphasis supplied).

The first of these causal requirements, *injury causation*, is an essential element of plaintiffs' burden to prove that the challenged provisions, though facially neutral, are nonetheless the kind of "official state sources of invidious racial discrimination" that it was the "clear and central purpose of the Fourteenth Amendment . . . to eliminate . . . ."  *Loving v. Virginia*, 388 U.S. 1, 10 (1967).

Plaintiffs also shoulder the initial burden of proving the second causal requirement, a consideration that might be called *legislative causation*, by demonstrating that the provisions they challenge were "motivated by a desire to discriminate against blacks on account of race . . . ."[780]  Once plaintiffs have done so, however, the law's defenders may present evidence to prove that racial discrimination was *not* the "but-for" cause of the legislature's policy choice, as detailed in the following section.

---

[779] "[W]hen facially neutral legislation is subjected to equal protection attack," a crucial determination is "whether the legislation in some sense was *designed to accord disparate treatment* on the basis of racial considerations."  *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484-85 (1982) (emphasis supplied).

[780] *Hunter*, 421 U.S. at 233.

### iv.     The defendant's burden under *Mt. Healthy*

"Proof that the decision . . . was motivated in part by a racially discriminatory purpose," *and*, that it has had a racially disproportionate impact, will "not necessarily . . . require[] invalidation of the challenged decision." *Arlington Heights*, 429 U.S. at 271 n.21 (alterations supplied).   Rather, once a plaintiff has shown that a facially neutral law creates racially disproportionate effects that are causally related to a racially discriminatory purpose for its enactment, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter,* 471 U.S. at 228 (citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)).[781]  If the governmental defendant demonstrates that "the same decision would have resulted even had the impermissible purpose not been considered," then "the complaining party . . . no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose.   In such circumstances, there would be no justification for judicial interference with the challenged decision." *Arlington Heights*, 429 U.S. at 271 n.21.

Ultimately, therefore, in order to invalidate a state constitutional provision, a

---

[781] *See also* Erwin Chemerinsky, *Constitutional Law:  Principles and Policies* § 9.3.3.2, at 717-18 (New York:  Aspen Publishers 3rd ed. 2006) ("**Chemerinsky I**") ("In other words, if a law is racially neutral, a challenger must show a discriminatory purpose and a discriminatory effect.  If such proof is provided, the government has the opportunity to demonstrate that it would have taken the same action regardless of race . . . .").

court must find that it "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation." *Hunter,* 471 U.S. at 231.[782]  This principle requires a court to consider *both* the evidence adduced by the plaintiffs tending to show that racial animus motivated the enactment, *and*, the evidence adduced by the defendant showing other motivations behind the enactment, and to then determine whether the former "was a 'but for' motivation" for the challenged provision. *Id.* at 232.  The so-called *Mt. Healthy/Arlington Heights* mixed-motives test

> allows those accused of unlawful discrimination to prevail, despite clear evidence of [a] racially discriminatory motivation, if they can show that the challenged decision would have been made even absent the impermissible motivation, or, put another way, that the discriminatory motivation was not a "but for" cause of the challenged decision.

*Kesser v. Cambra*, 465 F.3d 351, 372 (9th Cir. 2006) (alteration supplied).[783]

The mechanics of this court's analytical duty under *Mt. Healthy* were

---

[782] *See also Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999) (describing the defendant's burden once the plaintiff has shown purposeful discrimination to "prove that, at the time of the discriminatory act, the same decision would have been made for a legitimate reason") (citing *Mt. Healthy*, 429 U.S. at 287).

[783] *See also Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523, 539 (6th Cir. 2002) ("*Mt. Healthy* . . . requires an inquiry into whether the impermissible motive was a 'but for' cause of the challenged decision.").  Thus, even where a plaintiff has shown that race infected the decisionmaking process from which the challenged provisions emerged, his "constitutional claims [may still] fail under the 'but for' test set out in *Hunter* and *Mt. Healthy*" *if* the defendant presents evidence showing that there were sufficient alternative reasons to enact the challenged provision, such that the same decision would have been reached in the absence of the racial considerations. *Brooks*, 158 F.3d at 1242.

illuminated by the Eleventh Circuit's decision in *Brooks v. Miller*, 158 F.3d 1230 (11th Cir. 1998).[784]   In that case, the plaintiff challenged a Georgia statute that required a candidate in a primary election to secure a majority of the total votes cast in order to "win" the primary and be declared his or her party's nominee in the general election.  *Id.* at 1233.  If no candidate in the primary election secured a majority of the vote, a runoff election between the two candidates with the highest vote totals was required.  *Id.*  The plaintiffs contended that the system was motivated by a desire to diminish the voting strength of blacks in state elections.  *Id.*  The court recognized that, when the provision was originally enacted, "'the virus of race-consciousness was in the air . . . .'"  *Id.* at 1241 (quoting the district court opinion).  However, the Eleventh Circuit panel ultimately agreed with the district court that the defendants had "proved that legitimate 'good government' reasons were the primary motivating factor behind the majority vote provision's key proponents, including [then-Governor Carl E.] Sanders, and that the Sanders administration had sufficient power over the legislature to have the" challenged provision enacted, negating any inference that the provision would not have been enacted absent racial animus.  *Id.* at 1241. Accordingly, the court held that "the Plaintiffs' constitutional claims fail under the

---

[784] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief), at 184 ("The Eleventh Circuit cases most relevant to plaintiffs' claims are *Johnson v. Governor of Florida*, 405 F.3d 1214 . . . and *Brooks v. Miller*, 158 F.3d 1230 (11th Cir. 1998), *cert. denied, sub nom. Brooks v. Barnes*, 526 U.S. 1131 (1999).").

'but for' test set out in *Hunter* and *Mt. Healthy*." *Id.* at 1242. Thus, even though the challenged Georgia statute may have been motivated in part by race, the defendants had demonstrated adequate alternative driving forces behind its enactment, such that the impermissible racial motivations could not be held the "but-for" cause of its passage.

In summary, plaintiffs in the present action bear the burden to demonstrate by a preponderance of credible evidence that the Alabama Constitutional provisions they challenge were enacted with a discriminatory purpose to cause, and that they have in fact caused, a racially disproportionate result. Thereafter, the burden shifts to defendants to prove, similarly by a preponderance of the evidence, that the deliberations from which the challenged provisions emerged — even though tainted by impermissible racial motivations — were ultimately causally-driven (motivated) by non-racial concerns. If the defendants prove that the provisions would have been enacted for other, non-racial reasons, then plaintiffs "no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose" and, accordingly, "there would be no justification for judicial interference with the challenged decision." *Arlington Heights*, 429 U.S. at 271 n.21.

### 3.    The alleged impact of *San Antonio Indep. Sch. Dist. v. Rodriguez* upon the analysis

Defendants make much of the following language from the Supreme Court's

decision in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973):

> "[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification.  Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes."

*Id.* at 41 (quoting *Madden v. Kentucky*, 309 U.S. 83, 88 (1940)).  Nearly two dozen

times over the course of their two post-trial briefs, defendants contend that plaintiffs

must adduce "the most explicit" evidence that the provisions they challenge are

intentionally discriminatory.[785]  Defendants' implication is that, because the State

Constitutional provisions challenged by plaintiffs govern taxation, the level of proof

required of plaintiffs to show discriminatory purpose is somehow elevated.  However,

a thorough review of the caselaw by this court uncovered not a single case that has

ever read this passage to require a greater showing of discriminatory purpose in

constitutional challenges to tax provisions.  Nor logically would *Rodriguez* suggest

as much, given that it was decided *more than three years before* the Court's first

---

[785] *See* doc. no. 275 (Defendants' Post-Trial Brief), at 3, 11-12, 17, 185, 186, 210, 212, 222, 245, 250; doc. no. 279 (Defendants' Response to Plaintiffs' Post-Trial Brief), at 18, 34, 59, 667, 122, 125.

explicit articulation of the discriminatory purpose requirement in *Washington v. Davis*.[786]

### 4. The alleged impact of *Personnel Admin. of Mass. v. Feeney* upon the analysis

In their post-trial response brief, plaintiffs, for the first time, cite repeatedly to

---

[786] More importantly, the very sentence containing the "most explicit" language to which defendants advert begins with a reiteration of the "presumption of constitutionality" accorded to laws that *do not* discriminate upon the basis of race. *Arlington Heights*, 429 U.S. at 265-66 ("[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified."). Analytically, then, defendants' application of the "most explicit" evidence requirement to prove discriminatory purpose *inverts* the order of inquiry. Only *after* a court determines that a law does not invidiously discriminate against a suspect class does the court then inquire whether the plaintiff has made a "most explicit demonstration" that the law nonetheless is so egregiously discriminatory against a non-suspect class that it fails to survive rational basis scrutiny. Indeed, *Rodriguez* itself had already explicitly outlined the "inappropriateness of the strict-scrutiny test" when it quoted the statement of the Court in *Madden* that challenges to state taxation classifications require a "'most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes . . . .'" *Rodriguez,* 411 U.S. at 40-41 (quoting *Madden*, 309 U.S. at 87-88). Further, the next sentence after the portion of the *Madden* opinion that the *Rodriguez* Court quoted is simply a restatement of the burden on a plaintiff challenging a law under the rational basis test, making indisputably obvious the context in which the Court requires that "most explicit demonstration." *Madden*, 309 U.S. at 88 ("The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.") (footnote omitted). Finally, *every* court to have referred to the "most explicit demonstration" requirement has done so in the context of non-suspect classifications to which only rational basis scrutiny was being applied. *E.g.*, *Estate of Kunze v. C.I.R.*, 233 F.3d 948, 954 (7th Cir. 2000) (holding Congress had a "reasonable basis for the net worth limitation"); *New Neighborhoods, Inc. v. West Virginia Workers' Comp. Fund*, 886 F.2d 714, 721 (4th Cir. 1989) (holding "that West Virginia has acted reasonably in apportioning insurance obligations based upon an employer's type of business and history of liability"); *Maine Central R.R. Co. v. Brotherhood of Maintenance of Way Employees*, 813 F.2d 484, 489 (1st Cir. 1987) ("More recent cases make it clear that we are confined to the rational basis test in reviewing the Act challenged by Maine Central."); *New Rider v. Bd. of Educ. of Indep. Sch. Dist. No. 1*, 480 F.2d 693, 700 (10th Cir. 1973) (finding "nothing inherently 'suspect,' in a constitutional sense," in the challenged regulation).

*Feeney* as the basic authority for a newly asserted theory that "it is not necessary to show that modern-day legislators were aware of the history of discrimination that covertly underlies the [challenged] legislation they are considering."[787]  The following passage is quoted by plaintiffs as authority for this reconfiguration of the requirements of an equal protection claim:

> When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionably[788] adverse, a twofold inquiry is thus appropriate.  The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based.  If the classification itself, covert [or] overt, is not based upon gender, *the second question is* whether the adverse effect reflects invidious gender-based discrimination.

*Feeney,* 442 U.S. at 274 (1979) (emphasis and alterations supplied).  Plaintiffs argue that "[t]his first question requires examining the historical legislative antecedents" of the challenged provisions, and, provided those provisions in some fashion continue preexisting policies with racial dimensions, proof of the enacting legislature's intent

---

[787] Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 108.  *Compare id*. at 8-12, 99, 101-03, 108-10, 112, 114 (citing *Feeney* more than twenty times), *with* doc. no. 278 (Plaintiffs' Post-Trial Brief), *passim* (not once citing *Feeney*).

[788] "Disproportionably" is an arachaic form of "disproportionately."  *E.g.*, *Webster's Third New International Dictionary* 655.  Several courts have simply substituted "disproportionately" for "disproportionably" without adverting to the modification.  *E.g.*, *Keevan v. Smith*, 100 F.3d 644, 650 (8th Cir. 1996); *Austin v. Berryman*, 955 F.2d 223, 226 (4th Cir. 1992).  Though that older usage may be somewhat clumsy in a modern context, this court is of the opinion that fidelity to the original language of the Supreme Court outweighs any good derived from misquoting for the sake of clarity or comfort to modern ears.

is irrelevant.[789]  This argument bends *Feeney* beyond its breaking point.

First, that portion of the *Feeney* opinion upon which plaintiffs rely will not bear the reading they apply to it.  That quotation immediately follows the Court's reiteration of its application of the same principles articulated in *Arlington Heights* and *Washington v. Davis*.  *See Feeney,* 442 U.S. at 272.  Further, contrary to plaintiffs' assertion that *Feeney* dictated "examining the historical legislative antecedents" for proof of discriminatory purpose, the *Feeney* Court's "covert" classification inquiry was based upon an examination of whether "the impact of this statute could not be plausibly explained on a neutral ground, [so that] impact itself would signal that the real classification made by the law was in fact not neutral." *Id.* at 275.  In other words, as the Court twice repeated in the three paragraphs addressing that "first question," the inquiry was directed to determining whether the classification at issue (an absolute preference for veterans in hiring decisions for state employment) was "pretext for gender discrimination." *Id.*  The Court did refer (in one clause of a single sentence in that portion of the opinion addressing the "first question") to the historical antecedents of the law, but only as further support for the position that the veteran preference was "not a law that can rationally be explained on [a gender-based] ground." *Id.* (alteration supplied).  "Too many men are affected by [the challenged law] to permit the inference

---

[789] Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 106-08.

429

that the statute is but a pretext for preferring men over women." *Id.* (alteration supplied). Thus, as the *Feeney* Court acknowledged, it confronted the mirror-image of *Yick Wo*: rather than an impact so blatant that the law must have been invidiously discriminatory, "the legitimate noninvidious purposes of [the] law cannot be missed." *Feeney,* 422 U.S. at 275 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

In other words, plaintiffs' argument that proof of a racially-discriminatory purpose motivating the enactment of that legislation resulting in Amendments 325 and 373 to the Alabama Constitution is obviated by the *Feeney* Court's "covert classification" inquiry is not substantiated by the Court's application of it. The Court's discussion focused almost exclusively upon the *present impact* of the policy at issue in *Feeney*, and the existence of a plausible and legitimate non-discriminatory rationale for the policy, *not* its historical antecedents.[790]  Additionally, later in the decision, the Court made plain that proving invidious discriminatory intent requires "*more than* . . . [the decisionmakers'] *awareness* of consequences."[791]

The three sentences in which the *Feeney* Court discussed race as "the paradigm" of the test the Court applied in that case are instructive:

> A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary

---

[790] *Feeney*, 442 U.S. at 275.

[791] *Id.* at 279 (emphasis supplied).

justification.  This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination. But, as was made clear in *Washington v. Davis*, 426 U.S. 229, and *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.

*Feeney*, 442 U.S. at 272 (some citations omitted).  The first sentence addresses express racial classifications, the second those instances in which the *egregious effects* of the law *alone* demonstrate beyond disputation that those who enacted it must have intended that it be discriminatory, and the third sentence addresses laws that do not evidence such "obviously" purposeful efforts to discriminate, in which case the intent inquiry must be more searching.  As the chief exemplar of the second variety discussed in the passage from *Feeney*, the Court cited its decision in *Yick Wo*.[792] Those three categories are entirely congruent with the categories in the passage that plaintiffs cite, and provide a much sounder basis upon which to interpret the content of those categories than plaintiffs' assertion that the passage dictates that a law need not be proven to have been enacted with discriminatory intent if its antecedents were "covertly" discriminatory.

Notably, the Supreme Court has never again mentioned the "twofold inquiry" plaintiffs contend relieves them of their burden of proving Amendments 325 and 373

---

[792] *Id.* (citing, among other cases, *Yick Wo*, 118 U.S. 356); *see also id.* at 274-75 (citing *Yick Wo, Washington*, and *Arlington Heights* in the discussion of the "first question").

431

were enacted for a discriminatory purpose.  Justice Stevens's concurring opinion in

*Feeney* treated the majority's "two-fold inquiry" as merely an aspect of determining

discriminatory purpose:

> I confess that I am not at all sure that there is any difference between the two questions posed *ante* . . . .  If a classification is not overtly based on gender, I am inclined to believe the question whether it is covertly gender based is the same as the question whether its adverse effects reflect invidious gender-based discrimination.

*Feeney,* 442 U.S. at 281 (Stevens, J., concurring).[793]

Only two binding appellate court decisions have referred even in passing to

*Feeney*'s "twofold inquiry," and both treated the "covert" classification question as

simply a facet of the search for a discriminatory purpose.  *See Parks v. City of Warner*

*Robins*, 43 F.3d 609, 616-17 (11th Cir. 1995) (omitting the "covert" classification

---

[793] *See also, e.g.*, *Keevan v. Smith*, 100 F.3d 644, 650 n.6 (8th Cir. 1996) (indicating that the first inquiry asks whether "impact alone signaled a discriminatory purpose"); *McKee v. City of Rockwall*, 877 F.2d 409, 422 (5th Cir. 1989) (citing this portion of *Feeney* as holding that "[c]overt purposes and understandings are just as constitutionally relevant as overt purposes" to determining whether decisionmakers "purposefully discriminate by their actions against others based upon invidious reasons"); *Steiger v. United States Rail Road Ret. Bd.*, 761 F.2d 1428, 1431 (9th Cir. 1985) (stating, after quoting *Feeney*'s two-fold inquiry language, that "[d]etermining whether the classification is neutral entails an examination of the legislative purpose"); *Givens v. United States Rail Road Ret. Bd.*, 720 F.2d 196, 202 (D.C. Cir. 1983) (holding challenged provision "has a *nondiscriminatory purpose and is, thus, not covertly* gender-based") (emphasis supplied); *Frock v. United States Rail Road Ret. Bd.*, 685 F.2d 1041, 1048 (7th Cir. 1982) ("In determining whether a law is covertly gender-based the [*Feeney*] Court suggested looking to the purposes of the statute."); *Daily v. City of Philadelphia*, 98 F. Supp. 2d 634, 640 (E.D. Pa. 2000) (proceeding immediately from quoting the same passage plaintiffs quote to examining "whether the plaintiff has shown that a 'gender-based discriminatory purpose has, at least in some measure,' shaped this statute"); *Stathos v. Bowden*, 514 F. Supp. 1288, 1290 (D. Mass. 1981) (stating, immediately after quoting the same language that plaintiffs quote, that "purposeful discrimination [is] required to maintain a cause of action under the fourteenth amendment").

language altogether and stating as established law the proposition that "proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim"); *Wallace v. City of New Orleans*, 654 F.2d 1042, 1046-47 (5th Cir. 1981) (quoting the "twofold inquiry" language, but addressing only whether the challenged policy was "adopted or enforced . . . *for the purpose of discriminating*") (emphasis supplied).

In short, as nearly every court has explicitly or implicitly indicated, "[n]on-facial classifications, such as the veteran-preference policy at issue in *Feeney*, are subject to heightened scrutiny *only* upon proof that they have a disparate impact on a protected group *and* are motivated by a discriminatory intent." *Klinger v. Department of Corrections*, 31 F.3d 727, 737 (8th Cir. 1994) (emphasis in original).

Further, no reported decision has *ever* applied *Feeney*'s two-part inquiry to a racial classification. That is perhaps logical, because the inquiry into whether "a classification that is ostensibly neutral . . . is an obvious pretext for racial discrimination" had — as the *Feeney* decision itself indicated — already been specifically discussed in a series of Supreme Court cases that pre-dated *Feeney*.[794] Those decisions, rather than a stilted reading of *Feeney*, are controlling.

Moreover, all of the courts that have engaged in the "overt or covert"

---

[794] *Feeney*, 442 U.S. at 271 (citing *Gomillion*; *Lane v. Wilson*, 307 U.S. 268 (1939); *Guinn v. United States*, 238 U.S. 356 (1915); *Yick Wo*).

433

classification inquiry in any detail have rejected such challenges because the *present pattern* of the challenged law's impact did not demonstrate a covert gender classification.  *See Austin v. Berryman*, 955 F.2d 223, 227 (4th Cir. 1992) (rejecting contention that "spouse" was overtly or covertly a gender classification upon basis that it also covered males, and "defendants [had] enunciated legitimate goals" for challenged statute); *Ricketts v. City of Columbia*, 856 F. Supp. 1337, 1345 (W.D. Mo. 1993) (rejecting "covert" classification argument because "[v]ictims of domestic violence are not uniquely female").[795]  No court has ever suggested that *Feeney* requires or permits a court to ignore the intent of the enacting legislature.  In short, no court has ever read *Feeney* to suggest that "legislator awareness of the racial consequences of [the] challenged amendments is not relevant . . . when addressing the 'first question,'" nor that "*Feeney* teaches [that] it is not necessary to show that modern-day legislators were aware of the history of discrimination that covertly underlies the legislation they are considering."[796]

Finally, and most importantly, even if this court ignored the absence of any

---

[795] *Cf. Keevan*, 100 F.3d at 650 ("If the adverse impact of a facially neutral policy cannot be plausibly explained on a neutral ground, *the impact itself* would signal that the real classification made by the policy was in fact not neutral.") (emphasis supplied).  The Ninth Circuit's decision in *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 548 (9th Cir. 2004), quotes and addresses the *Feeney* twofold inquiry, but rejects its application, holding that "even if laws singling out abortion can be judicially recognized as not gender-neutral," *Planned Parenthood of Pennsylvania v. Casey*, 505 U.S. 833 (1992), provided the correct legal standard for analysis.

[796] Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 106-08.

caselaw supporting plaintiffs' reading of *Feeney*, decades of jurisprudence make indisputably plain "that 'purposeful discrimination is the condition that offends the Constitution' . . . ." *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 484 (1982) (quoting *Feeney*, 442 U.S. at 274 (quoting, in turn, *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16 (1971)). "[O]nly if there is purposeful discrimination can there be a violation of the Equal Protection Clause. . . . [A]n illicit purpose must be proved before a constitutional violation can be found." *Bolden,* 446 U.S. at 67; *see also id.* at 113 (Marshall, J., dissenting) ("[A] showing of discriminatory purpose is necessary to impose strict scrutiny on facially neutral classifications having a racially discriminatory impact."). *Feeney* itself reiterated as much. *See Feeney,* 442 U.S. at 275 (stating, in the first sentence of the concluding paragraph of the portion of the opinion that addresses the overt or covert classification inquiry, that "the purposes of the statute provide the surest explanation for its impact").[797]

To satisfy the requirement of discriminatory purpose, the challenger "must prove that the decisionmakers in *his* case acted with a discriminatory purpose."

---

[797] *See also City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188, 194 (2003) (stating that the Court has repeatedly "made clear that '[p]roof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause") (quoting *Arlington Heights*, 429 U.S. at 256) (alteration in original).

435

*McClesky*, 481 U.S. at 292 (emphasis in original).[798]  This court is unwilling to assume

that these unambiguous dictates from the higher courts can be circumvented by the

expedient of referring to racially discriminatory predecessor policies.  As the Court

cautioned in *City of Mobile v. Bolden*, 446 U.S. 55 (1908) (plurality opinion)

(superceded by statute in non-relevant part):

> [T]he District Court and the Court of Appeals supported their conclusion
> by drawing upon the substantial history of official racial discrimination
> in Alabama.  But past discrimination cannot, in the manner of original
> sin, condemn governmental action that is not itself unlawful.  The
> ultimate question remains whether a discriminatory intent has been
> proved in a given case.  More distant instances of official discrimination
> in other cases are of limited help in resolving that question.

*Bolden,* 446 U.S. at 74.[799]

More directly to the point, the decision of the *en banc* Eleventh Circuit Court

of Appeals in *Johnson v. Governor of Florida*, 405 F.3d 1214, 1219 (11th Cir. 2005)

(*en banc*), refutes plaintiffs' contention that *Feeney* requires this court to find

---

[798] *See also* Chemerinsky I § 9.3.3.2, at 710-12 ("[C]ases such as *Washington v. Davis, Mobile v. Bolden*, and *McCleskey v. Kemp* clearly establish that . . . to prove an equal protection violation[,] there must . . . be proof of a discriminatory purpose.").

[799] S*ee also Bolden*, 446 U.S. at 92 (Stevens, J., concurring in judgment) ("I do not believe otherwise legitimate political choices can be invalidated simply because an irrational or invidious purpose played some part in the decisionmaking process."); *id.* at 101 (White, J., dissenting) (agreeing that such factors as the "history of discrimination . . . are relevant only with respect to the question whether purposeful discrimination can be inferred") (emphasis supplied); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1195 (11th Cir. 1999) (quoting the second sentence from *Bolden* quoted above); *Hall v. Holder*, 117 F.3d 1222, 1226-27 (11th Cir. 1997) ("[T]he historical background for a given decision is only one factor relevant to intent.  It does not, by itself, compel us to find a discriminatory purpose behind every statute passed during regrettable periods of [a state's] past.") (emphasis supplied).

Amendments 325 and 373 unconstitutional, based upon previous discriminatory policies, but despite any awareness on the part of the legislators who enacted them of the odious origins of the constitutional provisions they modified.  In *Johnson*, the court addressed a felony disenfranchisement provision enacted in Florida in 1968 that was based upon a predecessor provision enacted in 1868 — a predecessor that the court assumed, for purposes of argument, to have been motivated by racial animus. *Id.* at 1223.   The plaintiffs contended "that Florida must demonstrate that it acknowledged that racial discrimination tainted the 1868 provision, and yet it knowingly reenacted the disenfranchisement provision for non-discriminatory reasons in 1968." *Id.* at 1225.  The Court did not "require [that] level of proof," however. *Id.* Instead, the challenged provision was held to be "constitutional because it was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias." *Id.*[800]

As the discussion in Part III(A)(11), *infra*, will demonstrate, Amendments 325 and 373 undoubtedly were devised for the purpose of avoiding the dramatic changes in Alabama's property tax structure portended by the decision of a three-judge federal court in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971).  Even so, there is

---

[800] S*ee also id.* at 1239 (Wilson, J., concurring in part and dissenting in part) ("As a matter of law, the state met its burden by re-enacting the [challenged] provision without an impermissible motive, as suggested by *Hunter v. Underwood* . . . .").

little doubt that each of those Amendments "substantively altered" the property tax assessment scheme that precipitated the decision.  Thus, *Johnson* indicates that this court must determine whether they were enacted "in the absence of any evidence of racial bias."[801]   In other words, the court must determine whether the specific legislative enactments that resulted in Amendments 325 and 373 were "motivated by a desire to discriminate against blacks on account of race . . . ."  *Hunter v. Underwood*, 471 U.S. at 233; *see also Feeney*, 442 U.S. at 272 (requiring proof that the challenged provision "has a disproportionately adverse effect upon a racial minority . . . [and] that impact can be traced to a discriminatory purpose.") (emphasis and alterations supplied).

Where there "is specific precedent from [the Eleventh Circuit] and the Supreme Court" that "establish[es] clear standards by which to judge state action, [courts] are bound by precedent and need not go into other areas of possibly analogous law."  *Johnson v. Governor*, 405 F.3d at 1226-27.  Thus, to the extent that the "first question" suggested by the Court in *Feeney* regarding "whether the . . . classification is indeed neutral" has any application in this context, *Feeney*, 442 U.S. at 274, both Eleventh Circuit and Supreme Court precedent make clear that this court must treat that question as an aspect of the inquiry into whether the enactments that plaintiffs

---

[801] *Johnson*, 405 F.3d at 1225.

challenge were motivated by a discriminatory purpose. *See Vieth v. Jubelirer*, 541 U.S. 267, 333 (2004) ("In evaluating a claim that a governmental decision violates the Equal Protection Clause, we have long required a showing of discriminatory purpose.").[802]

### 5.    The alleged impact of *United States v. Fordice* upon the analysis

In addition to agreeing that the appropriate legal standards for assessing their claims are those "set out in *Hunter v. Underwood*, 471 U.S. 222 (1985), and *Arlington Heights v. Metropolitan Development Corp.*, 429 U.S. 252 (1977),"[803] plaintiffs urge this court to conclude that "Amendments 325 and 373 . . . *must also be* assessed by the Fourteenth Amendment standards set out in *United States v. Fordice*, 505 U.S. 717 (1972)."[804]  They contend that "the *Fordice* standards are *fully applicable* to this case, and Amendments 325 and 373 violate the Fourteenth Amendment and Title VI of the Civil Rights Act if they perpetuate policies that 'began during the prior *de jure* era, produce[] adverse impacts, and persist[] without sound educational justification.'"[805]

---

[802] *See also Arlington Heights*, 429 U.S. at 266 (characterizing the determination of whether a law's impact is "unexplainable on grounds other than race" as part of the inquiry into invidious purpose); *see also Feeney*, 442 U.S. at 281 (Stevens, J., concurring) (suggesting, presciently in light of subsequent caselaw, that the "question whether [a law] is covertly gender based is the same as the question whether its adverse effects reflect invidious gender-based discrimination").

[803] Doc. no. 274 (Plaintiffs' Post-Trial Brief), at 184.

[804] *Id.* (emphasis supplied).

[805] *Id.* at 190-91 (alterations in original) (emphasis supplied) (quoting *Johnson*, 405 F.3d at 1225 (quoting, in turn, *Fordice*, 505 U.S. at 746 (Thomas, J., concurring))) (emphasis supplied).

In one of the immediate predecessors to this action — *Knight v. Alabama,* 476

F.3d 1219 (11th Cir.) ("*Knight III-A*"), *cert. denied*, 551 U.S. 1146 (2007), discussed

in Part II(G)(4)(o) of this opinion, *supra* — the Eleventh Circuit summarized the

*Fordice* standard to which plaintiffs direct this court's attention in the following

manner:

> *United States v. Fordice*, 505 U.S. 717 (1992) [was] the first case in
> which the Court enunciated the constitutional standards governing claims
> of persistent segregation in higher education.  In *Fordice*, the court made
> clear that even race-neutral "policies now governing the State's
> university system" may violate the Fourteenth Amendment.  505 U.S. at
> 733.  In order to successfully challenge such policies, the Court said,
> plaintiffs must demonstrate that they are traceable to the State's prior *de
> jure* system of segregation in higher education.  *Id.*  Having done so, the
> burden shifts to the State to prove that these policies do not have a
> continuing segregative effect.  *Id.* at 738-39.

*Knight III-A*, 476 F.3d at 1221 (parallel citations omitted, alterations supplied).[806]

"Under *Fordice*, 'policies now governing the State's university system' may violate

the Fourteenth Amendment if they are 'traceable to its prior *de jure* dual system' and

'continue to have segregative effects.'" *Id.* at 1225 (quoting *Fordice*, 505 U.S. at 733)

(emphasis removed).

As plaintiffs point out, however, the Eleventh Circuit has repeatedly declined

---

[806] Additionally, as the *Knight III-A* court noted, the state defendant in a challenge to its
educational polices assessed under the *Fordice* test "may nevertheless escape liability if 'the State
show[s] that there are no less segregative alternatives which are practicable and educationally
sound.'"  *Knight III-A*, 476 F.3d at 1221 n.3 (quoting *Fordice*, 505 U.S. at 743).

to "extend the education line of cases to other areas."[807]   In *Johnson*, "[t]he plaintiffs rel[ied] extensively on *United States v. Fordice* . . . to support their argument" that Florida's felon disenfranchisement provision violated the Equal Protection Clause. *Johnson*, 405 F.3d at 1225 (alterations supplied).   The court found such reliance to be misplaced, and stated that the two cases were "not analogous."   *Id.*   Among other reasons for this conclusion, the court observed that,"[i]n *Fordice* the question was one of what *remedy* the Constitution requires after a State *has already been found liable* for violating the Consitution *via de jure* segregation," rather than the question of whether the State could be held liable in the first instance.   *Id.* at 1225 n.22 (emphasis supplied).   Moreover, "school desegregation jurisprudence is unique and difficult to apply in other contexts."   *Id.* at 1226.   For these reasons, the court refused to apply "the heightened review in *Fordice*," as opposed to the ordinary equal protection framework.   *Johnson*, 405 F.3d at 1226 (citing, among other cases, *Hunter v. Underwood*, 471 U.S. 222 (1985)).

More than a decade ago, the Eleventh Circuit observed that it had "noted several times that no court has applied *Fordice* outside of the education setting," and that it had repeatedly "decline[d] to do so for the first time" on each occasion when the standard had been invoked to challenge state action other than educational policy

---

[807] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief), at 190; *see also Johnson*, 405 F.3d at 1225.

decisions. *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1344

n. 18 (11th Cir. 2000); *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1190

(11th Cir. 1999) (stating that "no court that has ever applied *Fordice* outside of the

education setting," and that, "given the unique nature of school desegregation, we

hesitate to extend *Fordice*" beyond that context). This court and its law clerks have

scoured the federal reporters and determined that the universal refusal of federal courts

to apply the *Fordice* standard outside the context in which it was formulated —

specifically, remediation of policies traceable to a state's prior, *de jure* system of

segregation in *higher education* — continues to this day. *See e.g.*, *Walker v. City of

Mesquite*, 402 F.3d 532, 534-36 (5th Cir. 2005) (holding that the Dallas Housing

Authority's site decision for public housing was not the kind of policy that triggered

*Fordice*).

More directly to the point, the issue of whether *Fordice* may be applied to the

Alabama Constitutional provisions challenged in this case has already been considered

under materially indistinguishable facts and rejected by the Eleventh Circuit. In

*Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004) ("*Knight III*), discussed

in Part II(G)(4)(n) of this opinion, *supra*, Judge Harold Murphy addressed a challenge

by the plaintiffs in that case to the very same constitutional provisions challenged in

442

this action, based upon many of the same facts,[808] by application of the *Fordice* standard. *Id.* at 1310-13.  In so doing, however, Judge Murphy "expresse[d] doubt that the matter before the Court even trigger[ed] *Fordice*," because "[p]laintiffs' claims that the State is not funding K-12 adequately . . . do not appear to fit the *Fordice* mold . . . ."  *Id.* at 1313 n.9 (alterations supplied).

In affirming that decision, the Eleventh Circuit addressed the concerns Judge Murphy articulated.  *Knight III-A,* 476 F.3d at 1226.  The plaintiffs there, as plaintiffs do here,[809] "allege[d] that Alabama's tax policies seriously limit the ability of both the State and its counties to raise revenue from property taxes and, therefore, fund its K-12 schools."  *Id.* at 1226.  That contention, however, did not "advance the plaintiffs' claim . . . that these tax policies may be challenged under *Fordice* as policies that perpetuate segregation in Alabama's *system of higher education*."  *Id.* (emphasis supplied).

The segregative policies proscribed by *Fordice* govern *higher education*,

---

[808] *Compare Knight III*, 458 F. Supp. 2d at 1278 (listing the six provisions challenged by the plaintiffs there), *with* doc. no. 1 (Complaint in the present action) ¶ 1 (quoting this portion of the case), *and id.* at 25-26 (seeking relief from those same provisions).

[809] *See* doc. no. 1, ¶ 46 ("The racially motivated property tax restrictions in the Alabama Constitution continue to have their intended discriminatory effects, namely, inadequate revenues currently collected from local property taxes, the resulting underfunding of the state's K-12 public school system, particularly rural and majority-black schools, the over-dependence of K-12 on the Education Trust Fund and the consequent underfunding of Alabama's entire system of public education, including higher education."); *see also* doc. no. 274, ¶ 427 ("The gravamen of plaintiffs' Complaint is the inability of local school systems to raise sufficient ad valorem tax revenues to provide for an adequate education.").

> not *revenue raising*.  The property tax policies plaintiffs now challenge,
> however, are revenue policies; they are *not* policies that "govern higher
> education" as contemplated by *Fordice*.  The challenged tax policies
> have nothing to do with admissions, faculty and administration,
> availability of degree programs, student recruitment, education facilities
> or any other aspects of higher education that *Fordice* recognized may
> discourage black students from attending historically white institutions
> and white students from attending historically black institutions.  They
> are not, therefore, the sort of *education* policies that *Fordice* recognized
> could perpetuate racial identifiability in higher education.  We conclude,
> therefore, that plaintiffs' present claim is not properly brought under
> *Fordice*.

*Id.* (emphasis in original) (footnotes omitted).  In short, "Plaintiffs' property tax claim

is aimed at Alabama's school finance policies.  Although brought under *Fordice*, this

claim has almost nothing to do with higher education policies."  *Id.* at 1229 n.19.

Accordingly, the court reiterated, "[t]o the extent that plaintiffs' claim is that

Alabama's tax policies evidence a discriminatory intent to deprive Alabama's K-12

children of equal protection of the law . . . it does not state a claim for desegregation

of higher education under *Fordice*."  *Id.*; *see also id.* at 1230 (restating "the

inapplicability of *Fordice*").

Thus Eleventh Circuit precedent may not be avoided.  Despite plaintiffs'

insistence that the court must apply *Fordice*, counsel has made no attempt to offer a

basis upon which this court could accomplish that feat without  ignoring the dictates

of the Court of Appeals.  Therefore, *Fordice* does not apply to the analysis of

plaintiffs' Equal Protection claims in this case.

[This page intentionally left blank.]

# III.  FINDINGS OF FACT

## A.   Findings of Historical Fact

*"What is truth?" said jesting Pilate; and would not stay for an answer.*

> Francis Bacon (1561–1626), "Of Truth," in *Bacon's Essays* 1 (Cambridge:  Cambridge University Press 1908 Alfred S. West ed.) (1625).[810]

[W]e *cannot shut our eyes to matters of public notoriety and general cognizance.  When we take our seats on the bench we are not struck with blindness and forbidden to know as judges what we see as men.*

> *Ho Ah Kow v. Nunan*, 12 Fed. Cas. 252, 255 (No. 6546) (C.C.D. Cal. 1879) (Field, J.).[811]

*We may try to see things as objectively as we please.  None the less, we can never see them with any eyes except our own.*

> Benjamin N. Cardozo, *The Nature of the Judicial Process* 13 (New Haven, Conn.:  Yale University Press, 1921).

Most of the land that eventually came to be known as "Alabama" was ceded by

Great Britain in the 1783 Treaty of Paris, formally declaring an end to the American

Revolution.[812]  Spain's claim to the area above the 31st parallel was relinquished in

---

[810] *John* 18:37-38 ("Pilate said to him, 'So you are a king?'  Jesus answered, 'You say that I am a king.  For this I was born, and for this I have come into the world, to bear witness to the truth. Every one who is of the truth hears my voice.'  *Pilate said to him*, '*What is truth?*' ") (Revised Standard Version) (emphasis supplied).

[811] This opinion was authored by Supreme Court Justice Stephen J. Field (1816–1819), sitting on Circuit.

[812] The Treaty was signed on September 3, 1783, by John Adams, Benjamin Franklin, and John Jay on behalf of the United States, and by David Hartley, a member of the British Parliament representing the British Monarch, King George III.  The Treaty was ratified by the Congress of the

447

1795.[813]   The final acquisition of land came in 1813, when the Mobile area was captured by American forces during the War of 1812, and added to the Mississippi Territory.[814]   Alabama became a separate territory on December 10, 1817, when Mississippi was admitted to the Union as the twentieth state, and the twenty-second state on December 14, 1819, when President James Monroe signed the resolution of Congress admitting Alabama to the Union.

According to historical accounts, the first school for English-speaking peoples within the boundaries of present-day Alabama was founded in 1779, on the shore of Lake Tensaw in Baldwin County, north of present-day Bay Minette, by a New Englander named John Pierce.[815]   Like many schools of its time, the Pierce School was not funded by governmental assistance.[816]   Washington Academy at St. Stephens

---

Confederation ("the thirteen united States of America in Congress Assembled") on January 14, 1784, and by the King of Great Britain on April 9, 1784.  The ratification documents were exchanged in Paris on May 12, 1784.

[813] William Warren Rogers & Robert David Ward, *August Reckoning:  Jack Turner and Racism in Post-Civil War Alabama* 4-5 (Baton Rouge:  Louisiana University Press 1973) ("**Rogers & Ward I**").

[814] Mobile did not become a part of the United States at the end of the American Revolutionary War, because it was a part of the territory captured by Spain from Great Britain in 1780.

[815] *See* Albert James Pickett, *Pickett's History of Alabama:  And Incidentally of Georgia and Mississippi from the Earliest Period* 469 (Montgomery, Ala.:  River City Publishing 2003) (1851) ("**Pickett**").

[816] *See* Ira W. Harvey, *A History of Educational Finance in Alabama 1819-1986*, at 7 (Auburn, Ala.:  Truman Pierce Institute for the Advancement of Teacher Education) ("**Harvey I**").

448

(founded in 1811) and Green Academy in Huntsville (founded in 1812) have been described as Alabama's first "state-established" schools,[817] even though both of those academies were primarily financed by the local sale of lottery tickets.   Nevertheless, the Mississippi Territorial Legislature did grant a modest amount of revenue to the support of Green Academy in Huntsville:  a legislative action sometimes referred to as Alabama's "first 'state' appropriation for education."[818]   After Mississippi became a separate state, the Alabama Territorial Legislature continued financial support for both academies.[819]   Following Alabama's admission to the Union, the State's first Governor, William Wyatt Bibb,[820] urged the Legislature to appropriate $500 for the support of St. Stephens Academy.[821]   "That was a specific grant for education and

---

[817] *Id*.; *see also* Harvey H. Jackson III, *Inside Alabama:  A Personal History of My State* 49 (Tuscaloosa:  The University of Alabama Press 2004) ("**Jackson**") (discussing St. Stephens Academy and noting that "in 1811, the Territorial Legislature authorized citizens to hold a lottery to generate $5000 for an academy").

[818] Harvey I, at 7.

[819] *Id*. at 8.

[820] Bibb also was serving as Governor of the Alabama Territory when it was granted statehood status.  *See* Daniel S. Dupre, "William Wyatt Bibb, 1919 – 1820, and Thomas Bibb, 1820 – 1821," in *Alabama Governors: A Political History of the State* 13-17 (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Armbrester eds.) ("**Dupre**").

[821] Harvey I, at 8.  Although the fate of St. Stephens Academy is unknown, Green Academy was a successful endeavor.  *Id*.  Indeed, the academy thrived until it was burned by federal soldiers in the Civil War.  Green Academy later merged into the Huntsville public school system, *id*., and the land upon which it stood became in 1936 the site of "East Clinton Grammar School," which still stands and is used for primary instruction (K–5) to the present day.  *See* Fed. R. Evid. 201 (*i.e.*, the author of this opinion received his primary instruction in that building); *see also* William Warren Rogers & Robert David Ward, "Part Two:  From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* 254 (Tuscaloosa:  The University of Alabama Press 1994) ("**Rogers & Ward II**").

indicates that the very first governor was conscious of the role that the State was to play in educating its inhabitants."[822]  Even so, as chronicled in this opinion, and also in the work of professional historians who have meticulously studied the history of Alabama, it was a very long time before any real attempt was made to fulfill the State's role as sponsor of *public* education, even for white children.   Political clashes throughout Alabama's history prevented the success of most efforts to improve the State's educational policies or system.   As Dr. Wayne Flynt testified, Alabama is "always swinging between the politics of class and the politics of race";[823] and whenever the political pendulum swings in the reactionary direction of race, no progress in the improvement of the public educational system occurs.

During the antebellum period, Alabamians were preoccupied with class differences and sectionalism.[824] Following the Civil War, the pendulum swung sharply

---

[822] *Id.* (citation and quotation marks omitted).

[823] Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257), at 84 ( "**Flynt 1 Tr.**"); *see also id.* at 126 ("And if I can go back to the great paradigm of Alabama politics, sometimes it's about class and sometimes it's about race."); *see also* Declaration of Dr. Wayne Flynt (PX 10), at 6 ("**Flynt Dec.**") ("No discussion of Alabama's traditional political culture strays far from race.").

[824] *See, e.g.*, Flynt 1 Tr., at 82-84; V.O. Key, Jr., *Southern Politics in State and Nation* 37 ("A powerful localism provides an important ingredient of Alabama factionalism.  Candidates for state office tend to poll overwhelming majorities in their home counties and to draw heavy support in adjacent counties.") (New York:  Alfred A. Knopf 1949) ("**V.O. Key**").

It is not a long step from localism to sectionalism based on a genuine diversity of interest.   Sectionalism amounts to localism on a larger scale, but divisions of voters along sectional lines may represent a rational sort of grouping of voters bound together by common interest and common policy objectives rather than a neighborhood loyalty.   Within the Alabama Democratic party [as it existed in 1949,

450

to the politics of race.[825]   Indeed, racism, and the resulting determination to maintain

the politics of "white supremacy" at all costs, has obstructed educational progress in

Alabama since the Civil War.   The result has been a shamefully neglected and grossly

underfunded public school system.   However, no specific group has historically

suffered more from Alabama's lack of an equitable and adequate public school system

than African-Americans — those whose ancestors were kidnaped, involuntarily

brought to these shores in chains, and lawfully enslaved as mere chattel property like

domesticated beasts of burden.   After being declared "free," the former slaves still

were subjected to physical, financial, and emotional oppression for nearly a century.

Education policy in Alabama, and its impact on African-Americans, is a

complex story that is as old as the State itself.   The State Constitutional provisions

challenged in this action cannot simply be carved out and viewed in isolation.   The

past foreshadows the present, and old problems are presented in new guises.   Proper

when V.O. Key penned his monumental analysis of Southern politics,] there emerges
from time to time a sectional cleavage that party lines would probably follow if the
state had parties.   In this sectional pattern north Alabama and southeastern Alabama
are usually allied against the black belt, a strip across the southern center of the state
so named because of the color of the soil.   The black belt, a region of large farms and
of many Negroes with the accompanying socio-economic system, tends to ally itself
with the "big mules" of Birmingham and the lesser "big mules" of Mobile.   The north
Alabama region, an area in which smaller farmers are more typical, retains to this day
a strident radical agrarian tone in its politics and tends to be the source of movements
disturbing to the "big mules."

V.O. Key, at 41-42.

[825] *See, e.g.,* Flynt 1 Tr., at 82-84.

analysis, therefore, requires an understanding of Alabama's various approaches to educating its people, and a context-based examination of the substantive changes made. Such an examination naturally begins with the founding of the State.

### 1. Antebellum Alabama

### a. The Alabama Constitution of 1819

Congress passed an enabling statute in 1819, permitting "the people of the Alabama Territory to form a constitution and state government and for the admission of Alabama into the union, on an equal footing with other states."[826] The convention that assembled in Huntsville on July 5, 1819 for the purpose of drafting the first constitution was dominated by non-wealthy white pioneers who owned little property and few (if any) slaves.[827] As a result, the Alabama Constitution of 1819 was among the most liberal of its era.[828] It provided for a progressive "tax system that actually made those who owned the most pay the most."[829] Also unusual at the time, the

---

[826] Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901: A Study in Politics, the Negro, and Sectionalism* 28 & n.66 (Chapel Hill: University of North Carolina Press 1955) (Spartanburg, S.C.: The Reprint Co. 1978) ("**McMillan**") (citation omitted).

[827] Doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 52 ("**Agreed Facts**").

[828] *See* Flynt 1 Tr., at 40; *see also* Agreed Facts ¶ 52; J. Mills Thornton III, *Politics and Power in a Slave Society: Alabama, 1800-1860* 12 (Baton Rouge: Louisiana State University Press 1970) ("**Thornton I**").

[829] Flynt 1 Tr., at 40; *see also* Report of Dr. Wayne Flynt (PX 8), at 1 ("**Flynt Report**") (noting that in Antebellum Alabama "[t]axes were levied mainly on wealth"); Jackson, at 62; Wayne Flynt, *Alabama in the Twentieth Century* 4 (Tuscaloosa: The University of Alabama Press 2004) ("**Flynt II**").

constitution provided that any white male who had reached the age of 21 years could vote, regardless of whether he owned land, was literate, or belonged to a church.[830] Perhaps the most liberal characteristic of the 1819 Constitution, however, was its approach to apportionment.  The convention delegates reached a consensus that the apportionment of representation in both houses of the State Legislature would be based upon total *white* population.[831]  That method differed from the United States Constitution, and the constitutions of many other states, in that slaves were not counted in any respect.  The delegates from the majority-black counties were not successful in their attempt to base legislative apportionment on the "federal ratio,"[832] under which each slave counted as three-fifths of a white person[833] — essentially a representation of wealth, rather than persons possessing political, civil, or social rights.[834]

    With the Planters in the majority-black counties unable to wield their slaves as a means of gaining greater representation in the State's Legislature, early Antebellum

---

[830] Flynt 1 Tr., at 42-43; *see also, e.g.*, Thornton I, at 12.

[831] *See* Flynt 1 Tr., at 40; Agreed Facts ¶ 52; Deposition of J. Mills Thornton, III from *Knight v. Alabama* (PX 682), at 16 ("**Thornton Depo**"); Thornton I, at 12; McMillan, at 36.

[832] Flynt 1 Tr., at 37-38.

[833]    *See* U.S. Const art. I, § 2, cl. 3 (1787) ("Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons."), *amended by* U.S. Const. amend. XIV, § 2.

[834] Flynt 1 Tr., at 38.

politics was controlled by representatives of "nonslave holding or very small slave holding small farmers [who] shifted the bulk of taxation onto the wealthiest citizens, the planters and large slave holders, who bore overwhelmingly the majority of the tax burden."[835]   In fact, approximately two-thirds of state revenue for the early antebellum period came from slaves and land.[836]

As progressive as it was, the 1819 Constitution, nevertheless, did little to foster education. It *did* set aside lands for a university, and for the promotion of "arts, literature, and the sciences."[837]   Even so, the section on education in the first constitutional document quoted directly from the Northwest Ordinance of 1787,[838] and provided only that "education shall forever be encouraged in this State."[839]  It was the

---

[835] Agreed Facts ¶ 52; *see also* Thornton Depo, at 18-19 (discussing tax burdens on the rich, and tax exemptions that favored the poor).

[836] Flynt 1 Tr., at 40-41; *see also* Agreed Facts ¶ 53; Horace Mann Bond, *Negro Education in Alabama:  A Study in Cotton and Steel* 37 (Tuscaloosa:  University of Alabama Press 1994) (1939) ("**Bond**") ("The white counties, prior to the War, had forced the levy of taxes upon slaves so that this form of property paid most of the taxes in 1860.").

[837] *See* Ala. Const. of 1819, art. VI, § 2 (Education Section Under "General Provisions" to the Alabama Constitution of 1819).

[838] The Northwest Ordinance — "An Ordinance for the Government of the Territory of the United States, North-West of the River Ohio" — was an act of the Congress of the Confederation of the United States passed on July 13, 1787.  The primary purpose of the Ordinance was the creation of the Northwest Territory as the first organized territory of the United States, and its mandate for the creation of new states from the region when a population of 60,000 inhabitants had been achieved within a particular area.  The territory encompassed by the Ordinance was the land south of the Great Lakes, north and west of the Ohio River, and east of the Mississippi River.  Five states (and a significant portion of a sixth) eventually were carved from the territory:  Ohio 1803 (17th state); Indiana 1816 (19th state); Illinois 1818 (21st state); Michigan 1837 (26th state); Wisconsin 1848 (30th state); and a portion of Minnesota (about one-third of the state) 1858 (32nd state).

[839] Thornton Depo, at 33.

task of the Legislature to determine whether (and how) to raise any revenue for the "encouragement" of education within the new state.[840]   The Legislature's power to raise taxes for whatever purposes and by whatever means was unrestricted by the 1819 Constitution, except for the requirement that "[a]ll lands liable to taxation in this State shall be taxed in proportion to their value."[841]

### b.    The rapid accumulation of wealth in the "Black Belt"

The southernmost parts of the land that eventually became Alabama — present-day Mobile and Baldwin Counties — were settled long before other parts of the Mississippi and Alabama Territories, but primarily by persons of Spanish and French descent.   The migration of English-speaking persons into the Alabama Territory

---

[840] The full text of the Education Provision read as follows:

EDUCATION.

Schools and the means of education shall forever be encouraged in this State; and the General Assembly shall take measures to preserve, from unnecessary waste or damage, such lands as are or hereafter may be granted by the United States for the use of schools within each township in this State, and apply the funds, which may be raised from such lands; in strict conformity to the object of such grant.  The General Assembly shall take like measures for the improvement of such lands as have been or may be hereafter granted by the United States to this State, for the support of a Seminary of learning, and the moneys which may be raised from such lands, by rent, lease, or sale, or from any other quarter, for the purpose, aforesaid, shall be and remain a fund for the exclusive support of a State University, for the promotion of the arts, literature, and the sciences: and it shall be the duty of the General Assembly, as early as may be, to provide effectual means for the improvement and permanent security of the funds and endowments of such institution.

Ala. Const. of 1819, art. VI, § 2.

[841] Ala. Const. of 1819, art. VI, § 8; *see also* Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253), at 19 ("**Norrell Tr.**").

initially "came in from the Tennessee River and the Cumberland River."[842]   The "Great

Bend" of the Tennessee River Valley in north Alabama was settled first, and began to

thrive before the remainder of the State.[843]   It was not until the Creek War ended in

1814, with the signing of the Treaty of Fort Jackson, and the "Federal Road" was cut

from Georgia into the east-central portion of the Alabama Territory, that the land west

of the Coosa River, formerly claimed by the Creek Indians, was opened to major

settlement.[844]   Long before that happened, however, the book-ends of the State —

Mobile and Baldwin Counties in the south, and Huntsville and the Tennessee Valley

in the north — were thriving economically.   In fact, the 1820 census recorded that 67

percent of all the cotton grown in Alabama was grown in Madison County.[845]   As

historical time is measured, however, that economic circumstance changed radically

in a very short period of time.   The "Black Belt" — a section that was defined in Part

I(D)(1) of this opinion, *supra* — quickly developed from "a raw frontier society" into

a place of tremendous wealth and power.[846]   By 1849, the counties traditionally

---

[842] Flynt 1 Tr., at 46.

[843] *Id.*; *see also* Thornton I, at 6-8 (noting that there were only two settlements prior to the foundation of the state:  (1) in the "Tombigbee" area near Mobile (the southwest area that makes up the present day counties of Washington and Clarke); and (2) the Tennessee Valley).

[844] Flynt 1 Tr., at 46; *see also*, *e.g.*, Thornton I, at 8-10 (noting that heavy migration into the Black Belt did not begin until 1818); Part I(D)(1)(b)(*iv*), *supra*.

[845] Flynt 1 Tr., at 46.

[846] Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258), at 208-09 ("**Flynt 2 Tr.**") (agreeing with the following passage from V.O. Key), read into the record by the court: "[N]orth Alabama and southeastern Alabama are usually allied against the black belt, a strip across the south

included in the Black Belt were producing *eighty-five percent of the cotton grown in Alabama*.[847]  Two statistics will serve to underscore the "enormous growth in wealth" in that section prior to the Civil War:  *i.e*., in that same year of 1849, "Alabama produced 23 percent of all the cotton grown in the United States.  And cotton constituted 50 percent of all U.S. exports to the rest of the world."[848]  As a consequence, Alabama's Black Belt counties became the wealthiest counties in all of America.  As Dr. Wayne Flynt testified,

> *that is a revolution of incomprehensible importance*.  Alabamians don't think about it much.  *But if you think about one product constituting half of all U.S. exports*, *and one-fourth of all that product grown basically in 12 or 14 counties in central Alabama*, you get some sense of the power and the wealth [of that section of the State].[849]

Dr. Edwin C. Bridges, the Director of the Alabama Department of Archives and History addressed the same subject as follows:

> Cotton prices fluctuated erratically after the Panic of 1819, but the early 1830s brought "flush times" to Alabama.  Prices remained relatively high and production increased dramatically.  Successful planters reaped enormous profits.  Steamboats, which had first appeared in Alabama in the early 1820s, helped planters get more cotton to market.  Starting in the 1840s, an expanding network of railroads supplemented the steamboats.  Alabama's cotton production continued to grow through

---

center of the state so named because of the color of the soil.  The black belt, a region of large farms and of many Negroes with the accompanying socio-economic system that tends to ally itself with the 'big mules' of Birmingham and the lesser 'big mules' of Mobile.").

[847] Flynt 1 Tr., at 47.

[848] *Id.* at 48.

[849] *Id.* (emphasis and bracketed alteration supplied).

the 1840s and 1850s, increasing by more than three hundred percent over the two decades.

As Alabama became the "Cotton State," Mobile, its principal port, became the "Cotton City." A British visitor to Mobile in 1858 caricatured the place of cotton in the lives of Alabamians: "They buy cotton, sell cotton, think cotton, eat cotton, drink cotton, and dream cotton. They marry cotton wives, and unto them are born cotton children. It is the great staple, the sum and substance of Alabama."

Cotton production dwarfed every other economic enterprise in Alabama. Much of the state settled into a routine that followed its annual cycle. Beginning with preparation of the land and planting in the spring, work continued through a hot summer of hoeing and tending. Picking began in August, followed by ginning, and then the excitement of selling. Winter was a time for repairs and for getting ready to begin the cycle again the next spring.

Yeoman farmers participated only marginally in the cotton economy during Alabama's early years. They pursued a "safety-first" agriculture, focusing on what they needed for survival. But as time passed and prices stayed high, more yeoman farmers were enticed into trying their hands at raising cotton. A significant part of the production increase through the 1850s appears to have come from yeoman farmers. *By 1860, Alabama produced more cotton than any other state except Mississippi. The combination of increased production and high prices brought wealth that was almost dizzying.*[850]

It was, of course, the geological composition, incredible fertility, and location

of the soil that made it ecologically possible to grow huge cash crops of cotton in the

Black Belt. Even so, as Alabama is learning as a direct consequence of the recent

---

[850] Edwin C. Bridges, "Historical Alabama," *The Alabama Guide: Our People, Resources, and Government* 66-67 (Montgomery, Ala.: Alabama Department of Archives and History, 2009) ("**Bridges**") (emphasis supplied).

enactment of the most severe immigration restrictions of any state in the Union, in the absence of laborers to harvest the crops, they will rot in the fields where they were planted. Consequently, the plantation owners of the Black Belt ushered in hundreds of thousands of slaves to work the land.[851]

At the time, *a mere one-third of one percent of white Alabamians* (0.0033% !) owned fifty or more slaves, and that incredibly small percentage of the white population owned thirty percent of all of the slaves, *and*, thirty percent all of the land in Alabama.[852]

Thus, an extraordinarily small cadre of wealthy whites owned a disproportionate share of Alabama's most valuable land and personal property (slaves), and the members of that elite aristocracy were greatly outnumbered by the workforce they held in servitude. Slaves represented "a very substantial percentage of the[] population in the case of [the] Black Belt, easily the majority and in many cases as much as 80 percent of their population was made up of slaves."[853]   By 1860, there were approximately 520,000 whites and 430,000 slaves in the state, with most of the slaves located in the Black Belt.[854]

---

[851] *See* Flynt 1 Tr., at 64-65, 89, 91 (discussing the large black population in the Black Belt Counties).

[852] *Id.* at 48.

[853] Thornton Depo. at 16-17.

[854] *Id.*; *see also* "Preface" in William Warren Rogers, Robert David Ward, Leah Rawls Atkins

459

Before the Civil War, the slave population represented wealth, and Black Belt leaders wielded that tool to advance their interests.  After the War, the former slaves represented votes that could be cast to benefit the economic and political interests of the Planters, and whites in the Black Belt used whatever means were necessary to manipulate and control those votes.  Thus, both before and after the War, the black descendants of African slaves were exploited by the Black Belt Planters, and "tied to the land" as cheap laborers.  The primary instrument that enabled the Black Belt aristocracy — a unique social, political, cultural, and economic force in the State — to exert disproportionately its influence on the affairs of Alabama was its black population, regardless of whether that population was viewed as chattel property, as citizens entitled to vote, or as a basis for apportionment in the legislature.

### c.    Taxation in Antebellum Alabama

"[I]n Antebellum Alabama . . . the largest source of tax revenue was the tax on slaves."[855]  Prior to 1847, that tax consisted of a flat poll (or "head") tax.[856]  Property taxes also were collected, but not to any great extent;[857] indeed, "land taxes were held

---

& Wayne Flynt, *Alabama:  The History of a Deep South State* xxi (Tuscaloosa:  The University of Alabama Press 1994) (stating that, by 1860, there were 526,271 whites and 435,080 blacks); Bond, at 4 (calculating the number at 526,271 whites, and 437,770 blacks).

[855] Thornton Depo, at 11; *see also* Declaration of Dr. Robert Norrell (PX 7) ¶ 2 ("**Norrell Dec.**") ("Originally slaves, blacks were the main source of state revenue . . . .").

[856] Thornton Depo, at 11.

[857] *Id.* at 12.

to very low levels" because the State "was receiving such substantial revenue from the slave tax."[858]  As Mills Thornton testified:

> Before 1847, land was valued by what was called the classification method.  *Land was divided into four classifications by the quality of the land*.  That is to say, the relative fertility or relative agricultural productivity of land.  And then the statute attributed to all land within each of the four categories a price per acre.  And then the tax was figured as a percentage of the revenue that would thus be created.  So that the number of acres you had times the statutorily-mandated value for the category your land was in, times the percentage that the revenue act required at that time, the millage rate that it required, produced the amount of tax that you paid.[859]

The State also taxed luxury items and capital.[860]  "Luxury taxes were specific levies on property that . . . a well-to-do citizen would be likely to own but a poor citizen would almost never own . . . ."[861]  Examples included clocks, gold watches, carriages, racehorses, furniture, and jewelry.[862]  The State also imposed a tax on money loaned at interest, as well as a percentage of the gross sales revenues of merchants, tantamount to an income tax.[863]

Thus, at least until the late Antebellum period, the plantation aristocracy bore

---

[858] *Id.*

[859] *Id.* at 13-14 (emphasis supplied).

[860] *Id.* at 14; Flynt 1 Tr., at 41.

[861] Thornton Depo, at 14-15.

[862] *Id.* at 15; Flynt 1 Tr., at 41.

[863] Thornton Depo, at 15.

461

the brunt of the tax burden in Alabama.[864]  Taxation, accordingly, became a "major source of political conflict" between the large slaveholding plantation owners  in the Black Belt and the small "yeoman" farmers located in the Wiregrass and hill country sections of the State who owned few (if any) slaves and little land.[865]  The disparity in slave ownership, and the groups' opposing social, economic, and political interests, was due to the fact that neither the North Alabama hill country nor the Wiregrass counties in the extreme southeastern section of the state were ecologically or economically suited for producing cotton.[866]  Thus, yeoman farmers had little regard

---

[864] *See* Flynt Report, at 1 (noting that during the Antebellum period in Alabama "[t]axes were levied mainly on wealth (land, slaves, objects of high value such as clocks and gold watches, etc.) . . . ."); Flynt 1 Tr., at 40; Thornton Depo, at 15-16.

[865]

And so in terms both of what was not taxed and of what was taxed, the tax structure represented the power of the small farmer constituency to effect its will.  Now, this was a tax structure with which planters were quite discontented.  They felt that they bore the burden of taxation and they felt that they bore it unfairly.

Thornton Depo, at 19-21.

[866] As professor Flynt testified, there were

a whole series of problems economically [with] growing cotton in the hill country and Wire Grass.

Number one, a cotton bale weighs 500 pounds and you have no hard roads and you have no navigable rivers in the hill country.  And, as a result of that, the first question you have if you are a farmer, [is] how are you going to get a 500-pound bale of cotton to market?  What that does is effectively cause hill country people to grow corn and other kinds of row crops, but not cotton as a commercial product.

Same thing is true of the Wire Grass. The Wire Grass, if you can envision this, is a huge virgin pine forest where the long leaf pine canopies are so high that the canopy underneath them is absolutely clear. And the result of that is you have huge herds of wild hogs and wild cattle.  . . .

462

for the plantation aristocracy, and favored a government that placed the greatest tax burden on the owners of slaves and other personal property likely to be found only among wealthy aristocrats, rather than upon land.[867]  Conversely, plantation owners sought a system that shifted the tax burden away from slaves and onto land — a system that required greater tax contributions from the small farmers.[868]  At that time, "[m]ost Alabamians did own some land."[869]

Planters, predominately those residing in the Black Belt counties, began to gain influence in the Alabama Legislature in the late 1840s.[870]  "[M]ore and more Alabamians [were] becoming slave owners in the '50s because of the enormous value of the kind of crop produced in Alabama during [that] period of time."[871]  Planters were eventually able to widen their base of influence sufficiently to take control of the State Legislature and shift the taxation system away from slaves to land.[872]  "[I]n 1847, the legislature . . . adopted an *ad valorem* system for land, eliminating the

---

And so you have very poor coastal soil, mainly sandy, not good for cotton production in the Wire Grass.  You have no transportation system and a rocky ground that's hard to clear, and hilly in the North Alabama section.  Well, that doesn't lend itself to the cotton culture.

Flynt 1 Tr., at 56-58 (bracketed alterations supplied).

[867] Thornton Depo, at 16-18.

[868] *Id.* at 19.

[869] Flynt 1 Tr., at 56.

[870] *Id.* at 42.

[871] *Id.* at 44.

[872] *Id.* at 44, 58; *see also* Agreed Facts ¶ 53.

classification system," but the slave tax was not abolished altogether.[873]  Instead, it was altered from a flat tax on each "head" to a system under which slaves were taxed according to their age:  the least for children and the elderly, and the most for young, able-bodied, adult fieldhands.[874]  The result was more taxes paid by small farmers, and a tax structure that, over time, raised more revenue from land than slaves.[875]  Significantly, however, none of that additional revenue aided the nascent public schools.[876]

### d.   Education funding

### i.   "Sixteenth Section Lands"

Public education in Antebellum Alabama initially was made possible by the "Sixteenth Section lands."[877]  Prior to Alabama's admission to the Union, the federal government ordered a survey to be conducted of land within the Alabama territory and divided it into Ranges and Townships.[878]  Each Township was then divided into

---

[873] Thornton Depo, at 20.

[874] *Id.*; Norrell Dec. ¶ 2; J. Mills Thornton III, "Fiscal Policy and the Failure of Radical Reconstruction in the Lower South*,*" in J. Morgan Kousser & James M. McPherson, *Region, Race, and Reconstruction:  Essays in Honor of C. Vann Woodward* 357 (New York:  Oxford University Press 1982) ("**Thornton II**").

[875] Thornton Depo, at 20-21 ("And the result of that reform is in the very late antebellum period, in the period after about 1855, in the final five years of the antebellum period, the land tax actually passed the slave tax as the principal source of revenue."); Agreed Facts ¶ 53.

[876] Thornton Depo, at 21 ("[E]ssentially none of [the tax revenues] went to the public schools."); Agreed Facts ¶ 54.

[877] Agreed Facts ¶ 54.

[878] Thornton Depo, at 21-22.  The Continental Congress was deeply in debt following the

sections.[879]   Once the Alabama Territory was admitted to the Union as a state, the

federal government, as it did with other newly-admitted states, granted to Alabama the

Sixteenth Section in each of the townships to be used expressly for schools.[880]   The

money raised from the "Sixteenth Section lands" became the first designated source

of revenue for education in Alabama.   The Sixteenth Section lands "would be rented

[or] leased, and then the lease income went to the township school trustees, who used

that to pay a teacher to run a school for that township."[881]

---

Declaration of Independence.  With little power to tax, the Continental government decided to use the sale of the western territories to pay off the American Revolutionary War debt.  Pursuant to that decision, the Continental Congress enacted the Land Ordinance of 1785, and then the Northwest Ordinance in 1787, to control the survey, sale, and settling of lands in the western territories.  Thus was born what has come to be known as the "Public Land Survey System," sometimes referred to as the "rectangular survey system."  It is a method to survey and identify land parcels, particularly for property descriptions in the titles and deeds of rural, wild, or undeveloped land.  Its basic units of identification of areas are the "Township" and "Sections."  The surveying of any region is a multi-step process.  *First*, two controlling survey lines are established:  a "baseline," which runs east-to-west, and a "principal meridian," which runs north-to-south.  Those two lines pass through, and intersect at, a location known as "an initial point."  Second, at a defined distance interval (commonly 24 or 30 miles, depending on the year and location of the original survey work), "standard parallels" are established, running parallel with the baseline.  The prime meridian, baseline, and standard parallels thus established form a lattice upon which all further surveying is based.  Subsequent survey work divides the land into a surveyed "Township" of, ideally, thirty-six square miles (or six miles on each side).  That is done by establishing "Township" and "Range" lines that run parallel to the "baseline" and "principal meridian," respectively, at six-mile intervals.  Finally, townships are subdivided into 36 "Sections" of one square mile each.  The "Sixteenth Section" in each Township was reserved under the terms of the Northwest ordinance of 1787 for educational purposes.

[879] *Id.*; McMillan, at 28 & n.68 ("An act of Congress approved April 20, 1818, had also provided the sixteenth section of each township in the Territory should be set aside for schools."). "This was by no means unique to Alabama.  In fact, it was the system that was used in all of the new states, in all of the non-Atlantic Seaboard states, the states . . . created other than the original 13 states."  Thornton Depo, at 22.

[880] Flynt 1 Tr., at 49; Thornton Depo, at 21-23; Harvey I, at 8 (citation omitted).

[881] Thornton Depo, at 22.

465

When the Alabama Legislature implemented procedures governing the use of revenues derived from Sixteenth Section lands for public education, it provided only for lease of the land.[882]  After Alabama established a state bank in 1823, however, the State Legislature began to allow Township Trustees to sell the Sixteenth Section lands, with the proceeds of sale to be used by the bank as lending capital.[883]  In 1828, by legislative act, the State became the fiduciary of the proceeds from the sales of Sixteenth Section lands, and obligated itself to pay interest on the proceeds of sale to the townships and school districts as additional revenue for the support of public education.[884]  That scheme proved to be as large a debacle as the "toxic assets" that precipitated the "sub-prime mortgage crisis" of 2007-08.  Many of the speculative purchasers of Sixteenth Section lands failed to repay their debts to the state bank during the "Panic of 1837,"[885] and that precipitated the bank's failure.[886]  A huge

---

[882] *See* PX 682 (*Knight* Plaintiffs' Request for Admissions) ¶¶ 20-24.

[883] *Id.* ¶¶ 24-28.

[884] *Id.*

[885] The "Panic of 1837" was a financial crisis built upon a combination of policies and events in the United States, together with international factors (*e.g.*, large silver imports and increased British interest rates).  The foundation of the eventual Panic was the land-purchasing fever that ran wild during the boom period of the early 1830s:  a speculative "bubble" fed by an inflated paper currency, much of it issued by state banks of questionable solvency.  The second precipitant was President Andrew Jackson's July 1836 "Specie Circular," which required that payments to the United States for the purchase of government lands be made and accepted only in "specie" (*i.e.*, gold or silver coinage).  Jackson's Specie Circular "effectively applied the brakes to the flush times in Alabama and forced the price of land, cotton, and slaves downward."  I William H. Brantley, *Banking in Alabama 1816-1860*, at 139 (Birmingham:  Privately Printed 1961).  The third precipitant was President Jackson's refusal to renew the charter of the Second Bank of the United States, an action that resulted in the withdrawal of government deposits and the bank's demise.  Finally, on

466

amount of Sixteenth Section land revenue was lost as a result.[887]

Even so, the revenue generated by the Sixteenth Section lands, regardless of whether derived from the lease or sale of such lands, never was very great, particularly in the non-cotton-producing regions of Alabama where land was less valuable, if of any value at all.[888]   That inequity was a matter of chance;  that is,

> where the 16th section ended up was a matter of chance, so that — the 16th section for a particular township could be very fertile land and could be leased at a very high lease value, and then there would be a very large income . . . for the school for that township.  But that 16th section could be rocky soil that nobody  would particularly want to lease or, even worse, it could have been [valueless] swamp land . . . .[889]

Due to the lack of a concentrated population willing and able to raise additional revenue to support schools — like the City of Mobile, for example, which used "everything from raffles to legalized gambling on riverboats" to supplement the revenue derived from its Sixteenth Section land[890] — a large portion of the Antebellum

---

May 10, 1837, every bank in New York City began to accept payment only in "specie," forcing a deflationary backlash.  The Panic was followed by a five-year depression, resulting in the failure of many banks and record-high unemployment levels.  *See generally id*. at 221, 337-43.

[886] *Id.* ¶¶ 29-31; Thornton I, at 46.

[887] Flynt 1 Tr., at 50; Thornton Depo, at 31; Bond, at 74 ("The failure of the [State] Bank, in 1843, left the State with a 'fictitious' school fund which thereafter was to be paid actually from direct taxation and general state funds . . . .").

[888] Flynt 1 Tr., at 49-50; Bond, at 73 ("With cotton cultivation as the economic basis of life, only those lands in rich cotton-producing areas were of much value, and, on sale or lease, realized any considerable income to the fortunate townships in which they were located.").

[889] Thornton Depo, at 22-23.

[890] Flynt 1 Tr., at 50.

Alabama populace was illiterate.[891]

Most of the public schools established prior to the Civil War were located in the Black Belt.[892]  The typical plantation owner identified with the Whig Party, and Whigs tended to value formal education more than residents of the north Alabama hill country and Wiregrass counties of the state, who were more likely to identify with the politics of Jacksonian Democrats.[893]  The Whigish political ideology of the Planter elites and the high value of the Sixteenth Section lands in the Black Belt facilitated public schools in that region.[894]  The wealthiest Black Belt plantation owners also provided for the education of their children by other means.[895]  Many utilized the British system of "buying a library" to educate their children.[896]  That required the purchase of books, such as the "Waverley Novels" and "Guffey's Reader," and hiring a private tutor to operate a school inside the plantation home.[897]

---

[891] *Id.* at 50.

[892] Thornton Depo, at 26-29.

[893] *Id.* at 18 (describing the "hill" and "wire grass" counties, and noting that "[i]n party terms, those were also the counties that were most heavily Democratic," and also that "the plantation counties, the majority slave counties, were the counties that were most heavily Whigs"); *see also* Flynt II, at 4 ("Jacksonian Democrats tended to be leery of any government activity or intrusion into their lives, while Whigs tended to be more supportive of business.").

[894] Thornton Depo, at 26-29.

[895] *See, e.g.*, Norrell Dec. ¶ 2 (noting that wealthy whites in the Black Belt educated their children privately).

[896] Flynt 1 Tr., at 50.

[897] *Id.* at 50-51.

*ii*.    **Public Schools Act of 1854**

As Alabama became more "urban" (a relative term at this period of the State's history),  "with younger, more progressive, business-oriented leaders," there was a movement toward fostering public education for all white children.[898]   One factor behind the movement was the frustration of urban interests by the policies of Jacksonian Democrats.[899]   Urban progressives believed that the "aggressively agrarian and anti-developmental policies that the government of Alabama [had] traditionally pursued under Jacksonian leadership . . . proceeded from an ill-educated white electorate, and if the electorate could be better educated . . . people would then begin voting for more progressive policies."[900]   Such persons proposed an act that would consolidate all Sixteenth Section funds in the State, and then redistribute the *aggregated revenue* on a pro-rata (per-student) basis among the Sate's schools to provide equitable funding for the promotion of education within the State.[901]

The Act was opposed by the elite Black Belt Planters, because a consolidation

---

[898] Thornton Depo, at 27.

[899] *Id.* at 28.   Led by President Andrew Jackson, this faction of the Democratic Party championed greater rights for the common man and a fierce opposition to any signs of "aristocracy" in the Nation.  Urban areas and interests tended to be viewed as "elitist," and therefore opposed by common, yeoman agrarians.  *See also* Flynt 1 Tr., at 53 (explaining that the Act was also supported by "the Evangelical Church as a method of making sure people could read the Bible and giving people an opportunity").

[900] Thornton Depo, at 28.

[901] *Id.* at 27.

469

of all Sixteenth Section funds "meant that they would be the principal contributors"; their Sixteenth Sections were "the ones that were producing the most income."[902] Black Belt counties generally opposed a diminution of the education funds they received for the purposes of improving education in the non-cotton-producing areas of the State, where Sixteenth Section lands were producing little (or no) revenue for public education.[903]

Despite the opposition of Black Belt legislators, the Public Schools Act became law in 1854.[904]  It led to the creation of Alabama's  "first statewide [public] school

---

[902] *Id.* at 28.  Dr. Flynt testified:

> And I think that probably part of the reluctance of the Black Belt was that having already fixed a system of education that was serving it quite well, the opulence and influence of the plantation system and the Black Belt in the 1850s, they really didn't see any need to tax land in order to create a public school system for the hill country and the Wire Grass.

Flynt 1 Tr., at 53; *see also* Bond, at 6 (noting that the Black Belt opposed the Act because its land was producing most of the revenue, and its leaders felt that they should not be forced to give that revenue to the state legislature for per capita distribution to benefit public education in other areas of the state).

[903] Thornton Depo, at 29; *see also generally* Norrell Dec. ¶ 2 ("Tax support for public education in antebellum Alabama was weak, with lowest support for it coming from the Black Belt region of the state where most wealthy whites educated their children privately.").

> "The Black Belt representatives objected to a State distributive fund because their 16th Section income was already pledged, largely, to the support of private academies and other institutions through the section; and the assessment of a State Fund would necessitate pooling this income for distribution to all of the white children in the State."

Bond, at 74.

[904] *See, e.g.*, Ira W. Harvey, *A History of Educational Finance in Alabama 1819-1986*, at 52-

system."[905]  It consolidated the Sixteenth Section funds for *per capita* distribution at the state level, and "authorized each county to levy a one mill school tax on real and personal property *without the requirement of voter approval by referendum*."[906]

Of course, Alabama's first meaningful attempt at promoting public education "did not benefit blacks, most of whom were enslaved, all of whom were disfranchised, and all of whom were forbidden to be taught how to read and write."[907]  Even free blacks were prohibited by law from receiving any form of education.[908]  As Professor Horace Mann Bond observed in his brilliant and exhaustive history of *Negro Education in Alabama*:

> Admitted to the Union in 1819, Alabama immediately adopted a slave code based upon that of Georgia.  Not until 1832, the year following [Nat] Turner's insurrection [in Virginia on August 21, 1831, resulting in

---

53 (Auburn, Ala.:  Truman Pierce Institute for the Advancement of Teacher Education) ("**Harvey I**") (describing the enactment and important features of the Act); *id.* at 558 ("Public School Act of 1854 establishes a statewide system of public education; provides for management of public school funds by State Superintendent of Education; Mobile County Schools are exempted from provisions.").

[905] Agreed Facts ¶ 54; Flynt 1 Tr., at 69; Flynt Report, at 1; Flynt II, at 4.

[906] Agreed Facts ¶ 54 (emphasis supplied, internal quotation marks deleted); Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257), at 53-54 ("**Flynt 1 Tr.**"); Harvey I, at 53.

[907] Agreed Facts ¶ 54; *see also* Thornton Depo, at 30; Flynt 1 Tr., at 54-55; Norrell Dec. ¶ 2 (noting that, even though African-Americans provided "the main source of state revenue . . . . blacks in antebellum Alabama received no benefit from state revenue."); Flynt Report, at 1 (noting that, in Antebellum Alabama, "relatively few blacks could read or write, there were no African-American schools, and no blacks could vote").

[908] Agreed Facts ¶ 54; Norrell Dec. ¶ 2 ("Starting in 1832, state law made it illegal for blacks to be educated, and therefore being African American and getting educated were mutually exclusive realities until 1865.").

the deaths of sixty whites and one hundred slaves], was any effort made to prohibit the education of Negroes.  In that year a statute was enacted making it a crime to instruct any Negro, free or slave, in the arts of reading and writing; a fine of from $250 to $500 was imposed upon persons found guilty of this offense.[909]

"[T]he theory was that Nat Turner had been a free black and had read abolitionist propaganda and that had led to [a] massacre of a large number of whites in Virginia in 1831."[910]  Alabama was "determined to prevent that."[911]

## 2.    Secession and the 1861 Constitution

### a.    The politics of secession

As the fiery debate over secession approached its denouement, the interests of the small farmers in the hill country and Wiregrass again collided with the agenda of the large slaveholding Planter elites of the Black Belt.[912]  As V.O. Key observed:

In the maneuvers leading to The War those with most at stake — the owners of large numbers of slaves — were to be found roughly in the same areas as present-day black belts.  They recruited allies wherever they could find them; their allies were fewest in the regions of few Negroes.  Opposition to The War was most intense in the highlands and in the upcountry, where the soil would not support a plantation economy and where independent yeomanry had no overwhelming desire to take up arms to defend the slave property of the lowland planters.

The impressive — and unfortunate — political victory of the large

---

[909] Bond, at 15.

[910] Flynt 1 Tr., at 55.

[911] *Id.*

[912] *Id.* at 55-59.

slaveholders came in their success, despite their small numbers, in carrying their states for war. . . .[913]

Dr. Flynt suggested that leaders of the Black Belt Planter class persuaded many of the poor whites, who felt as if they "didn't have a dog in the hunt," to favor secession *with the threat of increased taxation on land*.[914]  The argument was:  "if slavery's abolished, white yeoman farmers are going to be picking up the difference in funding state services, including public schools, by paying more taxes on their land."[915]  That tactic worked well for the Planters, as Professor Harvey Jackson noted

---

[913] V.O. Key, at 6.  *See also* Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901:  A Study in Politics, the Negro, and Sectionalism* 76-77 (Chapel Hill: University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Co. 1978) ("**McMillan**") (noting a "distinct sectionalism between North and South Alabama" regarding the issue of secession, and recording that most of the "unionists" and "cooperationists" elected to the secession convention came from North Alabama); Flynt 1 Tr., at 55-59 (testifying that yeomanry from the hill country and Wiregrass had no stake in the plantation system, and were generally less inclined toward the foolishness of secession); *id*. at 59 (testifying that the Black Belt counties were the most "fiercely secessionist county sections in the state"); Bond, at 37 (underscoring that Black Belt plantation owners held the largest investments in the State's "peculiar institution" when recording that "[a]n assessment in 1860 of state property in the amount of $432,193,654 included the item of $152,278,000 for slaves").

[914] Flynt 1 Tr., at 55-59.

[915] *Id.* at 56.

To make the hill-country yeomen loyal to slavery, despite their usual fear and hostility toward the planter class, would take extraordinary efforts.  One way to encourage their support was to remind them that the taxes paid on slaves represented almost one-third of state revenues.  The small farmer-yeoman class was mostly illiterate, lived in isolated areas, and could be swayed most effectively by oral arguments.  A man who was perhaps Alabama's greatest orator [*i.e.* William Lowndes Yancey,] a man committed to the interests of the yeoman, to the preservation and extension of slavery, and to Southern nationalism, stood ready to assume leadership.

in his history of the State:

> These yeomen, slaveholders and non-slaveholders alike, wanted to preserve slavery, were willing to leave the Union to preserve slavery, and ultimately were willing to fight and die to preserve slavery, not because they owned slaves (though some did) or because they wanted to own slaves (though most did) but because they believed that limiting slavery's expansion, then abolishing it altogether, would confirm both a northern victory and their own bondage. *And not incidental to this was the fact . . . that abolishing slavery meant abolishing the tax on slave property, and if that tax was abolished, non-slaveholders would be called on to take up the slack, pay more to the state, and have less to freely use themselves.*[916]

Nevertheless, many yeoman farmers remained opposed to secession, and some of them left the state or supported the Union Army.[917]  "Many, particularly from the hill counties of north Alabama, opposed the war, evaded conscription, or deserted from the army.  They were hounded and persecuted by their conforming neighbors or by Confederate officials."[918]  As Horace Mann Bond recorded, the "slogan of the

---

Leah Rawls Atkins, "Part One:  From Early Times to the End of the Civil War," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* 150 (Tuscaloosa:  The University of Alabama Press) ("**Atkins**") (bracketed alteration supplied).

[916] Harvey H. Jackson III, *Inside Alabama:  A Personal History of My State* 87-88 (Tuscaloosa:  The University of Alabama Press 2004) ("**Jackson**") (emphasis supplied).

[917] Flynt 1 Tr., at 59-60; *see also* Jackson, at 94 (noting that "some three thousand from the northwest counties, the 'Tories of the Hills' they were called" joined the Union Army); Walter L. Fleming, *Civil War and Reconstruction in Alabama* 54 (New York:  The Columbia University Press 1905) ("**Fleming**") ("Opposition after secession was unlawful and to even speak of it was wrong, and [William Lowndes Yancey] predicted that the name 'tory' would be revived and applied to such people."); *see also* Bond, at 8 (noting that North Alabama provided a considerable number of soldiers to the Union).

[918] William Warren Rogers & Robert David Ward, "Part Two:  From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The*

deserters was that 'it was a rich man's war and a poor man's fight.'"[919]

###### b.    Secession and Alabama's 1861 Constitution

Following the victory of Abraham Lincoln and the Republican Party in the 1860 Presidential election, the Alabama Legislature instructed Governor Andrew Moore to issue a proclamation for the election of delegates to a constitutional convention.[920] "Everywhere it was admitted that the most important question would be that of secession . . . . If Alabama were to become a sovereign and independent state or a member of a new union, [the] convention [would need to] revise Alabama's constitution."[921]   The delegates to the 1861 Constitutional Convention drafted and approved an ordinance dissolving "the Union between the State of Alabama and other States united under the compact styled 'The Constitution of the United States of America.'"[922]   The ordinance of secession was incorporated into the 1861 Constitution, along with another one ratifying the Constitution of the newly-formed "Confederate

---

*History of a Deep South State* 227 (Tuscaloosa:  The University of Alabama Press 1994) ("**Rogers & Ward II**").

[919] Horace Mann Bond, *Negro Education in Alabama:  A Study in Cotton and Steel* 8 (Tuscaloosa:  University of Alabama Press 1994) (1939) ("**Bond**") (citation omitted).

[920] Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901: A Study in Politics, the Negro, and Sectionalism* 76 (Chapel Hill:  University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Co. 1978) ("**McMillan**"); *see also* Fleming, at 28 ("The proclamation, ordering an election on Christmas Eve and the assembly of the convention at Montgomery, on January 7, 1861, was issued on December 6, the day after the choice of Lincoln by the electors.").

[921] McMillan, at 77 (bracketed alterations supplied).

[922] Ala. Const. Ordinance 1 (Jan. 11, 1861); *see also* McMillan, at 79-80; Fleming, at 37.

States of America" that "accomplished the task of adjusting Alabama to *the new situation.*"[923]   Several changes were made to the 1819 Constitution:  some cosmetic, but others reflecting more deeply-seated issues, such as a general distrust of the State's Legislature.[924]   The Secession Constitution became operable law on March 20, 1861, following its adoption by the convention, without a ratification election providing registered voters the opportunity to express opinions on the delegates' handiwork.[925] That Constitution, "like the 1819 Constitution, did not restrict the Legislature's plenary authority to regulate the funding and operation of public education."[926]

### 3.   The End of the Civil War and "Presidential" Reconstruction

> *The number of soldiers furnished by Alabama to the Confederate service will never be known.  The estimates range from 60,000, the number given by Col. M. V. Morre, in the Louisville* Evening Post *of May 30th, 1900, to 122,000 claimed by Governor Parsons in his proclamation of July, 1865.  Likewise the number of Alabama soldiers who lost their lives on the battlefield and from wounds, or from disease directly traceable to exposure in the army during the Confederate war will never be known.  We only know that Alabama soldiers were buried in every battle-field of importance east of the Mississippi, near every large hospital through the same extent of country, in all cemeteries of the war prisons of the North, and in every graveyard in this State. . . .*

---

[923] McMillan, at 80, 84 (emphasis supplied).

[924] *Id.* at 86-89 (detailing the differences between the 1819 and 1861 Alabama Constitutions); Fleming, at 50-53 (same).

[925] *See, e.g.*, McMillan, at 89.

[926] Doc. no. 242-1 ¶ 60 (Parties' Statement of Agreed Facts) ("**Agreed Facts**"); *see also* Flynt 1 Tr., at 40, 60; Agreed Facts ¶ 52; Deposition of J. Mills Thornton III from *Knight v. Alabama* (PX 682), at 16 ("**Thornton Depo**"); J. Mills Thornton III, *Politics and Power in a Slave Society: Alabama, 1800-1860* 12 (Baton Rouge:  Louisiana State University Press 1970) ("**Thornton I**"); McMillan, at 33-34.

L. D. Miller, *History of Alabama* 233 (Birmingham,
Ala.: Privately Printed 1901).

The period known as "Presidential Reconstruction" began shortly after General

Robert E. Lee surrendered the Army of Northern Virginia at Appomatox Courthouse.

As a result of Lincoln's assassination, Vice President Andrew Johnson became the

Seventeenth President of the United States, and assumed the task of "reconstructing"

the war-torn South.[927]  Prior to the outbreak of War, Johnson had been a United States

Senator from Greeneville, in the mountains of east Tennessee.  When his state seceded

in 1861, he was the only Southern Senator who refused to resign his seat and follow

his home state out of the Union.  He became the most prominent "War Democrat," and

supported Lincoln's military polices throughout the War.  Lincoln tapped Johnson as

his Vice-Presidential running mate on the "National Union Party" ticket for the 1864

election.  When he became Lincoln's unexpected successor, Johnson — emulating the

magnanimous spirit of the political mentor who had placed him in the position "to

bind up the nation's wounds, to care for him who shall have borne the battle and for

his widow and orphan, [and] to do all which may achieve and cherish a just and lasting

peace among ourselves and with all nations"[928] — hoped to pursue "a fairly congenial,

---

[927] Flynt 1 Tr., at 61.

[928] Lincoln's Second Inaugural Address, delivered on Saturday, Mar. 4, 1865 (last sent.).
Lincoln was assassinated 41 days later, on Good Friday, April 14, 1865.

easy reunion of the south [and] of the union.  He didn't want punitive actions."[929]

After the Union victory, the people of Alabama were without a legally recognized constitution.[930]   As part of his short-lived plan for Reconstruction, President Johnson organized a provisional government in the State, under which those persons willing to take an "amnesty oath" were allowed to regain their citizenship and the right to vote.[931]   The provisional governor, Lewis Parsons, called for a constitutional convention on July 20, 1865, in order to "take steps to restore Alabama to the union."[932]   As a condition for rejoining the Union, Alabama's new constitution needed to include provisions repealing the ordinance of secession, abolishing slavery,

---

[929] Flynt 1 Tr., at 61.

[930] Fleming, at 335 ("So the state after the war was in a condition of suspended animation, the so-called state governments were not governments in a constitutional sense . . . .").

[931] McMillan, at 90.  Fleming recorded that fourteen classes of people were excluded from the benefits of President Johnson's "amnesty oath," and that the following twelve classes affected persons living in Alabama:

> (1)The civil or diplomatic officers, or domestic or foreign agents of the Confederacy, (2) those who left judicial positions under the United States to aid the Confederacy; (3) all above the rank of colonel in the army and lieutenant in the navy, (4) those who left seats in the United States Congress and aided the Confederacy, (5) those who resigned commissions in the United States army and navy to escape service against the Confederacy, (6) persons who went abroad to aid the Confederacy in a private capacity, (7) graduates of the naval and military academies who were in the Confederate service, (8) the war governors of Confederate states; (9) those who left the United States to aid the Confederacy, (10) Confederate sailors (considered as pirates), (11) all in confinement as prisoners of war or for other offenses, (12) those who supported the Confederacy and whose taxable property was over $20,000.

Fleming, at 349.  Even those persons excluded under this list were allowed to apply for a pardon by President Johnson, nearly all of which he granted.  *See id.* at 356-57.

[932] McMillan, at 90; Fleming, at 351.

recognizing the legal rights of the recently-freed slaves, repudiating the State's war debt, providing for the election of state and federal officials, and making other changes necessary due to the abolition of slavery and defeat of the Confederate armies.[933] Significantly, however, Johnson's "Presidential Reconstruction" plan did not guarantee civil rights to the recently-freed slaves.[934]  Accordingly, the 1865 Alabama Constitution did not affirmatively provide political rights for the Freedmen, a fact that caused a great deal of criticism in the North.[935]   An article from the August 31, 1865 edition of the Huntsville *Advocate* is representative of the manner in which white Alabamians rationalized the failure to accord political rights to the former slaves:

> [W]e trust our people will look at things practically.  The Negro is free, and as a freeman the government will protect him in his legal rights.  It is our duty to ourselves to save ourselves from further loss and trouble, and to accord the Negro what secession and the war have secured to him.  *Legal rights and political privileges are essentially different.  He has been granted the former — not the later.*[936]

There was a widespread fear among the delegates to the 1865 Constitutional Convention that Congress would demand that the recently-freed slaves be allowed to

---

[933] McMillan, at 94.

[934] Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253), at 21 ("**Norrell Tr.**").

[935] McMillan, at 97; Rogers & Ward II, at 232 ("Without positively addressing the issue of full political rights for blacks, the convention managed to answer the matter with a sharp negative."); *id.* at 238 ("The constitutional convention of 1865 failed to make blacks equal before the law.").

[936] McMillan, at 97 (emphasis supplied) (citation omitted).

vote.[937]   In a balancing act, the delegates sought to meet the requirements for readmission to the Union, while also acting to protect the State's political process from the so-called "Negro threat."[938]   For example, "[f]earing Negro participation in the government, the convention struck from the declaration of rights of former Alabama constitutions the provision 'that all freemen, when they form a social compact, are equal in rights.'"[939]

For their part, the Black Belt representatives to the Convention fought to change the basis of apportionment from total *white* population to *total population,* in an effort to utilize the large numbers of recently-freed slaves in their counties for political gain.[940]   That attempt to use the Freedmen as a source of political power by the same class of persons who had led the State out of the Union and into a treasonous rebellion

___

[937] McMillan, at 102-03; *see also id.* at 106 ("A Negro mass meeting in Mobile petitioned the convention through the Freedmen's Bureau asking for 'the right of suffrage and other immunities of citizenship.'   The convention tabled the petition by a unanimous vote without discussion.") (citations omitted).

> The press of the state and delegates to the convention many times expressed their fear of Negro suffrage.   The Montgomery *Advertiser*, September 30, 1865, declared that 'the sympathy which the black skin is exciting [in the North] in behalf of the man who wears it is leading evil thinking men to open a path to the halls of legislation for them.

*Id.* at 106 n.101; Fleming, at 352 (noting that Johnson, who "made it clear that he was the source of all authority" in the reconstruction movement likely did not support Negro suffrage, nor did he even suggest it).

[938] *See* McMillan, at 103.

[939] *Id.*

[940] *Id.* at 104-05; Fleming, at 364-65.

that exacted a terrible toll on the blood and treasure of Alabama met vehement opposition, particularly from north Alabamians.  As an editorial in the Huntsville *Advocate* illustrates, white citizens in the northern tier of counties maintained an attitude that  it was "a white man's government and a white man's state and the counties must have representation according to their white inhabitants."[941]  Beyond such racist proclivities, some of the more politically-astute citizens feared that counting blacks for purposes of apportionment, but not allowing them to vote, might provoke the Republican-dominated Congress into requiring black suffrage.[942]

Ultimately, the delegates to the 1865 Constitutional Convention, by a close vote, again based apportionment upon total *white* population.[943]  Thus, the

> "white" counties had defeated the "black" counties in the first test of strength after the Civil War.  However, this was to mean very little as the Johnson government was soon to be replaced by one set up under Congressional Reconstruction, which not only would count the Negro in the basis of representation, but turn the government over to him and his allies.[944]

The 1865 convention, and the resulting constitution, met President Johnson's

---

[941] McMillan, at 104 (citations omitted); Rogers & Ward II, at 232.

[942] McMillan, at 104 (citation omitted).

[943] *See* Ala. Const. of 1865, art. IV, § 6; *see also* Fleming, at 365 ("This measure destroyed at a blow the political power of the Black Belt, and had the Johnson government survived, the state would have been ruled by the white counties instead of by the black counties."); Rogers & Ward II, at 232 (noting that the basis for apportionment was "a solid foundation for the Huntsville *Advocate*'s assertion that 'this is a white man's government and a white man's state'").

[944] McMillan, at 105.

terms.   With regard to the issues raised in this case, the 1865 Presidential Reconstruction Constitution retained the education and taxation provisions of the 1819 and 1861 Constitutions.  "Those Constitutions . . . did not restrict the Legislature's plenary authority to regulate the funding and operation of public education."[945] The 1865 Constitution gradually was put into effect, but it never became more than a provisional charter of state government.[946]

### 4.   Congressional, or "Radical," Reconstruction

In December of 1865, the United States Congress refused to seat the representatives and senators who had been elected by the people of Alabama under President Johnson's provisional government.[947]   Unlike Lincoln and Johnson, the Republicans who controlled Congress wanted a punitive reconstruction; in view of the terrible toll in death and treasure as a result of the War, they, quite understandably, "wanted to punish the south and the Democratic Party, of which the south was the seedbed and the heart."[948]

To many Northerners *the trouble with Johnson's plan was basic:*

---

[945] Agreed Facts ¶ 60; *see also* Flynt 1 Tr., at 60; Thornton Depo, at 33-34.

[946] Fleming, at 377 ("The state governments were recognized as provisional only, and for a year or more Congress was occupied in the fight with the President over Reconstruction.  The consequence was that [the governor] became provisional governor of a territory and not the constitutional governor of a state.").

[947] McMillan, at 110; Rogers & Ward II, at 233.

[948] Flynt 1 Tr., at 61.

*it had not changed anything*.  Unrepentant rebels still held sway in the South, loyal Unionists were proscribed, and the black man merely exchanged one form of slavery for another and remained at best only half a citizen.  This view raised the question of what the war was supposed to have accomplished.  If it had been intended to reconstitute the South in the image of a more democratic north, or to place political power in the hands of the loyal common man . . . then *plainly it had failed*.[949]

Several legislative acts demonstrate precisely how ineffectual Presidential Reconstruction had been for the Freedmen.  The Alabama Legislature passed a series of laws in 1866 for the purpose of circumventing black freedom:  the so-called "Black Codes" discussed in Part I(D)(7), *supra*.  Under one such law, black citizens were subject to arrest, imprisonment, and significant fines for ill-defined misconduct.[950]  Once imprisoned, the arrested individual could be advertised publicly and "hired out" for labor.[951]  Another law provided that children of former slaves who were orphaned, or whose parents were unable to support them, could be placed in the care and custody of their former masters.[952]  The Legislature, under Governor Robert Patterson, "did notable work in enacting what became known in the North as 'Black Codes,' for the regulation and control of Negro labor."[953]

---

[949] Rogers & Ward II, at 233 (emphasis supplied).

[950] *Id.* at 238.

[951] *Id.*

[952] *Id.*

[953] Horace Mann Bond, *Negro Education in Alabama:  A Study in Cotton and Steel* 63 (Tuscaloosa:  University of Alabama Press 1994) (1939) ("**Bond**").

The ultimate demonstration of the provisional government's contempt for the outcome of the Civil War and the emancipation of the slaves, however, was the State Legislature's 1866 refusal to ratify the Fourteenth Amendment, which provided, in part, that "No State shall . . . deprive *any person* of life, liberty, or property, without due process of law; nor deny to *any person* within its jurisdiction the equal protection of the laws."[954]

In an effort to curb the South's continued resistance to recognition of the privileges, immunities, and civil rights of citizenship for the recently-freed slaves, Congress passed the Civil Rights Act of 1866.[955] Later, with the "First Reconstruction Act" of March 2, 1867,[956] Congress invalidated President Johnson's Reconstruction plan and anything that had been done pursuant to its terms.[957] The Act declared that

---

[954] U.S. Const. amend. XIV, § 1 (1868) (emphasis supplied); *see also* Bond, at 63-64; Douglas H. Bryant, *Unorthodox and Paradox:  Revisiting the Ratification of the Fourteenth Amendment*, 53 Ala. L. Rev. 555, 564 n.87 (2002).

[955] *See* Ch. 31, 14 Stat. 27 (1866) (now codified *as amended* at 42 U.S.C. §§ 1981-1986).

> The measure was an obvious rebuttal to the Southern black codes.  It provided that persons born in the United States were citizens and that such persons 'of every race and color' had the right to give evidence in the courts, hold property, and receive equal benefits of the laws.  Denial of a person's equal rights was punishable by fine and imprisonment on conviction in federal court.

Rogers & Ward II, at 241.  For a full discussion of the provisions and history of the Act, *see* Robert J. Kaczorowski, *The Enforcement Provisions of the Civil Rights Act of 1866:  A Legislative History in Light of* Runyon v. McCrary, 98 Yale L. J. 565 (1989).

[956] First Reconstruction Act of 1867, ch. 153, 14 Stat. 428 (1867) ("**1st Reconst. Act**").

[957] McMillan, at 110.

"no legal State governments or adequate protection for life or property [existed] in the rebel States . . . ."[958]   The result was, once again, a provisional state government, an invalid constitution, and martial law.[959]   Federal soldiers were directed to ensure that there was no distinction between the races with regard to property rights or as persons.[960]

Under "Congressional Reconstruction," the rebellious states that led the Nation into Civil War would be readmitted to the Union only after:   disfranchising those disloyal whites excluded by the terms of the recently-proposed Fourteenth Amendment from exercising the franchise or holding public office;[961] providing voting rights to

---

[958] 1st Reconst. Act, at pmbl.

> Whereas no legal State governments or adequate protection for life or property now exists in the rebel States of Virginia, North Carolina, South Carolina, Georgia, Mississippi, Alabama, Louisiana, Florida, Texas, and Arkansas; and whereas it is necessary that peace and good order should be enforced in said States until loyal and republican State governments can be legally established . . . .

*Id.*

[959] Norrell Tr., at 21; McMillan, at 110.

[960] Norrell Tr., at 21; Fleming, at 475; Rogers & Ward II, at 234-35.

[961] The third section of the Amendment as ratified in 1868 provides that:

> Section 3. No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may, by a vote of two-thirds of each House, remove such disability.

black Freedmen;  ratifying a new state constitution framed by a convention of delegates elected by male citizens, *without regard to the voter's* "race, color, or previous condition of servitude"; obtaining Congressional approval of the constitution so drafted; and, ratifying the Fourteenth Amendment.[962]   In other words, Alabama had to choose between remaining in a limbo somewhere between territorial status and full statehood, in which its citizens were controlled by a provisional government under military occupation and martial law, or disfranchising many traitorous white citizens (former Confederate soldiers or officials in the Confederate government) while simultaneously allowing former slaves the right to vote, along with other civil rights.[963]  Sadly, most white Alabamians preferred to be ruled under the saber of an occupational army, than to grant civil liberties and political rights to the recently-freed slaves.[964]  That preference was a harbinger of worse things to come.

### a.    The movement toward the 1868 Constitution

As a result of the recalcitrant attitude of unreconstructed Southern whites, Congress passed the "Second Reconstruction Act" on March 23, 1867, essentially in

---

U.S. Const. amend. XIV, § 3 (1868).

[962] *See* 1st Reconst. Act § 5; *see also* Fleming, at 473-74.

[963] *See* Fleming, at 474 ("The act of March 2 did not provide for forcing Reconstruction upon the people.  If they wanted it, they might initiate it through the provisional governments, or if they preferred, they might remain under martial law.").

[964] *Id.*

486

order to force rebellious Southern states like Alabama to take those actions that were

conditions precedent to reunification.[965]   Under that Act, the Commanding General of

each military district was directed to "cause a registration" of those adult males willing

to swear a new loyalty oath:  an oath that was *far* more demanding than the "amnesty

oath" crafted by President Johnson.[966]   Afterwards, the Commanding General was

---

[965] *See* Second Reconstruction Act of 1867, ch. 6, 15 Stat. 2 (1867) ("**2d Reconst. Act**").

[966] *Id.* § 1.  The so-called "iron-clad oath" required by the Second Reconstruction Act read as follows:

> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That before the first day of September, eighteen hundred and sixty-seven, the commanding general in each district defined by an act entitled "An act to provide for the more efficient government of the rebel States," passed March second, eighteen hundred and sixty-seven, shall cause a registration to be made of the male citizens of the United States, twenty-one years of age and upwards, resident in each county or parish in the State or States included in his district, which registration shall include only those persons who are qualified to vote for delegates by the act aforesaid, and who shall have taken and subscribed the following oath or affirmation:  "I, _____, do solemnly swear (or affirm), in the presence of Almighty God, that I am a citizen of the State of _____; that I have resided in said State for _____ months next preceding this day, and now reside in the county of _____ or the parish of _____, in said State (as the case may be); that I am twenty-one years old; *that I have not been disfranchised for participation in any rebellion or civil war against the United States, nor for felony committed against the laws of any State or of the United States; that I have never been a member of any State legislature, nor held any executive or judicial office in any State and afterwards engaged in insurrection or rebellion against the United States, or given aid or comfort to the enemies thereof; that I have never taken an oath as a member of Congress of the United States, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, and afterwards engaged in insurrection or rebellion against the United States, or given aid or comfort to the enemies thereof; that I will faithfully support the Constitution and obey the laws of the United States, and will to the best of my ability, encourage others so to do, so help me God"* which oath or affirmation may be administered by any registering officer.

directed to order an election for delegates to a constitutional convention.[967]

The oath requirement disfranchised many whites.[968]  Many of those who were not disfranchised, nevertheless, "chose not to participate . . . because they believed that the federally-mandated government under congressional reconstruction in Alabama was illegitimate."[969]  Representation for electing delegates to create a new constitution was based upon the number of registered voters, and since more blacks were able to register, and *did* register, the black counties had more representation at the convention than the white counties.[970]  According to the July 13, 1867 edition of the Montgomery *Daily Star Sentinel*, those counties in which blacks constituted a majority of the registered voters were positioned to elect 48 of the 100 delegates to the constitution.[971]

---

*Id.* (emphasis supplied); *see also* Fleming, at 474-75.

[967] 2d Reconst. Act § 4; *see also* Fleming, at 475.

[968] Norrell Tr., at 21.

[969] *Id.* at 21-22.

When registration in 1867 was complete the figures showed that 61,295 whites and 104,418 blacks had registered.  If whites had registered in proportion to their total population at the same rate of black registrations, 114,704 would have qualified to vote.  Whatever the debatable assumption, perhaps as many as 53,409 whites did not register — either because they made no effort to register or because they were rejected and disfranchised for wartime activity.

Rogers & Ward II, at 244; *see also* McMillan, at 152-53 ("Many of the whites were disfranchised and many others felt that it was useless to oppose the Radicals.").

[970] McMillan, at 113.

[971] *See id.* at 113 n.17.  *But see* Fleming, at 514 ("Of the 65 counties in Alabama, 22 had negro majorities (according to the registration) and had 52 delegates of the 100 total . . . .") (citation omitted).

488

Due to the demanding Congressional oath requirement and the refusal by many whites to participate, the delegates to the 1867 Constitutional Convention consisted mainly of carpetbaggers,[972] scalawags,[973] and recently-freed slaves.[974]  The group was vilified by the pejorative adjective "radicals."  In an ironic twist of fate that only the Freedmen, abolitionists, and historians enjoyed, the Black Belt — the former power base of slavery, secession, and rebellion — was represented in large part by the recently-freed slaves, men who were populous in that region.[975]  Even so, and despite the fact that many blacks were delegates to the convention,[976] the sad fact is that "[a]ll

---

[972] For a discussion of the term "carpetbagger," *see* Part I(C)(3), *supra.*

[973] For a discussion of the term "scalawag," *see* Part I(C)(4), *supra.*

[974] Flynt 1 Tr., at 40, 64; *see also* Jackson, at 62; Wayne Flynt, *Alabama in the Twentieth Century* 4 (Tuscaloosa:  The University of Alabama Press 2004) ("**Flynt II**"), at 1.  As Dr. Jackson facetiously wrote:

> And then there were the carpetbaggers.  These were men who, according to tradition, arrived from the North with all they owned stuffed into a carpetbag, Republicans come to exploit white and black alike, steal what they could and make off with the loot one jump ahead of the law.  Allied with scalawags and renegade blacks, they descended on the prostrate South like a biblical plague of locusts.  Once blacks got the franchise, carpetbaggers stole or bought their votes, got elected, raised taxes, forced the sale of farms and plantations, filled their pockets from the treasury, and drove the state near to bankruptcy.  Carpetbaggers, scalawags, and their black allies — Alabama's evil trinity.

Jackson, at 109.

[975] Flynt 1 Tr., at 64-65.

[976] *See id.* at 64; Rogers & Ward II, at 245; Fleming, at 517 (stating that there were eighteen blacks at the convention, but also noting that there "is doubt about four or five men, whether they were black or white").

> There was a total membership of one hundred persons in the Convention.  The number of Negroes and "carpetbaggers" reported as members of the Convention

489

of the important offices were given to whites."[977]

### b.    The 1868 "Radical Reconstruction" Constitution

The Convention delegates assembled in Montgomery on November 5, 1867.[978]
"The most important constitutional question before the convention was that of the
franchise. . . . [S]ince the Reconstruction acts had made Negro suffrage a prerequisite
for [re-]admission to the Union and had disfranchised certain whites, the real issue in
the convention was the disfranchisement of *more whites*."[979]  Some whites feared (with
a certain degree of prescience, as it turned out) that Black Belt whites would
manipulate the black electorate and thereby regain control of their counties.[980]
Nevertheless, the delegates recognized that they had no choice other than that of

---

varies with the sympathies of the individual describing it.  One partisan Democratic
source stated that there were twenty-six Negroes.  A Republican newspaper
correspondent reported that there were seventeen.  A Republican member of the
Convention, forty years after it was held, stated that the number of Negroes had been
exaggerated, and that he could remember not more than twelve.  Fleming states that
"the lists differ," but gives the names of twenty-two Negroes in one connection while
stating elsewhere that there were eighteen blacks.

Bond, at 65.

[977] McMillan, at 123 (citation omitted).

[978] *See*, *e.g.*, Agreed Facts ¶ 62.

[979] *Id.* (emphasis and bracketed alterations supplied) (internal quotation marks omitted)
(ellipses in original).

[980] *Id.*; *see also* McMillan, at 126-27 ("The Scalawags, who as a group were bitterly opposed
to political and social equality of Negroes with whites, and feared the use of the Negro vote by Black
Belt leaders (Carpetbaggers or Conservatives), did not oppose Negro suffrage because they realized
that for the present Negro suffrage was the price of readmission.").

490

affirmatively providing voting rights for blacks in the new constitution.[981]    Quite

simply, "Negro suffrage . . . was the price of readmission."[982]    As for the disloyal

leaders of the former rebellion, the 1868 Constitution disfranchised those who fell into

the following categories:

> It shall be the duty of the General Assembly to provide, from time
> to time, for the registration of all electors; *but the following classes of
> persons shall not be permitted to register, vote or hold office*:   **1st**,
> Those, who, during the late rebellion, inflicted, or caused to be inflicted,
> any cruel or unusual punishment upon any soldier, sailor, marine,
> employee or citizen of the United States, or who, in any other way,
> violated the rules of civilized warfare.    **2d**, Those who may be
> disqualified from holding office by the proposed amendment to
> the Constitution of the United States, known as "Article XIV," and those
> who have been disqualified from registering to vote for delegates to the
> Convention to frame a Constitution for the State of Alabama, under the
> act of Congress, "to provide for the more efficient government of the
> rebel States," passed by Congress March 2, 1867, and the act
> supplementary thereto, except such persons as aided in the reconstruction
> proposed by Congress, and accept the political equality of all men before
> the law:   Provided, That the General Assembly shall have power to
> remove the disabilities incurred under this clause.    **3d**, Those who shall
> have been convicted of treason, embezzlement of public funds,
> malfeasance in office, crime punishable by law with imprisonment in the
> penitentiary, or bribery.    **4th**, Those who are idiots or insane.[983]

The 1868 Constitution provided for the *civil* and *political* equality of the former

slaves, but the idea of *social equality* between whites and blacks was rejected.[984]    The

---

[981] Agreed Facts ¶ 62.

[982] McMillan, at 127.

[983] Ala. Const. of 1868, art. VII, § 3 (emphasis supplied).

[984] McMillan, at 134-36 (detailing the "bitter controversy [that] arose when the Carpetbaggers

491

Constitution

> incorporated the classic phrase of the Declaration of Independence, "all
> men are created equal" into Alabama's bill of rights and declared that all
> citizens have "equal civil and political rights and public privileges."  The
> convention readopted the clauses abolishing slavery in the Constitution
> of 1865.  No property qualification had ever been required to hold office
> in Alabama but the committee deemed it wise in order to protect the
> freedmen to declare that for the future "no property qualification shall be
> necessary to the election to, or the holding of any office in this state."[985]

Unlike the 1865 Constitution, there was no provision in the 1868 document
requiring the Legislature to outlaw interracial marriage.[986]  The state militia was not
segregated.[987]  The requirement that only white men be permitted to hold legislative
office was abolished.[988]  State election dates were changed to coincide with federal
election dates, for the purpose of allowing federal officials to supervise the polls and
protect black voters.[989]  Significantly, not even segregation of the public schools was

---

and Negroes attempted to write into the bill of rights a guarantee in favor of equal rights for Negroes
on common carriers and in public places," and that it was opposed on the grounds that such a
provision would go too far in attempting to "grant[] the Negro social rather than political equality");
Rogers & Ward II, at 245 (noting that social equality for blacks was not accomplished in the 1868
constitution); Fleming, at 522-23 (noting that social equality for African-Americans was not the goal
of most delegates).

[985] McMillan, at 134.

[986] *Id.* at 139; *see also* Fleming, at 521-22 (noting that a report proposing to "prohibit
intermarriage to the fourth generation" was not adopted).

[987] McMillan, at 146.

[988] *Id.* at 136.

[989] *Id.* at 138 ("In order to insure federal control of state elections, the convention abolished
the old state election day (the first Monday in August) and provided that state elections be held with
federal election on Tuesday after the first Monday in November.") (citation omitted).

mandated by the 1868 Constitution.[990]

In fact, public education was the second most pressing issue at the Convention, second only to the question of the franchise.[991]  Blacks then constituted at least forty-six percent of the population of Alabama.[992]  In 1867, therefore, the delegates were faced with the daunting challenge of educating not only the state's white children, but its numerous black children (and illiterate black adults) as well.  Education for more than twice the number of students enrolled in schools under the Public Schools Act of 1854 needed to be provided for in the 1868 Constitution.[993]  For the first time, a body of constitutional delegates sought not only to "encourage" education in the state, but also to establish an efficient school system that they viewed as "desperately needed

---

[990] *Id.* at 145; *see also* Fleming, at 522; Bond, at 93 ("[T]he Negro members stated that they wished the issue of separate schools left out of the Constitution because, while they did not want to send their children to school with white children, the threat of mixed schools would remove the temptation from future officials to maintain inferior schools for Negroes.").

[991] Agreed Facts ¶ 63.

[992] Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257), at 71 ( "**Flynt 1 Tr.**").

[993] *Id.* at 70.

Q:     And so now you have got a centralized state education system delivering services, educational services to, what twice the number of students as before, or even more than that?

A:     It's even more than that, because it's not only you go from 0 to 40-some-odd thousand African-Americans immediately who are in public schools.  But the number of whites going to public schools goes up because there are now schools in their neighborhood.  And so it's an increase in both.

*Id.*

493

to educate the new electorate": *i.e.*, the Freedmen.[994]

### *i.*    The State Board of Education

"[T]he article on education in 1868 broke with the past both in regard to the administrative system and the large amount of funds allocated to schools."[995]  The 1868 Constitution provided for a state board of education, a centralized bureaucracy which was vested with *legislative powers* to regulate all matters relating to education in the state.[996]  As Mills Thornton testified, the

> state board of education [consisted of] . . . one member from each congressional district plus an elected state superintendent of education who presided, and it gave it legislative authority.  It passed . . . acts to regulate the entire structure of education.  The acts, in effect, were statutes.  That is to say, . . . once adopted by the board of education, they were submitted to the Governor for his signature.  If the Governor vetoed the act, then [it] could be re-passed over his veto by a vote of two-thirds of the board of education.  But the [State] board of education, in effect, [was] *acting as a sort of separate legislature whose authority* [was]

---

[994] Agreed Facts ¶ 63.

The *Mobile Nationalist*, organ of the Republican party in Mobile, declared that "the point that the Republican party is a unit upon is that every child in the state must and shall have an opportunity to acquire an education."  "Proper powers must be conferred on the legislature [argued the Montgomery *Daily State Sentinel*] to not only enable but to force that body to establish a thorough system of public education in the state."

McMillan, at 143 (citation omitted).

[995] Agreed Facts ¶ 63 (internal quotation marks omitted); *see also* Thornton Depo, at 34-35.

[996] Flynt 1 Tr., at 69-70; *see also* Report of Dr. Robert Norrell (PX 4), at 2 ("**Norrell Report**"); Thornton Depo, at 34-36 (Under the terms of the 1868 Constitution, "the entire educational system . . . from first grade all the way up through the university was under this single centralized state control[ed] body.").

494

*confined to educational . . . matters.  And the only role that the state legislature* ha[d] *in this is that by affirmative statute it* [could] *overrule a statute of the board of education, but otherwise, the statutes of the board of education . . .* [had] *the force of binding law.*[997]

### ii.    Increased taxation for public schools

Taxes were increased "significantly in order to fund education both for whites and newly emancipated blacks."[998]  The 1868 Constitution required that all property be assessed on a uniform *ad valorem* basis.[999]  It contained a number of earmarks, providing for certain revenue to be raised exclusively for the purposes of funding public education.[1000]  "[A]ll federal lands granted for education purposes, as well as

---

[997] Thornton Depo, at 34-35 (emphasis and bracketed alterations added); *see also* Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901:  A Study in Politics, the Negro, and Sectionalism* 144 (Chapel Hill:  University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Co. 1978) ("**McMillan**").

[998] Flynt Report, at 1.

[999] Ala. Const. of 1868, art. IX, § 1 ("All taxes levied on property in this state, shall be assessed in exact proportion to the value of such property:  Provided, however, That the General Assembly may levy a poll tax not to exceed one dollar and fifty cents on each poll, which shall be applied exclusively in aid of the public school fund.").

[1000] *See* Ala. Const. of 1868, art. XI, §§ 10-13.

> Section 10. The proceeds of all lands that have been or may be granted by the United States to the State for educational purposes; of the swamp lands; and of all lands or other property given by individuals or appropriated by the state for like purposes; and of all estates of deceased persons who have died without leaving a will or heir; and all moneys which may be paid as an equivalent for exemption from military duty, shall be and remain a perpetual fund, which may be increased but not diminished, and the interest and income of which, together with the rents of all such lands as may remain unsold, and such other means, as the General Assembly may provide, shall be inviolably appropriated to educational purposes, and to no other purpose whatever.

> Section 11. In addition to the amount accruing from the above sources,

495

a tax levied on industrial and commercial corporations, were earmarked for education."[1001]  The Legislature was vested with the power to authorize a state poll tax to produce revenues exclusively for education.[1002]  Local school districts could levy a poll tax for education funding.  Additionally, a *minimum* of one-fifth (twenty percent) of the *aggregate annual revenue of the State* was *exclusively devoted* to the maintenance of public schools.[1003]  Dr. Malcolm Cook McMillan later observed that the 1868 Constitution's Education Article, including the "large amount of revenue earmarked for education," was "the result of a sincere attempt to give the state a good public school system."[1004]

---

one-fifth of the aggregate annual revenue of the State shall be devoted exclusively to the maintenance of public schools.

Section 12. The General Assembly may give power to the authorities of the school districts to levy a poll tax on the inhabitants of the district in aid of the general school fund, and for no other purpose.

Section 13. The General Assembly shall levy a specific annual tax upon all Rail Road, Navigation, Banking, and Insurance corporations, and upon all Insurance and Foreign Bank and Exchange Agencies, and upon the profits of foreign bank bills issued in this State by any corporation, partnership or persons, which shall be exclusively devoted to the maintenance of public schools.

*Id.*

[1001]  Doc. no. 242-1 ¶ 67 (Parties' Statement of Agreed Facts) ("**Agreed Facts**"); *see also* McMillan, at 144.

[1002]  Agreed Facts ¶ 67; *see also* McMillan, at 144.

[1003]  Deposition of J. Mills Thornton III from *Knight v. Alabama* (PX 682), at 36 ("The 1867 Constitution required the legislature to appropriate at least 20 percent of the total revenues it received in every year to the public schools.") ("**Thornton Depo**"); *see also* McMillan, at 144.

[1004]  McMillan, at 145.

It was not the fault of members of the convention that continued economic depression, the disorganized condition of society following the war, and the incompetence and mismanagement of some school officials prevented the organization of a good public school system on the basis of the education article.[1005]

Significantly, however, the 1868 Constitution also contained "[t]he first limit on taxation to be found in any Alabama constitution, [a provision that] forbade the legislature to give any municipal corporation the right to 'levy a tax on real and personal property to a greater extent than *two percentum* of the *assessed value* of such property.'"[1006]

Also for the first time, and of great significance for subsequent events, the basis of representation in the state legislature was based upon the whole number of inhabitants.[1007]  Of course, that was a departure from the three previous constitutions, each of which had based apportionment on the number of white inhabitants.  The delegates understood "full well that it was an inevitable result of the abolition of slavery and the extension of the franchise to the Negro."[1008]

---

[1005] *Id.* at 145-46.

[1006] *Id.* at 137 (emphasis supplied, citation omitted) quoting Ala. Const. of 1868, art. VI, § 36 ("The General Assembly shall not have power to authorize any municipal corporation to pass any laws contrary to the general laws of the State, nor to levy a tax on real and personal property to a greater extent than two per centum of the assessed value of such property."); Agreed Facts ¶ 68.  It is important to note that, at that time, the "appraised" and "assessed" values were the same, because all property was assessed at 100% of its cash or fair market value.

[1007] McMillan, at 136.

[1008] *Id.*

497

c.     **The ratification campaign**

The proposed constitution was submitted to the people for consideration at an election scheduled to occur on February 4, 1868.  "Conservative" white opponents conspired on a scheme designed to defeat ratification by focusing on a term of the Second Reconstruction Act that was, to say the least, *unusual.*  The term specified that the proposed constitution would be deemed ratified *only if* two conditions were satisfied:  *first*, at least one-half of *all registered voters* were required to participate in the referendum; and *second*, at least one-half of *all registered voters* had to vote in favor of ratification.[1009]  Accordingly, whites opposed to ratification of the proposed constitution urged those of a like mind to *refrain from voting.*[1010]  Dr. McMillan quoted an "open letter to the people of Alabama" signed by eighty-two prominent citizens, including ex-governors, ex-United States representatives and senators, lawyers, judges, and editors, and stating the signatories' reasons for urging such a course of action:

---

[1009] 2d Reconst. Act § 5.  As McMillan observed, "[t]he Second Reconstruction Act also required that 'at least half of all the registered voters' *participate* in the election[, a requirement] which seems meaningless *since a majority of all registered voters was required for adoption*." McMillan, at 154 n.19 (emphasis supplied).

[1010] McMillan, at 155-56; *see also* "Part Two:  From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* 254 (Tuscaloosa:  The University of Alabama Press 1994) ("**Rogers & Ward II**"), at 244 (noting that whites utilized the strategy of registering to vote but not voting to undermine the ratification).

By the law of Congress as its now stands, a majority of the state must vote in the election, or the constitution is not adopted.  There are about 167,000 registered voters in the State, so that it will require 84,000 votes to adopt the constitution.

We would not, under the unfair influences arrayed against us, reasonably hope to secure more than 84,000 votes against the Constitution, and unless we do we would not accomplish more by voting than we would by refraining to vote.  Then the most certain way of defeating the Constitution as the law now stands is to refrain from voting. . . .[1011]

The strategy worked, at least initially.  When the election results were tallied, a total of 71,817 persons had cast ballots, of whom 70,812 voted in favor of ratification and 1,005 against.[1012]  Thus,

[n]either requirement of the Reconstruction Act had been met.  Since half the registered voters had not participated, obviously the constitution did not secure the sanction of a majority of the registered voters. . . .  The Conservatives had carried out their policy of not voting with great thoroughness.  The bulk of the votes for the constitution came from the "black counties."  Some 62,089 Negroes voted for the constitution and 105 against it.  In a report to Congress, General George Meade,[1013] who had replaced General John Pope as commander of the Third Military District, declared that the constitution had failed under the law because 8,114 more voters would have had to participate in the election to

---

[1011] McMillan, at 155 (citations omitted); *see also* Bond at 66-67 ("The Conservatives adopted the strategy of defeating the Constitution by refraining from voting, since the Enabling Act passed by Congress provided that the Constitution should not be declared in force until passed upon by a majority of registered voters."); Walter L. Fleming, Civil War and Reconstruction in Alabama 538-39 (New York:  The Columbia University Press 1905) ("**Fleming**") (stating that there were approximately 170,000 registered voters, requiring 85,000 votes to secure ratification).

[1012] McMillan, at 169; *see also* Fleming, at 541.

[1013] General George Meade is best known for his command of the Army of the Potomac at Gettysburg.

constitute a majority of the registered voters.[1014]

General George Meade recommended that Congress reassemble the convention, to reconsider and eliminate the document's "objectionable features," and submit the revised charter to another referedum.  "However, as he afterwards stated, 'my advice was not followed.'"[1015]  Instead, Congress enacted the "Fourth Reconstruction Act" on March 11, 1868.[1016]  Dr. McMillan best summarized that Act and subsequent events:

> It [the Fourth Reconstruction Act] provided for adoption of the constitution by a "majority of those voting" only.  As only Alabama's ratification election had been held under the old law, the bitter issue arose between Congressional Radicals and the Democratic minority as to whether Congress should apply the new law retroactively to Alabama.  William D. "Pig Iron" Kelley, a spokesman for Northern industrialists, worked unceasingly for the readmission of Alabama despite the law.  Kelley had recently prospected in the state in the interest of Pennsylvania iron manufacturers.  He wanted the readmission of Alabama in order that the state might be properly developed industrially under a Republican administration.   On March 10, 1868, Thaddeus Stevens, Kelley's colleague from Pennsylvania and chairman of the Committee on Reconstruction in the House, reported a bill for the admission of Alabama.
>
> . . .
>
> The Democrats on the committee submitted a minority report, which declared that the "registered voters, believing they had the right to defeat a constitution so objectionable as this in either of the ways

---

[1014] McMillan, at 169 (citations omitted).

[1015] Fleming, at 544.

[1016] Fourth Reconstruction Act of Mar. 11, 1868, 15 Stat. 11 (1868); *see also* McMillan, at 171-72.

provided in the aforesaid act, and relying on their own and the good faith of Congress in this behalf," had legally defeated the Constitution.  If Congress should disregard the law under which the Alabama election was held, it would commit an unparalleled breach of faith and a violation of a contract, the minority report declared.

As the debate continued on the admission of Alabama, even Thaddeus Stevens hesitated to admit Alabama under the circumstances. He declared that "after a full examination of the final returns from Alabama, which we had not received when the bill was drawn, I am satisfied, for one, that to force a vote on this bill and admit the state against our own law, where there is a difference of twenty odd thousand, would not be doing such justice in legislation as will be expected by the people.  *As a result, his bill to admit Alabama was withdrawn*.

*Instead the House passed a bill setting up a provisional government for Alabama.  The rejected constitution would be used as a basis for a state government*, and the candidates already elected under it would take office.  The first legislature was to submit the constitution (with or without amendments) to a vote of the people.  When the constitution had been accepted by a majority of those voting, and the legislature had ratified the Fourteenth Amendment, Alabama would be readmitted into the Union.  *Until that time Alabama would not be represented in Congress*.

*The proposal to establish a Radical provisional government in Alabama did not pass the Senate*, and [President] Johnson's [impeachment] trial held up the consideration of the admission of Alabama.  In the meantime other Southern states adopted constitutions by a "majority of those voting." *The House then passed a bill introduced by Thaddeus Stevens for the admission of Georgia, Louisiana, North Carolina, South Carolina, **and Alabama***.  The judiciary committee in the Senate in reporting the House bill struck Alabama from the list because "the election on the ratification of the constitution in Alabama took place when the law required that a majority of all the registered voters should vote on the question of ratification." *However, Alabama was again included among the states for readmission by amendment from the floor*.

501

*Senator John Sherman, who led the fight for the readmission of Alabama in the Senate, argued that Alabama ought to be admitted because of* frauds in the election, the necessity for the immediate ratification of the Fourteenth Amendment, *and the Republican party's need for Alabama's electoral vote in November, 1868*.  And, furthermore, he said rejection would force anarchy and lawlessness on the State.  Others argued that congress should follow the "spirit rather than the letter of the law."  In June, 1868, the bill easily passed the Senate as it had the House, was vetoed by President Johnson and carried over his veto.  In stating his reasons for the veto, the President cited the case of Alabama, and declared the bill a violation of "the plighted faith of Congress by forcing upon that state a constitution which was rejected by the people, according to the express terms of an act of congress requiring that a majority of the registered electors should vote upon the question of ratification."  Alabama, as soon as its new legislature ratified the Fourteenth Amendment, would be readmitted to the Union.

*The conservatives had been forced back into the Union under a Radical state government, when they much preferred continued military rule.  But Congressional ruthlessness in dealing with Alabama, further enabled the Conservatives, once they were back in control in 1874, to discredit the Radical Convention and Constitution*.  "The constitution of 1868 [said an Address to the people by the framers of the Constitution of 1875] was not the work of the people of Alabama.  It is the offspring of usurpation, and the contrivance of unscrupulous adventurers, inflicted upon our people after they had solemnly rejected it."[1017]

### d. Alabama under the 1868 "Radical Reconstruction" Constitution

*During the whole of the Reconstruction period our people throughout the South looked to the Federal Government for everything, very much as a child looks to its mother.  This was not unnatural.  The central government gave them freedom, and the whole Nation had been enriched for more than two centuries by the labour*

---

[1017] McMillan, at 171-74 (footnotes omitted, all emphasis and the first three bracketed alterations added).

*of the Negro. Even as a youth, and later in manhood, I had the feeling that it was cruelly wrong in the central government, at the beginning of our freedom, to fail to make some provision for the general education of our people in addition to what the states might do, so that the people would be the better prepared for the duties of citizenship.*

*It is easy to find fault, to remark what might have been done, and perhaps, after all, and under all the circumstances, those in charge of the conduct of affairs did the only thing that could be done at the time. Still, as I look back now over the entire period of our freedom, I cannot help feeling that it would have been wiser if some plan could have been put in operation which would have made the possession of a certain amount of education or property, or both, a test for the exercise of the franchise, and a way provided by which this test should be made to apply honestly and squarely to both the white and black races.*

Booker T. Washington, *Up From Slavery:  An Autobiography* 83-84 (New York:  Doubleday, Page & Co. 1907).

### *i.*    **Public schools and taxation**

The ideology of the Republican Party during Reconstruction was "pro-growth, pro-industry, pro-modernization."[1018]  The new education system created by the 1868 Constitution was symbolic of that ideology.  Black citizens were elected to fill positions on the State Board of Education.[1019]  Although the Board specified that schools were to be segregated on the basis of race, funding was equitably distributed.[1020]  The State's education revenue was divided among the counties in proportion to the number of school-age children residing in each county, without

---

[1018] Flynt 1 Tr., at 79.

[1019] Norrell Report ¶ 11; Declaration of Dr. Robert Norrell (PX 7) ¶ 5 ("**Norrell Dec.**").

[1020] Thornton Depo, at 37.

regard to race.[1021] Thus, there legally "could be no financial discrimination as to the funding of the black schools and the white schools."[1022]  For the first time, Alabama was attempting to  educate *all* of its children, including over 40,000 former slave children who were entering the public school system for the first time.[1023]

As evidenced by the constitutionally mandated earmarks for education, Republicans well knew that their plan for education required significant contributions from taxpayers.  Under the 1868 Constitution, the state moved to a general *ad valorem* property tax system under which *all* property was taxed according to its value.[1024] Although *land* had been taxed on an *ad valorem* basis since 1847, the shift to this method of taxation for *all property*, *both real and personal*, was a new device.[1025] Under Republican taxation, "all property of every description" was taxed by applying a millage rate to that property's assessed, fair market value.[1026]  Tax assessors under Republican control had "no particular interest in protecting well-to-do white property holders, virtually none of whom were Republicans," resulting in assessments that more

---

[1021] *Id.* at 36-37.

[1022] *Id.* at 37; *see also* Norrell Report ¶ 11; Norrell Dec. ¶ 5 ("The main way that blacks benefitted during the Reconstruction period between 1868 and 1874 was through the creation of segregated but equally funded schools.").

[1023] Flynt 1 Tr., at 88.

[1024] Thornton Depo, at 40.

[1025] *Id.*

[1026] *Id.*

504

closely reflected the full, fair market value of taxable property.[1027]  Further, the millage rate applied to real and personal property increased more than three-fold, from 2.0 to 7.5 mills.[1028]  As a result, the new *ad valorem* property tax system enforced by Republicans (principally Northern carpetbaggers) resulted in a *substantial* increase in the amount of taxes levied on Alabama citizens.  By 1870, the burden had become oppressive:  the State tax was nearly three times as large as in 1860, and the county tax had increased four times.  The town tax was approximately 35 times as heavy as in 1860.[1029]

Significantly, as far as the historical events leading to the issues of this case are concerned, public schools were the beneficiaries of much of the increased tax burdens.[1030]  Approximately half of the State's budget was appropriated for education.[1031]  Revenue raised for educational purposes alone doubled from that of the Antebellum period.[1032]  According to Dr. Flynt:  "Two overwhelming realities of

---

[1027] *Id.* at 42; *see also* Testimony of Dr. Robert J. Norrell, taken at pretrial hearing in order to preserve his testimony for trial (doc. no. 253), at 24, 27-28 ("**Norrell Tr.**") ("The taxation created under reconstruction . . . was based on the fair assessment of property."); Norrell Report ¶ 13; Flynt 1 Tr., at 87 (noting that prior to Congressional Reconstruction, the tax assessors were sympathetic to the planter class, and that "all of a sudden African-American tax assessors in the Black Belt are beginning to assess that land at its real value, not at this artificially low value of 1865").

[1028] Agreed Facts ¶ 66; *see also* Flynt 1 Tr., at 88.

[1029] *See* Flynt Report at 1; *see also* Flynt II, at 4 (noting that the Republican-ruled government tripled property taxes).

[1030] *See* Flynt 1 Tr., at 88.

[1031] *Id.* at 71.

[1032] Thornton Depo, at 42.

505

reconstruction were:  many more schools were built, where many more children were educated; and much higher taxes were levied to accomplish the improvements in schools."[1033]

### ii.   White hostility to education of the former slaves and the taxation that supported it

The fact that the primary source of the increased revenue necessary for the support of the public schools created by the State Board of Education was the tax levied on *land* "created intense opposition to taxation."[1034]  There were no more slaves to tax, and much of the taxable wealth in personal property, luxury items, and intangibles had been destroyed or looted by Union soldiers during the War.[1035]  As Black Belt political leaders had correctly predicted when arguing that poor whites of the hill counties and Wiregrass should support secession, the legislature was left with few revenue options other than that of taxing land.[1036]

The increased land taxes fell particularly hard on poor-white "yeoman farmers

---

[1033] Flynt Report, at 1.

[1034] *Id.*; *see also* Norrell Tr., at 23 ("[W]ith the abolition of slavery the main tax base for the state was land tax . . . .").

[1035] Flynt 1 Tr., at 88 ("So you have the necessity to raise money to educate children.  And you have got the loss of slaves and the loss of luxury items.  And you are transferring that to land."); *id.* at 73 ("So luxury items are gone, slaves are gone.  What can you tax?  Land.  Land.  That's the one thing you can tax.  And so what you do is you take a tax system that is based on slaves and land and luxuries and you base that tax system on land.").

[1036] *See* Norrell Report ¶ 13 ("Alabama's Reconstruction government levied much higher taxes on land than had existed during the antebellum years, and much of this new revenue supported a much expanded system of public schools.").

506

who had spent 40 years in the Antebellum period protecting themselves against being taxed and hoping that the tax would continue to be on slaves."[1037]   Many poor-white, cash-strapped, subsistence farmers could not afford increased taxes, and lost their land as a consequence.   Such fiscal realities forced them to become sharecroppers or tenant farmers, competing with the recently-freed slaves for survival in the post-war wasteland of privation and want.[1038]

During the Reconstruction period of Republican rule, the Freedmen actively participated in state government.   "Black Republicans were typically elected to fill many county and state legislative offices during the late 1860s and 1870s.   Blacks were elected county commissioners, judges, tax assessors, and state legislators."[1039] As a result of the fact that the former slaves had only recently been declared free, the overwhelming majority had little or no education or wealth, and very few owned any

---

[1037] Flynt 1 Tr., at 73-75 ("They paid low taxes in the Antebellum period because slaves had funded so much of the tax base.  That's completely gone.  And so when you're increasing land taxes by three times, that's hitting squarely on them."); Flynt II, at 4-5.

> Only not just the black folks, the freedmen, were caught in this system.  Every year there seemed to be more whites, so that by the turn of the century, sharecropping and tenant farming were Alabama's most thoroughly integrated occupations.  It was, no one can deny, a vicious cycle, and even today its legacy is felt in parts of the state.

Harvey H. Jackson III, *Inside Alabama:  A Personal History of My State* 120 (Tuscaloosa:  The University of Alabama Press 2004) ("**Jackson**").

[1038] *See* Flynt 1 Tr., at 75-81; *see also* Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. No. 258), at 75 ("**Flynt 2 Tr.**").

[1039] Norrell Report ¶ 11; *see also* Norrell Tr., at 24; Norrell Dec. ¶ 6.

taxable property.[1040]

Thus, black officeholders administered a post-war system of high taxes, and blacks received the bulk of the benefits of the increased tax revenues — *most notably public education* — but only a minuscule minority of the race were paying *any* property taxes.  To say the least, that fact did not "sit well" with white taxpayers, especially those who either had lost, or were on the verge of losing, their property to foreclosure or tax sale.[1041]   Indeed, most white Alabamians were outraged by Republican rule and the benefits bestowed upon the recently-freed slaves.[1042]  Black participation in the political process was "viewed as an affront to white authority and the kind of control that whites assumed they should have over Alabama society."[1043]

Whites also were vehemently opposed to education of the former slaves, believing that it undermined white supremacy and "implied equal status with

---

[1040] *See* Declaration of Dr. Wayne Flynt (PX 10), at 6 ("**Flynt Dec.**"); Thornton Depo, at 55.

[1041] Flynt Dec., at 6.

> Most of the Freedmen, because they own virtually no property, are exempted from taxation except for the poll tax.  So it doesn't extend to them but — but in terms of white small farmers, it means that for the very first time they're paying a very substantial part of their cash income to the tax collector.  And that had never happened in the antebellum period because of all the exemptions and because of the very low nature of the land tax.

Thornton Depo, at 55.

[1042] *See*, *e.g.*, Norrell Report, at 25.

[1043] *Id.* at 24.

whites."[1044]  Former slaves were not deemed worthy of education.  And whites deeply resented paying taxes that, they believed, were collected, at least in part, to line "the pockets of white carpetbaggers and radical officials . . . who were slopping at the public trough [and] being paid out of this large state fund to run *useless schools for the Freedmen*."[1045]

Thus, black schools were firmly connected in the minds of whites to increased land taxes, wasteful government spending, official corruption, and "intense hostility, anger and violence from whites."[1046]  As a consequence, black schools and educators became "the main object of white terrorism in the years between 1865 and 1875. Many black schools were burned, and many teachers threatened and terrorized, and a few were killed."[1047]

### 5.   "Redemption"

> *Without strong offsetting social canons, laws and policies tend to conform to the weight of wealth, the power of prestige, and on rare occasions, the influence of intellect.  Because the radical program* [of the Republican carpetbaggers, scalawags, and Freedmen] *left the*

---

[1044] *Id.* at 36; *see also id.* ("If a black person can get an education, then he or she has the chance to rise to this same status as a white person.  There was also a general feeling, especially among planters and land owners, that any education for a black person essentially spoiled a good field hand."); Horace Mann Bond, *Negro Education in Alabama: A Study in Cotton and Steel* 97-98 (Tuscaloosa: University of Alabama Press 1994) (1939) ("**Bond**").

[1045] Thornton Depo, at 50-52 (emphasis supplied).

[1046] Norrell Tr., at 22-24; *see also* Thornton Depo, at 52; Norrell Report ¶ 10; Norrell Dec., at 4; Report of Dr. Wayne Flynt (PX 8), at 1 ("**Flynt Report**").

[1047] Norrell Report ¶ 10; *see also* Norrell Tr., at 22-23; Norrell Dec. ¶ 4.

> *majority of blacks in the status of less-than-independent wage earners and then of sharecroppers, it perpetuated economic control in a planter class.  To a further extent the Republicans failed to protect fully the* [former slaves'] *right to vote and to ensure fair elections. These defeats doomed their political reforms to failure.*

> William Warren Rogers & Robert David Ward, "Part Two: From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama: The History of a Deep South State* 259 (Tuscaloosa:  The University of Alabama Press 1994).

White Alabamians were able to "redeem" their state from the hated "Radical Republican" rule in the 1874 elections, regaining control of the Governor's mansion and both houses of the State Legislature, and most county offices to boot.[1048]  The once-divided classes of Planters and small yeoman farmers united against "the two perceived villains of white Alabama history," the federal government and blacks,[1049] and formed an "all white alliance of the Democratic party" which became known as the "Conservative Democrats," consisting mostly of former Confederate officers, soldiers, sailors, and officeholders.[1050]  Their common purposes coalesced around an unholy trinity:  establish white supremacy; curb taxation; and abolish the Republican public education system.[1051]  The Democrats accused the Republicans, the former-

---

[1048] Norrell Dec. ¶ 6; Flynt Dec., at 10-11; McMillan, at 175.

[1049] *See* Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265), at 21 ("**Frederick 9 Tr.**") (noting that the federal government and blacks were "the two perceived villains of white Alabama history").

[1050] Thornton Depo, at 55-56.

[1051] Thornton Depo, at 56; Rogers & Ward II, at 263.

slave officeholders in particular,[1052] of corruption, waste, inefficiency, fraud, and

mismanagement of state government.[1053]    By 1874, the federal government had

---

"There are but two parties now in the field," one editor declared, "the negro party and the white man's party.  There is no middle ground between the two — to one or the other, every man must belong.  He that isn't for us is against us . . . . Nigger or no nigger is the question."

*Id.* (citation omitted, ellipsis original); Bond, at 129 ("The election of 1874 had been won on the issue of the fear of 'Negro domination.'").

[1052] *See* Thornton Depo, at 50-51.

Q.    [T]here were a lot of charges of abuse and mismanagement associated with radical government, including the administration of the school system; is that correct?

A.    Yes, that is correct.

Q.    To what extent did those charges of abuse have a racial component?

A.    Almost entirely. There was . . . an enormous Democratic and white hostility to the education of blacks, [and] a substantial portion of the leadership of the Republican party, particularly the carpetbaggers, were people who . . . were associated with the effort to educate the Freedmen.

A number of these people had come to the South precisely to build up . . . the public schools for blacks which had been established by the Freedmen's Bureau, and were generally called Freedmen schools, . . . there were northern missionary denominations, the American Missionary Association, which sent people to the South to attempt to educate the Freedmen.

There was deep white hostility to . . . these schools because they attempted to educate blacks in terms of academic subjects.

*Id.*

[1053] Flynt 1 Tr., at 81-82.  The Republicans also inherited an increasingly large railroad debt, which grew from $7 million in 1860 to $30 million in 1870.  *Id.* at 77; *see also* Thornton Depo, at 59-60 (explaining in detail the state's railroad debt prior to the "redemption" in 1874); McMillan, at 180-81 (discussing the state's railroad bond debt in context of the calling for a constitutional convention).

511

effectively left Alabama Freedmen to fend for themselves,[1054] and the "Conservative Democrats were at liberty to employ fraud and violence during that year's election cycle, and frightened many former slaves so badly that they did not participate."[1055]

Thereafter, white Planters in the Black Belt seized political control of their populous, black-majority counties by using all means available to them to manipulate and control the black vote.[1056]  As Dr. Flynt testified, the Planters regained control

> in a variety of ways.  One way was just physical intimidation and violence and the rise of the Klu [sic] Klux Klan. There is mayhem.  There is violence. There is economic intimidation.

> [T]he vast majority of blacks in the Black Belt were sharecroppers. Totally vulnerable to being displaced at any time by a planter simply saying ["]You're a trouble maker and you vote and I don't want you on this plantation as a sharecropper,["] and telling every other white in the community the same thing, not to hire this person as a sharecropper, not to sign a contract with them.

> And so there is physical intimidation and violence and murder, lynching.  And then there is economic intimidation because they were so vulnerable to planters who controlled the area.

> [I]t . . . begins in Reconstruction before the '75 constitution and picks up as gradually black congressmen are defeated, black legislators are defeated, black county commission candidates are defeated, black tax assessors are defeated.[1057]

---

[1054] *See* Norrell Tr., at 35-36.

[1055] S*ee* Norrell Tr., at 22; Norrell Dec. ¶ 6.

[1056] Norrell Tr., at 25.

[1057] Flynt 1 Tr., at 92-93; *see also* Thornton Depo, at 57 (noting that whites in the Black Belt were able to use "extra legal means" against blacks, along with apportionment based upon total

With apportionment based upon total population, and whites in the populous Black Belt[1058] able to control the majority-black vote, a small number of whites were able to harness a hugely disproportionate share of power in state government.[1059] Indeed, the rise to power of the Conservative Democratic Party in the 1874 election cycle was also the rise to power of the Black Belt as a distinct political section, a position it maintained until well into the twentieth century.

### 6. The 1875 "Redeemer" Constitution

Shortly after his election in 1874, Governor George Houston (who also was known as the "Redeemer") brought the question of a new constitution to the forefront of debate.[1060]   The victorious Conservative Democrats called for a convention to replace the "Radical Republican" Constitution of 1868 — a document they described as a "Negro, Carpetbag, and Scalawag constitution" that had been "forced" upon the State by "the enemies of the white people of Alabama."[1061]   They preached the necessity of drafting a new constitution, one that reflected the superiority of whites.[1062]

---

population, to gain "a very large presence" in the legislature).

[1058] Norrell Tr., at 25; *see also* Bond, at 129.

[1059] *See* Thornton Depo, at 56-57; Norrell Tr., at 25 ("With the change from apportionment based on total population, not just on the white population, then, the Black Belt acquires a lot of political power . . . .").

[1060] Thornton Depo, at 59; Norrell Tr., at 22; Flynt Report, at 2; McMillan, at 175.

[1061] McMillan, at 177.

[1062] *Id.* at 176-78.

"Democrats left no doubt about the racial animus of the campaign, calling Republicans 'Jacobins and niggers.'"[1063]   The projected consequence of the Democrats' determination to reestablish white supremacy over State government was not lost on Republicans.[1064]

> The Republican *Alabama State Journal* editorialized that the "old secession leaders are now scheming to get full and complete control of the State government . . . and entrench themselves in power," *and deprive Negroes of "every vestige of political existence*."  The paper warned that "*the poor whites of this commonwealth will lose their free schools, if that constitutional convention ever meets*.  We warn the people of the poor white counties that all the school fund they will ever afterwards receive will be their sixteenth section fund, which amounts to but a few dollars.  And we finally warn the poor white people of Alabama that if this convention ever assembles, a property and educational qualification will be required of voters.  *In the effort to keep down the Negroes, these old secession leaders will sacrifice every poor white man in the state*."[1065]

Nevertheless, the Planter aristocracy that dominated the "Conservative Democratic Party" — attacking taxation, the education system funded by that taxation,

---

[1063] Flynt Dec., at 11 (quoting Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901: A Study in Politics, the Negro, and Sectionalism* 187 (Chapel Hill:  University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Company 1978) ("**McMillan**")).  The term "Jacobin," as in the case of the pejorative "Bourbons" defined in Part I(D)(6), *supra*, is a word that came into the lexicon during the French Revolution.  It originally described a member of the "Jacobin Club" (1789–1794), the most famous political club of the French Revolution, and so named for the Dominican convent where the members originally met, in the Rue St. Jacques (Latin: Jacobus) of Paris.  At the time, the term was applied to all supporters of revolutionary opinions.  As applied by Alabama's "Conservative Democrats" during the period discussed in text, it referred to Republicans who believed in the concentration of political power in the National government, at the expense of state and local governmental entities.

[1064] Flynt Dec., at 11.

[1065] *Id.* (quoting McMillan, at 185-86) (emphasis supplied, citations omitted); *see also* Testimony of Dr. Wayne Flynt, Transcript Vol. 3 (doc. no. 259) at 102-03 ("**Flynt 3 Tr.**").

and "black rule" in particular — again successfully used the demogogic issues of race and white supremacy to manipulate poor-white voters into calling for a constitutional convention.[1066]  Alabamians sent the "old state leadership" back to Montgomery to craft a new constitution.[1067]

Notably, the delegates "voted down plans for a verbatim report of the proceedings" of the convention, because such a record would "give the United States government evidence against the new constitution."[1068]  Morever, several measures that undoubtedly had strong support among the racist delegates — measures such as disfranchising blacks, segregating the races on common carriers, and banning interracial marriage — were rejected simply because the delegates believed there still was "too much danger of federal intervention in 1875."[1069]

The language of the first section of the 1875 Constitution was changed from "all men are *created equal*" to "all men are *equally free*."[1070]  State election dates were

---

[1066] *See* Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257), at 84 ("[N]ow that blacks are there, race becomes the central theme.  In 1874 is just the playing out of this.  Basically, planters say the issue in 1874 is black rule.  And whites say we're not going to have black rule.") ("**Flynt 1 Tr.**"); *id.* at 95-96 ("If you actually study the election of 1874, if you watch the appeals, it's so clearly about race, and so exclusively about getting rid of this threat to white rule.  You know, I don't know of any historian who's looked at that who's come to a different conclusion."); Flynt Dec., at 11; McMillan, at 175-88.

[1067] Rogers & Ward II, at 266-67 (detailing the delegates representing old south leadership and noting "a number were Confederate veterans").

[1068] McMillan, at 192 (citation omitted).

[1069] McMillan, at 201; *see also* Flynt 1 Tr., at 91-92.

[1070] *Compare* Ala. Const. of 1868, art. I, § 1, *with* Ala. Const. of 1875, art. I, § 1; *see also*

changed, to intentionally separate state from federal elections and, thus, to avoid the presence of federal officials at the polls.[1071]  The sections of the 1868 Constitution that disfranchised persons who had aided in the "late rebellion" were stricken.[1072]  Persons deemed to be "idiots or insane," or those who had been convicted of a "crime punishable by imprisonment in the penitentiary," were not permitted to vote or to hold office.[1073]  And significantly, the 1875 Constitution *explicitl*y mandated that public schools be segregated by race:

> The general assembly shall establish, organize, and maintain a system of public schools throughout the state, for the equal benefit of the children thereof between the ages of seven and twenty-one years; *but separate schools shall be provided for the children of citizens of African descent*."[1074]

Moreover, the delegates "voted down a provision requiring *equal facilities* for

---

McMillan, at 193.

[1071] *Compare* Ala. Const. of 1868, art. IV, § 3 ("Senators and representatives shall be elected by the qualified electors, on the Tuesday after the first Monday in November."), *with* Ala. Const. of 1875, art. IV, § 3 ("Senators and representatives shall be elected by the qualified electors, on the first Monday in August, eighteen hundred and seventy-six; and one-half of the senators and all the representatives shall be elected every two years thereafter, unless the general assembly shall change the time of holding elections.").  *See also* McMillan at 195; Rogers & Ward II, at 267 ("In a provision designed to forestall federal intervention, the times for federal and state elections were separated."); Jackson, at 115 (noting that the 1875 Constitution specified that "state and federal elections be held at different times, meaning that state offices would be filled without federal officials there to make sure all voters were treated fairly").

[1072] McMillan, at 201.

[1073] Ala. Const. of 1875, art. VIII, § 3.

[1074] *Id.*, art. XIII, § 1 (emphasis supplied).

education to be provided white and colored children in [those] separate schools."[1075]

An entire article of the new constitution was devoted to the impeachment *without trial* of public officials of all varieties for "willful neglect of duty, corruption in office, habitual drunkenness, incompetency, or any offense involving moral turpitude while in office."[1076]  The new constitution provided "mechanisms to remove authority from local officeholders to a statewide authority like the governor *when blacks were elected to local office*."[1077]   Apportionment of seats in the State Legislature continued to be based upon total population, a provision that obviously benefited the elite white classes of the populous Black Belt.[1078]

---

[1075] McMillan, at 206 n.117 (citation and quotation marks omitted, emphasis supplied).

[1076] *See* Ala. Const. of 1875, art. VII, §§ 1-3.  Under those provisions, nearly every public office was subject to impeachment:  governor; secretary of state; auditor; treasurer; attorney-general; superintendent of education; judges of the supreme court; chancellors; judges of the circuit courts; judges of the probate courts; solicitors of the circuits; judges of inferior courts; sheriffs; clerks of the circuit, city, and criminal courts; tax collectors; tax assessors; county treasurers; coroners; justices of the peace; notaries public; constables; and all other county officers, mayors, and intendants of incorporated cities and towns in the state.  *Id.*

[1077] Norrell Dec. at ¶ 6 (emphasis supplied).

[1078] *See, e.g.*, Bond, at 129.

> The Constitution of 1875 placed the Black Belt Democrats in the most enviable position of any faction in the history of the State.  If the Negro vote could be controlled, the Black Belt Democracy would have a disproportionate share of representation in the General Assembly, because Negroes, voting or not, were counted for that purpose; and in addition the Black Belt Democracy, through manipulating the potential Negro vote, could insure continued control over the Democratic Party, for representation in the party convention was based upon the number of votes cast in the prior elections.

*Id.*

517

Taxes and debt were major issues at the 1875 constitutional convention.[1079]  The Black Belt-led Conservative Democrats were outraged by the fiscal policy of the Republicans during "Radical Reconstruction," and determined to lower property taxes at the state and local levels.  The party's overwhelming control of State government was not sufficient to allay the fears of the Planter class that blacks and their Republican allies might someday regain and exercise political power.[1080]  Convention delegates from the Black Belt, where blacks retained an overwhelming numerical majority of the population and still held some of the local offices, especially feared the black tax assessor who had the legal ability to appraise and assess property at a figure "injurious to the economic interest of planters":  *i.e.*, at a monetary value that was actually close to the property's  fair and reasonable market value.[1081]  There also was a belief that blacks would someday regain access to the Legislature:

> It's easy enough to look back from this distance and see that as a matter of fact blacks will not again have any kind of real political influence until after August of 1965 in the Voting Rights Act.  But [at that time in history,] the Supreme Court [still] was [somewhat] sympathetic to blacks and freedmen.  The federal government [also] was sympathetic.
>
> Radical Republicans controlled the process of Reconstruction. ...

---

[1079] Flynt 1 Tr., at 88-89; *see also* Doc. no. 242-1 ¶¶ 90-100 (Parties' Statement of Agreed Facts) ("**Agreed Facts**").

[1080] Flynt 1 Tr., at 89-92; Deposition of J. Mills Thornton III from *Knight v. Alabama* (PX 682), at 67-68 ("**Thornton Depo**").

[1081] Flynt 1 Tr., at 89; *see also* Thornton Depo, at 67-68.

> Union troops [still were] in the state to enforce fair elections and
> guarantee blacks a fair vote.  There [was] no reason to think [that was]
> not possible again.[1082]

For such reasons, the Black Belt delegates to the 1875 constitutional convention

sought to guard against a recurrence of the policies of the Radical Reconstruction

government, in the event the federal government intervened and re-empowered the

Freedmen.

> [D]uring Reconstruction, the experience of [Black Belt] whites had been
> a county government which was controlled by blacks and their
> Republican allies and *which had very heavily taxed them*, and *taxed them
> for purposes that they largely regarded as illegitimate, such as the
> education of the Freedmen*.
>
> Now that they had power back into their own hands, they were
> intent on . . . using that new control to protect themselves from the
> possibility that the black majority in their counties would ever again be
> able to use that political power . . . to tax them in a way that would force
> them as the property holders to cough up the funds . . . which would be
> used to the benefit of the majority of the people in the Black Belt who
> were black and essentially nonproperty holding.[1083]

In order to obstruct black political officeholders from collecting substantial

property taxes in the future, property tax restrictions, or "caps," were for the first time

embedded into the text of an Alabama constitution.[1084]  No county, municipality, city,

or town could "levy or collect a larger rate of taxation, in any one year, on the property

---

[1082] Flynt 1 Tr., at 91.

[1083] Thornton Depo, at 67-68 (emphasis supplied).

[1084] Flynt 1 Tr., at 89-91; Thornton Depo, at 66-69; Norrell Tr., at 38.

519

thereof, than one-half of one per centum [*i.e., 0.005 or 5 mills*] of the value of such property . . . ."[1085]  The state legislature was divested of "the power to levy, in any one year, a greater rate of taxation than three-fourths of one per centum [*i.e.,0.0075 or 7.5 mills*] on the value of the taxable property within [the] state."[1086]  "[T]here was a strong desire in the Constitutional Convention of 1875 to write . . . a lower cap than seven and a half mills," but the Governor persuaded the delegates otherwise, in order to provide sufficient tax revenues for payment of the state's bonded indebtedness.[1087] The Legislature could (and, in fact, subsequently *did*) lower the millage rates by statute during "flush times," when tax receipts were sufficient to meet the State's debt obligations and general operating expenses, and the statutory rate of taxation was at one point as low as four mills (0.004).[1088]

The limitations on taxation that were entrenched for the first time in the State's organic law were a direct response to the rule of "Radical Republicans," carpetbaggers, scalawags, and former slaves under the 1868 Constitution.[1089]

---

[1085] Ala. Const. of 1875, art. XI, §§ 5, 7; Flynt 1 Tr., at 90.

[1086] Ala. Const. of 1875, art. XI, § 4; Flynt 1 Tr., at 90.

[1087] Thornton Depo, at 68-69; *see also* Flynt 1 Tr., at 101-07 (explaining the 7.5 mill cap as a "compromise" between Planters who sought to repudiate the state's indebtedness for railroad bonds and the industrialists whose economic fate depended on the railroads and for whom repudiation was not a viable option, noting that "they work[ed] out this compromise, in terms of enough money to modernize the state, but not enough money to shift a heavy tax burden to the planter who's owning the land"); McMillan, at 203-05.

[1088] Thornton Depo, at 71-72.

[1089] Thornton Depo, at 59; *see also id.* at 58 ("The 1875 Redemption Constitution was a

520

Although much of the 1875 Constitution and the historical context in which it was crafted indicates that it was an instrument dedicated to the establishment of white supremacy in the *general* sense, the property tax caps targeted blacks for a *specific* reason.  The property tax restrictions were intended to prevent the possibility that taxes could again be levied on the property of Alabama Planters in an onerous amount for the purpose of educating blacks.[1090]  "The now-dominant Conservative Democratic element, based heavily in the newly-powerful Black Belt, were unrelenting in their opposition to black education."[1091]  The property tax caps reflected the intent of Black Belt Planters to keep blacks "tied to the land."[1092]  "[A]ny education for a black person essentially spoiled a good field hand."[1093]  "If the Negro was to have a place only as a peon on a cotton farm, there was the danger that 'education would spoil a good plow

---

constitution that was intended to consolidate the white supremacist domination of the Democratic party . . . ."); McMillan, at 210 ("The various sections of the new Alabama constitution were full of the suggestions of the history of the Southern people since the war.  Many prohibitions and regulations were written into the constitution because of the experiences of the people of Alabama with the Carpetbaggers.") (citations and internal quotation marks omitted).

[1090] Norrell Tr., at 39 (expressing his opinion that "the limits set on property taxes [in the 1875 Constitution] were directly connected to the opposition of black education"); Flynt 2 Tr., at 113-14 (explaining his conclusion that "race was the predominant motivation" behind the 1901 property tax caps); *see also generally* Thornton Depo, at 65-68 (discussing the 1875 Constitution's property tax caps and noting that they were motivated by Black Belt leaders' desire to protect themselves from the possibility that blacks might again gain political power and impose heavy taxes "for purposes that they largely regarded as illegitimate, *such as education of the Freedmen*") (emphasis supplied).

[1091] Norrell Dec. ¶ 7.

[1092] Flynt 1 Tr., at 93-94 (confirming that the Planter-dominated Democratic Party sought to protect their economic arrangements and maintain a strong labor force); Thornton Depo, at 58.

[1093] Norrell Tr., at 36; *see also* Bond, at 142.

hand,' and that it would make the Negro 'get beyond himself' . . . ."[1094]  More broadly, however, white opposition to the education of the former slaves had many bases.  It was perceived as a dangerous, "useless," and "illegitimate" use of State tax revenues: *one that whites feared might foster a sense of social equality between the races.*[1095]

As previously discussed, the primary source of revenue for the operation of State and local governments during Radical Reconstruction rule was the revenue derived from *ad valorem* property taxes, and a large part of that revenue — at one point nearly half of the State's budget — serviced the centralized public school system created by the Republican-dominated State Board of Education: a quasi-legislative entity dedicated to the education of blacks.[1096]  Therefore, the association of property taxes with black education was both logical and obvious in the minds of whites.  The restrictions placed on property taxes in the 1875 Constitution were but one means among many others that Conservative Democrats would employ to impede the kind of funding for black education that occurred during Radical Reconstruction.  In other words, "the limits set on property taxes were *directly connected* to the opposition to black education."[1097]  Judge Murphy had little difficulty reaching the same conclusion

---

[1094] Bond, at 142.

[1095] *See* Norrell Tr., at 36-39; Thornton Depo., at 52, 67.

[1096] *See, e.g.*, Flynt 1 Tr., at 71; Thornton Depo., at 42; Flynt Report, at 1.

[1097] Norrell Tr., at 39.

in *Knight III*:

> In 1875, whites from the Black Belt, concerned that a black majority might regain political power and raise taxes, placed in the constitution millage caps for both state and local property taxes. The 1875 Constitution thus became the first Alabama constitution to place strict constitutional limits on the ability of both the State and local governments to tax property.
>
> Specifically, the 1875 Constitution established a maximum tax rate of seven and one half mills . . . and a maximum tax rate of five mills for counties and municipalities. *Racial motives permeated the establishment of constitutional caps on millage rates . . . .*

*Knight v. Alabama*, 458 F. Supp. 2d 1273, 1283 (N.D. Ala. 2004) ("*Knight III*") (citations and paragraph numbers omitted) (emphasis supplied). Judge Murphy further concluded that Black Belt whites sought to utilize the restrictions as a means of protecting their property from taxation for the "illegitimate" purpose of educating Freedmen.[1098]

It should come as no surprise, therefore, that "Democrats . . . made the destruction of the Board of Education one of the main reasons for calling a convention."[1099]  The 1875 Constitution vitiated the progressive education system established in 1868, essentially returning the State to the antebellum public school system of township boards.[1100] Public schools were to be funded, *in theory*, by the

---

[1098] *Id.* (quotation omitted)

[1099] McMillan, at 206.

[1100] Thornton Depo, at 62-63.

"State School Fund," which consisted of revenue raised by Sixteenth Section funds, poll taxes, the surplus revenue fund, and money escheated to the state.[1101]  "As the State School Fund was a *purely fictitious claim* upon the State because of the loss of the Fund in ante-bellum times, [however,] the entire finance for the system was [in reality] to be derived from State taxation."[1102]

Further, both the State and local governments faced severe restrictions in obtaining the revenue necessary for funding essential governmental services.[1103]

---

The State Board of Education was abolished. [A]nd there are no county boards of education either.  And the governments of the public schools essentially returned to the antebellum system of township boards, of school trustees who were elected for a four-year term at the township level.

And . . . then there is a millage tax which is handed over to the . . . county superintendent of education who apportions this county fund among the townships within his . . . county.  And then those funds are administered directly by the various elected townships boards of trustees.

The county superintendent . . . continued to be appointed by the state superintendent.  The state superintendent was an elected position.  It was elected by the voters of state.  But there is no state board of education.

*Id.*; *see also* Flynt 1 Tr., at 101 (describing the system put into place as returning to the pre-war system of "every county for itself").

[1101] *See* Bond, at 148.

[1102] *Id.* (emphasis and bracketed alterations supplied).

[1103] Flynt Report, at 2 (explaining that property tax caps in the 1875 Constitution, along with the decentralizing of public education, ensured the "chronic underfunding" of public schools); William Warren Rogers and Robert David Ward, "Part Two: From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama: The History of a Deep South State* 267 (Tuscaloosa:  The University of Alabama Press 1994) ("**Rogers & Ward II**") ("In the area of education the controversial semilegislative State Board of Education was abolished.  There would be an elected state superintendent of education, separate schools for whites

Consequently, the significant earmarks for education established by in the 1868

Constitution were not retained in the 1875 Constitution.[1104]  The annual allocation of

---

and blacks, and much less money appropriated for education."); Bond, at 135 ("The Constitution of 1875 had severely restricted the amount of money available for the schools."); Wayne Flynt, *Alabama in the Twentieth Century* 5 (Tuscaloosa: The University of Alabama Press 2004) ("Conservative Democrats wrote their ideology into the [1875 Constitution] . . . . As a consequence of the new constitution, taxes decline as did revenue for education.") ("**Flynt II**").

[1104] *Compare* Ala. Const. of 1868, art. XI, §§ 10-13, *with* Ala. Const. of 1875, art. XIII, §§ 2-5.

> The report of the [Education] committee provided that at least $100,000 annually, the poll tax fund, interest on the trust fund, interest on the surplus revenue fund, and the money from the estates of deceased persons who die without heirs, should be set aside for public schools, *much less than the revenue provided by the 1868 constitution. Republicans charged that the funds provided were too meager and that the public school system would be destroyed*. They sought to write the 1868 provision of 'one-fifth of all the annual revenue' into the constitution. Democrats admitted that *the money earmarked for schools was less than that in the Constitution of 1868 . . . .*

McMillan, at 206-07 (emphasis supplied, citations omitted).

> [T]he Republicans charged as never before that the Democrats were destroying the public school system. "The present constitution provides a liberal system of education [contended the *Alabama State Journal*] and the poor man's children have an opportunity of acquiring education free of cost. The proposed constitution virtually drives the children of the poor from the school houses." Republicans compared the $100,000 per annum provided by the new constitution with the "one-fifth of all the annual revenue" section of the Constitution of 1868. They said that *the constitution reduced appropriations for schools by at least one-half. The old constitution set aside large sums for schools; the new constitution left the schools "dependent upon the prejudice, whim, or caprice of the legislature*."

*Id.* at 213 (emphasis supplied, citations omitted). *See also* Ala. Const. of 1875, art. XIII, § 6.

> Not more than four per cent of all moneys raised, or which may hereafter be appropriated for the support of public schools, shall be used or expended otherwise than for the payment of teachers employed in such schools; provided, that the general assembly may, by a vote of two-thirds of each house, suspend the operation of this section.

not less than twenty percent of the State's tax revenue to public schools[1105] was slashed by the 1875 Constitution, which guaranteed only $100,000[1106] — "a substantial reduction from what [the State] had been spending."[1107]

When the handiwork of the delegates to the 1875 Constitutional Convention was submitted to the people for ratification, Democrats raised the hue and cry of white supremacy as the means of motivating poor whites to turn-out and vote for confirmation.[1108]  The Montgomery *Advertiser* posed this rhetorical question:  "Who made the present constitution?," and then cruelly answered: "Corn field Negroes, corrupt carpetbaggers and United States soldiers.  Vote for the new one, made by your

---

*Id.*  "Numerous Democrats joined Republicans in objecting to the provision that not more than four percent of the school fund could be spent otherwise than on the payment of teachers.  The office of county superintendent would be abolished because there would be no money to finance it, they declared." McMillan, at 207 (citations omitted).

[1105] *See* Ala. Const. of 1868, art. XI, § 11 ("In addition to the amount accruing from the above sources, *one-fifth of the aggregate annual revenue of the State shall be devoted exclusively to the maintenance of public schools*.") (emphasis supplied).

[1106] *See* Ala. Const. of 1875, art. XIII, § 5.

The income arising from the sixteenth section trust fund, the surplus revenue fund, until it is called for by the United States government, and the funds enumerated in sections three and four of this article, with such other moneys, to be *not less than one hundred thousand dollars per annum, as the general assembly shall provide by taxation or otherwise, shall be applied to the support and maintenance of the public schools* . . . .

*Id.* (emphasis supplied).

[1107] Thornton Depo, at 61; Flynt Dec., at 13.

[1108] McMillan, at 211.

own representatives."  Democrats appealed for "white supremacy," and warned that the defeat of the constitution would return the "Jacobin Republicans" to power.[1109]

The most controversial portion of the 1875 Constitution within the general population was its approach to education.[1110]  Those opposed to the proposed constitution attacked the drastic reduction of funding for public education, arguing that it would "drive[] the children of the poor from the school houses."[1111]  In comparing the $100,000 State fund allocated to education under the 1875 Constitution to the twenty percent of State revenue allocation embedded in the 1868 Constitution, Republicans claimed that the appropriations for education would be reduced by at least one-half,[1112] and probably a good deal more than that.

> The *Alabama State Journal* filled its columns with the adverse criticism of the Northern Republican press.  It quoted the Chicago *Tribune* as follows: "The new instrument practically abolishes the public school system.  In this Alabama follows the example of Texas.  Both states propose to reduce the mass of the people to something like the literary level of the mule.  In both a herd of voting cattle is to be created, and the herd is to be domineered over by a privileged caste of educated men.  This is a proposition to go back to the barbarism that prevailed before the war."  The Washington *Republican* said: "It virtually destroys the free school system . . . ."[1113]

---

[1109] *Id.* at 211 (citations omitted).

[1110] *See id.* at 213.

[1111] *Id.* (citation omitted).

[1112] *Id.*

[1113] McMillan, at 213-14 (citations omitted).

527

Nevertheless, the constitution was ratified on November 16, 1875,[1114] and the Black-Belt-led Conservative Democrats thereby secured "firm and irrevocable control of the state government."[1115]  They did so by exploiting white outrage over the policies of the Radical Reconstruction government, and casting the blame for all the State had endured during the "tragic decade" of Reconstruction[1116] upon the descendents of African slaves.  "[T]he memory of Reconstruction [was] powerful for . . . for several generations in shaping attitudes about African-American political rights, about education, particularly education for black people. . . . [It was] very important . . . as a justification in the minds of conservative whites for hostility to taxation, in general."[1117]

Of course, the "memory" of Reconstruction and "Redemption" that was perpetuated by the oral traditions of White, Anglo-Saxon, Protestant Alabamians was not based upon truth.  Dr. Harvey Jackson illustrates this point well:

> Here is how it once was told among white families and in white schools . . . . '[R]adical Republicans in Congress betrayed the fallen president, and with malice towards many and charity for few, set out to humiliate the down-trodden South — which they did with the help of

---

[1114] *Id.* at 216.

[1115] *See* Thornton Depo, at 59.

[1116] *See* John Witherspoon DuBose, *Alabama's Tragic Decade: Ten Years of Alabama 1865-1874* (Birmingham, Ala.: Webb Book Company 1940) (James K. Greer ed.) ("**DuBose**").

[1117] Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253), at 26-27 ("**Norrell Tr.**").

renegade southerners ('scalawags') who did it for personal and political gain and 'corrigable' Negroes who did it for revenge and restitution. But "good and sensible" men (whites of course), "noble" and "self-sacrificing," stood firm against these evil forces, fought them by whatever means possible (including, "regrettably," violence), and at last, after a decade of struggle 'redeemed' Dixie from black Republican bayonet rule. 'Faithful' Negroes and 'loyal' whites praised what was done. The rest didn't matter.[1118]

### 7.   Democratic Rule Under the 1875 Constitution — *1875 - 1901*

#### a.   Extra-legal means of subverting black rights

Once in control of the state's affairs, Democrats in the Black Belt imposed their will upon the people of Alabama.[1119]  Their primary weapon was manipulation of the black majorities in their respective counties.[1120]  Indeed, one of the greatest ironies of history is that "[t]he Democratic party, which claimed to be 'the white man's party of Alabama,' remained in power by using the bulk of the Negro votes."[1121]

White control of the black vote quelled fears that blacks would use their political voice to raise land taxes.  The threat of the dreaded "black tax assessor" could be eliminated.  Depriving blacks of even the hope of electing to office representatives to speak for their interests further ensured that blacks could be kept in their "place"

---

[1118] Harvey H. Jackson III, *Inside Alabama:  A Personal History of My State* 106-07 (Tuscaloosa:  The University of Alabama Press 2004) ("**Jackson**").

[1119] *See* Norrell Tr., at 40.

[1120] *Id.* at 25.

[1121] McMillan, at 228.

— a position subservient to whites and inferior in all respects.  Finally, control of the

black vote allowed the Redeemers to deliver what they sold to poor whites when

campaigning for the 1875 Constitutional Convention and the ratification of the

convention's product:  white supremacy.

Following ratification of the 1875 Constitution, the State quickly began

removing "the Negro and his cohorts" from local offices, and appointing Democrats

to fill the positions.

> James Jefferson Robinson, a member of the legislature, explained that
> body's action as follows:  "Montgomery county came before us and
> asked us to give them protection of life, liberty and property by
> abolishing the offices that the electors in that county had elected.  Dallas
> asked us to strike down the officials they had elected in that county, one
> of them a Negro that had the right to try a white man for his life, liberty
> and property.  *Mr. Chairman, that was a grave question to the Democrats
> who had always believed in the right of the people to select their own
> officers, but when we saw the life, liberty and property of the Caucasians
> were at stake, we struck down in Dallas county the Negro and his
> cohorts.*  We put men of the Caucasian race there to try them. . . .  In
> Montgomery county we struck down the Commissioners Court because
> they would not protect the rights of property in that county."[1122]

In a similar manner, black tax collectors and assessors were replaced with persons

sympathetic to the interests of the Planter class.  As Professor McMillan explained:

> The key to control of the Negro vote was always to be found on the
> local government level where sheriffs, probate judges, and other officers
> were made responsible for elections.  In 1874, the Democrats won

---

[1122] *Id.* at 222-23 n.31 (citations omitted, ellipsis in original, and emphasis supplied).

control of most county governments in the state.  However, in some Black Belt counties where [sufficient] Republicans still remained [to have an electoral majority in an honest election], the legislature forced Republicans from office by placing their bonds so high that no local Republican could meet it.  The governor then appointed a Democrat to the vacant elective office.[1123]

With tax officials loyal to the Democratic Party,  "the whites in the Black Belt were able to maintain very low assessments of property."[1124]  Land began to be assessed at much lower values than during Reconstruction, and some parcels escaped taxation altogether.[1125]  "In 1890, 57 percent of the property valued had escaped taxation.  Ten years later . . . 65 percent of property went unassessed."[1126]

Ku Klux Klan violence, lynchings, and murder aided whites in controlling blacks who stepped out of their "place," and attempted to exercise political rights.[1127]  Black voting strength was further suppressed by the use of cosmetically "legal" means, such as gerrymandering, increasing the appointment power of the governor, and complex election laws purposefully designed to suppress the votes of blacks and dirt-

---

[1123] *Id.* at 218 (bracketed alterations supplied); *see also* Norrell Tr., at 40; Thornton Depo, at 87-88, 90.

[1124] Norrell Tr., at 40; *see also* Thornton Depo., at 75 (explaining that low tax assessments were due to the fact that local tax assessors were elected officials and "elected officials have to respond to their constituents").

[1125] Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257), at 167 ("**Flynt 1 Tr.**").

[1126] Rogers & Ward II, at 323.

[1127] *See* Flynt 1 Tr., at 92-95; McMillan, at 218-19 (noting that violence, the Ku Klux Klan "and other hooded orders helped to overthrow the Radical regime," but the Redeemers' methods of strengthening that control became even "more ingenious").

531

poor, troublesome white small farmers, tenant farmers, and sharecroppers.[1128]

But, the defining element of all the techniques of control utilized by the Black Belt Planter class — the keystone in their arch of political oppression — was corruption itself, a shamelessly transparent display of election fraud that ensured political control of the black majority counties in the Black Belt region and, by extension, the margin of victory in closely-contested state elections.[1129]  Democrats

---

[1128] McMillan, at 221.

> [T]he Democrats attempted to control the Negro vote by the passage of election laws designed to disfranchise the Negro.  These laws continued many of the centralized and arbitrary practices of the Radicals and added many new devices, including long residence requirements in the voting precinct, public challenging of voters at the polls, and the use of ballots so designed that fraud in elections could not be proven.  Moreover, many Negroes were disfranchised by Article VIII, Section 3, of the constitution, which had previously denied the ballot to those guilty of "grand larceny," but was now interpreted to disfranchise those guilty of "petit larceny."

*Id.* at 223; *see also id.* at 223-25 (discussing the Sayre Election Law — "the best and cheapest method of swindling the white people have ever devised for the maintenance of white supremacy"); Rogers & Ward II, at 312 (explaining the Sayre Election Law, which gave governor-appointed election officials the authority to fill out ballots for the illiterate, and noting that one commentator described it as "'conceived in iniquity, born in sin and . . . the child of the devil'").

> Most insidious in the act was the provision that registration would take place only in May, one of the busiest months in a farmer's year.  If the weather was good, a farmer was in the field.  If the weather was bad, impassable roads . . . made it impossible to get to the county seat.  The result was just what the Bourbons expected.

Jackson, at 133.

[1129] *See, e.g.*, David Ashley Bagwell, *The "Magical Process": The Sayre Election Law of 1893*, 25 Alabama Review 83 (April 1972) ("**Bagwell**"); Thornton Depo, at 87-88; McMillan, at 219.  Although blacks were "legally enfranchised" during the period between 1874 and 1901, the extent to which they actually were allowed by whites to vote varied from county to county.

> In the Black Belt there is very little capacity for blacks as a practical matter

532

cheated black voters and white yeoman farmers at the polls through the use of, among other tactics:  ballot box stuffing; theft of ballot boxes; removal of polls to unknown places; burning ballots before elections;  illegal arrests on election day; importation of voters who did not live in the precinct; calling off names wrongly; fabricating reasons to refuse to hold elections in precincts populated with blacks; the voting of dead or fictitious persons; ensuring that poll watchers and ballot counters became drunk while votes were counted; and, organizing "disorderly demonstrations" to intimidate voters.[1130]

---

> to vote.  Where blacks are a small percentage of the population, . . . there may be greater freedom.  So . . . there is no uniform statement that can be made about the hill counties and the Wiregrass as to the . . . capacity of blacks to vote freely.  But in the Black Belt, the black vote is essentially completely controlled by whites.
>
> As a practical matter, the Democratic party is able to control the electorate because the Democratic party controls who the sheriff is.  And the . . . sheriff and the probate judge create the poll officials.  And the poll officials can use any number of extra legal devices for controlling the black electorate all the way from simply not holding a poll in a majority black neighborhood, or a majority black beat, as it's called, which means a precinct, or to intimidation of a voter before he arrives at the poll, to fraud, a ballot box stuffing, or something of that character, and everything in between.

Thornton Depo, at 87-88.

[1130] McMillan, at 219-21; *see also* Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. No. 258), at 86-87 ("**Flynt 2 Tr.**"); Thornton Depo, at 87-88; Rogers & Ward II, at 288 ("Had blacks deserted the Republican party and made common cause with their landlords? No, but they were either intimated against voting at all, or they were physically taken to the polls by white land-owners and required to vote for the Democratic candidates.").

> Q.   According to McMillan, the clan [sic: Klan] and other hooded orders helped overthrow the radical regime.  However, during the late '70s and '80s methods used to control the negro vote became more ingenious.

### b.   The "convict leasing system"

With land all but immune from taxation at amounts even remotely approaching fair and reasonable market values, it became necessary for the State to explore other revenue streams.[1131]   An "ingenious solution" was found in the "convict leasing

---

[Q.]   Can you comment on some of those ingenious methods of control?

A.   Yes.  One is basically simply returning [a] total vote count that is no relation whatsoever to the number of people who voted.  So, for instance, no matter how an African-American may vote, whoever counts the votes and turns in the electoral returns to the secretary of state is the one who's going to determine the total head count in that county.

So just simply misrepresenting the count is one easy way to do it.  Another easy way of doing it is to simply tell sharecroppers on your plantation that if Rueben Cobb, [sic: Kolb] the populist candidate in 1890's carries the counties there's no point in showing up because he is not going to renew your contract.  That's another way to do it.

Another way is to haul everybody from your plantation in, in a single wagon and putting them all in one precinct, so you can know how that precinct goes and how it should go.  That's another way of doing it.

So there are all sorts of unethical and illegal methods of controlling the ballot. The most extreme examples actually had ballots of different colors.  You have might have a Republican of one color and Democrat of another color. That really sealed the issue.

Flynt 1 Tr., at 115-16.

[1131] *See* Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257), at 106 ( "**Flynt 1 Tr.**"); *see also* Testimony of Dr. Wayne Flynt, Transcript Vol. 3 (doc. no. 259) at 98-99 ("**Flynt 3 Tr.**") (explaining that the convict leasing system actually began under Presidential Reconstruction, but it was not until Democratic control that it was utilized to provide significant state revenue and essentially substitute the taxes that might had been raised if it were not for the property tax caps in the 1875 Constitution).

system."[1132]   A string of Governors closely allied with "Big Mule" financial and industrial interests and compliant State Legislators turned the State penal system into a source of revenue that not only covered the costs of building and maintaining prisons, but also generated sufficient surplus revenues to fund other aspects of State government.[1133]   Convicts were "rented out" to work on plantations, in coal mines, on railroads, in steel mills, and other industries.[1134]   "Virtually the entire convict population of the State [at the time this system was running full-tilt was] black.  The convicts who [were] leased [were] almost all black . . . . And the state [was] paid a lease fee for them and that [became a lucrative] source of revenue for the state."[1135]

---

[1132] Flynt 1 Tr., at 108-13.

[1133] *Id.* at 111 ("If you've got an absolute limit on the ability to generate revenue [*i.e.*, property tax caps], how are you going to fund a prison system.  And the answer to that is the convict lease system."); *see also id.* at 113 (explaining that the convict lease system "was not . . . devised in order to deal with penal issues, but to raise revenues to replace those that are lost through the tax system"); Thornton Depo, at 70.

> [Governor] Houston's determination to payoff railroad bondholders, coupled with a state constitution that severely limited state taxing authority, placed Alabama in a fiscal squeeze.  That crisis led John G. Bass, the state's new prison warden, to come forward with a novel idea:  lease individual prison laborers to willing contractors in exchange for cash. . . . Bass took charge of leasing prisoners out to various contractors.  Money earned from prison labor was then placed in the state's treasury as revenue.  Profits . . .  soon amounted to "between eleven and twelve thousand dollars . . . over and above all the expenses of the institution." At a time when the state desperately needed new revenue without new taxes, Bass transformed Alabama's penitentiary into a profitable moneymaker.

Mary Ellen Curtin, *Black Prisoners and Their World, Alabama 1865-1900*, at 65-66 (Charlottesville: The University of Virginia Press 2000) ("**Curtin**").

[1134] Flynt 1 Tr., at 111.

[1135] Thornton Depo, at 77; *see also* Flynt 1 Tr., at 109-11.

As a form of revenue generated from the blood, toil, sweat, and tears of involuntary black laborers, however, the convict lease system was in reality a re-invention of slavery, and a reinstitution of the Antebellum slave tax.[1136]

> Incidentally, the death rate among those prisoners who were 80 to 90 percent African-American — and all of them were prime age males, . . . was around 20 percent per year.  Because the state had no stake in how they were fed, how they were housed, how they were tended, what kind of medical care they got, they died by the thousands.  And the idea was ["]you can always find another one, [so] who cares["][1137]

It also should not escape notice that the revenue generated by the convict-lease system allowed the State to continue discounting land as a significant source of revenue.[1138]  Of course, the system served other purposes as well, including providing yet another means of suppressing the political rights of black citizens, and keeping them "in their place":  a "cheap, chained, and degraded working class."[1139]

---

[1136] *See* Thornton Depo, at 77; Flynt 1 Tr., at 112 ("So this is another place where planters are really concerned about labor force, and, basically, an involuntary labor force.  And, incidentally, the ratio in 1900 was 2,500 state, 700 county.  And most of those county prisoners were in the Black Belt.").  Of course, the antebellum slave tax was a burden on slaveholders — the convict lease system punished black laborers while providing the state enough revenue to keep property taxes low.

[1137] Flynt 1 Tr., at 109.

[1138] *See* Norrell Tr., at 40 (Professor Norrell explained that "the convict lease yielded a large portion of the state revenue.  And that sort of made it easier to put these limits on property taxation"); Thornton Depo, at 70-73; Flynt 1 Tr., at 109 ("By 1920, one-fifth of the total revenue funding the entire state of Alabama is being generated by the convict lease system."); Jackson, at 129 (noting that the convict lease system "had the advantage of reducing the need for Bourbon-paid [Black Belt-paid] taxes and underscored the state's determination that whenever possible revenue would be raised from the dispossessed rather than from those who possessed").

[1139] Curtin, at 70 ("[I]ndustrialists purposefully chose convicts because cheap, chained, and degraded African Americans fit into their vision of what the South's new working classes should be."); *see also* Norrell Tr., at 40-41 ("The convict lease system was understood as mostly  . . . a

536

### c.    Education

### i.    White motives to subvert black education

"The creation of [black] schools was protected . . . by the Fourteenth Amendment.  But that didn't mean that whites had really accepted [the idea of ] black education. . . . [T]here was a lot of opposition to using any of the state funds or the . . . local funds [for] the education of black children."[1140]  Black Belt Planters were especially motivated to prevent the black inhabitants of their region from attending public schools.  "It was the Booker T. Washingtons of the world that threatened" the interests of the Black Belt Planter class.[1141]  Black Belt Planters assumed that, "if a black kid gets an education, the black kid is much more likely to leave [the Black Belt] and go to Birmingham . . . . an industrial magnet, that offer[ed] alternative economic opportunities to the black child."[1142]  It therefore became a primary goal of Black Belt Planters to not make "that opportunity available to him."[1143]  Instead, Planters sought "to keep [the black child] plowing and picking and harvesting cotton in the Black

---

process of black control — white control of blacks — through using the criminal justice system . . . .").

[1140] Norrell Tr., at 42 (also reiterating the attitude of whites that education of blacks would "spoil[] a good field hand"); *see also* Thornton Depo, at 78 (explaining that "the township trustees [were] white and [were] hostile to the education of blacks in the Black Belt").

[1141] Flynt 1 Tr., at 165.

[1142] *Id.* at 161-62.

[1143] *Id.* at 162-63.

Belt."[1144]   The Planters' anti-black-education policy is well articulated in Dr. Horace Mann Bond's discussion of the Black Belt's reaction to the "Blair Bill," the first attempt to provide federal aid to state education.

> The result was that the Negro tenant [farmer] again figured in the agricultural scheme as he had before the war as a slave. *He was a labor item, engaged in crude processes which required no special intellectual training; and, indeed, it was thought he would be unfitted for his role by the educational process.*  In the course of the debate on the Blair Bill in the U. S. Senate, in 1888, John Tyler Morgan, [an] Alabama Senator whose home was in the Black Belt county of Dallas, argued that the amount of money which his county might receive from the Blair Bill fund would seriously disturb the labor conditions of his community.

> Evidently, Alabama could only use double the sum now employed in common schools in Dallas County, either to double the length of the school term, making it one hundred and forty-six days, or to double the salaries of the teachers . . . . seventy-three days out of a crop is a large item in a cotton country.  One hundred and forty-six days would ruin a crop.

> If the Negro was to have a place only as a peon on a cotton farm, there was the danger that "education would spoil a good plow-hand," and that it would make the Negro "get beyond himself," *i.e.*, beyond his status as fixed by the economic system.[1145]

---

[1144] *Id.* at 162.

[1145] Horace Mann Bond, *Negro Education in Alabama: A Study in Cotton and Steel* 37 (Tuscaloosa: University of Alabama Press 1994) (1939), at 142 ("**Bond**") (citations omitted, emphasis and bracketed alterations supplied); *see also* Flynt 1 Tr., at 163-64, where Dr. Flynt testified as follows:

Q.     And he's criticizing the Blair Bill — the Blair Bill — do you know what —

A.     Yeah.  The Blair Bill is really historic in American history, because it's the first attempt to provide federal aid to education.  And people in the hill counties and the wire grass [sic] are —  let me cast this more widely.

### ii.    Diversion of funding for black schools to white schools

Prior to 1891, State revenue for the support of public schools, by law, was distributed on a per capita basis without regard to race. Even so, black schools in the Black Belt counties were neglected. Mills Thornton provided a thorough explanation of the interaction between education funding and race prior to 1891:

> Congressmen and senators from the south who were in Congress at this time and who represented poor white constituencies[,] [t]he upland south[,] and the textile mill south[,] generally supported the Blair Bill.
>
> However, the Blair Bill had a provision for federal aid to all education, blacks no less than whites. So that what you would get is a bill that would equitably and justly — to use that famous term from 1891 — provide tax funding for all children who lived in a state.
>
> What happened was that senators like John Tyler Morgan offered amendments to the Blair Bill, which they could never get passed in Congress, that provided for the segregation of those funds. So they were not going to allow the fund to pass as just a huge pool of money available to all, but with some sort of segregation boundary in the law.
>
> At that point, southern senators and representatives had to decide whether to join their northern democratic friends who were supporting the Blair Bill and pass it even without restrictions, racial restrictions on it, or kill it. And what they chose to do was kill it.
>
> Q.    Senator Morgan says 146 days would ruin a crop?
>
> A.    Yeah. That's how many days they would be going to school under the Blair Bill.
>
> Q.    And, of course, education would spoil a good plow hand or a good field hand. We see that in just about all these histories, don't we?
>
> A.    Yeah. The literature is just overwhelming.

*Id.*

539

[T]he funds are relatively fairly-distributed between the black and the white schools in proportion to the number of black and white students. But the township trustees are white and are hostile to the education of blacks in the Black Belt.  And consequently, there is much less pressure to maintain a black school.  It's up to the elected township trustees to hire this teacher for the black schools.  They can . . . hire a person, they can neglect to hire a person, they can not keep the school in repair, or repair it.  All of these are decisions that are made at the local level by these elected trustees.

Now, these elected trustees in the Black Belt counties are all whites and . . . are responsive to the attitudes of whites and Democrats, who are a very small portion of the population in each of these townships.  And there is no effective way for the majority of the residen[ts] of a township who are black to bring any effective political pressure on the trustees, *and consequently the black schools are neglected. But it's not because of the unavailability of funds*.[1146]

The law existing at that time did not permit the funds allocated for black schools to be diverted to white schools.[1147]  Instead, the money apportioned for black children could only be held, unspent for its intended purpose.

---

[1146] Deposition of J. Mills Thornton III from *Knight v. Alabama* (PX 682), at 79 (emphasis supplied) ("**Thornton Depo**").

[1147] *Id.*

Q.    If the white trustees controlled the schools, why didn't they just give all the money to the white schooling and  very little to the blacks?

A.    Because that was not what the law was.  The law was that it was. . . that . . . in each township the funds were to be apportioned in proportion to the number of schools — of students of each race in that school.  The township trustees might not spend the funds but they couldn't divert it to the white schools.  After the Apportionment Act of 1891, that changed.

*Id.* at 80.

540

Eventually, however, Alabama's legislators found a "lawful" way to divert education funds to white schools.  The Apportionment Act of 1891 statutorily codified the conviction of white supremacists that tax revenues allocated for public education "should go to the education of white children, not black children."[1148]  Local school boards, all of which were dominated by whites, were given the authority to distribute education funding as a majority of the board members deemed "just and equitable."[1149]  And what the boards uniformly did was disproportionately spend available revenues on the education of white children at the expense of the education of black children.[1150]  The result was the collection of property taxes for the education of all school-age children, both white and black, but allocation of an overwhelming proportion of that revenue for the benefit of white children.[1151]    One rationalization for that discriminatory apportionment was: "Negroes were not mentally advanced to the point

---

[1148] Norrell Tr., at 43; *see also* Flynt 1 Tr., at 158-59.

[1149] S*ee* Thornton Depo, at 80-81 ("Now, the trustees under the Apportionment Act for the first time can take the funds that were destined for the black schools and spend them on the white schools.  And immediately, in all counties they start doing that.").

[1150] Norrell Tr., at 43.

[I]n the ensuing two to three decades . . . the discrimination. . . in the spending of school funds became astonishing; that is, in studies made in the next couple of decades found that . . . money spent on the education of white children was sometimes 10 or even 20 times more than that spent on black children.

*Id*.

[1151] *Id.* at 44.

where they needed as much education as the white race, and therefore did not need as

much money for their education."[1152]  Dr. Flynt explained the practices that followed:

> So what [the Apportionment Act of 1891] did was to give [*carte*] *blanche* to any local official in Alabama to take from the pool of money that had been given to black and white children [on a *per capita* basis] and distribute it [disproportionately] to white children.

> And I might add that if you look at the educational data from this period before 1891, it's surprising how closely the distribution of money [on a per capita basis] did reflect a just and equitable distribution of money.

> After the "just and equitable" [language was incorporated into the Apportionment Act] of 1891, . . .  [it] is amazing how unjust and inequitable the distribution of money was.  *You give local white officials the right to determine what is just and equitable, and it will not be what blacks define as just and equitable.*[1153]

The Apportionment Act affected the people of Alabama in different ways, but

it had "an enormous and devastating impact on black education."[1154]

> After the 1891 apportionment provisions of the school law were implemented, any resemblances between the schooling experiences of black and white children or the circumstances of teachers and school facilities quickly faded.  As funds that had previously been allocated to black students were diverted to whites the effects were dramatic, especially in the Black Belt.[1155]

---

[1152] Bond, at 156.

[1153] Flynt 1 Tr., at 159 (emphasis and bracketed alterations supplied).

[1154] Thornton Depo, at 81.

[1155] Edith M. Ziegler, *Schools in the Landscape: Localism, Cultural Tradition, and the Development of Alabama's Public Education System, 1865-1915*, at 133 (Tuscaloosa:  The University of Alabama Press 2010) (citations omitted) ("**Ziegler**"); *see also* Flynt 1 Tr., at 165-66.

Blacks, obstructed by whites at every turn from exercising political rights, were powerless to increase funding for their schools.[1156]  The black communities, getting such a tiny sliver of funding, were left "entirely on their own in providing housing for a school."[1157]  Teachers in black schools "had, first of all, to learn how to build a school."[1158]  Conversely, white schools located in the areas with a large black population — and especially in the Black Belt, where whites might constitute as little as an eighth of the total population — were extremely well funded.  Accordingly, the Black Belt counties had no incentive to seek further sources of revenue for education.[1159]  "As the Black Belt politically dominated the white counties through the control of the Negro vote, the Black Belt also stood in the way of [additional] local

---

[1156] Thornton Depo, at 88-89.

[1157] Norrell Tr., at 44; *see also* Flynt 1 Tr., at 160.

[1158] Norrell Tr., at 44.

[1159] *See* Flynt 1 Tr., at 159-60 (noting that the white population was so scattered in the Black Belt that its generous funding essentially went to plantation run, tutored schools).

> Well, once the *ad valorem* funds that were going to the . . . township level in the Black Belt could be diverted to the white schools, the result was, since the white . . . number of children in each township was so small, that those schools became very well-funded.  And so there would then have been virtually no pressure from whites living in the Black Belt to increase funding for the public schools at large in the state because their . . . white schools in the Black Belt are now getting all the money they need because the money is coming to them in terms of . . . the total population, both white and black, but effectively it's being spent almost all on the white students.

> And that's a very small percentage, a fifth, a sixth, to even an eighth of the population in some of these counties.

Thornton Depo, at 81-82.

taxation for the schools [in majority-white counties]."[1160]

### iii.    Failed attempts to improve public education

In rural areas of the State in which poor whites constituted a majority of the population, funding for white schools remained grossly inadequate even after the Apportionment Act of 1891.[1161]  In the hill country and Wiregrass counties, whites did not benefit from stealing funds theoretically allocated for black students, because there were relatively few, if any, black students residing within those counties. Accordingly, poor whites outside the Black Belt, along with organized labor groups in Birmingham, began agitating for better educational opportunities for their children.[1162]  In recognition of the fact that land was the untapped source for additional education revenue, proponents of that cause made numerous attempts to circumvent the millage cap restrictions contained in the 1875 Constitution.  School districts were

---

[1160] Bond, at 138 (citations omitted).

The Act . . . . gave the resources of a diverted school fund from Negro children to the politically powerful but minority white population of the Black Belt.  As a result, that section no longer clamored for local taxes; and for the next twenty-five years every effort, on the part of the "white counties," to obtain legislation permitting local taxation, was estopped by the Black Belt.

*Id.* at 163.

[1161] Thornton Depo, at 83.

[1162] Flynt 1 Tr., at 124 ("[B]y the 1880s economic conditions in the state are becoming so bad for poor whites they. . . think that . . . this is a dead-end world for my children.  They'll never have a life better than what I have."); *see also id.* at 128 ("More and more whites see that the future of their children is not going to be in illiteracy.  It will be in getting a public education.").

created, and given the power to levy special taxes of up to two mills for public school expenses.[1163]  That strategy was overturned by the Alabama Supreme Court's decision in  *Schultes v. Eberly*, 82 Ala. 242, 2 So. 345 (Ala. 1887), holding that "the general assembly had no authority to delegate the power to tax to [school district] trustees" under the terms of the 1875 Constitution.[1164]  The Legislature later attempted to transfer two mills of its constitutionally authorized 7.5 mills to Birmingham for public school funding.[1165]  Again, however, in *State v. Southern Railway Co.*, 22 So. 589 (Ala. 1897), the Alabama Supreme Court held that gambit to also be unconstitutional, saying that the Act "would sanction the levy of a tax by the state for the purposes of public education in the city, which the city itself is prohibited by the [1875] constitution from levying and collecting . . . ."[1166]

Leaders of the movement for increased education funding for the white counties then attempted to amend the 1875 Constitution.  They recognized that whites would resist any increase in taxation that benefitted black schools.[1167]  Accordingly, they developed a scheme under which property taxes could be raised, *but not for the benefit*

---

[1163] *See* Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901:  A Study in Politics, the Negro, and Sectionalism* 236-37 (Chapel Hill: The University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Co. 1978) ("**McMillan**"); Bond, at 137.

[1164] *Schultes*, 2 So. at 348.

[1165] McMillan, at 236-37.

[1166] *Southern Rail*, 22 So. at 592.

[1167] *See* Flynt 1 Tr., at 124-29.

*of black children.*[1168]  The idea was "to separate the school funds by race; that is . . . to officially collect the taxes *by the race of the tax-payer* and . . . the money to fund black education [would come] only from black taxpayers."[1169]  In short, whites would pay for white schools, and blacks — most of whom were not in a position to pay taxes — would pay for black schools.[1170]  "This was something that . . . became a kind of popular demand in the 1880s, and then . . . picked up steam and got a lot of support from the Populist movement in the 1890s.  The  . . . presumption being that no white taxpayer should have to help educate any black child."[1171]

The "Hundley Amendment," proposed in 1894 as an amendment to the 1875

---

[1168] *See* Norrell Tr., at 45; Flynt 1 Tr., at 129.

In 1882 the Superintendent of Education took cognizance of the growing agitation for local taxes and discontent at the share of the state apportionment received by Negroes.  In his report he suggested:

> If it can be constitutionally done, which it is the province of the General Assembly to determine, I would recommend the enactment of a law, giving to counties, cities, towns, and separate school districts, the power and authority, by a vote of the people resident therein (with proper restriction), to levy and collect a special school tax, not to exceed four mills on the dollar, to be used for the purpose of purchasing school sites, the erection of schoolhouses, and the payment of teachers, as a supplement to the amount appropriated by the State; the amounts so raised by each race to be applied to the use and benefit of such race.

Bond, at 150 (citations omitted); *see also* Flynt 1 Tr., at 129.

[1169] Norrell Tr., at 45; *see also* Flynt 1 Tr., at 129-30.

[1170] Norrell Tr., at 45-46.

[1171] *Id.* at 45.

Constitution, would have segregated school funding revenues by race, and allowed local governments to levy an additional two and a half mills for the support of public schools.[1172]   That was "greatly desired in the many majority white counties but was unnecessary in the Black Belt counties because they were already getting . . . adequate funding for the white schools by means of their theft of State funds allocated for black students, but diverted to the white schools."[1173]   The amendment was presented to the people, but not ratified due to the rigid requirements for amending the 1875 Constitution, and, the fraudulent voting practices in the Black Belt.[1174]

---

[1172] *See* Thornton Depo, at 93; Flynt 1 Tr., at 139-40.

[1173] Thornton Depo, at 93.

[1174] *Id.* at 94-96; Norrell Tr., at 45.

> After the Supreme Court voided the taxing power of school districts, the Alabama Educational Association, state superintendents of education, and other officials of the state government inaugurated a movement for a constitutional amendment providing for local taxation for schools.  In 1888, Oscar R. Hundley of Huntsville introduced and guided a local taxation for schools amendment through the House, but it failed to pass the Senate. Educational forces continued agitation for the proposed Hundley Amendment and the measure finally passed the legislature during the session of 1892-1893.  The proposal conferred upon school districts the power to levy a special tax of not more than 2.5 mills to be used exclusively for public schools.  However, when submitted to the voters the measure failed of ratification in the Kolb-Oates general election of 1894, despite the fact that it received the support of the leading state newspapers, both candidates for governor, Dr. J. L. M. Curry, and the teachers of the state. It was defeated because it did not secure a majority of all the whole vote cast (a very difficult requirement when political issues were paramount) in one of the most bitter gubernatorial elections in Alabama history.

McMillan, at 237-38 (citations omitted); *see also* William Warren Rogers & Robert David Ward, "Part Two:  From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* 269 (Tuscaloosa:  The University of Alabama Press 1994) ("**Rogers & Ward II**").

Having exhausted all avenues of either circumventing or amending the property tax restrictions embedded in the 1875 Constitution, "supporters of public schools [became] convinced that a constitutional convention was necessary to establish in Alabama a broad program of public education."[1175]  Indeed, "all the governors of the state in the eighteen-nineties demanded a constitutional convention in order to place additional support for education in Alabama's fundamental law."[1176] All recognized that "the low limit placed on local taxation [in the 1875 Constitution] restrained . . . the growth of the public school system."[1177]  The millage limitations on property taxation had to be addressed if the State intended to "change the educational truism of 'once behind always behind.'"[1178]

---

[1175] McMillan, at 238; *see also* Flynt 1 Tr., at 142-43; Rogers & Ward II, at 335 (noting that the 1875 Constitution "locked Alabama into a straightjacket" and that "[t]hose who believed in the need for educational reform demanded a constitutional convention").  It is noteworthy that a committee organized by the Alabama Education Association to address the matter recommended as reforms many of the instruments that were included, but later stricken from, Alabama's Constitution in 1868.  Among those were a State Board of Education, an allocation of a fixed per centum of the state's total revenues to education, and a more "equitable" system of distribution for school revenues. McMillan, at 239; Rogers & Ward II, at 324.

[1176] McMillan, at 240.

[1177] *Id.* at 234.

[1178] Rogers & Ward II, at 324; *see also* Thornton Depo, at 98.

Local taxation for public schools alone was sufficient reason for a convention, declared the *Age-Herald*, "for without it the public school system will remain incomplete and sadly crippled and the districts that desire better schools will be deprived of the right of taxing themselves for them . . . . Local taxation for public school purposes will be an issue outranked in the convention by suffrage reform only . . . ."

548

### d. Division within the Democratic Party and the movement for a new constitution

Three great crises have left an enduring imprint upon Southern history and political behavior. The first crisis, of course, was the calamitous Civil War of 1861–1865 and the decade of Reconstruction that followed.[1179] The second was the Civil Rights Movement of 1954–1968. In between those crises fell the "Populist Revolt" of the 1890s: a political conflict that highlighted the sectional cleavage between the white hill-counties of north Alabama and the Wiregrass in southeastern Alabama, on the one hand, and the "Bourbons" of the Black-Belt counties and "Big Mules" of Birmingham, on the other.[1180] Professor Samuel Webb explained the undercurrents of that sectional cleavage as follows:

> The Hill Country had chafed under Democratic rule ever since the Civil War, but differences between that region and the powerful Black Belt in southern Alabama had existed long before secession. This sectional division had more to do with socioeconomic differences than with mere geography. The Black Belt was blessed with rich soil, flat

McMillan at 238; *see also id*. at 236-37 ("Constitutional restrictions on local taxation also hampered the development of the public school system.").

[1179] *See, e.g.*, V.O. Key, at 7 (observing that "The War left a far higher degree of southern unity against the rest of the world than had prevailed before. Internal differences that had expressed themselves in sharp political competition were weakened — if not blotted out — by the common experiences of The War and Reconstruction. And, however unreasonable it may seem, it follows — as even a sophomore can see from observing the European scene — that a people ruled by a military government will retain an antipathy toward the occupying power.").

[1180] *See, e.g.*, *id*. at 42 (observing that the Alabama Black Belt, "a region of large farms and of many Negroes with the accompanying socioeconomic system, tends to ally itself with the 'big mules' of Birmingham and the lesser 'big mules' of Mobile").

land, staple crop agriculture, and water transportation routes to economic marketplaces.  The Hill Country was mountainous, rocky, more subject to soil erosion, and more isolated from market centers.  These differences led to disparities between the two regions in the value of farmland, the economic and social class of the farming population, and the percentage of black population.  In the antebellum period the Black Belt became the center of Alabama's plantation region, dominated by large landholders. Black slaves constituted the majority of the region's population.  Most self-sufficient small farmers lived in the predominantly white Hill Country of northern Alabama or in the much smaller Wiregrass region in the southeastern corner of the state, where large plantations were rare.

Political differences between the state's regions surfaced well before the Civil War when the Whig Party found its greatest support in the Black Belt and most Hill Country voters were staunch Jacksonian Democrats.  Their "Jacksonianism" referred in part to their devotion to Andrew Jackson but more broadly to an ideology that became fixed in the popular mind of the Hill Country even before Jackson's presidency. The white yeoman farmers of northern Alabama were attracted to Jacksonian ideas because of their self-sufficient and individualistic view of the world and also because of their distrust of the lowland planters to their south.  The Jacksonian ethos held that yeoman farmers were in a perpetual battle with elites who sought from the government special privileges that were unavailable to average people.  Often operating secretly, these elites threatened the independence of small farmers by tempting politicians to pass laws that benefitted wealthy private interests and corporations.[1181]

In contrast to the socioeconomic and class characteristics binding the white hill-counties of north Alabama and the Wiregrass in southeastern Alabama noted by Professor Webb, the interest that tied together the various elements of the Black

---

[1181] Samuel L. Webb, "The Populist Revolt in Alabama:  Prelude to Disfranchisement," in *A Century of Controversy:  Constitutional Reform in Alabama* 8 (Tuscaloosa:  The University of Alabama Press 2002, Bailey Thomson ed.) (footnotes omitted) ("**Webb**").

Belt–Big Mule political partnership was their common desire "to control the tenant farmers, sharecroppers, farm laborers, textile workers, lumber millhands, coal and iron ore miners, and workers in iron and steel mills who produced the wealth for the state's upper classes."[1182]

In addition, the members of the "Jacksonian Democratic Party" (as the Populists called their organization) promulgated a platform in 1892 that advocated

> protection of Negroes in their legal rights, a liberal public school system, equitable taxation on property, opposition to trusts, opposition to class legislation, the prohibition of competition between convict and free labor, abolition of national banks and expansion of the currency, free, and unlimited coinage of silver, popular election of state railroad commissioners, and a graduated federal income tax.[1183]

Such a platform, with its appeal to interests that affected poor-white agrarians and blacks alike, threatened segregation and the intricate system that guarded the intertwined interests of the Black Belt–Big Mule political partnership.  The Populists' platform represented the opening shot of an assault upon the citadel of white supremacy, and an insulting challenge to the previously-unquestioned hegemony of the aristocratic Bourbon–Big Mule elites and their political spawn.  In the eyes of the latter interests, the Populists were not only traitors to their race and heretics to

---

[1182] *Id.* at 5.

[1183] William Warren Rogers, *The One-Gallused Rebellion:  Agrarianism in Alabama, 1865–1896*, at 213 (Baton Rouge:  Louisiana State University Press 1970) ("**Rogers**").

551

Southern political ideology, but their ideology of the essential equality of all God's people was anathema.  The Populists had to be destroyed, if the "Southern way of life" and its "peculiar institution" was to be preserved.

Interestingly, the leader of the Populists in Alabama was Reuben F. Kolb of Barbour County in the Black Belt.  "Raised by his grandfather, who was the brother of Governor John Gill Shorter,[1184] and graduated from the University of North Carolina in 1859, Kolb entered adulthood with all of the advantages that a prominent Alabama family could give a son."[1185]  He was the youngest member of Alabama's secession convention, voted for secession, and enlisted in the Confederate Army as a sergeant.  He later raised his own company of artillery, "Kolb's Battery," fought through the war and emerged in 1865 "with a captain's commission and an honorable record.  *Family, place, breeding, education, service to the Lost Cause — Kolb's future should have been secure*."[1186]  Unfortunately, Kolb's future was anything but "secure." Like so many others who served in "the Lost Cause," Kolb returned from the war to find his family's fortune in ruins.

---

[1184] John Gill Shorter, a Jackson Democrat, was Governor from 1861 to 1863.  See, e.g., Henry M. McKiven, "John Gill Shorter, 1861–1863," in *Alabama Governors: A Political History of the State* 70–73 (Tuscaloosa:  The University of Alabama Press 2001, Samuel L. Webb & Margaret E. Armbrester eds.).

[1185] Sheldon Hackney, *Populism to Progressivism in Alabama* 5 (Princeton, N.J.: Princeton University Press 1969) ("**Hackney**").

[1186] *Id*. (emphasis supplied).

Through the years of Reconstruction, Kolb searched for ways to avoid personal disaster. He tried the grocery business, managed an "opera house" in Eufaula for a time, and even sought appointment as postmaster. Nothing succeeded.

Eventually Kolb found success in his watermelon patch. He began to experiment and soon developed his own strain of melon, the "Kolb Gem," whose popularity spread. Orders mounted until Kolb was primarily growing and shipping seed. As his cash returns rose, he also learned to grow foodstuffs for his own farm rather than buying his supplies. Modernization usually means specialization, but Kolb and other agricultural reformers were convinced that diversification was the southern farmer's road to the future. "There is, nor can be but one outcome to the all cotton idea," thought Kolb. It meant "disaster not only to the pocketbook, but to the land as well."

Kolb's experience made him an apostle of scientific agriculture and his success made him a leading agricultural spokesman. In 1887 he served as president of the National Farmers Congress at Chicago and was reelected when the meeting was held in Montgomery in 1889. When Governor Thomas Seay appointed him Commissioner of Agriculture in 1887, Kolb used his position to further his dream of making agriculture in Alabama modern and capable of competing in national and world markets. Through farmer's institutes, all-day meetings held throughout the state, Commissioner Kolb spread the knowledge that was coming out of the growing experimental farm system.

It soon became evident that Kolb wished to do *well* as well as do good, for he had strong political ambitions. The institutes gave him the opportunity to meet and speak to thousands of Alabamians, an opportunity he exploited to the full. His department also flooded the state with agricultural bulletins, each of which bore the commissioner's name as well as useful information. Touring the Northwest in 1888 with an exhibit called "Alabama on Wheels," Kolb won additional publicity for himself, though he lured very few immigrants to Alabama. . . .[1187]

---

[1187] *Id*. at 6-7 (emphasis in original).

The emergence of Reuben F. Kolb as the leader of the Populist Revolt in Alabama is interesting — and not just because of his family pedigree, place of birth, education, and service to the Lost Cause was wholly atypical of the class of poor-white yeoman-farmers and blacks to whom the Populist Party's platform and positions appealed — but also because Kolb is the great-grandfather of another judge on this same court:  Senior U.S. District Judge James Hughes Hancock.  Kolb's ascendancy to leadership of the Populist Party also is interesting because he *most assuredly* was twice elected Governor — first in 1892, and again in 1894 — but both victories were stolen from him:  the first time by a man who also served as U.S. District Judge for the Northern and Middle Districts of Alabama from 1901 to 1914:  Thomas Goode Jones.

> Both Kolb and Jones came from families of impeccable Southern pedigree, yet both had had to achieve individual success without the aid of family wealth.  The contrasting ways in which they did so are significant.  Where Kolb's achievements in the army, farming, and politics were the accomplishments of an individual operating outside of the system's established procedures for advancement, Jones had risen within the system.[1188]

The fratricidal conflict between Jones and Kolb in 1892 was a political

---

[1188] Hackney, at 11.  Jones was educated at the Virginia Military Institute, ended the Civil War as a Major in the Confederate Army, was a planter in Montgomery County from 1865-1868, was Editor of the Montgomery *Picayune* in 1868, engaged in the private practice of law in Montgomery at various times from 1868 until his recess appointment to the federal bench by President Theodore Roosevelt on Oct. 7, 1901, served as Reporter of the decisions of the Alabama Supreme Court from 1870 to 1880, served in the Alabama House of Representatives from 1884 to 1888 (and was Speaker of the House from 1886 to 1888), and served as Governor of Alabama two terms, from 1890 to 1894.  *See, e.g.*, www.fjc.gov/servlet/nGetInfo (biographies of all federal judges since 1789); Hackney, at 11-12.

bloodletting, in which Jones presented himself as the representative of the established economic, political, and social leadership of the State.  "The Jones forces attacked Kolb for embracing socialistic, communistic, and un-Democratic ideas."[1189]  Kolb thus was pushed to the political left, and "became the spokesman for the submarginal tenant farmers and for the increasing number of laborers, miners, and factory workers."[1190]  Kolb's "men poured on the anti-monopoly and anti-machine rhetoric. The monster they attacked resided not only in Wall Street, but in Montgomery and numerous county courthouses across the state."[1191]

Ultimately, Jones allegedly "won" the election by the slim margin of 11,435 votes (126,959 votes for Jones to 115,524 for Kolb).  "It seems certain," however, "that Kolb was the legitimately elected governor but was counted out in the black belt."[1192]

> In the four Black Belt counties of Dallas, Wilcox, Montgomery, and Bullock, Jones polled over 83 percent of the vote.  In these four counties alone his margin was 19,574.  In fact, Jones lost only one of the 12 Black Belt counties, where he polled 45,454 votes.  This gave him a margin of 27,210 votes, which Kolb could not overcome in the rest of the state.[1193]

The explanation for the outcome of the Governor's election of 1892, known among

---

[1189] *Id*. at 18.

[1190] Rogers, at 215.

[1191] Hackney, at 18.

[1192] Rogers, at 226.

[1193] Hackney, at 22.

Populists as "The Crime of '92," was as simple as it was diabolical:

> In the Black Belt there was a magical process by which Negroes who walked into the polling place to vote Republican [or for the Populist candidate], plus those who stayed at home, and even a few who were dead, were all counted in the Democratic column.[1194]

The "Crime of '92" was repeated in 1894, when Kolb was again "counted out" in the Black Belt on behalf of the Conservative Democratic candidate, Col. William C. Oates, who had commanded the 15th Alabama Infantry Regiment at (among other Civil War engagements) Gettysburg.  That was the high-water mark of the Populist Revolt in Alabama, and upon the Party's demise many of the former members dispiritedly returned to the Democratic party which offered them more than the Republican Party of William McKinley and Mark Hanna.

> In the fight against Populism and in the subsequent agitation about the place of the Negro, the black belts strengthened their position by re-enforcing the South's attachment to the Democratic party.  The raising of a fearful specter of Negro rule and the ruthless application of social pressures against those who treasonably fused with the Republicans under Populist leadership put down for decades the threat of the revival of two-party competition.[1195]

### i.    Class differences resurface

Education policy was one of the most important issues contributing to the

---

[1194] Hackney, at 360.  *See generally* David Ashley Bagwell, *The "Magical Process":  The Sayre Election Law of 1893*, 25 Alabama Review 83 (April 1972).

[1195] V.O. Key, at 8.

division between Conservative Democrats and Populists during the 1890s.[1196]  The "Bourbons" used their extralegal control of the black vote in Black Belt counties to maintain the *status quo* and prevent social and economic reforms.[1197]  The Populists

---

[1196] *See* Flynt 1 Tr., at 156-58; *see also* Harvey H. Jackson III, *Inside Alabama:  A Personal History of My State* 125 (Tuscaloosa:   The University of Alabama Press 2004) ("**Jackson**") ("Although elements of this conflict were evident during Reconstruction and redemption, Alabama had been governed a decade under its 1875 constitution before serious splits began to appear in what many thought was a seamless Democratic fabric.").  Another reason behind the fierce sectionalism was the Black Belt's successful escape from property taxation.  Dr. Flynt testified about the success of the Black Belt counties in avoiding fair taxation of their property.

Q. According to Rogers and Ward, the tax commissioner idea didn't work back then.  It says 1890, 57 percent of property taxes had escaped taxation.  Ten years later, and despite all the efforts, 65 percent of property went totally unassessed.

A. That's correct.  And that is what's so outrageous.  People who live in the hill country and wire grass [are] looking at stuff like this and say[ing], how come we own 20 acres of cotton land and we're paying our taxes, and people in Black Belt counties are not being assessed anything?  Well, it happens to be the color of the tax assessor is white down in the Black Belt, and sympathetic to the planters and elected by the planters and protecting planter property.  And that's fine and well and good, because white kids will go to school, anyway, using funds that are being paid from taxes in the hill country and the wire grass.  Looks like a terribly flawed system.

That's one reason for the outrage of the 1890s.  They don't understand all of that. They just understand something is terribly wrong.

Flynt 1 Tr., at 167.

[1197] McMillan, at 226; Rogers & Ward II, at 290 ("In Alabama the door to change was guarded by the Bourbons.").

By the 1880s the people, many of them, had become convinced that the enemy they faced, the enemy bent on taking their liberty, was a new Royal Party, a new elite, a new class of rich and powerful men who intended to stay that way by controlling the state and its resources.  They called them Bourbons.

Jackson, at 125.

sought reform, and began to challenge the rule of the Conservative Democrats.[1198]  As

Dr. McMillan observed in his study of Alabama's constitutional development:

> In many respects the revolt within the Democratic party was essentially a reassertion of economic differences and social animosities of . . . earlier Alabama history.   The whites of Alabama had submerged their differences since the war because of the danger of "Negro domination," but the depressing state of economic affairs during the nineties forced a separation.
>
> . . .
>
> The [Populist] movement was a sectional fight of "white" counties against the "Black Belt," [with] the "white" counties claiming that they had rescued the Black Belt from Negro domination in 1874, and that ever since the Negro had been used to "outvote" them and "out apportion" them in the legislature and state convention.  Machine domination, they declared, made it impossible to nominate any candidate with a progressive program.[1199]

Gubernatorial elections during the 1890s indicated that the Democratic party

was almost evenly split between the sectional factions, *and success in elections*

*depended upon which faction could "buy or 'count in or out' the most Negro*

*votes.*"[1200]  The Bourbon Democrats had a distinct advantage, because the State's black

---

[1198] McMillan, at 227.

[1199] *Id.* at 227-28 (alteration supplied).

[1200] *Id.* (emphasis supplied).

In the August [1892] election, Jones defeated Kolb by a majority of 11,435 in a vote of nearly a quarter of a million.  Kolb carried eight more counties than Jones, and the Birmingham *News* conceded that Kolb received a larger white vote than did Jones.  One historian has declared that the vote "was notoriously fraudulent and there can be little doubt that Kolb was counted out in the Black Belt."  The Kolb-Oates election

population then was concentrated in the Black Belt counties they controlled.[1201] Accordingly, many Jacksonian Democrats came to the conclusion that disfranchisement of blacks was a means of stripping Bourbon Democrats of their ability to use the black vote against them.[1202]

### ii.   Disfranchisement of black voters viewed as possible in the absence of federal intervention

The concern that denying suffrage rights to blacks might cause federal intervention was quelled in the 1890s. By the end of the century, national conditions boded well for the disfranchisement of blacks.

> Most of the post Civil War leaders had passed from the scene. The Spanish-American War had tended to unite the North and South once again . . . [and] had another effect on the Southern Negro suffrage problem. As the United States acquired subject races overseas, the people of the North were forced to consider the race problem objectively, without any sentimental prejudices growing out of the Civil War. *They could not consistently support an educational test which would place the government of Hawaii, Puerto Rico, and the Philippines in the hands of a favored white minority and deny the same privilege to Alabama.* The Negroes' exodus from the South into Northern cities [also] increased the North's understanding of the South's position.[1203]

---

of 1894 was in many ways a repeat performance of 1892.

*Id.* at 228-29.

[1201] *Id.* at 228.

[1202] McMillan, at 229.

[1203] *Id.* at 231 (emphasis supplied); *see also* Flynt 1 Tr., at 171-72 (noting in the context of disfranchising blacks: "[T]here are an awful lot of union soldiers killed to give African-Americans the right to be free and to vote. In 1878, that's an urgent memory. By 1900, that's a kind of distant memory.").

"The last vestiges of Reconstruction hopes were crushed by the Southern states whose actions were upheld and endorsed by compliant chief executives, sympathetic Congresses, and a Supreme Court whose views on race were one-dimensional."[1204]

The United States Supreme Court interpreted the Reconstruction Amendments in a manner that made their circumvention possible. The Court handed down the infamous *Plessy v. Ferguson* decision in 1896. *Plessy v. Ferguson,* 163 U.S. 537 (1896). As discussed in Part II(G)(1)(a) of this opinion, *supra,* the Court held that a Louisiana statute requiring "separate but equal" railway accommodations for black and white passengers did not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[1205] The Court found the challenged law to be a "reasonable regulation," and held that Louisiana was "at liberty to act with reference to the established usages, customs and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order."[1206] To those who believed that this "enforced separation of the two races stamps the colored race with a badge of inferiority," the Court opined that any such inferiority was "not by reason of anything found in the act, but solely because the

---

[1204] Rogers & Ward II, at 343.

[1205] *Plessy*, 163 U.S. at 550-51.

[1206] *Id.* at 550.

colored race chooses to put that construction upon it."[1207]  Confronting the elephant in the room, Justice Harlan wrote in his dissenting opinion:

> It was said in argument that the statute [in question] does not discriminate against either race, but prescribes a rule applicable alike to white and colored citizens . . . . *Every one knows that the statute in question had its origin in the purpose, not so much to exclude white persons from railroad cars occupied by blacks, as to exclude colored people from coaches occupied by or assigned to white persons.* Railroad corporations of Louisiana did not make discrimination among whites in the matter of [ac]commodation for travelers. *The thing to accomplish was, under the guise of giving equal accommodation for whites and blacks, to compel the latter to keep to themselves while traveling in railroad passenger coaches.* No one would be so wanting in candor as to assert the contrary.[1208]

It does not require guesswork to conclude that "every one" *did know* that the law was intended to preserve white supremacy, that seven justices of the United States Supreme Court — "the final expositor of the fundamental law of the land"[1209] — approved of that ideology, and that the *Plessy* decision was a signal that the Supreme Court intended to grant states a substantial degree of constitutional latitude on matters concerning race.

That signal was repeated two years later in the case of *Williams v. State of Mississippi,* 170 U.S. 213 (1898), in which the Court appeared to give its stamp of

---

[1207] *Id.* at 551.

[1208] *Id.* at 556-57 (Harlan, J., dissenting) (emphasis supplied).

[1209] *Id.* at 557 (Harlan, J., dissenting).

approval to a former rebel state's disfranchisement of blacks.  In 1890, Mississippi endeavored to defeat black suffrage with a number of complex voting requirements.[1210] The "understanding clause" was perhaps the state's most innovative constitutional provision.  Pursuant to the Mississippi constitution, a potential voter was required to be "able to read any section of the constitution . . .  or . . . able to *understand* the same when read to him, or give a reasonable interpretation thereof," in order to obtain the franchise.[1211]  Election officers were given discretion to determine whether a potential voter met the suffrage requirements, including the "understanding clause."[1212]  Despite assertions that election officials used their discretion "to end . . . the elective franchise of the colored voters," the United States Supreme Court rejected a Fourteenth Amendment challenge, holding that the contested provisions did not "on their face discriminate between the races, and it has not been shown that their actual administration was evil; only that evil was possible under them."[1213]  "Besides," wrote the Court, once again winking at what "everyone knows,"

> the operation of the [Mississippi] constitution and laws is not limited by their language or effects to one race.  They reach weak and vicious white

---

[1210] *See, e.g.*, Flynt 1 Tr., at 148 ("And so it was on considerable risks at your peril that you disfranchise blacks altogether [in 1875].  That didn't get done until 1890s and the so-called Mississippi plan.  So Mississippi wasn't willing to take this risk until 1890.").

[1211] *Williams*, 170 U.S. at 217 n.1.

[1212] *Id.*

[1213] *Id.* at 225.

men as well as weak and vicious black men, and whatever is sinister in their intention, if anything, can be prevented by both races by the exertion of that duty which voluntarily pays taxes and refrains from crime."[1214]

By 1900, four states — Mississippi, South Carolina, North Carolina, and Louisiana — had "disfranchised the Negro by the use of the poll tax, property, educational, or other qualifications."[1215]   It was becoming clear, therefore, that Alabama was at liberty to do the same if the State called a convention for that purpose.[1216]

### iii.   Black Belt support for a constitutional convention

Both factions of the Democratic party generally supported a convention to disfranchise black voters.  The Populists, pushing for increased funding for education

---

[1214] *Id.* at 222; *see also United States v. Reese*, 92 U.S. 214, 217 (1875) ("The Fifteenth Amendment *does not confer the right of suffrage upon any one.*  It prevents the States . . . from giving preference . . . to one citizen of the United States over another on account of race, color, or previous condition of servitude.") (emphasis supplied).

> [I]n *United States v. Reese*, the Court declared that the Fifteenth Amendment did not confer the suffrage on anyone.  Instead, it merely sought to prevent the state or the United States from discriminating against such matters on account of race, color, or previous condition of servitude . . . . The victor of the counter-reconstructionists was made complete by this decision of the Supreme Court.

John Hope Franklin, *Reconstruction After the Civil War* 202 (Chicago:  University of Chicago Press 1994).

[1215] McMillan, at 231.

[1216] Indeed, Alabama was "one of the very last states to get around to [disfranchising blacks].  We didn't get around to it until 1901."  Testimony of Dr. Wayne Flynt Transcript Vol. 1 (doc. no. 257), at 148 ("**Flynt 1. Tr.**").

and other reforms, had great incentive to disfranchise blacks.  The Bourbons were in firm control of black votes in the populous Black Belt.  The system of "voting" black citizens had been perfected into a "Black Belt art."[1217]  Thus, Black Belt support of a constitutional convention to disfranchise blacks and undermine the Planters' primary source of political power can be, at first glance, both counterintuitive and confounding.

The rationale lies in the recognition by the well-educated and politically astute Planter elite that their continued reign over the Black Belt under the 1875 Constitution was not guaranteed to last indefinitely.[1218]  Controlling the black vote was "hard work."[1219]  It was a task to which whites "had to devote themselves entirely at every election."[1220]  Despite their lofty position atop Alabama politics, Black Belt leaders recognized "that the limit had been reached in fraudulent election methods — that representative government itself was threatened."[1221]  Dr. Flynt explained some of the motives of Black Belt whites in supporting a constitutional convention as follows:

---

[1217] *See* Official Proceedings of the 1901 Constitutional Convention, at 3079 (1901), http://www.legislature.state.al.us/misc/history/constitutions/1901/proceedings/1901_proceedings _vol1/1901.html ("**1901 Proceedings**") ("It is an art, gentlemen, learned only by experience, one fraught with danger– a 'magnificent system' that cannot be inherited or perpetuated.").

[1218] *See* Flynt 1 Tr., at 168.

[1219] Thornton Depo, at 100.

[1220] *Id.*

[1221] McMillan, at 229.

The Black Belt wants a convention for a couple of reasons. One, is when you establish and maintain your political power by fraud, intimidation[,] and violence, there's always the possibility that sometimes the [federal] courts are going to get around to doing something about that. So there's always that specter.

Also, there's increasing political opposition to . . . the corruption coming out of the press. Almost all the urban press is now beginning to say, we can't go on like this. One famous editorial saying even our ministers are participating in the corruption, what will happen to our churches if we allow this to continue? So . . . there is a real concern that the system of government is simply rotting down.

From the standpoint of the Black Belt, it would be a lot better to institutionalize this than to allow it to continue in an irregular fashion where it threatens federal intervention[1222] . . . and it is basically creating a system of government that no one respects and that everyone knows is corrupt.

So how can you take the actual events that are taking place and put them into some constitutional fashion that will eliminate the need for intimidation, violence and corruption[?] So that's basically the run up to a 1901 convention.[1223]

Dr. Flynt's explanation omits reference to another important motivation, however. Fundamentally, the Populist Revolt of the 1890s gave birth to a fear among wealthy Planter elites and their Big Mule allies that poor whites and blacks would come to the realization that they shared common economic, political, and social interests, and that they then would unite in common purposes and gain control of state

---

[1222] *See* Thornton Depo, at 100-01; McMillan, at 219-21 (detailing several incidents where elections were contested in the United States House of Representatives).

[1223] Flynt 1 Tr., at 168-69; *see also* Thornton Depo, at 101-02 (articulating essentially the same reasons for Black Belt support of a constitutional convention).

governance.[1224]   In 1892 and 1894, the State *purportedly* elected governors who received a majority of the vote *only* because black votes in the Black Belt were "counted in" for the candidate of the Conservative Democratic faction.   Stated differently, the majority of white voters would have elected the Populist candidate, Reuben Kolb.[1225]   In both elections, "there was evidence of gross fraud."[1226]   By the 1890s, "[t]he whole social, economic, and political life of the state was affected.   The jury system, the legislature, and the entire governmental machine felt its harmful

---

[1224] *See, e.g.*, Rogers & Ward II, at 336 ("For the rulers of the Black Belt, constitutional revision was a thing of pluses and minuses.  Black disfranchisement would remove the threat of a black-poor white coalition that might have allowed a majority of Alabamians to control their own government."); Wayne Flynt, *Alabama in the Twentieth Century* 6 (Tuscaloosa:  The University of Alabama Press 2004) ("**Flynt II**") ("By appealing to Democrats, Republicans, and independents, blacks and whites, on a frankly class-based platform, Populists terrified conservative Democrats, especially in the Black Belt, where planters envisioned a neo-Reconstruction coalition taking over and imposing higher taxes."); Jackson, at 110 ("Planters feared that blacks and yeoman farmers might unite under the Republican banner and run the state to their advantage.").

[1225] *E.g.*, Rogers & Ward II, at 311-15.

[1226] Thornton Depo, at 99-100 (noting that their ability to control the black vote was "the principal source of the ability of the white conservative leadership of the regular Democratic party to defeat the Populist candidacy of Reuben F. Kolb, both in 1892 and in 1894.").

> The electorate reached a high pitch of excitement during the campaign of 1892.  In the August election, Jones defeated Kolb by a majority of 11,435 in a vote of nearly a quarter of a million.  Kolb carried eight more counties than Jones, and the Birmingham *News* conceded that Kolb received a larger white vote than did Jones.  One historian has declared that the vote was "notoriously fraudulent and there can be little doubt that Kolb was counted out in the Black Belt."  The Kolb-Oates election of 1894 was in many ways a repeat performance of 1892.

McMillan, at 228-29 (citation omitted).  Indeed, support from the Black Belt in an election was tantamount to a "litmus test for fraud."  Rogers & Ward II, at 317.

influence."[1227]    McMillan quoted from contemporary newspaper accounts of the

endemic corruption:

> "It is," said the Montgomery *Advertiser*, "a matter of common gossip in Montgomery that all sorts of constitutional irregularities were winked at by officers of the Assembly every day."  The editor further declared:

> There is little doubt that scores of bills, particularly local ones[,] were passed without being voted upon at a complete roll call and without a quorum being present.  The laxness in these matters has been a growing evil for a long time, and it has reached fearful proportions in the last two or three assemblies.  It is very likely that a large majority of the local bills on the statute books during the last few years were not passed constitutionally . . . Ballot box corruption did it."

> "After all, [declared the Birmingham *Age-Herald*] legislative rottenness springs from ballot box corruption, and until the latter is eliminated the former can not be."[1228]

Fears that the State would drive itself into lawless chaos prompted the

movement for a constitutional convention to legalize that which had been done

illegally since the Conservative Democrats "redeemed" control of state government

from the Republicans in 1874.[1229]  Those concerns could be eliminated, however, by

the counterintuitive expedient of disfranchising black voters.

---

[1227] McMillan, at 226.

[1228] *Id.* at 226-27 (ellipses and bracketed alteration in original)

[1229] Flynt 1 Tr., at 94-95, 168; McMillan, at 229-230; Rogers & Ward II, at 335; Flynt II, at 6 ("By 1900 whites agreed that something must be done to change the political climate.  Political corruption threatened the very existence of orderly government.").

### *iv*.   A constitutional convention, but with preconditions

After much debate, the Legislature agreed to call for a convention to draft a new constitution, but not without placing conditions upon the subjects that could be considered by the delegates at that convention.[1230]

On one side of the legislative divide stood the Black Belt's state senators and representatives, who would not agree to call for a convention to disfranchise the huge number of blacks residing within their counties, *unless* other means of maintaining the Black Belt's firm grasp on the reins of Alabama government could be ensured.[1231]  On the other side of the debate stood those legislators from the white counties who feared that constitutional provisions aimed at the disfranchisement of blacks would cut deeply into the ranks of poor whites who then were registered to vote in their counties and house districts.[1232]  In a compromise of sorts, the Democratic Party adopted a

---

[1230] McMillan, at 251.

[1231] *See* Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253), at 51-53 ("**Norrell Tr.**").

> Black Belt Bourbons had to be assured that their political power would not diminish with black disfranchisement.  They wanted guarantees that their seats in the legislature would not be reduced and that the new constitution would not allow state officials to interfere with the way they handled local affairs . . . . So around the state the Bourbons worked the crows, cut deals, made promises, and garnered allies. Black Belt planters, finally convinced that disfranchised blacks would still be counted for representation, joined the movement.

Jackson, at 135.

[1232] *E.g.*, Rogers & Ward II, at 335-36; McMillan, at 250-51.

platform that, like the Legislature, also restricted the actions of delegates to the convention.[1233]  The Party's State Executive Committee pledged, among other things: "to perpetuate the rule of the white man in Alabama"; to retain (or lower if practicable) the 1875 property tax restrictions on State and local governments; to submit the proposed constitution to a vote of the people for ratification; and, to not deprive white men of the right to vote, except for those guilty of infamous crimes.[1234]  Four

---

[1233] McMillan, at 251.

[1234] The full text of the Democratic platform read as follows:

We are in favor of holding a constitutional convention for so regulating the right to vote as to perpetuate the rule of the white man in Alabama.

The constitutional convention shall regulate suffrage so as not to conflict with the Federal Constitution and for the best interest of the people and taxpayers of Alabama.

There shall be invested in such constitution a provision limiting the rate of taxation by the state, counties and municipalities and such rate of taxation shall not exceed the rate now fixed by the present constitution.

The constitution must be submitted for rejection or ratification

We pledge ourselves not to deprive any white man in Alabama of the right to vote except for conviction for infamous crimes

The State capital shall not be removed

The provision and restrictions in the state constitution as to corporations shall remain unchanged.

We instruct all Democratic members of the convention to faithfully carry out instructions.

*Id.* at 255 n.45 (citation omitted).

resolutions also were adopted by the State Party's Executive Committee for the purpose of limiting the delegates' power at the convention: *i.e.,* soldiers and sailors could not be disfranchised; the capital would remain in Montgomery;  representation in the State Legislature would continue to be based upon total population, even after the disfranchisement of blacks; and, the millage rate restrictions placed upon *ad valorem* property taxes in the 1875 Constitution could not be removed, *only lowered* if possible.[1235]  The last  two of those conditions ensured continued Black Belt control of the Legislature, and, low property taxes.[1236]  With those and other self-imposed restrictions in place, an enabling act was passed by the Legislature in 1900.[1237]

Proponents of a new constitution convinced Alabama voters to ratify the Legislature's call for a convention by arguing the need to ensure "white supremacy" by law and the disfranchisement of blacks, rather than by manipulating black voters or ballot fraud.[1238]  As Dr. McMillan later observed, "Black Belt counties gave such

---

[1235] *Id.* at 251 (citations omitted); *see also* Flynt 1 Tr., at 174-76; Norrell Tr., at 50 ("[T]here was an agreement made before the convention that taxes — that anybody who participated in this convention agreed that they would not offer — certainly not raise the property tax circumstance situation in the constitution.").

[1236] Flynt 1 Tr., at 175-76; Rogers & Ward II, at 336 ("A majority accepted the idea of a convention with conditions: . . . . In deference to the Black Belt, apportionment of representation would be based on total population, and there would be no change in the ceilings on taxation.").

[1237] McMillan, at 251-59.  Another enabling act had previously been enacted, but it was overturned in a special session called by the Governor.  The new enabling act contained the same limitations as the prior act, but it also included a provision requiring that the constitution be submitted to the people for ratification. *See id.* at 259; Flynt 1 Tr., at 175; Rogers & Ward II, at 345.

[1238] *See* Flynt 1 Tr., at 126-27; McMillan, at 260.

large majorities for the convention that it is safe to conclude that even on an issue so vital to the Negro as his franchise, the Black Belt leaders could still manipulate the Negro vote."[1239]

Of course, no rational, reasonably-intelligent person would conclude that black citizens voluntarily voted to surrender their franchise in the absence of violence, economic intimidation, or (as most likely was the case) outright theft of their ballots.

Nevertheless, according to the numbers, those polling places in which African-Americans constituted a majority of the registered voters "were the ones most enthusiastic about the convention."[1240]  Indeed, without the enthusiastic "support" of black voters, the call for a constitutional convention would not have carried.[1241]

In short, the constitutional convention that produced the document that now

Bourbons outside the Black Belt were at work.  Claiming that they were out to reform the system, conservative Democrats argued that "honest elections (elections they could win) were possible only if "corruptible voters" (those who might someday vote or be voted against them) were removed from the rolls.  Untroubled that this argument suggested that the best way to keep the white man from stealing the black man's vote was to take the black man's vote away from him — or to put it another way, whites would stop stealing only when blacks had nothing to steal — they canvassed the state.  To make their campaign more attractive to white farmers who might be susceptible to populist promises, the Bourbons noted that under their plan, the white man would always be supreme.  On that point they left no doubts.

Jackson, at 135.

[1239] McMillan, at 261.

[1240] Flynt 1 Tr., at 187.

[1241] *Id.* at 186-87 ("Q: Endnote 99 says that, basically, that the Black Belt counties gave such large majorities that they made the difference in the election on whether to hold a convention?  A: Yeah, that's correct.").

governs the State of Alabama clearly appears to have been illegitimate *ab initio*, and made possible only through fraud, ballot theft, economic and physical intimidation, and unmitigated corruption — all aimed with the most heinous of intentions at the least powerful and most despised citizens of the State.[1242]

### 8.   **Alabama's Present Constitution —** *Disfranchisement and White Supremacy*

Despite the fact that forty-five percent of the State's population was black,[1243] Alabama's 1901 Constitution was crafted solely by whites, many of whom were former Confederate soldiers.[1244]   "No Negro was elected to the convention as the Negro for some time had been excluded from elected office in Alabama."[1245]  The 1901

---

[1242] *See id.* at 187.

> And what had the Black Belt done?  It delivered a huge and overwhelming vote for a convention.  It seemed as if blacks had voted for their own disfranchisement. . . . Democratic officials had promised such a vote.  As J. Thomas (Tom) Heflin of Randolph County put it, 'we have a very patriotic set of managers and probably all the Negroes will vote for the constitutional convention.'

Rogers & Ward II, at 345 (citation omitted); *see also* Horace Mann Bond, *Negro Education in Alabama:  A Study in Cotton and Steel* 164 (Tuscaloosa:  University of Alabama Press 1994) (1939) ("**Bond**") ("The customary heavy majorities for any administration measure were polled throughout the Black Belt, indicating, as the Populists pointed out, that the Negroes were voting for their own disfranchisement.").

[1243] *See* Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901:  A Study in Politics, the Negro, and Sectionalism* 263 (Chapel Hill:  University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Co. 1978) ("**McMillan**"); Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258), at 109 ("**Flynt 2 Tr.**").

[1244] McMillan, at 263.

[1245] *Id.* at 263.

convention "was, in fact, both in representation and intent, *the least democratic* of all [of] Alabama's constitutional conventions."[1246]   Ninety-six of the 150 delegates were lawyers.[1247]   For that reason, the convention has been referred to as "the lawyer's convention."[1248] To the everlasting shame of our profession, those attorneys — "some of the ablest lawyers in the state"[1249] — were instrumental in crafting the despicable provisions that disfranchised blacks.

The Black Belt delegates' power to protect the interests of Planters was bolstered by their alignment with the "Big Mule" delegates from the so-called Birmingham district, a belt of industrial towns stretching from Anniston and Gadsden to Tuscaloosa.  The economic and political interests of the Black Belt Planters also were bolstered by the pledges of the Democratic Party's State Executive Committee during the run-up to the convention that the cap of 7.5 mills on property taxes imposed by the State would not be increased, and that apportionment would be based upon total population, regardless of the inevitable disfranchisement of most of the Black Belt's population.[1250]

---

[1246] Wayne Flynt, *Alabama's Shame:  The Historical Origins of the 1901 Constitution*, 53 Ala. L. Rev. 67, 72 (2001) ("**Flynt III**") (emphasis supplied).

[1247] McMillan, at 263.

[1248] *Id*. at 263; *see also* Flynt 1 Tr., at 186.

[1249] McMillan, at 263.

[1250] *See* Flynt 1 Tr., at 174-79; Deposition of J. Mills Thornton III from *Knight v. Alabama* (PX 682), at 109 ("**Thornton Depo**").

Class and sectional conflicts between the "black counties" and the "white counties" inevitably surfaced during convention debates, but on one issue there appeared to be no disagreement:  disfranchising blacks to entrench white supremacy *by law* was the primary objective of all delegates, regardless of section or class.[1251]

### a.   Raw, racist rhetoric in the convention debates

In the words of defendants' witness, Dr. William Stewart, any person "who is at all familiar with the [1901] Constitution knows that it is impossible to separate Alabama constitutionalism from the issue of race relations."[1252]  Dr. Stewart noted that, among the themes present throughout Alabama's various constitutions, particularly the constitutions of 1868, 1875, and 1901, race "is the one that would be most perilous to *under*emphasize."[1253]  Such is particularly the case with the 1901 "Disfranchising Constitution" — the basic document still in effect today.  There was "a pervasive racial attitude that drove the 1901 constitution and the people who wrote it."[1254]  "[T]he entire context in the run-up to that convention was about race, *and nothing but race.*"[1255]  *Every delegate was a white supremacist*: "There [was] nobody at the

---

[1251] Flynt 1 Tr., at 177-78.

[1252] William H. Stewart, *The Alabama State Constitution* 9 (New York:  Oxford University Press 2011).

[1253] *Id.* (emphasis supplied).

[1254] Flynt 2 Tr., at 109.

[1255] *Id.* (emphasis supplied); *see also id.* at 109-10 ("And I would urge anybody to go back to the fall of 1901 and read the local newspapers, because what they're all about is race, race, race,

574

convention [who was] not a white supremacist."[1256]  The United States Supreme Court recognized in a unanimous opinion by (then) Justice Rehnquist that the "zeal for white supremacy ran rampant at the convention."  *Hunter v. Underwood*, 471 U.S. 222, 228-29 (1985).[1257]

The shared conviction of the necessity to ensure white supremacy in the State's fundamental law is perhaps best illustrated by the words spoken at the Convention. A mere sampling of statements uttered during the proceedings demonstrates the delegates' racist animus toward the least powerful and most vulnerable citizens of the State.  It began in the opening remarks by John Knox of Anniston,  President of the Convention:

> In my judgment, the people of Alabama have been called upon to face no more important situation than now confronts us, unless it be when they, in 1861, stirred by the momentous issues of impending conflict between the North and the South, were forced to decide whether they would remain in or withdraw from the Union.
>
> Then, as now, the negro was the prominent factor in the issue.
>
> . . . .

---

race, race.").

[1256] Thornton Depo, at 112.

[1257] The decision was decided 8-0.  Justice Powell did not participate.  *See also Hunter,* 471 U.S. at 229 ("The delegates to the all-white convention were not secretive about their purpose."); *Underwood v. Hunter*, 730 F. 2d 614, 618 (11th Cir. 1984), *aff'd Hunter* ("In the words of one delegate to the 1901 convention, 'Now we are not begging for "ballot reform" or anything of that sort, but we want to be relieved of purchasing the Negroes to carry elections.  I want cheaper votes.'") (citation omitted).

The Southern man knows the negro, and the negro knows him. The only conflict which has, or is ever likely to arise, springs from the effort of ill-advised friends in the North to confer upon him, without previous training or preparation, places of power and responsibility, for which he is wholly unfitted, either by capacity or experience.

. . . .

There is in the white man an inherited capacity for government which is wholly wanting in the negro.  Before the art of reading and writing was known, the ancestors of the Anglo-Saxon had established an orderly system of government, the basis, in fact, of the one under which we now live. . . . [T]he negro, on the other hand, is descended from a race lowest in intelligence and, moral perception of all the races, of men.[1258]

Knox dictated the solution to the "negro problem" when framing his response to a rhetorical question:  "And what is it that we want to do?  Why, it is, within the limits imposed by the Federal Constitution, to establish white supremacy in this State."[1259]

Thomas Watts of Montgomery County framed the central purpose of the convention even more clearly when speaking in support of a provision specifically excluding blacks from holding public office:

I have heard it said that we ought not to put this [*i.e.,* the Report of the Committee on Suffrage, containing the numerous restrictions on the franchise] in the Constitution. Why not?  That we ought not to put it here because it shows too plainly that our purpose is to keep the negro out of Alabama politics.  Now, Mr. President, how much plainer do we want it?  Isn't every letter and every line of the report of the Committee on

---

[1258] 1901 Proceedings, at 7-12.

[1259] *Id.* at 8.

576

Suffrage to that effect?  Haven't we said to the people of Alabama upon the hustings that this is what this Convention is for?  Are not the people waiting to hear how we are going to provide for disfranchising the negro?  Our purpose is plain.  It is not denied by any man upon the floor of this Convention or in this State.  You must remember that the State of Alabama never adopted the 15th amendment.  It was forced upon us by the other States in the Union. The negro was forced upon us as he was forced upon other Southern States.[1260]

When explaining a proposed amendment to the provision governing the qualifications of State senators, John Burns of Dallas County bluntly stated that the amendment's purpose was "to keep 'niggers' from being Senators."[1261] According to the Chairman of the Local Legislation Committee, Emmet O'Neal of Lauderdale County, who would later become Governor,[1262] "[f]or two thousand years while the white races have been progressing, the negro in Africa remained stationary, as uncivilized today as he was before the birth of Christ."[1263]  Samuel Blackwell of Morgan County spoke of the need for the constitution to "relieve [the people] of negro domination."[1264] Russell Cunningham of Jefferson County declared that "the negro . . . is intrinsically and essentially and naturally inferior to the white race, and will always be."[1265]

---

[1260] *Id.* at 2388-89.

[1261] *Id.* at 2266.

[1262] McMillan, at 264; *see also id.* at 266 (noting that O'Neal chaired the local legislation committee).

[1263] 1901 Proceedings, at 2782.

[1264] *Id.* at 590.

[1265] *Id.* at 2998.

577

In arguing against a provision that would provide financial support for the families of sheriffs killed while defending black pretrial detainees from being forcibly kidnaped from county jails by lynch mobs, Thomas Heflin of Chambers County — who would later become better-known as "Cotton Tom," and represent Alabama in the United States Senate[1266] — said: "Why it will put the price of negroes above that before the war, it makes the negro more precious in the standpoint of dollars and dimes than he was away back yonder in the good old days of slavery."[1267]  In a lengthy address to the convention on another day, Heflin expressed his conviction of the inferiority of black Americans:

> In the course of time, gentlemen of the Convention, the slaves were hunted out in Africa.  The negro wandering through the woods like a beast of the field, and brought here to do what[?]  Put upon the block and sold to the highest bidder, to be the servant of his superior, the white man in this country.  I believe as truly as I believe that I am standing here, that God Almighty intended the negro to be the servant of the white man.  I believe that the Scripture will sustain my position on that question. I know he is inferior to the white man and I believe that delegates of this Convention believe him to be.  He knows it himself. [1268]

Heflin also declared his disdain for the right of blacks to vote in various ways: *e.g.,* "the striking from [the negro] of the title slave, and placing in his hand the ballot was the most diabolical piece of tyranny ever visited upon a proud though broken people";

---

[1266] McMillan, at 264.

[1267] 1901 Proceedings, at 983.

[1268] *Id.* at 2841.

578

"I would just as soon give a toddling child a razor in his hand, expecting him not to hurt himself, as to expect the negro to use the ballot and not use it to his injury and to ours";[1269] and "God Almighty has made them different from the white man. You had just as well try to legislate a donkey into an Arabian courser, as to legislate a negro into a white man. You cannot do it. It is impossible to do it."[1270]

Gesner Williams of Marengo County, who was one of the younger delegates at the Convention, said:

> I am persuaded that some short message should be delivered to this Convention by one of these younger men and one who has never known slavery. I mean slavery as it existed prior to the war, because so far as I am concerned, and *we of the younger generation, we have known but one slavery, and that — slaves to the negro vote*, and when I say this I mean it in its fullest and deepest sense, *for if there ever was a set of people who have been slaves, it has been our Southern people — slaves to the votes of an unprogressive race*; *slaves to the slaves of our own fathers*, the hardest task-masters that ever drew the blood of life from a quivering nation. Not slaves in a physical sense indeed, but even worse, for while we of the Caucasian race are held responsible for the policy and politics of this country, yet those of the North, not understanding that they have thrown upon us a vote — a vote that is harder to bear than the lash of the cruel task-master . . . . [1271]

He concluded with this appalling statement: "I say here without fear of contradiction that if there is any good in the negro race — such as elevates a nation, or elevates his

---

[1269] *Id.* at 2848.

[1270] *Id.* at 2881.

[1271] *Id.* at 2836 (emphasis supplied).

579

race — I say that good comes from the Caucasian blood that runs in his veins."[1272]

When debating the question of whether it should be lawful to lash, whip, or flog convicts, John Rogers of Sumter County delivered an argument in the affirmative:

> Now everybody knows that the great bulk of convicts in this State are negroes. Everybody who knows anything about the character of a negro, knows that there is no punishment in the world that can take the place of the lash with him. He must be controlled that way. He inherited that peculiarity from his ancestors when he came from the shores of Africa, where they provide that kind of punishment, and if we take away the lash from this convict system, we will destroy the efficiency of the system.[1273]

Judge Thomas Coleman of Greene County, chairman of the Committee on Suffrage and Elections, was rewarded with foot-stomping cheers and applause as he delivered remarks from the perspective of a former slave owner.[1274]  He said that he "had a right to regard [blacks] as property," and that a once peaceful and loyal group of slaves had, as Freedmen, "developed the character of savages."[1275]  He further argued that blacks were "incapable of self-government," and that only "one race is capable of self-government as a race and the other as a race should not be trusted with the right to vote."[1276]

---

[1272] 1901 Proceedings, at 2837.

[1273] *Id.* at 1738.

[1274] According to Dr. McMillan, Judge Coleman "commanded a personal following in the convention." McMillan, at 266.  He was "a graduate of Princeton, an ex-slaveholder, Civil War veteran, member of the constitutional convention of 1865, legislator, and a former associate justice of the State Supreme Court." *Id.* at 267.

[1275] 1901 Proceedings, at 2710-11.

[1276] *Id.* at 2712-13.

The statements quoted in the preceding paragraphs are but a small sampling of the shocking racist remarks uttered at the 1901 Convention.  It would be a far easier task to strike out those portions of the thousands of typewritten transcript pages on which race was *not* an issue, than it would be to chronicle all of the debates in which race *was* an explicit topic of discussion.  Indeed, one could not throw a dart blindfolded at the pages upon which the suffrage debates are recorded without hitting some racially offensive comment by a delegate to the Convention.

A full study of the proceedings reveals more than just the racist rumblings of white supremacists, however.  Several prominent African-Americans addressed the convention, but only by means of written petitions.  As already noted, no convention delegates were black.  Moreover, no blacks were permitted on the floor of the convention, or accorded the dignity of being allowed to speak to the assembly.  Hence, the only means left to black citizens for having their views and "voices" heard was by the ignominious and demeaning medium of petitions submitted in the form of letters to the convention.  After reading those communications with contemporary eyes, they can only be characterized as pleas of desperation on behalf of a despised and dispirited race.  Dr. Booker T. Washington, Ph.D., President of Tuskegee Institute, drafted a petition on behalf of a committee "representing the feelings and wishes of the colored people of the State of Alabama." He stated that the State's black citizens were not

581

"stirrers" of strife between the races, but " hard working, tax-paying, and . . . law[-]abiding citizen[s]" who were deeply interested in the work of the convention:  "It could not be expected that the 800,000 colored people in this state would not have some interest in the deliberations of a body that is to frame the fundamental law under which both races are to be governed in this state, perhaps for all future time."[1277]  Dr. Washington stressed that "It requires little thought, effort or strength to degrade and pull down a weak race, but it is a sign of great statesmanship to encourage and lift up a weak and unfortunate race.  Destruction is easy; construction is difficult."[1278]

"It was a bad omen for black Alabamians that many in the convention objected

---

[1277] The entire text of Dr. Washington's petition is set out in **Appendix III-1** to this opinion.  The petition of Dr. Willis E. Sterrs, M.D., a black physician from Decatur, Alabama, is attached as "**Appendix III-2**."

[1278] Appendix III-1 (7th paragraph).  When asked whether the tone and content of the letters reprinted in Appendices III-1 and III-2 accurately represented the attitudes of black Alabamians at the time, Dr. Flynt responded:

> No. . . . that's called playing Sambo, from the great book on the Sambo Thesis.  And it is that if you play a role long enough you begin to drift dangerously close to the role you play.  Obsequiousness.

> Trying not to be a threat was a way in which African-Americans protected themselves.  And increased as much as whites would allow them to do so, the opportunities they had within the convention.  What you had to constantly reassure whites is that what I am asking for is no detriment to the whites, and, at the same time, at the sufferance of those of you who control all the power and the wealth.  So please don't be unkind to us, because we really appreciate you bringing us here so that we could become Baptists and Methodists and Presbyterians . . . .

Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257), at 207-08 ("**Flynt 1 Tr.**").

582

to having the petition read, though finally it was."[1279]    Professor Volney Riser

explained the sequence of events very well in his book, *Defying Disfranchisement*:[1280]

> Within days, the document [drafted by Dr. Washington] appeared
> on the convention floor.  Alabama's boisterous delegates were in no
> mood to hear the complaints or pleas of the state's black population, but
> Booker T. Washington was a special case.  On the twenty-ninth of May,
> at one o'clock, the appointed hour for a temporary lunchtime
> adjournment, the president *pro tempore* asked that the members linger
> awhile as he had before him "a communication . . . addressed" to
> convention president John B. Knox.

> The delegates, who had already begun to trickle away, protested
> with cries of "leave." But former state supreme court justice and delegate
> Thomas Coleman asked, "Who is the author of the communication?"

> The chair replied, "I see it is signed by Booker T. Washington."

> There was a motion to adjourn, joined by cries of "Read it."
> Coleman wanted it read, insisting that "the author . . . is the most noted
> man of his race in the State, and perhaps in the South."  "Under the
> circumstances," he continued, "as we are considering a question in which
> he and his race are vitally interested, I for one would be pleased to hear
> it read."

> Another adjournment motion followed, whereupon [former
> Governor] Thomas G. Jones[, the architect of the 1892 election stolen
> from Reuben Kolb,] intervened with an attempt to suspend the rules,
> which was met with another adjournment motion.

> The parliamentary scuffle went on for some time before Coleman
> rose again.  "Mr. President," he insisted, "we are here, and I do not

---

[1279] Robert J. Norrell, *Up From History:  The Life of Booker T. Washington* 204 (Cambridge, Mass.:  The Belknap Press 2009) ("**Norrell**").

[1280] R. Volney Riser, *Defying Disfranchisement:  Black Voting Rights Activism in the Jim Crow South, 1890–1908* (Baton Rouge:  The Louisiana State University Press 2010).

suppose it would take but a very short time to read it."   At last, he prevailed.

Thanks to Judge Coleman and Governor Jones, Washington's petition received a public airing over the objections of the convention's younger members.  Those younger men were the sons of the old master class to which Jones and Coleman belonged and they were decidedly less impressed by the Tuskegeean.  The clerk read the letter accompanying the document as well as the petition, while the unruly delegates sat twisting in their chairs, their lunches delayed, forced to hear the honeyed entreaties of the most famous man in Alabama.[1281]

Based upon a study of the entire text of the official proceedings of the 1901 Constitutional Convention, every secondary source to touch upon the subject, the testimony of every expert addressing the matter in this case, and the sound judgment of modern Alabama historians, there can be no doubt that the context within which the present constitution was framed was one saturated in white supremacy and the plenary hatred of a dispirited and downtrodden race of people.  That historical truth must remain at the forefront in the mind of any reader passing upon the content of the 1901 Constitution.  As Dr. Flynt testified, "you can't break it into chunks and say it's mainly about race, but [one particular piece] is not about race."[1282]  University of Alabama Law School Professor Bryan Fair agrees, as explained in the following excerpt from one of his law review articles:

---

[1281] *Id*. at 116.  *Cf.* R. Volney Riser, *The Burdens of Being White:  Empire and Disfranchisement*, 53 Ala. L. Rev. 335 (2002).

[1282] Flynt 1 Tr., at 215.

It is important that all Alabamians understand the principal purpose of the 1901 Constitutional Convention.    The chief goal was to disenfranchise African American voters. *That primary goal pervades the entire document . . . . Convention delegates reviewed each Article for consistency and harmony with other provisions*.    Any provisions that might impede the delegates' primary goal were altered. *Thus, one cannot read Articles of the Constitution in isolation*.    As we question provisions in one Article, we must consider the whole document's [racist] design and [discriminatory] purpose.[1283]

### b.    Taxes and education

The two most important issues to come before the 1901 Constitutional Convention, other than disfranchisement, were taxation and education.[1284]    The subjects were inextricably intertwined because education "was by far the largest single item in the state's budget."[1285]    Funding for education depended upon "the degree to which limits were set on the state's taxation power, on the share of tax levies assigned to education, and on whether the [1901 Constitution] provided for local taxation for public schools."[1286]

Delegates to the 1901 Constitutional Convention, like the delegates to the 1875 Convention, were opposed to the education of black children, and firmly against the

---

[1283] Bryan K. Fair, *Equality for All:  The Case For a New Declaration of Rights Article of the Alabama Constitution*, 33 Cumb. L. Rev. 339, 341 (2003) ("**Fair**") (emphasis and bracketed alteration supplied).

[1284] Doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 104 ("**Agreed Facts**"); McMillan, at 317.

[1285] Agreed Facts ¶ 104 (quoting McMillan, at 317).

[1286] *Id.*

funding of black schools with white tax dollars.  Thomas Bulger of Tallapoosa County succinctly summarized the collective attitude about the intertwined objectives in one short sentence:  "What we would like to do . . . more than any other two things, would be to *disfranchise the darkeys* and *educate white children*."[1287]

Dr. Norrell commented on the anti-black education propaganda prevalent during this period:  "As the 1901 constitution approached, a Mobile newspaper announced that 'Negroes in Alabama pay 3 percent of the taxes and receive 50 percent of the educational advantages' — *a gross falsehood*, *but the kind of statement that many whites believed*."[1288]

Black Belt Planters opposed expenditures for black education for additional reasons.  They remained reliant on black labor and did not want to provide blacks with the educational tools that would enable them to escape the cotton fields.[1289]

---

[1287] Official Proceedings of the 1901 Constitutional Convention, at 3377 (1901), http://www.legislature.state.al.us/misc/history/constitutions/1901/proceedings/1901_proceedings_vol1/1901.html (**"1901 Proceedings"**) (emphasis supplied).  As Judge Murphy concluded in *Knight III*: "White supremacy was *unquestionably* the dominant view *of education* for *all the members* of the 1901 Constitutional Convention."  *Knight III*, 458 F. Supp. 2d at 1285 (emphasis supplied, citation omitted).

[1288] Norrell Tr., at 49 (emphasis supplied).

[1289] Flynt 1 Tr., at 165 (agreeing that Planters feared educated blacks who might learn of their political rights, find a way to assert them, and threaten the sharecropping system).

Under the Apportionment Act of 1891 the state superintendent of education was instructed to apportion funds to all counties in the state "according to the entire number of children of schools age," but township trustees were then empowered to distribute the money "as they may deem just and equitable."  As a result of this law, township trustees in the black counties did not divide funds between the races on a

586

Another popular basis for white opposition to black education was voiced by "Cotton Tom" Heflin, in one of his numerous racist statements to the convention:

> The negroes are being educated very rapidly, and I say . . . some day when the two separate and distinct races are thrown together, some day the clash will come and [only] the fittest [will survive], and *I do not believe it is incumbent upon us to lift him up and educate him and put him on an equal footing that he may be armed and equipped when the combat comes.*[1290]

As Dr. Norrell observed, "Heflin and a growing contingent of like-minded people saw the education of African-Americans as a threat not only to white supremacy, but to white ability to maintain the order that they wanted in society."[1291]

Delegates from the white counties favored an increase in education funding, but only to the extent that it would benefit white children.[1292]  Time and again, delegates introduced amendments proposing that black public schools be funded only by taxes paid by black citizens, ensuring both that black schools would remain woefully

---

per capita basis.  Negro teachers were hired for less than white teachers and less money was spent on buildings and equipment for Negroes.  Thus more money became available per capita for the white children in the Black Belt than in the white counties.  Funds were often available in the black counties to defray all or part of the expenses of white students who went away to an academy or college.  When the prevailing attitude that education of the Negro "ruined a good field hand" is also taken into consideration, the lack of general enthusiasm for additional taxation for public schools in the Black Belt is at least explainable.

McMillan, at 317-18.

[1290] 1901 Proceedings, at 4302-03 (bracketed alterations supplied); Norrell Tr., at 49-50.

[1291] Norrell Tr., at 50.

[1292] McMillan, at 318.

underfunded and that whites would not be required to pay for an "illegitimate" and "useless" endeavor.[1293]  "Separation of school funds fired the convention's most vociferous white nationalists."[1294]  Delegates from the Black Belt counties voted down the racial apportionment of taxes, however, because such a policy would reduce the aggregate amount of state revenue that section could devote to the education of its white children by theft and misappropriation of the funds intended for the education of black children.[1295]  Under the Apportionment Act of 1891 — which, as discussed below, was incorporated into the 1901 Constitution — the Black Belt received State *ad valorem* property tax revenues for every school-age child in its counties, regardless of race, and diverted most of the funding allocated for the education of black children

---

[1293] *See, e.g.*, Agreed Facts ¶ 121 ("At the 1901 Constitution, some delegates proposed that white schools should be supported by taxes levied on whites; and black schools should be supported by taxes levied on blacks."); Flynt 2 Tr., at 157; Thornton Depo, at 52, 67.

> Max Bennett Thrasher wrote [in] the New York *Evening Post* that more than half of over twenty ordinances introduced in the Alabama convention on education favored a division between the races on the basis of taxes paid.  The Mobile *Herald* complained that "Negroes in Alabama pay three per cent of the taxes and receive fifty percent of the educational advantages."  And the Selma *Journal* declared that "*if the constitutional convention shall accomplish but one reform, and that the separating of the education fund so that white children shall receive the benefit of the taxes of white people and the colored children receive the benefit of taxes of Negro taxpayers, it will have conferred upon this people a lasting benefit.*"

McMillan, at 318 (citations omitted, emphasis supplied).

[1294] Norrell Tr., at 49.

[1295] *Id.* at 47-48.

to the few white schools in its counties.[1296]   The Black Belt, therefore, already had ample revenue for the education of its white children.[1297]   Accordingly, there was a "lack of general enthusiasm" among Black Belt delegates for education reform, even to the extent that reform would benefit white children in white counties.[1298]

Proposals to separate school tax revenue on the basis of race were also rejected on the basis that including a clearly racist provision in the *actual language* of the Constitution was "a dangerous act" that would plainly expose the intent of the delegates and, thereby, "provide the basis for a constitutional challenge and perhaps the overturning of the whole constitution."[1299]

### c.   Tax provisions

White supremacy and an enmity towards black education infected every facet of the education and taxation articles.[1300]   The relevant tax provisions of the

---

[1296] *See, e.g.*, *id*. at 48; Flynt 2 Tr., at 158-60.

[1297] *See, e.g.*, Norrell Tr., at 48; Thornton Depo, at 110.

[1298] McMillan, at 318.

[1299] Norrell Tr., at 47; *see also* McMillan, at 323 ("Delegates likewise expressed fear of the effect of such open discrimination on Northern public opinion and on the United States Supreme Court's review of the suffrage article.  A measure so unjust and unconstitutional could only endanger the suffrage decision, they maintained.").

[1300] *See, e.g.*, Flynt 1 Tr., at 215-16 (testifying, when asked about how the 1901 millage caps related to white supremacy and disfranchisement of blacks, that "it's all about one piece — you can't break [the 1901 Constitution] into chunks and say it's mainly about race, but this [piece] is not about race . . . ."); *id.* at 217 (testifying that the 1901 Constitution was about "race, race, race, race, race"); Flynt 2 Tr., at 109-10 (speaking in detail about the pervasive racism, arguing that everything about the 1901 Constitution is based upon white racism and that no particular provisions can be extrapolated from that context, that "race underl[ay] these debates completely," and that "the entire

589

Constitution of 1901 are substantially the same as those in the 1875 Constitution.[1301]

Under the terms of the 1901 Constitution, just as in the 1875 document, the state and local governments could levy no more than *an aggregate* of 12.5 mills on taxable property.[1302]  Under Article XI, Sections 215 and 216 of the 1901 document, just as in the 1875 Constitution, counties and municipalities could levy no more than 5 mills on taxable property.  The state property tax cap that first appeared in the 1875 Constitution was changed in only one respect: it was lowered from 7.5 mills in the 1875 charter to 6.5 mills in the 1901 Constitution.[1303]

The delegates to the convention did agree upon constitutional provisions to increase public education funding, but they did so only with the assurance that revenue allocated for public education would primarily benefit white schools, and that, due to disfranchisement, blacks had little hope of obtaining even a mediocre education.[1304]

_____

context in the run-up of that convention was about race, and nothing but race").

[1301] *See* Agreed Facts ¶¶ 116-20; McMillan, at 329; Report of Dr. Robert Norrell (Plaintiffs' Exhibit 4) ¶¶ 22-23 ("**Norrell Report**"); Flynt 1 Tr., at 191; Flynt 2 Tr., at 168; Thornton Depo, at 119 (testifying that the 1901 school funding provisions are directly traceable to the 1875 funding provisions).

[1302] *See, e.g.*, Flynt 1 Tr., at 211.

[1303] That provision provides today, as it did in 1901, that: "The legislature shall not have the power to levy in any one year a greater rate of taxation than sixty-five one-hundredths of one per centum [6.5 mills] on the value of the taxable property within this state."  Ala. Const. art. XI, § 214 (1901).

[1304] As discussed below, the incorporation of the Apportionment Act of 1891 ensured that state and local funding of education would be diverted to black schools.  When questioned regarding how millage caps, which did not divide funds according to race, could be motivated by racial animus, Dr. Flynt testified:  "It's the per capita expenditure of a millage rate based upon *a*

590

The delegates agreed to earmark three mills out of the state's 6.5 mill cap for education funding.[1305]   In Article XIV, Section 269, counties were authorized to levy an additional one mill special tax for education, provided that such a tax was approved by three-fifths of the *qualified, registered voters* in the county:  *i.e.,* neither a majority nor three-fifths of those *actually voting* in the referendum on the proposed additional mill, but three-fifths of all *registered* voters, regardless of how many persons actually cast a ballot.[1306]   It also should be noticed that this optional tax required, *for the first time in Alabama history*, a voter referendum, thus ensuring that only those who could vote (*i.e.*, whites) had authority to raise taxes for education in their counties.[1307]   In Mills Thornton's words, after disfranchising black voters, "the conservative white leadership in the Black Belt was willing to allow some additional local funding for public schools because the assurance would be that it would be white people . . . who

---

*racially-discriminatory assumption* that people who control the money in the black county distribute[] the proceeds of that constitutional provision in a way that is inequitable." Flynt 2 Tr., at 243-44 (emphasis supplied); *see also* Thornton Depo, at 100-06 (explaining that the Black Belt, fearing federal intervention and finding itself in the same situation "that they had escaped from in 1874," was a strong motivator in disfranchising blacks so that "the decisions in the election of township school commissioners or . . . the county board of education, and county commission and other local officials would be a decision that would be made exclusively and legally by white people"); *id.* at 92, 107 (testifying that whites agreed to the optional county educational tax because only the whites would be able to vote for it).

[1305] Agreed Facts ¶ 120.

[1306] Ala. Const. article XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956).

[1307] Thornton Depo, at 92, 107, 115; Flynt 1 Tr., at 131.

would be giving this consent."[1308]

As already discussed, the millage caps woven into the fabric of the 1875 Constitution were motivated by the fears of those Conservative Democrats who had "redeemed" the State from "Radical Republican" rule that blacks might again obtain political power, and increase tax millage rates in order to fund "radical" programs, such as education for the Freedmen. The collective consciousness of "Radical Republican" rule during Reconstruction was no less powerful in shaping the policies adopted by the delegates to the 1901 Constitutional Convention.[1309] Dr. Flynt testified that he was aware of no historian who studied the 1901 Convention and disagreed with the conclusion that "race and [R]econstruction was more than just . . . a major issue, it was a *preoccupation*, a *fixation*, an *overwhelming and intrusive concern that demanded attention*" among the Delegates.[1310] Even after suppressing black civil and

---

[1308] Thornton Depo, at 115-16.

[1309] *See id.* at 26-27; Flynt 1 Tr., at 168-69 (testifying that Black Belt support for the 1901 Convention was, in part, due to a fear that federal intervention would undo what had been done by extralegal means since the redemption of the state).

[1310] Flynt 1 Tr., at 217 (emphasis supplied).

Reconstruction — with its syndrome of prohibitions against racial equality, activism, Yankee and alien intruders, and liberal spending and taxation, for programs that included blacks — was a major part of the racial obsession. The powerful concern with race and Reconstruction was more than just an issue or even a major issue. It was a preoccupation, a fixation, an overwhelming and intrusive concern that demanded attention. And it was quite telling about the power of this fixation that, for the anti-Democrats, it held the capacity to define both support for and opposition to the constitution. Redeemers such as Sidney J. Bowie went into the white counties to encourage plain whites to think of ratification along the lines of Reconstruction:

political rights by whatever means necessary for more than a quarter of a century,

whites in the Black Belt retained the mindset that they must guard against black voting

majorities — that they must not allow blacks to regain access to the ballot box and,

thereby, to inflict upon whites the double blows of Radical Reconstruction:  *i.e.,*

onerous property taxes imposed for the purpose of providing adequate funding for

black public schools.[1311]   Dr. Norrell summarized the motivation behind both

---

the document meant the "elimination of the great bulk of the incompetent, vicious and ignorant negro vote, without the disfranchisement of any white man, . . . [the guarantee of] white supremacy . . . by law, . . . [and] the limit . . . [and] reduc[tion] of taxation." Of course, appeals such as these from the Redeemers were consciously calculated to press the buttons of poor whites who might, under other circumstances oppose ratification. To be sure, some anti-Democrats still opposed the constitution, even in the face of such appeals. But many of them did so precisely because of the same concerns raised by Bowie and the Redeemers — emotional race and Reconstruction concerns.

Glenn Feldman, *The Disenfranchisement Myth:  Poor Whites and Suffrage Restriction in Alabama* 121 (Athens:  The University of Georgia Press 2004) ("**Feldman I**"); *see also* Flynt 1 Tr., at 217;

> With such a conflagration of Civil War veterans and members of the legal profession — often one and the same — present at the 1901 Constitutional Convention, it would be impossible to imagine that both individual and collective memories of the war did not play a pivotal role in drafting the new document. Indeed, when the new constitution was drafted and ratified, it contained numerous provisions designed to keep blacks from voting and to keep power safely in the hands of wealthy whites.

Glory McLaughlin, *A Mixture of Race and Reform:  The Memory of the Civil War in the Alabama Legal Mind*, 56 Ala. L. Rev. 285, 308-09 (2004).

[1311] *See* Thornton Depo, at 100-06; *see also* Flynt 1 Tr., at 144 (noting that from 1868 to 1901 whites were focused on guarding against "black control of politics"); Testimony of Dr. Wayne Flynt, Transcript Vol. 3 (doc. no. 259), at 108 ("**Flynt 3 Tr.**") (testifying that the Black Belt opposed increased local taxation for education on the grounds that it would favor blacks if they were able to regain control of their black majority counties).

593

constitutions as follows:

> The caps on millage rates placed in the 1901 constitution are directly traceable to the 1875 constitution and had the same racially discriminatory purpose that the ones in the 1875 constitution contained. Indeed, the 1901 convention had agreed *a priori* to caps on taxation in order to continue the 1875 agreement on limiting the property taxes that benefitted black children.[1312]

Consistent with a "pattern in Alabama public policy that [spanned] 150 years," the tax provisions in the 1901 Constitution were fashioned "to protect property and to protect [property owners, and particularly the owners of large plantations] from the kind of demands that blacks want[ed] for social services,"[1313] the most important of which was funding for black schools.  It was again the events of the Radical Reconstruction period of governance — "taxes tripling . . . in order to help African-Americans" gain literacy and acquire the basic skills necessary to survive as a free people — that drove the delegates to the 1901 Constitutional Convention when crafting the taxation article.[1314]

In summary, it is unequivocally clear that the racist intentions of the drafters of

---

[1312] Norrell Report ¶ 22; *see also* Flynt 1 Tr., at 95 (explaining that the 1901 Constitution was intended to "replace what had been done by economic intimidation and extralegal violence in the years 1874 and 1901" and essentially protect property from blacks seeking social services, "especially education and the right to vote"); Thornton Depo, at 107 (agreeing that the convention sought to protect property owners from taxes raised by African-Americans).

[1313] Flynt 1 Tr., at 96, 193 (agreeing that fear of the black vote motivated the tax provisions of the 1901 Constitution).

[1314] *Id.* at 193-94.

the 1901 Constitution permeated virtually every word of every provision of the final document.[1315]   As in the Constitution of 1875, the state and local property tax restrictions were adopted for the purpose of protecting white taxpayers from the threats of "black rule" and increased taxation for the purpose of funding equitable and adequate educational opportunities and other social services important to blacks.[1316] Further, the property tax restrictions were incorporated with an assumption (a correct assumption, as it turned out) that *per capita* expenditures were nothing more than a guise, and that most of the funding for the education of black children would be diverted by local officials to white schools.[1317]   The optional county tax for education was no less discriminatory.   It was adopted only because blacks, disfranchised by every means conceivable under the 1901 Constitution, would be barred from the ballot boxes, and unable to vote in favor of taxes that might fund schools for their own children.[1318]

### d.   Embedding the 1891 Apportionment Act in the constitution

The incorporation of the 1891 Apportionment Act into the organic law of the

---

[1315] *See, e.g.*, *id.* at 215-17; Report of Dr. Wayne Flynt (PX 8), at 3 ("**Flynt Report**").

[1316] *See, e.g.*, Flynt 1 Tr., at 95.

[1317] *See, e.g.*, Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258), at 243-44 ("**Flynt 2 Tr.**").

[1318] *See* Deposition of J. Mills Thornton III from *Knight v. Alabama* (PX 682), at 100-06, 199 ("**Thornton Depo**").

State was perhaps a harder blow to the education of African Americans than any other provision in the 1901 Constitution.  Under the 1891 Act, local school boards were empowered to allocate education funds received from the State in any manner that a majority of the board members deemed to be "just and equitable."[1319]  Predictably, local officials allocated the funding received from the State for the education of white *and* black children disproportionately, to the benefit of white children.[1320]  The Act devastated the Republicans' hopes for black progress through education.[1321]  The delegates to the 1901 convention incorporated the intent behind the 1891 Act into the Constitution.  Section 256 substituted the phrase "as nearly as practicable" for the 1891 Act's "as just and equitable" language — a distinction without a difference.

> The Legislature shall establish, organize, and maintain a liberal system of public schools throughout the State for the benefit of children thereof between the ages of seven and twenty-one years.  The public school fund shall be apportioned to the several counties in proportion to the number of school children therein, *and shall be so apportioned to the districts or*

---

[1319] *See, e.g.*, Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253), at 43, 48 ("**Norrell Tr.**"); Thornton Depo, at 80-81 ("Now, the trustees under the Apportionment Act for the first time can take the funds that were destined for the black schools and spend them on the white schools.  And immediately, in all counties they start doing that.").

[1320]

> [I]n the ensuing two to three decades, this . . . discrimination . . . in the spending of school funds became astonishing; that is, in studies made in the next couple of decades found that . . . money spent on the education of white children was sometimes 10 or even 20 times more than that spent on black children.

Norrell Tr., at 43.

[1321] Thornton Depo, at 81.

> *townships in the counties as to provide*, *as nearly as practicable*, *school terms of equal duration* in such school districts or townships. Separate schools shall be provided for white and colored children, and no child of either race shall be permitted to attend a school of the other race.

Ala. Const. art. XIV, § 256 (1901) (emphasis supplied).[1322]  Dr. Flynt "completely agree[d]" with Dr. Edith Zeigler's opinion regarding the meaning of the phrase "as nearly as practicable," which she explained as follows:

> Alabama's . . . new constitution adopted in 1901 made it clear that *future state responsibility for public education would be almost entirely directed toward white children*.  Article XIV, Section 256 specified that the public school fund should be "so apportioned to the schools in the districts or townships in the counties as to provide, *as nearly as practicable*, school terms of equal [duration] in such school districts or townships."  These were weasel words whose intent was the same as that of the 1891 School Law regarding funding apportionments.[1323]

Dr. Flynt also relied upon the work of Dr. Horace Mann Bond in supporting his opinion, stating that Dr. Bond's reasoning was "exactly the rationale" for the convention delegates' motives.[1324]  In his meticulous study of the subject, Dr. Bond wrote:

---

[1322] *See also* Ala. Const. of 1875 art. IX, § 1 ("The general assembly shall establish, organize, and maintain a system of public schools throughout the state, *for the equal benefit of the children* thereof between the ages of seven and twenty-one years; but separate schools shall be provided for the children of citizens of African descent.") (emphasis supplied).

[1323] Edith M. Ziegler, *Schools in the Landscape: Localism, Cultural Tradition, and the Development of Alabama's Public Education System, 1865-1915*, at 133 (Tuscaloosa: The University of Alabama Press 2010) ("**Ziegler**") (emphasis and bracketed alteration supplied); *see also* Flynt 1 Tr., at 199.

[1324] Flynt 1 Tr., at 209.

597

The Black Belt representatives presented resolutions which proposed, as the only change from the old Constitution, the substitution of the phrase "just and equitable" for that in the Constitution of 1875 which required that all funds be apportioned "for the equal benefit of all the children." . . . . This was the language of the [Apportionment Act of 1891] which had proved satisfactory to the Black Belt in every respect.

. . . .

The question of segregated taxes arose again when the Committee on Taxation resumed its report in the Convention on Section 5 which dealt with tax limitations for minor civil bodies.   Mr. Browne [*the chairman of the taxation committee*] moved an amendment to the county taxation proposal which would have required all funds to be divided in a "just and equitable" fashion.  *He made it quite clear that his intention was to permit county authorities to divide the school fund "unequally," but not to permit any phraseology which would be unconstitutional.*  Mr. Foster asked if the phraseology would not permit the County Commissioners to divide the fund "unequally."  Mr. Browne answered, "No, sir; to divide it equitably."

Mr. Foster. "What does 'equitably' mean?"

Mr. Browne. "Some commissioners' courts would construe it one way and some another."  He believed that the decision in the case of *Claybrooke vs. Owensboro* (16 Fed. Rep., 302) released officials of the duty of making exact per capita expenditures. So long as the terms for the two races were identical in length, the requirement of equal benefit was satisfied. "*There is no necessity for paying a teacher for a colored school the same amount you pay to white school teachers, because you can get them at much less salary.  Under the present laws of Alabama, if the law is carried out, the colored pupil gets the same amount of money per capita as the white pupil, and that is not justice.*"[1325]

---

[1325] Horace Mann Bond, *Negro Education in Alabama: A Study in Cotton and Steel* 181-82 (Tuscaloosa: The University of Alabama Press 1994) (1939) ("**Bond**") (citations omitted, emphasis supplied).  As demonstrated by myriad, indisputable evidence in this case, funding may have been distributed *per capita*, without regard to race, but blacks were not, as Mr. Browne suggests, receiving

Indeed, according to Dr. Flynt, the "weasel words" ultimately placed into the 1901 Constitution carried both the intent and effect of discrimination against blacks and education funding for black public schools.[1326]  He testified,

> if you look at the state budget expenditures from the . . . state Department of Education papers in Montgomery, you'll see how [these "weasel words"] play out.

> In fact, I used in my book Chambers County as one example.  If you take average expenditure for [a] black child, average expenditure for [a] white child, the first time a black high school was built as opposed to white high schools — and the most notable example is not only per capita by race, but also the multi-faceted, the multi-tiered pay for teacher. The lowest paid teachers in Chambers County and virtually every other teacher, regardless of their experience or age or career, were black women in rural schools.

> The next lowest paid was black males in rural schools.  The next lowest paid white females in rural schools.  And the highest paid was white males in rural schools.  Go to the cities, same thing.  So what they did, practically meant basically race, think race.[1327]

### e.    Suffrage provisions

Unquestionably, the *primary* purpose of the 1901 Alabama Constitution was that of "purifying the suffrage" by removing blacks from the political process, but that was not the only purpose.  Due to a concern that such a purpose might be found unconstitutional under the Fifteenth Amendment, the delegates spent considerable

---

"the same amount of money per capita as the white people."  *See, e.g.*, Norrell Tr., at 43.

[1326] Flynt 1 Tr., at 199.

[1327] *Id.* at 199-200.

time debating precisely how to craft the suffrage provisions, as well as reassuring themselves that the federal government would approve of their handiwork.[1328]  As a part of that exercise, the disfranchisers chased hints of federal approval, going as far as the Pacific Rim and Caribbean Sea to find it.  The expansion of America into those regions through the acquisition of Hawaii, Puerto Rico, and the Philippines during the Spanish-American war seemed to be a fortuitous development to many delegates. Emmett O'Neal proclaimed that the so-called "race problem" was "no longer confined to the States of the South."[1329] Territorial expansion and the creation of an American Empire had triggered a change in inter-sectional relations, he declared, "and in the wise solution of this question we have the sympathy instead of the hostility of the North."[1330]  Richard Channing Jones, delegate and former President of the University of Alabama, believed the spirit of North-South reconciliation that emerged during the Spanish-American War had ended the threat of federal intervention.  The "Splendid Little War," as the Spanish-American conflict sometimes was called, "brought about a change," he said, because the Republicans have "had a great deal of trouble" with islanders "outside of the Caucasian race."[1331]  The result, Jones believed, was that

---

[1328] *See, e.g.*, McMillan, at 271.

[1329] 1901 Proceedings, at 2783.

[1330] *Id.*

[1331] *Id.* at 2886.

"[t]housands and thousands of [Republicans] who were our enemies are in full sympathy with us now."[1332]  For those reasons, among others, the delegates to the 1901 Convention became reasonably confident that the United States Supreme Court and other institutions of the federal government would turn a blind eye to the disfranchisement provisions incorporated into the State's new Constitution, *provided* those provisions *appeared* to conform to the letter of the United States Constitution. If so, Alabama would finally join those other Southern states that had placed in organic law a means to disfranchise the "ignorant, vicious, and incompetent Negro voter."[1333]

Professor McMillan described the Committee on Suffrage and Elections as follows:

> The committee which "towers above all others is the Committee on Suffrage and Elections," wrote a newspaper correspondent from Montgomery.  Certainly the revision of the suffrage was the cardinal reason for the assembling of the convention and the committee of twenty-five on the suffrage received the constant attention of the people and the press.  Its chairman, Judge Thomas W. Coleman of the Black Belt, was a graduate of Princeton, an ex-slaveholder, Civil War veteran, member of the constitutional convention of 1865, legislator, and a former associate justice of the State Supreme Court.  Twenty-one of the twenty-five members of the committee were lawyers.  Although one delegate described the committee as coming "from the cities and the country . . .

---

[1332] *Id.*

[1333] Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901: A Study in Politics, the Negro, and Sectionalism* 269 (Chapel Hill:  University of North Carolina Press 1955) (Spartanburg, S.C.:  The Reprint Co. 1978) ("**McMillan**").

from the Black Belt and the hill counties . . . from the mountains of North Alabama and the flat lands of South Alabama," nine of the members of the committee were from the Black Belt and the most able of the members represented the industrial and urban centers of the state.[1334]

The committee met on May 29, 1901, and quickly set about its chief purpose: appointing a subcommittee to collate United States Supreme Court decisions addressing the franchise and circulating copies of the franchise provisions from the constitutions of Mississippi, South Carolina, Louisiana, North Carolina, Massachusetts, Connecticut, Maryland, Pennsylvania, California, and Utah.[1335] After extensive research and discussion, the committee approved a suffrage plan designed to disfranchise virtually all black voters, purportedly within the bounds of the Fifteenth Amendment, by taking advantage of certain social and economic distinctions that closely followed racial lines. The suffrage article included, among other things: a residency requirement designed to obstruct the highly transient black populace;[1336] an *annual* poll tax of $1.50, an amount that became cumulative upon failure to pay, and that was crafted to "take advantage of the obvious economic weakness of the Negro";[1337] a literacy test, which would affect blacks more harshly than whites;[1338] a

---

[1334] *Id.* at 267 (citations omitted).

[1335] *Id.* at 266-67, 274 (citation and internal quotation mark omitted).

[1336] *Id.* at 276.

[1337] *Id.*

[1338] McMillan, at 276.

requirement for ownership of real or personal property assessed at $300 or more, or forty acres of land owned tax-free, a standard that few blacks could meet;[1339] and the absence of criminal convictions for a laundry list of offenses, most of which were thought most likely to be committed by blacks.[1340]  Cognizant of the fact that many poor whites would also be disfranchised under these provisions — and that ratification of the proposed constitution would, for that reason, be in jeopardy in the white counties — the drafters included the infamous "fighting grandfather clause," specifically crafted to allow whites to circumvent the demanding suffrage requirements.[1341]  Under that clause, citizens were permitted a temporary window of time within which they could register to vote, if they met age, residency, and poll tax requirements, *and if* they *or an ancestor* had fought in any American conflict since the War of 1812.[1342]  Of course, virtually no blacks would fit that loophole.[1343]  As one delegate noted during the suffrage debates:  "We have quite enough traps set to catch all the negroes in Africa or anywhere else."[1344]

Following his exhaustive study of the convention, Professor McMillan

---

[1339] *Id.*

[1340] *Id.* at 281.

[1341] *See* Flynt 1 Tr., at 190-91.

[1342] *Id.*

[1343] McMillan, at 276.

[1344] 1901 Proceedings, at 3170 (statement by Thomas L. Long).

concluded that:

> *The suffrage article* adopted by the [1901] convention *was the most intricate article on the elective franchise adopted up to that time by any Southern state*.  Its temporary plan contained the good character clause, the understanding clause and registration plan of the Mississippi Constitution, and the newly invented solider and fighting grandfather clauses.  In its permanent plan were educational, property, and employment qualifications as well as the disfranchising crimes section and the poll tax, which had been used in many states in order to secure a select electorate.  One historian has declared that in 1901 Alabama "drew up in convention and established in her constitution the most elaborate suffrage requirements that have ever been in force in the United States.  They accomplished all that Mississippi, South Carolina and Louisiana had accomplished and even more."[1345]

Dr. Flynt wrote of the resounding success of the plan:

> The consequences of [the suffrage provisions] became apparent immediately and fully justified black attempts to have the 1901 Constitution declared unconstitutional.  In 1900 there were 181,000 registered black male voters; in 1903 there were less than 5,000. . . . In the first election held after enactment of the 1901 Constitution, overall voter turnout declined by 38% (the white turnout by 19%, black voting by 96%).[1346]

### f.    The Black Belt's continued domination of state politics

The Black Belt's delegates to the 1901 Constitutional Convention ensured their

section's continued control of state government through the inclusion of several

---

[1345] McMillan, at 306 (citation omitted).  In terms of "intricacy," it appears that the present Alabama Legislature attempted to emulate (if not surpass) the delegates to the 1901 Convention when drafting and enacting the mean-spirited immigration statute.

[1346] Wayne Flynt, *Alabama's Shame:  The Historical Origins of the 1901 Constitution*, 53 Ala. L. Rev. 67, 75 (2001) ("**Flynt III**") (citations omitted).

measures.  Foremost among those was the provision specifying that apportionment in the Legislature would continue to be based upon total population, even though overwhelming numbers of voters in the black majority counties would be disfranchised under the Constitution's complex suffrage provisions.[1347]    As a consequence, a mere handful of elite whites in the majority-black counties would have grossly disproportionate representation in the State Legislature and, thereby, possess the power to protect and advance their sectional interests in state government.[1348]   Further, and despite the fact that the 1901 Constitution required reapportionment of the Legislature following each decennial census, Black Belt legislators successfully blocked all attempts to enforce that mandate for more than sixty years.   Their stranglehold on the legislative process was only broken by the decision of the U. S. Supreme Court in *Reynolds v. Sims*, 377 U.S. 533 (1964), a case arising out of Alabama and holding that the Equal Protection Clause of the Fourteenth Amendment

> requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis.  Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State.

---

[1347] Norrell Tr., at 52; Thornton Depo, at 103-05.

[1348] Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257), at 222-23 ("**Flynt 1 Tr.**"); Norrell Tr., at 52; Thornton Depo, at 104-05.

605

*Id.* at 569.[1349]

Additionally, after successfully maintaining the cap on local property taxes, while also managing to *reduce* the restriction on State property taxes by one mill (reducing the cap from 7.5 to 6.5 mills), the property of the Black Belt Planter class continued to be shielded from meaningful taxation to provide revenue for needed social services to either blacks *or* poor whites — the most important service being, of

---

[1349] Flynt 1 Tr., at 197; Norrell Tr., at 76-77.

Future representation was to be apportioned on the basis of the whole population after each Federal census. However, considering the failure of state legislatures to make any reapportionment against controlling interests and the fact that the apportionment by the convention itself placed the Black Belt and other rural counties in control of the legislature, future reapportionment was at least doubtful. The fears of underrepresented counties became a reality when the legislature refused to reapportion itself after the census of 1910 and each census thereafter. Although the shift of population toward North Alabama has continued, representation in the legislature of Alabama today [1955] is the same as that of more than fifty years ago. The courts have declared reapportionment a legislative matter, and all attempts to force the legislature to reapportionment itself have thus far failed.

In conclusion, it may be said that the suffrage and representation articles combined were a great victory for Alabama conservatives who took advantage of the decline of Populism in order to regroup their forces to prevent another such movement. The Black Belt, supported by similar-minded industrialists and their able attorneys had effectively used the race issue to disfranchise not only the Negro but large numbers of whites. The suffrage decisions of 1819 and 1868 had both been reversed. Alabama had been made safe not only for white supremacy but the supremacy of white Bourbon Democracy. Moreover, instead of abolishing the inequality of representation in the state legislature, the convention actually consolidated and made more permanent the power of the Black Belt oligarchy in that body. Therefore, both in regard to suffrage and representation the new constitution was grossly undemocratic.

McMillan, at 308-09 (citations omitted).

course, public education.[1350]

Finally, the Planter class of former slaveholders and their descendants received an added benefit from the suffrage article of the 1901 Constitution.  Its restrictive provisions would have the long-term effect of disfranchising those poor whites who had swelled the ranks of the Populists, and thereby limiting their capacity to challenge the interests of the Black Belt Planter class.  Indeed, as a direct result of the Populist movement, and the terrifying prospect that poor whites and blacks might unite in common revolt against the privileges, perquisites, and power of the State's wealthiest elite, Black Belt delegates to the 1901 Convention, along with their "Big Mule" allies, were "anxious . . . to limit the franchise to 'the intelligent and the virtuous'":[1351] characteristics that excluded the poor whites who had swelled the ranks of the Populist Party.  As Dr. McMillan observed, the Black Belt Planters wanted "to disfranchise . . . the uneducated and propertyless whites in order to legally create a conservative

---

[1350] Norrell Tr., at 53.

[1351] McMillan, at 269.

Some delegates among the predominant planter-Big Mule coalition left no doubt about their objective.  To them, poor white Populists — the great unwashed, uneducated masses of white tenant farmers; textile, steel, and sawmill workers; coal and iron ore miners — were as much a threat to their class hegemony as were black voters.  Why discriminate against blacks, who "knew their place" within the social and political hierarchy, when the greater threat came from uppity whites?

Flynt I, at 8.

electorate."[1352]   Indeed, Black Belt delegates "*were not willing to disfranchise the Negro alone* — to do so would be suicidal since they had long remained in power with his vote.  In order to accomplish their objective [of disfranchising both blacks and poor whites] they would have to make concessions to the poor whites in the present, *but not in the future*."[1353]   They brilliantly accomplished that objective by deceitfully claiming that the suffrage provisions were aimed only at blacks, and that there were loopholes, such as the "fighting grandfather clause," that would protect the franchise of poor whites.  As Dr. Flynt testified:

> There . . . were a whole series of ways in which those who were most likely to vote against the ratification of this constitution were placated by saying this is not really meant to get you, you're white.  We want you to vote.  This is designed to get blacks.
>
> It turned out the device got blacks, as well as whites.  *But they put in wording that made it appear that they were going to exempt whites from the effects of the plan.*[1354]

---

[1352] McMIllan, at 269.

[1353] *Id.* (emphasis and alteration supplied).

In 1905, Francis G. Caffey, a lawyer who was practicing in Montgomery at the time of the Alabama convention, wrote concerning its motives:  "It was generally wished by leaders in Alabama to disfranchise many unworthy white men. . . . To rid the state eventually, so far as could possibly be done by law, of the corrupt and ignorant among its electorate, white as well as black, the poll tax and vagrancy clauses were put into the constitution."

*Id.* at 269 n.42 (citation omitted); *see also id.* at 285 ("[T]he only way to secure ratification of the constitution was to make concessions to the uneducated and propertyless whites for the present . . . .").

[1354] Flynt 1 Tr., at 191 (emphasis supplied).

Thus, once again, the delegates from a Black Belt-dominated convention emerged from an assembly gathered to draft an Alabama Constitution with a document that shielded their property from taxation and preserved their political dominance of state government.

g.    **The fraudulent ratification of the 1901 Constitution**

Predictably, the campaign for ratification of the 1901 Constitution focused upon race, *and nothing but race*.  The rallying cry for public confirmation of the delegates' dirty deeds was "White supremacy, honest elections, a new constitution, one and inseparable."[1355]    Although typically quick to jump on the white supremacy bandwagon, a majority of the white male citizens of the state who actually voted in the ratification election *did not ratify* the 1901 Constitution — a fact that likely was due to the "property and literacy test" requirements which produced the fear (a correct perception, as it turned out) that poor and illiterate whites would be disfranchised along with blacks under the suffrage article.[1356]

The 1901 Constitution *purportedly* was ratified on November 11, 1901, by a vote of approximately 108,000 to 81,000:  *i.e., allegedly* 57% "for" and 43% "against" ratification.[1357]  Those numbers stink like rotten fish, however, when one focuses upon

---

[1355] *Id.* at 215-17.

[1356] *Id.* at 221.

[1357] *Id.* at 217; McMillan, at 350 ("On November 11, the new constitution was ratified by a

609

these facts: the margin of victory was 27,000 votes; and that margin was inexplicably provided by twelve counties in the Black Belt, "where the overwhelming black majority [was] being asked to disfranchise themselves," but nevertheless and incomprehensibly voted approximately 36,000 to 5,000 "*in favor of their own disfranchisement*."[1358]  Such a circumstance is so devoid of logic, wisdom, or good sense that it can only be described by words such as "preposterous," "ludicrous," or "ridiculous nonsense."

> The most absurd example of this political *democracy* [was] Lowndes County, which had 5,600 registered African-Americans and 1,000 registered white votes and cast 5,300 votes in favor of disfranchising blacks and 338 votes against disfranchising blacks. *That is an example of black enthusiasm for taking away their own right to vote that I don't think any American historian would look at and say is credible.*[1359]

Of course, "in urban areas, where blacks could freely exercise the right to vote, blacks vote[d] against the constitution."[1360]  However, "in the 12 counties where . . . [blacks] were so thoroughly controlled by violence and intimidation [or their votes were corruptly stolen or miscounted], they voted in favor of ratification."[1361]   In his discussion of the fraudulent ratification of the 1901 Constitution, Dr. Flynt stated:

---

vote of 108,613 to 81,734.").

[1358] Flynt 1 Tr., at 218 (emphasis supplied).

[1359] *Id.* (emphasis supplied).

[1360] *Id.* at 219-20.

[1361] *Id.* at 220.  Conveniently, all of those twelve counties were late in reporting their votes. McMillan, at 350.

"[I]f somebody could explain that to me, . . . I'd be amazed."[1362]  Dr. McMillan agreed,

saying that:  "A study of the election returns, contemporary sources, and Black Belt

voting practices has convinced the author that in some counties almost every eligible

Negro was 'voted' although thousands never appeared at the polls."[1363]   Mills

Thornton also held the opinion that the 1901 Constitution was fraudulently "ratified."

> Alabama had . . . 66 counties.  If you take out the 12 Black Belt counties, the Constitution lost.  That is to say, if you total the vote in the remaining . . . 54 counties, the Constitution would have been defeated. *The Constitution carried because of the vote in the 12 Black Belt counties*.  And in the 12 Black Belt counties, it carried by a margin of seven to one.

> So it is clear . . . this is the very [opportunity for] the white Democratic leadership in the Black Belt . . . to use the black votes.  *So this is the very last example of a quarter century of essentially fictitious black votes from the Black Belt* carrying a statewide . . . election.

> But in effect, therefore, it will be fair to say that *the white population of the state rejected the 1901 Constitution, and that the 1901 Constitution became law because of the votes of the black population of this state though . . . those [votes] were essentially fictitious*.[1364]

It appears that even Dr. Stewart, defendants' expert historian, has no

disagreement with the proposition that the ratification of the 1901 Constitution was

made possible only by fraud.  In a 2001 article, Dr. Stewart used the work of another

---

[1362] Flynt 1 Tr., at 220.

[1363] McMillan, at 351.

[1364] Thornton Depo, at 113-14.

scholar to detail the ratification of the 1901 Constitution.

> Dr. Bailey Thomson, then associate editor of the Mobile Register, noted several years ago that to pass the 1901 Constitution its architects "imposed their will through a criminal act." "*They stole the election to ratify their monstrosity, and they did it in such a bold, outrageous manner that their evil deed stuck*." Thomson's conclusion is *based on the fact that the relatively narrow victory for the constitution "came from the 12 Black Belt counties, where a small group of white planters ran up huge majorities in favor of the constitution by fraudulently reporting black votes*." Elsewhere, the constitution was mostly disfavored. "What an irony," Thomson concludes, "that the planters stole votes from the very black men that the convention proposed to disfranchise."[1365]

To state the obvious:  blacks did not vote to disfranchise themselves; and the Constitution of 1901 was not ratified by a majority of the legal, non-fraudulent votes cast.  Just as in the gubernatorial elections of 1892 and 1894, when the Conservative Democratic candidates *allegedly* "defeated" Reuben Kolb, the candidate of the Populist Party, and just as in the vote calling for the 1901 Constitutional Convention, blacks "got counted in."[1366]  Without such criminal acts committed by a white elite in the Black Belt counties, the document presented to the people as the 1901 Constitution would not govern the State today.[1367]  The evidence of this *fact*, both in this case and

---

[1365]  William H. Stewart, *The Alabama State Constitution* 296-97 (New York:  Oxford University Press 2011) ("**Stewart**") (citations omitted, emphasis supplied).

[1366]  Flynt 1 Tr., at 217-20; *see also id.* at 186-87 ("Q:  Endnote 99 says that, basically, that the Black Belt counties gave such large majorities that they made the difference in the election on whether to hold a convention?  A:  Yeah, that's correct."); McMillan, at 351-52.

[1367]

> The actual white vote in quite a large number of counties was much smaller than the ratification vote.  So that's having to come from black voters, even assuming

in reliable secondary sources that address the matter,[1368] is overwhelming.  Plaintiffs did not base their claims in this case upon the illegitimacy of the 1901 ratification election, however.  Indeed, they did not even allege that fact.  As a consequence, this court must  leave that issue for another day, and another forum.

---

that every single white who is registered is still alive in 1901, and that every single white who is alive and registered votes in favor of ratification, it would take 2 or 3,000 additional votes from blacks to explain the ratification vote. So there's no question.  Black votes ratified the 1901 constitution.

Flynt 1 Tr., at 220; *see also* McMillan, at 352 ("Figures prove that the constitution was adopted by the majorities of the black counties, whether the vote was fictitious or real.").

[1368] *See, e.g.*, Susan Pace Hamill, *A Tale of Two Alabamas*, 58 Ala. L. Rev. 1103, 1107 (2007) (reviewing Wayne Flynt, *Alabama in the Twentieth Century* (Tuscaloosa:  The University of Alabama Press 2004) ("**Flynt I**")) ("**Hamill I**"); Brian K. Landsberg, *Sumter County, Alabama and the Origins of the Voting Rights Act*, 54 Ala. L. Rev. 877, 886 n.66 (2003) ("Over eighty-eight percent of the voters in heavily black counties were counted as in favor of ratification of the 1901 constitution, while less than half the voters in the other counties voted to ratify.") (citation omitted).

The statewide vote on ratification was 108,613 in favor to 81,734 opposed — a total vote that rivaled the great fights of the agrarian revolt.  The constitution was adopted. How had this ratification passed?  The vote in twelve Black Belt counties was 36,224 in favor to 5,471 against, while the vote in the remaining fifty-four counties was 76,263 against and 72,389 in favor.  The winning majority came from the Black Belt, and over one-half of that majority came — it had to come — from black votes. There were ten counties — Black Belt or on its fringe — where more votes were cast for ratification than there were legal voters (males over age twenty-one).  Even historians who note they cannot "prove" the black vote was fictitious admit that "in some counties almost every Negro was "voted" although thousands never appeared at the polls."

William Warren Rogers & Robert David Ward, "Part Two:  From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* 353 (Tuscaloosa:  The University of Alabama Press 1994) ("**Rogers & Ward II**") (citation omitted).

### 9.      Alabama from 1901 to 1954

Predictably, the State became more supportive of public education after blacks were disfranchised by the 1901 Constitution, and local government officials were constitutionally permitted to divert education funding for black schoolchildren to white schools.[1369]  When asked to explain the so-called "Educational Awakening" that occurred in Alabama following the "ratification" of the 1901 Constitution, Dr. Flynt testified as follows:

> There were a lot of factors.  The disfranchisement of the blacks gave whites, ordinary common whites who were interested in education[, the opportunity] to have a conversation without race being a factor, so that was part of it.

> Another part of it was a huge embarrassment in Alabama at all levels of society to the number of draftees who were rejected by the U.S. Army during the first world war, because . . . they were illiterate.  The fact that there were so many whites rejected was a source of just huge publicity in the papers and embarrassment by the state at large.

> So . . . "opportunity schools" [were established] schools during the first world war. They were designed to provide functional literacy to adult illiterates.  And these popped up like mushrooms all over the state . . . .

> That effort continued beyond 1918 and the end of the war and was part of the reason that Governor Thomas Kilby . . . . launched a major education drive to modernize the state. . . . Bibb Graves continued that in 1926.

---

[1369] Flynt 1 Tr., at 223-27.

So you had two governors in a period of eight years who crusaded in their gubernatorial campaigns and in their administrations to ratchet up funding for [schools].

There's also a very important national report that was commissioned by the Russell Sage Foundation in the teens. And their report was just about as bad a condemnation of the state as you could possibly find [and it concluded] that Alabama was a state with considerable wealth, but [the state] expended relatively very little of this wealth on the education of its citizenry. And that explained a whole panoply of social problems in the state.

And so you have national reports, progressive governors and embarrassment from World War I, all of which are coming together to create an enormous emphasis upon education in the period after the [1901] constitution.[1370]

Initially, advancements in public school funding came by way of higher local property taxes.[1371] Prior to 1911, the Legislature created a "State Board of Equalization" to police county tax assessors in an effort to remedy unreasonably low assessments.[1372] That effort "had some positive effect, but [was] not at all" as effective as the Legislature intended.[1373] Accordingly, in 1911, the Legislature established a sixty percent assessment ratio for all property (a law that was slightly amended in 1935).[1374] "And the idea behind that was [that] property was so grossly

---

[1370] *Id.* at 223-25 (bracketed alterations and ellipsis supplied).

[1371] *Id.* at 226.

[1372] Deposition of J. Mills Thornton, III from *Knight v. Alabama* (PX 682), at 125-26 ("**Thornton Depo**").

[1373] *Id.* at 126.

[1374] *Id.* at 126-27; *see also* the discussion of these two statutes in Part II(G)(3)(b), *supra.*

615

underestimated all around the state, [a] 100 percent ratio [was unworkable], but maybe . . . [if the law required] only . . . 60 percent, maybe the assessment officials would agree to increase [assessments] to that point."[1375]   Regardless of the Legislative rationale, the sixty percent assessment ratio was ignored by most, if not all, county tax assessors.[1376]

In 1916, Amendment 3 was ratified, authorizing counties to levy an additional three mils for schools, provided a simple majority of those persons voting in the county election approved the additional levy.[1377]

In 1927, the Legislature turned to State tax receipts as a means for financing educational advancement.  It established the "Equalization Fund" for schools, thereby segregating public school funds from the State's general budget.[1378]  A constitutional amendment authorizing the State's first income tax passed in 1933.[1379]   The

---

[1375] Thornton Depo. at 127.

[1376] *See, e.g.*, *id.* at 129 (noting that the state had to take further action because "[t]he 60 percent effort had not worked so well").

[1377] *Id.* at 130. Amendment 3 made only a small improvement. In 1919, State Superintendent Spright Dowell reported to Governor Kilby: "Under the present constitution, and in fact, since the Constitution of 1875, we have found ourselves more limited and restricted in the matter of local school support than any state in the Union."  Ira W. Harvey, *A History of Educational Finance in Alabama 1819-1986*, at 103 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education) ("**Harvey I**")(citation omitted).  However modest and inadequate were the local taxation provisions of Amendment 3, the "educational awakening" they were one part of in the second decade of Twentieth Century Alabama was made possible by the disfranchisement of blacks.

[1378] Flynt 1 Tr., at 234; *see also* Act No. 382, 1927 Ala. Acts, pp. 450-52; Harvey I, at 331-33.

[1379] Flynt 1 Tr., at 233-34; Ala. Const. art XI, § 211.01 (1901), *added by* amend. 25 (*ratified* Aug. 2, 1933).  Governor Benjamin M. Miller proposed the income tax amendment after obtaining

Legislature also authorized the state's first sales tax in 1935, and created the "Minimum Program Fund" for schools:  two measures that substantially increased public school funding.[1380]  The state income tax was earmarked for K-12 teacher salaries by Amendment 61, ratified in 1947.[1381]

While the white children of Alabama were reaping the benefits of increased funding for public education, black children were left to fend for themselves.  "From 1901, with Negroes thoroughly disfranchised . . . emphasis was laid on the education of 'white' children in the State. . . .  So far as educational campaigns were concerned, *Negro children did not exist in the State*."[1382]  Dr. Flynt testified that, with the obvious exception of slavery during the Antebellum period, "there [was] no period of American history that [was] worse" for black education than the early Twentieth

---

funding for a study of state government by the Brookings Institution.

> The report's tax section reached conclusions similar to the 1918 Russell Sage Foundation report:  Alabama assessed property at ridiculously low rates.  State tax assessments on farmland were lower than any of eight adjacent states with the result that Alabama's landowning farmers paid less than 20 percent of the state's taxes. The governor, unwilling to challenge Black Belt planters and the powerful Farm Bureau, ignored the recommendation (not an uncommon fate for the tax reform proposals in Alabama history) and proposed gas and income taxes instead.

Wayne Flynt, "Part Three:  From the 1920s to the 1990s," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* 498 (Tuscaloosa:  The University of Alabama Press 1994) ("**Flynt I**").

[1380] Flynt 1 Tr., at 235; Act No. 295, 1935 Ala. Acts, p. 714; Harvey I, at 333-35.

[1381] Ala. Const. art. XI, § 211.01 (1901), *added by* amend. 61 (*ratified* Sept. 11, 1947).

[1382] Declaration of Dr. Wayne Flynt (PX 10), at 14 ("**Flynt Dec.**") (quoting Bond, at 192).

Century.[1383]

> Alabama whites were generally reluctant to see their tax dollars go for improvements that would benefit people of color. As a result, Jim Crow facilities for blacks remained fewer, inferior, and more irregular. They were staffed by black volunteers, maintained by meager black funds, and usually came into existence long after parallel white facilities had already been put into place. The story was much the same in recreation, welfare, social services, and farm extension work.[1384]

Whites' hostility towards black rights and education were essentially frozen.[1385] While that hostility remained, the power of the Black Belt in the State Legislature was diminished by federally mandated reapportionment in 1967.[1386]

### 10.    Public school funding after *Brown v. Board of Education*

The State of Alabama into which the *Brown* decisions were delivered was dramatically different from the State in which we find ourselves today. By the mid-point of the twentieth century, the era of "Congressional Reconstruction" — that all-too-brief period during which African-Americans were able to improve their lot in life — had faded into a distant memory. Terror and intimidation had become a pervasive

---

[1383] Flynt 1 Tr., at 145.

[1384] Glenn Feldman, *The Disenfranchisement Myth: Poor Whites and Suffrage Restriction in Alabama* 164 (Athens: The University of Georgia Press 2004) ("**Feldman I**") (footnote omitted).

[1385] Norrell Tr., at 52-54; Report of Dr. Robert Norrell (Plaintiffs' Exhibit 4) ¶ 27 ("**Norrell Report**").

[1386] The evidence is conclusive that the power of the Black Belt was greatly reduced by 1967 and practically non-existent by 1971. Testimony of Richard Manley, Transcript Vol. 10 (doc. no. 266), at 130 ("**Manley 10 Tr.**"); Testimony of Robert Harris, Transcript Vol. 14 (doc. no. 270), at 176-79, 197 ("**Harris 14 Tr.**"); PX 284 (Legislative Rosters 1971), at 4341-48; PX 285 (Legislative Rosters 1978), at 2154-55, 2163-68; PX 286 (Legislative Rosters 1982), at 1948-49, 1956-61.

and constant threat to African-Americans who did not keep their "place."

The *Brown* decisions ushered in the era of the "Civil Rights Movement," which became "one of the most important reform movements . . . in American history."[1387] The Movement was "deeply distressing" to the people of Alabama who had "invested so heavily in white supremacy [and] white domination of Alabama society."[1388]

The impact of the first *Brown* decision on white Alabamians' support for public education varied according to how seriously they took the threat of federally mandated school desegregation.  Many Alabamians doubted that the federal government could (or would) force racial integration of the schools.[1389]  Those Alabamians continued to support funding for public schools, but only so long as they remained segregated. Conversely, those who thought desegregation likely to occur supported the creation of *private* schools and abolition of the *public* school system.  Mills Thornton summarized these contradictory attitudes as follows:

> For many years after *Brown* . . . [t]he feeling was quite widespread in the South that there simply was going to be no way that the federal government would ever have the power to bring integration to the state. There was no sense . . . that integration was impending or even very likely.  And if you are quite confident . . . that's true, then you can continue to be an advocate of increased funding for the schools and

---

[1387] Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253), at 65 ("**Norrell Tr.**").

[1388] *Id.*

[1389] Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258), at 9-10 ("**Flynt 2 Tr.**").

[have] the confidence that these schools will . . . continue [to be] segregated.

If, on the other hand, you believe that there is some real likelihood that schools will be integrated, then you would have substantial doubts because all political leaders at this period said, and some actually believed, that the outcome of the integration of the schools would be the abolition of the schools.[1390]

The second *Brown* decision, however, had an *immediate* negative impact on the willingness of white Alabamians to increase revenues for the support of public education. In the 1955 regular legislative session, Sam Engelhardt and other Black Belt legislators pushed a "Pupil Placement Bill" that would have assigned students to schools based on their "sociological" characteristics — a direct contradiction to the Court's mandate that public schools be desegregated.[1391] Attempts at increases in education funding were stifled by the Legislature, which resulted in the calling of a special session by Governor Folsom in July of 1955 to address the problem of public school funding.[1392] State Superintendent of Education Austin Meadows argued that funds were needed to improve black schools in an attempt to placate federal courts that might enforce the *Brown* decrees — an argument that then was considered the

---

[1390] Thornton Depo, at 163-64.

[1391] Testimony of Dr. Henry McKiven, Transcript Vol. 5 (doc. no. 261), at 40-43 ("**McKiven 5 Tr.**").

[1392] *Id.* at 42-43.

"moderate" approach to the dilemma presented by *Brown*.[1393]  Black Belt legislators, however, took "a more hardline approach":[1394]  they held Governor Folsom's school funding bills hostage until he dropped his opposition to the Pupil Placement Bill, which then passed.[1395]  Another statute that was even more sinister than the Pupil Placement Bill was the Act sponsored by legislators representing Macon and Wilcox Counties, which was enacted during the special session, but vetoed by Governor Folsom.[1396]  That Act would have required the immediate termination of any teachers who advocated school desegregation.

An Act sponsored by Senator Albert Boutwell of Birmingham that allowed local school systems to adopt so-called "freedom of choice" plans *did* become law, however.[1397]  Dr. Frederick described that statute as "a mechanism that white parents and white supremacists [used] to preserve segregation."[1398]  He explained the rationale undergirding the statute as follows:  "You should have the freedom of choice for your white child to not . . . have to go to an integrated school, or to, at least, . . . go to one

---

[1393] *Id.* at 43.

[1394] *Id.*

[1395] *Id.* at 44.

[1396] McKiven 5 Tr., at 47-48.

[1397] *Id.* at 48.

[1398] Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265), at 30 ("**Frederick 9 Tr.**") (bracketed alteration supplied).

that's primarily white."[1399]

The following constitutional amendments related to education funding also were enacted during the 1955 special session, but were defeated in a December 20, 1955 referendum:[1400] (1) an amendment that would have increased consumer taxes;[1401] (2) an amendment that would have authorized a bond issue dedicated to building black schools;[1402] and (3) an amendment that would have given counties more flexibility in raising local school revenues, a compromise rural legislators made with urban legislators.[1403]

Amendment 111, which adopted most of the recommendations of the 1954 Interim Legislative Committee report for the purpose of preserving segregation in public schools of the state, *was* ratified in the December 20, 1955 referendum.[1404] That Amendment removed language from the Alabama Constitution that guaranteed citizens the "right" to a public education, and authorized the Legislature to allow parents to send their children to schools provided for their own race, to make financial grants to private schools, to authorize bequests to private schools, to redirect poll taxes

---

[1399] *Id.* (ellipses added).

[1400] McKiven 5 Tr., at 44.

[1401] *Id.* at 45. The amendment was opposed by urban legislators because of the disproportionate redistribution of state school revenues to rural counties. *Id.*

[1402] *Id.*

[1403] *Id.* at 45-46.

[1404] Flynt 2 Tr., at 7-9.

to private schools, and to redirect the optional county education tax provided for in Section 269 to private schools.[1405]

In short, early in *Brown*'s wake the Legislature declined to provide for public schools when there was a possibility that both blacks and whites would attend, and reap the benefits of, those schools. Several years after the *Brown* decisions, however, the Legislature appeared to change its position, despite "white flight" and the anti-integration consensus among most Alabama whites. In 1962, at Governor Patterson's request, the Legislature passed a constitutional amendment authorizing county commissions to increase property taxes by 5 mills, subject to approval by a majority of the persons voting in a referendum on the proposed levy.[1406]

### 11.   Amendments 325 and 373

#### a.   Historical Context

Dr. Frederick explained why he believes it is necessary to understand the historical context in which Amendments 325 and 373 were enacted.

> Well, I think without an understanding of the Wallace administration policies and actions — of the way they viewed segregation, of a political culture that viewed spaces and places as necessary to keep separate, *unless we understand the culture of white supremacy, that dates in some way back to Antebellum Alabama, but certainly flourishes in the 20th century*, unless we really grasp all of what

---

[1405] DX 369 (Amendment 111); McKiven 5 Tr., at 50-53.

[1406] Harvey I, at 219-20.

Wallace solidified in time, the concept of fighting rather than switching, the concept of one evasive scheme after another, unless we put all of that together, then I don't think what happens in 1971, '72, or 1978 . . . stands out.

I think *you have to know the context. Otherwise, if you don't read the whole book, if you just pick out a couple of instances in two different places, you don't get the flow of events that makes those two events pretty important.*[1407]

Dr. Norrell testified that, in his opinion, the "memory of [R]econstruction" had been passed down for generations in Alabama.[1408]  Dr. Frederick agreed, testifying that, even in the twentieth century, "Reconstruction [was still] viewed as a . . . pariah."[1409]  It was perceived "as a period of great catastrophe, great tragedy for white Alabamians."[1410]  As the story was told among white families and in white schools, "good and sensible men (whites of course), 'noble' and 'self-sacrificing,' stood firm against evil forces, fought them by whatever means possible [and] 'redeemed' Dixie from black . . . bayonet rule."[1411]  In the *first Reconstruction*, Alabama defeated "the

---

[1407] Frederick 9 Tr., at 118.  Dr. Frederick's statement about reading "the whole book" is to his own treatise. Jeff Frederick, *Stand Up For Alabama: Governor George C. Wallace* (Tuscaloosa: The University of Alabama Press 2007) ("**Frederick I**"); *see also* Jeffrey J. Frederick, *Command and Control:  George Wallace, Governor of Alabama, 1963-1972* (May 10, 2003) (unpublished Ph.D. dissertation, Auburn University) (available through ProQuest Information and Learning Co., Ann Arbor Michigan) ("**Frederick II**").

[1408] Norrell Tr., at 26-27.

[1409] Frederick 9 Tr., at 21.

[1410] *Id.* at 22.

[1411] Harvey H. Jackson III, *Inside Alabama:  A Personal History of My State* 106-07 (Tuscaloosa:  The University of Alabama Press 2004) ("**Jackson**").

two perceived villains of white Alabama history[:]  the federal government and blacks."[1412]

"The civil rights era is often referred to . . . as the *second* [*R*]*econstruction*."[1413] Whites in Alabama were, again, "victims" who were "under attack" by those same villains of Radical Reconstruction, those who represented a threat to white traditions, institutions, and heritage.[1414]  As Governor George Wallace made clear in his 1963 inaugural speech, whites were determined to fight against any affront to the "southern way of life."[1415]  Dr. Frederick described the "southern way of life" as follows:

> [The] southern way of life . . . refers to social realities.  The idea of spaces and places could refer to keeping politics and political power in the hands of white[s].  It could refer to economics, keeping economic power, decision making, supervisory positions in the hands of whites.
>
> It also could refer to social spaces and places, where, for example, if a white man and a black man were walking down the sidewalk it was expected that the black man would step off and allow the white man to pass.  Those are the spaces and places that whites had reserved for themselves.[1416]

The determination of whites to prevent a second "Reconstruction" and preserve the "southern way of life" is significant in analyzing the "flow of events" that led to

---

[1412] *See* Frederick 9 Tr., at 21.

[1413] *Id.* at 22 (emphasis supplied).

[1414] *Id.* at 21.

[1415] *Id.* at 18-19.

[1416] *Id.* at 18-19.

the amendments challenged in this action.[1417]

> ### i.   The "fightin' little judge" who vowed to "never be out-niggered again" — *George C. Wallace*

George Wallace used whites' fear of a second reconstruction to his advantage in gaining office and advancing the interests of his core constituency during the early years of his political career: *e.g.,* leaders in the  Black Belt; the White Citizens' Council; the Alabama Farm Bureau ("Farm Bureau") and all true "[b]elievers in white supremacy."[1418]

> ### (A)   Early campaigning and election in his second, 1962 race for Governor

> *A South politician preaches to the poor white man*
> *"You got more than the blacks, don't complain.*
> *You're better than them, you been born with white skin," they explain.*
> *And the Negro's name*
> *Is used it is plain*
> *For the politician's gain*
> *As he rises to fame*
> *And the poor white remains*
> *On the caboose of the train*
> *But it ain't him to blame*
> *He's only a pawn in their game.*
>
> Bob Dylan, "Only a Pawn In Their Game (1963).[1419]

Wallace, who was a sitting State Circuit Judge, and who had served in the State

---

[1417] *See* Frederick 9 Tr., at 118.

[1418] *Id.* at 22, 47-49.

[1419] Written and recorded by Bob Dylan July 26, 1963.  Copyright © 1963, 1964 by Warner Bros. Inc.; renewed 1991, 1996 by Special Rider Music.

House of Representatives from 1947 to 1953, was defeated in his first run for governor in 1958 by Attorney General John Patterson.[1420]  Dr. Frederick explained the election, and the reason Wallace was unsuccessful.

> [T]he principal combatants in 1958 were Attorney General John Patterson and George Wallace.  Patterson [won] the primary over Wallace, but not with [a majority] to earn the nomination.  So it then went to a runoff.
>
> Both candidates were supporters of segregation in that 1958 campaign.  But what became clear to voters was that Governor Patterson's campaign came to a harder edge.  It was more forceful, more defiant in terms of support of segregation.
>
> Wallace seemed to be taking the stand that he would use the existing political system, where possible, to prevent integration.  Where[as] Governor Patterson was much more defiant in the 1958 campaign.
>
> Governor Patterson also mobilized a variety of groups in Alabama, including, but not limited to [the Ku Klux] Klan in order to assist his campaign.  He won the primary [and won] the runoff pretty convincingly over Wallace, which is the time where Wallace states, *I was out-niggered, and I will never be out-niggered again.*[1421]

Wallace learned this lesson well, and, indeed, he would not be "out-niggered" again.  Dr. Harvey Jackson III explained this in his book:

> [I]f John Patterson had not let hooligans and Klansmen assault the Freedom Riders, he might have appeared in history as a fairly good governor.  In areas like education, health care, and such, his

---

[1420] *Id.* at 7-8.

[1421] *Id.* at 7-8 (emphasis and bracketed alterations supplied).

administration deserves a strong "OK" by Alabama standards.  But we don't remember that, mainly because it was not what got the juices flowing back then.  It was when Patterson talked about how he wasn't going to let outsiders come in and stir up trouble, come in and tell Alabamians how to treat "our colored people" (note the possessive) that he became the popular hero — at least to white people.  *George Wallace watched this, watched and understood*.[1422]

Realizing that it was demagoguery of the race issue that would ensure his political success, Wallace struck a Faustian bargain.  "Impatiently biding his time, Wallace . . . altered his politics to conform with the growing rage of white Alabamians over racial integration."[1423]  Following his failed run in 1958, Wallace began using his position as a State Circuit Court Judge to advance his political aspirations.[1424]  For example, the United States Commission on Civil Rights sought certain county voting records from Judge Wallace.[1425]  After refusing to comply, Wallace, moving "behind the scenes," had a midnight conversation with his law school classmate and friend (soon to be former friend), U.S. District Judge Frank M. Johnson, Jr., in which Wallace "essentially" said "that he [would] turn over the records, but would like to be arrested, first, . . . so that he [could] become something of a martyr."[1426]  Judge

---

[1422] Jackson, at 249-50.

[1423] Flynt II, at 89.

[1424] Frederick 9 Tr., at 8.

[1425] *Id.* at 8-9.

[1426] *Id.* at 9.

Johnson refused, and Wallace then developed another scheme.[1427]  He turned the records over to a grand jury, instead of to the Civil Rights Commission, and wrote the account of the official proceedings, casting himself in a "heroic light."[1428]  Wallace declared that he "stopped the biggest threat to the [S]outh since Sherman's march to the sea . . . ."[1429]  Through such tactics, Wallace "elevate[d] his profile among the hardcore white supremacy segregationists crowd."[1430]  In the 1962 Gubernatorial election, Wallace used their support, and his self-promoted stance of hard-line segregationism, to court the white voters into electing him in a landslide victory.[1431]

"[I]t's important to note the context of [Wallace's first victory].  The integration of Ole Miss is occurring in 1962.  The issue of integration is becoming no longer a back burner issue, [but] a front burner issue."[1432]  Wallace's first election in 1962 occurred during the quick of the Civil Rights Movement.[1433]  White Alabamians were in search of a leader who would erect and fortify the barricades between federal

---

[1427] *Id.* at 9.

[1428] *Id.* at 9-10.

[1429] Frederick 9 Tr., at 9.

[1430] *Id.* at 8.

[1431] Norrell Tr., at 66.; Frederick 9 Tr., at 10-11.

[1432] Frederick 9 Tr., at 10-11.

[1433] *See id.* at 8-25 (discussing Wallace's inaugural address in detail and noting that the speech even referenced reconstruction).  "When Wallace is making his reference to reconstruction, white Alabamians, his core constituents, know exactly what he means.  He means the federal government and blacks conspiring to take away the white supremacy society that had been built." *Id.* at 22; *see also* Norrell Tr., at 66.

mandates and the institution of white supremacy, a leader who would invent "legal" means to circumvent federal court orders, who would drag the State's feet in defiance of desegregation, but most of all, a leader who would — as Wallace said to tremendous applause during his 1962 campaign — "stand in the schoolhouse door" if such action was necessary to prevent integration.[1434]  "George Wallace convinced voters that he was that man.  That was how he won."[1435]

In his now infamous 1963 inaugural speech,[1436] Wallace bellowed: "In the name of the greatest people that have ever trod this earth, I draw the line in the dust and toss the gauntlet before the feet of tyranny . . . and I say . . . segregation today . . . segregation tomorrow . . . segregation forever."[1437]  The 1963 inaugural speech contained many of the coded words and phrases Wallace would use throughout his public career to invoke opposition to equal rights for African-Americans:[1438] *e.g.,*

---

[1434] Jackson, at 250.  For the Wallace quote, *see,* Frederick 9 Tr., at 11.

[1435] *Id.*

[1436] *See* PX 631 (George Wallace Inaugural Address, 1963).

[1437] *Id.* at 4.

[1438] *See*, *e.g.,* Marshall Frady, *Wallace:  The Classic Portrait of Alabama Governor George Wallace* 9 (New York:  Random House 1996) ("**Frady**").

A former Alabama senator echoe[d], "It's conceivable that he could win a state like Illinois or even California when he puts the hay down where the goats can get at it. He can use all the other issues — law and order, running your own schools, protecting property rights — and never mention race.  But people will know he's telling them, 'A nigger's trying to get your job, trying to move into your neighborhood.'  What Wallace is doing is talking to them in a kind of shorthand, a kind of code."

criticizing the "edicts" of the United States Supreme Court; accusing the Court of adopting the agenda of "communist-front organizations";[1439] referring to segregation as "the great freedom of our American founding fathers";[1440] accusing federal authorities of being influenced by "communist philosophers," and attempting to create "a single all powerful government";[1441] claiming that Alabama's segregationist heritage was best "for both races";[1442] and pledging to "Stand Up for Alabama" in order to "preserve our freedoms and liberties."[1443]

### (B)    Wallace's rhetoric

One of Governor Wallace's defining roles as Alabama's governor was his "outspoken advoca[cy] of private school education throughout the entire 1960s and into the 1970s."[1444]   He was perhaps the State's most active participant in the promotion of private schools, encouraging "white flight" from the public school system.[1445]

---

*Id.*

[1439] PX 631, at 7.

[1440] *Id.* at 8.

[1441] *Id.*

[1442] *Id.*

[1443] *Id.* at 10; McKiven 5 Tr., at 60-64.

[1444] Frederick 9 Tr., at 29.

[1445] Judge Murphy spoke to this same issue in his third *Knight* opinion, when making the following Findings of Fact:

> 55. During his first term as governor, George Wallace, who grew up in

> In the fall of 1963 . . . Wallace solicited support for the building of private schools before the State Farm Bureau annual meeting. And it is [this] event that suggests how he found support for his political efforts, his emerging political movement among the Farm Bureau interests who [were] composed heavily of the large landed interest in the Black Belt.[1446]

Like many others during this period of history, Wallace considered closing public schools altogether if integration became a reality in Alabama. Dr. Frederick testified to this effect:

> [B]eginning in the fall of 1963, with integration of schools in [the] Macon County area, Wallace begins to argue that there are several strategies that could be pursued in order to prevent wholesale integration: Closing of schools, closing of an entire school system, maybe even could be considered.

---

Barbour County, made no attempt to achieve property tax reform. (Pls.' Request for Admissions ¶ 102.) Throughout the 1960s and 70s, his hallmark opposition to school desegregation, his rural county constituent base, and the growth of private school options for white flight all contributed to the defeat of property tax reform. (*Id.*) In January 1964, Governor Wallace toured the newly opened Macon Academy. (*Id.* ¶ 103.) He praised the private school and a month later called for public contributions to support white students boycotting Macon County's integrated schools. (*Id.*) Wallace's office maintained a file of letters from individuals giving money to the Macon Academy; one contribution was for twenty thousand dollars. (*Id.* ¶ 104.) A woman wrote to Wallace telling him that she would like to donate seven thousand dollars toward the improvement of education in Alabama and asked him to suggest where it should go. (*Id.*) He replied: "You may wish to contact the Macon Academy in Tuskegee, Alabama. The academy is a private school which was set up by individuals in Macon County who were not satisfied with the Federal Court order which did away with their rights to run the schools in that County as they saw fit." (*Id.*) There were many more letters like this in the one-and-a-half-inch-thick file. (*Id.*) Governor Wallace also supported white academies in other counties, and he pressured cabinet members to contribute to them. (*Id.* ¶ 105.) His office maintained lists of contributors. (*Id.*)

*Knight v. Alabama,* 458 F. Supp. 2d 1273, 1289-90 (N.D. Ala. 2004) ("*Knight III* ").

[1446] Norrell Tr., at 67; PX 204 (Audio Transcript of Wallace Speech).

>And . . . . Wallace publicly supports the concept of private segregated schools. He raises money for private segregated schools. He appears and endorses private segregated academies. He allocates state troopers to take students to and from private schools.
>
>I've seen one telegram where he pledges to provide football equipment to a private school. All under the idea of a private segregated school, a private segregated school that could, Wallace suggests, get state money for tuition grants, would be more valuable than integrated public schools.[1447]

Federal judges were "a frequent whipping boy of the governor . . . anytime that he [was] speaking to any crowd of supporters."[1448] The federal judiciary, "in Wallace's mind," was "altering the system that white Alabama had put in place after Reconstruction and then cemented with the 1901 constitution."[1449] The governor was once quoted addressing a crowd as follows: "Earl Warren on the Supreme Court, he's one of them big Republicans, and he's done more against you 'n' me than anybody else in this country. *He hasn't got enough brains to try a chicken thief* in Chilton County."[1450] Wallace spoke of "tyrannical, dictatorial federal judges making indiscriminate policy changes that affect[ed] southern society."[1451] "He famously

---

[1447] Frederick 9 Tr., at 28-29.

[1448] *Id.* at 18.

[1449] *Id.* at 14, 18.

[1450] Frady, at 22 (emphasis supplied); *see also* Frederick 9 Tr., at 18.

[1451] Frederick 9 Tr., at 18.

633

suggested some federal judges needed barbed wire enemas."[1452]   Also speaking of federal judges, Wallace stated that "we will tolerate their boot in our face no longer and let those certain judges put that in their opium pipes of power and smoke it . . . ."[1453]

Wallace took full advantage of the "white supremacy" ideology that was common among Alabama whites.[1454]   He preached his anti-black rights, pro-segregation policy across the state, and it never failed to resonate with the people of Alabama.[1455]

> Wallace got an enthusiastic response there as he called for private schools, and as he . . . developed all of his . . . rhetorical flourishes against block [*sic: bloc*] voting — that's a code word for blacks voting — in various denunciations of the federal government and all of its many forms of intervention in 1963, of the news media, the newspapers, and television for promoting communists, and for the assertion that communists are at least partly responsible for the civil rights movement in the south.[1456]

"This is how George Wallace summed up his situation, his dilemma:  'I started off talking about schools and highways and prison and taxes, and I couldn't make them listen.  *Then I began talking about niggers — and they stomped the floor*.'  That's the

---

[1452] *Id.*

[1453] *Id.* at 17.

[1454] *Id.* 16.

[1455] Norrell Tr., at 70-71.

[1456] *Id.*

634

nub of it."[1457]   Wallace's manipulation of the white masses with his racist rhetoric is well illustrated by his 1962 campaign promise of "no sales taxes."[1458]   During his tenure, an alcohol sales tax passed.[1459]

> And at that time Speaker of the House Brewer goes to Governor Wallace and says, Governor Wallace, you campaigned on no new sales taxes, and now this package for the junior college system has the sales tax, a bottle beer tax, in it. *And Governor Wallace says, well, I'll just yell nigger and everything will be all right.*[1460]

### (C)   George Wallace and linkages to the Alabama Farm Bureau Federation

Governor Wallace maintained "a very close" and reciprocal relationship with the Alabama Farm Bureau (the precursor of "ALFA"), a powerful lobbying organization that was the political arm of Planters in the Black Belt and other very large farming operations in other parts of the State.[1461]   The Farm Bureau promoted

---

[1457] Jackson, at 249 (emphasis supplied).

[1458] Frederick 9 Tr., at 66.

[1459] *Id.*

[1460] *Id.*

[1461] Frederick 9 Tr., at 47-48.  The Alabama Farm Bureau Federation ("Farm Bureau") was one of the most powerful and influential political organizations in the Twentieth Century.  It was founded in 1919 "as an advocacy group for farmers . . . to influence legislation that might . . . be pertinent to farmers."  Flynt 2 Tr., at 11.  From the time of its foundation, however, it was "basically a *big farmer* planter kind of organization."  *Id.* at 11-12 (emphasis supplied).  As Dr. Flynt testified, it was a "rich people's organization," essentially an arm of the white Planters in the Black Belt section.  *Id.* at 11-16.  The Farm Bureau worked closely with the Alabama Forestry and Cattlemen's Associations, and with powerful members of the Alabama Legislature from the Black Belt region, such as Pete Matthews, Rick Manley, Sam Engelhardt, Walter Givhan, Joe McCorquodale, and Roland Cooper.  *Id.* at 21-31, 230; Testimony of Dr. Wayne Flynt, Transcript Vol. 3 (doc. no. 259), at 28-29 ("**Flynt 3 Tr.**").

Governor Wallace in his various campaigns, both inside and outside the state, and supported his legislative agenda, and Wallace returned the favors by using his political muscle to support the Farm Bureau's interests.[1462]   Indeed, the Farm Bureau enjoyed some of its most powerful influence during the Wallace years.[1463]   Farm Bureau President J.D. Hays of Madison County considered George Wallace a "hopeless" candidate for President of the United States, "but that wasn't the point," Hays noted in explaining his support of Wallace's presidential run.[1464]   "*I was sharpening my plow in Alabama*.  It was well taken because he served many years as governor."[1465]   Dr. Flynt interpreted this statement to mean essentially:   "I aligned myself with the racially-discriminatory governor with the racially-discriminatory policies so that I could accomplish my agenda in Alabama because of his great popularity."[1466] Wallace and the Farm Bureau had a close relationship, and plaintiffs aver that along with the Black Belt elite, they maintained an "alliance."[1467]

---

By the time the challenged amendments were under consideration, however, the Black Belt counties themselves were no longer a powerful force in the Legislature.  Manley 10 Tr., at 130; Harris 14 Tr., at 176-79, 197; PX 284 (Legislative Rosters 1971), at 4341-48; PX 285 (Legislative Rosters 1978), at 2154-55, 2163-68; PX 286 (Legislative Rosters 1982), at 1948-49, 1956-61.

[1462] Frederick 9 Tr., at 47-48.

[1463] Flynt 3 Tr., at 58-61; PX 815, at 16 (J.D. Hays Oral History).

[1464] PX 815, at 21; Flynt 3 Tr., at 71.

[1465] PX 815, at 21 (emphasis supplied); Flynt 3 Tr., at 71.

[1466] Flynt 3 Tr., at 72.

[1467] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief), at 66-70, ¶¶ 161-77 (discussing the "Wallace, Alabama Farm Bureau, and Black Belt Alliance").

Governor Wallace and the Farm Bureau certainly were aligned in this respect: both were fiercely opposed to tax increases.  As Wallace's political biographer, Dr. Jeff Frederick, testified, early in his political career, Wallace "promised two specific things:  One, he would not back any new tax increases, none whatsoever . . . .  The second thing he [promised was] that if a tax is passed [it should go] to the people, they could vote on it.  But [he was not] going to push for any new taxes."[1468]  During his first term as governor, Wallace made no attempt to achieve property tax reform.  Throughout the 1960s and '70s, his hallmark opposition to school desegregation, his rural county constituent base, and the growth of private school options for "white flight" all contributed the political capital that proved helpful in achieving his supporters' economic goals.[1469]

> ### ii.      History repeating itself — *Black Belt rule again threatened by the "Second Reconstruction"*

The Supreme Court's decision in *Reynolds v. Sims,* subsequent legislative reapportionment, the Civil Rights Acts of 1964 and 1965, the rise of the black vote, and fear of increased property taxes *all* combined to cause Black Belt Planters and legislators to fear that their section would again be subjected to "black rule," as it had

---

[1468] Frederick 9 Tr., at 66.

[1469] *See* Norrell Tr., at 66-67 (describing Wallace's "defiance against the civil rights movement" and his alliance with Farm Bureau interests).

been during Congressional Reconstruction.[1470]  Plaintiffs point to Sam Engelhardt, a

State Senator from Macon County, as typifying the fears of Black Belt whites during

this period in Alabama's history.[1471]  Engelhardt was a Planter and cotton ginner in

Shorter, Alabama.  He began his political career in the Alabama House, serving as a

Representative of Macon County from 1950 to 1954.  From 1954 to 1958 he was the

State Senator from Macon and Bullock counties.  Dr. Robert J. Norrell wrote this

about Engelhardt in his book, *Reaping the Whirlwind*:

> Engelhardt's first legislative initiative was an effort to protect
> segregation in public schools.  He submitted a bill in the state legislature
> that would end public education in Alabama should the United States
> Supreme Court outlaw segregated schools.  The bill was prompted in part
> by *Briggs v. Elliott*, the NAACP's challenge to segregation in Clarendon
> County, South Carolina, school system, a case that would become a
> companion suit to *Brown v. Board of Education*.  If the court should
> strike down segregated schools, "there's nothing left to do but . . . shut
> off state appropriations for education and establish private schools,"
> Engelhardt told the legislature.  "Now is the time to see who wants to
> stand up for preservation of our segregation policy—who does not," he
> said, drawing distinction that left no room for debate, at least among the
> vast majority of white Alabamians.  "I do not want to see a single brick
> removed from the wall of segregation."[1472]

---

[1470] Norrell Tr., at 76-77.

[1471] *See* doc. no. 274 ¶¶ 146-49.

[1472] *Id.* (quoting Robert J. Norrell, *Reaping the Whirlwind:  The Civil Rights Movement in
Tuskegee* 80-81 (Chapel Hill:  The University of North Carolina Press 1996) ("**Norrell**")) (emphasis
supplied, ellipsis in original).

During his political career, which extended into the late 1960s, Senator Engelhardt also served as head of the White Citizens' Council of Alabama, Chairman of the Alabama Democratic Party, State Highway Director, the legislator who proposed splitting Macon County, the author of the 1956 Alabama Pupil Placement Act, and the legislator who procured the infamous Tuskegee gerrymander that was struck down in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).[1473]  Despite two unsuccessful runs for office — one for Lieutenant Governor in 1958, and one for Governor in 1962 — Engelhardt essentially led the way in "bolster[ing] disfranchisement" in response to court orders.[1474]

Engelhardt "made it very specific" in interviews "that he was determined to preserve disfranchisement, because he assumed that if blacks got the right to vote, especially in his county and similar Black Belt counties, that they would gain control of the tax assessor's office and would raise the property tax on whites."[1475]  Mixed motives of race and economics guided his actions:  specifically, his fear of the "nigger tax assessor."[1476]  Indeed, Engelhardt posed the following question to a journalist in

---

[1473] Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253), at 65-66 ("**Norrell Tr.**"); Flynt 2 Tr., at 24-25.

[1474] Norrell Tr., at 73.  *See Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986) (discussing Engelhardt's role in Alabama's efforts to suppress black voting strength).

[1475] Norrel Tr., at 73-74.

[1476] Declaration of Dr. Robert Norrell (PX 7) ¶ 5 ("**Norrell Dec.**").

1956: "[I]f you have a nigger tax assessor, what would you do?"[1477]  The answer, to Engelhardt, was obvious:  a black tax assessor would exploit white landowners. Engelhardt's fear of an African-American tax assessor was not unique to him; virtually all white Alabamians who owned large tracts of agricultural or timberlands shared it.[1478]  The apprehension was directly traceable to the experiences of those Black Belt Planter elites who had "redeemed" the state from "Radical" Reconstruction rule in 1874, and the increased property taxes that funded African-American schools during that period.  Faced with the growing threat of a second Reconstruction, during which blacks would again gain political power, Black Belt whites were prepared to fortify their defenses against increased taxation.

### *iii.* **The racial context of events leading up to the enactment of Amendment 325**

In the mid 1960s, "the Justice Department began to file suits in Alabama counties, *particularly in Black Belt counties*, to force the counties to produce plans for eliminating" segregated schools.[1479]   In response, Alabama relied upon various "freedom of choice" plans to feign compliance with court desegregation orders.[1480]

---

[1477] Flynt 2 Tr., at 24-25.

[1478] Norrell Dec. ¶ 16.

[1479] Testimony of Dr. Henry McKiven, Transcript Vol. 5 (doc. no. 261), at 65 ("**McKiven 5 Tr.**").

[1480] *Id.* at 65-66.

"[T]he idea was to have some kind of limited integration in order presumably to show that [school systems] were making a good-faith effort to do what the courts were ordering."[1481]  Of course, "no white children were going to choose to go to . . . black schools."[1482]  On the other hand, in an environment of "great racial tension," where race-based violence was widespread, it was not likely that many African-American parents would jeopardize the safety of their children by "choosing" for them to attend white schools.[1483]  Thus, segregation was not required by law, but it, nevertheless, remained a fact of life.[1484]  Most white Alabamians believed they had avoided federal desegregation mandates until 1970, when "the courts began to rule against Freedom of Choice plans."[1485]  Led by Governor Wallace, whites, desperate and outraged by the reality of integrated schools, renewed their determination to defy *Brown*.[1486]  By September 1971, approximately 25,000 white students, including most white students in the Black Belt, were attending private schools.[1487]  With the threat of integrated

---

[1481] *Id.* at 75.

[1482] *Id.* at 66.

[1483] *Id.* at 67.

[1484] *See* McKiven 5 Tr., at 65-67.

[1485] *Id.* at 91-92.

[1486] *See, e.g.*, *id.* at 93-95.

[1487] See PX 39 (*Birmingham News*, Sept. 15, 1971).  Frank Sikora reported in the *Birmingham News* that 25,000 white students were in private schools in Alabama to avoid court-ordered desegregation.  In Mobile County alone, 32 private schools had sprung up since January.  Dr. Max Howell, director of the Alabama Private School Association, said more private schools would be organized if the busing issue continues.  As a result, many county school systems

641

schools lingering, tax increases to benefit public education were unpopular, to say the least.

When Governor Lurleen Burns Wallace, wife of and placeholder for George Wallace (who then was precluded by the State Constitution from serving consecutive terms as Governor), died in office in 1968, Lieutenant Governor Albert Brewer became Governor to serve the remainder of her term.[1488]  During his short tenure in office, Governor Brewer convinced the Legislature in 1969 to agree to "the biggest tax package ever passed for schools percentage wise in Alabama history."[1489]  Dr. Frederick testified that Brewer's ability to persuade the Legislature to adopt his education budget, with its "education enhancements [and] new revenue streams," was a "remarkable" accomplishment, especially when viewed in the context of the times.

Even so, the success came back to haunt Brewer when he sought election as Governor in his own right during the 1970 Democratic Primary.[1490]  Brewer's main opponent in that race was George Wallace, who resorted to some of the meanest and

---

were now almost all-black, including Marengo, Bullock, Lowndes, Sumter, Perry, Choctaw, Greene, and Macon.  Hale and Wilcox were "sitting on the fence."  Whites began leaving in 1970 when the federal courts ordered merger of student bodies.  Marengo County Superintendent Fred Ramsay said federal court orders were "futile to bring about integration."  *Id.*

[1488] Doc. no. 242-1 ¶ 136 (Parties' Statement of Agreed Facts) ("**Agreed Facts**").

[1489] Testimony of Albert Brewer, Transcript Vol. 10 (doc. no. 266), at 180 ("**Brewer 10 Tr.**").

[1490] Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265), at 63 ("**Frederick 9 Tr.**").

most explicit racial campaign tactics ever seen in Alabama.[1491]   Brewer was the

frontrunner in the "first primary," but failed to secure enough votes to become the

Democratic nominee without a runoff.  Wallace turned the election in the "second

primary."[1492]   Dr. Flynt provided examples of some of the race-based tactics that

defeated Brewer:

> Photographs [were] circulated . . . of a woman [who] was alleged to be
> one of Albert Brewer's daughters with a group of African-Americans in
> a compromising situation, . . . [There also were advertisements run on]
> radio programs . . . that had a very deep-voiced person say, "Imagine
> your wife was driving late at night on a lonely Alabama road and her car
> broke down, and she saw a whirling blue light of a state trooper, and the
> state trooper pulled up behind her and she felt so relieved, and out
> stepped a black state trooper."  End of radio advertisement.  [T]his is
> such a graphic horrible campaign that it's been impossible for Albert
> Brewer to get over it, even after all these years.[1493]

According to Dr. Flynt, the 1970 Democratic runoff was "just Wallace at his racist

worst and Alabama politics at its very worst . . . . [and the] definition of exactly what's

taking place in the politics in 1970."[1494]   It was "the nadir, in terms of racism and

---

[1491] *Id.* at 68-71.

[1492] Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258), at 54-57 ("**Flynt 2 Tr.**").

[1493] *Id.* at 56-57 (bracketed alterations supplied); *see also* Report of Dr. Robert Norrell (Plaintiffs' Exhibit 4) ¶ 44 ("**Norrell Report**") ("When challenging Albert Brewer for governor in 1970, George Wallace condemned Brewer as a pawn of the 'black bloc' in Alabama, which in collaboration with federal judges, were undermining Alabama's 'way of life,' another coded message to signal to whites his defense of segregation.").

[1494] Flynt 2 Tr., at 57.

political campaigns in the state."[1495]  Wallace attacked Brewer's increased education

funding legislation, thereby "tapping into the . . . [white voters'] resentment . . . over

what was happening to the public schools in the state."[1496]

Wallace frequently linked his anti-taxation policy to the actions of the federal

government, calling for votes "against further taxes for . . . *federal schools*."[1497]

Indeed, 1970 campaign literature frequently linked "high taxes" with "the crisis in

[the] public schools."[1498]  In 1970, Wallace "became the anti-tax . . . candidate . . . ."[1499]

Dr. Frederick testified that after the 1970 election, Wallace put aside explicit

---

[1495] *Id.* at 54.

[1496] McKiven 5 Tr., at 97-98.

[1497] *Id.* at 98.

[1498] *See, e.g.*, PX 165 (George C. Wallace Newsletter), at 15.  One issue of "The George C. Wallace Newsletter" circulated during the 1970 primary campaign made a thinly veiled reference to the Brewer education revenue package:

> Dear Friend:
>
> As I have stumped the State during the past five weeks as a candidate for Governor of Alabama in the May 5 Democratic Primary, I have stressed the urgent need for relief from high taxes, the high cost of living, and the solving of the crisis in our public schools.
>
> These are the issues I have found are very much in the minds of the people in all areas of Alabama as well as throughout the country.
>
> Candidates and officials presently in office who neglect to discuss and seek solutions to these problems are failing to deal with the issues most vital to our future and our children's future.

*Id.*

[1499] McKiven 5 Tr., at 98.

644

references to race and resorted to "code words" that had clear racial connotations for white Alabamians thereby tailoring his rhetoric toward a national constituency, as he prepared for another run at the office of President of the United States.[1500]

White hostility toward court-ordered busing was at a peak in 1971, the year of *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971), and *Davis v. Board of School Commissioners of Mobile County*, 402 U.S. 33 (1971).  Beginning his second term in office in 1971, Governor Wallace responded to those decisions by continuing to serve as the voice of the white supremacists of the state, and crusading against integrated public schools.  Wallace opposed busing in rhetoric and action, passed a pupil transfer bill known as "Act No. 1418," and made efforts to reopen segregated schools that had been closed by federal court orders as "private schools."[1501]  "Essentially all of these evasive schemes — Teacher Choice, health and safety, Freedom of Choice, as it pivots towards whites, tuition grants for private schools — one by one the legislature of Alabama passe[d] them, and one by one the federal courts invalidate[d] them."[1502]

In the midst of this tense racial environment, the three-judge federal court sitting in the Middle District of Alabama  handed down its decision in the case of *Weissinger*

---

[1500] Frederick 9 Tr., at 106-07.

[1501] *Id.* at 83-84.

[1502] *Id.* at 84.

*v. Boswell*, 330 F. Supp. 615 (M.D. Ala.1971), which was discussed in Part II(G)(3)(i) of this opinion, *supra,* and which required equalization of property assessments statewide.[1503]   The Legislature was in regular session when the decision was announced, and urban representatives reacted immediately to the *Weissinger* decree by advancing bills to equalize assessments.[1504]  Governor Wallace, however, yet again seized the opportunity to attack the federal courts.[1505]  The day after the *Weissinger* decision was released, Wallace linked federal-court-ordered property-tax equalization with white opposition to school desegregation.  Dr. McKiven testified to that effect:

> Well, the people in Alabama heard attacks on the federal court, they — they were thinking about what was then ongoing, the fight against the civil rights.  And then, at the same time, he's referring to a federal court decision that . . . had to do with funding of schools. [Wallace is] putting all of that together, and purposely, it seems to me. He's framing the issue as yet another challenge that's associated with integration and all the problems we've been dealing with.[1506]

---

[1503] The *Weissinger* decision was discussed more fully in Section II(G)(3)(i), *supra.*

[1504] *See, e.g.*, PX 34 (*Birmingham News*, June 30, 1971), at 8.

Lawmakers immediately began studying three proposals which until the Tuesday federal ruling had been given little attention.  One is by Rep. Ben Cherner of Jefferson, requiring all property, business or private, to be assessed at 30 per cent of its market value. . . . Another bill by Rep. Francis Falkenburg, also of Jefferson, would fix the assessment at not less than 30 per cent.  Still another proposal by Rep. Doug Hale of Huntsville would fix the rate at 25 per cent.

*Id.*

[1505] *See, e.g.*, PX 34, at 9-10.

[1506] McKiven 5 Tr., at 112 (citing PX 34, at 9).

Two weeks after the *Weissinger* decision, Governor Wallace told private school patrons in Bibb County:  "I think it's a horrible thing that you people have to pay taxes to support *public schools*.  Then you have to dig in again to pay for *quality education* for your children *in a private school*."[1507]   Wallace continued to link opposition to federal court school desegregation orders with resistance to increased school taxes.[1508] He repeatedly vowed to "veto any direct taxes" for schools, including any bill that would raise property taxes.[1509]   Wallace addressed the following comments to a joint session of the Legislature at the beginning of the 1971 Regular Session, on May 4, 1971:

> Education is still the primary function of State Government, and I believe under existing revenues we can have a teacher salary increase, a better free textbook program, a better retirement program which has already been introduced.  Other legislation along this line will be introduced, because I am proud of the fact that during the time I was Governor the

---

[1507] PX 34, at 7 (emphasis supplied).

[1508] Wallace told a Point Clear conference of Southern Regional School Boards that he would continue fighting school desegregation orders, and he urged school boards to fight as well.  Wallace suggested ways for school boards to get public support: "Come up with concrete plans for better teaching and soft-pedal the constant cry for more tax money."  *Id.* at 13.

Wallace was in favor of keeping as many districts in line with traditional election of whites by a majority of white electors.

   In one instance, there's a need to redistrict, and Wallace supports something called the white supremacy plan, an idea that says we have to keep as few districts where a majority of the voters could be black and, therefore, elect a black candidate.

Frederick 9 Tr., at 33-34.

[1509] *See* PX 35 (*Birmingham News*, August 1, 1971).

first time, a breakthrough in education came.  The largest increases at any time because of our interest.  *But I am frank to tell you, and to tell educators, that the people of Alabama are simply turned off on education and some educators because of what the Federal Courts and HEW have done to their children from Huntsville to Mobile*.  Every one of you know I am telling you the truth when I tell you that.[1510]

In a March 18, 1971 speech to the Alabama Education Association, Governor Wallace even more explicitly linked his opposition to increasing school revenues with his opposition to federally-mandated school desegregation.  He said:  "I speak to you again in your annual convention here in Birmingham, and [I] speak on the needs of education at a time when the support for education among the general public is at a rather low ebb."[1511]  He recalled that, in 1947, he had supported Governor Folsom's redirection of surplus income taxes to K-12 education, as opposed to using the surplus revenue to reduce *ad valorem* taxes.[1512]  Then Wallace reviewed the steps he was continuing to take to resist school desegregation, particularly demanding that schools closed by court order be reopened, and that parents be allowed to exercise "freedom of choice" in the schools their children were to attend.[1513]  He blamed public

---

[1510] Ira W. Harvey, *A History of Educational Finance in Alabama 1819-1986*, at 256 (Auburn, Ala.:  Truman Pierce Institute for the Advancement of Teacher Education) ("**Harvey I**") (quoting 1971 House Journal, Regular Session, p. 4713).

[1511] DX 3 (George Wallace Speech to AEA), at 3.

[1512] *Id.* at 3-4.

[1513]

A survey is being made and will be complete soon of the schools that have been arbitrarily closed by court decision and which closing has brought about inconvenience to parents, teachers and children through overcrowding – the transfer

648

opposition to desegregation for the defeat of Governor Brewer's public school income tax amendment, and for the defeat of local property tax proposals called for by Brewer's local effort school legislation.[1514]  Wallace closed his remarks by demanding that the teachers join him in opposing school desegregation.[1515]

At the same time, the "threat" of the recently re-empowered black voting bloc to the political agenda of the Farm Bureau and like-minded people and institutions was becoming a reality.  Even though only two blacks, Fred Gray and Thomas Reed, had been elected to the State Legislature in 1970, the three-judge federal court sitting in Montgomery was clearly on the path to issuing new decrees that would increase black

---

of children from their neighborhood schools, etc. The State will go into court and ask that these schools be reopened on a nondiscriminatory basis – on freedom of choice – to relieve overcrowding and to do away with the inconvenience to parents, teachers and children and the attendant problems that go with such closing of schools such as overcrowding, busing and destruction of neighborhood schools.

*Id.* at 6.

[1514]

[T]he public, as things now stand, "is simply turned off" on education and on educators [handwritten interlineation: as far as more taxes are concerned because HEW-Courts.] This is no guess or surmise, it is an actual documented fact – you recall quite vividly last year in November when the people of Alabama turned down overwhelmingly an income tax that would apply only to a few taxpayers in the State and that every county that has voted upon taxes for local schools has defeated them and even one county having voted to take off a tax that had been routinely accepted for a great number of years.

*Id.* at 11-12.

[1515] *Id.*

649

representation in the Alabama House of Representatives and Senate.[1516] "The promise of real legislative reapportionment after the 1970 census meant a big expansion of power for urban, suburban, and black interests in the state and a drastic diminution of Black Belt power."[1517]    As a result of federal court-ordered reapportionment, legislative power was already passing to urban areas, where there was much stronger support for property taxes, and where the millage rates already were higher than millage rates in rural areas.[1518]    Blacks residing in the cities were becoming better organized politically, and more capable of making their influence felt in the Legislature.  As successive legislative reapportionment plans increased the number of legislators from urban areas and decreased their counterparts from rural areas, Black Belt whites relied more and more on Governor Wallace to defend their historical interests.[1519]

---

[1516] On July 22, 1971, a three-judge federal district court ordered the Alabama Legislature to show cause why it should not reapportion itself in 1971 so a new legislature could be elected in 1972. PX 34, at 14.  The next day Rep. Fred Gray said he would introduce a redistricting bill the following week.  "Any Gray plan for legislative reapportionment would be sure to include districts to bolster black representation in the Legislature."  *Id.*

[1517] Norrell Report, at 6.

[1518] Declaration of Dr. Wayne Flynt (PX 10), at 7-8 ("**Flynt Dec.**").

[1519]

The legislature that met in 1967 was the first in the state's history to be fully reapportioned on a one-person-one-vote basis.  Reapportionment brought many changes, not all of them for the better.  Urban-rural division became the major base of conflict.  The outnumbered Black Belt delegation found new allies in other rural legislators, sometimes joining them in fights against old alliance partners from Jefferson County who now worked with other urban interests.  The Governors Wallace sided with the Black Belt-rural counties.

In short, when the Legislature was forced by the *Weissinger* decision to address property tax equalization, more than just taxation was at issue.  Faced with the reality of integration, whites were fleeing the public school system, and they were opposed to funding not only integrated schools, but schools that their children were not even attending.  Racial tensions were high, and the political powers that had "redeemed" the state a century before were once again threatened by the specter of "black rule."

### b.    Amendment 325

#### i.    Failed equalization attempts and *Weissinger v. Boswell*

Throughout the 1950s and 1960s, the principal opposition to reform of the State's *ad valorem* property tax system came from the Alabama Farm Bureau and forestry interests, which researched and began lobbying for a classification system that would protect them from high assessment ratios, and preserve the artificially low property valuations they had maintained in the Black Belt and other rural areas for

---

Anne Permaloff & Carl Grafton, *Political Power in Alabama:  The More Things Change* . . . 241 (Athens:  The University of Georgia Press 1996 ("**Permaloff & Grafton I**").

> Just as Black Belt and rural legislators were the core of the Wallace leadership base, so Black Belt and rural voters had been the core of his electoral support.  As more blacks entered the electorate and the urban areas continued to grow in the 1970s, Wallace's support base eroded.  Winning future elections would be more difficult.

*Id.* at 298.

more than a century.[1520]   As previously discussed in Part II(G)(3)(e) of this opinion, *supra,* Governor Patterson's Revenue Commissioner, Professor Harry Haden, promulgated a regulation that required all taxable property to be assessed at thirty percent of its fair market value.[1521]   He then had representatives of the revenue department review the compliance of county tax assessors with that directive, and increase any non-compliant assessments.[1522]   In an effort to subvert Commissioner Haden's regulation, legislators introduced bills to strip the office of Revenue Commissioner of its statutory powers. Ultimately, Governor Patterson agreed to discontinue Mr. Haden's equalization program in return for abandonment of the bills purporting to weaken the powers of the State Revenue Commissioner.[1523]

---

[1520] Flynt 3 Tr., at 46-48.  According to Governor Brewer, the rural counties that resisted efforts to equalize property assessments were primarily those in the Black Belt and in the Tennessee River counties of north Alabama.  "Madison and Limestone Counties and, to some extent, Lawrence County were in that category; that is, where there was large landholdings, and that's where most of the resistance came to reappraisals."  Brewer 10 Tr., at 203.

[1521] Doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 52 ("**Agreed Facts**").

[1522] Brewer 10 Tr., at 154.

[1523] Agreed Facts ¶ 133.  Individual property owners also took action to undercut higher assessments.  "[W]hen the first wave of [Haden's] assessments hit, property owners began looking for ways to get relief and found the statutory right of appeal from the assessment ultimately to the circuit court."  Brewer 10 Tr., at 154-55.  Once appealed to the circuit court, it was the responsibility of the county solicitors (*i.e.*, district attorneys) to represent the government in the action.  *Id.* at 155.  The county solicitors, concerned about maintaining public support, declined to aggressively pursue the challenges.  *Id.* at 155.  Governor Brewer's observation, speaking just for Morgan County, "was that most of the circuit solicitors didn't really have any stomach for getting involved in litigation over tax assessments, and so on, particularly with their unpopularity with the electorate [and, as a result,] most of [the appeals] got settled" once appealed.  *Id.* at 154-55.

Much to the benefit of the Black Belt region, "the assessment chaos and, essentially, the failure to assess property at anything like its real value continued after Haden's [failed] efforts."

In 1967, the Legislature's Joint Committee on *Ad Valorem* Taxation issued a report that recommended the establishment of a statewide reassessment program, lowering the unenforced sixty percent maximum assessment rate to thirty percent. Thus began the legislative process that would culminate in Amendment 325. Under the proposed plan, timberland would be assessed at its bare-land value, and, with the exception of severance taxes, growing timber and other crops would be exempt from taxation. There would be no exemptions, however, for personal property used for business purposes.[1524]   A bill proposing classification schemes that would further shield the property of large landholders from taxation was introduced by state legislators who carried water for the Farm Bureau:

> A report issued by a four-person minority of the interim committee recommended different percentage levels for the assessment of the various classes of property. In particular, it recommended that rural property be assessed at lower levels than other kinds. Bills reflecting *this Farm Bureau Federation perspective* were introduced in the Senate on Tuesday in the third week of July and assigned to the Finance and Taxation Committee. At 5 P.M. Wednesday, a notice was placed on the Senate bulletin board announcing that the committee would hold hearings at 9 A.M. on Thursday. *Few were surprised when the only witnesses to appear represented the Farm Bureau, and of course they spoke in favor of the bills.* In other venues urban legislators contended that the classification scheme in the rural bill was unconstitutional and that other groups besides farmers deserved tax relief.[1525]

---

[1524] Agreed Facts ¶ 135.

[1525] Permaloff & Grafton I, at 249-50 (emphasis supplied).

The Farm Bureau bill was defeated in the House of Representatives on August 8, 1967, because it failed to win the three-fifths vote required for a constitutional amendment.[1526]  Two days later, however, the House voted to reconsider the Farm Bureau bill, and the motion passed by a vote of seventy-two to sixteen.[1527]  In the bill that finally passed the House, personal property was assessed at twenty percent of fair market value, business property at twenty-five percent, residential property at twenty percent, and utilities at forty percent.[1528]  Farm land was assessed at the lowest ratio of all, fifteen percent.[1529]  The House proposal was not adopted by the Senate, but the Legislature did pass an act on September 8, 1967, placing a state-wide limit of thirty percent of appraised, fair-market value on assessments.[1530]  Despite the fact that the House classification bill failed, the new law was a victory for the Farm Bureau. Capping all property tax assessments at thirty percent of fair market value, and granting state and local tax officials wide discretion in the setting of *ad valorem* assessment rates, assured that local tax assessors would not raise taxes significantly. According to Albert Brewer, who was Lieutenant Governor in 1967, the thirty percent assessment ratio specified by this statute was a hedge against an adverse judicial

---

[1526] *See, e.g.*, *id.* at 250.

[1527] *See, e.g.*, *id.*

[1528] *See, e.g.*, *id.*

[1529] *See, e.g.*, *id.*

[1530] *See* 1967 Ala. Acts. § 502; *Weissinger*, 330 F. Supp. at 619 n.9.

judgment — *i.e.*, "an insurance policy against the courts saying you have got to go to 60 percent [the assessment ratio specified in the state statute discussed in Part II(G)(3)(b), *supra*,] *and enforce it*."[1531]

### ii.     The Farm Bureau and Amendment 325

### (A)     The immediate impact of *Weissinger*

On October 1, 1971, county tax assessors began a new fiscal year with no instructions from George Wallace's new Revenue Commissioner, Charles A. Boswell, about how to comply with the *Weissinger* court order.[1532]  Boswell was under court order to file his plan of compliance with the *Weissinger* panel no later than December 29, 1971.[1533]  He intended to use the sixty percent assessment ratio,[1534] but met with resistance from county tax assessors: for example, the Montgomery County tax assessor said she would go to jail before increasing assessment ratios.[1535]  Governor Wallace spoke out, expressing the opinion that "equalization" of property taxes was "supposed to equalize, not raise new taxes."[1536]  He supported a property classification plan, and charged that the recent legislation establishing legislative efforts to set a

---

[1531] Brewer 10 Tr., at 163 (bracketed alteration and emphasis supplied).

[1532] Agreed Facts ¶ 170.

[1533] *Id.*

[1534] *Id.*

[1535] *Id.*

[1536] *Id.*

statewide maximum assessment ratio of thirty percent fair market value actually amounted to "a back door way of raising new revenue."[1537]

On October 20, 1971, Boswell requested that the State's county tax assessors begin the process of reappraising taxable property within their respective jurisdictions.[1538]  The effect of Boswell's request was unclear.  In the past, many tax assessors either had been unwilling to reappraise taxable property, or did not have either the financial resources or skill to do so.[1539]  Boswell's letter further muddied the waters, telling the assessors that "Governor Wallace is very much concerned that compliance with the court order will increase the tax burden on homeowners and small businesses.  He is especially unalterably opposed to any increase in the taxes on small businesses."[1540]  Boswell and the county tax assessors received a reprieve on December 28, 1971, when the three-judge *Weissinger* court granted the State a thirty-day extension for filing a progress report on the actions taken to equalize property assessments.[1541]

### (B)    The legislative process of Amendment 325

In the meantime, the Legislature was struggling to find a solution to the property

---

[1537] Agreed Facts ¶ 170.

[1538] *Id.* ¶ 174.

[1539] *Id.*

[1540] *Id.*

[1541] *Id.* ¶ 220.

tax problem.  One bill, supported by the Farm Bureau, proposed the creation of a classification system, and another, introduced by urban legislators, called for an across-the-board, twenty-five percent assessment ratio.[1542]  The Farm Bureau property tax classification bill was passed by the House, but died in a Senate filibuster orchestrated by urban legislators.[1543]  Unless a compromise was reached in the Senate, the *Weissinger* mandate would require application of the sixty percent ratio required by the Act of July 10, 1935, No. 194, 1935 Ala. Acts 256, 263 ("All taxable property within this State shall be assessed for the purpose of taxation at 60% of its fair and reasonable market value."), subsequently codified at Ala. Code Title 51, § 17 (1940) (Recomp. 1958).  With the *Weissinger* deadline looming, some supporters of the Farm Bureau classification bill, fearful of the political repercussions of allowing a sixty percent assessment ratio to go into effect as a result of legislative inaction, considered backing the twenty-five percent ratio act sponsored by urban legislators.[1544]

Governor Wallace, in a strongly worded statement containing Populist rhetoric, attempted to bully the Legislature into passing the Farm Bureau's property tax classification bill, to avoid the imposition of a "catastrophic" burden on homeowners:

---

[1542] Agreed Facts ¶ 164.

[1543] PX 39, at 4 (*Birmingham News*, September 16, 1971) (describing the filibuster of the classification bill, and noting that the alternative twenty-five percent bill was still pending).

[1544] Agreed Facts ¶ 164.

A group in the Senate seems to be committed to push for the legislation which benefits the utility companies and special interest groups at the expense of the average citizen. I am calling for the Legislature to present to the voters of this state a proposed amendment to the Constitution which would bring about a classified system of property assessment. I feel that this should be offered to the voters to take the place of any across-the-board percentage figures that might be passed. It is simply impossible under current law to provide a percentage factor which would retain the current level of revenue from the special interest groups and at the same time refrain from increasing property taxes for homeowners. I have often said, and I repeat again, that I am opposed to any measure of legislation that would have the effect of increasing property taxes on our homeowners in Alabama.[1545]

The Legislature adjourned the 1971 regular session *sine die* on September 23, without passing either the general fund or education budgets, and leaving redistricting and property tax issues unresolved.[1546] Therefore, a special session was necessary. But at a news conference, Wallace said he would not call a special session until the legislative leaders reached agreement with his administration on property taxes.[1547] He repeated his pledge to not raise "any new consumer tax on the people of this state who already are burdened by federal, state and local taxation."[1548]

While waiting for Wallace to call a special session, Senate leaders came close to reaching a compromise property tax plan that, among other things, would have left

---

[1545] *Id.* ¶ 165 (quoting Wallace's speech).

[1546] *Id.* ¶ 168.

[1547] PX 43 (*Birmingham News*, Oct. 1, 1971), at 9.

[1548] *Id.* at 7.

658

determination of property assessment ratios up to each county.[1549]  But, as Wallace met with the leadership of the House and Senate to plan for a special session, those talks ground to a halt.[1550]  On October 24, Wallace vowed to veto any "fix" for the property tax dilemma that involved any new "direct" taxes.[1551]

On October 28, Wallace called the chairmen of most House and Senate committees to his office in an effort to resolve the differences between his administration and the legislative leaders.[1552]  Wallace outlined the topics that would be included in his call for three special sessions:[1553] the first session in mid-November would cover appropriations; the second session, to convene immediately after the first adjourned, would deal mainly with *ad valorem* taxes; and the third, immediately following the second, would be a "junk session," dealing with matters closer to the governor.[1554]

On November 3, having delayed as long as he could in operating the State without legal appropriations, Governor Wallace announced that he would summon the Legislature into the first of the three special sessions on November 15, 1971, to deal

---

[1549] Agreed Facts ¶ 175.

[1550] *Id.*

[1551] *Id.* ¶ 176.

[1552] *Id.* ¶ 177.

[1553] *See generally* Robert L. McCurley & Keith Norman, *Alabama Legislation* 87-92 (Tuscaloosa:  Alabama Law Institute 7th ed. 2010) (discussing special sessions).

[1554] Agreed Facts ¶ 177.

with appropriations for the education and general fund budgets.[1555]  At the same time, Wallace asked state television stations to make available public air time for the evening of November 15th, and to broadcast statewide the Governor's speech to the joint houses of the State Legislature.[1556]  "I will say this," Wallace vowed, "[t]here will be no new direct or indirect taxes.  The only way new taxes will be passed is if the Legislature overrides my veto."[1557]  Wallace also said a second special session would be called to consider *ad valorem* property taxes, because:  "There could be an increase of $300 million on land and property tax unless we take action this year."[1558]

In his November 15th address to both chambers of the State Legislature before a live statewide television audience Wallace "[s]ound[ed] more like an old time campaigner than a governor trying to coax his Legislature into his way of thinking."[1559]  He announced there would be another special session to deal with property taxes, indicating that he wanted to keep basically the same tax structure already in existence, "but somehow, equalize it."[1560]

On November 24, Wallace officially called the second special session, to begin

---

[1555] *Id.* ¶ 178.

[1556] *Id.* ¶ 179.

[1557] *Id.*

[1558] *Id.*

[1559] Agreed Facts ¶ 181.

[1560] *Id.*

on November 30.[1561]  Wallace instructed the Legislature to satisfy the federal court's order to equalize taxes, but repeated his demand that equalization effect no tax increase on property owners.[1562]  Wallace opened the special session "with a warning that he would veto any *ad valorem* tax bill that substantially increases taxes."[1563]  He favored the Farm Bureau classification plan, which "apparently had the necessary votes to win passage barring a filibuster."[1564]  Wallace warned the Legislature under threat of veto not to use this special session called for property tax equalization as an excuse to raise *ad valorem* taxes.[1565]  Equalization should not be a "back door" method of increasing taxes, he told a joint session of the House and Senate.[1566]  Wallace said that the Legislature must not pass any law that would "amount to a confiscation of the property of the homeowners of Alabama."[1567]  Any "substantial increase" in property taxes, he said, would be vetoed.[1568]

The Farm Bureau classification plan passed the House, but it was headed for an urban filibuster in the Senate.[1569]  Legislators managing the competing bills were

---

[1561] PX 51 (*Birmingham News*, Nov. 24, 1971), at 2.

[1562] *Id.*

[1563] PX 52 (*Birmingham News*, Nov. 30), at 17.

[1564] *Id.* at 17, 19.

[1565] Agreed Facts ¶ 181.

[1566] *Id.* ¶ 185.

[1567] PX 52 (*Birmingham News*, Dec. 1, 1971), at 6.

[1568] Agreed Facts ¶ 185.

[1569] PX 53 (*Birmingham News*, Dec. 7, 1971), at 17.

attempting to negotiate a compromise.[1570]    But the Farm Bureau-backed, rural legislators would not agree to the proposed compromise bill.[1571]    Senator George Lewis Bailes of Jefferson County, the leader of the urban bloc in the Senate, said the Farm Bureau was:

> just trying to write into law (*de jure*) what has been the practice (*de facto*) in Alabama since reconstruction.    They're simply trying to continue the practice of making the average Alabama wage earner pay the land taxes for the owners of vast tracts of land who have never, and they hope never will, paid any taxes to speak of on their holdings.[1572]

It was apparent that the Wallace administration would need to be involved in any compromise solution to the *ad valorem* taxation question.[1573]

At midnight on December 16, 1971, the Senate broke down in a filibuster over the *ad valorem* tax issue and adjourned until January 5, 1972.[1574]  "The Senate seemed farther from a solution to the pressing problem of property tax equalization than it did when the special session convened."[1575]    Wallace angrily denounced the senators

---

[1570] PX 53, at 11.

[1571] PX 55 (*Birmingham News*, Dec. 15, 1971), at 9, 11.  The bill would have required legislative approval of any ratios set by local authorities.  *Id; see also* PX 62 (*Montgomery Advertiser*, Dec. 14, 1971), at 9 ("Twice they have been close to an agreement only to have run into objections from the powerful Alabama Farm Bureau.").

[1572] Agreed Facts ¶ 193.

[1573] PX 62, at 12 ("And from the present temper of the legislature, it doesn't appear likely that a compromise is in the immediate offing.").

[1574] *Id*. at 13.

[1575] *Id.*

responsible for the filibuster that prevented consideration of any legislative solution to the taxation issues:

> [A] minority group in the senate has filibustered and obstructed the [orderly] processes of the senate, and this group is composed of those who really seek to continue to fight the governor's race in 1970, rather than work for the good of the people of Alabama in 1971.  They thought Wallace was defeated, but the people of Alabama were stronger than national democrats.[1576]

Despite such rhetoric, the legislators were still in need of a compromise bill to solve the property tax problem.  Senator Robert Harris of Decatur, who represented Morgan and Limestone Counties, drafted the compromise bill that eventually became Amendment 325.[1577]  Harris testified that his interest in the classification approach to property taxes predated the *Weissinger* decision, and that he began to circulate potential plans shortly after that decision was entered.[1578]  Harris testified that he was attracted to a classification plan, more than to an across-the-board assessment ratio, because "[t]here was a difference, in my mind, in what farmland was worth."[1579]  He came to that conclusion after researching property tax laws in other states, and

---

[1576] Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265), at 217 ("**Frederick 9 Tr.**") (quoting DX 254 (*Birmingham News*, Dec. 17, 1971), at 2 and PX 55, at 19).

[1577] Agreed Facts ¶ 216.

[1578] Testimony of Robert Harris, Transcript Vol. 14 (doc. no. 270), at 185-87 ("**Harris 14 Tr.**").

[1579] *Id.* at 187.

corresponding with experts on taxation.[1580]   He drafted the classification plan that became Amendment 325 in a Montgomery hotel room with the assistance of his friend, former Senator C.C. "Bo" Torbert from Lee and Russell Counties (who, in 1976, was elected Chief Justice of the Alabama Supreme Court).[1581]   The Harris plan called for a division of property into different assessment classes, to be applied statewide, but also left local tax assessors some flexibility in setting the assessment ratios that applied to taxable property within their jurisdiction.[1582]   Although the Wallace administration initially approached Harris about drafting the bill,[1583] Wallace himself took no part in its creation.[1584]

In fact, the Governor took little interest in most day-to-day aspects of actual state *governance.*   As plaintiff's historian testified at trial (and reading from his book, *Stand Up For Alabama*), "Policy and governance always took a backseat in the Wallace administration to campaigning.  'Hell he didn't want to have to fool with it,' McDowell Lee declared. 'It was just, 'y'all take care of that.'"[1585]

During the special session's Christmas adjournment, Lieutenant Governor Jere

---

[1580] *Id.* at 184-85.

[1581] *Id.* at 191-92.

[1582] *Id.* at 190.

[1583] Harris 14 Tr., at 187-89.

[1584] *Id.* at 192-93.

[1585] Frederick 9 Tr., at 257 (quoting Jeff Frederick, *Stand up for Alabama:  Governor George Wallace* 402 (Tuscaloosa:  The University of Press 2007) ("**Frederick I**")).

Beasley voiced his support for the Harris compromise bill,[1586] while Farm Bureau officials and Jefferson County legislators traded accusations.[1587]   The Farm Bureau message studiously avoided the benefit a classification plan would confer on large farmers and, instead, astutely focused upon the "inequity" that would befall rural landowners if assessment ratios were equalized in a uniform, across-the-board fashion as advocated by urban legislators.[1588]   One effective Farm Bureau tactic was to provide a form letter for its members to submit to the editorial pages of newspapers in their area.   Among other things included in the "spin" package mailed to Farm Bureau's membership, the members were "coached" on how to respond to typical arguments against a classification system:

> It is also common for reporters to say the classification system gives farmers a "tax break."   I strongly disagree with this because the basic concept of ad valorem taxation is to pay taxes for services received.   Quite obviously, farmers do not receive the same police and fire protection as their city neighbors.   Neither do they receive the same utility service at the same rates as those persons living in town.[1589]

The goal of such a letter was to elicit support for the small farmer living in the

---

[1586] PX 55, at 24.

[1587] *See, e.g. id.* at 27 ("Bailes said the Farm Bureau is spending $50,000 per week in advertisements to keep from having to pay their fair share in taxes."); PX 56 (*Birmingham News*, Dec. 29, 1971), at 6-7 ("The charges that the Farm Bureau is attempting to speak for or protect the interests of . . . large commercial concerns are asinine . . . .").

[1588] *Cf.* PX 56, at 6 ("The Farm Bureau is backing a formula of varied assessment rates for property taxes.   Hays said it 'insures the equality of assessment within classes throughout the state.'").

[1589] PX 177 (Farm Bureau memorandum on letters to editor), at 13-14.

countryside, while avoiding discussion of the unsavory facts that such farmers were few in number, and, that the real beneficiaries of the amendment would be the State's largest landholders.

The Legislature reconvened on January 5, 1972, and the Senate reached a compromise the following day.  But on January 7th, the rural bloc began filibustering, refusing to vote on the bill in the form agreed upon two days before.[1590]  The filibuster called for amendments to the bill that would make it conform more closely to the Farm Bureau's position.[1591]  Once those amendments were added, "the Alabama Farm Bureau's forces in the Alabama Senate rammed through the bureau's classification-of-property plan on *ad valorem* taxation late Saturday night after shutting off debate with a cloture motion."[1592]

In an historic Sunday session on January 9, 1972, the Senate passed the classification formula that would become Amendment 325, with the details of the plan to be finalized in a joint Senate-House conference committee charged with the responsibility of reconciling any differences between the versions passed by each chamber.[1593]  "Several amendments were passed without any explanation, simply a

---

[1590] Agreed Facts ¶ 224.

[1591] *Id.* ¶¶ 225-26.

[1592] PX 65 (*Montgomery Advertiser*, Jan. 9, 1972), at 2.

[1593] PX 58 (*Birmingham News*, Jan. 10, 1972), at 8-9.

reading by the reading clerk.  As a result, not many members knew just what the bills they passed Sunday morning did, in detail."[1594]  The classification bill was the primary attention-getter, but the legislators also passed a backup bill, which would level all property assessment ratios at thirty percent, in the event voters rejected the constitutional amendment.[1595]

On Wednesday, January 12, 1972, the House concurred in the Senate property tax bills and sent them to Governor Wallace for signature, taking a mere 45 minutes to pass the legislation.[1596]  Once Wallace signed the bills, the final remaining hurdle for Amendment 325 was ratification by the Alabama voters.

### (C)   Ratification and the Farm Bureau advertising blitz

During the four months preceding the referendum to determine whether Amendment 325 would be ratified, the Alabama Farm Bureau organized and orchestrated a statewide campaign that oversimplified and misled voters about the effects of the proposed amendment.  The organization that presented a public face for the ratification campaign — *i.e.,* the "front group" that represented a coalition of "agriculture, agribusiness, and others vitally interested and affected by the property

---

[1594]  PX 65 (*Montgomery Advertiser*, Jan. 9, 1972), at 6.

[1595]  *Id.* at 9.

[1596]  *Id.* at 12.

tax proposal" — was called the "Fair Share Tax Committee of Alabama," and it was co-chaired by Farm Bureau President J.D. Hays and Lawrence County Probate Judge William J. Lee.[1597]   The campaign's theme was:  "The easiest decision you ever had to make:  Vote YES — It'll Cost You Less *Amendment #1*."[1598]   The Farm Bureau advertising plan, distributed internally to the membership, began:

> The message we will try to convey to the public will be a simple one, namely, a "Yes" vote means less taxes on a person's home and farm than a "No" vote.  We will not attempt to explain or justify classification in any manner.  We will not give examples of how much taxes a person would pay under different instances.  We will not mention reappraisal.[1599]

Because a defeat of Amendment 325 would result in statewide application of the back-up bill's thirty percent assessment ratio, a "no" vote was essentially a vote for a thirty percent ratio on homes, while proposed Amendment 325 called for a fifteen percent assessment ratio.   One commentator highlighted the "quandary" presented to the electorate in this way:  "'Do you think I'm a nut?' a voter may mull. 'Thirty per cent is double 15 per cent, and I'm paying too much tax already.  Who would vote 30 per cent?'"[1600]

Misleading the voters by distracting their attention from the large farm and

---

[1597] PX 177, at 9.

[1598] *Id.* at 3 (emphasis in original).  Amendment 325 appeared on the referendum ballots as "Amendment 1."

[1599] *Id.* at 4.

[1600] PX 223 (*Anniston Star*, Feb. 27, 1972) at 2.

timber landowners, who were the real beneficiaries of Amendment 325, was a standard campaign method, as Alabama Forestry Association lobbyist Boyd Kelly explained at trial:

> Q.    Well, tell us what some of the messages were that were conveyed by TV and radio to the voters.
>
> A.    The — one of them was that the big — that the big power companies are going to get a tax decrease, the big power is going to get a tax decrease.  One of them was — they're going — they'll tax services like haircuts and car repairs.  One of them was — frankly, I don't remember them all, but there were about seven points that tested pretty good with focus groups and in polling that we kind of repeated and echoed through different, you know, ways.  I don't remember all the points.
>
> Q.    What did you tell the voters about the impact that the Amendment 1 would have on forest property?
>
> A.    Nothing.
>
> Q.    Why not?
>
> A.    A political — in a political campaign, you've got to refine your message down to just a few points.  And that was just not one of the ones that the campaign felt like was worth spending any money on.[1601]

The Farm Bureau did not even have to address the benefits its constituents would reap, because the packaging of the amendment and the back-up bill essentially left the voter with only one choice.   Strengthening the campaign was the involvement of the

---

[1601] Testimony of Boyd Kelly, Transcript Vol. 12 (doc. no. 268), at 34.

Governor:

> During the process of passing the 1971 Lid Bill that actually gets passed in 1972 and the run-up to the ballot initiative, [Wallace] appears on Farm Bureau television commercials.
>
> The Farm Bureau creates an organization — I think it's called the committee for fair tax, something along those lines. . . . and they produce a series of commercials, I want to say somewhere around 50 different commercials.  They air on a dozen or more stations.  Wallace appears on many of those.
>
> In fact, there's a story that a little girl saw the Governor on a Farm Bureau commercial and she says, ["]look, mommy, it's the Farm Bureau man.["]  Not, ["]look, it's the Governor.["][1602]

On May 30, 1972, voters ratified Amendment 325.[1603]  Months of aggressive promotion by the Farm Bureau had ensured the electoral success of the classification plan.

### (D)    Race in the legislative debate on Amendment 325

All of the fact witnesses who appeared at trial testified that they did not recall any discussion of race in the debate on Amendment 325.  Ben Erdreich, a representative from Jefferson County (who later served as a member of the U.S. House of Representatives) called by plaintiffs, testified on cross-examination that the fight was one between urban and rural interests:

---

[1602] Frederick 9 Tr., at 49.

[1603] Agreed Facts ¶¶ 233-34.

Q:    So would it be fair to say that the debate in your mind was between Jefferson County and the rest of the state?

A:    Well, on this issue I can only speak for myself as from Jefferson County.  But we had others who joined with us in opposing this particular ad valorem change who were urban county representatives.  But it was the rural counties . . . that were on the other side of the battle.

Q:    Did race ever enter the discussion of Amendment 325?

A:    No.  It did not.

Q.    Did you ever have any information to lead you to believe that . . . [Amendment] 325 might have a discriminatory effect on African-Americans.

A:    No.  No.[1604]

Former Governor Albert Brewer also was called by plaintiffs, and he testified that he had never heard race "discussed as part of [a] property tax agenda" in sixteen years in state government.[1605]  Furthermore, Brewer affirmed a statement in his deposition that "[v]oting for a bill like this would be like voting for motherhood.  It would just be that basic."[1606]  Bob Harris, who drafted the bill, and whose interest in property tax classification systems predated the *Weissinger* decision, testified that race was not an issue.

---

[1604] Testimony of Ben Erdreich, Transcript Vol. 10 (doc. no. 266), at 224-25.

[1605] Testimony of Albert Brewer, Transcript Vol. 10 (doc. no. 266), at 205 ("**Brewer 10 Tr.**").

[1606] *Id.*

671

Q:     Did race ever enter into any discussion or consideration of [Amendment 325] that you know of?

A:     Absolutely not.  Absolutely not.

Q:     Did race enter into any discussion or consideration with anyone that you dealt with in the administration?

A:     Absolutely not.

Q:     Anyone in the legislature?

A:     Absolutely not.

Q:     Any lobbyists?

A:     Absolutely not.[1607]

### c.     Amendment 373 (the "Lid Bill") and "current use"

### i.     The passage of Amendment 373

As discussed in Part II(G)(3)(i), *supra*, the *Weissinger* court extended the State's reappraisal deadline from the original 1971 date to September 17, 1978.[1608]  On April 8, 1978, as that deadline neared, the *Weissinger* court ordered the State to begin collecting taxes based on the new appraisal amounts on October 1, 1978.[1609]  As also discussed in Part II(G)(3)(k), *supra*, the U.S. District Court for the Southern District

---

[1607] Harris 14 Tr., at 211-12.  *See also* Testimony of Richard Manley, Transcript Vol. 10 (doc. no. 266), at 126 ("**Manley 10 Tr.**"); Deposition of Sen. James Thomas ("Jabo") Waggoner, Jr. (Court's Exhibit 12), at 10 ("**Waggoner Depo**"). Rep. Manley and Sen. Waggoner testified that race was not an issue during legislative consideration of the Act that became Amendment 325.

[1608] Agreed Facts ¶ 242

[1609] *Id.*

of Alabama held on April 21, 1978, in the case of *McCarthy v. Jones*, 449 F. Supp. 480 (S.D. Ala. 1978), that the legislation implementing Amendment 325, and applying different assessment ratios by county, violated the Equal Protection Clause.[1610]   Even so, the *McCarthy* decision did not invalidate the remainder of the amendment, and held that it was possible to apply different assessment ratios without violating equal protection.[1611]   Nevertheless, as the re-appraisal work proceeded and the 1978 deadlines approached, it became apparent that, even with Amendment 325 in place, assessment values of (and, therefore, taxes the taxes due on) residential, farm, timberland, and commercial property would be far higher than they had been prior to the court's decision in *Weissinger*.[1612]

As the failure of Amendment 325, on its own, to protect rural interests became clear, the Farm Bureau and rural legislators launched another campaign to amend the property tax provisions of the State Constitution yet again.   To accomplish that objective, the Alabama Farm Bureau turned to one of the most reliable and pliable protectors of its interests in the State Legislature:  Rick Manley, a Representative from a district including parts of Marengo and Hale counties, both among the traditional

---

[1610] *Id.* ¶ 241 (citing *McCarthy v. Jones*, 449 F. Supp. 480, 484 (M.D. Ala. 1978)).  The *McCarthy* plaintiffs, represented by Edward Still, did not allege racial discrimination.  *Id.* ¶ 330.

[1611] *Id.*

[1612] *Id.* ¶ 243.

Black Belt counties.[1613]   With the support of and input from the Farm Bureau, Representative Manley had introduced bills proposing constitutional amendments to create a "current use" system for determining the value of farm and timber lands in each of the four legislative sessions held between 1975 and 1978.[1614]   None of Manley's bills were enacted.[1615]   Nevertheless, in recognition of Manley's persistent efforts to impose a "current use" system of valuation on Alabama law, and his subsequent sponsorship of the legislation that became Amendment 373, which contained a cap (or "lid") on the aggregate amount of property taxes that could be levied on the same taxpayer by all taxing authorities, Manley was called the "Father of the Lid Bill":  a title he "accept[s]."[1616]

Contrary to Senator Harris's experience in connection with the legislation leading to Amendment 325, Governor Wallace took a personal interest in the so-called "Lid Bill."   Representative Manley recalled meeting in the Governor's office with Wallace, members of Wallace's administration, and Montgomery bond-lawyers Stan Gregory and Bob Thorington, who had been retained by the Wallace administration to draft both the legislation that became Amendment 373, and the subsequent

---

[1613] Manley 10 Tr., at 51.

[1614] *Id.* at 54-55, 96-97.

[1615] *Id.* at 96; Frederick 9. Tr., at 113.

[1616] Manley 10 Tr., at 98.

implementation statutes.[1617]  Wallace instructed Stan Gregory, the draftsman of the legislation, to meet with Farm Bureau representatives.[1618]  Even so, according to Gregory, the Governor himself was the "ultimate decider" of what went into the bill.[1619]

Wallace made the Lid Bill a priority,[1620] warning legislators that they would be called into a special session if they failed to pass the legislation during the 1978 regular session.[1621]  The regular session closed on April 24, however, without passage of a property tax bill.[1622]  The regular session also ended without enacting an education budget,[1623] giving the Governor additional justification for calling a special session. Even so, Wallace did not call the special session immediately after the end of the regular session.  Instead, he delayed until July 31, a mere five weeks prior to the primaries for the 1978 legislative elections.[1624]  The timing put additional pressure on the legislators.  If the assembly failed to enact a Lid Bill (particularly, if the legislation

---

[1617] *Id.* at 100.

[1618] Testimony of Stan Gregory, Transcript Vol. 14 (doc. no. 270), at 58-59, 77-79 ("**Gregory 14 Tr.**").

[1619] *Id.* at 110.

[1620] Doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 251 ("**Agreed Facts**").

[1621] PX 30 (AEA Journal, Apr. 21, 1978), at 11.

[1622] PX 30 at 10 lists the last day of the session as the Monday following April 21st, which Monday was the 24th.

[1623] *Id.* at 12.

[1624] PX 66 (*Montgomery Advertiser*, July 26, 1978), at 11 (stating that primaries were to be held on September 5).

was killed by a Senate filibuster), incumbent legislators would be sure to face accusations by both the Governor and political opponents that they had "raised" property taxes.[1625]

While Governor Wallace firmly supported the Lid Bill, municipal and educational groups lined-up in opposition, because of the negative effect it would have on revenues for schools and local governments.[1626]   Their primary objection was to the "current use" provision, which was "being pushed strongly by the Alabama Farm Bureau and Manley."[1627]   Yet again, therefore, Governor Wallace and the Farm Bureau were aligned against urban interests on the issue of property taxes; and, once again, Wallace and his Farm Bureau allies succeeded, with the Lid Bill passing soon after the special session opened.[1628]   The proposed amendment was ratified on November 7, 1978.[1629]

Although Governor Wallace's influence in Alabama politics was waning by

---

[1625] *Id.* at 11 (noting that the pending election will put pressure on legislators to lower property taxes); PX 292 (Remarks of Governor Wallace, July 31, 1978), at 2-4 ("And if you don't take care of this business that you left unfinished from the Regular Session, then I am afraid that it is your political funeral September 5th. . . . [I]f you don't make it right with [the people] . . . they're going to make it right with you on September 5th, and I'm going to help them do it.").

[1626] Agreed Facts ¶ 252; PX 30 (AEA Journal, April 21, 1978), at 11.

[1627] *Id.*

[1628] PX 33 (*Birmingham News*, Aug. 5, 1978), at 18 (noting the passage of the legislation "in the minimum amount of time possible").

[1629] Agreed Facts ¶ 277.

1978,[1630] he was instrumental in the enactment of Amendment 373. That is demonstrated by the fact that the Legislature rejected similar legislation in each of the four sessions held between 1975 and 1978, but quickly passed the bill that became Amendment 373 after Wallace called a special session for the purpose of focusing upon that legislation. Professor Flynt testified that Wallace was "almost solely responsible" for the amendment passing in the special session.[1631] Even so, Wallace's involvement was no longer necessarily a proxy for racism. By 1978, Wallace had begun to court, and to receive, support from black voters.[1632]

Following the Legislature's approval of the Lid Bill, the Farm Bureau once again was in the vanguard in the campaign promoting ratification of Amendment 373. This time, the front group providing cover for the Farm Bureau's financial support of the advertising campaign was named the "Alabamians for Tax Relief Committee."[1633] The Farm Bureau contributed over $96,000 to the campaign, and another $18,000 came from forestry interests.[1634]

---

[1630] *Id.* ¶ 248.

[1631] Testimony of Dr. Wayne Flynt, Transcript Vol. 3 (doc. no. 259), at 75 ("**Flynt 3 Tr.**"); *see also* PX 33 (*Birmingham News,* Aug. 5, 1978), at 18 ("The Legislature . . . has given Gov. Wallace everything he wanted out of a special session . . . .").

[1632] *See* Frederick 9 Tr., at 225 (discussing Wallace's invitation to address the Southern Black Mayors' Conference in 1973 in Tuskegee); *id.* at 228-230 (discussing Wallace receiving an honorary degree from historically black Alabama State University in 1975).

[1633] PX 189 (Alabamians for Tax Relief Committee meeting minutes).

[1634] *Id.* at 7.

The Farm Bureau's advertising campaign was aided by the property tax "revolution" then sweeping the nation.[1635]   That revolution, growing out of the widespread unpopularity of property taxes,[1636] began in California in 1978, with the enactment of Proposition 13 (officially named the "People's Initiative to Limit Property Taxation").[1637]   Amendment 373 was a result of the national mood regarding property taxes.[1638]   To the extent the amendment was an extension of prior Alabama policy, it was born of Amendment 325, and not a child of Alabama's race-driven past.

The legislators involved in the process of enacting Amendment 373 stressed in their testimony that the debate was one between urban and rural interests, not the politics of blacks versus whites.   Former Lieutenant Governor George D.H. McMillan, Jr., testified that no argument was "ever made, nor did anyone ever suggest[,] that the passage of the legislation would treat blacks differently than whites."[1639]   Senator Ted Little testified:  "I do not recall that race was an issue . . . .

---

[1635] Agreed Facts ¶¶ 244-47.

[1636] *See id.* ¶ 19.

[1637] *Id.* ¶ 244.

[1638] Other states acting to cut property taxes in 1978 were distributed throughout the country, including, among others:  Arizona, Colorado, Massachusetts, Michigan, Nebraska, Oregon, and South Dakota. *Id.* ¶¶ 246-47.

[1639] Testimony of George McMillan, Transcript Vol. 11 (doc. no. 267), at 136 ("**McMillan 11 Tr.**").  Notably, McMillan was a close ally of black legislators Clemon, Pearson, and McNair, none of whom objected to the amendment on racial grounds. *Id.* at 136-37.  Moreover, editorial pages in Alabama newspapers opposed the amendment, but did not raise the issue of race. *Id.* at 136.

678

If it was an issue, it did not ever come to my attention."[1640]   Douglas Johnstone, who later served on the Alabama Supreme Court, was a State Representative in 1978.[1641] Johnstone testified that he did not recall any "racial dimension to" Amendment 373.[1642] Rick Manley, the "Father of the Lid Bill," testified that he had no reason to believe "that Amendment 373 would treat black citizens different from whites," or "that its effects would be different on black citizens as compared to whites."[1643]   Moreover, *plaintiffs'* expert historian, Jeff Frederick, admitted that he could neither identify a member of the 1978 State Legislature, nor any other contemporary source, suggesting that Amendment 373 was intended to discriminate along racial lines.[1644]

> ### ii.   The passage of the 1982 statutes implementing "current use"[1645]

Although Amendment 373 called for the appraisal of farm and timber land based upon "current use" valuation methodologies, rather than standard techniques for appraising the fair market value of taxable properties, the amendment itself did not

---

[1640] Deposition of Sen. Ted Little (Court's Exhibit 17), at 16-17 ("**Little Depo**").

[1641] Deposition of Hon. Douglas Johnstone (Court's Exhibit 13), at 9.

[1642] *Id.* at 16-17.

[1643] Manley 10 Tr., at 129.

[1644] Testimony of Dr. Jeff Frederick, Transcript Vol. 10 (doc. no. 266), at 29-30.

[1645] Plaintiffs challenge the general rule of current use, *viz.* Amendment 373, rather than the actual current use formula, *viz.* the 1982 act, but the court considers a discussion of the act worthwhile, as it is presently the law of the land.

679

include a formula for calculating current use value.[1646]  Instead, the amendment left the Legislature with that responsibility, which it initially delegated to the Department of Revenue by means of a statute passed concurrently with the legislation resulting in the amendment.[1647]  However, the Department of Revenue did not issue regulations for a long period of time; and, when it finally did so, quickly rescinded those that it did issue, leaving county tax assessors with little guidance.[1648]  Much as Amendment 325 left the landowners unsatisfied, leading to Amendment 373, the latter amendment, without a preferential current use formula in place, failed to meet their needs.  As reappraisal approached in 1982, therefore, landowners in several counties brought suit (or threatened to bring suit) alleging that current use valuation was *still* too high.[1649]

In response to the complaints of landowners and the failure of the Department of Revenue to issue regulations, Representative Manley introduced a new current use bill in the 1982 legislative session.[1650]  The bill was drafted by Montgomery bond attorney Stan Gregory, who — after Wallace left office in 1979 — was retained

---

[1646] Agreed Facts ¶ 279.

[1647] *Id.*  The legislators left the formula out of the Amendment, and simultaneously passed a statute delegating the responsibility, because of the time constraints on the special session. *Id.*

[1648] McMillan 11 Tr., at 121-24.  In the meantime, the legislature passed a resolution stating its interpretation of how Amendment 373 should be enforced. *Id.*

[1649] Agreed Facts ¶ 280.  Black Belt landowners who brought suit were from Dallas, Hale, Perry, and Lowndes counties.  Suits were also brought by citizens of Montgomery and Mobile counties. *Id.*

[1650] Gregory 14 Tr., at 148.

directly by the Farm Bureau.[1651]  Gregory's legislation called for the application of a strict formula in calculating the current use value of farm and timber land.[1652]  As was the case when previous property tax classification bills were before the Legislature, the 1982 current use legislation enjoyed the support of the Alabama Farm Bureau.[1653] Unlike the bill introduced during the decade of the 1970s, however, the 1982 statute was not backed by the Governor.  Wallace had retired when his term ended,[1654] and his successor, Fob James, vetoed the current use bill after it passed the Legislature.[1655] James attached an executive amendment to the bill, the effect of which was to limit its application to tracts of less than 500 acres, but the Legislature overrode the Governor's veto and executive amendment.[1656]  The original bill, as drafted by attorney Stan Gregory on behalf of the Farm Bureau, as introduced by the Bureau's reliable functionary, Representative Rick Manley, and as enacted by the Legislature over the

---

[1651] *Id.* at 148-49. Gregory testified that he began working directly for the Farm Bureau in the early 1980s.  All of Gregory's work on the current use legislation was performed on behalf of the Farm Bureau.  *Id.* at 91, 148.  Gregory apparently still represents the Farm Bureau, because, in his testimony, he revealed that he was retained by the Farm Bureau to monitor the trial.  *Id.* at 53-54. He attended most of the trial. *Id.*

[1652] The formula, which is still in use today, is described more fully in Part II(F)(2)(b), *supra*.

[1653] PX 32 (*Birmingham News*, Apr. 9, 1982) at 12 (characterizing the bill as "pushed by powerful farm and timber interests").

[1654] To return four years later, as it turned out.

[1655] PX 32, at 15.

[1656] *Id.*  James's executive amendment, of course, would have limited the application of the bill to the small farmer so frequently invoked by Farm Bureau advertisements.

veto of Governor James, was delivered to the Secretary of State on April 21, 1982.[1657]

As with the legislation leading to Amendment 373, the legislators involved in the passage of the 1982 implementation statutes establishing the current use formula now codified in Alabama law uniformly testified that there was no discussion of race in the debate on the legislation.  Senator Little testified that he did "not recall that there was any discrimination connotation made whatsoever."[1658]  Senator "Jabo" Waggoner stated that "race was never an issue, never mentioned."[1659]  Dr. Dewey White, a member of the State Senate in 1982, testified that he did not remember race playing any role in the discussion of the current use bill.[1660]  Paul Hubbert, Executive Secretary of the Alabama Education Association, which joined the League of Municipalities in opposing the current use bill, testified to the same effect.[1661]  Representative Rick Manley affirmed his deposition testimony, saying "this was always financial.  How are we going to save paying taxes?  Race was never an issue in any of it.  I never had anyone approach it on a racial issue."[1662]

---

[1657] Agreed Facts ¶ 300.

[1658] Little Depo, at 18.

[1659] Waggoner Depo, at 15-16.

[1660] Deposition of Dr. Dewey White (Court's Exhibit 11), at 26.

[1661] Deposition of Dr. Paul Hubbert (Court's Exhibit 14), at 27-31 ("Whether it came up or not, I can't speak to it.  But I did not witness it.").

[1662] Manley 10 Tr., at 113.

## B.   Findings of Fact Relevant to an Assessment of Disparate Impact on the Basis of Race

This Part of the opinion addresses the measures that were applied and the data produced for the analysis of whether the provisions of the Alabama Constitution challenged by plaintiffs have a racially discriminatory effect.  The data sets presented by the parties come from an assortment of sources and years and, therefore, are not optimal.  As a result, many of the statistics presented do not correspond to one particular point in time, but are instead approximations for the relative period of time from which the underlying data were derived.  The court would have preferred for all data to have arisen from the same years, but it is constrained by the evidence presented by the parties at trial.

### 1.    Background Information

In order to place the measures employed and data produced in proper context, an understanding of the following background topics is helpful:  (a) the concept of "adequacy" in the funding of public schools; (b) Alabama's racial demographics; (c) poverty rates among Alabama's citizens; and (d) the distribution of "Class III" and "current use" property throughout the State.

#### a.    The concept of "adequate" education funding

While the definition of "adequate funding," or an "adequate education," is a

683

contested issue,[1663] a resolution of that dispute as an objective, universal matter is not necessary. Even under the most basic definition — the one that is set forth in Alabama's Foundation Program[1664] — the State's public school students may not receive an adequately funded education experience, depending on the level of local tax revenues available. That is because the Foundation Program requires school systems to meet certain requirements to be eligible to receive Foundation Program funds, and many of those requirements are unfunded mandates.[1665] An "unfunded mandate" is a statutorily-required expenditure that lacks a State funding source: *i.e.*, an expenditure the State requires local school boards to incur, but for which the State does not provide compensatory revenue.[1666] The unfunded mandates local school boards face include, but are not limited to, the costs of purchasing textbooks, maintenance of school facilities, acquiring technology equipment, and the expenses of meeting the special needs of "at-risk" children.[1667]

---

[1663] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief), at 129 (where plaintiffs claim that "there are not adequate funds to provide an adequate education"); Trial Testimony of Dr. Daniel Sullivan, Transcript Vol. 8 (doc. no. 264), at 32-34 ("**Sullivan 8 Tr.**").

[1664] *See* Ala. Admin. Code r. 290-2-1-.01 - .05 (2010).

[1665] *See id.* (providing "Requirements for Expending Foundation Program Funds" and "Requirements to Receive State Funds").

[1666] *See* Sullivan 8 Tr., at 36. Unfunded mandates are constitutionally prohibited in Alabama, but there is an exception for local boards of education. Ala. Const. amend. 621.

[1667] *See* Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 130-38 ("**Harvey 4 Tr.**"); Declaration of Dr. Ira Harvey (PX 20), at 24 (listing unfunded mandates) ("**Harvey Dec. I**").

### b.      Racial demographics

In 2009, Alabama had sixty-seven counties,[1668] and eleven of those counties had majority-black populations.[1669]  The majority-black counties were:  Bullock, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Sumter, and Wilcox.[1670]   In those eleven counties, black citizens accounted for population majorities ranging from a low of 51% of the total population of Marengo County, to a high of 82% of the total population of Macon County.[1671]   Almost half of all of Alabama's black citizens (49%) lived in just four counties:  Jefferson, Madison, Mobile, and Montgomery.[1672]   Of those four counties, however, only Montgomery County had a majority-black population.[1673]

As discussed earlier in this opinion, Alabama has a geographically and historically distinct section that is generally known as the "Black Belt."  While the precise definition of that section is contested, this court will employ plaintiffs' definition for purposes of the statistical analyses performed in this Part of the

---

[1668] Doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 334 ("**Agreed Facts**").

[1669] PX 353 (2009 Estimated county population by race).

[1670] *Id.*

[1671] *Id.*

[1672] Doc. no. 275 (Defendants' Post-Trial Brief) ¶ 110; doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 23.  This makes intuitive sense, because these counties are the most heavily populated in the State.

[1673] *See* PX 353 (tabulating the population of Alabama's counties by race).

opinion.[1674]   Plaintiffs define the Black Belt as consisting of the following twelve counties: Barbour, Bullock, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Perry, Pickens, Sumter, and Wilcox.[1675]   In 2009, the aggregate number of black citizens residing in those twelve counties (137,704 persons) constituted only 11.10% of the total number of black citizens residing in the entire State of Alabama (1,240,739 persons).[1676]

As seen in Table III-1 below, plaintiffs' Black Belt counties and Alabama's majority-black counties were nearly identical in 2009.

TABLE III-1: COMPARISON OF PLAINTIFF'S "BLACK BELT COUNTIES" TO ALABAMA'S MAJORITY-BLACK COUNTIES

| BLACK BELT COUNTIES | MAJORITY-BLACK COUNTIES |
|---|---|
| Barbour | — |
| Bullock | Bullock |
| Dallas | Dallas |
| Greene | Greene |
| Hale | Hale |
| Lowndes | Lowndes |
| Macon | Macon |
| Marengo | Marengo |
| — | Montgomery |
| Perry | Perry |
| Pickens | — |

[1674] See supra Part I(D)(1) (discussing the "Black Belt").

[1675] See doc. no. 274 (Plaintiffs' Post-Trial Brief), at 165.

[1676] PX 353 (2009 Estimated county population by race).

686

| BLACK BELT COUNTIES | MAJORITY-BLACK COUNTIES |
|---|---|
| Sumter | Sumter |
| Wilcox | Wilcox |

During the time frame relevant to this action, there were 131 school systems in Alabama.[1677]  The State has more school systems than counties because each of the State's 67 counties has a school system, and, some municipalities also have separate school systems.[1678]  Of those 131 systems statewide, 36 had a majority-black student enrollment during the 2009-10 school year.[1679]

---

[1677] Agreed Facts ¶ 340.  After this litigation began, one further school system was created in Alabama, bringing the current total to 132 systems.  *See* Testimony of Dr. Ira Harvey, Transcript Vol. 6 (doc. no. 262), at 180 ("**Harvey 6 Tr.**").  That new school system is Saraland, created in Mobile County, which was previously a unified county school system.  *Id.*; *see also* Testimony of Dr. Ira Harvey, Transcript Vol. 3 (doc. no. 259), at 252 ("**Harvey 3 Tr.**").  Because it is so new, the data presented to the court do not include or account for Saraland, nor remove from the Mobile County school system that portion of students or revenues that now would be attributed to the Saraland school system. *See* Harvey 4. Tr., at 66; Harvey 6 Tr., at 180.  Accordingly, throughout this opinion, the court will refer to Alabama's 131 school systems, and all figures will be based upon a 131 system framework, even though, in fact, there are now 132 school systems in the State.

[1678] *See e.g.*, PX 424 (Enrollment Black and White 2008 and 2009), at 6-11 (listing the State's school systems).

[1679] Agreed Facts ¶ 340; PX 424 (Enrollment Black and White 2008 and 2009), at 6-11.  In 2009, Alabama's majority black school systems, and the percentage of their students who were black, were:

| Greene County | 99.58% | Dallas County | 78.89% |
|---|---|---|---|
| Wilcox County | 99.57% | Montgomery County | 78.58% |
| Lowndes County | 99.11% | Marengo County | 78.14% |
| Perry County | 99.02% | Hale County | 75.25% |
| Sumter County | 98.67% | Tuscaloosa City | 73.74% |
| Fairfield City | 98.53% | Choctaw County | 68.77% |
| Macon County | 98.37% | Clarke County | 65.65% |
| Midfield City | 97.65% | Opelika City | 62.72% |
| Linden City | 96.67% | Phenix City | 62.37% |
| Birmingham City | 96.51% | Pickens County | 61.18% |
| Selma City | 96.25% | Butler County | 60.50% |

687

In 2009, of the State's 131 school systems, sixteen were located in the Black Belt.[1680]  Black students constituted a majority of the students enrolled in fifteen of the sixteen Black Belt school systems.[1681]   The sixteenth, non-majority-black school system was the Demopolis City School System, in which blacks constituted 48.04% of the students enrolled during the 2009-10 academic year.[1682]  A total of 33,534 black students were enrolled in the fifteen *majority-black*, Black Belt school systems during the 2009-10 academic year.[1683]  Those students constituted 21.5% of the black students enrolled in the State's 36 majority-black school systems, and 12.9% of the total number of black students enrolled in all of the State's 131 school systems.[1684]

There were 155,941 black students in the State's 36 majority-black school systems during the 2009-10 academic year, and those students constituted 60.17% of the 259,185 black students enrolled statewide.[1685]

| | | | |
|---|---|---|---|
| Bullock County | 93.94% | Troy City | 60.21% |
| Bessemer City | 93.55% | Talladega City | 57.75% |
| Anniston City | 91.69% | Eufala City | 55.91% |
| Lanett City | 87.60% | Monroe County | 54.48% |
| Barbour County | 87.19% | Dothan City | 53.98% |
| Conecuh County | 83.87% | Gadsden City | 52.43% |
| Tarrant City | 80.70% | Mobile County | 50.26% |

[1680] PX 424 (Enrollment Black and White 2008 and 2009), at 6-11.

[1681] *Id.*

[1682] *Id.*

[1683] *Id.*

[1684] *Id.*

[1685] PX 424 (Enrollment Black and White 2008 and 2009), at 6-11.

During the 2009-10 academic year, slightly more than half of Alabama's black students (50.62%) attended school in the ten public school systems with the largest *number* of black students enrolled — *i.e.*, listed in descending order based on the total number of black students enrolled, those school systems were:  Mobile County, Birmingham City, Montgomery County, Jefferson County, Huntsville City, Tuscaloosa City, Dothan City, Tuscaloosa County, Bessemer City, and Baldwin County.[1686]

### c.    Poverty

Alabama's black citizens have significantly lower median per-household and per-capita incomes than white citizens.[1687]  In 2006, an estimated 29.59% of Alabama's black citizens lived below the poverty line, whereas only 11.54% of whites did so: *i.e.,* a poverty rate that is more than 2.5 times higher for blacks than for whites.[1688] Throughout Alabama, the median value of homes owned by blacks was less than the median value of homes owned by whites.[1689]

As might be expected under the foregoing circumstances, Alabama's black school children suffer from poverty at a much higher rate than Alabama's white students.  The number of students eligible for free or reduced lunches is a good

---

[1686] *Id.*

[1687] PX 139 (Income and Race by Alabama counties); PX 140 (income by race, ownership, type); PX 358 (2000 Census - Per capita income by race, county).

[1688] PX 361 (Comparison of black and white poverty levels), at 2.

[1689] PX 691(Income distribution - 2000 U.S. Census data, county level for Alabama).

measure of the number of students residing in poverty-stricken homes.[1690]  During the

2007-08 school year, the percentage of students receiving free or reduced lunches

exceeded the statewide mean in *every* majority-black school system.[1691]  Majority-

black school systems had a mean of 75.75% of all students receiving free or reduced

lunches, a proportion that far exceeded the statewide mean of 51.26%.[1692]  In the ten

school systems educating the largest *number* of black students, the mean percentage

of all students, of all races, receiving free or reduced lunches was 55.97%.[1693]

The Black Belt is particularly hard-hit by poverty.  In 2000, the mean per-capita

income for black citizens of Black Belt counties was $8,847.[1694]  That amount was

slightly less than half of the statewide mean for all citizens:  *i.e.,* $18,189.[1695]

For the 2007-08 school year, the proportion of students receiving free or

reduced lunches exceeded 90% in eight Alabama school systems, all of which were

in the Black Belt.[1696]  The proportion of students receiving free or reduced lunches in

---

[1690] Amended Report of Dr. Daniel J. Sullivan (PX 117), at 13 ("**Sullivan Report**"); Sullivan 8 Tr., at 165.

[1691] PX 411 (Free lunch data by school system 2007-08).

[1692] *Id.*

[1693] *Id.*

[1694] PX 358 (2000 Census - Per capita income by race, county).

[1695] *Id.*  It is important to emphasize, however, that this data cannot be dismissed simply as the product of the generally poor economic environment, or general poverty, of these counties. White citizens in all but three Black Belt counties had a per-capita income in excess of the statewide mean.

[1696] PX 411 (Free lunch data by school system 2007-08).

each of the sixteen Black Belt school systems exceeded the statewide mean of 51.26%.[1697]   For all but two Black Belt school systems, the percentage of students receiving free or reduced lunches exceeded 70% of the students enrolled.[1698]

Due to the general socioeconomic conditions of Alabama's black citizens relative to the State's white citizens, and the undeniable linkage between poverty and literacy,[1699] any disparity in educational funding will likely have an adverse impact on black students, both in terms of their daily educational experience, *and* in terms of their life outcomes.

### d.    The distribution of Class III and "current use" properties

As discussed in various sections of Part II of this opinion, Section 217 of the 1901 Alabama Constitution, as modified by Amendments 325 and 373, distributes real and personal property subject to *ad valorem* taxation among four classifications. So-called "Class III" properties — *i.e.*, residential, agricultural, timber, and historic properties — are assessed at the lowest ratio of the four classifications (*i.e.*, 10% of the appraised value).[1700]  Moreover, the owner of a Class III property may elect to have

---

[1697] *Id.*

[1698] *Id.*   Demopolis City school system had 52.61%, and Eufala City school system had 63.53% of their respective student enrollments receiving free or reduced lunches. *Id.*

[1699] *See* Sullivan 8 Tr., at 34-35.

[1700] *See supra* Part II(F)(3) (listing the State's four classes of property and explaining the assessment ratios applied to each).

the value of his or her property determined ("appraised") according to "current use" standards, rather than according to standards normally used for determining the "fair and reasonable market value" of taxable property.[1701]  Class III agricultural and timber properties subject to appraisal on the basis of "current use standard values per acre of property"[1702] are not equally distributed among the State's 67 counties.  Indeed, Class III "current use" property is more prevalent in Alabama's rural counties, and it is statistically related to the distribution of the State's black population.

> ### *i.* "Current use" property distribution by county classification

As seen in Table III-2 below, "current use" properties were unequally distributed in 2009 among:  (1) the twelve counties composing plaintiffs' Black Belt; (2) the forty counties classified as "rural, non-Black Belt counties;" and (3) the remaining fifteen counties classified as "urban."[1703]

---

[1701] *See supra* Parts II(F)(2)(a)-(b) (explaining the fair market value and "current use" methods of property appraisal and the property to which the methods apply).

[1702] Ala. Code §§ 40-7-25.1(d)(1) (final para.) (1975); *see also* Part II(F)(2)(b), *supra*.

[1703] The twelve Black Belt counties were all rural during the time period relevant to this litigation.  The second category used here, and throughout this Part of the opinion, consists of all non-Black Belt, rural counties in Alabama.  Baldwin County is counted as an urban, rather than rural, county. Plaintiffs included Baldwin County within their list of rural counties based on census figures for Standard Metropolitan Statistical Areas.  As defendants make clear, however, Baldwin County is more properly characterized as an urban county. *See* doc. no. 275 (Defendants' Post-Trial Brief), at 148.  In 2009, Baldwin County had the seventh largest population of any county in the State of Alabama, and the sixteenth highest population density in Alabama, higher than the population density of Shelby, Colbert, and Russell Counties, all of which plaintiffs included in the urban county category. *See* PX 353 (2009 Estimated county population by race); PX 415 (assessed valuation per square mile per county).  In 2009, the Baldwin County School District was the sixth largest school

**TABLE III-2:  MEAN PERCENTAGE OF LAND SUBJECT TO APPRAISAL BY "CURRENT USE STANDARD VALUES PER ACRE" IN 2009, BY COUNTY CLASSIFICATION** [1704]

| 12 BLACK BELT COUNTIES | 40 RURAL, NON-BLACK BELT COUNTIES | 15 URBAN COUNTIES |
|---|---|---|
| 75.08% | 58.65% | 50.60% |

Additionally, six of the ten counties with the highest proportion of property appraised by "current use" standards in 2009 were Black Belt counties.[1705]

Alabama's majority-black counties have a significantly higher percentage of their land area subject to appraisal by "current use" methodologies than the State's non-majority-black counties.  A mean of 74% of the land area of majority-black counties consisted of "current use" acreage in 2009, whereas the mean for non-majority-black counties was 57% of the land area.[1706]

Based on this 2009 data, statewide, there is a direct and positive, statistically-significant relationship between a county's racial makeup and the percentage of its land area subject to "current use" appraisal methodologies; that is, the percentage of a county's land area subject to "current use" appraisal methodologies tends to increase as the black percentage of a county's population increases.  The correlation coefficient

---

system in the State, in terms of number of students. PX 424 (Enrollment Black and White 2008 and 2009), at 6-11.  In all further references to "Black Belt," "rural, non-Black Belt" and "urban" counties, therefore, Baldwin County will be classified as an urban county.

[1704] PX 387 (Dept. of Rev. Current Use Data Set 4-14-09-enhanced).

[1705] Id.

[1706] See id. (listing the State's counties and the proportion of their land area subject to "current use" appraisal).

for the black percentage of a county's population and the proportion of a county's acreage classified as "current use" acres is +0.49 — a number that, when rounded to +0.5, indicates a statistically-significant relationship between race and the distribution of "current use" property.[1707]

Despite the statistically-significant relationship between race and the percentage of land area subject to "current use" appraisal techniques on a county-by-county basis, when the statistics are viewed statewide, the State's *total* black population does not tend to live in counties with a high proportion of "current use" property.  In 2009, the four Alabama counties which had the largest *number* of black citizens (Jefferson, Madison, Mobile, and Montgomery Counties), and which together accounted for almost half of the State's black citizens (49%), had a mean of 43% of their land area in "current use" acres, compared to the statewide county-mean of 59.79%.[1708]

### ii.    "Current use" property distribution by race

"Current use" property is also unequally distributed by race.  The share of such property owned by whites is significantly higher than the white percentage of the State's population, as seen in Table III-3 below, using 2009 population data, 2009

---

[1707] *See id.*  The positive nature of the correlation coefficient indicates that as the black percentage of a county's population rises, the percentage of the county's land area subject to appraisal by "current use" methodologies also rises.  For an explanation of correlation coefficients, see Part III(B)(2), *infra*.

[1708] *See* PX 387 (Department of Revenue Current Use Data Set 4-14-09-enhanced).

694

timber land data, and 2007 agricultural land data.[1709]

**TABLE III-3:  LAND SUBJECT TO APPRAISAL BY "CURRENT USE STANDARD VALUES PER ACRE" BY RACE OF OWNER** [1710]

|  | TOTAL | WHITE OWNERS | BLACK OWNERS |
|---|---|---|---|
| **AGRICULTURAL LAND** | 9,033,357 acres (100%) | 8,665,095 acres (95.92%) | 266,637 acres (2.95%) |
| **TIMBER LAND** | 14,792,000 acres (100%) | 13,094,000 acres (88.52%) | 276,000 acres (1.86%) |
| **POPULATION** | 4,708,708 (100%) | 3,340,085 (70.93%) | 1,240,739 (26.35%) |

While blacks accounted for 26.35% of the State's total population, they owned only about 3% of Alabama's agricultural acreage and 2% of its timber acreage.[1711]  Whites owned almost 96% of the State's agricultural acreage and 89% of its timber acreage, while constituting about 71% of the total State population.

---

[1709] *See* Sullivan 8 Tr., at 216-17.

[1710] *See* PX 22 (Agriculture Census 2007); PX 24 (USDA Forest Inventory 2009); PX 353 (2009 Estimated county population by race).  The sum of the acreages listed in the table as owned by blacks and whites does not equal the statewide total because persons of other races — "American Indian or Alaska Native," "Asian," "Native Hawaiian or Other Pacific Islander," and persons of "More than one race" — also own agricultural land and timber land in Alabama.  *Id.*

[1711] The same disparity appears when comparing the number of farm owners or timber owners by race.  Whites own 93% of the State's farms and 84% of its timber operations, while constituting 71% of Alabama's population. *See* PX 22 (Agriculture Census 2007); PX 24 (USDA Forest Inventory 2009); PX 353 (2009 Estimated county population by race).  Blacks own 6% of the State's farms and 3% of its timber operations, while constituting 26.35% of Alabama's population. *See* PX 22 (Agriculture Census 2007); PX 24 (USDA Forest Inventory 2009); PX 353 (2009 Estimated county population by race).  Persons of other races own the remainder of the farms and timber operations in Alabama. *See* PX 22 (Agriculture Census 2007); PX 24 (USDA Forest Inventory 2009).

The unequal distribution of "current use" property by race is especially pronounced in the Black Belt.  As shown in the following Table III-4, presenting ownership figures for a representative sample of seven of the twelve Black Belt counties, using 2007 agricultural land data and 2009 population data, whites in the Black Belt controlled the vast majority of the farm and timber acreage (Class III "current use" property), despite constituting only about a third of all persons residing within the twelve Black Belt counties.

TABLE III-4:  AGRICULTURAL LAND IN BLACK BELT COUNTIES SUBJECT TO APPRAISAL BY "CURRENT USE STANDARD VALUES PER ACRE" BY RACE OF OWNER [1712]

|  | WHITE OWNED | BLACK OWNED |
|---|---|---|
| AGRICULTURAL LAND | 1,060,130 acres (90.72%) | 108,435 acres (9.28%) |
| POPULATION | 79,127 (36.04%) | 109,287 (49.78%) |

In Pickens County, for example, whites owned 99% of the agricultural acreage in 2007, even though, in 2009, blacks constituted 42% of that county's population.[1713]

In Marengo, Lowndes, and Wilcox counties, black agricultural acreage ownership was

---

[1712] *See* PX 493 (2007 Agriculture census racial breakdown of farm land, Black Belt); PX 353 (2009 Estimated county population by race).  The numbers are a representative sample for the Black Belt counties.  The data here excludes percentages for three Black Belt counties — Marengo, Lowndes, and Wilcox counties — for which the USDA withheld acreage data for farm and timber acreage owned by blacks "to avoid disclosing data for individual farms," and the presence and inclusion of data for those counties would thus likely show a sharper disparity between acreage owned by whites and acreage owned by blacks.  Plaintiffs' Exhibit 493 contains only ten of the twelve Black Belt counties; data for Barbour and Bullock counties are missing.  The parties did not present data on timber land ownership by county.

[1713] PX 493 (2007 Agriculture census racial breakdown of farm land, Black Belt); PX 353 (2009 Estimated county population by race).

so low in 2007 that the United States Department of Agriculture declined to release black agricultural acreage ownership data in order "to avoid disclosing data for individual farms,"[1714] yet blacks constituted a majority of the population in each of those counties in 2009.[1715]

### 2.    Statistical measures

Four descriptive statistics are used repeatedly when analyzing the data produced in this case:  the mean (average); the median; the correlation coefficient; and the weighted average.  The mean and median are both measures of central tendency:  *i.e.*, the typical number in a group of numbers.

> Central Tendency (of a Distribution) —   A point in a distribution of scores that corresponds to a typical, representative, or middle score in that distribution — such as the *mode, *mean, or *median.
>
> Central Tendency, Measure of — Any of several statistical summaries that, in a single number, represent the typical number in a group of several numbers.  Examples include the *mean, *mode, and *median. . . . A batting average is a well-known measure of central tendency in the United States.  A grade point average might seem a more important example to typical college students.[1716]
>
> The "mean" is the most familiar statistic:  it is calculated by summing all values

---

[1714] PX 493 (2007 Agriculture census racial breakdown of farm land, Black Belt).

[1715] PX 353 (2009 Estimated county population by race).

[1716] W. Paul Vogt, *Dictionary of Statistics and Methodology* 38 (Thousand Oaks, Cal.:  Sage Publications 2d ed. 1999) ("**Vogt**").

697

and dividing the result by the number of values summed.[1717]  It is commonly referred to by the vernacular term, "average."

The "median" is the middle score or value in a set of ranked data.[1718]  It is determined by either finding the middle value in an odd number of values, or taking the mean of the two middle values in an even number of values.[1719]  The *median* usually is a poor measure of central tendency because, unless the distribution is nearly identical on both sides of the median, the statistic represents nothing more than an arbitrary number near the middle of the distribution, rather than the actual point of central tendency.[1720]

Thus, the *mean* ("average") usually is the better measure of central tendency. Even so, a mean also can be a poor measure of central tendency when the sample contains a large number of values, most of which are clustered around a central value, and a few values at one end of the distribution are much higher or lower than the other

---

[1717] *Id.* at 172 ("To get the mean, you add up the values for each case and divide the total by the number of cases.  Often symbolized as *M* or as *X̄* ('X-bar').  For an example of how to calculate an arithmetic mean, see *mode [the most common, or most frequent, score in a set of scores].  When used without specification, 'mean' refers to the *arithmetic* mean.  Much less commonly used are the *geometric* mean and the *harmonic* mean.  ").

[1718] *Id.* at 173 ("The middle score or measurement in a set of ranked scores or measurements; the point that divides a distribution into two equal halves.  When the number of scores is even, there is no single middle score; in that case, the median is found by taking an average of the two middle scores.").

[1719] *Id.*

[1720] *See* Declaration of Dr. Daniel Sullivan (PX 21), at 4-5 ("**Sullivan Dec.**").

values.[1721]   These aberrant values, so-called "outliers,"[1722] will skew the mean away

from the value around which most of the values are clustered (the true central

tendency).[1723]  For the measures discussed below, a small number of Alabama counties

are outliers with tax bases, tax revenue, and per-student expenditures that are much

higher than most other counties in the State.   Consequently, the *median* (*i.e.*, the

middle measurement in a set of ranked measurements) may be a better measure than

the *mean* ("average") for some of the statistical calculations presented in this Part of

the opinion.

The statistical concept of a "correlation coefficient" is a statistical technique for

determining "the extent to which two or more things are related ('correlated') to one

another."[1724]   A "correlation coefficient" is the standard unit of measurement for

---

[1721] *See* Testimony of Michael Bell, Transcript Vol. 15 (doc. no. 271), at 45-47 ("**Bell 15 Tr.**"); Harvey 6 Tr., at 179-186.

[1722] An "outlier" is a statistical observation relating to a score or value that is markedly different from the other values included in a sample.

[1723] Bell 15 Tr., at 46.

[1724] Vogt, at 58; *see also* Bell 15 Tr., at 62-66 (defining correlation coefficient, discussing how it is calculated, and giving examples); DX 891 (Bell Powerpoint), at 21 (depicting graphical representations of correlation coefficients).   Dr. Vogt's definition of the term "correlation" is instructive:

**Correlation** — The extent to which two or more things are related ("co-related") to one another.  This usually is expressed as a *correlation coefficient.

Sadly, students often misinterpret a warning about correlations found in elementary textbooks — *correlation does not equal causation*.  I have seen students take this warning so literally as to believe that two correlated variables *cannot* possibly be causally linked under any circumstances.  Less erroneous, and even more

describing the relationship between two sets of numbers ("bivariate data").[1725]   A

correlation coefficient of either +1.0 or -1.0 means that two sets of numbers are

perfectly correlated.   The closer the correlation coefficient is to either +1.0 or -1.0, the

stronger the relationship between the two sets of numbers.   A zero correlation

coefficient (0.0) means that there is no relationship between the two sets of numbers:

*i.e.*, they essentially are random sets of numbers.[1726]

---

widespread, is the mistaken view that a correlation between two variables provides
no evidence whatsoever about cause.  The evidence from correlations often is weak
by experimental standards, but it is evidence — often important evidence — that it
would be foolish to ignore.  Disciplines as diverse as economics and epidemiology
are heavily based on correlational evidence.  Textbook warnings would be more
accurate were they to read "Correlation does not *necessarily* equal causation."  . . .

Vogt, at 58 (emphasis in original).

[1725] Agreed Facts ¶ 343 n.9.

[1726] *Id.*; *see also* Vogt, at 58 ("**Correlation Coefficient**[s] . . . range from -1.0 to 1.0.  If there
is a perfect negative correlation (-1.0) between A and B, then whenever A is high, B is low, and *vice
versa*.  If there is a perfect positive correlation (+1.0) between A and B, then whenever one is high
or low, so is the other.  A correlation coefficient of 0 means that there is no relationship between the
variables.") (emphasis in original).  In effect, a correlation coefficient analysis plots two sets of
numbers on a graph, with one set of numbers on the x-axis and one set of numbers on the y-axis, and
then determines how closely the plotted points conform to a linear positive or negative relationship.
*Id.*  Defendants' expert, Dr. Michael Bell, utilized the correlation coefficient function built into the
Microsoft Excel software program.  *Id.*; Amended Report of Dr. Michael Bell (DX 881), at 7 n.14
("**Bell 2d Report**").  In all recent versions of that program, the correlation function calculates what
is known as the "Pearson product-moment correlation coefficient," a statistic that measures the linear
dependence between two variables.  *See* Vogt, at 210 (defining "Pearson's Correlation Coefficient,"
also known as "Pearson product-moment correlation," as "A statistic . . . showing the degree of
linear relationship between two variables that have been measured on interval or ratio scales, such
as the relationship between height in inches and weight in pounds.").  *Cf.* Excel Statistical Functions,
http://support.microsoft.com/kb/828129 ("PEARSON and CORREL both compute the Pearson
product-moment correlation coefficient . . . .") (last visited Aug. 7, 2011).  For a graphic example
of how a correlation coefficient is calculated, see DX 891 (Bell Powerpoint), at 21.  *See also* Lloyd
Jaisingh, *Statistics for the Utterly Confused* 86 (New York, NY:  McGraw-Hill 2000) (stating that
the Pearson product moment correlation coefficient is a "numerical measure of the association

If the correlation coefficient exceeds a predetermined "critical value," there *is* a statistically-significant relationship between the two sets of data; conversely, if the correlation coefficient does not exceed the critical value, there is *not* a statistically-significant relationship.[1727]  In this case, the parties have agreed that the critical value is 0.5, and that a statistically-significant relationship exists when the correlation coefficient is greater than +0.5, or less than -0.5.[1728]

A correlation coefficient is a strong method of measuring the existence (or non-existence) of adverse impact on the basis of race, because it allows consideration of the relationship (or lack of relationship) between a particular set of data (or variables) and race on a statewide basis.

Even so, the correlation coefficient as a measurement tool suffers from a weakness:  that is, it assumes that the values (or variables) being correlated are identical in every way, except for the variables under consideration.[1729]  To the extent

between two variables" that "measures the strength and direction of a relationship between [the] two variables," and restating that a negative linear relationship will give a value "close to -1," while a positive linear relationship will give a value "close to +1," and "little or no linear relationship" will give a value "close to 0").

[1727] Mario F. Triola, *Elementary Statistics* 372 (Boston:  Addion Wesley Longman 8th ed. 2001)  ("The critical value is any value that separates the critical region (where we reject the null hypothesis) from the values of the test statistic that do not lead to rejection of the null hypothesis.").

[1728] Agreed Facts ¶ 343 n.9 ("Economists and statisticians generally consider a correlation coefficient greater than 0.5 or -0.5 to indicate a [statistically] significant relationship between two sets of numbers . . . ."); doc. no. 275 (Defendants' Post-Trial Brief) ¶ 125 n.14; *see also* Bell 15 Tr., at 65-66.

[1729] *See* Sullivan Dec., at 4.

that there are other relevant variables that distinguish the values (or variables) — in this case counties or school systems — the correlation coefficient can be an unsatisfactory measure.

Finally, a "weighted average" is a statistical "procedure for combining the means [averages] of two or more groups of different sizes; it takes the sizes of the groups into account when computing the overall or grand mean."[1730]  Many of the measures contained in this opinion — *e.g.*, values for tax capacity, tax revenue, or per-student expenditures — are known for each county or school system.  Also, the sizes of the white and black populations in each county or school system are known.  A "weighted average" allows the calculation of a statewide mean for blacks and whites using the data for counties or school systems.[1731]

Plaintiffs point out that a weighted average is deficient as a statistical measure, to the extent that the groups compared differ in ways other than the difference accounted for in the weighted average.[1732]  However, all means (averages), including weighted averages, suffer from this criticism.  Comparing means only shows how the groups compared vary according to the one variable that was averaged.  To the extent

---

[1730] Vogt, at 306; *see also* DX 891 (Bell Powerpoint), at 17 (providing step-by-step instructions on calculating a weighted average); Bell 15 Tr., at 49-60 (discussing how to calculate a weighted average).

[1731] *See* Bell 15 Tr., at 47-48, 91 ("[I]t allows for differences in the composition of each of the population of each county or each school system . . . .").

[1732] *See* Sullivan 8 Tr., at 39-40; Sullivan Dec., at 3-4.

702

that there are other relevant variables on which the groups differ, those relevant differences are unaccounted for by a weighted average. Even so, to the extent that the analysis is concerned only with the one variable averaged, a weighted average is an excellent method for comparing two groups.[1733]

### 3.    Measures of Impact

The expert witnesses presented by the parties employed several different measures to determine whether the State Constitutional provisions challenged by plaintiffs disproportionately affect blacks in terms of local tax revenues and school funding. The first general category of measurements is an examination of the relative abilities of counties to generate revenues through property taxes — a measurement known as "property tax capacity." The second general category of measurements entails an examination of the actual property tax revenues that counties generate for the purpose of funding public schools. A third category of measurements is based upon the amount of money that counties devote to the support of public schools — a variable that takes into account the amount generated by all revenue sources, including property taxes and other sources. A fourth and final category entails a consideration of what school funding would look like if the challenged constitutional provisions were eradicated: in other words, a "what-if" analysis.

---

[1733] Bell 15 Tr., at 47-48.

Generally, all of the measures utilize a repetitious set of comparisons.  First, the relevant units of comparison are either counties or school systems.  Second, counties or school systems are subjected to three groups of comparisons:  Black Belt counties *versus* counties outside the Black Belt; majority-black populations (both total county population and K-12 students enrolled in specific school systems) *versus* non-majority-black populations (again, both in the county as a whole, and then school systems); and finally, statewide comparisons.

### a.        Property tax capacity

Property tax "capacity" measures the assessed value of taxable property in a county and, thus, the ability of the county to raise revenue from *ad valorem* property taxes.[1734]  Property tax capacity encompasses two interchangeable measures:  the "property tax base" and "yield per-mill."  The "property tax base" is the total amount of *assessed value* to which a taxing authority can apply any given millage rate.[1735]  "Yield per-mill" is the *revenue produced* by the application of one mill of tax (0.001)

---

[1734] *Nota bene*:  as explained previously, the assessed value of property is different from its appraised value.  The assessed value is always lower than the appraised value.  The assessed value is *not* equal to, or synonymous with, the fair market value or the "current use" value of property.  The *assessed* value is the actual dollar value to which a millage rate is applied.  The assessed value subject to taxation is determined by multiplying the appraised value by the assessment ratio specified for each of the four property classifications defined by Article XI, Section 217 of the Alabama Constitution, as modified by Amendment 373 (the so-called "Lid Bill").  *See supra* Parts II(F)(2)-(3) (distinguishing assessed value from appraised value and explaining the calculation of each).

[1735] *See* Agreed Facts ¶ 336; Bell 15 Tr., at 43 ("The base is how much is available for a county or a school district to raise revenues."); *see also supra* Part II(F)(3) (explaining assessed value and how it is calculated).

to the property tax base.[1736]  Property tax base and yield per-mill are interchangeable measures, because the yield per-mill is simply 0.1% (one mill) of the property tax base.[1737]

Property tax capacity demonstrates the ability of a taxing authority to raise revenue from *ad valorem* property taxes, without regard to the actual rate of taxation (*i.e.*, the millage rate) applied in that jurisdiction.  While other impact measures focus on the actual revenues counties derive from *ad valorem* taxation, property tax capacity disregards a jurisdiction's particular millage rate, and focuses on the amount of revenue the jurisdiction derives from *one mill* of taxation.  Property tax capacity, therefore, is a strong measurement tool because it reflects the effects of "current use" appraisal standards and Amendment 373's property classification system on a particular county's ability to raise revenue for education, independent of the actual millage rate that county imposes.  On the other hand, property tax capacity is a weak measurement tool when the object of inquiry is the relative amount of tax revenue

---

[1736] *See, e.g.*, PX 474 (The Measure of Tax Capacity is the District Mill), at 2 (stating that, in Alabama, "the yield per-mill of [property] tax would be the proxy for tax capacity for all [local education authorities]");  Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 68-69 ("**Harvey 4 Tr.**") (describing a large yield per unit of *ad valorem* taxation as "tax capacity"); Harvey 6 Tr., at 40-46 ("[B]y definition, tax capacity is the yield per-mill."); *id.* at 57-58 ("The current understanding that we have is that if you look at the assessed value of property, you're looking at the tax capacity."); DX 891 (Bell Powerpoint), at 10 ("Tax capacity is the total property tax base to which a local government can apply any given millage rate.").

[1737] *See supra* Part II(F)(2d ¶) (defining "mill").

different counties devote to the support of public schools, and not the impact of the challenged constitutional provisions on the particular taxing authority's ability to generate property tax revenues.  If a county imposes a millage rate *below* that which is permissible under the challenged constitutional provisions, the county's low millage rate, as opposed to the challenged provisions, may be (and usually is) the cause of that county's low level of education funding.[1738]

Three specific measurements of property tax capacity are relevant:  *i.e.*, the county per-capita property tax base; the per-capita school property tax base; and the yield per-mill per-student.  For all property tax capacity measurements, the *median* is the better statistical measure of central tendency than the *mean*.  As seen in the graphs of property tax capacity contained in Defendants' Exhibit 891,[1739] for each measure of property tax capacity, a few outlier counties skew the mean value away from the true point of central tendency.[1740]

### *i.*    County per-capita property tax base

The county per-capita property tax base is a measure of the total assessed value of the taxable property within a particular county, divided by the number of citizens

---

[1738] *See* Bell 15 Tr., at 45.

[1739] *See* DX 891 (Bell Powerpoint), at 15-16, 26 (presenting graphs of property tax capacity by county).

[1740] *See supra* Part III(B)(2); Bell 15 Tr., at 67-69, 75.

residing in that county.  The per-capita property tax base demonstrates the ability of a county to raise *ad valorem* property tax revenue and fund public services.[1741]  As the number of persons residing in a particular county increases, local government must generate additional revenue in order to provide the same level of services, including public education, to the larger number of citizens.  A county with a high property tax base but a small population can provide the same level of services by applying a lower millage rate than a county with a less valuable property tax base and a larger population.

However, the county per-capita property tax base is a measure with limited relevance to the determination of the issue of adverse impact on the basis of race.  In part, that is due to the fact that the county per-capita property tax base is not limited to revenue for schools.  It is a measure of the county's property tax capacity for funding a variety of governmental services.  The county per-capita property tax base also is of limited relevance because it is a per-capita statistic, rather than a per-student statistic.

Using 2007 Alabama Department of Revenue tax data and 2008 population data produced by the United States Census Bureau, the statewide mean county per-capita

---

[1741] *See* Bell 2d Report, at 5.

property tax base was $9,667, and the median value was $8,838.[1742]  Of Alabama's twelve Black Belt counties, one-quarter were at or above the mean value, and a third were at or above the median.[1743]  For the forty rural, non-Black Belt counties, slightly less than a third (32.5%) were at or above the mean, and 47.5% were at or above the median.[1744]  For the fifteen urban counties, nearly three-quarters (73%) were at or above the mean, and four-fifths (80%) were at or above the median.[1745]

Alabama's eleven majority-black counties tend to have a lower county per-capita property tax base than the 56 non-majority-black counties.  Of Alabama's majority-black counties, 36% were at or above the mean, and 36% were at or above the median.[1746]  Of Alabama's non-majority-black counties, 36% were at or above the mean, and 54% were at or above the median.[1747]

Statewide, the evidence does not indicate a relationship between race and the county per-capita property tax base.  Of the four counties with the largest number of black citizens, which account for almost half (49%) of Alabama's black population, all were above both the mean and median values.[1748]  The twenty percent of Alabama

---

[1742] *Id.* at 6, 18-20.

[1743] *Id.* at 18.

[1744] *Id.*

[1745] *Id.*

[1746] *Id.*

[1747] Bell 2d Report, at 18.

[1748] *Id.*

counties with the lowest county per-capita property tax base accounted for 8.2% of the State's black population, whereas the twenty percent of counties with the highest county per-capita property tax base accounted for 40.6% of the State's black population.[1749]  The statewide weighted average for county per-capita property tax base is $12,098 for blacks, and $12,154 for whites.[1750]  The correlation coefficient for the percentage of a county's population that is black and the county per-capita property tax base was -0.071, which indicates that there is not a statistically-significant relationship between the racial composition of a county and its ability to raise county property tax revenue.[1751]

### ii.   Per-capita school property tax base

The per-capita *school* property tax base is a means of measuring the assessed value of taxable property in a county that is available for the generation of revenue to fund public schools, divided by the number of citizens residing in the county.  The per-capita *school* property tax base statistic is more directly related to a determination

---

[1749] *Id.*

[1750] Bell 15 Tr., at 76-77; Bell 2d Report, at 7.  A "weighted average" allows comparison of the mean per-capita property tax capacity for blacks statewide, as opposed to whites statewide.  In other words, the weighted average takes into consideration the differences in per-capita property tax capacity between counties statewide, and the number of black or white residents of those counties, to arrive at per-capita means for blacks statewide and for whites statewide. *See* Vogt, at 306. Plaintiffs' objection to the use of weighted averages, and the contention that they are subject to "Simpson's Paradox," is resolved in Part III(B)(3)(a)(*iv*)(B), *infra*.

[1751] Bell 15 Tr., at 78-79; Bell 2d Report, at 7-8.

of adverse impact on the basis of race than the *county* per-capita property tax base measurement.

The following data were calculated using the Alabama Department of Revenue's 2007 tax data and the United States Census Bureau's 2008 population data. Statewide, the mean per-capita school property tax base at the county level was $10,579, and the median value was $9,807.[1752]

As seen in Table III-5 below, compared to other types of counties, significantly fewer Black Belt counties had per-capita school property tax bases above the statewide mean or median.[1753]

TABLE III-5:  COUNTIES ABOVE THE STATEWIDE MEAN AND MEDIAN PER-CAPITA SCHOOL PROPERTY TAX BASE BY COUNTY CLASSIFICATION [1754]

|  | PERCENTAGE OF COUNTIES ABOVE THE STATEWIDE MEAN | PERCENTAGE OF COUNTIES ABOVE THE STATEWIDE MEDIAN |
|---|---|---|
| **12 BLACK BELT COUNTIES** | 17% | 25% |
| **40 RURAL, NON-BLACK BELT COUNTIES** | 30% | 50% |
| **15 URBAN COUNTIES** | 67% | 67% |

The lower per-capita school property tax bases of Black Belt counties is clear from the comparison of the mean per-capita school property tax base for each group

---

[1752] Bell 2d Report, at 18-20 (using 2007 Alabama Department of Revenue tax data and 2008 population data produced by the U.S. Census Bureau).

[1753] *Id.*

[1754] *Id.*

of counties in the following Table.[1755]

TABLE III-6:  MEAN PER-CAPITA SCHOOL PROPERTY TAX BASE
BY COUNTY CLASSIFICATION [1756]

|  | MEAN PER-CAPITA SCHOOL PROPERTY TAX BASE |
|---|---|
| **12 BLACK BELT COUNTIES** | $8,919 |
| **40 RURAL, NON-BLACK BELT COUNTIES** | $10,263 |
| **15 URBAN COUNTIES** | $12,749 |

Alabama's majority-black counties had lower per-capita school property tax bases than non-majority-black counties.  The majority-black counties had a mean per-capita school property tax base of $9,509 and a median of $8,845.[1757]  The non-majority-black counties had a mean of $10,788 and a median of $9,809.[1758]  However, these results are somewhat moderated by the fact that the State's eleven majority-black counties had a higher mean per-capita property tax base than the State's eleven counties with the lowest percentage of black residents.[1759]

Statewide, blacks fared better in terms of per-capita school property tax base than whites.  The four Alabama counties which together account for almost half of

---

[1755] *Id.*

[1756] *Id.* (using 2007 Alabama Department of Revenue tax data and 2008 population data produced by the U.S. Census Bureau).

[1757] Bell 2d Report, at 18-20 (using 2007 Alabama Department of Revenue tax data and 2008 population data produced by the U.S. Census Bureau).

[1758] *Id.*

[1759] Doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 338 ("**Agreed Facts**"); Bell 2d Report, at 6.

Alabama's black citizens (49%) had a per-capita school property tax base above the statewide mean or median.[1760]  Those four counties had a mean per-capita school property tax base of $12,733, compared to the statewide mean of $10,579.[1761]  Significantly, approximately 78% of the State's black citizens lived in counties that had a per-capita school property tax base at or above the median value, as compared to only 66% of all white citizens.[1762]  The correlation coefficient for the percentage of a county's population that is black and the county's per-capita school property tax base was -0.07, indicating that there is not a statistically-significant relationship between race and a county's per-capita school property tax base.[1763]

### iii.    Per-student school property tax base

Per-student school property tax base is the assessed value of all taxable property in a county divided by the number of students in the county.[1764]  The measurement shows the dollar value of taxable property to which a taxing authority may apply a millage rate, and it accounts for the number of students for whom the revenue from the

---

[1760] *See* Bell 2d Report, at 18-20 (using 2007 Alabama Department of Revenue tax data and 2008 population data produced by the U.S. Census Bureau).

[1761] *Id.*

[1762] *Id.*; PX 353 (2009 Estimated county population by race).  Defendants' calculations, 79% of blacks and 69% of whites, differed slightly from the court's calculations. *See* doc. no. 275 (Defendants' Post-Trial Brief), at 48.

[1763] *See* Bell 2d Report, at 18; Bell 15 Tr., at 78-79.

[1764] Bell 15 Tr., at 73-74.

application of a millage rate must provide education funding.[1765]

The parties did not compare types of counties on the basis of per-student school property tax base; however, the parties did summarize the *statewide* differences between blacks and whites in terms of per-student school property tax base. The following data were calculated using the Alabama Department of Revenue's 2007 fiscal year tax data and the Alabama Department of Education's 2008 student enrollment data.[1766] The results show that black students fared slightly better than white students at the county level.

Statewide, 79% of Alabama's black-students lived in a county with a per-student school property tax base above the statewide median, whereas 68% of Alabama's white students lived in a county with per-student school property tax base above the median.[1767] The weighted average per-student school property tax base statewide was $76,876 for black students and $76,213 for white students.[1768] The correlation coefficient for the percentage of a county's black citizen population and per-student school property tax base was -0.02, indicating the absence of a

---

[1765] *Id.*

[1766] DX 891 (Bell Powerpoint), at 16.

[1767] *Id.*; *see also* PX 480 (Department of Revenue abstract book 2007); PX 424 (Enrollment Black and White 2008 and 2009), at 2-5.

[1768] Bell 15 Tr., at 78; DX 891, at 20.

713

statistically-significant relationship.[1769]

### iv.    Yield per-mill per-student by school system

Yield per-mill per-student is a measure of the revenue raised for each student by the application of one mill of school property tax.  Yield per-mill per-student is a stronger measure of impact than county per-capita property tax base or per-capita school property tax base, because it is directly tied to school funding revenue rather than general county revenue, and it is per-student, rather than per-capita.

Yield per-mill per-student *by school system* is also a strong measure, as compared to measurements at the *county* level, because it "account[s] for the possibility that while a county-level analysis might show no racially disparate impact, the racial composition of individual school districts might vary widely enough in a systematic way to indicate the existence of a disparate impact at the school district level."[1770]  In other words, while a disparate impact might not be visible at the county level, a disparate impact may appear when comparing school systems.

The following data were calculated using the Alabama Department of Revenue's tax data for fiscal year 2008 and the Alabama Department of Education's student enrollment data for the 2009-10 school year.  For school systems statewide,

---

[1769] DX 891, at 16; *see also* PX 480; PX 424, at 2-5.  Data were not available for the black student population of each county.

[1770] Bell 2d Report, at 9.

the mean yield per-mill per-student was $60.52, and the median yield per-mill per-student was $51.98.[1771]  Breaking down the state's school systems into four categories — *i.e.*, Black Belt school systems;[1772] rural, non-Black Belt county school systems; urban county school systems; and city school systems — reveals the following percentages of school systems in each category above the statewide mean and median:[1773]

TABLE III-7:  SCHOOL SYSTEMS ABOVE THE STATEWIDE MEAN AND MEDIAN YIELD PER-MILL PER-STUDENT BY SCHOOL SYSTEM CLASSIFICATION [1774]

| | PERCENTAGE OF SCHOOL SYSTEMS ABOVE THE STATEWIDE MEAN | PERCENTAGE OF SCHOOL SYSTEMS ABOVE THE STATEWIDE MEDIAN |
|---|---|---|
| **16 BLACK BELT SCHOOL SYSTEMS** | 19% | 31% |
| **40 RURAL, NON-BLACK BELT COUNTY SCHOOL SYSTEMS** | 40% | 53% |
| **15 URBAN COUNTY SCHOOL SYSTEMS** | 53% | 67% |
| **60 CITY SCHOOL SYSTEMS** | 40% | 50% |

Black Belt school systems also fared worse in terms of *mean* yield per-mill per-

---

[1771] *Id*. at 21-26; Bell 15 Tr., at 83-84.

[1772] The category of Black Belt school systems includes all sixteen school systems in the Black Belt, both county and city school systems.  Thus, the Black Belt school systems category includes the twelve county schools systems of the twelve Black Belt counties plus four city school systems:  Linden City, Selma City, Eufala City, and Demopolis City.  All city school systems in the State, with the exception of the four Black Belt city school systems, are included in the category of "city school systems."

[1773] Bell 2d Report, at 21-26 (using Alabama Department of Revenue's tax data for fiscal year 2008 and the Alabama Department of Education's student enrollment data for 2009).

[1774] *See id.*

student than did other school systems.[1775]

**TABLE III-8:  SCHOOL SYSTEM MEAN YIELD PER-MILL PER-STUDENT BY SCHOOL SYSTEM CLASSIFICATION** [1776]

|  | MEAN YIELD PER-MILL PER-STUDENT |
| --- | --- |
| **16 BLACK BELT SCHOOL SYSTEMS** | $51.08 |
| **40 RURAL, NON-BLACK BELT COUNTY SCHOOL SYSTEMS** | $62.06 |
| **15 URBAN COUNTY SCHOOL SYSTEMS** | $70.37 |
| **60 CITY SCHOOL SYSTEMS** | $62.55 |

The mean yield per-mill per-student in the Black Belt school systems was only 82% of the mean yield per-mill per-student in the closest county grouping (rural counties).[1777]

Viewed from a statewide perspective, majority-black school systems fared better in terms of yield per-mill per-student than non-majority-black school systems.  Of Alabama's majority-black school systems, 44% were at or above the mean, and 56% were at or above the median.[1778]  Of Alabama's non-majority-black school systems, 38% were at or above the mean, and 47% were at or above the median.[1779]  The mean yield per-mill per-student for majority-black school systems was $61.19, whereas the

---

[1775] *See id*.

[1776] *See id.*

[1777] *Id*.

[1778] Bell 2d Report, at 21-26 (using Alabama Department of Revenue's tax data for fiscal year 2008 and the Alabama Department of Education's student enrollment data for 2009).

[1779] *Id*.

716

mean for non-majority-black school systems was $60.27.[1780]

All of the ten school systems educating the largest number of black students (50.62% of the black students statewide) had a yield per-mill per-student higher than the mean and median values for school systems statewide.[1781]   Thus, over half of Alabama's black students attended a school system with a yield per-mill per-student over the statewide *mean*.   Approximately 76% of all black students in the State attended school in a system with a yield per-mill per-student above the *median*, as compared to 60% of all white students.[1782]

Regardless of whether plaintiffs' or defendants' data set is used, the correlation coefficient for the percentage of a school system's students who are black and the school system's yield per-mill per-student was +0.02, indicating the absence of a statistically-significant relationship between race and yield per-mill per-student.[1783]

Using a weighted average, the statewide yield per-mill per-student for black students was $74.26, as compared to a $69.40 yield per-mill per-student for white students.[1784]   Plaintiffs contest the use of a weighted average generally, and for this result in particular.   For that reason, a brief digression to discuss the weighted average

---

[1780] *Id.* at 21.

[1781] *Id.*

[1782] Bell 15 Tr., at 84-85; DX 891, at 26.

[1783] Bell 2d Report, at 9 n.19; Bell 15 Tr., at 90-91.

[1784] Bell 2d Report, at 10.

measurement tool is necessary.

Plaintiffs assert that the weighted averages calculated by defendants' expert Dr. Michael Bell fall victim to "Simpson's Paradox," and, thus, are misleading.[1785] Simpson's Paradox is the name for the statistical phenomenon that occurs when a statistical value for a set of data is — when the set is split into subsets — reversed for each subset.[1786]  Stated more simply, Simpson's Paradox means that "what may be true for the whole is <u>not</u> necessarily true for any part."[1787]

First and foremost, the court is not convinced that Simpson's Paradox has any relevance to Dr. Bell's weighted average figures.  Plaintiffs claim to represent a class of *all* black public school students, or all white and black public school students, *in the State of Alabama*.[1788]  If the protected class that plaintiffs claim is injured by the challenged provisions is a class consisting of all school children in the state (black,

---

[1785] *See e.g.*, doc. no. 274 (Plaintiffs' Post-Trial Brief) ¶¶ 494-95; doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 117-23; PX 823 (Sullivan Reformatted Tables), at 2; Sullivan 8 Tr., at 39-44.

[1786] PX 637 (Simpson's Paradox (Stanford Encyclopedia of Philosophy 12-23-09)), at 2 (quoting *The Stanford Encyclopedia of Philosophy*, which defines Simpson's Paradox as occurring when:  "An association between a pair of variables can consistently be inverted in each subpopulation of a population when the population is partitioned."); Sullivan 8 Tr., at 41 ("[T]hat analysis is subject to something called Simpson's Paradox, which is how I can have a reverse result in all my cells and then the – the overall average be different because of the different presence in these cells.").

[1787] Sullivan Dec., at 5 (emphasis in original).

[1788] *See* doc. no. 1 (Complaint) ¶¶ 13-14 (describing a "class of all public school students and citizens of Alabama" as well as a "subclass of all African-American public school students and citizens of Alabama").

white, or both), then statewide measurements such as Dr. Bell's weighted averages are the most relevant statistical evidence of racially disparate, adverse impact, regardless of what comparisons among certain subsets within the statewide population may suggest.

Second, the only evidence presented to the court to show the effect of Simpson's Paradox on Dr. Bell's weighted averages — the testimony and declaration of plaintiffs' expert, Dr. Daniel Sullivan — does not support plaintiffs' argument.[1789] As defined by plaintiffs, Simpson's Paradox exists when the relationship between variables is "consistently . . . inverted in *each* subpopulation."[1790]  However, in the table provided by Dr. Sullivan, the yield per-mill per-student is not inverted for Dr. Sullivan's category of "white-county" school systems.[1791]  Thus, the relationship between the variables of race and yield per-mill per-student is not "inverted in *each* subpopulation."[1792]

---

[1789] *See* Sullivan Dec., at 5-6; PX 823 (Sullivan Reformatted Tables), at 2.

[1790] PX 637 (Simpson's Paradox (Stanford Encyclopedia of Philosophy 12-23-09)), at 2 (emphasis supplied); *see also* Trial Testimony of Dr. Daniel Sullivan, Transcript Vol. 8 (doc. no. 264), at 41 ("**Sullivan 8 Tr.**") ("[T]hat analysis is subject to something called Simpson's Paradox, which is how I can have a reverse result in *all* my cells and then the – the overall average be different because of the different presence in these cells.") (emphasis supplied).

[1791] PX 823 (Sullivan Reformatted Tables), at 2, tbl.2, col. 5 (presenting separate yield per-mill per-student values for white students and black students for four school system categories: "Large," "White-cities," "White-county," and "Black-majority.").

[1792] PX 637 (Simpson's Paradox (Stanford Encyclopedia of Philosophy 12-23-09)), at 2 (emphasis supplied).

719

Third, Dr. Sullivan's table lacks evidentiary support and credibility for the following reasons. Dr. Sullivan's "large" school systems category purports to consist of "large cities and metro counties with enrollments of 10,000 students or more."[1793] However, an examination of enrollment data for Alabama's public schools in 2009 shows that Dr. Sullivan's description of his own category is incorrect. Two of the twelve school systems he included in the "large" school systems category, Dothan City and Tuscaloosa City, did not have more than 10,000 students.[1794] Notably, both of those systems also had majority-black enrollments.[1795] One system, Elmore County, did have more than 10,000 students, but it was inexplicably left out of Dr. Sullivan's "large" school systems category.[1796] In addition, that category excludes, without explanation, four systems that educated more students than the smallest system, Dothan City, included in Dr. Sullivan's "large" systems category — *i.e.*, Lee County, Autauga County, Cullman County, and, as noted previously, Elmore County.[1797]

Also, Dr. Sullivan includes 33 unspecified school systems in the "black-majority" category, and five majority-black school systems in the "large"

---

[1793] Sullivan Dec., at 7; PX 823 (Sullivan Reformatted Tables), at 2, tbl.2.

[1794] PX 424 (Enrollment Black and White 2008 and 2009), at 6-7.

[1795] *Id.*

[1796] *Id.* at 8.

[1797] Amended Report of Dr. Michael Bell (DX 881), at 8-9 ("**Bell 2d Report**").

systems category, for a total of 38 majority-black school systems statewide.[1798]  All of the other evidence of record indicates that there were 36, not 38, majority-black school systems in Alabama in 2009.[1799]   Therefore, Dr. Sullivan's "black-majority" school systems category must contain two extra, white-majority school systems.  Because Dr. Sullivan failed to identify the school systems he categorized as "black-majority," it is impossible to determine the source of his error, or the effect of the error on his calculations.

Finally, Dr. Sullivan presented his table of data attempting to control for the alleged effects of Simpson's Paradox,[1800] but he admitted at trial that the table does not show a discriminatory impact.[1801]   Accordingly, plaintiffs failed to persuasively demonstrate either that Simpson's Paradox rendered Dr. Bell's weighted averages erroneous or misleading, or that plaintiffs' attempts at controlling for Simpson's Paradox reveal discriminatory impact.

---

[1798] Sullivan Dec., at 7; PX 823 (Sullivan Reformatted Tables), at 2, tbl.2.  Dr. Sullivan's table indicates that there is no overlap between the "large" and "black-majority systems," *i.e.*, the latter category is composed solely of majority-black schools systems that are not "large."  The five majority-black school systems included in the "large" systems category were Birmingham, Dothan and Tuscaloosa City systems, and the Mobile and Montgomery County systems. PX 823, at 2, tbl.2.

[1799] *See* PX 424 (Enrollment Black and White 2008 and 2009), at 6-7 (showing 36 majority-black school systems); Agreed Facts ¶ 340 (stating that there were 36 majority-black school systems in 2006-2007).

[1800] PX 823 (Sullivan Reformatted Tables), at 2.

[1801] Sullivan 8 Tr., at 60 ("Q:  Okay.  Now the question is these figures on this chart [Plaintiff's Ex. 823 (Sullivan Reformatted Tables), at 2, tbl.2, col. 5], do they show racial discrimination in Alabama's property tax, as it relates to education?  A:  No.").

721

### b.     Tax revenue

Tax revenue is a measure of the actual amount of revenue generated by *ad valorem* property taxes in a particular tax jurisdiction.[1802]   For purposes of this analysis, tax revenue is measured by school tax revenue at the county level, and thus, accounts for all property taxes a county raised for schools.  The measure is analyzed both per-capita and per-student.

Tax revenue is a very different measuring tool from tax capacity, in that revenue is a measure of actual results, whereas capacity is a measure of potential.[1803]   A measurement of tax revenue thus reflects the "extent to which [a jurisdiction's] capacity is *actually* being accessed by the counties and the school systems."[1804]  Two variables impact the amount of tax revenue generated by a taxing jurisdiction: capacity and the millage rate imposed.[1805]   While tax revenue is included in this analysis, solely in the interest of completeness, it is a poor measure of the impact of the challenged constitutional provisions because a jurisdiction's decision to not tax at the highest possible millage rate — rather than the challenged constitutional provisions themselves — may be the cause of a jurisdiction's low property tax

---

[1802] The computation of property taxes in Alabama is explained in Part II(F), *supra*.

[1803] *See* Testimony of Michael Bell, Transcript Vol. 15 (doc. no. 271), at 96 ("**Bell 15 Tr.**").

[1804] *Id*. (emphasis supplied).

[1805] *Id*. ("[Revenue is] the [tax] base times the [tax] rate.").

revenues.  Further, for tax revenue, the median is a better statistical measure for comparing revenue raised than the mean because a few outliers skew the mean away from the central tendency among counties.[1806]

### *i.* **Per-capita school tax revenue measures**

Per-capita school tax revenue is the actual amount of revenue generated by property taxes to fund public schools in a particular tax jurisdiction, divided by the number of citizens residing in the jurisdiction.  The following data were calculated using the Alabama Department of Revenue's fiscal year 2007 tax data and the United States Census Bureau's 2008 population data.[1807]  The statewide mean *ad valorem* school tax revenue per-capita was $137.70, and the median amount was $118.46.[1808] A comparison of the percentage of counties above the mean or median values shows a significant difference between urban and other counties, but not between Black Belt and rural, non-Black Belt counties.

---

[1806] *See* DX 891 (Bell Powerpoint), at 33-34 (depicting graphs of school tax revenue per-capita and per-student); Bell 15 Tr., at 96-97.

[1807] DX 891, at 33; Bell 2d Report, at 29.

[1808] Bell 15 Tr., at 96; DX 891, at 33; Bell 2d Report, at 27-29.  The value of the median over the mean is especially clear here.  Several school systems are extreme outliers with revenues per-student exceptionally higher than the remaining school systems. *See* Testimony of Dr. Ira Harvey, Transcript Vol. 6 (doc. no. 262), at 179-86 ("**Harvey 6 Tr**.").  For a visual representation, see the graph prepared by defendants' expert witness Dr. Michael Bell of school tax revenue per-capita, and notice at the top of the graph the three data points that are clear outliers and the four data points below them that do not follow the trend of the majority of the data points.  DX 891, at 33.

**TABLE III-9:  COUNTIES ABOVE THE STATEWIDE MEAN AND MEDIAN PER-CAPITA SCHOOL TAX REVENUES BY COUNTY CLASSIFICATION** [1809]

|  | PERCENTAGE OF COUNTIES ABOVE THE STATEWIDE MEAN | PERCENTAGE OF COUNTIES ABOVE THE STATEWIDE MEDIAN |
|---|---|---|
| **12 BLACK BELT COUNTIES** | 25% | 50% |
| **40 RURAL, NON-BLACK BELT COUNTIES** | 28% | 40% |
| **15 URBAN COUNTIES** | 67% | 80% |

Similar results occur when the mean per-capita school tax revenues for each group of counties are compared.

**TABLE III-10:  COUNTY MEAN PER-CAPITA SCHOOL TAX REVENUE BY COUNTY CLASSIFICATION** [1810]

|  | MEAN PER-CAPITA SCHOOL TAX REVENUE |
|---|---|
| **12 BLACK BELT COUNTIES** | $123.59 |
| **40 RURAL, NON-BLACK BELT COUNTIES** | $117.68 |
| **15 URBAN COUNTIES** | $202.39 |

Majority-black counties fared worse than non-majority-black counties in school tax revenues per-capita.  Of Alabama's majority-black counties, 18% were at or above the mean amount, and 45% were at or above the median amount.[1811]  For non-majority-black counties, 38% were at or above the mean amount, and 52% were at or above the median.[1812]  Alabama's majority-black counties had a mean school tax revenue per-

---

[1809] Bell 2d Report, at 27-29 (using fiscal year 2007 tax data and 2008 population data).

[1810] *Id.*

[1811] *Id.*

[1812] *Id.*

student of $123.36, whereas non-majority black counties had a mean of $140.52.[1813]

Statewide, blacks fared better than whites in terms of school tax revenue per-capita.  Three of the four Alabama counties which account for almost half of Alabama's black citizens (49%) had per-capita school tax revenues above the statewide mean and median values.[1814]  Approximately 70% of all black citizens of Alabama lived in counties with per-capita school tax revenues above the median, whereas approximately 66% of all whites lived in counties above the median.[1815]  The statewide weighted average for per-capita school tax revenues was $206.22 for blacks and $193.11 for whites.[1816]  The correlation coefficient for the percentage of a county's population that is black and the county's school tax revenue per-capita was +.057, indicating the absence of a statistically-significant relationship between race and county school tax revenue per-capita statewide.[1817]

### ii.    Per-student school tax revenue measures

The parties presented evidence of *per-student* school tax revenue, but only at the statewide level.  Per-student school tax revenue is the actual amount of revenue

---

[1813] *Id.*

[1814] Bell 2d Report, at 27-29.  Montgomery County was below both the mean and median values. *Id.*

[1815] *Id.* at 33; *see* Bell 2d Report, at 27-29.

[1816] Agreed Facts ¶ 348.

[1817] *Id.* ¶ 349; Bell 15 Tr., at 101.

generated by property taxes to fund public schools in a particular tax jurisdiction, divided by the number of students in that jurisdiction.  The following data were calculated using the Alabama Department of Revenue's 2007 tax data and the Alabama Department of Education's 2008 data for the number of students enrolled in each school system.[1818]

The median for school tax revenue per-student at the county level was $721.54.[1819]  Approximately 74% of black students attended school in a county that was at or above the median, whereas approximately 66% of all white students attended school in a county above the median.[1820]  The weighted average for school tax revenue per-student at the county level was $1,286 for black students and $1,208 for white students.[1821]  The correlation coefficient for the percentage of a county's students who are black and school tax revenue per-student at the county level was 0.00, indicating the absence of a statistically-significant relationship between the racial composition of a county's student body and revenues raised from school property taxes.[1822]

### c.    Per-student expenditures

Per-student expenditures are a measure of the actual amount of money, from

---

[1818] DX 891, at 34.

[1819] *Id.*

[1820] *Id.*

[1821] *Id.*, at 36; Bell 15 Tr., at 101.

[1822] DX 891, at 38; Bell 15 Tr., at 101-02.

both state and local sources, spent on the education of each student in a school system on an annual basis.[1823]  Because the measure includes education funding from sources other than local property taxes, and those sources of funding could potentially ameliorate, if not eliminate, any potential adverse impact from the challenged constitutional provisions, per-student expenditures are a strong measure of race-based impact.

In 2008, the statewide mean for state and local per-student expenditures was $7,781.28, and the median amount was $7,582.17.[1824]  As for previous measures, the median is a better measure of central tendency than the mean, because a few outlier counties skew the mean value away from the true point of central tendency.[1825]

As seen in Table III-11, Black Belt school systems fared better than all other school system types, except for the sixty city school systems, in terms of per-student expenditures.

---

[1823] The state funding sources include the State Foundation Program.  As explained in Part II(E)(2)(a)(*iv*), *supra*, the Foundation Program provides funds to school systems in amounts that are inversely proportional to the ability of each school system to raise *ad valorem* property tax revenues. Per-student expenditures also takes into account local sources of education funding other than *ad valorem* property taxes, such as local taxes and user fees.  *See* Part II(E)(3) (detailing local funding sources); Bell 15 Tr., at 106:1-19.  However, the per-student expenditures presented here include only funding from State and local sources.  The measure does not include federal funding.  *See supra* Part II(E)(1) (listing and explaining the federal sources of education funding).  The parties did not present expenditure data including federal funding sources.

[1824] *See* Bell 2d Report, at 30-34.

[1825] *See* DX 891 (Bell Powerpoint), at 44-45 (depicting graphs of expenditures by counties).

727

**TABLE III-11:  SCHOOL SYSTEMS ABOVE THE 2008 STATEWIDE MEAN AND MEDIAN PER-STUDENT STATE AND LOCAL EXPENDITURES BY SCHOOL SYSTEM CLASSIFICATION** [1826]

|  | PERCENTAGE OF SCHOOL SYSTEMS ABOVE THE STATEWIDE MEAN | PERCENTAGE OF SCHOOL SYSTEMS ABOVE THE STATEWIDE MEDIAN |
|---|---|---|
| **16 BLACK BELT SCHOOL SYSTEMS** | 38% | 50% |
| **40 RURAL, NON-BLACK BELT COUNTY SCHOOL SYSTEMS** | 30% | 38% |
| **15 URBAN COUNTY SCHOOL SYSTEMS** | 27% | 40% |
| **60 CITY SCHOOL SYSTEMS** | 52% | 62% |

As seen in Table III-12, a comparison of the mean per-student expenditures by school system type presents the same results.

**TABLE III-12:  SCHOOL SYSTEM MEAN PER-STUDENT STATE AND LOCAL EXPENDITURES IN 2008 BY SCHOOL SYSTEM CLASSIFICATION** [1827]

|  | MEAN STATE AND LOCAL PER-STUDENT EXPENDITURES |
|---|---|
| **16 BLACK BELT SCHOOL SYSTEMS** | $7,640.88 |
| **40 RURAL, NON-BLACK BELT COUNTY SCHOOL SYSTEMS** | $7,500.45 |
| **15 URBAN COUNTY SCHOOL SYSTEMS** | $7,591.62 |
| **60 CITY SCHOOL SYSTEMS** | $8,077.96 |

Majority-black school systems had lower per-student state and local expenditures than non-majority-black school systems.  Of Alabama's majority-black school systems, 30% were above the mean, and 43% were above the median for state

---

[1826] *See* Bell 2d Report, at 30-34.

[1827] *Id.*

and local per-student expenditures.[1828]  For non-majority-black school systems, 44%

were above the mean, and 53% were above the median.[1829]  The mean per-student state

and local expenditures for majority-black school systems was $7,647.35, whereas the

mean for non-majority-black school systems was $7,843.01.[1830]

Statewide in 2008, white students had slightly higher levels of per-student state

and local expenditures than black students.  Whereas 48% of Alabama's black

students attended school in a system with per-student state and local expenditures

above the median, 50% of Alabama's white students attended school in a system

above the median.[1831]  The statewide weighted average for per-student state and local

expenditures was $7,810 for black students and $7,858 for white students.[1832]  The

correlation coefficient for the percentage of a school system's students who are black

and the school system's per-student state and local expenditures was -0.02, indicating

the absence of a statistically-significant relationship between race and per-student

---

[1828] *Id.*

[1829] *Id.*

[1830] *Id.*

[1831] DX 891 (Bell Powerpoint), at 44.  If only local per-student expenditures are considered, rather than both state and local per-student expenditures, 64% of all black students in the State were at or above the median, whereas 66% of all whites students were at or above the median.  *Id.* at 45; Bell 15 Tr., at 109.

[1832] Agreed Facts ¶ 351; DX 891, at 46; *see also* Bell 15 Tr., at 109-10.  If only local per-student expenditures are considered, rather than both state and local per-student expenditures, the weighted mean for black students is $1,607, whereas the weighted mean for white students is $1,733. DX 891, at 47; Bell 15 Tr., at 110.

expenditures.[1833]

In 2008, of the ten Alabama school systems that educate the largest number of black students and which account for 50.62% of the State's black students, exactly half (50%) were above the mean, and 60% were above the median for per-student state and local expenditures.[1834]  Those ten school systems had mean per-student state and local expenditures of $7,938.84,[1835] a value that is higher than both the statewide mean of $7,781.28, and the statewide median of $7,582.17.[1836]

>    **d.    The hypothetical Alabama in which the challenged provisions do not apply:  *i.e.*, "what-if" measurements**

A final method of measuring the impact of the constitutional provisions challenged by plaintiffs is to compare actual property tax revenues and school funding amounts to the hypothetical circumstances that would exist *if* the constitutional restrictions were eliminated.  In other words, the exercise attempts to answer the question:  "*What if the challenged provisions did not exist?*"

Plaintiffs' witness, Dr. Ira Harvey, attempted just such a "what-if analysis"

---

[1833] DX 891, at 48; Bell 15 Tr., at110-11.  If only local per-student expenditures are considered, rather than both state and local per-student expenditures, the correlation coefficient for the percentage of black students in a school system's student body and the school system's local per-student expenditures is -0.14, again indicating the lack of a statistically-significant relationship. DX 891, at 49; Bell 15 Tr., at 111.

[1834] *See* Bell 2d Report, at 30-34.

[1835] *Id.*

[1836] *Id.*

using Alabama Department of Revenue data from fiscal year 2008.[1837]  His analysis

presents three hypothetical scenarios.[1838]   In the first, the challenged *property*

*classification system* is eliminated, and all property is subjected to an across-the-board,

uniform assessment ratio.   In that scenario, however, the "current use" appraisal

methodologies continue to be applied, so agricultural and timber properties, as well

as residential and historic properties, continue to be assessed at their "current use"

appraised value, rather than their "fair and reasonable market values."   The second

scenario maintains the four property classifications created by Amendment 373, but

extinguishes the "current use" methodologies for appraising "Class III" properties, and

subjects all property classifications to normal appraisal techniques for determining fair

market value.[1839]  In Dr. Harvey's third scenario, *both* the classification system *and* the

"current use" methods of appraising Class III properties created by Amendment 373

are eliminated, and *all* taxable property is assessed at the same ratio of its "fair and

---

[1837] *See* PX 826 (What-If Analysis Master).

[1838] For an explanation of the sources of data and how PX 826 works, see Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 148-60 ("**Harvey 4 Tr.**"); Harvey 6 Tr., at 186-214.

[1839] In other words, Class I (utility) property is assessed at 30% of its appraised (fair and reasonable market) value, Class II (commercial) property is assessed at 20% of its appraised (fair and reasonable market) value, Class III (residential, agricultural, timber, and historic) property is assessed at 10% of its appraised (fair and reasonable market, *not "current use"*) value, and Class IV (automobiles and other specified property) property is assessed at 15% of its appraised (fair and reasonable market value) value. *See* Doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 33 ("**Agreed Facts**"); *see also* Part II(F)(3) (explaining the classification system).

reasonable market value," as determined by normal appraisal methodologies.[1840]

Plaintiffs suggested evaluating the results of Dr. Harvey's "what-if" scenarios by comparing the percentage increases in the school property tax base or school tax revenue among counties.[1841]   That approach, in the opinion of this court, is flawed, because the comparison of relative or proportional increases fails to take into account the differing land areas, distribution of property types, and population sizes of each county, or the relative needs of each county to provide pubic services to its citizens. Furthermore, the evaluation of only percentage increases between counties does not show whether the existing inequality among counties increased or decreased after the hypothetical change.

It seems that a better method of evaluating Dr. Harvey's "what-if" scenarios is to compare the *per capita* measures (school tax revenue and school tax base) as a percentage of the statewide mean before and after the hypothetical changes.  *Per capita measures*, unlike *percentage increases*, take account of a county's population. As noted for previous methods of measuring adverse impact, a county's property tax

---

[1840] *See* Part II(F)(2)(a) of this opinion, *supra,* for a discussion of "the usual methods of determining fair market value."

[1841] The school property tax base is the total amount of assessed value to which a taxing authority can apply any given millage rate to generate revenue for school funding. *See supra* Part III(3)(a)(*ii*) (defining "school tax base"); Part II(E)(3) (explaining local funding sources for K-12 education); Part II(F)(3) (explaining assessed value and how it is calculated); Part III(B)(3)(a) (defining "tax base").

base (or the amount of school tax revenue a county generates from property taxes) must be considered in relation to the number of citizens residing in the county, for whom the county taxing authority must provide public services.  Comparing counties' tax revenues or bases as a percentage of the statewiee mean before and after the hypothetical changes shows whether the existing inequalities among counties increased or decreased.  The statewide mean provides a baseline by which to compare counties.

Thus, using 2008 population data, Dr. Michael Bell's per-capita school tax revenue and per-capita school tax base data, and Dr. Harvey's what-if analysis based on Alabama Department of Revenue data for fiscal year 2008, the per-capita improvement of each county is analyzed by comparing the county's per-capita school tax base or school tax revenue in relation to the statewide mean, before and after the hypothetical change.[1842]  County per-capita school tax bases or revenues are expressed

---

[1842] The 2008 population data, per-capita school tax revenue data, and per-capita school tax base data are derived from Dr. Michael Bell's Amended Report.  *See* Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).  Dr. Bell's per-capita school tax revenue and per-capita school tax base data are used to ensure consistency with, and allow comparison to, the school tax revenue and school tax base data presented in Parts III(B)(3)(a)-(b), which rely on Dr. Bell's data.  The results of the hypothetical scenarios, *i.e.*, the "what-if" data, are derived from Dr. Ira Harvey's "what-if" analysis.  *See* PX 697 (What-if analysis of 2008 Abstract); PX 826 (What-If Analysis Master).

as a percentage of the statewide mean.  A lower percentage of the statewide mean indicates that a county's per-capita tax revenues or base is further below the statewide mean.

### i.  Uniform assessment ratio for all properties

The first scenario eliminates the four property classifications created by Amendment 373 and applies a uniform, 30% assessment ratio to all taxable properties.[1843]  As seen in Table III-13 on the following page, applying a uniform assessment ratio to all properties would improve the condition of the Black Belt counties, but would not remove the current inequality among the remaining county groups, in terms of school tax revenues.

---

[1843] While plaintiffs also presented evidence about what would occur if a 60%, or 100%, assessment ratio was applied to all taxable properties, increases of the assessment ratio above 30% do not change the *relevant results* in determining adverse impact on the basis of race, because all uniform assessment ratios above 30% will show the same *relative changes* for counties. Bell 15 Tr., at 121, 121-22.

TABLE III-13:  MEAN PER-CAPITA SCHOOL TAX REVENUES AND MEAN PER-CAPITA SCHOOL TAX REVENUES AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX REVENUES, AT PRESENT, *AND,* IN HYPOTHETICAL SCENARIO IN WHICH A UNIFORM ASSESSMENT RATIO IS APPLIED TO ALL PROPERTIES BY COUNTY CLASSIFICATION [1844]

| | CURRENT MEAN PER-CAPITA SCHOOL TAX REVENUES | CURRENT MEAN PER-CAPITA SCHOOL TAX REVENUES AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX REVENUES | MEAN PER-CAPITA SCHOOL TAX REVENUES AFTER A UNIFORM ASSESSMENT RATIO IS APPLIED | MEAN PER-CAPITA SCHOOL TAX REVENUES AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX REVENUES AFTER A UNIFORM ASSESSMENT RATIO IS APPLIED |
|---|---|---|---|---|
| **12 BLACK BELT COUNTIES** | $120.03 | 87.57% | $264.77 | 89.80% |
| **40 RURAL, NON-BLACK BELT COUNTIES** | $117.68 | 85.85% | $253.02 | 85.82% |
| **15 URBAN COUNTIES** | $202.39 | 147.65% | $430.09 | 145.97% |
| **STATEWIDE** | $137.07 | | $294.84 | |

The relatively small change each group of counties would experience relative to the statewide mean indicates that a uniform assessment ratio would do very little to change the unequal per-capita school tax revenues among the different groups of counties.[1845]

---

[1844] *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

[1845] The same results occur if the mean school tax revenues of the different groups of counties before and after the hypothetical change to a uniform assessment ratio are compared as percentages of the statewide median before and after the change. *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.*

As shown in the Table III-14 on the following page, a change to a uniform assessment ratio would cause only a slight decrease in the inequality in per-capita school tax revenues between majority-black and non-majority-black counties, and a significant inequality still would remain.[1846]

at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).  Comparing the means to the statewide median ensures that outliers are not skewing the results for the statewide mean.

[1846] *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

TABLE III-14:  MEAN PER-CAPITA SCHOOL TAX REVENUES AND MEAN PER-CAPITA SCHOOL
TAX REVENUES AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX
REVENUES, AT PRESENT *AND* IN HYPOTHETICAL SCENARIO IN WHICH A UNIFORM ASSESSMENT
RATIO IS APPLIED TO ALL PROPERTIES BY MAJORITY RACE IN COUNTY [1847]

| | CURRENT MEAN PER-CAPITA SCHOOL TAX REVENUES | CURRENT MEAN PER-CAPITA SCHOOL TAX REVENUES AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX REVENUES | MEAN PER-CAPITA SCHOOL TAX REVENUES AFTER A UNIFORM ASSESSMENT RATIO IS APPLIED | MEAN PER-CAPITA SCHOOL TAX REVENUES AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX REVENUES AFTER A UNIFORM ASSESSMENT RATIO IS APPLIED |
|---|---|---|---|---|
| **11 MAJORITY-BLACK COUNTIES** | $119.48 | 87.17% | $264.61 | 89.75% |
| **56 NON-MAJORITY-BLACK COUNTIES** | $140.52 | 102.52% | $300.77 | 102.01% |

Statewide, blacks would experience increases in per-capita school tax revenues

from a change to a uniform assessment ratio.  That increase would be of little

significance, however, because blacks already enjoy statewide per-capita school tax

---

[1847] *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).  The same results appear if the mean school tax revenues of the different groups of counties before and after the hypothetical change to a uniform assessment ratio are compared as percentages of the statewide median before and after the change. *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).  Comparing the means to the statewide median ensures that outliers are not skewing the results for the statewide mean.

737

revenues in excess of the statewide mean.[1848]  The four counties with almost half of Alabama's black population (49%) would see their per-capita school tax revenue increase from 177.84% of the statewide mean before the change, to 180.22% of the statewide mean after the change.[1849]  The correlation coefficient for the percentage of a county's population that is black and the county's per-capita school tax revenue is currently statistically-insignificant and would remain statistically-insignificant after the hypothetical change.[1850]

### ii.   "Current use" appraisal methodologies abolished

The second scenario is that in which the four property classifications created by Amendment 373 are retained, but the "current use" methods of appraisal are abolished, and all property is appraised at its fair and reasonable market value by one of the usual

---

[1848] *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

[1849] *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

[1850] *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).  The correlation coefficient for the percentage of a county's population that is black and the county's per-capita school tax revenue under the existing system is +0.04, and the correlation coefficient would be +.06 under the hypothetical scenario.  *See* PX 697 (What-if analysis of 2008 Abstract); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 27-29 tbl.3 col. 6 (tabulating the per-capita school tax revenue for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

methods for determining value.[1851]

It is not surprising to find that Black Belt counties would benefit more than other counties from abolition of the "current use" appraisal methodologies, since such large percentages of agricultural and timber properties are found in that section of the State.

Even so, the abolition of "current use" methodologies for appraising taxable properties in "Class III" would not remove the inequality in school tax bases that presently exists among the State's counties, as seen in Table III-15 on the following page.

---

[1851] *See supra* Part II(F)(2)(a).

TABLE III-15:  MEAN PER-CAPITA SCHOOL TAX BASE AND MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE, AT PRESENT *AND* IN HYPOTHETICAL SCENARIO IN WHICH "CURRENT USE" METHODS OF APPRAISAL ARE ABOLISHED BY COUNTY CLASSIFICATION [1852]

| | CURRENT MEAN PER-CAPITA SCHOOL TAX BASE | CURRENT MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE | MEAN PER-CAPITA SCHOOL TAX BASE AFTER THE "CURRENT USE" METHODS ARE ABOLISHED | MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE AFTER THE "CURRENT USE" METHODS ARE ABOLISHED ASSESSMENT RATIO IS APPLIED |
|---|---|---|---|---|
| **12 BLACK BELT COUNTIES** | $8,918.22 | 84.30% | $11,886.74 | 88.11% |
| **40 RURAL, NON-BLACK BELT COUNTIES** | $10,262.92 | 97.02% | $13,169.68 | 97.62% |
| **15 URBAN COUNTIES** | $12,748.69 | 120.51% | $15,632.72 | 115.87% |
| **STATEWIDE** | $10,578.59 | | $13,491.33 | |

As seen in Table III-16 on page 742, however, the abolition of "current use" appraisal methodologies would move the per-capita school tax base of majority-black counties closer to the statewide mean county per-capita school tax base, while leaving the non-majority-black counties in essentially the same position.[1853]  Nevertheless,

---

[1852] *See* PX 826 (What-If Analysis Master); Amended Report of Dr. Michael Bell (DX 881), at 18-20 tbl. 1 col. 4 ("**Bell 2d Report**") (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

[1853] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating

even after abolishing "current use" appraisal methodologies, majority-black counties still would have a significantly lower mean per-capita school tax base than non-majority-black counties.[1854]

---

the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

[1854] The same results occur if the mean school tax revenues of the different groups of counties before and after the hypothetical change to a uniform assessment ratio are compared as percentages of the statewide median before and after the change.  *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data). Comparing the means to the statewide median ensures that outliers are not skewing the results for the statewide mean.

TABLE III-16: MEAN PER-CAPITA SCHOOL TAX BASE AND MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE, AT PRESENT *AND* IN HYPOTHETICAL SCENARIO IN WHICH "CURRENT USE" METHODS OF APPRAISAL ARE ABOLISHED BY MAJORITY RACE IN COUNTY [1855]

| | CURRENT MEAN PER-CAPITA SCHOOL TAX BASE | CURRENT MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE | MEAN PER-CAPITA SCHOOL TAX BASE AFTER THE "CURRENT USE" METHODS ARE ABOLISHED | MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE AFTER THE CURRENT USE METHODS ARE ABOLISHED |
|---|---|---|---|---|
| **11 MAJORITY-BLACK COUNTIES** | $9,509.12 | 89.89% | $12,629.33 | 93.61% |
| **56 NON-MAJORITY-BLACK COUNTIES** | $10,788.67 | 101.99% | $13,660.65 | 101.62% |

The statewide analysis shows that blacks would not benefit to a greater degree than whites from the abolition of "current use" appraisal methodologies. The four counties with almost half of Alabama's black population (49%) would see a *decrease* in their per-capita school property tax base from 120.37% of the statewide mean before the change, to 112.07% of the statewide mean after the change.[1856]   The

---

[1855] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

[1856] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

correlation coefficient for the percentage of a county's population that is black and the county's per-capita school tax revenue is currently statistically-insignificant at -0.07, and it would remain statistically-insignificant at 0.00 after the hypothetical change.[1857]

### iii.    Uniform assessment ratio for all properties *and* "current use" methodologies abolished

In the third scenario, *both* the four property classifications *and* the current use methodologies for appraising the value of properties are eliminated, and all taxable property is appraised at its fair and reasonable market value by one of the usual methods for determining market value, and then a uniform, thirty-percent assessment ratio is applied to the values thus determined.  As seen in Table III-17 below, while the degree of inequality would be reduced by these changes, significant inequalities still would exist among the Black Belt, rural-non-Black Belt, and urban counties.[1858]

---

[1857] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

[1858] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).  The same results occur if the mean school tax bases of the different groups of counties before and after the hypothetical change are compared as percentages of the statewide median before and after the change. *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).  Comparing the means to the statewide median ensures that outliers are not skewing the results for the statewide mean.

TABLE III-17: MEAN PER-CAPITA SCHOOL TAX BASE AND MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE, AT PRESENT *AND* IN THE HYPOTHETICAL SCENARIO IN WHICH "CURRENT USE" METHODS OF APPRAISAL ARE ABOLISHED *AND* A UNIFORM ASSESSMENT RATIO IS APPLIED TO ALL PROPERTIES BY COUNTY CLASSIFICATION [1859]

| | CURRENT MEAN PER-CAPITA SCHOOL TAX BASE | CURRENT MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE | MEAN PER-CAPITA SCHOOL TAX BASE AFTER THE "CURRENT USE" METHODS ARE ABOLISHED AND A UNIFORM ASSESSMENT RATIO IS APPLIED TO ALL PROPERTIES | MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE AFTER THE CURRENT USE METHODS ARE ABOLISHED AND A UNIFORM ASSESSMENT RATIO IS APPLIED TO ALL PROPERTIES |
|---|---|---|---|---|
| **12 BLACK BELT COUNTIES** | $8,918.22 | 84.30% | $25,707.79 | 90.95% |
| **40 RURAL, NON-BLACK BELT COUNTIES** | $10,262.92 | 97.02% | $28,505.03 | 100.84% |
| **15 URBAN COUNTIES** | $12,748.69 | 120.51% | $30,798.15 | 108.96% |
| **STATEWIDE** | $10,578.59 | | $28,266.67 | |

As shown in Table III-18 on page 746, the per-capita school tax base of the State's majority-black counties would improve relative to the statewide mean, while the tax base of the non-majority-black counties would remain in essentially the same

---

[1859] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

position.[1860]  Even after the hypothetical changes, however, majority-black counties would remain below the statewide mean, while non-majority-black counties would remain above the statewide mean.

---

[1860] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).  The same results occur if the mean school tax bases of the different groups of counties before and after the hypothetical change — a uniform assessment ratio and abolishing the "current use" methodologies — are compared as percentages of the statewide median before and after the change. *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data). Comparing the means to the statewide median ensures that outliers are not skewing the results for the statewide mean.

TABLE III-18:  MEAN PER-CAPITA SCHOOL TAX BASE AND MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE, AT PRESENT *AND* IN HYPOTHETICAL SCENARIO IN WHICH "CURRENT USE" METHODS OF APPRAISAL ARE ABOLISHED *AND* A UNIFORM ASSESSMENT RATIO IS APPLIED TO ALL PROPERTIES BY MAJORITY RACE IN COUNTY [1861]

| | CURRENT MEAN PER-CAPITA SCHOOL TAX BASE | CURRENT MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE | MEAN PER-CAPITA SCHOOL TAX BASE AFTER THE "CURRENT USE" METHODS ARE ABOLISHED AND A UNIFORM ASSESSMENT RATIO IS APPLIED TO ALL PROPERTIES | MEAN PER-CAPITA SCHOOL TAX BASE AS A PERCENTAGE OF THE STATEWIDE MEAN PER-CAPITA SCHOOL TAX BASE AFTER THE CURRENT USE METHODS ARE ABOLISHED AND A UNIFORM ASSESSMENT RATIO IS APPLIED TO ALL PROPERTIES |
|---|---|---|---|---|
| **11 MAJORITY-BLACK COUNTIES** | $9,509.12 | 89.89% | $12,629.33 | 94.56% |
| **56 NON-MAJORITY-BLACK COUNTIES** | $10,788.67 | 101.99% | $13,660.65 | 101.07% |

Statewide, the what-if analysis does not show a benefit to blacks as opposed to whites due to a change to a uniform assessment ratio *and* the abolition of the "current use" appraisal methodologies.  Significantly, the four counties with almost half of Alabama's black population (49%) would see a *decrease* in their per-capita school tax base from 120.37% of the statewide mean before the change to 102.95% of the

---

[1861] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

statewide mean after the change.[1862]  The correlation coefficient for the percentage of a county's population that is black and the county's per-capita school tax revenue is currently statistically-insignificant at -0.07, and it would remain statistically-insignificant at 0.00 after the hypothetical change.[1863]

---

[1862] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county).

[1863] *See* PX 826 (What-If Analysis Master); Bell 2d Report, at 18-20 tbl.1 col. 4 (tabulating the 2008 population of each Alabama county); *id.* at 18-20 tbl.1 col. 6 (tabulating the per-capita school tax base for each Alabama county based on 2007 fiscal year Alabama Department of Revenue tax data and 2008 U.S. Census Bureau population data).

[This page intentionally left blank.]

# IV.  CONCLUSIONS OF LAW

The question of first importance is:  *What standard of judicial review applies to plaintiffs' equal protection claims?*  As stated in Part II(H), *supra*, discussing controlling principles of law, this court cannot apply "strict scrutiny" standards to the constitutional provisions at issue unless plaintiffs demonstrate both (a) that a racially-discriminatory intent was a substantial reason motivating the enactment of the challenged provisions, *and* (b) that those provisions have a disparate, or disproportionate, impact along racial lines.[1864]

## A.  Discriminatory Intent

With regard to the first of those elements, the *overwhelming* weight of evidence in this record establishes — clearly, convincingly, and beyond reasonable debate[1865] — that virtually every provision of the basic charter of Alabama government drafted by the delegates to the 1901 Constitutional Convention was perverted by a virulent,

---

[1864] *See, e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 333 (2004) ("In evaluating a claim that a governmental decision violates the Equal Protection Clause, we have long required a showing of discriminatory purpose."); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *see also generally* Section II(H)(2)(b), *supra*.

[1865] *Cf. Hayes v. Luckey*, 33 F. Supp. 2d 987, 994 (N.D. Ala. 1997) (Smith, J.) (viewing all standards utilized to gauge the sufficiency and persuasive effect of evidence as but segments of a continuum, and, a hierarchical scale of values).  The weight of the evidence in this case borders upon being characterized as *unequivocal*:  an adjective that "implies proof of the highest possible character" and "imports proof of the nature of mathematical certainty."  *Id.* at 994 n.14 (quoting *Black's Law Dictionary* 1528 (6th ed. 1990)).

racially-discriminatory intent.  The voluminous, verbatim records of Convention debates, as well as contemporary newspaper accounts urging ratification of the document, lay bare for all who have eyes to see the works of those days and hands,[1866] and ears to hear the distant echoes, the malevolent intentions of the drafters and those who advocated that the delegates' misbegotten spawn be christened.

The pervasive theme of the Convention's records is, unquestionably, that of adopting provisions to strip the franchise from virtually all black citizens — and, in the bargain, great numbers of those poor-white yeoman agrarians who had formed the economic and political base of the Populist revolt during the last decade of the nineteenth century.

Even so, the records also clearly and convincingly establish that another objective of nearly equal importance to a large majority of the delegates was that of reaffirming those provisions of the 1875 Constitution suppressing the millage rates of *ad valorem* property taxes that could be devoted to the support of black education at public expense.

---

[1866] The phrase "the works of those days and hands" refers to the title of Hesiod's *Works and Days* (*circa* 700 BC), a didactic poem praising the virtues of harsh agricultural toil, and so in ironic contrast with the luxuries enjoyed by aristocratic Black Belt Planters and their elitist, "Big Mule" brethren, as a result of riding, booted and spurred, upon the backs of the oppressed and degraded descendants of African slaves, poor-white sharecroppers, yeoman farmers in the hill counties and wiregrass regions, and the poor of all races, religions, national origins, genders, and ages who toiled insanely-long hours for sub-poverty wages in the coal mines, steel mills, cast-iron foundries, textile mills, and other enterprises of the early industrial revolution in post-Reconstruction Alabama.

As discussed in Parts III(A)(7)(d)(*iii*), and, III(A)(8)(g), *supra,* the evidence clearly supports the conclusion that the elections calling for the 1901 Constitutional Convention *and* the ratification of the document produced by the delegates were both fraudulent.  Even so, plaintiffs do not challenge the 1901 Constitution in its entirety, nor the legitimacy of its ratification.  Instead, the gravamen of their complaint focuses on the taxation provisions added to the basic document by amendments ratified more than seven decades after the alleged "ratification" of the 1901 charter.[1867]

Under the binding precedent that controls the analysis, this court must consider the actual motivation behind the amendments challenged by plaintiffs.  In other words, it must be shown that those amendments were drafted by their sponsors, adopted by the State Legislature, and ratified by the citizens *because of* their racially adverse effects.[1868]  Further, that racially-discriminatory intent must have been a "substantial," or "motivating," factor in each step of the process.[1869]  The racist, white supremacist intent of the delegates to the 1901 Constitutional Convention, most of whom were two generations in the grave by the decade between 1972 and 1982, cannot be imputed to the persons who drafted, adopted, and ratified Amendments 325 and 373 and the 1982

---

[1867] Doc. no. 216 (Pretrial Order) ¶ 5(a).

[1868] *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1976); *see also McClesky v. Kemp*, 481 U.S. 279, 292 (1987) (holding that an Equal Protection plaintiff "must prove that the decisionmakers in *his* case acted with a discriminatory purpose") (emphasis original).

[1869] *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

implementation statutes.[1870]

Stated differently, the precedent that controls this court's decision in a case of this nature creates a secular theology devoid of the doctrine of original sin. *See*, *e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.") (Stewart, J., plurality opinion) (superseded by statute in non-relevant part).[1871]

Furthermore, the Eleventh Circuit has held that a state constitutional provision which is substantially the same as one that was previously adopted with a racist intent can still be upheld, *if* the passage of time between the two provisions is great enough, *and*, the motives for enactment of the subsequent statute were devoid of a racially-discriminatory intent.[1872] *Johnson v. Governor of the State of Florida*, 405 F.3d 1214, 1223-24 (11th Cir. 2005) (*en banc*) (holding that a subsequent legislative re-enactment can eliminate the taint from a law that was originally enacted with a discriminatory intent) (citing *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1988) (holding that each

---

[1870] *McClesky*, 481 U.S. at 298 n.20 ("[W]e cannot accept official actions taken long ago as evidence of current intent."); *Johnson v. Governor of Florida*, 405 F.3d 1214, 1219, 1225-26 (11th Cir. 2005) (*en banc*), *cert denied sub nom Johnson v. Bush*, 546 U.S. 1015 (2005) (holding that, even assuming "racial discrimination may have motivated certain . . . provisions in Florida's 1868 Constitution," a similar provision passed in 1968, without evidence of racially discriminatory motivation at that time, was constitutional).

[1871] This canon of constitutional jurisprudence is to be distinguished from the New Testament theology undergirding the most common offense in contemporary federal criminal law, conspiracy: *i.e.*, "*Wherever two or more are gathered in Satan's name, therein lies a conspiracy.*"

[1872] *Johnson*, 405 F.3d at 1223-24.

of two amendments to a provision of the Mississippi Constitution that had been adopted in 1890 with a racially-discriminatory intent "superseded the previous provision and removed the discriminatory taint associated with the original version")).

1.    **Analysis of Section 217, as modified by Amendment 325**

Alabama still was in the midst of racial turmoil in the early years of the decade beginning in 1970, as clearly demonstrated by the run-off election between the incumbent Governor, Albert Brewer (who had succeeded to the office upon the death of Lurleen Burns Wallace on May 7, 1968), and George C. Wallace, who was vying for his second full term as Governor in the 1970 Democratic Party primary.  Even so, there is no direct evidence in the record that *either* Amendment 325 *or* Amendment 373 was racially motivated.[1873]  For that reason, plaintiffs devoted considerable effort to documenting circumstantial evidence of the racism which pervaded that decade,

---

[1873] "Direct evidence" is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need to indulge an inference or presumption. *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (holding that the term "direct evidence," when used in the context of a Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (same); *Earley v. Chamption Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same). *See generally Black's Law Dictionary* 636 (defining "direct evidence" as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.") (9th ed. 2009, Bryan A. Garner ed.).

focusing particularly on the 1970 Wallace-Brewer gubernatorial primary run-off.[1874]

Dr. Flynt characterized that election as the "nadir, in terms of racism and political

campaigns," in Alabama history.[1875]  Yet, just over a year later, the legislation resulting

in Amendment 325 passed the Legislature and was ratified by the voters with no racial

rhetoric and, as far as the evidence actually produced at trial shows, no overt or covert

racial motivation.[1876]

Plaintiffs, through the testimony of Dr. Jeff Frederick, argue that Wallace toned

down his overtly-racist rhetoric following the 1970 Democratic Party primary run-off

election, and tailored his message to be more suitable to a national audience in

preparation for his second run for the office of President of the United States in

1972.[1877]  While that explains why *Wallace* was not using overtly-racist appeals as a

justification for Amendment 325, it fails to explain the silence of contemporary

*legislators* on that issue.  There is nothing in the record or contemporary accounts of

newspaper columnists suggesting that legislators were promoting or justifying

Amendment 325 on the basis of race, or for the purpose of diverting *ad valorem*

---

[1874] *See* Part III(A)(11)(a)(*iii*), *supra*.

[1875] Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258,) at 57 ("**Flynt 2 Tr.**").

[1876] *See* Part III(A)(11)(b)(*ii*)(D), *supra*.

[1877] Testimony of Dr. Jeff Frederick, Transcript Vol 9 (doc. no. 265), at 106-07 ("**Frederick 9 Tr.**").

property tax revenues from public school systems that educated black students.[1878]  If

that had been their motivation, it surely would have been apparent in the history of the

period because, as plaintiffs have meticulously shown, race was the fastest ticket to

success in Alabama *State politics* during the period when both Amendment 325 and

Amendment 373 were enacted and presented to the voters for ratification.[1879]

To this court, however, the most important testimony came from former State

Senator Robert H. "Bob" Harris, who represented Morgan and Limestone Counties in

the Alabama Senate for two terms (1967 to 1975), during which he also served as

Chairman of the Alabama Code Revision Commission for the current, 1975 Code of

Alabama.  Senator Harris drafted the legislation that became Amendment 325.[1880]  Mr.

Harris testified that he became interested in property tax reform in general, and

classification systems in particular, while practicing law in Decatur before his election

to the State Senate.[1881]  In fact, Harris had already begun drafting classification bills,

---

[1878] *See* Part III(A)(11)(b)(*ii*)(D), *supra.*

[1879] *See Brooks v. Miller*, 158 F.3d 1230, 1243 (11th Cir. 1998), *cert. denied sub nom. Brooks v. Barnes*, 526 U.S. 1131 (1999) ("The clear historical trail of racial purpose on other issues . . . stands in stark contrast with the *absence* of evidence of racial purpose in connection with the [challenged action].  This contrast supports the district court's finding that the challenged provision was not racially motivated.").

[1880] Agreed Facts ¶ 216.

[1881] Testimony of Robert Harris, Transcript Vol. 14 (doc. no. 270), at 181-84 ("**Harris 14 Tr.**").  The "attorney profile" for Mr. Harris on his law firm's website, www.harriscaddell.com, shows that he graduated from Auburn University with a B.S. degree in 1951, and from the University of Alabama School of Law (at which he was a member of the Farrah Order of Jurisprudence and Omicron Delta Kappa) with an LL.B degree in 1954.  He has practiced law in Decatur since 1957.

and circulating them among his colleagues, *before* the entry of the three-judge district court's decision in *Weissinger v. Boswell* and the ensuing property tax crisis.[1882] Mr. Harris testified unequivocally that race was not a factor in his thought process while drafting the legislation that resulted in Amendment 325.[1883]

Of course, the denials of discriminatory intent by those former state legislators who testified at trial, uttered some forty years after the debates, are not alone sufficient to establish that no racial motivation existed, as few would be expected to admit in open court in today's world that they had intentionally discriminated on the basis of race.[1884] Even so, the testimony of those former legislators does not exist in an evidentiary vacuum. Other evidence of record clearly identifies the non-racial force motivating the adoption of Amendment 325: the Alabama Farm Bureau. The Farm Bureau, representing the interests of Black Belt Planters and other, extremely-large landholders, was especially keen to see some form of property tax relief passed in the wake of the *Weissinger* decision.[1885] Otherwise, its constituents would face enormous *ad valorem* property tax increases, as some of the lowest pre-*Weissinger* assessment

---

[1882] Harris 14 Tr., at 185-87.

[1883] *Id.* at 211-12 (repeatedly answering "Absolutely not" to questions regarding racial motives or intended consequences).

[1884] *See Brooks*, 158 F.3d at 1242 (suggesting that "after-the-fact reconstructions of legislative purpose can be self-serving and unreliable").

[1885] *See* Part III(A)(11)(b)(*ii*), *supra*.

756

rates were applied in rural counties with high concentrations of farm and timber properties.[1886]  Such support does not automatically render the amendment racist in origin.

As previously discussed in the Findings of Historical Fact, the Farm Bureau, acting primarily through its President at the time, J.D. Hays of Madison County, actively courted the favor of, and supported the political ambitions of, Governor Wallace.  The Farm Bureau made a major advertising push to cloak Amendment 325 in the veil of relieving homeowners of high property taxes, hiding the reality that it was a money grab by wealthy planters and timber growers.[1887]  Plaintiffs attempted to make much of the alliance among Governor Wallace, the Farm Bureau, Black Belt landowners, and large agricultural interests generally when arguing that Amendment 325 was racially motivated.[1888]  Plaintiffs stressed the influence of Black Belt legislators in the State capitol, many of whom demonstrated undeniably overt racist tendencies,[1889] but the evidence is conclusive that the legislative power of the Black Belt, so long a staple of Alabama politics, was reduced by 1971,[1890] and that it

---

[1886] *See generally* DX 202 (Appendix from *Weissinger I* opinion).

[1887] *See* Part III(A)(11)(b)(*ii*)(C), *supra*.

[1888] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief) ¶¶ 161-64.

[1889] *See, e.g., id.* ¶¶ 146-149.

[1890] Testimony of Richard Manley, Transcript Vol. 10 (doc. no. 266), at 130 ("**Manley 10 Tr.**"); Harris 14 Tr., at 176-79, 197; PX 284 (Legislative Rosters 1971), at 4341-48; PX 285 (Legislative Rosters 1978), at 2154-55, 2163-68; PX 286 (Legislative Rosters 1982), at 1948-49,

continued to be eroded by the confluence of the twin streams of post-*Reynolds v. Sims* reapportionment, *and*, the growing effect of the 1965 Voting Rights Act in electing persons of African descent to State Legislative offices.

Of course, J.D. Hays and the Farm Bureau supported Wallace in his first two presidential runs (1968 and 1972), and maybe even in his abbreviated campaign for that office in 1976 (although the record is not clear on that point), but never in the expectation or hope that Wallace would succeed. Rather, Hays was quite clear that such support translated into favorable treatment for the Farm Bureau and its interests within the State of Alabama.[1891] Dr. Flynt interpreted Hays' remarks as essentially stating: "I aligned myself with the racially-discriminatory governor with the racially-discriminatory policies so that I could accomplish my agenda in Alabama because of his great popularity."[1892] Thus, plaintiffs' theory that the alignment of Wallace and the Farm Bureau demonstrates discriminatory intent in the enactment of Amendment 325 requires the court to make an untenable logical leap: *i.e.*, that the Farm Bureau, by hitching its political plow to a politician who became enormously popular during the period between 1962 and 1972 because of his racist views, *necessarily shared the same racist intent*. This final link, or "smoking gun," as Dr.

---

1956-61.

[1891] *See* Part III(A)(11)(a)(*i*)(C), *supra*.

[1892] Testimony of Dr. Wayne Flynt, Transcript Vol. 3 (doc. no 259), at 72 ("**Flynt 3 Tr.**").

758

Flynt called it, proved elusive at trial.  Dr. Flynt suggested that the "smoking gun" could be found within the J.D. Hays papers archived at Auburn University,[1893] but he struggled to articulate how the comments of Hays that he quoted during his trial testimony actually amounted to a killing shot.  Dr. Flynt stated that "[a] smoking gun is about race and about the way in which race is used and the way in which it enters a conversation,"[1894] but then failed to demonstrate that race actually *did* enter the conversation about Amendment 325 (or, more importantly, Amendment 373).  As with the legislators, there was no reason for the Farm Bureau *not* to discuss race openly, if race actually was *the* motivation (or even *a part of the* motivation) for either Amendment 325 or Amendment 373.  The Farm Bureau spent heavily to ensure that both Amendments were ratified, but there is no evidence that its advertisements touched even indirectly or implicitly upon the issue of race and schools.  Instead, the advertisements addressed only the financial burden of increased property taxes.[1895] There was no use of "code words," no warnings about higher taxes supporting "federal schools," no demagogy about "carpetbagging, scalawagging federal judges" attempting to tell Alabamians "how to park their bicycles straight," and no discussion about the additional financial hardships that increased *ad valorem* property taxes

---

[1893] Flynt 2 Tr., at 196.

[1894] Flynt 3 Tr., at 72.

[1895] *See* Part III(A)(11)(b)(*ii*)(C), *supra*.

759

would impose upon homeowners who were having to pay tuition for their children to attend private segregation academies. As the plaintiffs showed at trial, Alabama voters have historically been clearly averse to any increase in property taxation for the support of either black or integrated public schools;[1896] yet, the promotional campaigns for Amendments 325 and 373 did not exploit that prejudice by appealing to the desire to limit taxation benefitting public schools.

An alternate conclusion that can be drawn from J.D. Hays's support of Wallace is that it would be politically expedient and supremely pragmatic for the leader of a lobbying group to form a close relationship with a popular Governor, regardless of the methods that Governor had employed to gain his popularity. The Farm Bureau's motivation for supporting Wallace in his various campaigns, therefore, cannot be colored in black and white, but in "green": *i.e.*, the alliance was the most direct path to political and financial gain. In fact, a lobbyist in Alabama who did not seek the patronage of George Wallace in the decades of the 1960s and '70s would be derelict in the performance of those duties owed to the organization he or she represented.

It bears reiteration that, in 1861, Alabama's Black Belt Planter elite used race to convince poor-white, yeoman farmers in the hill counties and Wiregrass to march

---

[1896] *See* Part III(A)(11)(a)(*iii*), *supra*.

off and fight a rich man's war.[1897]  A generation later, the State's aristocratic elite again used racism to entrench their interests in the State Constitutions of 1875 and 1901, at the expense of poor whites.[1898]  In that tradition, the Farm Bureau, representing the scions of those Planter elites, used its connections with a sitting governor who was popular because of his racist rhetoric to effect a classification plan that would promote their political and financial interests over those of all other citizens of the State.[1899] While taking advantage of such political influence may demonstrate greed or powerlust, it is not necessarily tantamount to a racially discriminatory intent on the part of the organization itself, or its officers, lobbyists, and lawyers.

## 2.   Analysis of Section 217, as modified by Amendment 373

Amendment 373 also was enacted with the support of the Farm Bureau, and it is clear that the Bureau still was intent on ensuring that the wealthy owners of large tracts of farm properties and timber lands would not experience a significant tax increase.  The much delayed *Weissinger* deadline loomed large on the economic horizon of the large landowners, and it had become clear that Amendment 325 was not

---

[1897] Harvey H. Jackson III, *Inside Alabama:  A Personal History of My State* 87-88 (Tuscaloosa:  The University of Alabama Press 2004) ("**Jackson**").

[1898] *See* Part III(A)(7)(d), *supra*.

[1899] It is worth noting that Wallace's public racism was likely motivated as much by a thirst for power as it was by genuine personal hatred.  *See* Part III(A)(11)(a)(*i*)(A), *supra*.  Such a motive is no less base than full-fledged racism, but it militates against plaintiffs' assertion that association with Wallace is a proxy for racism, instead, it is very likely a proxy for powerlust and greed.

sufficient to stifle the impending tax burden.   In that sense, Amendment 373 functioned more as an amendment to Amendment 325 than a law unto itself, and it also was consistent with a general trend among the states to reform their tax codes to give taxpayers in general, and landowners in particular, relief from the financial burdens of *ad valorem* property taxes.[1900]

Furthermore, and as was discussed above, in the case of Amendment 325, the legislation leading to Amendment 373 was passed without any discussion of race.[1901] In the case of the former amendment, the lack of racial discussion was particularly noteworthy because Amendment 325 was passed in the midst of a tumultuous period of social change and upheaval, and during a period in which Alabama politicians certainly were not shy about mentioning race.  The lack of any discussion of the issue of race during debate on Amendment 373 is not as noteworthy, however, because it was passed during a period of nationwide reduction of property taxes.  In short, the evidence did not indicate a racial intent in the enactment of either amendment.

The "current use" appraisal methodology was an innovation adopted by Amendment 373, and it was intended to give large farmers and timber growers the fiscal protection they had expected Amendment 325 to provide, but which it had failed

---

[1900] Doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶¶ 244-47 ("**Agreed Facts**").

[1901] *See* Part III(A)(11)(c)(*i*), *supra*.

to accomplish.   The Legislature's rejection of Governor Fob James's executive amendment to the 1982 current use bill, limiting the application of that appraisal methodology to tracts of not more that 500 acres, makes it unequivocally clear that the goal of that innovation in Alabama tax policy was protection of the *large landholders* represented by the Farm Bureau.[1902]

The challenged provisions of the Alabama Constitution, and particularly the "current use" and "Lid Bill" aspects added to the State's organic law by Amendments 325 and 373, arguably are a continuation in practical, but not in legal, terms of the *de facto* classification system that existed prior to the *Weissinger* decision.  That system flowed from the period following the ratification of the 1901 Constitution, when county tax assessors consistently undervalued property, particularly in rural areas, and primarily to prevent adequate funding for black schools.[1903]  But the amendments ratified in 1972 and 1978 were not measures adopted for the purpose of depriving black public school students of adequate funding for education.  Rather, the weight of the evidence indicates they were a reaction to the increases in property appraisals and assessments mandated by the *Weissinger* decision, and the accompanying threat of a tremendous increase in the property taxes paid by large landowners.  The decision of

---

[1902] *See* Part III(A)(11)(c)(*ii*), *supra.*

[1903] *See* Part III(A)(8)(b), *supra*.

763

the Southern District of Alabama in *McCarthy v. Jones*, 449 F. Supp. 480 (M.D. Ala. 1978), struck that section of Amendment 325 that allowed reinstatement of discretionary assessment powers for some counties,[1904] and it was that provision which most closely mirrored the old *ad hoc* system.  All that remains of Amendment 325 today is the classification system, as amended by Amendment 373.  That classification is uniform statewide, and it leaves local officials no authority to assess property at whatever ratios they find convenient or politically expedient.  Thus, any connection between the current provisions and the prior, *ad hoc* system is not significant to the constitutional analysis.  Mere resemblance between the present system and the preexisting one is not equivalent to a showing of a racially discriminatory intent, unless there is evidence of racial motivation in establishing the new scheme.[1905]

### 3.    Analysis of Sections 214, 215, and 216

As stated in the first two sentences of this Part IV(A), the evidence clearly, convincingly, and conclusively establishes that the 1901 Constitution was enacted with a racially discriminatory intent.[1906]  That Constitution contains three sections on property taxes that remain unchanged today.  Section 214 limits the rate of *ad valorem*

---

[1904] *See* Part III(A)(11)(c)(*i*), *supra*.

[1905] *See Johnson*, 405 F.3d at 1219.

[1906] *See* Parts III(A)(8)(a) and (c), *supra*.

764

taxation *the State* may levy upon real and personal property to 6.5 mills.[1907]  Section 215 limits the rate of *ad valorem* taxation that *county governments* may levy upon taxable property to 5 mills.[1908]  Section 216 limits the rate of *ad valorem* taxation *municipalities* may levy upon taxable property to 5 mills.[1909]  Arguably, the passage of Amendments 325 and 373 removed the taint of discriminatory intent in those Sections.[1910]  However, those amendments dealt only with the appraisal and assessment of property, and did not address the millage rates specified in Sections 214, 215, and 216.  Thus, there was no "current government action that is not itself unlawful"[1911] to validate those provisions.  The discriminatory intent that infected the entirety of the 1901 Constitution has not been washed from those three Sections.

### 4.    Analysis of Section 269, as modified by Amendment 111

As discussed in Part I(C)(1)(a)(*v*), *supra*, Section 269 of the 1901 Alabama Constitution as originally adopted allowed counties to levy an additional mill "for the support of public schools."   However, that language was revised in 1956 by

---

[1907] Ala. Const. art. XI, § 214 (1901).

[1908] Ala. Const. art. XI, § 215 (1901).

[1909] Ala. Const. art. XI, § 216 (1901).

[1910] *Cf. Johnson*, 405 F.3d at 1219 (holding that, even assuming "racial discrimination may have motivated certain . . . provisions in Florida's 1868 Constitution," a similar provision passed in 1968, without evidence of racially discriminatory motivation at that time, was constitutional).

[1911] *Bolden*, 446 U.S. at 74.  Both *Bolden* and *Johnson* addressed race-neutral state action long after the initial race-motivated action occurred.  Sections 214, 215, and 216 of the Alabama Constitution have remained in force, unaltered, as enacted in 1901.

Amendment 111, in order to remove the reference to "public schools,"[1912] and replace that term with a generic reference to "*education*" — a semantic change that was intended to include both *private schools* (*i.e.*, white segregation academies), as well as public educational facilities.[1913]  The evidence clearly demonstrates that Amendment 111 was part of the state's resistance to the *Brown* decisions,[1914] but the amended provision is not facially discriminatory:  *i.e.*, there is no language about race in Section 269.

---

[1912] The original language of Section 269 read as follows:

> Sec. 269.  The several counties in this Sate shall have power to levy and collect a special tax (a) not exceeding ten cents on each one hundred dollars of taxable property in such counties, *for the support of public schools*; provided, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, State and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads and bridges and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.  The funds arising from such special school tax shall be so apportioned and paid through the proper school officials to the several schools in the townships and districts in the county that the school terms of the respective schools shall be extended by such supplement as nearly the same length of time as practicable; provided, that this section shall not apply to the cities of Decatur, New Decatur and Cullman.

Ala. Const. art. XIV, § 269 (1901) (emphasis supplied); *see also* James J. Mayfield, *Constitutions of 1875 and 1901:  Paralleled, Annotated and Indexed* 139-40 (Nashville, Tenn:  Marshall & Bruce Co. 1904) ("**Mayfield**").

[1913] Ala. Const. art. XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956).

[1914] *See* Part III(A)(10), *supra*.

5.    **Conclusion**

The evidence in the record demonstrates that Sections 214, 215, 216, and 269 of the 1901 Alabama Constitution were enacted with a racially discriminatory intent. The former three remain in the same form as when they were first penned at the white supremacy ball that was the 1901 Constitutional Convention. The latter was a reaction to the *Brown* decisions, and was intended to macadamize the road to future support of private segregation academies.

The two amendments adopted in the 1970s were a reaction to the *Weissinger* decision. After that ruling, all Alabama property owners faced the prospect of higher *ad valorem* taxes. The danger was most acute for large landowners in rural areas, who traditionally had benefitted from the lowest property assessment ratios in the State and pliant county tax assessors who systematically ignored state law in order to illegally bestow financial favors on some of the State's most wealthy citizens. But those large landowners also had one of the strongest voices in Alabama politics to champion their cause. The Farm Bureau, with assistance from an extraordinarily-popular Governor, was able to ensure the enactment of legislation that protected the interests of the large, rural landholders, guaranteeing that some of Alabama's wealthiest citizens paid some of its lowest taxes. The clear purpose of the two amendments and the statutes passed for the purpose of implementing them was to ensure that the *Weissinger* decision did

767

not cause the property of large landowners to be appraised and assessed similarly to public utilities and industrial groups.

The evidence presented at trial illuminates Alabama's twisted racist past: a historical reality that many would like to ignore, but old sins cast long shadows. In the present year of 2011, marking the sesquicentennial of the outbreak of hostilities in the Civil War, we are reminded of the calamity that historical reality wreaked on the American people. The evidence further demonstrates that racism did not die with the 618,000 Americans who perished in Blue and Gray, but rather festered for more than a century after Lee's surrender at Appomattox. But the general existence of racism is not sufficient, standing alone, to show that particular constitutional provisions were enacted with a discriminatory intent.

Plaintiffs have shown that Alabama's governing 1901 Constitution was written with clear discriminatory intent and purposes. Its ratification was an outright fraud. Therefore, Sections 214, 215, and 216, unchanged since 1901, are infected by that racist intent. Plaintiffs have also shown that Amendment 111 was a racially motivated reaction to the *Brown* decisions. But they have not sustained their burden to show that the amendments adopted in the 1970s, and which reformed Section 217, were enacted because of a racial animus. Therefore, the court finds that there was no racially discriminatory intent in the enactment of Amendments 325 and 373, or in the current

768

use statutes passed in 1982.

## B.    Disparate Impact on the Basis of Race

When analyzing discriminatory impact, the relevant geographic area is that which is coterminous with the scope of the law's application.  The state constitutional provisions challenged by plaintiffs apply to the State as a whole.  Thus, the analysis must be of their statewide effect.  *See San Antonio Independent School District v. Rodriguez*, 411 U.S.1, 26-27 (1973) (finding a lack of impact at the statewide level dispositive); *Robinson v. Kansas*, 117 F. Supp. 2d 1124, 1140 (D. Kan. 2000) (stating that, to properly analyze claims of racial disparities in funding levels among school districts, the comparison must be "statewide").  *Cf. Hazelwood School District v. United States*, 433 U.S. 299, 308-13 (1977) (treating as an unstated premise that the proper analysis for the purpose of determining discriminatory impact in an employment discrimination case against a school district must include the entire population of minorities in the workforce of that school district, as opposed to subsets of the workforce in particular schools, or particular portions of the district).

As discussed in Part II(H), *supra*, in order to strike down a state constitutional provision or statute under the Fourteenth Amendment's Equal Protection Clause on racial grounds, the challenged law must have a disparate impact along racial lines. *Hunter v. Underwood*, 471 U.S. 222, 227 (1985).  A disparate impact exists when one racial group is more affected than other racial groups (*i.e.*, disproportionately

770

affected), or when the law disadvantages a greater proportion of one race than others. *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Defendants are correct when arguing that plaintiffs' focus upon the Black Belt counties and majority-black counties is not appropriate, because the Black Belt counties constitute only a small subset of the State's 67 counties and, thus, do not illuminate any statewide effect of the challenged constitutional provisions. Furthermore, the Black Belt counties are not representative of the State's counties, or the State's black citizens.  Plaintiffs themselves argue that the Black Belt counties are *different from*, rather than representative of, the remainder of the State, and the evidence supports that proposition.  The Black Belt counties suffer from poverty at a much higher rate than other areas of the State, are uniformly rural (indeed, even *more* rural than other parts of the State), have a higher percentage of black citizens than other parts of the State, and, have a unique historical heritage.[1915]  Additionally, the black citizens of the Black Belt counties are not a representative subset of the State's black population, because the black population of those counties is only a small portion of the State's total black population.[1916]

In like manner, the State's majority-black counties are only a subset of the

---

[1915] *See supra* Parts I(D)(1) & III(B)(1).

[1916] *See supra* Part III(B)(1).

State's counties, and do not illuminate any statewide impact of the constitutional provisions at issue. Furthermore, the State's majority-black counties are not representative of the State's total black population, because they represent only a small fraction of the State's black population.[1917] Therefore, the following analysis will focus on *statewide* measures of the impact of the challenged provisions on the black population of the State as a whole.

Statewide, Alabama's black citizens and black public school students are not disparately impacted by the challenged provisions. The challenged provisions do not disadvantage a greater proportion of blacks than whites, nor do they generally affect blacks differently than whites on a statewide level. Instead, the evidence shows that the challenged provisions impact blacks and whites roughly equally. For all measures of impact, black students or citizens statewide were equal to, above, or insignificantly below white students and citizens in terms of tax revenues and school funding.

The *ad valorem* tax yield per-mill per-student is the most effective measure of the effects of the challenged provisions on local education funding, because its per-student measure ties it directly to the students among whom local education funds must be divided. Its yield per-mill measure causes it to show only the effects of statewide provisions on local tax revenues, and leaves out the effects of the particular

---

[1917] *See supra* Part III(B)(1).

millage rate chosen by a particular jurisdiction.

Statewide, school systems are just as able to raise tax revenues for the education of black students as they are for the education of white students. In fact, Alabama's black students actually fare *better* in terms of yield per-mill per-student than do white students.[1918] A greater proportion of Alabama's black students are enrolled in public school systems with a yield per-mill per-student above the statewide median than are white students. Black students enjoy a higher statewide average yield per-mill per-student than white students. Further, there is no statistically significant relationship between the percentage of black students enrolled in a school system and the system's yield per-mill per-student. Finally, majority black school systems fare better in terms of yield per-mill per-student than do non-majority-black school systems.

Relative per-student expenditures also are a strong measure of discriminatory impact, because they show whether the education of black students is funded at a level different than that for white students.[1919] Statewide, any differences in per-student expenditures for black students are not sufficiently significant to establish a disparate impact on the basis of race. Nearly equal percentages of the State's white and black students attend school in systems with per-student expenditures above the statewide

---

[1918] *See supra* Part III(B)(3)(a)(*iv*).

[1919] *See supra* Part III(B)(3)(c).

773

median.  Admittedly, the statewide weighted average of per-student expenditures for black students is $48 less than the statewide weighted average for white students. However, that $48 disparity represents only 6% of the weighted average per-student expenditures for black students.  The slight difference in weighted averages is, alone, not sufficiently significant — when compared with the rest of the per-student expenditure data, and the data from the other measures of impact — to prove a disparate impact.  Moreover, while it is less than the average for white students, the weighted average for black students is still above the statewide median.  Finally, there is not a statistically significant relationship between race and per-student expenditures.

Tax revenue is a poor measure of disparate impact, because the amount of revenue generated by any particular jurisdiction is determined, in large part, by the millage rates the adult, voting citizens of that jurisdiction choose to apply.[1920] However, even if tax revenue was a good indicator of adverse impact, blacks actually fare *better* than whites in terms of tax revenue, both per-capita and per-student.[1921]  A greater percentage of Alabama's black citizens live in counties with per-capita school tax revenues above the statewide median than do Alabama's white citizens, and there is not a statistically-significant relationship between race and school tax revenue per-

---

[1920] *See supra* Part III(B)(3)(b).

[1921] *See supra* Parts III(B)(3)(b)(*i*)-(*ii*).

capita.[1922]  Furthermore, a greater percentage of Alabama's black students live in counties in which the median school tax revenue per-student is above the statewide median than do white students; the weighted average for per-student school tax revenue is higher for black students than for white students; and, there is not a statistically significant relationship between race and school tax revenue per-student.[1923]

Even the weaker measures of impact, measures that are only loosely tied to the claimed racially adverse impact, do not show that blacks are in a worse position than whites.  For example, school property tax base per-capita is a weak measure because, unlike yield per-mill, it does not account for the number of students among whom the tax base must be divided.[1924]  Even so, blacks fare better statewide than whites in terms of school property tax base per-capita.[1925]  The weakest measure, in terms of relevance to the claimed adverse impact (county per-capita property tax base), also does not show that blacks have a significantly lower county per-capita property tax base statewide.[1926]  The weighted average county per-capita property tax base for blacks is lower than that for whites, but all of the other county per-capita property tax base data

---

[1922] *See supra* Part III(B)(3)(b)(*i*).

[1923] *See supra* Part III(B)(3)(b)(*ii*).

[1924] *See supra* Part III(B)(3)(a)(*ii*).

[1925] *See supra* Part III(B)(3)(a)(*ii*).

[1926] *See supra* Part III(B)(3)(a)(*i*).

775

show that blacks are not disproportionately impacted, and that there is not a statistically-significant relationship between race and county per-capita property tax base. The lower weighted average for blacks is of little significance in determining impact, both because the other data relating to county per-capita property tax base do not show that blacks have a lower tax base than whites, and also because the county per-capita property tax base measurements have little relevance to the claims in this case. The county per-capita property tax base is a weak measure of impact because it is a per-capita, rather than a per-student, measurement, and also because it assesses the revenue available for funding county services generally, rather than for education alone.

Finally, just as all of the contemporary measures of impact comparing counties and school systems do not reveal an adverse impact on the basis of race, a "what-if" analysis — comparing counties in a hypothetical Alabama lacking the challenged provisions to counties as they exist under the present laws — does not reveal a disparate impact either.[1927]  Statewide, the elimination of the challenged constitutional provisions either would not benefit blacks differently than whites, or blacks actually would be harmed relative to whites by striking-down the challenged provisions.

While most of this opinion's analysis of whether a racially-discriminatory

---

[1927] *See supra* Part III(B)(3)(d).

adverse impact exists focused on the "current use" appraisal method and property classification system set forth in Section 217 of the Alabama Constitution, as amended by Amendments 325 and 373, plaintiffs also challenged four other sections of the Alabama Constitution:  Sections 214, 215, 216, and 269.[1928]  Because *each* of the challenged State Constitutional provisions is alleged to cause a racially-adverse impact by hindering the ability of the State and local governments to "raise funds adequate to support public education,"[1929] and "raise revenue from [the] taxation of property,"[1930] any racially-discriminatory adverse impact of any of the challenged provisions would be illuminated by the *statewide* analysis of the State's property tax system as whole and education funding as a whole, as presented in Part III(B), *supra*.

Furthermore, to the extent that the four provisions of the Alabama Constitution not analyzed in detail in Part III(B) — Sections 214, 215, 216, and 269 — could individually have an impact independent of the other challenged constitutional provisions, plaintiffs failed to meet their burden of persuasion, because plaintiffs presented no evidence of any alleged, independent racially-discriminatory adverse impact of those sections.

Further, Section 214 — limiting the State *ad valorem* property tax rate — is a

---

[1928] *See* doc. no. 1 (Complaint), at 25.

[1929] *Id.* ¶ 61.

[1930] *Id.* ¶ 62.

limitation *of statewide effect* on the State's *ad valorem* property tax rate, and thus cannot have a racially-discriminatory adverse impact on any particular group of individuals within the State. All property in the State is taxed by the State at the *same* millage rate as limited by Section 214.

Plaintiffs presented no evidence that either Section 215 — limiting county *ad valorem* property tax rates[1931] — or Section 216 — limiting municipal *ad valorem* property tax rates[1932] — has any current effect on the State's property tax system. There is no evidence that any county or municipality would impose a higher tax rate if it was not limited by Section 215 or 216.

Additionally, plaintiffs presented no evidence that Section 269 — allowing public funding of private schools — has any current effect on the State's property tax system and education funding. There is no evidence that the State or any local governments currently provide funding to private schools. Because Sections 215, 216, and 269 do not currently affect the State's property tax system and education funding, those State Constitutional provisions cannot create a racially-discriminatory adverse impact.

As none of the measures of impact show that blacks are disadvantaged by the

---

[1931] *See supra* Part I(C)(1)(a)(*ii*) (stating the pertinent portion of Section 215).

[1932] *See supra* Part I(C)(1)(a)(*iii*) (stating the pertinent portion of Section 216).

constitutional provisions challenged by plaintiffs in a way whites are not, or that blacks are disproportionately affected when compared to whites, this court can only conclude that the provisions do not have a racially-discriminatory adverse impact. Thus, plaintiffs have failed to establish one of the necessary elements of a race-based equal protection claim.

What the impact measures do show is that Alabama's *rural* counties, both those in the Black Belt and those located outside that section of the State, are unable to generate significant local tax revenues to fund public services for their citizens to the same extent as urban counties can (and sometimes do).[1933]   However, residence in a rural area is not a constitutionally protected suspect class.   As plaintiffs have not proven a constitutionally significant adverse impact on any suspect class, or the violation of a constitutionally protected fundamental right, the effects of the State Constitutional provisions challenged by plaintiffs are not subject to analysis under a strict scrutiny standard of judicial review.

---

[1933] *See supra* Parts III(B)(3)(a) – (c).

779

## C.   Rational Basis Review

Plaintiffs have not proven the violation of a fundamental right, and they have not established that Section 217, as twice amended, was motivated by a desire to discriminate against the members of a constitutionally protected suspect class, or that it has an adverse impact on the members of any suspect class.  Consequently, Section 217 is not subject to heightened constitutional scrutiny.[1934]  Instead, that provision will be subjected to "rational basis" review, and it will be deemed to survive such scrutiny if the section is rationally related to some conceivable, legitimate, governmental purpose.[1935]

On the other hand, plaintiffs *have* proven the existence of a racially discriminatory intent in the enactment of Sections 214, 215, and 216 of the Alabama Constitution, inasmuch as those provisions are inseparable from the overtly racist convention that produced them in 1901.[1936]  But plaintiffs have offered no evidence that those three sections, which set millage caps on *ad valorem* taxes levied by the

---

[1934] *See* Part II(H), *supra*  ("Conversely, if the plaintiff does establish that a facially neutral law was enacted with a racially-discriminatory purpose and causes a disproportionate impact upon the intended targets, and the defendant cannot show that the law would have been enacted absent the discriminatory purpose, then the law must be "subject[ed] to the most exacting scrutiny; to pass constitutional muster, [it] must be justified by a compelling governmental interest and must be 'necessary . . . to the accomplishment' of [that] purpose.") (citations omitted).

[1935] *See* Part II(H), *supra* (citing multiple cases applying the rational basis standard).

[1936] *See* Part IV(A), *supra*.

State, counties, and municipalities, respectively, have an adverse impact on a protected class.[1937]  Therefore, they will also be subjected to rational basis review.[1938]

Finally, Section 269 of the Alabama Constitution, as amended, was clearly the product of a racially discriminatory intent.  Amendment 111, enacted in the wake of (and as part of Alabama's resistence to) the *Brown* decisions, changed the language of Section 269 to allow counties to levy a one-mill tax "for the support and furtherance of *education* [as opposed to the "*public* schools"] in any manner as may be authorized by the legislature."[1939]  But there is no evidence in the record that any county is currently using this mechanism in a racially discriminatory manner.[1940]  The provision has no current effect and, therefore, cannot possibly have a racially disparate impact. It too is subject to rational basis review.

None of the parties addressed the rational basis standard in their post-trial briefs.  Instead, the parties focused their arguments on the question of whether the evidence established that the challenged provisions discriminated on the basis of race, which obviously is a suspect class that would trigger strict scrutiny review.  In fact,

---

[1937] *See* Part IV(B), *supra.*

[1938] As discussed in Part II(H), *supra*, heightened scrutiny is only applicable if *both* discriminatory intent *and* disparate impact are present.

[1939] Ala. Const. art. XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956) (emphasis supplied).

[1940] *See* Part IV(B), *supra*.  In fact, there was no evidence presented to suggest that any county is currently using the provision in a manner that would have been impermissible before the enactment of Amendment 111.

the only time the rational basis standard has been addressed by the parties in this case

was in defendants' summary judgment brief, where those parties stated:

> Because the Challenged Laws do not operate to the peculiar disadvantage of a suspect class, rational basis review is appropriate. This rational basis inquiry in this case is quite simple, as the Eleventh Circuit has already conducted the analysis with respect to many of the restrictions in Amendments 325 and 373 and determined that those restrictions are rationally related to achieving a permissible state purpose.[1941]

As defendants stated, the Eleventh Circuit has already ruled on the

constitutionality of Alabama's classification and "current use" provisions.   In

*Weissinger v. White,* 733 F.2d 802 (11th Cir. 1984) ("*Weissinger II*"), the Court of

Appeals applied rational basis standards to Amendment 373's current use and

classification provisions.[1942]  Recognizing the leeway the federal courts traditionally

give the states on matters of taxation, the Court held that the State of Alabama:

> is free to enact measures that attempt to perpetuate certain desirable uses of its land in the face of economic pressures to convert the property to other more lucrative pursuits.  Institution of a favorable tax system is one

---

[1941] Doc. no. 151 (Defendants' Brief in Support of Motion for Summary Judgment), at 26 (footnote omitted).  Plaintiffs did not respond to this argument in their response brief.  *See* doc. no. 166 (Plaintiffs' Brief Opposing Defendants' Motion for Summary Judgment).

[1942] *Weissinger v. White*, 733 F.2d 802, 805-07 (11th Cir. 1984) ("*Weissinger II*").  The *Weissinger II* opinion, a scant six pages in the Federal Reporter, does not address Amendment 325 as such.  However, Amendment 373 modified and replaced Amendment 325's three-tiered classification system and 1.5% lid with a four-tiered system with varying lids.  Thus, this court need not make a separate inquiry as to the rational basis of Amendment 325.  Moreover, the *McCarthy* ruling upheld Amendment 325, even while striking a statute enacted under it, applying rational basis review to both the amendment and the statute.  *McCarthy v. Jones*, 449 F. Supp. 480, 484 (S.D. Ala. 1978).

> rationally related means by which to effect that end. A formula for evaluation of farm and timber property that routinely holds assessment values below the normal selling price will certainly encourage the continued use of land for its present purpose. Therefore, in view of Alabama's legitimate goal to preserve land for agriculture and forestry, we conclude that any disparity in the valuation of [agricultural and timber land] is rationally related to the achievement of a permissible state purpose.[1943]

The Eleventh Circuit's ruling in *Weissinger II* controls the instant case, as it addressed the same tax provisions challenged here.

The millage caps in Sections 214, 215, and 216 are also rationally related to a legitimate governmental interest. Property taxes are generally disliked by a majority of Americans,[1944] and maintaining low millage rates promotes property ownership. Stated differently, placing restrictions on millage rates provides stability and predictability for property owners. Such stability is important in view of the fact that assets subject to *ad valorem* taxation are not liquid in nature, especially in a recessionary economy. A sudden and significant increase in millage rates could force property owners out of their homes or, as in the days of Congressional Reconstruction when sudden, sharp increases in property taxes occurred in a cash-strapped, depression economy, off their land. Although changes in assessment rates could produce the

---

[1943] *Weissinger II*, 733 F.2d at 806-07 (footnotes omitted, bracketed alteration supplied).

[1944] *See* doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 19 ("The property tax remains one of the most disliked of all taxes.").

same result, it is not the court's place to determine whether there might have been better, or even equally effective, means of reaching the Legislature's objectives, but only whether the challenged laws are rationally related to a legitimate governmental policy.

Section 269 allows property taxation for the purpose of supporting "education," as opposed to limiting such revenues to the support of "public schools." Despite the racist, segregationist origin of Amendment 111 during the day of "massive resistence" to the *Brown* decisions, the provision as thus amended arguably retains a relationship to the legitimate government interest of promoting education. The provision could be used, for example, to fund scholarships for county students pursuing higher education. Some of those students might choose to enroll in private colleges. By allowing the counties to levy a land tax for the support of "education," rather than "public schools," the county would have more freedom in awarding and disbursing scholarships, enabling students to take advantage of a broader array of higher education opportunities. Moreover, "education" is not limited to traditional schooling. For example, a county could arguably use the provision to raise appropriations for improving a public library, or preserving a historical site.

Plaintiffs have proven a disparity in funding among the State's public school systems, but not a disparity along racial lines. Faced with similar facts in *San Antonio*

784

*Independent School District v. Rodriguez*, 411 U.S. 1 (1972), the Supreme Court ruled that such a variation in funding is rationally related to the legitimate governmental interest in "permit[ting] and encourag[ing] a large measure of participation in and control of each district's schools at the local level . . . ."[1945]

In sum, each of the challenged provisions, individually, is rationally related to a conceivable, legitimate governmental interest.  Additionally, Alabama's school funding system, on the whole, bears a strong resemblance to that considered in *Rodriguez*.  For these reasons, the court has no choice but to rule that the challenged provisions survive rational basis review and are, therefore, constitutional.[1946]

---

[1945] *Rodriguez*, 411 U.S. at 49 (bracketed alterations supplied).

[1946] That is not to say, of course, that the court approves of the challenged provisions and the policies behind them.  *See* Part V, *infra.*

## D.   Title VI of the Civil Rights Act of 1964

Plaintiffs also alleged in their complaint that the "racially motivated state constitutional property tax provisions challenged herein violate plaintiffs' federal statutory rights guaranteed by Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq.*"[1947]   Plaintiffs argue that, by entering an order denying defendants' motion for judgment on the pleadings, this court already rejected defendants' argument that plaintiffs are not entitled to relief under Title VI, and that there is no basis for reconsideration of that prior ruling.[1948]   This court does not agree. It is true that the court entered a short order denying defendants' motion for judgment on the pleadings, stating, in pertinent part, that plaintiffs' Title VI claim against all defendants would remain pending.[1949]   That does not mean, however, that this court already ruled in plaintiffs' favor on the merits of their Title VI claim.   Rather, the court's prior order means only that the Title VI claim survived defendants' motion for judgment on the pleadings and was allowed to proceed to trial.   Now that the trial has been completed and all the evidence presented, the time has arrived to consider the merits of the Title VI claim.

Title VI provides that "No person in the United States shall, on the ground of

---

[1947] Doc. no. 1 (Complaint) ¶ 58.

[1948] *See* doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 124-25.

[1949] *See* doc. no. 126 (Order on Defendants' Motion for Judgment on the Pleadings), at 1-2.

race, color, or national origin, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance."  42 U.S.C. § 2000d.  As the Supreme Court noted in *United*

*States v. Fordice,* 505 U.S. 717, 732 n.7 (1992),

> Our cases make clear, and the parties do not disagree, that the reach of
> Title VI's protection extends no further than the Fourteenth Amendment.
> *See Regents of Univ. of California v. Bakke*, 438 U.S. 265, 287, 98 S. Ct.
> 2733, 2746, 57 L. Ed.2d 750 (1978) (opinion of Powell, J.); *id.*, at 328,
> 98 S. Ct., at 2767 (opinion of Brennan, WHITE, Marshall, and
> BLACKMUN, JJ., concurring in judgment in part and dissenting in part);
> *see also Guardians Assn. v. Civil Service Comm'n of New York City*, 463
> U.S. 582, 610-611, 103 S. Ct. 3221, 3237, 77 L. Ed.2d 866 (1983)
> (Powell, J., concurring in judgment); *id.*, at 612-613, 103 S. Ct., at 3238
> (O'CONNOR, J., concurring in judgment); *id*., at 639-643, 103 S. Ct., at
> 3252-3254 (STEVENS, J., dissenting).  We thus treat the issues in these
> cases as they are implicated under the Constitution.

Like the Supreme Court in *Fordice,* this court will consider plaintiffs' Title VI

claim through the same lens as the plaintiffs' Fourteenth Amendment claim.  Having

already determined that plaintiffs' Fourteenth Amendment claims fail on the merits,

the court also concludes that plaintiffs' Title VI claim fails on the merits, in that

plaintiffs have failed to prove that they were subjected to discrimination on the basis

of race under any program receiving federal financial assistance.[1950]  Accordingly, final

---

[1950] Because plaintiffs' Title VI claim fails on the merits due to the absence of any proof of
racial discrimination, it is not necessary to consider defendants' other arguments, including: (1) that
plaintiffs have failed to identify a specific program or activity that subjects them to discrimination;
(2) that plaintiffs did not identify any specific source of federal funding; and (3) that plaintiffs did
not demonstrate a logical connection between any program or activity receiving federal funds and

judgment is due to be granted in defendants' favor on plaintiffs' Title VI claim.

---

the discrimination they suffer.  *See* doc. no. 275 (Defendants' Post-Trial Brief), at 250-54.

[This page intentionally left blank.]

# V.  CONCLUSIONS

The journal of proceedings during Alabama's 1901 constitutional convention is a singular historical document, unique in the breadth and rawness of the racist statements uttered by nearly every delegate.   The savagery of the language of intolerance and hatred that permeated almost every day of every debate is so shocking that this court cannot imagine that the fundamental charter of any other state could possibly equal the patently racist animus that motivated virtually every article of the document drafted by the delegates.   The Alabama Constitution truly is *sui generis*, of its own kind or class.[1951]

When approaching the issues of this case for the first time, therefore, rational persons might logically conclude that such facts should work a difference in the standards of judicial review to be applied to the provisions challenged by plaintiffs. "Not so," said the United States Supreme Court, in so many words, in *City of Mobile v. Bolden*, 446 U.S. 55 (1980), holding that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."[1952]

Further, it has been unequivocally demonstrated by virtually every scholar to review the 1901 Alabama Constitution that it "is the most heavily laden state

---

[1951] *Black's Law Dictionary* 1572 (9th ed. 2009) (Bryan A. Garner, ed.).

[1952] *Mobile v. Bolden*, 446 U.S. at 74 (Stewart, J., plurality opinion) (superseded by statute in non-relevant part).

constitution in the United States with respect to provisions dealing with taxation and

government spending."[1953]  As a result,

> Alabama's taxes not only fail the most important test — raising
> enough revenue — they fail other tests of good tax policy.  The taxes are
> regressive.  They are not very elastic, meaning that revenue grows more
> slowly than the economy (and presumably, more slowly than needs).
> Each tax has its own administrative scheme, complicating administration
> and trapping taxpayers.  Many of the taxes are earmarked for specific
> purposes so that revenue-enhancing reform of the tax would not help
> solve a funding crisis elsewhere in the state government.  . . .[1954]

Again, rational persons might logically conclude that such facts could work a

difference in the standards of judicial review to be applied to the provisions

challenged by plaintiffs; but, once more, rational persons would be disappointed,

because the Supreme Court held in *San Antonio Independent School District v.

Rodriguez*, 411 U.S. 1 (1973), that gross, incredibly-egregious inequities in school

funding produced by the impact of disparate incomes and property values on local *ad

valorem* tax revenues did not offend the Fourteenth Amendment's Equal Protection

Clause.[1955]

---

[1953] Bruce P. Ely and Howard P. Walthall, *State Constitutional Limitations on Taxing and
Spending:  A Comparison of the Alabama Constitution of 1901 to its Counterparts*, 33 Cumb. L.
Rev. 463, 464 (2003).

[1954] James D. Bryce, *Tax Reform Issues in Alabama*, 43 Ala. L. Rev. 541, 542 (1992)
(footnotes omitted).

[1955] *See supra* Part II(G)(2)(b), explicating the *Rodriguez* decision; *see also* Paul A. Sracic,
San Antonio v. Rodriguez *and the Pursuit of Equal Education:  The Debate over Discrimination and
School Funding, e.g.*, at 64-72 (Lawrence:  The University Press of Kansas 2006) (discussing how
Justice Lewis Powell, the author of the majority opinion in *Rodriguez*, was deeply influenced by the

Ultimately, this court must confront the fact that trial court judges cannot write opinions on clean sheets of paper.  Our responsibilities are discharged, instead, in the trenches, on the grubby front-lines of the battle to provide substance for the abstract principles of "truth" and "equal justice under law."  In that daily struggle, the duty of trial judges, like that of any other line officer, is to "obey orders" — orders delivered in the form of binding precedents that cannot be distinguished on the basis of underlying facts or the issues decided by higher courts.

Like it or not, Supreme Court precedent compels a conclusion that the property tax scheme embedded in Alabama's 1901 Constitution and subsequent amendments does not offend the Fourteenth Amendment's Equal Protection Clause.  The inability of plaintiffs to prove both that the challenged constitutional provisions are the product of a racially-discriminatory intent, and that the provisions produce a racially-disproportionate effect, mandates the application of a "rational basis" standard of judicial review.  That lenient test produces, as it nearly always does, a ruling in favor of defendants.

None of this is meant to say, however, that the court is satisfied as to either the *quality* or *equality* of public education in this State.  Alabama continues to be plagued by an inadequately-funded public school system — one that hinders the upward

---

notion that plaintiffs' claims would result in the destruction of local control over the schools, and lead to the creation of a centralized public school system similar to that of the Soviet Union).

mobility of her citizens, black and white alike, especially in rural counties. That circumstance is the product of two unfortunate realities. The first is mankind's self-serving nature. Taxpayers are generally unwilling to pay for government services that do not benefit them directly, and they specifically dislike property taxes. Interest groups spend untold amounts in lawyer, lobbying, and advertising fees to promote legislation enhancing the wealth of their members. State powerbrokers perceive little benefit from investing in a quality *statewide* public school system, because the children of their most influential constituents are generally enrolled in exclusive suburban school systems, with large *local* tax bases, or in private schools. Many of those private schools sprouted following court-mandated integration. As demonstrated in this opinion, however, "white flight" to the suburbs or private schools has not *disproportionately* harmed blacks. Instead, it also punishes many white students who remain in the public school systems. The children of the rural poor, whether black or white, are left to struggle as best as they can in underfunded, dilapidated schools. Their resulting lack of an adequate education not only deprives those students of a fair opportunity to prepare themselves to compete in a global economy, but also deprives the State of fully-participating, well-educated adult citizens.

The second reality that hamstrings the State's education system is Supreme

Court jurisprudence that has allowed unequal and inadequate public school funding to evolve.  The Court's rulings on education since the 1970s mirror its decisions from the late nineteenth century.  Following ratification of the Civil War amendments and their enabling statutes during Reconstruction, the Supreme Court repeatedly issued decisions undermining the civil rights of black Americans.  In the *Slaughterhouse Cases*, the *Civil Rights Cases*, *Plessy v. Ferguson*, and *Williams v. Mississippi*, among others that might be listed, the Court eviscerated those amendments as they related to equality for blacks.[1956]  In doing so, the Court shifted its focus from improvement of the lot of the former slaves to the business of developing the doctrine of "substantive due process" as a defense of property, contracts, and corporations.  The result was *Plessy*'s affirmation of "separate but equal," and decades of inequality under "Jim Crow laws."

The *Brown* decision is usually seen as the Court's repudiation of the *Plessy* rule, and the first step in the eradication of "Jim Crow."  But the Court's decisions since the early 1970s have undone *Brown*, and have given constitutional legitimacy to *separate and unequal* public schools — the very antithesis of the Court's monumental holding in the first *Brown* decision.[1957]  Dean Erwin Chemerinsky recognized that fact in a law

---

[1956] *See generally*, *e.g.*, Lawrence Goldstone, *Inherently Unequal:  The Betrayal of Equal Rights by the Supreme Court, 1865–1903* (New York: Walker & Company 2011).

[1957] See, for example, the Virginia Law Review article by Judge Jeffrey Sutton (who served as law clerk to Justice Lewis F. Powell Jr. (Ret.), the author of the *Rodriguez* majority opinion, as

review article written seventeen years ago, saying that

> *American schools are separate and unequal.  To a very large degree, education in the United States is racially segregated.*  By any measure, schools are not equal in their resources or their quality. Wealthy suburban school districts are almost entirely white; poor inner city schools are often exclusively comprised of African-American and Hispanic students.  Forty years after [*now, fifty-seven years after!*] *Brown v. Board of Education* proclaimed that separate can never be equal in public education, *American schools are racially segregated and grossly unequal.*

> How did this come to happen?  How was the majestic promise of *Brown* lost?  There is no simple or single answer to the question.  The task of equalizing educational opportunity has been far more difficult than ever could have been imagined forty [now fifty-seven] years ago. White flight to suburban and private schools frustrated desegregation in most cities.  Equalizing expenditures is usually a political impossibility. Intense opposition exists at every step along the way to meaningful desegregation or equalization of school funding.[1958]

---

well as Justice Antonin Scalia (from 1991-92) and Judge Thomas Meskill on the Second Circuit (from 1990-91), before being nominated to the Sixth Circuit Court of Appeals by President George W. Bush), observing that:

> One need not be a scholar of Supreme Court history to appreciate that there were some differences between the late Warren Court of 1968 and the early Burger Court of 1973.  After four appointments by President Nixon — Chief Justice Burger for Chief Justice Warren [1969], Justice Blackmun for Justice Fortas [1971], Justice Powell for Justice Black [1972], and Justice Rehnquist for Justice Harlan [1972] — the Court had become a different forum in which to advance the argument that education was a fundamental right or that wealth was a suspect class.   The five-member majority that ultimately rejected the plaintiffs' claims in [*San Antonio Independent School District v.*] *Rodriguez*, as it turns out, consisted of the four Nixon appointees and Justice Stewart.

Jeffrey S. Sutton, San Antonio Independent School District v. Rodriguez *and Its Aftermath*, 94 Va. L. Rev. 1963, 1968 (2008).

[1958] Erwin Chemerinsky, *Lost Opportunity:  The Burger Court and the Failure to Achieve Equal Educational Opportunity*, 45 Mercer L. Rev. 999 (1994); *see also id*. at 1011 (stating that

It is a tragic irony to realize that the separate and inherently unequal system of segregation in public schools that *Brown* decried as the legacy of *Plessy* has become the legacy of *Brown* — even if in a new, and arguably worse form.  Before *Brown*, black and white students were educated separately, but there was at least a *de jure* requirement that black and white schools be equal.  *Brown* sought to mend the tear in our national fabric created by segregated schools by envisioning integrated schoolrooms in which all students, white and black, would attend school and receive a decent education together.   A "unitary" system surely would have been less expensive and more efficient than "dual" systems, but states resented federal court involvement in their internal affairs.  When massive resistance to the *Brown* mandates eventually was overcome, states grudgingly attempted to preserve their separate independence ("sovereignty"), while giving the appearance of complying with federal decrees, by providing a meager public education to white and black students, and allowing a parallel education system to evolve — one in which only the wealthy can access a quality education for their children, either by moving into exclusive suburbs with public schools well-funded by *local* tax revenues, or by paying for their children

*Milliken v. Bradley*, 418 U.S. 717 (1974) (restricting the power of federal courts to impose inter-district desegregation orders), "means that effective desegregation is impossible because there is no way to combine white students in suburban areas with minority students attending city schools. *Rodriguez* means that these racially separate school systems will be unequal in resources because wealthier, white, suburban areas will spend much more money on schools than cities.").

796

to attend private schools.  In other words, because federal courts refused to permit states to focus limited public resources on the education of a chosen few, the states chose to not incur voter disapproval of increased tax levies for the support of an integrated public school system.  In *Rodriguez*, the Court blessed this terrible choice and eviscerated the vision of *Brown*.

Today, instead of being repaired. the tear in our nation's educational system has widened, with students still largely separated on the basis of race, and inequality legally permitted.  Those students whose families cannot afford private school tuition or a home in a choice neighborhood with good schools sadly represent a substantial portion of the nation's minority population, and they are relegated to poor schools and a sub-par education.  Those students, most often non-minority students, who by the simple accident of birth have families that *can afford* private school or a home in a choice neighborhood, are shunted off into a separate educational world to receive a quality education.

For too long our Nation has used arbitrary distinctions of class, wealth, race, and place of residence to withhold from a great number of our fellow citizens a commodity more precious than pearls — a commodity unlimited in its ability to provide an abundant life for those who are accorded the means to pursue it, and, one that is essential to the functioning and continued existence of our still-young experiment in

representative democracy — *knowledge*.  Our Nation continues down that dangerous path at its own peril, and the time has long since passed that we should recognize and enforce the true meaning of *Brown v. Board of Education*:  we must cast aside arbitrary distinctions of birth, race, and place, and allow every American to harness the power provided by a quality education.  After all, the most sacred tenant of our secular theology is that we hold certain "truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, [and] that among these are Life, Liberty and the pursuit of Happiness."  Unfortunately, this court is constricted by binding precedent from writing an opinion that might advance those "unalienable Rights."

> *How many times can a man turn his head,*
>   *and pretend that he just doesn't see?*
>     . . . .
> *And how many ears must one man have,*
>   *before he can hear people cry?*
>     . . . .
> *The answer my friend is blowing in the wind,*
>   *the answer is blowing in the wind.*

Bob Dylan, "Blowing in the Wind" (1962).

A separate judgment consistent with this opinion will be entered contemporaneously herewith.

**DONE** this 21st day of October, 2011.

_____
United States District Judge

# APPENDIX I-1

**Alabama Constitution art. XI, § 215 (1901),**
*amended by* **amend. 208 (***ratified* **Nov**. **11, 1962**)

No county in this state shall be authorized to levy a greater rate of taxation in any one year on the value of the taxable property therein than one-half of one per centum; provided, that to pay debts existing on the sixth day of December, eighteen hundred and seventy-five, an additional rate of one-fourth of one per centum may be levied and collected which shall be appropriated exclusively to the payment of such debts and the interest thereon; provided, further, that to pay any debt or liability now existing against any county, incurred for the erection, construction, or maintenance of the necessary public buildings or bridges, or that may hereafter be created for the erection of necessary public buildings, bridges, or roads (a) any county may levy and collect such special taxes, not to exceed one-fourth of one per centum, as may have been or may hereafter be authorized by law. The proceeds of taxes levied under said proviso (a) for public building, road, or bridge purposes in excess of amounts payable on bonds, warrants, or other securities issued by the county may be spent for general county purposes, in such manner as the court of county commissioners, board of revenue, or other like county governing body may determine.

# APPENDIX I-2

## Alabama Constitution, art. XI, § 216 (1901)

No city, town, village, or other municipal corporation, other than as provided in this article, shall levy or collect a higher rate of taxation in any one year on the property situated therein than one-half of one per centum of the value of such property as assessed for state taxation during the preceding year; provided, that for the purpose of paying debts existing on the sixth day of December, eighteen hundred and seventy-five, and the interest thereon, a tax of one per centum may be levied and collected, to be appropriated exclusively to the payment of such indebtedness; and provided further, that this section shall not apply to the city of Mobile, which city may from and after the ratification of this Constitution, levy a tax not to exceed the rate of three-fourths of one per centum to pay the expenses of the city government, and may also levy a tax not to exceed three-fourths of one per centum to pay the debt existing on the sixth day of December, eighteen hundred and seventy-five, with interest thereon, or any renewal of such debt; and, provided further, that this section shall not apply to the cities of Birmingham, Huntsville, and Bessemer, and the town of Andalusia, which cities and town may levy and collect a tax not to exceed one-half of one per centum in addition to the tax of one-half of one per centum as hereinbefore allowed to be levied and collected, such special tax to be applied exclusively to the payment of interest on bonds of said cities of Birmingham, Huntsville, and Bessemer, and town of Andalusia, respectively, heretofore issued in pursuance of law, or now authorized by law to be issued and for a sinking fund to pay off said bonds at the maturity thereof; and, provided further, that this section shall not apply to the city of Montgomery, which city shall have the right to levy and collect a tax of not exceeding one-half of one per centum per annum upon the value of the taxable property therein, as fixed for state taxation, for general purposes, and an additional tax of not exceeding three-fourths of one per centum per annum upon the value of the property therein, as fixed for state taxation, to be devoted exclusively to the payment of its public debt, interest thereon, and renewals thereof, and to the maintenance of its public schools, and public conveniences; and, provided further, that this section shall not apply to Troy, Attalla, Gadsden, Woodlawn, Brewton, Pratt City, Ensley, Wylam, and Avondale, which cities and towns may from and after the ratification of this Constitution, levy and collect an additional tax of not exceeding one-half of one per centum; and, provided further, that this section shall not apply to the cities of Decatur, New Decatur, and Cullman, which cities may from and after the ratification of this Constitution, levy and collect an additional tax of not exceeding three-tenths of one per centum per annum; such special tax of said city of Decatur to be applied exclusively for the public schools, public school buildings, and public improvements; and such special tax of New Decatur and Cullman to be applied exclusively for educational purposes, and to be expended under their respective boards of public school trustees; but this additional tax shall not be levied by Troy, Attalla, Gadsden, Woodlawn, Brewton, Pratt City, Ensley, Wylam, Avondale, Decatur, New Decatur, or Cullman unless authorized by a majority vote of the qualified electors voting at a special election held for the purpose of ascertaining whether or not said tax shall be levied; and, provided further, that the purposes for which such special tax is sought to be levied shall be stated in such election call, and, if authorized, the revenue derived from such special tax shall be used for no other purpose than that stated; and, provided further, that the additional tax authorized to be levied by the city of Troy, when so levied and collected, shall be used

801

exclusively in the payment of the bonds and interest coupons thereon, hereafter issued in the adjustment of the present bonded indebtedness of said city; and, provided further, that the additional tax authorized to be levied and collected by the city of Attalla shall, when so levied and collected, be used exclusively in the payment of bonds to the amount of not exceeding twenty-five thousand dollars and the interest coupons thereon, hereafter to be issued in the adjustment of the present indebtedness of said city; provided further that the governing boards of said cities, which are authorized to levy an additional tax after the holding of an election as aforesaid, are hereby authorized to provide by ordinance the necessary machinery for the holding of said election and declaring the result thereof.

# APPENDIX I-3

### Alabama Constitution art. XI, § 217 (1901),
### *amended by* amend. 325 (*ratified* June 8, 1972)

(a)   All taxable property within this state, not exempt by law, shall be divided into the following classes for the purposes of ad valorem taxation:

| | |
|---|---|
| Class I. | All property of utilities used in the business of such utilities, |
| Class II. | All property not otherwise classified, |
| Class III. | All agricultural, forest and residential property. |

(b)  With respect to ad valorem taxes levied by the state, all taxable property shall be forever taxed at the same rate, and such property shall be assessed for ad valorem tax purposes according to the classes thereof as herein defined at the following ratios of assessed value to the fair and reasonable market value of such property:

| | |
|---|---|
| Class I. | 30 per centum |
| Class II. | 25 per centum |
| Class III. | 15 per centum |

(c)   With respect to ad valorem taxes levied by counties, municipalities or other taxing authority, all taxable property shall be forever taxed at the same rate, and such property shall be assessed for ad valorem tax purposes according to the classes of property defined in paragraph (a) herein and at the same ratios of assessed value to the fair and reasonable market value thereof as fixed in paragraph (b) herein, provided, however, that the legislature may vary the ratio of assessed value to the fair and reasonable market value as to any class of property as defined in paragraph (b) herein, and provided, further, that the legislature may fix a uniform ratio of assessment of all property within a county defined in paragraph (a) herein as Class II and III and may fix a different ratio of assessment for property defined in paragraph (a) as Class I.  Such ratios as herein authorized may vary among counties so long as each such ratio is uniform within a county.

No class of property shall have a ratio of assessed value to fair and reasonable market value of less than 15 per centum nor more than 35 per centum.

(d)  A county, municipality, or other taxing authority may decrease any ad valorem tax rate at any time, provided such decrease shall not jeopardize the payment of any bonded indebtedness secured by such tax.  When the tax assessor of each county shall complete the assembly of the assessment book for his county for the ad valorem tax year immediately following the adoption of this amendment and the computation of ad valorem taxes that will be paid upon such assessment, he shall certify to each authority within his county that levies an ad valorem tax the amount of ad valorem tax that will be produced by every levy in that year but excluding for this purpose any assessment of property added to the tax rolls of such county for the tax year in which such certification is made that

was not included on the tax rolls for the next preceding year.  If it shall appear that the estimated ad valorem tax receipts from any levy so estimated shall be less than the receipts from the same levy during the next preceding ad valorem tax year, then the levying authority shall increase each tax rate by such millage as is necessary to produce revenue that is not less than and that is substantially equal to that received during such immediately preceding tax year.  It is further provided that any and all millage adjustments shall be made in increments of not less than ½ mill.  The adjustment herein required shall be made only one time and shall be made in the ad valorem tax year immediately following the adoption of this amendment.

(e)  Any county, municipality, or other taxing authority may increase the rate at which ad valorem taxes are levied above the limit now provided in the Constitution provided that the proposed increase shall have been (1) proposed by the authority having power to levy the tax after a public hearing on such proposal, (2) thereafter approved by an act of the legislature, and (3) subsequently approved by a majority vote of the qualified electors of the area in which the tax is to be levied or increased who vote on the proposal.

(f)  The legislature is authorized to enact legislation to implement the provisions of this amendment, and may provide for exemptions from taxation; provided, however, that any statutory exemption existing prior to the adoption of this amendment shall not be repealed, except by subsequent legislative act, and shall remain in full force and effect.

(g)  Wherever any constitutional provision or statute provides for, limits or measures the power or authority of any county, municipality or other taxing authority to levy taxes, borrow money, or incur indebtedness in relation to the assessment of property therein for state taxes or for state and county taxes such provision shall mean as assessed for county or municipal taxes as the case may be.

(h)  Any provision of the Constitution of Alabama to the contrary notwithstanding, ad valorem taxes shall never exceed 1½ % of the fair and reasonable market value of the property in any one taxable year.

(i)  The following property shall be exempt from all ad valorem taxation:  the real and personal property of the state, counties and municipalities and property devoted exclusively to religious, educational or charitable purposes.

# APPENDIX I-4

**Alabama Constitution art. XI, § 217 (1901),**
*amended by* **amend. 325 (*ratified* June 8, 1972),**
*further amended by* **amend. 373 (*ratified* Nov. 20, 1978)**

(a) On and after October 1, 1978, all taxable property within this state, not exempt by law, shall be divided into the following classes for the purposes of ad valorem taxation:

|  |  |
|---|---|
| Class I. | All property of utilities used in the business of such utilities. |
| Class II. | All property not otherwise classified. |
| Class III. | All agricultural, forest and single-family owner-occupied residential property, and historic buildings and sites. |
| Class IV. | All private passenger automobiles and motor trucks of the type commonly known as "pickups" or "pickup trucks" owned and operated by an individual for personal or private use and not for hire, rent or compensation. |

(b) With respect to ad valorem taxes levied by the state, all taxable property shall be forever taxed at the same rate. On and after October 1, 1978, such property shall be assessed for ad valorem tax purposes according to the classes thereof as herein defined at the following ratios of assessed value to the fair and reasonable market value (except as otherwise provided in subsection (j) hereof) of such property:

|  |  |
|---|---|
| Class I. | 30 per centum. |
| Class II. | 20 per centum. |
| Class III. | 10 per centum. |
| Class IV. | 15 per centum. |

(c) With respect to ad valorem taxes levied by counties, municipalities or other taxing authorities, all taxable property shall be forever taxed at the same rate. On and after October 1, 1978, such property shall be assessed for ad valorem tax purposes according to the classes of property defined in subsection (a) hereof and at the same ratios of assessed value to the fair and reasonable market value thereof as fixed in subsection (b) hereof, except as otherwise provided in subsection (j) hereof and this subsection (such ratios being herein called "assessment ratios"). In connection with the ad valorem taxes that a county, municipality or other taxing authority is authorized or required to levy and collect pursuant to any provision of this Constitution, for the ad valorem tax year beginning October 1, 1978, any such taxing authority may, subject to criteria established by act of the legislature, by resolution of the governing body of that taxing authority, at any time not later than September 30, 1979, increase or decrease the assessment ratio applicable to any class of taxable property, such increase or decrease to be effective for ad valorem tax years beginning on and after October 1, 1978. If (1) a county, municipality or other taxing authority adjusts an assessment ratio pursuant to the preceding sentence and (2) the receipts from all ad valorem taxes levied by or with respect to such taxing authority during the ad valorem tax year beginning October 1, 1978, exceed

805

by more than five percent, or are less than 95 percent of, the receipts from such ad valorem taxes for the ad valorem tax year beginning October 1, 1977, then at any time not later than September 30, 1980, for ad valorem tax years beginning on and after October 1, 1979, the taxing authority may, subject to criteria established by act of the legislature, by resolution of the governing body of that taxing authority, adjust any assessment ratio applicable to any class of taxable property.  On and after October 1, 1979, the governing body of any county, municipality or other taxing authority may, subject to criteria established by act of the legislature, at any time increase or decrease the assessment ratio applicable to any class of taxable property; provided, that any proposed adjustment to an assessment ratio to be made pursuant to this sentence, whether an increase or a decrease, shall have been (1) proposed by the governing body of the taxing authority after a public hearing on such proposal, (2) thereafter approved by an act of the legislature, and (3) subsequently approved by a majority vote of the qualified electors residing in the taxing authority who vote on the proposal at a special election called and held in accordance with the law governing special elections.  No decrease in an assessment ratio pursuant to this subsection (c) shall be permitted with respect to either of the ad valorem tax years beginning October 1, 1978, and October 1, 1979, if such county, municipality or other taxing authority has increased any millage rate under subsection (e) of this section with respect to such ad valorem tax year.  The legislature shall enact general laws applicable to all counties, municipalities and other taxing authorities regulating and establishing criteria for the exercise of the powers granted such taxing authorities to adjust assessment ratios as hereinabove provided.  Such assessment ratios as herein authorized may vary among taxing authorities so long as each such assessment ratio is uniform within a taxing authority.  Any decrease in any assessment ratio pursuant to this subsection shall not jeopardize the payment of any bonded indebtedness secured by any tax levied by the taxing authority decreasing the assessment ratio.  Any action authorized by this subsection to be taken by a taxing authority, or the governing body thereof, shall, other than in the case of a municipality, be taken by resolution of the governing body of the county in which such taxing authority is located acting on behalf of such taxing authority.

(d) With respect to ad valorem taxes levied by the state or by any county, municipality or other taxing authority, no class of taxable property shall have an assessment ratio of less than five per centum nor more than 35 per centum.

(e) A county, municipality or other taxing authority may decrease any ad valorem tax rate at any time, provided such decrease shall not jeopardize the payment of any bonded indebtedness secured by such tax.  For the ad valorem tax year beginning October 1, 1978, when the tax assessor of each county shall complete the assembly of the assessment book for his county for that ad valorem tax year and the computation of ad valorem taxes that will be paid upon such assessment, he shall certify to each authority within his county that levies an ad valorem tax the amount of ad valorem tax that will be produced by every levy in that ad valorem tax year but excluding for this purpose any assessment of new taxable property not previously subject to taxation (except "escaped" property as defined by law) added to the tax rolls of such county for the ad valorem tax year in which such certification is made that was not included on the tax rolls for the next preceding ad valorem tax year.  Any county, municipality or other taxing authority, at any time not later than September 30, 1979, may increase the rate at which any ad valorem tax is levied by or with respect to that taxing authority

806

above the limit otherwise provided in this Constitution, provided that the amount of the above-described certification of the anticipated tax receipts with respect to such tax is less than 120 percent of the actual receipts from such tax for the ad valorem tax year beginning October 1, 1977, such increase to be effective for ad valorem tax years beginning on and after October 1, 1978; provided, that any such millage increase shall not exceed in mills the total of (I) the number of additional mills that is necessary, when added to the millage rate imposed with respect to such tax on each dollar of taxable property situated in the taxing authority for the ad valorem tax year beginning October 1, 1977, to produce revenue that is not less than and that is substantially equal to that received by the taxing authority with respect to such tax during such immediately preceding ad valorem tax year, plus (ii) a number of additional mills equal to 20 percent of the total mills imposed by that taxing authority with respect to such tax on each dollar of taxable property situated in the taxing authority for the ad valorem tax year beginning October 1, 1977. If, for the ad valorem tax year beginning October 1, 1978, the receipts from any ad valorem tax with respect to which any millage rate has been increased pursuant to the immediately preceding sentence are less than 95 percent of the receipts from such ad valorem tax for the ad valorem tax year beginning October 1, 1977, then at any time not later than September 30, 1980, the taxing authority may increase any millage rate with respect to such ad valorem tax in the manner provided in the immediately preceding sentence, such increase to be effective for ad valorem tax years beginning on and after October 1, 1979. It is further provided that all millage adjustments shall be made in increments of not less than one tenth (1/10) mill.

(f) On and after October 1, 1979, any county, municipality or other taxing authority may at any time increase the rate at which any ad valorem tax is levied above the limit otherwise provided in this Constitution; provided, that the proposed increase to be made pursuant to this subsection shall have been (1) proposed by the governing body of the taxing authority after a public hearing on such proposal, (2) thereafter approved by an act of the legislature, and (3) subsequently approved by a majority vote of the qualified electors residing in the taxing authority who vote on the proposal at a special election called and held in accordance with the law governing special elections. Any adjustments or other actions authorized to be made or taken pursuant to this subsection and subsection (e) hereof shall be made or taken by resolution of the governing body of such taxing authority, or if there is no such governing body and in the case of a taxing authority other than a municipality, by resolution of the governing body of the county in which such taxing authority is located acting on behalf of such taxing authority. The provisions of subsections (c), (e) and (f) of this section shall not apply to ad valorem taxes levied by the state.

(g) The legislature is authorized to enact legislation to implement the provisions of this section and may provide for exemptions from taxation; provided, that unless otherwise expressly provided, no amendment to this section shall be construed to repeal any statutory exemption existing on the effective date of any such amendment hereto.

(h) Wherever any constitutional provision or statute provides for, limits or measures the power or authority of any county, municipality or other taxing authority to levy taxes, borrow money or incur indebtedness in relation to the assessment of property therein for state taxes or for state and county

807

taxes, such provision shall mean as assessed for county or municipal taxes, as the case may be.

(i) Except as otherwise provided in this Constitution, including any amendment thereto whenever adopted with respect to taxable property located in the city of Mountain Brook, the city of Vestavia Hills, or the city of Huntsville, the amount of ad valorem taxes payable to the state and to all counties, municipalities and other taxing authorities with respect to any item of taxable property described as Class I property shall never exceed 2 percent of the fair and reasonable market value of such taxable property in any one ad valorem tax year, such amount with respect to any item of Class II property shall never exceed 1 ½ percent of the fair and reasonable market value of such taxable property in any one ad valorem tax year, such amount with respect to any item of Class IV property shall never exceed 1 1/4 percent of the fair and reasonable market value fo such taxable property in any one ad valorem tax year, and such amount with respect to any item of Class III property shall never exceed 1 percent of the fair and reasonable market value of such taxable property in any one ad valorem tax year.  Whenever the total amount of ad valorem property taxes otherwise payable by any taxpayer with respect to any item of taxable property shall exceed in any one ad valorem tax year the maximum amount of such taxes permitted by this section, such amount of taxes shall be reduced by subtracting that amount of tax due that is in excess of the amount of tax otherwise permissible under the constitution.  In connection with the taxation of any item of taxable property, the amount of tax to be subtracted with respected to each authority levying and collecting any ad valorem property tax shall be in the same proportion to the total amount of tax to be subtracted that the total number of mills on each dollar of taxable property situated in the taxing authority levied by such taxing authority bears to the total number of mills on each dollar of taxable property situated in the taxing authority levied by all taxing authorities with respect to such item of taxable property.  Before sending to any taxpayer any notice relating to the collection of ad valorem taxes, the tax collector in each county shall determine whether any portion of the amount of ad valorem property tax otherwise due with respect to any item of taxable property shall be subtracted pursuant to the provisions of this subsection and shall apportion the amount to be subtracted in accordance with the provisions of this subsection.

(j) Notwithstanding any other provision of this section, on and after October 1, 1978, taxable property defined in subsection (a) hereof as Class III property shall, upon application by the owner of such property, be assessed at the ratio of assessed value to the current use value of such taxable property and not the fair and reasonable market value of such property.  The legislature may enact laws uniformly applicable to the state and all counties, municipalities and other taxing authorities establishing criteria and procedures for the determination fo the current use value of any eligible taxable property and procedures for qualifying such property for assessment at its current use value. The legislature may also enact laws uniformly applicable to the state and all counties, municipalities and other taxing authorities providing for the ad valorem taxation of any taxable property ceasing to qualify for current use valuation; provided, however, that any additional tax on taxable property ceasing to qualify for current use valuation shall not apply to more than the three ad valorem tax years immediately preceding such cessation of qualification (including as one such year the year in which cessation of qualification occurs).

(k) The following property shall be exempt from all ad valorem taxation: the real and personal property of the state, counties and municipalities and property devoted exclusively to religious, educational or charitable purposes, household and kitchen furniture, all farm tractors, all farming implements when used exclusively in connection with agricultural property and all stocks of goods, wares and merchandise.

(*l*) Not withstanding the other provisions of this section, with respect to the costs of reappraisal incident to the state-wide reappraisal of property heretofore authorized by the legislature, each county, municipality or other taxing authority for ad valorem tax years beginning on and after October 1, 1978, may impose and levy an additional ad valorem tax of not more than two mills on all taxable property located in the taxing authority in order to reimburse itself for its payment of such costs of reappraisal or to pay any unpaid costs or its pro rata share of such unpaid costs of reappraisal. The taxes provided for in this subsection, or any pro rata part thereof, shall terminate at the end of the ad valorem tax year in which sufficient funds are received from the taxes to pay in full the said reappraisal costs and any receipts from such taxes that are received during the ad valorem tax year of their termination that are not needed for the purposes specified herein may be used by the taxing authority levying the tax for general purposes of the taxing authority.  The taxes authorized in this subsection shall not exceed in the aggregate, with respect to any item of taxable property located in the taxing authority, a total of two mills for all such taxes levied by all taxing authorities in a county and not two mills for each taxing authority in a county.  If more than one such taxing authority in a county has paid or owes all or a portion of its reappraisal costs, such two mills shall be prorated among such taxing authorities in the county as they may agree, or if they cannot agree, in the percentage which each such taxing authority's costs of reappraisal bear to the total costs of reappraisal of all taxing authorities in the county.  The provisions of this subsection shall apply only to the costs incurred by a taxing authority incident to the state-wide reappraisal of property heretofore authorized by the legislature, the amount of which costs shall be certified by the department of revenue, and shall not be applicable to any future reappraisals that may be required by law.

(m) If any portion of this section should be declared invalid by any court of competent jurisdiction, such invalidity shall not affect the validity of any of the remaining portions of this section, which shall continue effective.

809

# APPENDIX I-5

**Alabama Constitution art. XIV, § 260 (1901),**
***amended by* amend. 111 (*ratified* Sept. 7, 1956)**

The income arising from the sixteenth section trust fund, the surplus revenue fund, until it is called for by the United States government, and the funds enumerated in sections 257 and 258 of this Constitution, together with a special annual tax of thirty cents on each one hundred dollars of taxable property in this state, which the legislature shall levy, shall be applied to the support and furtherance of education, and it shall be the duty of the legislature to increase the educational fund from time to time as the necessity therefor and the condition of the treasury and the resources of the state may justify; provided, that nothing herein contained shall be so construed as to authorize the legislature to levy in any one year a greater rate of state taxation for all purposes, including schools, than sixty-five cents on each one hundred dollars' worth of taxable property; and provided further, that nothing herein contained shall prevent the legislature from first providing for the payment of the bonded indebtedness of the state and interest thereon out of all the revenue of the state.

Except as they may be specifically set aside in trust funds or otherwise applied to the payment of indebtedness, all proceeds of income or other taxes levied by the state, and of all special ad valorem or other taxes levied by counties and other municipalities, or school districts, pursuant to the Constitution as heretofore amended, for public school purposes, shall be applied to the support and furtherance of education pursuant to section 256 of the Constitution, as amended.

# APPENDIX II-1

**Alabama Constitution art. XIV, § 269 (1901),**
*amended by* **amend. 111 (***ratified* **Sept**. **7, 1956)**

The several counties in this state shall have power to levy and collect a special tax not exceeding ten cents on each one hundred dollars of taxable property in such counties, for the support and furtherance of education in such manner as may be authorized by the legislature; provided, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, state and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads, bridges, and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.

# APPENDIX II-2

**Facsimile of the Slip Opinion Entered in**
***Hornbeak v. Rabren*, No. 2877-N (M.D. Ala. Oct. 29, 1969)**
(The original opinion was typed on legal-size paper:  hence, the difference in pagination.)

```
IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
        DISTRICT OF ALABAMA, NORTHERN DIVISION

MARTHA A. HORNBEAK, ET AL.,      )
                                 )
             Plaintiffs,         )
                                 )
        vs.                      )    CIVIL ACTION NO. 2877-N
                                 )
HARVEY L. RABREN, Commissioner   )
of Revenue for the State of      )
Alabama, and his successors in   )
office,                          )
                                 )
             Defendant.          )
```

<u>O R D E R</u>

Plaintiffs bring this civil action in their own behalf and in behalf of all other citizens and taxpayers in the State of Alabama similarly situated.  The defendant is the Commissioner of Revenue for the State of Alabama.  Plaintiffs allege nonfeasance on the part of the defendant and his predecessors in office in failing to comply with their statutory duties imposed by Title 51, Sections 131 and 133, Code of Alabama 1940, Recompiled 1958, and for violating Section 211, Constitution of Alabama 1901.  Plaintiffs allege that the Commissioner's failure to comply with requirements of and his violations of Alabama law deprives them of due process and the equal protection of the law under the Fourteenth Amendment to the Constitution of the United States.

The plaintiffs are citizens of the United States and the State of Alabama and reside in various counties in the State of Alabama. The plaintiffs generally comprise three separate groups; each,

812

however, contends that the defendant and his predecessors in office have failed and continue to fail to assess the taxable property in the State of Alabama as required by the law, that is, that the assessments of property in the state shall be made in exact proportion to the fair and reasonable market value thereof, and that the defendant has the power and the duty to equalize the assessment of the property subject to taxation.  The first group of plaintiffs are adults owning real estate in various counties in which their property is assessed at 15 to 30 percent of its fair and reasonable market value.   The second group of plaintiffs are corporations owning real property in Jefferson County, [**page 2** ➡] Alabama; they allege that their property is assessed for purposes of ad valorem taxation at 30 percent of its fair and reasonable market value. Both groups contend that the failure of the defendant and his predecessors in office properly to perform the duties imposed in the equalization and assessment of property taxes has resulted in vast disparity and inequality.  These two groups of plaintiffs say that they and other taxpayers within the state who are similarly situated are thus being deprived of property in the form of ad valorem taxes without due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States.   The third group of plaintiffs are minors attending the public schools of the State of Alabama and sue through their parents or next friends.   Each of these minor-plaintiffs brings this action for himself and others similarly situated.  They contend that the systematic refusal of the defendant to perform his duties as required by the law deprives the school district in which they attend school of monies due for the purpose of the education of these plaintiffs and others similarly situated, thus depriving them of the equal protection of the law under the Fourteenth Amendment to the Constitution of the United States.

   The defendant moves to dismiss the complaint and assigns as

grounds therefor failure of plaintiffs to state a claim upon which relief can be granted and lack of jurisdiction in this Court to hear and determine the issues.

Plaintiffs allege jurisdiction under 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. § 1343(3) and 28 U.S.C. § 1331(a). Initially, it should be noted that §§ 1983 and 1988 are not jurisdictional statutes. They create substantive rights which can be enforced only in a court on which jurisdiction has been conferred by another statute. Haque v. C.I.O, 307 U.S. 496 (1937); Hornbeak v. Hamm, Comm'r of Revenue, 283 F.Supp. 549 (M.D. Ala.), aff'd 393 U.S. 9 (1968) (per curiam). Section 1343(3) does confer jurisdiction in a civil action where the proper allegations are stated and claims are made designed to redress the deprivation under color of state law of personal rights secured by the Constitution of the United States. Thus, we find that the group of plaintiffs who are minors, attending the public schools in Alabama, do state an equal protection claim within the meaning of 42 U.S.C. § 1343(3), in alleging that the refusal of the defendant equally to assess [**page 3** ➡] real property deprives them of monies to which they and their school districts are entitled. Where the state undertakes to operate a public school system, it violates the Equal Protection Clause of the Fourteenth Amendment if it differentiates among those meeting the required qualifications for use of the system on grounds not based on rational classifications. Furthermore, since the right to a non-discriminatory enjoyment of the public school system is incapable of pecuniary valuation, federal district courts have jurisdiction to hear such claims without regard to the amount in controversy. Gomillion v. Lightfoot, 364 U.S. 339 (1960); McGowan v. Maryland, 366 U.S. 420 (1961); Baker v. Carr, 369 U.S. 186 (1962); Lee v. Macon County Board of Education, 221 F.Supp. 297, 298 (M.D.Ala. 1963); Griffin v. County School Board of Prince Edward County, 377 U.S. 218 (1964); McInnis v. Shapiro, 293 F.Supp. 327,

814

329 (N.D.ILL. 1968), aff'd sub nom McInnis v. Ogilvie, 394 U.S. 322
(1969).

The group of plaintiffs comprised of adult taxpayers who own
real estate in various counties throughout the state allege that
unequal assessment deprives them of property without due process.
This is a property right claim capable of a pecuniary valuation and
the federal district courts do not have jurisdiction of such claims
under 42 U.S.C. § 1343(3).  Hornbeak v. Hamm, supra.  Nor does this
Court have jurisdiction over the claim this group of plaintiffs seek
to present under 42 U.S.C. § 1331, since their claims do not exceed
$10,000.  None of the individual taxpayer-plaintiffs allege an
amount in excess of $10,000.  The individual claims cannot be
aggregated in a class action to confer jurisdiction.  Brown v.
Trousdale, 138 U.S. 389 (1891); Snyder v. Harris, 394 U.S. 332
(1969).

The last group of plaintiffs are corporations located in
Jefferson County, Alabama, and own real property in that county.
They and the assessed value of their property are:

| Corporate Plaintiff | Assessed Value of Property |
|---|---|
| Ken Realty | $237,000 |
| Vulcan Realty and Investment Corporation, Inc. | $416,170 |
| Booker T. Washington Insurance Company, Inc. | $360,655 |

These plaintiffs allege that Vulcan Realty and Investment
Corporation and Booker T. Washington Insurance Company each pay ad
valorem taxes in excess of $10,000.  Moreover, the difference
between what each of these plaintiffs presently pays in taxes and
what each of them would pay if its real property [page 4 ➡] were
assessed at the rate used in Madison County, Alabama (Madison County

815

assesses at 4.2%) exceeds $10.000.  Accordingly, this Court has jurisdiction as to the claims made by these two corporate plaintiffs.

Defendant also contends as a ground for dismissal that the plaintiffs' action is barred by the Tax Injunction Act of 1937, 28 U.S.C. § 1341.  This statute reads:

§1341.  Taxes by States

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under any State law where a plain, speedy and efficient remedy may be had in the courts of such State.

The allegations of the complaint amply demonstrate that there is no plain, speedy and efficient remedy available to the taxpayers and the minor plaintiffs.

Accordingly, and for the reasons herein state, it is ORDERED that defendant's motion to dismiss the claims of the individual taxpayer-plaintiffs and the class they represent be and the same is hereby granted.

It is further ORDERED that the claim made by and on behalf of Ken Realty Company be and the same is hereby dismissed.

As to the claims advanced by the remaining plaintiffs, it is ORDERED that the motion to dismiss be and the same is hereby denied.

Done, this the 29th day of October, 1969.


/s/ John C. Godbold
_____
UNITED STATES CIRCUIT JUDGE

/s/ H. H. Grooms
_____
UNITED STATES DISTRICT JUDGE

/s/ Frank M. Johnson, Jr.
_____
UNITED STATES DISTRICT JUDGE

816

# APPENDIX III-1

## Petition of Dr. Booker T. Washington, Ph.D.
## Tuskegee, Alabama

Dr. Booker T. Washington, the President of Tuskeegee Institute, presented the following petition on behalf of a committee "representing the feelings and wishes of the colored people of the State of Alabama":

To the Members of the Constitutional Convention:

Since it is true that our race numbers in this state about 800,000 and there is no member of the[ ]race a member of your body, who can speak directly for us in an official capacity, we do not think that you will misunderstand the object and spirit of this communication, for it is not sent to you in a dictatorial,[ ]fault-finding spirit, but with an earnest desire to be of some assistance in the performance of a grave and perplexing task.  We make ourselves all the more bold to send you this communication because members of your body in nearly every part of the state have expressed a desire to hear from us.

It could not be expected that the 800,000 colored people in this state would not have some interest in the deliberations of a body that is to frame the fundamental law under which both races are to be governed in this state, perhaps for all future time.

Your petitioners are not stirrers up of strife between the races, but we feel that the questions with which you are to deal are above and beyond party politics. Each of us, in[ ]some calling, is a hard working, taxpaying, and we trust, law[-]abiding citizen, and we believe that we represent in a large measure the feelings and desires of the masses of our people in the state.

We beg to your honorable body to keep in mind in dealing with the problems that grow out of our presence that, as a race, we did not force ourselves upon you, but were brought here in most cases against our will; but nevertheless, we recognize that since being here, we have been vastly benefitted.  We have gotten habits of industry, the English language, and the Christian religion, and at the same time, we have tried in an humble way, to render valuable service to the white men in clearing the forests, building the railroads, cultivating the lands, working the mines, as well as in many forms of domestic service and in other activities.  Our fathers and mothers have helped nurse you and your children, and when the male members of the family were away from home fighting in war that might have meant our continued enslavement, we remained at home, working your farms, supporting and protecting your helpless wives and daughters. When we have been called to perform any duty of citizenship, whether fighting a foreign foe, working the public roads, or any other duty, we have tried to do our best.

We beg of you to bear in mind that for more than twenty years the Negro in this State has not,

as a rule, been a disturbing or offensive element. Immediately after the war, we made mistakes just as would have been true of any people placed in the same position, but we have learned our lesson from those mistakes and they are not likely to be repeated.

The changes wrought by time and the Providence of God, it seems to us, place your body in a particularly responsible position. You assemble at a time when your actions will not be directed or restricted by any pressure from the Federal government or elsewhere. The North is almost unanimous in its agreement that the future of the Negro in a large degree rests with the South. Almost for the first time since freedom came to us, a law-making body assembles in the South, bearing the supreme law-making power of the state, and is left free to act entirely untrammeled by outside influences. Almost for the first time, the Negro is to rest his future in a large degree upon the conscience and intelligence of a great law-making body of a great Southern state. You have the power.  The world will watch while you act.

It requires little thought, effort or strength to degrade and pull down a weak race, but it is a sign of great statesmanship to encourage and lift up a weak and unfortunate race. Destruction is easy; construction is difficult.

There are those among your petitioners who have persistently urged the Negro to learn to trust his future with his Southern white neighbor and that when the supreme test came he would receive justice at his hands. This is a crucial hour for those who have thus advised our race, but we do not believe that our faith in you will be misplaced. We believe that the possession of great power will deepen your sympathy for the weak and dependent elements of our population.

It seems to us on the whole, that the relations of the two races in this state are reasonably satisfactory, and we tremble and fear lest something will be done to disturb these relations and to bring discouragement and demoralization to our race.

Of the greatest importance is the economic consideration. The greater portion of our people are settled upon the plantations in the cotton raising districts, while a large number of others is in the mining districts. These people are occupying and cultivating land that is largely owned by white people or operating other industries owned by white people. Still others are buying homes and thereby contributing to the welfare of the state. In most cases, they are a contented, producing, law-abiding people. Already, alarm is beginning to spread among them and their fears are being worked upon by emigration agents and exodus associations who are telling them that under the new constitution the Negro's citizenship will be taken from him and that his schools will be virtually blotted out. These agencies expect in one way or another to reap gain by reason of something that you will do in your Convention.

Anything that will unsettle and cause excitement of people at the present time when, more than ever, in all parts of the state, the race is beginning to improve, to settle down to habits of thrift, economy and common sense, will not only prove injurious to our race, but to yours also. The history of all races proves that a contented intelligent friendly working class is the greatest possession of any state.

The Negro youth must have some incentive for right and useful living held out to him. Let the Negro youth feel that no matter how intelligent or useful he makes himself, that there is no hope of reward held out before him, and there will be danger that he will become a beast, revelling in crime and a body of death about the neck of the state. In a thousand ways, the ignorant, shiftless, criminal Negro will retard the progress of the white race.

The Negro is not seeking to rule the white man. In this state the Negro holds not a single elective office. Whenever he votes, he usually votes for some white man and is learning more and more to vote for the best white man. There is in the last analysis a feeling of tenderness, good will and sympathy existing between the two races in this State, which the outside world can hardly understand or appreciate. We pray that this relation may not be disturbed.

The Negro does ask, however, that since he is taxed, works the roads, is punished for crime, is called upon to defend his country, that he have some humble share in choosing those who shall rule over him, especially when he has proven his worthiness by becoming a taxpayer and a worthy reliable citizen. While the amount of direct taxes paid by the Negro is small, all will acknowledge that he is a large factor in enabling some one else to pay taxes for the Negro who rents a farm or a house not only pays the rent, but indirectly, the taxes also.

We rejoice in that we have reached a period in our development, when we can speak in frank but friendly terms of the objects of your convention, the chief aim of which is, we trust, the wise and just government of all the people of Alabama. In this high purpose, your petitioners agree and sympathize with you. We are all owners of property and tax payers and have the same interest in good government that you have. We know that the task before you is a delicate, trying and perplexing one. In this connection, we desire to add that, in our humble opinion, while there may be doubt and uncertainty in many directions, one thing is absolutely and unmistakably clear, — that nothing that is not absolutely just and fair, will be permanently successful.

Any law which will merely change the name and form of fraud, or can be interpreted as meaning one thing when applied to one race and something else when applied to another race, will not in our opinion improve our present condition, but may unsettle the peace and thrift of our people and decrease the wealth and prosperity of Alabama.

While you deliberate and act, be assured that you will have the prayers and good wishes of thousands of black people in every part of our state.

# APPENDIX III-2

### Petition of Dr. Willis E. Sterrs, M.D.
### Decatur, Alabama[1959]

Mr. President and Members of the Alabama Constitutional Convention:

Realizing the fact that no member of the negro race is represented in your august body to speak one word for us, we must appeal to you in this manner.  Being Southern born, of ex-slaves, Southern raised, within the city where you are now in session, and having spent my energies among my people in this State for thirty years, I represent the product of Alabama negro manhood.  I speak the sentiments of thousands of my race whose timidity locks their mouths.

We have made many errors since emancipation.  We were weaker than now, and prone to mistakes.  But, gentlemen, could you have looked for perfection in a race of ignorant liberated people?  No matter how ignorant we were thirty years ago, and no matter how intelligent we become one hundred years from now, yet the fact remains the same — that then, now and henceforth we realize that the negro's best friend is the Southern white man.  You have proven your genuine friendship to us all along.  You have given us work at any trade at which we were proficient.  You have given us good schools, gone into your own pockets to educate us.  You have given us counsel when we were in need of advice, for all of which we are grateful, and we hope we have proven the same to you.  Do not expect more of us than of any other race at the same stage of development.  We know that the salvation of the negro is in your hands.  You can make us industrious, contented, loyal and useful citizens, or you can make us shiftless, discontented and good for nothing.  You are framing a constitution for future government of generations of negroes of Alabama, as well as of other races.  We are interested, because we are lawabiding and must live up to your new constitution or get out.  Say to us, forsooth, that you are black, that your hair is kinky, or features Hamitic, or say that, forsooth, some negro blood is in your veins, you cannot enjoy the franchise in Alabama, and you at once relegate us to the ranks of a brute.  We would have not one incentive to go forward.  You would cripple an already weak race.

We are among you, and satisfied.  It was not of our own free will that we are here.  Like other nations of the far East, we did not migrate here and force ourselves upon you.  Had we done so it might be fair and conservative that you say to us "Get out," or drive us out by discriminative methods that were basely unjust.  But, gentlemen, we were snatched from our motherland, heathens.  By the providence of God we were brought here, and for three hundred years toiled for you as your slaves.

American slavery, though wrong, was a blessing to us. In its school of three hundred years we learned trades, language, customs and the religion of Jesus Christ.  There is a just God who guards the destiny of nations and in His own time slavery was abolished and we were left among you

---

[1959]    Official   Proceedings   of   the   1901   Constitutional   Convention   (1901), http://www.legislature.state.al.us/misc/history/constitutions/1901/proceedings/1901_proceedings _vol1/1901.html, at 652-54.

ignorant of franchise and government with no education or character.

Be conservative to us, gentlemen.  Do not deal a crushing blow. A blow from you at this critical moment — with no flag except the glorious Stars and Stripes for which we have bled and died; no friend except you, whose fathers and mothers we have guarded from harm, and you yourself whom we have cherished and cared for while the Southern man fought for a Lost Cause — would be as Brutus's dagger of steel warming its blade in the-life blood of Caesar.  The tickle of our hoe has made your hands laugh forth in harvest. Our axe has cleared your forests. We have built your cities. Our picks have sunk down into the bowels of the earth and thrown up iron and coal.  We emerged from slavery and went at once to work at whatever price you valued our labor.  We do not cause any organic disturbance by strikes.  We are striving to fit ourselves for citizenship.  We petition and implore you to not disturb our content by an unjust franchise.  If you place an educational qualification that touches all alike, we are satisfied.  In short, we, though only thirty-five years old, are willing to be weighed in the scale of manhood and measured with a tape of justice.

Alabama, one of the greatest States of the Union; one upon whom the eyes of the world are turned at present, a State whose alphabetical arrangement stands first of the States of the greatest country of God's creation (a country upon whose territory the sun never sets), can not afford to disfranchise several hundred thousand of its citizens; can not afford to remove the public educational fund from them.  An educated dog is worth a hundred good-for-nothing curs.  We do not demand anything of you.  We can not demand if we would.  We simply entreat you as honest citizens to frame a Constitution that will not disgrace the wisdom of Alabama; that will not cause us to degenerate; that will not cause us discontent; that will not cause us to doubt your friendship which we have cherished for nearly four hundred years.  Frame a constitution that will be a pride of the State — one that we will be proud of, as well as you; one that will benefit both races. Frame a constitution that will place you at the head of the column of sister States where you belong. Do not drive us into degradation. What incentive would a $10,000,000 property qualification be to us?

Don't drive us from you; we are here and want to remain. God intended us to be here and He intends us to remain. Had it not been so we would have perished long ago. Before the onward tread of Anglo-Saxon civilization races have vanished more rapidly than extinction from shot and shell or bayonet. The New Zealander, Pacific Islander and American Indian have all gone to their grave; they were not able to withstand the environments of the Nineteenth Century civilization. No race, save the American negro, has been able to gaze into the blue eyes of the Anglo-Saxon for centuries and live. God so constructed us of better stamina. We have lived, increased and prospered. Remember, gentlemen, that might is not at all times right. Judge not the whole race by its criminals. All races have them, and the better element of us, as of you, abhor crime and do not wish to be called criminals because we have criminals in our race.

The Constitution that you frame shall live as an everlasting monument, not of stone or brass, nor Egyptian, to crumble and decay under the chemical changes of time, but shall stand out prominent above all other Alabama documents after death and the grave have claimed you. It shall live on after God has called you to rest. Inborn generations of negroes and whites shall look up to it after your flesh has been devoured by the earth-worm, your homes bleached in the tomb, and your soul given account for your earthly transit.

Whether this monument will be one of honor or disgrace to the name of our fair State, to its citizens, both black and white, and to you, will depend upon your election.

# APPENDIX IV-1

## Alabama Constitution art. XIV, § 269.08 (1901),
### *added by* amend. 778 (*ratified* Dec. 4, 2006)

(**a**) There is hereby authorized and there shall be levied and collected for general public school purposes, for the ad valorem tax year commencing October 1, 2006, and for each ad valorem tax year thereafter, in each school district of the state, in addition to all other taxes, a special ad valorem school property tax at a rate equal to the difference between ten dollars on each one thousand dollars of taxable property in such district and the sum of the rates per thousand of all the ad valorem property taxes described in Section (b) hereof otherwise levied and collected for general public school purposes in such school district and required or permitted by the terms of this amendment to be taken into account for purposes of determining the rate of said tax.  The County Commission or other like governing body of each county in the State is hereby directed to compute and determine annually the rate or rates of, and to levy and collect in and for the benefit of each school district within such county, the additional ad valorem property tax authorized hereby, in compliance with the provisions of this amendment.  The proceeds from said tax shall not, any provisions of any law or of this constitution to the contrary notwithstanding, be subject to any fees, charges or commissions for assessment or collection by any person whatever, it being the intent hereof that the full amounts of the proceeds of said tax collected shall be used for general public school purposes.

(**b**) The following described ad valorem property taxes, to the extent the use of the proceeds thereof is not lawfully restricted, earmarked or otherwise designated for a purpose or purposes more particular than general public school purposes, now or hereafter levied and collected in each school district of the State, shall be taken into account annually in determining the rate of the tax required to be levied each year pursuant to the provisions of Section (a) of this amendment:

(**1**) countywide ad valorem property taxes levied and collected for public school or educational purposes under the provisions of Section 269 of, or Amendments 3 or 202 [§§ 269.01 through 269.04] to, the Constitution of Alabama of 1901 or any amendment thereto adopted subsequent to the adoption of this amendment similarly authorizing the levy of such taxes,

(**2**) countywide ad valorem property taxes levied and collected for public school or educational purposes,

(**3**) that portion, expressed as an ad valorem tax millage rate, of any local countywide ad valorem property tax or taxes levied and collected in any county of the state for general purposes that is paid or required to be distributed to or used for the benefit of the respective public school system or systems of the county to which the school district has reference, and that is designated by official action of the taxing authority levying the same as creditable for purposes of Section (a) of this amendment, provided that any such portion of such tax once so designated may not thereafter be designated for other than general school purposes and shall be recorded as a school tax that may be levied and collected without limit as to time,

823

(**4**) school district ad valorem property taxes levied and collected under the provisions of Amendments 3 or 382 to the Constitution of 1901 [§§ 269.01 through 269.04], or the provisions of any constitutional amendment applicable only to the county (or part thereof) in which the school district is located authorizing the levy of an ad valorem property tax in the school district, and

(**5**) any ad valorem property taxes otherwise levied by and collected in any municipality of the state for public school purposes the proceeds of which are paid or required to be used for the benefit of the school system of such municipality, and that are designated by the taxing authority levying the tax as creditable for purposes of Section (a) of this amendment, provided that any such tax once so designated may not thereafter be designated for other than general school purposes and shall be recorded as a school tax that may be levied and collected without limit as to time.

(**c**) Each local taxing authority in the State levying ad valorem property taxes for public school purposes shall annually notify the Alabama Department of Revenue, the Alabama State Superintendent of Education, and the Director of Finance of all ad valorem property taxes so levied by such authority for school purposes (including the tax authorized to be levied hereby), of the authority under which such taxes were levied and collected, the provisions of any referendum at which they were approved pertaining to the rates thereof, the time they are to continue, the purposes for which they were approved, and the particular constitutional authority under which they were submitted for referendum, if applicable.

(**d**) The levy and collection of the additional ad valorem property tax authorized and required to be levied and collected pursuant to the provisions of this amendment shall not affect or reduce any authorization heretofore or hereafter otherwise existing for the levy of any school district or countywide ad valorem property tax or taxes, whether such levy is subject to approval by the qualified electors of the jurisdiction in which the tax may be levied at a referendum election or otherwise.

(**e**) The tax levied pursuant to this amendment may be pledged for payment of any debt obligations incurred for public school purposes for which any other ad valorem property tax levied in the school district in which the tax is levied is or may be pledged for repayment. No provision of this amendment shall affect or impair the validity of any pledge of any local ad valorem property tax heretofore or hereafter made for the payment of any indebtedness of any type whatever.

(**f**) Any provision of the Constitution of Alabama of 1901, as amended, to the contrary notwithstanding, all ad valorem property taxes for public school or education purposes in the state of Alabama the levy of which has been approved by a majority vote of the appropriate electorate prior to the ratification of this amendment by the qualified electors of the State, and the levy and collection of any such tax from the date of the initial levy thereof, are hereby authorized, ratified and confirmed regardless of any statutory or constitutional defects, mistakes, errors or ambiguities in the authorization or levy thereof or the election thereon, or in any act of the Legislature with respect thereto; provided, however, that the authorization, ratification and confirmation effected by this

Section (f) shall not be applicable to any tax the validity of which was being challenged in appropriate judicial proceedings in any proper court on the date of final passage of the act of the legislature pursuant to which this amendment was proposed.