# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

INDIA LYNCH, a minor who sues )
by her parent, SHAWN KING )
LYNCH, *et al.*, )
                                     )
        **Plaintiffs,** )
                                       )
**vs.** )       **Civil Action No. 08-S-450-NE**
                                       )
**THE STATE OF ALABAMA, *et al.*,** )
                                       )
        **Defendants.** )

# CORRECTED MEMORANDUM OF OPINION
### Entered November 7, 2011, *nunc pro tunc* October 21, 2011

## SUMMARY OF CONTENTS

| Topic | Page |
|---|---|
| I.  INTRODUCTION | 1 |
|     A.  THE CENTRALITY OF RACE | 5 |
|     B.  STATEMENT OF THE CASE | 15 |
|     C.  THE "BLACK BELT," "BIG MULES," AND OTHER TERMS | 45 |
| II.  PRELIMINARY CONSIDERATIONS | 97 |
|     A.  STANDING | 97 |
|     B.  TAX INJUNCTION ACT | 107 |
|     C.  COMITY | 115 |
|     D.  ELEVENTH AMENDMENT IMMUNITY | 123 |
|     E.  GENERAL OVERVIEW OF K-12 FUNDING IN ALABAMA | 139 |
|     F.  THE COMPUTATION OF PROPERTY TAXES IN ALABAMA | 177 |

G.   SUMMARY OF PREDECESSOR LITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   203

H.   CONTROLLING PRINCIPLES OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   397

III. FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   453

A.   FINDINGS OF HISTORICAL FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   453

B.   FINDINGS OF FACT RELEVANT TO AN ASSESSMENT OF DISPARATE IMPACT
ON THE BASIS OF RACE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   689

IV. CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   757

A.   DISCRIMINATORY INTENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   757

B.   DISPARATE IMPACT ON THE BASIS OF RACE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   777

C.   RATIONAL BASIS REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   787

D.   TITLE VI OF THE CIVIL RIGHTS ACT OF 1964. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   793

V.  CONCLUSIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   795

VI.  APPENDICES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   805

ACKNOWLEDGMENTS
(Page 843)

## ILLUSTRATIONS

**Alabama Counties** (Showing Dates of Creation).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *xxx*

**Traditional Counties of the Alabama Black Belt**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

**Georgia in 1825** (Depicting the Confluence of the Broad and Savannah Rivers). . . . . . . . . . . . . . . . .   56

**Plan of the Town of Petersburg, Georgia** (in the Fork of the Broad and Savannah Rivers).. . . . . . . .   60

**Route of the Federal Road Through the Alabama Territory**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

**Map of Alabama's Public School Systems**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   138

## EXPANDED TABLE OF CONTENTS

## I.  INTRODUCTION

A.  The Centrality of Race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    1.  **The Slave Experience** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    2.  **The Post-Emancipation Experience** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.  Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    1.  **The Plaintiffs and Their Contentions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        a.  **The state constitutional provisions challenged by plaintiffs** . . . . . . . . . 18

            *i*.  **Article XI, Section 214** — *limiting the State tax rate* . . . . . . . . . . . . . . . 19

            *ii*.  **Article XI, Section 215** — *limiting county tax rates* . . . . . . . . . . . . . . . 20

            *iii*.  **Article XI, Section 216** — *limiting municipal tax rates* . . . . . . . . . . . . . 21

            *iv*.  **Article XI, Section 217**, *as twice amended* . . . . . . . . . . . . . . . . . . . . . . . 21

                **(A)  Amendment 325**, *ratified in 1972* . . . . . . . . . . . . . . . . . . . . . . . . 22

                **(B)  Amendment 373**, *ratified in 1978* . . . . . . . . . . . . . . . . . . . . . . . . 23

            *v*.  **Article XIV, Section 269**, *as amended* . . . . . . . . . . . . . . . . . . . . . . . 31

        b.  **The injuries alleged by plaintiffs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        c.  **The relief sought by plaintiffs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    2.  **The Defendants and Their Contentions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

C.  The "Black Belt," "Big Mules," and Other Terms . . . . . . . . . . . . . . . . . . . . . . . . 45

    1.  **The Defining Characteristics of the "Black Belt"** . . . . . . . . . . . . . . . . . . . . 47

        a.  **The geology of the Black Belt** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        b.  **The social history of the Black Belt** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

            *i*.  **The origins of those persons who settled the region,
                and their society, education, and wealth** . . . . . . . . . . . . . . . . . . . . . . 50

*ii*. **From the Virginia Piedmont to the Broad River Valley of Georgia**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    (A) **The Virginians of the Broad River Valley**. . . . . . . . . . . . . . . . . . . . . . . 58

    (B) **The Pope, Watkins, Thompson, Bibb, and Walker families of Petersburg, Georgia, and Huntsville, Madison County, Alabama**. . . . . . . 61

*iii*. **From the Broad River Valley to the "Great Bend of the Tennessee River" in the Alabama Territory**. . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*iv*. **The Federal Road**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*v*. **The War of 1812, the Battle of Horseshoe Bend, and the Opening of East-Central Alabama**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*vi*. **From the Broad River Valley of Georgia to the Alabama Black Belt** . . . . . . . 68

*vii*. **"The Georgia Machine"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

  c. **The demographic make-up of the Black Belt**. . . . . . . . . . . . . . . . . . . . . . . . . . 75

  d. **The enduring political influence of the Black Belt**. . . . . . . . . . . . . . . . . . . . . . 78

2. **"Big Mules"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

3. **"Carpetbaggers"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

4. **"Scalawags"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

5. **"Radical Republicans"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

6. **"Conservative Democrats" and "Bourbons"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

7. **"Black Codes"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

8. **"Redeemers"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

9. **"Jim Crow laws"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

## II. PRELIMINARY CONSIDERATIONS

A. Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

B. Tax Injunction Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

C. Comity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

D.   Eleventh Amendment Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

E.   General Overview of K-12 Funding in Alabama . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

   1.   **Federal Funding Sources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

      a.   **Elementary and Secondary Education Act of 1965** . . . . . . . . . . . . . . . . . . . . . 140

      b.   **Individuals with Disabilities Education Act of 1975** . . . . . . . . . . . . . . . . . . . . 142

   2.   **State Funding Sources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

      a.   **The Education Trust Fund** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

         *i.*   **Current sources of revenue** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

      b.   **The Public School Fund** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

      c.   **Special trust funds** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

      d.   **The Foundation Program** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

   3.   **Local Funding Sources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

      a.   **1.0 mill county tax** — *Section 269* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

      b.   **3.0 mill county tax** — *Section 269.01* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

      c.   **3.0 mill school district tax** — *Section 269.02* . . . . . . . . . . . . . . . . . . . . . . . 164

      d.   **5.0 mill special county tax — *Section 269.04*** . . . . . . . . . . . . . . . . . . . . . . . 165

      e.   **3.0 mill school district tax — *Section 269.05*** . . . . . . . . . . . . . . . . . . . . . . . 166

      f.   **Municipal levies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

   4.   **Exceeding Generally Authorized Millage Rates** . . . . . . . . . . . . . . . . . . . . . . . . 167

      a.   **General constitutional amendment with statewide application** . . . . . . . . . . . . . 168

      b.   **So-called "general constitutional amendments *with local application*"** . . . . . . . . 169

      c.   **Local constitutional amendment** — *Amendments 425 & 555* . . . . . . . . . . . . . . 170

      d.   **Increasing the millage rate of an existing tax** . . . . . . . . . . . . . . . . . . . . . . . . 172

F.   The Computation of Property Taxes in Alabama. . . . . . . . . . . . . . . . . . . . . . . . . . . 177

   1.   **First Step** — *Identifying the property subject to taxation*. . . . . . . . . . . . . . . . . . . . . 179

   2.   **Second Step** — *Appraisal*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

      a.   The usual methods of determining fair market value. . . . . . . . . . . . . . . . . . . 182

      b.   The "current use" method of valuation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

         *i*.   **Residential property and historic buildings and sites**. . . . . . . . . . . . . . . . 185

         *ii*.   **Agricultural and timber properties**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

            (A)   **Agricultural land**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

            (B)   **Timber property**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

            (C)   **2008 current use standard values for agricultural and timber properties**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

   3.   **Third Step** — *Determining the assessed value*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

   4.   **Fourth Step** — *Deduction of exemptions*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

   5.   **Fifth Step** — *Applying the tax millage rate*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

      a.   Computation of the State *ad valorem* tax on Class III agricultural and timber properties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

   6.   The "Lid Bill's" Impact Upon the Aggregate Amount of *Ad Valorem* Property Taxes Owed the State, Counties, Municipalities, and School Districts. . . . . . . . . . . 198

G.   Summary of Predecessor Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

   1.   ***Brown v. Board of Education* and its Progeny**. . . . . . . . . . . . . . . . . . . . . . . . . . . 204

      a.   ***Plessy v. Ferguson***. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

      b.   ***Brown v. Board of Education***. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

      c.   **Overcoming the South's campaign of "massive resistance"**. . . . . . . . . . . . 217

      d.   ***Milliken v. Bradley*  and the issue of interdistrict desegregation remedies**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

   2.   **School Finance Litigation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

**a.**  *Serrano v. Priest*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  233

**b.**  *San Antonio Independent School District v. Rodriguez*. . . . . . . . . . . . . . . . . . . . . .  235

    *i.*  **The underlying facts**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  235

    *ii.*  **Socioeconomic status as a "suspect classification"**. . . . . . . . . . . . . . . . . . .  242

    *iii.*  **Public education as a "fundamental right"**. . . . . . . . . . . . . . . . . . . . . . . . .  244

    *iv.*  **"Rational basis review" of the Texas system**. . . . . . . . . . . . . . . . . . . . . . .  247

**c.**  **The Alabama Equity Funding litigation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  250

**3.**  **The *Weissinger* Line of Cases**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  259

**a.**  **The requirement of uniformity and equality**. . . . . . . . . . . . . . . . . . . . . . . . . . . .  260

**b.**  **The requirement of uniform assessment ratios**. . . . . . . . . . . . . . . . . . . . . . . . . .  262

**c.**  *State v. Alabama Power Co*. — Ala. Sup. Ct. (Oct. 19, 1950). . . . . . . . . . . . . . . . . . . .  266

**d.**  **The interregnum** — *1950-1959*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  270

**e.**  **The Haden Regulation** — *1959*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  271

**f.**  *Louisville and Nashville Railroad Co. v. State* — Montgomery
County, Ala. Circuit Court (Apr. 5, 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  281

**g.**  *Hornbeak v. Hamm* — M.D. Ala. Civil Action No. 2608-N. . . . . . . . . . . . . . . . . . . .  282

**h.**  *Hornbeak v. Rabren* — M.D. Ala. Civil Action No. 2877-N. . . . . . . . . . . . . . . . . . . .  291

**i.**  M.D. Ala. Civil Action No. 2877-N *redux* — the evolution of
*Hornbeak v. Rabren* into ***Weissinger v. Boswell*** (June 29, 1971). . . . . . . . . . . . . . .  296

**j.**  **Amendment 325**:  *the initial Legislative response
to the* Weissinger *mandate*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  300

**k.**  *McCarthy v. Jones* — S.D. Ala. Civil Action No. 77-242-H and
the second invalidation of variable assessment ratios. . . . . . . . . . . . . . . . . . . . . . . .  302

**l.**  *Thorn v. Jefferson County* — Ala. Sup. Ct. (Sept. 28, 1979) . . . . . . . . . . . . . . . . . . .  307

**m.**  **Amendment 373** — *the second Legislative attempt to deflect the
substantial increases in* ad valorem *taxes portended by the*
Weissinger *mandate*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  308

*vii*

**n.** ***Weissinger v. Eagerton*** — M.D. Ala. Civil Action No. 2877-N *continued* (March 26, 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310

**o.** ***Weissinger v. White*** — M.D. Ala. Civil Action No.2877-N *continued* (October 5, 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

**p.** ***Weissinger v. White*** — Eleventh Circuit appeal (June 1, 1984). . . . . . . . . . . . . . . . . 322

**q.** Summary of the ***Weissinger*** line of cases and plaintiffs' claims. . . . . . . . . . . . . . . 325

**4.** The ***Knight*** Line of Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 331

    **a.** The original, Middle District action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 331

    **b.** The Northern District action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

    **c.** Merger of the Middle and Northern District actions. . . . . . . . . . . . . . . . . . . . . . . 335

    **d.** Motions to disqualify Judge U.W. Clemon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

    **e.** The first trial — *conducted by Judge Clemon*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

    **f.** Eleventh Circuit reversal and disqualification of Judge Clemon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

    **g.** Reassignment of Northern District action to Judge Harold Murphy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

    **h.** Designation of the Knight Class as lead plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . 339

    **i.** The second trial — *but the first conducted by Judge Murphy*. . . . . . . . . . . . . . . . . . 340

    **j.** Judge Murphy's first opinion — "*Knight I*". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

        ***i.*** Relevant findings of fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

    **k.** The Supreme Court's intervening opinion in ***Fordice***. . . . . . . . . . . . . . . . . . . . . . 364

    ***l.*** Eleventh Circuit reversal and remand of Judge Murphy's first opinion — "*Knight I-A*". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

    **m.** Proceedings on remand and Judge Murphy's second opinion — "*Knight II*". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

    **n.** Third and final opinion by Judge Murphy, addressing plaintiffs' "motion for additional relief" — "*Knight III*". . . . . . . . . . . . . . . . . . . . . . . . . . . . . 374

**o.**    **Eleventh Circuit affirmance — "***Knight III-A***"**. . . . . . . . . . . . . . . . . . . . . . . . . . . 379

**H.** Controlling Principles of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 397

   **1.**    **Express Racial Classifications**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

   **2.**    **Facially Neutral Racial Classifications**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

     **a.**    **"Ordinary equal protection standards"**. . . . . . . . . . . . . . . . . . . . . . . . . . . 406

       **i.**    **Disproportionate effects along racial lines**. . . . . . . . . . . . . . . . . . . . . . . 412

       **ii.**    **Racially-discriminatory purpose**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417

       **iii.**    **Causation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 425

       **iv.**    **The defendant's burden under *Mt. Healthy***. . . . . . . . . . . . . . . . . . . . . . 428

   **3.**    **The alleged impact of *San Antonio Independent School District v. Rodriguez* upon the analysis**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 432

   **4.**    **The alleged impact of *Personnel Administrator of Massachusetts v. Feeney* upon the analysis**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

   **5.**    **The alleged impact of *United States v. Fordice* upon the analysis**. . . . . . . . . . . . . . . . . . 445

## III.  FINDINGS OF FACT

**A.** Findings of Historical Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 453

   **1.**    **Antebellum Alabama**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 458

     **a.**    **The Alabama Constitution of 1819**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 458

     **b.**    **The rapid accumulation of wealth in the "Black Belt"**. . . . . . . . . . . . . . . . 461

     **c.**    **Taxation in Antebellum Alabama**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 466

     **d.**    **Education Funding**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 470

       **i.**    **"Sixteenth Section Lands"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 470

       **ii.**    **Public Schools Act of 1854**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475

   **2.**    **Secession and the 1861 Constitution**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 478

      **a.**    **The politics of secession**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 478

      **b.**    **Secession and Alabama's 1861 Constitution**. . . . . . . . . . . . . . . . . . . . . . . . . . . 481

**3.**    **The End of the Civil War and "Presidential" Reconstruction**. . . . . . . . . . . . . . . . . . 482

**4.**    **Congressional, or "Radical," Reconstruction**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 488

      **a.**    **The movement toward the 1868 Constitution.**. . . . . . . . . . . . . . . . . . . . . . . . . 492

      **b.**    **The 1868 "Radical Reconstruction" Constitution**. . . . . . . . . . . . . . . . . . . . . . 496

            *i.*    **The State Board of Education**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500

            *ii.*    **Increased taxation for public schools**. . . . . . . . . . . . . . . . . . . . . . . . . . . 501

      **c.**    **The ratification campaign**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 503

      **d.**    **Alabama under the 1868 "Radical Reconstruction" Constitution**. . . . . . . . . . . . 508

            *i.*    **Public schools and taxation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 509

            *ii.*    **White hostility to education of the former slaves and the taxation that supported it**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 511

**5.**    **"Redemption"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 515

**6.**    **The 1875 "Redeemer" Constitution**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

**7.**    **Democratic Rule Under the 1875 Constitution — *1875-1901*.** . . . . . . . . . . . . . . . . . . 534

      **a.**    **Extra-legal means of subverting black rights**. . . . . . . . . . . . . . . . . . . . . . . . . 534

      **b.**    **The "convict leasing system"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 540

      **c.**    **Education**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 542

            *i.*    **White motives to subvert black education**. . . . . . . . . . . . . . . . . . . . . . . . 542

            *ii.*    **Diversion of funding for black schools to white schools**. . . . . . . . . . . . . . 545

            *iii.*    **Failed attempts to improve public education**. . . . . . . . . . . . . . . . . . . . . 550

      **d.**    **Division within the Democratic Party and the movement for a new constitution**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 554

            *i.*    **Class differences resurface**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 563

*x*

   *ii*. **Disfranchisement of black voters viewed as possible in the absence of federal intervention.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 566

   *iii*. **Black Belt support for a constitutional convention.** . . . . . . . . . . . . . . . . . . . 570

   *iv*. **A constitutional convention, but with preconditions.** . . . . . . . . . . . . . . . . . 574

**8.** **Alabama's Present Constitution —** *Disfranchisement and White Supremacy.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 579

  **a.** **Raw, racist rhetoric in the convention debates.** . . . . . . . . . . . . . . . . . . . . . . . . 581

  **b.** **Taxes and education.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 592

  **c.** **Tax provisions.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 596

  **d.** **Embedding the 1891 Apportionment Act in the constitution.** . . . . . . . . . . . . . . 602

  **e.** **Suffrage provisions.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 606

  **f.** **The Black Belt's continued domination of state politics.** . . . . . . . . . . . . . . . . . . 611

  **g.** **The fraudulent ratification of  the 1901 Constitution.** . . . . . . . . . . . . . . . . . . . . 616

**9.** **Alabama from 1901 to 1954.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 620

**10.** **Public school funding after** ***Brown v. Board of Education.*** . . . . . . . . . . . . . . . . . . . . 625

**11.** **Amendments 325 and 373.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 630

  **a.** **Historical context.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 630

   *i*. **The "fightin' little judge" who vowed to "never be out-niggered again" —** *George C. Wallace.* . . . . . . . . . . . . . . . . . . . . . . . . . 632

    **(A)** **Early campaigning and election in his second, 1962 race for Governor.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 633

    **(B)** **Wallace's rhetoric.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 638

    **(D)** **George Wallace and linkages to the Alabama Farm Bureau Federation.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 642

   *ii*. **History repeating itself —** *Black Belt rule again threatened by the "Second Reconstruction".* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 644

*xi*

*iii*.   **The racial context of events leading up to the enactment of Amendment 325** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 647

b.   **Amendment 325** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 657

*i*.   **Failed equalization attempts and *Weissinger v. Boswell*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 658

*ii*.   **The Farm Bureau and Amendment 325** . . . . . . . . . . . . . . . . . . . . . . . . 661

(A)   **The immediate impact of *Weissinger*** . . . . . . . . . . . . . . . . . . . . . . . . . . 661

(B)   **The legislative process of Amendment 325** . . . . . . . . . . . . . . . . . . . . . . 663

(C)   **Ratification and the Farm Bureau advertising blitz** . . . . . . . . . . . . . . 673

(D)   **Race in the legislative debate on Amendment 325** . . . . . . . . . . . . . . . . 676

C.   **Amendment 373 (the "Lid Bill") and "current use"** . . . . . . . . . . . . . . . . . . . . . . . 678

*i*.   **The passage of Amendment 373** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 678

*ii*.   **The passage of the 1982 statutes implementing "current use"** . . . . . . . . . . . . 685

B.   Findings of Facts Relevant to an Assessment of Disparate Impact on the Basis of Race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 689

1.   **Background Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 689

a.   **The concept of "adequate" education funding** . . . . . . . . . . . . . . . . . . . . . . . . . 689

b.   **Racial demographics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 691

c.   **Poverty** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 695

d.   **The distribution of Class III and "current use" properties** . . . . . . . . . . . . . . . . . . 697

*i*.   **"Current use" property distribution by county classification** . . . . . . . . . . . 698

*ii*.   **"Current use" property distribution by race** . . . . . . . . . . . . . . . . . . . . . . 701

2.   **Statistical Measures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 704

3.   **Measures of Impact** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 709

a.   **Property tax capacity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 711

   *i.* **County per-capita property tax base.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 713

   *ii.* **Per-capita school property tax base.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 716

   *iii.* **Per-student school property tax base.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 719

   *iv.* **Yield per mill per-student by school system.**. . . . . . . . . . . . . . . . . . . . . . . . . . . 721

     **(A)** **"Weighted Averages" and "Simpson's Paradox".**. . . . . . . . . . . . . . . . . 725

  **b.** **Tax Revenue.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 730

   *i.* **Per-capita school tax revenue measures.**. . . . . . . . . . . . . . . . . . . . . . . . . . . 731

   *ii.* **Per-student school tax revenue measures.**. . . . . . . . . . . . . . . . . . . . . . . . . 734

  **c.** **Per-student expenditures.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

  **d.** **The hypothetical Alabama in which the challenged provisions do not apply:** ***i.e.,*** **"what-if" measurements.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 739

   *i.* **Uniform assessment ratio for all properties.**. . . . . . . . . . . . . . . . . . . . . . . . . 742

   *ii.* **"Current use" appraisal methodologies abolished.**. . . . . . . . . . . . . . . . . . . . 746

   *iii.* **Uniform assessment ratio for all properties *and* "current use" methodologies abolished.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 751

## IV. CONCLUSIONS OF LAW

A. Discriminatory Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 757

 **1.** **Analysis of Section 217, as modified by Amendment 325.**. . . . . . . . . . . . . . . . . . . . 761

 **2.** **Analysis of Section 217, as modified by Amendment 373.**. . . . . . . . . . . . . . . . . . . . 769

 **3.** **Analysis of Sections 214, 215, and 216.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 772

 **4.** **Analysis of Section 269, as modified by Amendment 111.**. . . . . . . . . . . . . . . . . . . . 773

 **5.** **Conclusion.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 775

B. Disparate Impact on the Basis of Race. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

C. Rational Basis Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 787

D.   Title VI of the Civil Rights Act of 1964 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   793

# V.  CONCLUSIONS
(pages 795–804)

# VI.  APPENDICES

**I-1**   Alabama Constitution art. XI, § 215 (1901), *amended by* amend. 208
(*ratified* Nov. 11, 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   805

**I-2**   Alabama Constitution, art. XI, § 216 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   807

**I-3**   Alabama Constitution art. XI, § 217 (1901), *amended by* amend. 325
(*ratified* June 8, 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   809

**I-4**   Alabama Constitution art. XI, § 217 (1901), *amended by* amend. 325
(*ratified* June 8, 1972), *further amended by* amend. 373 (*ratified* Nov. 20, 1978) . . . . . . . . . . . .   811

**I-5**   Alabama Constitution art. XIV, § 260 (1901), *amended by* amend. 111
(*ratified* Sept. 7, 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   817

**I-6**   Black Belt Counties Identified By Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   819

**II-1**   Facsimile of the Slip Opinion Entered in *Hornbeak v. Rabren*, No. 2877-N
(M.D. Ala. Oct. 29, 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   821

**II-2**   Amendment 325 & Counties Designated in Alabama Code § 40-8-1(e) . . . . . . . . . . . . . . . . . .   829

**III-1**   Petition of Dr. Booker T. Washington, Ph.D., Tuskegee, Alabama . . . . . . . . . . . . . . . . . . .   831

**III-2**   Petition of Dr. Willis E. Steers, M.D., Decatur, Alabama . . . . . . . . . . . . . . . . . . . . . . . .   835

**IV-1**   Alabama Constitution art. XIV, § 269.08 (1901), *added by* amend. 778
(*ratified* Dec. 4, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   839

# ACKNOWLEDGMENTS
(Page 843)

# CITATION ABBREVIATIONS

**TRIAL EXHIBITS**

| | |
|---|---|
| **PX** | Plaintiffs' Exhibit [Number (and Parenthetical Description)] |
| **DX** | Defendants' Exhibit [Number (and Parenthetical Description)] |

*xiv*

**TRIAL TESTIMONY**

| | |
|---|---|
| **Anderson 10 Tr.** | Testimony of Stella Anderson, Transcript Vol. 10 (doc. no. 266) |
| **Ball 7 Tr.** | Testimony of Miranda Ball, Transcript Vol. 7 (doc. no. 263) |
| **Bell 15 Tr.** | Testimony of Michael Bell, Transcript Vol. 15 (doc. no. 271) |
| **Berryman 7 Tr.** | Testimony of Tyler Berryman, Transcript Vol. 7 (doc. no. 263) |
| **Brewer 10 Tr.** | Testimony of Albert Brewer, Transcript Vol. 10 (doc. no. 266) |
| **Brooks 10 Tr.** | Testimony of Michael Brooks, Transcript Vol. 10 (doc. no. 266) |
| **Brunori 3 Tr.** | Testimony of David Brunori, Transcript Vol. 3 (doc. no. 259) |
| **Edington 5 Tr.** | Testimony of Robert Edington, Transcript Vol. 5 (doc. no. 261) |
| **Erdreich 10 Tr.** | Testimony of Ben Erdreich, Transcript Vol. 10 (doc. no. 266) |
| **Flynt 1 Tr.** | Testimony of Dr. Wayne Flynt, Transcript Vol. 1 (doc. no. 257) |
| **Flynt 2 Tr.** | Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258) |
| **Flynt 3 Tr.** | Testimony of Dr. Wayne Flynt, Transcript Vol. 3 (doc. no. 259) |
| **Frederick 9 Tr.** | Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265) |
| **Frederick 10 Tr.** | Testimony of Dr. Jeff Frederick, Transcript Vol. 10 (doc. no. 266) |
| **Gray 6 Tr.** | Testimony of Jerome Gray, Transcript Vol. 6 (doc. no. 262) |
| **Gregory 14 Tr.** | Testimony of Stan Gregory, Transcript Vol. 14 (doc. no. 270) |
| **Harris 14 Tr.** | Testimony of Robert Harris, Transcript Vol. 14 (doc. no. 270) |
| **Harvey 3 Tr.** | Testimony of Dr. Ira Harvey, Transcript Vol. 3 (doc. no. 259) |
| **Harvey 4 Tr.** | Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260) |
| **Harvey 6 Tr.** | Testimony of Dr. Ira Harvey, Transcript Vol. 6 (doc. no. 262) |
| **Hubbard 13 Tr.** | Testimony of Mike Hubbard, Transcript Vol. 13 (doc. no. 269) |
| **Kelly 12 Tr.** | Testimony of Boyd Kelly, Transcript Vol. 12 (doc. no. 268) |
| **Knight 6 Tr.** | Testimony of John Knight, Transcript Vol. 6 (doc. no. 262) |
| **Lynch 6 Tr.** | Testimony of Shawn King Lynch, Transcript Vol. 6 (doc. no. 262) |
| **McKenzie 7 Tr.** | Testimony of Fannie McKenzie, Transcript Vol. 7 (doc. no. 263) |
| **McKiven 5 Tr.** | Testimony of Dr. Henry McKiven, Transcript Vol. 5 (doc. no. 261) |
| **McMillan 11 Tr.** | Testimony of George McMillan, Transcript Vol. 11 (doc. no. 267) |

**Manley 10 Tr.**      Testimony of Richard Manley, Transcript Vol. 10 (doc. no. 266)

**Marsh 13 Tr.**      Testimony of Delbert Marsh, Transcript Vol. 13 (doc. no. 269)

**Norrell Tr.**      Testimony of Dr. Robert J. Norrell, taken at a pretrial hearing in order to preserve his testimony for trial (doc. no. 253)

**Ormand 10 Tr.**      Testimony of Barbara Ormand, Transcript Vol. 10 (doc. no. 266)

**Pearson 11 Tr.**      Testimony of J. Richmond Pearson, Transcript Vol. 11 (doc. no. 267)

**Perry 14 Tr.**      Testimony of David Perry, Transcript Vol. 14 (doc. no. 270)

**Pride 7 Tr.**      Testimony of Wendell Pride, Transcript Vol. 7 (doc. no. 263)

**Primm 7 Tr.**      Testimony of Fred Primm, Transcript Vol. 7 (doc. no. 263)

**Quick 7 Tr.**      Testimony of Gary Quick, Transcript Vol. 7 (doc. no. 263)

**Rigney 12 Tr.**      Testimony of Douglas Rigney, Transcript Vol. 12 (doc. no. 268)

**Stewart 7 Tr.**      Testimony of Keith Stewart, Transcript Vol. 7 (doc. no. 263)

**Sullivan 7 Tr.**      Testimony of Dr. Daniel Sullivan, Transcript Vol. 7 (doc. no. 263)

**Sullivan 8 Tr.**      Testimony of Dr. Daniel Sullivan, Transcript Vol. 8 (doc. no. 264)

### DEPOSITION TESTIMONY

**Anderson Depo**      Deposition of Stella Anderson (Court's Exhibit 8)

**Ball Depo**      Deposition of Miranda Ball (Court's Exhibit 4)

**Berryman Depo**      Deposition of Tyler Berryman (Court's Exhibit 5)

**Brewer Depo**      Deposition of Albert Brewer (Plaintiffs' Exhibit 533)

**Brooks Depo**      Deposition of Michael Brooks (Court's Exhibit 10)

**Ellis Depo**      Deposition of Aubrey Ellis (Court's Exhibit 18)

**F. Gray Depo**      Deposition of Fred Gray (Court's Exhibit 16)

**J. Gray Depo**      Deposition of Jerome Gray (Plaintiffs' Exhibit 19)

**Hubbert Depo**      Deposition of Dr. Paul Hubbert (Court's Exhibit 14)

**Johnstone Depo**      Deposition of Hon. Douglas Johnstone (Court's Exhibit 13)

**Key Depo**      Deposition of DeWayne Key (Court's Exhibit 15)

**Little Depo**      Deposition of Sen. Ted Little (Court's Exhibit 17)

**Lynch Depo**      Deposition of Shawn King Lynch (Court's Exhibit 2)

*xvi*

| | |
|---|---|
| **Ormand Depo** | Deposition of Barbara Ormand (Court's Exhibit 9) |
| **Pride Depo** | Deposition of Wendell Pride (Court's Exhibit 6) |
| **Thornton Depo** | Deposition of J. Mills Thornton III from *Knight v. Alabama* (Plaintiffs' Exhibit 682) |
| **Waggoner Depo** | Deposition of Sen. James Thomas Waggoner, Jr. (Court's Exhibit 12) |
| **White Depo** | Deposition of Dr. Dewey White, Jr. (Court's Exhibit 11) |

## EXPERT WITNESS REPORTS

| | |
|---|---|
| **Bell 1st Report** | First Report of Dr. Michael Bell (doc. no. 90) |
| **Bell 2d Report** | Amended Report of Dr. Michael Bell (Defendants' Exhibit 881) |
| **Brunori Report** | Report of David Brunori (Defendants' Exhibit 479) |
| **Flynt Report** | Report of Dr. Wayne Flynt (Plaintiffs' Exhibit 8) |
| **Frederick Report** | Report of Dr. Jeff Frederick (Plaintiffs' Exhibit 11) |
| **McKiven Report** | Report of Dr. Henry McKiven (Plaintiffs' Exhibit 14) |
| **Norrell Report** | Report of Dr. Robert Norrell (Plaintiffs' Exhibit 4) |
| **Stewart Report** | Report of Dr. William Stewart (Defendants' Exhibit 498) |
| **Sullivan Report** | Amended Report of Dr. Daniel J. Sullivan (Plaintiffs' Exhibit 117) |

## AFFIDAVITS AND DECLARATIONS

| | |
|---|---|
| **Eddington Aff.** | Affidavit of Robert S. Eddington (Plaintiffs' Exhibit 18) |
| **Flynt Dec.** | Declaration of Dr. Wayne Flynt (Plaintiffs' Exhibit 10) |
| **Frederick Dec.** | Declaration of Dr. Jeff Frederick (Plaintiffs' Exhibit 13) |
| **Harvey Dec. I** | Declaration of Dr. Ira Harvey (Plaintiffs' Exhibit 20) |
| **Harvey Dec. II** | Corrected Declaration of Dr. Ira Harvey (Plaintiffs' Exhibit 824) |
| **McKiven Dec.** | Declaration of Dr. Henry McKiven (Plaintiffs' Exhibit 16) |
| **Norrell Dec.** | Declaration of Dr. Robert Norrell (Plaintiffs' Exhibit 7 ) |
| **Pearson Dec.** | Declaration of J. Richmond Pearson (Plaintiffs' Exhibit 17) |
| **Sullivan Dec.** | Declaration of Dr. Daniel Sullivan (Plaintiffs' Exhibit 21) |

**DOCUMENTS IN CASE FILE**

| | |
|---|---|
| **Doc. no. 44** | Doc. no. 44 (Plaintiffs' Reply Brief in Support of Motion for Summary Judgment) |

# BIBLIOGRAPHY

## PRIMARY SOURCES

| | |
|---|---|
| **1865 Journal** | http://www.archives.alabama.gov/senateproject/convjour/search_vsearchform.cfm |
| **1875 Journal** | Journals of the 1875 Constitutional Convention: http://www.legislature.state.al.us/misc/history/constitutions/1875/1875-constitution-journals/nav.html |
| **1901 Proceedings** | Official Proceedings of the 1901 Constitutional Convention (1901), http://www.legislature.state.al.us/misc/history/constitutions/1901/proceedings/1901_proceedings_vol1/1901.html. |

## SECONDARY WORKS

| | |
|---|---|
| **Appraisal of Real Estate** | The Appraisal Institute, *The Appraisal of Real Estate* (Chicago: The Appraisal Institute 11th ed. 1996). |
| **Atkins** | Leah Rawls Atkins, "Part One:  From Early Times to the End of the Civil War," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* (Tuscaloosa:  The University of Alabama Press 1994). |
| **Bailey** | Richard Bailey, *Neither Carpetbaggers Nor Scalawags:  Black Officeholders During the Reconstruction of Alabama 1867 – 1878* (Montgomery, Ala.: New South Books 5th ed. 2010). |
| **Baldwin** | Joseph G. Baldwin, *The Flush Times of Alabama and Mississippi:  A Series of Sketches* (New York:  D. Appleton & Co. 1854). |
| **Bass & DeVries** | Jack Bass & Walter DeVries, *The Transformation of Southern Politics:  Social Change and Political Consequences Since 1945* (Athens: The University of Georgia Press 1995) (1976). |
| **Bell** | Michael E. Bell, "Property Tax Assessment," in *The Encyclopedia of Taxation & Tax Policy* (Washington, D.C.: The Urban Institute 2d ed. 2005) (Joseph J. Cordes, Robert D. Ebel & Jane G. Gravelle eds.). |
| **Blair** | Lewis H. Blair, *A Southern Prophecy:  The Prosperity of the South Dependent upon the Elevation of the Negro* (Boston:  Little, Brown and Company 1964) (C. Vann Woodward ed.) (1889). |
| **Blight** | David W. Blight, *Passages to Freedom:  The Underground Railroad in History and Memory* (Washington, D.C.:  Smithsonian Books 2001). |

**Bond**            Horace Mann Bond, *Negro Education in Alabama: A Study in Cotton and Steel* (Tuscaloosa: The University of Alabama Press 1994) (1939).

**Branch**          Taylor Branch, *Parting the Waters:  America in the King Years 1954-63* (New York:  Simon & Schuster 1989).

**Brantley**        William H. Brantley, *Banking in Alabama 1816-1860* (privately printed) (Volume I printed in 1961 by Birmingham Printing Co., Volume II printed in 1967 by the Oxmoor Press of Birmingham, Ala.).

**Brewer**          Willis Brewer, *Alabama: Her History, Resources, War Record, and Public Men – From 1540 to 1872* (Montgomery, Ala.:  Barrett & Brown, Steam Printers and Book Binders 1872).

**Bridges**         Edwin C. Bridges, "Historical Alabama," in *The Alabama Guide:  Our People, Resources, and Government* (Montgomery, Ala.: Alabama Department of Archives and History 2009).

**Brookings Institution**   Vol 4 (Part 3) of the 1932 *Report on a Survey of the Organization and Administration of the State and County Governments of Alabama Submitted to Governor B.M. Miller by the Institute for Government Research of the Brookings Institution* (Washington, D.C. 1932).

**Brunori**         David Brunori, *State Tax Policy:  A Political Perspective* (Washington, D.C.:  The Urban Institute Press 2001).

**Cardozo**         Benjamin N. Cardozo, *The Nature of the Judicial Process* (New Haven, Conn.:  Yale University Press 1921).

**CCH Tax Guide**   1 *CCH Alabama State Tax Reporter* (2006).

**Chemerinsky I**   Erwin Chemerinsky, *Constitutional Law:  Principles and Policies* (New York: Aspen Publishers 3rd ed. 2006).

**Chemerinsky II**  Erwin Chemerinsky, *Federal Jurisdiction* (New York:  Aspen Publishers 5th ed. 2007).

**Chemerinsky III** Erwin Chemerinsky, *The Conservative Assault on the Constitution* (New York: Simon & Schuster 2010).

**Coulter**         Ellis Merton Coulter, *Old Petersburg and the Broad River Valley of Georgia:  Their Rise and Decline* (Athens:  The University of Georgia Press 1965).

**Curtin**          Mary Ellen Curtain, *Black Prisoners and Their World, Alabama 1865 – 1900* (Charlottesville:  The University Press of Virginia 2000).

**Crawford**        Samuel W. Crawford, *The History of the Fall of Fort Sumter* (Whitefish, Mont.: Kessinger Publishing LLC 2006) (1887).

**W.E.B. Du Bois**  W.E.B. Du Bois, *A Soliloquy on Viewing My Life from the Last Decade of Its First Century:  The Autobiography of W.E.B. Du Bois* (New York:  International Publishers Co. 1968) (Herbert Aptheker ed.).

**J. W. DuBose**    John Witherspoon DuBose, *Alabama's Tragic Decade: Ten Years of Alabama 1865-1874* (Birmingham, Ala.: Webb Book Company 1940) (James K. Greer ed.).

**Dunning**    William Archibald Dunning, *Reconstruction: Political and Economic, 1865–1877* (New York: Harper & Brothers Publishers 1907).

**Dupre I**    Daniel S. Dupre, *Transforming the Cotton Frontier: Madison County, Alabama 1800–1840* (Baton Rouge: Louisiana State University Press 1997).

**Dupre II**    Daniel S. Dupre, "William Wyatt Bibb, 1919 – 1820, and Thomas Bibb, 1820 – 1821," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Armbrester eds.).

**Ely, Compton, & Compton**    Bruce P. Ely, J. Whiteney Compton, & Chris W. Compton, *The Property Tax Deskbook — Alabama* (St. Paul, Minn.: American Bar Association Section of Taxation, 14th ed. 2009) (Stewart M. Weintraub *et al*. eds.).

**Eskew I**    Glenn T. Eskew, "George C. Wallace, 1963–1967, 1971–1979, 1983–1987," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.).

**Eskew II**    Glenn T. Eskew, "Lurleen B. Wallace, 1967–May 1968," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.).

**Feldman I**    Glenn Feldman, *The Disenfranchisement Myth: Poor Whites and Suffrage Restriction in Alabama* (Athens: The University of Georgia Press 2004).

**Feldman II**    Glenn Feldman, *Politics, Society and the Klan in Alabama, 1915-1949* (Tuscaloosa: The University of Alabama Press 1999).

**Feldman III**    Glenn Feldman, *From Demagogue to Dixiecrat: Horace Wilkinson and the Politics of Race* (Privately Printed 1995).

**Fink & Tushnet**    Howard P. Fink & Mark V. Tushnet, *Federal Jurisdiction*: *Policy and Practice – Cases and Materials* (Charlottesville, Va.: The Michie Co. 1984).

**Fischer**    David Hackett Fischer, *Albion's Seed: Four British Folkways in America* (New York: Oxford University Press 1989).

**Fleming**    Walter Lynwood Fleming, *Civil War and Reconstruction in Alabama* (New York: The Columbia University Press 1905).

**Fleming Docs**    Walter Lynwood Fleming (ed.), *Documentary History of Reconstruction, 2 Volumes* (Cleveland: Arthur H. Clark Co. 1907).

**Flynt I**    Wayne Flynt, "Part Three: From the 1920s to the 1990s," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama: The History of a Deep South State* (Tuscaloosa: The University of Alabama Press 1994).

**Flynt II**          Wayne Flynt, *Alabama in the Twentieth Century* (Tuscaloosa:  The University of Alabama Press 2004).

**Flynt III**         Wayne Flynt, *Poor but Proud:  Alabama's Poor Whites* (Tuscaloosa: The University of Alabama Press 1989).

**Flynt IV**          Wayne Flynt, "Bibb Graves, 1927–1931, 1935–1939," in *Alabama Governors:  A Political History of the State* (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.).

**Foner I**           Eric Foner, *Reconstruction — America's Unfinished Revolution:  1863–1877* (New York:  History Book Club Francis Parkman Prize Edition 2005) (Harper & Row 1988).

**Foner II**          Eric Foner, *Forever Free:  The Story of Emancipation and Reconstruction* (New York:  Knopf 2005).

**Frady**             Marshall Frady, *Wallace: The Classic Portrait of Alabama Governor George Wallace* (New York:  Random House 1996) (1968).

**Franklin**          John Hope Franklin, *Reconstruction After the Civil War* (Chicago: University of Chicago Press 1994).

**Franklin & Moss**   John Hope Franklin & Alfred A. Moss, Jr., *From Slavery to Freedom:  A History of African Americans* (New York:  McGraw-Hill Companies 7th ed. 1994).

**Frederick**         Jeffrey J. Frederick, *Stand Up For Alabama:  Governor George C. Wallace* (Tuscaloosa:  The University of Alabama Press 2007).

**Frederick II**      Jeffrey J. Frederick, *Command and Control:  George Wallace, Governor of Alabama, 1963-1972* (May 10, 2003) (unpublished Ph.D. dissertation, Auburn University) (available through ProQuest Information and Learning Co., Ann Arbor Michigan).

**Friedman**          Lawrence M. Friedman, *A History of American Law* (New York: Simon & Schuster 2d ed. 1985).

**Gates**             Grace Hooten Gates, *The Model City of the New South:  Anniston, Alabama 1872-1900* (Tuscaloosa:  The University of Alabama Press 1978).

**Going**             Allen Johnston Going, *Bourbon Democracy in Alabama 1874-1890* (Tuscaloosa: The University of Alabama Press 1992) (1951).

**Goldstone**          Lawrence Goldstone, *Inherently Unequal:  The Betrayal of Equal Rights by the Supreme Court, 1865–1903* (New York: Walker & Company 2011).

**Hackney**           Sheldon Hackney, *Populism to Progressivism in Alabama* (Princeton, N.J.: Princeton University Press 1969).

**Hamill I**          Susan Pace Hamill, *As Certain as Death: A Fifty-State Survey of State and Local Tax Laws* (Durham, N.C.:  Carolina Academic Press 2007).

**Hamilton**        Virginia Van der Veer Hamilton, *Lister Hill – Statesman From the South* (Tuscaloosa:  University of Alabama Press 1987).

**Hanson**          Harry Hanson, *The Civil War:  A History* (New York: Signet Classics 2010) (1961).

**Harvey I**        Ira W. Harvey, *A History of Educational Finance in Alabama* (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989).

**Harvey II**       Ira W. Harvey, *Financing Alabama's Schools*:  *The Pursuit of Accountability, Adequacy and Equity* (Montgomery, Ala.:  Auburn University Montgomery Center for Government and Public Affairs 2000).

**Harvey III**      Ira W. Harvey, *School Finance Training Program Manual* (Tuscaloosa: University of Alabama Superintendents' Academy, Jan. 2005 Rev.), found at http://uasa.ua.edu/academy%20programs%20html/school_finance_Training_Manual.html

**Holmes**          Oliver Wendell Holmes, Jr., *The Common Law* (Boston, Mass.:  Little, Brown, and Company 1881).

**Irons**           Peter Irons, *Jim Crow's Children:  The Broken Promise of the* Brown *Decision* (London:  Penguin Books 2004).

**Jackson**         Harvey H. Jackson III, *Inside Alabama: A Personal History of My State* (Tuscaloosa:  The University of Alabama Press 2004).

**Jacobs**          Grover Tolbert Jacobs, *Constitutional, Statutory and Judicial History of Property Tax as a Source of Support for Public Education in Alabama, 1819-1976* (June 8, 1976) (unpublished Ph.D. dissertation, Auburn University) (on file with University of Georgia Libraries).

**Jaisingh**        Lloyd Jaisingh, *Statistics for the Utterly Confused* (New York: McGraw-Hill 2000).

**James**           Lawrence James, *Aristocrats — Power, Grace, and Decadence:  Britain's Great Ruling Classes From 1066 to the Present* (New York:  St. Martin's Press 2009).

**Johns & Morphet**  Roe L. Johns & Edgar L. Morphet, *The Economics and Financing of Education* (Englewood Cliffs, N.J.:  Prentice Hall 2d ed. 1969).

**V.O. Key**        V.O. Key, Jr., *Southern Politics in State and Nation* (New York:  Alfred A. Knopf 1949).

**Legislator's Guide**  The Legislative Fiscal Office, *A Legislator's Guide to Alabama's Taxes:   A Summary of the Major Revenue Sources of the State of Alabama* (2007).

**Lester**          Julius Lester, *To Be A Slave* (New York:  Scholastic Press 1968).

**Martin**          Thomas W. Martin, *The Story of Horseshoe Bend National Military Park* (Birmingham, Ala.:  The Southern University Press 1959).

**Mayfield**        James J. Mayfield, *Constitutions of 1875 and 1901:  Paralleled, Annotated and Indexed* (Nashville, Tenn:  Marshall & Bruce Co. 1904).

| | |
|---|---|
| **McCurley & Norman** | Robert L. McCurley & Keith B. Norman, *Alabama Legislation* (Tuscaloosa: Alabama Law Institute 4th ed. 1997). |
| **Martineau** | Harriet Martineau, *Society in America* (London: Saunders & Otley 1837). |
| **McKelvey** | John Jay McKelvey, *Principles of Common-Law Pleading* (New York: Baker, Voorhis & Company 2d ed. 1917) |
| **McMillan** | Malcolm Cook McMillan, *Constitutional Development in Alabama, 1798-1901: A Study in Politics, the Negro, and Sectionalism* (Chapel Hill: University of North Carolina Press 1955) (Spartanburg, S.C.: The Reprint Company 1978). |
| **McPherson** | James M. McPherson, *Ordeal by Fire: The Civil War & Reconstruction* (New York: McGraw-Hill 2d ed. 1992). |
| **Miller I** | Perry Miller, *Errand into Wilderness* (Boston: Harvard University Press 1956) |
| **Miller II** | Perry Miller, *The New England Mind, From Colony to Province* (Boston: Harvard University Press 1953) |
| **Mitchell** | Margaret Mitchell, *Gone With The Wind* (New York: Macmillan Publishing Co. 1936). |
| **Morgan** | Edmund S. Morgan, *American Slavery, American Freedom — The Ordeal of Colonial Virginia* (New York: History Book Club Francis Parkman Prize Edition 2005) (1975). |
| **Newman** | Roger K. Newman, *Hugo Black: A Biography* (New York: Fordham University Press 1997). |
| **Norrell I** | Robert J. Norrell, *Reaping the Whirlwind: The Civil Rights Movement in Tuskegee* (Chapel Hill: The University of North Carolina Press 1998) (1985). |
| **Norrell II** | Robert J. Norrell, *Up From History: The Life of Booker T. Washington* (Cambridge, Mass.: The Belknap Press 2009). |
| **Oxford Sup. Ct. I** | *The Oxford Companion to the Supreme Court of the United States* (New York: Oxford University Press 1992) (Kermit L. Hall, James W. Ely, Jr., Joel B. Grossman & William M. Wiecek eds.). |
| **Oxford Sup. Ct. II** | *The Oxford Companion to the Supreme Court of the United States* (New York: Oxford University Press 2d ed. 2005) (Kermit L. Hall, James W. Ely, Jr. & Joel B. Grossman eds.). |
| **Patrick** | Rembert W. Patrick, *Jefferson Davis and His Cabinet* (Baton Rouge: Louisiana State University Press 1944). |
| **Patterson** | James T. Patterson, Brown v. Board of Education: *A Civil Rights Milestone and Its Troubled Legacy* (New York: Oxford University Press 2001). |
| **Permaloff & Grafton I** | Anne Permaloff & Carl Grafton, *Political Power in Alabama: The More Things Change . . .* (Athens: The University of Georgia Press 1996). |

| | |
|---|---|
| **Permaloff & Grafton II** | Carl Grafton & Anne Permaloff, "James E. Folsom, 1947-1951, 1955-1959," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001, Samuel L. Webb & Margaret E. Arbrester eds.). |
| **Permaloff & Grafton III** | Anne Permaloff & Carl Grafton, "John Patterson, 1959-1963," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001) (Samuel E. Webb & Margaret E. Arbrester eds.). |
| **Pickett** | Albert James Pickett, *Pickett's History of Alabama: And Incidentally of Georgia and Mississippi from the Earliest Period* (Montgomery, Ala.: River City Publishing 2003) (1851). |
| **Remini** | 1 Robert V. Remini, *Andrew Jackson: The Course of American Empire, 1767–1821* (Baltimore: The Johns Hopkins University Press 1998) (1977). |
| **Roberts** | Frances Cabaniss Roberts, *Background and Formative Period in the Great Bend and Madison County* (May 10, 1956) (unpublished Ph.D. dissertation, University of Alabama) (on file with Gorgas Library, The University of Alabama, Tuscaloosa). |
| **Rogers I** | William Warren Rogers, *The One-Gallused Rebellion: Agrarianism in Alabama, 1865–1896* (Baton Rouge: Louisiana State University Press 1970). |
| **Rogers & Ward I** | William Warren Rogers & Robert David Ward, *August Reckoning: Jack Turner and Racism in Post-Civil War Alabama* (Baton Rouge: Louisiana State University Press 1973). |
| **Rogers & Ward II** | William Warren Rogers & Robert David Ward, "Part Two: From 1865 through 1920," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama: The History of a Deep South State* (Tuscaloosa: The University of Alabama Press 1994). |
| **Sellers** | James Benson Sellers, *Slavery in Alabama* (Tuscaloosa: The University of Alabama Press 1994) (1950). |
| **Sracic** | Paul A. Sracic, San Antonio v. Rodriguez *and the Pursuit of Equal Education: The Debate over Discrimination and School Funding* (Lawrence: The University Press of Kansas 2006) |
| **Smith** | Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* (New York: P.F. Collier & Son ed. 1902) (1776). |
| **Stewart I** | William H. Stewart, "Forrest ('Fob') James, Jr., 1979–1983, 1995–1999," in *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001, Samuel L. Webb & Margaret E. Armbrester eds.). |
| **Stewart II** | William H. Stewart, *The Alabama State Constitution* (New York: Oxford University Press 2011). |
| **Thornton I** | J. Mills Thornton III, *Politics and Power in a Slave Society: Alabama, 1800-1869* (Baton Rouge: Louisiana State University Press 1978). |

| | |
|---|---|
| **Thornton II** | J. Mills Thornton III, "Fiscal Policy and the Failure of Radical Reconstruction in the Lower South," in J. Morgan Kousser & James M. McPherson, *Region, Race, and Reconstruction: Essays in Honor of C. Vann Woodward* (New York: Oxford University Press 1982). |
| **Trest** | Warren Trest, *Nobody But The People: The Life and Times of Alabama's Youngest Governor* (Montgomery, Ala.: New South Books 2008). |
| **Triola** | Mario F. Triola, *Elementary Statistics* (Boston: Addison Wesley Longman 8th ed. 2001). |
| **Vitaliano** | Donald F. Vitaliano, in "Property tax, farm," *The Encyclopedia of Taxation and Tax Policy* (Washington, D.C.: The Urban Institute Press 1999) (Joseph J. Cordes, Robert D. Ebel, and Jane G. Gravelle eds.). |
| **Vogt** | W. Paul Vogt, *Dictionary of Statistics and Methodology* (Thousand Oaks, Cal.: Sage Publications 2d ed. 1999). |
| **Walker** | Williston Walker, *The Creeds and Platforms of Congregationalism* (New York: Charles Scribner's Sons 1893). |
| **Ward & Sparkman** | Keith J. Ward & Betty D. Sparkman, *Property Tax Administration: Reappraisal in Alabama* (Auburn, Ala.: Office of Public Service & Research, School of Arts & Sciences 1980). |
| **Washington** | Booker T. Washington, *Up From Slavery: An Autobiography* (New York: Doubleday, Page & Co. 1907). |
| **Webb** | Samuel L. Webb, "The Populist Revolt in Alabama: Prelude to Disfranchisement," in *A Century of Controversy: Constitutional Reform in Alabama* (Tuscaloosa: The University of Alabama Press 2002, Bailey Thomson ed.). |
| **Webb & Armbrester** | *Alabama Governors: A Political History of the State* (Tuscaloosa: The University of Alabama Press 2001, Samuel L. Webb & Margaret E. Armbrester eds.). |
| **White** | Marjorie Longenecker White, *The Birmingham District: An Industrial History and Guide* (Birmingham: Birmingham Publishing Co., for the Birmingham Historical Society 1981). |
| **Wiggins** | Sarah Woolfolk Wiggins, *The Scalawag in Alabama Politics, 1865–1881* (Tuscaloosa: The University of Alabama Press 1977). |
| **Wood** | Gordon S. Wood, *The Purpose of the Past: Reflections on the Use of History* (New York: The Penguin Press 2008). |
| **Woodward** | C. Vann Woodward, *The Strange Career of Jim Crow* (New York: Oxford University Press 2002) (1955). |
| **Ziegler** | Edith Ziegler, *Schools in the Landscape: Localism, Cultural Tradition, and the Development of Alabama's Public Education System, 1865-1915* (Tuscaloosa: The University of Alabama Press 2010). |

**PERIODICALS, SCHOLARLY JOURNALS, AND PUBLISHED REPORTS**

| | |
|---|---|
| **Bagwell** | David Ashley Bagwell, *The "Magical Process": The Sayre Election Law of 1893*, 25 Alabama Review 83 (April 1972). |
| **Bailey** | Hugh C. Bailey, *John W. Walker and the "Georgia Machine" in Early Alabama Politics,* 8 Ala. Rev. 179 (1955). |
| **Barnes & Chemerinsky** | Mario L. Barnes & Erwin Chemerinsky, *The Once and Future Equal Protection Doctrine*, 43 Connecticut Law Review 1059 (2011). |
| **Bickel** | Alexander M. Bickel*, The Original Understanding and the Segregation Decision*, 69 Harvard Law Review 1 (1955). |
| **Brest** | Paul Brest, Palmer v. Thompson: *An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Supreme Court Review 95 (Chicago: The University of Chicago Press 1972). |
| **Bryant** | Douglas H. Bryant, *Unorthodox and Paradox: Revisiting the Ratification of the Fourteenth Amendment*, 53 Alabama Law Review 555 (2002) |
| **Bryce** | James D. Bryce, *Tax Reform Issues in Alabama,* 43 Alabama Law Review 541 (1992) |
| **Chafetz** | Josh Chafetz, *Multiplicity in Federalism and the Separation of Powers*, 120 Yale Law Journal 1084 (2011). |
| **Chemerinsky III** | Erwin Chemerinsky, *Lost Opportunity: The Burger Court and the Failure to Achieve Equal Educational Opportunity*, 45 Mercer Law Review 999 (1994). |
| **Currie** | David P. Currie, *The Reconstruction Congress*, 75 University of Chicago Law Review 383 (2008). |
| **Dayton & Dupre** | John Dayton & Anne Dupre, *School Funding Litigation: Who's Winning the War?*, 57 Vanderbilt Law Review 2351 (2004). |
| **Eisenberg & Johnson** | Theodore Eisenberg & Sherri Lynn Johnson, *The Effects of Intent: Do We Know How Legal Standards Work?*, 76 Cornell Law Review 1151 (1991). |
| **Ely** | John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale Law Journal 1205 (1970). |
| **Ely & Walthall** | Bruce P. Ely & Howard P. Walthall, Sr., *State Constitutional Limitations on Taxing and Spending: A Comparison of the Alabama Constitution of 1901 to its Counterparts*, 33 Cumberland Law Review 463 (2003). |
| **Fair** | Bryan K. Fair, *Equality for All: The Case For a New Declaration of Rights Article of the Alabama Constitution*, 33 Cumberland Law Review 339 (2003). |
| **Farber & Frickey** | Daniel A. Farber & Philip P. Frickey, *Is* Carolene Products *Dead? Reflections on Affirmative Action and the Dynamics of Civil Rights Legislation*, 79 California Law Review 685 (1991). |

**Fellner** Jamie Fellner, Race, Drugs, and Law Enforcement in the United States, 20 Stanford Law & Policy Review 257 (2009).

**Gibson** J. Sullivan Gibson, *The Alabama Black Belt:  Its Economic Status*, 17 Economic Geography 1 (1941).

**Haden** Harry H. Haden, *Equality — The Cornerstone of Democracy*, 21 Alabama Lawyer 269 (1960).

**Hamill II** Susan Pace Hamill, *An Argument for Tax Reform Based on Judeo-Christian Ethics*, 54 Alabama Law Review 1 (2002).

**Hamill III** Susan Pace Hamill, *Constitutional Reform in Alabama:  A Necessary Step Towards Achieving a Fair and Efficient Tax Structure*, 33 Cumberland Law Review 437 (2003).

**Howe** Scott W. Howe, *Human Dignity as the Polestar for Rights Decision Making*, 73 Boston University Law Review 695 (1993).

**Hutchinson** D.J. Hutchinson, *Unanimity and Desegregation*, 68 Georgetown Law Journal 1 (1979).

**Kaczorowski** Robert J. Kaczorowski, *The Enforcement Provisions of the Civil Rights Act of 1866: A Legislative History in Light of* Runyon v. McCrary, 98 Yale Law Journal 565 (1989).

**Karlan** Pamela S. Karlan, *John Hart Ely and the Problem of Gerrymandering:  The Lion in Winter*, 114 Yale Law Journal 1329 (2005).

**Klarman** Michael Klarman, Brown*, Racial Change, and the Civil Rights Movement*, 80 Virginia Law Review 7 (1994).

**Kobick** Julia Kobick, *Discriminatory Intent Reconsidered:  Folk Concepts of Intentionality and Equal Protection Jurisprudence*, 45 Harvard Civil Rights – Civil Liberties Law Review 517 (2010).

**Landsberg** Brian K. Landsberg, *Sumter County, Alabama and the Origins of the Voting Rights Act*, 54 Alabama Law Review 877 (2003).

**Linzer** Peter Linzer, *The* Carolene Products *Footnote and the Preferred Position of Individual Rights*, 12 Constitutional Commentary 277 (1995) (Minneapolis, Minn.: Minnesota Center for Legal Studies 1995).

**Longmore** Paul K. Longmore, *Good English Without Idiom or Tone:  The Colonial Origins of American Speech*, 37 Journal of Interdisciplinary History 513 (2007).

**McLaughlin** Glory McLaughlin, *A Mixture of Race and Reform: The Memory of the Civil War in the Alabama Legal Mind*, 56 Alabama Law Review 285 (2004).

**Mills & Fisher** Michael R. Mills & Deborah Perry Fisher, Comment, *Alabama's Property Tax: Ineffective, Inefficient, and Inequitable*, 36 Alabama Law Review 147 (1984).

| | |
|---|---|
| **Nourse & Maguire** | V.F. Nourse & Sarah A. Maguire, *The Lost History of Governance and Equal Protection*, 58 Duke Law Journal 955 (2009). |
| **Ortiz** | Daniel R. Ortiz, *Got Theory?*, 153 University of Pennsylvania Law Review 459 (2004). |
| **Peters** | Christopher J. Peters, *Outcomes, Reasons, and Equality*, 80 Boston University Law Review 1095 (2000). |
| **Riley** | Kathleen Riley, *The Long Shadow of the Confederacy in America's Schools: State-Sponsored Use of Confederate Symbols in the Wake of* Brown v. Board, 10 William & Mary Bill of Rights Journal 525 (2002). |
| **Rubin** | Peter J. Rubin, *Reconnecting Doctrine and Purpose: A Comprehensive Approach to Strict Scrutiny after* Adarand *and* Shaw, 49 University of Pennsylvania Law Review 1 (2000). |
| **Shavers** | Anna Williams Shavers, *Rethinking the Equity vs. Adequacy Debate: Implications for Rural School Finance Reform Litigation*, 82 Nebraska Law Review 133 (2003). |
| **Sherry** | Suzanna Sherry, *All the Supreme Court Really Needs to Know it Learned from the Warren Court*, 50 Vanderbilt Law Review 459 (1997). |
| **Smedley** | Theodore Smedley, *Developments in the Law of School Desegregation*, 26 Vanderbilt Law Review 405 (1973). |
| **Starkey** | Brando Simeo Starkey, *Criminal Procedure, Jury Discrimination & the Pre-Davis Intent Doctrine: The Seeds of a Weak Equal Protection Clause*, 38 American Journal of Criminal Law 1 (2010). |
| **Stumpf** | Juliet P. Stumpf, *States of Confusion: The Rise of State and Local Power Over Immigration*, 86 North Carolina Law Review 1557 (2008). |
| **Sutton** | Jeffrey S. Sutton, San Antonio Independent School District v. Rodriguez *and its Aftermath*, 94 Virginia Law Review 1963 (2008). |
| **Ward & Sauser** | Keith J. Ward & Lane D. Sauser, *Equity Funding for Education: A Report to the Alabama Legislature* (Auburn, Ala.: Auburn University Center for Governmental Services 1997). |
| **Ward & Sparkman** | Keith J. Ward & Betty D. Sparkman, *Property Tax Administration: Reappraisal in Alabama* (Auburn, Ala.: Auburn University School of Arts & Sciences, Office of Public Service & Research 1980). |
| **Yoshino** | Kenji Yoshino, *The New Equal Protection*, 124 Harvard Law Review 747 (2011). |

## MISCELLANEOUS SOURCES

| | |
|---|---|
| **Agreed Facts** | Doc. no. 242-1 (Parties' Statement of Agreed Facts). |

| | |
|---|---|
| **1st Reconst. Act** | First Reconstruction Act of 1867, ch. 153, 14 Stat. 428 (1867). |
| **2d Reconst. Act** | Second Reconstruction Act of 1867, ch. 6, 15 Stat. 2 (1867). |
| **2007 National Resources Inventory** | 2007 National Resources Inventory Summary Report (compiled and published jointly by the United States Department of Agriculture Natural Resources Conservation Service and the Iowa State University Center for Survey Statistics and Methodology). |
| **Kendrick** | Benjamin Burks Kendrick, *The Journal of the Joint Committee of Fifteen on Reconstruction* (1914). |
| **Winemiller** | Terrance L. Winemiller, "Black Belt Region in Alabama," in online version of The Encyclopedia of Alabama, found at http://www. encyclopediaofalabama.org/face/Article.jsp?id=h-2458 (last visited Oct. 5, 2011). |
| **Wright, Miller, & Cooper** | Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure:  Jurisdiction* (2d ed. 2006). |



**ALABAMA COUNTIES**
(Showing Dates of Creation)

ALABAMA
DATES OF CREATION OF COUNTIES

*xxx*

# I.  INTRODUCTION

*We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.  . . .*

> The unanimous Declaration of the thirteen united States of America, adopted in Congress, July 4, 1776.

This case is a sequel to the action litigated in this District from 1981 through 2004 under the style of "*John F. Knight, Jr., et al. vs. State of Alabama, et al.*," Civil Action No. CV 83-M-1676-S (N.D. Ala. July 11, 1983) (Murphy, J., sitting by designation).[1]  The plaintiffs in the *Knight* line of cases, discussed in detail later in this opinion, originally claimed that Alabama had failed to complete the desegregation of its public colleges and universities, and that "many of the State's policies governing higher education tended to perpetuate its formerly *de jure* segregated university system."  *Knight v. Alabama*, 476 F.3d 1219, 1220 (11th Cir. 2004) ("*Knight III-A* ").  As such, both *Knight* and the present case implicate the Nation's original sin, slavery, and its post-emancipation manifestations:  segregation and oppression of African-Americans in virtually all aspects of their lives, but

---

[1] *See, e.g.*, *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), *aff'd in part*, *rev'd in part*, *vacated in part*, 14 F.3d 1534 (11th Cir. 1994), *on remand*, *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995); *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1277 (N.D. Ala.), *aff'd*, 476 F.3d 1219 (11th Cir. 2004), *cert. denied* 127 S. Ct. 3014 (2007).  For convenience, the foregoing citations were listed in chronological, as opposed to *Bluebook*, order.

1

especially in educational opportunities.  Judge Harold Murphy addressed the same points in his first *Knight* opinion, saying:

> More than three hundred and fifty years ago, Africans were first brought to this country to be sold into slavery.  Forbidden formal education, slaves served at the pleasure of their white masters and learned only the anguish of unrewarded toil.  The "self-evident" truth contained within the Declaration of Independence that all persons are created equal had no application to the slave.  The slave was neither free nor equal.  Commenting on whether the Framers of the Constitution considered slaves to be included within the phrase "We the People," Chief Justice Taney penned the following remarks in the *Dred Scott* case:
>
> > We think they are not, . . . [and] were not intended to be included. . . .
> >
> > > . . . .
> >
> > They had for more than a century before been regarded as beings of an inferior order; and altogether unfit to associate with the white race . . .; and so far inferior, that the negro might justly and lawfully be reduced to slavery for his benefit.
> >
> > > . . . .
> >
> > [A]ccordingly, a negro of the African race was regarded . . . as an article of property, and held, and bought and sold as such. . . .
>
> *Scott v. Sandford*, 60 U.S. (19 How.) 393, 405, 407-08, 15 L. Ed. 691 (1857) quoted by, Marshall, *The Constitution's Bicentennial: Commemorating the Wrong Document?,* 40 Vand. L. Rev. 1337, 1340 (1987).
>
> The emancipation of the African American as property was

2

accomplished at the conclusion of the Civil War with the ratification of the Thirteenth Amendment to the United States Constitution. The prize of freedom was effectively denied[,] however, by the enactment of the Black Codes whose intent was the continued subordination of the newly freed slave. *One of the forms of subordination was the rigid control by whites of black education. Most whites wanted blacks educated, if at all, only to the minimum level necessary to provide semi-skilled labor. Black educational institutions were under the complete control of white officials who, for the most part, shared the paternalistic view that black subordination was a natural condition that worked for the betterment of both races*.

The history of black higher education in Alabama following the Civil War is not atypical. *Strict white control was the hallmark of black higher education in the state until the 1970's*. For many years blacks were effectively denied the benefits of a collegiate education by the operation of two interrelated practices: the uncompromising segregation of the state's white institutions and the limited educational mission assigned to the state's black colleges. *Concomitant to these two practices, there arose a host of policies and laws designed to institutionalize segregation while assuring the inferior status of black education*. The case at bar is[,] in large measure, about identifying and eliminating those segregative policies and practices which survived federally mandated integration.

These surviving policies and practices, referred to as vestiges of the *de jure* period of segregation, must be abolished root and branch if the mandate of the Constitution is to be satisfied. . . .

*Knight v. Alabama*, 787 F. Supp. 1030, 1045-46 (N.D. Ala. 1991) ("*Knight I* ")

(emphasis and bracketed alterations supplied). The following two subsections

elaborate Judge Murphy's observations.

[this page intentionally left blank]

## A.    The Centrality of Race

The history, politics, and policies of all Southern states, but those of Alabama in particular, must take into account the centrality of race, and the destructive influence of the evil institution of human slavery on the human mind and spirit.  For just one example, when Thomas Jefferson penned the immortal testament from our Nation's secular scripture that is quoted at the beginning of this opinion, "he was personally depriving nearly two hundred men, women, and children of their liberty. When he died, on the fiftieth anniversary of his great Declaration, he still owned slaves, probably more than two hundred."[2]   The fact that two such inherently-contradictory notions — *i.e.*, the toleration of slavery in the Southern colonies, concurrently with the evolution of concepts of self-governance and the "unalienable Rights" of all men to "Life, Liberty and the pursuit of Happiness" — could coexist side-by-side is far more than just a perplexing conundrum.  It is, as Professor Edmund S. Morgan observed, "the central paradox of American history":

> For the historian it poses a challenge to probe the connection:  to explain how a people could have developed the dedication to human liberty and dignity exhibited by the leaders of the American Revolution and at the same time have developed and maintained a system of labor that denied human liberty and dignity every hour of the day.

---

[2] Edmund S. Morgan, *American Slavery, American Freedom — The Ordeal of Colonial Virginia* 4 (New York:  History Book Club Francis Parkman Prize Edition 2005) (1975) (footnote omitted) ("**Morgan**").

. . . .

The paradox is American, and it behooves Americans to understand it if they would understand themselves. . . .[3]

Harvard Professor V.O. Key made a similar observation in his monumental study of Southern politics:

> In its grand outlines the politics of the South revolves around the position of the Negro. It is at times interpreted as a politics of cotton, as a politics of free trade, as a politics of agrarian poverty, or as a politics of planter and plutocrat. Although such interpretations have a superficial validity, in the last analysis the major peculiarities of southern politics go back to the Negro. Whatever phase of the southern political process one seeks to understand, sooner or later the trail of inquiry leads to the Negro.[4]

## 1.    The Slave Experience

For at least eighty-eight years, from the "Corrupt Bargain" of 1877,[5] ending

---

[3] *Id*. at 4-5.

[4] V.O. Key, Jr., *Southern Politics in State and Nation* 5 (New York: Alfred A. Knopf 1949) ("**V.O. Key**").

[5] The Compromise of 1877, or "Corrupt Bargain" as it also was known, refers to the reliably authenticated, but unwritten deal that resolved the disputed 1876 Presidential election, ended Congressional ("Radical") Reconstruction, and led to withdrawal of federal troops from those southern states still under military occupation, and the end of martial law and "provisional governments." As a result of this politically-brokered bargain, the Republican candidate for President, Rutherford B. Hayes, who had not attained the largest share of the popular votes, was awarded the White House over the Democratic candidate, Samuel J. Tilden, on the understanding that Hayes would remove the federal troops that were propping up Republican state governments in Florida, Louisiana, and South Carolina. However, as will be seen in Part III(A) of this opinion, *infra*, discussing this court's findings of historical facts, conservative Alabama Democrats previously had "redeemed" control of State government from Republican carpetbaggers, scalawags, and former slaves in the 1874 general election.

federal attempts to "Reconstruct" the rebellious, former-slaveholding states, until the enactment of the Civil Rights Act of 1964 and the Voting Rights Act of 1965, historians,[6] movie makers,[7] and authors[8] crafted romanticized versions of the Antebellum South and its "peculiar institution."

"The typical slave experience, however, was very different and characterized by a vicious cruelty."[9]  "Regarding the African slaves as little more than animals, the slave-holders bought them at market, branded them, sometimes gave them names ordinarily reserved for dogs and horses, and bridled, haltered, and punished them as if they were domesticated livestock."[10] With the sole exception of those blessed few who found their way to freedom on the "Underground Railroad,"[11] death was the only

[6] *E.g.*, Walter Lynwood Fleming, *Civil War and Reconstruction in Alabama* (New York:  The Columbia University Press 1905); John Witherspoon DuBose, *Alabama's Tragic Decade:  Ten Years of Alabama 1865-1874* (Birmingham, Ala.:  Webb Book Company 1940) (James K. Greer ed.).

[7] *E.g.*, D.W. Griffith's 1915 silent film classic, "The Birth of a Nation" (originally released as "The Clansman," after the title of the 1905 novel by Thomas Dixon, Jr., upon which the movie script was based).

[8] *E.g.*, Margaret Mitchell, *Gone With The Wind* (New York:  Macmillan Publishing Co. 1936).

[9] Julius Lester, *To Be A Slave* 32 (New York:  Scholastic Press 1968).  *See generally* James Benson Sellers, *Slavery in Alabama* (Tuscaloosa:  The University of Alabama Press 1994) (1950).

[10] Gordon S. Wood, *The Purpose of the Past:  Reflections on the Uses of History* 295 (New York:  The Penguin Press 2008).

[11] The Underground Railroad was an informal network of secret routes and safe houses used by nineteenth century black slaves in the Southern states to escape to free states and Canada with the aid of abolitionists and other allies who were sympathetic to their plight.  *See generally*, *e.g.*, David W. Blight, *Passages to Freedom:  The Underground Railroad in History and Memory* (Washington, D.C.:  Smithsonian Books 2001).  Unreliable accounts indicate that as many as 30,000 slaves escaped by means of this network at its pre-Civil War peak, but respected chroniclers of the African

7

escape from "the anguish of their unrewarded toil."[12]

More accurate portrayals of a slave's daily existence were provided by contemporary witnesses who traveled through Alabama during its "flush times," prior to the Civil War.[13]  The following account, for example, was penned by an English noblewoman and diarist in 1837, and describes her impressions of African slaves observed during a transit through the Black Belt counties of East-Central Alabama.

> We saw to-day, the common sight of companies of slaves traveling westwards; and the very uncommon one of a party returning into South Carolina.  When we overtook such a company proceeding westwards, and asked where they were going, the answer commonly given by the slaves was, "Into Yellibama."[14] — Sometimes these poor creatures were encamped, under the care of the slave-trader, on the banks of a clear stream, to spend a day in washing their clothes. Sometimes they were loitering along the road; the old folks and infants mounted on the top of a wagon-load of luggage; the able-bodied, on foot, perhaps silent, perhaps laughing; the prettier of the girls, perhaps with a flower in the hair, and a lover's arm around her shoulder.  *There were wide differences in the air and gait of these people.  It is usual to*

---

experience in America put the number at closer to 6,000 precious few. John Hope Franklin & Alfred A. Moss, Jr., *From Slavery to Freedom:  A History of African Americans* 204-209 (New York: McGraw-Hill Companies 7th ed. 1994).

[12] *Knight I*, 787 F. Supp. at 1045.

[13] *Cf.* Joseph G. Baldwin, *The Flush Times of Alabama and Mississippi:  A Series of Sketches* (New York: D. Appleton & Co. 1854).

[14] This court speculates that the description probably was based upon either the Yellow-bellied Woodpecker (*Picus varius*), a beautiful species that migrates to Southern states about the beginning of October, and departs before the beginning of April, returning to the middle and northern parts of the United States (*see*, *e.g.*, www.audabon.org), or the "Yellowhammer" (the Northern Flicker, *Colaptes auratus*), which has been Alabama's official State Bird since 1927 (*see*, *e.g.*, www.statesymbolsusa.org/Alabama/bird/_yellowhammer).  Both should be distinguished from the Yellow-bellied Sapsucker (*Sphyrapicus varius*).

*call the most depressed of them brutish in appearance.  In some sense they are so*; *but I never saw in any brute an expression of countenance so low, so lost, as the most degraded class of negroes.*  There is some life and intelligence in the countenance of every animal; even in that of "the silly sheep," [but] *nothing so dead as the vacant, unheeding look of the depressed slave is to be seen.*  To-day there was a spectacle by the roadside which showed that *this has nothing to do with negro nature. . . .*  To-day, we passed, in the Creek Territory, *an establishment of Indians who held slaves.  Negroes are anxious to be sold to Indians*, who give them moderate work, and accommodations as good as their own.  *Those seen today among the Indians were sleek, intelligent, and cheerful-looking, like the most favored house-slaves, or free servants of colour, where the prejudice is least strong.*[15]

An even more poignant, first-hand description of what it was like to be born into the slave system was provided by one of the extraordinary historical figures of the nineteenth century, and a great leader of his race, Dr. Booker T. Washington, President of Tuskegee Institute:

I was born a slave on a plantation in Franklin County, Virginia. I am not quite sure of the exact place or exact date of my birth, but at any rate I suspect I must have been born somewhere and at some time. As nearly as I have been able to learn, I was born near a cross-roads post-office called Hale's Ford, and the year was 1858 or 1859. I do not know the month or the day.  The earliest impressions I can now recall are of the plantation and the slave quarters — the latter being that part of the plantation where the slaves had their cabins.

My life had its beginning in the midst of the most miserable, desolate, and discouraging surroundings.  This was so, however, not

---

[15] Harriet Martineau, *Society in America* (London:  Saunders & Otley 1837) (emphasis and bracketed alteration supplied), quoted in Walter Bertram Hitchcock, Jr., "Telling Observations: Early Travelers in East-Central Alabama," in *Clearings in the Thicket:  An Alabama Humanities Reader* 39, 51-52 (Macon, Ga.:  Mercer University Press 1985) (Jerry Elijah Brown, ed.).

because my owners were especially cruel, for they were not, as compared with many others.  I was born in a typical log cabin, about fourteen by sixteen feet square.  In this cabin I lived with my mother and a brother and sister till after the Civil War, when we were all declared free.

Of my ancestry I know almost nothing.  In the slave quarters, and even later, I heard whispered conversations among the coloured people of the tortures which the slaves, including, no doubt, my ancestors on my mother's side, suffered in the middle passage of the slave ship while being conveyed from Africa to America.  I have been unsuccessful in securing any information that would throw any accurate light upon the history of my family beyond my mother.  She, I remember, had a half-brother and a half-sister.  In the days of slavery not very much attention was given to family history and family records — that is, black family records.  My mother, I suppose, attracted the attention of a purchaser who was afterward my owner and hers.  Her addition to the slave family attracted about as much attention as the purchase of a new horse or cow.  Of my father I know even less than of my mother.  I do not even know his name.  I have heard reports to the effect that he was a white man who lived on one of the near-by plantations.  Whoever he was, I never heard of his taking the least interest in me or providing in any way for my rearing.  But I do not find especial fault with him.  He was simply another unfortunate victim of the institution which the Nation unhappily had engrafted upon it at that time.[16]

## 2.    The Post-Emancipation Experience

*In the beauty of the lilies Christ was born across the sea,*
*With a glory in His bosom that transfigures you and me:*
*As He died to make men holy, let us die to make men free,*
*While God is marching on.*

Julia Ward Howe, "Battle Hymn of the Republic," 5th verse (1861).

---

[16] Booker T. Washington, *Up From Slavery: An Autobiography* 1-3 (New York: Doubleday, Page & Co. 1907) ("**Washington**").

The Civil War was the deadliest conflict in American history.  More than 620,000 persons died in the struggle to restore the Union and eradicate the evil institution of slavery — more Americans than have died in all other wars and conflicts in which this Nation has been involved, before or since.[17]  Sadly, that sacrifice of blood by the hallowed dead produced few beneficial effects in the lives of the emancipated slaves.  As Judge Murphy observed, the "prize of freedom was effectively denied . . . by the enactment of the Black Codes whose intent was the continued subordination of the newly freed slave."[18]  Indeed, the lives of an overwhelming number of black men, women, and children for most of the century following the end of the Civil War continued to be one of drudgery, illiteracy, few (or no) educational opportunities, poor nutrition, bad health, high infant mortality rates, short life expectancies for those who survived infancy, oppressive discrimination, brutal violence, and lynchings (mob murder unsanctioned by state law).

As Professors Rogers and Ward observed, during the nine decades between the 1874 election cycle (when "Conservative Democrats" "redeemed" control of State government from the "Radical Republican" cabal of carpetbaggers, scalawags, and

---

[17] Confederate deaths were about 260,000, of whom 93,000 were killed in combat, and 137,000 were wounded.  Union deaths numbered at least 360,000, and 275,200 were wounded in combat.  Disease was the major cause of death in the Civil War.  Of the 620,000 who died on both sides, more than 400,000 succumbed to disease.

[18] *Knight I*, 787 F. Supp. at 1045.

former slaves) and the Civil Rights Act of 1964,

> Alabama became a state whose institutions were frankly, admittedly, unashamedly, and triumphantly dominated by whites. The theory of white supremacy and black inferiority found daily expression and constant application. If Caucasian dominance became legally fixed and formalized (as it did), Anglo-Saxon superiority was no less manifest in unstated ways. If a white man and a black man met face to face on a narrow walk, it was the black who stepped aside to let the other pass; a white man's surname was always prefaced with "Mister," or some sort of title, a Negro's never; purchases paid for in cash primarily involved the color green[,] until a merchant was confronted simultaneously with two customers whom he must accommodate according to black or white.

> White superiority was no less evident in a verbal folklore spawned by, repeated by, and believed by whites: Negro men were naturally lazy and without ambition, desirous of having sexual relations with white women, incapable of higher reasoning, uncontrollable when under the influence of liquor, and cursed forever with an offensive body smell. And yet with all his negative qualities, the black, according to the Southern mystique, given proper guidance by his white mentors[,] was carefree, musical, naive, gentle, mercurial, anatomically limber, religious (in an outlandish way), and humorous. Still, the black race, as everyone knew, *was* inferior, and all things proceeded from this basic premise.

> Schools at all levels were separate and unequal. With a few exceptions white people worshiped in white churches and heard sermons by white preachers, while black congregations gathered in black churches and listened to the discourses of black ministers. Presumably both races prayed to the same God and were somehow hopeful of the same hereafter — but in the here and now religious life was firmly segregated. The Negro did not achieve economic independence. In the debased, sub-marginal world of tenant farmers and sharecroppers, the unenvied place on the bottom rail was occupied by the black man. In a society where the accumulation of money bore integral relation to the possession of power, the Negro was tragically unarmed.

12

As for politics, the Negro was frequently discouraged from voting, but not until the Populists courted Negro votes in the 1890s and threatened Bourbon supremacy . . . was there a movement for mass disfranchisement.  Before that, what was important to the Bourbons was how the Negroes voted, and their votes were, as a matter of course, manipulated and controlled.   After the Bourbons came to power, government and politics and all their trappings — the rewards of office, fame, the awarding of contracts, the right to draft, pass and enforce legislation — were the domain of the white race and Negro participation was by sufferance.[19]

---

[19] William Warren Rogers & Robert David Ward, *August Reckoning:  Jack Turner and Racism in Post-Civil War Alabama*, at *ix-xi* (Baton Rouge:  Louisiana State University Press 1973) (bracketed alteration supplied) ("**Rogers & Ward I**").

[this page intentionally left blank]

## B.   Statement of the Case

*No governmental power is more easily abused, or more often perverted, than the taxing power.*

*Mayor of Mobile v. Stonewall Insurance Co.*, 53 Ala. 570, 576 (1875) (Brickell, C.J., unanimous opinion).

The proximate thrust of the claims asserted in this case against the State of Alabama, its Governor, and the Commissioner of the State's Department of Revenue concern the State's *ad valorem* property tax system.  Such forms of taxation are

the oldest type tax that we know anything about.  As far as history shows, there was no tax used earlier than the ad valorem property tax. I suppose that when the very first group organized into a unit of society and decided to have one police force to protect the property of all rather than to operate as they had in the past with each man protecting by force his own property, that the first question to arise was how the cost of this one police force would be met.  I suppose that the obvious answer to this question was that the man with the most property would bear the greater portion of the cost, and the man with least property would bear the least portion of the cost.  *This seems to be such an obvious and fair answer to this problem that it is amazing that today we have large groups of individuals denying openly that this would be a fair manner in which to divide the cost of government.  This is the basic premise upon which the* ad valorem *property tax is built.*  The words "ad valorem" mean in Latin "by value."   Ad valorem "by value" property tax is the only kind of property tax we can have under the Alabama Constitution.  In some states you can have a per specie property tax, but not in Alabama.[20]

### 1.    The Plaintiffs and Their Contentions

*Verily the work does not end with the abolition of slavery, but only*

---

[20] Harry H. Haden, *Equality — The Cornerstone of Democracy*, 21 Ala. Law. 269, 270-71 (1960) (emphasis supplied) ("**Haden**").

*begins.*

> Frederick Douglass (1818–1895).[21]

*Education makes a people easy to lead, but difficult to drive; easy to govern, but impossible to enslave.*

> Henry Peter Brougham, First Baron of Broughham and Vaux, Lord Chancellor of Great Britain (1778–1868).

Fifth. *We want our children educated. The school system in the country districts of the South is a disgrace and in few towns and cities are the Negro schools what they ought to be. We want the national government to step in and wipe out illiteracy in the South. Either the United States will destroy ignorance or ignorance will destroy the United States.*

*And when we call for education we mean real education. We believe in work. We ourselves are workers, but work is not necessarily education. Education is the development of power and ideal. We want our children trained as intelligent human beings should be, and we will fight for all time against any proposal to educate black boys and girls simply as servants and underlings, or simply for the use of other people. They have a right to know, to think, to aspire.*

> The Niagra Address to the Country, issued at the second Niagra Conference held at Harper's Ferry, West Virginia in 1906.[22]

*Upon the education of the people of this country, the fate of this country depends.*

> Benjamin Disraeli, Lord Beaconsfield, Prime Minister of Great Britain (1804-1881).

---

[21] Quoted in Eric Foner, *Forever Free: The Story of Emancipation and Reconstruction* 67 (New York: Knopf 2005) ("**Foner II**").

[22] Quoted in W.E.B. Du Bois, *A Soliloquy on Viewing My Life from the Last Decade of Its First Century: The Autobiography of W.E.B. Du Bois* 251 (New York: International Publishers Co. 1968) (Herbert Aptheker ed.).

This action was commenced by the parents of two African-American ("black")

and three Caucasian ("white") public school students residing in Lawrence County,

Alabama,[23] and five black public school students residing in Sumter County,

Alabama.[24] Those persons assert that the current *ad valorem* tax structure of the State

---

[23] *See* doc. no. 1 (Complaint) ¶ 7 ("Plaintiffs India Lynch and Wendell Pride, Jr., are minor African-American citizens of Alabama and students in the Lawrence County, Alabama, public schools. They appear through their parents and next friends, Shawn King Lynch and Wendell Pride, who are residents and taxpayers of Lawrence County over the age of eighteen years.") and ¶ 8 ("Plaintiffs Ivy Rose Ball, Slade Berryman, and Cannon Berryman, are minor white citizens of Alabama and students in the Lawrence County, Alabama, public schools. They appear through their parents and next friends, Miranda Ball and Tyler Berryman, who are residents and taxpayers of Lawrence County over the age of eighteen years.").

[24] *Id.* ¶ 9 ("Plaintiffs Rochester Anderson, Cezanne Anderson, Sharnay Brooks, Zekeiah Ormond, and Adrian Widemon are minor African-American citizens of Alabama and students in the Sumter County, Alabama, public schools. They appear through their parents and next friends, Stella Anderson, Michael Brooks, Barbara L. Ormond, and Ada Widemon Jones, who are residents and taxpayers of Sumter County over the age of eighteen years.").

All plaintiffs allege that they satisfy the requirements of Federal Rules of Civil Procedure 23(a) and (b)(2), and asked the court to certify them as representatives of a class consisting of

> all public school students and citizens of Alabama who are injured by the racially discriminatory property tax provisions in the Alabama Constitution complained of herein.
>
> 14. Plaintiffs India Lynch, Wendell Pride, Jr., Rochester Anderson, Cezanne Anderson, Zekeiah Ormond, Adrian Widemon and their parents further request that they be certified to represent a subclass of all African-American public school students and citizens of Alabama who are injured by the racially discriminatory property tax provisions in the Alabama Constitution complained of herein.
>
> 15. Plaintiffs Ivy Rose Ball, Slade Berryman, Cannon Berryman and their parents further request that they be certified to represent a subclass of all white public school students and citizens of Alabama who are injured by the racially discriminatory property tax provisions in the Alabama Constitution complained of herein.

*Id.* ¶¶ 13-15. Plaintiffs never filed a motion seeking class certification, however, and for that reason no plaintiff classes have been certified. For purposes of this opinion, the court will *assume* that the

17

of Alabama "is a vestige of discrimination inasmuch as the [State] constitutional provisions governing the taxation of property are traceable to, rooted in, and have their antecedents in an original segregative, discriminatory policy."[25]  Further, in their response to defendants' motion to dismiss, plaintiffs stated that they are "members of a racially defined group who have been purposefully targeted by state legislative action, and who continue to be disadvantaged in exactly the way the laws' drafters intended."[26]   They also allege that they are affected by "a set of Alabama constitutional provisions rooted in historic racially discriminatory policies and practices that directly create multiple barriers to the ability of black citizens to obtain school revenues through ad valorem taxes."[27]

### a.    The state constitutional provisions challenged by plaintiffs

The five provisions of the State's Constitution that plaintiffs contend "are traceable to Alabama's prior *de jure"* segregated system of K-12 public education facilities are outlined in the following subsections.[28]

---

purported plaintiff classes could satisfy all the certification requirements set forth in Federal Rules of Civil Procedure 23(a) and (b)(2), and that it is, therefore, appropriate to construe and consider their claims as having been brought by the sub-classes of individuals discussed in the complaint.

[25] *Id*. ¶ 1 (quoting *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1311 (N.D. Ala. 2004) ("*Knight III* ")).

[26] Doc. no. 31 (Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss), at 11-12.

[27] *Id.* at 16.

[28] The words between quotation marks in the sentence preceding this footnote are copied from that portion of Judge Murphy's third, 2004 opinion in the *Knight* line of cases ("*Knight III* "), discussed later in this opinion, in which Judge Murphy set out his conclusions of law.  In part, he

*i*.        **Article XI, Section 214** — *limiting the State tax rate*

Section 214 of Alabama's 1901 Constitution limits the rate of *ad valorem*

taxation *the State* may levy upon real and personal property to 6.5 mills:  *i.e.*, "The

legislature shall not have the power to levy in any one year a greater rate of taxation

than sixty-five one-hundredths of one per centum on the value of the taxable property

within this State."  Ala. Const. art. XI, § 214 (1901).  A "mill" is equivalent to one-

thousandth of a dollar, or one-tenth of a penny ($0.001).  Thus, the state tax of 6.5

mills is equivalent to slightly more than one-half of one cent ($0.0065);[29] *or*, as stated

_____

said the following:

> 7.  The Court first considers whether Plaintiffs have demonstrated that the constitutional restrictions placed on the property tax authority of both state and local governments are traceable to Alabama's prior *de jure* dual system [of public colleges and universities].

> 8.  Based on the extensive record before the Court, the Court finds that Plaintiffs have met their burden to demonstrate that the current ad valorem tax structure is a vestige of discrimination inasmuch as the constitutional provisions governing the taxation of property are traceable to, rooted in, and have their antecedents in an original segregative, discriminatory policy.

> 9.  It is clear that the current tax structure in Alabama cripples the effectiveness of state and local governments in Alabama to raise funds adequate to support higher education.  The Lid Bill and the low assessment ratios impede and restrict the ability of the State and local governments from raising revenue from taxation of property.

*Knight III*, 458 F. Supp. 2d at 1311-12 (addressing the first element of the analytical framework sketched by the Supreme Court in *United States v. Fordice*, 505 U.S. 717 (1992), the Mississippi college desegregation case that also is discussed *infra*).

[29] *See* The Legislative Fiscal Office, *A Legislator's Guide to Alabama's Taxes:  A Summary of the Major Revenue Sources of the State of Alabama* 3 (2007) ("**Legislator's Guide**") ("6.5 mills

in Section 214, "sixty-five one-hundredths of one per centum." *See also* Ala. Const. art. XIV, § 260, *amended by* amend. 111 (*ratified* Sept. 7, 1956) (containing an alternative manner of stating the maximum State millage rate: *i.e*., "nothing herein contained shall be so construed as to authorize the legislature to levy in any one year a greater rate of state taxation for all purposes, including schools, than *sixty-five cents on each one hundred dollars' worth of taxable property*") (emphasis supplied).[30]

Even though the language of Sections 214 and 260 does not explicitly say so, the millage rate is applied to the *assessed value* of the property subject to taxation, as distinguished from its *appraised* (estimated fair market) *value*.[31]  The distinction between the "appraised" and "assessed" values of property is discussed in detail in Part II(F) of this opinion, *infra*, addressing the subject of the manner of computing property taxes in Alabama.

*ii*.     **Article XI, Section 215** — *limiting county tax rates*

The pertinent portion of Section 215 limits the rate of *ad valorem* taxation that *county governments* may levy upon taxable property to 5 mills:  *i.e*., "No county in this state shall be authorized to levy a greater rate of taxation in any one year on the

---

equal $.0065").

[30] The full text of § 260 is set out in "**Appendix I-5**."

[31] Legislator's Guide, at 3 (observing that millage rates are applied to the "*assessed* value of property") (emphasis in original).

value of the taxable property therein than one-half of one per centum [0.005]."  Ala. Const. art. XI, § 215 (1901), *amended by* amend. 208 (*ratified* Nov. 11, 1962) (bracketed alteration added).[32]

### *iii*.    **Article XI, Section 216** — *limiting municipal tax rates*

The pertinent portion of Section 216 limits the rate of *ad valorem* taxation *municipalities* may levy upon taxable property to 5 mills: *i.e.*, "No city, town, village, or other municipal corporation, other than as provided in this article, shall levy or collect a higher rate of taxation in any one year on the property situated therein than one-half of one per centum [0.005] of the value of such property as assessed for state taxation during the preceding year. . . ."  Ala. Const. of 1901 art. XI, § 216.[33]

### *iv*.    **Article XI, Section 217**, *as twice amended*

As originally adopted, Section 217 of the Alabama Constitution simply provided that:  "The property of private corporations, associations and individuals of this State shall forever be taxed at the same rate; provided, this section shall not apply to institutions devoted exclusively to religious, education or charitable purposes."  Ala. Const. art. XI, § 217 (1901).[34]  This language was extensively modified in 1972

---

[32] The full text of § 215, which contains certain exceptions that are not relevant here, is set out in "**Appendix I-1**."

[33] The full text of § 216, which contains certain exceptions that are not relevant here, is set out in "**Appendix I-2**."

[34] *See* James J. Mayfield, *Constitutions of 1875 and 1901:  Paralleled, Annotated and*

by Amendment 325, and a second time in 1978 by Amendment 373.  Both are discussed below.

### (A)    **Amendment 325**, *ratified in 1972*

Amendment 325 revised the language of Section 217 in order to establish three classes of property for purposes of *ad valorem* taxation:  *i.e.*, Class I (all property of public utilities used in the business of such utilities); Class II (all property not otherwise classified); and Class III (agricultural, forest, and residential property).  The Amendment also set the assessment ratio corresponding to each class at 30% of the "fair and reasonable market value" for Class I properties, 25% for Class II properties, and 15% for Class III properties.  *See* Ala. Const. art. XI, §§ 217(a), (b) (1901), *amended by* amend. 325 (*ratified* Jun. 8, 1972), *reproduced at* 1940 Ala. Code, vol. 1 (Recomp. 1958) (Supp. 1973), at 292.[35]   The amendment also required voter approval of all property tax increases:

> (e)  Any county, municipality, or other taxing authority may increase the rate at which ad valorem taxes are levied above the limit now provided in the Constitution provided that the proposed increase shall have been (1) proposed by the authority having power to levy the tax after a public hearing on such proposal, (2) thereafter approved by an act of the legislature, and (3) subsequently approved by a majority vote of the qualified electors of the area in which the tax is to be levied

---

*Indexed* 120 (Nashville, Tenn:  Marshall & Bruce Co. 1904) ("**Mayfield**").

[35] See "**Appendix I-3**" for the full text of Ala. Const. art. XI, § 217 (1901), *amended by* amend. 325 (*ratified* June 8, 1972).

Case 5:08-cv-00450-CLS    Document 296    Filed 11/07/11    Page 53 of 450

or increased who vote on the proposal.

*Id*. § 217(e).  Finally, Amendment 325 imposed a cap (or "lid") of 1.5% of the appraised fair market value on the *aggregate* amount of *ad valorem* taxes that could be levied by *all* taxing authorities in each tax year:  *i.e.*, the State, a county, any municipalities within the county, and all school districts within the county, *combined*. *Id*. § 217(h) ("Any provision of the Constitution of Alabama to the contrary notwithstanding, ad valorem taxes shall never exceed 1½% of the fair and reasonable market value of the property in any one taxable year.").

### (B)    **Amendment 373**, *ratified in 1978*

Amendment 373, ratified on November 20, 1978, further altered the language of Section 217, as previously revised by Amendment 325.  It established *four* property classifications, and lowered the assessment ratios for all classifications (except that of utilities) below those established by the previous amendment.  The four classifications and their respective assessment ratios are as follows:

Class I      all real and personal property owned by public utility companies used in the business of such utilities[36] — assessed at 30% of fair market value;

Class II     all property not otherwise classified (a catch-all category, capturing all real and personal property that does not fit within the definitions of the other three classifications, and including most business, commercial, and

---

[36] *See* Ala. Code §§ 40-8-1(a), (b)(5) (1975) (2003 Replacement Vol.).

industrial properties, as well as residential rental properties and "second homes" not occupied as the owner's primary residence)[37] — assessed at 20% of fair market value;

Class III     all agricultural, forest, and single-family owner-occupied residential property, and historic buildings and sites — assessed at 10% of fair market value; and,

Class IV     all private passenger automobiles and motor trucks of the type commonly known as "pickups" or "pickup trucks" owned and operated by an individual for personal or private use, and not for hire, rent, or compensation — assessed at 15% of fair market value.

*See* Ala. Const. art. XI, §§ 217(a), (b) (1901), *amended by* amend. 373 (*ratified* Nov. 20, 1978).[38]

Amendment 373 also imposed variable caps (or "lids") on the *total* amount of *ad valorem* taxes that can be levied on a particular parcel of taxable property within one year by *all* taxing authorities: state, county, municipalities, *and* school districts *combined*. These absolute dollar limits are based upon the *appraised value* (estimated fair and reasonable market value) of the property — *not* its *assessed value* — and the sum of *all* property taxes levied by *all* taxing authorities may not exceed in any one year: 2% (0.02) of the fair market value of Class I property; 1.5% (0.015) of the fair market value of Class II property; 1% (0.01) of the fair market value of

---

[37] *Id*. §§ 40-8-1(a), (b)(4).

[38] See "**Appendix I-4**" for the full text of Ala. Const. art. XI, § 217 (1901), *amended by* amend. 373 (*ratified* Nov. 20, 1978).

Class III property; and 1.25% (0.0125) of the fair market value of Class IV property.[39]

*Id*. § 217(i).  Thus, the computation of the absolute dollar limits on the aggregate

amount of all *ad valorem* property taxes is made *before* applying the *assessment* ratio

applicable to the class in which the property is grouped.[40]

This means, for example, that a Class III residence with an appraised fair

market value of $100,000 can only be assessed by all taxing authorities at a total tax

that does not exceed the aggregate amount of $1,000 (*i.e.*, 100,000 x 0.01 "lid").[41]

Practically speaking,

> [t]he local tax assessor applies any "Lid Bill" dollar limitations before
> sending the property tax notice to the property owner.  If the "Lid Bill"
> disallows the collection of a portion of the property tax, the actual
> property tax collection enjoyed by the state, county, municipalities and
> school districts is reduced proportionally according to each of their
> relative millage rates as compared to the total, which is obtained by
> adding up all four levels of millage rates.[42]

The most fundamental change in preexisting law wrought by Amendment 373,

however, was the provision that allows the owners of Class III properties — *i.e.*, land

---

[39] The absolute dollar limits on the aggregate amount of taxes that may be imposed within any one year by all taxing authorities are specified in § 217(i), which is commonly referred to as "the Lid Bill."  *Nota bene*:  The cities of Mountain Brook, Vestavia Hills, and Huntsville were specifically exempted from the limitations imposed by the Lid Bill amendment because the total taxes levied within those municipalities exceeded the lids when Amendment 373 was proposed.

[40] *See, e.g.*, Susan Pace Hamill, *Constitutional Reform in Alabama*:  *A Necessary Step Towards Achieving a Fair and Efficient Tax Structure*, 33 Cumb. L. Rev. 437, 445 (2003) ("**Hamill III**").

[41] *Id*. at 446.

[42] *Id*. at 446 n.25.

devoted to agricultural pursuits or timber and forest-product production, historical buildings and sites, and single-family, owner-occupied, residential dwellings — the option of electing to have the value of such property appraised on the basis of *either* its "fair and reasonable market value" (as in the case of the other three classes of property created by Amendment 373), *or* on the basis of the property's "current use value"[43] — a method of appraisal that ignores the property's fair market value, and limits the valuation process to the use being made of the property on the date of appraisal.[44]   It is specifically provided that "*no consideration* shall be taken of the *prospective value* such property *might* have *if it were put to some other possible use*."[45]   As one academician has noted:  "Virtually every state in the Union has some sort of program designed to confer special property tax treatment upon farms. . . ."[46]

> Farm property is accorded special treatment in several different ways:  preferential assessment at current use value instead of market value; deferred taxation of land kept in farming; credits against state income taxes; purchase of development rights; and land-use zoning. ...[47]

---

[43] *See* Ala. Const. art. XI, § 217, ¶ (j) (1901), *amended by* amend. 373 (*ratified* Nov. 20, 1978) (providing, in part, that "Class III property shall, *upon application by the owner of such property*, be assessed at the ratio of assessed value to the *current use value* of such taxable property *and not the fair and reasonable market value* of such property") (emphasis supplied).

[44] *See* Ala. Code § 40-7-25.1(a) (defining "current use" as "the value of eligible taxable property based on the use being made of that property on October 1 of any taxable year").

[45] *Id*. (emphasis supplied).

[46] Donald F. Vitaliano, "Property tax, farm," in *The Encyclopedia of Taxation and Tax Policy* 287 (Washington, D.C.:  The Urban Institute Press 1999) (Joseph J. Cordes, Robert D. Ebel, and Jane G. Gravelle eds.) ("**Vitaliano**").

[47] *Id*.  Professor Vitaliano goes on to observe that such plans originally were thought of as

26

As of 1997, forty-four states "relied primarily upon some variant of use-value assessment."[48]

The policy rationale undergirding most of the programs adopted by other states to confer special property tax treatment upon farms is that they allow the owners of agricultural lands located on the fringe of an urban area, or next to a commercial development or industrial site, to avoid the higher property taxes that would result if the property were to be appraised on the basis of a speculative value that might be attributed to the property "because of market forces on adjoining property,"[49] and, based upon an assumption that the parcel would be devoted (or converted) to the same use as the adjoining and higher-valued property if sold.[50] Dr. Harvey observed,

a way to preserve family farming.  "However, *the weight of professional judgment and empirical evidence appears not to support such programs*, whether judged on their own terms or by the conventional public finance criteria of equity, economic efficiency, and ease of administration."  *Id*. (emphasis supplied).

[48]  *Id*.

[49]  Ira W. Harvey, *A History of Educational Finance in Alabama* 471 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**").

[50]  *See, e.g.*, Ira W. Harvey, *School Finance Training Program Manual*, at 7-12 to 7-13 (Tuscaloosa:  University of Alabama Superintendents' Academy, Jan. 2005 Rev.) ("**Harvey III**") ("In other states, current use is a greenbelt assessment method created to protect agricultural land on the urban fringe from a rate of taxation similar to that on developed land similarly situated.  Normal use of current use provisions values land on a greenbelt perimeter as that outside the urban perimeter."), found at http://uasa.ua.edu/academy (School Finance Training Manual Module 7); Susan Pace Hamill, *An Argument for Tax Reform Based on Judeo-Christian Ethics*, 54 Ala. L. Rev. 1, 24-25 (2002) ("**Hamill II**") ("The current use election of valuation protects owners of Class III property from unreasonably high property taxes that would result if property values were *artificially inflated by prospective developers*.  For example, if a homeowner elects current use status, the value of the house and lot must reflect only what a willing buyer will pay for the house to be used as a house *and cannot reflect a higher price a willing developer would offer to convert the house to*

however, that Alabama's approach is materially different from other states in important respects.

> "Rather than protecting suburban area farm land from tax values that might apply to developing land, current use in Alabama is applied statewide and becomes a special tax exemption benefitting the special interest groups which wrote and sought passage of the legislation [that implemented the provisions of Amendment 373] in 1982." Current use valuation can be obtained by all Class III landowners who file for the exemption by claiming that their land is used for agricultural purposes. The loss in revenue, a large portion [of] which would be for rural public schools, has been estimated to be as high as $40 million.[51]

The "current use" method of appraisal is a focal point of plaintiffs' claim that Alabama Constitution Section 217 as amended by Amendments 325 and 373, is unconstitutional because, omitting the 997,900 acres of Federal land,[52] and 1,290,100

---

*commercial use*.") (emphasis supplied, footnotes omitted).

[51] Harvey III, at 7-13 (quoting Keith J. Ward & Lane D. Sauser, *Equity Funding for Education:  A Report to the Alabama Legislature* 5.4 (Auburn:  Auburn University Center for Governmental Services 1997) ("**Ward & Sauser**")).

[52] "Federal land" is a term defined by the 2007 National Resources Inventory Summary Report (compiled and published jointly by the United States Department of Agriculture Natural Resources Conservation Service and the Iowa State University Center for Survey Statistics and Methodology) ("**2007 National Resources Inventory**") as: "A land ownership category designating land that is owned by the Federal Government.  It does not include, for example, trust lands administered by the Bureau of Indian Affairs or Tennessee Valley Authority (TVA) land.  No data are collected for any year that land is in this ownership."  *Id*. at 13.  A copy is available at www.nrcs.usda.gov/wps/portal/nrcs/main (click on the bold blue words in the first sentence of the second paragraph appearing on the "Land Use" page (*i.e.*, "Per the 2007 National Resources Inventory there are . . ."), and a PDF copy of the Summary Report can be viewed with Adobe Acrobat®) (last viewed Aug. 31, 2011).

28

acres of water areas,[53] and 2,942,900 acres of developed land[54] from the total surface

area encompassed within the boundaries of the State of Alabama (33,423,800 acres)

leaves a remainder of 28,192,900 acres of rural land subject to being devoted to

agricultural pursuits or timber production.[55] Of that acreage, the following land areas

were devoted to the uses listed during 2007, the most recent year for which reliable,

objective, and unimpeachable governmental information is available:[56]  2,221,900

---

[53] "Water areas" is defined as:  "A *Land cover/use* category comprising water bodies and streams that are permanent open water."  *Id*. at 16 (emphasis in original).

[54] "Developed land" is defined as:  "A combination of land cover/use categories.  *Large urban and built-up areas, Small built-up areas, and Rural transportation land*."  *Id*. at 10 (emphasis in original).  The term "urban and built-up areas" is, in turn, defined as:  "A *Land cover/use* category consisting of residential, industrial, commercial, and institutional land; construction sites; public administrative sites; railroad yards; cemeteries; airports; golf courses; sanitary landfills; sewage treatment plants; water control structures and spillways; other land used for such purposes; small parks (less than 10 acres) within urban and built-up areas; and highways, *railroads*, and other transportation facilities if they are surrounded by urban areas. . . ."  *Id*. at 16 (emphasis in original).  The term "small built-up areas" is defined as:  "A *Land cover/use* category consisting of developed land units of 0.25 to 10 acres, which meet the definition of *Urban and built-up areas*."  *Id*. at 15 (emphasis in original).  "Rural transportation land" is defined as:  "A *Land cover/use* category which consists of all highways, roads, railroads and associated rights-of-way outside *urban and built-up areas*; also includes private roads to *farmsteads or ranch headquarters*, logging roads, and other private roads (field lines are not included)."  *Id*. at 14 (emphasis in original).

[55] All of the figures quoted in text are taken from the 2007 National Resources Inventory, at 19 ("Table 1 – Surface area of non-Federal land and water areas, by State and year").

[56] *I.e.*, the 2007 National Resources Inventory cited in the preceding footnote.  *See also* Federal Rule of Evidence 803, providing, in the part here relevant, that public records, reports, statements, or data compilations, in any form, of public offices or agencies, that set forth "**(B)** matters observed pursuant to [a] duty imposed by law as to which matters there was a duty to report, . . . or **(C)** in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness," are not excluded by the hearsay rule, even though the author(s) of the governmental report ("declarant") may be available as a witness. Fed. R. Evid. 803(8)(B), (C).

acres (7.88%) to Cropland;[57] 456,600 acres (1.62%) to Conservation Reserve Program (CRP) land;[58] 3,464,200 acres (12.29%) to Pastureland;[59] 73,300 acres (0.26%) to Rangeland;[60] and 21,529,400 acres (76.36%) to Forest land.[61]

In other words, a total of 27,745,400 acres of rural land[62] — 98.4% of the total rural acreage in Alabama, and 83.0% of the total surface area encompassed within the State's boundaries — was subject to being appraised under the "current use" methodologies discussed in more detail in Part II(F)(2)(b)(*ii*) of this opinion, *infra*. In addition, 1,499,200 of the 2,221,900 acres of Alabama cropland in 2007 (67.47%) was defined as "Prime farmland."[63]

---

[57] "Cropland" is defined, in part, as: "A *Land cover/use* category that includes areas used for the production of adapted crops for harvest. . . ." 2007 National Resources Inventory, at 10 (emphasis in original).

[58] "Conservation Reserve Program (CRP) land" is defined as: "A *Land cover/use* category that includes land under a CRP contract." *Id*. at 9 (emphasis in original).

[59] "Pastureland" is defined, in part, as: "A *Land cover/use* category of land managed primarily for the production of introduced forage plants for livestock grazing. . . ." *Id*. at 13 (emphasis in original).

[60] "Rangeland" is defined, in part, as: "A *Land cover/use* category on which the climax or potential cover is composed principally of native grasses, grasslike plants, forbs or shrubs suitable for grazing and browsing, and introduced forage species that are managed like rangeland. . . ." *Id*. at 14 (emphasis in original).

[61] "Forest land" is defined, in part, as: "A *Land cover/use* category that is at least 10 percent stocked by single-stemmed woody species of any size that will be at least 4 meters (13 feet) tall at maturity. Also included is land bearing evidence of natural regeneration of tree cover (cut over forest or abandoned farmland) and not currently developed for nonforest use. . . ." *Id*. at 14 (emphasis in original).

[62] 2007 National Resources Inventory, at 32 ("Table 2 – Land Cover/Use of non-Federal rural land by State and year").

[63] *Id*. at 72 (Table 11 – Prime farmland, by land cover/use, by State and year"). The generic term "Prime farmland," which apparently encompasses crop, pasture, and range land, is defined as

For such reasons, plaintiffs have made this approach to appraising the value of Class III agricultural and timber properties a primary target of this action.

*v*.     **Article XIV, Section 269**, *as amended*

As originally adopted, Section 269 of the 1901 Constitution limited the rate of *ad valorem* taxation that counties could levy "for the support of public schools" to one mill (*i.e*., "ten cents on each one hundred dollars of taxable property in such counties"). The language of that provision was revised in 1956 by Amendment 111, in order to remove the reference to "public schools"[64] and replace that term with a generic reference to "*education*" — a pattern of language that was, as will be seen

"Land that has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops and is also available for these uses." *Id*. at 13.

[64] The original language of Section 269 read as follows:

> Sec. 269.  The several counties in this state shall have power to levy and collect a special tax (a) not exceeding ten cents on each one hundred dollars of taxable property in such counties, *for the support of public schools*; provided, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, state and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads, bridges, and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.  The funds arising from such special school tax shall be so apportioned and paid through the proper school officials to the several schools in the townships and districts in the county that the school terms of the respective schools shall be extended by such supplement as nearly the same length of time as practicable; provided, that this section shall not apply to the cities of Decatur, New Decatur and Cullman.

Ala. Const. art. XIV, § 269 (1901) (emphasis supplied).  *See also* Mayfield, at 139-40.

31

later in this opinion, designed to include *private* as well as public educational facilities.  The present provision reads as follows:

> The several counties in this state shall have the power to levy and collect a special tax not exceeding ten cents on each one hundred dollars of taxable property in such counties, for the support and furtherance of *education in such manner as may be authorized by the legislature*; provided, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, state and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads, bridges, and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.

Ala. Const. art. XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956) (emphasis supplied).

### b.   The injuries alleged by plaintiffs

Plaintiffs contend that they "are injured by the racially discriminatory property tax restrictions . . . which impede their ability and the ability of their elected representatives to raise state and local revenues adequately to fund the public services they need, including public education."[65]   The essence of plaintiffs' contentions is captured in the following allegations:

> 33.  Alabama's constitutional development since Reconstruction

---

[65] Doc. no. 1 (Complaint) ¶¶ 7-9.

32

has been driven by its policy of shielding property from taxation that whites in the Black Belt feared could be imposed for the benefit of black public school students by democratically elected state and local governments potentially influenced by a re-enfranchised black electorate.    The two main mechanisms of this policy were constitutionally entrenched millage caps and artificially low property assessments.  This century-old scheme came under attack on several fronts after *Brown v. Board of Education*, 347 U.S. 483 (1954).

. . . .

43.    The racially motivated property tax restrictions in the Alabama Constitution continue to have their intended discriminatory effects, namely, inadequate revenues currently collected from local property taxes, the resulting underfunding of the state's K-12 public school system, particularly rural and majority-black schools, the over-dependence of K-12 on the Education Trust Fund and the consequent underfunding of Alabama's entire system of public education, including higher education.

> [O]ne of the most important changes needed in Alabama is a substantial increase in property taxes because in Alabama, the property tax revenue is so low the state has to pick up the bulk of the cost of the public schools from regressive sales and income taxes; moreover, inasmuch as higher education is funded from the same source as K-12, the monies available to higher education are substantially reduced.

[*Knight v. Alabama*,] 458 F. Supp. 2d [1273,] 1304 [(N.D. Ala. 2004)] (citations omitted).

. . . .

46.  This tax system disadvantages low-income citizens and poor, rural counties.  It is neither just nor practical to seek more education revenues through sales and income taxes; "a greater reliance on sales

33

taxes cannot compensate for disproportionately low property taxes."
458 F. Supp. 2d at 1298.

. . . .

49.  "The effect of low property tax revenues has had a crippling
effect on poor, majority black school districts." 458 F. Supp. 2d at 1299
(citation omitted).  These majority-black school districts are primarily
in the rural Black Belt.

> In rural areas of the state, most local school districts
> simply do not have a critical mass of valuable commercial
> property and residential homes — the two types of property
> shouldering eighty-five percent of the property taxes — to
> raise adequate funds for public education.  Moreover, in
> areas where the significant source of wealth is timber, the
> property tax structure bars taxation above ten percent of the
> current use value of such areas; consequently, that property
> does not provide much property tax revenue.  *Id*. (Citations
> omitted).[66]

The primary variable affecting the amount of *ad valorem* tax owed to any

taxing authority is the "tax base":  that is, the value of the real and personal property

subject to taxation that is located within the relevant jurisdiction.  As a result,

unintended (and, plaintiffs say, intended) consequences may flow from such a system.

For example, property-poor tax districts are unlikely to generate as much revenue to

fund public services, such as the local public school systems, as can those districts

with a more valuable property base.[67]  For such reasons, plaintiffs concentrated their

---

[66] *Id*. ¶¶ 33, 43, 46 & 49.

[67] *See*, *e.g*., Ward & Sauser, at 1.1 (observing that, "when a child lives in a district with less

34

attention upon Alabama's system of levying *ad valorem* property taxes at the *local*

level.[68]

All of the paragraphs of plaintiffs' complaint falling under the subsection

heading "Continuing racially discriminatory impact" discuss underfunding of

education in the State and, particularly, the disproportionate impact that taxation

---

wealth, that district will have less money to spend for each student than will districts with greater amounts of wealth").

[68] Without question, plaintiffs challenge the constitutionality of the 6.5 mill limitation on the State's *ad valorem* tax levy. Even so, plaintiffs' counsel made clear on the last day of trial that the focus of their challenge is on the various provisions that limit the levy of property taxes at the *local* level. Counsel stated:

> Your Honor, if you would look at Page 2 of the complaint, it lists the six constitutional provisions that the plaintiffs are challenging. And they include as you say, Section 214 of the original 1901 constitution, which limits the 6.5 mills the state legislature may levy. But it also challenges Section 215, which is the limit on what a county may levy; Section 216, which is a limit on what a municipality may levy; Section 269, which is a limit on what may be levied by a county for school purposes; and then Amendments 325 and 373, which amend the original 269 —
>
> . . . .
>
> So — and actually, *the main focus is on local revenues*, *not state revenues*.
>
> In fact, we have not challenged the way the Minimum Foundation Program redistributes the Education Trust Fund, which is mainly, as you know, sales and income taxes; nor are we challenging the way the 3 mills that are levied by the state and go to education are being restricted.
>
> . . . .
>
> But *the case is mainly about the ability of each local school system to raise local revenues so that they can fund things that state funds don't provide*. . . .

Transcript Vol. 15 (doc. no. 271) (arguments of counsel), at 40-42 (emphasis supplied).

revenue shortages have on the least-well-funded, and often majority-black, school systems.[69]   In their reply brief in support of their motion for summary judgment, plaintiffs emphasized that "[t]he harm intended by — and all too well accomplished by — the challenged property tax provisions is to restrict the ability of local school systems to raise revenue for their students."[70]  In plaintiffs' responses to defendants' First Interrogatories, which were filed with this court on April 9, 2009, plaintiffs answered "yes" to both of the following questions:  "Is it your contention that the alleged underfunding of K-12 public education in Alabama denies Plaintiffs an adequate education?"; and "Is it your contention that the quality of Plaintiffs' public education is diminished by the alleged racially discriminatory property tax restrictions in the Alabama Constitution?"[71]   In response to defendants' motion for summary judgment, plaintiffs argued that

> the six racially motivated property tax restrictions in the Alabama Constitution **targeted** students in Black Belt counties like Sumter, that those provisions are the proximate **cause** of why their school systems are under-resourced, and that students in rural Lawrence County are among the drive-by victims of the Black Belt scheme to shield white landowners.[72]

---

[69] Doc. no. 1 (Complaint) ¶¶ 43-57.

[70] Doc. no. 44 (Plaintiffs' Brief in Response to Defendants' Brief Opposing Summary Judgment), at 38.

[71] Doc. no. 68 (Plaintiffs' Responses to Defendants' First Series of Interrogatories) ¶¶ 42-43.

[72] Doc. no. 166 (Plaintiffs' Brief Opposing Defendants' Motion for Summary Judgment), at 44 (boldface emphasis in original).

36

In the same brief, plaintiffs state that the relevant question is not the **distribution** of school revenues among school systems in Alabama, but "whether the six challenged constitutional provisions cause a substantial diminution of the **amount** of local school revenues available to residents and students in Sumter, Lawrence, and other similarly impacted counties and school systems."[73]  They also state that the "millage caps and cumbersome override process" in the Alabama Constitution cause "**local** school revenues to be regressive and inadequate" to fund schools in the Black Belt and other rural areas, thereby causing an over-reliance on state school funding and a consequent reduction in the overall amount of revenues for all public schools in the state.[74]  Later in the brief, plaintiffs state:

> African-Americans in the Black Belt counties that were targeted by the drafters of these constitutional provisions continue to suffer from inadequate local revenues to fund their (almost all-black) public schools. In addition, black and white students of public schools in other rural counties suffer a similar lack of local revenues, because the facially neutral devices written into the state constitution to accomplish the purposeful discrimination necessarily removed the same kinds of property from all rural tax bases and revenues.[75]

Finally, plaintiffs sum up their theory as follows: "the six[76] racially motivated

---

[73] *Id.* at 45 (boldface emphasis in original).

[74] *Id.* at 6, ¶¶ 4(b), 5, & 6 (boldface emphasis in original).

[75] *Id.* at 38.

[76] Plaintiffs' Complaint lists the challenged provisions as:  (1) § 214, (2) § 215, (3) § 216, (4) § 269, (5) Amendment 325, and (6) Amendment 373, as opposed to the manner in which this court organized them in Part I(A)(1)(a)(*i*)–(*v*) above.

property tax provisions have accomplished their two-pronged racially discriminatory purpose:  whites are favored with lower taxes, and blacks are burdened with less funding for schools."[77]

During the trial, in response to defendants' oral motion for judgment as a matter of law at the close of plaintiffs' case-in-chief, plaintiffs' counsel stated:

> counsel for the state continues to insist on an argument that was rejected by earlier motions that they filed[;] that in order for the plaintiffs to establish the continuing discriminatory effects we have to prove that the money that is raised by the state is being distributed unfairly.  That is not our case.  *This is not an equity case.  This is an adequacy case.*
>
> There is no question but that Amendment 373, by its lids, by its procedures, by its — certainly by the classification assessment ratios, and, most importantly, by the current use provisions, restrict the amount of property tax than can be raised, particularly at the local level where property tax is needed the most.
>
> *This is a case about adequacy.*  And we have produced evidence through Dr. Sullivan and others, Dr. Harvey, I believe also testified about this, how because the local revenues are restricted in the amount that they can raise, there's a disproportionate reliance in our public schools or [sic: "on"] state school revenues, and that reduces the amount of money that's available for schools everywhere in the state.  And the reduction of that amount falls most heavily on schools that need more money the most, which are poor schools and which are predominantly black schools.[78]

At the conclusion of trial, plaintiffs' counsel again emphasized that this case

---

[77] Doc. no. 166 (Plaintiffs' Brief Opposing Defendants' Motion for Summary Judgment), at 56.

[78] Transcript Vol. 11 (doc. no. 267) (arguments of counsel), at 91-92 (emphasis supplied).

was about the "size of the pie," not the "distribution of the pie."[79]  And, in plaintiffs'

post-trial brief, counsel argued that:

> The racially motivated property tax restrictions in the Alabama Constitution continue to have their intended discriminatory effects, namely, inadequate revenues currently collected from local property taxes, the resulting underfunding of the state's K-12 public school system, particularly rural and majority-black schools, the over-dependence of K-12 on the Education Trust Fund and the consequent underfunding of Alabama's entire system of public education, including higher education.[80]

They also state:

> 11.  Today these constitutional restrictions on millage and on the tax base to which the millage is applied still operate as their drafters intended to reduce the amount of **local** school revenues in the Black Belt counties more than elsewhere in Alabama, because these counties are most dependent on farm and timber land for their tax base.  But the millage caps, complicated override procedures, low assessment ratios, and current use provisions embedded in the Alabama constitution necessarily restrict the amount of local property taxes that can be raised by all school systems, especially those in other rural counties.  White public school children necessarily are denied adequate local revenues just as are black children.

> 12.  Moreover, the absence of adequate local revenues to meet even the state's own education requirements causes an over-reliance on the regressive sales and income taxes that contribute most of the funds in the state's education trust fund.  That means less overall funding for all public K-12 students in Alabama and less state funding for public higher education.  Underfunding public education hurts low- and middle- income students most, because they need more K-12 resources

---

[79] Transcript Vol. 15 (doc. no. 271) (arguments of counsel), at 186.

[80] Doc. no. 274 (Plaintiffs' Post-Trial Brief) ¶ 3.

and more financial aid to meet the rising costs of college.[81]

Immediately below the subheading "*This Litigation is About Inadequate Local Funding of Education*" in their post-trial brief, plaintiffs state, "The gravamen of plaintiffs' Complaint is the inability of local school systems to raise sufficient ad valorem tax revenues to provide for an adequate education."[82]

Finally, in their response to defendants' post-trial brief, plaintiffs describe the injury allegedly caused by the challenged constitutional provisions as follows: "[The complaint] alleges causes of action based on racial discrimination. *Lack of adequate school revenues, especially at the local level, is the injury caused by the racial discrimination.*"[83]  Later in that same brief, however, plaintiffs appear to contradict that assertion when saying that their "injury in this action is caused by racial discrimination, not by 'underfunding that deprives' them an 'adequate education,' as defendants argue."[84]  On the following page, plaintiffs' counsel attempts to clarify the apparent inconsistency between the foregoing statements by linking them:

> So the first injury suffered by plaintiffs is being subject to state constitutional provisions that were designed to discriminate against African Americans.  But, in addition to this continuing official insult,

---

[81] *Id.* ¶¶ 11-12 (boldface emphasis in original).

[82] *Id.* ¶ 427.

[83] Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 5-6 (emphasis supplied).

[84] *Id.* at 76-77.

40

these six provisions continue, as they were intended, to benefit white
landowners and to make it more difficult to raise local school revenues
for black students, particularly for those black students in the targeted
Black Belt school systems.[85]

### c.   The relief sought by plaintiffs

Plaintiffs ask this court to enter a judgment declaring that the property tax

restrictions embedded in Alabama's Constitution violate the Equal Protection Clause

of the Fourteenth Amendment to the United States Constitution and Title VI of the

Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, "and to [fashion] a prohibitory

injunction against their future enforcement."[86]

> Plaintiffs do not ask this Court to oversee reform of Alabama's property
> tax system, its system for raising revenue for public education, or the
> adequacy of its funding of the system of public education.  As stated by
> the Alabama Supreme Court and the U.S. Court of Appeals, tax reform
> and the provision of adequate education funding are the responsibility
> of the legislative branch of government.  If this Court grants the relief
> requested herein, the Governor and Legislature of Alabama will be able
> to carry out these vital legislative functions free of the purposefully
> racially discriminatory barriers placed in the state constitution.[87]

### 2.   The Defendants and Their Contentions

Plaintiffs asserted their claims against three defendants:   the State of

Alabama;[88] the Governor of the State of Alabama;[89] and the Revenue Commissioner

---

[85] *Id.* at 78.

[86] Doc. no. 1 (Complaint) ¶ 6.

[87] *Id.*

[88] *Id.* ¶ 10 ("Defendant State of Alabama has departments, agencies and political subdivisions

41

for the State of Alabama.[90]   According to plaintiffs, the State of Alabama receives

federal funding within the meaning of Title VI, and has waived its sovereign

immunity from suit in this case.  The Governor holds the "supreme executive power"

in the State, including the responsibility for appointing the Revenue Commissioner

and approving legislation governing the State's revenue policies.  The Revenue

Commissioner is responsible for enforcing all of the constitutional provisions

challenged in this case and their enabling statutes, as well as for promulgating rules

and regulations governing the valuation of property subject to *ad valorem* taxes.

The interests and positions of all defendants were aligned throughout this

litigation, despite the fact that the Governor is represented by separate counsel from

the State and Revenue Commissioner.  All defendants have generally denied the

---

which are programs or activities receiving federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d and 2000d-4a. Congress has abrogated the Eleventh Amendment immunity of the State of Alabama with respect to plaintiffs' claims in this action. 42 U.S.C. § 2000d-7.").

[89] *Id*. ¶ 11 ("Defendant Bob Riley [now Dr. Robert J. Bentley, pursuant to Fed. R. Civ. P. 25(d)], in his official capacity as Governor of Alabama, exercises the supreme executive power of the State of Alabama.  Ala. Const., Art. V, § 13.  Among his executive duties, Governor [Bentley] must appoint the Alabama Commissioner of Revenue, who holds office at the pleasure of the Governor.  Ala. Code § 40-2-41.  As Governor, defendant  [Bentley] must also approve legislation governing the revenue policies of state and local governments in Alabama.").

[90] *Id*. ¶ 12 ("Defendant Tim Russell [now Julie P. Magree], in his [now her] official capacity as Commissioner of Revenue, is the chief executive officer of the Alabama Department of Revenue and exercises all the powers, authority, and duties vested in the Department of Revenue.  Ala. Code § 42-2-40.  The Department of Revenue enforces the provisions of the Alabama Constitution complained of herein and their enabling statutes and promulgates rules and regulations governing the valuation of property subject to ad valorem taxes pursuant to its enforcement authority.").

42

material allegations of plaintiffs' complaint.[91]  This court has concluded that the best

manner in which to state defendants' specific arguments in opposition to plaintiffs'

claims is to address them in the contexts in which they arise, rather than attempting

to summarize them here.  For the sake of introduction, however, and in only the most

general of terms, the primary arguments defendants advance are that this court does

not have jurisdiction, that plaintiffs have failed to prove that the challenged

provisions were enacted with a discriminatory intent, that plaintiffs have failed to

prove any discriminatory effect of the challenged provisions, and that plaintiffs have

failed to prove a violation of Title VI.[92]

---

[91] See doc. no. 37 (Answer of the State of Alabama and Revenue Commissioner), at 10; doc. no. 38 (Answer of the Governor), at 9.

[92] *See generally* doc. no. 275 (Defendants' Post-Trial Brief); doc. no. 279 (Defendants' Response to Plaintiffs' Post-Trial Brief).

# Traditional Counties of the Alabama Black Belt

Lauderdale
Limestone   Madison   Jackson
Colbert
Franklin
Lawrence   Morgan   Marshall   De Kalb
Marion
Winston   Cullman   Cherokee
Etowah
Blount
Lamar   Walker   St. Clair   Calhoun
Fayette   Cleburne
Jefferson
Pickens   Talladega
Tuscaloosa   Clay   Randolph
Shelby
Coosa   Tallapoosa
Bibb
Chambers
Chilton
Elmore   Lee
Autauga
Greene   Hale
Perry
Sumter   Dallas   Montgomery   Macon   Russell
Bullock
Marengo
Wilcox   Lowndes
Clarke   Barbour
Monroe
Butler   Crenshaw   Pike
Washington   Henry
Coffee
Conecuh   Dale
Covington
Escambia   Geneva   Houston
Mobile

Traditional Counties of the
Alabama Black Belt

Source: Center for Business and Economic Research,
The University of Alabama

Baldwin

44

## C.   The "Black Belt," "Big Mules," and Other Terms

Plaintiffs identified a group of twelve Alabama counties that, they contend, constitute the present-day "Black Belt" for the purpose of illustrating the allegedly racially-discriminatory effects of the challenged constitutional provisions.[93]  Those counties are Barbour, Bullock, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Perry, Pickens, Sumter, and Wilcox;[94] and their respective locations within the State are depicted in the map on the facing page.  During the course of trial, however, the attorneys for the State and its Commissioner of Revenue repeatedly objected to any questions by plaintiffs' attorneys that referred to, or incorporated that definition.[95] That debate may be excused somewhat, because at least eight different iterations of what constitutes the "Black Belt" emerged during the course of trial, ranging from

---

[93] *See*, *e.g.*, "**Appendix I-6**" (map of the "Black Belt Counties Identified by Plaintiffs"); doc. no. 274 (Plaintiffs' Post-Trial Brief), at 165; Declaration of Dr. Ira Harvey (Plaintiffs' Exhibit 20), at 1 n.1 (using the same twelve counties for purposes of analysis); PX 387 (DOR Current Use Data Set 4-14-09 Enhanced), *passim* (same); PX. 415 (Assessed Valuation per Square Mill per County), *passim* (same); Transcript Vol. 3 (doc. no. 259) (arguments of counsel), at 253-55 (describing plaintiffs' use of these twelve counties and the school systems contained within or coterminous with them throughout their statistical evidentiary presentation).

[94] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief); *see also* PX 135 (Black Belt Alternative Lists), at 2.

[95] *See*, *e.g.*, Testimony of Dr. Wayne Flynt, Transcript Vol. 2 (doc. no. 258) ("**Flynt 2 Tr.**"), at 200-09; Testimony of Dr. Ira Harvey, Transcript Vol. 6 (doc. no. 262) ("**Harvey 6 Tr.**"), at 36-38; Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265) ("**Frederick 9 Tr.**"), at 132-34. More substantively, defense counsel challenged whether any such category of counties, however described, is relevant to determining whether the property tax provisions at issue have a disproportionate effect along racial lines. *See*, *e.g.*, doc. no. 279 (Defendants' Response to Plaintiffs' Post-Trial Brief), at 142, 144-46, 149-51.

eleven to twenty-two counties.[96]  Fundamentally, however, attempts to target the specific Alabama counties that should or should not be included in a contemporary (as opposed to an historical or "traditional") definition of that section of Alabama known as the "Black Belt" totally miss the mark.  Indeed, such an exercise overlooks the fact that the disputed section may be — and, at various times since the land that became "Alabama" was opened to settlement by English-speaking peoples, *has been* — more accurately defined in terms of a number of characteristics:  features such as the region's physical geography; its societal history (*i.e.*, the origins of those persons who settled the region, and their society, education, and wealth); its demographic make-up; and, possibly of greatest importance, the section's enduring influence over the State's political history.  Some of those inextricably-intertwined characteristics are explored below.

---

[96] *See* doc. no. 279 (Defendants' Response to Plaintiffs' Post-Trial Brief), Appendix B, at 1 (collecting different definitions of "Black Belt" offered at trial); PX 135 (Black Belt Alternative Lists), at 2; *see also* Flynt 2 Tr., at 202 ("When I used the term Black Belt, I referred to three different phenomena that lead to one culture.  But depending upon which of these three you use, you get three different answers to the question of what is the Black Belt."); *id.* at 203 ("So the answer to your question is some maps say 12, some maps say 14, some maps say 20, some say 22.").  *See generally id.* at 200-207 (describing in detail multiple different definitions of the Black Belt).  The "Black Belt Action Commission," formed during the Administration of Governor Robert R. "Bob" Riley for the purpose of improving the lives of persons residing in that section of the State (*see* Executive Order # 22 issued on Aug. 11, 2004, and, Executive Order # 50 issued on June 4, 2010), defined the Black Belt as consisting of the following twelve counties:  Bullock, *Choctaw*, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Perry, Pickens, Sumter, and Wilcox.  Notice that the Black Belt Action Commission's definition does not include Barbour County (on plaintiffs' list), but does include Choctaw County (not on plaintiffs' list).

1.    The Defining Characteristics of the "Black Belt"

a.    The geology of the Black Belt

The label "Black Belt" originated with descriptions provided by the earliest settlers of the dark, rich topsoil found in a narrow (25–30 mile wide), crescent-shaped, fertile plain stretching like a belt nearly 310 miles across central Alabama. That defining soil-belt runs out of Georgia, through parts of Russell and Barbour Counties in eastern Alabama, and then arcs in a northwesterly direction to (and through) Sumter County in western Alabama, and from there proceeds into the northeastern portions of Mississippi.[97] "At the heart of Alabama's Black Belt is the Ripley *cuesta*, a ridge with a steep north face and a gentle, sloping southern face."[98] A geological formation known as "the Selma Chalk" underlies the so-called "Blackland Prairie," a major physiographic component of the region. This sedimentary limestone bed was formed over millions of years in the warm and shallow gulf waters that once covered much of present-day Alabama. That prehistoric sea abounded with marine creatures and algae that produced tiny platelets of calcium carbonate. When the marine organisms died, their remains settled to the

---

[97] *See*, *e.g.*, www.ag.auburn.edu/hort/landscape/blackbelt.html for a map and description of the geological features and soils of the Alabama Black Belt.  Similar soil runs through parts of northeastern Georgia, eastern Tennessee, and southern South Carolina.

[98] Terrance L. Winemiller, "Black Belt Region in Alabama," in online version of The Encyclopedia of Alabama, found at http://www.encyclopediaofalabama.org /face/Article.jsp?id=h-2458 (last visited Sept. 7, 2011).

47

bottom and, over eons of time, accumulated to form a thick layer of white, chalk-like material.  When the ocean waters receded, those landmasses began to weather and plants colonized them.  The impermeable nature of the underlying chalk, together with the alkalinity of the soils originating from the chalk, promoted the growth of prairie grasses and cane.[99]  The organic material left behind by countless generations of decayed grasses and cane produced a fertile black clay soil that gave the region its distinctive color and original name.[100]

Moreover, unlike other portions of the State, the land of the Black Belt "was easily cleared because it had no large forests on it."[101]  Navigable rivers also were interwoven throughout the region, thereby making the transportation of cotton from plantations to markets in Mobile, New Orleans, and (eventually) Pensacola easy and efficient.[102]

### b.    The social history of the Black Belt

Even though the term "Black Belt" originated as a description of the prairies and dark soil of central Alabama and northeastern Mississippi, it also long has been

---

[99] In fact, during the earliest period of exploration, the central Alabama Black Belt Prairie region was "once known as the 'Canebrake' . . . ."  *See  Agriculture in Alabama*, www.encyclopediaofalabama.org (last visited Aug. 10, 2011).

[100] *See, e.g.*, David K. Nelson, *The Origins of Alabama's Black Belt Prairies*, www.outdooralabama.com; *Black Belt Region in Alabama*, www.encyclopediaofalabama.org (last visited Aug. 10, 2011).

[101] Flynt 2 Tr., at 200-03.

[102] *Id.*

48

used to describe a broad agricultural region in the American South characterized by a history of plantation agriculture in the nineteenth century, and, a very high percentage of African-Americans in the population. As many as one million persons were taken there before the Civil War, in a forced migration of enslaved laborers for the region's cotton plantations. After several generations in the area, many remained in the region following the Civil War and emancipation as rural workers, tenant farmers, and sharecroppers.

Because of the decline of family farms, the rural communities in the Black Belt commonly face acute poverty, exodus to cities, inadequate education programs, low educational attainments, poor health care, high infant mortality rates, short life expectancies, substandard housing, and high levels of crime and unemployment. Those socioeconomic problems led the *Birmingham News* to publish in 2002 a series of twenty-nine "special reports" over the course of seven months, all under the series title of "The Black Belt: *Alabama's Third World.*"[103] The emphasized portion of that title speaks volumes. Even though the authors of that series did an admirable job of describing may of the difficulties faced by persons residing in that section of the State, they failed to address fundamental questions, such as: Who settled the Black Belt?; How did they create its society?; and, Given the abundance and richness of the

---

[103] *See* www.al.com/specialreport/birminghamnews/?blackbelt.html (last visited October 10, 2011) (emphasis added). The series ran from May 12, 2002, to December 15, 2002.

region's natural resources, why did it become "Alabama's Third World"?[104]   The

following subsections attempt to address some of those questions.

> *i*.      **The origins of those persons who settled the region, and
> their society, education, and wealth**

David Hackett Fischer observed in his provocative study of the settlement of

the Atlantic seaboard, *Albion's Seed*,[105] that the British colonies were settled by at

least four great waves of English-speaking immigrants during the period between the

early seventeenth century and the American Revolution.   The first was an exodus

during the period of 1629 to 1640 of about twenty thousand "Puritans," originally

from the eastern region of England, by way of a sojourn in the Netherlands, and then

to Massachusetts.[106]   The second was composed of a small group of royalist

---

[104] During undergraduate school, the author of this opinion took a series of courses on Latin-and South-American politics.  Initially, I did so because that was my Departmental Advisor's area of specialization, and it seemed only proper that I should exhibit some academic interest in subjects about which he possessed a passionate interest.  Over time, however, I perceived similarities between the politics of that region of the world and those of Alabama.  I was particularly struck by the metaphorical similarity between this State and a phrase that one author penned to describe the economic condition of twentieth-century Peruvians:  they were "a nation of beggars sitting on benches of gold."  So also have been Alabamians.  We reside in a state that was blessed with an abundance of natural resources.  Yet we are impoverished spiritually, economically, and politically by the original sin of slavery, and its modern manifestations:  segregation and racism.

[105] *I.e.*, David Hackett Fischer, *Albion's Seed:  Four British Folkways in America* (New York: Oxford University Press 1989) ("**Fischer**").

[106] These immigrants were a deeply-religious people with a Calvinist bent who "protested" the creeds and rituals of the Church of England, and who are more accurately described as either *Separatists* or *Congregationalists*.  *See, e.g.*, Williston Walker, *The Creeds and Platforms of Congregationalism* (New York:  Charles Scribner's Sons 1893);  Perry Miller, *Errand into the Wilderness* (Boston:  Harvard University Press 1956) ("**Miller I**"); Perry Miller, *The New England Mind, From Colony to Province* (Boston:  Harvard University Press 1953) ("**Miller II**").

aristocrats that Fischer calls "Cavaliers," and large numbers of servants indentured to those aristocrats,[107] who migrated from the south and west of England to Virginia between the early 1640s and the 1670s.  The third wave was the movement of twenty-three thousand Quakers and Quaker sympathizers from the North Midlands of England during the half-century after 1675 to the Delaware Valley region, encompassing parts of New Jersey, Delaware, and Maryland, but principally the Colony of Pennsylvania.  The final wave of immigration was a massive flow of English-speaking peoples from the borders of north Britain and northern Ireland to the Appalachian backcountry during the second and third quarters of the eighteenth century.

---

[107] As Lawrence James observed, the word "aristocracy"

appeared late in our language, arriving via France in the mid-sixteenth century.  It was a compound of the Greek 'aristo' (the best) and 'kratos' (government) and defined an Aristotelian notion of the distribution of political power in an ideal state. Aristotle's aristocrats were men of learning and wisdom whose wealth gave them the leisure to devote their lives to government and the general welfare of the rest of society.  *This concept of aristocracy was highly flattering to an already dominant elite*, which, since the eleventh century, had been called the 'baronage,' 'nobility and latterly 'the peerage.'  *The Aristotelian notion of aristocracy reinforced an already deeply rooted sense of superiority and public responsibility which justified power and privilege.*

This new word assisted the long process of collective self hypnosis by which aristocrats convinced themselves that their distinctive qualities made them indispensable to the nation.  . . .

Lawrence James, *Aristocrats — Power, Grace, and Decadence:  Britain's Great Ruling Classes From 1066 to the Present* 1-2 (New York:  St. Martin's Press 2009) (single 'quotation marks' in original, emphasis supplied).

Although all of these groups of migrants were alike in speaking English, in being Protestants, and in being jealous of their British liberties, they differed from one another in many other, and significant, ways:  *e.g.*, in their particular brands of Protestantism; in their social ranks; in their education and commitment to the education of younger generations; in their historical customs; and, of course, in the British regions from whence they came and, therefore, the peculiar dialects spoken by each.[108]  Significantly, writes Fischer, each group "carried across the Atlantic four different sets of British folkways which became the basis of regional cultures in the New World."[109]   By the eve of the Revolution, these four cultures were firmly established in America.  The people of each group built their houses in different ways, ate different foods, cooked differently, treated the opposite sex differently, used time differently, and ordered their society and government differently.

The earliest settlers who had the greatest, and most enduring, influence upon the land that became "Alabama," and particularly that section of the State known as the "Black Belt," were those aristocratic elitists who moved from the south and west of England to (initially) Virginia and (later) Georgia.   Virginia's culture was

---

[108] George Bernard Shaw famously said:  "England and America are two countries separated by a common language."  The same can be said of the dialects spoken in different parts of the small island-home of English-speaking peoples, *especially* during the periods discussed above.  *See* Paul K. Longmore, *Good English Without Idiom or Tone:  The Colonial Origins of American Speech*, 37 J. of Interdisc. Hist. 513, 517 (2007).

[109] Fischer, at 6.

decisively shaped by the long-existing customs of its English immigrants.  As Fischer notes, most of the forty to fifty thousand people who migrated to Virginia between 1645 and 1670 came from sixteen counties in the south and west of England,[110] a triangular territory between Bristol, Warwick, and Kent that was roughly coterminous with the medieval kingdom of Wessex:  a region with its own distinctive culture dating back a millennium or more, and one that was well-established and deeply-ingrained in the psyche and mores of the peoples of that region long before King Harold II lost the Battle of Hastings to William of Normandy on October 14, 1066, during the Norman Conquest of England.[111]

"The countryside of [the Wessex] region was divided into comparatively large manors — larger than in the east of England — and dominated by a small landholding class":[112]  a socioeconomic group of lords, ladies, and other aristocratic elitists who were related to one another by blood and marriage, who had a highly developed sense of "honor," and who held a hierarchical conception of the "liberties" accorded to the multiple strata of their society.[113]

In the seventeenth century, a very much "smaller part of the population were

---

[110] *Id.* at 236.

[111] *Id.* at 241.

[112] *Id.* (bracketed alteration supplied).

[113] *Id.*

53

freeholders in the south and west of England than in East Anglia."[114]  People from the former region were royalist in their politics, Anglican in their faith,[115] and accustomed to extreme inequalities in their society, scattered rural living, and the production of agricultural staples.[116]   Of even greater significance for purposes of the present discussion is this fact:  slavery had existed on a huge scale throughout that area of England during the early Middle Ages,[117] and in the eighth and ninth centuries the size of major slaveholdings had been as large as some plantations in the American South a thousand years later.[118]  Indeed, Wessex slavery lasted far longer than in any other part of England.  Although slavery on the soil of England's home island had disappeared by the seventeenth century, the region that is the subject of this discussion was generally slow to change:  "The long continuity from the twelfth to the eighteenth century was very striking."[119]

Seventeenth century migrants to Virginia from the Wessex region of England brought their culture with them; and, argues Fischer, it was the inherited and deeply-ingrained culture of those aristocrats — *not* the physical environment of the

---

[114] Fischer, at 243.

[115] *Id.* at 243.

[116] *Id*. at 245.

[117] *Id.* at 241.

[118] *Id.* at 243.

[119] Fischer, at 245.

Chesapeake, *not* the plantation economies of the James and Potomac River regions, *not* the character of tobacco production, and *not* the demand for labor to cultivate the tobacco — that determined most of the patterns and social habits of living in Virginia. Thus, writes Fischer, in one of the most provocative of his theses, American slavery "did not create the culture of the tidewater Virginia; [instead,] *that culture created slavery.*"[120]   If Fischer's thesis is correct, and the author of this opinion tends to believe that it is, then the following discussion should serve to demonstrate that the same culture created the slavery that first took root in the "Great Bend of the Tennessee River Valley" and, later, spread like Kudzu into the Black Belt of Alabama.

---

[120] *Id.* at 256 (emphasis and bracketed alteration supplied).



### *ii*.   From the Virginia Piedmont to the Broad River Valley of Georgia

Many of the descendants of those English-speaking peoples who originally migrated to Virginia — Fischer's royalist "Cavaliers" — eventually moved from the Old Dominion to an area of Georgia known as the Broad River Valley, located in the northeastern portion of the state.  That Valley was bordered on the west by the river for which the region is named, and on the east by the Savannah River, which forms the boundary between Georgia and South Carolina.[121]  The confluence of the two rivers was the most strategic location in upper Georgia; and, for that reason, the third (and last) of Georgia's Colonial Governors, Sir James Wright, ordered "Fort James" to be constructed at the juncture of the rivers in 1773.  South Carolina's Colonial Governor also recognized the strategic importance of the location — and not just for defense of settlers from Indian assaults,[122] but also to assist in putting-down rebellion if the traitorous rumblings emanating from Massachusetts should reverberate into his Colony.  Consequently, he ordered "Fort Charlotte" to be built nearby, on the South

---

[121] The North Fork of the Broad River begins in the foothills of the Appalachian Mountains, in Stephens County, then joins the Middle Fork west of Royston in Franklin County to form the main stem.  The river flows in a generally southeasterly course, being joined along its sixty-mile length by the Hudson Fork, flowing from the west out of Franklin County, and the South Fork, which joins from the west at the junction of Oglethorpe, Madison, and Elbert counties.  From there the Broad River continues its course uninterrupted toward the Savannah River.

[122] Prior to the nineteenth century, the Broad River was the mutual border between the Cherokee people to the north, and the Creek people to the south.

Carolina side of the Savannah River.[123]   Those fortifications, plus the natural

advantages of the Valley, attracted settlers like iron filings pulled to a magnet.

> The Broad River, itself, was kind to its settlers.  Its waters
> provided fish for their tables and sport in catching them.  Since much of
> its watershed was never denuded of its timber and vegetation, the rains
> seldom ran off in such quantities as to produce devastating floods . . . .
> Broad River's bottom lands were as fertile as any to be found anywhere,
> and much of its uplands were almost as good for tobacco and cotton as
> the bottoms were for corn.  In fact, the Broad River Valley was a good
> place for those who chose to come and to stay.[124]

### (A)    The Virginians of the Broad River Valley

Many of the Virginians who migrated to the Broad River Valley came from

Albemarle County — the home of, among other notable families, the Jeffersons,

Randolphs, and Monroes — but the Potomac River, James River, and Tidewater

regions of the Old Dominion also contributed settlers.[125]   Dionysius Oliver was

among the earliest persons to move from Virginia to Georgia.  He settled in the Broad

River Valley  "about the time of the outbreak of the Revolution.  He is reputed to

have been captain of a privateer . . . to have been with General Benjamin Lincoln's

army at the siege of Savannah in 1778, and subsequently to have fought at Kettle

---

[123] *See* Ellis Merton Coulter, *Old Petersburg and the Broad River Valley of Georgia: Their Rise and Decline* 12-13, 31 (Athens:  The University of Georgia Press 1965) ("**Coulter**").

[124] *Id.* at 30.

[125] *Id.* at 16.

Creek and Kings Mountain. . . ."[126]

Oliver capitalized on his war services by obtaining from the State of Georgia in July of 1784 land grants in the Broad River Valley amounting to 5,250 acres.[127] Oliver then laid-out in the fork of the junction of the Broad and Savannah Rivers, on the site of the former "Fort James," the plat of a town that he named "Petersburg," "in honor of Petersburgh, Virginia, in or near which he was born in 1735."[128]

> The promotion of Petersburg became the marvel of the times. Its location between its two rivers made it appear to all who had its location described to them or its location viewed on a map, as the commercial center of all the upper Savannah river country. Here was a bonanza for investors that should not be ignored. All those Virginians who had settled up the Broad River Valley would be tributary to Petersburg as would the people living up the Savannah, on both sides of the river. The down river towns of Augusta and Savannah would court the trade of this upcountry metropolis. Its fame would not stop short of Philadelphia, New York, and Boston. This was the era of the Yazoo Speculation, when Georgia lands and lots were being hawked and bought as far away as even Europe.[129]

A drawing of the plat of the town that Dionysius Oliver laid out in the fork formed by the confluence of the Broad and Savannah Rivers is shown on the following page.[130]

---

[126] *Id.* at 31.

[127] *Id*. at 31-32.

[128] Coulter, at 32.

[129] *Id.* at 34.

[130] *Id*. at *ii* (frontispiece).



This plan was constructed from the deed records in the Elbert County Courthouse, Elberton, Ga.

**(B)     The Pope, Watkins, Thompson, Bibb, and Walker families of Petersburg, Georgia, and Huntsville, Madison County, Alabama**

The greatest speculator in Petersburg lots was a man who later became even more prominent in Alabama:  LeRoy Pope, who had been born in Northumberland County, Virginia on January 30, 1765, but moved with his parents to (and was reared in) Amherst County, Virginia.  In 1790, Pope and a host of friends and relations removed to the town of Petersburg, where Pope became a tobacco planter, an important merchant, and served as postmaster for a half dozen years.[131]

> [Pope] was allied through marriage relations with the Watkinses and the Walkers, other prominent residents of Petersburg.  He was already buying and selling lots when in 1797 he bought all fifteen lots which [another speculator] owned.  With this supply, he carried on an active real estate business for some years thereafter.  . . .[132]

Dr. Ellis Merton Coulter, the former dean of the University of Georgia Department of History,[133] described the Watkins family from Prince Edward County, Virginia, as "one of the most prominent families to settle in Petersburg," adding that they were "notable in their many marriage connections and in their migrations

---

[131] Coulter at 35.

[132] *Id.*

[133] Dr. Coulter taught at the University of Georgia for more than fifty years, and served at various times as Dean of the Department of History and Regents' Professor Emeritus of History. He authored or edited more than 25 books, and his contributions to periodicals were extensive.

westward, principally to Alabama."[134]   Most of the Watkins children moved to

Alabama.  The only daughter born into the family, Sarah Herndon Watkins, married

Captain Robert Thompson, and the couple followed LeRoy Pope to Huntsville,

Alabama.  "One of their daughters, Pamelia [Thompson], married Thomas Bibb, the

second governor of the State of Alabama, his brother William Wyatt Bibb having

been the first."[135]   The Bibb family bears special attention because, as Dr. Coulter

observed:

> No family which came out of Virginia to Georgia was more
> famous, prolific, and widely connected than the Bibbs.  The original
> ancestor of the Bibbs in America came to Virginia from Wales, but by
> tradition the Bibbs were Huguenots.[136]  Of the fourth generation of
> Bibbs in Virginia two brothers became of special note — Richard and
> William.  Richard moved to Kentucky; his son George M. Bibb had a
> distinguished career in that state as judge, United States Senator, and
> Secretary of the Treasury under President John Tyler.  William moved
> to Georgia in 1789 and settled up Broad River and died seven years
> later.  His first wife having died, he married Sally Wyatt, described at
> the time as "an amiable young lady, with a handsome fortune."  By his
> first wife there were four children, and by his second wife, eight.  ...
>
> All of Sally Wyatt Bibb's children married and did well.  As
> previously noted, Thomas married Pamelia Thompson, a daughter of
> Robert Thompson and his wife Sarah [Watkins] . . . .  They later moved
> to Alabama where Thomas became the second governor of that state.  ...
>
> The oldest of Sally Wyatt Bibb's children was William Wyatt

---

[134] Coulter, at 38.

[135] *Id*.

[136] A French Protestant of the sixteenth and seventeenth centuries.

Bibb, her most famous one.  Born in 1780 in Prince Edward County, Virginia, he came to the Broad River Valley with his parents when he was nine years old.  He attended the College of William and Mary [in Williamsburg, Virginia] . . . .  He then studied medicine in the Medical College of the University of Pennsylvania, and after completing his course began his practice in Petersburg in 1801.  He was soon attending patients far up the Broad River, even in Lexington . . . .[137]

The practice of medicine was not sufficient to satisfy William Wyatt Bibb's worldly ambitions, however, "nor to fill his pockets with needed money — especially so the latter."[138]  Consequently, in 1803, he ran for and was elected to the Georgia House of Representatives, where he served until 1806, when he was elected to the United States House of Representatives.  Bibb resigned his House seat in 1813, to accept his selection by the Georgia Legislature as United States Senator

to fill the vacancy made by the resignation of his friend William H. Crawford. [Bibb] served in this position until 1816, when he resigned to accept the appointment of governor of the Territory of Alabama.  He now moved to Alabama, and when the territory was admitted as a state in 1819 he was elected its first governor.[139]

As Mills Thornton observed, "[s]ince the homes of many of the Broad River

---

[137] Coulter, at 41-42 (bracketed alteration and ellipses supplied).

[138] *Id.* at 43.

[139] Coulter, at 44 (bracketed alteration supplied); *see also* U.S. Const. art. I, § 3, cl. 1 ("The Senate of the United States shall be composed of two Senators from each State, *chosen by the Legislature thereof* for six Years; and each Senator shall have one Vote.") (1797) (emphasis supplied).  The emphasized portion of the foregoing clause was affected by the Seventeenth Amendment, providing in pertinent part that:  "The Senate of the United States shall be composed of two Senators from each State, *elected by the people thereof*, for six years; and each Senator shall have one vote."  U.S. Const. amend. XVII, cl. 1 (*ratified* May 31, 1913) (emphasis supplied).

people had been in the same area of Virginia, some intermarriage had already taken

place, but in Georgia the intermarriage reached such heights that every member of the

group was closely related to every other."[140]  The most significant of those marriages

was the union of John Williams Walker and Matilda Pope, the daughter of LeRoy

Pope.   Among the couple's children were two sons who achieved political

prominence.   Percy Walker followed in the footsteps of his father and became a

United States Senator, while LeRoy Pope Walker served, among other prominent

positions in Alabama history, as the first Secretary of War for the Confederacy,[141]

---

[140] J. Mills Thornton III, *Politics and Power in a Slave Society: Alabama, 1800-1869*, at 8 (Baton Rouge:  Louisiana State University Press 1978) ("**Thornton I**").

[141] Coulter, at 170.  It was LeRoy Pope Walker who, from his Montgomery, Alabama office (the first and temporary capitol of the Confederate States of America), drafted and transmitted on April 10, 1861 the telegram to Pierre Gustave Toutant Beauregard, the General commanding Confederate forces in Charleston, South Carolina, giving him permission to fire upon Fort Sumter, if Union forces failed to comply with the demand to evacuate the citadel:

> If you have no doubt of the authorized character of the agent [of the United States government] who communicated to you the intention of the Washington Government to supply Fort Sumter by force [*in fact, the message from President Lincoln stated his intention to provide provisions to the troops stationed in Fort Sumter* "*peaceably if they can, forcibly if they must* "], you will at once demand its evacuation and, if this is refused, proceed in such manner as you may determine to reduce it.  Answer.
>
>                                                        L.P. Walker, Secretary of War

Samuel W. Crawford, *The History of the Fall of Fort Sumter* 421 (Whitefish, Mont.:  Kessinger Publishing LLC 2006) (1887) (bracketed alterations and emphasis supplied).  *See generally* Rembert W. Patrick, *Jefferson Davis and His Cabinet* 104–120 (Baton Rouge:  Louisiana State University Press 1944).  Pursuant to those instructions, the first mortar shell arched over Charleston Harbor in the pre-dawn hours of Friday, April 12, 1861, and exploded above Fort Sumter at 4:30 a.m.  Thus was ignited the fuse that exploded into Civil War.

and, as Chairman of the 1875 "Redeemer Constitutional Convention."[142]

### iii.   From the Broad River Valley to the "Great Bend of the Tennessee River" in the Alabama Territory

The first public sales of lands in the Tennessee Valley region of Alabama were held in Nashville, Tennessee in 1809, and "much of the best land was purchased by wealthy Georgians":[143]   a group that Mills Thornton characterized as "a most interesting congregation."[144]   "Interesting" is an understated adjective:  the Broad River aristocracy dominated the social, political, and economic life of Alabama in its early years.[145]

### iv.   The Federal Road

Following the 1803 Louisiana Purchase, the federal government began planning a new road to connect Eastern cities with New Orleans.  Construction began on a post road through Indian territory in 1806, to connect Washington to the Crescent City by a more direct route than the existing Natchez Trace.[146]

---

[142] *See generally* www.georgiaencyclopedia.org/nge/Article.

[143] Thornton I, at 7; *see also* Edwin C. Bridges, "Historical Alabama," in *The Alabama Guide:  Our People, Resources, and Government* 62 (Montgomery:  Alabama Department of Archives and History 2009) ("**Bridges**") ("For many yeoman farmers, even the base price of $1.25 an acre ($200 for a 160-acre parcel) was an impossibly large amount.").

[144] Thornton I, at 7.

[145] *Id.* at 8.

[146] The drawing on the following page, showing the route of the Federal Road out of Georgia through the Alabama Territory to Mobile, and from there to New Orleans, is based upon the 1818 map by John Melish.  *See* "Historical Maps of Alabama" at www.alabamamaps.ua.edu.



**Route of Federal Road Through Alabama Territory**
(Based upon 1818 Map by John Melish)

### *v.*  **The War of 1812**, **the Battle of Horseshoe Bend**, **and the Opening of East-Central Alabama**

As traffic on the new Federal Road increased, tensions with the Creek Indian Nation, through whose territory the road passed, grew as well.  Those tensions eventually resulted in "the Creek War of 1813-14," a subchapter of the War of 1812 between the United States and Great Britain.[147]

General Andrew Jackson, commanding an army of some 3,300 men,[148] decisively defeated "Red Stick" warriors from the "Upper Creek" faction of the Creek Indian Nation at the Battle of Horseshoe Bend on the Tallapoosa River in east-central Alabama on March 27, 1814.[149]  Jackson forced the defeated Creeks to sign the Treaty

---

[147] For more information on the Federal Road, see *Federal Road in Alabama*, www.encyclopediaofalabama.org (last visited October 10, 2011).

[148] Jackson's army was composed of West Tennessee militia units, the 39th United States Infantry Regiment, 500 Cherokee and Choctaw warriors, and about 100 warriors from the "Lower Creek" faction of the Creek Indian Nation.

[149] The Creek Indian Nation of Georgia and Alabama had become divided into two factions: the "Lower Creeks," who had assimilated many aspects of the culture of white Americans and maintained a generally good relationship with United States Indian Agent Benjamin Hawkins; and, the "Upper Creeks," a majority of whom opposed American expansion and joined with the British and Spanish during the War of 1812.  The Shawnee Indian leader Tecumseh traveled to Creek and other Southeastern Indian settlements in 1811-12, to recruit warriors to join his war against American encroachment into frontier territories.  The British attempted to aid Tecumseh in his recruitment efforts by proposing a large "neutral" Indian state west of the Appalachian Mountains that would serve as a buffer to westward expansion by the Americans.  *See* 1 Robert V. Remini, *Andrew Jackson:  The Course of American Empire, 1767–1821*, Chap. 13 (Baltimore:  The Johns Hopkins University Press 1998) (1977).

The "Red Sticks" were impetuous young warriors of the Upper Creek faction of the Creek Indian Nation who resisted white assimilation, and who desired to revive traditional religious and cultural values.  They began to raid American frontier settlements and homesteads.  After the July 27, 1813 "Battle of Burnt Corn" in Monroe County, Alabama, and the August 30, 1813 "Fort Mims Massacre" in Baldwin County, Alabama (in which 250 American men, women and children were

of Fort Jackson on August 9, 1814, thereby ceding twenty-three million acres (half

of central Alabama and part of southern Georgia) to the United States government.[150]

The defeat of the Creeks allowed white settlers migrating westward, into the newly

opened lands, to travel the Federal Road unmolested.

### vi.  From the Broad River Valley of Georgia to the Alabama Black Belt

> Land is the only thing in the world that amounts to anything, . . . the
> only thing in this world that lasts, . . . the only thing worth working
> for, worth fighting for — worth dying for.

Margaret Mitchell.[151]

---

slaughtered), frontier settlers appealed to the government for assistance.  Tennessee, Georgia, and Alabama organized militias, placed under the overall command of General Jackson, to march against the Red Sticks.

Jackson's army attacked about 1,000 Red Stick warriors, of whom more than 800 died. According to the National Park Service:  "Never before or since in the history of our country have so many American Indians lost their lives in a single battle."  *See* www.nps.gov/hobe/index (last visited Oct. 8, 2011).  *See generally* Thomas W. Martin, *The Story of Horseshoe Bend National Military Park* (Birmingham, Ala.:  The Southern University Press 1959); *see also*, *e.g.*, Albert James Pickett, *Pickett's History of Alabama:  And Incidentally of Georgia and Mississippi from the Earliest Period*, at 510–43, 588–611 (Montgomery, Ala.:  River City Publishing 2003) (1851).

Among the Americans who attacked the Creek barricade that day was a young officer named Sam Houston, who fought on in spite of being hit in the thigh by an arrow, and shot twice by musket balls.  Houston subsequently was elected governor of two states, Tennessee and Texas.  He served as president of the latter when it was an independent republic.

[150] As evidence of the treacherous nature of America's first "Caesar," 1.9 million of the 23 million acres that Jackson forced the Creeks to cede in the Treaty of Fort Jackson *actually was land claimed by the Cherokee Nation* — warriors from which had allied with the United States during the War of 1812.  During Jackson's Presidency and the "Indian Removal" of the 1830s, many Cherokees bitterly recalled how their warriors fought with Jackson at the Battle of Horseshoe Bend, and how (according to oral tribal tradition) Cherokee warrior Chief Junaluska saved Jackson's life during that battle.  Even though there is no written evidence to prove that Chief Junaluska did save Jackson's life, there is no question about the fact that Cherokee warriors played a pivotally important part in the battle.  Such was the nature of General (and later President) Jackson's "gratitude."

[151] Gerald O'Hara, in Margaret Mitchell, *Gone With The Wind* 55 (New York:  Macmillan

68

When the federal government held the first auctions for land in North Alabama, Broad River residents were eager to buy up the fertile lands in the "Great Bend of the Tennessee River" of north Alabama.[152]  LeRoy Pope became, as he had been in the purchase of Petersburg lots from Dionysius Oliver some years before, the largest speculator in north Alabama land.  He purchased large tracts of land around the "Big Spring," now the heart of downtown Huntsville, and laid out a new town that he proudly named "Twickenham" after a fashionable suburb of London.[153]

Quickly, however, Pope and his fellow Broad River Band — both those who moved with him to Huntsville, and those who came later — realized that Alabama's Black Belt had more to offer in terms of the malleability of the region and the fertility of the soil for cotton production.  Further, the defeat of the Creek Indians at Horseshoe Bend in 1814 brought peace to what then was called "the Southwest

---

Publishing Co. 1936).

[152] Thornton I, at 7.

[153] Bridges, at 65.  *See generally* Daniel S. Dupre, *Transforming the Cotton Frontier: Madison County, Alabama 1800–1840* (Baton Rouge:  Louisiana State University Press 1997) ("**Dupre I**"); Frances Cabaniss Roberts, *Background and Formative Period in the Great Bend and Madison County* (May 10, 1956) (unpublished Ph.D. dissertation, University of Alabama) (on file with Gorgas Library, The University of Alabama, Tuscaloosa).  John Hunt, one of the earliest pioneers to move into the Territory, had erected a log cabin at the site of Huntsville's "Big Spring." Hunt either could not, or failed to, purchase the land, however.  Consequently, when LeRoy Pope bought all of what now is downtown Huntsville at the federal auction in Nashville, Hunt was forced to move on.  As Dr. Edwin Bridges observed in his brilliant and all too brief history of the State, what next occurred exhibited the class tensions that existed between yeoman farmers and the aristocratic Planters from Georgia's Broad River Valley:  "Madison County delegates to the territorial assembly appealed to yeoman farmers back home by voting to rename the town Huntsville in honor of the unfortunate squatter Pope had supplanted."  Bridges, at 65.

69

frontier," and caused "Alabama fever" to sweep the Nation.  Consequently, when in

1817, the federal government held a land auction in Milledgeville, Georgia for the

huge tracts of land ceded in the Treaty of Fort Jackson, many more persons from the

Broad River Valley migrated to Alabama.

> Thousands of settlers began to migrate into the rich river valleys and carve farms from lands ceded by the Creeks.  James Graham, writing from Lincoln County, North Carolina, observed that "The *Alabama Feaver* [*sic*] rages here with great violence and has carried off vast numbers of our Citizens. . . .  There is no question that this *feaver* [*sic*] is contagious . . . for as soon as one neighbor visits another who has just returned from Alabama he immediately discovers the same symptoms which are exhibited by the one who has seen alluring Alabama."  Graham complained that "anxiety and confusion" reigned in his county as people were selling their farms to seek a "new home in the wide wild wilderness" of Alabama.

> In the decade before 1820 the population of Alabama increased more than 1,000 percent to 127,901, most of that growth coming after 1815.  In 1830 the United States census counted a population of 309,527, a 142 percent increase, far greater than that for any other southwestern state.  Riding in wagons or on mules or horses, pushing or pulling a hogshead with all their worldly possessions, and even walking with gear upon their backs, settlers came from the piedmont regions of Georgia, South Carolina, North Carolina, and Virginia.[154]

"During that boom, the bulk of the Broad River community decided to follow

its pioneer relatives from Georgia to the new territory."[155]  They settled in a "choice"

---

[154] Leah Rawls Atkins, "Part One:  From Early Times to the End of the Civil War," in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama: The History of a Deep South State* 54 (Tuscaloosa:  The University of Alabama Press 1994) (emphasis in original, footnotes omitted).

[155] Thornton I, at 10.

section of land around what later became Montgomery.[156]  As Dr. Edwin Bridges, the

Director of the Alabama Department of Archives and History perceptively observed:

> In an interesting way, federal land policy shaped future Alabama
> politics.  Wealthy planters purchased prime tracts in river valleys and
> across the fertile Black Belt.  These areas would remain under planter
> domination for generations.  *So many prominent Georgia planters
> bought land in Alabama that they immediately formed a political
> network, transposed from Georgia to the new territory.*  Yeoman
> farmers were left with more remote and less productive tracts.  They
> settled the hill country and the Wiregrass, where society and culture
> today still bear their imprint.[157]

As discussed in the beginning of this part of the opinion, the soil of the Black

Belt was extraordinarily fertile at the time the region was opened for settlement.  The

nutrient-laden soil, along with the extensive network of navigable rivers in the area,

made the Black Belt ideal for the cultivation of cotton.  Perhaps equally important

was the natural state of vegetation in the region before the Planters arrived.  Unlike

much of Alabama and the rest of the Southeastern United States, the Black Belt was

---

[156] *Id*.

[157] Bridges, at 63 (emphasis supplied).  Dr. Bridges also noted that, for many of the yeoman farmers who bid on central Alabama land at the 1817 federal land auction in Milledgeville, Georgia,

> even the base price of $1.25 an acre ($200 for a 160-acre parcel) was an impossibly
> large amount.  some tried borrowing the money.  Others squatted on unclaimed land,
> hoping they might eventually raise the money to buy it[,] but knowing they might
> have to move if someone bought the land from underneath them.  *Many squatters
> expected to keeping moving.*

*Id*. at 62 (emphasis supplied).

not covered by pine forests.  Instead, low brush and natural grasses abounded.[158]  The scions of Virginia and Georgia Planters looking to establish their own cotton society had fertile, easily cleared soil, in an ideal climate.  They only needed one other ingredient to establish a booming cotton industry — labor.  The soil characteristics that proved such a blessing to the Broad River transplants were a curse upon the hundreds of thousands of African slaves they purchased and put to work.

### *vii*.    "**The Georgia Machine**"

The close-knit community of tobacco planters in Petersburg, Georgia enjoyed spectacular political success in that state.  The small Broad River town sent a succession of representatives to the federal congress, its candidates repeatedly winning statewide elections.[159]  One of those early members of the House of Representatives was William Wyatt Bibb.[160]  Bibb then became a United States Senator, joining Charles Tait in the upper chamber, and for three years in the second decade of the nineteenth century "there was the unheard of situation when both [United States] Senators came from the same neighborhood — Petersburg."[161]  "The combination of [William] Crawford, [William Wyatt] Bibb, and [Charles] Tait [went

---

[158] J. Sullivan Gibson, *The Alabama Black Belt:  Its Economic Status*, 17 Econ. Geog. 1, 10 (1941) ("**Gibson**").

[159] Coulter, at 87.

[160] *Id.*

[161] *Id.* at 88 (bracketed alteration supplied).

72

on to] make itself felt as a dominant force in the rise of the State of Alabama."[162]

In the early days of Alabama, the political leaders came from Huntsville and Madison County. And in the early days, the Alabama leaders came from the Broad River Valley of Georgia. The result was "two Petersburgers as governors in succession [the Bibb brothers], another as a Federal judge [Charles Tait], and others from Petersburg and the Broad River Valley in responsible positions," including William Crawford as United States Attorney[163] and John Williams Walker as United States Senator,[164] creating "a matter of Petersburgers running the State of Alabama during its infant years . . . ."[165] This "Georgia Machine" in Alabama politics was transplanted from the Broad River Valley, and was made up of the same Virginians who had dominated Georgia politics while living in that state.[166]

The goal of the Georgia Machine was "to have Alabama admitted to the Union as a Broad River fief."[167] The Machine's connections with Georgia politicians in Washington allowed it to quickly move the Alabama territory toward statehood, a

---

[162] *Id.* (bracketed alteration supplied).

[163] Hugh C. Bailey, *John W. Walker and the "Georgia Machine" in Early Alabama Politics*, 8 Ala. Rev. 179, 191 (1955) ("**Bailey**").

[164] *Id.* at 190.

[165] Coulter, at 170.

[166] Bailey, at 180 ("It was popularly referred to as the party of the 'Virginians and their allies' since it commanded the allegiance of the majority of Virginians in the state and was ably led by the sons of the 'Old Dominion.'").

[167] Thornton I, at 11.

goal that also was shared by many of the poorer residents of the territory.[168]  Once

Alabama was admitted to the Union, however, the Georgia Machine's success was

short-lived.  Governor William Wyatt Bibb died after being thrown from a horse in

1820.[169]  His brother and successor, Thomas Bibb, was not nearly as popular a

Governor, and the Machine's leader in the southern part of the state, Israel Pickens,

broke ranks with the party to form his own faction.[170]  Then, as has often occurred in

the course of historical events, the economy collapsed during the "Panic of 1819,"

completing the damage to the Machine's political fortunes.  Once again, Dr. Edwin

Bridges provides a succinct account:

> Most of Alabama's first state officials were, like Governor Bibb, members of the Georgia planter network.  They had connections in Washington and were leaders by habit and tradition.  But just as Alabama became a state, the economy collapsed under the weight of a worldwide depression.  Cotton prices fell and banks retrenched.  The Planters and Merchants Bank of Huntsville [founded by LeRoy Sims], the first and largest bank in the state, squeezed its debtors to repay their loans.  Then, the bank refused to pay off its own paper notes in gold or silver of equal value.
>
> The bank's policies infuriated Alabama voters.  It had been chartered by the state, and its owners included leading members of the "Georgia aristocracy."  Political opponents of the Georgians denounced

---

[168]  *Id.* at 10-12 (noting that the Broad River group, while not generally popular in the territorial elections, was able to use its influence in Washington to defeat more popular local leaders who did not support statehood).

[169] Bailey, at 192.

[170] *Id.* at 192-94.

the bank, the state officials who had chartered it, and the planters who owned it.  They urged Alabama voters to reject "royal party" leaders, whom they accused of misusing their offices for personal enrichment.  Voters responded, and the Georgia aristocracy was soundly defeated in the 1821 elections.

The 1821 elections reflected a deep cultural division between planters and yeoman farmers.  Planters tended to view government as an instrument for promoting the economic development of the state.  They favored banks, improved transportation, and education.  Yeoman farmers, by contrast, were descendants of people who had lived under some type of aristocracy for as far back in time as their collective memory could recall.  Having just thrown off the yoke of British monarchy in their fathers' time, they feared anything that might lead to a new aristocracy in America.  They were intensely suspicious of governments, banks, great wealth, or anything new that smacked of "special privilege."[171]

### c.    The demographic make-up of the Black Belt

*The hard core of the political South — and the backbone of southern political unity — is made up of those counties and sections of the southern states in which Negroes constitute a substantial proportion of the population.  In these areas a real problem of politics, broadly considered, is the maintenance of control by a white minority.  The situation resembles fundamentally that of the Dutch in the East Indies or the former position of the British in India.*  Here, in the southern black belts, the problem of governance is similarly one of the control by a small, white minority of a huge, retarded, colored population.  *And, as in the case of the colonials, that white minority can maintain its position only with the support, and by the tolerance, of those outside — in the home country or in the rest of the United States.*

*It is the whites of the black belts who have the deepest and most immediate concern about the maintenance of white supremacy.  Those whites who live in counties with populations 40, 50, 60, and even 80 percent Negro share a common attitude toward the Negro.  Moreover, it is generally in these counties that large-scale plantation*

---

[171] Bridges, at 64.

> *or multiple-unit agriculture prevails.  Here are located most of the large agricultural operators who supervise the work of many tenants, sharecroppers, and laborers, most of whom are colored.  As large operators they lean generally in a conservative direction in their political views.*

V. O. Key, at 5.

That part of Alabama possessing the thick, dark, and naturally rich soil was the section of Alabama best suited for the cultivation of upland cotton.  Prior to the invention of the gasoline engine and mechanization of farm operations, however, cotton cultivation was an extraordinarily, and incredibly, labor-intensive form of agriculture.  Accordingly, the Black Belt was the section in which the possession of slaves was most profitable and, consequently, they were taken there in the largest numbers.  In antebellum America, that meant that large slave populations and cotton production went hand-in-hand.  For that reason, the Planters in the Black Belt were *far outnumbered* by the people they enslaved, and the Black Belt historically had a demographic makeup distinct from the rest of the state.  While the rest of Alabama was predominantly white, the total population of the Black Belt was overwhelmingly black.  At the time of the Civil War, roughly half of all Alabamians were Africans or descendants of Africans,[172] but they were largely concentrated in a relatively small

---

[172] *See, e.g.*, "Preface" in William Warren Rogers, Robert David Ward, Leah Rawls Atkins & Wayne Flynt, *Alabama:  The History of a Deep South State* xxi (Tuscaloosa:  The University of Alabama Press 1994) (stating that, by 1860, there were 526,271 whites and 435,080 blacks); Horace Mann Bond, *Negro Education in Alabama:  A Study in Cotton and Steel* 4 (Tuscaloosa:  University of Alabama Press 1994) (1939) ("**Bond**") (calculating the number at 526,271 whites, and 437,770

76

area:  *i.e.*, the Black Belt counties.[173]

From the end of the Civil War to the present day, the population of the Black

Belt as a percentage of the total Alabama population has steadily declined.  *Within*

the Black Belt, however, the percentage of the population that is black has remained

very high.  Nearly eighty years after the Civil War, distribution of black Alabamians

had changed very little:  *i.e.*, in 1940, all of the counties in which at least 45% of the

population was black were located in the Black Belt.[174]  In the "heart" of the region,

blacks outnumbered whites four to one.[175]  In 2009, of Alabama's eleven majority-

black counties, ten were in the Black Belt as defined by plaintiffs, and the eleventh,

Montgomery County, is included in many alternate definitions of the section.[176]  Some

---

blacks).

[173] *See* Booker T. Washington, *Up From Slavery:  An Autobiography* 108 (New York: Doubleday, Page & Co. 1907) ("I have often been asked to define the term 'Black Belt.'  So far as I can learn, the term was first used to designate a part of the country which was distinguished by the colour of the soil.  The part of the country possessing this thick, dark, and naturally rich soil was, of course, the part of the South where the slaves were most profitable, and consequently they were taken there in the largest numbers.  Later, and especially since the war, the term seems to be used wholly in a political sense — that is, to designate the counties where the black people outnumber the white.").

[174] V.O. Key, Jr., *Southern Politics in State and Nation* 43 (New York:  Alfred A. Knopf 1949) ("**V.O. Key**").  Key includes a map showing these counties, which form a contiguous belt across the state.  Although they include counties outside plaintiffs' definition of the Black Belt, almost all of them are included in at least one of the alternate definitions.

[175] Gibson, at 15.

[176] *See* PX 353 (2009 Estimated County Population by Race); PX 135 (Black Belt Alternative Lists), at 2.

of those counties have black concentrations as high as 82%.[177]   This population

distribution is distinct from the rest of the State's rural areas, which are

predominantly white, and its urban areas, which are more racially balanced.[178]

### d.    The enduring political influence of the Black Belt

> *The black belts make up only a small part of the area of the South and — depending on how one defines black belt — account for an even smaller part of the white population of the South.  Yet if the politics of the South revolves around any single theme, it is that of the role of the black belts.*  Although the whites of the black belts are few in number, their unity and their political skill have enabled them to run a shoestring into decisive power at critical junctures in southern political history.

V.O. Key, at 5-6.

The Black Belt's demographic makeup — many black slaves and few white

Planters — limited its political power during the antebellum period.  Alabama's first,

1819 Constitution apportioned representation in the State Legislature on the basis of

each county's *white* population, not total population (*i.e.*, slaves were not counted in

any respect, even as a percentage of the county population).[179]   Coupled with

extremely liberal suffrage provisions, that apportionment rule kept political power in

the hands of the smaller, yeoman farmers who populated the "white" counties.[180]   As

Dr. Mills Thornton extensively documents, "aristocratic" politicians had little

---

[177] *See* PX 353; part III(B)(1)(b), *infra*.

[178] For an in depth discussion about Alabama's demographics, see Part III(B)(1)(b), *infra.*

[179] Thornton I, at 12.

[180] *See id.* at 14.

78

electoral success following the demise of the Georgia Machine.[181]   Following the

Civil War and during Congressional ("Radical") Reconstruction, however, black

Alabamians were awarded the franchise and the Legislature was apportioned

accordingly.   Thus, the Black Belt counties suddenly became very powerful

politically, because they had a very large *total* population relative to the white

counties of the hill country and Wiregrass.  Following the end of Reconstruction, this

newfound political power fell into the hands of the region's old Planter class:  those

descendants of the Broad River Georgia aristocracy who were accustomed to

domination, and able to manipulate black votes to ensure that the counties' smaller

white population held all the elective offices.[182]   Because these white leaders

"represented" vast numbers of recently-freed slaves, the Black Belt had the largest

and strongest caucus in the State Capitol.

As will be discussed more fully in Part III(A)(7)(d), *infra*, Alabama's white

politicians eventually decided it was better to strip blacks of the franchise than to

manipulate their "exercise" of it.  Even so, the crafty and extremely-intelligent elite

class of men who shaped and guarded the interests most critical to the Black Belt's

economy ensured that the loss of their black "votes" would not dilute their influence

---

[181] *See generally id.*

[182] For a discussion of election fraud in this period, see Part III(A)(5), *infra*.

in the Legislature.  They brokered a deal with the leaders of the faction representing the white, agrarian counties of the hill country and Wiregrass that bordered upon the coin-toss game of "heads, I win; tails, you lose."  Under the terms of Alabama's 1901 Constitution, even though blacks would be almost completely disfranchised, legislative apportionment would continue to be based upon total population. Ostensibly, the Black Belt was conceding electoral control of the Governor's mansion to maintain its control of the State Legislature until the next decennial census.  The cleverness of their ruse, however, lay in the fact that the Black Belt leaders had no intention of allowing reapportionment, either in 1910, or following any other decennial census.  Thus, as urbanization and migration reduced the proportionate total population of the Black Belt, its Planter elite continued to be able to elect far more than their fair share of state senators and house representatives.  The region was allotted seats not only on the basis of its nonvoting black population, but also on the basis of nonvoting blacks who had long since died or moved out of the Black Belt. Alabama's Legislature remained apportioned according to the 1901 total population until federal courts ordered reapportionment in the late 1960s.  *See Reynolds v. Sims*, 377 U.S. 533 (1964).  By such means, the Black Belt leadership was able to retain its disproportionate political influence far into the twentieth century.[183]

---

[183] For an in-depth discussion of the Black Belt hold on power, see Part III(A)(8)(f), *infra*.

The power of the Black Belt Planter class was not merely a function of malapportionment, or even of its wealth. The earliest aristocrats of Alabama kept close ties not only among themselves, but also with their cousins in Georgia and Virginia. Even after the downfall of the Georgia Machine, reducing the "aristocratic" influence in the State Legislature, the Planters remained a tightknit network of like-minded men who shared not only the same politics, background, education, and training, but also common ancestors and a deeply-seated sense of self-identity. Such a blood bond goes far deeper, and is far stronger, than the shifting alliances of partisan politics and "democratic government" (to the extent that the elite class understood "democracy"), and ensured that the Black Belt power structure would be perpetuated for decades. When apportionment by total population increased their representation in the Legislature, the Black Belt leadership took a firm grip on state politics that it would not relinquish for decades.

The unity of political goals among the Black Belt electorate resulted in stability and continuity in the region's representation in the State Legislature. The power brokers in the region would identify politically talented men and ensure their election to key state offices, and especially the Legislature. The Black Belt network ensured that those legislators had a reliable source of steady income at home, allowing them to focus on their roles in the State Capitol. Thus, the Black Belt legislators were able

to take up what amounted to full time residence in Montgomery during their terms of office.  Moreover, while legislators from other parts of the State would come and go — having to return home to resume working full time after a term or two of public service — the secure income received by Black Belt legislators (and lack of competitive elections in the region) allowed them to stay in the Legislature for decades, developing institutional experience and expertise to pair with their political instincts.  Among those long-tenured and politically powerful Black Belt legislators were:  Walter Givhan, who spent 38 years in the Legislature (16 years in the house, and another 22 in the senate); Rick Manley, who served 21 years (17 in the house, and one term in the senate); "Jimmie" Clark, who spent 32 years in Montgomery (16 in the house and another 16 in the senate);[184] and Roland "the Wily Fox from Wilcox" Cooper, who spent 26 years in the Legislature.

### 2.   "Big Mules"

The pejorative term "Big Mules" refers to Alabama's monied interests: *i.e.*, the coal mining, iron, steel, railroad, power, telephone, insurance, banking, and other industrial and financial institutions that clustered in and around Birmingham,

---

[184] James S. ("Jimmie") Clark of Barbour County was a very powerful figure in Alabama politics for nearly forty years.  He served four consecutive terms in the Alabama Senate (1959 to 1975), then as Mayor of Eufaula from 1976 to 1978, followed by four consecutive terms in the Alabama House of Representatives (1983 to 1999), during the last three of which he was Speaker of the House of Representatives.

beginning in 1871, with the founding of the City and the construction of the first blast furnaces.[185]   On the face of it, a political alliance between those interests and the Planter elites of the Black Belt, who built their fortunes upon agrarian pursuits, seems illogical.  The seemingly incongruent interests converge, however, along the fault line of those socioeconomic and political issues that conserve vested wealth from encroachment by the great, unwashed mass of humanity — shared interests that Dr. Flynt explained in the following passage from his portion of the most recent and currently definitive history of Alabama:

> On the surface the interests of industrial Birmingham, which had only one senator despite containing a fifth of the state's population, seemed inimical to those of Black Belt planters.  In the Black Belt the population steadily declined throughout the century.  But appearances were deceiving.  Because Birmingham's Big Mules opposed higher taxes, labor unions, and political change as much as Black Belt planters did, they were determined to allow Birmingham's volatile, polyglot population to go underrepresented rather than risk a reapportioned legislature that might be unsympathetic to their interests.
>
> Conversely, north Alabama's plain folk, consisting mainly of white subsistence farmers and industrial workers, had little in common with Big Mules and Black Belt planters.  Oftentimes they made common cause with small farmers in the mainly white southeast Alabama Wiregrass region.[186]

---

[185] *See generally* Marjorie Longenecker White, *The Birmingham District:  An Industrial History and Guide* (Birmingham:  Birmingham Publishing Co. for the Birmingham Historical Society 1981); Grace Hooton Gates, *The Model City of the New South:  Anniston, Alabama 1872-1900* (Tuscaloosa:  The University of Alabama Press 1978).

[186] Wayne Flynt, "Part Three: From the 1920s to the 1990s," in Rogers, Ward, Atkins & Flynt, *Alabama:  The History of a Deep South State* 413 (Tuscaloosa:  The University of Alabama

The label of "Big Mules" was hung around the necks of those wealthy interests by David Bibb Graves during his 1926 campaign for Governor of Alabama. Graves was a Democratic politician who served as the State's thirty-eighth and fortieth Governor during the period when the Alabama Constitution did not permit Governors to serve consecutive terms. He was the first person in State history to be elected to serve two, four-year, non-consecutive terms (*i.e.*, 1927 to 1931, and, 1935 to 1939),[187] and he undoubtedly "would have been elected again in 1942 had death not overtaken him during the campaign."[188]

Graves was an extraordinarily able, if incongruous political figure in Alabama history.[189] He was a descendent of Alabama's first Governor, William Wyatt Bibb,

Press 1994) ("**Flynt I**").

[187] *See* Wayne Flynt, "Bibb Graves, 1927–1931, 1935–1939," in *Alabama Governors: A Political History of the State* 173 *et seq.* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) ("**Flynt IV**").

[188] V.O. Key, at 50. Graves died at age 68 on March 14, 1942, in Sarasota, Florida, while preparing for another gubernatorial campaign. *Id.*

[189] Graves served as Adjutant-General of the Alabama National Guard from 1907 to 1911, and as Colonel of an Alabama regiment in World War I. "He endeared himself to his men. Campaigners in later years were amazed by the number of his erstwhile comrades in arms who idolized the colonel and talked him up in their communities." V.O. Key, at 51-52.

Graves first ran for Governor in 1922 and made a poor showing, but four years later, with the secret endorsement of the Ku Klux Klan, he was elected. He almost certainly was the Exalted Cyclops (chapter president) of the Montgomery Klavern. *See generally* Glenn Feldman, *Politics, Society and the Klan in Alabama, 1915-1949* (Tuscaloosa: The University of Alabama Press 1999) ("**Feldman II**"). Thereafter, Graves constructed the most powerful political machine in State history, and that assertion does not exclude the political organization of George C. Wallace who — although elected governor more times than any other person in Alabama history (not even counting the partial-term of his wife, Lurleen Burns Wallace (Jan. 17, 1967–May 7, 1968), for whom George served as her "number one advisor") — built his political fortunes on an unparalleled ability to

84

and he attended the University of Alabama, where he was a member of the school's

first football team and a Phi Beta Kappa graduate with a degree in Civil Engineering

---

engage in racist demagogy and oratory, and not upon the basis of organizational politics.

Unlike Wallace, Graves succeeded by utilizing the tools that had been employed so successfully in New York City by William March "Boss" Tweed during the hegemony of "Tammany Hall politics," and the same "Ward-healing" techniques that later would be used to equal effect in Kansas City, Missouri by Thomas J. Pendergast, in Memphis by Edward "Boss" Crump, and in Chicago by the first Mayor Richard J. Daley: *i.e.*, Graves "impressed local politicians over the state as *a practical man who could and would do business with them* to meet the immediate practical problems of governing *with mutually beneficial results*. With the *friends produced by favors and the expectation of favors*, he bound to himself an essentially personal following." V.O. Key, at 51 (emphasis supplied). For example, during a 1934 campaign speech in Selma, Graves proclaimed: "Those who help me bake the pie will help me eat it."

One of the most important "friends" bound to Governor Graves "by favors and the expectation of favors" was Horace C. Wilkinson, the "Boss" of Birmingham's "Wilkinson Machine." *See* Glenn Feldman, *From Demagogue to Dixiecrat: Horace Wilkinson and the Politics of Race* 99-120 (Privately Printed 1995) ("**Feldman III**"); *see also* the memorandum opinion filed as document number 934 in the case of *United States v. Jefferson County*, Civil Action No. 75-666 (N.D. Ala. July 8, 2002) (Smith, J.), at 92 *et seq*.

As Governor, Graves earned a reputation as a reformer by abolishing the convict leasing system and raising taxes on public utilities, railroads, and coal and iron companies. The new revenue was used to expand educational and public health facilities, increase teachers' salaries and veterans' pensions, fund an ambitious road-building program, and improve the port facilities in Mobile. Even though both Governor Graves and his close political associate, United States Senator (and, later, Supreme Court Justice) Hugo L. Black, were both identified as staunch "New Deal Democrats" during Franklin D. Roosevelt's first two terms, V.O. Key described Graves as

> an able man but not notable as the exponent of any particular philosophy or point of view in politics . . . . In his long political career he gathered about himself a popular following that coincided with no apparent natural grouping of voters. The area of his highest popular strength wove in and out of the black belt — with its center of gravity there — and in and out of northern Alabama *in a manner completely at variance with the way Alabama voters divide when the chips are down in a battle over issues comprehensible to them* [*e.g.*, race].

> "A natural-born dealer" — thus he is described by his friends and associates. "He would deal with anybody on anything," one of them reports but with no suggestion of personal dishonesty. . . .

V.O. Key, at 50-51 (emphasis and bracketed alteration supplied).

85

(1893). He subsequently earned a degree from Yale Law School (1896). The "little brown hickory nut of a man" softened the shock of his Yale law degree and intellectual prowess on dirt-poor agrarian voters with a chew of tobacco, an energetic, captivating personality, and folksy metaphors that captured his position on complex social and economic issues. For example, when speaking to groups of small farmers in the north Alabama hill counties or the Wiregrass, Graves would say that the State's industrial and monied interests "reminded him of a farmer who had harnessed a small mule to a wagon heavily loaded with corn. Behind the wagon, he had hitched a big mule who munched contentedly while the smaller animal strained every muscle to pull the load."[190] If elected Governor, Graves vowed, he would "hitch the big mules to the wagon" and make them shoulder a heavier portion of the State's and counties' tax burdens.[191] "The imagery was memorable, and many ordinary Alabamians became convinced that the wealthiest and most powerful citizens were not pulling their fair share of the load."[192]

### 3.    "Carpetbaggers"

"Carpetbaggers" was a derogatory term used to describe Republicans who

---

[190] Flynt IV, at 177.

[191] *See, e.g.*, Roger K. Newman, *Hugo Black: A Biography* 102 (New York: Fordham University Press 1997); Virginia Van der Veer Hamilton, *Lister Hill — Statesman From the South* 83 (Tuscaloosa: University of Alabama Press 1987).

[192] Flynt IV, at 177.

came south during Reconstruction, and who often arrived toting "carpet bags," a common form of luggage at the time made from carpet material.  As Eric Foner recorded in his definitive analysis of Reconstruction,[193] white Southerners viewed such persons as unscrupulous, dishonest profit-seekers who came south to loot and plunder the defeated region:

> Political, regional, and class prejudices combined to produce the image of the carpetbagger as a member of "the lowest class" of the Northern population.  Able to pack "all of his earthly belongings" in his carpetbag, he supposedly journeyed south after the passage of the Reconstruction Act "to fatten on our misfortunes," in the process poisoning the allegedly harmonious race relations of 1865–67.  In fact, far from the dregs of Northern society, carpetbaggers tended to be well educated and middle class in origin.  Not a few had been lawyers, businessmen, newspaper editors, and other pillars of Northern communities.  The majority (including fifty-two of the sixty who served in Congress during Reconstruction) were veterans of the Union Army, and their ranks included teachers, Freedmen's Bureau agents, and men who had invested tens of thousands of dollars in cotton plantations.[194]

### 4.    "**Scalawags**"

"Scalawags" were native Southerners who cast their lot with the Republicans

---

[193] Eric Foner, *Reconstruction — America's Unfinished Revolution:  1863–1877* (New York: History Book Club Francis Parkman Prize Edition 2005) (Harper & Row 1988) ("**Foner I**").

[194] *Id.* at 294-95 (footnotes omitted, emphasis supplied); *see also id.* at 137 (where Foner observes that those "northerners who purchased land, leased plantations, or formed partnerships with Southern planters" were "a varied, ambitious group, mostly former soldiers eager to invest their savings in this promising new frontier, and civilians lured south by press reports of 'the fabulous sums of money to be made in the South in raising cotton.' . . . Joined with the quest for profit, however, was a reforming spirit, a vision of themselves as agents of sectional reconciliation and the South's 'economic regeneration.'").

and Freedmen.  To Democrats, the scalawag was even more detestable than the hated carpetbaggers.  "We can appreciate a man who lived north, and . . . even fought against us," declared one Southern politician, "but a traitor to his own home cannot be trusted or respected."[195]  Evidence of the odium heaped upon Alabama's scalawags appeared in the August 7, 1868 edition of the Montgomery *Daily Advertiser*, which printed the following, scornful description:

> Our scalawag is the local leper of the community.  Unlike the carpetbagger, he is native, which is so much the worse.  Once he was respected in his circle; his head was level, and he could look his neighbor in the face.  Now, possessed of the itch of office and the salt rheum of Radicalism, he is a mangy dog, slinking through the alleys, haunting the Governor's office, defiling with tobacco juice the steps of the Capitol, stretching his lazy carcass in the sun on the Square, or the benches of the Mayor's Court.[196]

## 5.    "**Radical Republicans**"

"Radicals" was a term that described those Republicans who had most strongly opposed slavery prior to and during the Civil War, who distrusted former Confederates (particularly Army officers and those who held political offices in the former Confederate States), who believed that harsh and punitive policies were required (both to punish those who had led the Nation into Civil War and thereby

---

[195] *Id.* at 297.

[196] Sarah Woolfolk Wiggins, *The Scalawag in Alabama Politics, 1865–1881*, at 1-2 (Tuscaloosa:  The University of Alabama Press 1977) (bracketed alterations supplied).

caused the loss of so much blood and treasure, and to "Reconstruct" the South), who

demanded civil and political rights for the recently-freed slaves, and who understood

that the moral redemption and future prosperity of the South were dependent upon the

education and elevation of the Freedmen.[197]

### 6.    "**Conservative Democrats**" and "**Bourbons**"

Professor William Archibald Dunning, the progenitor of the "Dunning School

of Reconstruction historiography" at Columbia University, observed that the Southern

opponents to the Radical Republicans, carpetbaggers, scalawags, and Freedmen were

> generally designated as the conservatives, though the name Democrats
> became also a common and sufficiently accurate title.  In it were
> included the great mass of the white political population, with a
> sprinkling of negroes too scanty in number to serve any purpose save
> that of illustrating from time to time the claim of the more optimistic
> whites that some headway was being made against the radical control of
> the freedmen.  . . .[198]

The term "Bourbon" — regardless of whether it is used as a noun or an

adjective ("Bourbon Democrats") — "originated during the Reconstruction period

and was used by the Radicals to label their Democratic opponents as anti-progressive

and ultra-conservative."[199]   The term was derogatory, and used to disparage those

---

[197] *See*, *e.g.*, Lewis H. Blair, *A Southern Prophecy: The Prosperity of the South Dependent upon the Elevation of the Negro* (Boston:  Little, Brown and Company 1964, C. Vann Woodward ed.) (1889).

[198] William Archibald Dunning, *Reconstruction:  Political and Economic, 1865–1877,* at 116-17 (New York:  Harper & Brothers Publishers 1907).

[199] Allen Johnston Going, *Bourbon Democracy in Alabama 1874-1890*, at *xvii* (Tuscaloosa:

members of the "Conservative and Democratic Party" who were attempting to reclaim control of State government from the "Radical Republicans."  It referenced the Bourbon Dynasty that had been overthrown in the French Revolution (1788–94), but returned to power in 1815, and thereafter ruled in a harsh, reactionary fashion until its final overthrow during the July Revolution of 1830.

In Alabama, the term "Bourbon Democrats" more specifically referenced those persons who represented the interests of Black Belt plantation owners who farmed huge tracts of cotton-producing land, and who had owned most of the State's slave population prior to the Civil War.  As the coal, iron, steel, and other industrial enterprises located in Anniston and the "Birmingham district" began to grow in wealth and political influence during the last two decades of the nineteenth century, the Bourbons allied themselves with the so-called "Big Mules" of Birmingham, which quickly had become the State's largest and wealthiest city.[200]  As a consequence, the term "Bourbons" has sometimes been used to include all of the members of that political partnership:

> Since the end of Reconstruction the Democrats' statewide leaders had been a group of wealthy, elite men known popularly as the "Bourbons." Whether they were large Black Belt planters, directors of railroads, corporation lawyers, or leaders of Alabama's growing iron and steel

The University of Alabama Press 1992) (1951).

[200] *See supra* Part I(D)(2).

industry, Bourbons had one common interest:  they wanted to control the tenant farmers, sharecroppers, farm laborers, textile workers, lumber millhands, coal and iron ore miners, and workers in iron and steel mills who produced the wealth for the state's upper classes.[201]

### 7.    "Black Codes"

The phrase "Black Codes" generically refers to laws enacted immediately after the end of the Civil War and during the period of "Presidential Reconstruction"[202] by Southern states to "replace slavery with some kind of caste system and to preserve as much as possible of the prewar way of life."[203]   As Eric Foner observed, the "centerpiece" of the Black Codes

> was the attempt to stabilize the black work force and limit its economic options apart from plantation labor.  Henceforth, the state would enforce labor agreements and plantation discipline, punish those [Freedmen] who refused to contract [with plantation owners], and prevent whites from competing among themselves for black workers [by, *e.g.*, offering higher wages and better working conditions].[204]

### 8.    "Redeemers"

Reconstruction came to an end in all states of the former Confederacy as a

---

[201] Samuel L. Webb, "The Populist Revolt in Alabama:  Prelude to Disfranchisement," in *A Century of Controversy:  Constitutional Reform in Alabama* 5 (Tuscaloosa:  The University of Alabama Press 2002, Bailey Thompson ed.) ("**Webb**").

[202] As Eric Foner observed, the Black Codes enacted before the smoke of war had fully dissipated played "a crucial role in the undoing of Presidential Reconstruction," and strengthened the hand of those Congressional leaders who lobbied successfuly for the imposition of a harsh, punitive period of "Radical Reconstruction."  Foner I, at 199.

[203] Lawrence M. Friedman, *A History of American Law* 504 (New York:  Simon & Schuster 2d ed. 1985).

[204] Foner I, at 199 (bracketed alterations supplied, footnote omitted).

result of "the Corrupt Bargain" of 1877: the politically-brokered deal that resolved the disputed 1876 Presidential election, ended Congressional ("Radical") Reconstruction, and led to withdrawal of all federal troops from those southern states still under military occupation, martial law, and "provisional governments." Reconstruction in Alabama had effectively ended in November of 1874, however, when candidates representing the "Conservative Democratic Party" swept all state offices, elected safe majorities in both chambers of the State Legislature, and reclaimed most of the county government offices across the State. The leaders of that political *coup d'état* were called "Redeemers" because, by way of analogy to the legal term defining the *equity of redemption*, they had reclaimed control of State government. Eric Foner described them as follows:

> No single generalization can fully describe the social origins or political purposes of the South's Redeemers, whose ranks included secessionist Democrats and Union Whigs, veterans of the Confederacy and rising younger leaders, traditional planters and advocates of a modernized New South. They shared, however, a commitment to dismantling the Reconstruction state, reducing the political power of blacks, and reshaping the South's legal system in the interests of labor control and racial subordination. In a majority of Southern States, they moved, upon assuming office, to replace Reconstruction constitutions with new documents severely restricting the scope and expense of government. "Instruments of prohibition," as one newspaper described them, Redeemer constitutions reduced the salaries of state officials, limited the length of legislative sessions, slashed state and local property taxes, curtailed the government's authority to incur financial obligations (in Georgia and Louisiana, it could borrow money only to repel an

92

invasion or suppress an insurrection), and repudiated, wholly or in part, Reconstruction state debts.    Public aid to railroads and other corporations was prohibited, and several states abolished their central boards of education.[205]

A North Carolina Democrat had presciently predicted at the beginning of "Radical" Reconstruction:  "When the bayonets shall depart . . . then look out for the reaction.  Then the bottom rail will descend from the top of the fence."[206]  And, indeed, the "bottom rail" — the hated cabal of "Radical Republicans," carpetbaggers, scalawags, and Freedmen — descended "from the top of the [Reconstruction] fence," and was replaced by members of the "Conservative and Democratic Party" who immediately set about the business of enacting "Jim Crow laws" for the purpose of forcing the former slaves to stay in their allotted "places," and out of white "spaces."[207]

### 9.    "Jim Crow laws"

"Jim Crow laws" were state laws and local ordinances enacted from the end of Reconstruction through the first six decades of the twentieth century for the purpose of mandating *de jure* racial segregation of all public transportation conveyances, restaurants, restrooms, water fountains, schools, hotels, libraries, and virtually every

---

[205] Foner I, at 588 (footnote omitted).

[206] *Id.* (footnoted citation omitted).

[207] *See* Testimony of Dr. Jeff Frederick, Transcript Vol. 9 (doc. no. 265), at 118 ("**Frederick 9 Tr.**") (describing white attitudes about "spaces and places").

other form of public accommodations and facilities.  C. Vann Woodward, the preeminent historian of the South during and following Reconstruction, said that the origin of the term "Jim Crow," as it was applied to such laws and African-Americans in general, was "lost in obscurity."[208]  Nevertheless, he *believed* the source to be

> Thomas D. Rice, who wrote a song and dance called "Jim Crow" in 1832, and the term had become an adjective by 1838.  The first example of 'Jim Crow law' listed by the *Dictionary of American English* is dated 1904.  But the expression was used by writers in the 1890's . . . .[209]

Woodward's supposition was endorsed and expanded by the subsequent work of another historian, Peter Irons, who wrote:

> During the last two decades of the nineteenth century, the white lawmakers who controlled the South began the process of replacing slavery with segregation, installing the Jim Crow system that separated the races in every aspect of life.  The term itself had its origins in the 1830s, beginning with the minstrel show of Thomas "Daddy" Rice, a white man who blackened his face with burnt cork, dressed in rags, and danced and sang in a caricature of blacks.  He called this part of his show "Jump Jim Crow," after a crippled black slave who belonged to a white man named Crow.  White audiences loved the demeaning portrayal of a grinning, shuffling black man, and the term quickly entered the language.  During the 1840s, abolitionist newspapers adopted the term to describe the segregated railroad cars in northern states.
>
> The Jim Crow laws passed by southern legislatures in the 1880s and '90s mandated racial segregation in restaurants, hotels, parks,

---

[208] C. Vann Woodward, *The Strange Career of Jim Crow* 7 n.1 (New York:  Oxford University Press 2002) (1955) ("**Woodward**").

[209] *Id.*

libraries, theaters, railroads, beauty parlors, and barbershops.  With its "WHITES ONLY" and "COLORED ONLY" signs posted above the railroad waiting rooms, bathrooms, and drinking fountains, the Jim Crow system inflicted daily humiliations on blacks of both sexes and all ages.  Jim Crow laws were accompanied by a system of southern "customs" that allowed whites to address black men as "boy" and black women as "girl."  Blacks who refused to conform to white expectations of deference and grinning servility were considered "uppity" and could lose their jobs or credit if they failed to mend their ways.[210]

---

[210] Peter Irons, *Jim Crow's Children:  The Broken Promise of the* Brown *Decision* 12 (London:  Penguin Books 2004) ("**Irons**").

[this page intentionally left blank]

# II.  PRELIMINARY CONSIDERATIONS

## A.   Standing

"Standing frequently has been identified by both justices and commentators as one of the most confused areas of the law."[211]   "Many exasperated courts and commentators have . . . [complained] that [the] standing doctrine is no more than a convenient tool to avoid uncomfortable issues or to disguise a surreptitious ruling on the merits."[212]

In light of this persistent confusion and consternation, it is helpful to "begin with the most basic doctrinal principles:  Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'"  *Sprint Communications Co.*, *L.P. v. APCC Services*, *Inc.*, 554 U.S. 269, 273 (2008) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)).[213]   "One element of that

---

[211] Erwin Chemerinsky, *Federal Jurisdiction* § 2:3, at 57 (5th ed. 2007) ("**Chemerinsky II**").

[212] Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, 13 *Federal Practice & Procedure:  Jurisdiction* § 3531 (2d ed. 2006) ("**Wright, Miller & Cooper**")  (footnote omitted).

[213] Article III, § 2 reads, in pertinent part, as follows:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;— to all Cases affecting Ambassadors, other public Ministers and Consuls;— to all Cases of admiralty and maritime Jurisdiction;— to Controversies to which the United States shall be a Party;— to Controversies between two or more States;— between a State and Citizens of another State;— between Citizens of different States;— between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof,

97

'bedrock' case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *McConnell v. Federal Election Commission*, 540 U.S. 93, 225 (2003) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)), *overruled on other grounds by Citizens United v. Federal Election Commission*, — U.S. —, 130 S. Ct. 876 (2010).

Standing is essential because "[t]he constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity 'to adjudge the legal rights of litigants in actual controversies.'" *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1982) (quoting *Liverpool S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 (1885)). In other words, federal courts are not, and were never intended to be, national forums for airing "generalized grievances." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Our business is to decide concrete disputes brought to our attention by parties possessing more than a mere metaphysical or theoretical interest in the outcome.[214]

Hence, the presence of a plaintiff with standing to sue is a necessary pre-

and foreign States, Citizens or Subjects.

U.S. Const. art. III, § 2.

[214] *See Warth*, 422 U.S. at 499 ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, . . . though the court's judgment may benefit others collaterally.").

condition to a federal court's exercise of Article III judicial power, and a challenge

to a plaintiff's standing is an attack on the court's subject matter jurisdiction. *See*,

*e.g.*, *Stalley v. Orlando Regional Healthcare System, Inc.*, 524 F.3d 1229, 1232 (11th

Cir. 2008) ("Because standing is jurisdictional, a dismissal for lack of standing has

the same effect as a dismissal for lack of subject matter jurisdiction[.]") (internal

quotations omitted); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1251 (11th Cir.

2003) ("The issue of whether plaintiff lacks standing is jurisdictional[.]").

Although the standing doctrine is animated in part by prudential considerations,

*see Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 11-12 (2004), the

Supreme Court has identified three requirements that collectively constitute an

"'irreducible constitutional minimum.'" *Vermont Agency of Natural Resources v.*

*Stevens*, 529 U.S. 765, 771 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560 (1992)).

> First, a plaintiff must demonstrate an "injury in fact," which is
> "concrete," "distinct and palpable," and "actual or imminent." *Whitmore*
> *v. Arkansas*, 495 U.S. 149, 155 (1990) (internal quotation marks and
> citation omitted). Second, a plaintiff must establish "a causal connection
> between the injury and the conduct complained of — the injury has to
> be 'fairly traceable to the challenged action of the defendant, and not . .
> . . the result of some third party not before the court.'" *Lujan v.*
> *Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992) (quoting *Simon v.*
> *Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)).
> Third, a plaintiff must show the "'substantial likelihood' that the
> requested relief will remedy the alleged injury in fact." [*Vermont Agency*

99

*of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)].

*McConnell*, 540 U.S. at 225-26 (all parallel citations and bracketed alterations [except for last alteration, containing citation to *ex rel. Stevens*] omitted)).   Reduced to jurisprudential buzzwords, this constitutional formula requires:  (1) "an injury in fact"; (2) "causation"; and (3) "redressability."[215]   "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence."  *U.S. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04 (1998) (footnote omitted).  Defendants contest plaintiffs' ability to establish each of these elements.

Plaintiffs call attention to the fact that at least one of these three requirements (causation) is also a *prima facie* element of just about any cause of action — including the one underlying this case, which is fundamentally based upon alleged

---

[215] *Sprint Communications*, 554 U.S. at 273.  The Court in *Sprint Communications* outlined these elements with helpful parenthetical references:

> And in order to have Article III standing, a plaintiff must adequately establish (1) an injury in fact (*i.e.*, a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (*i.e.*, a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, is it 'likely' and not 'merely speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Id.* at 273 (quoting *Lujan*, 504 U.S. at 560-61) (bracketed alteration in *Sprint Communications*).

violations of the Equal Protection Clause of the Fourteenth Amendment.[216] *See, e.g.,*
*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979)
(holding that, "even if a neutral law has a disproportionately adverse effect upon a
racial minority, it is unconstitutional under the Equal Protection Clause only if that
impact can be traced to a discriminatory purpose"); *Johnson v. DeSoto County Board
of Commissioners*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000) (holding that "the
government's discriminatory intent alone, without a causal connection between the
intent and some cognizable injury to Plaintiffs, cannot entitle Plaintiffs to relief").

However, as this court explained previously, in connection with its ruling on
defendants' motion to dismiss for lack of subject matter jurisdiction, not just the
element of causation, but *each element* of the standing analysis merges into the
ultimate merits inquiry in this case.[217]  For one thing, plaintiffs have neither standing
nor a viable cause of action under the Constitution unless they can show "an invasion

---

[216] The Equal Protection Clause is situated within the final clause of § 1 of the Fourteenth
Amendment.  In full, § 1 reads as follows:

> All persons born or naturalized in the United States, and subject to the
> jurisdiction thereof, are citizens of the United States and of the State wherein they
> reside.  No State shall make or enforce any law which shall abridge the privileges or
> immunities of citizens of the United States; nor shall any State deprive any person
> of life, liberty, or property, without due process of law; nor deny to any person within
> its jurisdiction the equal protection of the laws.

U.S. Const. amend XIV, § 1.

[217] *See* doc. no. 35 (Memorandum Opinion and Order on Motion to Dismiss), at 15.

of a *legally protected interest*."[218]  Moreover, causation is not altogether distinct from

redressability.  Indeed, the Supreme Court has indicated that in cases where, as here,

"[t]he relief requested . . . [is] simply the cessation of the allegedly illegal conduct .

. . the 'redressability' analysis is identical to the 'fairly traceable' analysis."  *Allen

v. Wright*, 468 U.S. 737, 759 n.24 (1984).  Overlaps of this sort in cases where

standing is an issue raise concerns of "drive-by jurisdictional rulings,"[219] that is,

situations in which opinions actually addressing substantive defects with a cause of

action might later be read as jurisdictional precedents.[220]  The converse also is

possible:  courts have dismissed lawsuits on explicitly *jurisdictional* grounds based

on the conclusion that the complaint fails to state a viable *cause of action*.  *See*, *e.g.*,

*Bell v. Hood*, 327 U.S. 678, 680 (1946) (reversing such a decision).

It is true that "'standing in no way depends on the merits of the plaintiff's

contention that particular conduct is illegal.'"[221]  Nevertheless, standing, as previously

noted, "'often turns on the *nature* and *source* of the claim asserted.'"[222]  "Essentially,

---

[218] *Lujan*, 504 U.S. at 560 (emphasis supplied); *see also McConnell*, 540 U.S. at 227 (noting that standing "'often turns on the *nature* and *source* of the claim asserted'") (emphasis supplied) (quoting *Warth*, 422 U.S. at 500).

[219] *U.S. Steel Co.*, 523 U.S. at 91.

[220] *See id.* (rejecting any reliance on such cases).

[221] *McConnell*, 540 U.S. at 227 (quoting *Warth*, 422 U.S. at 500); s*ee also* Wright, Miller & Cooper § 3531 (2d ed. 2006) ("The focus on the party also means that standing is not defeated by failure to prevail on the merits.").

[222] *McConnell*, 540 U.S. at 227 (emphasis supplied) (quoting *Warth*, 422 U.S. at 500).

102

the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."[223]

In other words, the standing question in cases such as the present action essentially conflates with the substantive question of whether plaintiffs can prevail on the claims asserted in this action.  This is especially true considering that, at the post-trial stage, it is not sufficient for the plaintiffs merely to *allege* a specific harm; instead, they must *prove* harm, by a preponderance of the evidence in the record.[224] In the present case, that analysis will require the court to consider many of the same facts, and ponder many of the same legal conclusions, that will be relevant to the substantive analysis of plaintiffs' claims on the merits.   There is no point in conducting separate, repetitive analyses of the these facts and legal principles.  As the former Fifth Circuit has pointed out in a case that remains binding on this court:

> Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court (assuming that the plaintiff's federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) is to find that

---

[223] *Warth*, 422 U.S. at 500.

[224] *See, e.g.*, *Lujan*, 504 U.S. at 561 ("Since [the three elements of the standing inquiry] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.") (citations omitted).

jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case. The Supreme Court has made it clear that in that situation no purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits.

*Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. May 20, 1981) (footnote omitted).[225]

This court sees no reason why the same principles should not apply when considering the standing issue in conjunction with the merits of a plaintiff's claim based upon the evidence presented at trial. Furthermore, this court already has found that plaintiffs' claim is not "immaterial," "insubstantial," or "frivolous."[226] If

---

[225] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[226] This court found in its Memorandum Opinion and Order on Motion to Dismiss:

All that remains at this juncture is to determine whether plaintiffs' 'alleged claim under the Constitution . . . clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or [whether the] claim is wholly insubstantial and frivolous.' *Bell*, 327 U.S. at 682-83. The sheer number of pages devoted to plaintiffs' theory of discrimination by both Judge Harold Murphy, who authored the opinion in *Knight VI* [now *Knight III*], and the Eleventh Circuit panel that affirmed his decision, *see Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004), *aff'd*, 476 F.3d 1219 (11th Cir.), *cert. denied* 127 S. Ct. 3014 (2007), suggests that plaintiffs' present claim is both material and substantial, and a quick review of the allegations of the complaint confirms this assessment. The black plaintiffs in this action allege that they were singled out for unequal treatment because of their race: in other words, they allege that the drafters of the subject constitutional provisions made a series of conscious decisions to limit their ability to compete for government dollars on an equal footing with their white counterparts (and, thereby, hampered the black plaintiffs' attempts to dismantle structural barriers to change) based on animosity toward their race. The complaint alleges that the inclusion of certain

anything, the court is even more emphatic about that finding after hearing all of the evidence at trial.  Consequently, the court concludes that the standing analysis is inextricably intertwined with the analysis of plaintiffs' claims on the merits, and all issues relevant to the standing analysis will be addressed in the discussion of the merits of plaintiffs' claims.[227]

---

racially discriminatory provisions in the Alabama Constitution has, perhaps unexpectedly, also resulted in the denial of equal access to educational benefits and other public services to whites, especially those who reside in poor, majority-black school districts.  These are troubling allegations of deep-rooted, invidious discrimination, not entirely unlike those that gave rise to the Supreme Court's watershed decision in the case of *Brown v. Board of Education*, 347 U.S. 483 (1954).").

Doc. no. 35, at 22.

[227] The court acknowledges that the issue of whether plaintiffs have standing in this case is a very close question, particularly with regard to the elements of causation and redressability.  The court need not engage in that close and complex analysis, however, because defendants are entitled to a judgment on the merits.

[this page intentionally left blank]

## B.    Tax Injunction Act

Defendants assert, once again, that plaintiffs' claims are barred by the Tax Injunction Act of 1937 ("the Act" or "the TIA"), which provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  This court first addressed that argument in the memorandum opinion and order denying defendants' motion to dismiss for lack of subject matter jurisdiction, and concluded that the Act did not preclude plaintiffs' claims.[228]   In their post-trial brief, defendants contend that a Supreme Court case decided after that opinion should cause this court to reach a different conclusion.[229]

This court's prior decision was based primarily upon *Hibbs v. Winn,* 542 U.S. 88 (2004), in which the Supreme Court considered a challenge to a provision of Arizona state law that allowed income-tax credits for individuals who make payments to organizations that award educational scholarships and tuition grants to children

---

[228] *See* doc. no. 35, at 23-33.

[229] The case relied upon by defendants as the basis for their renewed argument, *Levin v. Commerce Energy, Inc*., — U.S. —, 130 S. Ct. 2323 (2010), was decided on June 1, 2010, almost two years after this court's memorandum opinion and order on defendant's motion to dismiss. Consequently, the case was not discussed in that opinion, nor was it briefed by the parties before trial.  In any event, for the sake of convenience and clarity, the court will reiterate much of its prior discussion of the Tax Injunction Act here.

attending private schools.[230]  The plaintiffs were Arizona taxpayers who alleged that

the state statute violated the Establishment Clause of the First Amendment, because

the scholarship and grant funds could be directed to "schools that provide religious

instruction or that give admissions preference on the basis of religion or religious

affiliation."[231]  The plaintiffs did not contest their personal tax liability or "seek to

impede Arizona's receipt of tax revenues."[232]  Instead, they sought:  a judgment

declaring that the state law violated the Establishment Clause, both on its face and as

applied; an injunction prohibiting the Director of the Arizona Department of Revenue

from allowing the tax credit for payments directed to religious schools; and an order

mandating that all organizations that had received funds in violation of the

Establishment Clause repay the money into the state's general fund.[233]

The Director of the Arizona Department of Revenue argued that the plaintiffs'

claims were barred by the Tax Injunction Act.  Specifically, he contended that the Act

"bars *all* lower federal-court interference with state tax systems, even when the

challengers are not endeavoring to avoid a tax imposed on them, and no matter

whether the State's revenues would be raised or lowered should the plaintiffs

---

[230] *See Hibbs*, 542 U.S. at 92.

[231] *Id.* at 95.

[232] *Id.* at 93.

[233] *Id.* at 99.

prevail."[234]  The Supreme Court unequivocally rejected that argument, and held that the Act did not preclude the plaintiffs' claims.

In determining the proper reach of the Act, the Supreme Court examined its legislative history, which revealed

> two closely related, state-revenue-protective objectives: (1) to eliminate disparities between taxpayers who could seek injunctive relief in federal court — usually out-of-state corporations asserting diversity jurisdiction — and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later; and (2) to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances. . . .  In short, in enacting the TIA, Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority.  Nowhere does the legislative history announce a sweeping congressional direction to prevent "federal-court interference with all aspects of state tax administration."[235]

The *Hibbs* Court characterized its prior decisions under the Tax Injunction Act as being in harmony with the Act's legislative purpose, and distinguished past decisions barring claims under the Act because they "involved plaintiffs who mounted federal litigation to *avoid* paying state taxes (or to gain a refund of such taxes)."[236]  In all of those prior cases, the granting of federal court relief "would have

---

[234] *Id.* at 94 (emphasis supplied).

[235] *Hibbs*, 542 U.S. at 104-05 (citations omitted).

[236] *Id.* at 106 (emphasis supplied).

operated to *reduce* the flow of state tax revenue."[237]

The *Hibbs* Court also found it important that other federal courts had construed the Tax Injunction Act "to restrain state taxpayers from instituting federal actions to contest their liability for state taxes, but not to stop third parties from pursuing constitutional challenges to tax benefits in a federal forum."[238]   Finally, the Court noted that it and other federal courts had issued "numerous" decisions reaching "the merits of third-party constitutional challenges to tax benefits without mentioning the TIA."[239]

When applying *Hibbs* to defendants' motion to dismiss based on the Tax Injunction Act, this court concluded the motion should be denied, and wrote:

> In the present case, the only items of relief sought by plaintiffs are a declaratory judgment that the challenged provisions of the Alabama Constitution violate their rights under Title VI and the Equal Protection Clause, and, an injunction prohibiting defendants or any others associated with them from enforcing the challenged provisions and any statutes and regulations implementing those provisions.   Plaintiffs do not challenge their respective personal liabilities to pay property taxes under the allegedly unconstitutional provisions.   Furthermore, if

---

[237] *Id.* (emphasis supplied) (citing *Arkansas v. Farm Credit Services of Central Arkansas*, 520 U.S. 821, 824 (1997); *National Private Truck Council, Inc. v. Oklahoma Tax Commission*, 515 U.S. 582, 584 (1995); *California v. Grace Brethren Church*, 457 U.S. 393, 408-10 (1982); *Fair Assessment in Real Estate Association, Inc. v. McNary,* 454 U.S. 100, 105-06 (1981); *Rosewell v. LaSalle National Bank,* 450 U.S. 503, 510 (1981)).

[238] *Hibbs*, 542 U.S. at 108-09 (citing *In re Jackson County*, 834 F.2d 150, 151-52 (8th Cir. 1987); *Dunn v. Carey*, 808 F.2d 555, 558 (7th Cir. 1986); *Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir. 1975)).

[239] *Hibbs*, 542 U.S. at 110-12 (citations omitted).

110

plaintiffs are successful, their challenge will not *reduce* the flow of state revenue; to the contrary, the effect of a successful challenge will be to raise *additional* revenue to fund public services, particularly education.[240]

This court also rejected defendants' argument that the *Hibbs* holding should be limited to cases involving state tax credits or benefits. In so doing, this court discredited the Tenth Circuit's decision in *Hill v. Kemp*, 478 F.3d 1236, 1249 (10th Cir. 2007), which held that the *Hibbs* exception to the TIA's prohibition only applied to cases involving tax *credits*.[241]

---

[240] Doc. no. 35, at 26-27 (emphasis in original); *see also Weissinger v. Boswell*, 330 F. Supp. 615, 618 n.4 (M.D. Ala. 1971) (three-judge court) (*per curiam*) ("It should also be noted that defendant's contention, as a ground for dismissal, to the effect that plaintiffs' action is barred by the Tax Injunction Act of 1937, 28 U.S.C.A. § 1341, was considered and disposed of by this Court in the October 29, 1969, order. This portion of our order was to the effect that the Alabama courts do not afford plaintiffs a plain, speedy and efficient remedy. In this connection *see State ex rel. Foshee v. Butler*, 225 Ala. 194, 142 So. 533; *State ex rel. Chilton County v. Butler*, 225 Ala. 191, 142 So. 531; *Morrison v. Morris*, 273 Ala. 390, 141 So. 2d 169.").

[241] The underlying facts of the Tenth Circuit's decision in *Hill v. Kemp* were as follows:

a group of motorists in the State of Oklahoma sought injunctive relief and a declaratory judgment that the State's scheme for granting specialty motor vehicle license plates violated the First and Fourteenth Amendments "by permitting drivers to obtain license plates bearing the messages 'Adoption Creates Families' and 'Choose Life' under terms and conditions more favorable than those available to those who wish to have license plates bearing messages of support for abortion rights." *Id.* at 1239. The defendants argued that the suit was barred by the Tax Injunction Act, and the Tenth Circuit agreed. The court refused to interpret Hibbs as allowing any lawsuit by taxpayers who are "not seeking to challenge an assessment imposed on them, but rather assessments imposed on and paid by other persons or entities." *Id.* at 1249. The Tenth Circuit panel reasoned that

[n]othing in the language of the TIA indicates that our jurisdiction to hear challenges to state taxes can be turned like a spigot, off when brought by taxpayers challenging their own liabilities and on when brought by third parties challenging the liabilities of

111

This court also rejected defendants' argument that the possibility of the relief requested by the plaintiffs in this case would actually increase state revenue was too speculative to defeat application of the Tax Injunction Act, because the undisputed "immediate effect of granting the declaratory judgment and injunction plaintiffs seek will be to increase property taxes in the State of Alabama."[242]  As noted in this court's

---

others.  Rather, Congress plainly directed us that we "shall not enjoin . . . any tax under State law," without qualification — and nothing in *Hibbs* commands a result contrary to the Congress's express direction.

*Id.*  The Tenth Circuit acknowledged that *Hibbs* did involve a third-party challenge to the Arizona law at issue, but dismissed *Hibbs*' entire discussion of the plaintiffs' third-party status as nothing more than a long side-note, included to "simply . . . underscore how unusual the case before it was compared with most [Tax Injunction Act] suits." *Hill*, 478 F.3d at 1249. According to the Tenth Circuit, *Hibbs* held that the Act did not apply only because "the plaintiff there simply did not seek to enjoin the levy or collection of any tax under State law, as is typically the case, but instead sought to challenge the provision of a tax credit aimed at limiting or constraining State tax revenues." *Hill*, 478 F.3d at 1249 (citing *Hibbs*, 542 U.S. at 95) (emphasis in original).  In other words, *Hibbs* "held that giving away a tax credit is a very different thing than assessing, levying or collecting a tax." *Hill*, 478 F.3d at 1249.

Doc. no. 35, at 27-28.  This court disagreed with *Hill* because the Supreme Court in *Hibbs* "would not have paused so long to underscore how the plaintiffs' third-party status distinguished the case from other Tax Injunction Act cases if the difference was not significant to the Court's decision," and because the Supreme Court's intent was to *limit,* not enlarge, the application of the TIA. *Id.* at 28-29.  Indeed, the Court in *Hibbs* firmly rejected the notion that the TIA was intended as a "sweeping congressional direction to prevent 'federal-court interference with *all* aspects of state tax administration." *Hibbs*, 542 U.S. at 105 (citation omitted) (emphasis supplied).

[242] Doc. no. 35, at 31.  In support of this statement, the court noted that defendants had stated the following in the brief they filed in support of their motion to dismiss:

If Plaintiffs are successful in challenging the restrictions on assessment ratios in Amendment 373 to the Alabama Constitution, and an injunction is issued, property in every classification would automatically be assessed at 100%, as opposed to the 10%, 20%, and 30% current ratios for residential, commercial, and utility property,

previous opinion, that effect would be true even though the Alabama legislature could later vote to impose even lower tax rates than those required by the current structure. "If that should occur, it will not be as a result of this court's injunction. The undisputed, direct effect of the requested injunction would be to *increase* property tax revenue."[243]

Defendants now argue that this court should reconsider its prior decision in light of the Supreme Court's intervening decision in *Levin v. Commerce Energy, Inc.*, — U.S. —, 130 S. Ct. 2323 (2010). This court is not persuaded by defendants' argument. The *Levin* case will be discussed in more detail in the following section, but it is important to note for purposes of the Tax Injunction Act analysis that the *Levin* case did not reach any decision based upon that Act. *Levin* did spend significant time discussing the Act and the *Hibbs* case, but its ultimate decision was based upon principles of comity, *not* upon the TIA.[244] Therefore, any discussion of

---

respectively. Millage rates, which Plaintiffs do not attack, would remain constant. By way of example, Alabama taxpayers with a $100,000 home in a county with a property tax rate of 50 mills would see their annual property tax bill increase from $300 to $3,000, after taking into account the homestead exemption and the change in assessment ratio.

*Id.* at 31 n.23 (citing doc. no. 27 (Defendants' Memorandum in Support of Motions to Dismiss), at 2 n.1).

[243] Doc. no. 35, at 32 (emphasis in original).

[244]*Levin*, 130 S. Ct. at 2336-37 ("Because we conclude that the comity doctrine justifies dismissal of respondents' federal-court action, we need not decide whether the TIA itself would block the suit.") (citations omitted).

113

the TIA in *Levin* was *dicta*, and is helpful only insofar as it informs the comity analysis. *Levin* is not precedent for a TIA challenge, and, contrary to defendants' assertion, it did not constitute "a dramatic about-face" from the Supreme Court's decision in *Hibbs*.[245]

In summary, this court is not persuaded, even after considering the *Levin* case, that it should reconsider its prior decision that plaintiffs' claims are not barred by the Tax Injunction Act.

---

[245] *See* doc. no. 275 (Defendants' Post-Trial Brief), at 180.

## C.    Comity

This court also addressed the effect of the "comity" doctrine on the viability of plaintiffs' claims in the memorandum opinion and order denying defendants' motion to dismiss for lack of subject matter jurisdiction, but that was not a substantive discussion.  Rather, this court found that considerations of comity within our federal system of government were never intended to operate as a jurisdictional bar, so comity could not serve as the basis for dismissing a case for lack of subject matter jurisdiction.[246]  The court now will substantively address the subject for the first time, giving consideration to both the arguments raised in the parties' post-trial briefs, and the arguments raised in the parties' earlier briefings filed in connection with defendant's motion to dismiss for lack of subject matter jurisdiction.

The most relevant Supreme Court decision on comity is also the most recent, and the one most relied upon in the parties' post-trial briefs:  *i.e.*, *Levin v. Commerce*

---

[246] *See* doc. no. 35 (Memorandum Opinion and Order on Motion to Dismiss), at 33-36; *see also*, *e.g.*, *Rhines v. Weber,* 544 U.S. 269, 274 (2005) (stating that the doctrine of comity "teaches that one court should defer action on causes *properly within its jurisdiction* until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.") (emphasis supplied) (citing *Rose v. Lundy*, 455 U.S. 509, 518 (1982)); *O'Sullivan v. Boerckel*, 526 U.S. 838, 851-52 (1999) (implying that a court's refusal to hear a case on comity grounds is premised on an "abstention principle" that is separate from the question of subject matter jursdiciton); *Fair Assessment in Real Estate Association, Inc. v. McNary*, 454 U.S. 100, 119 (1981) (Brennan, J., concurring) ("[T]he 'principle of comity' may be a source of judicial policy, [but] it is emphatically no source of judicial *power* to renounce jurisdiction.") (emphasis in original).

*Energy, Inc.*, — U.S. —, 130 S. Ct. 2323 (2010).  In that case, two corporations that

marketed and sold natural gas to Ohio consumers, together with one of the customers

of those corporations, sued the Ohio Tax Commissioner in federal district court,

alleging that state tax exemptions provided to competitors of the plaintiff-

corporations, but not to the plaintiffs themselves, were discriminatory in violation of

the Commerce Clause and Equal Protection Clause.[247]   The plaintiffs sought

"declaratory and injunctive relief invalidating the three tax exemptions [the

competitors] enjoy and ordering the Commissioner to stop 'recognizing and/or

enforcing' the exemptions."[248]   The question before the court was whether the

plaintiffs' suit should be barred by considerations of comity.[249]

      The Supreme Court provided the following summary of the policy undergirding

the comity doctrine, and its application to the case:

> The comity doctrine counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction. The doctrine reflects
>
>> "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States

---

[247] *See Levin*, 130 S. Ct. at 2328-29.

[248] *Id.* at 2329.

[249] *Id.* at 2328.  The Court acknowledged that the Tax Injunction Act also was relevant to its decision, but that Act nonetheless did not serve as the grounds for the Court's decision.

and their institutions are left free to perform their separate functions in separate ways." *Fair Assessment[ in Real Estate Ass'n v. McNary*, 454 U.S. 100, 112 (1981) (quoting *Younger v. Harris*, 401 U.S. 37, 44, 91 S. Ct. 746, 27 L. Ed.2d 669 (1971)).

Comity's constraint has particular force when lower federal courts are asked to pass on the constitutionality of state taxation of commercial activity. For "[i]t is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible." *Dows v. Chicago*, 11 Wall. 108, 110, 20 L. Ed. 65 (1871).

"An examination of [our] decisions," this Court wrote more than a century ago, "shows that a proper reluctance to interfere by prevention with the fiscal operations of the state governments has caused [us] to refrain from so doing in all cases where the Federal rights of the persons could otherwise be preserved unimpaired." *Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276, 282, 29 S. Ct. 426, 53 L. Ed. 796 (1909). *Accord Matthews v. Rodgers*, 284 U.S. 521, 525-526, 52 S. Ct. 217, 76 L. Ed. 447 (1932) (So long as the state remedy was "plain, adequate, and complete," the "scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it.").[250]

---

[250] *Levin*, 130 S. Ct. at 2330 (footnoted omitted) (first bracketed alteration supplied, other bracketed alterations in original). In the omitted footnote, the Court related Justice Brennan's prior explanation of "the special reasons justifying the policy of federal noninterference with state tax collection":

    The procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules. State tax agencies are organized to discharge their responsibilities in accordance with the state procedures. If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape

The Court emphasized that "the comity doctrine is more embracive than" the Tax Injunction Act, and criticized Courts of Appeals that "have comprehended *Hibbs* to restrict comity's compass."[251]   Even though, as discussed in the previous Part of this opinion, *Hibbs* was decided under the Tax Injunction Act, the defendants in that case also raised the doctrine of comity as a bar to the plaintiffs' claims.   The *Hibbs* Court paused only briefly to consider the comity argument, stating the following in a footnote:   "We note, furthermore, that this Court has relied upon 'principles of comity' . . . to preclude original federal-court jurisdiction only when plaintiffs have sought district-court aid in order to arrest or countermand state tax collection."[252] Other courts, including the Sixth Circuit Court of Appeals, which decided the *Levin* case before *certiorari* was granted by the Supreme Court, had interpreted the *Hibbs* footnote narrowly to restrict the application of the comity doctrine.   The *Levin* Court rejected that approach, however, by stating that

---

the ordinary procedural requirements imposed by state law.   During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency.   Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts.

*Levin*, 130 S. Ct. at 2330 n.2 (quoting *Perez v. Ledema*, 401 U.S. 82, 128 n.2 (1971)) (Brennan, J., concurring in part and dissenting in part).

[251] *Id*. at 2332.   *Hibbs v. Winn*, 542 U.S. 88 (2004), was discussed in the preceding Part of this opinion.

[252] *Hibbs*, 542 U.S. at 107 n.9 (citing *McNary*, 454 U.S. at 107-08; *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 296-99 (1943)) (citation to the record in *Hibbs* omitted).

the *Hibbs* footnote comment on comity is most sensibly read to affirm that, just as the case was a poor fit under the TIA, so it was a poor fit for comity. The Court, in other words, did not deploy the footnote to recast the comity doctrine; it intended the note to convey only that the Establishment Clause-grounded case cleared both the TIA and comity hurdles.[253]

The *Levin* Court also explained why that case was distinguishable from *Hibbs*,

saying:

A confluence of factors in this case, absent in *Hibbs*, leads us to conclude that the comity doctrine controls here. First, respondents seek federal-court review of commercial matters over which Ohio enjoys wide regulatory latitude; their suit does not involve any fundamental right or classification that attracts heightened judicial scrutiny.[254] Second, while respondents portray themselves as third-party challengers to an allegedly unconstitutional tax scheme, they are in fact seeking federal-court aid in an endeavor to improve their competitive position.[255] Third, the Ohio courts are better positioned than their

---

[253] *Levin*, 130 S. Ct. at 2335-36.

[254] *See also id*. at 2333 ("When economic legislation does not employ classifications subject to heightened scrutiny or impinge on fundamental rights, courts generally view constitutional challenges with the skepticism due respect for legislative choices demands. *See, e.g., Hodel v. Indiana*, 452 U.S. 314, 331–332, 101 S. Ct. 2376, 69 L. Ed. 2d 40 (1981); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488–489, 75 S. Ct. 461, 99 L. Ed. 563 (1955). And 'in taxation, even more than in other fields, legislatures possess the greatest freedom in classification.' *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590 (1940)."); *id.* at 2334 ("A 'State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination.'") (quoting *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U.S. 18, 39-40 (1990)).

[255] The Court's conclusion in this regard would have been different if the plaintiffs had in fact been third parties whose tax liabilities would remain unaffected by their requested relief. As the Court explained,

The plaintiffs in *Hibbs* were outsiders to the tax expenditure, "third parties" whose own tax liability was not a relevant factor. In this case, by contrast, the very premise of respondents' suit is that they are taxed differently from [their competitors]. Unlike

119

federal counterparts to correct any violation because they are more familiar with state legislative preferences and because the TIA does not constrain their remedial options.[256]  Individually, these considerations may not compel forbearance on the part of federal district courts; in combination, however, they demand deference to the state adjudicative process.[257]

The *Levin* Court's ultimate conclusion was that "comity precludes the exercise of original federal-court jurisdiction" in a case involving "a taxpayer's complaint about allegedly discriminatory state taxation framed as a request to increase a competitor's tax burden."[258]

Defendants assert that, under *Levin,* the principle of comity should also bar plaintiffs' claims in this action, because those claims could have a disruptive effect on the State's system of tax administration, and because the Alabama state courts would be better suited than this court to remedy any constitutional violations.  Those

the *Hibbs* plaintiffs, respondents *do* object to their own tax situation, measured by the allegedly more favorable treatment accorded [their competitors].

*Levin*, 130 S. Ct. at 2335 (emphasis supplied).

[256] The Court pointed out that there would be no appropriate way to remedy the plaintiffs' grievances, even if the plaintiffs were able to succeed on the merits of their claims.  The Court could not help the plaintiffs achieve parity with their competitors by reducing their tax liability, because such an action would be prohibited by the Tax Injunction Act.  The Court also could not "reshape the relevant provisions of Ohio's tax code," because by doing so, it "would engage in the very interference in state taxation the comity doctrine aims to avoid."  *Id.* at 2334-35.  Instead, if the Ohio tax scheme was deemed unconstitutional, the plaintiffs' requested remedy, "an order invalidating the exemptions enjoyed by [their competitors], may be far from what the Ohio Legislature would have willed."  The Ohio courts would be "better positioned to determine — unless and until the Ohio Legislature weighs in — how to comply with the mandate of equal treatment."  *Id.* at 2335.

[257] *Id.* at 2336.

[258] *Id.* at 2332-33.

concerns are alleviated, however, by the precise nature of the relief sought by plaintiffs.  Plaintiffs ask this court to invalidate the challenged state constitutional provisions, but they do not ask this court to reshape the property tax system.  The Alabama courts may indeed be better suited than this court for the task of fashioning a new property tax system, if one is constitutionally required, but this court is better suited than the state courts for determining whether the United States Constitution has been violated, and that is the only relief plaintiffs have requested here.  Furthermore, plaintiffs asked the court to stay any injunction that might issue for at least a one-year period, in order to allow the State Legislature an opportunity to consider what measures might bring the *ad valorem* property tax system into compliance with the United States Constitution.  Consequently, in that event, there would be no disruptive effect on the State's tax system.  To the contrary, the system would continue to operate as it currently does, until the Alabama Legislature convenes to take any necessary remedial action.[259]

Plaintiffs assert two additional arguments to distinguish *Levin*, and this court

---

[259] It also should be remembered that the court in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971) (three-judge court) (*per curiam*) — a case that will be discussed in great detail in Part II(G)(3)(i) of this opinion, *infra* — also originally allowed the State of Alabama one year to comply with the court's mandate, but that one-year hiatus stretched into ten.  Thus, there should be little concern that, in the event this court rules in plaintiffs' favor on the issue of liability, the Alabama Legislature might not "be convened on the spot, and the blunt interim relief respondents ask the District Court to decree 'may [immediately] derange the operations of government, and thereby cause serious detriment to the public.'"  *Levin*, 130 S. Ct. at 2335 n.11 (quoting *Dows v. Chicago*, 11 Wall. (78 U.S.) 108, 110 (1871)) (bracketed alteration in original).

finds both to be persuasive.  First, plaintiffs assert that they are like third-party challengers to an allegedly unconstitutional tax scheme, because they are not seeking the aid of the federal courts to ease their tax burden.  Indeed, quite to the contrary, if plaintiffs are granted all of their requested relief, their individual property tax burdens almost certainly will be *increased*.  Second, "and even more importantly,"[260] plaintiffs have asserted claims for discrimination based on race, a suspect class that triggers heightened constitutional review, whereas *Levin* involved alleged discrimination in the taxation of commercial activity, which enjoys no such scrutiny and involves no suspect class.  The importance of the federal issues involved in this case is the primary factor distinguishing it from *Levin*.  Weighing the vital constitutional issues at stake here, especially in light of the long and detailed history of federal equal protection jurisprudence and race relations in this State, is a task the federal courts are uniquely qualified to perform.

In summary, this court finds that the federal issues at stake in this litigation outweigh any concerns over the preservation of state sovereignty.  Consequently, the principle of comity should not be applied as a bar to plaintiffs' claims.

---

[260] Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 95.

## D.   Eleventh Amendment Immunity

The issue of the Eleventh Amendment as a defense to plaintiffs' claims was first raised in defendants' motion for judgment on the pleadings.[261]   Defendants argued that the Eleventh Amendment barred plaintiffs' Fourteenth Amendment claims against all defendants:   the State of Alabama, its Governor, and the Revenue Commissioner.[262]   In response, plaintiffs conceded that "the Eleventh Amendment bars claims against the State of Alabama based solely on the Fourteenth Amendment," but opposed defendants' motion in all other respects.[263]   Following consideration of the parties' briefs and oral arguments, this court dismissed all claims against the State of Alabama based upon the Fourteenth Amendment, but denied the motion in all other respects.[264]

---

[261] *See* doc. no. 79 (Defendants' Motion for Judgment on the Pleadings).

[262] *See* doc. no. 79-2 (Brief in Support of Defendants' Motion for Judgment on the Pleadings), at 4-5, 22-31.

[263] *See* doc. no. 93 (Plaintiffs' Response to Defendants' Motion for Judgment on the Pleadings), at 5-6; doc. no. 99 (Defendants' Reply Brief in Support of Motion for Judgment on the Pleadings).

[264] *See* doc. no. 126 (Order Addressing Defendants' Motion for Judgment on the Pleadings), stating in part:

> This case is before the court on defendants' motion for judgment on the pleadings.  Upon consideration of the motion, pleadings, briefs, and oral arguments of counsel, the motion is GRANTED in part and DENIED in part.  Plaintiffs' claims against the State of Alabama based solely upon the Fourteenth Amendment to the United States Constitution are DISMISSED.  All other claims asserted by plaintiffs – including their Fourteenth Amendment claim against the Governor and Revenue Commissioner for the State of Alabama, and their Title VI claim against all

Defendants renewed this issue in their post-trial brief, arguing that the Eleventh Amendment also prohibits plaintiffs' claims against the Governor and Revenue Commissioner.[265]  Because this court's prior order denying defendants' motion for judgment on the pleadings did not discuss that contention in a substantive manner, the court will address it now, for the sake of completeness.

The Eleventh Amendment limits the power of federal courts to hear suits instituted by private litigants against a state.  The Amendment itself is quite brief, containing only forty-three words.  Its full text provides that:  "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI (1795).  Despite the Amendment's brevity and (to this court) extraordinary clarity of expression — explicitly denying to federal courts the power to decide suits against states brought by only two classes of plaintiffs, "Citizens of another State" and "Citizens or Subjects of any Foreign State" — the Supreme Court has layered a case-law gloss on the Amendment's language that "is replete with historical anomalies,

---

defendants – remain.

*Id*. at 1-2 (capitalization in original) (footnotes omitted).

[265] *See* doc. no. 275 (Defendants' Post-Trial Brief), at 172-77.

124

internal inconsistencies, and senseless distinctions."[266]

For example, the Supreme Court long ago interpreted the Amendment as barring federal court suits against a state by *one of its own citizens*, and not just "Citizens of another State."  *See Hans v. Louisiana*, 134 U.S. 1, 13-15 (1890) (holding that the ancient doctrine of sovereign immunity barred a person from suing his own state in federal court, even when the basis of the claim was a federal question arising under the laws or Constitution of the United States).[267]

The Court also has held that a plaintiff's claim based upon a federal statute is barred when it is filed in the defendant state's own court system, rather than a federal forum.  *See Alden v. Maine*, 527 U.S. 706 (1999) (holding that state employees could not subject their state to suit in the state's own court system to recover damages for violation of the overtime provisions of the Fair Labor Standards Act of 1938, because

---

[266] Howard P. Fink and Mark V. Tushnet, *Federal Jurisdiction*:  *Policy and Practice – Cases and Materials* 137 (Charlottesville, Va.:  The Michie Co. 1984).

[267] *See also*, *e.g.*, *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001) (holding that Congress did not validly abrogate the states' sovereign immunity to suits by private individuals when enacting the Americans with Disabilities Act of 1990 (ADA) and, accordingly, such suits are barred by the Eleventh Amendment); *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) (holding that Congress did not validly abrogate the states' sovereign immunity to suits by private individuals when enacting the Age Discrimination in Employment Act of 1967 and, accordingly, such suits also are barred by the Eleventh Amendment); *Edelman v. Jordan*, 415 U.S. 651, 662-663 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."), *overruled on other grounds by Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989); *In re Employment Discrimination Litigation Against State of Alabama*, 198 F.3d 1305, 1317 (11th Cir. 1999) ("The Amendment has been interpreted as a jurisdictional bar on the federal courts from hearing suits brought against states by their own citizens, or by citizens of other states.")

Congress lacked the power under Article I of the Constitution to abrogate the states'

sovereign immunity to suit in their own courts upon claims based on federal statutes).

The bases for such conclusions are obscure at best, especially when they are

read beside the scant, forty-three words of the Amendment itself.  The murkiness of

the rationale results from the confluence of powerful historical streams:  "the non-

constitutional but ancient doctrine of sovereign immunity,"[268] *and*

> the Constitution's structure, . . . its history, and the authoritative
> interpretations by the [Supreme] Court [which] make clear [that] the
> States' immunity from suit is a fundamental aspect of the sovereignty
> which the States enjoyed before the ratification of the Constitution, and
> which they retain today (either literally or by virtue of their admission
> into the Union upon an equal footing with the other States) except as
> altered by the plan of the Convention or certain constitutional
> Amendments.[269]

For such reasons, as well as others that it is not necessary to discuss here, the

Eleventh Amendment has been construed in a manner that bars federal courts from

hearing suits commenced by private litigants against non-consenting states for the

retrospective recovery of money damages.[270]   In other words, the amendment is a

---

[268] *Fitzpatrick v. Bitzer*, 427 U.S. 445, 457 (1975) (Brennan, J., concurring).

[269] *Alden*, 527 U.S. at 713 (bracketed alterations supplied).

[270] *See*, *e.g.*, *Garrett*, 531 U.S. at 363 ("Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States.  The ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court.") (citations omitted); *Kimel*, 528 U.S. at 73 ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States."); *Edelman*, 415 U.S. at 663 (observing that the Eleventh Amendment insulates states from "private parties seeking to impose a liability [in federal

126

limitation on the judicial power of United States courts under Article III of the Constitution, and federal courts accordingly "lack jurisdiction to entertain claims that are barred by the Eleventh Amendment."  *McClendon v. Georgia Department of Community Health*, 261 F.3d 1252, 1256 (11th Cir. 2001) (citations omitted).

The Eleventh Amendment also shields state officials who are sued under 42 U.S.C. § 1983 in their "official capacity" from federal court actions seeking money damages for past actions allegedly committed in violation of the Constitution or federal statutes, because such claims are tantamount to a suit against the state itself; and, absent waiver or consent, the Eleventh Amendment bar remains intact.[271]  As the Court explained in *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), it is obvious that "state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  . . .  As such, it is no different from a suit against the State itself."[272]

---

court] which must be paid from public funds in the state treasury").

[271] *See*, *e.g.*, *McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Lassiter v. Alabma A & M University*, 3 F.3d 1482, 1485 (11th Cir. 1993) ("Official capacity actions seeking damages are deemed to be against the entity of which the officer is the agent."); *Carr v. City of Florence*, 916 F.2d 1521, 1524 (11th Cir. 1990) (observing that, in such cases, "the state is considered the real party in interest because an award of damages would be paid by the state").

[272] *Will*, 491 U.S. at 71; s*ee also*, *e.g.*, *Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) ("[T]he Eleventh Amendment prohibits suits against state officials where the state is, in fact, the real party in interest."); *Lassiter*, 3 F.3d at 1485 ("Where the defendant

It is undisputed that the Governor and Revenue Commissioner are each sued only in their respective official capacities.[273]  Thus, the Eleventh Amendment would bar plaintiffs' claims against those defendants, *but only if* those claims were for money damages as payment for past unlawful acts.  Indeed, a well-recognized exception applies in suits by private individuals against state officials seeking *declaratory relief* or *prospective injunctive relief* for *continuing violations* of federal law.  *See Ex Parte Young*, 209 U.S. 123, 1599-60 (1908) (holding that a state official who has acted unconstitutionally may be sued in his official capacity for prospective injunctive relief because such a suit "does not affect the State in its sovereign or governmental capacity," and, an official who commits an unconstitutional act is deemed to have been "stripped of his official or representative character").[274]

---

is an entity other than the state, the suit may nonetheless be barred where the state is the real party in interest.") (quotation marks and citation omitted).

[273] When determining the capacity in which a governmental employee is sued, the court looks "at the complaint and the course of proceedings."  *Colvin v. McDougall*, 62 F.3d 1316, 1317 (11th Cir. 1995).  Plaintiffs clearly state in their complaint that the Governor and the Revenue Commissioner both are sued in their respective official capacities.  *See* doc. no. 1 (Complaint), at ¶ 11 ("Defendant Bob Riley [now Dr. Robert J. Bentley pursuant to Fed. R. Civ. P. 25(d)], *in his official capacity as Governor of Alabama* . . . .") (emphasis supplied); ¶ 12 ("Defendant Tim Russell [now Julie Magee pursuant to the same Rule], in his [now her] *official capacity as Commissioner of Revenue* . . . .") (emphasis and bracketed alterations supplied).

[274] *See also*, *e.g.*, *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102 (1984) (discussing *Young*, and holding that prospective injunctive relief may be sought in "a suit challenging the constitutionality of a state official's action"); *Miller v. King*, 384 F.3d 1248, 1264 (11th Cir. 2004) ("While the Eleventh Amendment generally bars suits against non-consenting states, '[u]nder the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), there is a long and well-recognized exception to this rule for suits against state *officers* seeking prospective equitable relief to end continuing violations of federal law."); *McClendon*, 261 F.3d at 1256 ("The *Young* doctrine permits

The Eleventh Circuit has observed that the exception to Eleventh Amendment immunity established in *Young* "turns on three considerations: *first*, does the Plaintiff seek prospective or retrospective relief; *second*, is the violation ongoing and continuous; and *finally*, would equitable relief 'implicate special sovereignty interests.'" *Sandoval v. Hagan*, 197 F.3d 484, 500 (11th Cir. 1999) (quoting *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261 (1997)) (emphasis supplied, and some internal quotation marks omitted), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001).  As Judge Harold Murphy astutely observed in his first opinion in the *Knight* line of cases discussed in detail in Part II(G)(4)(j) of this opinion, *infra* (*i.e.*, *Knight v. State of Alabama,* 787 F. Supp. 1030 (N.D. Ala. 1991) ("*Knight I* ")),

> *Ex parte Young* focuses on ongoing violations of federal law "as opposed to cases in which federal law has been violated at one time or over a period of time in the past. . . ." *Papasan v. Allain*, 478 U.S. 265, 277–78, 106 S. Ct. 2932, 2939–40, 92 L. Ed. 2d 209 (1986).  Relief that

---

federal courts to entertain suits against state officers seeking *prospective* equitable relief to end continuing violations of federal law.") (citations omitted) (emphasis in original); *Summit Medical Associates*, 180 F.3d at 1336 ("The Eleventh Amendment generally does not bar the exercise of the judicial power of the United States where a plaintiff seeks to compel a state officer to comply with federal law."); *Cross v. State of Alabama*, 49 F.3d 1490, 1502-03 (11th Cir. 1995) (holding that plaintiffs' § 1983 official capacity claims against the Commissioner and Associate Commissioner of the state Department of Mental Health and Mental Retardation, and the Director of that department's Taylor Hardin Secure Medical Facility, for prospective injunctive relief [*i.e.*, *reinstatement*] "is not treated as an action against the state, and the 'Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief'") (quoting *Lassiter*, 3 F.3d at 1485).  *See generally* Erwin Chemerinsky, *Federal Jurisdiction* § 7.5 (New York: Aspen Publishers 5th ed. 2007) ("**Chemerinsky II**").

in essence serves to compensate a party injured by past illegal state conduct is barred by the Eleventh Amendment. Only that relief which is designed to bring an end to a present violation of federal law is not barred by the Eleventh Amendment "even though accompanied by a substantial ancillary effect on the state treasury." *Id.* at 278, 106 S. Ct. at 2940.[275]

All of the requirements for application of the *Young* doctrine are satisfied in the present action. Plaintiffs seek *prospective* relief to end ongoing and continuous violations of federal law. They do not seek any compensation for past injuries. Instead, they seek only a declaration that the challenged provisions are unconstitutional, and an injunction to prevent *future* injuries. Furthermore, "special sovereignty interests" do not weigh in favor of exercising the Eleventh Amendment bar in this case. While the federal courts are obligated to give special weight to state sovereignty interests when considering issues of "state taxation *of commercial activity*,"[276] the federal interests at stake here are sufficient to outweigh any concerns over unduly interfering with the fiscal operations of state government.

Defendants' arguments to the contrary are not persuasive. They argue that the *Young* doctrine does not apply in this case because "[t]he claims for injunctive relief against the Governor and Revenue Commissioner simply are not the type of claims

---

[275] *Knight I,* 787 F. Supp. at 1370.

[276] *Levin v. Commerce Energy, Inc.,* – U.S. – , 130 S. Ct. 2323, 2330 (2010) (emphasis supplied), quoted in Part II(C) of this opinion, *supra*, discussing the subject of "Comity."

permitted in *Ex parte Young.*"[277]  Defendants base that argument upon the following

passage from the *Young* decision:

> The various authorities we have referred to furnish ample
> justification for the assertion that individuals who, as officers of the
> state, are clothed with some duty in regard to the enforcement of the
> laws of the state, and *who threaten and are about to commence
> proceedings*, either of a civil or criminal nature, *to enforce against
> parties affected* an unconstitutional act, violating the Federal
> Constitution, may be enjoined by a Federal court of equity from such
> action.[278]

According to defendants, this passage demonstrates that there are "two required

elements of a *Young* injunction":  *i.e.*, imminent threat of civil or criminal

enforcement action; and, plaintiffs who would be "parties affected" by the threatened

enforcement action.[279]

Defendants first rely upon the undisputed fact that none of the minor student-

plaintiffs own property or pay property taxes in this State.[280]  Thus, according to

defendants, none of those plaintiffs would be "parties affected" by any action taken

to enforce property tax laws.  However, that argument ignores the fact that the minor

plaintiffs are suing by and through their parental representatives, most of whom *do*

---

[277] Doc. no. 275 (Defendants' Post-Trial Brief), at 173.

[278] *Young*, 209 U.S. at 155-56 (emphasis supplied).

[279] *See* doc. no. 275, at 174.

[280] *See* doc. no. 242-1 (Parties' Statement of Agreed Facts) ("**Agreed Facts**") ¶ 357 ("The minor student Plaintiffs do not own property or pay property taxes in the State of Alabama.").

own property and pay taxes in this State.[281]   Furthermore, defendants' argument implicitly assumes that the only way for a plaintiff to be "affected" by an injunction in a case about the constitutionality under the United States Constitution of the Alabama Constitutional provisions restricting the *ad valorem* millage rates that may be levied for the support of public schools is through an increase or decrease in tax burden.   That, of course, is not the case.   Plaintiffs would be affected by any injunction that might be entered in this case, because any such injunction would alter the amount of tax revenue available to fund the K-12 school systems in the counties in which they reside, regardless of whether plaintiffs' personal tax burdens are increased or decreased, and regardless of whether plaintiffs even pay *ad valorem* property taxes in the first place.

Defendants also argue that the first purported "element" of the *Young* analysis has not been satisfied, because it is undisputed that, "[a]t no time has any official of the State of Alabama ever initiated or threatened to initiate any civil or criminal action against any plaintiff in this action threatening the liberty or property of that

---

[281] The deposition testimony demonstrates that five of those parental representatives pay property taxes.   Deposition of Stella Anderson (Court's Exhibit 8), at 8-9; Deposition of Miranda Ball (Court's Exhibit 4), at 11; Deposition of Tyler Berryman (Court's Exhibit 5), at 9; Deposition of Michael Brooks (Court's Exhibit 10), at 11; Deposition of Shawn King Lynch (Court's Exhibit 2), at 10.   One of the parental representatives paid property taxes until he was exempted due to disability.   Deposition of Wendell Pride (Court's Exhibit 6), at 16-17.   Property taxes were not addressed in the testimony of the other parental representative.   *See generally* Deposition of Barbara Ormand (Court's Exhibit 9).

132

plaintiff in any way regarding the challenged Property Tax Provisions."[282]  Because the injunction sought in this case "does not target any threatened or even reasonably anticipated act of the Revenue Commissioner or Governor for prohibition, but rather seeks only to have a State's constitutional provision declared unconstitutional under the Fourteenth Amendment,"[283] defendants assert that the case actually amounts to nothing more than a disguised request for an advisory opinion.  That is impermissible, according to defendants, under the Supreme Court's decision in *Fitts v. McGhee*, 172 U.S. 516 (1899), which was cited by the Court in *Young*.  Defendants focus their argument on the following passage from *Fitts*:

> There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state.[284]

Although the Court's directive to avoid suits "merely to test the constitutionality of a state statute" does appear, on initial reading, to caution against asserting jurisdiction over this case, seeking an injunction prohibiting the Governor and the Revenue Commissioner from enforcing the allegedly unlawful state constitutional provisions,

---

[282] Agreed Facts ¶ 356.

[283] Doc. no. 275, at 175.

[284] *Fitts*, 172 U.S. at 529-30.

a closer examination of the quoted passage from the *Fitts* opinion, and construed *in its proper context*, actually suggests otherwise.  In the portion of the *Fitts* opinion relied upon by defendants, the Court was concerned with the question of whether the claims asserted against the State officials were, in reality, claims against the State as a sovereign governmental entity entitled to claim Eleventh Amendment immunity. The *Fitts* Court addressed that question as follows:

> [T]here is no escape from the conclusion that, although the state of Alabama was dismissed as a party defendant, this suit against its officers is really one against the state. As a state can act only by its officers, an order restraining those officers from taking any steps, by means of judicial proceedings, in execution of the statute of February 9, 1895, is one which restrains the state itself, and the suit is consequently as much against the state as if the state were named as a party defendant on the record.[285]

Thus, the language relied upon by defendants is part of a long passage discussing whether the State Attorney General and a local prosecutor, both of whom were defendants in the case, had a sufficient connection to the enforcement of the challenged law to be parties to any injunction that might be entered.

> It is to be observed that neither the attorney general of Alabama nor the solicitor of the Eleventh judicial circuit of the state appear to have been charged by law with any special duty in connection with the act of February 9, 1895.  In support of the contention that the present suit is not one against the state, reference was made by counsel to several cases, among which were *Poindexter v. Greenhow*, 114 U. S.

---

[285] *Id.* at 528-29.

270, 5 Sup. Ct. 903, 962; *Allen v. Railroad*, 114 U. S. 311, 5 Sup. Ct. 925, 962; *Pennoyer v. McConnaughy*, 140 U. S. 1, 11 Sup. Ct. 699; *In re Tyler*, 149 U. S. 164, 13 Sup. Ct. 785; *Reagan v. Trust Co.*, 154 U. S. 362, 388, 14 Sup. Ct. 1047; *Scott v. Donald*, 165 U. S. 58, 17 Sup. Ct. 265; and *Smyth v. Ames*, 169 U. S. 466, 18 Sup. Ct. 418.   Upon examination, it will be found that the defendants in each of those cases were officers of the state, specially charged with the execution of a state enactment alleged to be unconstitutional, but under the authority of which, it was averred, they were committing, or were about to commit, some specific wrong or trespass to the injury of the plaintiffs' rights. *There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state.  In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional.   They were not expressly directed to see to its enforcement.*  If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes.  That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.  If their officers commit acts of trespass or wrong to the citizen, they may be individually proceeded against for such trespasses or wrongs.  Under the view we take of the question, the citizen is not without effective remedy, when proceeded against under a legislative enactment void for repugnancy to the supreme law of the land; for,

135

whatever the form of proceeding against him, he can make his defense upon the ground that the statute is unconstitutional and void. And that question can be ultimately brought to this court for final determination.[286]

It seems clear, to this court at least, that the Supreme Court in *Fitts* was more concerned over the question of whether the named defendants had proper enforcement authority over the challenged law — not whether those defendants, as State officials, had actually initiated or threatened to initiate any enforcement action against the plaintiffs in the case. *Fitts*, therefore, cannot properly be construed as limiting *Young* to only that class of cases in which actual enforcement proceedings have been commenced against a plaintiff; and that seems especially to be the proper rule, in light of all the subsequent authority interpreting *Young* as allowing challenges to the constitutionality of a state law.

Furthermore, even if this court did construe the *Fitts* passage quoted by defendants in isolation and apart from all other considerations, that passage, in the opinion of this court, still would not bar plaintiffs' claims. Plaintiffs are not simply asking this court to render an "advisory opinion" on the constitutionality of the challenged State constitutional provisions and implementing statutes and related Department of Revenue regulations. Unquestionably, they *do* request a judgment

---

[286] *Id.* at 529-30 (emphasis supplied).

136

declaring the challenged provisions, statutes, and regulations to be unconstitutional under the Fourteenth Amendment's Equal Protection Clause; but, importantly, they also request an injunction prohibiting the future enforcement of those provisions. That relief is precisely the kind of remedy that the *Young* doctrine was designed to permit.

In conclusion, the Eleventh Amendment does not prohibit plaintiffs' Fourteenth Amendment claims against the Governor of Alabama and his Revenue Commissioner.

## Alabama Public School Systems



# E.    General Overview of K-12 Funding in Alabama

Alabama had 131 public school systems during the period relevant to this action.[287]   Each received revenue from federal, State, county, municipal, and other local sources.[288]   For the 2006-2007 school year, federal programs provided only 8.3% of the total revenue for all Alabama public school systems.[289]   Nearly half of the total revenue (48%) came from the State,[290] leaving approximately 37.5% to be paid from local sources, and 6.2% from other, unspecified sources.   Some of those revenue streams are summarized in the following sections.

## 1.    Federal Funding Sources

The State receives federal revenues to support a variety of academic programs in the K-12 public school system.[291]   Local jurisdictions also receive federal funding

---

[287] Agreed Facts ¶ 340.   After this litigation began, one additional public school system was created in Alabama, bringing the current total to 132 systems.   *See* Testimony of Dr. Ira Harvey, Transcript Vol. 6 (doc. no. 262), at 180 ("**Harvey 6 Tr.**").   That new school system is Saraland, created in Mobile County, which was previously a unified county school system.   *Id.*; *see also* Testimony of Dr. Ira Harvey, Transcript Vol. 3 (doc. no. 259), at 252 ("**Harvey 3 Tr.**").   Because it is so new, the statistics presented to this court do not include data about Saraland, nor do they remove from the Mobile County school system that portion of students or revenues that previously would have been attributed to the Mobile County school system.   *See* Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 66 ("**Harvey 4 Tr.**"); Harvey 6 Tr., at 180.   This court also has seen newspaper accounts reporting that the citizens of Pike Road, Alabama recently voted in favor of establishing their own public school system.   If that is true, the number soon will be 133 systems.

[288] Agreed Facts ¶ 20.

[289] PX 403 (Annual Report, 2006-2007), at 25.

[290] Harvey 4 Tr., at 15-16; PX 403, at 25

[291] *See* Testimony of David Perry, Transcript Vol. 14 (doc. no. 270), at 7 ("**Perry 14 Tr.**").

for specific programs on an as-needed basis. An exhaustive analysis of every source of federal funding received by local jurisdictions within the State is not necessary to this opinion, and it would not be supported by the evidence gathered at trial. By way of example only, local school boards may receive money from: the U.S. Department of Agriculture for school breakfast, lunch, and snack programs; the U.S. Department of Health and Human Services for Head Start and rural health programs; and the U.S. Department of Defense for Junior ROTC programs.[292]

### a. Elementary and Secondary Education Act of 1965

Alabama schools also receive several categories of funds from the United States Department of Education pursuant to the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701 *et seq.*[293] First, Title I of the Act encompasses a group of programs established by the U.S. Department of Education to distribute funds to schools and school districts with a high percentage of students from low-income families. Part A of the Title authorizes the grant of federal funds to support academic

---

[292] *See, e.g.*, Ira W. Harvey, *School Finance Training Program Manual* 11-1, and 11-45 to 11-46 (Tuscaloosa: University of Alabama Superintendents' Academy, Jan. 2005 Rev.), found at http://uasa.ua.edu/academy%20programs%20html/school_finance_Training_Manual.html ("**Harvey III**").

[293] The Elementary and Secondary Education Act was enacted on April 11, 1965, as a part of President Lyndon B. Johnson's "War on Poverty." The Act is an extensive statute that funds primary and secondary education, while explicitly forbidding the establishment of a "national curriculum." The Act was originally authorized only through 1970, but Congress has reauthorized it every five years since its enactment. One reauthorized version of the Act was the so-called "No Child Left Behind Act of 2001," named and proposed by President George W. Bush.

programs designed to increase student achievement among student populations with the highest risks of academic failure.  A state's entitlement to these funds is based upon a formula that considers the number of students in poverty, as measured by the number of students receiving free and reduced-price lunches.[294]

The U.S. Department of Education also disburses Title I, Part A "School Improvement" funds to individual schools that are considered to be "failing" under certain performance metrics set forth in the No Child Left Behind Act of 2001, 20 U.S.C. § 6301 *et seq*.  Schools must apply to receive these "School Improvement" funds.[295]

Additionally, each school system receives federal funds pursuant to Title II, Part A, for teacher and principal training designed to improve academic performance in at-risk student populations.  Title II, Part A funds are disbursed according to a formula that considers levels of poverty, as measured by the number of students receiving free and reduced-price lunches.[296]

Alabama schools also receive funds under Title III of the Act to support "English Language Acquisition" programs.  Those funds are disbursed according to

---

[294] Perry 14 Tr., at 8-9; *see also* DX 889 (Alabama Department of Education Analysis of School Districts and Federal Allocations FY 2011).

[295] Perry 14 Tr., at 9-10; *see also* DX 889.

[296] Perry 14 Tr., at 10-11; *see also* DX 889.

the number of students in each school system for whom English is a second language.[297]

Alabama schools receive funds under Title IV, Part B, for the "21st Century Community Learning Program."  Those funds are used to support after-school programs, such as tutoring, technical instruction, and drug prevention, for at-risk students, and they are disbursed upon application to qualifying school systems.[298]

Finally, Title VI, Part B funds are available to support the "Rural Education Initiative," which offers supplemental assistance to students in school systems that are defined as "rural" by the United States Census Bureau.[299]

### b.   Individuals with Disabilities Education Act of 1975

Alabama schools receive two types of federal funds under the Individuals with Disabilities Education Act of 1975, as amended, 20 U.S.C. § 1400 *et seq.* ("IDEA").[300]   First, the schools receive general IDEA Part B funds to pay for

---

[297] Perry 14 Tr., at 11; *see also* DX 889.

[298] Perry 14 Tr., at 11-12; *see also* DX 889.

[299] Perry 14 Tr., at 12; *see also* DX 889.

[300] The IDEA was originally enacted by Congress in 1975 to ensure that children with disabilities have the opportunity to receive a free appropriate public education like other children without disabilities.  The law has been revised many times over the years.  The most recent amendments were passed by Congress in December of 2004, with final regulations published in August 2006.  So, in one sense, the law is very new, even as it has a long, detailed, and powerful history.  IDEA 2004 is divided into the following four parts:  Part A – *General Provisions*, which includes findings of Congress, the purposes of IDEA, and key definitions; Part B – *Assistance for Education of All Children with Disabilities*, which describes the processes that school systems and States must use to identify children with disabilities and educate them, including preschoolers, as

142

instructional staff and support for the education of individuals with disabilities. Schools also receive funds under the IDEA Part B preschool program to provide additional services, such as speech and physical therapy, for children less than five years of age who have been identified as being learning disabled or developmentally handicapped.[301]

### 2.    State Funding Sources

As noted at the beginning of this discussion, nearly half of the total revenue for the operation of Alabama's public school systems during the 2006-2007 school year (48%) came from State sources.  State funds are generally prorated among the school systems on the basis of each system's "Average Daily Membership" ("ADM"), a measurement of the number of students "enrolled or anticipated to be enrolled in [a] school system for [any given academic] year."[302]  The parties provided the following summary of State funding for K-12 education in their pre-trial statement of agreed

---

well as such other critical areas as parent and student rights; Part C – *Infants and Toddlers with Disabilities*, which describes the responsibilities that States have for providing early intervention services to babies and toddlers with disabilities or developmental delays; and Part D – *National Activities to Improve Education of Children with Disabilities*, which authorizes programs meant to improve outcomes for children with disabilities, including teacher training programs, parent training and information centers ("PTIs") in every state, and the Technical Assistance and Dissemination ("TA&D") network of projects that assist states, locales, and families to implement the IDEA.

[301] Perry 14 Tr., at 12-13; *see also* DX 889.

[302] Harvey 4 Tr., at 23 (describing the calculation of ADM under the current regulations); *see also* doc. no. 274 (Plaintiffs' Post-Trial Brief), at 152-53 ("State funds for schools are generally distributed on the basis of the average daily membership ('ADM').''); Harvey 4 Tr., at 40-42 (stating that distribution of state funds is principally based upon the count of ADM).

facts:

> 21.  State-provided funds for the benefit of local public schools in Alabama are primarily derived from statewide income and sales taxes, utilities gross receipts and use taxes, and excise taxes on mobile telecommunications, the payment of certain insurance premiums and on the sale of beer.  In addition, approximately one-half of the State-level ad valorem tax (3.0 of 6.5 mills) is dedicated to public school education.

> 22.  Almost all state income taxes are earmarked for payment of teacher salaries.  State sales taxes are first used to pay debt service on bond issues for capital outlay for public schools and colleges and universities; however, the bulk of state sales tax proceeds are appropriated for general education purposes through the state Education Trust Fund.[303]

This summary is succinct and accurate, but a more detailed discussion of the intricacies of the State system for funding public education is necessary to place the present controversy in its proper, relative perspective.

### a.    The Education Trust Fund

State government and public school systems depended heavily on *ad valorem* property tax revenues to finance their operations during the first quarter of the twentieth century.[304]  When that funding began to prove inadequate, Governor Bibb Graves pushed for legislative approval to establish a new fund to improve public

---

[303] Agreed Facts ¶¶ 21-22.

[304] Harvey III, at 3-2; Ira W. Harvey, *Financing Alabama's Schools: The Pursuit of Accountability, Adequacy and Equity* 204 (Montgomery, Ala.:  Auburn University Montgomery Center for Government and Public Affairs 2000) ("**Harvey II**"); Ira W. Harvey, *A History of Educational Finance in Alabama* 402 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**"); Harvey 4 Tr., at 3-2.

education in the State.  The difficulty of that endeavor lay in the fact that Governor Graves had campaigned on a promise not to raise property taxes and, as a consequence, he was forced to arrange for other funding sources, which included luxury and excise taxes.  The Alabama Legislature established the "Special Education Trust Fund" (as it originally was known) in 1927, and specified that revenues deposited into that fund were to be spent "for educational purposes only."[305]  Just two years later, however, on "Black Tuesday," October 29, 1929, the Stock Market crashed and ushered in the Great Depression.  The economic deprivations of that period hit hardest in the South, a region that had not recovered fully from the ravages of the Civil War and Reconstruction, and public school funding suffered most grievously of all.  To remedy the desperate funding situation, Governor Graves pushed for and received legislative approval to levy sales taxes in 1936 and 1937.  Sales tax revenues were earmarked for the Special Education Trust Fund.

The State Legislature also adopted a personal and corporate income tax in 1933, for the purpose of paying off the State's mounting debt and creating a homestead exemption to ease the property tax burden on homeowners.  In 1947, the income tax was largely repurposed to the Special Education Trust Fund, for the

---

[305] Harvey II, at 204.

specific purpose of funding public school teachers' salaries.[306]

### *i.*    Current sources of revenue

The Legislature changed the name of the Special Education Trust Fund to, simply, the "Education Trust Fund" ("ETF") in 1996.  *See* Ala. Code § 16-13-16 (1975) (2001 Replacement Vol.).  The ETF receives the lion's share of its funding from State income tax and sales tax revenues.  Most of the income tax remains earmarked for the payment of teachers' salaries.  The State sales tax (currently at a rate of 4.0%) is used first to pay debt service on bond issues for capital outlays for public schools, colleges, and universities in the State, but the bulk of the proceeds are used to fund the ETF.  Other, less significant sources of revenue deposited to the ETF include the following taxes:

1. *Utility Tax*— a privilege tax on every utility:  electricity, domestic water, natural gas, telegraph, and telephone service;

2. *Use Tax*— an excise tax applied as a companion to the sales tax on storage, use, or other consumption in Alabama on items purchased outside the State, due on or before the 20th of each month;

3. *Insurance Premium Tax*— a premium tax imposed on the amount of insurance coverages written by an insurer within Alabama

---

[306] Under Amendment 61, after annually deducting allocations of income tax revenues to cover the amount of State *ad valorem* tax revenue lost due to homestead exemptions, the residue is deposited in "the state treasury to the credit of the Alabama special education trust fund to be used for the payment of public school teachers salaries only."  Ala. Const. art XI, § 211.02 (1901), *added by* amend. 61, § B (last sentence) (*ratified* Sept. 11, 1947); *see also* Ala. Code § 40-9-24; Harvey I, at 402-03; Harvey II, at 204-05; Harvey III, at 3-2 to 3-3; Harvey 4 Tr., at 11-13.

(the proceeds of this tax that are deposited into the ETF are capped at $30,993,296);

4. *Beer Tax*— an excise tax on the sale, storage, or receipt of malt or brewed beverages for the purpose of distribution;

5. *Hydroelectric Tax*— a privilege tax levied on each person, firm, or corporation engaged in the production or sale of hydroelectric power, computed as a percentage of the number of kilowatt hours of electricity so produced or sold within the State;

6. *Store Licenses Tax*— an annual license fee for the purpose of opening, establishing, operating, or maintaining stores; and

7. *Mobile Telecommunications Services Tax*— a gross receipts tax levied on the monthly, recurring, access charges on all air-time charges with a primary use in Alabama.[307]

b.    **The Public School Fund**

The Public School Fund was created by Section 260 of the 1901 Constitution.[308] The name of the fund was officially changed to the "Education Fund"

---

[307] *See* Harvey III, at 3-3 to 3-4; s*ee also* Harvey I, at 403; Harvey II, at 204-07; Harvey 4 Tr., at 13-16.

[308] As originally adopted in 1901, Section 260 read as follows:

The income arising from the sixteenth section trust fund, the surplus revenue fund, until it is called for by the United States Government, and the funds enumerated in Sections 257 and 258 of this Constitution, together with a special annual tax of thirty cents on each one hundred dollars of taxable property in this state, which the legislature shall levy, shall be applied to the support and maintenance of *the public schools*, and it shall be the duty of the legislature to increase *the public school fund* from time to time as the necessity therefor and the condition of the treasury and the resources of the State may justify; provided, that nothing herein contained shall be so construed as to authorize the legislature to levy in any one year a greater rate of state taxation for all purposes, including schools, than sixty-five cents on each one hundred dollars' worth of property; and provided further, that nothing herein

147

by Amendment 111, ratified on September 7, 1956.  Nevertheless, the fund continues

to be commonly referred to by its original name, "the Public School Fund."[309]  As will

be discussed in succeeding Parts of this opinion, Amendment 111 was a part of the

State's "massive resistance" to integration of the public schools mandated by the

Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), and

the purpose of changing the name of this fund, as well as other amendments to

Section 260,[310] was that of allowing tax revenues deposited into the Public School

---

      contained shall prevent the legislature from first providing for the payment of the
      bonded indebtedness of the state and interest thereon out of all the revenue of the
      state.

Ala. Const. art. XIV, § 260 (1901) (emphasis supplied); *see also* James J. Mayfield, *Constitutions of 1875 and 1901:  Paralleled, Annotated and Indexed* (Nashville, Tenn.:  Marshall & Bruce Co. 1904) ("**Mayfield**").

   [309] *See* Harvey II, at 127, 221; Harvey III, at 6-1 to 6-2.

   [310] Amendment 111, ratified on Sept. 7, 1956, deleted the terms "public schools" and "public school fund" from the preexisting language of Section 260, and replaced them with the terms "education" and "educational fund," respectively.  The amendment also added an entirely new second paragraph, emphasizing that all *ad valorem* property taxes levied by any taxing authority "for *public school purposes*, shall be applied to the support and furtherance of *education* pursuant to section 256 of the Constitution, as amended" (emphasis supplied).  As thus amended, Section 260 now reads as follows:

      The income arising from the sixteenth section trust fund, the surplus revenue
      fund, until it is called for by the United States government, and the funds enumerated
      in sections 257 and 258 of this Constitution, together with a special annual tax of
      thirty cents on each one hundred dollars of taxable property in this state, which the
      legislature shall levy, shall be applied to the support and furtherance of *education*,
      and it shall be the duty of the legislature to increase *the educational fund* from time
      to time as the necessity therefor and the condition of the treasury and the resources
      of the state may justify; provided, that nothing herein contained shall be so construed
      as to authorize the legislature to levy in any one year a greater rate of state taxation
      for all purposes, including schools, than sixty-five cents on each one hundred dollars'

148

Fund to be used to fund K-12 educational programs in *private*, white-only, segregation academies, as well as the integrated public school systems.

The Public School Fund receives an overwhelming portion of its revenue from the State's *ad valorem* property tax revenues.  Three of the 6.5 mills of property tax levied statewide are earmarked for the Public School Fund.[311]  Other, less significant revenue sources for the Public School Fund include income arising from the "Sixteenth Section Trust Fund"[312] and the "Surplus Revenue Fund,"[313] principal from

worth of taxable property; and provided further, that nothing herein contained shall prevent the legislature from first providing for the payment of the bonded indebtedness of the state and interest thereon out of all the revenue of the state.

Except as they may be specifically set aside in trust funds or otherwise applied to the payment of indebtedness, all proceeds of income or other taxes levied by the state, and of all special ad valorem or other taxes levied by counties and other municipalities, or school districts, pursuant to the Constitution as heretofore amended, for *public school purposes*, shall be applied to the support and furtherance of *education* pursuant to section 256 of the Constitution, as amended.

Ala. Const. art. XIV, § 260 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956) (emphasis supplied).

[311] *Id*. (calling for "a special annual tax of thirty cents on each one hundred dollars of taxable property in this state" to be payable to the Public School Fund).

[312] The Sixteenth Section Trust Fund is a "permanent trust[] established to account for the funds accumulated from the sale or use of properties set aside for educational purposes."  Harvey III, at 6-6.

[313] Dr. Harvey explained the origins of the Surplus Revenue Fund as follows:

By 1833, surplus had accumulated in the United States Bank, and President Andrew Jackson authorized the withdrawal of $10 million of this surplus to be deposited in the various state banks. . . .

On June 23, 1836, Congress approved "An Act to Regulate the deposits of public money," which provided that any surplus money in excess of $5 million

149

the sale or other disposition of lands or other property granted to the State, property donated by individuals, and all estates of deceased intestates.[314]

The Public School Fund is used for two primary purposes.[315]  The first is to fund the "Endowment Interest Program" for interest due on Sixteenth Section land funds held by the State.[316]  *See* Ala. Code § 16-13-234(a) (1975 & 2011 Amends.).

---

remaining in the U.S. Treasury on January 1, 1837, would be deposited with the states of the union in direct proportion to their number of representatives in Congress. Under the terms of this act, the deposits were a loan and not a permanent grant.  An official receipt was required from the state and the state was obligated to pay any partial or full amount upon demand by the Secretary of the United States Treasury. An estimated $37 million was set aside to be lent to the states, but only $28 million was actually transferred to the states . . . .

Alabama, Delaware, Louisiana, Missouri, and New York all set aside their respective shares as a separate fund or deposited them with some permanent school fund already established.  From this United States Surplus Revenue Loan Alabama received its share of $669,086.78 in 1837.  This amount was deposited in the state bank of Alabama and used as capital for the operation of the bank . . . .

The surplus revenue was made part of the public school fund in 1840, when the legislature on February 3, 1840, passed "An Act to raise a School Fund to aid the valueless Sixteenth Sections in this State." . . .  The interest of six percent per annum was set aside as part of the Public School Fund and paid to schools until the bank failed in 1843, and the principal was lost forever.  Accordingly, the interest on this amount was also lost to the schools until 1854.

Harvey I, at 35-36.

[314] *See* Ala. Const. art. XIV, § 260 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956); *see also* Harvey II, at 127-28, 221-22; Harvey III, at 6-1 to 6-2, 6-17; Harvey 4 Tr., at 16.

[315] A third fund — the Hold Harmless Fund — originally was included in the statute. The purpose of the Hold Harmless Fund was "to insure that no local board of education receive less state funds per pupil than it received in fiscal year 1994-95." Ala. Code § 16-13-234(b) & (c) (1975 & 2011 Amends.).  However, the Hold Harmless Fund was phased out, by statute, in 2002.  Ala. Code § 16-13-234(c) (1975 & 2011 Amends.)

[316] Harvey II, at 131-32; Harvey III, at 6-5 to 6-7.

150

After the Endowment Interest Program requirement has been satisfied, the remainder

of the Public School Fund is used for

> capital outlay, including the planning, construction, reconstruction, enlargement, improvement, repair or renovation of public school facilities, for the purchase of land for public school facilities, for debt payments related to public school facilities, for insuring public school facilities, and for the acquisition and/or purchase of education technology and equipment.

Ala. Code § 16-13-234(d) (1975) (Supp. 2011).  Capital improvement funds are

distributed on a matching basis according to a formula that takes into account the

wealth of each local board of education, which is determined by evaluating the yield

of 1.0 mill of school district tax per pupil.[317]

### c. Special trust funds

The Alabama Legislature also has established a number of special funds in the

state treasury that have more minor roles in the funding of K-12 education.  These

include the "State Drivers' Fund," the "Catastrophic Trust Fund for Special

Education," and the "Children First Trust Fund."

The State Drivers' Fund was created in 1975 to collect a portion of the costs

and charges for violation of municipal traffic ordinances and a portion of docket fees

for traffic offenses.  The statute creating the State Drivers' Fund was amended in

---

[317] Harvey II, at 134-35; Harvey III, at 6-9.

151

1991 to allocate part of the proceeds to the Catastrophic Trust Fund for Special Education.[318]  The purpose of this fund is to provide funding for school systems that have students whose exceptional needs cause their education to be "unduly expensive, extraordinary and/or beyond the routine and reasonable education and services provided."[319]

The Children First Trust Fund was established in 1998 to receive moneys from tobacco revenues and private donations.[320]  The proceeds of the fund are allocated as follows:  10% to programs sponsored by the Alabama Department of Public Health, including the Children's Health Insurance Program, tobacco control programs, and the Alabama Qualified Health Center Grant Program; 22% to the State Board of Education for the operation of alternative schools, the School Safety Enhancement Program ("designed to prevent or reduce violence in the schools and communities and reduce school disciplinary or safety problems"), and other programs; 20% to the Alabama Department of Human Resources to fund foster care programs, child care programs, child care shelters, special needs adoptions, and child advocacy centers; 5% to the Children's Trust Fund for various community programs to benefit children;

---

[318] *See* Ala. Code §§ 12-14-14, 16-39-30 to 16-39-34, and 32-5-313 (1975) (2005 and 2010 Replacement Vols.); *see also* Harvey III, at 5A-1.

[319] Harvey III, at 5A-2.

[320] *See* Ala. Code § 41-15B-2 (1975) (2000 Replacement Vol.).

152

5% to the State Multiple Needs Children's Fund to fund various programs for the benefit of children with multiple needs; 5% to the Department of Mental Health to fund services for children and families in crisis, intensive long-term rehabilitation programs, and other programs; 10% to the Juvenile Probation Services Fund to "unify and upgrade the juvenile justice system and improve the delivery of services to children who have been referred to the juvenile court"; 17% to the Department of Youth Services to fund group homes, graduated release facilities, regional detention facilities, "boot camp" programs, and other alternatives to detention; 3.5% percent to the Alabama Medicaid Agency to fund services benefitting children; 1.0% to the Alcoholic Beverage Control Board for education and enforcement of laws that prohibit access to tobacco products by minors; 1.0% to the Department of Forensic Sciences to fund child abuse education, investigation of child deaths, and other child-related forensic services; and, one-half of one percent to the Department of Rehabilitation Services to fund child death review teams and early intervention services for children with traumatic brain injuries.[321]

### d. The Foundation Program

The Alabama Foundation Program is a State "equalization aid program" that guarantees a foundational level of funding for each student or group of students,

---

[321] Ala. Code § 41-15B-2.2 (1975) (Supp. 2009).

together with a minimum tax effort that each local school system must provide for the educational purposes of the program.[322]   The program attempts to equalize variations in the respective abilities of various cities and counties to fund public schools by distributing State funds on the basis of the number of students enrolled in a school system, while also requiring a minimum rate of local *ad valorem* tax contributions as the prerequisite for participation in and receipt of Foundation funds.[323]   The program has three basic components which combine to determine the amount of funds paid by the State to local school systems.   First, the average number of students actually enrolled in a school system on a daily basis (the so-called "Average Daily Membership" or ADM)[324] is counted.

---

[322] Harvey III, at 12-4.

[323] Harvey 6 Tr., 114-16; *see also* Testimony of David Brunori, Transcript Vol. 3 (doc. no. 259), at 168-69 ("**Brunori 3 Tr**.") (stating some of the factors that have driven states to centralized funding programs like Alabama's Foundation Program over the course of the past few decades); Harvey 3 Tr., at 11, 40-41; Harvey 4 Tr., at 62-63 (discussing the funding impacts of "state equalization"); Harvey III, at Chs. 12 & 13.   *Cf.* John Dayton & Anne Dupre, *School Funding Litigation:  Who's Winning the War?*, 57 Vand. L. Rev. 2351 (2004) (discussing state equal protection challenges, both successful and unsuccessful, that have been based upon gross disparities in revenue raising ability between districts and the "major education funding changes" some of these suits have occasioned, including state programs directed at funding equalization); Anna Williams Shavers, *Rethinking the Equity vs. Adequacy Debate:  Implications for Rural School Finance Reform Litigation*, 82 Neb. L. Rev. 133, 135-36 (2003) (discussing various state foundation programs "under which the state will provide funds up to a minimum guaranteed level for any district that is unable to raise that level of money through local property taxes assessed at levels specified by the state" as well as "equalization plan[s] whereby the state guarantees the same amount of money per-pupil to all districts that tax themselves at the same rate").

[324] Harvey III, at 13-7 ("The method for counting students [under the 1995 and present Foundation Program] is Average Daily Membership (ADM), or the average number of students actually enrolled on a daily basis.").

Second, the costs necessary to provide a minimum educational program during a school year are estimated by the State Superintendent of Education.[325]  Four basic categories of cost factors are taken into account:  salaries; fringe benefits; other current expenses; and classroom instructional support (*e.g.*, textbooks, library enhancement, classroom materials and supplies, professional development programs, and technology).[326]  The sum of those cost factors for

> each school site represents the foundation program cost for that school. The sum of the amounts of the school sites constituting a local school system is the foundation program cost for that local school system.  This cost is designed to be shared among two revenue sources:  the first is local revenues, and the second is a state appropriation from the Education Trust Fund [through the Foundation Program].[327]

To participate in the Foundation Program and, thereby, receive State funding, a local school district *must* contribute an amount of local revenue which is calculated as being available for specified state educational purposes.  This required level of local revenue — which, for some reason that was not made clear to this court, is called the "chargeback" — was defined during fiscal year ("FY") 1995-96 as being the tax-based equivalent of the yield of 5.0 mills of school district tax.  The

---

[325] *See id.* at 12-5; Harvey 4 Tr., at 21 (stating that the Foundation Program is "a statement by the legislature of the anticipated cost of operating statewide a minimum school term").

[326] *See* Harvey III, at 13-21 to 13-35.

[327] *Id*. at 13-35 (alteration added).  The Foundation Program "is the largest consumer of ETF revenues through the annual appropriations process."  *Id*. at 3-5.

chargeback for FY 1996-97 increased to 7.5 equivalent mills, and for FY 1997-98 to

an amount of local receipts equivalent to 10.0 mills of school tax, where it remains

today.[328]

It should be noted, however, that Amendment 778, adopted in 2006, amended

Section 269 of the Constitution in order to *require* that every "school tax district"[329]

_____

[328] *See* Ala. Code § 16-13-231 (1975) (Supp. 2009).  The text of the relevant portions of this statute read as follows:

REQUIREMENTS FOR PARTICIPATING IN FUND.  In order for a local board of education to share in the apportionment of the Foundation Program Fund and to receive the maximum benefits therefrom, the board shall meet the following conditions:

a. The appropriate local governing body must insure that the local board of education within its jurisdiction is receiving an amount of local tax receipts equivalent to ten mills of school tax as computed from the most current assessed valuation of property which comprises the school tax district or districts of the local board of education.  The State Superintendent of Education shall determine compliance with this provision of the law in accordance with rules or procedures adopted by the State Board of Education.  In determining compliance for a county board of education, tax revenues provided to the county board of education from the county, from whatever tax source derived, shall be considered.  In determining compliance for a city board of education, tax revenues provided to the city board of education by the county and the city, from whatever tax source derived, shall be considered.

*Id.*, at § 16-13-231(b)(1)(a); *see also* Harvey 4 Tr., at 21.

[329] Due to the peculiar requirements of Amendment 3 to the Alabama Constitution, counties have subdivided themselves into school tax districts, a geographical division that is unique to property taxation for education purposes. *See* Harvey 3 Tr., at 246-47.  As noted below, each school tax district may have different rates of taxation from other school districts that are nominally within the same school system under the direction of the same local school board.  *See* doc. no. 242-1 (Parties' Statement of Agreed Facts) ("**Agreed Facts**") ¶ 38.  Counties or, in some cases, school *systems*, however, actually levy the taxes collected in these school tax districts.  *Id.*  Moreover, "[i]n Alabama, what we commonly refer to nationwide as a school district is a school system.  A system is that educational activity which is under the control of a local board of education.  Counties are

156

*actually* levy and collect *at least* 10 mills in *ad valorem* property taxes for general

public school purposes.[330]  Thus, the statutory requirement that the "chargeback" be

"equivalent to" 10 mills of school tax was rendered redundant, as Amendment 778

now requires each school district to levy and collect *10 actual mills of property tax*

*for general public school purposes.*[331]  In other words, prior to the enactment of

---

subdivided for educational taxation purposes into tax districts.  This is peculiar to education."
Harvey 3 Tr., at 246.  Throughout this opinion, however, "school district" may sometimes be used
interchangeably with "school system," for ease of reference, unless the phrase "school tax district"
is used.

[330] Agreed Facts ¶ 43.

[331] The Alabama Administrative Code sets forth regulations intended to "establish guidelines
and procedures for the minimum levy of 10 mills of property tax in each school district pursuant to
Act 2005-215, passed in the 2005 Regular Session of the State Legislature and approved as a
Constitutional Amendment by a majority vote of the electorate in the General Election held
November 7, 2006."  Ala. Admin. Code § 810-4-1-.08(a) (2007).  That regulation states that "each
school district of the state, in addition to all other taxes, shall levy a minimum of 10 mills property
tax . . . for general public school purposes."  *Id.* at (b).  Statutory requirements for participation in
the Foundation Program Fund state that the "local governing body [of each school system] must
insure that the local board of education within its jurisdiction is receiving an amount of local tax
revenue equivalent to ten mills of school tax as computed from the most current assessed valuation
of property which comprises the school tax district or districts of the local board of education."  Ala.
Code § 16-13-231(b)(1)a. (1975).  The same provision states that the "required local effort charged
against each local board of education for its share of the cost of the Foundation Program shall be .
. . the equivalent of ten mills of local school tax district *ad valorem* tax" for each fiscal year after
1997-98.  That provision appears never to have been amended to take account of the change wrought
by Amendment 778, but it is plain that the requirement of ensuring each board of education receives
"revenue equivalent to ten mills" is factually made redundant by those portions of Amendment 778
and its implementing regulations that require the levy of 10 mills of property tax.  *See also* Harvey
4 Tr., at 31 ("Amendment 778, as applied to both the recordkeeping and activities of the revenue
department and the Department of Education, says that you've got to have every taxpayer in each
school tax district of the state paying 10 mills of ad valorem tax."); Corrected Declaration of Dr. Ira
Harvey (PX 824), at 4 ("Funding of the 1995 Foundation Program requires local boards of education
to contribute the equivalent amount of local tax-based revenues to 10.0 mills of school tax district
ad valorem tax. . . .  This is known as the chargeback.").  *Cf. id.* at 77 (stating that an "equivalent
mill" can come from a mix of city and/or county *ad valorem* property taxes; city and/or county sales
taxes; business franchise license fees (taxes); and parimutuel betting taxes, and that "the entire range

Amendment 778, the "chargeback" could consist of revenue from any source, including sales or income tax receipts, so long as the total amount of the "chargeback" was "equivalent to" the amount that would be collected from the levy of 10 mills of property tax.  Now, after Amendment 778, the "chargeback" must actually come from the levy of property tax.  Even so, Amendment 778 did not otherwise substantively affect the Foundation Program.

Once the minimum educational program cost for a local school system is determined by summing the four cost factors discussed above, the amount of local revenue generated for public school purposes is subtracted.  The difference is due to be paid to local boards of education.[332]

The amount of revenue thus distributed by the State to local school systems on a *per capita* (per student) basis, as determined by the ADM, is *inversely proportional* to the amount of revenue the school system is able to raise in local sources for each pupil.[333]  *For example*, the Homewood school system, which raised $8,407.08 in local tax revenue for each student in 2009, received State Foundation funds in the amount of $3,833.16 per pupil, while the Linden school system, which raised only $2,291.98

---

of tax-based revenue is considered").  *See* "Appendix IV-1" for the text of Ala. Const. art. XIV, § 269.08(a) (1901), *amended by* amend. 778 (*ratified* Dec. 4, 2006).

[332] *See* Harvey III, at 3-5; Harvey II, at 205-06.

[333] Harvey 6 Tr., at 114-16.

per pupil in local tax revenues during the same year, received $8,263.34 per student from the State.[334]  Even though the total amount of local and State revenue received by Homewood ($12,240.24 per student) still exceeded the aggregate funding of the Linden school system ($10,555.32 per pupil) by $1,684.92, the disparity between the amount of revenue available for the education of public school students in the wealthy Birmingham suburb of Homewood *vis-a-vis* the less wealthy town of Linden was ameliorated by the Foundation Program.[335]

### 3.    Local Funding Sources

Local support for public education may include such funding sources as sales and use taxes; franchise fees; privilege license fees; occupational taxes; auto registration fees; lodging taxes; "sin taxes" on cigarettes, alcoholic beverages and liquors; gasoline taxes; and mineral lease taxes.[336]  As the parties have stipulated, however, "[l]ocal funds provided for public schools in Alabama are primarily derived

---

[334] PX 403A (Alabama Education Report Card 2008-09), at 22-23.  Plaintiffs' expert Dr. Daniel J. Sullivan stated that the state's contribution to public schooling could be stated as $6,500 per pupil per district per year, plus or minus $1,100.  *See* Amended Expert Report of Dr. Daniel J. Sullivan (PX 117), at 11.  However, that formula is contradicted by the figures in PX 403A, which shows a much broader range of state contributions per ADM, though the figures for county systems only are closer to the range suggested by Dr. Sullivan.  *Id.* at 22-23.

[335] These figures indicate that state equalization eliminated approximately 72.447% of the disparity between per pupil funding between these two districts.

[336] Harvey II, at 239-43; *See* Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 17 ("**Harvey 4 Tr.**").

from *ad valorem* taxes and local sales and use taxes."[337]   Of those two revenue

streams, *ad valorem* property taxes have traditionally been the major source of funds

for the operation of the public school systems, not only in Alabama, but elsewhere.[338]

> In Alabama, property taxes are levied by the state, counties, municipalities, and in certain cases school boards (these various school boards are hereinafter collectively referred to as "School Systems"), for the benefit of local public schools located within the School Systems or within School Tax Districts within School Systems.  Counties and municipalities are also School Tax Districts.  The millage rate does not have to be the same for each School Tax District in a School System, because School Tax Districts are not necessarily coterminous with School Systems.[339]

Through various amendments to Section 269 of the 1901 Constitution that

apply to the State as a whole (as opposed to constitutional amendments that apply

only to a specific county, municipality, or school tax district), Alabama has

authorized all local school systems to levy up to an aggregate of 15.0 mills in *ad*

*valorem* property taxes for educational purposes, in a combination of county and

school tax district taxes.

Any School Tax District can benefit from all or a portion of this

---

[337] *See* Agreed Facts ¶ 26.

[338] *See* Keith J. Ward & Lane D. Sauser, *Equity Funding for Education:  A Report to the Alabama Legislature* 5.1 (Auburn, Ala.: Auburn University Center for Governmental Services 1997) ("All states use the property tax as a fundamental provider in the revenue stream for public education.  At one time property taxes constituted 80 percent of public school support.  The percentage has declined over the decades, but the property tax still provides over two-thirds of the educational support in our nation.").

[339] Agreed Facts ¶ 28.

160

authority through a local referendum for additional financial support for its schools, and there is no requirement to seek prior approval from the state legislature.  Their levy and collection, upon a referendum, cannot be for more than thirty years.[340]

The 15.0 mills are the sum of the taxes permitted by the five constitutional provisions described below.

### a.    1.0 mill county tax — *Section 269*

Section 269, as amended by Amendment 111, allows counties to call for an election authorizing the levy of a special *ad valorem* tax of not more than 1.0 mill for the support of public education.[341]  The proposal to impose this tax may be initiated

---

[340] *Id*. ¶ 36 (citing Ala. Code § 16-13-108 (1975)).  Section 16-13-108 provides, in pertinent part, that "[n]o election for the voting of the tax shall be held which would authorize the tax for a period or aggregate periods which would cause the tax to become due and payable later than 30 years from the October 1 next after such election."  Ala. Code § 16-13-108(b) (1975).

[341] Section 269 provides that:

> The several counties in this state shall have power to levy and collect *a special tax not exceeding ten cents on each one hundred dollars of taxable property in such counties*, for the support and furtherance of education in such manner as may be authorized by the legislature; *provided*, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election; but the rate of such special tax shall not increase the rate of taxation, state and county combined, in any one year, to more than one dollar and twenty-five cents on each one hundred dollars of taxable property; excluding, however, all special county taxes for public buildings, roads, bridges, and the payment of debts existing at the ratification of the Constitution of eighteen hundred and seventy-five.

Ala. Const. art XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956) (emphasis supplied).  As two attorneys familiar with Alabama's tax structure have observed, the italicized language of Section 269 "sound[s] generous but, since it is only ten cents measured against 'each one hundred dollars' rather than against each dollar of taxable or assessed value, [the formulation] translates into a one mill ceiling on each dollar of assessed value."  Bruce P. Ely & Howard P.

either by the county commission itself, or by presentation of a petition to the commission signed by at least 200 qualified voters.[342]  The rate, duration, and purpose of the tax must be approved by *an extraordinary majority of* "*three-fifths of those voting at such election.*"[343]  If there is more than one school system in the county, the tax is divided among the systems based upon each system's proportionate share of the total Foundation Program allocation to the school systems within the county.[344]

> **b**.    **3.0 mill county tax** — *Section 269.01*

Amendment 3, Section 1 added a new provision to the State Constitution, identified as Section 269.01, that authorizes a special 3.0 mill county tax for school purposes.[345]  The proposal to impose a tax under this provision may be initiated either

---

Walthall, Sr., *State Constitutional Limitations on Taxing and Spending: A Comparison of the Alabama Constitution of 1901 to its Counterparts*, 33 Cumb. L. Rev. 463, 481 (2003) (alteration supplied).

[342] *See* Ala. Code § 16-13-160 (1975) ("Upon a petition signed by 200 or more qualified electors of the county, who are also freeholders, to the county commission in any county within the State of Alabama, the said commission shall order an election to determine whether or not a special tax of one mill shall be levied for the support of the public schools within said county as hereinafter provided.").

[343] *See* Ala. Const. art XIV, § 269 (1901), *amended by* amend. 111 (*ratified* Sept. 7, 1956) (emphasis supplied).

[344] *See* Ala. Code § 16-13-166 (1975) ("The tax collector shall collect such special tax in the same manner and under the same requirements and laws as taxes of the state are collected, shall keep said amount separate and apart from all other funds, shall keep a clear and distinct account thereof and shall turn the same over to the custodian of county school funds whose duty it shall be to receipt therefor.  The county board of education shall apportion the same to the various schools throughout the county in the same manner as the public school funds from the state are apportioned in said county.").

[345] Section 269.01 provides that:

162

by the county commission, or by presentation of a petition to the commission signed by at least 200 registered voters.[346]   Again, the tax proposal must specify the rate, duration, and purpose of the levy, and must be approved by a simple "majority of those voting at such election."[347]   If there is more than one school system in the county, the tax is divided among the systems based upon each system's proportionate share of the total Foundation Program allocation to the school systems within the county.[348]

---

> The several counties in the state shall have power to levy and collect a special county tax not exceeding thirty cents on each one hundred dollars worth of taxable property in such counties in addition to that now authorized or that may hereafter be authorized for public school purposes, and in addition to that now authorized under section 260 of article XIV of the Constitution; provided, that the rate of such tax, the time it is to continue and the purpose thereof shall have been first submitted to the vote of the qualified electors of the county, and voted for by a majority of those voting at such election.

Ala. Const. art. XIV, § 269.01, *added by* amend. 3, § 1 (*ratified* Nov. 22, 1916).

    [346] *See* Ala. Code § 16-13-160 (1975).

    [347] *See* Ala. Const. art. XIV, § 269.01, *added by* amend. 3, § 1 (*ratified* Nov. 22, 1916); s*ee also* Ala. Code § 16-13-180 (1975).

    [348] *See* Ala. Const. art. XIV, § 269.03, *added by* amend. 3, § 3 (*ratified* Nov. 22, 1916) ("The funds arising from the special county school tax levied and collected by any county shall be apportioned and expended as the law may direct, and the funds arising from the special school tax levied in any district which votes the same independently of the county shall be expended for the exclusive benefit of the district, as the law may direct."); s*ee also* Ala. Code § 16-13-166; Ala. Code § 16-13-197 ("Whenever such a levy as is provided for in this article is made, it shall be the duty of the tax collector within and for that county to collect such tax in the same manner and under the same requirements and laws as the taxes of the state are collected, and he shall keep said amount separate and apart from all other funds and keep a clear and distinct account thereof, showing what amount is paid, and turn the same over to the county custodian of school funds whose duty it shall be to receipt therefor, and pay the same on monthly payrolls and other prescribed forms, with the authority and approval of the county board of education.").

c.    **3.0 mill school district tax** — *Section 269.02*

Amendment 3, Section 2 added another provision to the 1901 Constitution,

identified as Section 269.02, that authorizes "school districts of any county in the

state . . . to levy and collect a special district tax not exceeding thirty cents on each

one hundred dollars worth of taxable property in such district [*i.e.*, 3.0 mills] for

public school purposes."[349]  The proposal to impose a tax under this provision is

initiated by a resolution by the school board of the concerned district presented to the

county commission.[350]  If the resolution specifies the rate, duration, and purpose of

---

[349] Ala. Const. art. XIV, § 269.02 (first clause) (1901), *added by* amend. 3, § 2 (*ratified* Nov. 22, 1916).  From 1916, when Amendment 3 was ratified, through the end of 2000, this tax could not be levied *unless* the 3.0 mill county tax authorized by Section 269.01 (Amendment 3, § 1) had been levied.  However, Amendment 669 removed that condition precedent.  *See* Ala. Const. art. XIV, § 269.07 (1901), *added by* amend. 669 (*ratified* Dec. 13, 2000) ("The provision contained in Section 2 of Amendment No. 3 to this constitution [§ 269.02] relating to district school taxes and providing that no district school tax shall be voted upon or collected except in those counties that are levying and collecting not less than a three-mill special county school tax *is hereby repealed*. Notwithstanding any other provision of this constitution or any law to the contrary, *the levy of a countywide tax shall not be required as a condition precedent for the levy and collection of any district school tax in any school district in the state*.") (alteration and emphasis supplied).

[350] The Constitutional provision defines "a school district" as including "incorporated cities or towns, or any school district of which an incorporated city or town is a part, or such other school districts now existing or hereafter formed as may be approved by the county board of education. . . ." Ala. Const. art. XIV, § 269.02 (second clause) (1901), *added by* amend. 3, § 2 (*ratified* Nov. 22, 1916).  Dr. Harvey's Training Manual for newly appointed or elected Superintendents of Education of the State's various school systems states that, "[i]n the event there is a separate municipal school system, this school system constitutes a separate school tax district, and the balance of the county, excluding the municipal system(s), comprises one or more school tax districts."  Ira W. Harvey, *School Finance Training Program Manual* 8-2 (Tuscaloosa:  University of Alabama Superintendents' Academy, Jan. 2005 Rev.), found at http://uasa.ua.edu/academy%20programs%20html/school_finance_Training_Manual.html ("**Harvey III**").

the proposed levy, and the date when a referendum should be called, the county commission is required to call the election.[351]  The levy must be approved by a simple majority of those district residents voting at an election called for that purpose.  The funds arising from the special school tax levied and collected "in any district which votes the same independently of the county shall be expended for the exclusive benefit of the district, as the law may direct."[352]

> d.    **5.0 mill special county tax** — *Section 269.04*

Amendment 202 added another provision to the State Constitution, identified as Section 269.04, that authorizes county governments to levy a special county tax that does not exceed 5.0 mills for educational purposes.[353]   As before, the rate,

---

[351] Harvey III, at 8-3.

[352] Ala. Const. art. XIV, § 269.03, *added by* amend. 3, § 3 (*ratified* Nov. 22, 1916).

[353] Section 269.04 provides:

> The court of county commissioners, board of revenue, or other like governing body of each of the several counties in the state shall have the power to levy and collect a special county tax of not to exceed fifty cents on each one hundred dollars of taxable property, in addition to all other taxes now or hereafter authorized by the Constitution and laws of Alabama, for educational purposes, on the value of the taxable property in the county as assessed for state taxation, provided the purpose thereof, and the time such tax is proposed to be continued shall have been first submitted to a vote of the qualified electors of the county and voted for by a majority of those voting at such election. If any proposal to levy the tax is defeated in any election, subsequent elections thereon may be held at any time. The election provided for herein shall be called, held, conducted, paid for, and governed otherwise in the manner provided for an election on the school district tax authorized in constitutional amendment III [§§ 269.01-269.03].

Ala. Const. art. XIV, § 269.04 (1901), *added by* amend. 202 (*ratified* May 10, 1962) (bracketed

duration, and purpose of the levy must be approved by a simple majority of those voting in an election.  If there is more than one school system in the county, the tax is divided among the systems based upon each system's proportionate share of the total Foundation Program allocation to the school systems within the county.[354]

    e.    **3.0 mill school district tax** — *Section 269.05*

Finally, Amendment 382 added Section 269.05 to the Constitution, which authorizes school districts to levy a special school tax that does not exceed 3.0 mills, provided the rate, duration, and purpose of the tax are approved by a majority of those voting in an election.[355]

    f.    **Municipal levies**

---

alteration supplied).

[354] *See* Ala. Code § 16-13-166 (1975).

[355] Section 269.05 provides:

> In addition to any and all taxes now authorized, or that may be hereafter authorized by the Constitution and laws of Alabama, the several school districts of any in the state shall have power to levy and collect an additional special district school tax not exceeding thirty cents on each one hundred dollars worth of taxable property in such district for public school purposes in addition to that now authorized or that may hereafter be authorized for public school purposes; provided, that a school district under this section shall include incorporated cities or towns, or any school district of which an incorporated city or town is a part, or such other school districts now existing or hereafter formed as may be approved by the county board of education; provided, further, that the rate of such tax, the time it is to continue and the purpose thereof shall have been first submitted to the vote of the qualified electors of the district, and voted for a majority of those voting at such election.

Ala. Const. art. XIV, § 269.05 (1901), *added by* amend. 382 (*ratified* Mar. 26, 1980).

Municipalities have no set limits on the millage rates each may impose upon taxable property, except in the manner in which the taxes are levied.

> The first five mills may be levied by the city simply through an ordinance passed by the governing body.  To levy more than five but less than twelve and one-half mills, an ordinance must be passed and then a referendum held.  For millage rates more than twelve and one-half, legislative approval and a successful referendum must accompany the city ordinance.[356]

### 4.    Exceeding Generally Authorized Millage Rates

As of 2010, no more than 68 of Alabama's 131 public school systems had levied all of the 15.0 mills authorized by the constitutional provisions with statewide application discussed in sub-sections 3(a) through (e) above.[357]   Neither of the counties in which the plaintiffs reside was levying all of the generally-authorized mills:  Sumter County levies 13.8 mills, and Lawrence County levies 10 mills, for the support of public education.[358]

Of those sixty-odd school systems that *have* levied the full 15.0 mills, and which desire to further increase property tax revenues for the support of public education, there are basically two methods for doing so:  one, a new *ad valorem* tax

---

[356] Keith J. Ward & Betty D. Sparkman, *Property Tax Administration:  Reappraisal in Alabama* 82-83 (Auburn, Ala.:  Auburn University School of Arts & Sciences, Office of Public Service & Research 1980) ("**Ward & Sparkman**").

[357] Agreed Facts ¶ 36(A).

[358] *See id.* ¶ 36(B).

may be authorized by constitutional amendment; or two, the millage rate of an existing tax may be increased. There are three processes for amending the Constitution to levy new millages, and a single process for increasing the rate of an existing millage. Each is discussed below.

a.    **General constitutional amendment with statewide application**

Amendments that apply to the State as a whole may be proposed by the introduction in the Legislature of a bill or resolution setting forth the proposed amendment. For example, the Legislature might propose a general constitutional amendment that, if approved by a majority of the qualified electors participating in a statewide election, would allow every school system in the state to conduct a separate election on the question of whether the additional millage specified in the general amendment should be levied in the geographic area encompassed by that system.[359] The bill or resolution must be read in the house in which it originates on three separate days, and three-fifths of the members elected to that house must vote affirmatively to pass the proposal. The measure then goes forward to the second house, where it also must be read on three separate days and receive a three-fifths

---

[359] The parties stipulated that the Alabama Constitution has been amended "at least" four times since 1980 "to provide for additional property taxes for schools in all counties," Agreed Facts ¶ 37(B); but, only one of the amendments cited in the footnote to that statement, *id.* at 11 n.5 ("The amendments affecting all counties are Amendments 395, 525, 669, and 778."), appears to support the assertion: *i.e.*, Amendment 778, ratified on Dec. 4, 2006, and adding Section 269.08 to Article XIV of the 1901 Constitution.

168

affirmative vote of the members elected to that house.  If the proposal passes both houses, it will be submitted to the electorate in a statewide election.  The Legislature has the responsibility for fixing the date of the election on proposed amendments. Such a referendum may be held either at the next general election, or at a special election conducted not less that three months after the final adjournment of the session at which the amendment was proposed.[360]   A constitutional amendment submitted at a general election along with another amendment will become a part of the Constitution if a majority of the votes cast on the amendment are in favor of its adoption, even if that majority did not constitute a majority of the votes cast in the general election on other amendments, candidates for public office, or other issues.[361]

### b. So-called "general constitutional amendment *with local application*"

The same process described in the preceding subsection is followed to propose an amendment affecting only one county, municipality, or school tax district. Significantly, however, the proposed amendment must win approval by a majority of all persons voting in a statewide election, even though only one local taxing authority

---

[360] *See* Ala. Const. art. XVIII, § 284 (1901), *amended by* amend. 24 (*ratified* Aug. 2, 1933); *id.*, art. XVIII, § 285 (1901); *see also* Harvey III, at 8-14; Robert L. McCurley & Keith B. Norman, *Alabama Legislation* 219-20 (Tuscaloosa:  Alabama Law Institute 4th ed. 1997) ("**McCurley & Norman**").

[361] *See*, *e.g.*, *Harris v. Walker*, 199 Ala. 51, 74 So. 40, 41 (1917).

is affected:  hence, the adjective "general."[362]  Despite that requirement, numerous constitutional amendments having a local application, and referring to only one county or local school system, have been ratified.[363]

### c.    **Local constitutional amendment** — *Amendments 425 & 555*

Amendment 425, ratified in 1982, added Section 284.01 to the 1901 Constitution, and provided a method to propose a constitutional amendment affecting only one county, or a political subdivision within a county (or counties).[364]  Section 284.01 was itself amended in 1995 by Amendment 555.  As the law now stands, the required steps are as follows.  *First*, the proposed amendment must be approved by the affirmative vote of at least three-fifths of the elected members of each house of the Legislature, *with no dissenting vote cast*.[365]

*Second*, the legislation proposing the constitutional amendment also must be approved by a majority of the Local Constitutional Amendment Commission, which is composed of the Governor, Presiding Officer of the Senate, Attorney General,

---

[362] Harvey III, at 8-15.

[363] Dr. Harvey wrote that there were "approximately 83 such amendments at this time" (Winter of 2004).  *Id*.

[364] For example, the incorporated area of the City of Huntsville extends into Limestone County, to the west of Madison County.

[365] Ala. Const. art. XVIII, § 284.01(b) (1901), *added by* amend. 425 (*ratified* Nov. 17, 1982), and *amended by* amend. 555 (*ratified* Jan. 6, 1995).

Secretary of State, and Speaker of the House of Representatives.[366]

*Finally*, approval of the proposed amendment rests with the voters in the affected local area. If it is a county amendment, it must receive "a favorable vote of a majority of the qualified electors of the affected county who vote on the amendment," but if the amendment "affects or applies to only one political subdivision within a county or counties," it must receive "a favorable vote of a majority of the qualified electors of *both* the county *and* the political subdivision affected by the amendment who vote on the amendment."[367]

Two scenarios potentially affecting this amendatory process must be considered: *on the one hand*, if legislation proposing a local amendment under these procedures is approved by at least a three-fifths vote of the elected members of each house of the Legislature, *but* with one or more dissenting votes cast, *or*, *on the other hand*, if after having been approved by at least a three-fifths vote of the elected members of each house of the Legislature without a dissenting vote cast, the proposed amendment is not approved by a majority of the Local Constitutional Amendment Commission, *then*, *in either of those events*, the following special procedures apply: (*i*) the amendment must be voted upon in a statewide election, in the same manner as

---

[366] Ala. Const. art. XVIII, § 284.01(b).

[367] *Id*. § 284.01(a) (emphasis added).

general constitutional amendments with statewide application;[368] and (*ii*) in addition to receiving a majority of the votes cast in the affected local area, the proposed amendment must receive a majority of the votes cast across the state, in counties and areas that will not be affected by the local amendment.[369]

The parties stipulated that, "[s]ince 1980, the Alabama Constitution has been amended at least 17 times to provide for the levy of additional ad valorem taxes for school purposes in specific counties, cities or school system[s] . . . ."[370]

### d.    Increasing the millage rate of an existing tax

Amendment 373 was proposed and ratified in 1978, ostensibly for the purpose of complying with the federal court orders in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971) (three-judge court) (*per curiam*):  a case that will be discussed in more detail in Part II(G)(3)(i) of this opinion, *infra*.  Essentially, however, the

---

[368] *See*, *e.g.*, McCurley & Norman, at 234 ("Amendment No. 555 provides that proposed local constitutional amendments that are not certified become general constitutional amendments.").

[369] *See* Ala. Const. art. XVIII, §§ 284.01(d), (e).  The specific language is:

> If the proposed amendment is submitted in a statewide referendum, it shall not become effective unless approved at a referendum by a majority of the qualified voters of the affected county voting on the proposition and the affected political subdivision voting on the proposition, if it affects less than the whole county.  The referendum in a political subdivision may be held at the same time as the election for the ratification of the proposed amendment, or at another time if provided by the proposed amendment.

*Id.* at § 284.01(e); *see also* Ala. Const. art. XVIII, §§ 284, 285.

[370] Agreed Facts ¶ 37(B).

*Weissinger* decision put an end to the seven-decade-long corrupt practices of State and county tax authorities of intentionally applying arbitrary assessment ratios to similar properties in abject defiance of State constitutional and statutory law.

This amendment, often referred to as the "Lid Bill," spawned six complex statutes, enacted for the purpose of implementing the amendment. The amendment and its enforcement statutes do not allow for a referendum on the levy of *a new ad valorem* property tax, but instead only provide a means for *increasing* the millage rate of *an existing tax* that previously had been levied under one of the constitutional provisions discussed above. The process entails the following steps.

First, if the board of education was not the governmental taxing authority that initiated the proposal for the existing school district tax, the millage rate of which is proposed to be increased, then the school board must identify the taxing authority that levied the existing tax:  *i.e.*, the county commission in a county tax levy, or the municipal government body in the case of a city tax levy. The school board then must adopt a resolution requesting the applicable taxing authority (county commission or city council) to conduct a public hearing on the board's proposed millage rate increase, and thereby initiate Amendment 373's increase procedures by giving public notice of the hearing, proposed millage rate increase, duration of the tax, and purpose for which the additional revenue is sought. However, it is not sufficient for the taxing

173

authority to simply hold a public hearing on the school board's proposal; instead, following the hearing, the taxing authority must formally propose and vote to approve the millage rate increase.

If the relevant taxing authority gives its approval, the proposed increase also must be approved by local act of the State Legislature.[371]  According to the Alabama Constitution, local acts must be advertised for four weeks before being introduced in the Legislature.[372]

Finally, if the local act is approved by the legislature, the proposed rate increase must be approved by a majority of the voters residing within the governmental taxing authority that levied the existing tax.  Amendment 373 and its implementing statutes require that the election be held under laws governing "special elections."[373]

> Election requirements for municipal taxes (a "municipal tax" is a tax levied by a municipality; school district taxes, even in a municipal school district, are county-levied taxes and are not "municipal taxes")

---

[371] The parties have stipulated that "[w]ith respect to local amendments[,] the Alabama Legislature has long observed an informal local courtesy rule, pursuant to which local constitutional amendments that enjoy the unanimous support of a local legislative delegation are not opposed." Agreed Facts ¶ 37(A).

[372] Harvey III, at 8-17.

[373] "Neither statutory nor judicial guidance has specified the type of special election; [but] a sound recommendation is to follow the pertinent election procedure relating to the tax under consideration.  State law governs elections for school district and county 3-mill taxes (*Code of Alabama 1975*, §§ 16-13-180 through 199), and there are specific laws relating to special elections conducted by municipalities."  Harvey III, at 8-17.

differ from those for county and district taxes.  State law (Code of Alabama 1975, § 11-46-22 and § 11-46-93) requires an eight-week notice of the election.  The election has to be held on [a] Tuesday or Thursday and notice of the election first must be published on or before the corresponding Tuesday or Thursday of the second month prior to the election.

Election procedures for county and district taxes require a 30-day notice published in a newspaper in the county.  If there is no newspaper published in the county, the notice must be posted at the courthouse door and at three other public places in the county.  In addition to the newspaper notice, notice of *district tax elections* must be posted in three public places within the district.  The notice should include the election date and the rate, duration and purpose of the tax . . .[374]

The parties have stipulated that, since 1978, "counties and other local taxing authorities have been successful in obtaining Legislative approval in substantially all the instances where a county local legislative delegation has sought such approval to hold a referendum on local property tax increases."[375]  More specifically, as of 2007 (which apparently is the latest set of statistics available), "the rates of property taxes for schools in School Tax Districts in 36 of 67 Alabama counties have been increased through the procedures set forth in Amendment 373."[376]

c.  In the 2007 Regular Session of the Alabama Legislature, the Legislature approved 13 new or increased property taxes in various local taxing jurisdictions (including the counties of Barbour, Bullock, Wilcox, and Tallapoosa, and the cities of Auburn and Phenix City), subject to a

---

[374] *Id*. at 8-18.

[375] Agreed Facts ¶ 38(a) (citations omitted).

[376] *Id.* ¶ 38(b).

favorable vote of the qualified voters of the affected jurisdictions.  *See e.g.*, 2007 Ala. Acts 295.

    d.  Lawrence County has received legislative approval for at least two local ad valorem tax increases under Amendment 373 of the Alabama Constitution:  one for 3 mills in 1989 and one for 11 mills in 1992.  *See* 1989-90 Ala. Acts 30; 1992 Ala. Acts 842.  Both proposals were thereafter submitted to the voters of Lawrence County for approval.  The proposed increases were rejected by Lawrence County voters.  However, 5 of the 6 majority-black precincts voted in favor of the 1992 increase.  *See* Key Aff. (Doc. 31-7) at 3.

    e.  Sumter County has successfully obtained legislative approval for at least three local ad valorem tax increases since 1978 (11 mills in 1987, 3 mills in 1997, and 15 mills in 2006).  *See* 1987 Ala. Acts 829; 1997 Ala. Acts 262; 2006 Ala. Acts 513.  Sumter County has approximately 5,870 black registered voters and 2,200 white registered voters.  *See* Singleton Aff. (Doc. 31-6) at p. 3.

    f.  In Sumter County, with an African-American voting majority of roughly 2.7 to 1, the electorate in 2006 defeated, by a 60-40 margin, a proposal under the Amendment 373 procedure to increase local property taxes by 15 mills.  The majority-black Sumter County Commission also opposed the tax increase.  *Id*.[377]

Unfortunately, "[t]here is no evidence showing on how many occasions a school system's request for a millage increase has been turned down either by the county or municipal governing body or by the local legislative delegation."[378]

---

[377] *Id*. ¶¶ 38(c) – (f).

[378] *Id*. ¶ 39.

## F.    The Computation of Property Taxes in Alabama

All real and personal property in Alabama is subject to *ad valorem* taxation, unless specifically exempted by law.[379]  The taxes imposed are based upon the property's fair market value as determined by an appraisal,[380] as opposed to the property's quantity, weight, or measurement.[381]  The Alabama Constitution limits the rate of taxation that may be levied by the State to 6.5 mills of the *assessed* value of property subject to taxation,[382] as distinguished from its *appraised* value.   As explained in Part II(F)(3), *infra*, the "assessed" and "appraised" values of property are not identical.

A "mill" is a notational unit of currency that is used in figuring rates of

---

[379] *See*, *e.g.*, Ala. Code § 40-11-1(b) (1975) (2003 Replacement Vol.) (listing the property that is subject to ad valorem taxation, "except as exempted by law").  Intangible personal property (*e.g.*, stocks, bonds, equities, copyrights, patent rights, franchises, money on deposit, futures contracts, insurance policies, and other financial assets) is not taxed in Alabama.

[380] "The essential characteristic of an *ad valorem* tax is that the tax is levied according to the value of property, as determined by an assessment or appraisal." 71 Am. Jur. 2d *State and Local Taxation* § 18 (2010); *see also id*. § 20 (1973) (stating that "an *ad valorem* tax . . . requires the intervention of assessors or appraisers to estimate the value of such property before the amount due from each taxpayer can be determined").

[381] "Taxes may be specific or *ad valorem*.  Specific taxes are of a fixed amount by the head or number, or by some standard of weight or measurement, and require no assessment other than a listing or classification of the subjects to be taxed. " *Id.* § 18.

[382] *See* Ala. Const. art. XI, § 214 (1901) ("The legislature shall not have the power to levy in any one year a greater rate of taxation than sixty-five one-hundredths of one per centum on the value of the taxable property within this state."); *id*. art. XIV, § 260 (1901), *amended by* Amend. 111 (*ratified* Sept. 7, 1956) (providing that "nothing herein contained shall be so construed as to authorize the legislature to levy in any one year a greater rate of state taxation for all purposes, including schools, than sixty-five cents on each one hundred dollars' worth of taxable property; ...").

taxation.  The term generally is defined as one-thousandth of a dollar, or one-tenth of

a penny,[383] but both fractions can be expressed decimally as 0.001.  In other words,

10 mills is one cent (0.01), 100 mills is ten cents (0.10), and 1,000 mills is one dollar

(1.00).  The maximum State tax rate of 6.5 mills, therefore, is equivalent to slightly

more than one-half of one cent ($0.0065) of each dollar of a property's *assessed*

value.[384]

The process of calculating the amount of tax due under Alabama's *ad valorem*

tax structure can entail as many as six steps.[385]  *First*, the property subject to taxation

must be identified.  *Second*, the fair and reasonable market value of the property must

be estimated by means of an "appraisal."  *Third*, the "assessed value" of the property

---

[383] The term was first used in the United States in the Aug. 8, 1786 *Journal of the Continental Congress*, where it was described as the "lowest money of account, of which 1,000 shall be equal to the federal dollar."  See the online edition of the *Oxford English Dictionary*, found at www.oed.com (last viewed Aug. 12, 2011).

[384] *See, e.g.*, The Legislative Fiscal Office, *A Legislator's Guide to Alabama's Taxes:  A Summary of the Major Revenue Sources of the State of Alabama* 2-3 (2007) ("**Legislator's Guide**") ("A mill is 1/1000 of a dollar or 1/10 of a cent, so that 6.5 mills equal $.0065 or .65% of $1.  One mill equals $1 of taxes per $1,000 of *assessed* value of property.") (emphasis in original).

[385] The process was described in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1970) (three-judge court) (*per curiam*), as a "three-step procedure":  *i.e.*,

> Alabama's ad valorem tax structure embraces a three-step procedure.  For purposes of assessment, property must be estimated at its fair and reasonable market value (Title 51, Section 46, Code of Alabama).  Then it must be assessed for the purpose of taxation at a fixed percentage (60%) of that fair and reasonable market value (Title 51, Sections 17, 131 and 133, Code of Alabama), and, finally, the tax rate is applied to the assessed value. . . .

*Id*. at 620 n.11.  In point of fact, however, as discussed in text, the process can entail as many as six steps.

178

is calculated.  *Fourth*, if any exemptions from taxation are allowed by law, they are subtracted from the assessed value.  *Fifth*, the *net* assessed value is multiplied by the applicable millage rate.  *Finally*, if a taxpayer disagrees with the county tax assessor's appraised or assessed values, he or she may take the issue before the county's board of equalization, an entity that is charged with the duty of equalizing the assessment of all property within the county.[386]  The first five steps of this computational process are discussed in more detail below.

### 1.   **First Step** — *Identifying the property subject to taxation*

The first step in the calculation of State, county, municipal, or school district *ad valorem* tax levies requires the county tax assessor to identify each parcel of real

---

[386] *See*, *e.g*., Ala. Code § 40-3-16 (1975) (2009 Supp.) ("It shall be the duty of the boards of equalization to inspect, review, revise, and fix the value of all the property returned to or listed with the assessing official for taxation each year. . . .").  In addition:

> The State Department of Revenue is charged with the responsibility of equalizing the various county equalization board assessments and its own assessments on railroad and utility property, so that all taxable property in the state will be assessed in accordance with Sections 211 and 217.  Sections 131 and 133 of Title 51 of the Code of Alabama [*now codified at* Ala. Code § 40-2-11 (1975)] authorize the Department of Revenue to exercise general and complete supervision over and control of valuation, equalization, and assessment of property "to the end that all taxable property in the state shall be assessed and taxes shall be imposed and collected thereon in compliance with the law, and that all assessments on property . . . shall be made in exact proportion to the fair and reasonable market value thereof."

*Weissinger v. Boswell*, 330 F. Supp. 615, 620-21 (M.D. Ala. 1971) (three-judge court) (*per curiam*) (footnotes omitted, alteration added).

property and each taxable unit of personal property within his or her jurisdiction.[387]

The identification of real property — land and the improvements that have been made

thereon — typically involves the preparation of a tax map that depicts each parcel of

real estate within the county, "showing for each the boundaries, size, location, parcel

identification number, ownership, value, and other spatially oriented details such as

easements, rights-of-way, soil types, and flood plains."[388]

### 2.   **Second Step** — *Appraisal*

The second step requires an "appraisal" — a term that describes the process of

_____

[387] *See, e.g.*, *State v. Alabama Power Co.*, 254 Ala. 327, 48 So. 2d 445 (1950), observing that, when beginning the process for computing the property taxes due,

> the taxpayer or tax assessor [is required to] list all the different kinds and types of property owned by the taxpayer. On one sheet the taxpayer lists his real estate and improvements thereon and on another sheet he lists his personal property. The personal property is then broken down into a considerable number of different types, classes or species of property set out in the printed form. . . . The reason for enumerating the various species or classes of property is to make sure that the taxpayer is listing for assessment and taxation all his property and not omitting or overlooking any.

*Id.* at 339, 48 So. 2d at 455 (alteration added).

[388] Michael E. Bell, "Property Tax Assessment," in *The Encyclopedia of Taxation & Tax Policy* 307-308 (Washington, D.C.: The Urban Institute 2d ed. 2005) (Joseph J. Cordes, Robert D. Ebel & Jane G. Gravelle eds.) ("**Bell**"); *see also* Ira W. Harvey, *A History of Educational Finance in Alabama* 223 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**") ("The basis for identification is the tax map found in the tax assessor's office in the county courthouse. This tax map is a map which is drawn to scale and delineated by lot lines, property lines, or both with sufficient identification for all parcels of land. From these maps, all real property is identified based upon ownership, property size, and location. Tax maps are to be properly maintained and kept current to reflect changes in ownership or changes in the size of the lot. Currently, the use of computerized mapping and geographic information systems has greatly improved the process.") (citation omitted); Harvey III, at 7-7.

developing a well-supported opinion about the property's "fair and reasonable market value": that is, the highest price at which the property would sell on the open market in a voluntary, arm's-length transaction between a willing seller and a willing purchaser, with neither party under compulsion to sell or to buy, and allowing a reasonable time to find a buyer who purchases with full knowledge of all uses to which the property can be put, and for which it is capable of being used, in the light of applicable zoning, building set-back lines, access, and other limiting laws, restrictions, or ordinances.[389]   The valuation process "is inherently subjective and

_____

[389] *See* Ala. Const. art. XI, § 217(c) (1901); Ala. Code § 40-1-1(16) (1975) (defining the "value" of property subject to *ad valorem* taxation as "[t]he fair and reasonable market value of property, estimated at the price which the property would bring at a fair voluntary sale"); *id*. § 40-7-15 (stating that "for the purpose of assessment, real and personal property shall be appraised at its fair and reasonable market value, according to the best judgment the assessor, the board of equalization, and agents of the Department of Revenue can form upon information, inspection, or otherwise, taking into consideration all elements or factors bearing on such value").  The following definition of market value is used by federal agencies charged with the regulation of financial institutions:

> Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) Buyer and seller are typically motivated; (2) Both parties are well informed or well advised, and acting in what they consider their own best interests; (3) A reasonable time is allowed for exposure in the open market; (4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

55 Fed. Reg. § 1608.2(f), at 34228-29; s*ee also*, *e.g*., 1 *CCH Alabama State Tax Reporter* ¶ 20-610 (2006) ("**CCH Tax Guide**") (citing Ala. Dept. of Revenue, *Alabama Appraisal Manual* (1995)); The

requires the talents of highly trained and experienced personnel, generally referred to as assessors, valuers, property appraisers, or property valuation administrators."[390]

### a.   The usual methods of determining fair market value

The fair and reasonable market value of real property usually is determined by application of one or more standard appraisal methods.  The most commonly employed techniques are the "market," "cost," and "income capitalization" approaches.[391]  Those methodologies are not mutually exclusive, but interrelated, in the sense that "each requires the gathering and analysis of sales, cost, and the income data that pertain to the property being appraised."[392]

The *market approach* to valuation is commonly used to estimate the worth of residential property, based upon a comparison of the sale prices and relevant amenities of comparable properties within the general vicinity of the subject property.[393]  It is the least complex appraisal method.[394]

The *cost approach* derives the value of a subject property by adding the estimated value of land to the current cost of constructing a reproduction or

---

Appraisal Institute, *The Appraisal of Real Estate* 23-24 (Chicago: The Appraisal Institute 11th ed. 1996) ("**Appraisal of Real Estate**").

[390] Bell, at 307.

[391] *See* 1 CCH Tax Guide ¶ 20-615 (2008).

[392] Appraisal of Real Estate, at 81.

[393] *See*, *e.g.*, 1 CCH Tax Guide ¶ 20-625, at 2222.

[394] Harvey III, at 7-7.

replacement for the structures and other improvements located on that land, and then subtracting an amount for the depreciation of the structures from all causes (*e.g.*, deterioration, functional or economic obsolescence, etc.).[395]

The *income capitalization approach* is most often used in connection with the evaluation of rental and commercial properties, and takes into account the property's ability to produce revenue or income.[396]   The present value of a subject property's projected income stream and resale value are capitalized into a current, lump-sum value.[397]   This is, by far, the most complicated of the standard appraisal methodologies.   Even so, a *significantly* more complex method of appraising the value of some Alabama properties was added to the State Constitution by Amendment 373, ratified in 1978.

### b.    The "current use" method of valuation

Amendment 373 significantly altered Article XI, Section 217 of the Alabama

---

[395] "This approach is particularly useful in valuing new or nearly new improvements and properties that are not frequently exchanged in the market.  Cost approach techniques can also be employed to derive information needed in the sales comparison and income capitalization approaches to value, such as the costs to cure items of deferred maintenance."  Appraisal of Real Estate, at 90.

[396] *See* Harvey III, at 7-7.

[397] There are two methods of income capitalization — direct capitalization and yield capitalization — but a description of the complex algebraic formulas used to produce estimated property values by use of those methods is unnecessary to discussion of the issues addressed in this opinion.  *See*, *e.g.*, Appraisal of Real Estate at 91-92, 184-85; 1 CCH Tax Guide ¶ 20-620, at 2221-22 (citing Alabama Department of Revenue, *Alabama Appraisal Manual*, Chapter 4 ("The Appraisal Process") (1995)).

Constitution, as previously amended by Amendment 325. Alabama property now is appraised on two bases. The value of all real and personal property that is *not included* within "Class III" is appraised at its fair and reasonable market value as determined (normally) by one of the standard methods summarized in the preceding section. On the other hand, the owners of Class III properties — *i.e.*, land devoted to agricultural pursuits or timber and forest-product production, historical buildings and sites, and single-family, owner-occupied, residential dwellings — are given the option of electing to have the value of such property appraised on the basis of *either* its "fair and reasonable market value" (as in the case of the other three classes of property created by Amendment 373), *or* on the basis of the property's "current use value"[398] — a method of valuation that ignores the property's fair market value, and limits the estimation process to the use being made of the property on the date of appraisal.[399] It is specifically provided that "*no consideration* shall be taken of the *prospective value* such property *might* have *if it were put to some other possible use.*"[400]

---

[398] *See* Ala. Const. art. XI, § 217, ¶ (j) (1901), *as amended by* Amend. 373 (ratified Nov. 20, 1978) (providing, in part, that "Class III property shall, *upon application by the owner of such property*, be assessed at the ratio of assessed value to the *current use value* of such taxable property *and not the fair and reasonable market value* of such property") (emphasis supplied).

[399] *See* Ala. Code § 40-7-25.1(a) (1975) (2003 Replacement Vol.) (defining "current use" as "the value of eligible taxable property based on the use being made of that property on October 1 of any taxable year").

[400] *Id*. (emphasis supplied).

184

There are some significant nuances in the methods of estimating the current use values of, on the one hand, historic buildings and sites and single-family, owner-occupied residential dwellings and, on the other hand, properties devoted to agricultural pursuits and timber production.  Those differences are discussed below.

### i.    Residential property and historic buildings and sites

An Alabama statute dictates that the value of a historic building or site,[401] or a single-family, owner-occupied, residential dwelling,[402] is to be determined by comparing the subject property to the "fair and reasonable market values of comparable residential or historic building and site property located in the county," but tax assessors also are specifically directed "to presume that there is no possibility of the property being used for any other purpose than as residential property or an historic building and site, as if there were a legal prohibition against its use for any other purpose."[403]  As a result of those legislative directives, a county tax assessor is prohibited from taking into account the value of property that adjoins the residential

---

[401] Ala. Code § 40-8-1(b)(2) (1975) (defining the term *historic buildings and sites* as including, "[r]egardless of the use to which such property is put, all buildings or structures (*i*) determined eligible by the state historic preservation officer for listing on the National Register of Historic Places; or (*ii*) located in a registered historic district and certified by the United States Secretary of the Interior as being of historic significance to the district").

[402] *See* Ala. Code § 40-8-1(b)(6) (defining the term *residential property* as meaning "[o]nly real property, used by the owner thereof exclusively as the owner's single-family dwelling.  This includes an owner who resides on the property and remains in possession of the property after it is sold at a tax sale.").

[403] Ala. Code § 40-7-25.1(d)(3).

185

property or historic building or site, regardless of whether the adjoining property is devoted to "higher and better uses,"[404] such as a shopping center, apartment units, other residential rental properties, a condominium complex, or an industrial site.

## *ii*. **Agricultural and timber properties**

The statutory methodology for determining the "current use" values of land devoted to agricultural pursuits or timber and forest-product production is "unusually long and complex."[405] It is based upon the productivity of the soil. State law divides Alabama land into ten "soil groups," determined by the U.S. Soil Conservation Service,[406] and then rates the productivity of each soil group for agricultural and forest purposes as "good," "average," "poor," or "nonproductive."[407] The basic assumption is that each soil group will produce a stream of income that can be capitalized to estimate property value on a per-acre basis.

---

[404] The phrase "highest and best use," as used in conjunction with the term "fair market value," refers to the estimated amount that a willing buyer might pay, if the property were put to some other, possible, more lucrative function than the use being made of the property at the moment of valuation. *See* 1 CCH Tax Guide ¶ 20-620 ("The 'highest and best use' of property means the use most likely to produce the highest yield or maximum benefit over a reasonably foreseeable period of time for a prudent or typical owner.").

[405] *Weissinger v. White*, 733 F.2d 802, 805 n.11 (11th Cir. 1984).

[406] *See* Ala. Code §§ 40-7-25.1(c)(1) – (c)(10).

[407] The productivity ratings for seven of the ten soil groups are the same, regardless of whether the land is devoted to agricultural purposes or timber production: that is, the ratings are different only for soil groups 6 ("poor" for agriculture, "average" for timber), 7 ("nonproductive" for agriculture, "poor" for timber), and 9 ("poor" for agriculture, "average" for timber). *See* Ala. Code § 40-7-25.1(c).

The Alabama Department of Revenue is charged with the responsibility of determining the stream of income presumptively produced by each of the various agricultural and forest soil groups — a computational process that yields estimated productivity figures which are described in the Alabama Code as "current use standard values per acre of property."[408]

### (A)   Agricultural land

In order to determine "the current use standard values per acre" for land devoted to agricultural uses,[409] the Department of Revenue, "utilizing statistics from the Alabama Crop and Livestock Reporting Service, the Alabama Cooperative Extension Service and the Alabama Agricultural Experiment Station,"[410] annually identifies the "state's top three crops," meaning those that produced the greatest harvest on a per acre basis.[411]  The Department then determines the "seasonal average price received" for those crops during each of the preceding ten years.[412]  The Department next multiplies the total production in the State for each of the top three crops during the

---

[408] *See*, *e.g.*, Ala. Code §§ 40-7-25.1(d)(1) (final para.) (1975).

[409] Agricultural property is defined as "real property used for raising, harvesting, and selling crops or for the feeding, breeding, management, raising, sale of, or the production of livestock, including beef cattle, sheep, swine, horses, ponies, mules, poultry, fur-bearing animals, honeybees, and fish, or for dairying and the sale of dairy products, or for . . . any other agricultural or horticultural use or animal husbandry and any combination thereof."  *Id.* at § 40-8-1(b)(1) (1975).

[410] *Id*. §§ 40-7-25.1(d)(1) (final para.).

[411] *Id*. § 40-7-25.1(d)(1)(a).

[412] Ala. Code § 40-7-25.1(d)(1)(b).

current year by the "seasonal average price."

>    c. From the gross return figures thus obtained, costs of production
>    for each crop (determined for each crop using U.S. Department of
>    Agriculture cost of production data [excluding land costs and general
>    farm overhead costs] or such similar data as may be available to the
>    department) shall be subtracted, giving the net return to land per year per
>    crop;
>
>    d. The net return per year to land per crop shall be totaled, the total
>    being weighted to give effect to the average number of acres of each crop
>    being harvested in the state in the 10 most recent calendar years since
>    1973 for which statistics are available, such total yielding income flow
>    per acre; and
>
>    e. Income flow per acre shall be capitalized by dividing it by the
>    average of the annual effective interest rates on new federal land bank
>    loans . . . charged by the New Orleans District Federal Land Bank for the
>    10 most recent calendar years since 1973 for which figures are available
>    as of October 1 of each tax year, such rate to be reduced by four and
>    one-half percent for determinations made for the first tax year to which
>    the provisions of this chapter shall apply; with respect to tax years
>    thereafter, the income flow per acre shall be divided by the average of
>    said annual effective interest rates determined for the 10 most recent
>    calendar years since 1973 for which figures are available, such rate to be
>    reduced by the lesser of four and one-half percent or the difference
>    between such rate and two percent.[413]

The "current use standard values per acre of property in agricultural use in the

state" then is calculated by adjusting the figure produced by the foregoing formula as

follows:  *increasing* the final figure by 20% for land having a productivity rating of

"good"; *decreasing* the final figure by 30% for land having a productivity rating of

---

[413] *Id.* §§ 40-7-25.1(d)(1)(c) – (e).

"poor"; *decreasing* the final figure by 75% for "nonproductive" soil; and leaving the final figure "unchanged with respect to property having a productivity rating of average. . . ."[414]

## (B)    Timber property

A different, and somewhat simpler, process is followed to determine the "current use standard values for forest property in the state."[415]   As stated in the Alabama Code, the Forestry Commission is charged with the responsibility of annually determining

the average pulpwood price per cord received by timber growers in the

---

[414] *Id*. §§ 40-7-25.1(d)(1) (final para.).  The Eleventh Circuit summarized this "unusually long and complex" computational process in the following manner:

1.  Determine the state's top three crops for the current year.

2.  Determine the average net income (gross income less production costs) of each crop per acre.

3.  Compute a weighted average net income per acre figure based on the respective proportions of land that were planted in each of the three crops over the last 10 years.

4.  Take this final net income per acre figure and capitalize it using a specified interest rate.

5.  Finally, take the capitalized figure and increase or decrease it by a specified percentage depending on soil productivity.

Timberland valuation is based on a similar, low-variable formula.

*Weissinger v. White*, 733 F.2d at 805 n.11.

[415] Ala. Code § 40-7-25.1(d)(2) (1975).  Forest property is defined as land used for "the growing and sale of timber and forest products. . . ."  *Id*. § 40-8-1(b)(1).

state by estimating the average pine pulpwood price per cord and the average hardwood pulpwood price per cord received in the state during such year and determining the weighted average of those two average prices, weighting those prices on the basis of the ratio that the approximate number of cords of each of those two types of pulpwood harvested in Alabama bears to the total cords of both of such types of pulpwood harvested in Alabama, and provide that information to the Department of Revenue. The Department of Revenue shall utilize timber yields of 1.38 cords per acre per year, 1.05 cords per acre per year, .75 cords per acre per year and .6 cords per acre per year for land having good, average, poor, and nonproductive productivity ratings respectively to establish annual yields per acre in cords and multiply the yield per acre of timber property of each rating by the average pulpwood price per cord as provided by the Alabama Forestry Commission.  From the products thus obtained, 15 percent thereof shall be subtracted therefrom for expenses of ownership and management, and the result of that subtraction shall equal imputed timberland net income per acre for property of each productivity rating.  The imputed net income per acre figures for property of each productivity rating shall then be divided by the average of the annual effective interest rates charged on new federal land bank loans . . . by the New Orleans District Federal Land Bank for the 10 most recent calendar years since 1973 for which figures are available as of October 1 of each tax year, such rate to be reduced by four and one-half percent for determinations made for the first tax year to which the provisions of this act shall apply; with respect to tax years thereafter, the imputed net income per acre figures shall be divided by the average of said annual effective interest rates for the 10 most recent calendar years since 1973 for which figures are available, such rate to be reduced by the lesser of four and one-half percent or the difference between such rate and two percent. *The results thus obtained shall be the current use standard values per acre for property of each of the timber productivity ratings* with respect to which current use valuation is elected by the owner thereof; . . . .[416]

_____

[416] *Id*. (emphasis supplied).

(C)    **2008 current use standard values for agricultural and timber properties**

By following the procedures outlined in sections 40-7-25.1 through 40-7-25.3 of the Alabama Code, the Department of Revenue annually computes and publishes current use values according to the productivity ratings of agricultural and forest properties.  As seen in Table II-1 and Table II-2 below, the values for the 2008 tax year, introduced as Plaintiffs' Exhibit 25, were:

**TABLE II-1:  2008 CURRENT USE VALUES FOR AGRICULTURAL LAND**

| SOIL GROUP | PRODUCTIVITY RATING | CURRENT USE VALUE |
|---|---|---|
| 1 | Good | $532 |
| 2 | Good | $532 |
| 3 | Average | $443 |
| 4 | Average | $443 |
| 5 | Average | $443 |
| 6 | Poor | $310 |
| 7 | Non-productive | $110 |
| 8 | Good | $532 |
| 9 | Poor | $310 |
| 10 | Non-productive | $110 |

**TABLE II-2:  2008 CURRENT USE VALUES FOR TIMBERLANDS**

| SOIL GROUP | PRODUCTIVITY RATING | CURRENT USE VALUE |
|---|---|---|
| 1 | Good | $653 |
| 2 | Good | $653 |
| 3 | Average | $498 |
| 4 | Average | $498 |

191

| SOIL GROUP | PRODUCTIVITY RATING | CURRENT USE VALUE |
|:---:|:---:|:---:|
| 5 | Average | $498 |
| 6 | Average | $498 |
| 7 | Poor | $355 |
| 8 | Good | $653 |
| 9 | Average | $498 |
| 10 | Non-productive | $284 |

**3**.    **Third Step** — *Determining the assessed value*

The third step in the calculation of *ad valorem* taxes is determination of the subject property's "assessed value."  It must be emphasized that, in Alabama, the appraised and assessed values of property are not synonymous.  Rather, the appraised value *always* is greater than the assessed value — a term referring to that portion of the appraised value against which State, county, municipal, or school district millage rates will be applied.[417]

The assessed value subject to taxation is determined by multiplying the appraised value by the *assessment ratio* specified for each of the four property

---

[417] As one treatise observed:

Generally, "assessed value" is synonymous for property tax purposes with "taxable value," in that it is the amount to which tax applies.  Some states apply a single statutorily mandated percentage regardless of how property is classified.  Others eliminate this step altogether by assessing all property at its appraised value, so that "appraised value" is synonymous with "assessed value."  Others, such as Alabama, apply different assessment percentages (sometimes called assessment ratios) to different classes of property to arrive at assessed value.

1 CCH Tax Guide ¶ 20-700 (2006).

classifications defined by Article XI, Section 217 of the Alabama Constitution, as modified by Amendment 373 (the so-called "Lid Bill"). Those four classes and their respective assessment ratios are listed in the following Table:[418]

TABLE II-3:  ASSESSMENT RATIOS BY CLASS OF PROPERTY

| CLASS | DESCRIPTION OF PROPERTY | ASSESSMENT RATIO |
|-------|------------------------|------------------|
| I | All real and personal property owned by utility companies that is used in the business of such utilities.[419] | 30% |
| II | A catch-all category, capturing all real and personal property that does not fit within the definitions of the other three classifications, and including most business, commercial, and industrial property, as well as residential rental properties and "second homes" not occupied as the owner's primary residence.[420] | 20% |
| III | All agricultural and timber property, single-family owner-occupied residential property, and historic buildings and sites. | 10% |
| IV | All private passenger automobiles and motor trucks of the type commonly known as "pickups" or "pickup trucks" owned and operated by the taxpayer for personal or private use, and not for hire, rent, or other compensation. | 15% |

**4**.    **Fourth Step** — *Deduction of exemptions*

The fourth step in calculating property taxes requires that any exemptions allowed by law be taken into account by deduction from the *assessed value*. There are more than 150 exemptions to *ad valorem* taxation in Alabama.[421]  Foremost among

---

[418] *See* Harvey I, at 469 (Table 7-4); s*ee also* Ira W. Harvey, *Financing Alabama's Schools*: *The Pursuit of Accountability, Adequacy and Equity* 224 (Table 10-5) (Montgomery, Ala.:  Auburn University Montgomery Center for Government and Public Affairs 2000) ("**Harvey II**").

[419] *See* Ala. Code §§ 40-8-1(a), (b)(5) (1975).

[420] *Id*. §§ 40-8-1(a), (b)(4).

[421] *See id.* §§ 11-20-47, 11-54-96, 31-2-80 to -81, 40-9-1 to -49, 40-11-1(1), 41-9-329, -358. For a comprehensive listing of exemptions to *ad valorem* taxation in Alabama, see Bruce P. Ely, J.

those, as far as the average taxpayer is concerned, is the "homestead exemption" that

may be claimed by the owner of a single-family dwelling occupied as the taxpayer's

primary residence, together with the land upon which it is situated (not to exceed 160

acres), in order to reduce the property's "assessed value" for purposes of computing

the *State tax levy* by $4,000.[422]  State statutory law also exempts all homeowners from

county property taxes (except for school taxes) up to $2,000 of assessed value.[423]

> This means that an owner of a homestead valued at $40,000 (and, therefore, assessed at $4,000) would not pay any state property taxes on his homestead, would pay county taxes based on only $2,000 of the $4,000 assessed value, and would pay school district and city property taxes based on the full $4,000 assessed value of the homestead. . . .[424]

Whiteney Compton & Chris W. Compton, *The Property Tax Deskbook — Alabama* §§ 1-610 to -640, at pages 1-8 to 1-12 (St. Paul, Minn.:  American Bar Association Section of Taxation 14th ed. 2009) (Stewart M. Weintraub *et al*. eds.).

[422] No State *ad valorem* tax is due on the first $4,000 of assessed value from a homeowner aged 65 or less, but the "homesteads of residents . . . over 65 years of age, or who are retired due to permanent and total disability, regardless of age, or who are blind . . . , regardless of age or whether such person is retired, shall be exempt from all *state* ad valorem taxes."  Ala. Code §§ 40-9-19(a) (1975) (emphasis supplied).  Further, any residents who are over 65 years of age and have an annual adjusted gross income of less than $12,000, or any residents who are blind or who are retired because of a disability, also qualify for an exemption from all county property taxes, including school district taxes.  *Id*. § 40-9-19(d).  This exemption may not exceed $5,000 in assessed value or 160 acres in area.  *Id*.  Those residents who are over 65 years of age with a net taxable income of less than $7,500, and those residents who are totally disabled, also receive a complete exemption for *all* property taxes on their "principal residence and 160 acres adjacent thereto."  *Id*. § 40-9-21.  The revenue lost to the State by virtue of the homestead exemption is replaced by a transfer from the first proceeds of the State income tax, before it is deposited to the credit of the Educational Trust Fund in accordance with the provisions of Amendment No. 61.  *See* Ala. Const. art XI, § 211.02 (1901), *added by* amend. 61, § B (last sentence) (*ratified* Sept. 11, 1947); s*ee also* Ala. Code § 40-9-24; Harvey I, at 402-03; Harvey II, at 204-05; Harvey III, at 3-2 to 3-3; Testimony of Dr. Ira Harvey, Transcript Vol. 4 (doc. no. 260), at 11-13 ("**Harvey 4 Tr**.").

[423] Ala. Code § 40-9-19(b).

[424] Michael R. Mills & Deborah Perry Fisher, Comment, *Alabama's Property Tax:*

5.   **Fifth Step** — *Applying the tax millage rate*

Once all applicable exemptions are subtracted, the resulting *net* assessed value is multiplied by the millage rate levied by each taxing authority.  The total millage rate will include the 6.5 mills levied statewide, as well as any additional mills levied at the local level by counties, municipalities, and school districts.  The following table depicts the manner of calculating the State's 6.5 mill *ad valorem* tax, based upon hypothetical values for all classes of properties *except* Class III agricultural and timber tracts.[425]

| TABLE II-4: CALCULATING THE 6.5 MILL STATE AD VALOREM TAX | | | | |
|---|---|---|---|---|
| **DESCRIPTION** | **CLASS I UTILITIES** | **CLASS II COMMERCIAL** | **CLASS III HOMES** | **CLASS IV AUTOS** |
| Appraised Value | $1,000,000 | $400,000 | $100,000 | $20,000 |
| Assessment Ratio | 30% | 20% | 10% | 15% |
| Assessed Value | $300,000 | $80,000 | $10,000 | $3,000 |
| Deduct Any Exemption | 0.00 | 0.00 | -$4,000 | 0.00 |
| Net Assessed Value | $300,000 | $80,000 | $6,000 | $3,000 |
| Multiply by Millage Rate | x 0.0065 | x 0.0065 | x 0.0065 | x 0.0065 |
| Tax Due State | $1,950 | $520 | $39 | $19.50 |

The State's 6.5 mills is allocated as follows:  3 mills for "the maintenance of the public schools of this state,"[426] 1 mill for "the relief of needy Confederate soldiers and

---

*Ineffective, Inefficient, and Inequitable*, 36 Ala. L. Rev. 147, 185 (1984).

[425] *See* Harvey II, at 226 (Table 10-7).

[426] Ala. Code § 40-8-3(1) (1975).

sailors, resident citizens of Alabama and their widows;"[427] and, 2.5 mills to the State's

General Fund.[428]

>    a.    **Computation of the State *ad valorem* tax on Class III agricultural and timber properties**

As discussed in sub-section F(2)(b) of this Part of the opinion, *supra*, the

Alabama Constitution allows the owners of Class III properties devoted to agricultural

pursuits or timber and forest-products production to elect an alternative method of

determining the market value of such properties — a method that limits the appraisal

process to the "current use standard values per acre" established annually by the

Department of Revenue.  As an example of how those values might have been applied

by a county tax assessor in 2008, assume the case of a hypothetical farmer who owned

1,410 acres of "good" land in Soil Group 1, with a current use standard value of $532

an acre.  The "appraised" value of that land, based upon the owner's then current

agricultural use of it for row-crops and pasture, would have been $750,120 (1,410

acres x $532 an acre).  Assume further that this same farmer owned an additional 501

---

[427] *Id*. § 40-8-3(2) ("For the relief of needy Confederate soldiers and sailors, resident citizens of Alabama and their widows, $.10 on each $100 of the assessed value of taxable property of which one percent of the gross amount collected will be expended by the Alabama Historical Commission to provide for capital improvements and maintenance at the Confederate Memorial Park at Mountain Creek, Chilton County, Alabama."); *cf*. Jay Reeves, *Obscure Property Tax Pays for Confederate Memorial*, The Huntsville *Times*, July 21, 2011, at A6, col. 4.

[428] Ala. Code § 40-8-3(3) ("For the use of the state and to raise revenue therefor, $.25 on each $100 of the assessed value of taxable property.").

acres of timberland in Soil Group 3, having an "average" productivity rating, and a

current use value of $498 an acre.  A county tax assessor accordingly would appraise

that land as worth $249,498 (501 acres x $498 an acre).   Thus, the aggregate

"appraised value" of those 1,911 acres based upon their "current use standard values"

would have been $999,618 — an amount that, for ease of computation, will be

rounded-up to $1,000,000.  The *ad valorem* property tax owed to the State of Alabama

by this hypothetical farmer would have been as follows:

|  |  |
|---|---|
| $1,000,000 | aggregate "appraised" (current use) value |
| x   0.10 | ten percent assessment ratio for Class III properties |
| $100,000 | assessed value |
| – 0 – | (No amount is deducted for a homestead exemption because, for purposes of this hypothetical, it is assumed that the farmer either lived in town and not upon his farm property, or that his home and the acreage surrounding it was subject to an assessment separate from the "current use standard values per acre" used as a basis for determining the "appraised value" of the land devoted to income production.) |
| $100,000 | *Net* assessed value |
| x  0.0065 | 6.5 State millage rate |
| $650 | *ad valorem* property tax owed to the State |

The $650 tax bill represents only 0.00065% of the "appraised"/current use value of

1,410 acres of "good" agricultural and 501 acres of "average" timber lands (650 ÷

1,000,000).

197

6. **The "Lid Bill's" Impact Upon the Aggregate Amount of *Ad Valorem* Property Taxes Owed the State, Counties, Municipalities, and School Districts**

As discussed in Part II(E)(3) of this opinion, *supra*, addressing the topic of local funding sources for K-12 education, Alabama has authorized all local school systems, through various amendments to the 1901 Constitution, to levy up to an aggregate of 15.0 mills in *ad valorem* property taxes for educational purposes in a combination of countywide and school tax district levies.  In addition to those authorizations with statewide application, counties, municipalities, or school tax districts may increase school property taxes above the generally authorized 15.0 mills by following one or more of the procedures outlined in Part II(E)(4), *supra*.

The same steps previously outlined are followed when calculating the amount of taxes due to those local taxing authorities, but with one very important caveat. Each of the four classes of property also has a maximum dollar limit, or "lid," on the *aggregate amount of taxes* that may be levied in any one year by *all taxing authorities*: *i.e.*, the State, a county, municipalities within that county, *and* school districts within that county and its municipalities, *combined*.  The dollar limits are based upon the *appraised* (estimated fair and reasonable market) *value* of the property, *not* its *assessed value*.  The sum of *all* property taxes levied by *all* taxing authorities must not exceed in any one year:  2% of the appraised value of Class I property; 1.5% of the

198

appraised value of Class II property; 1% of the appraised value of Class III property; and 1.25% of the appraised value of Class IV property.[429]

This means, for example, that a Class III single-family, owner-occupied residence with an appraised (fair market) value of $100,000 can only be assessed by all taxing authorities a total amount of tax levies that does not exceed the aggregate amount of $1,000 ($100,000 x 0.01). These limits on taxation are summarized in the following Table.[430]

### TABLE II-5: LIDS ON TOTAL PROPERTY TAXES BY CLASS AND PERCENTAGE OF APPRAISED, FAIR MARKET VALUE

| CLASS | DESCRIPTION | ASSESSMENT RATIO | "LID" OR "CEILING TAX" |
|---|---|---|---|
| I | Utility Property | 30% (0.30) of Appraised Value | 2.0% (0.02) of Appraised Value |
| II | Commercial Property (all property not otherwise classified) | 20% (0.20) of Appraised Value | 1.5% (0.015) of Appraised Value |
| III | Owner-Occupied Residential Dwellings, Historic Buildings or Sites, Agricultural and Timber Properties | 10% (0.10) of Appraised Value | 1.0% (0.01) of Appraised Value |
| IV | All private passenger autos and motor trucks devoted to personal uses | 15% (0.15) of Appraised Value | 1.25% (0.0125) of Appraised Value |

[429] The text of Ala. Const. art. XI, § 217(i) (1901), *amended by* Amend. 373 (*ratified* Nov. 20, 1978) is set out in "Appendix I-4." The cities of Mountain Brook, Vestavia Hills, and Huntsville were specifically exempted from the limitations imposed by that constitutional provision, because the total taxes levied by those municipalities exceeded the "lids" when Amendment No. 373 was proposed.

[430] The following Table II-5 is a combination of information depicted in Harvey I, at 469-70 (Tables 7-4 and 7-5) and Harvey II, at 24-25 (Tables 10-5 and 10-6).

Thus, assuming a Class II parcel of commercial property with an appraised value of $400,000 and, therefore, an assessed value of $80,000 ($400,000 x 0.20 assessment ratio); excluding any applicable exemptions allowed by law; and, considering that millage rates vary from one taxing authority to another (with the exception of the State rate, which always is 6.5 mills), the following is an example of a basic computation of tax levies based on the millage rates shown:

| Taxing Authority | Mills x Assessed Value | = | Tax Levy |
|---|---|---|---|
| State (6.5 mills) | 0.0065 x $80,000 | = | $   520 |
| County (14.5 mills) | 0.0145 x $80,000 | = | $ 1,160 |
| Municipality (5 mills) | 0.0050 x $80,000 | = | $   400 |
| School District (2 mills) | 0.0020 x $80,000 | = | $   160 |
| Total Tax Bill | | | $ 2,240 |

Given that the "Lid" (or maximum aggregate tax levy) on Class II commercial property is 1.5% (0.015) of appraised (fair and reasonable market) value, the total amount of taxes that may be levied in any one year by all taxing authorities on such property is $6,000 ($400,000 x 0.015). Therefore, the "lid" does not affect the total levy in the hypothetical depicted above.

In the unlikely event those lids should be exceeded, the amount of taxes must be reduced by subtracting the amount that is in excess, and prorating the decrease

among all applicable taxing authorities.[431]

---

[431] *See* Ala. Const. art. XI, § 217(i) (1901), *added by* amend. 325 (*ratified* June 8, 1972), *amended by* amend. 373 (*ratified* Nov. 20, 1978), providing in pertinent part:

> Whenever the total amount of ad valorem property taxes otherwise payable by any taxpayer with respect to any item of taxable property shall exceed in any one ad valorem tax year the maximum amount of such taxes permitted by this section, such amount of taxes shall be reduced by subtracting that amount of tax due that is in excess of the amount of tax otherwise permissible under the Constitution.   In connection with the taxation of any item of taxable property, the amount of tax to be subtracted with respect to each authority levying and collecting any ad valorem property tax shall be in the same proportion to the total amount of tax to be subtracted that the total number of mills on each dollar of taxable property situated in the taxing authority levied by such taxing authority bears to the total number of mills on each dollar of taxable property situated in the taxing authority levied by all taxing authorities with respect to such item of taxable property.  . . .

*Id.*; s*ee also* Ira W. Harvey, *A History of Educational Finance in Alabama* 470-71 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**") ("If the sum of all state and local ad valorem taxes exceeds the ceiling allowable, then those taxes must be reduced.  For example, a piece of Class I property valued at $1,000 and assessed at 30% or $300 still cannot be taxed in excess of 2% or $20.  If however, a total state and local ad valorem millage of 100 mills is levied, the tax bill is $30 ($300 x .10).  This excess tax of $10 must be reduced by that amount.  Reductions in taxes due are prorated back to each taxing authority in proportion to its millage as compared to the total millage levied, whether state or local.").

201

[this page intentionally left blank]

## G.    Summary of Predecessor Litigation

> *The life of the law has not been logic.  It has been experience.*
> *. . . The law embodies the story of a nation's development through*
> *many centuries, and it cannot be dealt with as if it contained only the*
> *axioms and corollaries of a book of mathematics.  In order to know*
> *what it is, we must know what it has been, and what it tends to*
> *become.  We must alternately consult history and existing theories of*
> *legislation.  But the most difficult labor will be to understand the*
> *combination of the two into new products at every stage.*

Oliver Wendell Holmes, Jr.[432]

The issues of this action are influenced by several lines of cases.  The oldest, but still influential line is identified by the name of the Supreme Court's most significant decision of the past century:  *Brown v. Board of Education*, 347 U.S. 483 (1954), *overruling in part Plessy v. Ferguson*, 163 U.S. 537 (1896).  The second progression addresses the school financing cases leading up to, and including, Alabama's so-called "Equity Funding litigation."  The third line includes the judgment of the three-judge district court in *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971), which precipitated Amendments 325 and 373 to the 1901 Alabama Constitution.  The final line, and the one most proximate to the present action, both temporally and in terms of a common nucleus of operative facts, is the litigation commenced in this District during 1983, and ending with the Eleventh Circuit's decision in *Knight v. Alabama*,

---

[432] Holmes, *The Common Law* 1-2 (Boston:  Little, Brown, and Co. 1881). S*ee also*, *e.g.*, William Shakespeare, *The Tempest* act 2, sc. 2, line 254 ("What's past is prologue.") (quotation engraved on the National Archives Building in Washington, D.C.).

476 F.3d 1219 (11th Cir. 2007).  Even though hindsight does not ensure an unerring

perception of contemporary issues, it is helpful to trace from whence the present action

has come in order to better assess the merits of the parties' claims and defenses.

### 1.    *Brown v. Board of Education* **and its Progeny**

The Supreme Court's decision in *Brown v. Board of Education* cannot be

appreciated except by contrasting it to the judgment it partially overruled, *Plessy v.

Ferguson*, 163 U.S. 537 (1896).  Consequently, discussion of this line of cases actually

begins fifty-eight years before the first *Brown* opinion.

### a.    *Plessy v. Ferguson*

The *Plessy* case addressed the constitutionality of a Louisiana statute that

mandated separate railway carriages for members of the "white and colored races."[433]

The law required all railway companies operating within that state to provide "equal

but separate accommodations" for each race, and to prohibit members of one race from

riding in seats set apart for members of the other.[434]  Passengers who insisted upon

occupying seats other than those assigned to persons of their own race were subject

to fines and imprisonment, as were any railroad employees who assigned a passenger

to a seat other than one set aside for that person's race.[435]  Homer Plessy was arrested

---

[433] *Plessy v. Ferguson*, 163 U.S. 537, 540 (1896).

[434] *Id.*

[435] *Id.* at 541.

204

pursuant to that law for refusing to ride in the "colored only" section of an *intrastate* train.[436]

A New Orleans group of Creoles and blacks who had organized themselves as the "Citizens' Committee to Test the Constitutionality of the Separate Car Law" orchestrated the incident in order to produce a "test case" to challenge the statute, which was but one example of the "Jim Crow laws" then being passed in Louisiana and other parts of the South as white supremacists sought to embellish their subjugation of persons with African ancestors.[437]   Their challenge enjoyed some support from the railroads, which objected to the additional costs of providing separate cars.   Homer Plessy agreed to initiate the challenge on behalf of the committee. Although he appeared to be white, Plessy was classified as "colored" under Louisiana law because one-eighth of his biological heritage was African.[438]

A Louisiana Supreme Court decision handed down prior to Plessy's arrest had held that the state statute could not apply to railway carriages moving in *interstate* commerce.[439]   Plessy therefore was careful to purchase a ticket for an *intrastate*

---

[436] *Id.*

[437] *See*, *e.g.*, Walter F. Pratt, Jr., "Plessy v. Ferguson," in *The Oxford Companion to the Supreme Court of the United States* 637 (New York:  Oxford University Press 1992) (Kermit L. Hall, James W. Ely, Jr., Joel B. Grossman & William M. Wiecek eds.) ("**Oxford Sup. Ct. I**").

[438] In the racist parlance common at that time, Plessy was called an "Octoroon," a person who was by descent seven-eighths Caucasian and one-eighth African.  *Plessy*, 163 U.S. at 541.

[439] *Id.* at 546.

205

journey, entirely within the State of Louisiana, and he also ensured in advance that both the railroad company and the conductor on his train knew of his mixed-race heritage.  He was arrested when he refused to move to the "colored only" section of the coach.  Plessy attempted to halt the subsequent criminal prosecution by arguing that the state statute was unconstitutional under both the Thirteenth and Fourteenth Amendments to the United States Constitution.  After the Louisiana courts rejected his arguments, he sought review by the United States Supreme Court.

Justice Henry Billings Brown, who authored the majority opinion for seven members of the Court,[440] passed quickly over Plessy's argument that the Louisiana statute violated the Thirteenth Amendment by construing it as prohibiting only "slavery," as that institution was known prior to the Civil War, and other forms of involuntary servitude, "of whatever class or name," except as punishment for crime.[441]

---

[440] The *Plessy* appeal was decided by a vote of 7 to 1:  Brown for the Court; Justice John Marshall Harlan in dissent; and Justice David Josiah Brewer not participating.

[441] *Id.* at 542.  The Thirteenth Amendment provides:  "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII, § 1 (1865).  Justice Brown's majority opinion construed that language as follows:

This amendment was said in the *Slaughter-House Cases*, [83 U.S. (16 Wall.) 36 (1872)], to have been intended primarily to abolish slavery, as it had been previously known in this country, and that it equally forbade Mexican peonage or the Chinese coolie trade, when they amounted to slavery or involuntary servitude, and that the use of the word "servitude" was intended to prohibit the use of all forms of involuntary slavery, of whatever class or name.  It was intimated, however, in that case, that this amendment was regarded by the statesmen of that day as insufficient to protect the colored race from certain laws which had been enacted in the Southern states,

When addressing Plessy's argument that the Louisiana statute violated the Fourteenth Amendment, Brown's majority opinion conceded that the amendment was designed to "enforce the absolute equality of the two races *before the law*," but immediately distinguished that objective from "distinctions based upon color," and denied that the amendment had been intended to eradicate *social* prejudices, or to compel "commingling of the two races upon terms unsatisfactory to either."[442] The

---

imposing upon the colored race onerous disabilities and burdens, and curtailing their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value; and that the fourteenth amendment was devised to meet this exigency.

So, too, in the *Civil Rights Cases*, 109 U. S. 3, 3 Sup. Ct. 18 [(1883)], it was said that *the act of a mere individual*, *the owner of an inn*, a public conveyance *or place of amusement*, refusing accommodations to colored people, cannot be justly regarded as imposing any badge of slavery or servitude upon the applicant, but only as involving an ordinary civil injury, properly cognizable by the laws of the state, and presumably subject to redress by those laws until the contrary appears. "It would be running the slavery question into the ground," said Mr. Justice Bradley, "to make it apply to every act of discrimination which a person may see fit to make *as to the guests he will entertain*, *or as to the people he will* take into his coach or cab or car, or *admit to his concert or theater*, *or deal with in other matters of intercourse or business*."

A statute which implies merely a legal distinction between the white and colored races — a distinction which is founded in the color of the two races, and which must always exist so long as white men are distinguished from the other race by color — has no tendency to destroy the legal equality of the two races, or re-establish a state of involuntary servitude. . . .

*Plessy*, 163 U.S. at 542-43 (majority opinion) (emphasis supplied).

[442] *Id*. at 544 ("The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either.").

207

majority opinion also rejected the claim that the Louisiana statute stamped blacks with "a badge of inferiority," saying that:  "If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it."[443]

The lone dissenter in *Plessy*, Justice John Marshall Harlan, chastised the majority for their dismissal of the Fourteenth Amendment as a barrier to racial segregation imposed by state law.  Justice Harlan believed that the Thirteenth, Fourteenth, and Fifteenth Amendments had, together, "removed the race line from our governmental systems," and no longer allowed "any public authority to know the race of those entitled to be protected in the enjoyment" of constitutional rights.[444]  Justice Harlan emphasized those points in some of the most eloquent statements in the history of American Constitutional law:  *i.e.*,

> [I]n view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens.  There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens.  In respect of civil rights, all citizens are equal before the law.  The humblest is the peer of the most powerful.  The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved.  It is therefore to be regretted that this high tribunal, the final expositor of the fundamental law of the land, has reached the conclusion that it is competent for a state to regulate the enjoyment by citizens of

---

[443] *Id*. at 551.

[444] *Id*. at 555, 554 (Harlan, J., dissenting).

208

their civil rights solely upon the basis of race.

> In my opinion, the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the Dred Scott Case.[445]

Harlan's prediction was correct. The majority opinion sanctioning the doctrine of "separate but equal" did become a pernicious jurisprudential pestilence: one that spread like a cancer to all facets of society — schools, hotels, restaurants, public restrooms and water fountains, recreational facilities, businesses, housing — and into all aspects of the lives of Americans of African descent, especially those residing within the eleven states of the former Confederacy. Perhaps the most iniquitous effect of the *Plessy* doctrine over the course of the succeeding fifty-eight years, however, lay in that part of the majority opinion linking segregation on trains with that in public schools:

> Laws permitting, and even requiring, [the] separation [of blacks from whites], in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. *The most common instance of this is connected with the establishment of separate schools for white and colored children, which have been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced.*[446]

---

[445] *Id.* at 559 (Harlan, J., dissenting).

[446] *Plessy*, 163 U.S. at 544 (Brown, J., majority opinion) (bracketed alterations and emphasis

Fifty-eight long, hard, and often violent years passed before Justice Harlan's statements in dissent began to have a substantive effect upon the Supreme Court's interpretation of the Reconstruction Amendments. During the interim, the heart of the "Jim Crow" system endorsed by the majority opinion in *Plessy*, and the institution most central to its functioning, was the segregated public school system. Peter Irons described its corrosive effects as follows:

> The consignment of black children to separate schools kept them "in their place" and safely away from white children, especially girls, who might not realize that black males — even at the grade-school level — might threaten the "purity" of the young "flowers of southern womanhood." The combined power of racial prejudice and sexual phobia should not be underestimated as a motivating factor in the southern insistence on school segregation. But an equally important reason for maintaining separate schools was to make it simpler to provide a separate curriculum for black children, one that would provide the rudiments of literacy and training for manual labor and domestic service. There was no need to educate blacks in literature, foreign languages, or advanced mathematics, or to encourage them to aspire to higher education. White southerners did recognize the need for "normal schools" to train black teachers, but

supplied). As one student of the opinion observed:

> By linking racial separation on trains with that in education, [Justice Brown's opinion for the majority] touched one of the most sensitive parts of the efforts to maintain separation of the races. Education was a bugbear for anyone who suggested legislation mandating racial equality. Brown therefore sought to support his conclusion by implying that transportation was like education. The enduring effect of Brown's analogy was to place the Court's imprimatur on a considerably expanded field in which segregation was justified.

Charles A. Lofgren, "Plessy v. Ferguson," in *The Oxford Companion to the Supreme Court of the United States* 739-40 (New York:  Oxford University Press 2d ed. 2005) (Kermit L. Hall, James W. Ely, Jr. & Joel B. Grossman eds.) ("**Oxford Sup. Ct. II**") (bracketed alterations supplied).

210

these postsecondary schools were hardly "colleges" with a full curriculum in the liberal arts and sciences.  The governor of Georgia expressed a common attitude toward the efforts of northern philanthropists to establish black colleges:  "We can attend to the education of the darkey in the South and give them the education they most need.  I do not believe in the higher education of the darkey.  He must be taught the trades.  When he is taught the fine arts, he is educated above his caste, and it makes him unhappy."

Many blacks, even those with little or no education, were unhappy that their children were forced to attend segregated schools, many of them housed in churches or private homes, and most lacking desks and books for each student.  The children sat on benches, crowded together, and shared tattered, hand-me-down books that had been discarded by white schools.  The Jim Crow schools were "public" in name only, and often received so little funding from county school boards that hard-strapped parents had to "board" the teachers to supplement their meager salaries. . . .[447]

### b.    *Brown v. Board of Education*

The Supreme Court's 1954 decision under the style of *Brown v. Board of Education of Topeka*, *Shawnee County*, *Kansas*, 347 U.S. 483 (1954) ("*Brown I* "), *overruling in part Plessy v. Ferguson*, 163 U.S. 537 (1896), actually involved consolidated consideration of constitutional challenges to the segregated public school systems in four states,[448] as well as the District of Columbia.[449]

---

[447] Peter Irons, *Jim Crow's Children:  The Broken Promise of the* Brown *Decision* 12 (London:  Penguin Books 2004) ("**Irons**").

[448] The cases that were consolidated for decision by the opinion in *Brown* arose from the states of Kansas, South Carolina, Virginia, and Delaware.  *See Brown I*, 347 U.S. 486 & n.1.

[449] The companion case decided the same day as *Brown* — *Bolling v. Sharpe*, 347 U.S. 497 (1954) — addressed the segregated public school system in the District of Columbia.

In each of the cases, minors of the Negro race, through their legal representatives, [sought] the aid of the courts in obtaining admission to the public schools of their community on a nonsegregated basis. In each instance, they [had] been denied admission to schools attended by white children under laws requiring or permitting segregation according to race. This segregation was alleged to deprive the plaintiffs of the equal protection of the laws under the Fourteenth Amendment. In each of the cases other than the Delaware case, a three-judge federal district court denied relief to the plaintiffs on the so-called "separate but equal" doctrine announced by this Court in *Plessy v. Ferguson*, 163 U.S. 537. *Under that doctrine, equality of treatment is accorded when the races are provided substantially equal facilities, even though these facilities be separate.* In the Delaware case, the Supreme Court of Delaware adhered to that doctrine, but ordered that the plaintiffs be admitted to the white schools because of their superiority to the Negro schools.

*Brown I*, 347 U.S. at 487-88 (alterations and emphasis supplied).

The plaintiffs in the four state cases consolidated under the style of *Brown v. Board of Education* did not focus their claims on the fact that, in most of the segregated school systems of Southern states, there was no pretense of compliance with *Plessy's* requirement that "substantially equal facilities" be provided to black children, even though they easily could have established such a claim, because black schools were uniformly under-financed, poorly staffed, and woefully maintained, compared to the white schools.[450]

---

[450] *See, e.g.*, Irons at 33 ("In the Jim Crow states that stretched from Delaware to Texas, local school boards spent almost three times as much on each white student as they did on blacks. The funding disparities in the Deep South states, where blacks outnumbered whites in hundreds of rural counties, were far greater. Alabama spent $37 on each white child in 1930 and just $7 on those who were black; in Georgia the figures were $32 and $7, in Mississippi they were $31 and $6, and those in South Carolina were $53 and $5, a disparity of more than ten to one.").

Instead, the plaintiffs in the consolidated state cases founded their challenges on the Fourteenth Amendment, and argued that "segregated public schools are not 'equal' and cannot be made 'equal,' and . . . hence [black children were] deprived of the equal protection of the laws." *Id*. at 488 (alteration supplied).[451]  The question thus presented was framed by the Supreme Court as follows: "Does segregation of children in public schools solely on the basis of race, *even though the physical facilities and other 'tangible' factors may be equal*, deprive the children of the minority group of equal educational opportunities?"  *Id*. at 493.

Because of the obvious importance of the question presented, the Court took jurisdiction.  The cases were argued together before the Supreme Court in December 1952, and then reargued by order of the Court a year later, in December of 1953, on specific questions propounded by the Court — particularly the historical circumstances surrounding the adoption and ratification of the Fourteenth Amendment.[452]

---

[451] Of course, the Fourteenth Amendment applies only to the states and, thus, was not available as a basis for the challenge to the segregated public schools in the District of Columbia. Even so, Chief Justice Warren, again writing for a unanimous court, held that the Due Process Clause of the Fifth Amendment contained an equal protection "component" that *implicitly* forbid most racial discrimination by the federal government, just as the Equal Protection Clause of the Fourteenth Amendment restricted the states.  Such an embellishment of the Fifth Amendment's content was necessitated by the Court's decision in *Brown I*, holding that states could not segregate public schools on the basis of race.  As Chief Justice Warren said, the imposition of "a lesser duty" in the District of Columbia, where the Fifth Amendment covered Congressional action, would be "unthinkable."  *Bolling*, 347 U.S. at 500.

[452] *See Brown I*, 347 U.S. at 488-89.

When Chief Justice Earl Warren announced on May 17, 1954 the brief, nontechnical opinion he had authored for a unanimous Court, he began by observing that the historical evidence relating to the intent of Congress and the state ratification debates, as that evidence might shed light upon the meaning of the Equal Protection Clause of the Fourteenth Amendment as it related to segregated schools, was at best "inconclusive."[453]  Accordingly, said the Chief Justice:

> In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy v. Ferguson* was written. *We must consider public education in the light of its full development and its present place in American life throughout the Nation.*  Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws.
>
> Today, education is perhaps the most important function of state and local governments.  Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society.  It is required in the performance of our most basic public responsibilities, even service in the armed forces.[454]  It is the very foundation of good citizenship.  Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.  In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.  *Such an opportunity*, *where the state has undertaken to provide it*, *is a right which must be made available to all on equal terms*.

---

[453] *See id.*

[454] *See*, *e.g.*, Wayne Flynt, *Alabama in the Twentieth Century* 377 (Tuscaloosa:  The University of Alabama Press 2004) ("**Flynt II**") (observing that, even though nearly 80,000 Alabama men served in the military during the First World War, many more than that number were rejected for service because of "failure to pass a simple intelligence test").

*Brown I*, at 493-93 (emphasis supplied).

Viewed in that light, the Court concluded that, "in the field of public education the doctrine of 'separate but equal' has no place.  Separate educational facilities are inherently unequal."  *Id*. at 495.[455]

Having thus established that segregated public education facilities were

---

[455] In reaching the conclusion that "[s]eparate educational facilities are inherently unequal," the Court held that "intangible considerations," similar to those that had supported its decisions in the cases raising Fourteenth Amendment challenges to segregated facilities in graduate and professional schools — *e.g.*, *McLaurin v. Oklahoma State Regents for Higher Education*, 339 U.S. 637 (1950) (holding that a black admitted to a white graduate school must not be segregated from all other students, because to do so would deprive him of the "ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession"), and *Sweatt v. Painter*, 339 U.S. 629 (1950) (holding that a segregated law school for blacks could not provide equal educational opportunities, because it deprived them of "those qualities which are incapable of objective measurement but which make for greatness in a law school") — applied with equal, *or*

> *added force* to children in grade and high schools.  To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.  The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:
>
>> "Segregation of white and colored children in public schools has a detrimental effect upon the colored children.  The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group.  A sense of inferiority affects the motivation of a child to learn.  Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system."

*Brown I*, 347 U.S. at 494 (emphasis supplied, footnote omitted).

215

unconstitutional, the Court was then faced with the difficult questions of how, and at what pace, relief should be provided to the prevailing parties. If the Court had ordered all public schools to be integrated the following Fall, there was the risk that its decree would be ignored in many areas, or that violence might erupt. Furthermore, the Court explicitly observed that, "because of the wide applicability of [its] decision, and because of the great variety of local conditions, the formulation of [remedial] decrees [presented] problems of considerable complexity."[456]  Accordingly, the cases were restored to the Court's docket, and counsel were directed to brief and present further argument on specific questions propounded by the Court bearing on the formulation of remedial decrees.[457]

　　During reargument the following Term, Thurgood Marshall, then counsel for

---

[456] *Id.* at 495.

[457] *Id.* at 495 n.13.  Another reason for not directly confronting the scope of the relief to be ordered in the first *Brown* opinion has been suggested by Dennis J. Hutchinson:

> When *Brown* was first argued in 1952, the Court internally was divided not so much on the merits but on how, and at what pace, to order relief.  The Court remained at loggerheads over the issue during the summer of 1953 when fate intervened.  Chief Justice Fred Vinson, who wrote *Sweatt* [*v. Painter*, 339 U.S. 629 (1950),] and *McLaurin* [*v. Oklahoma State Regents for Higher Education*, 339 U.S. 637 (1950),] but hesitated to require massive desegregation, died suddenly.  His replacement, Earl Warren, responded to the situation by convincing his colleagues to decide the merits in one opinion and to defer the question of relief to a second opinion following reargument.

Dennis J. Hutchinson, "Brown v. Board of Education," in Oxford Sup. Ct. II, at 111 (bracketed alterations supplied); s*ee also* Dennis J. Hutchinson, *Unanimity and Desegregation*, 68 Geo. L.J. 1, 36-44 (1979).

the Legal Defense and Education Fund, Inc., of the National Association for the Advancement of Colored People, and later Associate Justice of the Supreme Court, urged the Court to order that desegregation of all public school systems should proceed immediately, or at least within firm deadlines.  The Court did neither, however.  Apparently fearing hostility and even violence if the NAACP's proposals were adopted, the Court remanded the hard questions to lower courts.  Those courts were instructed to require that the defendants in each case "make a prompt and reasonable start toward full compliance with" the Court's ruling in the first *Brown* opinion, but once initial steps were taken, the Court provided little guidance to the lower courts in its second *Brown* opinion, other than admonishing those courts to apply "equitable principles," and, "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis *with all deliberate speed* the parties to these cases."  *Brown v. Board of Education*, 349 U.S. 294, 299-301 (1955) ("*Brown II* ") (emphasis supplied).

### c.   Overcoming the South's campaign of "massive resistance"

The directive for lower courts to dismantle segregated public school systems "with all deliberate speed" surely is among the least-happy utterances in American constitutional law.  The phrase provided an interstitial space into which racist

217

demagogues throughout the Nation, but especially those hate-mongers residing within the eleven states comprising the former Confederacy, drove obstructive wedges. Southern states used every imaginable technique to resist desegregation.

> Violence. Intimidation. Anguished alarms about social and sexual mingling. Emotional appeals to the Cause of the Confederacy. Raising the specter of communism. These were among the many southern white reactions to *Brown* and *Brown II*. But opponents of change in the South believed after *Brown II* that they had to do four things: litigate, organize at the local level, agree on a sectionwide statement of resistance, and — most important — devise strategies for assignment of students that would satisfy the federal courts without giving away anything of substance.[458]

Governor Orville Faubus and the Arkansas state legislature sanctioned mob opposition to the integration of Central High School in Little Rock at the beginning of the 1957 school year by asserting that the state was not bound by the Supreme Court's rulings in the *Brown* cases. The state's officials had to be re-educated that, under the Supremacy Clause (U.S. Const. art. VI, cl. 2), "the federal judiciary is supreme in the exposition of the law of the Constitution," *Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (quoting *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 177 (1803)), a legal point that was forcefully driven home by President Eisenhower's executive orders federalizing the Arkansas National Guard and dispatching units of the 101st Airborne Division to Little Rock.

---

[458] James T. Patterson, Brown v. Board of Education:  *A Civil Rights Milestone and Its Troubled Legacy* 94 (New York:  Oxford University Press 2001).

Some Southern school systems simply closed their doors. That occurred in Prince Edward County, Virginia, in 1959, when all public schools were closed, but a "private school foundation" was established for white students. While initially maintained by state funds, the foundation was eventually financed by private contributions. Most of the black school-age children, who constituted 52 percent of the students in Prince Edward County, received no formal education between 1959 and 1964, when the Supreme Court finally held in *Griffin v. County School Board of Prince Edward County*, 377 U.S. 218 (1964), that it was unconstitutional for one county to close its schools under state law while other schools in the state remained open.

As a result of such resistance, very little desegregation actually occurred during the first decade after *Brown*. In Alabama, not one black child attended a public school with a white child during the 1962-63 school year.[459] In the South, just 1.2% of black school-age students were attending schools with whites.[460] During that period, some Southern school boards adopted so-called "freedom of choice" plans that allowed students to choose the school where they would enroll, with the result of continued segregation. In 1968, however, the Court held that the adoption of such plans did not

---

[459] Michael Klarman, Brown*, Racial Change, and the Civil Rights Movement*, 80 Va. L. Rev. 7, 9 (1994) ("**Klarman**").

[460] *Id.*

satisfy the obligations of a school systems that had been segregated as a matter of law (*de jure* systems) if the plan failed to decrease, if not eliminate, the racial imbalance within that system. *See Green v. County School Board of New Kent County*, 391 U.S. 430, 441 (1968). Instead, the Court required education officials to take affirmative steps to transform their "dual" K-12 educational systems into "unitary" ones in which "racial discrimination would be eliminated root and branch."[461] The Court noted that the racial identification of public schools as either historically (or predominantly) white or black facilities extended to every facet of the system, including not only the racial composition of each school's student body, but also the faculty, staff, transportation facilities, extracurricular activities, and physical facilities.[462] The Court charged the school board with the duty to produce an affirmative desegregation plan "that promises realistically to work, and promises realistically to work *now*."[463]

Persistent efforts at desegregation ultimately had an impact. The *Green* decision was followed by a nationwide wave of litigation and extensive, court-ordered desegregation plans addressing the racial identifiability of individual schools, as well as the other factors identified by the Court. *See*, *e.g.*, *Swann v. Charlotte-Mecklenburg*

---

[461] *Green*, 391 U.S. at 437-38.

[462] *Id.* at 435.

[463] *Id.* at 439 (emphasis in original).

*Board of Education*, 402 U.S. 1 (1971) (Mecklenburg County, North Carolina);[464]

*Keyes v. Denver School District No. 1*, 413 U.S. 189 (1973) (Denver, Colorado).[465]

By 1972-73, 91.3% of Southern schools were desegregated.[466]

Erwin Chemerinsky, the Dean of the University of California, Irvine School of Law, explained the nature of the issues subsequently faced by the Court in a perceptive article.

> But much more difficult issues faced the Supreme Court in the early 1970s [than continued resistance by elected officials in Southern states]. White flight to suburban areas — in part, to avoid school desegregation and, in part, as a result of a larger demographic

---

[464] The school district implicated in the *Swann* case was a sprawling, part-urban, part-rural, district that covered 550 square miles and served 84,000 pupils in 101 schools. The student population was 29% black, but those students were concentrated in one quadrant of the district. In the wake of the Supreme Court's *Green* decision, the federal district court — in an effort to attain a 71-to-29 white-to-black ratio in the various schools of the district — adopted a plan to disperse the highly-concentrated black-student population under a program that transported 13,000 children in more than 100 new buses at an annual operating cost of more than $500,000, and a startup cost of more than $1 million. The Supreme Court unanimously approved the busing remedy. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 30 (1971) ("Desegregation plans cannot be limited to the walk-in school."). Even so, the Court also observed that the "constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole," but, nevertheless, affirmed that "the very limited use of mathematical ratios was within the equitable remedial discretion of the District Court." *Id.* at 24-25.

[465] *Keyes* was the first non-Southern desegregation case to be reviewed by the Supreme Court. The court's opinion held that a school district that "racially or ethnically" segregated one part of a large urban district created a rebuttable presumption that similar segregation throughout the district was not "adventitious," and implied that wholesale, districtwide relief under *Swann* was appropriate. The opinion was generally "viewed as a greenlight for districtwide (if not necessarily interdistrict) desegregation of northern school districts," and "ambiguously signaled *Green's* application to *de facto* segregation in the North, but also indicated growing fissures within the Court over the issue." Dennis J. Hutchinson, "Keyes v. Denver School District No. 1," in Oxford Sup. Ct. II at 558-559.

[466] Klarman, at 10.

phenomenon—endangered successful desegregation.  In virtually every urban area, the inner city is predominately and increasingly, comprised of racial minorities.  By contrast, the surrounding suburbs are almost exclusively white and what little minority population does reside in the suburbs is concentrated in towns that are almost exclusively black. School district lines parallel town borders, meaning that the racial separation of cities and suburbs results in segregated school systems.  For example, by 1980, whites constituted less than one-third of the students enrolled in public schools in [the inner-city systems of] Baltimore, Dallas, Detroit, Houston, Los Angeles, Miami, Memphis, New York, and Philadelphia.

*Thus, by the 1970s it was clear that effective school desegregation required interdistrict remedies.*  There were simply not enough white students in most major cities to achieve desegregation.  Likewise, suburban school districts could not be desegregated via intradistrict remedies because of the scarcity of minority students in the suburbs.  As Professor Smedley explains:

> Regardless of the cause, the result of this movement [of whites to suburban areas] is that the remaining city public school population becomes predominately black.  When this process has occurred, no amount of attendance zone revision, pairing and clustering of schools, and busing of students within the city school district could achieve substantially integrated student bodies in the school, because there are simply not enough white students left in the city system.[467]

Moreover, efforts to desegregate inner cities, through intradistrict remedies, are often counter-productive because they encourage white-flight.  Desegregation of central city schools frequently encourages whites to flee to suburban areas, making desegregation even more difficult.

---

[467] Theodore Smedley, *Developments in the Law of School Desegregation*, 26 Vand. L. Rev. 405, 412 (1973).

By the 1970s, *the crucial issue — perhaps the single most important issue since* Brown *in achieving desegregation — was whether courts could fashion interdistrict remedies*.  By then it was clear that desegregating urban schools by relying solely on intradistrict solutions is simply impossible.

*Also, by the 1970s, it was clear that to make equal educational opportunity a reality, the Court had to address inequities in school funding*.  A series of reports and books in the early 1970s documented the enormous inequalities in educational expenditures.  In 1971, the National Educational Financing Project issued its report.  The report revealed that local property taxes are the primary source of funds for schools in the United States.  *The result is that wealthy suburban areas have far more to spend on education*, *with lower property tax rates*, *than poorer inner-city areas can spend*, *even with higher tax rates*. . . .

. . . .

By 1971, it was recognized that the *inequities in school funding correlated strongly to race*.  *As a result, achieving racial equality in education necessitated equalizing expenditures*.  Inadequate resources means that poorer, predominately black, inner city districts hire less qualified teachers and have significantly higher teacher-pupil ratios.  The separation of school districts along political boundary lines has created wealthy schools for whites and comparatively inadequate schools for African-Americans and Hispanics.  Hence, again, the 1970s were sure to be a critical juncture in the judicial effort to create equal educational opportunity as the Supreme Court was virtually certain to decide a case on the issue.

Also, it was clear that in the 1970s the Court would need to address the issue of segregation in northern city school systems.  Until then, cases involved school systems where segregation had been mandated by law.  Northern city school systems often were just as segregated, but not as a result of laws mandating separation of the races.  Racially separate residential housing patterns, which themselves frequently reflected discriminatory government policies, caused racial

separation in schooling.  Likewise, attendance zones within school districts often caused segregation.  A critical question was how the Court was going to deal with such *de facto* segregation.

All of these issues — the permissibility of interdistrict remedies; the constitutionality of inequities in school funding; the standard for evaluating *de facto* segregation — realistically could not have come before the Court much before the 1970s.  Thus, this was certain to be a crucial time in the battle for equalizing education.

As the Supreme Court entered the 1970s, two things were certainly clear.  First, effective equalization of educational opportunity would come only through the judiciary.  No legislature in the country adopted laws to desegregate schools.  The political realities were such that all of the legislative action was in the opposite direction.  Racial minorities lacked political clout to secure legislation for desegregation and there was insufficient political support among whites for such legislation.  *Nor was there any likelihood the school expenditures would be equalized via legislative action.  Equalizing schooling necessitated court action and if the judiciary failed, no other institution was likely to do much*.

Second, by the 1970s it was apparent that eliminating the vestiges of segregation and equalizing schooling would require a long-term effort.  Jim Crow laws existed for almost a century; their effects could not be erased in a few years or even a decade.[468]

The first issue identified by Dean Chemerinsky in the article quoted above — the question of whether courts could fashion interdistrict remedies — was addressed by the Supreme Court in the case of *Milliken v. Bradley*, 418 U.S. 717 (1974), discussed in the following subsection.  The second issue — the need for a more

---

[468] Erwin Chemerinsky, *Lost Opportunity:  The Burger Court and the Failure to Achieve Equal Educational Opportunity*, 45 Mercer L. Rev. 999, 1005-08 (1994) (emphasis supplied, most footnotes omitted) ("**Chemerinsky III**").

equitable allocation of school funds — was the focus of *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1972), discussed in the next Part of this opinion, Part II(G)(2), addressing the subject of "School Finance Litigation."

### d.   *Milliken v. Bradley* and the issue of interdistrict desegregation remedies

> [W]e *deal here with the right of all of our children, whatever their race, to an equal start in life and an equal opportunity to reach their full potential as citizens. Those children who have been denied that right in the past deserve better than to see fences thrown up to deny them that right in the future. Our nation, I fear, will be ill served by the Court's refusal to remedy separate and unequal education, for unless our children begin to learn together, there is little hope that our people will ever learn to live together.*
>
> *Milliken v. Bradley*, 418 U.S. 717, 783 (1974) (Marshall, J. dissenting).

In *School Board of Richmond v. State Board of Education*, 412 U.S. 92 (1973), an equally divided Court was unable to decide whether a district court could require the merger of three school districts in order to eliminate racial segregation in one.[469]

---

[469] Justice Lewis Powell did not participate in the *Richmond* case, because he had chaired the Richmond School Board from 1952 to 1961:  a position that required him to assist in the desegregation of the school district in the aftermath of the *Brown* decisions.  *See* Jeffrey S. Sutton, San Antonio Independent School District v. Rodriguez *and its Aftermath*, 94 Va. L. Rev. 1963, 1969 (2008) (citing John C. Jeffries Jr., *Justice Lewis F. Powell, Jr*. 139-60 (Bronx, N.Y.:  Fordham University Press 2001) (1994)).

The result of the Court's inability to decide the appeal was to affirm the judgment of the Fourth Circuit in *Bradley v. School Board of Richmond*, 462 F.2d 1058 (4th Cir. 1972) (*en banc*), *rev'g,* 338 F. Supp. 67 (E.D. Va.), and holding that when it became clear that state-imposed, *de jure* segregation had been removed, further intervention by the district court was neither necessary nor justifiable; and, in the absence of any constitutional violation in the establishment and maintenance of three school districts in Richmond, or any unconstitutional consequences of such maintenance, it was not within the district judge's authority to order consolidation of separate political subdivisions of the Commonwealth of Virginia.

One year later, however, in the case of *Milliken v. Bradley*, 418 U.S. 717 (1974), the Court confronted a district court opinion finding that the Detroit Public School System, in which blacks constituted a majority of the students enrolled in the various school facilities,[470] had engaged in segregative practices, and concluding that the only way to achieve a "unitary" (racially integrated) school system was to order 53 surrounding, suburban school districts to participate in the busing of students.[471]  On appeal, the Sixth Circuit affirmed, saying that "any less comprehensive a solution than a metropolitan plan would result in an all-black system immediately surrounded by practically all-white suburban school systems."[472]  The court of appeals held that, since "school district lines are simply matters of political convenience . . . they may not be used to deny constitutional rights."[473]

---

[470] *See* Dennis J. Hutchinson, "Milliken v. Bradley," in Oxford Sup. Ct. II at 638 ("The Detroit school district, then fifth largest in the nation, covered 140 square miles; at the time of the suit in 1970, its school population of almost 290,000 was 65 percent black and 35 percent white — a substantial recent growth in black population owing to white flight to nearby suburbs; for the metropolitan area, the proportion of black to white student population was 19 to 81 percent."); *Milliken*, 418 U.S. at 799-800 (Marshall, J., dissenting).

[471] *See Bradley v. Milliken*, 338 F. Supp. 582 (E.D. Mich. 1971), *aff'd*, 484 F.2d 215 (6th Cir. 1973), *rev'd*, 418 U.S. 717 (1974).

[472] *Milliken v. Bradley*, 484 F.2d 215, 245 (6th Cir. 1973), *rev'd*, 418 U.S. 717 (1974).

[473] *Id.* at 244.  The Supreme Court's majority opinion began by acknowledging this principle, but quickly drew a distinction between that general proposition and the Detroit metropolitan-area-wide desegregation remedy, saying:

> Of course, no state law is above the Constitution.  School district lines and the present laws with respect to local control, are not sacrosanct and if they conflict with the Fourteenth Amendment federal courts have a duty to prescribe appropriate remedies. . . .  But our prior holdings have been confined to violations and remedies

On further appeal, "a bitterly divided" Supreme Court ruled 5 to 4 that "segregative practices in one district did not warrant relief that included another nonsegregating district."[474]  In an opinion by Chief Justice Burger, the Court reasoned that suburban school districts could not be included in the desegregation plan in the absence of proof that the suburban districts had committed independent constitutional violations, and held that the metropolitan-wide desegregation remedy violated the equitable principle that "the scope of the remedy is determined by the nature and extent of the constitutional violation."[475]  The Court declared that, if it were to approve the remedy ordered by the district court, that would "impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy."[476]  In other words, the Court determined that the remedy for *de jure* segregation must be limited to districts responsible for the constitutional wrong.[477] Thus, the suburban districts that had not maintained segregation policies could not be forced to merge with the urban Detroit public schools to attain a greater racial balance.

---

within a single school district.  We therefore turn to address, for the first time, the validity of a remedy mandating cross-district or interdistrict consolidation to remedy a condition of segregation found to exist in only one district.

*Milliken v. Bradley*, 418 U.S. 717, 744 (1974) (Burger, C.J., majority opinion) (citations omitted).

[474] Oxford Sup. Ct. II, at 638.

[475] *Milliken*, 418 U.S. at 744 (majority opinion).

[476] *Id*. at 745.

[477] *Id*. at 729

Although the Court did not completely rule out the possibility of judicially created metropolitan relief in all cases, the Court made it clear that such relief was to be viewed as an extraordinary remedy,[478] and emphasized the importance of local control over schools:  a concept that the majority believed to have been sacrificed unjustifiably by the district court's order.[479]

The practical result of *Milliken* was the preclusion of inter-district mergers as a remedy in desegregation lawsuits.

> The dissent by Justice Thurgood Marshall, who had argued *Brown I* and *II* for the NAACP, bitterly complained that the Court was now turning back the clock in response "to a perceived public mood that we have gone far enough in enforcing the Constitutions's guarantee of equal justice."
>
> The gradual ratcheting out of remedies to implement *Brown I* ended as abruptly and as conclusorily as it began twenty years and two months earlier.  Subsequent cases fine-tuned the grounds for identifying constitutional violations and added minor remedial weapons, but *Milliken*

---

[478] *See, e.g.*, Chemerinsky III, at 1010-11 ("*Milliken* only permits interdistrict remedies if there is proof that the suburban districts committed a constitutional violation.  Occasionally, this can be demonstrated. . . . Nonetheless, these instances in which metropolitan remedies were permitted are clearly the exception.  In case after case, the federal courts, following the dictates of *Milliken*, have refused to order metropolitan-wide remedies.  It is usually impossible to prove that the suburbs or state governments are directly responsible for the existence of segregated schools in the cities. As a result, after *Milliken* it is usually futile to hope for judicial action creating metropolitan school districts to eliminate the dual system of urban public education.") (footnote omitted); Dennis Hutchinson, "Pasadena Board of Education v. Spangler," Oxford Sup. Ct. II at 721 ("Whatever doubts remained after *Milliken v. Bradley* (1974) that the Supreme Court would exercise a more lenient overview of school desegregation remedies were put to rest two years later in *Pasadena Board of Education v. Spangler* [427 U.S. 424 (1976)].").

[479] *See, e.g.*, *Milliken*, 418 U.S. at 741 (observing that "[n]o single tradition in public education is more deeply rooted" than local control).

228

*v. Bradley*, by rejecting so-called interdistrict remedies, established the new outer limit of constitutional remedies.[480]

Unable to involve suburban districts as a means of achieving "unitary status," urban school systems in which blacks constituted a majority of the students enrolled were often left without a meaningful way to integrate.  As a result, urban plaintiffs soon shifted their attention to the manner in which states funded public education:  a topic that is addressed in the next Part of this opinion.

---

[480] Dennis J. Hutchinson, "Milliken v. Bradley," in Oxford Sup. Ct. II, at 639.

[this page intentionally left blank]

## 2.    School Finance Litigation

*The poor you always have with you . . . .*

*John* 12:8 (Revised Standard Version)

As discussed in Part II(G)(1)(b), *supra*, the Supreme Court stated in the first *Brown* opinion that "education is perhaps the most important function of state and local governments," and proceeded to hold that, "in the field of public education the doctrine of 'separate but equal' has no place.  Separate educational facilities are inherently unequal."[481]   The first *Brown* opinion thus removed the most obvious barrier to equal educational opportunities, schools segregated as a matter of law, but left in place another:  the obstacle faced by poor public school systems that desire to provide an education to their students "on equal terms" relative to the educational facilities, curriculum, quality of teachers and staff, and other amenities offered by wealthier school systems.  The decision to not seek relief on the basis of the failure of Southern states to provide substantially equal facilities and funding for black schools was a conscious choice.[482]   Thurgood Marshall, lead counsel for plaintiffs in *Brown*,

---

[481] *Brown v. Board of Education of Topeka*, *Shawnee County*, *Kansas*, 347 U.S. 483, 493, 495 (1954) ("*Brown I*").

[482] See the discussion in Part II(G)(1)(b), *supra*, observing that plaintiffs in the four state cases consolidated under the style of *Brown v. Board of Education* did not focus their claims on the fact that, in most of the segregated school systems of Southern states, there was no pretense of compliance with *Plessy*'s requirement that "substantially equal facilities" be provided to black children, even though they easily could have established such a claim, because black schools were uniformly under-financed, poorly staffed, and woefully maintained, compared to the white schools.

believed the overriding condition that

> made the enforced separation of black children from whites most damaging . . . was not tattered books or untrained teachers, but the stigma of inferiority that segregation inflicted on black children.   School officials could buy newer books and hire better teachers for black children, but they could not erase feelings of inferiority from their minds.[483]

As a result, Marshall argued that "segregated public schools are not 'equal' and cannot be made 'equal' . . . ."[484]   To the extent that the first *Brown* opinion may be read as having addressed, *at all*, the huge disparities then existing between the funding provided to black and white schools, that argument can only be gleaned by implication from the following statements in Chief Justice Warren's brief opinion:

> In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.  Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all *on equal terms*."

*Brown I*, 347 U.S. at 492-93 (emphasis supplied).  Thus, this part of the opinion in the present case confronts a subject that was neither addressed explicitly, nor clearly decided, by either *Brown* decision:    the disparity between the educational opportunities offered by wealthy (taxable-property-value rich) school systems *vis-a-vis* less wealthy ones.

---

[483] Peter Irons, *Jim Crow's Children:   The Broken Promise of the* Brown *Decision* 63 (London:  Penguin Books 2004) ("**Irons**").

[484] *Brown I*, 347 U.S. at 488.

### a.   *Serrano v. Priest*

[T]he *public schools of this state are the bright hope for entry of the poor and oppressed into the mainstream of American society.*

*Serrano v. Priest*, 487 P.2d 1241, 1259 (Cal. 1971).

California was among the first states to address the financial inequities in the funding of its public school systems.  A group of elementary and high school students in Los Angeles County commenced an action "to secure equality of educational opportunity" on behalf of a class consisting of "all children attending public schools in California[,] except children in that unnamed, unknown school district which 'affords the greatest educational opportunity.'"  *Serrano v. Priest*, 89 Cal. Rptr. 345 (Ct. App. 1970) ("*Serrano I* "), *rev'd*, 487 P.2d 1241 (Cal. 1971) ("*Serrano II* ").  Plaintiffs alleged that the state's system of funding public education was substantially dependent upon local *ad valorem* property tax revenues and, as a consequence, the money spent per pupil varied from one school district to another in direct proportion to the wealth of the pupils' parents and the value of taxable property located in the school district, and not according to the pupils' educational needs.  They claimed that such disparities violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar provisions of the California Constitution.[485]  The California officials most responsible for collecting and disbursing

---

[485] *See, e.g.*, Cal. Const. art. I, §§ 11, 21.

state funds and county property tax revenues were named as defendants.[486]   The

Superior Court of Los Angeles County sustained defendants' "general demurrer" to

the complaint;[487] and, after the plaintiffs failed to amend within the time allowed,

granted defendants' motion to dismiss.

The plaintiffs appealed to the California Supreme Court, which determined that

wealth was "a suspect classification," and, that education was a "fundamental right."

*Serrano v. Priest*, 487 P.2d 1241, 1250, 1259 (Cal. 1971).   That Court accordingly

applied a "strict scrutiny" standard of judicial review, and

> determined that this funding scheme invidiously discriminates against the
> poor because it makes the quality of a child's education a function of the
> wealth of his parents and neighbors.   Recognizing as we must that the
> right to an education in our public schools is a fundamental interest
> which cannot be conditioned on wealth, we can discern no compelling
> state purpose necessitating the present method of financing.   We have
> concluded, therefore, that such a system cannot withstand constitutional
> challenge and must fall before the equal protection clause.

---

[486] The defendants were the State Treasurer, the State Superintendent of Public Instruction, the State Controller, the tax collector and treasurer of Los Angeles County, the superintendent of Los Angeles County schools, and fictional defendants.

[487] For those attorneys unfamiliar with the arcane system of pleading historically used in the three common-law courts of England (the King's Bench, the Court of Common Pleas, and the Court of the Exchequer) until 1873, and in the state courts of Alabama until 1973, you have this judge's warmest congratulations on being able to obtain a legal education without having your brain contorted by the necessity to master "pleadings subsequent to the declaration": *e.g.*, "dilatory pleas," "general demurrers," "special demurrers," "speaking demurrers," "pleas by way of confession and avoidance," "pleas by way of traverse," "replications," etc.   *See generally*, *e.g.*, John Jay McKelvey, *Principles of Common-Law Pleading* (New York:  Baker, Voorhis & Company 2d ed. 1917).

*Serrano*, 487 P.2d at 1244.[488]

### b.   *San Antonio Independent School District v. Rodriguez*

The year after the California Supreme Court's decision in *Serrano v. Priest*, however, the United States Supreme Court reached contrary conclusions on the same issues.  The Court held, in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1972) ("*Rodriguez II* "), that wealth was *not* a "suspect classification," *and*, that public education was *not* a "fundamental right."  As a consequence, the Court applied a "rational basis" standard of judicial review and concluded that the Texas system of financing public education was rationally related to a legitimate governmental purpose — *i.e.*, the state goal of allowing a measure of local control over school funding decisions — and, therefore, that the system did not violate the Fourteenth Amendment's Equal Protection Clause.[489]

### i.   The underlying facts

The case leading to the Supreme Court's decision began four years earlier, when a group of Mexican-American parents of children attending elementary and secondary

---

[488] *Accord Van Dusartz v. Hatfield*, 334 F. Supp. 870 (D. Minn. 1971) (holding that the Minnesota system of financing public schools, which made spending per pupil a function of each school district's wealth, *i.e.*, the value of taxable property located within the district, violated the Fourteenth Amendment's Equal Protection Clause).

[489] *Rodriguez II*, 411 U.S. at 44-55; *see also*, *e.g.*, *Papasan v. Allain*, 478 U.S. 265, 287 (1986) (describing *Rodriguez II* as holding "that funding disparities resulting from differences in local taxes were acceptable because related to the state goal of allowing a measure of effective local control over school funding levels").

schools in the Edgewood Independent School District — one of seven school districts lying wholly or partly within the City of San Antonio, Texas — filed a complaint in the U.S. District Court for the Western District of Texas challenging the constitutionality of that state's system for funding public education.  *See Rodriguez v. San Antonio Independent School District*, 337 F. Supp. 280, 281 (W.D. Tex. 1972) (three-judge court) (*per curiam*) ("*Rodriguez I*").  The plaintiffs sued on behalf of a class of "all other children throughout Texas who live in school districts with low property valuations."[490]  All public schools in Texas were

> dependent upon federal, state, and local sources of financing.  Since the federal government contribute[d] only about ten percent of the overall public school expenditures, most revenue [was] derived from local sources and from two state programs — the Available School Fund and the Minimum Foundation Program.  In accordance with the Texas Constitution, the $296 million in the Available School Fund for the 1970-1971 school year was allocated on a per capita basis determined by the average daily attendance within a district for the prior school year.

> Costing in excess of one billion dollars for the 1970-1971 school year, the Minimum Foundation Program provide[d] grants for the costs of salaries, school maintenance[,] and transportation.  Eighty percent of the cost of this program is financed from general State revenue with the remainder apportioned to the school districts in "the Local Fund Assignment."  Tex. Educ. Code Ann. arts. 16.71-16.73 (1969) . . . .

> To provide their share of the Minimum Foundation Program, to satisfy bonded indebtedness for capital expenditures, and to finance all

---

[490] *Rodriguez I*, 337 F. Supp. at 281.  *Compare Rodriguez II*, 411 U.S. at 4 (where the majority characterizes the plaintiff class as "members of minority groups or who are poor and reside in school districts having a low property tax base").

236

expenditures above the state minimum, local school districts are empowered within statutory or constitutional limits to levy and collect ad valorem property taxes. Tex. Const. art. 7, §§ 3, 3a, Vernon's Ann. St.; Tex. Educ. Code Ann. art. 20.01 et seq. Since additional tax levies must be approved by a majority of the property-taxpaying voters within the individual district, these statutory and constitutional provisions require as a practical matter that all tax revenues be expended solely within the district in which they are collected.

Within this ad valorem taxation system lies the defect which plaintiffs challenge. *This system assumes that the value of property within the various* [school] *districts will be sufficiently equal to sustain comparable expenditures from one district to another. It makes education a function of the local property tax base*. The adverse effects of this erroneous assumption have been vividly demonstrated at trial through the testimony and exhibits adduced by plaintiffs. In this connection, a survey of 110 school districts throughout Texas demonstrated that[,] while the ten districts with a market value of taxable property per pupil above $100,000 enjoyed an equalized tax rate per $100 of only thirty-one cents, the poorest four districts, with less than $10,000 in property per pupil, were burdened with a rate of seventy cents. Nevertheless, the low rate of the rich districts yielded $585 per pupil, while the high rate of the poor districts yielded only $60 per pupil. As might be expected, those districts most rich in property also have the highest median family income and the lowest percentage of minority pupils, while the poor property districts are poor in income and predominately minority in composition.

*Rodriguez I*, 337 F. Supp. at 218-82 (bracketed alterations and emphasis supplied),

footnotes omitted).

The central contention of the plaintiffs' complaint was that the school funding

system that had existed in Texas since the late 1880s — one that consisted primarily

of a state "Minimum Foundation Program," which contributed funds to local school

districts on a *per capita* (per student) basis, as well as local *ad valorem* property taxes levied upon referendum by the residents of the various school districts — resulted in gross disparities in the amount of revenue available for funding public schools in districts in which poor Hispanic (and/or other minority) children constituted a majority of the student bodies.

The *Rodriguez* plaintiffs based their claims upon the Fourteenth Amendment's Equal Protection Clause, and their complaint featured two theories of unconstitutionality:   one premised upon the contention that education is a "fundamental right," and the other upon the argument that wealth is "a suspect classification."   Both theories led to the same end:   *that is*, if either theory was accepted, the federal courts would be required to gauge the constitutionality of Texas's system under the "strict scrutiny" framework of judicial review, thereby forcing the state to provide a compelling justification for the marked disparities between the quality of public education offered to children living in property-rich *versus* property-poor school districts.

The *Rodriguez* plaintiffs illustrated those disparities by comparing the tax revenues generated in two San Antonio public school systems:  the Edgewood District in which the plaintiffs' children resided, and the neighboring Alamo Heights Independent School District.  Edgewood was located in the inner city, educated 22,000

238

students (96% of whom were members of a minority group, primarily Mexican-Americans) in 25 elementary and secondary schools, and had the lowest median family income ($4,686 annually) and real-property values in the metropolitan area.  Further, *despite the fact that Edgewood's millage rate was the highest property tax rate in the San Antonio metropolitan area during the 1967-68 year* (*i.e.*, $1.05 per $100 of assessed valuation[491] = 10.5 mills, or 0.0105% of assessed value), *it generated the lowest amount of revenue*:  *i.e.*, approximately $26 per student, per school year,  an amount that, when added to the $222 per student amount guaranteed by the state, and, an additional $108 in federal funds, yielded a total of $356 per pupil per school year.[492]

In contrast, the Alamo Heights Independent School District, in which white (non-minority) students constituted 80% of school enrollment, had an annual median family income of $8,001, and the district's local property tax rate of 85 cents per $100 of assessed valuation (8.5 mills, or 0.0085% of assessed value) supplied its students with $333 per student, per school year:[493]  *i.e.*, *nearly thirteen times as much in local property tax revenue as Edgewood could generate with a tax rate that was 2.0 mills higher.*[494]  That amount, when added to the $225 per student amount guaranteed by the

---

[491] *Rodriguez II*, 411 U.S. at 11-12 (majority opinion).

[492] *See id.* at 11-12.

[493] *See id.* at 12-13.

[494] *Id.* at 13-14.

State, and, an additional $36 per student in federal funds, yielded a grand total of $594 per pupil per school year.  To equal the revenues of Alamo Heights, Edgewood would have had to increase its *ad valorem* property tax millage rate more than five times, to 52.5 mills — *something that was legally impossible*, because the aggregate millage rate for local *ad valorem* property taxes in Texas was capped by the state constitution at an amount that was just above the rate at which Edgewood residents were already taxing themselves.[495]  As Justice Byron White lamented in his dissenting opinion, the foregoing figures plainly demonstrated that "revenues d[id] not correlate with effort, in terms of tax rate."[496]

The Edgewood School District plaintiffs claimed that these "substantial interdistrict disparities" existed throughout Texas,[497] and the three-judge district court that tried the case found that similar disparities demonstrated a "statewide pattern."[498] Indeed, tables that summarized a 110-district survey relied upon by the district court[499] showed a strong correlation, at least at the top and bottom of the range of local property tax revenues, among those school districts with higher percentages of

---

[495] *Rodriguez II*, 411 U.S. at 13.

[496] *Id.* at 65 (White, J., dissenting) (alteration supplied).

[497] *Id.* at 15 (majority opinion).

[498] *Rodriguez I*, 337 F. Supp. at 282.

[499] The tables were appended to the dissenting opinion of Justice Thurgood Marshall.  *See Rodriguez II*, 411 U.S. at 134-37 (Marshall, J., dissenting).

minority pupils, poverty, and lower assessed value of taxable property per pupil.[500]

Those districts with more than $100,000 in assessed property value per pupil had an

annual median family income base of $5,900, and only 8% minority pupils, whereas

those school districts in which the assessed value of taxable property per student was

less than $10,000 had an annual median family income base of $3,325, and 79% of the

students enrolled in the public schools were minorities.[501]   Those disparities were

attributed by the Supreme Court majority "to differences in the rates of taxation or in

the degree to which the market value for any category of property varie[d] from its

assessed value,"[502] and the "differences in the amount of assessable property available

within any district."[503]

The three-judge district court that tried the *Rodriguez* claims held that such

funding "disparities, largely attributable to differences in the amounts of money

collected through local property taxation, . . . violated the Equal Protection Clause."[504]

The district court's holding was based upon its conclusion that "[m]ore than mere

_____

[500] *Id*. at 15 n.38 (majority opinion).

[501] *Id.*; *see also Rodriguez I*, 337 F. Supp. at 282 (finding that, on average, "the low rate of the rich districts yielded $585 per pupil, while the high rate of the poor districts yielded only $60 per pupil," because of differences in assessed property value).

[502] *See Rodriguez II*, 411 U.S. at 46 n.100 (majority opinion) (alteration supplied) ("There is no uniform statewide assessment practice in Texas.  Commercial property, for example, might be assessed at 30% of market value in one county and at 50% in another.").

[503] *Id*. at 46.

[504] *Id*. at 16.

241

rationality is required . . . to maintain a state classification which affects [*i*] a 'fundamental interest,' or which [*ii*] is based upon wealth," and that [*iii*] "both factors were involved" in the *Rodriguez* case.[505]  The district court further held that Texas had offered no evidence of a compelling governmental or educational interest that the funding system was "narrowly tailored" to promote and, accordingly, enjoined the enforcement of the challenged state constitutional provisions, together with the statutory provisions implementing those provisions.[506]

The Supreme Court split five to four when reviewing the three-judge district court's judgment.  The majority opinion castigated the lower court for failing to comprehend "the novelty and complexity of the constitutional questions posed."[507]

### *ii*.   Socioeconomic status as a "suspect classification"

The majority opinion first addressed the question of whether socioeconomic status — *i.e.*, relative wealth *versus* poverty — was a "suspect classification" requiring the application of a "strict scrutiny" standard of judicial review, and said that the three-judge district court — like other courts that had struck-down school financing systems in other states — had "virtually assumed" that such a classification applied

---

[505] *Rodriguez I*, 337 F. Supp. at 282 (alterations supplied).

[506] *Id*. at 285-86; *see also Rodriguez II*, 411 U.S. at 16 (majority opinion) (observing that Texas had virtually conceded that "its historically rooted dual system of financing education could not withstand the strict judicial scrutiny") (footnotes omitted).

[507] *Rodriguez II*, 411 U.S. at 17 (majority opinion).

"through a simplistic process of analysis . . . ."[508]  The majority said that the plaintiff-class was not a group that had suffered an "absolute deprivation of education," but only a "relative" deprivation — *that is*, residence within school districts that generated *less* revenue for the support of public schools than other districts.[509]  The majority held that, by accepting a class defined only in relative terms, the district court had "largely ignored the hard threshold questions."[510]  The majority opinion further observed that, even though the expert statistical evidence presented to the district court judges showed a correlation between the wealth of residents and the assessed value of taxable property within the 110 school districts surveyed, especially when comparing the highest and lowest categories,[511] the asserted correlation evaporated when data for the remainder of Texas was taken into account.[512]  In other words, the evidence only showed a relationship between personal wealth and the assessed value of local taxable property when isolated sub-groups were compared, but not when looking at the state as a whole.  Thus, the majority concluded that, even if "comparative wealth discrimination" could be a constitutionally significant classification imposed by the

---

[508] *Id*. at 19 (alterations supplied).

[509] *Id*.

[510] *Id*.

[511] *See id*. at 134-37 (Marshall, J., dissenting) (copies of tabular results of 110 school districts surveyed).

[512] *Rodriguez II*, 411 U.S. at 26-27.

243

financing system,[513] the "proof fail[ed] to support . . . the District Court's conclusions."[514]

Ultimately, the majority concluded that the plaintiffs were asking the Court "to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts."[515] The majority declined to do so, saying that the "system of alleged discrimination" and the class defined by the district court had "none of the traditional indicia of suspectness" that would warrant "extraordinary protection from the majoritarian political process."[516]  Accordingly, the opinion concluded that the Texas system of financing public education did "not operate to the peculiar disadvantage of any suspect class," even though it may have operated to the *relative* disadvantage of the poor; accordingly, it did not merit strict scrutiny upon that basis.[517]

### *iii*.    Public education as a "fundamental right"

The majority opinion then turned to a discussion of the alternative basis for evaluating the Texas system of financing public education under a strict scrutiny

---

[513] *Id*. at 25-26 & n.61.

[514] *Id.* at 27 (alteration supplied).

[515] *Id*. at 28.

[516] *Id*.

[517] *Rodriguez II*, 411 U.S. at 28-29.

standard of judicial review that had been endorsed by the three-judge district court:

*i.e.*, that the system impermissibly interfered with the exercise of a "fundamental

right."[518]   The majority recognized that the "question [of] whether education is a

fundamental right, in the sense that it is among the rights and liberties protected by the

Constitution . . . [had] consumed the attention of courts and commentators" for a

number of years.[519]   The opinion also acknowledged that much of that academic and

judicial discussion had its genesis in language from the first *Brown* opinion:  *i.e.*,

> "Today, education is *perhaps* the most important function of state
> and local governments.  Compulsory school attendance laws and the
> great expenditures for education both demonstrate our recognition of the
> importance of education to our democratic society.  It is required in the
> performance of our most basic public responsibilities, even service in the
> armed forces.  It is the very foundation of good citizenship.  Today it is
> a principal instrument in awakening the child to cultural values, in
> preparing him for later professional training, and in helping him to adjust
> normally to his environment.  In these days, it is doubtful that any child
> may reasonably be expected to succeed in life if he is denied the
> opportunity of an education.  Such an opportunity, where the state has
> undertaken to provide it, is a right which must be made available to all
> on equal terms."

*Rodriguez II*, 411 U.S. at 30-31 (quoting *Brown I*, 387 U.S. at 493) (emphasis

supplied).   Even though the foregoing passage from the first *Brown* opinion

constitutes a powerful affirmation of the civic and political importance of public

---

[518] *Id.* at 29 (alterations supplied) (citing *Graham v. Richardson*, 403 U.S. 265, 275-76 (1971); *Kramer v. Union Free School District*, 395 U.S. 621 (1969); *Shapiro v. Thompson*, 394 U.S. 618 (1969)).

[519] *Id.* (alterations supplied).

education in a democratic republic, it did not explicitly acknowledge a fundamental constitutional right to education.  Instead, the Court said that education was "perhaps" the most important function of state and local governments.  Moreover, when explaining that the history of the Fourteenth Amendment relating to its intended effect on public education was "inconclusive," the Court cited as one reason "the status of public education at that time," and its early stage of development.  Thus, the argument was made by Charles Alan Wright on behalf of the State of Texas that "[t]he strict scrutiny test was applied in *Brown* not because education is a fundamental interest but because classification by race is clearly suspect."[520]

The majority opinion in *Rodriguez* acknowledged that the "grave significance of education[,] both to the individual and our society[,] cannot be doubted," but immediately denigrated that characterization by equating education with any other public service, and holding that "the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause."[521]

According to the *Rodriguez* majority, an individual does not have a fundamental right to a governmental benefit simply because that benefit is important, or even

---

[520] Brief for Appellants at 30, *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973) (No. 71-1332), 1972 WL 137565 at *29.

[521] *Rodriguez II*, 411 U.S. at 30-31 (bracketed alterations supplied).

246

indispensable.  If it were otherwise, opined the majority, access to health care, food, shelter, and other needs of subsistence could be characterized as "fundamental rights," and all governmental decisions affecting such areas would be subject to rigorous review.[522]  Further, said the majority, if the Court were to base the constitutionality of legislative action upon shifting conceptions of what a majority of citizens considered the "relative social significance" of various public services, it would "be assuming a legislative role and one for which the Court lacks both authority and competence."[523]  "Rather," said the majority, the determination of the position of public education in the Pantheon of rights, privileges, and immunities protected by the Constitution lay in "assessing whether there is a right to education explicitly or implicitly guaranteed in the Constitution."[524]  The Northwest Ordinance, written in the same year as the Constitution, explicitly stated that "schools and the means of education shall be forever encouraged," and tangibly affirmed that statment by dedicating the Sixteenth Section of each Township to education.  The Constitution, on the other hand, was silent on the subject of education.

### iv.   "Rational basis review" of the Texas system

As a result of the *Rodriguez* majority's conclusion that the case was not one "in

---

[522] *Id*. at 37.

[523] *Id.* at 31-33.

[524] *Id.* at 33-34.

which the challenged state action must be subjected to the searching judicial scrutiny reserved for laws that create suspect classifications or impinge upon constitutionally protected rights," the constitutional provisions and implementation statutes that defined the Texas system only had to "be shown to bear some rational relationship to legitimate state purposes."[525]

Ultimately, the Court found the Texas system to be "comparable to the systems employed in virtually every other state," in that it included a component designed to assure "a basic education for every child in the State," while permitting local governments to exceed the minimum amount of funding supplied by the state "foundation" program by imposing, or increasing — with the approval of a majority of persons voting in a local referendum — additional mills upon the assessed value of taxable property.[526]  The system served the governmental interest by permitting and encouraging "a large measure of participation in and control of each district's schools at the local level," including "the freedom to devote more money to the education of one's children" and the "opportunity for participation in the decisionmaking process

---

[525] *Id.* at 40; *see also* Erwin Chemerinsky, *Constitutional Law:  Principles and Policies* § 9.7, at 786-87 (describing the Court's rejection of wealth ("poverty") as a suspect classification in *Rodriguez II*) (New York:  Aspen Publishers 3rd ed. 2006) ("**Chemerinsky I**"); *id.* § 10.10, at 917-18 (describing the Court's refusal "to recognize a fundamental right to education" in the same opinion).

[526] *Rodriguez II*, 411 U.S. at 46-49; *see also id.* at 54 ("[T]he system here challenged is not peculiar to Texas or any other State.").

248

that determines how those local tax dollars [would] be spent."[527]  The Court held that

local control, through local participation, satisfied the requirement of a legitimate

governmental interest.[528]  Further, "[w]hile it [was] no doubt true that reliance on local

property taxation for school revenues [had] provide[d] less freedom of choice with

respect to expenditures for some districts than for others, the existence of 'some

inequality' in the manner in which the State's rationale is achieved is not alone a

sufficient basis for striking down the entire system."[529]

        Thus, having determined that the Texas system of financing public education

was rationally related to a legitimate governmental purpose, the majority found the

system did not violate the Equal Protection Clause.[530]

        The primary effect of the *Rodriguez* decision was to constrict, if not totally

foreclose, challenges to school funding systems under the Equal Protection Clause of

the United States Constitution.  As a consequence, plaintiffs seeking additional

revenue for the support of public education began to turn their attention to state

Constitutional provisions as the basis for challenges based upon a tax system's lack

---

        [527] *Id.* at 49-50 (alteration supplied).

        [528] *Id.* at 50-51, 55.  *But see id.* at 63-70 (White, J., dissenting) (conceding that the law was not subject to strict scrutiny, but contending, nevertheless, that it bore no rational relationship to the goal of local control of school finance).

        [529] *Rodriguez II*, 411 U.S. at 51 (alterations supplied).

        [530] *See Papasan v. Allain*, 478 U.S. 265, 287 (1986) (describing *Rodriguez II* as holding "that funding disparities resulting from differences in local taxes were acceptable because related to the state goal of allowing a measure of effective local control over school funding levels").

of "equity" or "adequacy."[531]  The most relevant example of that tactic is the line of

Alabama cases commonly referred to as the "Equity Funding Litigation," discussed

in the following subsection.

c.    **The Alabama Equity Funding Litigation**

In 1990, the Alabama Coalition for Equity, Inc., a non-profit education

advocacy organization acting on behalf of public school students, the parents of such

children, and school systems from various parts of Alabama, filed an action in the

Circuit Court of Montgomery County, Alabama, seeking a judgment declaring that

Amendment 111 to the Alabama Constitution was unconstitutional because its avowed

purpose was racial discrimination.[532]  The suit was against the Governor and other

---

[531] *See* Erwin Chemerinsky, *The Conservative Assault on the Constitution* 36 (New York: Simon & Schuster 2010) ("**Chemerinsky III**") ("Since *Rodriguez*, any challenges to disparities in school funding must be brought under state constitutions.  States are allowed to provide more rights under their state constitutions than the U.S. Constitution offers, but not fewer.").

[532] Amendment 111 modified a number of provisions of the Alabama Constitution: *e.g.*, art. V, § 137; art. XIV, § 256; art. XIV, § 258; art. XIV, § 259; art. XIV, § 260; art. XIV, § 269; and art. XIV, § 270.  Of those, the one most pertinent to the present discussion is Ala. Const. art. XIV, § 256 (1901), amended by amend. 111 (ratified Sept. 7, 1956), and reading as follows:

It is the policy of the state of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources, and the willingness and ability of the individual student, *but nothing in this Constitution shall be construed as creating or recognizing any right to education or training at public expense*, nor as limiting the authority and duty of the legislature, in furthering or providing for education, to require or impose conditions or procedures deemed necessary to the preservation of peace and order.  [Emphasis supplied.]

The legislature may by law provide for or authorize the establishment and operation of schools by such persons, agencies or municipalities, at such places, and upon such conditions as it may prescribe, and for the grant or loan of public funds

250

State officials, and claimed that the "educational opportunities" available to public

school students in Alabama were neither equitable nor adequate, and violated the

education, equal protection, and due process clauses of the Alabama Constitution.

*Alabama Coalition for Equity, Inc. v. Hunt*, No CV-90-883-R, 1993 WL 204083, at

*1-2 (Ala. Cir. Ct. Apr. 1, 1993).[533]   That action subsequently was consolidated with

a similar case filed in the same court the following year, *Harper v. Hunt*, No CV-91-

0117-R (Ala. Cir. Ct. Jan.19, 1991), and together the consolidated actions became

---

and the lease, sale or donation of real or personal property to or for the benefit of citizens of the state for educational purposes under such circumstances and upon such conditions as it shall prescribe.  Real property owned by the state or any municipality shall not be donated for educational purposes except to nonprofit charitable or eleemosynary corporations or associations organized under the laws of the state.

To avoid confusion and disorder and to promote effective and economical planning for education, the legislature may authorize the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end, such election to be effective for such period and to such extent as the legislature may provide.

As Dean Chemerinsky observed, the emphasized language in the first paragraph of this constitutional amendment — "nothing in this Constitution should be construed as creating or recognizing" that education is a right protected by the Alabama Constitution — was added in order to

allow Alabama public schools to close rather than desegregate.  Alabama was so determined to resist the end of Jim Crow education, as decreed by *Brown v. Board of Education*, that its voters amended their constitution to allow school districts to close *all* schools to avoid having to desegregate them.

Chemerinsky III, at 36 (emphasis in original).

[533] The plaintiffs also launched a challenge to the education system under the Equal Protection Clause of the United States Constitution, but they did not substantively pursue that contention in the state Circuit Court, and Judge Reese did not address the issue in his opinion.

251

known as "*the Equity Funding Cases.*"  *See Opinion of the Justices No. 338*, 624 So.

2d 107, 110-67 (Ala. 1993).[534]

Montgomery County Circuit Judge Eugene Reese, to whom the consolidated

cases were assigned, found that widespread disparities existed in the revenues

available for public school systems within the state, and that those disparities resulted

in dramatic differences between school districts in which property values were quite

high ("wealthy districts") and less-wealthy school districts in terms of:  the age and

quality of school facilities; the education levels of administrators, teachers, and other

staff; books and supplies; and equipment.[535]  The court also found that the educational

facilities, programs, and services provided by Alabama's public schools were, by any

measure, inadequate under the Alabama Constitution, and that those inadequacies

were very costly to the State in terms of social and economic progress.[536]  Based upon

those and other factual findings, Judge Reese concluded that Alabama's system of

public education violated the education clause of the State Constitution, which

requires the State to "establish, organize, and maintain a liberal system of public

schools throughout the state for the benefit of the children thereof between the ages

---

[534] The statements in the preceding paragraph are based upon doc. no. 242-1 (Parties' Statement of Agreed Facts) ¶ 366 ("**Agreed Facts**").

[535] *Alabama Coalition for Equity,* 1993 WL 204083 at *5-17.

[536] *Id.* at *19-34.

of seven and twenty-one years."[537]   Judge Reese also determined that the system violated the equal protection and due process clauses of the State Constitution, because public education was a "fundamental right" deserving of the strictest constitutional scrutiny, and the State had not provided a compelling (or even rational) justification for the inequities and inadequacies found by the trial court.[538]   Judge Reese entered a judgment declaring that Alabama schoolchildren have a right under the State Constitution to an equitable and adequate education, and outlined the "essential principles and features" of an equitable and adequate education system.  He ordered State officials to "establish, organize and maintain a system of public schools that provides equitable and adequate educational opportunities to all school-age children . . . ."[539]   Finally, Judge Reese retained jurisdiction to fashion an appropriate remedy.[540]

Less than a month after the entry of that judgment, however, members of the Alabama Senate requested the Justices of the Alabama Supreme Court to render an opinion advising the Legislature whether it was required to comply with Judge Reese's

---

[537] *Id.* at *43 (quoting the text of Ala Const. art. XIV, § 256 that was in effect at the time); *see also id.* at *44-53.

[538] *Id*. at *53-59.

[539] *Id.* at *62-63.

[540] *Alabama Coalition for Equity*, 1993 WL 204083, at *63.

orders.[541]  In *Opinion of the Justices*, *No. 388*, 624 So. 2d 107 (Ala. 1993), the State

Supreme Court concluded, in accordance with traditional separation of powers

principles, that a state Circuit Court had "the power, and indeed the duty, when

requested to do so in cases involving justiciable controversies, to interpret the

constitution, and its interpretation, unless changed by a competent court having the

power to overturn it, must be accepted and followed."[542]  Therefore, the Legislature

was required to follow Judge Reese's orders, unless and until they were either

modified by him, or modified or reversed by a higher court on appeal.[543]

Two years later, however, the Alabama Supreme Court held in *Pinto v. Alabama*

*Coalition for Equity*, 662 So. 2d 894 (Ala. 1995), that Judge Reese had erred when

denying the applications of a class of State taxpayers and citizens, and a class of

students in gifted programs and adequately funded schools and their parents, to

intervene in the *remedy* phase of the trial of the Alabama Coalition for Equity

litigation.[544]

Judge Reese then withdrew from any further proceedings in the consolidated

cases, and they were reassigned to Montgomery County Circuit Judge Sarah M.

---

[541] *See* Ala. Code § 12-2-10 (1975) (authorizing the Justices of the Supreme Court to issue advisory opinions in cases that involve "important constitutional questions").

[542] *Opinion of the Justices No. 338*, 624 So. 2d at 110.

[543] *Id.* at 109-10.

[544] *Pinto*, 662 So. 2d at 898-900.

254

Greenhaw.  *See Ex parte James*, 713 So. 2d 869, 871-72 (Ala. 1997) ("*James I* ").

Following reassignment, the defendants moved to vacate the declaratory judgment and

remedial orders entered by Judge Reese following the liability and remedy phases of

trial, and to dismiss all of plaintiffs' claims for lack of subject matter jurisdiction.

Both motions were denied,[545] and the Alabama Supreme Court upheld the trial court's

denial of defendants' motions on appeal, saying that Judge Reese's prior judgment and

orders were not automatically rendered ineffective by his withdrawal,[546] and the case

still presented a justiciable controversy.[547]   The State Supreme Court also held that,

even though Judge Reese's liability and remedial orders did not *necessarily* violate the

separation of powers doctrine, he should have allowed the State Legislature an

opportunity to remedy the deficiencies in the education system before fashioning

detailed remedial orders.[548]   Thus, the case was remanded with instructions for the

Circuit Court to stay its judgment for a one-year period, to allow the Alabama

Legislature an opportunity to consider remedial measures.[549]   On application for

rehearing, the Alabama Supreme Court rephrased its remand directions to allow the

Legislature "a reasonable time," as opposed to one year, to fashion remedial

---

[545] *James I*, 713 So. 2d at 872.

[546] *Id.* at 874-75.

[547] *Id.* at 876-78.

[548] *Id.* at 878-82.

[549] *Id.* at 882.

measures.[550]  Later that same year, the Alabama Supreme Court entered an opinion

affirming the trial court's award of attorney's fees to the plaintiffs' attorneys.  *See*

*James v. Coalition for Equity, Inc.*, 713 So. 2d 937 (1997) ("*James II* ").

   In an extraordinary turn of events, however, five years after the entry of its

opinion in *James I*, the Alabama Supreme Court *sua sponte* reconsidered its

jurisdiction over the Equity Funding Cases.  *See Ex parte James*, 836 So. 2d 813 (Ala.

2002) ("*James III* ").  As a result of the fact that Judge Reese's declaratory judgment

following the *liability* phase of trial had never been appealed, the Supreme Court

declined to consider the merits.[551]  Even so, and based upon the separation of powers

doctrine and principles of judicial restraint, the Alabama Supreme Court declared that

the trial judge's *remedial* orders could not stand.   Section 43 of the Alabama

Constitution states that "the judicial [branch] shall never exercise the legislative and

executive powers, or either of them; to the end that it may be a government of laws

and not of men."  Ala. Const. art. III, § 43 (1901).  The Court recognized that "any

specific remedy that the judiciary could impose would, in order to be effective,

necessarily involve a usurpation of that power entrusted exclusively to the

Legislature."[552]  Thus, the court completed its "judicially prudent retreat from this

---

[550] *James I*, 713 So. 2d at 935.

[551] *James III*, 836 So. 2d at 816.

[552] *Id.* at 819; *see also* Agreed Facts ¶ 367 ("The Alabama Supreme Court dismissed the

province of the legislative branch in order that we may remain obedient to the command of the people of the State of Alabama" set forth in Section 43 of the State Constitution.[553]   The court dismissed all of the Equity Funding Cases and left resolution of the remaining issues to the state legislature.[554]

Within a year of the Alabama Supreme Court's dismissal of the *Equity Funding Cases*, the plaintiffs in the "*Knight* line of cases" discussed in Part II(G)(4), *infra*, filed a "Motion for Additional Relief with Respect to State Funding of Public *Higher Education*."   *See Knight v. Alabama*, 458 F. Supp. 2d 1273, 1277 (N.D. Ala. 2004) (emphasis supplied) ("*Knight III* ").   Although that motion was styled as a motion for "additional relief," the *Knight* plaintiffs actually sought an adjudication of a new claim:  *i.e.*, "For the first time in the *Knight* line of cases, the plaintiffs claimed that segregation in Alabama's system of higher education was caused by Alabama's constitutional limitations on its ability to raise property taxes for K-12 education."[555]

---

Equity Funding Cases, holding that the circuit court's order requiring additional funding for Alabama's public schools did, after all, violate the Alabama Constitution's principle of separation of powers.  *Ex Parte James*, 836 So. 2d at 816.  The court held that "because the duty to fund Alabama's public schools is a duty that — for over 125 years — the people of this State have rested squarely upon the shoulders of the Legislature, it is the Legislature, not the courts, from which any further redress should be sought.").

[553] *James III*, 836 So. 2d at 819.

[554] *Id.* at 815.

[555] Agreed Facts ¶ 368.

[this page intentionally left blank]

3.     **The *Weissinger* Line of Cases**

> *A state constitution is always interpreted in the light of the common law, and if it be not the first constitution, in the light of its predecessors.*
>
> Mayor of Mobile v. Stonewall Insurance Co., 53 Ala. 570, 577 (1875) (Brickell, C.J., unanimous opinion).

Section 211 of the Alabama Constitution provides that "[a]ll taxes levied on property in this state shall be assessed in exact proportion to the value of such property . . . ."[556]  It prohibits "the Legislature from prescribing or declaring an arbitrary or artificial value of the property of individuals or corporations, and assessing taxes on such valuation."  *Pullman Car & Mfg. Corp. v. Hamilton*, 229 Ala. 184, 187, 155 So. 616, 618 (1934) (citation omitted).[557]

For seventy-one years, Section 211 was invariably construed by state courts in conjunction with Section 217,[558] a provision that — until 1972, when it was substantially revised by Amendment 325 (and, in 1978, revised yet again by

---

[556] The full text of this provision reads as follows:  "All taxes levied on property in this State shall be assessed in exact proportion to the value of such property, but no tax shall be assessed upon any debt for rent or hire of real or personal property, while owned by the landlord or hirer during the current year of such rental or hire, if such real or personal property be assessed at its full value."  Ala. Const. art. XI, § 211 (1901).  Section 211 has never been amended.

[557] *See also Pullman Car*, 229 Ala. at 187, 155 So. at 618 (observing that this "constitutional limitation upon the taxing power . . . was designed to secure uniformity and equality by the enforcement of an ad valorem system of taxation and to prohibit arbitrary or capricious modes of taxation without regard to value") (citations omitted).

[558] *See, e.g.*, *State v. Murphy*, 45 Ala. App. 637, 645, 235 So. 2d 888, 895 (Ala. Civ. App. 1970) ("Section 211 of the Constitution of Alabama of 1901 must be considered in connection with Section 217.").

259

Amendment 373) — stated simply that "[t]he property of private corporations, associations and individuals of this State shall forever be taxed at the same rate. . . ."[559]

### a.   The requirement of uniformity and equality

Indeed, until the revision of Section 217 by Amendments 325 and 373, the Alabama Supreme Court consistently construed Sections 211 and 217 of the 1901 Constitution, as well as their predecessor provisions in the Constitutions of 1868 and 1875,[560] as requiring uniformity and equality in the methods employed to estimate the fair market value of comparable parcels and items of real and personal property,

---

[559] The full text of Section 217, prior to its amendment in 1972, provided that: "The property of private corporations, associations and individuals of this State shall forever be taxed at the same rate; provided, this section shall not apply to institutions devoted exclusively to religious, education or charitable purposes." Ala. Const. art XI, § 217 (1901); *see*, *e.g.*, James J. Mayfield, *Constitutions of 1875 and 1901: Paralleled, Annotated and Indexed* 120 (Nashville, Tenn.:  Marshall & Bruce Co. 1904) ("**Mayfield**").

[560] For the forerunners to § 211, see Ala. Const. art. XI, § 1 (1875) ("All taxes levied on *property* in this State shall be assessed in exact proportion to the value of such property; *Provided, however*, the General Assembly may levy a poll-tax, not to exceed one dollar and fifty cents on each poll, which shall be applied exclusively in aid of the public school fund in the county so paying the same.") (emphasis supplied), and Ala. Const. art. IX, § 1 (1868) (same); Ala. Const. art. III, § 39 (1865) ("All *lands* subject to taxation in this State, shall be taxed in proportion to their value.") (emphasis supplied); Ala. Const. art. VI, § 8 (same).

Note that the 1819 and 1865 Constitutions restricted *ad valorem* taxation to real property ("lands").  "On personal property[,] taxes could be imposed as the legislature might consider most expedient." *Western Union Tele. Co. v. State Bd. of Assessment*, 80 Ala. 273, 279 (1885); *see also Mayor of Mobile v. Stonewall Ins. Co*., 53 Ala. 570, 576 (1875) (same) (unanimous opinion).

For the constitutional forerunners to § 217, see Ala. Const. art. XI, § 6 (1875) ("The property of private corporations, associations and individuals of this State shall forever be taxed at the same rate; *Provided*, this section shall not apply to institutions or enterprises devoted exclusively to religious, educational, or charitable purposes.") (emphasis in original), and Ala. Const. art. XIII, § 4 (1868) ("The property of corporations now existing, or hereafter created, shall forever be subject to taxation the same as property of individuals, except corporations for educational and charitable purposes.").

assessment ratios, and millage rates on all forms of taxable property.  For example, the

Alabama Supreme Court held, in *State v. Alabama Power Co.*, 254 Ala. 327, 336, 48

So. 2d 445, 452 (1950), that Sections 211 and 217 required "uniformity and equality

among all taxpayers, 'private corporations, associations and individuals alike,' both

as to ratio and percentage of taxation and also as to rate of taxation."[561]

---

[561] *See also*, *e.g.*, *State v. Alabama Power Co.*, 254 Ala. at 339, 48 So. 2d at 454 ("[U]nder §§ 211 and 217 there can be no distinction between taxpayers with different powers or who own different kinds of real or personal property, because all property must be taxed at the same rate by whomsoever owned."); *Hamilton v. Adkins*, 250 Ala. 557, 35 So. 2d 183 (1948) (holding that "Sections 211 and 217 [of the 1901 State Constitution] are aimed at securing a practical and common sense equality in taxation"); *Pullman Car*, 229 Ala. at 187, 155 So. at 618 (holding that § 211 "was designed to secure uniformity and equality by the enforcement of an ad valorem system of taxation and to prohibit arbitrary or capricious modes of taxation without regard to value"); *Proctor v. State*, 215 Ala. 6, 109 So. 105, 106 (1926) (holding that § 217 of the 1901 Constitution was "a guaranty of uniformity and equality in the rate of taxation, and this requirement is fully met when a like tax is levied upon the same class of property by whomsoever owned"); *State Bank v. Board of Revenue of Montgomery County*, 91 Ala. 217, 223, 8 So. 852, 855 (1891) ("What we . . . decide is that, whenever the legislature levies a tax on property, the rate must be in exact proportion to the value of such property; and that, if a tax is imposed on any species of property, all property belonging to that species must be taxed at the same rate, whether it belongs to an individual, an association of persons, or to a private corporation."); *Moog v. Randolph*, 77 Ala. 597, 692 (1884) (holding "that the general purpose of these clauses [art. XI, §§ 1 and 6 of the 1875 Constitution] is to establish an *ad valorem* system of taxation, thus exacting a certain kind of uniformity in the rules of taxation, as applied to property of all persons, whether private or artificial. . . .  Their object has been construed to be, to secure, as far as practicable, that equality in bearing the just burdens of government, which has become a distinguishing characteristic of the American States. . . ."); *Clark & Murrell v. The Port of Mobile*, 67 Ala. 217, 219 (1880) (observing that "the purpose of the [1875] Constitution was to prevent invidious exemptions or discriminations by which the property of an individual, or of a corporation, is relieved from bearing a just proportion of the common burden of taxation") (citing *Mayor of Mobile v. Stonewall Ins. Co.*, 53 Ala. at 580-81 (Brickell, C.J., unanimous opinion) (construing the provision from Alabama's 1868 Constitution that paralleled Section 217 in the 1901 Constitution, and holding that:  "If property of a particular kind is subject to taxation, and owned by a corporation, it must bear the rate of taxation imposed on individuals.  . . .  Equality in bearing a common burden . . . is secured alike to the corporation and to the citizen.")).

### b.    The requirement of uniform assessment ratios

Section 211's directive that "[a]ll taxes levied on property in this state shall be assessed in exact proportion to the value of such property" *suggested* — but, did not explicitly state — that taxable property was to be assessed at 100% of its appraised, fair market value.[562]   Moreover, the constitution did not define the term "assessed value" — *i.e.*, that portion of the fair market value of a particular parcel or item of real or personal property to which millage rates are applied.  For those reasons, a statute was enacted during the 1911 Regular Session of the Alabama Legislature stating that "taxable property within this State shall be assessed, for the purpose of taxation, at sixty per cent of its fair and reasonable *cash value*."  Act of March 31, 1911, No. 216, § 36 A, 1911 Ala. Acts 159, 185 (emphasis supplied).  That statute was amended in 1935, and the term "market value" was substituted for "cash value," but the sixty percent assessment ratio was retained.  *See* Act of July 10, 1935, No. 194, § 6, 1935 Ala. Acts 256, 263 ("All taxable property within this State shall be assessed for the purpose of taxation at 60% of its fair and reasonable *market value*.") (emphasis supplied), subsequently codified at Ala. Code Title 51, § 17 (1940) (Recomp. 1958).

---

[562] *See*, *e.g.*, Ira W. Harvey, *A History of Educational Finance in Alabama* 464 (Auburn, Ala.: Truman Pierce Institute for the Advancement of Teacher Education 1989) ("**Harvey I**"); Keith J. Ward & Betty D. Sparkman, *Property Tax Administration:  Reappraisal in Alabama* 100-01 (Auburn, Ala.:  Office of Public Service & Research, School of Arts & Sciences 1980) ("**Ward & Sparkman**").  As discussed elsewhere in this opinion, the "assessed value" of taxable property in Alabama now is different from, and less than, its "appraised, fair market value."

The statutory requirement for a uniform assessment ratio of sixty percent of the fair and reasonable market value of all taxable property was briefly extinguished by a 1967 Act that repealed Alabama Code Title 51, § 17 (1940) (Recomp. 1958), and replaced it with statutory language allowing taxable property to be assessed at *any ratio* of fair market value *up to*, *but not more than*, thirty percent of the appraised value. *See* Act of September 8, 1967, No. 502, § 1, II 1967 Ala. Acts 1215 ("All taxable property within this state shall be assessed for the purpose of taxation *not to exceed* thirty percent of its fair and reasonable market value.") (emphasis supplied), subsequently codified at Ala. Code Title 51, § 17(1) (1940) (Recomp. 1958) (Supp. 1969).[563]  That statutory provision was effective for less than four years, however.  It

---

[563] This Act was sponsored by Senator James S. Clark of Barbour County, one of the Black Belt counties, and introduced as Senate Bill 56, the stated purpose of which was: "To regulate the rate of assessing property for taxation and repeal conflicting laws."  "Jimmie" Clark, as the Senator from Barbour generally was known, was a very powerful figure in Alabama politics for nearly forty years.  He served four consecutive terms in the Alabama Senate (1959 to 1975), then as Mayor of Eufaula from 1976 to 1978, followed by four consecutive terms in the Alabama House of Representatives (1983 to 1999), during the last three of which he was Speaker of the House of Representatives.  The Act referenced in the text accompanying this marginal note read as follows:

SECTION 1.  All taxable property within this State shall be assessed for the purpose of taxation not to exceed thirty per cent of its fair and reasonable market value.

SECTION 2.  Code of Alabama Title 51, Section 17, which conflicts with this Act, and all other laws or parts of law in conflict herewith[,] are hereby repealed.

SECTION 3.  This Act shall take effect October 1, 1967.

Act of September 8, 1967, No. 502, § 1, II 1967 Ala. Acts 1215 (subsequently codified at Ala. Code Title 51, § 17(1) (Recomp. 1958) (Supp. 1969)).

was declared unconstitutional on June 29, 1971, in *Weissinger v. Boswell*, 330 F.

Supp. 615 (M.D. Ala. 1971) (three-judge court) (*per curiam*) ("*Weissinger I*"), a case

that will be discussed in more detail in Parts II(G)(3)(h) & (i), *infra*.

There were two rationales for the *Weissinger* Court's determination that Act No.

502 was unconstitutional: one state, and the other federal. The state law rationale was

the Alabama constitutional provision requiring that "[a]ll *bills for raising revenue*

shall originate in the house of representatives." Ala. Const. art. IV, § 70 (1901)

(emphasis supplied). The Alabama Supreme Court had often construed the term "bills

for raising revenue" as meaning "[a]ny bill . . .whose chief purpose is to create

revenue, *or to* increase or *decrease revenue as created in another act. . . ." In re*

*Opinion of the Justices*, 238 Ala. 289, 290, 190 So. 824, 825 (1939) (emphasis

supplied).[564] Act No. 502 "decrease[d] revenue as created in" Alabama Code Title 51,

§ 17, the statute it repealed. The Act also originated in the Alabama Senate.

Therefore, it was unconstitutional under state law.

> There can be no question that a bill which attempts to lower the ad
> valorem assessment rate from a fixed rate of 60 percent to a maximum
> rate of 30 percent is one "whose chief purpose is to . . . decrease

---

[564] *Accord Glasgow v. Aetna Ins. Co*., 284 Ala. 177, 180, 223 So. 2d 581, 583 (1969) (same); *In re Opinion of the Justices*, 260 Ala. 81, 82, 68 So. 2d 840, 841 (1953) (same); *In re Opinion of the Justices*, 259 Ala. 514, 516, 66 So. 2d 921, 923 (1953) (same); *see also*, *e.g.*, *In re Opinion of the Justices*, 249 Ala. 389, 390, 31 So. 2d 558, 559 (1947) ("If the proposed act affects the amount of revenue which flows into the State treasury, either as an original measure, or as an amendment to one already in existence, it is one to raise revenue as provided in the first part of section 70.").

264

revenue."  Section 17(1), being a revenue bill, should, therefore, have originated in the House of Representatives.

*Weissinger I*, 330 F. Supp. at 624 (footnote omitted).[565]

The  federal  rationale  for  invalidating  Act  No.  502  was  based  upon  the *Weissinger* Court's determination that the assessment scheme created by the statute was arbitrary and irrational and, therefore, could not survive scrutiny under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[566]

> [A] statute which fails to provide clearly ascertainable and well-defined standards  to  guide  the  ministerial  officers  charged  by  law  with  its implementation  and  administration  creates  an  unwarranted  and  void delegation of legislative power.
>
> Section 17(1), literally interpreted, encourages, if not authorizes, the very situation we have previously condemned — unequal taxation among members of the same class — by permitting state and local tax officers to use assessment rates ranging from 0 to 30 percent of fair market value.  Vesting such wide discretion in the hands of tax officers, no matter how good their motives, necessarily will result in an arbitrary and discriminatory system of taxation.

---

[565] *See also Hornbeak v. Hamm*, 268 F. Supp. 549, 556 n.1 (M.D. Ala. 1968) (three-judge court) (Johnson, J., dissenting) (stating that Senate Bill 56, which became the Act subsequently codified as Ala. Code Tit. 51, § 17(1), "is clearly unconstitutional by reason of § 70, Article 4, Constitution of Alabama, which requires that all bills for the raising of revenue originate in the House of Representatives").

[566] The Supreme Court has held that a statute violates due process if the terms of the enactment are so vague that they "authorize and even encourage arbitrary and discriminatory enforcement," *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999), or if the statute "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (decided in the context of the Fifth Amendment Due Process Clause) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

> The power of taxation is a peculiarly legislative function. Delegating to an administrative agency the power to fix the ratio of assessment, without formulating a definite and intelligible standard to guide the agency in making its determination, constitutes an unconstitutional delegation of legislative power.

*Id*. at 625.

As a result of the invalidation of Act No. 502, the assessment rate reverted to the uniform, sixty percent of appraised, fair-market-value ratio established during the 1935 Legislative Session.[567]   It remained at that ratio until Amendment 325 was declared to have been ratified on June 8, 1972, and thereby created a system of tax classifications with varying assessment ratios that was slated to become effective "[o]n or after October 1, 1978."[568]

### c.    *State v. Alabama Power Co*. — Ala. Sup. Ct. (Oct. 19, 1950)

> *Invidious exemptions or discriminations, by which the property of an individual, or of a corporation, is relieved from bearing a just proportion of the common burden* [that] *taxation is intended to discharge, are violative of the equality of right of the citizen, which is a fundamental principle of our institutions.*

---

[567] *See id.* at 625 ("Since Section 17(1) [Act No. 502] is unconstitutional in violation of Section 70 of the Alabama Constitution, Title 51, Section 17, which purported to have been repealed by Section 17(1), remains in full force.") (footnote and citations omitted; *see also* Act of July 10, 1935, No. 194, § 6, 1935 Ala. Acts 256, 263 (subsequently codified at Ala. Code Title 51, § 17 (1940) (Recomp. 1958)); Act of March 31, 1911, No. 216, § 36 A, 1911 Ala. Acts 159, 185 (providing that "taxable property within this State shall be assessed, for the purpose of taxation, at sixty per cent of its fair and reasonable cash value").

[568] Ala. Const. amend. 325, § (a) (amending Ala. Const. art. XI, § 217 (1901, amended 1972, 1978)) ("On and after October 1, 1978, all taxable property within this state, not exempt by law, shall be divided into the following classes for the purposes of ad valorem taxation: . . . .").

266

*Mayor of Mobile v. Stonewall Insurance Co.*, 53 Ala. 570, 579
(1875) (Brickell, C.J., unanimous opinion).[569]

The statutory requirement for property to be assessed at sixty percent of its fair

market value was systematically and intentionally ignored by Alabama taxing

authorities for most of the twentieth century.   County tax assessors and boards of

equalization commonly assessed taxable property at no more than forty percent of fair

market value,[570] and usually a great deal less than that.[571]   Such willful refusals to

acknowledge and follow state law were first brought to a head in 1949, when the

Alabama Power Company complained of the fact that the State Department of

Revenue (which is charged by statute with the sole responsibility of assessing for

---

[569] *See also*, *e.g.*, III Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* 225 (New York:  P.F. Collier & Son ed. 1902) (1776) ("The subjects of every state ought to contribute towards the support of the government, as nearly as possible, in proportion to their respective abilities; that is, in proportion to the revenue which they respectively enjoy under the protection of the state.").

[570] *See*, *e.g.*, *State v. Alabama Power Co*., 254 Ala. 327, 337, 48 So. 2d 445, 453 (1950) ("In the case at bar there is . . . an allegation of an intentional and systematic undervaluation of the property of other taxpayers generally at less than forty percent and the valuation of appellee's property at sixty percent.").

[571] *See*, *e.g.*, *Weissinger I*, 330 F. Supp. at 621 (noting that a 1969 assessment-sales ratio study conducted by the Department of Revenue revealed that the median assessment ratios for Alabama counties ranged "from lows of 6.7 and 7 percent of fair market value in rural Hale and Washington Counties to highs of 23.1 and 26.8 percent of fair market value in urban Madison and Jefferson Counties," and that the median assessment ratio for the State as a whole "was approximately 16.9 percent of fair market value"); *Louisville and Nashville Railroad Co. v. State*, Nos. 36367, 36642, and 36936, slip op. at 8 (Circuit Court of Montgomery County, Ala., in Equity Apr. 5, 1967) (finding that, in 1967, the "general level of assessment in Alabama" was "approximately 15.4%" of fair market value and "the average with any reasonable degree of probability does not exceed 16.1% and could not exceed 16.7%").

267

taxation all property of railroads and public utilities operating within the State[572]) had assessed the company's properties located in 58 of Alabama's 67 counties at the statutorily-required rate of sixty percent of fair market value, while county tax authorities had assessed comparable properties of other taxpayers in the same jurisdictions at ratios that did not exceed forty percent of market value.[573]

The power company asked the Court to "vacate and set aside the final assessment made by the Department against its properties and fix the assessment of its properties for the tax year 1949 . . . at a figure not in excess of the percentage at which other property is generally and systematically assessed in Alabama."[574]

The Alabama Supreme Court agreed that such disparate assessment ratios violated the uniformity and equality policies undergirding Sections 211 and 217, and held that "all taxable property in the state, by whomever owned, must for ad valorem tax purposes be taxed uniformly and equally at the same rate and the same ratio of assessment."  *State v. Alabama Power Co*., 254 Ala. 327, 340, 48 So. 2d 445, 456 (1950).

      What we want to make clear is that railroads and public utilities

---

[572] *See*, *e.g*., Ala. Code Tit. 51, § 142 (1940) (Recomp. 1958), now codified at Ala. Code § 40-21-1 (1975) (2008 Replacement Vol.).  The Department apportions the assessed values of such properties and the taxes received among the counties, municipalities, school districts, and other tax districts within the State.  *See*, *e.g*., Ala. Code §§ 40-21-17, 40-21-27.

[573] *See Alabama Power Co.*, 254 Ala. at 331-32, 48 So. 2d at 447.

[574] *Id.* at 332, 48 So. 2d at 447-48.

cannot be put in a class to themselves and their property taxed on a basis different from other taxpayers in the light of §§ 211 and 217 of the Alabama Constitution.  If this were not true not only would §§ 211 and 217 of the Alabama Constitution be emasculated but the confusion which would result is apparent.  It would mean that if a piece of real estate is owned by an individual, the county tax assessor could assess the same at less than 40% of its value, while on the contrary if an adjacent piece of real estate is owned and occupied by a company which is a public utility as an office or store, it could be assessed at 60% of its value.  No such power can be said to exist under the Alabama Constitution.

*Id.* at 338-39, 48 So. 2d at 454.

The Supreme Court held that the Alabama Department of Revenue could not assess the property of public utilities and railroads at the statutory ratio of sixty percent of fair market value, as long as county tax authorities were systematically employing lower assessment ratios on all other property.[575]  Accordingly, the Court ordered the Department to re-assess the power company's property at a ratio not greater than forty percent of its fair market value, reasoning that, "where it is impossible to secure both the standard of the true value [*i.e.*, the statutory requirement for *all* assessments to be at sixty percent of fair market value], and the uniformity and

---

[575] *See* Harry H. Haden, *Equality — The Cornerstone of Democracy*, 21 Ala. Law. 269, 271 (1960) ("**Haden**") (construing the *Alabama Power Co.* opinion as holding "that the sixty per cent assessment could not be used unless the State could show that enough property was assessed at sixty per cent [by county tax authorities] to dispel the lack of uniformity, and denial of due process, which would result from the use of the statutory ratio on certain property [railroads and public utilities] and at the same time a lessor [sic] ratio on other property") (alterations added); *see also* Anne Permaloff & Carl Grafton, *Political Power in Alabama: The More Things Change . . .* 107 (Athens: The University of Georgia Press 1996) ("**Permaloff & Grafton I**") ("In 1950 the Supreme Court of Alabama held that assessment at 60 percent could not be enforced because virtually no property was in fact assessed at that amount.").

269

equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law."[576]

> **d**.    **The interregnum** — *1950 - 1959*

The Alabama Supreme Court's holding in the *Alabama Power Co.* case inevitably resulted in substantial losses of revenue to all taxing authorities.  Even so, nothing was done to compel county tax assessors and boards of equalization to alter their systematic under-assessment of property.  The Alabama Legislature's "Interim Committee on the Revision of State Taxes" reported in June of 1957 that, despite the pervasive failure of taxing authorities to comply with state laws regulating the appraisal and assessment of property, no remedy had been provided by either the Commissioner of the Alabama Department of Revenue, or the office of Governor James E. Folsom.[577]  The Committee's report stated, in part, that:

> For tax purposes property in Alabama is valued whimsically and erratically under 67 county assessment units.  The statutory requirement is that property shall be assessed at 60 per cent of actual market (cash) value.  Actual assessments are at levels far below the statutory ratio.  Not a few counties are assessing at less than 20 percent; no county exceeds a 35 per cent level of assessments.

---

[576] *Alabama Power Co.*, 254 Ala. at 341, 48 So. 2d at 457 (citation and quotation marks omitted, bracketed alteration supplied).

[577] James E. "Big Jim" Folsom — "the little man's big friend" — served two, non-consecutive terms as Governor of Alabama.  *See* Carl Grafton & Anne Permaloff, "James E. Folsom, 1947-1951, 1955-1959," *Alabama Governors* 197-210 (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) (**"Permaloff & Grafton II"**).

For locally-assessed property the average assessment level in the state is estimated at 25 per cent of actual value. This ratio of assessed to true value fixes *the effective maximum state tax rate at a very low* 1.6 *mills.*

Public utility property is assessed centrally by the State Department of Revenue. Uniform assessment of this type of property has been achieved. Although well below the legal 60 per cent ratio, utility assessments are considerably above the levels of locally-assessed property.[578]

e.    **The Haden Regulation** — *1959*

Following Attorney General John Patterson's 1958 election to the office of Governor, he envisioned two primary objectives for his administration: funding public education at an adequate level;[579] and, reforming the state's property tax system.[580] Of

---

[578] Alabama Department of Archives & History, Accession No. SG 1964 Sec. of State, Bills & Resolutions (Report of Interim Legislative Committee on the Revision of State Tax Laws, *Current Tax Problems in Alabama* 16 (Montgomery, Ala.: June 1957) (emphasis in original)); *see* Fed. R. Evid. 201 (Judicial Notice), 803(8) (Public Records and Reports), 803(16) (Ancient Documents), and 807 (Residual Exceptions); *see also* Harvey I, at 465 (quoting first paragraph of textual material).

[579] *See, e.g.*, Anne Permaloff & Carl Grafton, "John Patterson, 1959–1963," in *Alabama Governors* 210 *et seq.* (Tuscaloosa: The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) ("**Permaloff & Grafton III**").

Patterson's upbringing as the son of two schoolteachers predisposed him to support public education, and his campaign travels exposed him firsthand to the deplorable condition of the public education system of Alabama. Urban schools were overcrowded due to the migration of population from Black Belt counties. The physical plants of hundreds of schools were in appalling condition, with an estimated $340 million needed to repair rotting floors and leaking roofs and to replace inadequate plumbing and heating systems. More than one hundred schools had failed to attain accreditation standards and were on probation. Serious underfunding led to actual and threatened loss of accreditation for several programs on the college and university levels. Property taxes, the major source of local support, were so low that public school funding was inadequate. Reports from a blue-ribbon Commission on

271

course, both objectives were inextricably intertwined.

In connection with his ambition to reform the property tax system, Patterson asked Harry H. Haden, a professor on the faculty of the University of Alabama School of Law, to become Commissioner of the Alabama Department of Revenue.  Patterson had been a student of taxation under Professor Haden,[581] and he told his former

---

Alabama Education created by a legislative act in 1957, a legislative interim committee, and group meetings of educational leaders outlined actions to be taken. From these recommendations, Patterson forged a "rescue" reform package, which he presented to a special session of the legislature in June.

       Patterson's plan contained a tax package designed to raise $42 million per year in additional revenues beyond current educational funding levels.  Increased revenue was to come from higher taxes on the sale of automobiles, reductions in exemptions for personal income tax, and increases in corporate income tax rates.  In addition, he proposed a $75 million bond issue for school construction with two-thirds of the funds to be allocated to public schools and one-third to higher education.  In order to build legislative support, Patterson identified specific allocations in the plan for each school district and for each university and college and advertised them before the special session met.  . . .

*Id*. at 213.

[580] *See, e.g., id.* at 214:

Related to the education battle was Patterson's campaign for property tax equalization.  Each county had a board of equalization whose job was to hear appeals from property owners who believed their property had been assessed unfairly.  The state revenue commissioner appointed members to a four-year term but had to select them from a list submitted by the county commission, county board of education, and a county commissioner of revenue.  County boards of equalization rarely raised an assessment and frequently lowered them.  Furthermore, although Alabama's 1901 constitution called for property taxed to be assessed at 60 percent of its fair market value, this was never done in any county.  In 1950 the Alabama Supreme Court overturned the 60 percent rate, noting that actual assessments tended to run at 5 to 15 percent of fair market value with high population counties such as Jefferson and Mobile having their property assessed at higher rates.

[581] Haden, at 269 ("Soon after I joined the law faculty at the University of Alabama I became

272

professor that he wanted the Commissioner of Revenue "to be a man who knows taxation and who is free of political obligations."[582]  Professor Haden agreed to leave his academic post and accept the appointment, but only upon the basis of an understanding with the Governor-elect that he would be allowed to run the Alabama Department of Revenue "according to law and free of politics."[583]

The year after assuming his duties, Haden wrote an article for *The Alabama Lawyer*, the official journal of the Alabama State Bar Association, in which he said that, after reviewing the forty-five taxes administered by the Department of Revenue,

> I found that the tax being administered further from the law than any other was, and is, the Ad Valorem Property Tax.  I say that I found this.  That is not a true statement.  I knew that this was the situation before becoming Commissioner, and every citizen of the State who has ever given this any thought knows that this is the situation.[584]  In the past a defeatist attitude has been taken in this matter.  I simply could not accept the position of Commissioner of Revenue with the avowed intent of running the Department according to the law and free of politics and not face the ad valorem tax situation *head-on*.[585]

---

acquainted with a very excellent student by the name of John Patterson.  I recognized in this student sincerity, scholastic ability, honesty, and determination.  My judgment made at that time has proven to be a correct analysis.").

[582] *Id*.

[583] *Id*. at 269-70.

[584] *Id*. at 273 (observing that:  "A 'Sales-Assessment Ratio Study,' made in 1955, indicates that of the 22,229 taxpayers who purchased property during the study, 11% were assessed at over 35% of what they paid for the property, while 4% were assessed at less than 5% of what they paid for the property.  This study shows that 26% were assessed at between 5% and 15% of what they paid for the property, and that 56% fall between 15% and 35%.  Continued study of this subject indicates that the situation shown by this 1955 study is still basically true today.").

[585] Haden, at 270 (emphasis supplied).

273

Haden's "head-on" approach began with a recognition of two facts.  *First*, the various county tax assessors, the county boards of equalization, and the State Department of Revenue were, jointly and severally, "under a statutory duty to equalize assessments at that percentage of true value nearest sixty per cent of the 'fair and reasonable market value' which [would] protect the taxpayer's right to uniformity and due process."[586]  *Second*, "[i]f any one of these three [taxing authorities] had performed their statutory duty, the State would not be in the unconscionable position it is now in with regard to ad valorem assessments."[587]

Haden's initial step in the effort to correct the systemic problems that existed was to launch a study aimed at determining the highest percentage at which an "appreciable" amount of taxable property then was being assessed in the State.[588] After several false starts, he settled on a thirty percent assessment ratio,[589] and issued a Regulation directing county taxing authorities to assess all property subject to taxation at thirty percent of its fair and reasonable market value.  The regulation also defined the term "fair and reasonable market value and suggested some of the types

---

[586] *Id.* at 274 (bracketed alterations supplied).

[587] *Id*. (bracketed alterations supplied).

[588] *See id*. at 272 ("I felt that one of my first duties upon taking office should be to decide what per cent of the fair and reasonable market value should be used by the persons having the duty to assess.  For this reason I assigned to several competent men the task of deciding the highest per cent at which an 'appreciable' amount of property was being assessed.").

[589] *Id*.

of evidence which should be used in arriving at the figure."[590]  Haden's authority for the directive was a statutory provision empowering the Revenue Commissioner to step in, and to appraise, assess, levy, and collect taxes whenever a county tax assessor or board of equalization failed to do so.[591]

Haden later stated his opinion that an across-the-board, "true equalization of assessments" at thirty percent of the appraised, fair market value of all taxable property — only half of what statutory law then required, but more than double the assessment ratios then being arbitrarily and unlawfully applied by most county tax

---

[590] *Id.*

[591] For contemporary authority to this effect, see Ala. Code §§ 40-2-11(1), (2) (1975).  The three-judge court's decision in the *Weissinger* case, *Weissinger v. Boswell*, 330 F. Supp. 615 (M.D. Ala. 1971) (three-judge court) (*per curiam*) (footnotes omitted, bracketed alteration supplied) ("*Weissinger I*"), summarized preexisting Alabama law as follows:

> The State Department of Revenue is charged with the responsibility of equalizing the various county equalization board assessments and its own assessments on railroad and utility property, so that all taxable property in the state will be assessed in accordance with Sections 211 and 217.  Sections 131 and 133 of Title 51 of the Code of Alabama authorize the Department of Revenue to exercise general and complete supervision over and control of valuation, equalization, and assessment of property "to the end that all taxable property in the state shall be assessed and taxes shall be imposed and collected thereon in compliance with the law, and that all assessments on property . . . shall be made in exact proportion to the fair and reasonable market value thereof."

> The defendant [Commissioner of Revenue], as the chief executive officer of the Department of Revenue, thus has the responsibility for seeing that all taxable property in the state is assessed at uniform assessment ratios for ad valorem tax purposes. . . .

*Weissinger I*, 330 F. Supp. at 620-21 (footnotes omitted, bracketed alteration supplied).

275

assessors — would have increased annual tax receipts by at least $43.6 million,[592] more than enough to fund Governor Patterson's education initiatives.  Even so, after Haden issued his Regulation, "the lid blew off" in the State Legislature.[593]  Professors Permaloff and Grafton wrote that legislative opposition to Haden's regulation was "immediate and ferocious,"[594] and reprinted Bob Ingram's account of Haden's testimony to the Senate Finance and Taxation Committee that appeared in the March 8, 1959 edition of the *Montgomery Advertiser*:

> Haden went into painful detail citing the inequities which exist in assessments.  Especially was this the case, the non-political Haden observed, in the assessing of timber land, industrial property and farms.
>
> Sen. E. O. Eddins of Marengo, like Haden a Patterson man, nearly had apoplexy.  Rep. Ira Pruitt of Sumter, also a Patterson man, appeared on the verge of a stroke. . . [Pruitt] picked up a pencil and began to do a little figuring, obviously calculating what it would cost him (and his clients) if Haden's program was carried out.  When he completed his multiplying a look of sheer terror flashed across his flushed fact.
>
> Haden, nobody's fool, wasn't long in sensing the effect his words were having on some of the Patterson people.  But this only seemed to encourage him to new heights.

---

[592] The actual amount of Haden's estimated increase was $43,609,134.  *See* Haden, at 276.

[593] *Louisville and Nashville Railroad Co. v. State*, Nos. 36367, 36642, and 36936, slip op. at 3-4 (Circuit Court of Montgomery County, Ala., in Equity Apr. 5, 1967) ("Commissioner Haden, in the exercise of his statutory powers, issued an order in 1959 directing that ad valorem assessments be equalized throughout the State at 30%.  Such equalization at 30% would have produced additional revenues of over $43,600,000.  *One of the witnesses testified that when this order was issued 'the lid blew off' in the Legislature*.") (emphasis supplied).

[594] Permaloff & Grafton III, at 214.

Sen. Eddins finally broke in to voice a complaint.  After all, he reasoned, assessments in Marengo County had been increased 106 percent in the past 10 years.

"You ought to give some credit to counties who have done a good job like that," Eddins complained.

Had he been very politic Haden could have agreed to this thinking and in doing so reduce Eddins' rocketing blood pressure.  But he didn't.

"The assessments are still too low," Haden retorted.  "I can show you instances right now in your county where some property is assessed at 3 percent of its value while other property is assessed at 30 per cent."[595]

A classic Black Belt–Big Mule coalition formed in opposition to Haden's attempt to reform the property tax system's irrational, "crazy quilt" pattern of disparate assessment ratios across the State.[596]  Newspapers reported that Haden also had "antagonized the powerful farm bloc in the legislature along with large timberland owners and big industry."[597]  Those interest groups coalesced in support of a package of "Anti-Haden Bills" that were designed to strip the office of Revenue Commissioner of its statutory authority to seize control of the tax computation and collection process from county authorities, even though most local officials then were conducting

---

[595] Permaloff & Grafton I, at 108-09.

[596] *See* Parts I(D)(1) and (2), *supra*, defining "Black Belt" and "Big Mules."

[597] Warren Trest, *Nobody But The People: The Life and Times of Alabama's Youngest Governor* 282 (Montgomery, Ala.:  New South Books 2008) ("**Trest**") (quoting Hugh W. Sparrow, "Patterson, Legislature may fight on assessments," *Birmingham News*, Apr. 12, 1959; "Solons Open Fight to Kill 30 Pct. Tax," *Dothan Eagle*, June 5, 1959).

appraisal, assessment, and collection functions in blatant derogation of State law.[598]

Professors Permaloff and Grafton provided the following account of the legislative shenanigans that ensued.

> During one committee hearing, Albert Davis (a former senator from Pickens County) and other Farm Bureau speakers drew applause as they tried to characterize equalization as a power grab by the revenue commissioner. The *Montgomery Advertiser* described the scene: "Davis, his white hair cut in a senatorial sweep, pumped out his indictment in orotund language. At one point, he got carried away and addressed the committee as 'gentlemen of the jury.'" His arguments had a well-used ring about them: "The power to tax is the power to destroy." "That's too much power for one man. The only man I would trust with that much power is the man who walked up Golgotha's hill." "My God, the sins that have been committed in the name of education."

> Anti-property tax legislators launched a filibuster that stopped the general appropriation bill. Filibuster participants included the Black Belt leader J. Roland Cooper; Walter Givhan, a veteran Farm Bureau, Citizens Council, and Black Belt power-wielder; and Bob Kendall, a frequent Black Belt supporter. While the hard core of filibusterers came from the Black Belt, the extended debate enjoyed support far beyond their ranks and included Senator Larry Dumas of Jefferson County.

> The major foes of property tax equalization were rural, but Larry

---

[598] Warren Trest, Governor Patterson's authorized biographer, recounted that:

> When the [Anti-Haden] bill's sponsors got enough signatures in both houses to pass it, they went to the governor with an ultimatum that if the commissioner didn't back off the plan to equalize property taxes, they were going to take the authority away from him. They threatened dire consequences for the state, perhaps resulting in losses of millions of dollars in revenue annually, and might have even bankrupted some counties suffering losses from taxes on public utilities. Patterson "decided that the better part of valor would be [a] strategic retreat."

Trest, at 283 (footnote omitted).

Dumas's active opposition, plus that of Associated Industries, individual mining companies and the Alabama Mining Institute, the Committee of 100, U.S. Steel, and Alabama Power, indicate that the ["Big Mule"] alliance was still functioning. John Patterson regards this explanation as valid, saying that opposition to equalization came from a "classic Black Belt-industrial coalition (with some exceptions) with a lot of other help and little enthusiasm on our side."

The Alabama League of Municipalities favored equalization, but Patterson believes that Ed Reid, the organization's politically astute head, regarded equalization as a lost cause even before the fight began and expended little effort on its behalf. "Even school people didn't support us much," Patterson says today, shaking his head in disbelief.

Patterson and the anti-property tax reform group finally agreed to end the filibuster. Under the truce, as reported in newspapers, Patterson would allow the bills that would strip Haden of his equalization powers out of the Senate Finance and Taxation Committee once the regular session resumed. The actual terms of the truce were different from those made public. Patterson promised to end widespread equalization in return for the legislature's abandoning the anti-equalization bills that would have stripped the revenue commissioner (Haden) of his authority.

According to Patterson, the leader who most effectively represented anti-equalization interests was Dallas County's Walter Givhan. J. Bruce Henderson, a former senator from Wilcox County, also played an important role behind the scenes. Both men had supported Patterson's gubernatorial candidacy because of his civil rights position, and both enjoyed support in Jefferson County. Givhan was always associated publicly with Black Belt agricultural interests, but he received campaign money from Jefferson County contributors even when he had no opponents.

Patterson finally gave up the fight in order to avoid damaging the revenue commissioner's authority and, less important, because he did not want to further antagonize the many legislators who opposed equalization but favored increased spending for education. "It became

obvious that they would win.  We felt that it was better to have the power and not exercise it than not have the power.  If we hadn't done this, the power would have been stripped."

In describing his defeat on equalization and his partial victory on school taxation, Patterson sketched out the basic technique by which Big Mules developed long-term legislative support.  A young man fresh out of law school would put up his shingle in a rural county as one of perhaps fifteen or twenty attorneys in the county.  He had no business.  Then a representative of Alabama Power Company would offer him a five-hundred-dollar-a-month retainer.  A railroad company would offer another five hundred, an insurance company another five hundred, and so forth.  Soon the young lawyer would have a steady two-thousand-dollar monthly income and have done little or nothing to earn it.  Then he might get into the legislature, perhaps with additional support from his benefactors.  "Do you think he will be reminded of those retainers?" Patterson asked rhetorically.[599]

Following the withdrawal of Commissioner Haden's Regulation, Alabama's *ad valorem* property tax system continued to be administered in an arbitrary and systemically dysfunctional manner.[600]  That began to change in 1967, however, with

---

[599] Permaloff & Grafton I; *see also*, *e.g.*, Permaloff & Grafton III, at 214.

[600] The Montgomery County, Alabama Circuit Court Judge who rendered the decision in the *Louisville & Nashville Railroad* case described in the subsection immediately following this one stated in 1967 that he had been unable to find that the Department of Revenue had

taken any effective steps to equalize ad valorem taxation in Alabama at 40%, 30%, or even 20% [in the years following the withdrawal of Commissioner Haden's 1959 Regulation].  In fact, one witness for the State who has been head of the Ad Valorem Tax Division for 12 years admitted that during such period of time neither he nor the Department had set aside all assessments of real property in Alabama, nor had he done it in any one county in the state.  In fact, he admitted that during that 12-year period he had not set aside a single assessment involving one piece of real property in the State of Alabama.  Despite these undisputed facts and history, this same Department continued to assess L&N at 40%.  The head of the Department which assesses L&N and others similarly situated testified that as such he had no

280

the court cases discussed in the following subsections.

> **f.**    ***Louisville and Nashville Railroad Co. v. State*** — Montgomery County, Ala. Circuit Court (Apr. 5, 1967)

Even though the Louisville and Nashville Railroad Company ("L & N") had not been a party to the *Alabama Power Co.* case discussed in Part II(G)(3)(c), *supra*, that company, along with all other railroads and public utilities owning property in Alabama, had been a beneficiary of the Alabama Supreme Court's decision. Eventually, however, the railroad tired of paying *ad valorem* taxes calculated at a ratio of forty percent of the fair market value of its taxable property, while comparable properties in the same localities were assessed by county tax authorities at far lower ratios to value.  Consequently, during three successive tax years (1964, 1965, and 1966), L & N appealed the assessments levied against it by the Alabama Department of Revenue to the Circuit Court of Montgomery County, Alabama.  Following a trial of the consolidated cases,[601] the circuit judge found, among other things, that:

> 1.  The general level of assessment in Alabama (exclusive of centrally-assessed property) is approximately 15.4% of fair and

---

> jurisdiction or authority over the assessment of other taxpayers generally.  However, the Department itself under our laws had the power and the duty to equalize [all assessments in the State].

*Louisville and Nashville Railroad Co. v. State*, Nos 36367, 36642, and 36936, slip op. at 4 (Circuit Court of Montgomery County, Ala., in Equity, Apr. 5, 1967) ("*L & N R.R.* ").

[601] The three appeals were assigned Montgomery, Ala. Circuit Court Case Nos. 36367, 36642, and 36936, respectively, but eventually all were consolidated for a single trial and decision.

reasonable market value and the average with any reasonable degree of probability does not exceed 16.1% and could not exceed 16.7%.

    2.  L & N's properties were systematically and intentionally assessed at 40% of fair and reasonable market value.

    3.  Such disparity in assessment ratio is systematic and intentional and is illegal and discriminatory.

    4.  L & N is entitled to have its assessments reduced.

    5.  In the exercise of the Court's equitable powers . . . the Court finds that L & N's assessments should be reduced to 36⅔% for 1964, 33⅓% for 1965, and 30% for 1966, of fair and reasonable market value.[602]

The state circuit court retained jurisdiction of the case "for the purpose of receiving periodic reports at least annually from [the State Department of Revenue] of what steps it has taken to achieve uniformity among all taxpayers in Alabama, whether centrally or locally assessed, as required by the Constitution and laws of this State. . . ."[603]

    **g.**    ***Hornbeak v. Hamm*** — M.D. Ala. Civil Action No. 2608-N

As discussed above, in Part II(G)(3)(b), the 1935 statute requiring that all

---

[602] *L & N R.R.*, slip op. at 8. A copy of the state circuit court's slip opinion in the *L & N R.R.* case was attached as Exhibit "G" to the Aug. 28, 1969 answers of defendant Harvey L. Rabren, Commissioner of the Alabama Department of Revenue (*i.e.*, the predecessor to defendant Julie P. Magee in the present action) to interrogatories propounded by plaintiffs in the case of *Hornbeak v. Rabren*, No. 2877-N, M.D. Ala., discussed in Part II(G)(3)(h), *infra*. As such, it is a matter of which this court may take judicial notice under Fed. R. Evid. 201.

[603] *L & N R.R.*, slip op. at 10.

taxable property be assessed at sixty percent of its "fair and reasonable market value"[604] was repealed in 1967 by Act No. 502, which briefly authorized state and county taxing authorities to assess taxable property at any ratio of market value up to, but not more than, thirty percent of the property's fair market value.  *See* Act of September 8, 1967, No. 502, § 1, II 1967 Ala. Acts 1215, subsequently codified at Ala. Code Title 51, § 17(1) (1940) (Recomp. 1958) (Supp. 1969).  That Act had an effective date of October 1, 1967.  Five days later, Martha A. Hornbeak, the owner of real estate located in Jefferson County that had been assessed at thirty percent of its fair market value, filed a suit challenging the constitutionality of Act No. 502 in the U.S. District Court for the Middle District of Alabama.  Her case was assigned Civil Action No. 2608-N.

Hornbeak cited the inequity of allowing tax assessors to arbitrarily assess taxable property at ratios between one and thirty percent of fair market value, and sought to require uniform assessments of all taxable property in the State at the thirty percent ratio applied to her property.  She alleged that the "lack of uniformity of valuation and assessment of property" permitted by Act No. 502 deprived her, and

---

[604] *See* Act of July 10, 1935, No. 194, § 6, 1935 Ala. Acts 256, 263 ("All taxable property within this State shall be assessed for the purpose of taxation at 60% of its fair and reasonable *market value*.") (emphasis supplied) (subsequently codified at Ala. Code Title 51, § 17 (1940) (Recomp. 1958)); *see also* Act of March 31, 1911, No. 216, § 36 A, 1911 Ala. Acts 159, 185 ("All taxable property within this State shall be assessed, for the purpose of taxation, at sixty per cent of its fair and reasonable *cash value*.") (emphasis supplied).

other, similarly situated taxpayers, "of property without due process of law and [was] a denial of equal protection of the laws, in violation of the 14th [sic] Amendment to the Constitution of the United States."  *Hornbeak v. Hamm*, 283 F. Supp. 549, 550-51 (M.D. Ala. 1968) ("*Hornbeak I*") (three-judge court) (Godbold, J., majority opinion) (alterations supplied).   She sought an injunction against the Alabama Revenue Commissioner, who then was Phillip Hamm,[605] to prevent him from continuing, under color of state law, to deprive plaintiffs "of property without due process of law."[606] Two of the members of the three-judge district-court panel assembled to hear Hornbeak's claims dismissed her complaint on April 10, 1968,[607] because, in their view of the jurisdictional statute invoked by Hornbeak, the complaint only raised non-cognizable questions of "property rights."[608]

Hornbeak's constitutional claims were asserted under 42 U.S.C. §§ 1983 and 1988.[609]  However, neither of those statutes provides a jurisdictional basis for claims

[605] On Oct. 6, 1967, the date Hornbeak filed this action, Lurleen Burns Wallace, the wife of George C. Wallace, was Governor of Alabama.  *See*, *e.g.*, Glenn T. Eskew, "Lurleen B. Wallace, 1967–May 1968," in *Alabama Governors* 230 *et seq.* (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.).

[606] *Hornbeak I*, 283 F. Supp. at 551.

[607] Such a court was assembled because, in 1967, 28 U.S.C. § 2281 provided that an "injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute . . . shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application thereof is heard and determined by a district court of three judges."

[608] *Hornbeak I*, 283 F. Supp. at 554.

[609] For the benefit of readers not familiar with federal jurisprudence, 42 U.S.C. § 1983

asserted under their rubric.  Instead, both are "remedial vehicles": *that is*, they are

means of asserting claims that a person has been deprived of rights, privileges, or

immunities secured by the Constitution and laws of the United States.  For example,

as the Supreme Court once observed when addressing claims asserted under 42 U.S.C.

§ 1983, that statute is "not jurisdictional," and it is not "itself a source of substantive

rights, but merely provides a method for vindicating federal rights elsewhere

conferred."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citations and internal

quotation marks omitted).  Section 1988 is expressly non-jurisdictional.[610]

---

provides a means of seeking redress against governmental entities and officials whose conduct, "*under color of state law*," deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes.  Section 1983 was originally § 1 of the Civil Rights Act of 1871, and it was "modeled" on § 2 of the Civil Rights Act of 1866; it also "was enacted for the express purpose of enforcing the provisions of the Fourteenth Amendment."  *Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972) (citations, internal quotation marks, footnotes, and bracketed alterations omitted).  In pertinent part, the statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  Section 1988 is discussed in the text preceding the following footnote.

[610] On the date Hornbeak filed this action, the portion of 42 U.S.C. § 1988 quoted by the majority opinion read as follows:

> Section 1988.  Proceedings in vindication of civil rights.  The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this

Consequently, the "jurisdiction" of federal courts — *i.e.*, their power to entertain claims asserted under either § 1983 or § 1988 — must be based upon other statutes.

Hornbeak had a choice of two jurisdictional statutes upon which to base her claims: 28 U.S.C. § 1343, the jurisdictional counterpart of 42 U.S.C. § 1983; and 28 U.S.C. § 1331, the general "federal question" statute.  Of the two statutes, Section 1331 provided for more expansive jurisdiction, because it afforded jurisdiction in all cases raising a "federal question":  that is, any action in which the plaintiff asserts that a defendant violated the United States Constitution or statute.  In 1967, however, Section 1331 required a plaintiff to allege and prove that more than $10,000 was "in controversy."[611]   In contrast, Section 1343 limited federal jurisdiction to suits involving "civil rights," but no minimum amount in controversy was required.[612]  Hornbeak invoked Section 1343(3) as the basis for her claims:  a jurisdictional choice that proved fatal, because a majority of the three-judge panel concluded that it did not

---

chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced (etc).

*Hornbeak I*, 283 F. Supp. at 550-51 n. 3.

[611] On the date Hornbeak commenced this action, Section 1331 provided that:  "The district court shall have original jurisdiction of all civil actions *wherein the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs*, and arises under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331 (1967) (emphasis supplied).  The amount in controversy requirement was not removed until Dec. 1, 1980, with the passage of Public Law 96-486 (S. 2357), which amended § 1331 to state simply that:  "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."

[612] *See Hornbeak I*, 283 F. Supp. at 551 (majority opinion).

encompass her claims.[613]  Circuit Judge John C. Godbold, who wrote for himself and Southern District of Alabama District Judge Virgil Pittman, adopted a restrictive interpretation of the statute.  According to his majority opinion, the complaint alleged "only a 'property right' and not a 'civil right'" cognizable under § 1343.[614]  That conclusion was based upon a single Fifth Circuit opinion, *Bussie v. Long*, 383 F.2d 766 (5th Cir. 1967), *affirming* 254 F. Supp. 797 (E.D. La. 1966).

> *Bussie* was a similar attack on non-uniform assessments in Louisiana, in which it was alleged that plaintiff was assessed at a higher percentage of value than owners of similar property, and plaintiff asked that the State Tax Commission be ordered to determine actual cost value of all property, to fix a uniform percentage of cash value for purposes of ad valorem taxation and to carry out its statutory duty of equalizing assessments.  Basically these are the same allegations and the same type of relief involved in the case before us.  *Bussie* held such a suit involved only a "property or monetary right" and not a "civil right" within the purview of § 1343.
>
> The *Bussie* ruling was based upon *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 59 S. Ct. 954, 83 L. Ed. 1423 (1939).  There was no opinion of the court as such in *Hague*.  But the

---

[613] On Oct. 6, 1967, the date Hornbeak filed her complaint, the relevant portion of this statute provided that:

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:  . . .  (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

28 U.S.C. § 1343(3) (1967).

[614] *Hornbeak I*, 283 F. Supp. at 554.

concurring opinion of Mr. Justice Stone considered the two jurisdictional statutes, §§ 1331 and 1343, and distinguished between them, saying: "By treating [§ 1343] as conferring federal jurisdiction of suits brought under the Act of 1871 in which the right asserted is inherently incapable of pecuniary valuation, we harmonize the two parallel provisions of the Judicial Code, construe neither as superfluous, and give to each a scope in conformity with its history and manifest purpose." *Id*. at 530, 59 S. Ct. at 971, 83 L. Ed. at 1444-1445. Mr. Justice Stone distinguished between *Holt v. Indiana Mfg. Co*., 176 U.S. 68, 20 S. Ct. 272, 44 L. Ed. 374 (1900), a suit to restrain alleged unconstitutional taxation of patent rights, held not to involve a "civil right" under the predecessor to § 1343, and other cases in which "the gist of the cause of action was not damage or injury to property, but unconstitutional infringement of a right of personal liberty not susceptible of valuation in money."

    . . . .

    The plaintiff does not seek refund of ad valorem taxes or relief from the valuation of her property or the assessment based thereon. She asks that the assessments of all others be brought up to the same level as that against her, 30% of fair and reasonable market value. Such action, done statewide and involving millions of dollars in taxes, is said to make her claim one inherently incapable of pecuniary valuation. But this does not convert the essential nature of the claim from property tax and fiscal to a right of personal liberty.

*Hornbeak I*, 283 F. Supp. at 551-52 (Godbold, J., majority opinion) (bracketed alteration in original, footnote omitted).

    Frank M. Johnson Jr., Chief Judge of the Middle District of Alabama and the third member of the *Hornbeak* panel, filed a vigorous dissent that accused the majority of ignoring the fact that Act No. 502, allowing assessment of property at "anything up to 30 percent," was inequitable, illegal, and failed to meet the minimal demands of the

288

Fourteenth Amendment.

The substance of plaintiff's constitutional claim is that the defendant Commissioner of Revenue for the State of Alabama and his predecessors in office have abridged, and the defendant and his successors in office will continue, unless prevented by this Court, to abridge, the privileges and immunities of the plaintiff and all other citizens of the State of Alabama similarly situated by continuing to refuse to perform, or neglecting to perform, the duties of the office of the Commissioner of Revenue for the State of Alabama.   In testing a complaint against a motion to dismiss, the allegations of the complaint and the reasonable inferences to be drawn therefrom must be assumed to be true.  *Cooper v. Pate*, 378 U.S. 546, 84 S. Ct. 1733, 12 L. Ed. 2d 1030. Thus we find here that Martha Hornbeak, the plaintiff and the owner of real estate located in Jefferson County, Alabama, has her real estate assessed for purposes of ad valorem taxation at 30 percent of its fair and reasonable market value; that the defendant Commissioner of Revenue has the power and duty to maintain equalization of the valuation of real property throughout the State of Alabama for the purposes of assessment for ad valorem taxation; that the defendant Commissioner of Revenue and his predecessors in office have for many years failed, refused or neglected to perform the statutory duties provided by §§ 131 and 133, Title 51, Code of Alabama, pertaining to the supervision and control of the valuation, equalization and assessment of property taxes; [and] that the average assessment of real estate for ad valorem taxation within the State of Alabama is approximately 15.4 percent of the fair and reasonable market value.  The plaintiff says that, by reason of the lack of uniformity in the valuation and assessment of real property by the defendant, she and others similarly situated are deprived of property without due process of law and are also denied the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States. Plaintiff further alleges, and again we must at this point accept as true, that she has no adequate state remedy.  To me, such allegations constitute a cause of action under 42 U.S.C. §§ 1983 and 1988 and are, therefore, cognizable under the federal jurisdictional statute, 28 U.S.C. § 1343(3).

. . . .

289

In dismissing this case, the majority of this Court is judicially determining that Alabama's statutory procedure for taxation, regardless of how inequitable or illegal, is not subject to the minimal demands of the Fourteenth Amendment to the Constitution of the United States. I simply do not believe this to be the law of this country. It is my firm conviction that such arbitrariness on the part of the State authorities (and upon the present submission it is conceded that the plaintiff has no State remedy) in the assessment of real estate for purposes of taxation by the State of Alabama is, if the appropriate complaint and allegations are made under 42 U.S.C.A. § 1983, cognizable in a federal district court as a "civil action for deprivation of rights" and jurisdiction exists under 28 U.S.C.A. § 1343(3) "to redress the deprivation."

*Id.* at 554-56 (Johnson, J., dissenting) (footnote omitted).[615]   In a footnote, Judge

Johnson presciently predicted the ultimate ruling on the constitutionality of Act No.

502 under state law:

Act No. 502, which is under consideration here, legalizes the assessment of property for ad valorem taxation at "anything up to 30 percent." This means anything from one percent (1%) to thirty percent (30%) without any rational basis is authorized by this Act of the Alabama Legislature as a basis for taxing property. While it is not before us at this time, Senate Bill No. 56, which became Act No. 502 — the Act plaintiff is attacking in this case — originated in the Alabama Senate. The Act is clearly unconstitutional by reason of § 70, Article 4, Constitution of Alabama, which requires that all bills for the raising of revenue originate in the House of Representatives.

*Hornbeak I*, 283 F. Supp. at 556 n.1 (Johnson, J., dissenting).

---

[615] Judge Johnson also observed in dissent that *Bussie v. Long*, the basis for the majority opinion, was contrary to "at least four Fifth Circuit cases, . . . the preponderance of authority." *Hornbeak I*, 283 F. Supp. at 555-56 (discussing *Atlanta Bowling Center, Inc. v. Allen*, 389 F.2d 713 (5th Cir. 1968); *Mansell v. Saunders*, 372 F.2d 573 (5th Cir. 1967); *McGuire v. Sadler*, 337 F.2d 902 (5th Cir. 1964); *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964)).

The majority opinion in the *Hornbeak* case was affirmed by the Supreme Court on October 14, 1968, by means of a *per curiam* memorandum.[616]

**h**.   ***Hornbeak v. Rabren*** — M.D. Ala. Civil Action No. 2877-N

Undaunted, Hornbeak commenced a second suit on May 22, 1969, and once again filed it in the U.S. District Court for the Middle District of Alabama, where it was assigned Civil Action No. 2877-N.  She was joined in this action by about one hundred other individuals and several corporations.  All plaintiffs sued on their own behalf, as well as on behalf of all others similarly situated.  The sole defendant was Harvey L. Rabren who, during the interim between Hornbeak's suits, had succeeded Phillip Hamm as Commissioner of the Alabama Department of Revenue.[617]   The various plaintiffs were divided into three groups.  The first subclass was composed of corporate taxpayers owning real property in Jefferson County assessed at thirty percent of fair market value.[618]  The second subclass consisted of minors who attended public

---

[616] *Hornbeak I*, *aff'd*, 393 U.S. 9 (1968) (*per curiam*).  The Supreme Court's *per curiam* memorandum order of affirmance stated simply:  "The motion to affirm is granted and the judgment is affirmed.  Mr. Justice BLACK, Mr. Justice HARLAN, and Mr. Justice STEWART are of the opinion that probable jurisdiction should be noted and the case set for argument." 393 U.S. 9.  There is an indication in a subsequent decision that the Court apparently then believed that there was an adequate remedy available to Hornbeak in state court.  *See Lynch v. Household Finance Corp.*, 405 U.S. 538, 542 n.6 (1971).

[617] In his answers to plaintiffs' interrogatories in *Hornbeak v. Rabren*, No. 2877-N (M.D. Ala. Aug. 28, 1969), Rabren stated that he assumed the duties of Revenue Commissioner on Nov. 1, 1967.  *See* Fed. R. Evid. 201.

[618] The corporate plaintiffs included Booker T. Washington Insurance Company, Inc. ($360,655 assessed value); Ken Realty Company ($237,000 assessed value); and Vulcan Realty and Investment Corporation, Inc. ($416,170 assessed value).  *See Hornbeak v. Rabren*, No. 2877-N, slip

schools in the State of Alabama, and who sued by and through their parents or next friends.[619]  The final subclass consisted of adult taxpayers (of whom Hornbeak was one) who owned taxable property in various counties throughout the State, and who claimed that *ad valorem* assessments by the tax assessors of the counties in which their respective properties were located irrationally and illegally ranged from fifteen to thirty percent of the property's appraised, fair market value.[620]

All plaintiffs alleged that the determination of the appraised, fair market values of comparable properties, as well as the assessment ratios applied by county tax assessors to such fair market values, varied significantly from county to county in violation of Sections 211 and 217 of the Alabama Constitution.[621]  Plaintiffs contended that this lack of uniformity in the appraisal and assessment of taxable property resulted from the failure of the defendant and his predecessors in office to comply with and

---

op. at 1-2 and 3 (M.D. Ala. Oct. 29, 1969) (three-judge court) ("*Hornbeak II* ").  A copy of the slip opinion is attached as **Appendix II-1**.

[619] *Id*. at 2.

[620] *Id*. at 1.

[621] As discussed previously, Section 211 requires that all taxes levied on property in Alabama must be "assessed in exact proportion to the value of such property."  Further, when Section 211 is considered together with Section 217, the two provisions require "uniformity and equality among all taxpayers, 'private corporations, associations and individuals alike,' both as to ratio and percentage of taxation and also as to rate of taxation."  *See, e.g.*, *Alabama Power Co*., 254 Ala. at 336, 48 So. 2d at 452.  "In other words[,] under Sections 211 and 217, all taxable property, by whomsoever owned, in the State of Alabama must be assessed and taxed at uniform ratios for ad valorem purposes."  *Weissinger I*, 230 F. Supp. at 620.

discharge their statutory duties.[622]

Revenue Commissioner Rabren filed a motion to dismiss all claims, "the main thrust of which was to challenge the court's jurisdiction over the subject matter."[623] In an order entered on October 29, 1969, the three-judge district court ruled that the

---

[622] The plaintiffs relied upon two provisions of the Alabama Code:  Title 51, Sections 131 and 133, the pertinent portions of which then read as follows:

> *Powers and duties of department*.  It shall be the duty of the department of revenue . . . (a) To have and exercise general and complete supervision and control of the valuation, equalization and assessment of property . . . and of the enforcement of the tax laws of the state, and of the several county tax assessors, . . . and each and every state and county official, board or commission charged with any duty in the enforcement of tax laws, to the end that all taxable property in the state shall be assessed and taxes shall be imposed and collected thereon in compliance with the law, and that all assessments on property . . . in the state shall be made in exact proportion to the fair and reasonable market value thereof in substantial compliance with the law. (b) To equalize, value and assess . . . any property subject to taxation. . . .

Ala. Code, Title 51, § 131 (1940) (Recomp. 1958).  This statute is currently codified at Ala. Code § 40-2-11 (1975) (2003 Replacement Vol.).  Section 133 of the same Title provided that:

> *Equalization of valuation*. — It shall be the duty of the department of revenue to examine such of the tax records of the several counties as will enable it to ascertain whether the tax valuation of the various classes of property as made in the respective counties of the state, is reasonably uniform as between the respective counties, and is in proportion to the fair and reasonable market value of the property assessed.  . . .  If it shall appear to the said department of revenue that in any one or more counties of this state, . . . the taxable values upon any one or more classes of property are not reasonably uniform with the values fixed upon the same classes of property in other counties, . . . the department of revenue . . . shall have authority to order and direct the board of equalization to readjust and reequalize the same for the current or succeeding tax year, so that each item of property will bear its just proportion of the taxes as provided for herein.  . . .

*Id*. § 133.  The current provision is codified at Ala. Code § 40-2-16 (1975).

[623] *Weissinger I*, 330 F. Supp. at 617.

293

due process claims asserted by the subclass of adult plaintiffs who owned real property in various counties throughout the State (of which Hornbeak was the lead plaintiff), and, the subclass of corporate plaintiffs could not be asserted under 42 U.S.C. § 1983, because their claims involved only "property" rights that were capable of pecuniary valuation,[624] and federal district courts did not have jurisdiction of such claims under 28 U.S.C. § 1343(3).[625]  The court also granted defendant-Commissioner Rabren's motion to dismiss all claims asserted by the subclass of adult plaintiffs under 42 U.S.C. § 1331, saying that the court did not have jurisdiction because the individual claims of each plaintiff did not exceed the required, statutory-threshold amount in controversy ($10,000), and their individual claims could not be aggregated to confer jurisdiction.[626]

On the other hand, the court denied defendant Rabren's motion as to two of the three corporate plaintiffs owning real property in Jefferson County,[627] ruling that the court had jurisdiction over the claims of those defendants asserted under 42 U.S.C. §

---

[624] Those plaintiffs contended that the non-uniform appraisal of the fair market values of comparable properties, and the non-uniform assessment ratios applied to those values by the various county tax assessors, deprived them of the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.

[625] *Hornbeak II*, at 3 (citing *Hornbeak I* ); *see also Weissinger I*, 330 F. Supp. at 617-18.

[626] *Hornbeak II*, at 3 (citing *Snyder v. Harris*, 394 U.S. 332 (1969); *Brown v. Trousdale*, 138 U.S. 389 (1891)); *see also Weissinger I*, 330 F. Supp. at 618.

[627] Those entities were Vulcan Realty & Investment Corp. and Booker T. Washington Insurance Co., Inc.

1331 because "the difference between what each of these plaintiffs presently pays in taxes and what each of them would pay if its real property were assessed at the rate used in Madison County, Alabama . . . exceeds $10,000."[628]

Finally, the court denied defendant's motion to dismiss the Fourteenth Amendment due process and equal protection claims asserted by the subclass of public-school students under 42 U.S.C. § 1983 and its jurisdictional counterpart, saying that those plaintiffs had stated

> an equal protection claim within the meaning of 28 U.S.C. § 1343(3), in alleging that the refusal of the defendant equally to assess real property deprives them of monies to which they and their school districts are entitled.  Where the state undertakes to operate a public school system, it violates the Equal Protection Clause of the Fourteenth Amendment if it differentiates among those meeting the required qualifications for use of the system on grounds not based on rational classifications. Furthermore, since the right to a non-discriminatory enjoyment of the public school system is incapable of pecuniary valuation, federal district courts have jurisdiction to hear such claims without regard to the amount in controversy.  *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *McGowan v. Maryland*, 366 U.S. 420 (1961); *Baker v. Carr*, 369 U.S. 186 (1962); *Lee v. Macon County Board of Education*, 221 F. Supp. 297, 298 (M.D. Ala. 1963); *Griffin v. County School Board of Prince Edward County*, 377 U.S. 218 (1964); *McInnis v. Shapiro*, 293 F. Supp. 327, 329 (N.D. Ill. 1968), *aff'd sub nom McInnis v. Ogilvie*, 394 U.S. 322 (1969).

---

[628] *Hornbeak v. Rabren*, No. 2877-N, slip op. at 3-4 (M.D. Ala. Oct. 29, 1969) (three-judge court) ("*Hornbeak II*"); *see also Weissinger I*, 330 F. Supp. at 618 ("Defendant's motion was denied . . . as to the two corporate defendants, each alleging an amount in controversy in excess of $10,000.").

*Hornbeak II*, slip op. at 1-2.[629]

> **i.**    M.D. Ala. Civil Action No. 2877-N *redux*[630]— the evolution of *Hornbeak v. Rabren* into ***Weissinger v. Boswell*** (June 29, 1971)

As a result of the rulings of the three-judge court on the motions to dismiss filed by Revenue Commissioner Harvey L. Rabren in the *Hornbeak* case discussed in the preceding subsection, the claims of those corporate plaintiffs that met the required jurisdictional amount and the claims of the subclass of minor schoolchildren evolved into a new action, styled "*Susan Lee Weissinger, et al. vs. Charles A. Boswell*."  Susan Lee Weissinger, a public school student, was the first plaintiff appearing on the court docket after the subclass of adult taxpayers had been dismissed as parties, and Charles A. Boswell had succeeded Harvey L. Rabren as the Commissioner of the Alabama Department of Revenue in 1971, at the beginning of George C. Wallace's second term as Governor.[631]  The three-judge panel identified the subclass of corporate plaintiffs

----

[629] A copy of this slip opinion is attached as **Appendix II-1**; *see also Weissinger I*, 330 F. Supp. at 618 ("This Court further ruled in its order of October 29, 1969, that the plaintiff-schoolchildren's due process and equal protection claim stated a cause of action under 42 U.S.C.A. § 1983 and its jurisdictional counterpart, 28 U.S.C.A. § 1343, for the reason that plaintiffs' right to use and enjoy the public schools, free from arbitrary and unreasonable conduct (or lack of conduct) on the part of the Government, is clearly a "civil" right within the meaning of Section 1343. Defendant's motion to dismiss was therefore denied as to the Group II plaintiffs.") (footnotes omitted).

[630] *Redux*: from the Latin, an adjective defined by the *Oxford English Dictionary* as meaning: "Brought back, restored; experienced or considered for a second time; revisited."

[631] *See Charles A. Boswell*, http://www.encyclopediaofalabama.org.  Boswell served as Commissioner of Revenue from 1971 to 1979, during George C. Wallace's second and third terms as Governor.  *Cf.* Glenn T. Eskew, "George C. Wallace, 1963–1967, 1971–1979, 1983–1987," in *Alabama Governors: A Political History of the State* 216-230 (Tuscaloosa: The University of

as "Group I," and the subclass of public-school students as "Group II."   As thus

distinguished, the court described their respective claims in the following manner:

> The corporate (Group I) taxpayers contend that defendant's failure to perform his duties in accordance with state law, and the resultant disparity and inequality in the assessment and taxation of real property in the state, has deprived and continues to deprive them of property, in the form of ad valorem taxes, without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.   *The plaintiff-schoolchildren* (Group II) *contend that since a fixed percentage of the state's ad valorem tax revenue is distributed each year to the various public school districts in the state, defendant's systematic refusal to equalize assessments has deprived these school districts of monies to which they would otherwise be entitled for the education of plaintiffs and all others similarly situated, thus denying plaintiffs due process and equal protection of the law under the Fourteenth Amendment.*

*Weissinger v. Boswell*, 330 F. Supp. 615, 619 (M.D. Ala. 1971) (three-judge court)

(*per curiam*) (emphasis supplied, footnotes omitted) ("*Weissinger I* ").

The district court panel presiding over the *Weissinger* claims[632] acknowledged

that the United States Constitution did not prohibit a state from establishing

"reasonable" classes of property, or from subjecting "one class of property to one rate

of assessment and another class of property to a different rate."[633]   Even so, the court

---

Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) ("**Eskew I**").

[632] The composition of the three-judge district court that entered the *Weissinger v. Boswell* opinion addressed in this section changed slightly from the panel that ruled upon the Revenue Commissioner Harvey L. Raben's motions to dismiss when the action was styled *Hornbeak v. Rabren*:   *i.e.*, Senior U.S. District Judge for the Northern District of Alabama Hobart Grooms replaced James Hughes Hancock as the second District Judge sitting with Circuit Judge Godbold and Middle District Judge Frank M. Johnson, to whom the action originally had been assigned.

[633] *Weissinger I*, 330 F. Supp. at 619-20 ("Preliminarily, it should be noted that this case does

297

held that,

> when a state, such as Alabama, has decided, through its duly elected officials, that all property in the state shall be assessed and taxed at a uniform ratio, and has enacted laws and formulated procedures to ensure this end, any substantial disparity or differences in taxation resulting from the failure of state officers to properly administer the state's tax laws will offend the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

> . . . .

> Even if the State of Alabama were permitted by its own Constitution and laws to classify property for tax purposes, it is clear that its present ad valorem tax program still would not comport with the stringent requirements of the Federal Constitution. While distinctions based on geographical areas are not, in and of themselves, violative of the Fourteenth Amendment, *Salsburg v. Maryland*, 346 U.S. 545, 74 S. Ct. 280, 98 L. Ed. 281 (1954), a state must demonstrate, if it wishes to establish different classes of property based upon different geographical localities — *e.g.*, rural areas as opposed to urban areas — that the classification is neither capricious nor arbitrary but rests upon some reasonable consideration of difference or policy. *State Board of Tax Comm'rs of Indiana v. Jackson*, 283 U.S. 527, 537, 51 S. Ct. 540, 75 L. Ed. 1248 (1931). Such a showing has not been made in this case.

> Defendant has, for example, offered no explanation in an attempt to justify or explain why an urban area like Jefferson County assesses property at a higher percentage (26.8%) of actual cash value than does a rural area like Elmore County (9.7%), while at the same time an area like Dallas County with one municipality of substantial size —Selma— assesses property at a higher percentage (23.1%) of fair market value

---

not question the right of a state to establish different classes of property. Nor does it question the right of a state to subject one class of property to one rate of assessment and another class of property to a different rate.") (footnote omitted); *see also id*. at 622 ("It is true that the Federal Constitution does not prohibit a state from establishing reasonable classes of property and taxing these classes at different rates.") (footnote omitted).

than does a similar area like Montgomery County (15.5%), which also has only one municipality of a substantial size.  Nor has any evidence been submitted to explain why property in Dale County is assessed at 19.1 percent of fair market value, while property in neighboring Coffee and Geneva Counties is assessed at 13.5 and 9.2 percent of actual cash value.

Being unable to find any legitimate state objective to be served by the vast disparity which presently exists in Alabama's ad valorem tax program, this Court is forced to conclude that the variation in percentages, as between geographical areas of the state, results in the arbitrary classification of taxable property and therefore violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

*Weissinger I,* 330 F. Supp. at 622-24.[634]

After ordering that "like property must be treated in a like manner,"[635] the three-judge panel in *Weissinger I* retained jurisdiction of the case, and allowed the Revenue Commissioner one year to bring the State's *ad valorem* tax system into compliance with the court's mandate.[636]

---

[634] *See also*, *e.g.*, *Louisville & Nashville Railroad Co. v. Public Service Comm'n of Tenn.*, 249 F. Supp. 894, 902 (M.D. Tenn. 1966), *aff'd*, 389 F.2d 247 (6th Cir. 1968) ("[T]he Fourteenth Amendment clearly prohibits unequal treatment within a class. . . .").

[635] *Weissinger v. White*, No. 2877-N, slip op. at 2 (M.D. Ala. Oct. 5, 1983) (Thompson, J.) ("The mandate of this court in 1971 was simple:  like property must be treated in a like manner.").

[636] *See Weissinger I*, 330 F. Supp. at 625 ("The Court is aware of the impact of the present decision upon the tax structure of the state and its subdivisions, since the type of discriminatory treatment here involved is deep-seated and of long standing.  For these reasons, the Court will give defendant [Commissioner of Revenue Charles A. Boswell] a reasonable period of time, up to one year from the date of this opinion and order, to bring assessments throughout the state into conformity with the mandate of this opinion.  It is so ordered.").

j.    **Amendment 325**: *the initial Legislative response to the* Weissinger *mandate*

The Alabama Legislature responded to the *Weissinger I* decision with legislation directing statewide reappraisal on a uniform basis of all property subject to *ad valorem* taxation.  *See* Act of January 19, 1972, No. 160, 1971 Ala. Acts 4404-4409, subsequently codified at Ala. Code §§ 40-7-60 *et seq*. (1975).  The legislature also proposed a constitutional amendment that was designed to slip a revised Section 217 through the loophole identified in the *Weissinger* opinion — *i.e.*, that portion of the opinion acknowledging that "the Federal Constitution does not prohibit a state from establishing *reasonable classes of property* and *taxing these classes at different rates*"[637] — and thereby legitimize the illicit, *de facto* classification scheme that had been declared unconstitutional by the three-judge district court panel.[638]  *See* Ala. Const. amend. 325, proposed by Act of January 9, 1972, No. 116, 1971 Ala. Acts 4339

---

[637] *Id.* at 622; *see also id.* at 619-20 ("Preliminarily, it should be noted that this case does not question the right of a state to establish different classes of property.  Nor does it question the right of a state to subject one class of property to one rate of assessment and another class of property to a different rate.  The sole question presented in this case, as will be seen, is whether a state has the right to assess property in the same class at different ratios.") (footnotes omitted).

[638] *See* PX 841 (copy of *Stanley v. Eagerton*, No. 79-3448, slip op. (5th Cir., Unit B, July 16, 1981) (*per curiam*)), at slip op. page 2 ("The Alabama Legislature responded [to the decision in *Weissinger I*] by enacting Act No. 160 at the Third Extraordinary Session of 1971, Ala. Code § 40-7-60 *et seq.*, directing a statewide reappraisal on a uniform basis of property subject to ad valorem taxation.  Also in 1971 the State Legislature proposed a constitutional amendment to Section 217 of the Constitution of Alabama of 1901."); *McCarthy v. Jones*, 449 F. Supp. 480, 484 (S.D. Ala. 1978) (Hand, J.) (observing that Amendment 325 "was passed in response to the *Weissinger* decision").

*et seq.*, amending Ala. Const. art. XI, § 217 (1901).[639]

As previously discussed in Part I(C)(1)(a)(*iv*)(A), *supra*, Amendment 325 created three classes of taxable property,[640] each assessed at a different ratio of appraised (fair market) value,[641] and imposed a cap (or "lid") of 1.5% of fair market value on the *aggregate* amount of *ad valorem* taxes that could be levied by *all* taxing authorities in a single tax year on property grouped within any of the three classes.[642]

The most telling indication that Amendment 325 was designed to evade the fiscal impact upon Alabama taxpayers portended by the decision in *Weissinger I*, however, was found in subsection (c) of the amendment, which authorized the legislature to vary the assessment ratios specified in the amendment among the State's 67 counties, so long as each ratio was uniform within a county.

> (c) With respect to ad valorem taxes levied by counties, municipalities or other taxing authority [sic], all taxable property shall be forever taxed at the same rate, and such property shall be assessed for ad valorem tax purposes according to the classes of property defined in paragraph (a) herein and at the same ratios of assessed value to the fair and reasonable market value thereof as fixed in paragraph (b) herein, provided, however, that the legislature may vary the ratio of assessed

---

[639] See "**Appendix I-3**" for the full text of Ala. Const. art. XI, § 217 (1901), as modified by amend. 325, ratified on June 8, 1972.

[640] Class I, all property of utilities used in the business of such utilities; Class II, all property not otherwise classified; and Class III, all agricultural, forest, and residential property.

[641] The ratios were 30% of the "fair and reasonable market value" for Class I properties; 25% for Class II properties; and 15% for Class III properties.

[642] *See* Ala. Const. art. XI, § 217(h), as modified by Amend. 325, ratified on June 8, 1972 (*reproduced at* Ala. Code Vol. 1 (Recomp. 1958) (1973 Cum. Supp.), at 292).

value to the fair and reasonable market value as to any class of property as defined in paragraph (b) herein, and provided, further, that the legislature may fix a uniform ratio of assessment of all property within a county defined in paragraph (a) herein as Class II and III and may fix a different ratio of assessment for property defined in paragraph (a) as Class I. *Such ratios as herein authorized may vary among counties so long as each such ratio is uniform within a county*.

No class of property shall have a ratio of assessed value to fair and reasonable market value of less than 15 per centum nor more than 35 per centum.

Ala. Const. art. XI, § 217(c), *added by* amend. 325(c) (*ratified* June 8, 1972) (emphasis supplied).  In effect, subsection (c) allowed the Alabama Legislature to assign different assessment ratios to comparable properties situated in different counties, thereby creating distinctions based on geographical location — the same arbitrary and irrational basis for distinction condemned in *Weissinger I*.  Not surprisingly, therefore, both subsection (c) and its implementing statute, Ala. Code § 40-8-1(e) (1975), eventually came under constitutional attack.

        **k**.    ***McCarthy v. Jones*** — S.D. Ala. Civil Action No. 77-242-H and the second invalidation of variable assessment ratios

The suit challenging Amendment 325 and its implementing statute was filed in the U.S. District Court for the Southern District of Alabama by a class composed of 77,000 public school students residing in seventeen Alabama counties: *i.e.*, Barbour, Bibb, Bullock, Clay, Cleburne, Coffee, Dale, Etowah, Hale, Henry, Houston,

Limestone, Monroe, Morgan, Perry, Randolph, and Wilcox.  *See McCarthy v. Jones*, 449 F. Supp. 480, 481-82 (S.D. Ala. 1978).  Defendants were the tax assessors and collectors in the same counties.[643]

Subsection (a) of the statute implementing Amendment 325 conflated the first two subsections of the amendment,[644] and read as follows:

> With respect to ad valorem taxes levied by the state, and, unless otherwise provided with respect to ad valorem taxes levied by a county, municipality or other taxing authority other than the State all taxable property shall be divided into the following classes and no other and shall be assessed for ad valorem tax purposes at the following ratios of assessed value to the fair and reasonable market value of such property:

> CLASS I.    All property of utilities used in the business of such utilities, 30%.

> CLASS II.    All property not otherwise identified, 25%.

> CLASS III.  All agricultural, forest and residential property, 15%.

Act of September 20, 1973, No. 1216, § 1(a), 1973 Ala. Acts 2062, originally codified as Ala. Code Title 51, § 17(1) (1940) (Recomp. 1958) (Supp. 1973), but subsequently recodified as Ala. Code § 40-8-1(a) (1975).

The district court found that Amendment 325(c) allowed "the state legislature to create distinctions in the rate of assessment of similar property in different counties,

---

[643] *McCarthy*, 449 F. Supp. at 482; *see also id.* at 485 ("Appendix A").

[644] See "**Appendix I-3**" for the full text of Ala. Const. art. XI, §§ 217, as modified by Amend. 325, ratified on June 8, 1972.

and that, in the instant case, such authorization has been employed to create such

distinctions based on nothing other than geographical location."[645]   Specifically,

Alabama Code § 40-8-1(e) provided:

> (e) In the following designated counties taxable property shall be assessed at the ratio of assessed value to fair and reasonable market value for each class of property at the rate indicated:

| County | Class I | Class II | Class III |
|--------|---------|----------|-----------|
| Morgan | 30% | 20% | 20% |
| Limestone | 30% | 20% | 15% |
| Etowah | 30% | 20% | 15% |
| Clay | 30% | 20% | 15% |
| Cleburne | 30% | 20% | 15% |
| Barbour | 30% | 15% | 15% |
| Coffee | 30% | 15% | 15% |
| Bullock | 30% | 15% | 15% |
| Hale | 30% | 15% | 15% |
| Wilcox | 30% | 15% | 15% |
| Monroe | 30% | 15% | 15% |
| Randolph | 30% | 15% | 15% |
| Perry | 30% | 15% | 15% |
| Bibb | 30% | 15% | 15% |
| Houston | 30% | 15% | 15% |
| Dale | 30% | 15% | 15% |
| Henry | 30% | 15% | 15% |

---

[645] *McCarthy*, 449 F. Supp. at 483.

| Jefferson | 30% | 25% | 20% |
| Calhoun | 30% | 25% | 15% |

Ala. Code § 40-8-1(e) (1975).[646]  In other words, this statutory scheme *mandated* that comparable Class II and Class III taxable properties located in nineteen of the State's 67 counties "shall be assessed" at different ratios of fair market value.  As a result, the seventeen counties implicated by the *McCarthy* suit had "a lower [assessed] property value upon which tax rates may be applied than would be available if the counties employed the state wide assessment rates set out in section 40-8-1(a)."[647]

There was no logical, geographic basis tying the counties together, and there was no reasonable justification for the distinctions in assessment ratios among them. The counties identified in the statute were scattered from the Wiregrass, in the southeastern corner of the State; to Limestone and Morgan counties, bracketing the

---

[646] Following the enactment of the Act of Sept. 20, 1973, No. 1216, 1973 Ala. Acts 2062, this language was originally codified at Ala. Code Title 51, § 17(5) (1940) (Recomp. 1958) (Supp. 1973), but subsequently recodified as cited in text:  Ala. Code § 40-8-1(e) (1975).

[647] *McCarthy*, 449 F. Supp. at 482 (alteration added, footnote omitted).  *Nota bene* that none of the public school students on whose behalf *McCarthy* was filed resided within Jefferson or Calhoun counties and, therefore, the assessment ratios for those two counties were not at issue in *McCarthy*.

Also, note that the *McCarthy* plaintiffs' complaint focused upon the variable assessment ratios for Class II taxable properties ("all property not otherwise identified"), which Amendment 325 specified should be assessed at 25% of fair market value, because:  (a) Class I property of public utilities under the contested statute was assessed at the ratio specified in the Amendment (30%); and (b) Class III property in all of the counties identified in Ala. Code § 40-8-1(e), except for that located in Morgan and Jefferson Counties, was to be assessed under the statute at the ratio specified in Amendment 325 (15%).

305

Tennessee River in north-central Alabama; three were in east-central Alabama, along

the Georgia line; and three were in the Black Belt: *see* "Appendix II-2." Accordingly,

the district court held that Alabama Code § 40-8-1(e) violated the Fourteenth

Amendment's Equal Protection Clause.

> There is no rational pattern tying together the seventeen counties with decreased assessment ratios. The Court takes judicial notice that many sparsely populated, rural counties are on the list, such as Bullock, Hale, Wilcox, Perry, and Bibb counties. But there are other counties on the list that contain some of the larger municipalities within the state, such as Morgan (Decatur), Etowah (Gadsden), Barbour (Eufala) and Houston (Dothan). Certainly there is no urban/rural dichotomy objective. Nor is there a geographical objective, since the list includes counties in every area of the state; some are contiguous, some are not. Facially, there is clearly no geographical justification for the statutory scheme. The Court is of the opinion that the statutory scheme at issue is totally without a rational basis in making distinctions between the ratios of assessment of ad valorem taxes in various counties, and that, on this basis, the statute is repugnant to the Fourteenth Amendment to the United States Constitution. . . .[648]

Nevertheless, the district court refused to strike down Amendment 325(c) as *facially*

unconstitutional, saying that it might be possible for a future state legislature to ground

variations in assessment ratios in different counties on some reasonable consideration

of difference or policy.

> This Court does not subscribe to the theory that the fact that a statutory scheme is unconstitutional serves to invalidate the enabling legislation under which it was adopted. The Court is convinced that a statutory

---

[648] *McCarthy*, 449 F. Supp. at 484 (footnote omitted).

scheme allowing variations in the assessment ratios in different counties grounded upon a legitimate and rational state interest would not be violative of the Fourteenth Amendment.  Since the Court is convinced that the Amendment itself permits the adoption of valid legislation, the Court is of the opinion that the relief requested as to the Amendment is due to be DENIED.[649]

### *l.*    ***Thorn v. Jefferson County*** — Ala. Sup. Ct. (Sept. 28, 1979)

Amendment 325 and the implementing statute addressed in *McCarthy* also came under attack in a class action filed in the Circuit Court of Jefferson County.  The plaintiffs claimed that the levy of taxes based upon Alabama Code § 40-8-1(e) (1975) violated the Fourteenth Amendment's Equal Protection Clause because

> they were required to pay ad valorem taxes to the Jefferson County Tax Collector on Class III [agricultural, forest, and residential properties] based upon an assessment rate of 20% of the market value of the property while taxpayers in other counties were required to pay only at the rate of 15% of the market value of the property.  . . .

*Thorn v. Jefferson County*, 375 So. 2d 780, 781 (Ala. 1979).  The circuit court granted defendants' motion to dismiss, and plaintiffs appealed to the Alabama Supreme Court, which reversed.  The Court found no rational basis for the variation in assessment ratios specified in the statute for Class III property.[650]  The Court remanded the case, with a direction for the circuit court to determine whether defendants could

---

[649] *Id.* at 484-85.

[650] *See Thorn*, 375 So. 2d at 785 (quoting *Weissinger I*, 330 F. Supp. at 623-24).  "As to Class II property, § 40-8-1(e) has already been declared unconstitutional by a Federal District Court in *McCarthy v. Jones*, 449 F. Supp. 480 (S.D. Ala. 1978)."  *Id.*

demonstrate a rational basis for the variations.

> There may be a rational reason why the Legislature selected Jefferson and Morgan Counties for special classification.  We do not now hold that there was no rational basis for the legislation, but we would point out that it is difficult for this Court to understand why citizens of Jefferson County should be taxed at a higher rate than citizens of Mobile County and Montgomery County.  Why should citizens of Morgan County be taxed at a higher rate than citizens of Madison County?  . . .[651]

> > m.   **Amendment 373** — *the second Legislative attempt to deflect the substantial increases in* ad valorem *taxes portended by the* Weissinger *mandate*

As the Supreme Court of Alabama observed in its 1983 decision in *Eagerton v. Williams*, 433 So. 2d 436 (Ala. 1983), the state-wide reappraisals conducted in response to the *Weissinger* mandate

> took considerably longer to complete than the one year contemplated by the federal court.  *It* [also] *became clear that many Alabama landowners' property taxes would increase significantly*.  In 1978, the Governor called the legislature into special session *to avert the substantial increases in ad valorem taxes imminent under the new appraisals*.

> Included in the governor's tax relief package was a proposed amendment to Section 217 of the Constitution of Alabama of 1901.  It passed the legislature, was ratified by the people, and is now Amendment No. 373 to the Constitution of 1901.  . . .[652]

During the same special session in which the Act proposing Amendment 373

---

[651] *Id.* at 787.

[652] *Eagerton*, 433 So. 2d at 238-39 (emphasis supplied, footnotes omitted).

(*i.e.*, the Act of August 4, 1978, No. 6, 1978 Ala. Acts 1602-09)[653] was passed, the Alabama Legislature also passed a series of acts designed to implement the provisions of the proposed amendment, in the event it was ratified by a majority of voters.

Two of those acts — *i.e.*, the Act of August 7, 1978, No. 46, 1978 Ala. Acts 1724-29, and, the Act of August 8, 1978, No. 135 (House Joint Resolution 172), 1978 Ala. Acts 1868-74 — together with the enabling provisions of Amendment 373, became the subjects of the issues presented in an amended complaint filed by the subclass of public school student plaintiffs who had initiated *Hornbeak v. Rabren*, subsequently restyled *Weissinger v. Boswell*, Civil Action No. 2877-N in the U.S. District Court for the Middle District of Alabama.

By the time those plaintiffs filed a motion to amend their complaint on December 6, 1978, however, the style of the action had evolved yet again, to "*Susan Lee Weissinger, et al. vs. Ralph P. Eagerton Jr., et al.*," as a result of the fact that Forrest Hood ("Fob") James, Jr., had been elected Governor in 1978, and, in January of 1979, had appointed Ralph P. Eagerton to be the Commissioner of Revenue.[654] That

[653] Act No. 6, which proposed Amendment 373 to the Constitution of Alabama for the purpose of further amending Section 217, as previously modified by Amendment 325, was proposed and enacted during the Second Special Session of the Alabama Legislature that convened on July 31, 1978.

[654] *See* PX 841 (copy of *Stanley v. Eagerton*, No. 79-3448, slip op. (5th Cir., Unit B, July 16, 1981) (*per curiam*)) at 2 ("This action was originally filed as a class action in 1969 [*i.e.*, *Hornbeak v. Rabren*, No. 2877-N, slip op. (M.D. Ala. Oct. 29, 1969) (three-judge court)] challenging the federal constitutional validity of Alabama's ad valorem tax structure.  On June 29, 1971, a three-

309

chapter in the ongoing litigation is addressed in the following subsection.

> **n.**   ***Weissinger v. Eagerton*** — M.D. Ala. Civil Action No. 2877-N
> *continued* (March 26, 1979)

As discussed in Parts I(C)(1)(a)(*iv*)(B) and II(F)(2)(b), *supra*, Amendment 373 altered Section 217 of the Constitution, as previously amended by Amendment 325, by creating a fourth class of taxable property, and, by changing some of the assessment ratios prescribed by Amendment 325.  The most important purposes of Amendment 373, however, were to place a cap (or "lid") on the *aggregate* amount of *ad valorem* taxes that could be levied by *all* taxing authorities in any one year on taxable property within *each* of the four classes (*i.e.*, 2.0%, 1.5%, 1.0%, and 1.25% of the fair market value of taxable properties grouped in Class I, II, III, and IV, respectively), *and*, the creation of a "current use" option, available to taxpayers owning Class III properties, and which allowed the owners of agricultural, forest, residential, and historic properties to elect to have their property appraised at its "current use value," as opposed to the property's fair and reasonable market value.  It was those provisions of the Amendment and their implementing statutes that the *Weissinger* subclass of public school students (the "Group II plaintiffs") challenged as violating the Fourteenth Amendment's Equal Protection Clause in this installment of the ongoing

---

judge district court panel entered an order [in *Weissinger I* that] found that the vast disparities that existed in the Alabama ad valorem tax system violated the fourteenth amendment's equal protection clause.") (alterations added).

Middle District litigation identified by Civil Action No. 2877-N.

After striking down only a small and, in the broad scheme of things, unimportant section of one of the statutes,[655] the three-judge district court dismissed the plaintiffs' facial challenge to the current use provisions of Amendment 373 and Act No. 135 under the Equal Protection Clause. The court applied the test set forth in its *Weissinger I* opinion,[656] and concluded that the plaintiffs had failed to carry their burden of proof.

> In considering plaintiffs' Fourteenth Amendment challenge to the current use valuation provisions, the following from this court's June 29, 1971 order is quite pertinent:
>
>> "It is well established that the states have wide discretion in the laying and collection of their taxes. The law is equally clear, however, that such discretion cannot be exercised so as to arbitrarily deprive persons of their constitutional rights. So, while the Fourteenth Amendment does not require precise equality or uniformity in taxation, or prohibit inequality in taxation which results from mere mistake or error in judgment of tax officials, it does 'secure every person within the state's jurisdiction against

---

[655] The court found that § 4 of Act No. 46 (which authorized a tax credit to taxpayers in counties that had collected higher taxes as a result of early completion of the property reappraisals ordered by *Weissinger I*) violated § 45 of the Alabama Constitution (which requires each Bill introduced in the state legislature to contain only one subject that must be clearly expressed in its title) because, before enactment, Act No. 46 (originally House Bill 171) was amended on the floor of the state House of Representatives to add § 4 to the text of the bill, but without amending the title of the bill. Defendant Eagerton conceded, and the court agreed, "that the presence of Section 4 in Act 46 causes Act 46 to be materially broader than its title and therefore its presence offends Section 45 of the Alabama Constitution of 1901." PX 840 (*Weissinger v. Eagerton*, No.2877-N, slip op. at 5 (M.D. Ala. Mar. 26, 1979) (three-judge court) (*per curiam*)) ("*Eagerton*").

[656] *See Weissinger I*, 330 F. Supp. at 621-22.

intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'  Stated differently, the Fourteenth Amendment protects only against taxation which is palpably arbitrary or grossly unequal in its application to the persons concerned."  [footnotes omitted] 330 F. Supp. at page 621.

Thus, to mount a successful challenge based upon a denial of equal protection, plaintiffs must show either (a) that there is no legitimate objective which the current use value classification is designed to achieve, or (b) that the current use value classification arbitrarily accomplishes or seeks to accomplish what otherwise would be a legitimate objective. Plaintiffs have shown neither. Indeed they virtually admit the objective sought to be achieved by the current use value classification is legitimate.   And while plaintiffs do point out discriminatory effects of that classification, they have clearly failed in their effort to show that such discrimination is arbitrary.  In *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, at 528 (1959), the court stated:

> " . . . [I]t has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it."

Defendant's brief and argument present a variety of reasonable bases for current use value classification, including the preservation of owner-occupied homes in or near developing urban areas, the preservation of land for farming or forestry purposes, the continued maintenance of historic properties, and the equalization of the tax burden on similar properties used for the same purpose.  In short, plaintiffs have failed to carry the burden which rests on them in their effort to have Section 217(j) of the Alabama Constitution of 1901 and Act 135 declared facially unconstitutional and the order and decree at the end of this opinion will so hold.

*Weissinger v. Eagerton*, No. 2877-N, slip op. at 6-8 (M.D. Ala. Mar. 26, 1979)

312

(three-judge court) (*per curiam*) (PX 840) ("*Eagerton*").[657]

It is important to note that the *Eagerton* three-judge court determined only that the "current use" provisions of Amendment 373 were *facially* constitutional: the door was left open for "any person with proper standing . . . to pursue in an appropriate forum a claim of unconstitutional *application* of the 'current use value' provisions."[658]

In addition, the plaintiffs challenged Amendment 373(i), which places different ceilings (or "lids") on the aggregate tax levy for each of the four classes of property. Again, the court held that plaintiffs had failed to show that the classification was unreasonable or arbitrary.

> Plaintiffs also seek a declaration that Section 1(i) of Act 6 [which is now Section 217(i) of the Constitution of Alabama of 1901 by virtue of the approval of the votes on November 7, 1978, of Constitutional Amendment Number 373 proposed by Act 6] violates the Equal Protection Clause of the Fourteenth Amendment. Section 1(i) of Act 6 substitutes a different ceiling on the tax burden for each class of property rather than the single 1½% of value ceiling applicable to all classes of property under Amendment No. 325 to the Constitution of Alabama of

---

[657] This decision was affirmed *sub nom. Stanley v. Eagerton*, No. 79-3448 (5th Cir. July 16, 1981) (*per curiam*). In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on Sept. 30, 1981. A copy of the Fifth Circuit opinion is identified in this record as PX 841.

[658] *Eagerton*, slip op. at 5. In that portion of the brief submitted by the schoolchildren subclass in support of (and also during their attorney's oral argument on) Count IV of the plaintiffs' amended complaint — which alleged that the "current use" provisions of the amendment and implementing statute were unconstitutional on their face — plaintiffs attempted "to broaden their challenge to include a claim of unconstitutionality *as applied*." *Id.* at 6 (emphasis added). The three-judge district court panel did not permit the challenge to be expanded, and determined only plaintiffs' claim of facial unconstitutionality.

1901.  Under the challenged provision the total ad valorem taxes payable to all taxing authorities in any one year cannot exceed 2%, 1½%, 1% or 1¼% of fair and reasonable market value with regard to Classes I, II, III and IV, respectively.  While three cities are expressly exempted from this ceiling, any other city and any county may obtain a similar exemption through a future constitutional amendment, and it is admitted that the enumerated three cities were the only cities in the state exceeding the proposed ceiling at the time of its adoption.

> Plaintiffs concede that the objective sought by Section 1(i) of Act 6 is a proper objective, but once again they have not shown the approach the legislature  selected to accomplish that objective to be unreasonable or arbitrary.  While it is theoretically possible to have a variation in the rate of property tax owing the state in two different counties, no such variation exists at the present time.  And in view of the valid objective sought by the challenged law, the *possibility* of a slight variation is not sufficient to justify a holding that Section 217(i) of the Constitution of Alabama of 1901 is unconstitutional on its face.  The order and decree at the end of this opinion denying plaintiffs relief on their challenge of the validity of such Section 217(i) will of course not prevent any person with proper standing challenging hereinafter in an appropriate forum the constitutionality of an application of such Section 217(i) which produces an unacceptable variation.

*Id.* at 8-9.[659]

---

[659] The subclass of schoolchildren plaintiffs also contended in Count VII of their amended complaint that the summary of Amendment 373 printed on the ratification election ballot omitted several important provisions that served to deceive the voters and, thereby, violated Section 285 of the 1901 Alabama Constitution.  The three-judge district court noted in its order, however, that:

> When confronted with *Jones v. McDade*, 200 Ala. 230 (1917), plaintiffs conceded during oral argument that the ballot did satisfy Section 285 and they abandoned that argument.  They then, for the first time, orally pursued a due process claim under the Fourteenth Amendment.  That claim is totally outside the scope of the issues framed by the pleadings before the court and will not be allowed as a basis for relief under Count VII.  Plaintiffs having conceded that their original basis for relief under Count VII is not valid, defendant's motions for summary judgment on that claim will be granted.

    **o.**    ***Weissinger v. White*** — M.D. Ala. Civil Action No. 2877-N *continued* (Oct. 5, 1983)

Amendment 373 was again challenged in Middle District Case No. 2877-N by the subclass of minor public schoolchildren (Group II) plaintiffs who initiated *Hornbeak v. Rabren*, subsequently restyled "*Weissinger v. Boswell*," and then "*Weissinger v. Eagerton*." In this chapter of the fourteen-year-old lawsuit, the style changed yet again, to "*Susan Lee Weissinger et al. vs. James C. White, et al.*," to reflect the re-election of George C. Wallace to his fourth (and final) term as Governor, and his appointment of James C. White as his Revenue Commissioner. Moreover, the three-judge district court panel had dissolved itself on August 26, 1980, and reassigned the case to a single judge, Myron Thompson,[660] for the purpose of supervising the implementation of the three-judge court's prior orders.[661]

This installment of the ongoing litigation focused upon that aspect of

*Id.* at 10. On April 4, 1979, the plaintiff schoolchildren subclass filed a motion requesting that the district court either reconsider its decision as to Count VII, or allow plaintiffs to amend their complaint to add a new Count VIII, essentially restating Count VII in the framework of a Fourteenth Amendment Due Process claim. Both aspects of that motion were denied by the district court, and those decisions — and only those decisions of the district court panel — were appealed to and affirmed by the former Fifth Circuit in an unpublished opinion entered on July 16, 1981. *See* PX 841 (copy of *Stanley v. Eagerton*, No. 79-3448 (5th Cir. July 16, 1981) (*per curiam*)).

[660] Myron Thompson was nominated by President Carter to fill the Middle District seat vacated when Judge Frank M. Johnson Jr. was elevated to the former Fifth Circuit Court of Appeals. He was confirmed by the Senate on Sept. 26, 1980, becoming only the second person of African heritage to serve on a United States District Court in Alabama.

[661] *See Weissinger v. White*, No.2877-N, slip op. at 6 n.7 (M.D. Ala. Oct. 5, 1983) (citing *Costello v. Wainwright*, 430 U.S. 325 (1977) (*per curiam*); *Wyatt v. Ireland*, 515 F. Supp. 888 (M.D. Ala. 1981)).

Amendment 373 which allowed the owners of Class III properties (agricultural, forest, historical, and single-family, owner-occupied residential dwellings) the option of affirmatively electing to have their property assessed at its "current use value," as opposed to its fair and reasonable market value.  The amendment did not define the term "current use value," however, but instead authorized the legislature to determine and enact criteria and procedures for determining the current use value of eligible property.  In relevant part, Amendment 373(j) provided that:  "The legislature may enact laws uniformly applicable to the state and all counties, municipalities and other taxing authorities establishing criteria and procedures for the determination of the current use value of any eligible taxable property and procedures for qualifying such property for assessment at its current use value."

The Alabama Legislature initially responded to that enabling language with the Act of Aug. 8, 1978, No. 135 (also sometimes identified as "House Joint Resolution No. 172"), 1978 Ala. Acts 1868-74, which directed the Department of Revenue to "prescribe all needful rules and regulations for the enforcement and implementation" of the current use provisions of Amendment 373 by May 1, 1979.  *Id*. § 4, at 1870-71. When the Department failed to issue any guidelines or regulations by that deadline, however, "the legislature responded with guidelines of its own, in the form of House Joint Resolution No. 153, 1979 Ala. Acts 269 . . . ."  *Eagerton v. Williams*, 433 So. 2d

316

436, 440 (Ala. 1983) (bracketed alteration added, footnote omitted).  House Joint Resolution 153, also referred to as Act of May 31, 1979, No. 79-163, was the first legislation to suggest "current use" valuation of farm and timber lands under a complex "net income" formula based on ten soil groups — each having a suggested net income flow per acre, with the net income being capitalized on the most recent five-year average of the interest rates on certain long-term, United States Government bonds.[662]

Act No. 135 and the Legislative Guidelines specified in Act No. 79-163 ("House Joint Resolution 153") were repealed by the Act of Apr. 20, 1982, No. 82-302, 1982 Ala. Acts 383, which replaced both with the current law now codified at Alabama Code § 40-7-25.1 (1975) (2003 Replacement Vol.).  Act 82-302 directed that current use valuation be made by employing a "standard value" method.

> Standard value can be calculated in one of two ways, depending on whether the property is agricultural or forest as opposed to residential or historic.  Residential and historic land is to be valued in much the same way as set forth in Act 135.  Conversely, Act 82-302 directs that the standard value of agricultural and forest land be computed applying a capitalized net income approach.

---

[662] *See* Act of May 31, 1979, No. 163 ("House Joint Resolution 153"), 1979 Ala. Acts 269; *see also Weissinger v. White*, 733 F.2d 802, 805 n.9 (11th Cir. 1984); *Weissinger v. White*, No. 2877-N, slip op. at 5; *Eagerton v. Williams*, 433 So. 2d at 441.  The current use valuation of historical and single-family, owner-occupied residential properties was based upon the fair market value of comparable properties, and on the assumption that the subject property being valued could never be put to a use different from the existing one.

*Weissinger v. White*, 733 F.2d 802, 805 (11th Cir. 1984) ("*Weissinger II* ") (footnotes

omitted).  The district court opinion described those different methodologies more

specifically:

> *Current use value for residential and historical property* was based on
> the fair and reasonable market value of comparable property, with the
> assumption that the property being valued could never be put to a use
> different from the existing one.  *In contrast*, *current use value for
> agricultural and forest property* was unhinged from the concept of fair
> and reasonable market value; instead, current use value was based on a
> legislatively created complex formula, characterized and summarized by
> the Alabama Supreme Court as follows:  "[T]he current use value of
> agricultural and forest property [is] determined from a 'net income'
> formula.  This formula established ten soil groups along with a suggested
> net income per acre, the net income being capitalized at a percentage
> based on the most recent five-year average of the interest rates on
> long-term United States Government bonds." *Eagerton v. Williams*, 433
> So. 2d at 441 (footnote omitted).  The intended effect of the formula was
> that agricultural and forest property located both in rural areas and in and
> near urban areas should be assessed at less than its fair and reasonable
> market value.  *Id.*, 433 So. 2d 443-46.

*Weissinger v. White*, No. 2877-N, slip op. at 5-6 (M.D. Ala. Oct. 5, 1983).[663]

Act No. 82-302 was the focus of the amended complaint filed by the subclass

of minor schoolchildren in the case discussed in the present subsection:  *i.e.*, "*Susan

Lee Weissinger et al. vs. James C. White, et al.*"  They argued that the current use

option authorized by Acts 135 and 82-302 created property classifications or

---

[663] The "current use standard value per acre" computations for the valuation of agricultural
and timber properties mandated by Act 82-302 were discussed previously, in Part II(F)(2)(b)(ii) of
this opinion, *supra*.

distinctions between (*a*) Class III property and all other classes of property, and (*b*)

within Class III, a distinction between residential and historic properties, on the one

hand, and agricultural and forest properties, on the other.  The plaintiffs claimed that

such distinctions violated the Fourteenth Amendment's Equal Protection Clause, the

1971 order of the *Weissinger* court, and Amendment 373 to the Alabama Constitution.

District Judge Myron Thompson rejected the contentions of the schoolchildren

subclass, however, saying:

> Since this court in 1971 did nothing more than order state officials
> to adhere to the dictates of the fourteenth amendment, resolution of the
> plaintiffs['] fourteenth amendment claim also resolves the claim of non-
> compliance with prior orders of this court.

> It is beyond cavil that the United States Constitution does not
> prohibit states from classifying property and taxing different classes of
> property differently.  Forty-three years ago the Supreme Court declared
> "[t]hat the states may classify property for taxation; may set up different
> modes of assessment, valuation and collection; [and] may tax some kinds
> of property at higher rates than others . . . — these are among the
> commonplaces of taxation and constitutional law."  *Nashville,
> Chattanooga & St. Louis Railway Co. v. Browning*, 310 U.S. 362, 368,
> 60 S. Ct. 968, 972 (1940).  This principle remains vital today.  *Western
> & Southern Life Insurance Co. v. State Board of Equalization of
> California*, 451 U.S. 648, 656-57, 101 S. Ct. 2070, 2077 (1981); *Kahn v.
> Shevin*, 416 U.S. 351, 355, 94 S. Ct. 1734, 1737 (1974); *Lenhausen v.
> Lake Shore Auto Parts Co.*, 410 U.S. 356, 359, 92 S. Ct. 1001, 1003
> (1973).  The authority of the states is not unbridled, however.  The equal
> protection clause provides that a "State must proceed upon a rational
> basis and may not resort to a classification that is palpably arbitrary."
> *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 527, 79 S. Ct. 437,
> 441 (1958).  A classification is not palpably arbitrary if "any state of facts

reasonably can be conceived that would sustain it." *Id.*, 358 U.S. at 52, 79 S. Ct. at 441.

This court must determine whether there is any state of facts that could conceivably support the following classifications: the distinction between Class III property and all other property; and the distinction between residential and historical property and agricultural and forest property.

In an earlier opinion, this court pointed to a state of facts to support the first distinction:

> Defendant's brief and argument present a variety of reasonable bases for current use value classification, including the preservation of owner-occupied homes in or near developing urban areas, the preservation of land for farming or forestry purposes, [and] the continued maintenance of historic properties.

*Weissinger v. Eagerton*, No. 2877-N, mem. op., p. 7 (M.D. Ala. March 26, 1979). This observation is based on the fact that all of the land uses enumerated in Class III produce no or relatively low income as compared to more intensive uses. Fair market value ordinarily considers not only the value of the land in its present use but also the value of the land were it available on the open market for development. Class III property located in or near high or moderate income-producing property often has increased market value and, accordingly, increased tax liability. This process has often had the effect of making relatively low income uses uneconomical, with the consequence that the land was sold for more intensive use. *See* Nelson, *Differential Assessment of Agricultural Land in Kansas: A Discussion and Proposal*, 25 Kan. L. Rev. 215, 216-18 (1977).

Similar concerns justify the distinction between residential and historical property and agricultural and forest property. The plaintiffs appear to argue that by including four property types within Class III, Alabama is without constitutional power to draw further distinctions

among them.  The equal protection clause does not exalt form at the expense of substance to this extent.  A state may constitutionally create subclasses within broader classifications and treat the subclasses differently if such treatment is rational.  *See Charleston Federal Savings & Loan Ass'n v. Alderson*, 324 U.S. 182, 65 S. Ct. 624 (1945).  Alabama has essentially done this.  Its property tax scheme, as interpreted by the Alabama Supreme Court in *Eagerton v. Williams*, *supra*, creates two subclasses within Class III property.  And the rationale behind this subclass distinction is apparent:  Alabama is particularly concerned about the preservation of its agricultural and forest property and seeks through its property tax structure to preserve such property by providing additional preferential tax treatment for such property.

The plaintiffs also broadly argue that the formula for current use valuation of agricultural and forest property fails to provide a "true measure" of the valuation, that it is not an "accepted method" among property experts.  Whether the formula provides a true or accepted measure depends upon what is sought to be valued or measured.  It is apparent that the intent behind Acts 135 and 82-302 was to value agricultural and forest property *at some point below* its fair and reasonable market value; and the current use formula created by the acts does just this.  The plaintiffs note, however, that there are a few instances in which the current use valuation of agricultural and forest property has resulted in a valuation higher than its market value.  These few instances do not necessarily condemn the entire valuation procedure.  The United States Constitution does not require that a state select the best tax program conceivable, only that it select a rational one.  In *Great Atlantic & Pacific Tea Co. v. Grosjean*, 301 U.S. 412, 57 S. Ct. 772 (1937), the Supreme Court was presented with fourteenth amendment challenges to a Louisiana license tax for retailers that was graduated according to the number of retail outlets the taxpayers controlled nationwide.  The taxpayer argued that the tax was invalid because it did not accurately measure the earnings of the Louisiana stores that were actually being taxed.  The Court rejected this argument holding that the legislature could rationally conclude that the existence of a nationwide distribution system enhanced the value of the Louisiana outlets and thus constituted a valid measure of their value.  The Court stated:

321

> We cannot say that classification of chains according to the number of units must be condemned because another method more nicely adjusted to represent the differences in earning power of the individual stores might have been chosen, for the legislature is not required to make meticulous adjustments in an effort to avoid incidental hardships.

301 U.S. at 424, 57 S. Ct. at 776.

*Weissinger v. White*, No.2877-N, slip op. at 6 (M.D. Ala. Oct. 5, 1983) (Thompson, J.) (bracketed alterations added).

> **p**.    ***Weissinger v. White*** — Eleventh Circuit appeal (June 1, 1984)

The *Weissinger* subclass of minor schoolchildren appealed the district court's denial of their claims to the Eleventh Circuit, where they argued that

> the net income method is arbitrary in that it fails to take into account any variable except the soil group of farmland or the productivity rating of timber property.  It ignores such value-affecting factors as proximity to transportation facilities and the product actually grown.  Hence, the appellants argue that the use of two different methods for computation of the four types of Class III property violates the equal protection clause of the fourteenth amendment.

*Weissinger II*, 733 F.2d at 805 (footnote omitted).[664]  The Court of Appeals rejected plaintiffs' contentions, saying:

---

[664] In the omitted footnote, the Eleventh Circuit observed that:  "The net income capitalization method does make an adjustment, however, for soil productivity in the farmland computation.  The net figure is increased by 20%, or decreased by 30% or 75%, depending on whether the soil is Good, Poor or Non-Productive, respectively. . . . The appellants claim that this adjustment is arbitrary as well."  *Id.* at 805 n.12.

322

The law is well-settled that "[t]he States have a very wide discretion in the laying of their taxes." *Allied Stores v. Bowers*, 358 U.S. 522, 526, 79 S. Ct. 437, 440, 3 L. Ed. 2d 480, 484 (1959). They may "classify property for taxation; may set up different modes of assessment, valuation and collection; [and] may tax some lands or property at higher rates than others," all without offense to the Constitution. *Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362, 368, 60 S. Ct. 968, 972, 84 L. Ed. 1254, 1257 (1940). *See also Lehnhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 359, 93 S. Ct. 1001, 1003, 35 L. Ed. 2d 351, 354-55 (1973) ("[w]here taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation."). To protect the states' fundamental taxing authority, federal equal protection challenges to state tax laws are reviewed with a minimal level of scrutiny. A statutory classification will withstand an equal protection challenge as long as it "rest[s] upon some ground of difference having a fair and substantial relation to the object of the legislation." *Allied Stores v. Bowers*, 358 U.S. 522, 527, 79 S. Ct. 437, 441, 3 L. Ed. 2d 480, 485 (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S. Ct. 560, 561, 64 L. Ed. 989, 990 (1920)).

The "fair and substantial relation" standard generally has been applied liberally to invalidate state taxing classifications only when they are "palpably arbitrary." *Randolph v. Simpson*, 410 F.2d 1067, 1069 (5th Cir. 1969). Even an intentionally discriminatory classification will pass muster if it "is founded upon a reasonable distinction, or difference in state policy," *Allied Stores v. Bowers*, 358 U.S. at 528, 79 S. Ct. at 441, 3 L. Ed. 2d at 485, or "any state of facts reasonably can be conceived that would sustain it." *Id*., 79 S. Ct. at 441, 3 L. Ed. 2d at 486. *See also State Board of Tax Commissioners v. Jackson*, 283 U.S. 527, 51 S. Ct. 540, 75 L. Ed. 1248 (1931).

The foregoing authority clearly expresses the historical policy of federal deference to state taxing power. In view of the wide latitude accorded the states in matters of taxation, classification schemes creating disparate tax treatment which are justified by a legitimate state purpose

323

and are rationally related to effectuating that valid purpose will withstand federal constitutional attack.

Alabama justifies its disparate tax treatment of half of the four types of Class III property in two ways.  First, it claims that individualized assessment of income-producing property is not administratively feasible because compilation of the necessarily detailed evaluations required would be an unduly tedious and time-consuming burden.  Second, it asserts a special interest in preserving farm and timberland.  Because the state's desire to maintain property for these two pursuits warrants a different approach to taxation, we need not reach the question of whether administrative convenience alone would constitute a sufficient excuse.  *See*, *e.g.*, *Frontiero v. Richardson*, 411 U.S. 677, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973) (administrative convenience alone will not justify disparate treatment based on sex).

The district court recognized that "Alabama is particularly concerned about the preservation of its agricultural and forest property and seeks through its property tax structure to preserve such property by providing additional preferential tax treatment for such property." *Weissinger v. White*, No. 2877-N, mem. op. at 10 (M.D. Ala. Oct. 5, 1983).  Record at 52.  The state is free to enact measures that attempt to perpetuate certain desirable uses of its land in the face of economic pressures to convert the property to other more lucrative pursuits. Institution of a favorable tax system is one rationally related means by which to effect that end.  A formula for the evaluation of farm and timber property that routinely holds assessment values below the normal selling price will certainly encourage the continued use of land for its present purpose.  Therefore, in view of Alabama's legitimate goal to preserve land for agriculture and forestry, we conclude that any disparity in the valuation of two of the types of Class III property is rationally related to the achievement of a permissible state purpose.

*Id.* at 805-07 (alterations in original, footnote omitted).

324

q.    **Summary of the *Weissinger* line of cases and plaintiffs' claims**

In *Weissinger I*, the three-judge district court panel concluded that Alabama's *ad valorem* tax laws were being administered in violation of the Fourteenth Amendment's Equal Protection Clause and the Alabama Constitution.  In particular, the court concluded that, while the Alabama Constitution required all property to be assessed at an equal ratio of its fair market value, the actual assessment rates within the State varied from approximately nine to thirty percent.  Consequently, the court declared a portion of the State's *ad valorem* tax structure to be unconstitutional and ordered all taxable property to be re-assessed at a fixed ratio of sixty percent of fair market value.[665]   The State was given a year to bring property assessments into conformity with *Weissinger I*'s mandate.

In compliance with that mandate, the State Legislature twice passed, and the voters twice approved, amendments to the Alabama Constitution.  The amendment most at issue in the present action is No. 373, which created four classes of taxable property, each with a different assessment ratio ranging from a high of 30% for utility property to a low of 10% for "Class III" agricultural, forest, historical, and single-family, owner-occupied residential properties.  Moreover, the owners of Class III properties were given the option of affirmatively electing to have their properties

---

[665] *Weissinger I*, 330 F. Supp. at 625.

assessed on a "current use" basis, as opposed to the property's fair and reasonable market value.

Relying on the considerable deference to which the states are entitled when federal courts review state tax laws, the Eleventh Circuit in 1984 concluded that the *ad valorem* tax system established by Alabama after *Weissinger I* did not violate the United States Constitution.  In reaching that conclusion, the Court noted that "[e]ven an intentionally discriminatory [property] classification will pass muster if it is founded upon a reasonable distinction, or difference in state policy, or any state of facts reasonably can be conceived that would sustain it."[666]

As a general matter, the Eleventh Circuit's decision in *Weissinger II* would seem to preclude a broad-based attack on the constitutionality of Alabama's present *ad valorem* tax system, provided the State had a rational basis for structuring the system in the manner it did.  *Weissinger II* affirmed the constitutionality of the differing assessment ratios of Alabama's current system.  The Court concluded that such differentials were rationally related to the achievement of permissible state purposes — *e.g.*, "preservation of its agricultural and forest property," and the perpetuation of "certain desirable uses of its land in the face of economic pressures to convert the property to other more lucrative pursuits" — and that they therefore were

---

[666] *Weissinger II*, 733 F.2d at 806 (alteration added, citations and quotation marks omitted).

proper under the Fourteenth Amendment's Equal Protection Clause.[667]

Even so, plaintiffs' challenge in the present case is *not* that the State's *ad valorem* tax system is unconstitutional because of differing assessment ratios for the four Classes of property created by Amendment 373, but that the system created in response to the mandate in *Weissinger I* is unconstitutional because it was devised as a means of perpetuating, as much as possible, the same anemic *ad valorem* tax revenues generated by a system that had been devised with the racially discriminatory intent of minimizing the monies available for the education of black children, *and*, that continues to adversely impact the educational opportunities of the State's black and poor-white children by unreasonable restrictions on the mechanism for increasing the millage rates of local *ad valorem* property taxes devoted to education.   Indeed, plaintiffs hope to avoid the application of *Weissinger II* by asserting that the tax system is itself racially discriminatory, not that it generates revenue through the dissimilar treatment of similarly situated properties.

What is interesting about the theory of the case advanced by the *Lynch* plaintiffs and its relationship to the *Weissinger* line of cases is that the subclass of plaintiffs who were the driving force behind the *Weissinger* cases throughout the history of that litigation following the dismissal of Mrs. Hornbeak's claims consisted of minor

---

[667]*Id.*

children who attended Alabama's public schools.[668]  The three-judge district court panel identified that subclass as the "Group II" plaintiffs, and described their claims as follows:

> The plaintiff-schoolchildren (Group II) contend that since a fixed percentage of the state's ad valorem tax revenue is distributed each year to the various public school districts in the state, defendant's systematic refusal to equalize assessments has deprived these school districts of monies to which they would otherwise be entitled for the education of plaintiffs and all others similarly situated, thus denying plaintiffs due process and equal protection of the law under the Fourteenth Amendment.

*Weissinger I*, 330 F. Supp. at 619 (footnote omitted).

Regrettably, in view of this court's duty to rule upon the issues raised by the *Lynch* plaintiffs, the three-judge panel in *Weissinger I* did not separately analyze the claims of the "Group II" plaintiff-schoolchildren.  Perhaps that is understandable, given the manner in which the three-judge district court framed the issue before it: *i.e.*, "The sole question presented in this case . . . is whether a state has the right to assess property *in the same class* at different ratios."[669]  In answer to that question, the court concluded that a state had no such right.[670]  By the time the litigation reached the

---

[668] *See Weissinger I*, 330 F. Supp. at 617.

[669] *Id.* at 620 (emphasis in original, footnote omitted); *see also id.* at 617 ("This is a class action challenging the federal constitutional validity of Alabama's present ad valorem tax program. The crucial question presented in the case is whether the Due Process and Equal Protection Clauses of the Fourteenth Amendment require the State of Alabama to assess all property within the state at a uniform ratio for ad valorem tax purposes.").

[670] The panel's rationale for that conclusion was premised upon Sections 211 and 217 of the

Eleventh Circuit nearly fourteen years later, in *Weissinger II*, there was, again, no discussion of the claims asserted by the minor schoolchildren in *Weissinger I*.

In summary, plaintiffs' litigation strategy in the present action is focused on attempting to develop a tie between the alleged racial motivation of the legislature in creating the post-*Weissinger I ad valorem* tax system, and the limited funds available for K-12 education statewide. Metaphorically speaking, their legal task is somewhat akin to threading a very small needle, and the holdings of *Weissinger I* and *II* appear to be of little help in that endeavor.

---

Alabama Constitution which, as observed previously, required

> "uniformity and equality among all taxpayers, 'private corporations, associations and individuals alike,' both as to ratio and percentage of taxation and also as to rate of taxation." In other words under Sections 211 and 217, all taxable property, by whomsoever owned, in the State of Alabama must be assessed and taxed at uniform ratios for ad valorem purposes. *Thus, rather than establishing various classes of taxable property, the State of Alabama has chosen to place all taxable property within the state in a single class for ad valorem tax purposes.*

*Id.* at 620 (quoting *Alabama Power Co.*, 254 Ala. at 336, 48 So. 2d at 453) (other footnoted citations omitted) (emphasis supplied); *see also id.* at 622 ("The Constitution and laws of the State of Alabama provide, for tax purposes, for but one class of property. This means that all property within the state must be assessed and taxed at uniform ratios.").

[this page intentionally left blank]

### 4.    The *Knight* Line of Cases

The fourth line of cases, and the one most proximate to the present action in terms of time and a common nucleus of operative facts, began with a suit to desegregate Alabama's public colleges and universities that was commenced more than thirty years ago.  It is something of an understatement to say, as did the Eleventh Circuit in *Knight v. Alabama*, 14 F.3d 1534, 1539 (11th Cir. 1994), that the *Knight* litigation had "a complicated procedural history." That history is explored in the following sections.

### a.    The original, Middle District action

The original action was filed on January 15, 1981, in the United States District Court for the Middle District of Alabama, by John F. Knight, Jr., and other alumni, students, and faculty members of Alabama State University.  The defendants to that suit included Governor Forrest Hood ("Fob") James, Jr. (then serving the first of two, non-consecutive, terms as chief executive officer of the State of Alabama),[671] the Alabama Public School and College Authority, the Alabama Commission on Higher Education, Auburn University, and Troy State University.  The plaintiffs alleged that the State had perpetuated a *de jure* system of segregated public institutions of higher

---

[671] *See* William H. Stewart, "Forrest ('Fob') James, Jr., 1979–1983, 1995–1999," in *Alabama Governors:  A Political History of the State* 243-48 (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Armbrester eds.).

331

education by establishing and operating the predominantly white Auburn University at Montgomery ("AUM") and Troy State University at Montgomery ("TSUM") in the same metropolitan area served by the historically black institution of Alabama State University ("ASU").  The plaintiffs asserted that the "dual system" of public higher education in the Montgomery area violated their rights to equal protection under the Fourteenth Amendment, and they sought injunctive and declaratory relief under 42 U.S.C. § 1983.  The plaintiffs also argued that, as a result of the fact that AUM, TSUM, and ASU all received federal funding, the actions of defendants violated plaintiffs' rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.  The plaintiffs asked the court to order the merger of AUM and TSUM with ASU under the name of "Alabama State University," and under the control of ASU's Board of Trustees.[672]  That action was assigned to U.S. District Judge Truman M. Hobbs.

Governor James and the Alabama Commission on Higher Education responded to the complaint with motions to stay the case, pending exhaustion of Title VI administrative proceedings then ongoing between the State of Alabama and the U.S. Department of Education aimed at desegregating all public institutions of higher education throughout the State.  Judge Hobbs granted the motion on May 20, 1981,[673]

---

[672] *See Knight v. James*, 514 F. Supp. 567, 568 (M.D. Ala. 1981).

[673] *Id.*

but dissolved the stay nearly a year later, on April 6, 1982, when he was informed that the Department of Education had referred the Title VI enforcement proceedings to the United States Department of Justice.[674]  Thereafter, on October 24, 1982, Judge Hobbs certified a plaintiff class consisting of graduates of ASU and African American citizens of Alabama who were eligible for employment by, or who attended, or who might attend, public institutions of higher education in the Montgomery, Alabama area.

### b.    The Northern District action

On July 11th of the following year, notwithstanding the fact that the original *Knight* case was still pending in the Middle District, the Department of Justice filed an action in this District against the State of Alabama, George C. Wallace (who, by then, had begun his fourth, and final, term as Governor),[675] the State Board of Education, the State Superintendent of Education, the Alabama Commission on Higher Education, the Alabama Public School and College Authority, and most of the

---

[674] *See Knight v. Alabama*, 476 F.3d 1219, 1220 n.1 (11th Cir. 2007) ("***Knight III-A***") ("The United States Department of Education informed Governor Fob James and the various university presidents that there were vestiges of a prior de jure segregated system of higher education in Alabama.  After several months of unsuccessful negotiations, the Justice Department filed [suit in the Northern District of Alabama]. . . .").

[675] *See*, *e.g.*, Glenn T. Eskew, "George C. Wallace, 1963–1967, 1971–1979, 1983–1987," in *Alabama Governors:  A Political History of the State* 216-30 (Tuscaloosa:  The University of Alabama Press 2001) (Samuel L. Webb & Margaret E. Arbrester eds.) ("**Eskew I**").

publicly-supported colleges and universities in the state.[676]   *See United States v. Alabama*, No. CV 83-C-1676-S (N.D. Ala. July 11, 1983).  The government exercised its statutory authority to bring suit to enforce Title VI of the Civil Rights Act of 1964, and alleged that the State had failed to complete the desegregation of its colleges and universities.  Specifically, the government claimed that

> many of Alabama's polices governing higher education tended to perpetuate its formerly *de jure* segregated university system.  The challenged education policies included:  admissions standards at historically white institutions, claimed to disqualify disproportionate numbers of black applicants; selection procedures for the governing boards, administrations and faculty of historically white institutions, claimed to result in the under representation of blacks; curriculum policies at historically white institutions, claimed to include little representation of black history, thought, or culture; campus environments at historically white institutions, claimed to be hostile to blacks; funding and facility policies governing historically black institutions, claimed to result in their inadequacy; duplication of programs at both historically white and historically black institutions, claimed to result in racial

---

[676] The institutions named as defendants in the government's complaint included Alabama Agricultural & Mechanical University, Alabama State University, Auburn University, Jacksonville State University, Livingston University, Troy State University, the University of Montevallo, the University of Alabama, the University of North Alabama, the University of South Alabama, Athens State College, and Calhoun State Community College.  Immediately after the government commenced the action, however, the two historically black institutions of higher education named as defendants, Alabama State University (ASU) and Alabama A & M University (AAMU), separately moved for realignment as plaintiffs, or in the alternative, for permission to file cross claims.  Judge U.W. Clemon, the judge to whom the United States' complaint was originally assigned, granted both motions.  ASU and AAMU thereafter sought leave to file amended complaints.  Judge Clemon granted the request, and AAMU subsequently asserted Title VI and Fourteenth Amendment claims against the University of Alabama System, Auburn University, and the State.  ASU asserted similar claims against Auburn University, Auburn University at Montgomery, Troy State University, Troy State University at Montgomery, and the State of Alabama.

separation; and restrictive institutional missions at historically black institutions, claimed to result in the absence of graduate and other desirable programs at those institutions. Plaintiffs sought change in these policies that would tend to decrease the *de facto* segregation, or racial identifiability, of Alabama's colleges and universities.

*Knight v. Alabama*, 476 F.3d 1219, 1220-21 (11th Cir. 2007) ("*Knight III-A*") (footnote omitted).[677]  That case was assigned to U.S. District Judge U.W. Clemon, now retired.

### c.   Merger of the Middle and Northern District actions

On April 18, 1984, Judge Clemon granted the motion of the class of private plaintiffs represented by John F. Knight and others (the plaintiffs in the parallel proceedings filed in the Middle District and described in Part II(G)(4)(a) above) to intervene in *United States v. Alabama*, on the ground that the outcome of the Northern District action would be determinative of the issues raised in the predecessor case of *Knight v. James*.  Further, on January 3, 1985, Judge Clemon certified the *Knight* intervenors to represent essentially the same Montgomery-related class that had been certified by Judge Hobbs.[678]  As a consequence of those actions, Judge Hobbs stayed

---

[677] The omitted footnote stated: "For a detailed summary of plaintiffs' contentions and those of the other parties, see *Knight v. Alabama*, 787 F. Supp. 1030, 1051-61 (N.D. Ala. 1991) ('*Knight I* ')."  *Knight III-A*, 476 F.3d at 1221 n.2.

[678] *See Knight v. Alabama*, 14 F.3d 1534, 1539 (11th Cir. 1994) ("Knight and the other named plaintiffs were certified as representing in this suit a class composed of both the black citizens of Alabama generally, and the students, faculty, staff, and administrators of Alabama State University ('ASU') and Alabama A & M University ('A & M'), the two HBIs in the Alabama system.") ("*Knight I-A* ").

all further proceedings in his Middle District action, "until a final judgment or order is reached in *United States v. Alabama*. . . ."  *Knight v. Wallace*, CA No. 81-52-N (M.D. Ala., June 12, 1984).[679]

### d.   Motions to disqualify Judge U.W. Clemon

During September of 1983, Auburn University and the State Superintendent of Education moved Judge Clemon to disqualify himself.  He denied the motion.  *See United States v. Alabama*, 574 F. Supp. 762 (N.D. Ala. 1983), and *United States v. Alabama*, 571 F. Supp. 958 (N.D. Ala. 1983).[680]  Auburn then petitioned the Eleventh Circuit for a writ of mandamus, and a panel of that Court granted the writ in part and remanded the case with directions for another judge to be assigned to hear the recusal motion.  *See In re Auburn University*, No. 83-7557 (11th Cir. Nov. 10, 1983).

Senior District Judge Hobart Grooms was assigned to determine whether Judge Clemon should be disqualified.   After taking evidence, he entered an order on December 19, 1983, granting the motions to disqualify.  One month later, however,

---

[679] The change in the style of the Middle District case reflects the fact that George Wallace had been reelected Governor following Judge Hobbs' imposition of a stay.  No trial was ever conducted in *Knight v. Wallace*, however; and, on December 12, 1990, in light of the proceedings still pending in the Northern District, Judge Hobbs dismissed without prejudice the Middle District case (which, by then, had been restyled yet again, as "*Knight v. Hunt*," to reflect the succession of Guy Hunt to the office of Governor from 1987-1993).

[680] Two grounds for recusal were argued by Auburn and the State Superintendent.  The first alleged that Judge Clemon was allegedly biased or prejudiced concerning one of the parties; and the second contended that the Judge's impartiality might reasonably be questioned.  Each of these issues was addressed separately by Judge Clemon, thus accounting for the two reported opinions.

Judge Grooms granted a motion for reconsideration, vacated his prior order, and recused *himself* from any further involvement in the disqualification controversy. Senior Circuit Judge David Dyer then heard the defendants' disqualification motion and denied it.  *See United States v. Alabama*, 582 F. Supp. 1197 (N.D. Ala. 1984). The defendants' subsequent request to certify the issue for interlocutory appeal was denied.  The case then proceeded to trial before Judge Clemon.

### e.    **The first trial** — *conducted by Judge Clemon*

The trial began on July 1, 1985, and concluded on August 2.  Before the start of trial, Judge Clemon bifurcated the proceedings, so that the only issue heard concerned the liability of the defendants.  On December 9, 1985, Judge Clemon entered an order and memorandum of opinion finding that a racially "dual system" of public higher educational institutions had been operated by the State of Alabama until at least 1967, and that the State had failed to dismantle the vestiges of the prior *de jure* system.  *See United States v. Alabama*, 628 F. Supp. 1137 (N.D. Ala. 1985).  Judge Clemon ordered the State, the Governor, the Alabama Commission on Higher Education, and the Alabama Public School and College Authority to submit a plan to eliminate all vestiges of the dual system of higher education.[681]

---

[681] *United States v. Alabama*, 628 F. Supp. 1137, 1173 (N.D. Ala. 1985).

### f.   Eleventh Circuit reversal and disqualification of Judge Clemon

Before the directives of that order could be accomplished, however, the Eleventh Circuit reversed and remanded the case in an opinion holding that:  the complaint of the United States should be dismissed without prejudice; the Knight plaintiffs' Title VI claim should also be dismissed without prejudice; Judge Clemon should be removed from presiding over any further proceedings in the consolidated cases; and a new trial should be conducted if the United States and the Knight class of plaintiffs refiled their claims.[682]   The Court of Appeals affirmed the Knight plaintiffs' right to challenge vestiges of segregation under the Fourteenth Amendment.[683]

### g.   Reassignment of Northern District action to Judge Murphy

Eventually, Harold L. Murphy, a United States District Judge for the Northern District of Georgia, was designated by the Chief Judge of the Eleventh Circuit to perform all judicial duties relating to the Northern District action on remand.  *See In re John F. Knight, Jr.*, No. 88-7764 (11th Cir. Apr. 12, 1989).[684]

---

[682] *See United States v. Alabama*, 828 F.2d 1532 (11th Cir. 1987) (*per curiam*), *cert. denied*, 487 U.S. 1210 (1988).

[683] *Id.* at 1551.

[684] This action occurred only after six other district judges on this court were recused on their own motion or by order of the Eleventh Circuit, and Sam C. Pointer Jr., the Chief Judge for the Northern District of Alabama, certified that a need existed for a judge from another district to preside over the case.

338

### h.   Designation of Knight Class as lead plaintiffs

On remand, John F. Knight and the other members of his class were designated

lead plaintiffs, and both they and the United States filed amended complaints.   On

March 12, 1990, Judge Murphy entered a lengthy order disposing of all pending

motions to dismiss.[685]

On June 15, 1990, following a hearing at which most of the named plaintiffs and

plaintiff-intervenors testified, the Court conditionally certified John F. Knight Jr.,

---

[685] Among other things, Judge Murphy denied all motions to dismiss the statewide Title VI claims of the United States and Knight plaintiffs, in reliance upon the Civil Rights Restoration Act of 1987, which legislatively overturned the Supreme Court's ruling in *Grove City College v. Bell*, 465 U.S. 555 (1984).  Motions to dismiss the Knight plaintiffs' Fourteenth Amendment claims and the intervention of the United States to assert its own Fourteenth Amendment claims were also denied.   Judge Murphy did grant, however, motions to dismiss the Knight plaintiffs' Section 2 Voting Rights Act claim, and, their vote dilution allegations, premised on the First, Thirteenth, Fourteenth, and Fifteenth Amendments.  Those counts were dismissed on the grounds that the factual predicate pled in the complaint did not constitute a cognizable claim concerning voting or voting strength as a matter of law.  *See Knight v. Alabama*, No. CV-83-M-1676-S, slip. op. at 52-63 (N.D. Ala. Mar. 12, 1990).  Finally, Judge Murphy dismissed the cross claims of Alabama State University and its Board of Trustees on the ground that they lacked standing to pursue the interest of third parties who were already adequately represented by the Knight plaintiffs.  *Id*. at 38-51.

Further, before the beginning of the second trial, and over the objection of the Knight plaintiffs, Judge Murphy reaffirmed several consent decrees that previously had been approved by Judge Clemon.  The reaffirmed decrees were between the United States and the University of South Alabama, the University of Montevallo, Jacksonville State University, and Livingston University. Judge Murphy also approved, over the objections of the Knight plaintiffs, consent decrees entered into for the first time between the United States and the following defendants:  Troy State University; the State Board of Education; Athens State College; and Calhoun State Community College.  When approving these consent decrees, however, Judge Murphy took care to inform the parties that, in the event there was a finding of liability and a judicial remedy required, those colleges and universities that had entered into consent decrees with the Government might well have to participate in the remedy stage of litigation, regardless of their independent agreements with the United States.  In other words, Judge Murphy made clear that he retained jurisdiction over all settling parties for the purposes of shaping appropriate remedies following a trial on the merits.  *See Knight v. Alabama*, No. 83-M-1676-S, slip op. at 2-3 (N.D. Ala. June 28, 1990).

339

Alease S. Sims, and others, to represent a class of "all black citizens of Alabama and all past, present and future students, faculty, staff and administrators of Alabama State University and Alabama A & M University." *Knight v. Alabama*, No. CV-83-M-1676-S, slip op. at 9 (N.D. Ala. June 15, 1990). That class was thereafter referred to as the "Knight plaintiffs."

> ### i.     **The second trial** — *but the first conducted by Judge Murphy*

The second trial began October 29, 1990, and, except for holiday recesses, it continued uninterrupted for six months, ending on April 16, 1991. The court heard from approximately 200 witnesses, received hundreds of thousands of pages of exhibits and produced a transcript well in excess of 22,000 pages.[686]

> ### j.     **Judge Murphy's first opinion** — *"Knight I"*

Seven and a half months after the conclusion of that trial, Judge Murphy entered a 360-page opinion finding liability. Among other things, he concluded that vestiges of segregation remained in Alabama's system of public higher education, particularly in the areas of faculty and administrative employment, allocation of state funding and

---

[686] Judge Murphy ordered that the record and transcript from the 1985 trial before Judge Clemon be incorporated into the proceedings conducted by him. Even so, the parties were given an opportunity to object to any portion of the 1985 trial record which was, in their opinion, improperly introduced into evidence. The parties also were allowed to object to the introduction of testimony from the 1985 trial, if it was felt that the cross examination had been unduly restricted.

Finally, Judge Murphy chose not to bifurcate the issues of liability from those of remedy, saying that he believed the best use of judicial and financial resources would be to hear both issues during a single trial.

facilities at historically black institutions of higher education, admissions policies at historically white institutions, and program duplication. *See Knight v. Alabama*, 787 F. Supp. 1030, 1368 (N.D. Ala. 1991) (Murphy, J., sitting by designation) ("*Knight I*"). All of these vestiges of the former, *de jure* system of segregation combined to result in the racial identifiability of Alabama's colleges and universities, and the perpetuation of a dual system of public higher education within the State. Judge Murphy's remedial decree ordered defendants to develop and the State to implement specific modifications to policies and practices in those areas, in order to remove barriers to black access to historically white institutions of higher education, and, to encourage whites to attend historically black colleges and universities.[687] The court declined to hold that either the State's allocation of funding for land grant programs, the institutional missions assigned to the historically black institutions, the campus environments at the historically white institutions, or the curricula at the historically white institutions were vestiges of segregation. He therefore ordered no relief in those areas. *See Knight v. Alabama*, 14 F.3d 1534, 1539-40 (11th Cir. 1994) ("*Knight I-A*").

### i. Relevant findings of fact

En route to the foregoing conclusions, Judge Murphy made 1,859 findings of fact. Some of his factual determinations bear upon issues that have been raised in the

---

[687] *See Knight I*, 787 F. Supp. at 1377-82.

present action.  Those findings are set out below.  The topical headings and paragraph

numbers were assigned by Judge Murphy.

A.    *The Nineteenth Century*

1.  The Antebellum Period

44.    Except at Mobile, which was founded by the French in the
early eighteenth century, there were no whites in what is now Alabama
until the Tombigbee settlement was founded in 1800 in southwest
Alabama and the Big Bend settlements in modern Madison County in
1810.   After Andrew Jackson's Tennessee militia defeated the Creek
Indians in 1814 [at the Battle of Horseshoe Bend], the United States
began selling land in what was then the western territories of Georgia.
Settlers poured into Alabama by the thousands during the period between
1816 and 1819.  In fact the growth was so rapid that by 1819 Alabama
had enough settlers in its territory to petition the Congress for statehood
which was granted that same year.  The settlers brought slaves with them
to the newly open territory in contravention of the Northwest Ordinance.
Upon the admission of Alabama into the Union, the provision of the
Northwest Ordinance prohibiting the importation of slaves was removed.
Thornton (11/5/90) 24-33.[688]

\* \* \* \*

---

[688] Judge Murphy is here referencing the testimony of Dr. J. Mills Thornton, a native of
Montgomery, Alabama, whom Judge Murphy described as

probably the preeminent living authority on the social and political history of
Alabama.  His doctoral dissertation at Yale (concerning antebellum Alabama) was
supervised by C. Vann Woodward, the most respected Southern historian living.
Thornton (11/5/90) 4-5.  Dr. Thornton presently is full professor of history at the
University of Michigan, one of the five leading history departments in the United
States.  *Id*. at 6-7.  He has published extensively over the whole scope of Alabama
history up to and including the Civil Rights Movement.  KX 3116.

*Knight I*, 787 F. Supp. at 1065 & ¶ 39.

47.     Alabama adopted a slave code similar to Georgia's immediately upon its admission to the Union in 1819.  In 1832, the year following Nat Turner's bloody insurrection in Virginia, *the Legislature of Alabama*, like those in most other Southern states, *enacted a statute making it a crime to instruct any black person*, *free or slave*, *in the arts of reading and writing*.  KX 653, 1832 Ala. Acts, sec. 10, p. 16.  In addition, among other things, the act provided criminal penalties, in the form of "lashes on the bare back" and being sold into slavery, for free blacks who wrote passes or free paper for slaves, sec. 11, who sold to or bought from a slave "any article or commodity whatsoever, without a written permission from the master," sec. 13, or who was found in the company of a slave without written permission of the master, sec. 14.  Any person distributing "any seditious papers, pamphlets or writing, tending to produce conspiracy or insurrection or rebellion among the slaves or colored population" could be put to death.  Sec. 13.  Thornton (11/5/90) 37-39.

48.     Dramatically evincing the resolve of whites during this period to totally control the thoughts and attitudes of all blacks, slave or free, the 1832 act even made it a crime for any slave or free person of color to "preach to, exhort, or harangue any slave or slaves, or free persons of color, unless in the presence of five respectable slave holders."  KX 653, sec. 24, p. 18.  On the other hand, the law was not to "be so construed . . . as to prevent free persons of color and slaves from attending places of public worship held by white persons."  *Id*., sec. 22, p. 18. Thornton (11/5/90) 38-39.

49.     *With the possible exception of a creole school in Mobile, there is no record of a school for black children in the State of Alabama prior to 1860.*

50.     At the outbreak of the Civil War, there were about 1,900 public schools and 200 private schools serving Alabama's white school-age children.  Thornton (11/5/90) 42.  There were seventeen private colleges, and only one public college — UA [*i.e.*, the University

of Alabama in Tuscaloosa].[689]  *Id*. at 44.

## 2. The Reconstruction Period

51.    The blood letting of the Civil War ended in April 1865, but the pain of Reconstruction was just beginning.  *During Reconstruction, the issue of access of newly freed black people to all levels of education was central to the political debate that characterized this historical period in Alabama.*  Blacks were able to vote for the first time, and the Black Belt[690] counties in particular elected black men and their white Republican allies to the Legislature.  Thornton (11/5/90) 125.

52.    During Reconstruction it is not possible to separate issues of partisan politics from the over-arching issues of race.

> [T]he Democratic Party was a white supremacist party, and the Republican — and all blacks were Republicans, or essentially all blacks were Republicans.  Now, there were elements within the Republican Party who were hostile to their black fellow Republicans, but all blacks were Republicans and all Democrats were white supremacists, so in that sense . . . what you have is the overlay of ordinary American political forms of election and passage of legislation over what is, in effect, a revolutionary situation over a deep seated division within the electorate over the nature of the polity and so there is not that consensus about aims or common set of presumptions about the goals of democracy and the welfare of the republic that ordinarily informs and surrounds the competition between the parties.

---

[689] This footnote bore the number "12" in Judge Murphy's opinion, and it read as follows: "Approximately 200 students were enrolled at UA at the outbreak of the Civil War."  *Knight I*, 787 F. Supp. at 1067 n.12.

[690] This footnote was numbered "13" in Judge Murphy's opinion, and read as follows:  "The 'Black Belt' counties are located in south Alabama and are so named because the soil in that region of the state is dark in color.  Additionally, during the period immediately following the Civil War, the majority population in that area of the state was black."  *Id*. at 1067 n.13.

344

>    In fact, *the parties are deeply divided* over the most
>    fundamental philosophical issues and those issues, *the
>    issues that chiefly divide them are racial, that is to say the
>    structure of the society, what the society is going to look
>    like now that the blacks have been freed*.

Thornton (11/5/90) 124-25.

53.    The white supremacist attitude of this period is one which

>    desire[s] to preserve blacks in a subordinate position within
>    the society.  And as those whites, who held this idea would
>    have understood it, to preserve civilization in the republic,
>    . . ., they understand themselves to be fighting to preserve
>    the essence of the republic.

Thornton (11/5/90) 128.[691]

54.    The dilemma for the Republican Party was always gaining
and holding the support of enough white voters to parlay solid black
support into electoral victory.  The Democrats used the Ku Klux Klan
and other means of violence, intimidation and social ostracism against
those white persons who aligned with the Republican Party.  Even white

---

[691] This footnote was numbered "14" in Judge Murphy's opinion, and read as follows:

>    Dr. Adon Morris, an expert witness for the Knight Plaintiffs, and sociologist
> on the faculty at Northwestern University defined the current parameters of 'white
> supremacy' in a sociological sense in the following manner:
>
> >    [White supremacy] . . . is a belief and practice which suggests that
> >    white people are superior to black people, number one.  Two, that the
> >    experiences and viewpoints of whites are superior to the experiences
> >    and viewpoints of black people,   That Europeans in general are
> >    superior to nonwhites, [noneuropeans], that western civilization is
> >    superior to nonwestern civilizations, and that black people are to
> >    serve white people.

*Id*. at 1068 n. 14 (quoting Morris Testimony) (bracketed alterations in original).

345

Republicans openly hostile to blacks' interests were ostracized merely for appearing on the same ticket with black candidates or for sitting in the Legislature with black Republicans.

> And of course, in the case of some scalawags, that has the effect of driving them to ostentatious desire to demonstrate that they . . . do not accept black goals and eventually it has the effect in some cases of simply driving them out of the Republican party and they join the Democratic party.  By 1874 that had happened on quite a broad front *and that's what we mean by drawing the color line, forcing all whites on one side and leaving the other side essentially black.*

Thornton (11/5/90) 126-27.

55.     As described by historian William Warren Rogers, any white politician who consents to appear before black politicians was looked upon

> as a time-serving, degraded carpet-bagger, willing to accept office from a negro constituency. . . .  The white man who would submit to be summoned by a few negro politicians and made to render an account of his stewardship, and eat his own words, is a stigma on his color, and is beneath the respect of the blackest and most ignorant negro in the United States.

Thornton (11/5/90) 127-28, *quoting* The Butler *Courier*, October 14, 1882, from W. Rogers, *August Reckoning*: *Jack Turner and Racism in Post-Civil War Alabama* 153 (1973).[692]

56.     On September 12, 1865, a state constitutional convention

---

[692] This note, numbered "15" in the opinion, read as follows:  "On numerous occasions, the Court allowed the parties to introduce excerpts from authoritative sources relied upon by the expert witnesses into the record.  This procedure was applied throughout the trial without objection and with the consent of the parties.  *See*, Thornton (11/7/90) 317-19 (discussing the admission of such exhibits)."  *Knight I*, 787 F. Supp. at 1068 n.15.

346

opened in Montgomery with 99 elected delegates, all of them whites. The 1865 Convention consisted mostly of unionists; they differed with other native whites about secession, but they shared the deep-seated social and racial attitudes of other native whites. "All of [them] believed that even though freed, the blacks had to be carefully regulated and controlled by the state government in order to preserve social order and the safety of the white population."  Thornton (11/5/90) 46-49.

57.    The 1865 Alabama Constitution drafted by this convention denied blacks the right to vote, as had the Constitutions of 1819 and 1860, *and it took no steps to provide them with educational opportunities*.  It apportioned representation in the General Assembly on the basis of white population.  The all-white legislature elected under the 1865 Constitution enacted the so-called "Black Codes" for the regulation and control of black labor, refused to ratify the Fourteenth Amendment,[693] and rejected proposals to give blacks the right to vote. Governor Patton said:

> We shall not only extend to the freedmen all their legitimate rights, but shall throw around them such effectual safeguards as will secure them in their full and complete enjoyment.  At the same time it must be understood that politically and socially ours is a white man's government.

Thornton (11/5/90) 49-56 quoting, Bond, *Negro Education in Alabama*: *A Study in Cotton and Steel* 23, (1969).

58.    On March 2, 1867, the First Reconstruction Act was passed by Congress over the veto of President Johnson.  It abolished the provisional governments of the Southern states and established districts under the control of the Union Army.  The Second Reconstruction Act, adopted March 23, 1867, provided for the registration of prospective voters "without distinction as to race, creed, or color," and for the holding of a Constitutional Convention to establish a new state

---

[693] This footnote, numbered "16" in the opinion, read as follows:  "[The] Thirteenth Amendment was ratified by the Alabama Legislature during the Constitutional Convention of 1865. Thornton (11/5/90) 50."  *Id.* at 1069 n.16 (alteration supplied).

government. A prerequisite to registration was subscription to the "Test Oath," a proviso that effectively disfranchised all persons who had held office before the Civil War and then had supported the Confederacy. Thornton (11/5/90) 56-57.

59.    Of the 100 delegates to the 1867 Constitutional Convention, 19 were black, at least 26 were "carpetbaggers" (white Republicans who came to Alabama after 1865), and at least 48 were "scalawags" (white Republicans who were in Alabama before the Civil War), and three were Democrats. Four Republicans cannot be further identified. Thornton (11/5/90) 58-60.

60.    The 1867 Constitution enfranchised blacks and apportioned representation in the General Assembly on the basis of total population, including blacks. After the re-registration, there were about 90,000 black and 75,000 white registered voters in the state. Thornton (11/5/90) 57-58. The previous three Alabama constitutions (1819, 1861 and 1865) had simply been declared in effect by their respective conventions. But the Military Reconstruction Acts required the new constitution to be ratified by the voters.

61.    The election to ratify the 1867 Alabama Constitution was held in February 1868, along with elections to state offices. White conservatives adopted a strategy of defeating the 1867 Constitution by refraining from voting, since the Reconstruction Act of March 2, 1867, provided that the Constitution should not be declared in force until ratified by a majority of voters. The vote was 70,812 for and 1,005 against the Constitution, which was less than half the approximately 170,000 registered voters. But the conservative strategy failed when Congress admitted Alabama as a reconstructed state in spite of the fact that the original proviso had not been met. Thornton (11/5/90) 61-68.

62.    All the conservative boycott accomplished was a Republican sweep of nearly all state offices. The Senate was composed of 32 Republicans, only one of whom was black, 10 were carpetbaggers, 21 were scalawags, and one was a democratic conservative. The House of Representatives had 97 Republicans, at least 26 of whom were black, and

3 Democrats.  Thornton (11/5/90) 68-69.

63.    *Reflecting the importance blacks and Republicans placed on education, the 1867 Constitution completely centralized the entire state school system by delegating full legislative power over all education matters to the State Board of Education,* ("SBE") including governance of the University of Alabama.  Following the model of the Iowa constitution, the 1867 Alabama Constitution set up a procedure whereby the SBE would pass education laws, which then had to be signed or vetoed by the governor, with the SBE retaining the authority to override the governor's veto.  In addition, the Legislature retained the authority to declare any act of the SBE void.  Thornton (11/5/90) 80-82.

64.    In the 1870 elections, the Democrats won the governorship, a majority of the House of Representatives, and elected the State Superintendent of Education.  The Republicans retained control of the Senate (whose members served for four years) and the elected State Board of Education.  Thornton (11/5/90) 69-70.  By then, Congress had removed the civil disabilities of most former Confederates, allowing them to register and vote.  *Id.* at 58-59.  So many Democrats participated in the 1870 election, amid considerable Ku Klux Klan activity, particularly in the western Black Belt.  Most of the white counties in the northern hill counties and the southeastern wiregrass counties voted democratic.  *Id.* at 69.

65.    One reason the incumbent Republican Governor, William H. Smith, was defeated by Democrat Robert B. Lindsey in 1870, was the presence of a black candidate for Secretary of State on the Republican ticket, James Rapier.  Most whites, including Republicans, were infuriated over the prospect of a black state officer sitting in authority over white people.  If Rapier had been elected, he would have been the first black person ever to hold statewide office.  Even though Smith ran a close race with Lindsey, Rapier finished dead last among all Republican candidates.  Thornton (11/5/90) 70-71.

66.    One black man, Peyton Finley of Montgomery, was elected from his congressional district to the State Board of Education.  After the

election, lots were drawn to divide up the seats into two-year and four-year terms, and Finley drew a two-year term. He therefore served from 1870 to 1872.  Thornton (11/5/90) 72-73.

67.    The Republicans regained the offices of Governor and State Superintendent of Education and a majority of the House of Representatives in the 1872 elections.   The Democrats, however[,] controlled the Senate by one vote.   Thornton (11/5/90) 74-75. Republican rule would be short-lived.

68.    In 1874 the Democrats drew the color line in order to eliminate the Republican threat to white supremacy once and for all. There was considerable intimidation and violence directed at both black and white Republicans, and outright fraud was used to stuff ballot boxes in the Black Belt.  The Democrats circulated "massive fright propaganda" claiming that Republicans might seek racially mixed schools to win over whites in North Alabama, many of whom previously had voted with the Republicans.  The Democrats won all the statewide offices and both houses of the legislature in 1874.  Thornton (11/5/90) 75-76.

69.    This Democratic victory led to adoption of the 1875 "Redeemer" Constitution, which

> redeemed . . . white rule.  *Redemption in all of the southern states is a term which essentially means the tossing out of Republicans and particularly blacks from public life*, and *the conversion of all offices to white Democratic incumbency*.

Thornton (11/5/90) 79.

70.    The Democratic white conservatives who took control of the Alabama State House in 1874 spun a web of subordination around black schools sufficient to ensure adequate white control of black educational aspirations.  Thornton (11/5/90) 139-40.  While *de facto* segregation existed from the beginning of Alabama's public school system, *the Constitution of 1875 made segregated schools part of Alabama's basic*

350

*law*.  The members of the constitutional convention understood that this *constitutional segregation applied to all levels of public education*. Thornton (11/5/90) 140-146.

71.    The full scope and depth of the forms of racism created by post-Redemption white supremacy in Alabama is vividly described by Dr. Rogers in the preface to his book, *August Reckoning*: *Jack Turner and Racism in Post-Civil War Alabama* (1973):

> The decades of [powerful Democratic] ascendancy came after 1874, as Alabama became a state whose institutions were frankly, admittedly, unashamedly, and triumphantly dominated by whites.  The theory of white supremacy and black inferiority found daily expression and constant application.  If Caucasian dominance became legally fixed and formalized (as it did), Anglo-Saxon superiority was no less manifest in unstated ways.  If a white man and a black man met face to face on a narrow walk, it was the black who stepped aside to let the other pass; a white man's surname was always prefaced with "Mister," or some sort of title, a Negro's never; purchases paid for in cash primarily involved the color green until a merchant was confronted simultaneously with two customers whom he must accommodate according to black or white.

> White superiority was no less evident in a verbal folklore spawned by, repeated by, and believed by whites: Negro men were naturally lazy and without ambition, desirous of having sexual relations with white women, incapable of higher reasoning, uncontrollable when under the influence of liquor, and cursed forever with an offensive body smell.  And yet with all his negative qualities, the black, according to the Southern mystique, given proper guidance by his white mentors was carefree, musical, naive, gentle, mercurial, anatomically limber, religious (in an outlandish way), and humorous.  Still, the black race, as

351

everyone knew, was inferior, and all things proceeded from
this basic premise.

KX 3129 (emphasis in original).[694]

72.   Emmet O'Neal, who attended the 1875 and 1901
Constitutional Conventions and who was elected Governor of Alabama
in 1910, said in a 1917 address to the Alabama State Bar Association:

> The constitution of 1875 placed no restriction on
> negro suffrage.  The Federal government was under the
> complete control of the Republican Party, which was
> bitterly hostile to the South.   The fear of Federal
> interference, therefore, prevented any effort on the part of
> the framers of the constitution of 1875 from undertaking to
> restrict negro suffrage or lessen its admitted evils.

> The negro vote constituted an overwhelming majority
> in that portion of the state known as the black belt, and it
> was sufficiently large in many other portions of the state, in
> combination with the white republicans, to constantly
> threaten white supremacy, which was the chief tenet of the
> Democratic Party.   The fear of negro rule, with the
> misgovernment which would follow, and the race conflicts
> which it would create, constantly threatened the state and
> checked its progress.  White supremacy was maintained by
> methods which could only find their justification in the
> imperious necessity of self-defense and self-protection.
> Negro rule meant that the white man must surrender his
> home and lands or remain under conditions which were
> intolerable. *The white race had settled Alabama and owned
> its lands and hence was determined not to surrender to an
> alien and inferior race, which had been brought to Alabama
> as slaves and which had acquired the right of suffrage only
> by grant from the victorious North, and as one of the results*

---

[694] The published opinion contains no emphasis in this quotation.  *See id*. at 1071.

*of the war.*

KX 3240, pp. 9-10.

73.    The SBE was very unpopular with white Democrats and scalawag Republicans "*because it aggressively sought educational opportunities for blacks* and it cooperated with the schools that had been established in Alabama by white northern missionaries during the years after 1865." Thornton (11/5/90) 83.

74.    During the period of Redemption the SBE faced the wrath of the Democrats. *The 1875 Constitution abolished the SBE* both as the governing body of the University of Alabama and *as the governing body of the public schools*, *in large part because it had sought to further equal educational opportunities for blacks*. There would be no State Board of Education in Alabama from 1875 until 1919. Thornton (11/6/90) 130.

* * * *

4. Blacks' Early Efforts For Equality Through Education

88.    After the Civil War, *during Congressional Reconstruction*, *a great struggle ensued over how much and what type education blacks in Alabama would have access to. The freedmen*, *who made up nearly half the state's population*, *laid all their hopes for social equality on education*, *and they flocked in great numbers to every school available to them*. Blacks' aspirations were supported by Northern white missionaries, who opened schools that taught blacks liberal curricula and equal rights. *They were opposed by most native whites*, *who used violence to discourage any kind of education for blacks*.

89.    The hostile attitude of white Alabamians toward the northern missionary schools for blacks during Reconstruction was succinctly stated by one of the Knight Plaintiff's expert historians, Dr. J. Mills Thornton.

[The northern missionary schools] were highly unpopular

353

with considerable number of whites who regarded the education of blacks as a threat and particularly were unpopular because it was thought that these missionaries were teaching blacks false notions. They were teaching them equality of the races, they were teaching them to be assertive. They were encouraging them not to continue a subservient role in the economy as part of the labor force. And white Democrats were also, particularly those allied with the Ku Klux Klan, were very hostile also to the history books that were used in these schools, because they thought that they presented a northern view of American history.

Thornton (11/5/90) 83-84.

90.    Access to higher education was particularly important to the freedmen's program of achieving full citizenship socially and economically. Higher education was the doorway to the many middle class social roles from which blacks had been excluded. "[T]he establishment of a black college therefore seemed to be essential to the general liberation of the freedmen." Thornton (11/5/90) 108.

91.    The main pressure on Alabama's whites to establish black schools came from Northern missionaries, who taught the newly freed blacks such "alien" values as equality, brotherhood, and citizenship for all, along with the traditional three R's. Thornton (11/5/90) 83-84.

92.    Whether the newly freed blacks were to be taught in integrated schools was an issue that consumed considerable debate but whose outcome was never seriously in question.

93.    *Among white Republicans, only some carpetbaggers favored school integration*; very few of the native white scalawags did. In fact, 23 of the scalawag delegates to the 1867 constitutional convention had repudiated the constitution adopted by the convention because it failed explicitly to require segregated schools and prohibit miscegenation. Thornton (11/5/90) 63-64.

354

94.   The Democratic charges in the 1874 elections that Republicans would promote school integration were outright lies. "[T]he scalawag element in the Republican party was strongly opposed to integration of the public schools.  Very few scalawags would have accepted integration of schools or for that matter any other facilities." Thornton (11/5/90) 76.

95.   *In order to gain access to the education they so desperately desired*, Alabama's black citizens compromised with conservative whites on two major issues:  segregation and white control.

96.   *Black political leaders sought to require racially integrated schools*.   Black members of the 1867 Constitutional Convention promoted a requirement of integration, but white scalawags tried to write segregation into the constitution.   *As a compromise*, *the 1868 Constitution ended up requiring the SBE to establish* "one or more" *public schools in each township or school district*.  KX 655, 1868 Ala. Const., Art. XI, sec. 6.  Then at its first session the SBE passed a law requiring each township to have a school for whites and a school for blacks, unless every white parent in the township was willing to have one racially integrated school.  This provision had the necessary result of requiring segregated schools.  Thornton (11/5/90) 85-86.

* * * *

6.  Educational Access and Black Political Power:
the End of the Nineteenth Century

168.   Educational opportunity for blacks in the nineteenth century is directly tied to their political empowerment.  Both Alabama State and Alabama A & M were founded during Reconstruction, when, for the first time, blacks were allowed to vote and to serve in the State Legislature. *From 1868 to 1874, blacks and their white Republican allies actually exercised majority control of state government. Nevertheless, native white Alabamians considered racial integration of the schools unthinkable and thought sharing political power with blacks was dangerous and demeaning*.  The University of Alabama remained all

355

white and almost closed its doors in 1872 rather than submit to governance by a State Board of Education that had a Republican majority, including one black member, Peyton Finley.  Funding for Alabama State and Alabama A & M had to come out of the blacks' share of the state's public school fund used to finance elementary and secondary education.  Even this modest progress toward education of the black population was reversed in 1874-75, when the Democrats "redeemed" the state from "black rule" and constitutionally installed the structures of official white supremacy.  *The "Redeemer" Constitution of 1875 was the first Alabama constitution explicitly to forbid attendance of black and white children in the same schools.*

169.  *Black educational opportunities declined directly in proportion to the decline of black political power after 1875.*

[T]he absence of black participation and particularly the absence of black office holders really meant that the black community was at the mercy of Democratic politicians whose commitment was first and foremost to white supremacy.

Thornton (11/5/90) 190-91.

170.  Black political influence did not disappear immediately, however, since not until the 1901 Constitution were most blacks disfranchised.  Thornton (11/5/90) 193.

171.  Along with the loss of political power came ever tighter, more oppressive white control of black educational institutions.

*The white control, white Democratic and white supremacist control of black education in Alabama shaped the content of the curriculum because the schools were always to teach within the limits imposed by the knowledge that the kind of education which they imparted could never be permitted to challenge the supremacy of whites within the state, the existing social order and the subordinate position of the*

356

*black race in the state.*

Thornton (11/5/90) 191.

172.  In Dr. Thornton's opinion, the limitation of ASU's mission to that of a normal school by the Alabama Supreme Court in *Elsberry v. Seay* was racially motivated:

> I think that there were racially discriminatory motives in the minds of justices of the Supreme Court who rendered the decision, and I think that the elimination of the university function of Alabama State which had been permitted all of those years was a reflection of the growing maturity of white supremacy within the state.  And certainly, the idea of not permitting blacks collegiate education was something that was congenial to white supremacists.

Thornton (11/5/90) 192.

173.  Black Alabamians fully understood the direct relation between their political powerlessness, white control of their schools, and the inferiority of public education made available to them.   They constantly made known their desire for autonomy with respect to black institutions — but the first half of the twentieth century would bring black education no repose.

### B. The Twentieth Century

### 1.  Disenfranchisement's Impact on Black Education

174.  *The systematic disenfranchisement of blacks, accomplished by the 1901 Alabama Constitution*[,] *was a main plank in the platform of Southern Progressivism culminating* [*in the*] *defeat of efforts in the 1890's to form political coalitions between Hill Country white Populists and black voters*.   According to Dr. Thornton, *such a coalition threatened to undermine the color line of wite* [*sic*: "*white*"] *supremacy that had been drawn in 1874 with the ascendancy of the Democrats*.

357

Thornton (11/5/90) 200-04.

175.   The 1901 Constitution[695] embodied a major compromise between white political forces in various parts of the state.  Hill Country whites, Black Belt land owners, Bourbon whites and their "Big Mule" industrial allies, agreed that the Hill Country whites would control election of the governor through direct primary elections, *while the Bourbons and Big Mules would preserve their interests by creating and maintaining a malapportioned state legislature that overrepresented Black Belt counties*.  Rogers (3/13/91) 48-58.

> Ever pragmatic in their approach to politics, the majority of the Bourbon elite took the lesson of the populist period to heart.  Without the Negro vote, they could not maintain themselves in power.  *But as long as Negroes remained legal voters, there was always the danger that a dissident white group might capture the Negroes' confidence, and with these allies go on to effect a complete revolution in state government.  Clearly, the way to prevent such an eventuality was to admit to some degree of power the excluded white groups from whose ranks dissident movements had time and again arisen, while concurrently*

---

[695] This footnote was numbered "22" in Judge Murphy's opinion, and read as follows:

> The 1901 Alabama Constitution institutionalized and legitimized white supremacy. The delegates to the all-white convention fully support[ed] the doctrine of white supremacy.  John B. Knox, president of the constitutional convention, stated in his inaugural address to the convention:
>
> > And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State.
>
> *Hunter v. Underwood*, 471 U.S. 222, 229, 105 S. Ct. 1916, 1921, 85 L. Ed. 2d 222 (1985), *quoting*, 1 Official proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901 to September 3rd, 1901, p. 8 (1940).

*Knight I*, 787 F. Supp. at 1090 n.22 (bracketed alteration supplied).

*eliminating the Negro from politics*.  Of course, such a program meant a considerable diminution of power for the Bourbons, but, "half a loaf was better than none."  The result was the Constitution of 1901.  *The Bourbons contented themselves with disproportionate power in the malapportioned legislature*, while largely — through the institution of the direct primary — abandoning executive offices to the formerly excluded white groups.  *The Negro was removed as a possible bone of contention between the two segments of the white electorate by his disfranchisement*.

176.  *Ironically, ratification of the 1901 Constitution would have failed if the Black Belt whites had not fraudulently stuffed the ballot boxes with captive black votes.  Incredulously, the returns show that blacks voted for their own disenfranchisement*.  Thornton (11/5/90) 203-04.

177.  *As a practical matter, blacks had been denied a fair vote and a fair count even before the 1901 Constitution, because the Black Belt Bourbon white politicians used fraud and intimidation to manipulate the black vote to support conservative Democratic candidates*.  The threat of black political influence gave blacks the potential of determining election outcomes and thus some leverage — albeit minimal — to demand fair treatment.  For example, the U.S. House of Representatives threw out the declared Democratic winners for congressional seats after the 1892, 1894 and 1896 elections and seated their Populist opponents *based on the evidence of fraud with respect to the black vote*.

> So that kind of intervention from outside could give blacks some sense that there was something to be gained by holding on to this legal right to vote, even though it only in certain occasions never [sic] (ever) became a practical . . . thing.  After 1901 that hope is gone.

Thornton (11/5/90) 202-03.

359

178.  *The 1901 Alabama Constitution not only disenfranchised the black population but entrenched a system of educational funding that was designed to improve white schools by raiding black students' portion of the public school fund*. This constitutional policy of racial discrimination in education was a hallmark of the so-called "Progressive" period in Alabama, as it was throughout the South.

> Vann Woodward in his *Origins of the New South* calls the chapter on progressivism For Whites Only.  And that really is accurate, *indeed one of the ways in which increased funding for white schools is achieved by the progressives is transferring of financial resources out of the black schools and towards the white schools*. . . .  [B]etween 1891 and 1908, the percentage that the black children are getting from the common school funds falls from 38 percent to 12 percent.

Thornton (11/5/90) 196-97.  *The gap between state funds received by white and black students grew at all school levels*, including higher education.  Thornton (11/5/90) 197.

* * * *

### 5.  Massive Resistance to Integration

i.  *The Legislature*

253.  Following World War II, Alabama's policy of segregation began to be attacked through the federal courts.  Thornton (11/7/90) 247-49.  A growing number of black war veterans were applying for admission to the University of Alabama, whose officials rejected the applications on the ground that the same programs were available to blacks at Alabama State or Alabama A & M.  Thornton (11/7/90) 260.

254.  In 1952 a special committee of the all-white Alabama Bar Association was appointed by the Legislature to help design the state's master plan for massive resistance to anticipated federally mandated

desegregation. *It was chaired by Birmingham lawyer*, *Joseph F. Johnston*, *the grandson and namesake of Governor Johnston*, *who defeated the Populist candidate in 1896*.  The bar committee's membership included Gessner T. McCorvey, leader of Alabama's Dixiecrat revolt of 1948, and others, all of whom were characterized by Johnston as "lifetime staunch segregation advocates." KX 3672.

255.   The four desegregation cases from South Carolina, Kansas, Virginia and Delaware were argued before the U.S. Supreme Court in December 1952 and reargued in December 1953.  On September 21, 1953, the Alabama Senate, anticipating rulings in the pending Supreme Court desegregation cases, appointed an Interim Joint Legislative Committee to work with the state bar on a massive resistance plan.  The committee resolution was sponsored by J.M. Bonner of Wilcox County, and the chair of the committee was State Senator Albert B. Boutwell. Boutwell "was genuinely convinced that segregated schools were the proper arrangement for Alabama and that the system had to be maintained." KX 3672, p. 7.  The same resolution directed the Alabama Attorney General to file a brief in the Supreme Court defending segregation. KX 3672, pp. 4-5.

256.   *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 was handed down May 17, 1954.  The Alabama Interim Legislative Committee responded to the *Brown* decision in its report issued October 18, 1954. KX 600. *The committee's report contained the main outlines of Amendment 111 to the Alabama Constitution, which would be adopted in 1956.*  KX 3672, p. 6.

257.   The   Interim   Legislative   Committee   recommended abandonment of legally explicit racial segregation of the schools in light of the Supreme Court's new ruling, but it proposed a new strategy for maintaining as much segregation as possible by means of seemingly neutral educational policies.  A centerpiece of this massive resistance strategy was the adoption of scholastic achievement standards that would exclude blacks.  The Committee expressed confidence in an academic standards-based strategy, because it shared the conviction of most white Southerners, instilled by a century of legal discrimination, that blacks are

intellectually inferior to whites.  According to the Interim Committee's report:

> There are profound psychological and cultural differences, including differences in aptitudes, between the white and negro races in Alabama which should not be ignored in dealing realistically with as sensitive a problem as that of education.  Those differences will not be ignored except by those determined on mechanical social integration as a dominant end however punitive or disastrous its consequences.

KX 600, p. 65.

258.   But this new, "qualifications"-based strategy did not seem necessary to white university officials until the NAACP targeted the University of Alabama for litigation.

259.   Amendment 111 to the Alabama Constitution, adopted by the Legislature and ratified by the voters in 1956, adopted most of the recommendations of the 1954 Interim Legislative Committee report for the racially discriminatory purpose of preserving segregation in the public elementary and secondary schools of the state.[696]   KX 3672.

260.   When it became clear that its separate-but-equal defense of segregation would fail, the state government withdrew the financial support that had allowed Alabama State and Alabama A & M to gain accreditation briefly.  Both black colleges lost their accreditation in the early 1960's, despite pleas by their presidents for the additional funding needed to prevent it.  Thornton (11/7/90) 192-93; (11/26/90) 13-14.  It was not until several years later that ASU and Alabama A & M regained full collegiate accreditation.

---

[696] Judge Murphy's opinion contained the following note at this point:  "The Circuit Court for Montgomery County, Alabama recently found Amendment 111 to the Alabama Constitution void in its entirety since it violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  *See*, *Alabama Coalition for Equity Inc. v. Guy Hunt, Governor*, No. CV-91-117-R (August 13, 1991)."  *Knight I*, 787 F. Supp. at 1104 n.24.

261.   The March 22, 1967, order in *Lee v. Macon County Board of Education*, 267 F. Supp. 458 (1967), reinitiated the campaign of massive resistance orchestrated by the Governor and Legislature.  The *Lee v. Macon* order required the desegregation of all elementary and secondary schools and a start towards the desegregation of the junior colleges and state colleges administered by the SBE, including ASU, AAMU, TSU, JSU and UNA.  Following the court's order, the SBE immediately went into executive session with George and Lurleen Wallace.[697]  SOF ¶ 55.

262.   A week later, Governor Lurleen Wallace announced to the Legislature in a televised speech a five-point plan of open resistance to the federal court.  The Legislature was to resolve itself into a committee of the whole, receive testimony about the damage compliance with the court order would do, issue a "cease and desist" resolution, and if a stay was denied turn the whole education system over to the Governor, who would interpose the state's sovereignty.  On the same day as Governor

---

[697] Judge Murphy included the following footnote, numbered "25," to the textual statement:

The March 22, 1967, injunction issued by the three judge court in *Lee v. Macon* directed:

> No person shall be denied admission to any trade school, junior college, or state college administered by the Alabama State Board of Education upon the ground of race, nor shall he be subjected to racial discrimination in connection with his application for enrollment in or his attendance at any such trade school, junior college or state college. Dual attendance zones based on race for such trade schools, junior colleges, and state colleges shall be abolished. The State Department of Education shall direct such trade schools, junior colleges, and state colleges to recruit, hire, and assign teachers so as to desegregate faculty and to accomplish some faculty desegregation in each trade school, junior college and state college by September 1967.

*Lee v. Macon*, 267 F. Supp. 458, 484 (M.D. Ala. 1967), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215, 88 S. Ct. 415, 19 L. Ed. 2d 422 (1967).

*Knight I*, 787 F. Supp. at 1105 n.25.

Wallace's speech, five state university presidents signed a resolution
urging appeal of the March 22nd decree and the seeking of a stay of the
decree's effects pending the appeal.  SOF ¶ 56.

263.   President Philpott of AU and President Rose of UA urged
appeal of the *Lee v. Macon* order, even though it was addressed to neither
of their institutions.  SOF ¶ 57.

264.   When the March 1967 *Lee v. Macon* order was appealed,
one of the Governor's chief legal arguments against the statewide
disestablishment of the dual system of elementary and secondary
education was that the state government lacked authority to control local
school boards to the extent needed to comply with federal court orders.
This was a tactic advocated by the experts who were counselling
Southern states involved in school desegregation cases.  John Satterfield
of Yazoo City, Ms., the Governor's lawyer, explained it to members of
the Alabama Legislature.

*Knight v. Alabama*, 787 F. Supp. 1030, 1066-74 (N.D. Ala. 1991) (Murphy, J., sitting

by designation) (emphasis and some bracketed alterations added) ("*Knight I*").

### k.   The Supreme Court's intervening opinion in *Fordice*

In June of 1992, just six months after Judge Murphy entered his first judgment

in the *Knight* case, the Supreme Court announced its decision in the case of *United*

*States v. Fordice*, 505 U.S. 717 (1992), involving Mississippi's public system of

colleges and universities.  Even though the end of segregation as a matter of state law

(*i.e.*, *de jure* segregation) in the Mississippi system pursuant to a federal court order

in 1962 had been hailed as a significant milestone in the burgeoning civil rights

movement,[698] the Mississippi system of public institutions of higher education

remained segregated as a matter of fact (*i.e.*, *de facto* segregation) well into the

1980s.[699]   Consequently, the United States intervened in a lawsuit that had been

instituted by a group of private plaintiffs in 1975, claiming that Mississippi officials

had not met their obligations under the Equal Protection Clause and Title VI to

dismantle the state's "dual system" of public higher education.  "After the lawsuit was

filed, the parties attempted for twelve years to achieve a consensual resolution of their

difference through a voluntary dismantlement by the State of its prior segregated

system." *Fordice*, 505 U.S. at 724.  When that effort ultimately proved unsuccessful,

the case proceeded to trial in 1987.  The district court and Fifth Circuit ruled in favor

of the state.[700]  As the Supreme Court observed, the Circuit "concluded that the State

---

[698] *See Meredith v. Fair*, 306 F.2d 374 (5th Cir.), *cert. denied*, 371 U.S. 828, *enforced*, 313 F.2d 532 (5th Cir. 1962) (*en banc*) (*per curiam*).  That litigation forced the University of Mississippi to enroll James Meredith, the first person of African heritage to be admitted to that previously all-white university. *See*, *e.g.*, Taylor Branch, *Parting the Waters: America in the King Years 1954-63*, 647-70 (New York: Simon & Schuster 1988) ("**Branch**").

[699] *See*, *e.g.*, *Fordice*, 505 U.S. at 724-25 ("By the mid-1980's, 30 years after *Brown*, more than 99 percent of Mississippi's white students were enrolled at University of Mississippi, Mississippi State, Southern Mississippi, Delta State, and Mississippi University for Women.  The student bodies at these universities remained predominantly white, averaging between 80 and 91 percent white students.  Seventy-one percent of the State's black students attended Jackson State, Alcorn State, and Mississippi Valley State, where the racial composition ranged from 92 to 99 percent black.") (citing *Ayers v. Allain*, 893 F.2d 732, 734-735 (5th Cir. 1990) (panel decision)).

[700] The district court concluded that the defendants had demonstrated that they were "'fulfilling their affirmative duty to disestablish the former *de jure* segregated system of higher education.'" *Id.* at 727 (quoting *Ayers*, 674 F. Supp. at 1564).  That conclusion was based upon the district court's understanding that,

had fulfilled its affirmative obligation to disestablish its prior *de jure* segregated system by adopting and implementing race-neutral policies governing its college and university system." *Id.* at 728.  The Supreme Court reversed, holding that it was not sufficient to avoid liability for a state to show merely that it had abrogated the laws that previously enforced segregation in its public system of higher education.

> We do not agree with the Court of Appeals or the District Court . . . that the adoption and implementation of race-neutral policies alone suffice to demonstrate that the State has completely abandoned its prior dual system. [The mere fact that] college attendance is by choice and not by assignment does not mean that a race-neutral admissions policy cures the constitutional violation of a dual system.  In a system based on choice, student attendance is determined not simply by admissions policies, but also by many other factors.  Although some of these factors clearly cannot be attributed to state policies, many can be.  Thus, even after a State dismantles its segregative admissions policy, there may still be state action that is traceable to the State's prior *de jure* segregation and that continues to foster segregation.  The Equal Protection Clause is offended by "sophisticated as well as simple-minded modes of discrimination."  If policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices. . . .

---

in the higher education context, "the affirmative duty to desegregate does not contemplate either restricting choice or the achievement of any degree of racial balance."  Thus, the court stated: "While student enrollment and faculty and staff hiring patterns are to be examined, greater emphasis should instead be placed on current state higher education policies and practices in order to insure that such policies and practices are racially neutral, developed and implemented in good faith, and do not substantially contribute to the continued racial identifiability of individual institutions."

*Id.* at 726-27 (quoting *Ayers*, 674 F. Supp. at 1553).

366

*Id*. at 729 (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)) (other citations omitted).

The Court held that a state was required to demonstrate that it had not left in place policies or practices "traceable to" its prior *de jure* system that continue to foster segregation in fact.

> If the State [*i*] perpetuates policies and practices traceable to its prior system that [*ii*] continue to have segregative effects — whether by [*ii.a*] influencing student enrollment decisions [*e.g.*, student "choice" of which institution to attend] or by [*ii.b*] fostering segregation in other facets of the university system — and [*iii*] such policies are without sound educational justification and [*iv*] can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system. Such policies run afoul of the Equal Protection Clause, even though the State has abolished the legal requirement that whites and blacks be educated separately and has established racially neutral policies not animated by a discriminatory purpose. . . .

*Fordice*, 505 U.S. at 731-32 (bracketed alterations added, footnote omitted).[701]

The Supreme Court's opinion in the *Fordice* case sketched an analytical

---

[701] In the omitted footnote, the Court observed:

> Of course, if challenged policies are not *rooted in the prior dual system*, the question becomes whether the fact of racial separation establishes a new violation of the Fourteenth Amendment under traditional principles. *Board of Ed. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 250-251, 111 S. Ct. 630, 638, 112 L. Ed. 2d 715 (1991); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).

*Fordice*, 505 U.S. at 732 n.6 (emphasis added). *See also id*. at 728 ("Our decisions establish that a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation.").

framework that could entail as many as four steps.  First, plaintiffs are required to demonstrate that a challenged policy or practice is "traceable to" decisions that were made, or practices that were instituted, in the past for the purpose of segregating the races in the state's colleges and universities.[702]

If plaintiffs make such a showing, then the policy or practice is deemed to be a "vestige of segregation,"[703] and the analysis proceeds to a second step:  a determination of whether the challenged policy or practice *continues to have segregative effects*.  At this stage of the inquiry, the burden shifts to *the state* to show that the policy or practice no longer has continuing segregative effects.[704]  As the Eleventh Circuit later noted, a state may carry that burden in either of two ways.  On one hand, the state "may show that the challenged contemporary policy, though traceable to segregation, is not constitutionally objectionable because it does not today have segregative effects."  *Knight v. Alabama*, 14 F.3d 1534, 1541 (11th Cir. 1994)

---

[702] *See, e.g.*, *Knight v. Alabama*, 14 F.3d 1534, 1540-41 (11th Cir. 1994) ("*Knight I-A*") ("Where plaintiffs in a lawsuit contend that a state or other public actor has not discharged its duty to dismantle its former system of *de jure* segregated higher education, the burden of proof lies with the charging party to show that a challenged contemporary policy is traceable to past segregation.").

[703] A "vestige of segregation" is a policy or practice that is traceable to a prior *de jure* system of school segregation, and which continues to have discriminatory effects.  *See, e.g.*, *United States v. Yonkers Bd. of Educ.*, 123 F. Supp. 2d 694 (S.D.N.Y. 2000) (citing *Fordice*, 505 U.S. at 727–28; *Freeman v. Pitts*, 503 U.S. 467, 495–96 (1992); *United States v. City of Yonkers*, 833 F. Supp. 214, 218–19 (S.D.N.Y. 1993)).

[704] *See Fordice*, 505 U.S. at 739 ("*Brown* and its progeny . . . established that the burden of proof falls on the *State*, and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system.") (citing *Brown II*, 349 U.S. at 300).

("*Knight I-A* ").  If the state demonstrates that the challenged policy or practice no longer has segregative effects, the inquiry ends at that point.[705]

On the other hand, another circumstance identified by the Eleventh Circuit in which a state *may be* relieved of its obligation to abolish or modify higher education policies traceable to the former *de jure* system of segregation

> obtains where, in effect, it simply is not possible to do so.  Where "policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies . . . must be reformed to the extent practicable and consistent with sound educational practices." [*Fordice*, 505 U.S. at 729].  Thus, where the state can show that there are no less segregative alternatives which are practicable and educationally sound, then it may permissibly maintain the vestigial practice or policy in place. *Id*. at [732-43], 112 S. Ct. at 2738-43; *id*. at [744], 112 S. Ct. at 2744 (O'Connor, J., concurring).  However, the state's burden of proving that such alternatives are impracticable or educationally unsound is a heavy one and "the circumstances in which a State may maintain a policy or practice traceable to *de jure* segregation that has segregative effects are narrow."  *Id*. at [744], 112 S. Ct. at 2743 (O'Connor, J., concurring).

*Knight I-A*, 14 F.3d at 1541 (bracketed alterations supplied).

If the state cannot, or does not, make either of the foregoing showings, then the inquiry proceeds to a third step:  a determination of whether the policy or practice is supported by sound educational purposes.  "If policies traceable to the *de jure* system

---

[705] *Knight I-A*, 14 F.3d at 1541 ("Where the state proves that a challenged policy, shown by plaintiffs to be traceable to segregation, has no segregative effects, it is relieved of its duty to eliminate or modify the policy.  This inquiry constitutes the second step in the *Fordice* analysis." (citing *Fordice*, 505 U.S. at 738-39)).  This is the element of "causation" — the continuing adverse, "segregative effects" prong of proof — that ultimately proved to be determinative in the last two opinions in the *Knight* line of cases.

are still in force and have discriminatory effects, those policies . . . must be reformed *to the extent practicable* and *consistent with sound educational practice*." *Fordice*, 505 U.S. at 729 (emphasis supplied).[706] "This examination of the . . . educational soundness of possible alternatives or modifications to a challenged policy constitutes the third step in the *Fordice* analysis." *Knight I-A*, 14 F.3d at 1541-42.

Even when the challenged policy or practice is supported by sound educational purposes, the inquiry still must proceed to a fourth step: a determination of whether the educational purposes can be feasibly accomplished by alternative means that have less segregative effects.[707]

> The state is obligated to adopt, from among the full range of practicable and educationally sound alternatives to the challenged policy, the one that would achieve the greatest possible reduction in the identified segregative effects. [*Fordice*, 505 U.S.] at 743-44, 112 S. Ct. at 2744 (O'Connor, J., concurring). Moreover, because the obligation to remedy the segregative effects of vestiges of segregation is an affirmative duty borne by the state, the onus is not on the plaintiffs to propose the remedy options to be considered. Rather, a court should consider the full range of all possible alternative remedies, including closure, when determining which would achieve the greatest possible reduction in the identified segregative effects. *Id.* at 742, 112 S. Ct. at 2743. This

---

[706] *See also Fordice*, 505 U.S. at 746 ("A challenged policy does not survive under the standard we announce today if it began during the prior *de jure* era, produces adverse impacts, and persists without sound educational justification.") (Thomas, J., concurring).

[707] *See Fordice*, 505 U.S. at 743 ("[T]he State may not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound educational policies."); *see also Knight I-A*, 14 F.3d at 1541 (observing that a state may escape liability if it shows that "there are no less segregative alternatives which are practicable and educationally sound").

examination of the practicability and educational soundness of possible alternatives or modifications to a challenged policy constitutes the third step in the *Fordice* analysis.

Where plaintiffs show that a current policy is traceable to past segregation, and defendants fail to demonstrate either (1) that the policy, in combination with other policies, has no current segregative effects, or (2) that none of the full range of less segregative alternative remedies are practicable and educationally sound, defendants must adopt the practicable and educationally sound alternatives that will bring about the greatest possible reduction in the segregative effects. "If the State has not discharged [this remedial] duty, it remains in violation of the Fourteenth Amendment." *Id*. at 717, 112 S. Ct. at 2735.

*Knight I-A*, 14 F.3d at 1541-42.

> ### *l*.   Eleventh Circuit reversal and remand of Judge Murphy's first opinion — "*Knight I-A* "

Thus, Judge Murphy's opinion in *Knight I* reached the Eleventh Circuit after the intervening *Fordice* decision, and his judgment was reviewed under the recently-minted standards. As demonstrated by the following quotation, however, the appellate court was obviously impressed with the degree to which Judge Murphy had anticipated the *Fordice* standards, affirmed most of his judgment, and remanded only for a limited review of a few discrete elements of the prior decision.

Although, as explained below, we find it necessary to reverse or vacate, and remand for reconsideration, a few isolated portions of the district court's judgment, in so doing we express nothing but the deepest respect for the manner in which the court below has handled this case. Judge Murphy's management of this complex piece of institutional reform litigation has been extraordinary. His meticulous and scholarly

opinion is a model of judicial thoroughness.  Writing without the benefit
of Supreme Court guidance on the applicable legal standard, Judge
Murphy anticipated in considerable measure the standards later set out
by the Court in *Fordice*.  Our ruling today reversing or vacating, and
remanding for reconsideration, a few discrete elements of the court's
opinion is based primarily on the legal standards announced by the
Supreme Court months after the district court opinion was issued.  This
disposition therefore in no way reflects negatively on the district court's
handling of the case.  The fact that defendants do not challenge the
district court's judgment at all, and that plaintiffs at this time take issue
with only a few isolated rulings, bears witness to the wisdom and fairness
manifested in the court's decision.

*Id*. at 1540.

> ### m.   Proceedings on remand and Judge Murphy's second opinion — *"Knight II"*

Following remand, Judge Murphy "took the extraordinary step of appointing

five neutral expert witnesses . . . in a effort to assist the Court and the parties in

analyzing the issues remanded from the Circuit."   *Knight v. Alabama*, 900 F. Supp.

272, 285 (N.D. Ala. 1995) ("*Knight II* ").[708]   Those experts reviewed the policies

---

[708] Judge Murphy "felt it important to secure the assistance of educational experts not
associated with any of the parties to this case."  *Knight II*, 900 F. Supp. at 285.  The five members
of the committee were:  Dr. Robert M. Anderson, Jr., Vice Provost for Extension and Director of
Cooperative Extension at Iowa State University; Lt. Gen. Julius W. Becton, Jr., former President of
Prairie View A & M University and board member for various organizations committed to equal
access to higher education and former member of various presidential administrations; Dr. Harold
L. Enarson, President Emeritus of The Ohio State University, Executive Director of the Western
Interstate Commission for Higher Education and member of President Truman's White House Staff;
Dr. Robben Fleming, President Emeritus of the University of Michigan at Ann Arbor, former
President of the Corporation for Public Broadcasting, Chairman of the American Association of
Universities, and a Fellow of the American Academy of Arts and Sciences; and Dr. Bryce Jordan,
President Emeritus of the Pennsylvania State University and founding president of the University
of Texas at Dallas.  *Id*. at 286; *see also Knight v. Alabama*, 476 F.3d 1219, 1222 n.4 (11th Cir. 2007)

previously found to perpetuate segregation in Alabama's colleges and universities and recommended changes to reduce racial separation in the system.  Judge Murphy then conducted an additional six-week trial.[709]

Judge Murphy entered another lengthy opinion on August 1, 1995, covering 113 pages in volume 900 of West's *Federal Supplement* reporter, and outlining remedial orders for each of the affected institutions.  The specific remedies were too numerous to recount here, but it can be said in summary that the decree was calculated to eliminate the vestiges of historical racial discrimination within the Alabama system of public higher education, and included orders to:  lessen duplication of programs at institutions that were geographically close to one another; strengthen curricula at historically black institutions; increase integration of administration and faculty at all institutions; fashion more flexible admissions policies; increase recruitment of black students; and, increase the amount of funds allocated to historically black institutions.[710]  Judge Murphy also appointed a Monitor[711] and committee of four neutral experts[712] to oversee the administration of the remedial decree, and retained

---

(same) ("***Knight III-A***").

[709] *See Knight II*, 900 F. Supp. at 280.

[710] *See id.* at 349 *et seq.*

[711] *See Knight v. Alabama*, 829 F. Supp. 1286, 1288 (N.D. Ala. 1993) (finding the existence of sufficient exceptional circumstances to authorize a Monitor to oversee compliance with remedial orders, and appointing Atlanta attorney Carlos A. González to serve in that capacity).

[712] *See Knight III-A*, 476 F.3d at 1222 n.5 (noting that the Oversight Committee was

jurisdiction to monitor the State's progress in implementing his orders.

Finally, and significantly, it was expressly provided that the remedial decree would terminate ten years after entry:  "On July 31, 2005, this Decree shall terminate automatically and without further formality unless a party to this litigation, by motion filed not less than sixty (60) days preceding the expiration date of this Decree, requests the Court to extend the term of the Decree."[713]

> ### n.    Third and final opinion by Judge Murphy, addressing plaintiffs' "motion for additional relief" — "*Knight III* "

Before the July 31, 2005 termination date was reached, however, plaintiffs filed a "Motion for Additional Relief with Respect to State Funding of Public *Higher Education*."  *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1277 (N.D. Ala. 2004) (emphasis supplied) ("*Knight III* ").  Judge Murphy summarized the contentions of that motion in the following manner:

> 3.    Plaintiffs contend that serious underfunding of the Educational Trust Fund ("ETF"), from which appropriations are made for both K-12 and higher education, has jeopardized the success of the remedies crafted by the Court to eliminate the vestiges of historical discrimination in the State of Alabama's system of public higher education.
>
> 4.    Plaintiffs claim that adequate state funding is necessary for fashioning an effective, educationally sound, and practicable remedy for

---

composed of four of the five previously appointed neutral expert witnesses).

[713] *Knight II*, 900 F. Supp. at 374.

the State of Alabama's history of *de jure* racial discrimination. Specifically, Plaintiffs claim that adequate funding is necessary for: (1) recruiting and retaining of black faculty members and high-ranking administrators at historically white institutions ("HWI"); (2) providing ASU and Alabama A & M University ("AAMU") with the necessary resources to overcome a century of underfunding by the State; (3) providing ASU and AAMU the ability to fund adequately scholarships to attract other-race students after the Court-ordered scholarships expire; and (4) developing new, high-quality programs at ASU and AAMU, including the capital facilities and faculty necessary to operate them.

5.    According to Plaintiffs, severe cuts in state funding have severely impeded the ability of ASU and AAMU to implement successfully remedial programs calculated to spur growth in academic, research, and public service functions. *Plaintiffs specifically point to Alabama's property tax system, which Plaintiffs claim is unfair, inadequate, and unconstitutional.*  Plaintiffs argue that because of low and inadequate property taxes, which are intended to be the primary source of K-12 funding, the State of Alabama has been forced to allocate an increasingly greater percentage of funds from the ETF to K-12 appropriations.  As a result, over the past several years, all of the public state universities have been forced to increase tuition dramatically. Plaintiffs submit that the State's tax burden disproportionately falls on the low-income portion of the population, which remains predominately black, and consequently acts as a barrier against blacks obtaining public higher education.

6.    Plaintiffs claim[ed] that the State's tax system is traceable to a prior *de jure* segregation regime. *Specifically, Plaintiffs contend that the restrictions on the amount of taxes that can be levied on real property are directly traceable to a policy of shielding the real property of white landowners from taxes that would benefit the education of blacks* — a policy that Plaintiffs claim persists to this day.  Plaintiffs identify six provisions of the Alabama Constitution that they claim are traceable to a legislative intent to preserve racial segregation throughout the State's system of public education and thwart and deny blacks an equal opportunity to obtain the benefits of public higher education in

375

Alabama.

> 7.    Those provisions are: [*the same provisions that plaintiffs have challenged in the present action*; see the discussion in Part I(B)(1)(a)(*i*)–(*v*) of this opinion, *supra*].

> 8.    Plaintiffs contend that those six constitutional provisions, as well as laws enacted pursuant to those provisions, effectively segregate the races and deny equal opportunity to African-Americans.

*Knight III*, 458 F. Supp. 2d at 1277-79 (emphasis supplied).

Judge Murphy conducted an evidentiary hearing on the plaintiffs' motion for additional relief on May 4 and 5, 2004, and entered a memorandum opinion resolving the motion five months later.[714]  He concluded that plaintiffs had met their burden of demonstrating that Alabama's "current ad valorem tax structure is a vestige of discrimination inasmuch as the constitutional provisions governing the taxation of property are traceable to, rooted in, and have their antecedents in an original segregative, discriminatory policy."  *Id*. at 1311, ¶ 8.  He also concluded that

> the current tax structure in Alabama cripples the effectiveness of state and local governments in Alabama to raise funds adequate to support *higher education*.  The Lid Bill and the low assessment ratios impede and restrict the ability of the State and local governments from raising revenue from taxation of property.

*Id*. at 1311-12, ¶ 9 (emphasis supplied).[715]  Moreover, Judge Murphy "agree[d] that the

---

[714] *Knight III*, 458 F. Supp. 2d at 1279.

[715] Those conclusions were not based solely upon the evidence adduced in a mere two-day hearing conducted from May 4 to 5, 2004, but upon the record from the 1991 trial, which lasted six months, and the second trial in 1995, which lasted six weeks.  *See id.* at 1311, ¶ 8 ("*Based on the*

current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K-12 schools." *Id*. at 1312, ¶ 13. Nevertheless, Judge Murphy ultimately concluded that defendants had carried their burden under *Fordice* of showing that the challenged Alabama constitutional provisions did not have a "continuing segregative effect," in the sense of resulting in "an unconstitutional denial of a student's right to make a decision [about which college or university to attend,] unfettered by vestiges of discrimination." *Id*. (bracketed alteration supplied).

That conclusion should be read in the context of Judge Murphy's statements on the issue of causation — the so-called "continuing effects" step of the *Fordice* analytical framework — which are set out below:

> 10.   Plaintiffs having satisfied their burden to show that the current tax structure is "traceable to" *de jure* segregation, the burden shifts to Defendants to show that the challenged provisions of the Alabama constitution do not have a continuing segregative effect. *Knight v. Alabama*, 14 F.3d at 1541.

> 11.   *Defendants contend that the property tax is not related to Alabama's system of higher education — i.e., that no nexus exists between the lack of funds derived from state and local property taxation and the effect on student enrollment decisions.*   Consequently, Defendants submit, the challenged provisions of the Alabama Constitution do not and cannot have a continuing segregative effect.

---

*extensive record before the Court*, the Court finds . . . .") (emphasis supplied).

12.   Plaintiffs contend that a causal nexus does indeed exist, arguing that the lack of property tax revenue has financially strained K-12 schools in Alabama, thereby requiring that the State allocate an increased proportion of the ETF to K-12.  As a result of this inequitable distribution, Plaintiffs claim that tuition at Alabama's institutions of higher education has skyrocketed and that funds available for need-based financial assistance have plummeted.  Consequently, the ability of poorer students, who are disproportionately black, to attend college is adversely affected.

13.   *The Court appreciates Plaintiffs' argument, and agrees that the current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K-12 schools.*  Nevertheless, the Court cannot agree that the property tax structure stymies school choice in such a way that results in an unconstitutional denial of a student's right to make a decision unfettered by vestiges of discrimination.

14.   The Court finds that the relationship between the funding of higher education and finding [sic: "funding"] of K-12 is marginal insofar as ad valorem property tax is concerned.  *Put differently, the effect of the state's inability to raise revenue due to the challenged constitutional provisions is simply too attenuated to form a causal connection between the tax policy and any segregative effect on school choice.*

15.   Additionally, although the proportion of the ETF allocated to higher education has fallen since 1990, the actual amount of money paid to higher education has increased from $820,063,882 to $1,160,033,885 over that same period. (Defs.' Ex. 04-004.)

16.   Moreover, insofar as Plaintiffs contend that the lack of funding for property taxes somehow works to frustrate the Court's prior remedial decrees, the Court finds that argument unavailing.  Rather, the State has unbegrudgingly complied with the Court's remedial decrees, meeting all its obligations as ordered by the Court.  Along those same lines, between the 1991-92 and 2002-03 academic years, black student enrollment and graduation rates at HWIs [historically white institutions

378

of higher education] have increased considerably. (Defs.' Exs. 04-001 to 003.)

17.    The Court concludes, therefore, that although the ad valorem taxation system in Alabama may be traceable to past discriminatory decisions, Defendants have satisfied their burden to demonstrate that the challenged provisions of the Alabama constitution *do not continue to have a segregative effect on student choice.*

*Knight III*, 458 F. Supp. 2d at 1312-13 (emphasis supplied, footnote omitted).

       o.     **Eleventh Circuit affirmance** — "*Knight III-A* "

The Knight plaintiffs appealed Judge Murphy's decision in *Knight III*, but were rebuffed by the Eleventh Circuit, which "agree[d] with the district court that plaintiffs' *present claim* is fundamentally about reforming *Alabama's K-12 school funding system*, *and not about* [the focus of the case during the preceding fifteen years of litigation,] *desegregating its colleges and universities*." *Knight v. Alabama*, 476 F.3d 1219, 1223 (11th Cir. 2007) (emphasis supplied) ("*Knight III-A*").

In order to better understand the plaintiffs' claims in the present action, it may be helpful to quote at length from the opinion authored by Judge Thomas A. Clark for the Eleventh Circuit panel composed of himself, Chief Judge J. L. Edmondson, and Judge Phyllis A. Kravitch.

       Plaintiffs claim that certain tax provisions of the Alabama Constitution violate the United States Constitution. They assert that these tax provisions so seriously underfund public education in Alabama that they have a segregative effect on Alabama's colleges and

379

universities.    The district court denied the claim, and this appeal followed.

## I.

This case was filed in 1981, claiming that the State of Alabama had failed to complete the desegregation of its colleges and universities. Plaintiffs alleged that many of Alabama's polices governing higher education tended to perpetuate its formerly de jure segregated university system.    The challenged education policies included:    admissions standards at historically white institutions, claimed to disqualify disproportionate numbers of black applicants; selection procedures for the governing boards, administrations and faculty of historically white institutions, claimed to result in the under representation of blacks; curriculum policies at historically white institutions, claimed to include little representation of black history, thought, or culture; campus environments at historically white institutions, claimed to be hostile to blacks; funding and facility policies governing historically black institutions, claimed to result in their inadequacy; duplication of programs at both historically white and historically black institutions, claimed to result in racial separation; and restrictive institutional missions at historically black institutions, claimed to result in the absence of graduate and other desirable programs at those institutions.  Plaintiffs sought change in these policies that would tend to decrease the de facto segregation, or racial identifiability, of Alabama's colleges and universities.

In 1991, following two bench trials that lasted over seven months, during which the court heard approximately 200 witnesses and received hundreds of thousands of pages of exhibits, the district court issued a 360-page opinion in which it found liability. *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991) ("*Knight I*").  The court found that several of Alabama's higher education policies, including those governing faculty and administrative employment, allocation of funds and facilities at historically black institutions, admissions at historically white institutions, and program duplication did tend to result in the racial identifiability of its colleges and universities.  *Id*. at 1368.  The court

380

ordered the parties to develop and the State to implement specific modifications to these policies in order to increase black access to historically white institutions and encourage white attendance at historically black institutions. *Id*. at 1377-82.

Just six months after the district court entered its judgment in *Knight I*, the Supreme Court decided *United States v. Fordice*, 505 U.S. 717, 112 S. Ct. 2727, 120 L. Ed. 2d 575 (1992), the first case in which the Court enunciated the constitutional standards governing claims of persistent segregation in higher education. In *Fordice*, the court made clear that even race-neutral "policies now governing the State's university system" may violate the Fourteenth Amendment. 505 U.S. at 733, 112 S. Ct. 2727. In order to successfully challenge such policies, the Court said, plaintiffs must demonstrate that they are traceable to the State's prior de jure system of segregation in higher education. *Id*. Having done so, the burden shifts to the State to prove that these policies do not have a continuing segregative effect. *Id*. at 738-39, 112 S. Ct. 2727. Failure of the State to do so authorizes the court to find liability and issue remedial orders. *Id*.

A few months later, *Knight I* reached us on appeal, and we reviewed the district court's judgment under the newly-established *Fordice* standards. We were impressed with the extent to which the district court had anticipated those standards, and we acknowledged this prescience, affirming most of the judgment and remanding only for a limited review of a few discrete elements of it. *Knight v. Alabama*, 14 F.3d 1534, 1540 (11th Cir. 1994).

On remand, and prior to any proceedings, the district court took the extraordinary step of appointing five neutral expert witnesses to assist it in fashioning a constructive remedial decree. These experts reviewed the policies found to perpetuate segregation in Alabama's colleges and universities and recommended changes to reduce racial separation in the system.

Then, in 1995, the court entered its remedial decree. The court ordered numerous changes in Alabama's higher education policies,

including less duplication of programs at geographically close institutions; strengthened curricula at historically black institutions; increased integration of administration and faculty at all institutions; more flexible admissions policies; increased black student recruitment; and increased funding of historically black institutions. *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995) ("*Knight II* ").

Additionally, the court appointed a Monitor and an Oversight Committee, charged with the administration of its remedial decree. The court also conducted periodic reviews of the State's compliance with its orders. Finally, the district court retained jurisdiction to monitor the State's progress in implementing these changes.

Over the succeeding decade, under the supervision of the court, the parties worked tirelessly to develop and implement new programs, change old ones, and in many other ways to effectuate the changes called for in the court's remedial decree. The district court has noted on numerous occasions, as it did in ruling on the instant motion, that "the State has unbegrudgingly complied with the Court's remedial decrees, meeting all its obligations as ordered by the Court." *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1312 (N.D. Ala. 2004) ( "*Knight III* "). The court and the parties anticipated that, after ten years of constructive remediation of Alabama's system of higher education, the court would return control of that system to Alabama in the summer of 2005. *Knight I* [*sic*: *Knight II* ], 900 F. Supp. at 374.

This lawsuit, then, for over fifteen years, has been about remedying segregation in Alabama's system of higher education by making changes in the education policies that tended to keep Alabama's historically black colleges black, and its historically white colleges white. While the court has ordered many changes that required the State to dramatically increase its funding of higher education — especially at its historically black institutions — the State has always "unbegrudgingly" raised and spent this money. *This lawsuit*, however, *has never been about how Alabama raised the money to meet its court-ordered obligations to higher education*, much less about how Alabama funds its system of lower ("K-12") education.

Nonetheless, in July of 2003, plaintiffs filed the pleading we now review. Although styled "Motion for Additional Relief," nowhere in the motion is there any request for additional relief regarding Alabama's higher education system. There is no request whatsoever for additional funding or any other changes in the education policies governing higher education in Alabama.

Instead, plaintiffs request an injunction ordering Alabama to fund adequately its system of lower education, and to do so by developing an entirely new method of public school finance in the state. Plaintiffs contend that only the complete reformation of Alabama's school finance system for lower education — including the invalidation of certain provisions of the Alabama Constitution that limit both the rates and actual revenues from property taxation — will allow the State to raise the revenue necessary to adequately fund its K-12 schools. And, only when Alabama's public schools are adequately funded, according to plaintiffs, will there be sufficient other funds to achieve the remedial goals of this lawsuit. Therefore, plaintiffs asked the district court to invalidate the property tax limitations of the Alabama Constitution and to enjoin the State to reform its method of public school finance within one year to provide adequate and equitable funding for its K-12 schools.

Although moved by defendants not to allow a new theory of liability ten years after the entry of the court's remedial decree, the district court held a two-day evidentiary hearing on the claim in May of 2004. The court heard from many experts on both the historical context and the school funding implications of Alabama's methods of public school finance.

The following October, the district court entered a ninety-page opinion and order denying the "Motion for Additional Relief." *Knight III*, 458 F. Supp. 2d at 1314. The district court held that, as a claim for liability, plaintiffs had failed to establish that the alleged funding crisis in Alabama's K-12 education system had a segregative effect on its system of higher education. *Id*. at 1312-13. Furthermore, the court held plaintiffs had failed to establish a need for any additional relief, as the State had already complied, or was complying, with all the court's

383

previously-entered remedial orders, as agreed upon by all the parties. *Id.* The district court concluded that, while it "appreciate[d] Plaintiffs' argument" that "the current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K-12 schools," it disagreed with plaintiffs' assertion that this lower school funding problem was sufficiently related to the desegregation of the State's higher education system to permit a remedy in this lawsuit. 458 F. Supp. 2d at 1312.

We agree with the district court that plaintiffs' present claim is fundamentally about reforming Alabama's K-12 school funding system, and not about desegregating its colleges and universities. Plaintiffs themselves made this clear when they filed the claim. On the first page of their supporting memorandum, plaintiffs called the district court's attention to Alabama Supreme Court's dismissal of the public school funding litigation in the Montgomery County Circuit Court, known as the *Equity Funding Cases. See Ex Parte James*, 836 So. 2d 813, 816 (Ala. 2002). Plaintiffs asserted that the dismissal of these state cases entitled them to "raise claims regarding Alabama's school funding system in this [federal] action." Plaintiffs' requested relief was that the district court enter an injunction requiring the State to revise its tax policies and tax rates to *adequately fund K-12 education*.

Plaintiffs['] present claim, then, is not a claim for desegregation in Alabama's system of higher education. It is a school finance claim. Because we find this distinction fatal to plaintiffs' claim, we pause to explain the difference.

## II.

Section 256 of the 1901 Alabama Constitution requires "a liberal system of public schools throughout the state for the benefit of the children." In 1956, as the State's direct, indeed avowed, response to *Brown v. Board of Education*, Section 256 was amended to provide that "nothing in this Constitution shall be construed as creating or recognizing any right to education or training at public expense." Ala. Const., art. XIV, § 256, Amend. 111 (1901). Thereby, Alabama served

384

notice that its support for integrated public education was conditional. Subsequently, other amendments were added to the state constitution that imposed strict limits on the ability of state and local governments to raise revenue from property taxes — the traditional method of funding K-12 education in Alabama.

In 1990, the Alabama Coalition for Equity, Inc. (the "Coalition"), acting on behalf of schoolchildren, parents and school systems throughout the State of Alabama, brought a lawsuit in circuit court in Montgomery County, Alabama, seeking a declaration that Amendment 111 was unconstitutional because its avowed purpose was racial discrimination. The Coalition also sought a declaration that state funding of K-12 education did not provide an adequate or equal education for all of Alabama's school children. *Alabama Coalition for Equity, Inc. v. Hunt*, No. CV-90-883 (Ala. Cir. Ct. Apr. 1, 1993). This case was consolidated with a similar lawsuit filed in the same court in 1991, *Harper v. Hunt*, No. CV-91-0117 (Ala. Cir. Ct. Jan. 19, 1991) and together they became known as the *Equity Funding Cases*, reprinted in *Opinion of the Justices No. 338*, 624 So. 2d 107, 110-67 (Ala. 1993).

In April of 1993, the *Equity Funding Cases* state court held that Amendment 111's racially discriminatory purpose violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Id*. at 111-12. The court declared that Amendment 111 of Section 256 was void in its entirety. *Id*. The court also declared that the original language of Section 256, guaranteeing Alabama's school children an "adequate education," remained Alabama law. *Id*. The court further held that, although Alabama's schoolchildren were guaranteed an adequate education, Alabama's funding of its public school system did not provide it. *Id*. The court enjoined state officers to "establish, organize and maintain a system of public schools, that provides equitable and adequate educational opportunities to all school-age children." *Id*. at 166.

This judgment was not appealed, in part because the circuit court retained jurisdiction over the case to address other matters, but the legislature immediately passed a resolution requesting the Alabama

385

Supreme Court to render an advisory opinion on whether the circuit court's judgment was binding in view of the separation of powers principle of the Alabama Constitution.  On April 27, 1993, barely four weeks after the circuit court's judgment, the Supreme Court advised the legislature that the state court's order must be enforced.  *Id*. at 110.

Over the course of the next decade, remedial plans were proposed but none was implemented.  Although there was much ado, it turned out to be about nothing much.  Consequently, in 2001, the *Equity Funding Cases* plaintiffs moved the Montgomery County circuit court to take some action to enforce its injunction.  Shortly thereafter, the State proposed a new remedial plan containing an estimated annual increase in expenditures for K-12 education of $1.7 billion.

One year later, in 2002, the Alabama Supreme Court dismissed the *Equity Funding Cases*, holding that the circuit court's order did, after all, violate the Alabama Constitution's principle of separation of powers.  *Ex Parte James*, 836 So. 2d at 816.  The court held that "because the duty to fund Alabama's public schools is a duty that — for over 125 years — the people of this State have rested squarely upon the shoulders of the Legislature, it is the Legislature, not the courts, from which any further redress should be sought."

Within a year of the Alabama Supreme Court's dismissal of the *Equity Funding Cases*, plaintiffs in this case filed their "Motion for Additional Relief."[716]  Although styled as a motion for additional relief, plaintiffs really sought an adjudication of a new claim. For the first time in this lawsuit, plaintiffs claimed that segregation in Alabama's system of higher education is caused by Alabama's constitutional limitations on its ability to raise property taxes for K-12 education.

Although the connection between underfunding of Alabama's public *schools* and segregation in its *universities* is far from intuitive,

---

[716] A footnote at this juncture in the Eleventh Circuit's opinion, which was numbered "13," read as follows:  "Plaintiffs seek an injunction requiring the legislature adequately to fund its K-12 schools.  This was the exact relief sought, ordered, but never obtained in the Equity Funding Cases." *Knight III-A*, 476 F.3d at 1225 n.13.

plaintiffs constructed an elaborate "chain of causation" said to link the two.  According to plaintiffs, Alabama's property tax limitations result in underfunded public schools.  This, in turn, results in the diversion of state funds intended for higher education to lower education.  This diversion of state funds to K-12 education, results in Alabama's inability to adequately fund its system of higher education.  This, in turn, results in higher tuition at Alabama's colleges and universities.  At the same time, plaintiffs contend, there is less state money for college scholarships. All of this impacts negatively and disproportionately on Alabama's black students, plaintiffs assert, because most cannot attend college without financial assistance.

Plaintiffs argue, therefore, that their new claim against Alabama's property tax policies is properly brought in this lawsuit because those policies produce a "continuing segregative effect" on its colleges and universities, as proscribed by *Fordice*.  We disagree.

## III.

1.   *Alabama's Tax Policies Are Not Policies "Governing Higher Education"*

Plaintiffs allege that Alabama's tax policies seriously limit the ability of both the State and its counties to raise revenue from property taxes and, therefore, fund its K-12 schools.  ***No one disputes that this is so***.  Plaintiffs also allege that these constitutionally enshrined tax policies were adopted for segregative purposes and with discriminatory intent. ***The district court has so held***.  The trouble is that neither of these contentions advance the plaintiffs' claim — asserted in its motion for additional relief — that these tax policies may be challenged under *Fordice* as policies that perpetuate segregation in Alabama's system of higher education.  They may not.

Under *Fordice*, "policies now *governing the State's university system*" may violate the Fourteenth Amendment if they are "traceable to its prior *de jure* dual system" and "continue to have segregative effects." 505 U.S. at 733, 112 S. Ct. 2727 (emphasis added).  The segregative

policies proscribed by *Fordice* govern *higher education*, not *revenue raising*. The property tax policies plaintiffs now challenge, however, are revenue policies; they are not policies that "govern higher education" as contemplated by *Fordice*. **The challenged tax policies have nothing to do with admissions, faculty and administration, availability of degree programs, student recruitment, education facilities or any other aspects of higher education that *Fordice* recognized may discourage black students from attending historically white institutions and white students from attending historically black institutions**. They are not, therefore, the sort of education policies that *Fordice* recognized could perpetuate racial identifiability in higher education. We conclude, therefore, that plaintiffs' present claim is not properly brought under *Fordice*. The district court knew that there was something wrong with this approach, but employed it anyway. *See* 458 F. Supp. 2d at 1313 n.9 ("The Court expresses doubt that the matter before the Court even triggers *Fordice*"). We decline to do so.

Furthermore, even if Alabama's property tax policies were properly attacked under *Fordice*, we would agree with the district court that any segregative effect they may have on its system of higher education is far too attenuated to entitle plaintiffs to the relief they request. Plaintiffs' chain of causation contains the following links: constitutional limits on property taxation result in underfunded K-12 schools, which causes the State to divert state funds intended for higher education to lower education, which results in higher tuition at Alabama's colleges and universities as well as fewer funds for student aid and, therefore, lower black attendance. The district court concluded that there are simply far too many links in this chain to permit us to infer that Alabama's method of funding its K-12 education causes, in any meaningful way, the continuing segregation of its colleges and universities. We agree.

Additionally, we note that plaintiffs' chain of causation silently incorporates too many unsupported assumptions. First, plaintiffs assume that the abolition of Alabama's constitutional limitations on property taxation will result in increased tax revenues. Second, plaintiffs assume that legislative decisions regarding the allocation of these putative

increased revenues will result in increased funding of higher education. Even a cursory examination reveals that neither of these assumptions is unproblematic.

It is not at all clear that the removal of Alabama's constitutional restrictions on property tax rates will necessarily result in either increased tax rates or increased tax revenues. In 2003, for example, proposed changes in Alabama's tax structure, including state and local property taxes, were overwhelmingly rejected by Alabama voters. Even in the absence of constitutional limitations, there is nothing in plaintiffs' request for relief that would inhibit the ability of the people of Alabama to refuse to raise property tax rates.

Similarly, there is no way to know how the elimination of constitutional limitations on property taxes will affect the willingness of industrial or other commercial activity to locate or remain in the state. The possibility of business flight, thereby decreasing tax revenues of all kinds, is not addressed by plaintiffs' chain of causation.

Furthermore, plaintiffs' demand for the removal of the constitutional property tax restrictions assumes not only that tax revenues will necessarily increase, but that these revenues would automatically go to Alabama's underfunded K-12 schools. But such revenue allocation decisions are the province of the Alabama state and local governments. Even if Alabama's property tax revenues were to increase, thereby potentially increasing funds for both K-12 and higher education, there is no way to know what the Alabama legislative response would be. Although Alabama presently spends a higher percentage of its total budget on public education than any other state in the union, and ranks higher in per capita spending for education than for overall government spending, there is no way to predict whether these levels of appropriations would continue if Alabama's property tax revenues were to increase.

Many other public programs compete with education for the Alabama tax dollar. Highway construction and maintenance, public safety programs, public health undertakings, and a host of other programs

389

compete for Alabama's tax dollar.  Presently, virtually 100% of the state income tax is appropriated to K-12 education (teacher salaries).  Most of the state's sales tax revenues also go to general education purposes.  If property tax revenues were to rise, it is impossible to say whether the State would continue to allocate the sales and income taxes to education or transfer these revenues to other programs.

Neither is there any way to know whether tuition would decline or student financial assistance would increase.  These appropriation decisions would remain totally unaffected by any order of this court affecting Alabama's property tax limitations, assuming, of course, that we do not also assume the "fundamental and delicate power of taxation" in the State of Alabama.  *Missouri v. Jenkins*, 495 U.S. 33, 51, 110 S. Ct. 1651, 109 L. Ed. 2d 31 (1990).

**We conclude that even if underfunding of Alabama's K-12 schools were related to segregation in its colleges and universities, this relationship is too attenuated and rests on too many unpredictable premises to entitle plaintiffs to relief under *Fordice*.**

At root, the problem with plaintiffs' new claim is that it is not a claim for desegregation, but is rather an attack on Alabama's method of public school funding.  Plaintiffs' claim is typical of those made in a proliferation of school finance litigation over the last thirty years.  Such litigation often attacks the county-based property tax method of funding K-12 education, seeking to increase the amount raised, and to equalize the amount available to each county in order to improve the academic opportunities and performance of students disadvantaged by existing finance schemes.  Aimed as it is at increased and equalized funding, it targets not only minority students, but all "poor" students.  **Thus**, **school finance litigation is not aimed at desegregation under the United States Constitution**, **but rather at equalization of resources in order to provide an adequate education required not by the federal, but by state constitutions**.[717]

---

[717] In a footnote to this sentence, numbered "18," the Eleventh Circuit panel observed that:

The Supreme Court rebuffed such efforts in the federal courts, holding that

The problem for plaintiffs is that this lawsuit *is* about desegregation. Plaintiffs, themselves, filed a claim alleging continued segregation in Alabama's colleges and universities. By asserting this claim, they set the agenda of the lawsuit, challenging Alabama's policies that govern higher education. *Fordice*, 505 U.S. at 733, 112 S. Ct. 2727. Alabama's property taxes are not such policies.

Plaintiffs' new claim, if successful, might obtain a remedy for the underfunding of Alabama's public schools already established in the *Equity Funding Cases*. While we, like the district court, are not entirely unsympathetic to plaintiffs' attempt to bring Alabama's K-12 funding problems, identified but never remedied in the *Equity Funding Cases*, within the reach of the mandatory injunction already in place in this case, we agree with the district court that such a remedy is not available in this lawsuit. After fifteen years of litigation aimed at changing Alabama's education policies that perpetuate segregation in its colleges and universities, plaintiffs are attempting to transform their *Fordice* attack on Alabama's segregative education policies into an attack on the adequacy and fairness of Alabama's entire public school finance system. This claim is not properly before us.[718]

there is no federal constitutional right to education and upholding an unequal school finance scheme under rational review. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 58-59, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). After *Rodriguez*, it has been noted that "[w]hether intentionally or not, at least some federal courts have used school desegregation decrees to circumvent the limitations imposed by *Rodriguez* or similar state-court decisions rejecting school finance challenges." [James E. Ryan, *School, Race, and Money*, 109 Yale L.J. 249, 264 (1999).] Others have noted that school districts that once intentionally segregated students "have become plaintiffs in school desegregation cases, seeking *Milliken II* relief against the state in an attempt to circumvent the limitations imposed by *Rodriguez*." Theodore M. Shaw, *Missouri v. Jenkins: Are We Really a Desegregated Society?*, 61 Fordham L. Rev. 57, 60 (1992). Similarly, plaintiffs in this desegregation lawsuit are seeking school *finance* reform.

*Knight III-A*, 476 F.3d at 1228 n.18 (emphasis in original, bracketed alterations supplied).

[718] In a footnote to this sentence, which was numbered "19," The Eleventh Circuit observed that:

Plaintiffs appear to argue in their brief that the legal basis for their present

claim (including, apparently, any requirement for causation) is irrelevant. They assert that it is Alabama's duty to eradicate "all the continuing barriers to black students' equal access to higher education, *regardless of how attenuated may be their causal connections to the property tax system* in the court's view." (Emphasis added). In plaintiffs' view, it is enough that "[h]igher education is where all the underfunded chickens in Alabama's K-Ph.D. system of public education come home to roost." Plaintiffs urge this court to provide them the remedy denied in the state courts because "[t]here is no statewide K-12 school desegregation case; only in the instant action can the full ramifications of the historical discrimination . . . be confronted and remedied."

This request for a remedy untethered to a constitutional violation, though sincere, misunderstands the nature of the judicial power. The courts are not empowered generally to "make things right." The district court's jurisdiction was invoked by plaintiffs to recognize and remedy the constitutional wrongs alleged to exist in Alabama's system of higher education.

Plaintiffs' property tax claim is aimed at Alabama's school finance policies. Although brought under *Fordice*, this claim has almost nothing to do with higher education policies. Furthermore, plaintiffs' belated attempt to add an argument against the tax policies under *Hunter v. Underwood*, 471 U.S. 222, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985) (raised for the first time on motion for reconsideration of the denial of their present claim) and *Hunter v. Erickson*, 393 U.S. 385, 89 S. Ct. 557, 21 L. Ed. 2d 616 (1969) [—] cases having absolutely nothing whatsoever to do with higher education — reinforce our conclusion that the present claim does not arise under *Fordice*.

To the extent that plaintiffs' attack on Alabama's tax policies is predicated upon allegations of underfunding that denies Alabama's schoolchildren an adequate education, it does not state a federal constitutional claim. *Rodriguez*, 411 U.S. at 58-59, 93 S. Ct. 1278. To the extent that plaintiffs' claim is that Alabama's tax policies evidence a discriminatory intent to deprive Alabama's K-12 children of equal protection of the law, under *Underwood* and *Erickson*, it does not state a claim for desegregation of higher education under *Fordice*.

Such distinctions are not mere legal technicalities. Simply put, it is plaintiffs' position that the district court in this case had not only the authority but the obligation to remedy any and all constitutional violations brought to its attention in this lawsuit (plaintiffs assert that "a federal court does not have the discretion to ignore patent constitutional violations solely because they expand the subject matter of the original complaint"). Plaintiffs believe that the district court should have enjoined enforcement of the offending tax provisions whether or not they affect

2.     *Even Under <u>Fordice</u>, the Constitutional Property Tax Provisions Do Not Have a Continuing Segregative Effect on Higher Education in Alabama.*

Even if we were to overlook the inapplicability of *Fordice*, and examine plaintiff's claim under that standard, we would agree with the district court that Alabama has met its burden to demonstrate that its property tax policies do not have a continuing segregative effect on its system of higher education.   Plaintiffs assert that higher education in Alabama is so underfunded that black students are denied an equal opportunity to attend college.   The record evidence is to the contrary.

Under *Knight I*, the State has demonstrated its willingness and ability to raise funds for higher education irrespective of its K-12 funding policies.   From 1990 to 2004, Alabama's appropriations for higher education increased from $820,063,882 to $1,160,033,885 annually.  Over $179 million in new funds had been appropriated to Alabama's historically black universities as of 2003.   Alabama has clearly demonstrated an ability to raise funds for its colleges and universities

---

higher education "in light of the findings of continuing adverse racial impact in other areas of public education and civil society."  We are asked to correct the "clear equal protection violations" alleged in Alabama's tax policies notwithstanding the fact that, as plaintiffs concede, they have "limited their demands for relief to desegregation of higher education."  We are empowered, plaintiffs assert, by Rule 54(c) of the Federal Rules of Civil Procedure to "grant the relief to which the party . . . is entitled, even if the party has not demanded such relief in his pleadings."

We must decline such a request to expand our authority beyond this "case or controversy" to the general "doing of justice" that plaintiffs appear to believe to be our statutory mandate.  Despite what plaintiffs think, Rule 54(c) does not empower us generally to provide a remedy for all wrongs. Plaintiffs' challenge of Alabama's tax policies at this late date in this higher education litigation raises issues involving the Eleventh Amendment, the Tax Injunction Act, the availability of a state remedy and a host of other issues — none briefed, argued, or considered by the district court. We must resist this attempt and the invitation to abandon long-standing principles of judicial restraint.

*Knight III-A*, 476 F.3d at 1229 n.19 (bracketed alteration containing em-dash in third paragraph supplied).

despite its K-12 funding limitations.

Furthermore, as a result of changes in the policies that govern higher education in Alabama — agreed to by the parties and implemented by the State — there has been enormous improvement in black students' access to higher education in Alabama.  During this period, total undergraduate or graduate degrees awarded to black students increased 96.43%, while white students' graduation rates actually dropped 13.36%.

Part of the credit for such improvement in black completion rates must be given to the many new financial aid programs benefitting black students that the State has instituted.  Numerous minority and diversity scholarships have been added at both of Alabama's historically black universities.  The State also created the Alabama State University Trust for Educational Excellence and the Alabama A & M University Trust for Educational Excellence — both of which have, as their first dedicated use, the funding of diversity scholarships.  *See Knight II*, 900 F. Supp. at 349-56.

The district court has unflaggingly monitored Alabama's progress in completing the desegregation of its system of higher education over the last ten years, and it has pronounced itself satisfied that the State has met its *Fordice* burden (if any) to demonstrate that the challenged tax policies do not produce a segregative effect on Alabama's system of higher education.  To be sure, Alabama's colleges and universities remain a work in desegregative process.  But, over the last ten years, the State has worked diligently with the plaintiffs to develop and implement modifications in the policies that govern Alabama's system of higher education.  These changes have ameliorated the segregative effects of underfunding — from *whatever* source — and underuse — for *whatever* reason — of Alabama's black colleges and universities, and brought meaningful desegregation to the State's system of higher education, as the district court envisioned and ordered.  We agree with that court that the challenged tax policies have not undermined that desegregative process to a level that even remotely triggers the United States Constitution.

## IV.

We cannot permit federal lawsuits to be transformed into amorphous vehicles for the rectification of all alleged wrongs, no matter how belatedly asserted, nor how unrelated to the underlying action.[719]

As the district court said in its 1995 remedial decree:

This Court does not intend this Remedial Decree to solve all of Alabama's education woes or racial tensions. Alabama has much of both that are beyond the scope of the court's remedial authority. The court does intend the Decree to eliminate segregative effects remaining within Alabama's system of higher education, as far as practicable and educationally sound.

Because the district court correctly rejected plaintiffs' newly raised claim that Alabama's tax policies have a continuing segregative effect on its system of higher education, we hold that the judgment of the district court is

AFFIRMED.

---

[719] A footnote at this point in the Eleventh Circuit's opinion, numbered "22," observed that:

Although our decision today may be seen to leave plaintiffs without a remedy for the wrong identified in the Equity Funding Cases, the Supreme Court suggested in *Rodriguez* that:

The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States . . . . [T]he need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax . . . but the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

*Knight III-A*, 476 F.3d at 1231 n.22 (quoting *Rodriguez*, 411 U.S. at 58-59) (bracketed alteration added).

*Knight III-A*, 474 F.3d at 1220-31 (italicized emphasis in original, boldface emphasis added, most footnotes omitted).

Nevertheless, and importantly, the Eleventh Circuit's opinion did not foreclose the possibility of a separate action, specifically aimed at those constitutional provisions constraining the extent to which the State of Alabama, its counties, municipalities, and school districts fund public education from pre-school and kindergarten programs through high school.  Thus came the present suit, which now is before this court following a lengthy bench trial.

396

## H.  Controlling Principles of Law

The Fourteenth Amendment provides, in the part pertinent to this case, that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1 (1868).  Only five years after the amendment was ratified, the Supreme Court pronounced the central principle of that clause, as well as the policy animating its addition to the Constitution:

> [I]t is not difficult to give a meaning to this clause.  The existence of laws in the States where the newly emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied by this clause, and by it such laws are forbidden.

*Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36, 81 (1872).  Eight years later, the Court elaborated its prior decision, saying in *Strauder v. West Virginia*, 100 U.S. 303 (1880), that the Fourteenth Amendment was "designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States."  *Id*. at 307.  Specifically, the Court said that the Fourteenth Amendment was

> one of a series of constitutional provisions having a common purpose; namely, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy.  The true spirit and meaning of the amendments, as we said in the *Slaughter-House Cases* (16 Wall. 36), cannot be

397

understood without keeping in view the history of the times when they were adopted, and the general objects they plainly sought to accomplish. At the time when they were incorporated into the Constitution, it required little knowledge of human nature to anticipate that those who had long been regarded as an inferior and subject race would, when suddenly raised to the rank of citizenship, be looked upon with jealousy and positive dislike, and that State laws might be enacted or enforced to perpetuate the distinctions that had before existed.  Discriminations against them had been habitual.  It was well known that in some States laws making such discriminations then existed, and others might well be expected.  The colored race, as a race, was abject and ignorant, and in that condition was unfitted to command the respect of those who had superior intelligence.  Their training had left them mere children, and as such they needed the protection which a wise government extends to those who are unable to protect themselves.  They especially needed protection against unfriendly action in the States where they were resident.  It was in view of these considerations the Fourteenth Amendment was framed and adopted.  It was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. It not only gave citizenship and the privileges of citizenship to persons of color, but it denied to any State the power to withhold from them the equal protection of the laws, and authorized Congress to enforce its provisions by appropriate legislation.  To quote the language used by us in the *Slaughter-House Cases*, 'No one can fail to be impressed with the one pervading purpose found in all the amendments, lying at the foundation of each, and without which none of them would have been suggested, — we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over them.'  So again: 'The existence of laws in the States where the newly emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied, and by it [the Fourteenth Amendment] such laws were forbidden.  If, however, the States did not conform their laws to its requirements, then, by the fifth section of the article of amendment,

> Congress was authorized to enforce it by suitable legislation.' And it was
> added, 'We doubt very much whether any action of a State, not directed
> by way of discrimination against the negroes, as a class, will ever be held
> to come within the purview of this provision.'

*Id.* at 306-07 (quoting *Slaughterhouse Cases*, 83 U.S. at 71, 81). Since that time, the

Supreme Court has consistently reaffirmed that "[t]he clear and central purpose of the

Fourteenth Amendment was to eliminate all official state sources of invidious racial

discrimination in the States." *Loving v. Virginia*, 388 U.S. 1, 10 (1967) (citations

omitted).

### 1.    Express Racial Classifications

The *Strauder* case addressed a challenge to a West Virginia statute that limited

service on a jury to white males.[720] The court held that the statute, "discriminating in

the selection of jurors . . . against negroes because of their color, amounts to a denial

of the equal protection of the laws to a colored man . . . ." *Strauder*, 100 U.S. at 310.

Laws of that sort, which *expressly* draw distinctions based upon a person's race or

color — so-called "facial racial classifications" — are almost invariably deemed

unconstitutional under the Equal Protection Clause, *unless* the state can carry the

heavy burden of demonstrating that such distinctions are necessary to the

accomplishment of a compelling governmental interest, *and*, that the distinctions are

---

[720] *Strauder*, 100 U.S. at 305.

narrowly tailored to the accomplishment of that purpose.   That standard of

constitutional review is called "strict scrutiny."   *See*, *e.g.*, *Grutter v. Bollinger*, 539

U.S. 306, 326-27 (2003) ("[A]ll racial classifications imposed by government must be

analyzed by a reviewing court under strict scrutiny.   This means that such

classifications are constitutional only if they are narrowly tailored to further

compelling governmental interests.") (citations and quotation marks omitted).[721]

During the more than 140 years that have passed since the Fourteenth

Amendment was ratified, "[t]here is only one situation in which the [Supreme] Court

expressly upheld [express, or facial] racial classifications burdening minorities . . . ."[722]

That situation involved laws placing special restrictions upon Japanese Americans

during World War II:   a shameful episode in American history that virtually all

educated persons now view with justifiable embarrassment.[723]

Even laws intended to provide special *benefits* to historically disadvantaged

---

[721] *See also*, *e.g.*, Erwin Chemerinsky, *Constitutional Law:  Principles and Policies* § 9.3.2, at 695 (New York:  Aspen Publishers 3rd ed. 2006) ("**Chemerinsky I**").

[722] *Id*. § 9.3.3.1, at 697 (bracketed alterations supplied).  "Ironically, the Supreme Court first articulated the requirement for strict scrutiny for discrimination based upon race . . . in *Korematsu v. United States* [323 U.S. 214 (1944)] during World War II."  *Id.* § 9.3.2, at 695. *Korematsu* is the only case in which the Supreme Court has found that an explicit racial classification disadvantaging a minority *survived* strict scrutiny analysis.

[723] In *Hirabayashi v. United States*, 320 U.S. 81, 94-95 (1943), the Court upheld a curfew applicable only to persons of Japanese ancestry.  In *Korematsu*, *supra* at 218-19, the Court upheld the federal government's decision to evacuate and forcibly intern Americans of Japanese descent. On the same day that it decided *Korematsu*, however, the Court also held that the detention of "loyal" Japanese was no longer authorized under the executive orders that had provided authority for the internment.  *Ex parte Endo*, 323 U.S. 283, 302 (1944).

minorities rarely survive strict scrutiny review if they do so based upon explicit racial

classifications.  *See*, *e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493

(1989).[724]

## 2.    **Facially Neutral Racial Classifications**

From the beginning of equal protection jurisprudence, courts have recognized

that laws which are (or which *appear* to be) neutral on their face may, nevertheless,

camouflage an insidious, clandestine, discriminatory purpose.  The Equal Protection

Clause was intended to excise from our society not only the cancer of *overt* official

prejudice (*de jure* racial discrimination), but also the more subtle, more devious forms

of discrimination.  *See*, *e.g.*, *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 467

(1988) (Marshall, J., dissenting) ("[T]he Constitution is concerned with 'sophisticated

as well as simple-minded modes of discrimination.'") (quoting *Lane v. Wilson*, 307

U.S. 268, 275 (1939)).  Indeed, it is a disappointing fact that, 146 years after the close

of the Civil War, 121 years after *Strauder*, and 57 years after *Brown v. Board of*

*Education*, "racial and other forms of discrimination still remain a fact of life, in the

administration of justice as [well as] in our society as a whole.  Perhaps today that

discrimination takes a form more subtle than before.  But it is not less real or

---

[724] *See also Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 742, 748 (2007) (Roberts, C.J.) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.")  *See generally* Chemerinsky I § 9.3.5.1, at 732 ("It is now clearly established that strict scrutiny is used to evaluate all government affirmative action plans.").

pernicious." *Rose v. Mitchell*, 443 U.S. 545, 558-59 (1979) (alteration added).[725]

Within eighteen years after ratification of the Fourteenth Amendment, the Supreme Court had occasion to address just such an ostensibly-neutral, but, nevertheless, invidiously-discriminatory law in the case of *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).[726]  That case addressed the constitutionality of a pair of ordinances adopted by the City of San Francisco in 1880 which made it a misdemeanor to provide laundry services in a wooden building without first obtaining permission from the city's board of supervisors.[727]  At the time, all but ten of San Francisco's 320 laundries were housed in wooden structures, and about 240 of those (three-quarters of the total) were owned and operated by persons of Chinese descent.[728]  Each petition for permission to continue business by a Chinese-owned laundry was denied by the board

---

[725] *See also*, *e.g.*, *Freeman v. Pitts*, 503 U.S. 467, 490 (1992) ("[T]he potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms after the effects of *de jure* segregation have been eliminated.").

[726] Both *Washington v. Davis*, 426 U.S. 229 (1976), and *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), indicate that *Yick Wo* is the generative case for the proposition that a neutral law with a disproportionate effect may violate the Equal Protection Clause. *Feeney*, 442 U.S. at 272 (citing *Yick Wo* for the proposition that, absent "extraordinary justification," a court should invalidate a "classification that is ostensibly neutral but is an obvious pretext for racial discrimination"); *Washington*, 426 U.S. at 241 (citing only *Yick Wo* as supporting the notion that "[a] statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race"); *see also* Juliet P. Stumpf, *States of Confusion:  The Rise of State and Local Power Over Immigration*, 86 N.C. L. Rev. 1557, 1575 (2008) ("*Yick Wo* is usually cited for the proposition . . . that laws that are neutral on their face may violate the Equal Protection Clause if motivated by discriminatory intent.").

[727] *Yick Wo*, 118 U.S. at 357-58.

[728] *Id.* at 358-59.

402

of supervisors, while all but one of the petitions by non-Chinese-owned laundries were granted.[729]   Moreover, the Sheriff admitted that 150 persons of Chinese descent had been arrested for violation of the ordinance, but no non-Chinese laundry operators had been subjected to the same treatment.[730]   Appalled by this egregious pattern of discrimination, the Supreme Court reasoned that, even though the law did not contain an express racial classification, it contained no principle to limit its extraordinarily discriminatory enforcement, and it was, for that reason, in violation of the Fourteenth Amendment's Equal Protection Clause.  *Id*. at 373-74.

Some commentators have noted that the *Yick Wo* opinion did not clarify whether it was the discriminatory *impact* of the San Francisco ordinance, or its discriminatory *intent*, that was the crucial consideration in the Court's decision.[731]   Further,

---

[729] *Id.*

[730] *Id.*

[731] *See*, *e.g.*, Theodore Eisenberg & Sherri Lynn Johnson, *The Effects of Intent: Do We Know How Legal Standards Work?*, 76 Cornell L. Rev. 1151, 1154 (1991).  There is, nonetheless, language in the *Yick Wo* opinion suggesting that the intent of the enacting body was *not* important to the Court's decision:  "[T]he facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, *whatever may have been the intent of the ordinances as adopted*, they are *applied* . . . with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured . . . by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States."  *Yick Wo*, 118 U.S. at 373.  However, the Court quoted, approvingly and extensively, language from the Circuit Judge's decision in one of the two cases consolidated under the style of *Yick Wo v. Hopkins*, and finding that *both* the starkness of the discriminatory enforcement, *and* the extreme disjunction between the proffered rationale for the law and the discretion granted those who enforced it, gave rise to *a presumption* that the ordinance *was* enacted for a discriminatory purpose:

subsequent decisions — such as the Court's opinion in *Palmer v. Thompson*, 403 U.S. 217 (1971) — have warned against the "hazards of declaring a law unconstitutional because of the motivations [intent] of its sponsors," and suggested that "the focus . . . [of equal protection jurisprudence is] on the actual *effect* of the enactments, not upon the motivations which led the States to behave as they did." *Id.* at 224-25 (bracketed alteration and emphasis supplied). *Palmer* involved a decision of the City of Jackson, Mississippi to close public swimming facilities because, according to the City, they could not be safely and economically operated on an integrated basis.[732] Without

---

[I]n a territory some ten miles wide by fifteen or more miles long, much of it still occupied as mere farming and pasturage lands, and much of it unoccupied sand banks, in many places without a building within a quarter or half a mile of each other, including the isolated and almost wholly unoccupied Goat island, the right to carry on this, when properly guarded, harmless and necessary occupation, in a wooden building, is not made to depend upon any prescribed conditions giving a right to anybody complying with them, but upon the consent or arbitrary will of the board of supervisors. In three-fourths of the territory covered by the ordinance there is no more need of prohibiting or regulating laundries than if they were located in any portion of the farming regions of the state. Hitherto the regulation of laundries has been limited to the thickly-settled portions of the city. Why this unnecessary extension of the limits affected, if not designed to prevent the establishment of laundries, after a compulsory removal from their present locations, within practicable reach of the customers or their proprietors? And the uncontradicted petition shows that all Chinese applications are, in fact, denied, and those of Caucasians granted; thus, in fact, making the discriminations in the administration of the ordinance which its terms permit.

*Id.* at 361 (quoting *The Case of Wo Lee*, 26 F. 471, 473-74 (C.C. Cal. 1886)). *Cf.* Brando Simeo Starkey, *Criminal Procedure, Jury Discrimination & the Pre-Davis Intent Doctrine: The Seeds of a Weak Equal Protection Clause*, 38 Am. J. Crim. L. 1, 17 (2010) ("One interesting facet of *Yick Wo* was that the Court found an equal protection violation in the absence of proof establishing discriminatory purpose.").

[732] *Palmer*, 403 U.S. at 224-26.

expressing doubt that racial considerations had played a part in the decision, the Court stated that it had never "held that a legislative act may violate equal protection *solely because* of the motivations of the men who voted for it." *Id.* at 224 (emphasis supplied). Thus, the City's decision to close the pools did not violate rights secured to its black citizens because it involved "no state action *affecting blacks differently from whites.*" *Id.* at 225 (emphasis supplied).

However, just five years after *Palmer*, the Court reiterated that "[t]he central purpose of the Equal Protection clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Providing an interesting echo of the previous quotation from *Palmer*, the Court declared that it had never held that "a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." *Id.* (emphasis in original). "Disproportionate impact is not irrelevant," said the Court, but "[s]tanding alone, it does not trigger the rule . . . that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations." *Id.* at 242. "[T]he invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Id.* at 240.

In the years since the decision in *Washington v. Davis*, the Court has repeatedly reaffirmed the centrality of proof of a discriminatory *purpose* to equal protection analysis. *See*, *e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 333 (2004) ("In evaluating a claim that a governmental decision violates the Equal Protection Clause, we have long required a showing of discriminatory purpose."); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").[733]

### a.   "Ordinary equal protection standards"

The evolution of doctrinal principles sketched above has resulted in what the Supreme Court has sometimes referred to as "ordinary equal protection standards": that is, proof that a contested governmental policy has both a discriminatory effect *and* that it was motivated by a discriminatory purpose. *See*, *e.g.*, *United States v. Armstrong*, 517 U.S. 456, 465 (1996); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 9.3.3.2, at 713-14 (stating that "ordinary equal protection standards" means that "a facially neutral law will be regarded as creating [an unconstitutional] race . . . classification only if there is proof of *both* a discriminatory

---

[733] *See also* Chemerinsky I § 9.3.3.2, at 710 ("Many times the Court has reaffirmed this principle that discriminatory impact is not [alone] sufficient to prove a racial classification.").

impact to the law and a discriminatory purpose behind it") (emphasis in original,

alteration supplied).[734]

Additionally, to demonstrate that a facially neutral law is a subterfuge for racial

discrimination, a plaintiff must prove the existence of a causal connection between the

discriminatory intent of the governmental decisionmakers and the disproportionate,

adverse impact that the plaintiff identifies.  *See*, *e.g.*, *Johnson v. DeSoto County Board

of Commissioners*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000) (stating as established

law that a plaintiff must show "a causal connection between the intent and some

---

[734] *See also United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), *Arlington Heights*, and *Washington v. Davis* as cases that established "ordinary equal protection standards"); *Brooks v. Miller*, 158 F.3d 1230, 1236-37, 1241 (11th Cir. 1998), *cert. denied sub nom. Brooks v. Barnes*, 526 U.S. 1131 (1999) (addressing, as the relevant issues in an equal protection challenge, "Discriminatory Purpose" *and* "Discriminatory Impact"); *Rozar v. Mullis*, 85 F.3d 556, 565 (11th Cir. 1996) (citing *Arlington Heights* for the proposition that "evidence of *both* discriminatory intent *and* discriminatory impact are required to show an equal protection violation") (emphasis supplied); Jamie Fellner, *Race, Drugs, and Law Enforcement in the United States*, 20 Stan. L. & Pol'y Rev. 257, 279 (2009) ("**Fellner**") ("Under longstanding constitutional jurisprudence in the United States, facially race-neutral governmental policies do not violate the guarantee of equal protection unless there is both discriminatory impact and discriminatory purpose."); Kathleen Riley, *The Long Shadow of the Confederacy in America's Schools:  State-Sponsored Use of Confederate Symbols in the Wake of Brown v. Board*, 10 Wm. & Mary Bill Rts. J. 525, 538-39 (2002) ("[T]he Court's interpretation of the Equal Protection Clause is well defined.  The United States Supreme Court has firmly established that a state's violation of equal protection requires a showing of both disparate impact and discriminatory intent.") (footnotes omitted); Christopher J. Peters, *Outcomes, Reasons, and Equality*, 80 B.U. L. Rev. 1095, 1108 (2000) ("[E]vidence of both discriminatory intent and discriminatory effect is required in litigation under the Equal Protection Clause."); Scott W. Howe, *Human Dignity as the Polestar for Rights Decision Making*, 73 B.U. L. Rev. 695, 713 (1993) ("[B]y the mid-1970s several U.S. Supreme Court decisions indicated that intent to discriminate in addition to racially disproportionate impact had to be shown under . . . the equal protection clause . . . ."); Daniel R. Ortiz, *Got Theory?*, 153 U. Pa. L. Rev. 459, 491 (2004) ("Ordinary equal protection doctrine requires a showing of both discriminatory intent and discriminatory effects.").

cognizable injury to Plaintiffs").[735]

Once the foregoing requirements are met, the burden shifts to the law's defenders to establish that "the same decision would have resulted even had the impermissible purpose not been considered.  If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose."  *Arlington Heights*, 429 U.S. at 270 n.21 (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)).

In short, under the principles of "ordinary equal protection," *if* proof of (*i*) a racially-discriminatory intent, or (*ii*) adverse impact, or (*iii*) a causal linkage between the invidious intent and the disparate impact is lacking, *or if* (*iv*) the defendant demonstrates that racial animus was not the "but-for" cause of the enactment, then the kind of "purposeful discrimination" that triggers analysis under strict scrutiny standards is not present and, accordingly, the law need only be subjected to so-called "rational basis" scrutiny:   that is, it need only be rationally related to some conceivable, legitimate governmental purpose.[736]

---

[735] *See also Feeney*, 442 U.S. at 279 (holding that plaintiffs in an equal protection action must demonstrate that the defendant "selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group").

[736] *See, e.g.*, *Washington v. Davis*, 426 U.S. at 242 (holding that proof of discriminatory impact, absent proof of discriminatory purpose, "does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny") (citations omitted); Chemerinsky I § 9.3.3.2, at 710, 718

Conversely, if the plaintiff does establish that a facially neutral law was enacted with a racially-discriminatory purpose and causes a disproportionate impact upon the intended targets, and the defendant cannot show that the law would have been enacted absent the discriminatory purpose, then the law must be subjected to "the most exacting scrutiny"; that is, "to pass constitutional muster, [it] must be justified by a compelling governmental interest and must be 'necessary . . . to the accomplishment' of [that] purpose." *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984) (alterations supplied) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 196 (1964)).[737]

---

("[L]aws that are facially neutral as to race . . . will receive more than rational basis review only if there is proof of a discriminatory purpose."); *cf. Heller v. Doe*, 509 U.S. 312, 320 (1993) (restating the standard for rational basis review under which "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification") (citation and internal quotation marks omitted); *Estate of McCall ex rel. McCall v. United States*, 642 F.3d 944, 950 (11th Cir. 2011) (reciting the rational basis test as requiring only that the challenged enactment be "rationally related to a legitimate governmental purpose," and observing that, under such a standard of review, a court "must uphold the statute against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification") (citations and internal quotation marks omitted); *Georgia Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1321 (11th Cir. 2003) (stating that, in an equal protection challenge where neither a suspect classification nor infringement of a fundamental right is established, "[a]ll there need be is a conceivable rational basis for the legislation"); *Tefel v. Reno*, 180 F.3d 1286, 1299 (11th Cir. 1999) ("Under rational-basis scrutiny, a statute is accorded a strong presumption of validity and will be upheld if any reasonably conceivable state of facts could demonstrate that the statute is rationally related to a legitimate government purpose.").

[737] *See also, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("A facially neutral law . . . warrants strict scrutiny . . . if it can be proved that the law was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race.") (citations and internal quotation marks omitted); *Washington*, 426 U.S. at 242; Chemerinsky I § 9.3.2, at 694-95 ("It now is clearly established that racial classifications will be allowed only if the government can meet the heavy burden of demonstrating that the discrimination is necessary to achieve a compelling government purpose. In other words, the government must show an extremely important reason for its action *and* it must demonstrate that the goal cannot be achieved through any less discriminatory alternative.")

All parties to this action agree that the "ordinary equal protection" standards enunciated and clarified in, among other cases, *Arlington Heights* and *Hunter v. Underwood*, 471 U.S. 222 (1985), are the principal lens through which this court should examine plaintiffs' claims.[738]  This framework was perhaps most succinctly articulated in *Hunter*:

> Presented with a neutral state law that produces disproportionate effects along racial lines, [a court is] correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment:
>
>> "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . .  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." [*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*,] 429 U.S., at 264-265.
>
> *See Washington v. Davis*, 426 U.S. 229, 239 (1976).  Once racial discrimination is shown to have been a "substantial" or "motivating" factor behind enactment of the law, the burden shifts to the law's

---

(emphasis in original); Julia Kobick, *Discriminatory Intent Reconsidered:  Folk Concepts of Intentionality and Equal Protection Jurisprudence*, 45 Harv. C.R.-C.L. L. Rev. 517, 522 (2010) ("If a plaintiff can prove that the government intended to discriminate on the basis of race despite the facially neutral action, the Court will apply a strict scrutiny analysis, upholding the government action only if it is necessary to achieve a compelling government objective and is narrowly tailored to achieve that objective.").

[738] *See* doc. no. 274 (Plaintiffs' Post-Trial Brief), at 183-84 (stating that "[t]he legal standards for assessing plaintiffs' claims that facially neutral state constitutional provisions have been adopted for racially discriminatory purposes and thus violate . . . the Equal Protection Clause of the Fourteenth Amendment are set out in *Hunter v. Underwood*, 471 U.S. 222 (1985), and *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)."); doc. no. 275 (Defendants' Post-Trial Brief), at 13, 186-87 (citing these two cases extensively for the basic principles).

> defenders to demonstrate that the law would have been enacted without
> this factor. *See Mt. Healthy*, 429 U.S., at 287.

*Hunter*, 471 U.S. at 227-28 (first and third alterations supplied) (parallel citations

omitted).

Further, said the Court, "it is clear that where both impermissible racial

motivation and racially discriminatory impact are demonstrated, *Arlington Heights* and

*Mt. Healthy* supply the proper analysis." *Id.* at 232.

It also should be noted that neither plaintiffs nor defendants dispute that the

standards applicable to plaintiffs' claims under Title VI of the Civil Rights Act of

1964, 42 U.S.C. § 2000d *et seq.*, are identical to those the court must apply to their

claims under the Equal Protection Clause. *See, e.g.*, *United States v. Fordice*, 505 U.S.

717, 732 n.7 (1992) ("Our cases make clear . . . that the reach of Title VI's protection

extends no further than the Fourteenth Amendment.").[739]

Even so, there *is* a significant dispute between the parties regarding the *meaning*

of the standards that must be applied — both as to the kinds of legal theories they

support, and, the kinds of evidence required to prove them.  Accordingly, a more

detailed exposition of each of the four elements of "ordinary equal protection" analysis

sketched above — *i.e.*, proof of a racially-discriminatory purpose, disproportionate

---

[739] *See also* Chemerinsky I § 9.3.5.1, at 733 (noting that, in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), "five Justices . . . concluded that the analysis under Title VI and the Constitution is identical").

effects along racial lines, a causal linkage between the first two elements, and the defendants' burden to negate but-for causation if all of the preceding elements are established — will be beneficial.

### i.     Disproportionate effects along racial lines

"[T]he Fourteenth Amendment guarantees equal laws, not equal results." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 273 (1979). Even so, results are not irrelevant.  A facially neutral law may still be determined to violate the Equal Protection Clause if it is proven to have had "disproportionate effects along racial lines . . . ."  *Hunter*, 471 U.S. at 227; *see also Cook v. Randolph County, Georgia*, 573 F.3d 1143, 1152 (11th Cir. 2009) (same).[740]  "Only when it is shown that the legislation has a substantial disparate impact on classes defined in a different fashion may analysis continue on the basis of the impact on those classes."  *Califano v. Boles*, 443 U.S. 282, 294 (1979).[741]

In the course of this action, there has been some disagreement and confusion regarding the meaning of what the Supreme Court has variously termed "racially

---

[740] *See also East-Bibb Twiggs Neighborhood Association v. Macon Bibb Planning & Zoning Commission*, 896 F.2d 1264, 1266 (11th Cir. 1989) (holding proof of "racially disproportionate impact" necessary to finding an equal protection violation).

[741] *See also Reno v. Bossier Parish School Board*, 528 U.S. 320, 337 (2000) (noting that it is "established that [proof of both a] discriminatory purpose as well as discriminatory effect [is] necessary [to establish] a constitutional violation") (alterations supplied).

disproportionate impact,"[742] "disproportionate effects along racial lines,"[743] racially "disparate impact,"[744] or racially "discriminatory effect."[745] As plaintiffs correctly point out, this element of an equal protection claim does not entail proof that *more blacks* than whites were adversely affected by the contested law, because such a requirement of proof would undermine the central minority-protective rationale for the Equal Protection Clause by setting an often-insurmountable evidentiary hurdle. Rather than requiring proof that *more blacks* than whites are adversely affected, the discriminatory effects requirement in a race-classification case under the Equal Protection Clause contemplates proof that *blacks are more affected* than are whites. In other words, racially-motivated legislation violates the Constitution only when it "affect[s] blacks differently than whites";[746] or better stated, when the law disadvantages "*a greater proportion* of one race than of another."[747]

The Supreme Court's decision in *Hunter v. Underwood* provides an archetypal example of "disproportionate effects along racial lines" that satisfies the discriminatory impact element.[748] That case, like this one, involved a challenge to

---

[742] *Arlington Heights*, 429 U.S. at 265.

[743] *Hunter*, 471 U.S. at 227.

[744] *Feeney*, 442 U.S. at 273.

[745] *McClesky v. Kemp*, 481 U.S. 279, 292 (1987).

[746] *Palmer*, 403 U.S. at 224.

[747] *Washington*, 426 U.S. at 242 (emphasis supplied).

[748] *See Hunter*, 421 U.S. at 227.

413

certain provisions of the 1901 Alabama Constitution.   The provisions at issue disfranchised "persons convicted of, among other offenses, 'any crime . . . involving moral turpitude.'"[749]  The Eleventh Circuit stated that the "disparate effect of the law persist[ed]" into the present, finding that "[i]n Jefferson and Montgomery Counties blacks are by even the most modest estimates at least *1.7 times as likely* as whites to suffer disenfranchisement" under the challenged provisions.  *Underwood v. Hunter*, 730 F.2d 614, 620 (11th Cir. 1984), *quoted in Hunter*, 471 U.S. at 227 (emphasis supplied).[750]  Early in the case, the *Hunter* district court held those figures "to be

---

[749] *Id.* at 223 (quoting Ala. Const. art. XI, § 218 (1901)).

[750] Plaintiffs "argu[e] that the reference to 1.7 times black/white disqualification was made in the context of proving original intent, not current effect."  Doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 101-02 (citing doc. no. 166 (Plaintiffs' Brief Opposing Defendants' Motion for Summary Judgment), at 40-42).  That is contradicted by the sentence preceding and the sentences following the Supreme Court's only reference to the "1.7 times" figure:

> "'This *disparate effect persists today*.  In Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under section 182 for the commission of nonprison offenses.'  [*Underwood v. Hunter*,] 730 F.2d [614,] 620 [11th Cir. 1984].
>
> So far as we can tell *the impact of the provision has not been contested*, and we can find no evidence in the record below or in the briefs and oral argument in this Court that would *undermine this finding* by the Court of Appeals.
>
> Presented with a neutral state law *that produces disproportionate effects along racial lines*, the Court of Appeals was correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment:
>
> > "[O]fficial action will not be held unconstitutional *solely because it results in a racially disproportionate impact. . . .* Proof of racially discriminatory intent or purpose is required to show a

414

typical of the other counties when it certified [the defendants'] registrars as class

representatives . . . ." Brief of the Appellees, *Hunter v. Underwood*, 471 U.S. 222 (No.

84-76), 1985 WL 669182, at *17.  By the time the case reached the Supreme Court,

the present-day impact of the disfranchisement provision was uncontested, and the

Supreme Court saw nothing that "would undermine this finding": *i.e.*, the conclusion

of the Eleventh Circuit Court of Appeals that the disfranchisement of 1.7 times as

many blacks as whites satisfied the requirement of disproportionate effect.[751]  Even

though, in absolute terms, there very well may have been more whites disfranchised

by the challenged provision, blacks were nearly *twice as likely* to be disfranchised,

satisfying the Court that the provision had a present disproportionate effect that

---

violation of the Equal Protection Clause." 429 U.S., at 264-265.

*Hunter*, 471 U.S. at 227-28 (emphasis supplied) (parallel citations omitted).  This court need not, as plaintiffs argue, "resolve this ambiguity in the *Hunter* opinion," doc. no. 280 (Plaintiffs' Response to Defendants' Post-Trial Brief), at 102, because there is no ambiguity.  The 1.7 multiple of blacks disenfranchised *versus* whites was indisputably the evidence from which the Court found that the challenged provision "continues to this day to have th[e] effect" of "discriminat[ing] against blacks on account of race . . . ."  *Hunter*, 471 U.S. at 231.  The absence of *any other* evidence that would satisfy the racially disproportionate effects prong, as well as the affirmed Eleventh Circuit's sole reliance upon the 1.7 figure in its finding on that element, also refutes plaintiffs' argument.  *See Underwood*, 730 F.2d at 617.

Even if there were some "ambiguity," the Supreme Court's subsequent discussion of *Hunter* in the case of *United States v. Armstrong*, 517 U.S. 456 (1996), which is addressed below, eliminated it.

[751] *Hunter*, 471 U.S. at 228 ("So far as we can tell the impact of the provision has not been contested, and we can find no evidence . . . that would undermine this finding by the Court of Appeals.").

justified an inquiry into the motivation or intent behind its enactment.[752]

Ten years later, in the case of *United States v. Armstrong*, 517 U.S. 456 (1996), the Court confirmed that its holding in *Hunter* was entirely

> consistent with ordinary equal protection principles, including the similarly situated requirement.  There was convincing direct evidence that the State had enacted the provision *for the purpose of disfranchising blacks . . .* and *indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites*: Blacks were "by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under" the law in question.

*Armstrong*, 517 U.S. at 467 (quoting *Hunter*, 471 U.S. at 227) (emphasis supplied, internal citations omitted).  "*Hunter* thus affords no support for [plaintiffs'] position" that proof of disproportionate effect along racial lines is not always required.  *Id.* (alteration supplied).  Rather, as noted above, it was not necessary for the Court in *Hunter* to discuss the requirement of "disproportionate effects along racial lines" in any detail, because evidence satisfying that element was neither disputed nor disputable.[753]

Under these precedents, therefore, plaintiffs must prove that the Alabama constitutional provisions they challenge cause  racially disproportionate effects in the present day.  Failure of proof on that element will render the provisions subject only

---

[752] *See id.* at 227, 233.

[753] *See id.* at 227.

to scrutiny for a conceivable rational relationship to a legitimate governmental purpose.

Defendants argue that this court *must* determine whether plaintiffs have satisfied the disproportionate effects element of proof *before* proceeding to determine whether the enactments were motivated by racial animus.[754]  This court disagrees.  Such an order of progression is precatory, not mandatory, much like the order of analysis advocated in *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."), but later restated as simply a *suggested* order of progression.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

### *ii*.    **Racially-discriminatory purpose**

On the other hand, proof that a challenged provision produces "disproportionate effects along racial lines" is not, alone, sufficient to establish an equal protection

---

[754] *See* doc. no. 275 (Defendants' Post-Trial Brief), at 13 ("Yet, the Supreme Court and the Eleventh Circuit have both made it indisputably clear that the analysis of whether a law violates the Equal Protection Clause **begins** with whether the law has a discriminatory effect.") (boldface emphasis in original).

claim.[755]  The Supreme Court has never "embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." *Washington*, 426 U.S. at 239 (emphasis in original).  "[H]aving a disproportionate effect on the group will be deemed to violate the Equal Protection Clause only if a discriminatory purpose can be proven."  *Joel v. City of Orlando*, 232 F.3d 1353, 1359 (11th Cir. 2000) (alteration supplied) (citing *Washington*, 426 U.S. at 239-40; *Feeney*, 442 U.S. at 272-81); *see also Crawford v. Board of Education of Los Angeles*, 458 U.S. 527, 537-38 (1982) ("[E]ven when a neutral law has a disproportionately adverse effect on a racial minority, the Fourteenth Amendment is violated only if a discriminatory purpose can be shown.").

As the Supreme Court observed in *Feeney*, the concepts of "discriminatory intent" or "[d]iscriminatory purpose" imply

> more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Feeney*, 442 U.S. at 279 (footnotes and internal citation omitted).  Nonetheless, the standard

---

[755] *Hunter*, 471 U.S. at 227.

> does not require a plaintiff to prove that the challenged action rested
> solely on racially discriminatory purposes.  Rarely can it be said that a
> legislature or administrative body operating under a broad mandate made
> a decision motivated solely by a single concern, or even that a particular
> purpose was the "dominant" or "primary" one.

*Arlington Heights*, 429 U.S. at 265.  Rather, "racial discrimination [must be] shown

to have been a 'substantial' or 'motivating' factor behind the enactment of the law .

. . ."  *Hunter*, 471 U.S. at 228 (alteration supplied).

"Proving the motivation behind official action is often a problematic

undertaking."  *Id.*  This is especially true of "a body of the size of the Alabama

Constitutional Convention of 1901," for example, or the Alabama Legislatures that

enacted the bills leading to Amendments 325 and 373, because of the added

"difficulties in determining the actual motivations of various legislators that produced

a given decision . . . ."  *Id.*  As the Court warned more than forty years ago in *United*

*States v. O'Brien*, 391 U.S. 367 (1968):

> Inquiries into congressional motives or purposes are a hazardous
> matter.  When the issue is simply the interpretation of legislation, the
> Court will look to statements by legislators for guidance as to the purpose
> of the legislature, because the benefit to sound decision-making in this
> circumstance is thought sufficient to risk the possibility of misreading
> Congress' purpose.  It is entirely a different matter when we are asked to
> void a statute that is, under well-settled criteria, constitutional on its face,
> on the basis of what fewer than a handful of Congressmen said about it.
> *What motivates one legislator to make a speech about a statute is not*
> *necessarily what motivates scores of others to enact it, and the stakes are*
> *sufficiently high for us to eschew guesswork.*

*Id*. at 383-84 (emphasis supplied); *see also Hunter*, 471 U.S. at 228 (quoting this passage in its entirety). Thus, the Court has repeatedly cautioned that "the search for the 'actual' or 'primary' purpose of a statute is likely to be elusive." *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 469-70 (1981) (citing *Arlington Heights*, 429 U.S. at 265; *McGinnis v.Royster*, 410 U.S. 263, 276-77 (1973)).

Furthermore, the level of precision in reconstructing legislative purpose that may suffice in the more familiar task of *statutory interpretation* will not suffice where the gravamen of the determination is the *constitutional validity* of a state law. Professor John Hart Ely made that observation in a 1970 law review article, saying that "there is a distinction between statutory construction and constitutional adjudication in terms of ascertainability. For the inquiry into motivation as it typically is framed . . . in a constitutional context is of a sort which is different from the questions of motivation involved in statutory construction." John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205, 1213 (1970). Thus, "[a]ny judicial use of legislators' remarks for imputing an unconstitutional motive to the legislative majority (as opposed to merely inferring the intended *meaning* of ambiguous legislation) raises troubling questions." *News America Publishing, Inc. v. FCC*, 844 F.2d 800, 810 n.12 (D.C. Cir. 1988) (emphasis in original).

420